Kassim M. Ferris, OSB No. 965260
Nathan C. Brunette, OSB No. 090913
STOEL RIVES LLP
760 S.W. Ninth Ave., Suite 3000
Portland, OR 97205
Telephone: (503) 224-3380
Facsimile: (503) 220-2480

Brian C. Park (*pro hac vice*)
STOEL RIVES LLP
600 University Street, Suite 3600
Seattle, WA 98101-4109
Telephone: (206) 386-7542
Facsimile: (206) 386-7500

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| LEUPOLD & STEVENS, INC., | No. 3:16-cv-1570-HZ |
| Plaintiff / Counterclaim-Defendant, | **PLAINTIFF'S OPENING CLAIM CONSTRUCTION BRIEF** |
| v. | |
| LIGHTFORCE USA, INC. d/b/a NIGHTFORCE OPTICS and NIGHTFORCE USA, | |
| Defendant / Counterclaimant. | |

PLAINTIFF'S OPENING CLAIM CONSTRUCTION BRIEF

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITEIS ............................................................................................ III

I.      INTRODUCTION ........................................................................................... 1

II.     CLAIM CONSTRUCTION STANDARDS ...................................................... 1

III.    DISPUTED PATENT TERMS AND ARGUMENTS ........................................ 2

    A.      U.S. Pat. No. 8,006,429 .......................................................................... 2

        1.      Turret Knob ................................................................................. 2

        2.      Locked In A Selected Position About The Axis Of Rotation ................... 4

        3.      Engagement Surface ...................................................................... 5

        4.      Spline Structure ............................................................................ 6

        5.      Telescopic Sight ........................................................................... 6

    B.      U.S. Pat. No. 8,516,736 .......................................................................... 8

        1.      Firearm Sighting Device ............................................................... 8

        2.      Actuator / Lock Actuator / Drives ................................................ 10

        3.      Engaged So As To Restrain The Actuator From Rotation ..................... 12

        4.      The Second Portion Selectively Movable [sic] Between Locked
             And Unlocked Positions ............................................................... 12

        5.      Telescopic Sighting Device .......................................................... 14

        6.      Cam Surface ............................................................................... 15

    C.      U.S. Pat. No. 9,665,120 ........................................................................ 17

        1.      Sighting Device .......................................................................... 17

        2.      Second Lock Element Selectively Movable Relative To The First
             Lock Element ............................................................................. 18

        3.      Drives ........................................................................................ 19

        4.      Engage One Another In A Locked Position .................................... 20

        5.      Riflescope .................................................................................. 21

    D.      U.S. Pat. No. 9,188,408 (the '408 Patent) ............................................. 22

        1.      Spindle ...................................................................................... 22

        2.      Operatively Coupled ................................................................... 22

        3.      Adjustable Portion ...................................................................... 24

        4.      Locking Mechanism .................................................................... 25

        5.      Button ........................................................................................ 27

        6.      Mechanically Driving .................................................................. 28

        7.      Engagement Surface .................................................................... 29

        8.      Installed Over The Spindle .......................................................... 31

## TABLE OF CONTENTS
(continued)

Page

E.  U.S. Pat. No. 9,170,068 ................................................................. 33

    1.  [A] Locking Adjustment Device For Adjusting A Setting Of A Riflescope Or Other Aiming Device ...................................... 33

    2.  Slide Surface / Second Slide Surface .................................... 35

    3.  Around ...................................................................................... 36

    4.  Biased Against ........................................................................ 38

    5.  Indicator Unit .......................................................................... 38

    6.  Scale ......................................................................................... 39

F.  U.S. Pat. No. 6,816,305 ................................................................. 40

    1.  Transversely ............................................................................ 40

    2.  Providing ................................................................................. 41

    3.  Nut ........................................................................................... 43

    4.  Pre-assembled/Pre-assembling ............................................ 44

G.  U.S. Pat. No. 7,721,480 ................................................................. 44

    1.  Spring ....................................................................................... 44

    2.  Interfere With … And … Brake ............................................ 45

H.  U.S. Pat. No. 6,351,907 ................................................................. 47

    1.  Drive Face ............................................................................... 47

    2.  Actuator ................................................................................... 48

    3.  Cam Track ............................................................................... 50

    4.  Cam Follower .......................................................................... 51

    5.  Along The Longitudinal Axis (of the housing) ................... 52

    6.  Pin ............................................................................................ 54

IV.  CONCLUSION .................................................................................. 55

# TABLE OF AUTHORITIES

**Page**

### Cases

*Apple Inc. v. Motorola, Inc.*,
　No. 1:11-CV-08540, 2012 WL 8123793 (N.D. Ill. Mar. 12, 2012) ....................................6, 9

*Baldwin Graphic Sys., Inc. v. Siebert, Inc.*,
　512 F.3d 1338 (Fed. Cir. 2008)........................................................................................42

*CCS Fitness, Inc. v. Brunswick Corp.*,
　288 F.3d 1359 (Fed. Cir. 2002).........................................................................................2

*Control Res., Inc. v. Delta Elecs., Inc.*,
　133 F. Supp. 2d 121 (D. Mass. 2001) ...........................................................................6, 9

*Deere & Co. v. Bush Hog, LLC*,
　703 F.3d 1349 (Fed. Cir. 2012)........................................................................................3, 4

*EON Corp IP Holdings LLC v. Apple Inc.*,
　2016 WL 5234609 (N.D. Cal. Sept. 22, 2016) ..............................................................6, 9

*Epos Techs. Ltd. v. Pegasus Techs. Ltd.*,
　766 F.3d 1338 (Fed. Cir. 2014).................................................................17, 44, 47, 55

*Gen. Foods Corp. v. Studiengesellschaft Kohle mbH*,
　972 F.2d 1272 (Fed. Cir. 1992).........................................................................................1

*HTC Corp. v. IPCom GmbH & Co., KG*,
　667 F.3d 1270 (Fed. Cir. 2012).........................................................................................9

*InterDigital Commc'ns, LLC v. ITC*,
　690 F.3d 1318 (Fed. Cir. 2012).......................................................................................14

*Kara Tech. Inc. v. Stamps.com Inc.*,
　582 F.3d 1341 (Fed. Cir. 2009).......................................................................................14

*Laitram Corp. v. NEC Corp.*,
　163 F.3d 1342 (Fed. Cir. 1998).........................................................................................2

*Markman v. Westview Instruments, Inc.*,
　517 U.S. 370 (1996) ............................................................................................... passim

*Merrill v. Yeomans*,
　94 U.S. 568 (1876)..............................................................................................................1

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
　134 S. Ct. 2120 (2014).................................................................................................41, 54

# TABLE OF AUTHORITIES
(continued)

**Page**

*NTP, Inc. v. Research In Motion, Ltd.*,
   418 F.3d 1282 (Fed. Cir. 2005)................................................................8, 33

*Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*,
   520 F.3d 1358 (Fed. Cir. 2008)......................................................................27

*Pacing Techs., LLC v. Garmin Int'l, Inc.*,
   778 F.3d 1021 (Fed. Cir. 2015).........................................................................8

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) (*en banc*) ...............................................1, 2

*Piggy Pushers, LLC v. Skidders Footwear, Inc.*,
   544 F. App'x 984 (Fed. Cir. 2013) ...............................................................3

*Plantronics, Inc. v. Aliph, Inc.*,
   724 F.3d 1343 (Fed. Cir. 2013)......................................................................14

*Poly-Am., L.P. v. GSE Lining Tech., Inc.*,
   383 F.3d 1303 (Fed. Cir. 2004)..................................................................3, 33

*Prima Tek II, L.L.C. v. Polypap, S.A.R.L.*,
   318 F.3d 1143 (Fed. Cir. 2003).................................................25, 26, 43, 54

*In re Suitco Surface, Inc.*,
   603 F.3d 1255 (Fed. Cir. 2010)........................................................................6

*Sulzer Textil A.G. v. Picanol N.V.*,
   358 F.3d 1356 (Fed. Cir. 2004)..................................................................4, 9

*Thorner v. Sony Comput. Entm't Am. LLC*,
   669 F.3d 1362 (Fed. Cir. 2012)..........................................................34, 36, 37

*U.S. Surgical Corp. v. Ethicon, Inc.*,
   103 F.3d 1554 (Fed. Cir. 1997)............................................................. passim

*Vehicular Techs. Corp. v. Titan Wheel Int'l, Inc.*,
   141 F.3d 1084 (Fed. Cir. 1998).......................................................................1

*Vizio, Inc. v. ITC*,
   605 F.3d 1330 (Fed. Cir. 2010).....................................................................34

**Statutes**

35 U.S.C. § 112 ¶ 2.........................................................................................1

**TABLE OF AUTHORITIES**
(continued)

**Page**

**Regulations**

37 C.F.R. § 1.141 ................................................................................................................11

**Other Authorities**

*American Heritage Dictionary* ............................................................... passim

*Collins Dictionary* ................................................................................22

*Larousse Dictionary* ................................................................15, 50, 51

*Merriam-Webster Online Dictionary* ............................................................7

U.S. Patent No. 6,657,784 ................................................................17

U.S. Patent Nos. 7,806,331 ................................................................11

*Webster's II New College Dictionary* ................................................23, 30

Plaintiff Leupold & Stevens, Inc. ("Leupold") respectfully submits this brief on the proper *Markman* construction of disputed claim terms and phrases in the asserted patents.

## I. INTRODUCTION

Leupold urges the Court to adopt Plaintiff's proposed patent claim constructions, which are faithful to the claim language, the context provided by the patent specifications and prosecution histories, and common usage of particular terms in the relevant field. The Court should resist Defendant's invitations to import into claim terms narrowing limitations from mere exemplary embodiments or from other claim terms. Claim constructions should be consistent with the intrinsic and extrinsic evidence and should define similar terms consistently across related patents. Contrived, inconsistent, and unsupported constructions are legally erroneous.

## II. CLAIM CONSTRUCTION STANDARDS

A patent document consists of two parts: (1) the specification, which includes the drawings and explanatory text, and (2) the numbered claims following the specification. The claims define the scope of the patent grant. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 373 (1996); *Phillips v. AWH Corp.*, 415 F.3d 1303, 1311-12 (Fed. Cir. 2005) (*en banc*). As a matter of law, claim construction is performed by the court. *Markman*, 517 U.S. at 372.

The starting point for any claim construction is the language of the claims themselves. *Vehicular Techs. Corp. v. Titan Wheel Int'l, Inc.*, 141 F.3d 1084, 1089 (Fed. Cir. 1998). Patent claims and their limitations "define or delimit the scope of the ... patent 'monopoly.'" *Gen. Foods Corp. v. Studiengesellschaft Kohle mbH*, 972 F.2d 1272, 1274 (Fed. Cir. 1992). Claims are therefore "'of primary importance, in the effort to ascertain precisely what it is that is patented.'" *Phillips*, 415 F.3d at 1312 (quoting *Merrill v. Yeomans*, 94 U.S. 568, 570 (1876)).

Because claim language is required to "particularly point[] out and distinctly claim[] the subject matter which the applicant regards as his invention," 35 U.S.C. § 112 ¶ 2 (pre-AIA), and

because it provides the only explicit notice to the world of the scope of the monopoly, there is a

"'heavy presumption' that a claim term carries its ordinary and customary meaning," *CCS*

*Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002) (citation omitted). The

"ordinary and customary meaning" refers to the understanding of a person having ordinary skill

in the art. *See, e.g., Laitram Corp. v. NEC Corp.*, 163 F.3d 1342, 1346 (Fed. Cir. 1998). The

understanding of a claim term to one of ordinary skill in the art must be considered "not only in

the context of the particular claim in which the disputed term appears, but in the context of the

entire patent, including the specification." *Phillips*, 415 F.3d at 1313. Nonetheless, the Court

need not "repeat or restate every claim term in order to comply with the ruling that claim

construction is for the court." *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed.

Cir. 1997). "Claim construction is a matter of resolution of disputed meanings and technical

scope, to clarify and when necessary to explain what the patentee covered by the claims, for use

in the determination of infringement. It is not an obligatory exercise in redundancy." *Id.*

### III.  <u>DISPUTED PATENT TERMS AND ARGUMENTS</u>

A.    **U.S. Pat. No. 8,006,429**

1.    **Turret Knob**

| Leupold's Proposed Construction | Nightforce's Proposed Construction |
|---|---|
| a generally cylindrical adjustment handle of an optical device | N/A (not an element of the claims).<br><br>Alternatively: a knob that can be used as an adjustment knob for a telescopic sight or any other optical-based instrument having adjustment knobs, for example, an optical enhancing devices [sic] such as a lens or microscope, telescope, etc. |

The term "turret knob" is used in the preamble of every claim of the '429 Patent: claims

1-18 claim "A locking turret knob … ," and claim 19 claims "A method of manufacturing a

locking turret knob…." Declaration of Kassim Ferris ("Ferris Decl.") ¶ 3, Ex. 2 ('429 Patent).

The parties dispute whether this term is a claim element and whether it should be defined by what it is (Plaintiff's proposal) versus examples of what it can be used for (Defendant's proposal).

