IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

LEUPOLD & STEVENS, INC.,                    No. 3:16-cv-01570-HZ

            Plaintiff,                       OPINION & ORDER

        v.

LIGHTFORCE USA, INC. d/b/a
NIGHTFORCE OPTICS and
NIGHTFORCE USA,

            Defendant.


Kassim M. Ferris
Nathan C. Brunette
Stoel Rives LLP
760 SW Ninth Ave., Suite 3000
Portland, OR 97205

Brian C. Park
Stoel Rives LLP
600 University Street, Suite 3600
Seattle, WA 98101

      Attorneys for Plaintiff

Scott E. Davis
Klarquist Sparkman, LLP
121 SW Salmon St., Suite 1600
Portland, OR 97204

David Casimir
Casimir Jones S.C.
2275 Deming Way, Suite 310
Middleton, WI 53562

      Attorneys for Defendant

HERNÁNDEZ, District Judge:

      Plaintiff Leupold & Stevens, Inc. ("Leupold"), brings this action against Defendant Lightforce USA, Inc. ("Nightforce"), alleging that it infringes eight of Leupold's patents concerning optical devices such as riflescopes. The patents-in-suit are listed below. The parties submitted a Joint *Markman* Chart identifying several disputed terms or phrases from the patents-in-suit. The parties then filed claim construction briefs and responsive memoranda. The Court held a claim construction hearing, also known as a *Markman* hearing, in which the parties presented oral arguments based on their memoranda and supporting evidence. The Court construes the disputed terms below.

## CLAIM CONSTRUCTION STANDARDS

      Patent infringement analysis involves two steps. First, the court construes the asserted patent claims. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc). Second, the factfinder determines whether the accused product or method infringes the

asserted claim as construed. *Id.* The first step, claim construction, is a matter of law "exclusively within the province of the court." *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996); *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). "It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quotation marks and citations omitted). Patent claims must precisely define the relevant invention to put both the public and competitors on notice of the claimed invention. *Id.*

To construe a patent claim, courts first look to the language of the claims in the patent itself, the description in the patent's specification, and the patent's prosecution history, all of which constitute a record "on which the public is entitled to rely." *Vitronics*, 90 F.3d at 1583; *Dow Chem. Co. v. Sumitomo Chem. Co.*, 257 F.3d 1364, 1372 (Fed. Cir. 2001). In most cases, the court should be able to resolve ambiguous claim terms by analyzing this intrinsic evidence. *See Phillips*, 415 F.3d at 1313–14. The court considers extrinsic evidence only if the intrinsic evidence is insufficient to resolve the ambiguity of a term. *Vitronics*, 90 F.3d at 1586.

"The actual words of the claim are the controlling focus." *Digital Biometrics, Inc. v. Identix, Inc.*, 149 F.3d 1335, 1344 (Fed. Cir. 1998). "[T]he words of the claims are generally given their ordinary and customary meaning." *Phillips*, 415 F.3d at 1312 (quotation marks and citations omitted). "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id.* at 1313. There is a "heavy presumption" that a claim term carries its ordinary and customary meaning, and a party seeking to convince a court that a term has some other meaning "must, at the very least," point to statements in the written description that "affect the patent's scope." *Johnson Worldwide*

*Assocs., Inc. v. Zebco Corp.*, 175 F.3d 985, 989 (Fed. Cir. 1999) (quotation marks and citation omitted). This may be accomplished if: (1) "a different meaning clearly and deliberately set forth in the intrinsic materials" of the patent; or (2) use of "the ordinary and accustomed meaning of a disputed term would deprive the claim of clarity[.] *K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1363 (Fed. Cir. 1999) (citations omitted). In making this assessment, the court should use common sense and "the understanding of those of ordinary skill in the art" of the patent at issue, unless the patent history supplies another meaning. *Id.* at 1365.

Beyond the plain language of the claims, the patent specification is always highly relevant and often dispositive to the proper construction. *Vitronics*, 90 F.3d at 1582 (explaining that the specification is "the single best guide to the meaning of a disputed term"). The purpose of the patent specification is to teach and enable those skilled in the art to make and use the invention, along with the best method for doing so. *Cyber Acoustics, LLC v. Belkin Int'l., Inc.*, No. 3:13–cv–01144–SI, 2014 WL 1225198, at *2 (D. Or. Mar. 24, 2014) (citing *Phillips*, 415 F.3d at 1323). The inventor can use the specification to describe the invention in a number of ways, such as describing different "embodiments" of the invention and by assigning particular meanings to specific claim language. *Metabolite Lab., Inc. v. Lab. Corp. of Am. Holdings*, 370 F.3d 1354, 1360 (Fed. Cir. 2004); *Phillips*, 415 F.3d at 1316. The embodiments serve as illustrative examples of the invention claimed. *Phillips*, 415 F.3d at 1323 ("One of the best ways to teach a person of ordinary skill in the art how to make and use the invention is to provide an example of how to practice the invention in a particular case."). The inventor can also clarify that he or she intends the claim language to carry a specific meaning different from its ordinary one. *Id.* In these cases, "the inventor's lexicography governs." *Id.* at 1316.

Finally, the prosecution history, which contains the record of the proceedings before the Patent and Trademark Office, informs what a person skilled in the art would understand the term to mean. *Vitronics*, 90 F.3d. at 1582–83. The prosecution history becomes useful where it "provides evidence of how the PTO and the inventor understood the patent." *Phillips*, 415 F.3d at 1317. However, this evidence is less valuable because it represents an "ongoing negotiation" between the inventor and the PTO. *Id.* The final result of that negotiation, the patent itself, provides better evidence of the claim's intended meanings at the time the patent issued. *Id.*

## BACKGROUND

### I.      Overview

Plaintiff and Defendant design, manufacture, and sell, among other things, optical scopes. Am. Compl. ¶¶ 2–4, ECF 28. Plaintiff alleges that Defendant's accused products infringe its eight patents-in-suit involving optical device structures and functions including: locking adjustment knobs; pivoting lens units; and pivoting lens covers. *Id.* at ¶¶ 10–16. The dispute centers around patents relating locking adjustment knobs on riflescopes that can be locked after adjustment in order to prevent inadvertent adjustment through physical contact or vibration.