Although patent claim preambles are sometimes deemed merely prefatory and non-limiting, the preamble is a limiting element of the claim "if it recites essential structure or steps, or if it is necessary to give life, meaning, and vitality to the claim." *Poly-Am., L.P. v. GSE Lining Tech., Inc.*, 383 F.3d 1303, 1309-10 (Fed. Cir. 2004) (internal quotation marks omitted). Here, the "locking turret knob" language represents an important characteristic of the claimed invention: "locking turret knob" is the title of the patent. It is also used in the abstract, in the "summary of the disclosure," in the preamble of every claim, and in every embodiment described in the specification. These same facts supported claim construction rulings of a limiting preamble in *Poly-Am.* and other cases. *See Poly-Am.*, 383 F.3d at 1310 (affirming that the preamble "blown-film textured liner" "discloses a fundamental characteristic [blown film] of the claimed invention that is properly construed as a limitation of the claim itself"); *Deere & Co. v. Bush Hog, LLC*, 703 F.3d 1349, 1358 (Fed. Cir. 2012) ("The recitation of a 'rotary cutter deck' in Claim 1 is necessary to understand the subject matter encompassed by the claim.... Unlike non-limiting preamble terms, 'rotary cutter deck' does not merely state a name or a use for the claimed box section. Rather, the term describes a 'fundamental characteristic of the claimed invention' that informs one of skill in the art as to the structure required by the claim."); *Piggy Pushers, LLC v. Skidders Footwear, Inc.*, 544 F. App'x 984, 988-89 (Fed. Cir. 2013) (holding that "[t]he requirement that the combined elements form a 'sock' is a 'fundamental characteristic of the claimed invention'") (quoting *Poly-Am.*, 383 F.3d at 1310). Like the preamble in each of these cases, "turret knob" in the '429 Patent supplies the form of the assembled elements, informs the skilled person of the structure required by the claim, and thereby breathes "life,

meaning, and vitality" into the claims.[1] *Deere & Co.*, 703 F.3d at 1357. For these reasons, "turret knob" is properly construed as an element of claims 1-19.

"Turret knob," as understood by one of ordinary skill in the art of telescopic sights, is a generally cylindrical adjustment handle of an optical device. *See, e.g.,* Ferris Decl., Ex. 13 (NRA Glossary) (Turret - "cylinders on an optical sight's main tube which hold adjustment knobs or screws. A turret is dedicated to one of several functions: windage, elevation, parallax, reticle type, reticle illumination, or ranging" ); *see also* Dkt. 45 at 3-4 (definitions of "turret"); Ferris Decl., Exs. 10-18 (providing documentary evidence for the definitions collected in Dkt. 45). The '429 Patent uses "turret knob" consistently with its ordinary meaning. Ferris Decl., Ex. 2 ('429 Patent) at Figs. 1-9 and 3:7-67 (describing Figs. 1-9). Thus, a "turret knob" is generally a cylindrical handle for adjusting an optical device.

Nightforce's proposed construction departs from the ordinary meaning of "turret knob" by adding the language "a knob that can be used as ... [a turret knob]." In other words, Nightforce would include all kinds of knobs that are not turret knobs so long as they *could* be used as turret knobs under some (undefined) conditions. This degree of separation and layer of ambiguity are unnecessary, unsupported by the intrinsic record of the '429 Patent, and likely to confuse and mislead the trier of fact. *See Sulzer Textil A.G. v. Picanol N.V.*, 358 F.3d 1356, 1366 (Fed. Cir. 2004) ("[T]he district court must instruct the jury on the meanings to be attributed to all disputed terms used in the claims in suit so that the jury will be able to intelligently determine the questions presented." (internal quotation marks omitted)).

## 2. Locked In A Selected Position About The Axis Of Rotation

---

[1] The patent examiner implicitly recognized this fact by including locking turret knob in the list of claim limitations that supported his reasons for allowance of the '429 Patent: "The prior art does not disclose a locking turret knob comprising an adjustment member ...." Ferris Decl., Ex. 23 (Notice of Allowance) at 6.

Stipulated Claim Construction (Dkt. 45 at 5).

3. **Engagement Surface**

| Leupold's Proposed Construction | Nightforce's Proposed Construction |
|---|---|
| Plain meaning. Needs no construction.<br><br>Alternatively:  a surface that is fixed relative to the axis of rotation and having one or more contours for interlocking with another component | a surface that contacts the engagement member while the adjustment member is in the locked position. |

The claim element "engagement surface" is used in asserted claims 1, 4, 6-8, 12, 14, 15, and 19 of the '429 Patent. Ferris Decl. ¶ 2, Ex. 1 (Claims List) and Ex. 2 ('429 Patent). The ordinary meaning of this claim element is easily understood. It does not involve lesser-known terminology specific to the art of optical device manufacturing and requires no further elucidation. *U.S. Surgical*, 103 F.3d at 1568 ("The *Markman* decisions do not hold that the trial judge must repeat or restate every claim term."). The parties dispute how much touching "engagement" refers to and whether it should be defined by reference to *other Markman* terms.

In context of the claims and specification, the ordinary meaning of "engagement surface" is a surface that (1) is fixed relative to the axis of rotation and (2) has one or more contours for interlocking with another component. Both (1) and (2) derive from the claim language of independent claims 1 and 19 that describes the adjustment member as being *adjustable* (relative to the axis of rotation) when another component (engagement member) does not engage the engagement surface and as being *locked* (fixed relative to the axis of rotation) when another component (engagement member) engages the engagement surface. The '429 Patent (claims 1 and 19). The engagement surface has shapes (contours) on its surface that enable interlocking with another component (i.e., a rotatable component). *See* The '429 Patent at 4:46-49 (describing an embodiment wherein spline valleys define engagement surfaces); 2:22-31 (describing a variety of configurations for engagement).

Nightforce's proposed construction is circular because it defines engagement surface in terms of the engagement member and *vice versa*, as illustrated in the following restatement of claim 1 using Nightforce's proposed construction: the adjustment member being locked in a selected position about the axis of rotation when at least one engagement member engages *a surface that contacts the engagement member*. The '429 Patent (claim 1) (italicized phrase replacing "an engagement surface" with Nightforce's proposed construction). This obscures, rather than illuminates, the meaning of "engagement surface." *See EON Corp IP Holdings LLC v. Apple Inc.*, 2016 WL 5234609, at *13 (N.D. Cal. Sept. 22, 2016) (rejecting proposed construction that "would only serve to confuse the jury") (citing *Control Res., Inc. v. Delta Elecs., Inc.*, 133 F. Supp. 2d 121, 127 (D. Mass. 2001) ("The claims must be translated into plain English so that a jury will understand.")); *Apple Inc. v. Motorola, Inc.*, No. 1:11-CV-08540, 2012 WL 8123793, at *1 (N.D. Ill. Mar. 12, 2012) ("The substantive concern is that many of the proposed claims constructions are not in language intelligible to jurors.").

Furthermore, Nightforce's proposed construction is too broad: the word "contacts," in particular, is overly broad because it encompasses components that merely touch rather than "engage." Nightforce's proposed construction improperly omits the engagement function of the engagement surface. *See In re Suitco Surface, Inc.*, 603 F.3d 1255, 1260–61 (Fed. Cir. 2010) (reversing PTO's claim construction for omitting the finishing function of the claimed "material for finishing").

### 4.    Spline Structure

Stipulated Claim Construction (Dkt. 45 at 9).

### 5.    Telescopic Sight

| Leupold's Proposed Construction | Nightforce's Proposed Construction |
| --- | --- |
| a magnifying firearm aiming device | an instrument with an arrangement of lenses and/or mirrors that gathers visible light |

| | allowing direct observation or photographic recording of distant objects. |
|---|---|

The claim element "telescopic sight" is used in claim 10 of the '429 Patent: "wherein the optical enhancement device comprises one of a telescopic sight, a telescope and a microscope" (claim 10). Ferris Decl. ¶ 2, Ex. 1 (Claims List) and Ex. 2 ('429 Patent). The parties dispute whether "sight" as used in the patent claim is directed to firearms technology (Plaintiff's proposal) or any optical technology (Defendant's proposal).

The ordinary meaning of "telescopic sight" is "a telescope on a firearm for use as a sight." Ferris Decl. ¶ 21, Ex. 20 (*Merriam-Webster Online Dictionary*) (telescopic sight). Consistently, the patent specification uses the term to refer to an "individual shoulder (or hand-fired) firearms sighting device (***telescopic sight herein***)." The '429 Patent at 1:16-18 (emphasis added); *see also id.* at 1:23-24 ( "A telescopic sight, typically used to aim a firearm, is usually mounted on the firearm."). The ordinary meaning of "sight" in the context of the '429 Patent is entirely consistent. A sight is "any part or device which allows a firearm to be aimed, versus merely pointed, at a target." Ferris Decl., Ex. 13 (NRA Glossary). Elsewhere, a sight is "a device to assist in aligning the eye with the bore or bow and pointing the aligned system at a target." Ferris Decl., Ex. 11 (4H Glossary).

Nightforce's proposed construction does not fit with the ordinary meaning to a skilled person in the art in light of the intrinsic record. Nightforce's construction also ignores how "telescopic sight" is used in the '429 Patent and the ordinary meaning of the term by omitting the concept of "sighting" in "sighting device" (i.e., aiming at a target). The specification identifies various kinds of optical enhancing devices "such as a microscope, telescope, etc." and provides that "it will be assumed herein that the optical enhancing device is a telescopic sight," as distinct from the others. The '429 Patent at 1:20-22. Nightforce's proposal errs by ignoring the meaning

of "sighting."

**B.    U.S. Pat. No. 8,516,736**

    **1.    Firearm Sighting Device**

| Leupold's Proposed Construction | Nightforce's Proposed Construction |
|---|---|
| a device that aids visually aiming a firearm | N/A (not an element of the claims).<br><br>Alternatively: a device for telescopic observation sighting and firearm sighting |

The claim element "firearm sighting device" is used in the preamble of claim 1 of the

'736 Patent: "A firearm sighting device comprising...." Ferris Decl. ¶ 2, Ex. 1 (Claims List) and

Ex. 3 ('736 Patent).  In addition to disputing whether this term is a claim element, the parties

again dispute whether this term as used in the patent claim defines firearms technology

(Plaintiff's proposal) or any telescopic observation technology (Defendant's proposal).

"When limitations in the body of the claim rely upon and derive antecedent basis from

the preamble, then the preamble may act as a necessary component of the claimed invention."

*NTP, Inc. v. Research In Motion, Ltd.*, 418 F.3d 1282, 1306 (Fed. Cir. 2005) ("Because these

limitations of claim 1 of the '960 patent derive their antecedent basis from the claim 1 preamble

and are necessary to provide context for the claim limitations, the use of these limitations in the

preamble limits the claim."); *Pacing Techs., LLC v. Garmin Int'l, Inc.*, 778 F.3d 1021, 1024

(Fed. Cir. 2015) ("That is the case here. The term 'user' in the preamble of claim 25 provides

antecedent basis for the term 'user' in the body of that claim."). "Firearm sighting device" is

necessary and limiting to claim 1 and its dependent claims because this phrase provides

antecedent basis for the claim term "the sighting device," used no fewer than six times in the

body of claim 1 and many more times in the dependent claims 2, 3, 9, 12, 13, and 14. *See* Ferris

Decl. ¶ 2, Ex. 1 (Claims List) and Ex. 3 ('736 Patent).

The ordinary meaning of "sighting device" to a person skilled in the art of the '429 Patent

is a machine or apparatus that performs the function of a sight by facilitating aiming another device at a target, here aiming a "firearm." To a person skilled in this art, "sight" means a "device to assist in aligning the eye with the bore or bow and pointing the aligned system at a target." Ferris Decl., Ex. 11 (4H Glossary); *see also* Dkt. 45 at 11-12 (definitions of "sight"); *see also* Ferris Decl., Exs. 10-18 (providing documentary evidence for Plaintiff's definitions collected in Dkt. 45 at 11-12). The specification of the '736 Patent distinguishes a "firearm sighting device" from a telescopic observation sighting device and other optical enhancing devices: "The present disclosure relates to an optical enhancing device, such as a telescopic observation sighting device or individual shoulder (or hand-fired) firearms sighting device (telescopic sight herein)." The '736 Patent at 1:15-18 (emphasis added). By directing claim 1 exclusively to a "firearm sighting device," the patentee elected claim scope limited to devices that aid in aiming a firearm, as distinct from devices for aiming a telescopic observation device or from other optical enhancing devices. *See HTC Corp. v. IPCom GmbH & Co., KG*, 667 F.3d 1270, 1275 (Fed. Cir. 2012) (reversing claim construction as inconsistent with distinctions made in the specification).

Both parts of Nightforce's compound construction run afoul of this distinction. First, "a device for telescopic observation sighting" must be rejected because the '736 Patent distinguishes a device for "firearm sighting" from a device for "telescopic observation sighting." The '736 Patent at 1:15-18. Thus, the former does not include the latter. Second, "a device for ... firearm sighting" does not elucidate the claim term "firearm sighting device"—it merely repeats the same words in a slightly different order. This will not advance a jury's understanding of the legally effective metes and bounds of the '736 Patent. *See Sulzer Textil*, 358 F.3d at 1366; *see also EON Corp*, 2016 WL 5234609, at *13; *Control Res.*, 133 F. Supp. 2d at 127; *Apple*, 2012 WL 8123793, at *1 (proposed constructions were not "intelligible to jurors").

      **2.**      **Actuator / Lock Actuator / Drives**

|  | Leupold's Proposed Construction | Nightforce's Proposed Construction |
|---|---|---|
| Actuator | Plain meaning. Needs no construction.<br><br>Alternatively:  a device that puts another structure into motion or action | a motor-driven device that is connected to a computer and is responsive to commands from the computer |
| Lock Actuator | a structure that operates the locking mechanism | a motor-driven device that is connected to a computer and adjusts the locking mechanism in response to computer commands |
| Drives | moves by force | motor-supplied movement of a component to propel another component |

The claim element "actuator" appears in claims 1, 3, 4, 8-13, 15, 19-24, 28, and 29 of the '736 Patent. Ferris Decl. ¶ 2, Ex. 1 (Claims List) and Ex. 3 ('736 Patent). The ordinary meaning of this claim element is easily understood. It does not involve arcane terminology specific to optical device manufacturing and requires no further elucidation. *U.S. Surgical*, 103 F.3d at 1568 ("The *Markman* decisions do not hold that the trial judge must repeat or restate every claim term."). The term "lock actuator" appears in claims 10-13. The term "drives" appears in claims 1, 15, and 24. The parties dispute whether each of these terms includes manual adjustment (Plaintiff's proposal) or requires motor-driven action (Defendant's proposal).