### II.     Patents-in-Suit

Count I, United States Patent No. 8,006,429 ("the '429 patent"), entitled *Locking Adjustment Turret Knob*. *See* Ferris Decl. Ex. 2, ECF 53.

Count II, United States Patent No. 8,516,736 ("the '736 patent"), entitled *Locking Adjustment Knob for a Sighting Device*. *See* Ferris Decl. Ex. 3.

Count VIII, United States Patent No. 9,665,120 ("the '120 patent"), entitled *Locking Adjustment Knob*. Ferris Decl. Ex. 4. The '429, '736, and '120 patents are collectively known as the "Windauer patents," a namesake gained from their shared inventor.

Count III, United States Patent No. 9,188,408 ("the '408 patent"), entitled *Auto-Locking Adjustment Device*. Ferris Decl. Ex. 5.

Count IV, United States Patent No. 9,170,068 ("the '068 patent"), entitled *Locking Adjustment Device*. Ferris Decl. Ex. 6.

Count V, United States Patent No. 6,816,305 ("the '305 patent"), entitled *Pre-Assembled Pivoting Lens Unit*. Ferris Decl. Ex. 7.

Count VI, United States Patent No. 7,721,480 ("the '480 patent"), entitled *Pivoting Lens Covers for Riflescopes and the Like*. Ferris Decl. Ex. 8.

Count VII, United States Patent No. 6,351,907 ("the '907 patent"), entitled *Spiral Cam Mechanism for Rifle Sight Adjustment*. Ferris Decl. Ex. 9.

## III. Disputed Terms

The parties raised thirty-eight disputed terms in their Joint *Markman* Chart and claim construction briefs. *See* Joint *Markman* Chart, ECF 45. Upon the Court's request, the parties narrowed their list of disputed terms down to fifteen terms for purposes of the *Markman* hearing. See Joint Notice of Selected Terms, ECF 62. The Court heard arguments on twelve of the fifteen disputed terms. *See* Minutes of Proceedings, ECF 65. The Court will construe the twelve disputed terms that were discussed at the hearing.

### A. *Terms from Counts I, II, and VIII*

1. "telescopic sight" (the '429 patent)

2. "sighting device" (the '120 patent)

3. "actuator" (the '736 patent)

4. "selectively moveable" / "the second portion selectively moveable between locked and unlocked positions" (the '736 patent)

5.      "engage one another in a locked position" (the '120 patent)

**B.      *Terms from Count IV***

6.      "locking adjustment device for adjusting a setting of a riflescope or other aiming

device" (the '068 patent)

7.      "around" (the '068 patent)

**C.      *Terms from Count VII***

8.      "drive face" (the '907 patent)

9.      "cam track" (the '907 patent)

10.      "actuator" (the '907 patent)

**D.      *Terms from Count III***

11.      "locking mechanism" (the '408 patent)

12.      "button" (the '408 patent)

## DISCUSSION

## I.      Terms from Counts I, II, and VIII

## 1.      *"telescopic sight" (the '429 patent)*

The term "telescopic sight" is found in Claim 10 of the '429 patent which provides: "The

locking turret knob according to claim **9**, wherein the optical enhancement device comprises one

of a *telescopic sight*, a telescope and a microscope." Ferris Decl. Ex. 2, col. 11, ll. 11–13

(emphasis added). The parties dispute whether the term "telescopic sight" refers only to firearms

or whether it encompasses other optical devices. Construction of this term bears on the issue of

invalidity as a broader meaning may increase the relevance of certain prior art. Plaintiff

proposes: "a magnifying firearm aiming device." Joint *Markman* Chart 9. Defendant proposes:

"An instrument with an arrangement of lenses and/or mirrors that gathers visible light allowing

direct observation or photographic recording of distant objects." *Id.* at 9–10. The language of

Claim 10 and the remaining claims of the '429 patent do not refer to a "firearm" when using the

term "telescopic sight." Turning to the specifications, both parties rely on the same intrinsic

evidence from the background to support their arguments:

> The present disclosure relates to an optical enhancing
> device, such as a telescopic observation sighting device or
> individual shoulder (or hand-fired) firearms sighting device
> (telescopic sight herein). Embodiments described herein may also
> be used with any optical enhancing device containing adjusters,
> such as a microscope, telescope, etc. For purposes of illustration, it
> will be assumed herein that the optical enhancing device is a
> telescopic sight.
> A telescopic sight, typically used to aim a firearm, is
> usually mounted on the firearm.

*Ferris Decl. Ex. 2,* at col. 1, ll. 15–23. According to Plaintiff, a person of ordinary skill in the art

("POSA") would understand the term "sight" above as referring to a firearm sighting device. The

Court disagrees and finds that the meaning of "telescopic sight" as a POSA would understand it

in the context of the entire '429 patent is not limited to firearms. *Phillips*, 415 F.3d at 1313

(emphasizing the importance of a POSA reading a claim term "in the context of the entire patent,

including the specifications"). The parenthetical at the end of the first sentence of the quotation

above refers to both "telescopic observation sighting devices" and "firearm sighting devices."

*Ferris Decl. Ex. 2,* at col. 1, ll. 15–18.The Court agrees with Plaintiff, however, that Defendant's

construction is overbroad and fails to give meaning to the term "sight." Plaintiff's proposed

construction, without the firearm limitation, gives meaning to claim term that is consistent with

the specifications' description of the term. *See Kinik Co. v. Int'l Trade Comm'n*, 362 F.3d 1359,

1365 (Fed. Cir. 2004) ("The words of patent claims have the meaning and scope with which they

are used in the specification. . . ."). Accordingly, the Court construes "telescopic sight" to mean

"a magnifying aiming device." Consistent with this construction is the lack of any intentional

disclaimer or disavowal within the specifications purporting to limit the scope of the invention to devices mounted onto firearms. *Phillips* 415 F.3d at 1316.