The ordinary meaning of "actuator" is something that puts another thing into motion or action. *See* Ferris Decl., Ex. 17 (*American Heritage Dictionary*) (defining "actuator" as "one that activates, especially a device responsible for actuating a mechanical device"; defining "actuate" as "to put into motion or action"). Ordinary meaning fits the '736 Patent, which refers to an "actuator" that "drives the adjustment mechanism to thereby adjust the setting of the sighting device" (claim 1) as well as a "lock actuator" that "urges the second portion of the locking mechanism to the locked position" (claim 11). Accordingly, Leupold's proposed construction identifies "actuator" as a device that puts another structure into motion or action.

The term "drives" describes the interaction of the rotation of the actuator (as the subject

of the verb "drives") with the adjustment mechanism (the direct object of the verb drives), specifically how the former moves the latter, resulting in an adjustment of the setting of the optical device. This context is consistent with the plain and ordinary meaning of "drives" as a transitive verb (i.e., used with a direct object): to move by force. *See* Ferris Decl., Ex. 19 (Dictionary.com) (drive: "to send, expel, or otherwise cause to move by force or compulsion").

Nightforce's proposed constructions are inconsistent with the ordinary meaning of these three terms as summarized above. Elsewhere, Nightforce uses "actuator" and "drives" more consistently with ordinary meaning, i.e., *not* requiring a motor-driven device. *See infra* Section III.D.5 (Nightforce's proposed construction of "button" includes an "actuator to ... move the locking mechanism"); Section III.C.6 (Nightforce argues that "mechanically driving" means a "transfer of force by a physical component to push a second physical component").

Nightforce's proposed constructions for these three terms rely entirely on unrelated subject matter from the provisional applications to which the '736 Patent claims priority. The unrelated subject matter is the AOSS system (Advanced Optical Sighting System), a motorized system for automatically adjusting the elevation setting of a sight. Ferris Decl., Ex. 25 (Prov. App. 60/638,561) at 36. The provisional application ('561 Provisional) describes a locking turret knob (Figs. 1-2) separately from the AOSS (Figs. 3-6), and the AOSS does *not* include a locking turret knob. *Id.* at 24-29 (Figs. 1-6). Notably, the AOSS has been separately patented. *See* U.S. Patent Nos. 7,806,331; 8,033,464; 8,317,100 ("The present inventive concept relates to an automatic optical sighting system (AOSS)."); *see also* 37 C.F.R. § 1.141 (two distinct inventions cannot be claimed in the same patent application). In contrast, the AOSS is completely absent from the specification of the '736 Patent: a clear sign that the '736 Patent is not directed to the AOSS. It appears that Nightforce points to the description of the AOSS in the '561 Provisional because that description uses the literal words <actuator> and <drives> and because the words

<actuator> and <drives> do not otherwise appear in the intrinsic record, except for in the claims of the '736 Patent. Nightforce's approach is not sound because the words <actuator> and <drives> used to describe the AOSS clearly refer to a different machine than the terms "actuator" and "drives" in the claims of the '736 Patent.

In the claims of the '736 Patent, "the actuator drives the adjustment mechanism to thereby adjust the setting of the sighting device" (claim 1) and "the lock actuator urges the second portion of the locking mechanism to the locked position" (claim 11). The specification of the '736 Patent describes the same structures as "index ring" (actuator) and "selector knob" (lock actuator) in exemplary embodiments. Examples of an "actuator" include index ring 107 and index ring 304, shown in Figs. 1-4, that are each rotated to make optical adjustments to the telescopic sight. The '736 Patent at 5:9-17, 6:42-49. Examples of a "lock actuator" include selector knob 601, shown in Figs. 6A-6D, that is "grasped and rotated from a locked position to an unlocked position." *Id.* at 8:6-9. Similarly, selector knob 801, shown in Figs. 8A-8D, is "grasped and pulled in an outwardly direction ... from a locked position to an unlocked position." *Id.* at 9:16-20. These examples show that it would be improper to rely, as Nightforce does, on the AOSS system, which does not appear in the specification of the '736 Patent, to understand the claim terms "actuator," "lock actuator," and "drives." Nightforce's proposed construction would import exemplary embodiments from a ***different invention*** into the claims-in-suit.

### 3. Engaged So As To Restrain The Actuator From Rotation

Stipulated Claim Construction (Dkt. 45 at 17).

### 4. The Second Portion Selectively Movable [sic] Between Locked And Unlocked Positions

| Leupold's Proposed Construction | Nightforce's Proposed Construction |
|---|---|
| Plain meaning. Needs no construction.<br><br>Alternatively: the second portion is moveable <u>by a user</u> between a first position where it is | The second portion is moveable between a first position where it is unable to be rotated about the axis of rotation, and a second position where it is able to be rotated about the axis of |

| unable to be rotated about the axis of rotation relative to the firearm sighting device, and a second position where it is able to be rotated about the axis of rotation relative to the firearm sighting device | rotation, <u>where the first position is chosen from multiple positions where the second portion is unable to be rotated about the axis of rotation.</u> |
|---|---|

The claim term "the second portion selectively movable [sic] between locked and unlocked positions" appears in claim 1 of the '736 Patent. Ferris Decl. ¶ 2, Ex. 1 (Claims List) and Ex. 3 ('736 Patent). The ordinary meaning of this claim element is easily understood. It does not involve lesser-known terminology specific to the art of optical device manufacturing and requires no further elucidation. *U.S. Surgical*, 103 F.3d at 1568 ("The *Markman* decisions do not hold that the trial judge must repeat or restate every claim term."). The parties dispute whether this term requires structure with a locked ("first") position and an unlocked ("second") position (Plaintiff's proposal) *as opposed to* being lockable/unlockable in ***every*** 360° position (Defendant's proposal).

Claim 1 of the '736 Patent explains that the second portion is "selectively movable ... such that when the second portion is in the locked position the first and second portions are engaged so as to restrain the actuator from rotation about the axis of rotation." Ferris Decl. ¶ 2, Ex. 1 (Claims List) and Ex. 3 ('736 Patent). Thus "second portion selectively movable between locked and unlocked position" refers to movement of a "second portion" that occurs when unlocking the knob. This claim element makes clear that, when unlocking the knob, the second portion (which "rotates about the axis of rotation along with the actuator") rather than the first portion (which is "non-rotatably coupled to the sighting device") is the moveable element in the locking mechanism. That much is evident from the plain meaning of the claim.

Nightforce's proposed construction is unwieldy because it does not specify that the structure is moveable between a locked and unlocked position by a user (rather than inadvertently by bumping or vibration). Additionally, Nightforce's proposed construction is improper because it imports a limitation from an exemplary embodiment in the specification.

Nightforce introduces a limitation that the first position (by which Nightforce refers to the locked position) must be "chosen from multiple positions where the second portion is unable to be rotated about the axis of rotation." Nothing of the sort is required by claim 1, and Nightforce's insertion of this additional requirement appears contrived. The specification identifies one embodiment ('736 Patent at 2:32-37) where there are multiple positions where locking is possible.  Under the law, the broader language of claim 1 covers other devices that do not have multiple locked positions. *See InterDigital Commc'ns, LLC v. ITC*, 690 F.3d 1318, 1328 (Fed. Cir. 2012) (holding that claim term "increased power level" covered step-wise power increases, as well as continuous increases, where the specification described the latter but not the former); *see also Plantronics, Inc. v. Aliph, Inc.*, 724 F.3d 1343, 1350 (Fed. Cir. 2013) ("The patentee is entitled to the full scope of his claims, and we will not limit him to his preferred embodiment or import a limitation from the specification into the claims.") (quoting *Kara Tech. Inc. v. Stamps.com Inc.,* 582 F.3d 1341, 1348 (Fed. Cir. 2009)). That embodiment points *against* limiting claim 1 because there is no cause to narrow independent claim 1 (and hence *all* the claims in the '736 Patent) to the embodiment of 2:32-37. Nightforce also cites to intrinsic evidence (5:28-53) describing the embodiment of Figs. 1 and 2, which provide "a cross-sectional view of one example of a locking pin turret knob assembly" (4:18-19).

There is no cause to narrow independent claim 1 (and hence *all* the claims that depend from claim 1) to the embodiment in Figs. 1 and 2. For these reasons, the locked position limitation should be left alone. If the Court feels a claim construction  is necessary, it should be construed per Leupold's alternative construction to aid the understanding of the fact finder rather than construed to import limitations from exemplary embodiments (presumably for purposes of non-infringement).

### 5.    Telescopic Sighting Device

| Leupold's Proposed Construction | Nightforce's Proposed Construction |
|---|---|
| a magnifying firearm aiming device | an instrument with an arrangement of lenses |

| | and/or mirrors that gathers visible light allowing direct observation or photographic recording of distant objects. |
|---|---|

Leupold proposes to construe this claim consistently with the term "telescopic sight" as used in the related '429 Patent (*see supra* Section III.A.5).

### 6.    Cam Surface

| Leupold's Proposed Construction | Nightforce's Proposed Construction |
|---|---|
| a surface that translates rotational motion into linear motion | a surface of <u>an eccentric wheel</u> mounted on a rotating shaft and used to produce variable or reciprocating motion in another engaged or contacted part |

The parties dispute whether "cam" should be defined to include all types of cams (Plaintiff's proposal) or limited to only the eccentric wheel type of cam (Defendant's proposal). The term "cam surface" is used in dependent claims 10 and 22. Ferris Decl. ¶ 2, Ex. 1 (Claims List) and Ex. 3 ('736 Patent).

The ordinary meaning of cam to one of ordinary skill in the art is a device having a profile designed to impart linear motion to another component. Ferris Decl., Ex. 21 (*Larousse Dictionary*) (cam) ("Linear or rotary device, machined to a predetermined profile, whose movement imparts a linear motion to another component."); *see also* Ferris Decl., Ex. 20 (*Merriam Webster Online*) ("cam 1. a rotating or sliding piece (such as an eccentric wheel or a cylinder with an irregular shape) in a mechanical linkage used especially in transforming rotary motion into linear motion or vice versa"). The specification and claims of the '736 Patent align with this general description. The '736 Patent (claim 10) ("the lock actuator is rotatable" and "includes a <u>cam surface</u>" and "the <u>cam surface</u> urges the second portion of the locking mechanism to the locked position" (emphasis added)). Figs. 5A and 5B of the '736 Patent, reproduced below, describe an exemplary cam surface 603 of the invention as a recessed surface of the shaft 602 so that rotation of the shaft 602 causes the cam surface 603 to impart linear movement to the pin 509

(pushing pin 509 radially outward or allowing it to withdraw radially inward).



*See* The '736 Patent at 8:6-22 ("In the unlocked position, cam surface 603 of a selector shaft 602 disengages cam-actuated locking wedge pin 509 from locking ratchet ring 506 and allows index ring 504 to be rotated about axis of rotation 507 (FIG. 5A)....  In the locked position, cam surface 603 of locking selector shaft 602 pushes outwardly on cam-actuated locking wedge pin 509 to engage cam-activated locking wedge pin 509 with grooves 511 (FIGS. 5A and 6A) of locking ratchet ring 506."). This example fits within the ordinary meaning of cam, so that a cam surface should be construed as a surface on a structure whose rotational movement imparts linear movement to another structure.

Nightforce's proposed construction is unduly limited to an "eccentric wheel," a structure that is not described in the specification of the '736 Patent. As made clear in the Merriam Webster dictionary cited above, an eccentric wheel is *one kind* of cam. Ferris Decl., Ex. 21 (*Merriam Webster Online* ) ("cam 1. a rotating or sliding piece (such as an eccentric wheel or a cylinder with an irregular shape) in a mechanical linkage ..."). ***But Nightforce's proposed construction would eliminate all other types of cams commonly used in general engineering and understood by one of ordinary skill in the art (including round, elliptical, pear, polygonal, star, snail, and other shapes of cams).*** Further, Nightforce's proposed construction is so narrow that it excludes one exemplary cam surface 603 (not an eccentric wheel but the irregular surface of a rotating

shaft) described in the '736 Patent (8:6-23; Figs. 5A & 5B) — a legally erroneous result. *See Epos Techs. Ltd. v. Pegasus Techs. Ltd.*, 766 F.3d 1338, 1347 (Fed. Cir. 2014) (holding that "a claim construction that excludes a preferred embodiment ... is rarely, if ever correct").

## C.    U.S. Pat. No. 9,665,120

### 1.    Sighting Device

| Leupold's Proposed Construction | Nightforce's Proposed Construction |
| --- | --- |
| an aiming device | a device for observation with an optical enhancing device such as a telescope or riflescope |

This term appears in claims 1, 12, 13, and 17 of the '120 Patent. Ferris Decl. ¶ 2, Ex. 1 (Claims List) and Ex. 4 ('120 Patent). The parties again dispute whether this term as used in the patent claim defines firearms technology (Plaintiff's proposal) or any telescopic observation technology (Defendant's proposal).

A sighting device is simply a sight. To a person skilled in this art, "sight" or "sighting device" means an aiming device. *See supra* Sections III.A.5 (telescopic sight), III.B.1 (firearm sighting device), and III.B.5 (telescopic sighting device). The specification of the '120 Patent is consistent with this ordinary meaning: it references "firearm sighting devices," and separately "telescopic observation sighting devices." The '120 Patent at 1:21-24. To a person skilled in the art, "telescopic observation sighting devices" refers to a secondary scope or eyepiece, typically equipped with crosshairs, that is used for aiming a primary telescope. *See, e.g.,* Ferris Decl., Ex. 30 (U.S. Patent No. 6,657,784) (sighting device for inclined telescope). Thus, whether aiming for the purpose of celestial observation or aiming for the purpose of firing a weapon at a target, a sighting device is for aiming.