### 2. *"sighting device" (the '120 patent)*

Next, the parties dispute the meaning of the term "sighting device" found in Claim 1 of the '120 patent. Independent Claim 1 provides, in relevant part: "An adjustment apparatus for a sighting device, the adjustment apparatus comprising. . . ." Ferris Decl. Ex. 4, col. 10, ll. 63–64. The parties dispute whether this term is limited to devices that "aim" or whether it also includes devices that "observe." Construction of this term also bears on the issue of invalidity as a broader construction may increase the relevance of certain prior art. Plaintiff proposes: "an aiming device." Joint *Markman* Chart 88. Defendant proposes: "A device for observation with an optical enhancing device such as a telescope or riflescope." *Id.*

Once more, the parties rely on the same portion of the specifications discussed above in the '429 to support their competing constructions here:

> The present disclosure relates to an optical enhancing device, such as a telescopic observation sighting device or individual shoulder (or hand-fired) firearms sighting device (telescopic sight herein). Embodiments described herein may also be used with any optical enhancing device containing adjusters, such as a microscope, telescope, etc. For purposes of illustration, it will be assumed herein that the optical enhancing device is a telescopic sight.

Ferris Decl. Ex. 4, col. 1, ll. 22–29. Defendant argues that the passage above delineates two types of sighting devices, "telescopic observation sighting devices" and "firearm sighting devices." *See* Def.'s Reply 11, ECF 58. According to Defendant, Plaintiff's import of "aiming" into its construction restricts the term only to firearms and improperly excludes telescopes from the ambit of the claim. Plaintiff argues that its construction includes aiming whether "for the purpose of celestial observation or aiming for the purpose of firing a weapon at a target." Pl.'s Br. 17,

ECF 54. Plaintiff argues that Defendant's construction fails to give meaning to the term "sighting" which consistently refers to "*aim-assisting* devices, such as for aiming a firearm or for aiming another device such as a high-powered observation telescope." *See* Pl.'s Reply 13, ECF 60.

The Court agrees with Plaintiff that a POSA would understand the term "sighting device" in the context of the '120 patent to mean an aim-assisting device. Plaintiff's reading is supported by both intrinsic and extrinsic evidence. Claim 1 states that the adjustment mechanism mounted to the sighting device is "configured to adjust a setting of the sighting device." Ferris Decl. Ex. 4, col. 10, ll. 65–67. The claim language is consistent with the written description of the invention in the specifications that describes using an adjuster on a sighting device to adjust settings on a riflescope, such as elevation, windage, and parallax. *Id.* at col. 1, ll. 30–40. In addition, Plaintiff's construction is further supported by industry usage of the term "sight" to refer to aiming at a target. *See* Joint *Markman* Chart 88. Thus, the Court is persuaded by Plaintiff's evidence and construes "sighting device" to mean "an aiming device."

### 3.    *"actuator" (the '736 patent)*

The term "actuator" is used throughout the '736 patent. Construction of "actuator" will determine the construction of two other terms that are inextricably linked: "lock actuator;" and "drives." Joint *Markman* Chart 13. The parties dispute whether this term refers to an actuator that must be motor-driven and computer-operated. Plaintiff argues that this term requires no construction and that its ordinary and customary meaning should control. Alternatively, Plaintiff proposes: "a device that puts another structure into motion or action." *Id.* Defendant proposes: "a motor-driven device that is connected to a computer and is responsive to commands from the computer." *Id.* The term "actuator" is not defined in the claim language or on the face of the

specifications. Defendant argues that the specifications explicitly incorporate provisional applications that describe actuators as motorized and computer-operated. The specifications provide that "[t]he entire teachings" of the provisional applications "are incorporated by reference herein." Ferris Dec. Ex. 3 Col 1, ll. 12–13. Those provisional applications relate to the "Advanced Optical Sighting System" ("AOSS"), which uses motor-driven actuators responsive to computer commands to adjust telescopic sights. *See* Def.'s Br. Exs. 11 & 12, ECF 52.

According to Defendant, because the provisional applications provide the only description of the term "actuator" and those applications are fully incorporated into the '736 patent's specifications, they must control the meaning of the term. *See Trustees of Columbia Univ. in City of New York v. Symantec Corp.*, 811 F.3d 1359, 1365–66 (Fed. Cir. 2016) (quoting *Advanced Display Sys., Inc. v. Kent State Univ.*, 212 F.3d 1272, 1282 (Fed. Cir. 2000) (recognizing that "provisional applications incorporated by reference are 'effectively part of the' specifications as though it was 'explicitly contained therein'")). Defendant's approach ignores the plain language of the patent which describes a non-motorized and non-computer-operated invention which is grippable by a user, i.e. a person. Ferris Decl. Ex. 3, col. 10, ll. 40–45. Adopting Defendant's construction would improperly limit the claims such that they would exclude the preferred embodiments. *See On-Line Techs., Inc. v. Bodensweewerk Perkin-Elmer GmbH*, 386 F.3d 1133, 1138 (Fed. Cir. 2004) (quotation and citation omitted) ("[A] claim interpretation that excludes a preferred embodiment from the scope of the claim is rarely, if ever, correct."). Moreover, Plaintiff's patent may rely on the teachings of the provisional applications without importing limitations from those distinct inventions into the claims of the '736 patent. Here, it would be improper to "import a limitation from the specification into the claims."

*Plantronics, Inc. v. Aliph, Inc.*, 724 F.3d 1343, 1350 (Fed. Cir. 2013) (quoting *Kara Tech. Inc. v. Stamps.com Inc.*, 582 F.3d 1341, 1348 (Fed. Cir. 2009)).

Defendant also argues that Plaintiff's proposed construction crops out the portions of the dictionary definitions upon which it relies that refer to computer systems. For example, Plaintiff's extrinsic evidence includes the following definition omitting the italicized portion: "One that activates, especially a device responsible for actuating a mechanical device, *such as one connected to a computer by a sensor link*." Def.'s Br. 12 (quoting AMERICAN HERITAGE DICTIONARY 18 (3d ed. 1996)). As the definition above demonstrates, actuators are not required to be motorized and computer-operated under all circumstances. The plain language of the '736 patent encompasses non-motorized and non-computerized components and it was proper for Plaintiff to rely on only those portions of the extrinsic evidence that were relevant to its proposed construction. In the context of this particular invention, a POSA would understand that the "actuator" within the adjustment device is operated by a user as opposed to being motorized or computer-operated. Accordingly, the Court concludes that the term "actuator" retains its ordinary and customary meaning. *See Infra* Part III.3.