Nightforce's proposed construction omits the concept of "sighting" in "sighting device." Nothing in the ordinary meaning of "sighting device" or in the intrinsic record of the '120 Patent

suggests that a sighting device would be used for observation generally rather than more specifically for aiming. Additionally, Nightforce's proposed construction references a second device (an optical enhancing device) that is "with" the sighting device. The relationship between this second (optical enhancing) device and the first "device for observation" is unspecified in Nightforce's proposal, except that the former is "with" the latter. The basis for proposing such a concept contrary to the claim language is also unclear. For at least these reasons, Nightforce's proposed construction is improper.

### 2. Second Lock Element Selectively Movable Relative To The First Lock Element

| Leupold's Proposed Construction | Nightforce's Proposed Construction |
| --- | --- |
| Plain meaning. Needs no construction. <br><br> Alternatively: the second lock element is moveable by a user relative to the first lock element between the locked position and the unlocked position | The second lock element is moveable between a first position where it is unable to be rotated about the axis of rotation, and a second position where it is able to be rotated about the axis of rotation relative to the first lock element, where the first position is chosen from multiple positions where the second lock element is unable to be rotated about the axis of rotation. |

The claim term "second lock element selectively moveable relative to the first lock element" appears in claims 1 and 17. Ferris Decl. ¶ 2, Ex. 1 (Claims List), Ex. 4 ('120 Patent). This claim element is easily understood and requires no further elucidation. *U.S. Surgical*, 103 F.3d at 1568 ("The *Markman* decisions do not hold that the trial judge must repeat or restate every claim term."). If the Court is inclined to construe this term, the parties dispute whether this term requires structure with a locked position and an unlocked position (Plaintiff's proposal) *as opposed to* being lockable/unlockable in *every* 360° position (Defendant's proposal).

The ordinary meaning of this claim element is that a user can move the second element relative to the first lock element, switching between locked and unlocked positions. The context of claims 1 and 17 confirms this meaning: the first and second lock elements "engage one

another in a locked position" and "are disengaged in an unlocked position." Claims 1 and 17.

Nightforce's proposed construction is unduly narrow because it arranges the claim elements in a way *not stated in the claims* ("a first position where *it* [the second lock element] is unable to be rotated"; "a second position where *it* [the second lock element] is able to be rotated"; "first position [of the second lock element?] is chosen from multiple positions"). First, Nightforce's proposed construction includes a requirement that "the first position is chosen from multiple positions," but this requirement is not contained or otherwise implied anywhere in the claim language of claim 1 or claim 17 or any other claim of the '120 Patent. The "first position" refers to the position of *the second lock element* (not the adjustment knob), for example a locking pin (claim 8), which is movable between locked and unlocked positions. It is not clear, and Nightforce has not explained, where "first position" or "multiple positions" fit into that framework. As a result, the "first position is chosen from multiple positions" aspect of Nightforce's construction is inaccurate and confusing.

Additionally, Nightforce's proposed construction refers to an "it" that cannot be rotated in the first position but can be rotated in the second position. The only antecedent for the "it" in Nightforce's proposed construction is the second lock element: in a first position the second lock element is unable to be rotated and in a second position the second lock element is rotatable. But that construction imports a limitation into the claim that is not otherwise present: Claims 1 and 17 talk about the *adjustment knob* (not the second lock element) being rotatable and unable to be rotated. Because of these errors, Nightforce's proposed construction should be rejected.

### 3.    Drives

| Leupold's Proposed Construction | Nightforce's Proposed Construction |
| --- | --- |
| Plain meaning. Needs no construction.<br><br>Alternatively: moves by force | motor-supplied movement of a component to propel another component |

The claim term "drives" appears in independent claims 1 and 17 of the '120 Patent. Ferris Decl. ¶ 2, Ex. 1 (Claims List), Ex. 4 ('120 Patent). This claim element is easily understood and requires no further elucidation. *U.S. Surgical*, 103 F.3d at 1568 ("The *Markman* decisions do not hold that the trial judge must repeat or restate every claim term."). The parties dispute whether this term includes manual adjustment (Plaintiff's proposal) or whether it requires separate motor-driven action (Defendant's proposal). The parties' positions on this term mimic their positions on the term "drives" in the '736 Patent. *Supra* Section III.B.2. Leupold incorporates by reference its arguments regarding "drives" in the '736 Patent.

### 4.    Engage One Another In A Locked Position

| Leupold's Proposed Construction | Nightforce's Proposed Construction |
|---|---|
| secure in position and prevent rotation relative to one another | unable to be rotated about the axis of rotation of the knob |

This claim term appears in both independent claims of the '120 Patent: the first and second lock elements "<u>engage one another in a locked position</u>" and "are disengaged in an unlocked position." Ferris Decl. ¶ 2, Ex. 1 (Claims List), Ex. 4 ('120 Patent). The parties dispute how securely the lock elements engage one another and whether this term should be defined by reference to *other Markman* terms.

The ordinary meaning of this element is that the first and second lock elements are fastened or secured *relative to one another*. Ferris Decl., Ex. 19 (Dictionary.com) (lock *verb used with an object*: 12. to fasten or secure (a door, window, building, etc.); 15. to make fast or immovable, as by engaging parts); *id.* (lock *noun*: a contrivance for fastening or securing something).

Nightforce's proposed construction is unduly narrow and ambiguous in that it requires the first and second lock elements to be "unable to be rotated," the scope of which depends on the ability, i.e., the strength, of the individual attempting to rotate the parts, as set up in Nightforce's *Non-Infringement Contentions*: "the spring can be compressed with sufficient torque on the knob

when the turret is in a brake position, and as such, there is no locking." Ferris Decl., Ex. 27

(Defendant's Count VIII Non-Infringement Contentions) at 1, 9-10. This proposed construction

ignores the claim language, which explains the purpose of "engage one another in a locked

position": "the first and second lock elements engage one another in a locked <u>position to restrain</u>

<u>rotation of the adjustment knob about the rotational axis</u>" (claim 1 (emphasis added)). The context

of the claims ("an adjustment apparatus for a sighting device") informs a skilled person in the art of

the meaningful level of resistance "to restrain rotation of the adjustment knob." Nightforce's

proposed construction improperly ignores this context by requiring that the locked parts are "unable

to be rotated" — in an absolute sense, not just with respect to each other — and should be denied.

### 5.    Riflescope

| Leupold's Proposed Construction | Nightforce's Proposed Construction |
|---|---|
| Plain meaning. Needs no construction.<br><br>Alternatively:  a telescopic sight for a rifle | a telescopic sight for a rifle that automatically adjusts the telescopic sight to compensate for various aiming variables |

This claim term appears in independent claim 17 of the '120 Patent: "A <u>riflescope</u>

comprising: an adjustment mechanism supported by the <u>riflescope</u> ...." Ferris Decl. ¶ 2, Ex. 1

(Claims List), Ex. 4 ('120 Patent). This claim element is easily understood and requires no

further elucidation. *U.S. Surgical*, 103 F.3d at 1568. The parties dispute whether this term

includes an ordinary riflescope (Plaintiff's proposal) or whether it requires a riflescope with

automatically adjusted settings (Defendant's proposal).

The ordinary meaning of "riflescope" is a telescopic sight for a rifle. Ferris Decl., Ex. 20

(*Merriam-Webster Online*) (riflescope). Nothing in the intrinsic record of the '120 Patent

recommends departure from the ordinary meaning of this term.  Nightforce's proposed

construction is unduly narrow in that it is inconsistent with the ordinary meaning of "riflescope"

and, further, it requires the sight to "automatically adjust," a feature that refers not to the subject

matter of the '120 Patent but to the AOSS system. The AOSS is a motorized system for automatically adjusting the elevation setting of a sight (Prov. App. 60/638,561, Attachment A at 6). The claims of the '120 Patent are not drawn to the AOSS (*an embodiment of a different invention*), for the reasons set forth above with respect to the '736 Patent. *Supra* Section III.B.2. Nightforce's proposed construction should be rejected to avoid importing exemplary embodiments from a ***different invention*** into the claims-in-suit

**D.    U.S. Pat. No. 9,188,408 (the '408 Patent)**

**1.    Spindle**

Stipulated Claim Construction (Dkt. 45 at 23).

**2.    Operatively Coupled**

| Leupold's Proposed Construction | Nightforce's Proposed Construction |
|---|---|
| mechanically linked, directly or indirectly | linked together so as to operate |

This term is used in claims 1, 24, and 25 of the '408 Patent: "the spindle <u>operatively coupled</u> to an adjustable portion of the optical device to thereby adjust the adjustable portion in response to rotation of the spindle." Ferris Decl. ¶ 2, Ex. 1 (Claims List), Ex. 5 ('408 Patent). The parties dispute whether this term, as used to describe the spindle action, should be defined to refer to mechanical linkage used by scope spindles (Plaintiff's proposal) or *any* type of linkage whether used by scope spindles or not (Defendant's proposal).

In ordinary parlance, "operatively coupled" refers to a connection through which one structure exerts force on another. *See* Dkt. 45 at 27 ("Operative": exerting force or influence; "Coupled": to connect (two things) together or to connect (one thing) to (another) (citing *Collins Dictionary*)); ("Operative": Exerting influence or force; "Coupled": To link together: connect. (citing *Webster's II  New College Dictionary*)). The specification of the '736 Patent uses the term "operatively coupled" to describe the interaction of the spindle and the adjustable portion of the

optical device. Examples of "operatively coupled" interaction include the following: "Rotation of the spindle 140 causes the plunger 120 to move along the axis 130 thereby adjusting a position of an adjustable portion of a device, such as the inner tube 103, for example" (9:24-26); "The auto-locking dial also comprises an adjustment member operatively connected to the adjustable portion of the optical device, wherein the adjustment member is operatively connected to the mechanical arrangement such that rotation of the rotatable portion about the axis of rotation causes the adjustment member to adjust the adjustable portion of the optical device" (2:10-17); "a mechanical coupling operatively connected to the spindle and constrained so that rotation of the spindle about the axis causes the mechanical coupling to move along a predetermined path relative to the axis" (claim 10).

The intrinsic evidence of the '736 Patent focuses on the force-transferring aspects of the ordinary meaning of "operative" and "coupled," such that "operatively coupled" should be construed as mechanically linked so that one structure exerts force on another. This includes direct contact and indirect contact via a rod or other coupling, but it excludes non-mechanical couplings (such as wireless and electrical links). The word mechanical, which refers to physical force (as opposed to electrical impulse), simplifies the proposed construction: mechanically linked, directly or indirectly.[2]

Nightforce's proposed construction simply repeats the word "operate" and thus fails to faithfully communicate the meaning of "operative" in the context of the '408 Patent: exerting force. In such circular fashion, Nightforce's proposed construction defines a term using that term, preserving rather than resolving ambiguity. Nightforce's proposal also does not account for the fact that the term is referring to a spindle's physical action ("the spindle operatively

_____

[2] *See* Ferris Decl., Ex. 19 (Dictionary.com) (mechanical: "10. pertaining to, or controlled or effected by, physical force").

coupled") — not some abstract force. Further, Nightforce's proposed construction is vague on the important point of whether the "coupled" devices must be coupled directly or indirectly.

### 3.    Adjustable Portion

| Leupold's Proposed Construction | Nightforce's Proposed Construction |
|---|---|
| a movable optical component | a component that adjusts an optical function of an optical device |

This term is used in claims 1, 10-12, 24, and 25 of the '408 Patent: "the spindle operatively coupled to an <u>adjustable portion</u> of the optical device to thereby adjust the <u>adjustable portion</u> in response to rotation of the spindle." Ferris Decl. ¶ 2, Ex. 1 (Claims List), Ex. 5 ('408 Patent). The parties dispute whether this term receives adjustments, as in "adjust the adjustable portion" (Plaintiff's proposal), *or* whether it provides adjustments (Defendant's proposal).

"Adjustable portion," to a skilled person reviewing the intrinsic evidence of the '408 Patent, means any movable optical component. The term is used in a variety of ways in the '408 Patent. Examples of the adjustable portion include the reticle and the lens assembly of the optical device: "rotation of a spindle 140 (into which the plunger 120 is threaded) is translated into linear motion of the plunger 120 along the axis 130, thereby adjusting a position of the reticle or lens assembly (e.g., the reticle is shifted perpendicular to the tube axis)." The '408 Patent at 4:52-56; *id.* (claim 11) ("The adjustment device of claim 1, further comprising a plunger threadably attached to the spindle and restrained from rotating about the axis relative to the optical device, such that rotation of the spindle about the axis causes the plunger to translate linearly along the axis, the plunger bearing against the <u>adjustable portion</u> of the optical device." (emphasis added)); *see also* Ferris Decl., Ex. 1 (Claims List includes additional intrinsic evidence). These examples are not limiting but illustrative, demonstrating the broad meaning of adjustable portion as a movable optical component. *See Prima Tek II, L.L.C. v. Polypap, S.A.R.L.*, 318 F.3d 1143, 1151 (Fed. Cir. 2003) ("Varied use of a disputed term in the written

description demonstrates the breadth of the term rather than providing a limited definition.").

Nightforce's proposed construction confuses the "adjustable portion" with the adjustment member that makes adjustments to the adjustable portion. ***Nightforce's proposed definition of "adjustable portion" as a component that adjusts something else is backwards; it flips the subject and object of the adjustment.*** *See* The '408 patent at 1:17-19 ("Rotatable adjustment knobs, or dials, are commonly used to make adjustments to an adjustable portion of a device such as an optical or electrical device."). The adjustment member, such as the spindle, adjusts the adjustable portion, not the other way around. *E.g., id.* (claim 1) ("the spindle operatively coupled to an adjustable portion of the optical device *to thereby adjust the adjustable portion* in response to rotation of the spindle" (emphasis added)). The plain meaning of "adjustable portion" requires the same outcome: "adjustable" means able to be adjusted — *not* (as Nightforce suggests) able to adjust something. Nightforce's proposed construction should be rejected.