**4.      *"selectively moveable" / "the second portion selectively moveable between locked and unlocked positions" (the '736 patent)***

The parties dispute the above-captioned term from independent Claim 1 of the '736 patent which provides in relevant part:

> A locking mechanism in operative association with the actuator, the locking mechanism including a first portion non-rotatably coupled to the sighting device and a second portion coupled to the actuator such that the second portion rotates about the axis of rotation along with the actuator, *the second portion selectively moveable between locked and unlocked positions* such that when the second portion is in the locked position the first and second portions are engaged so as to restrain the actuator from rotation about the axis of rotation and when the second portion is in the

> unlocked position and the first and second portions are disengaged so that the actuator is rotatable about the axis of rotation for adjusting the setting of the sighting device.

Ferris Decl. Ex. 3, col. 10, ll. 46–59 (emphasis added). In particular, the parties dispute whether "selectively moveable" means that the second portion of the locking mechanism is moveable between the locked and unlocked positions or whether the term means that the second portion is moveable between multiple locked positions. This construction bears on the issue of infringement as Defendant claims that some of its accused products have a single locked position. *See* Def.'s Reply 5–6. In Defendant's view "selectively" means that the locking position is chosen from multiple locking positions. Defendant proposes the following construction:

> The second portion is moveable between a first position where it is unable to be rotated about the axis of rotation, and a second position where it is able to be rotated about the axis of rotation, where the first position is chosen from multiple positions where the second portion is unable to be rotated about the axis of rotation.

Joint *Markman* Chart 18. Plaintiff, by contrast, contends that this term needs no construction or alternatively that it means that the position is "selected" from either locked or unlocked. Plaintiff proposes:

> [T]he second portion is moveable by a user between a first position where it is unable to be rotated about the axis of rotation relative to the firearm sighting device, and a second position where it is able to be rotated about the axis of rotation relative to the firearm sighting device.

*Id.* Beginning with the claim language, Claim 1 states that the second portion is selectively moveable "between locked and unlocked positions." Ferris Decl. Ex. 3, col. 10, ll. 51–52. The plain language of this claim does not require that the locked position be selected among several locked positions as Defendant argues. Defendant conflates selecting between locked and

unlocked positions with selecting the position of the adjustment member about the axis of rotation. Some of the preferred embodiments describe iterations of the invention including a spline structure providing multiple positions in which a locking pin may be in a locked position. *Id.* col. 4, ll. 66–col. 5, ll. 9. While Defendant may be correct that the claimed invention may include multiple locked positions, the claim language at dispute here does not require such a limitation.

The disputed claim phrase pertains to selecting between unlocked and locked positions, or in other words, selecting between engaged and disengaged positions such that the engaged position restrains rotation of the actuator. *Id.* at col. 10, ll. 51–59. Once the second portion has been "selected" from locked to unlocked, then the actuator (to which the second portion is attached) may be rotated around the axis of rotation. *Id.* Rotation of the actuator, and by extension the second portion of the locking mechanism, is not the "selectively moveable" to which the disputed claim term refers. *Id.* col. 2, ll. 13–18. Furthermore, while the preferred embodiments may include iterations of the invention with multiple locking positions, such a limitation is not required. Plaintiff has not stated the intention of limiting the claimed invention to the preferred embodiments and it would be improper to import such a limitation from the specifications into the claims. *See GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014) (holding that a patent with only a single embodiment is not necessarily limited by that embodiment absent a "disavowal or disclaimer based on clear and unmistakable statements by the patent that limit the claims"). There is no such disavowal or disclaimer in the '736 patent nor any other indication identified by the parties unmistakably showing that Plaintiff intended to limit Claim 1 to include locking mechanisms with multiple locked positions. The patent is clear that the preferred embodiments are exemplary and were not intended to limit the

patent claims. Ferris Decl. Ex. 3, col. 10, ll. 24–33. The Court therefore adopts Plaintiff's

construction of this term as it is consistent with the claim language and specifications and

reflects what a POSA would understand the claim to mean.

**5.**    ***"engage one another in a locked position" (the '120 patent)***

The parties indicated at the *Markman* hearing that they would confer as to this phrase and

may be able to reach a stipulated construction without the need for construction from the Court.

Accordingly, the Court defers construction of the phrase at this time.

**II.    Terms from Count IV**

**1.**    ***"locking adjustment device for adjusting a setting of a riflescope or other aiming
device" (the '068 patent)***

The parties dispute whether this phrase found in independent Claim 1 of the '068 patent

is preamble or intended use language that does not limit the claim. Ferris Decl. Ex. 6, col. 11, ll.

2–3.Alternatively, if the Court does construe the phrase, the parties dispute whether it refers only

to weapons or whether it includes other aiming devices.

Given that the disputed phrase is located within the preamble of Claim 1, it may not

constitute an element of the claim requiring construction. "In general, a preamble limits the

invention if it recites essential structure or steps, or if it is 'necessary to give life, meaning, and

vitality' to the claim." *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808

(Fed. Cir. 2002) (quoting *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1305 (Fed.

Cir. 1999)). "Conversely, a preamble is not limiting 'where a patentee defines a structurally

complete invention in the claim body and uses the preamble only to state a purpose or intended

use for the invention.'" *Id.* (quoting *Rowe v. Dror*, 112 F.3d 473, 478 (Fed. Cir. 1997)). "If the

preamble adds no limitations to those in the body of the claim, the preamble is not itself a claim

limitation and is irrelevant to proper construction of the claim." *IMS Tech., Inc. v. Haas*

*Automation, Inc.*, 206 F.3d 1422, 1434 (Fed. Cir. 2000) (citing *Pitney Bowes*, 182 F.3d at 1305). "[D]ependence on a particular disputed preamble phrase for antecedent basis may limit claim scope because it indicates a reliance on both the preamble and claim body to define the claimed invention. . . . Likewise, when the preamble is essential to understand limitations or terms in the claim body, the preamble limits claim scope." *Catalina Mktg.*, 289 F.3d at 808 (citations omitted).