### 4.    Locking Mechanism

| Leupold's Proposed Construction | Nightforce's Proposed Construction |
| --- | --- |
| Plain meaning. Needs no construction.<br><br>Alternatively:  a mechanism for securing a structure in a position | a system of parts that includes a linkage, a locking pin, and wedge pin that provide a locking capability |

This term is used in claims 1-5, 8, 14, 15, 24, and 25 of the '408 Patent. Ferris Decl. ¶ 2, Ex. 1 (Claims List), Ex. 5 ('408 Patent). The claim element is easily understood and requires no further elucidation. *U.S. Surgical*, 103 F.3d at 1568.  The parties dispute whether an exemplary embodiment in the specification is exemplary (Plaintiff's proposal) or mandatory and limiting (Defendant's proposal).

The ordinary meaning of "locking mechanism" is a mechanism for locking things. To lock something is to fasten or secure it in place. Ferris Decl., Ex. 19 (Dictionary.com) (lock *verb used with an object*: 12. to fasten or secure (a door, window, building, etc.) by the operation of a

lock or locks; 14. to make fast or immovable by or as if by a lock; 15. to make fast or immovable, as by engaging parts). Similarly, a "lock" (noun) is a contrivance for fastening or securing something. *Id.* The intrinsic record of the patent uses "locking mechanism" consistently with its broad ordinary meaning. *See, e.g.,* The '408 Patent (Claim 1) ("wherein the locking mechanism interlocks with the engagement surface and prevents rotation of both the spindle and the button relative to the optical device").

Nightforce's proposal improperly narrows this element by requiring specific parts from certain embodiments, embodiments described in the specification as mere examples, not limitations. Absent a clear definition or disclaimer of claim scope, claims should not be limited to the exemplary embodiments in the specification. *See supra* Section III.B.4 (citing cases). The specification even cautions against such error. "The terms and descriptions used above are set forth by way of illustration only and are not meant as limitations." The '408 patent at 15:25-26. Referring specifically to the locking mechanism, the specification lists a variety of components and combinations: "*In other embodiments* the locking mechanism includes a link comprising a linkage, such as linkage 170, a locking pin, such as locking pin 220, and a stopping element, such as wedge pin 180. *In other embodiments*, the locking mechanism includes a link comprising a linkage, such as linkage 170, a locking pin, such as locking pin 220, a stopping element, such as wedge pin 180, and an engagement surface 192. *In yet other embodiments*, a link may include a linkage and a locking pin that are formed as one item." *Id.* at 7:21-30 (emphasis added); *see Prima Tek II*, 318 F.3d at 1151 (varied use demonstrates breadth rather than providing a limited definition).

If, as Nightforce contends, a "linkage, a locking pin, and wedge pin" were required by the term "locking mechanism," claims 5 and 8 would be superfluous. Claim 5 ("The adjustment device of claim 1, wherein the locking mechanism includes: a linkage ... ; a wedge pin ... ; and wherein the linkage bears against the wedge pin when the linkage is in the locked condition ....");

claim 8 ("The adjustment device of claim 5, wherein the locking mechanism further includes a locking pin ...."). If "locking mechanism" were defined (as Nightforce requests) to include a linkage, wedge pin, and locking pin, the elements of dependent claims 5 and 8 would be redundant of the "locking mechanism." *See Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*, 520 F.3d 1358, 1362 (Fed. Cir. 2008) (affirming claim construction that avoided rendering several dependent claims meaningless). Because the components recited by Nightforce are illustrative — not mandatory and limiting — examples of the broader claim term "locking mechanism," Nightforce's proposed construction should be rejected.

### 5. Button

| Leupold's Proposed Construction | Nightforce's Proposed Construction |
|---|---|
| Plain meaning. Needs no construction.<br><br>Alternatively:  a manually depressible actuator | a component, separate from the locking mechanism, that is triggered by a user so as to cause an actuator to contract [sic] the linkage of the locking mechanism and move the locking mechanism |

This term is used in claims 1-3, 13-15, 18, 21, 24, and 25 of the '408 Patent. Ferris Decl. ¶ 2, Ex. 1 (Claims List), Ex. 5 ('408 Patent). This claim element is easily understood and requires no further elucidation. *U.S. Surgical*, 103 F.3d at 1568.  The parties dispute whether this ubiquitous term needs construction and, if so, whether it should be construed consistently with the understanding of one of ordinary skill in the art (Plaintiff's proposal) or limited to exemplary embodiments (Defendant's proposal).

The ordinary meaning of "button" in this context is a structure pressed to activate, operate, or open a device. Ferris Decl., Ex. 19 (Dictionary.com) (button: 4. any small knob or disk pressed to activate an electric circuit, release a spring, or otherwise operate or open a machine, small door, toy, etc.). The '408 Patent specification is consistent with the ordinary meaning and provides no definition or disavowal to depart from that meaning: "The user actuates or unlocks the auto-locking device 100 by grasping and squeezing or radially pinching the

buttons 240 and 242 between a thumb and finger." The '408 Patent at 8:58-60; *see also id.* (claim 1) ("manually depressing the button switches the locking mechanism from the locked condition ... to the unlocked condition").

Nightforce's proposed construction improperly narrows this element by requiring specific parts that are described in certain ***embodiments*** in the specification by way of example, not as limitations. Absent a clear definition or disclaimer of claim scope, claims should not be limited to the exemplary embodiments in the specification. *See supra* Section III.B.4 (citing cases). The specification even cautions against such error. "The terms and descriptions used above are set forth by way of illustration only and are not meant as limitations." (15:25-26.)

### 6. Mechanically Driving

| Leupold's Proposed Construction | Nightforce's Proposed Construction |
|---|---|
| Plain meaning. Needs no construction. Alternatively:  moving by mechanical force | transfer of force by a physical component to push a second physical component |

This term is used in claims 1, 24, and 25 of the '408 Patent. Ferris Decl. ¶ 2, Ex. 1 (Claims List), Ex. 5 ('408 Patent). This claim element is easily understood and requires no further elucidation. *U.S. Surgical*, 103 F.3d at 1568. The parties dispute whether this term includes moving forces like pulling, tilting, or rotation (Plaintiff's proposal) or requires a pushing force on a second component without necessarily moving it (Defendant's proposal).

The ordinary meaning of "mechanically driving" refers to moving an object by physical force. Mechanical, in this context, refers to physical force. Ferris Decl., Ex. 19 (Dictionary.com) (mechanical: "10. pertaining to, or controlled or effected by, physical force"). "Drive" as a transitive verb (i.e., used with a direct object) means to move by force. *Id.* ("drive *verb (used with object)* 1. to send, expel, or otherwise cause to move by force or compulsion"). The intrinsic record of the '408 Patent corroborates this meaning in descriptions of how the button of certain embodiments operates the locking mechanism.  *See* The '408 Patent (claim 1) ("the button

mechanically driving the locking mechanism such that manually depressing the button switches the locking mechanism from the locked condition ... to the unlocked condition"); *id.* at 9:8-11 ("In other words, the interaction between the actuator and the linkage 170 is configured to convert radial motion of the actuator shafts 230 and 232 into axial motion of the locking  pin 220.").

Nightforce's construction should be rejected because it requires a specific directional force (a "push"), which improperly excludes buttons that drive the locking mechanism by a pull, by a tilt, or by rotation, for examples. Each of those kinds of forced movements is encompassed by the claim term "mechanically driving" and should not be excluded from the claim scope. Furthermore, Nightforce omits the concept of movement; "mechanically *driving*" connotes movement, not merely static pressure or isometric forces. Ferris Decl., Ex. 19 (Dictionary.com) ("drive *verb (used with object)* 1. to send, expel, or <u>otherwise cause to move</u> by force or compulsion" (emphasis added)). By contrast, the "transfer of force" in Nightforce's proposed construction includes static pressure, isometric forces, and an impact of the first component against the second, none of which result in *driving*, i.e., moving by force, the second physical component. Lastly, Nightforce's proposed construction arguably requires a separate, second physical component, which would unnecessarily exclude products where the button and the locking mechanism are joined together. Indeed, such a direct link would be an ordinary example of one structure moving another by mechanical force. Such an arrangement is not excluded by the ordinary meaning of "mechanically driving," or by the specification and claims of the '408 Patent, and therefore has no place in the proper construction of this term. For all these reasons, Nightforce's proposed construction should be rejected.

### 7.    Engagement Surface

| Leupold's Proposed Construction | Nightforce's Proposed Construction |
|---|---|
| Plain meaning. Needs no construction.<br><br>Alternatively: a surface that is fixed relative to | a surface that interlocks with a component of the locking mechanism when in a locked position via regularly spaced apart features |

| the axis of the spindle and having one or more contours for interlocking with another component | such as detents |
|---|---|

This limitation is used in claims 1, 4, 5, 7, 24, and 25 of the '408 Patent. Ferris Decl. ¶ 2, Ex. 1 (Claims List), Ex. 5 ('408 Patent). The term is easily understood and requires no further elucidation. *U.S. Surgical*, 103 F.3d at 1568. The parties dispute whether this term needs construction and, if so, whether it should be construed consistently with the understanding of one of ordinary skill in the art (Plaintiff's proposal) or limited to exemplary embodiments (Defendant's proposal).

In view of the context of the claims and specification, the ordinary meaning of "engagement surface" is a surface that (1) is fixed relative to the axis of rotation and (2) has one or more contours for interlocking with another component. Both (1) and (2) derive from the claim language of independent claims 1, 24, and 25 that describes the spindle as being in a "locked condition, wherein the locking mechanism interlocks with the engagement surface and prevents rotation ... relative to the optical device," and an "unlocked condition, wherein both the spindle and the button are rotatable about the axis relative to the optical device and the engagement surface." *See* Ferris Decl. ¶ 2, Ex. 1 (Claims List) and ¶ 6, Ex. 5 ('068 Patent); *see also* Dkt. 45 at 46 (citing *Webster's II New College Dictionary*) ("Engage: To interlock or cause to interlock.").

Nightforce's proposed construction improperly narrows this element by requiring a specific arrangement of engagement features on the engagement surface (regularly spaced apart features). Regularly spaced apart features are illustrated in the drawings and described in the specification by way of examples, not as limitations. Absent a clear definition or disclaimer of claim scope, claims should not be limited to the exemplary embodiments in the specification and figures. *See supra* Section III.B.4 (citing cases). The specification even cautions against such error. "The terms and descriptions used above are set forth by way of illustration only and are not

meant as limitations." The '408 Patent at 15:25-26.

### 8.    Installed Over The Spindle

| Leupold's Proposed Construction | Nightforce's Proposed Construction |
|---|---|
| fitted to sheath the spindle | rest on or cover the spindle |

This term is used in the '408 Patent, claims 18 and 25: "a knob installed over the spindle and coupled to the spindle for rotation therewith." Ferris Decl. ¶ 2, Ex. 1 (Claims List), Ex. 5 ('408 Patent). The parties dispute whether this term requires covering/sheathing over the length of the spindle (Plaintiff's proposal) or whether resting on/covering only the top of the spindle suffices (Defendant's proposal).

The ordinary meaning of "installed over the spindle" is informed by the rotational reference frame of the spindle: installing something over a flat surface such as a floor is different than installing something over a rotating component such as a spindle. *See, e.g.,* Ferris Decl., Ex. 31 (Google Search results for "'installed over' and rotating"). To a person of ordinary mechanical skill, installation *over* a rotating component means that the installed object encircles the rotating component. This construction is supported by the specification of the '408 Patent that describes the installation of the knob:

> As illustrated in FIG. 6, the set screws 260 and 262 rotationally couple the knob 250 to the neck 144 of the spindle 140. A tool, such as a hex key, can be used to tighten the set screws 260 and 262 such that the screws 260 and 262 bear against the neck 144 of the spindle 140. Similarly, the tool can be used to loosen the set screws 260 and 262 so that knob 250 can be rotated relative to spindle 140 about axis 130 to adjust a calibration or "zero" setting of the device 100, as described in further detail below.  ***In other embodiments, knob 250 may be sized and dimensioned to snap fit or press fit over spindle 140***.

The '408 Patent at 7:38-48 (emphasis added). In the preceding description, the set screws attach the knob to the spindle so that when the set screws are tightened, the knob rotates with the spindle, and when the set screws are loosened, the knob and the spindle rotate independently of one another. Fig. 6, showing set screws 260 and 262 and knob

250, is reproduced below.



FIG. 6

In this context, "installed over the spindle" signifies both covering the spindle as well as encircling the spindle, so that the knob can be attached to the spindle for rotation therewith or detached from the spindle (i.e., when the set screws are removed). These aspects of installing the knob over the spindle are neatly summed up in the concept of a sheath: installed over the end of an implement, fits closely, and covers all sides.[3] Thus, "installed over the spindle" means "fitted to sheath the spindle."

Nightforce's proposed construction is insufficient because it lacks the lengthwise-encircling aspect of "installed over the spindle" that comes from the spindle being a rotating component. Defendant's proposed construction (analogous to a lid) does not fit the description in the specification in that it encompasses any flat object (e.g., a plate or piece of paper) placed only on the top of the spindle. Nightforce's proposed construction should be rejected.

**E.     U.S. Pat. No. 9,170,068**

**1.     [A] Locking Adjustment Device For Adjusting A Setting Of A Riflescope Or Other Aiming Device**

---

[3] *See* Ferris Decl., Ex. 19 (Dictionary.com) (sheath *noun* "1. a case or covering for the blade of a sword, dagger, or the like. 2. any similar close-fitting covering or case"); Ex. 20 (*Merriam Webster Online*) (sheath "3. any of various covering or supporting structures that resemble in appearance or function the sheath of a blade").

| Leupold's Proposed Construction | Nightforce's Proposed Construction |
|---|---|
| a securable adjuster of a weapon targeting device | "for adjusting a setting of a riflescope or other aiming device" is not an element of the claims for two reasons: 1) it is preamble; and 2) it is intended use language.<br>To the extent it is considered an element of the claims "or other aiming device" includes any optics device that benefit from adjustment of one or more of parallax, focus, illumination brightness, or other suitable features, including riflescopes, telescopes, binoculars, spotting scopes, and other aimed optical devices. Cameras and video cameras are not excluded |

This term is used in the preamble of every claim of the '068 Patent: "A locking

adjustment device for adjusting a setting of a riflescope or other aiming device, comprising ...."