The Court agrees with Plaintiff that the disputed phrase recites limiting elements of the claim and is not intended use language. As Plaintiff points out, the term "locking adjustment device" is found in the patent's title, several times within the body of Claim 1, in every dependent claim, and in every embodiment in the specifications. *See* Pl.'s Br. 33. Here, "locking adjustment device" as found in the preamble limits the claimed invention to devices for "adjusting a setting of a rifle or other aiming device." It is a claim phrase from which other claims derive an antecedent basis and the phrase is necessary to give meaning to Claim 1 and its dependent claims. Therefore, the Court must construe this phrase.

The parties do not dispute that "a locking adjustment device" is an element of the claim. As noted above, the parties dispute whether this phrase limits the claim to weapon targeting devices or whether it encompasses other aiming devices. Plaintiff proposes the following construction: "a securable adjuster of a weapon targeting device." Joint *Markman* Chart 48. Defendant does not provide any proposed construction and argues that the term "other aiming device" must include "any optical device that benefit[s] from adjustment . . . including riflescopes, telescopes, binoculars, spotting scopes, and other aimed optical devices." *Id.* The plain language of this claim phrase indicates that it is not limited to "weapon targeting device[s]" and encompasses "other aiming device[s]." The specifications explain that the invention "relates

generally to rotating adjustment mechanisms, and in particular, to locking adjustment knobs for actuating optical or electrical elements such as an elevation adjustment knob for a sighting device, such as a riflescope, a telescope, [sic] other aimed optical device." Ferris Decl. Ex. 6 Col 1, ll. 5–10. The specifications further explain:

> Rotatable knobs may also be used to adjust other features of riflescopes, binoculars, spotting scopes, or other suitable optical devices. . . . Although the rotatable knobs are described in relation to use with sighting devices, rotatable knobs may be used to adjust an adjustment portion of other devices, and may include volume control knobs, channel selection knobs, radio station selection knobs, and other suitable knobs.

*Id.* at col. 1, ll. 32–40. In sum, claim language and specifications do not limit Claim 1 to weapon targeting devices. Accordingly, the Court declines to adopt Plaintiff's proposed construction containing that limitation. Rather, the Court adopts a modified version of Plaintiff's construction that includes other aimed optical devices. Therefore, the Court construes "a locking adjustment device for adjusting a setting of a riflescope or other aiming device" to mean "a securable adjuster of an aimed optical device." The foregoing construction is consistent with what a POSA's understanding of the phrase would be in the context of the patent as a whole.

### 2.    *"around" (the '068 patent)*

Next, the parties provide competing constructions for the term "around" as found in Claims 1 and 2 of the '068 patent. This term is used in Claim 1 to describe "a guideway including a slide surface extending *around* a rotational axis." *Id.* at col. 11, ll. 4–5 (emphasis added). The parties dispute whether this term means that the slide surface can be on a single side of the rotational axis or whether it must extend around multiple sides of the rotational axis. This term bears on the issue of infringement as Defendant argues that its accused product includes a straight slide surface that extends to the side of the rotational axis. *See* Def.'s Reply 25. Plaintiff

argues that the term requires no construction or, alternatively, that it be construed to mean "to the side of." Joint *Markman* Chart 56. Defendant proposes: "On all sides of; encircle." *Id.*

Beginning with the claim language, the phrase "extending around" indicates that the slide surface is shaped such that it encircles the axis of rotation as opposed to merely extending to the side of it. This reading is consistent with the remainder of Claim 1 which describes a guide tab that rides along the slide surface as the knob is rotated:

> [A] guide tab carried by the knob for rotation therewith and slidably received in the guideway when the adjustment device is installed on the aiming device, the guide tab being moveable relative to the knob and biased against the slide surface so as to urge at least a portion of the guide tab toward the notch when the knob is rotated. . . .

Ferris Decl. Ex. 6, col. 11, ll. 9–14. Further, Claim 2 describes "a second slide surface extending *around* the axis and linked to the slide surface via a transition section wherein the guide tab is moveable along the second slide surface and the transition section when the knob is rotated." *Id.* at col. 11, ll. 24–28 (emphasis added). When the knob is rotated and the guide tab rides along the slide surface, at some point it reaches a transition surface upon which it transitions to the second slide surface and continues to ride as the knob rotates. As Defendant points out, every use of the term "around" in the specifications and drawings means to "encircle." *See* Def.'s Br. 36. For example, several the figures show a slide surface in the shape of a ring that encircles the adjustment knob. *See* Ferris Decl. Ex. 6, Figs. 2–5, 7. Written descriptions of the preferred embodiments describe a slide surface that encircles the axis of rotation as well. *Id.* col. 5, ll. 45–47; col. 6, ll. 17–24, 31–39; col. 7, ll. 62–64.

The Court is persuaded by the claim language and specifications that a POSA would understand "around" in the context of this patent to mean: "on all sides of; encircle." This construction is consistent with the intrinsic evidence as well as extrinsic evidence in the form of

dictionary definitions proffered by both parties. *See* Joint *Markman* Chart 56–57. Therefore, the Court adopts Defendant's construction of this term.

## III.    Terms from Count VII

### 1.    *"drive face" (the '907 patent)*

The term "drive face" is included in independent Claims 1 and 10 of the '907 patent. Claim 1 states, in relevant part: "the cam hub including a drive face and a spiral cam track formed in the face around the axis of rotation. . . ." Ferris Decl. Ex. 9, col. 7, ll.14–16. The parties dispute whether this term requires that the drive face contact an actuator. Construction of this term bears on the issue of infringement as Defendant claims that its accused product includes a drive face that only contacts air. Plaintiff proposes: "a surface in which the cam track is formed." Joint *Markman* Chart 77. Defendant initially proposed: "The face of a cam hub that contacts and drives an actuator positioned between the cam hub and a housing of a rifle sight." *Id.* In its reply, Defendant adopts what is calls a compromise construction as follows: "the face of a cam hub that contacts and drives an actuator." Def.'s Reply 35. According to Defendant, the "drive" in "drive face" connotes driving another component (an actuator) that it must necessarily contact.