Ferris Decl. ¶ 2, Ex. 1 (Claims List), Ex. 6 ('068 Patent).. The parties dispute whether this term is

a claim element and whether the term as used in the patent claim defines weapons technology

(Plaintiff's proposal) or any optical technology (Defendant's proposal).

The preamble is a limiting element of the claim "if it recites essential structure or steps,

or if it is necessary to give life, meaning, and vitality to the claim." *Poly-Am.*, 383 F.3d at 1309-

10 (internal quotation marks omitted); *see supra* Section III.A.1 (citing cases).  Separately, the

preamble is also a limiting element of the claim "[w]hen limitations in the body of the claim rely

upon and derive ***antecedent basis*** from the preamble." *NTP, Inc.*, 418 F.3d at 1306 (emphasis

added); *see supra* Section III.B.1 (citing cases). Here, "locking adjustment device" is the title of

the patent; it is also used in the summary of the patent, in the preamble of every claim, and in

every embodiment described in the specification. *E.g.,* The '068 Patent at 3:23-24 ("FIGS. 1-

5, 6A, 6B, and 6C illustrate various detailed views of a locking adjustment device 100"). Further,

"locking adjustment device for adjusting a setting of a riflescope or other aiming device"

provides ***antecedent basis*** for the claim term "adjustment device" used ***twice in the body*** of

claim 1 (and dependent claim 6) and also for the claim term "aiming device" used three times in the body of claim 1 (and in dependent claims 9 and 13). Because "locking adjustment device" provides essential legal and technical structure for claim 1 and its dependent claims, it is an element of claim 1.

In the context of the specification and claims of the '068 Patent, a "locking adjustment device" is a securable adjuster. Locking means securing or fastening in place. Ferris Decl., Ex. 19 (Dictionary.com) (lock *noun*); *see also id.* (lock *verb*).  The adjustment device of the '068 Patent is used "for making adjustments, such as to a volume, channel, or station setting, or other suitable mechanical, electrical, optical, or electronic adjustments." (3:55-57.)  The more specific claim element "locking adjustment device for adjusting a setting of a riflescope or other aiming device" is drawn to a subset of locking adjustment devices, namely to locking adjustment devices "for adjusting a setting of a riflescope or other aiming device."  *See Vizio, Inc. v. ITC*, 605 F.3d 1330, 1340 (Fed. Cir. 2010) (holding that "for decoding" in preamble of apparatus claim was "properly construed as a claim limitation, and not merely a statement of purpose or intended use"). The ordinary meaning of a "riflescope" is a telescope sight for a rifle that improves one's aim by magnifying and pinpointing the target. Ferris Decl., Ex. 19 (Dictionary.com) (riflescope) and Ex. 20 (*Merriam-Webster Online*) (riflescope). A sight, also synonymous with an "aiming device" in the context of the '068 Patent, is a device to assist in aligning the eye with the bore or bow and pointing the aligned system at a target. Ferris Decl., Ex. 11 (4H Glossary) (sight); *see also supra* Sections III.A.5 (telescopic sight), III.B.1 (firearm sighting device), and III.B.5 (telescopic sighting device).  The written description of the '068 Patent provides no reason to depart from the ordinary meaning of these terms. *See Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362, 1367 (Fed. Cir. 2012) ("The patentee is free to choose a broad term and expect to obtain the full scope of its plain and ordinary meaning unless the patentee explicitly redefines the term or

disavows its full scope."). Thus, the disputed term means a securable adjuster for a sight, i.e., for a weapon targeting device.

Nightforce's proposed construction should be rejected because it confuses a telescope with a riflescope, and an observation device with an aiming device. "Riflescope" and "aiming device," which limit the claim at issue, refer to devices for aiming a weapon at a target. No skilled person would mistake such aiming devices for a "videocamera." Any person skilled in the art would appreciate that the subject matter of the '068 Patent (incremental adjustments to elevation and windage (1:20-25)) relates to pinpointing a target, not to general viewing. *See, e.g., NRA Glossary* (sight: "any part or device which allows a firearm to be aimed, versus merely pointed, at a target."). By ignoring this distinction, Nightforce's proposed construction fails.

      2.      **Slide Surface / Second Slide Surface**

| Leupold's Proposed Construction | Nightforce's Proposed Construction |
|---|---|
| Slide Surface: "a surface of a slide component"<br><br>Second Slide Surface: "a second surface of a slide component" | A surface that provides, by contact, a guide surface for a guide tab or other follower device such that the guide tab or other follower device rides along the surface of the slide surface when in motion. |

These terms are used in claims 1-5, 8, and 16 of the '068 Patent. Ferris Decl. ¶ 2, Ex. 1 (Claims List), Ex. 6 ('068 Patent). The parties dispute whether this term describes sliding in at least one particular position (Plaintiff's proposal) or requires sliding at *every* 360° position (Defendant's proposal).

The ordinary meaning of a slide surface to a person skilled in the art is a surface of something that slides, i.e., a slide component. Nothing in the specification or file history of the '068 Patent departs from this ordinary meaning or requires, as Nightforce proposes, that *every* point along the path of the guide tab or follower device (front/back, left/right, 360°) ride on or experience contact with that surface. *See Thorner*, 669 F.3d at 1367 ("The patentee is free to

choose a broad term and expect to obtain the full scope of its plain and ordinary meaning unless the patentee explicitly redefines the term or disavows its full scope."); *see also* The '068 Patent at 7:29-31 ("To unlock knob 174, button 194 is depressed inwardly toward axis 124 to urge guide tab 198 out of notch 206 and onto curved slide surface 204 near first end 208."). The specification of the '068 Patent describes an embodiment where a guide tab moves out of a notch and onto the slide surface when the knob is unlocked. The '068 Patent at 7:29-31 and Figs. 4 and 5. A broadening amendment during patent prosecution for the term "slide surface" replaced the verbiage "curved slide surface" with just "slide surface." Ferris Decl., Ex. 26 (June 24, 2015 Response to Office Action). This indicates that the claim term should <u>not</u> be limited to a curved structure, as that language was expressly rejected by the patentee.

Nightforce's proposed construction improperly tries to embed in "slide surface" numerous aspects of the figures and exemplary embodiments from the '068 Patent, such as embodiments having a "curved slide surface," a "ramped transition section," and a "second curved surface" (6:17-24), but these do not and should not limit the scope of claims. *See supra* Section III.B.4 (citing cases). The specification even cautions against such error. *See* (10:61-67) ("It will be obvious to those having skill in the art that many changes may be made to the details of the above-described embodiments without departing from the underlying principles of the invention. The scope of the present invention should, therefore, be determined only by the following claims.").

### 3.  Around

| Leupold's Proposed Construction | Nightforce's Proposed Construction |
|---|---|
| Plain meaning. Needs no construction. Alternatively:  to the side of | on all sides of; encircle |

This term is used in claim 1, the sole independent claim of the '068 Patent: "a guideway including a slide surface extending <u>around</u> a rotational axis, and a notch formed in the slide

surface ..." (claim 1). Ferris Decl. ¶ 2, Ex. 1 (Claims List), Ex. 6 ('068 Patent). This claim

element is easily understood and requires no further elucidation. *U.S. Surgical*, 103 F.3d at 1568

("The *Markman* decisions do not hold that the trial judge must repeat or restate every claim

term."). The parties dispute whether this term describes a relative location at, at least, one

particular position (Plaintiff's proposal) or requires a relative location at **every** 360° position

(Defendant's proposal).

   The ordinary meaning of "around" is "on all or various sides." Ferris Decl., Ex. 20

(*Merriam-Webster Online*) (around). For example, when we speak of a vehicle driving *around*

an accident, we do not mean the vehicle drives in a circle around an accident, but rather, goes to

the side of it. Nothing in the specification or file history of the '068 Patent departs from this

ordinary meaning. *See Thorner*, 669 F.3d at 1367. The specification of the '068 Patent describes

an embodiment where a guide tab moves out of a notch and onto the slide surface when the knob

is unlocked. The '068 Patent at 7:29-31. The specification describes embodiments having a

"curved slide surface," a "ramped transition section," and a "second curved surface." *E.g.,* (6:17-

24). During prosecution, a broadening amendment during patent prosecution for the term "slide

surface" (*i.e.*, the structure that the claim states is "extending around a rotational axis") replaced

the verbiage "curved slide surface" with just "slide surface." Ferris Decl., Ex. 26 (June 24, 2015

Response to Office Action). This indicates that the claim term "around" should <u>not</u> be limited to

a curved structure, as that language was expressly rejected by the patentee.

   Nightforce's proposed construction would narrow the meaning of "around" to remove the

aspect of "on various sides" by requiring "on all sides." There is no basis for this narrowing

construction in the intrinsic record of the '068 Patent. *See supra* Section III.B.4 (citing cases). If

anything, the differentiation between a "curved slide surface," as described in the embodiments

of the specification (e.g., 6:17-24) and as required by the pending claims prior to removal of the

word "curved" (June 24, 2015 amendment), and a "slide surface" (claim 1) indicates to one of

ordinary skill that the slide surface does not have to be curved, does not necessarily "encircle"

the rotational axis, but is positioned to the side of the rotational axis. For these reasons,

Nightforce's proposed construction is unduly narrow.

### 4.    Biased Against

Stipulated Claim Construction (Dkt # 45 at 58).

### 5.    Indicator Unit

| Leupold's Proposed Construction | Nightforce's Proposed Construction |
| --- | --- |
| Plain meaning. Needs no construction.<br><br>Alternatively:  a visible or tactile marker that indicates lock status | a physical component coupled to a guide tab, that indicates by its visible position the locked or unlock position of the guide tab |

This term is used in claims 5-8 of the '068 Patent. Ferris Decl. ¶ 2, Ex. 1 (Claims List),

Ex. 6 ('068 Patent). This claim element is easily understood and requires no further elucidation.

*U.S. Surgical*, 103 F.3d at 1568 ("The *Markman* decisions do not hold that the trial judge must

repeat or restate every claim term."). The parties dispute whether this term describes a "visible or

tactile" marker (Plaintiff's proposal) or requires only a "visible" marker (Defendant's proposal).

The plain, ordinary meaning of an "indicator unit" in the context of the '068 Patent is a

marker (aka indicator) of a condition (e.g., in claim 5, whether the guide tab is aligned with the

notch or positioned along the slide surface). Ferris Decl. Ex. 1 (Claims List) ('068 Patent, claim

5). A person of ordinary skill would understand that the conditions referenced in the claims refer

to whether the adjustment device is locked or not.

Nightforce's proposed construction is unduly limited to a *visible* marker. The embodiments

described in the '068 Patent are not limited to visual indicators. For instance, indicator unit 196 has

"a retracted state in relation to central recess 200" when the knob 174 is locked. The '068 Patent at

8:42-47. When the knob 174 is unlocked, the user depresses button 194 "until it is substantially

flush in relation to grip surface 180" and indicator unit 196 "moves toward central recess 200 until

it is substantially flush in relation to central recess 200." *Id.* at 8:48-57. This description

contemplates a ***tactile indicator*** at least as much, if not more, as a visible indicator, especially

given the fact that the adjustment device itself is primarily a tactile interface between the user and

the aiming device ("grip surface 180" and "the user may depress button 194").

### 6. Scale

| Leupold's Proposed Construction | Nightforce's Proposed Construction |
|---|---|
| a measurement reference indicating the amount of adjustment of the setting of the riflescope or other aiming device | markings that provide visual feedback about a position of a knob |

This term is used in claim 17 of the '068 Patent: "The locking adjustment device of claim

1, wherein the knob further includes a <u>scale</u> comprising indicia spaced apart on a circumference

of the knob to facilitate fine adjustments." Ferris Decl. ¶ 2, Ex. 1 (Claims List), Ex. 6 ('068

Patent). The parties dispute whether this term describes a measurement reference for the amount

of adjustment of the riflescope (Plaintiff's proposal) or requires only a "visual" marking of the

knob's position (Defendant's proposal).

The plain, ordinary meaning of "scale" in the sense used in the '068 Patent is a system of

indicators at fixed intervals used as a reference standard in measurement. Ferris Decl. Ex. 17

(*American Heritage Dictionary*) (scale). In the context of the '068 Patent, the markings are used

as a reference for measuring the amount of adjustment made by the claimed locking adjustment

device for adjusting a setting of a riflescope or other aiming device. *See* The '068 Patent at 5:44-

47 ("Dial 178 may be supplied with a fine scale ... to facilitate fine adjustments.").  The marking

of the scale indicate the knob's position and thereby enable the user to measure the amount of an

adjustment to a setting of the riflescope.  *Id.* at 9:31-35.  In this regard, the scale has a similar

purpose to the click mechanism described in the '068 Patent. *Id.* at 5:4-6 ("Each click may

coincide with an adjustment amount *to alert the user about the extent of an adjustment being made*." (emphasis added)).  The ordinary meaning of scale, in the context of the '068 Patent, is a reference for measuring how much a riflescope setting has been adjusted.

Nightforce's proposed construction is overly broad by encompassing any marking on the knob. A scratch on a side of the knob could "provide visual feedback about the position of the knob." This proposed construction does not align with the ordinary meaning of "scale" as a reference standard for *measurement*. Ferris Decl. Ex. 17 (*American Heritage Dictionary*) (scale). Additionally, Nightforce's proposal is inconsistent with the intrinsic record of the '068 Patent,  in which a "scale" for the adjustment knob is one that provides meaningful feedback about knob position, i.e., a measurement of how much adjustment has been made to the riflescope.  For these reasons, Nightforce's proposed construction must be rejected.