The Court disagrees. The term "drive face" does not require that it contact an actuator; rather, it is the cam follower that makes contact with the cam track formed in the drive face. Claim 1 claims an actuator "including a cam follower operably engaged in the spiral cam track." Ferris Decl. Ex. 9, col. 7, ll. 17–24. The specifications show that the drive face is the surface upon which the cam track is formed. For example, in Figure 6B shows a flat round drive face upon which a spiral cam track is formed. *Id.* col. 5, ll. 56–66. While some embodiments depict an actuator making contact with the drive face, there is no indication in the specifications that

Plaintiff intended to limit the patent claims to those embodiments. *Id.* Fig. 5, col. 3, ll. 30–36.

Based on the foregoing, the Court adopts Plaintiff's construction and construes "drive face" to

mean "a surface in which the cam track is formed."

**2.    "cam track" (the '907 patent)**

Similar with "drive face," the term "cam track" is found in Claims 1, and 10 of the '907

patent. The parties dispute whether a "cam track" must be a groove or whether it can also be a

rail. Plaintiff proposes: "a groove that is curved along its length." Joint *Markman* Chart 79.

Defendant proposes: "A component of a cam hub in the form of a groove or a rail, for engaging a

cam follower." *Id.* Plaintiff contends that the plain language of Claims 1 and 10 demonstrate that

the cam track must be a groove. Those claims state that the cam track is "formed *in* the drive

face" and the cam follower is "operably *engaged in* the spiral cam track." Ferris Decl. Ex. 9, col.

7 ll. 15, 19 (emphasis added). A protruding rail, by contrast, requires that the cam track be *on* the

drive face. Additionally, Plaintiff argues that Defendant's insertion of "component" in its

construction is confusing given that the cam track is not necessarily a separate piece because it

can be a groove in the drive face of the cam hub.

Defendant argues that Plaintiff's proposed construction improperly excludes a preferred

embodiment. A preferred embodiment states: "In an alternative embodiment, the spiral cam track

is a spiral ridge or rail and the cam follower is a notch or fork including a slot sized for engaging

with the spiral ridge." *Id.* at col. 3, ll. 38–41. Defendant also invokes the doctrine of claim

differentiation to argue that independent Claim 1 encompasses rail cam tracks because dependent

Claim 6, which must necessarily be narrower, claims only a groove cam track. Claim 6 provides:

"The adjustment mechanism of claim **1** in which the spiral cam track includes a spiral groove

and in which the cam follower is a pin." *Id.* at col. 7, ll. 37–39. According to Defendant, Plaintiff's proposed construction would improperly render dependent Claim 6 superfluous.

The Court finds that the term "cam track" encompasses ridges and rails in addition to grooves. As noted above, a preferred embodiment expressly states that the cam track may be a spiral ridge or rail. As Defendant points out, the passage describing that alternative embodiment is immediately preceded by a description of a cam track as "formed in the drive face" which shows that the use of the word "in" is not inconsistent with ridge and rail cam tracks. *Id.* at col. 3, ll. 28–41. In addition, Defendant's point regarding dependent Claim 6 is well-taken. The presence of a dependent claim gives rise to the presumption that the limitation therein is not present in the independent claim. *Phillips*, 415 F.3d at 1315. This presumption may be rebutted by evidence from the specifications and prosecution history. *See Seachange Int'l, Inc. v. C–COR Inc.*, 413 F.3d 1361, 1369 (Fed. Cir. 2005). Plaintiff has not pointed to evidence sufficient to overcome the presumption of claim differentiation and the Court disagrees with Plaintiff's interpretation of the use of "in" in the claims. Accordingly, the Court adopts a modified version of Defendant's proposed construction. The Court agrees with Plaintiff that the cam track need not be a distinct "component" as Defendant proposes. The Court, therefore, constructs "cam track" as follows: "a groove, ridge, or rail that is curved along its length, for engaging a cam follower."

### 3. *"actuator" (the '907 patent)*

The term "actuator" is found throughout the claims of the '907 patent. Plaintiff argues that this term is easily understood and requires no construction. Alternatively, Plaintiff proposes: "a device that causes another structure to be put into motion or action." Joint *Markman* Chart 78. Defendant, by contract, maintains that "actuator" is undefined in the patent, requiring that the

term be limited to the preferred embodiments as a "means-plus-function" term under 35 U.S.C.

§ 112, para. 6. *See* Def.'s Br. 50. Accordingly, Defendant proposed construction is as follows:

> A device for actuating as embodied in the Specification (actuator 122 in Figs. 3, 4, and 5, that is slidably mountable between the housing and the cam hub, in contact with the drive face of the cam hub, and that comprises a cam follower engaged with a spiral cam track on the cam hub).

Joint *Markman* Chart 78. Under 35 U.S.C. § 112, para. 6, means-plus-function claim

construction applies when:

> An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

*Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1347 (Fed. Cir. 2015) (quoting 35 U.S.C.

§ 112, para. 6). When the patentee "express[es] a claim limitation by reciting a function to be

performed rather than by reciting structure for performing that function, while placing specific

constraints on how such a limitation is to be construed" courts restrict "the scope of coverage to

only the structure, material, or acts described in the specification as corresponding to the claimed

function and equivalents thereof." *Id.* (citing *Northrop Grumman Corp. v. Intel Corp.*, 325 F.3d

1346, 1350 (Fed. Cir. 2003)).

To determine whether means-plus-function construction applies, courts first look to see if

the word "means" is present. *Id.* at 1348. If the word "means" is present, then there is a

rebuttable presumption that § 112, para. 6 applies. *Id.* If "means" is not present, however, there is

a presumption that § 112, para 6 does not apply. *Id.* The presumption that it does not apply can

be overcome "if the challenger demonstrates that the claim term fails to 'recite[] sufficiently

definite structure' or else recites 'function without reciting structure for performing that

function.'" *Id.* (quoting *Watts v. XL Sys., Inc.*, 232 F.3d 887, 880 (Fed. Cir. 2000)). "The standard is whether the words of the claim are understood by persons of ordinary skill in the art to have a sufficiently definite meaning as the name for structure." *Id.* at 1349.