**F.     U.S. Pat. No. 6,816,305**

  **1.     Transversely**

| Leupold's Proposed Construction | Nightforce's Proposed Construction |
|---|---|
| in a direction cross-wise | The term is indefinite |

This term is used in every independent claim of the '305 Patent. Ferris Decl. ¶ 2, Ex. 1 (Claims List), Ex. 7 ('305 Patent). The parties dispute whether this term describes a cross-wise or orthogonal relationship (Plaintiff's proposal) or cannot be defined at all (Defendant's proposal).

The ordinary meaning of "transverse" is cross-wise or, in a narrower sense, perpendicular. Ferris Decl., Ex. 17 (*American Heritage Dictionary*) (transverse: "situated or lying across; cross-wise"); Ferris Decl., Ex. 20 (*Merriam-Webster Online*) (transverse: "made at right angles to the long axis of the body"). The claims of the '305 Patent follow this ordinary meaning by describing an element (the second end of the pivot tube, or the pivot tube itself) that is movable (Claims 1, 8, 16), rotatable (Claim 26), or pivotable (Claim 27) cross-wise

(transversely) to the "longitudinal axis of the housing." The transversely movable aspect of the claimed invention is illustrated by directional arrows in Fig. 1 and Fig. 2 (Fig. 1 reproduced below) across the longitudinal axis of the housing.



"The adjustment mechanism 108 adjustably extends into the bore 104 and is manually adjustable to drive the pivot tube 202 for movement transversely of the longitudinal axis 106 in a vertical direction to adjust an elevation setting of the riflescope 100." '305 Patent, 5:44-48.  This portion of the specification, combined with the reference to the figures and the arrows in the figures, illustrates the pivoting movement of the pivot tube cross-wise (transversely) to the axis 106.

Contrary to Nightforce's proposed construction, indefiniteness is not at play here.  As explained in the preceding paragraph, the meaning of "transversely" is perfectly clear in the context of the specification and figures of the '305 Patent, and one of ordinary skill would have no difficulty understanding the meaning of transversely moving (or pivoting, or rotating) in the claims, in view of the written description and the figures. Because the '305 Patent does not "fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention," its claims are sufficiently definite. *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2124 (2014).

### 2.    Providing

| Leupold's Proposed Construction | Nightforce's Proposed Construction |
| --- | --- |
| Plain meaning. Needs no construction.<br><br>Also, the order of clauses in claim is not limiting as to the order of steps. | producing |

This term is used in one of the method claims (26) of the '305 Patent: "A method for manufacturing an optical sighting device, comprising: (a) <u>providing</u> a tubular housing, the housing having a longitudinal axis ..." (Claim 26). Ferris Decl. ¶ 2, Ex. 1 (Claims List), Ex. 7 ('305 Patent). This claim element is easily understood and requires no further elucidation. *U.S. Surgical*, 103 F.3d at 1568 ("The *Markman* decisions do not hold that the trial judge must repeat or restate every claim term."). The parties dispute whether this term requires construction. If so, the parties dispute whether the term requires a specific order of steps *and* whether it covers sourcing as well as on-site manufacturing of components.

The order in which this step is listed in this method claim is not limiting. *Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1345 (Fed. Cir. 2008) ("[A]lthough a method claim necessarily recites the steps of the method in a particular order, as a general rule the claim is not limited to performance of the steps in the order recited, unless the claim explicitly or implicitly requires a specific order."). Here, nothing in the claim language requires the "providing" step to occur before any other step.

Nightforce's proposed construction is unduly narrow because it requires production, i.e. manufacturing of the tubular housing, as part of the claimed method. As reflected in the specification of the '305 Patent, there are many ways to "provide" a thing, such as sourcing, positioning, or mounting, without manufacturing it oneself. The '305 Patent at 2:45-48 ("the above-described lens assembly may be positionally <u>fixed</u> ... <u>to provide</u> an optical sighting device with fixed magnification"), (4:19-21) ("the lens assembly 208 is slidably <u>mounted</u> ... <u>thereby providing</u> a variable power feature") (emphases added). "Varied use of a disputed term in the written description demonstrates the breadth of the term rather than providing a limited definition." *Prima Tek*, 318 F.3d at 1151. This breadth of meaning in the intrinsic record of the '305 Patent is consistent with the ordinary meaning of "providing." Ferris Decl., Ex. 19

(Dictionary.com) ("provide" includes making available, furnishing, supplying, equipping, affording, yielding); Ex. 20 (*Merriam-Webster Online*) ("provide" includes supplying, making available). Because neither ordinary meaning nor the intrinsic record of the '305 Patent supports Nightforce's narrow construction, it should be rejected.

### 3.   Nut

| Leupold's Proposed Construction | Nightforce's Proposed Construction |
|---|---|
| a threaded fastener ring | a fastener having a central hole that is internally threaded |

This term is used in claim 7 of the '305 Patent: "The lens unit of claim 1 wherein said fastener comprises a nut." (Claim 7). Ferris Decl. ¶ 2, Ex. 1 (Claims List), Ex. 7 ('305 Patent). The parties dispute whether this term describes a threaded fastening ring with threading on the inside or outside (Plaintiff's proposal) or only on the inside (Defendant's proposal).

The term "nut" ordinarily refers to threaded fastener. The same is true in the intrinsic record of the '305 Patent: "A fastener <u>such as a nut</u> is used to pivotally secure the pivot cartridge to the first end of the pivot tube." The '305 Patent at 2:40-42. "A fastener 210 <u>such as a nut</u> is externally threaded to mate with interior threads in the pivot cartridge 200, thereby pivotally securing the pivot tube 202 to the pivot cartridge 200." *Id.* at 4:15-18 (emphasis added). Externally threaded fastener 210 is shown in Fig. 3, reproduced in relevant part below.



<u>By requiring internal threading, Nightforce's construction attempts to exclude one explicitly</u>

taught aspect of the externally threaded nuts described in the '305 Patent.  "[A] claim

construction that excludes a preferred embodiment ... is rarely, if ever correct and would require

highly persuasive evidentiary support." *Epos Techs. Ltd.*, 766 F.3d at 1347 (alterations in

original). Because externally-threaded nuts are expressly described in the '305 Patent, there is no

reason to adopt Nightforce's narrowing construction.

### 4. Pre-assembled/Pre-assembling

Stipulated Claim Construction (Dkt # 45 at 69).

## G. U.S. Pat. No. 7,721,480

### 1. Spring

| Leupold's Proposed Construction | Nightforce's Proposed Construction |
| --- | --- |
| structure behaving according to Hooke's Law (with exertion of force against the lens cap proportional to the deflection of the lens cap along its swing path) | an elastic device that regains its original shape after being compressed or extended |

This term is used in claim 1 of the '480 Patent: "a spring operatively engaging the lens

cap for driving the lens cap toward the open position; a stop positioned to interfere with spring-

driven movement of the lens cap ..." (Claim 1).  Ferris Decl. ¶ 2, Ex. 1 (Claims List), Ex. 8 ('480

Patent). The parties dispute whether this term describes an actual "spring" as understood by one

of ordinary skill in the art (Plaintiff's proposal) or any elastic device (Defendant's proposal).

In mechanical engineering and design, a spring is a device that resists deflection (in at

least one direction and for at least some amount of deflection) with a force proportional to the

amount of deflection (i.e., it behaves according to Hooke's law in physics [$F = kX$;  where $F =$

force, $k =$ spring stiffness constant, and $X =$ displacement/stretch]). Ferris Decl., Ex. 22 (Tipler's

*Physics* at 81, 128). A structure may behave according to Hooke's law when compressed,

extended, twisted, or under other kinds of deflection. *Id.* A structure may behave according to

Hooke's law for a limited range of deflection, up to an elastic limit, and still be a spring even

though it does not follow Hooke's law when deflected beyond its elastic limit (e.g., when a spring is stretched so far that it unwinds or breaks). *Id.* (Fig. 5-4).

Nightforce's proposed construction is overbroad in the sense that it includes all kinds of elastic structures that do not behave like a spring (for example a rubber ball or rubber band). It is also unduly narrow in that it requires the elastic device to regain its original shape, which is not necessarily the case in a product where the elastic device is always compressed or under tension (i.e., never or rarely restored to its original shape during normal product use), for instance during spring-driven movement. These errors make Nightforce's proposed construction improper.

  2.  **Interfere With … And … Brake**

| Leupold's Proposed Construction | Nightforce's Proposed Construction |
|---|---|
| Plain meaning. Needs no construction other than that interference and braking are not required to be separate actions.<br><br>Alternatively:  "to slow … and … stop" | hinder and reduce the speed of |

This term is used in claim 1 of the '480 Patent: "a stop positioned to <u>interfere with</u> spring-driven movement of the lens cap along at least a portion of the swing path <u>and</u> to <u>brake</u> the lens cap at an intermediate position between the open position and the closed position" (Claim 1). Ferris Decl. ¶ 2, Ex. 1 (Claims List), Ex. 8 ('480 Patent). The parties dispute whether this term needs construction and, if so, whether it covers the two effects of slowing and stopping described in the specification (Plaintiff's proposal) *or* only one effect of slowing inconsistent with the specification (Defendant's proposal).

The words "interfere with" and "brake" are common words in the English language that speak for themselves.  There is no need to construe commonly understood terms using other commonly understood terms. *U.S. Surgical*, 103 F.3d at 1568 ("The *Markman* decisions do not hold that the trial judge must repeat or restate every claim term."). That said, if the Court is

inclined to construe those terms, it should be done in a way that is faithful to the claim language in a manner consistent with the ordinary sense of those words and the context of Claim 1. "Brake," if construed, means to stop the motion of lens cap at the intermediate position from which a user can manually move the lens cap from the intermediate position to the open position. The '480 Patent (Claim 1); *see also id.* at 4:37-39 ("The frictional drag profile may be such that, when cap 530 opens under spring force, cap 530 is stopped short of the fully open position."). "Interfere," if construed, means to slow the motion of the lens cap, for example by generating substantial frictional drag over a portion of the pivoting travel of the cap. *Id.* at 4:26-27.

Nightforce's construction is linguistically ambiguous in that "hinder" has a variety of different meanings that could go to reducing the speed, direction, or extent of something. Nightforce's proposed construction also obscures the dispute that the Court should resolve at claim construction — i.e., that the claim language requires the "stop" to actually stop something, not just slow it down. The use of two distinct verbs indicates two distinct effects, even if they are part of the same action of deceleration. Nightforce's proposed construction ignores this grammatical structure and seeks to replace it with two redundant synonyms (hinder and reduce the speed of). Nightforce's construction also ignores the technical explanation in the specification about why the invention calls for the lens cap to actually "stop" in the intermediate position when the shooter is deploying the riflescope for fast, *silent* target acquisition.

> The frictional drag profile generated as outer surface 584 rides over cushioning device 580 may cooperate with the biasing force profile generated by spring 540 (which may vary over the same pivoting travel path), to thereby facilitate *fast and reliable opening* of cap 530 *while preventing noise during opening* of cap 530. The frictional drag profile may be such that, when cap 530 opens under spring force, cap 530 is stopped short of the fully open position.... Thereafter, cap 530 may be *manually pivoted to the fully open position* by rotating stop rib 589 past a ridge 588 of cushioning device 580, as shown in FIGS. 4, 6, 8-10, 12, and 13.

'480 patent at 4:31-50 (emphasis added). Nightforce's proposed construction ignores the point of the patented invention and excludes exemplary embodiments. *See Epos*, 766 F.3d at 1347

("[A] claim construction that excludes a preferred embodiment ... is rarely, if ever correct.").

## H.   U.S. Pat. No. 6,351,907

### 1.   Drive Face

| Leupold's Proposed Construction | Nightforce's Proposed Construction |
| --- | --- |
| a surface in which the cam track is formed | the face of a cam hub that contacts and drives an actuator positioned between the cam hub and a housing of a rifle sight |

This term is used in both independent claims of the '907 Patent: for example, "the cam hub including a drive face and a spiral cam track formed in the drive face around the axis of rotation" (Claim 1). Ferris Decl. ¶ 2, Ex. 1 (Claims List), Ex. 9 ('907 Patent). The parties dispute whether this term should be given the full breadth of its language (Plaintiff's proposal) *or* limited to exemplary embodiments (Defendant's proposal).

The patent teaches that the drive face is the face of the cam hub that drives the cam follower, i.e., where the cam track is formed.  Exemplary embodiments are described as follows:  "The cam hub includes a drive face positioned facing the interior of the housing and a spiral cam track formed in the drive face around the axis of rotation and spiraling outwardly from the axis of rotation" ('907 Patent at 3:30-33); "A cam hub 134 is rotatably mounted to housing 12 so that actuator 122 is slidably captured between housing 12 and a drive face 136 of cam hub 134. FIGS. 6A and 6B are respective enlarged top and bottom perspective views of cam hub 134 showing detail of drive face 136." (5:52-56).  The embodiment of Fig. 6B with drive face 136 is shown below.



FIG. 6B

Nightforce's proposed construction is unduly narrow because it requires structures

(actuator, housing) separately described in the claims. By incorporating separate claim elements into the construction of "drive face," Nightforce limits the arrangement of those elements ("cam hub," "actuator," and "housing") in a way *not stated in the claims* ("contacts and drives" and "positioned between"). Nightforce's arrangement of those elements is not present in Claims 1 and 10 of the '907 Patent. *See* Ferris Decl. ¶ 2, Ex. 1 (Claims List), Ex. 9 ('907 Patent).

Nightforce's proposed construction adds additional structures and limitations to the arrangement of these elements in the claims. The exemplary embodiments do not limit the scope of the claims. Nightforce's attempt to limit the patent claims to the illustrative examples from the specification invites legal error. *See supra* Section III.B.4 (citing cases). The specification even cautions against such error: "It will be obvious to those having skill in the art that many changes may be made to the details of the above-described embodiments of this invention without departing from the underlying principles thereof. The scope of the present invention should, therefore, be determined only by the following claims." The '907 patent at 7:1-6.