In this case, the word "means" is not present in the disputed claim and it is presumed that means-plus-function construction does not apply to the term "actuator." Defendant contends that the '907 patent does not define "actuator" and fails to recite a sufficiently definite structure for the term. Because the term has no specific structural meaning, according to Defendant, it should be limited to the corresponding structures described in the specifications. *See* Def.'s Br. 50.

In response, Plaintiff argues that the patent recites structure and that the term "actuator" is well-understood by POSAs as a term for a structure in the art. Therefore, Plaintiff maintains that the plain meaning should govern and means-plus-function construction is inapplicable. The "essential inquiry" for determining whether § 112, para 6 applies "is not merely the presence or the absence of the word 'means' but whether the words of the claim are understood by [POSAs] to have a sufficiently definite meaning as the name for a structure." *Williamson*, 792 F.3d at 1348 (citing *Greenberg v. Ethicon Endo-Surgery, Inc.*, 91 F.3d 1580, 1583 (Fed. Cir. 1996)). "What is important is . . . that the term, as the name for a structure, has a reasonably well understood meaning in the art." *Greenberg*, 91 F.3d at 1583. The Federal Circuit in *Greenberg* found that even though a particular mechanism was "defined in functional terms" that it was "not sufficient to convert a claim element containing that term into a means for performing a specified function" under § 112. *Id.* at 1583. In *Greenberg*, the court considered the claim term "detent mechanism" and recognized that "[m]any devices take their names from the functions they perform. . . . such as 'filter,' 'brake,' 'clamp,' 'screwdriver,' or 'lock.'" *Id.* The court explained that "'detent' denotes a type of device with a generally understood meaning in the mechanical

arts, even though the definitions are expressed in functional terms." *Id.* While "detent" did not

"call to mind a single well-defined structure" the court explained that the "same could be said of

other commonplace structures." *Id.* The court emphasized that what is important is that the term

is defined "as the name for structure" which "has a reasonably well understood meaning in the

art." *Id.* The Federal Circuit concluded that there was no reason to read the claim language as a

means-plus-function term under § 112 para. 6. *Id.* at 1584.

Here too, "actuator" like "detent" takes its name from the function it performs. Likewise,

while "actuator" may not have a "single well-defined structure," it is the name of a structure that

has a reasonably well-understood meaning to POSAs. This conclusion is reinforced by dictionary

definitions demonstrating that the "actuator" is generally understood in the art. *See* AMERICAN

HERITAGE DICTIONARY 18 (3d 1996) ("One that activates, especially a device responsible for

actuating a mechanical device" and "to put into motion or action"); COLLINS ENGLISH

DICTIONARY 16 (4th ed. 1998) ("'actuate': to put into action or mechanical motion.");

WEBSTER'S II NEW COLLEGE DICTIONARY 12 (1999) ("'actuator': One that activates, esp. a

device responsible for actuating another device."); WEBSTER'S NEW INT'L DICTIONARY 22 (3d

ed. 2002) ("Actuator: one that actuates" and "Actuate: to put into mechanical action or motion").

In sum, the term "actuator" has a commonplace structural meaning and is reasonably well

understood in the art.

Moreover, the Court agrees with Plaintiff that the specifications recite sufficient structure

for the term "actuator" obviating the need for means-plus-function construction. Claim 1 recites:

> [A]n actuator slidably mounted for movement along the
> longitudinal axis of the housing and including a cam follower
> operably engaged in the spiral cam track so that the actuator moves
> generally along the longitudinal axis in response to rotation of the
> cam hub, the actuator operatively connected to the optical element
> to drive the optical element in response to rotation of the cam hub.

Ferris Decl. Ex. 9, col. 7, ll. 17–24. This claim language recites structural limitations for its functional language. In particular, the cam follower (which is structurally described elsewhere in the claims) is a component of the actuator and the claim recites corresponding structures to the term "actuator." The Federal Circuit recognized in *Innova/Pure Water, Inc.* that the use of the term "operatively connected" is a "general descriptive term frequently used in patent drafting to reflect a functional relationship between claimed components." *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1118 (Fed. Cir. 2004). Similarly, a district court found that a patent recited sufficient corresponding structure for the term "actuatable" in the following passage: "actuat[ing] between a ground engagement position allowing the first tire to contact the ground surface and a lifted position elevating the first tire away from the ground surface." *Saf-Holland, Inc. v. Hendrickson USA, L.L.C.*, No. 1:14-CV-650, 2016 WL 845286, at *7 (W.D. Mich. Mar. 4, 2016).

Defendant has not overcome the presumption that § 112 para. 6 does not apply. Accordingly, the Court finds that the ordinary and customary meaning of this term as a POSA would understand it controls and "actuator" does not require construction from the Court.

## IV.    Terms from Count III

### 1.    *"locking mechanism" (the '408 patent)*

The term "locking mechanism" is found throughout the claims of the '408 patent. The parties dispute whether this claim term encompasses a pin as a locking mechanism or a multicomponent structure. Construction of this term bears on the issue of infringement as Defendant argues that its accused device includes a single-component lock as opposed to a multicomponent locking mechanism. Plaintiff argues that the ordinary and customary meaning of the term should govern or, alternatively, that it should be construed as follows: "a mechanism for

securing a structure in place." Joint *Markman* Chart 29. Defendant proposes: "A system of parts that includes a linkage, a locking pin, and wedge pin that provide a locking capability." *Id.*

Plaintiff argues that Defendant's proposed construction improperly limits the claims using a locking mechanism from the preferred embodiments. In particular, Figure 4 describes a locking mechanism consistent with Defendant's construction. *See* Ferris Decl. Ex. 5, Fig. 4, col. 5, ll. 44–51. Defendant relies on the patent's prosecution history to argue that the patent contemplates a specific locking mechanism and that Plaintiff admitted as much to the USPTO in order to distinguish the patent from prior art.