### 2.    Actuator

| Leupold's Proposed Construction | Nightforce's Proposed Construction |
|---|---|
| Plain meaning. Needs no construction.<br><br>Alternatively:  a device that causes another structure to be put into motion or action | A device for actuating as embodied in the Specification (actuator 122 in Figs. 3, 4, and 5, that is slidably mountable between the housing and the cam hub, in contact with the drive face of the cam hub, and that comprises a cam follower engaged with a spiral cam track on the cam hub). |

"Actuator" is used in claims 1, 4, 7, and 8 and "actuator slide" in claims 10, 13, and 17-20 of the '907 Patent. Ferris Decl. ¶ 2, Ex. 1 (Claims List), Ex. 9 ('907 Patent). This claim element is easily understood and requires no further elucidation. *U.S. Surgical*, 103 F.3d at 1568 ("The *Markman* decisions do not hold that the trial judge must repeat or restate every claim term.").   The parties dispute whether this ubiquitous engineering term needs construction and, if so, whether to give it the full breadth of its ordinary meaning (Plaintiff's proposal) *or* to limit it

to exemplary embodiments (Defendant's proposal).

      <u>This claim term should be construed consistently with the plain, ordinary meaning of the same term ("actuator") from the '736 Patent (discussed above).</u>  *Supra* Section III.B.2. The ordinary meaning of "actuator" is a thing that puts something else into motion or action. Ferris Decl., Ex. 17 (*American Heritage Dictionary*) (actuator: "one that activates, especially a device responsible for actuating a mechanical device"). "Actuate" means "to put into motion or action." *Id.* (actuate). This meaning fits the uses of actuator in the claims of the '907 Patent, which refer to an "actuator" that is "operatively connected to the optical element to drive the optical element in response to rotation of the cam hub." The '907 Patent (claim 1). The specification provides examples of this structure: "Rotation of cam hub 134 about its axis of rotation 144 drives actuator 122 along guide slot 128, which in turn moves movable objective lens portion 26 along longitudinal axis 14 to adjust the focus of sight 10." *Id.* at 5:59-63.

      Nightforce's proposed definition seizes on actuator 122, described in an ***embodiment*** of the '907 Patent (*see* 5:53-54), and argues that the specific features of that sample actuator 122 are limiting on the broader claim term "actuator." This is improper because the exemplary embodiments of the patent do not limit the scope of the claims. *See supra* Section III.B.4 (citing cases). The specification even cautions against such error. The '907 Patent at 7:1-6 ("It will be obvious to those having skill in the art that many changes may be made to the details of the above-described embodiments of this invention without departing from the underlying principles thereof. The scope of the present invention should, therefore, be determined only by the following claims.").

      **3.**    **Cam Track**

| Leupold's Proposed Construction | Nightforce's Proposed Construction |
|---|---|
| a groove that is curved along its length | A component of a cam hub in the form of a groove or a rail, for engaging a cam follower |

This term appears in claims 1-3, 6-8, 10-12, and 16-18 of the '907 Patent. Ferris Decl. ¶ 2, Ex. 1 (Claims List), Ex. 9 ('907 Patent). The parties dispute whether this term needs construction and, if so, whether to give it the meaning consistent with related terms (Plaintiff's proposal) *or* to construe it broadly so as to conflict with related terms (Defendant's proposal).

A cam track is a species of cam profile, which is the portion of a cam whose movement imparts linear motion to another component (a cam follower). Ferris Decl., Ex. 21 (*Larousse Dictionary*) (cam: "Linear or rotary device, machined to a predetermined profile, whose movement imparts a linear motion to another component, the *cam follower*. The profile can be complex giving eg [sic] a variable slow forward and rapid reverse movement to a cutting tool on an automatic lathe or, with several on a shaft, opening and closing the valves of an internal-combustion engine in the desired sequence."). The structure of the claims of the '907 Patent imposes an additional limitation on the claim term "cam track." <u>Specifically the "cam track" of the '907 patent claims is "*formed **in** the drive face*"; and the cam follower is "operably *engaged **in** the spiral cam track.*"</u> (Claims 1 and 10) (emphases added). These indicate that the cam track, as claimed, is a groove (as opposed to a protruding rail or other kind of feature). A protruding cam profile such as a rail would be formed *on* the drive face (not *in*), and the cam follower would engage *with*, *on*, or *over* the profile (not *in*). For these reasons, "cam track" as claimed is a groove curved along its length.

Nightforce's proposed construction identifies the cam track as a "component." That phrasing is misleading, or at best confusing, because the cam track is a feature formed in the surface of the cam hub, whereas a "component" suggests a separate piece or part. Further, Nightforce's proposed construction includes a rail. Although a rail or "ridge" is contemplated in the specification of the '907 Patent (3:36-41), that particular embodiment is not claimed in the '907 Patent. As explained above, the formation of the cam track *in* the drive face and the

engagement of the cam follower *in* the track impose a requirement that the cam track is a groove and not a rail. For these reasons, Nightforce's proposed construction is unsatisfactory.

### 4.   Cam Follower

| Leupold's Proposed Construction | Nightforce's Proposed Construction |
|---|---|
| Plain meaning. Needs no construction<br><br>Alternatively: a rigid structure that engages the cam track | a component in the form of a notch, fork, or pin, for following a cam track |

This claim term appears in claims 1, 6, 10, and 16 of the '907 Patent. Ferris Decl. ¶ 2, Ex. 1 (Claims List), Ex. 9 ('907 Patent). This claim element is easily understood and requires no further elucidation. *U.S. Surgical*, 103 F.3d at 1568 ("The *Markman* decisions do not hold that the trial judge must repeat or restate every claim term"). The parties dispute whether this term needs construction and, if so, whether to give it the meaning consistent with related terms (Plaintiff's proposal) *or* to construe it broadly so as to conflict with related terms (Defendant's proposal).

The ordinary meaning of "cam follower" is the component moved by the cam track. Ferris Decl., Ex. 21 (*Larousse Dictionary*) (cam: "Linear or rotary device, machined to a predetermined profile, whose movement imparts a linear motion to another component, the *cam follower*"); *id.* (follower: 1. That which follows the profile of a cam); *see also* Ferris Decl., Ex. 17 (*American Heritage Dictionary*) (follower: 5. A machine element moved by another machine element). The "cam follower" of the '907 Patent is consistent with that ordinary meaning. *E.g.*, (3:43-45) ("...the cam follower slides along the spiral cam track in response to rotation of the cam hub"); (Claim 1) ("a cam follower operably engaged in the spiral cam track so that the actuator moves generally along the longitudinal axis in response to rotation of the cam hub").

Nightforce's construction distorts the meaning of this term by requiring the cam follower to take a certain form (notch, fork, or pin). Those forms are described with reference to exemplary embodiments in the '907 Patent (3:36-41) — they are not limiting on the claims. *See*

*supra* Section III.B.4 (citing cases).  Moreover, the proposed construction of a notch or fork is

outside the proper construction because a notch or fork would not engage *in* a cam track (as

opposed to a rail) as required by claims 1 and 10, i.e., a cam track formed as a groove (not a rail).

Nightforce's proposed "pin" is too narrow, because any number of protruding shapes (knob, ball,

cone, etc.) could engage in the cam track.  Nightforce's construction should be rejected.

### 5.    Along The Longitudinal Axis (of the housing)

| Leupold's Proposed Construction | Nightforce's Proposed Construction |
|---|---|
| Plain meaning. Needs no construction.<br><br>Alternatively: in the same direction as the longitudinal axis of the housing | The term is indefinite. |

This claim term is independent claims 1 and 10 as well as dependent claim 19 of the '907

Patent. Ferris Decl. ¶ 2, Ex. 1 (Claims List), Ex. 9 ('907 Patent). This claim element is easily

understood and requires no further elucidation. *U.S. Surgical*, 103 F.3d at 1568 ("The *Markman*

decisions do not hold that the trial judge must repeat or restate every claim term"). The parties

dispute whether this term needs construction and, if so, whether this term has its broad ordinary

meaning (Plaintiff's proposal) *or* cannot be defined at all (Defendant's proposal).

The ordinary meaning of a longitudinal axis is an axis (a line) running the length of an

object. Ferris Decl., Ex. 20 (*Merriam-Webster Online*) (longitudinal: 1. placed or running

lengthwise); Ex. 19 (Dictionary.com) (longitudinal: 2. tending in the direction of the length of a

thing; running lengthwise). A "longitudinal axis" often, but not necessarily, refers to the specific

axis running lengthwise through the center of an object. Ferris Decl., Ex. 32 (*Oxford*

*Dictionaries Online*) (longitudinal axis: "The long axis of an object or structure; specifically an

axis running the length of a craft or vehicle through its centre of gravity"). "Along" means "over

the length of" or "on a parallel line." Ferris Decl., Ex. 17 (*American Heritage Dictionary*)

(along: 1. Over the length of.; 2. On a line or course parallel and close to). That ordinary

meaning is consistent with the term as used in the '907 Patent. For example, in one embodiment, the objective lens (which adjusts focus) travels "along a central longitudinal axis of the housing." The '907 Patent at 3:24-26. Similarly, in one embodiment, the actuator slide (connected to the objective lens and to the cam follower) "slides generally along the longitudinal axis of the housing as the cam follower slides along the spiral cam track in response to rotation of the cam hub." *Id.* at 3:42-43; *id.* (Claim 1) ("the actuator moves generally along the longitudinal axis in response to rotation of the cam hub" ). The exemplary embodiments identify longitudinal axis 14 (see Fig. 3 below). Thus, as applied in the '907 Patent, "along the longitudinal axis" would include movement on axis 14 as well as off-axis movement that is parallel with or in the same direction as the axis 14, such as the movement indicated by Δχ in Fig. 3 below.



FIG. 3

Contrary to Nightforce's proposed construction, indefiniteness is not at play here. As explained in the preceding paragraph, a skilled person would have no difficulty understanding the meaning of movement "along the longitudinal axis" in the context of the claims, the written description, and the figures. The '907 Patent includes a picture illustrating what this term means in the exemplary embodiment of Fig. 3. Because the '907 Patent does not "fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention," its claims are sufficiently definite. *Nautilus,* 134 S. Ct. at 2124.

### 6.    Pin

| Leupold's Proposed Construction | Nightforce's Proposed Construction |
|---|---|
| a short, rigid protruding structure | a peg or dowel |

This term is used in dependent claims 6 and 16 of the '907 Patent: "in which the cam follower includes a <u>pin</u>" (Claims 6 and 16). Ferris Decl. ¶ 2, Ex. 1 (Claims List), Ex. 9 ('907 Patent). The parties dispute whether this term has its broad ordinary meaning as used in the specification and figures of the '907 Patent (Plaintiff's proposal) *or* requires a narrowly defined structure that excludes exemplary embodiments of the '907 Patent (Defendant's proposal).

The ordinary meaning of pin is a short piece of wood or metal (Ferris Decl., Ex. 29 (*Google Search* "define pin")) or a slender, usually cylindrical piece of wood or metal for holding or fastening parts together (Ferris Decl., Ex. 17 (*American Heritage Dictionary*) (pin)). As illustrated by the figures below, the '907 Patent includes examples of cylindrical and non-cylindrical pins: "An orienting pin 176 (FIG. 6A) of cam hub 134" (6:21-22); "a stop pin 182 of indicator flange 160" (6:25-26); and "a cam follower pin 140 of actuator 122 extends into and is guided by a spiral cam groove 142" (5:56-59). This diversity of pin profiles in the '907 Patent shows the "pin" should be given the full breadth of its ordinary meaning. *See Prima Tek*, 318 F.3d at 1151.



Nightforce's proposed construction is too narrow because it requires the term "pin" to be a peg or dowel. First, a "pin," as claimed, includes structures that are integrally formed with another structure (i.e., it does not have to be a separate part, like the peg or dowel proposed by

Nightforce) but can include the integrally formed cam follower pin 140 (5:56-59) as shown above in Fig. 5. Moreover, a "pin" does not require a circular cross section like a peg or a dowel but can have the oblong profile of orienting **pin 176** as shown above in Fig. 6A above (6:21-22). Nightforce's unduly narrow construction should be rejected. *Epos*, 766 F.3d at 1347 ("[A] claim construction that excludes a preferred embodiment … is rarely, if ever correct").

## IV. CONCLUSION

As set forth above, Leupold requests that the Court adopt Plaintiff's claim constructions.

DATED this 8th day of November, 2017.

Respectfully submitted,
STOEL RIVES LLP

*/s/ Nathan C. Brunette*
Kassim M. Ferris, OSB No. 965260
Nathan C. Brunette, OSB No. 090913
Brian C. Park (*pro hac vice*)
Telephone: (503) 224-3380

Attorneys for Plaintiff / Counterclaim-Defendant
LEUPOLD & STEVENS, INC.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing was served by email on all counsel for the parties who have appeared in this case. Additionally, a true and correct copy of the foregoing was served today via U.S. Mail, postage prepaid, as follows:

David A. Casimir, Esq., Ph.D.
Casimir Jones, S.C.
2275 Deming Way, Suite 310
Middleton, WI 53562
dacasimir@casimirjones.com
(608) 662-1277

Scott E. Davis, Esq.
Klarquist Sparkman LLP
One World Trade Center
121 SW Salmon Street, Suite 1600
Portland, OR 97204
scott.davis@klarquist.com
(503) 473-0933

DATED: November 8, 2017.

STOEL RIVES LLP

/s/ Nathan C. Brunette
NATHAN C. BRUNETTE
Telephone: (503) 294-9678

Attorneys for Plaintiff / Counterclaim-Defendant
LEUPOLD & STEVENS, INC.