The claim language does not limit the term "locking mechanism" to a multicomponent structure and the specifications expressly state that its preferred embodiments are for illustrative purposes and not meant as limitations. *Id.* at col. 15, ll. 25–26. Turning to whether the prosecution history narrows the scope of the claim under the doctrine of prosecution waiver, "a patentee may limit the meaning of a claim term by making a clear and unmistakable disavowal of scope during prosecution." *Purdue Pharma L.P. v. Endo Pharm. Inc.*, 438 F.3d 1123, 1136 (Fed. Cir. 2006) (citing *Seachange*, 413 F.3d at 1372–73). "This may occur, for example, when the patentee explicitly characterizes an aspect of his invention in a specific manner to overcome prior art." *Id.* (citing *Microsoft Corp. v. Multi–Tech Sys., Inc.*, 357 F.3d 1340, 1349 (Fed. Cir. 2004)).

The Court finds that Plaintiff did not make a clear and unmistakable disclaimer or disavowal during patent prosecution limiting "locking mechanism" to a multicomponent structure. While the prosecution history suggests that "lock" was amended with "locking mechanism" with a particular mechanism in mind, it does not represent a clear and unmistakable

disavowal. *See* Def.'s Br., Ex. 19, at 15. Plaintiff explained the amendment to the USPTO as follows:

> In response to paragraph 7 ("lock") of the Office action, Applicant has amended the claims by replacing the claim term "lock" with "locking mechanism" in all pending claims. This amendment is not intended to narrow the scope of the claims but rather to use a term with adequate antecedent basis in the specifications. The "locking mechanism" structure is described with reference to the drawings in paragraph [0046] of Applicant's specifications.

*Id.* Defendant points out that in the prosecution history, Plaintiff sought to claim a particular locking mechanism to overcome the Talpe reference. Plaintiff stated that "Talpe discloses no structure that is analogous to the locking mechanism in the present application." *Id.* at 19.

Plaintiff responds that Defendant misreads the prosecution history and that Talpe did not disclose *any* locking mechanism whatsoever as opposed to disclosing a structure that was somehow distinct from a particular locking mechanism in the '408 patent. *Id.* at 18 (explaining that Talpe pertains to safety door knobs and it "does not involve a lock"); *see also* Williams Decl. Ex. 7, ECF 59 (the Talpe reference). While the Talpe reference does not use the term "lock" or "locking mechanism," the claimed invention describes a safety knob including a structure that in essence operates in reverse of the '408 patent's locking mechanism. *See* Def.'s Br. Ex. 19, at 20–21 (Plaintiff argues to the USPTO that the '408 patent's "locked condition" corresponds with Talpe's disengagement of internal components); Williams Decl. Ex. 7, at p. 5. While Plaintiff characterizes Talpe as lacking any "lock," Plaintiff's attempts to distinguish the '408 patent from Talpe as well as the Court's independent review of the prior art shows that Talpe does include some form of lock that restrains rotation of the safety knob and is distinct from the one at issue here. In other words, Talpe does not lack any lock as Plaintiff claims; rather, it contains a lock that operates very differently from the '408 patent's claimed locking

mechanism. Assuming that the prosecution history shows that Plaintiff attempted to distinguish

the '408 patent's locking mechanism from Talpe, the prosecution history does not provide a clear

and unmistakable disavowal. As noted above, Plaintiff stated in the prosecution history that

amending "lock" with "locking mechanism" was not intended to limit the claims and the

specifications expressly state that the preferred embodiments are for illustrative purposes only.

Therefore, the Court is persuaded that "locking mechanism" is not limited to the structure

described in the preferred embodiments.

Accordingly, the Court finds that the term "locking mechanism" is claimed broadly in the

'408 patent and Plaintiff is entitled to its proposed construction. The Court construes "locking

mechanism" to mean "a mechanism for securing a structure in a position."

### 2. *"button" (the '408 patent)*

Lastly, the parties dispute the meaning of the term "button" found throughout the '408

patent. The parties dispute whether this term requires construction and whether the "button" must

be a distinct component from the "locking mechanism." Plaintiff argues that the ordinary and

customary meaning of "button" should control. Alternatively, Plaintiff proposes: "a manually

depressible actuator." Joint *Markman* Chart 34. Defendant proposes: "A component, separate

from the locking mechanism, that is triggered by a user so as to cause an actuator to contact the

linkage of the locking mechanism and move the locking mechanism." *Id.*

The ordinary and customary meaning of "button" should control and this term does not

require construction from the Court. There is a heavy presumption that the ordinary and

customary meaning should control here and Defendant has not directed to the Court to any

statements in the written description that affect the patent's scope with respect to the term

"button." *Johnson Worldwide*, 175 F.3d at 989. The '408 patent's use of "button" was consistent

with the ordinary meaning of the term and there is no indication in the intrinsic materials that Plaintiff deliberately used a different meaning. *K-2 Corp.*, 191 F.3d at 1363. Defendant instead proposes a construction that improperly limits the claim term based on requirements described in certain preferred embodiments such as the button's interactivity with other components. As noted above, the '408 patent states that the preferred embodiments are for illustrative purposes and not limiting. Further, there is no disclaimer or disavowal in the patent purporting to narrow the meaning of "button." In sum, Defendant has not demonstrated that "button" must be construed more narrowly than its ordinary and customary meaning. Therefore, the plain and ordinary meaning controls.

## V.     Summary of Construction

The Court construes the terms as follows

- "telescopic sight" means "a magnifying aiming device";

- "sighting device" means "an aiming device";

- "actuator" as used in the '736 patent has its ordinary and customary meaning;

- "selectively moveable" / "the second portion selectively moveable between locked and unlocked positions" means "[T]he second portion is moveable by a user between a first position where it is unable to be rotated about the axis of rotation relative to the firearm sighting device, and a second position where it is able to be rotated about the axis of rotation relative to the firearm sighting device";

- "locking adjustment device for adjusting a setting of a riflescope or other aiming device" means "a securable adjuster of an aimed optical device"

- "around" means "on all sides of; encircle";

- "drive face" means "a surface in which the cam track is formed";

- "cam track" means "a groove, ridge, or rail that is curved along its length, for engaging a cam follower";

- "actuator" as used in the '907 patent has its ordinary and customary meaning;

- "locking mechanism" means "a mechanism for securing a structure in a position"; and

- "button" has its ordinary and customary meaning.

## CONCLUSION

The Court construes the disputed terms as stated.

Dated this ___31___ day of ___January___, 2018.

*Marco Hernández*

MARCO A. HERNÁNDEZ
United States District Judge