Scott E. Davis, OSB No. 022883
Email: scott.davis@klarquist.com
Todd M. Siegel, OSB No. 001049
Email: todd.siegel@klarquist.com
KLARQUIST SPARKMAN, LLP
121 S.W. Salmon St., Ste. 1600
Portland, Oregon 97204
Telephone: (503) 595-5300

David A. Casimir, *pro hac vice*
Email: dacasimir@casimirjones.com
CASIMIR JONES, S.C.
2275 Deming Way, Ste. 310
Middleton, WI 53562
Telephone: (608) 662-1277

*Attorneys for Defendant*
LIGHTFORCE USA, INC.

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| **LEUPOLD & STEVENS, INC.,** | Civil Case No.: 3:16-cv-01570-HZ |
| Plaintiff, | **DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OF INVALIDITY OF U.S. PAT. NO. 6,816,305** |
| v. | |
| **LIGHTFORCE USA, INC. d/b/a NIGHTFORCE OPTICS and NIGHTFORCE USA,** | **REQUEST FOR ORAL ARGUMENT** |
| Defendant. | |

# TABLE OF CONTENTS

Page(s)

LOCAL RULE 7-1 CERTIFICATION ........................................................................ 1

MOTION............................................................................................................... 1

MEMORANDUM ................................................................................................... 1

I.           TECHNICAL TUTORIAL............................................................... 2

II.          STATEMENT OF UNDISPUTED MATERIAL FACTS ................... 5

      A.    Structural elements of the Asserted Claims ............................ 5

      B.    Effective Date of the Asserted Claims .................................... 6

      C.    Structural Elements in the Prior Art Nightforce Scopes ........ 6

III.         THE PRIOR ART NIGHTFORCE SCOPES  ANTICIPATE THE ASSERTED PRODUCT CLAIMS ..................................................................... 8

      A.    Prior Art Nightforce Scopes Were Sold and On-Sale Before October 27, 2001 .... 8

      E.    Patentability Of A Product Does Not Depend On Its Method Of Manufacture ... 11

      F.    Leupold Cannot Distinguish The Prior Art Based On The Recited "Pre-Assembly" Step........................................................................ 12

IV.         ASSERTED CLAIMS 1, 5-8, AND 12-15 ARE INDEFINITE......................... 14

      A.    Claims Must Be Drawn To A Single Statutory Class........................................... 15

      B.    The '305 Product Claims Are Not Properly Drawn to a Single Statutory Class .. 16

V.          PRIOR ART NIGHTFORCE PRODUCTS  ANTICIPATE THE ASSERTED METHOD CLAIMES .................................................................... 19

      A.    The Prior Art Nightforce Scopes Anticipate The Asserted Method Claims......... 20

      B.    Skilled Artisans Would Infer That Nightforce's  Prior Art Methods Anticipate Claims 26 And 27 ..................................................... 26

VI.         THE ASSERTED CLAIMS ARE INVALID AS OBVIOUS ............................ 27

      A.    The Law Of Obviousness............................................................................ 28

      B.    The Prior Art Nightforce Scopes Render Obvious The Asserted Claims............. 30

VII.      CONCLUSION................................................................................. 33

i

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Amgen Inc. v. Hoechst Marion Roussel, Inc.*,
    314 F.3d 1313 (Fed. Cir. 2003)....................................................................... 11

*Atlantic Thermoplastics Co., Inc. v. Faytex Corp.*,
    970 F.2d 834 (Fed. Cir. 1992)......................................................................... 10

*B.F. Goodrich Co. v. Aircraft Braking Sys. Corp.*,
    72 F.3d 1577 (Fed. Cir. 1996)........................................................... 28, 29, 30

*Blue Calypso, LLC v. Groupon, Inc.*,
    815 F.3d 1331 (Fed. Cir. 2016)....................................................................... 27

*Ex Parte Forsyth*,
    151 USPQ 55 (Bd. of Appeals 1965)............................................................... 15

Ex parte Lyell,
    17 U.S.P.Q.2d 1548 (1990)....................................................................... 15, 16

*Ferag AG v. Quipp, Inc.*,
    45 F.3d 1562 (Fed. Cir. 1995)........................................................................... 9

*Gen. Elec. Co. v. Wabash Appliance Corp.*,
    304 U.S. 364 (1938).......................................................................................... 11

*George M. Martin Co. v. Alliance Mach. Sys. Int'l LLC*,
    618 F.3d 1294 (Fed. Cir. 2010)................................................................. 28, 29

*Graham v. John Deere Co. of Kansas City*,
    383 U.S. 1 (1966)............................................................................................. 28

*Group One, Ltd. v. Hallmark Cards, Inc.*,
    254 F.3d 1041 (Fed. Cir. 2001)....................................................................... 10

*Hamilton Beach Brands, Inc. v. Sunbeam Prods., Inc.*,
    726 F.3d 1370 (Fed. Cir. 2013)....................................................................... 10

*In re Baxter Travenol Labs.*,
    952 F.2d 388 (Fed. Cir. 1991)......................................................................... 27

*In re Caveney,*
   761 F.2d 671 (Fed. Cir. 1985)................................................................. 10

*In re Donohue,*
   766 F.2d 531 (Fed. Cir. 1985)................................................................. 9

*In re* Marosi,
   710 F.2d 799 (Fed.Cir.1983)................................................................. 12

*In re Nordt Dev. Co., LLC,*
   881 F.3d 1371 (Fed. Cir. 2018)................................................................. 13

*In re Thorpe,*
   777 F.2d 695 (Fed. Cir. 1985)................................................................. 12

*IPXL Holdings, L.L.C. v. Amazon.com, Inc.,*
   *430 F.3d 1377 (Fed. Cir. 2005)*................................................................. 15

Johnson & Johnson v. W.L. Gore,
   436 F. Supp. 704 (D. Del.1977)................................................................. 12

*KSR Int'l Co. v. Teleflex Inc.,*
   550 U.S. 398 (2007).................................................................... 28, 29, 32

*Linear Tech. Corp. v. Micrel, Inc.,*
   275 F.3d 1040 (Fed. Cir. 2001)................................................................. 9

*Mehl/Biophile Int'l Corp. v. Milgraum,*
   192 F.3d 1362 (Fed. Cir. 1999)................................................................. 9

*Pfaff v. Wells Elecs., Inc.,*
   525 U.S. 55 (1998)................................................................. 9

*Purdue Pharma LP v. Epic Pharma, LLC,*
   811 F.3d 1345 (Fed. Cir. 2016)................................................................. 11

*SmithKline Beecham Corp. v. Apotex Corp.,*
   439 F.3d 1312 (Fed. Cir. 2006)................................................................. 11

*Tokai Corp. v. Easton Enter., Inc.,*
   632 F.3d 1358 (Fed. Cir. 2011)................................................................. 29

*Transweb, LLC v. 3M Innovative Prop. Co.,*
   16 F. Supp. 3d 385 (D. N.J. 2014)................................................................. 26, 27

*Vanmoor v. Wal-Mart Stores, Inc.,*
   201 F.3d 1363 (Fed. Cir. 2000)................................................................. 10

*W.L. Gore & Associates v. Garlock, Inc.*,
    721 F.2d 1540 (Fed. Cir. 1983) .......................................................................................... 26

**Statutes**

35 U.S.C. § 102 ........................................................................................................... passim

35 U.S.C. § 103 ................................................................................................................ 1, 6

35 U.S.C. § 112 ........................................................................................................... passim

**Other Authorities**

*Manual of Patent Examination Procedure* § 2173.05 .................................................. 16

## LOCAL RULE 7-1 CERTIFICATION

In compliance with this Rule, the parties made a good faith effort through telephone conferences to resolve the dispute and have been unable to do so.

## MOTION

Defendant Lightforce USA, Inc. d/b/a Nightforce Optics and Nightforce USA ("Nightforce") moves this Court for an order granting summary judgment that:

(1) each of the asserted claims, claims 1, 5-8, and 12-15, of United States Patent No. 6,816,305 ("the '305 Patent")[1] is invalid under 35 U.S.C. § 102(b) (pre-AIA) over Nightforce Scopes on sale and sold in the United States United States prior to October 28, 2001, including Nightforce riflescope model numbers 1.75-6x42, 2.5-10x50, 3.5-15x56, 5.5-22x56, 8-32x56, 12-42x56, 26x56, and 36x56 (1996 catalog) and 3.5-15x50 NXS, 3.5-15x56 NXS, 5.5-22x56 NXS, 8-32x56 NXS, and 12-42x56 NXS (1999 catalog) ("Prior Art Nightforce Scopes");

(2) each of claims 1, 5-8, and 12-15 of the '305 Patent is invalid under 35 U.S.C. § 112 as being directed to a hybrid claim that claims both an apparatus and a particular method of making the apparatus; and

(3) each asserted method claim (claims 26 and 27) of the '305 Patent is invalid under 35 U.S.C. § 102(b) and/or 103(a) (pre-AIA) over the Prior Art Nightforce Scopes.

## MEMORANDUM

Central to the legal bases for this motion is the fact that certain Nightforce riflescope products sold in the United States prior to October 28, 2001 ("Prior Art Nightforce Scopes") are prior art to U.S. Patent No. 6,816,305 (the "'305 Patent"), and that the Prior Art Nightforce Scopes comprise all the structural elements of the asserted claims of the '305 Patent. Leupold has

---

[1] The '305 Patent was previously filed as ECF No. 1-5.

DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT OF INVALIDITY OF U.S. PAT. NO. 6,816,305    1

not disputed either fact. Indeed, these pre-October 28, 2001 components and the manufacturing processes using them have been in continuous use in the industry, and Nightforce used them from 1995-October 27, 2001, in the prior art period.

Leupold is interpreting its patent to try to preclude Nightforce—and by implication many other in this industry—from selling products that were sold in the 1990s. When Leupold did not file a patent application until 2002, the inequity of Leupold's position is clear. And the law is clear. Leupold has no valid patent rights covering products on the market years before Leupold filed a patent application.

## I.    TECHNICAL TUTORIAL

The claims of the '305 patent recited herein below use a number of technical terms that refer to fairly simple parts and the way they are assembled.  The tutorial below provides a summary of the terminology associated with images of the products and figures of the patent to simplify the Court's analysis.

A central issue in the case is the timing of when a "pivoting lens unit" (recited in each asserted patent claim) is installed into the housing of a riflescope.  The pivoting lens unit contains lenses that provide part of the optics of a riflescope.  The "pivoting lens unit," when assembled appears as follows:

      (1)      From the '305 Patent (ECF No. 1-5, item 114):



(2)    From a prior art Nightforce scope (image taken from Nightforce's invalidity contentions) (Johnson Decl., Ex. D):



Two important components of the pivoting lens unit that should be understood to evaluate the issues in this motion are the "pivot tube" and "pivot cartridge." These two features are identified by the added arrows below.

(1)    From the '305 Patent (ECF No. 1-5, item 114):



(2)    From a prior art Nightforce scope (image taken from Nightforce's invalidity contentions (Johnson Decl., Ex. C):



The pivot cartridge fits over one end of the pivot tube such that the pivot tube is seated in the pivot cartridge and can pivot relative to the pivot cartridge. This pivotability allows the pivot tube, when installed into the housing of a riflescope, to be moved within the housing to make adjustments to the position of lenses contained into the pivot tube.



A fastener ring is added to lock the pivot cartridge to the pivot tube. As discussed below, the tightness of this fastening ring sets the tension of the pivot (image shown above taken from Nightforce invalidity contention. (Johnson Decl., Ex. C.)

The assembled pivoting lens unit is installed into a riflescope housing and secured thereto with a retaining screw. The issues presented herein relate, in part, to <u>when</u> the assembled pivoting lens unit (right image below) is installed inside the riflescope housing (left image below).



The '305 Patent describes a manufacturing process where the pivoting lens unit is "pre-assembled" prior to its insertion into the housing.

## II.    STATEMENT OF UNDISPUTED MATERIAL FACTS

### A.    Structural elements of the Asserted Claims

Claim 1 of the '305 Patent recites:

> **A pre-assembled pivoting lens unit** for installation into a tubular housing of an optical sighting device, the housing having a longitudinal axis, the lens unit comprising:
>
> **a pivot cartridge** sized to be at least partially received within the housing;
>
> **a pivot tube** having a longitudinal axis, the pivot tube comprising:
>
> a first end pivotably coupled to the pivot cartridge
>
> a second end extending from the pivot cartridge and movable transversely to the longitudinal axis of the housing, and
>
> a lens assembly disposed within the pivot tube between the first and second ends; and
>
> **a fastener** pivotally securing the pivot tube to the pivot cartridge, the first end of the pivot tube being keyed to the pivot cartridge independent of the housing to thereby limit rotation of the pivot tube about its longitudinal axis relative to the pivot cartridge after pre-assembly of the pivoting lens unit and before installation of the pre-assembled pivoting lens unit in the housing.

Independent claim 8 of the '305 Patent is directed to an optical sighting device and recites a "pre-assembled pivoting lens unit" comprising the same elements recited in claim 1, above, and further recites a tubular housing (Ex. 2, Byron Expert Report, ¶442-3). The "pre-assembled pivoting lens unit" of these asserted claims are the same structure, whether standing alone, *e.g.*, outside a housing, as is within the scope of claim 1, or at least partially received in a tubular housing, according to claim 8.

Claim 26 of the '305 Patent recites:

> A method for manufacturing an optical sighting device, comprising:
>
> (a) providing a **tubular housing**, the housing having a longitudinal axis;
>
> (b) pre-assembling a **pivoting lens unit**, the lens unit including:

(i) **a pivot cartridge** sized to be at least partially received by the housing,

(ii) **a pivot tube**, the pivot tube including a first end movably coupled to the pivot cartridge and a second end extending from the pivot cartridge, the second end being rotatable transversely of the longitudinal axis of the housing, and

(iii) **a lens assembly disposed within the pivot tube** between the first and second ends;

(c) positioning the pivoting lens unit in said housing; and

(d) securing the pivot cartridge within the housing.

Claim 27 of the '305 Patent recites:

A method of manufacturing a riflescope, comprising the steps of:

(a) pre-assembling **a pivoting lens unit** for insertion into a **tubular housing of the riflescop**e having a longitudinal axis by the steps of:

(i) pivotally seating a lens-holding **pivot tube** in a **pivot cartridge** so that the pivot tube is pivotable transversely to the longitudinal axis of the housing when the pivoting lens unit is installed in the housing, and, and

(ii) after pivotally seating the pivot tube in the pivot cartridge, attaching a **fastener** to the pivot cartridge to retain the pivot tube to the pivot cartridge;

(b) positioning the pre-assembled pivoting lens unit in the housing; and

(c) securing the pre-assembled pivoting lens unit in the housing.

## B.   Effective Date of the Asserted Claims

The '305 Patent was filed on October 28, 2002, and does not claim priority to any earlier-filed application or patent. (ECF No. 1-5). Nightforce Scopes sold in the United States prior to October 28, 2001 are prior art to the '305 Patent under the provisions of 35 U.S.C. §§ 102(b) and 103.

## C.   Structural Elements in the Prior Art Nightforce Scopes

Leupold has not disputed that Nightforce riflescope products comprising a pivoting lens unit with the structural features described above *i.e.,* a pivot cartridge, a pivot tube, and a

fastener, were in public use and sold prior to October 28, 2001 (Coleman Decl., Ex. A; Stockdill

Decl., Ex. E; Ex. 2, Byron Report;[2] Ex. 5, Byron Rebuttal Report).

These features are shown in the image below, which is taken from a Nightforce catalog

from 1996. (Johnson Decl., Ex. A) The 1996 Nightforce catalog image shows the pivot tube

fastened to a pivot cartridge with a keying screw. It is not disputed that a keying screw in the

Prior Art Nightforce Scopes is installed through the pivot cartridge from outside, into a hole in

the pivot tube.  (Johnson Decl., Ex. A.)



(Johnson Decl., Ex. A.)

It is not disputed that Prior Art Nightforce Scopes include all of the structural features of

claim 1 '305 Patent, and that they also comprise a tubular housing of claim 8 of the '305 Patent.

Further, it is not disputed that the Prior Art Nightforce Scopes comprise the structural elements

recited in dependent claims 5-6 and 12-15 of the '305 Patent. It is not disputed that the pivoting

lens units of the Prior Art Nightforce Scopes comprise an externally threaded lock-ring.

---

[2] Unless otherwise noted, numbered exhibits are attached to the accompanying Declaration of Xuan-Giang Tran.

III.    **THE PRIOR ART NIGHTFORCE SCOPES**
        **ANTICIPATE THE ASSERTED PRODUCT CLAIMS**

    A.    **Prior Art Nightforce Scopes Were Sold and On-Sale Before October 27, 2001**

Nightforce riflescope model numbers 1.75-6x42, 2.5-10x50, 3.5-15x56, 5.5-22x56, 8-32x56, 12-42x56, 26x56, and 36x56 (1996 catalog) and 3.5-15x50 NXS, 3.5-15x56 NXS, 5.5-22x56 NXS, 8-32x56 NXS, and 12-42x56 NXS (1999 catalog) were offered for sale and sold in the United States between 1995 and October 27, 2001 ("Prior Art Nightforce Scopes") (Coleman Decl., Ex.A) (Stockdill Decl., ¶¶ 11-13; Exs. A and B). The transactions included a commercial offer for sale, "to give and to pass rights of property" in return for the buyer's payment or promise "to pay the seller for the things bought or sold."  In particular, thirty-six invoices from a representative time period of February, 2000, between Nightforce and customers in various U.S. states for sales of Nightforce 5.5-22x56NXS riflescopes are provided (Coleman Decl., ¶¶ 4, Ex. A) (Stockdill Decl., ¶¶ 17).  One example of these invoices is document LS00003850, which is an invoice for the sale of seventeen 5.5-22x56NXS riflescopes from Lightforce (Nightforce) in Orofino, Idaho to D&B Supply in Cramerton, North Carolina for a total cost of $13,812.50. (Coleman Decl., Ex. A) (Stockdill Decl., ¶¶ 17, Ex. E at 21). Further, the Nightforce scopes that were on sale were 'ready for patenting' as such scopes (*e.g.*, 5.5-22x56NXS riflescopes) were reduced to practice prior to October 27, 2001.  Indeed, the scopes were sold *commercially*, which is clear evidence of reduction to practice ((Coleman Decl., ¶¶ 4; Ex. A) (Stockdill Decl. ¶¶ 17; Ex. E)).

In addition to being offered for sale, each of several models of riflescopes were in fact sold to customers in the 1995 to October 27, 2001 time frame.  (Stockdill Decl. ¶¶13, Ex. B,). Nightforce obtained from a customer an example of such a prior art Nightforce scope with its

original box, invoice and manual, which was sold in the U.S. in March 2001. (*See* Johnson Decl. Ex. F.)

### B.    The Law Of Anticipation

The anticipation analysis for this Motion involves two steps.  First, each reference must be shown to be a prior art under 35 U.S.C. § 102.  Second, the reference must be shown to include all elements of the patent claims at issue, to the extent the elements have patentable weight.  *In re Donohue*, 766 F.2d 531, 534 (Fed. Cir. 1985) (anticipation "requires a showing that each limitation of a claim must be found in a single reference, practice, or device"); *Mehl/Biophile Int'l Corp. v. Milgraum*, 192 F.3d 1362, 1365 (Fed. Cir. 1999) ("To anticipate, a single reference must teach every limitation of the claimed invention.").  Once the claims have been construed as a matter of law by the Court, often no genuine issue of fact remains regarding what the prior art discloses, thus permitting summary judgment of anticipation.  Such is the case here.

### C.    Legal Standard for On-Sale Bar

A prior art sale has occurred if there was a definite sale, or offer to sell, more than one year before the effective filing date of the U.S. application and the subject matter of the sale, or offer to sell, fully anticipated the claimed invention or would have rendered the claimed invention obvious by its addition to the prior art. *Ferag AG v. Quipp, Inc.*, 45 F.3d 1562, 1566 (Fed. Cir. 1995).  The on-sale bar of pre-AIA 35 U.S.C. § 102(b) is triggered if the invention is both (1) the subject of a commercial offer for sale not primarily for experimental purposes and (2) ready for patenting. *Pfaff v. Wells Elecs., Inc.*, 525 U.S. 55, 67 (1998). Traditional contract law principles are applied when determining whether a commercial offer for sale has occurred. *Linear Tech. Corp. v. Micrel, Inc.*, 275 F.3d 1040, 1048 (Fed. Cir. 2001); *Group One, Ltd. v.*

*Hallmark Cards, Inc.*, 254 F.3d 1041, 1047 (Fed. Cir. 2001) ("As a general proposition, we will look to the Uniform Commercial Code ('UCC') to define whether … a communication or series of communications rises to the level of a commercial offer for sale.").  A sale is a contract between parties wherein the seller agrees "to give and to pass rights of property" in return for the buyer's payment or promise "to pay the seller for the thing bought or sold." *In re Caveney*, 761 F.2d 671, 676 (Fed. Cir. 1985). A contract for the sale of goods requires a concrete offer and acceptance of that offer. *Linear Tech.*, 275 F.3d at 1052-54.  Even a single sale or offer to sell the invention may bar patentability under pre-AIA 35 U.S.C. 102(b).  *Atlantic Thermoplastics Co., Inc. v. Faytex Corp.*, 970 F.2d 834, 836-37 (Fed. Cir. 1992).

An invention is "ready for patenting" when, before the critical date, it is reduced to practice.  *Hamilton Beach Brands, Inc. v. Sunbeam Prods., Inc.*, 726 F.3d 1370, 1375 (Fed. Cir. 2013).  If the invention was actually reduced to practice before being sold or offered for sale more than one year before filing of the application, a patent will be barred. *Vanmoor v. Wal-Mart Stores, Inc.*, 201 F.3d 1363, 1366-67 (Fed. Cir. 2000) ("Here the pre-critical date sales were of completed cartridges made to specifications that remain unchanged to the present day, showing that any invention embodied in the accused cartridges was reduced to practice before the critical date.").

**D.    The Prior Art Nightforce Scopes Anticipate The Asserted Apparatus Claims**

The asserted '305 apparatus claims (claims 1, 5-8, and 12-15) are anticipated by the Prior Art Nightforce Scopes, as Leupold has not disputed that such prior art scopes provide all of the structural elements of these claims.

The only "feature" that Leupold identifies as a potential difference between the Prior Art Nightforce Scopes and the asserted '305 apparatus claims is that the  prior art Prior Art

Nightforce Scopes allegedly do not satisfy the "pre-assembled" aspects of the pivoting lens unit as recited by these claims. (Ex. 1, Response to Interrogatory No. 14 at p. 10.) However, as explained below, this is not a distinguishing feature for <u>apparatus</u> claims because the recited "pre-assembly"-related claim features pertain to the order of steps in which the pivoting lens units and scopes were assembled. Indeed, the parties have stipulated that the claimed "pre-assembled/pre-assembling" means "assembled / assembling in a separate operation, in advance of installation in the housing." (ECF No. 45 at 69.)  Thus, this claim language pertains to a step in the manufacturing *method* of the claimed *product*, and does not differentiate any physical or structural feature of the claimed lens unit or optical sighting device. Leupold's assertion thus fails as a matter of law because *product (apparatus) claims* are only defined by the structural features of the product itself, and not by any recited method of manufacture.

### E.    <u>Patentability Of A Product Does Not Depend On Its Method Of Manufacture</u>

"A claimed product shown to be present in the prior art cannot be rendered patentable solely by the addition of source or process limitations." *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1354 n.20 (Fed. Cir. 2003) (citing *Gen. Elec. Co. v. Wabash Appliance Corp.*, 304 U.S. 364, 373 (1938)) ("[A] patentee who does not distinguish his product from what is old except by reference, express or constructive, to the process by which he produced it, cannot secure a monopoly on the product by whatever means produced."); *Purdue Pharma LP v. Epic Pharma, LLC*, 811 F.3d 1345, 1353-54 (Fed. Cir. 2016) (affirming obviousness finding and approving district court disregarding a limitation in the claim because it was a process limitation that imparted no structural or functional differences distinguishing the claimed product from the prior art); *SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1317 (Fed. Cir. 2006) ("It

has long been established that one cannot avoid anticipation by an earlier product disclosure by claiming the same product . . . as produced by a particular process.").

Even if a product claim recites a specific process, as in, *e.g.*, a product-by-process claim, the patentability is still based only on the *features of the product itself*, regardless of the novelty of the process. "[E]ven though product-by-process claims are limited by and defined by the process, determination of patentability is based on the product itself. The patentability of a product does not depend on its method of production. If the product in a product-by-process claim is the same as or obvious from a product of the prior art, the claim is unpatentable even though the prior product was made by a different process." *In re Thorpe,* 777 F.2d 695, 697 (Fed. Cir. 1985) (citations omitted), citing *In re Marosi,* 710 F.2d 799, 803 (Fed.Cir.1983); and *Johnson & Johnson v. W.L. Gore,* 436 F. Supp. 704, 726 (D. Del.1977).

### F.    Leupold Cannot Distinguish The Prior Art Based On The Recited "Pre-Assembly" Step

The '305 Patent makes clear that the alleged invention is directed at manufacturing and assembly processes: "there exists a need to simplify the manufacturing and assembly processes …" ('305 Patent at 2:19-20); "[t]he present invention … facilitates the manufacturing and assembly processes …" ('305 Patent at 2:27-28); "pre-assembling the pivoting lens unit … simplifies the final assembly process and eliminates the need for special assembly tools to install the pre-assembled pivoting lens unit within the optical sighting device." ('305 Patent at 3:19-23). Consistent with the parties' stipulated construction, these passages make clear that "pre-assembly" refers to an assembly operation (step) performed prior to installing the pivoting lens unit in the housing. Notwithstanding the supposed benefits of "pre-assembly" identified by the '305 Patent, it is not a structural feature of the apparatus claims that can be used to distinguish

the prior art. "Pre-assembly" pertains to the timing of a step in the manufacturing process, but has no structural significance to the claimed product.

Regarding the claimed structural features, Leupold has not disputed that the Prior Art Nightforce Scopes comprise all of the structural features recited in asserted product claims 1, 5-8, 12-15. Leupold's sole argument is that the asserted product claims are distinguished because of the particular method of manufacture, namely that claims 1, 5-8, 12-15 allegedly require a pivoting lens unit that was "pre-assembled[3]" (Ex. 5, Byron Rebuttal Report, ¶¶ 392-94).

But, as noted above, that's not the law. *Cf. In re Nordt Dev. Co., LLC*, 881 F.3d 1371, 1375 (Fed. Cir. 2018) ("the Board typically will not accord patentable weight to a process limitation in a product-by-process claim").

Leupold's reliance on the *method of production*—pre-assembly of the pivoting lens unit—to distinguish these product claims from the Prior Art Nightforce Scopes, without reference to a single structural characteristic attributable to this method of production, is wrong as a matter of law. *Supra*, Sec. III.

As noted above, Leupold has not disputed that the Prior Art Nightforce Scopes comprise all of the structural features recited in asserted product claims 1, 5-8, and 12-15. More specifically, Leupold has not disputed that the Prior Art Nightforce Scopes contain an assembled pivoting lens unit containing the same arrangement of elements as the pivoting lens unit claimed in asserted claims 1, 5-8, and 12-15 of the '305 Patent.

---

[3] The parties have stipulated that "pre-assembled/pre-assembling" means "assembled / assembling in a separate operation, in advance of installation in the housing" (ECF No. 45 at 69, filed Sept. 29, 2017). Leupold has recently adduced a theory as to the meaning of "separate operation" that Nightforce does not agree with and that finds no support in the agreed claim construction. Such distinction is not relevant, however, to the device claims.

DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT OF INVALIDITY OF U.S. PAT. NO. 6,816,305                    13

Because there is no genuine dispute of any structural difference between the apparatus claims and the Prior Art Nightforce Scopes, summary judgment of invalidity of claims 1, 5-8, and 12-15 over Prior Art Nightforce Scopes under 35 U.S.C. § 102(b) should be granted.

A holding that claims 1, 5-8, and 12-15 are invalid as anticipated by the Prior Art Nightforce Scopes is dispositive for these claims, and the indefiniteness of these claims, as set forth in following Section IV, need not be considered if the Court rules that these claims are invalid in view of the Prior Art Night Force Scopes.

## IV.    ASSERTED CLAIMS 1, 5-8, AND 12-15 ARE INDEFINITE

Leupold argues that the asserted product claims are distinguished from Prior Art Nightforce Scopes because the claims require a particular method of manufacture.  However, if the method of manufacture is given limiting weight in product claims 1, 5-8, and 12-15, these claims are invalid under 35 U.S.C. § 112 as being indefinite for reciting both product and method elements.

Leupold does not dispute that the Prior Art Nightforce Scopes contain pivoting lens units having the arrangement of structural elements set forth in claims 1, 5-8, and 12-15 of the '305 Patent. Yet, Leupold asserts that these claims are not anticipated by the Prior Art Nightforce Scopes because disassembly and inspection of the Nightforce scopes does not and cannot establish *how* the pivoting lens units had been made (whether they had been "pre-assembled") or *when* the pivot tube had been keyed to the pivot cartridge (whether the first end of the pivot tube had been keyed to the pivot cartridge "after pre-assembly of the pivoting lens unit and before installation of the pre-assembled pivoting lens unit in the housing.") (Ex. 5, Byron Rebuttal Report, ¶¶ 387-88.)

In asserting that the Prior Art Nightforce Scopes cannot anticipate product claims 1, 5-8, and 12-15 unless it can be shown that they were made by a particular method, using a particular order of steps, Leupold is blurring the line between claims directed to methods and claims directed to products. Under the interpretation urged by Leupold, it is impossible for a skilled person to determine from a final product, *e.g.*, an assembled pivoting lens unit having all the structural limitations of claim 1, whether the product does or does not infringe claim 1. This ambiguity renders these claims indefinite and therefore invalid[4].

A.    **Claims Must Be Drawn To A Single Statutory Class**

A single patent may include claims directed to one or more of the classes of patentable subject matter, but no single claim may cover more than one subject matter class. *IPXL Holdings, L.L.C. v. Amazon.com, Inc.*, 430 F.3d 1377, 1384 (Fed. Cir. 2005). "The dichotomy between process and product classes of invention has also been recognized and noted in the following discussion in *Ex Parte Forsyth*, 151 USPQ 55, 56 (Bd. of Appeals 1965):"

> A claim such as those before us cannot be both method and apparatus. **It must be clear from its wording that it is drawn to one or the other of these mutually exclusive statutory classes of invention.** A method or process, as indicated above, is an act or a series of acts and from the standpoint of patentability must distinguish over the prior art in terms of steps, whereas a claim drawn to apparatus must distinguish in terms of structure. This is so elemental as not to require citation of authorities. The Patent Act of 1952 did not abolish the then existing different classes of invention. It reaffirmed the same by Section 101 of USC 35.

(*Ex parte Lyell,* 17 U.S.P.Q.2d 1548 (1990), quoting *Ex Parte Forsyth*, 151 U.S.P.Q. 55, 56 (Bd. of Appeals 1965) (emphasis added).

---

[4] This is in the alternative to the foregoing arguments that claims 1, 5-8, and 12-15 of the '305 patent are product claims that are invalid in view of the Prior Art Nightforce Scopes.

The second paragraph of 35 U.S.C. § 112 requires a claim to "particularly point[] out and distinctly claim[] the subject matter which the applicant regards as his invention." Its purpose is to provide "adequate notice demanded by due process of law, so that [those who approach the area circumscribed by the patent] may more readily and accurately determine the boundaries of protection involved and evaluate the possibility of infringement and dominance." (*Ex parte Lyell,* 17 U.S.P.Q.2d 1548 (1990)). A single claim which purports to be both a product or machine and a process is ambiguous and is properly rejected under 35 U.S.C. §112, second paragraph, (pre-AIA) for failing to particularly point out and distinctly claim the invention. (*Id.*). This rule is well recognized and has been incorporated into the USPTO's *Manual of Patent Examination Procedure* § 2173.05(p)(II)(Ninth Edition, Revision 08.2017) ("A single claim which claims both an apparatus and the method steps of using the apparatus is indefinite under 35 U.S.C. §112(b) or pre-AIA 35 U.S.C. §112, second paragraph.").

### B.    The '305 Product Claims Are Not Properly Drawn to a Single Statutory Class

Product claims 1, 5-8, and 12-15 are invalid under 35 U.S.C. § 112 as being indefinite for reciting both product and method elements. The two independent claims, claims 1 and 8, both recite product and method elements, according to Leupold's interpretation, and the remaining claims of this group depend from claim 1 or claim 8. As such, all of asserted 'product' claims contain a mixture of product and method elements as Leupold interprets and applies them.

Claim 1 recites a product ("A pre-assembled pivoting lens unit") with structural elements ("pivoting cartridge," "pivot tube," and a "fastener,") but then also introduces temporal method steps ("*after* pre-assembly" and "*before* installation").

> 1. **A pre-assembled pivoting lens** unit for installation into a tubular housing of an optical sighting device, the housing having a longitudinal axis, the lens unit comprising:
>
> **a pivot cartridge** sized to be at least partially received within the housing;

**a pivot tube** having a longitudinal axis, the pivot tube comprising:

a first end pivotably coupled to the pivot cartridge

a second end extending from the pivot cartridge and movable transversely to the longitudinal axis of the housing, and

a lens assembly disposed within the pivot tube between the first and second ends; and

**a fastener** pivotally securing the pivot tube to the pivot cartridge, the first end of the pivot tube being keyed to the pivot cartridge independent of the housing to thereby limit rotation of the pivot tube about its longitudinal axis relative to the pivot cartridge **after pre-assembly** of the pivoting lens unit and **before installation** of the pre-assembled pivoting lens unit in the housing.

Claim 8 recites a product ("An optical sighting device") with structural elements ("a tubular housing," "pivoting cartridge," and "a pre-assembled pivoting lens unit," having a "pivoting cartridge," "pivot tube," and a "fastener") but then also introduces temporal method steps ("*after* pre-assembly" and "*before* installation").

8. **An optical sighting device**, comprising:

**a tubular housing** having a longitudinal axis; and

**a pre-assembled pivoting lens** unit at least partially received within the housing, the lens unit comprising:

**a pivot cartridge** coupled to the housing;

**a pivot tube** having a longitudinal axis, the pivot tube comprising:

a first end pivotably coupled to the pivot cartridge,

a second end extending from the pivot cartridge and movable transversely to the longitudinal axis of the housing, and

a lens assembly disposed within the pivot tube between the first and second ends, the first end of the pivot tube being keyed to the pivot cartridge independent of the housing to thereby limit rotation of the pivot tube about its ion longitudinal axis relative to the pivot cartridge **after pre-assembly** of the pivoting lens unit and **before installation** of the pre-assembled pivoting lens unit in the housing; and

**a fastener** pivotally securing the pivot tube to the pivot cartridge.

The mixture of product/device claims with temporal method steps is fatal. All of these asserted product claims (claims 1, 5-8, and 12-15) are indefinite under 35 U.S.C. § 112 and therefore invalid.

DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT OF INVALIDITY OF U.S. PAT. NO. 6,816,305                    17

Leupold has confirmed that it is intended that apparent method steps are properly read as method steps and are elements of the claims. For example, Leupold asserts that to be "pre-assembled" in accordance with the claims 1, 5-8, and 12-15, the pivoting lens unit of the prior art Prior Art Nightforce Scopes must have been assembled in advance, in a separate operation (Ex. 5, Byron Rebuttal Report, ¶ 388). Leupold goes on to assert that the Prior Art Nightforce Scopes do not anticipate the claims of the '305 Patent because the Nightforce products were not *necessarily* pre-assembled.

In addition, Leupold's expert witness David Byron characterizes having been "pre-assembled" as an element of the '305 claims, including product claims 1 and 8 (*Id.,* Byron Rebuttal Report, ¶¶ 387 and 391-392):

> 392. Furthermore, I have seen no evidence indicating whether the pivoting erector portions of the 1995-2001 Nightforce Scopes were each assembled on an as-needed basis in a single continuous operation of scope assembly, or were each assembled in a separate operation. Nothing in the Bates Report addresses whether the pivoting lens units of the 1995-2001 Nightforce Scopes were assembled in advance of installation in a separate operation, and I have identified no evidence indicating that such advance assembly took place in a separate operation prior to the invention of the '305 patent, as is required for "pre-assembly" under the claim construction agreed and stipulated by the parties[5].

(*Id.,* Byron Rebuttal Report, ¶ 392.)

Again, Leupold asserts that *product* claims 1, 5-8, and 12-15 require performance of the *method* of **pre-assembling** the pivoting lens unit. Consistent with this, Leupold's expert David Byron, a person held out as one of skill in the art, reads claim 1 as being directed to **both** a method ***and*** apparatus:

---

[5] Nightforce has not and does not acquiesce to Byron's further *interpretation* of the jointly stipulated meaning of "pre-assembled/pre-assembling."

12    Q. Okay. Let's turn to claim 1 of the '305 patent.
13        Let me know when you are there in column 6.
14    **A. Yes. I'm there.**
15    Q. And some of the claims in this patent are directed
16        to manufacturing methods and some are directed to
17        devices. What is claim 1 directed to?
18        Specifically, a method of manufacture or a device or
19        something else if you believe it's something else?
20    **A. I think this is both method and apparatus.**

(Ex. 6, Byron Deposition Transcript, 130:12-20.)

Under the reading urged by Leupold, each of claims 1, 5-8, and 12-15 would require both

the recited pre-assembling method step <u>and</u> the claimed product. Leupold's interpretation is

wrong, but in any event, claims 1, 5-8, and 12-15 are unclear in their wording as to whether they

are drawn to a method <u>or</u> a product, as evidenced by the Byron Rebuttal Report and the Byron

Deposition.

Whether the claims are directed to both a method <u>and</u> a product, or whether it is unclear

whether these claims are directed to a method <u>or</u> a product, render claims 1, 5-8, and 12-15

indefinite under 35 U.S.C. § 112, ¶ 2 (pre-AIA) for failing to particularly point out and distinctly

claim the invention, and are consequently invalid. Summary judgment is appropriate, as there are

no disputed facts and this is a question of law.

## V.    PRIOR ART NIGHTFORCE PRODUCTS <br> <u>ANTICIPATE THE ASSERTED METHOD CLAIMES</u>

The asserted '305 method claims (claims 26 and 27) are anticipated by the Prior Art

Nightforce Scopes. Leupold has not disputed that such prior art scopes teach all of the structural

elements of these claims, *e.g.*, a pivot tube and a pivot cartridge that are pivotally coupled. The

structures of the Prior Art Nightforce Scopes necessarily require the steps of method claims 26

and 27—and disassembly of one of these scopes discloses how it was assembled in accordance

with claims 26 and 27. Thus, claims 26 and 27 are both anticipated by the Prior Art Nightforce

Scopes.

### A.     The Prior Art Nightforce Scopes Anticipate The Asserted Method Claims

Claim 26 of the '305 Patent recites:

> A method for manufacturing an optical sighting device, comprising:
>
> (a) providing a **tubular housing**, the housing having a longitudinal axis;
>
> (b) **pre-assembling a pivoting lens unit**, the lens unit including:
>
> (i) **a pivot cartridge** sized to be at least partially received by the housing,
>
> (ii) **a pivot tube**, the pivot tube including a first end movably coupled to the pivot cartridge and a second end extending from the pivot cartridge, the second end being rotatable transversely of the longitudinal axis of the housing, and
>
> (iii) **a lens assembly disposed within the pivot tube** between the first and second ends;
>
> (c) positioning the pivoting lens unit in said housing; and
>
> (d) securing the pivot cartridge within the housing.

Claim 27 of the '305 Patent recites:

> A method of manufacturing a riflescope, comprising the steps of:
>
> (a) **pre-assembling a pivoting lens unit** for insertion into a tubular housing of the riflescope having a longitudinal axis by the steps of:
>
> (i) pivotally seating a lens-holding **pivot tube** in a **pivot cartridge** so that the pivot tube is pivotable transversely to the longitudinal axis of the housing when the pivoting lens unit is installed in the housing, and, and
>
> (ii) after pivotally seating the pivot tube in the pivot cartridge, attaching a **fastener** to the pivot cartridge to retain the pivot tube to the pivot cartridge;
>
> (b) positioning the pre-assembled pivoting lens unit in the housing; and
>
> (c) securing the pre-assembled pivoting lens unit in the housing.

It is not disputed that the Prior Art Nightforce Scopes comprise a tubular housing, or that

the pivoting lens unit of the prior art scopes comprised a pivot cartridge sized to be at least

partially received by the housing, a pivot tube, and a lens assembly disposed within the pivot

tube between the first and second ends. (Ex. 4, Infringement Contentions; Ex. 3, Invalidity

Contentions; Ex. 2, Byron Report; Exs. A-B, Johnson Decl.) However, Leupold asserts that the

Prior Art Nightforce Scopes do not convey or disclose to the skilled person a method in which

the pivot tube is coupled to the pivot cartridge before these parts are installed in a housing as

claimed in claims 26 and 27.

A pivoting lens unit shown in the Nightforce 1996 catalog (Johnson Decl., Ex. A at 13) is

reproduced below.  The Nightforce 1996 catalog image is labeled to show the pivot tube, pivot

cartridge, and keying screw of the pivoting lens unit of a riflescope. *(Id.,* Johnson Decl., ¶8)



*Figure 1*

The pivot tube, pivot cartridge, and keying screw of the pivoting lens unit from a 2001

Nightforce 3.5-15x50 NXS are shown in photographs the Invalidity/Unenforceability

Contentions submitted to Plaintiff Leupold & Stevens, Inc. ("Leupold") by Defendant Lightforce

USA, Inc. ("Nightforce") on March 15, 2017 ("Invalidity Contentions"). (Johnson Decl. Ex. C.)

The structure and assembly of the pivoting lens unit and its installation in the housing/tube of

this 3.5-15x50 NXS riflescope is representative of the structure of the other 1995-2001

Nightforce scopes (Johnson Decl., ¶11; Ex. C).

In the Invalidity Contentions, the top photograph in the third column page 91 shows a

partially disassembled pivoting lens unit from this riflescope. A portion of that photograph is

shown below, enlarged to show detail. In this image, the keying screw has been removed from the pivoting lens unit and the pivot cartridge surrounding the end of the pivot tube has been separated from the end of the pivot tube.



*Figure 2*

The photograph above in Figure 2 shows that the pivot tube has a threaded hole that engaged the keying screw prior to removal of the keying screw. The photograph also shows that the pivot cartridge has a slot opening in it. Prior to its removal, the keying screw was positioned in this slot through the pivot cartridge and was engaged in the threaded hole in the pivot tube.

(Johnson Decl., ¶ 13; Ex. C.)

In assembly of a pivoting lens unit from the parts shown in the photograph, the pivot cartridge is placed over and around the end of the pivot tube so that the slot in the pivot cartridge is aligned with the hole in the pivot tube. The keying screw is installed from the outside of the pivot cartridge, through the slot in the pivot cartridge into the threaded hole in the pivot tube, as indicated in the photograph. (*Id.,* Johnson Decl., ¶ 13.)

The design of these components in Prior Art Nightforce Scopes was such that the keying screw *must* be inserted and removed outside of the riflescope housing as there was no physical space that permitted insertion or removal of the screw when the lens unit was positioned inside the riflescope housing.  (Stockdill Decl., ¶ 14; Ex. D.) Once inserted through the pivot cartridge and into the pivot tube, the keying screw keys the pivot tube to the pivot cartridge and limits rotation of the pivot tube around its longitudinal axis relative to the pivot cartridge. When the keying screw is installed through the pivot cartridge and into the threaded hole in the pivot tube, the pivot cartridge cannot be removed from the pivot tube.  (Johnson Decl., ¶ 15; Ex. C.) A lock ring further fastened the pivot tube to the pivot cartridge, and sets the tension of the pivot between the pivot tube and the pivot cartridge. (Stockdill Decl., ¶ 14; Ex. D.)

These facts are not in dispute. Leupold's expert, Mr. Byron admits in his rebuttal expert report that the prior art Nightforce scopes keyed the pivot tube to the pivot cartridge via the screw outside of the housing. Mr. Byron's only alleged difference here is whether the final lock ring was installed before or after the keyed pivoting lens unit was placed into the housing (a point addressed further below).

> "**I understand that, in the 1995-2001 Nightforce Scopes, the erector is keyed to the pivot cartridge via a screw through the outside of the pivot cartridge. Based on the information I have reviewed, once this screw has been installed outside of the scope housing, the pivot cartridge and erector may be seated in the scope body**, and the lock-ring may be installed

> separately into the scope body over the rear end of the pivot cartridge to
> secure the erector within the pivot cartridge."

(Ex. 5, Byron Rebuttal Report, page 170-171 (emphasis added)).

In the Prior Art Nightforce Scopes, when the keying screw has been inserted through the pivot cartridge into the pivot tube, the screw is fastened to both the pivot tube and the pivot cartridge. The pivot tube and the pivot cartridge are coupled in a manner that is both moveable and pivotable, and they cannot be uncoupled or taken apart unless the keying screw is removed. A first end of the pivot tube is fastened to the pivot cartridge, and the pivot tube is pivotable with respect to the pivot cartridge such that, if installed in a tubular housing, a second end of the pivot tube is movable across the longitudinal axis of the housing. (Johnson Decl., ¶16; Ex. C.)

These undisputed facts are sufficient on their own to anticipate claim 26 and 27 of the '305 Patent. As noted above, there is no dispute that all of the parts recited in the claims are present in the Prior Art Nightforce Scopes. The only potential dispute is the order of steps of assembly. However, Leupold's acknowledgment that the pivoting lens unit was at least pre-assembled by the act of keying the pivot cartridge to the pivot tube with the keying screw *outside of the scope housing* is alone sufficient to meet the claimed method steps. (*See* Figures 1-2, above; Ex. 5, Byron Rebuttal Report, page 170-171.)

Claim 26 requires that a tubular housing is provided. There is no dispute that Prior Art Nightforce Scopes were manufactured using a step where a tubular housing was provided. Claim 26 further requires that a pivoting lens unit containing a pivot cartridge, a pivot tube, and a lens assembly disposed in the pivot tube be pre-assembled. As noted above, there is no dispute that the pivot cartridge was keyed to the pivot tube (which contains the lens assembly) with a keying screw. *See* Figures 1-2, above. As such, this step is found in the Prior Art Nightforce Scopes. There is no dispute that the remaining two steps of positioning the pivoting lens unit in the

DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT OF INVALIDITY OF U.S. PAT. NO. 6,816,305                                    24

housing and securing the pivot cartridge in the housing are steps that were conducted in the prior art Nightforce scope manufacture. Thus, all of the elements of claim 26 are found in the manufacturing process used to make the Prior Art Nightforce Scopes—and disclosed by disassembling a scope—according to Leupold's own expert. (*See* Ex. 5, Byron Rebuttal Report, page 170-171.)

The same is true of claim 27. Step one of claim 27 requires pre-assembling a pivoting lens unit using two sub-steps. First, the lens-holding pivot tube is pivotally seated in the pivot cartridge. This step is not in dispute. Second, a fastener is attached to the pivot cartridge to retain the pivot tube to the pivot cartridge. Leupold has assumed that the lock ring of the Prior Art Nightforce Scopes accomplishes this task (it does), and argues that while the lock ring might have been added prior to placing the pivoting lens unit in the housing, it might have occurred afterwards. Setting this point aside for now, the <u>keying screw</u> is <u>also</u> a fastener that attaches to the pivot cartridge to retain the pivot tube to the pivot cartridge. Leupold does not dispute that the prior art scopes were manufactured with this screw added prior to positioning the lens unit in the housing (nor could Leupold reasonably dispute this point, as it is physically impossible to insert this screw once the lens unit is in the housing). (*See* Figures 1-2, above.) And that process is disclosed by examining the Prior Art Nightforce Scopes. There is no dispute that the remaining two steps of positioning the pivoting lens unit in the housing and securing the pivoting lens unit in the housing are steps that were conducted in the prior art Nightforce scope manufacture. Thus, there is no genuine dispute that all of the elements of claim 27 are indeed found in the manufacturing process used to make the Nightforce scopes.

**B.**     **Skilled Artisans Would Infer That Nightforce's
Prior Art Methods Anticipate Claims 26 And 27**

The Prior Art Nightforce Scopes were manufactured by a contract manufacture, Light

Optical Works (LOW) in Japan and delivered to Nightforce in the United States for sale.

Leupold may attempt to argue that manufacturing steps occurring in Japan do not qualify as prior

art under 35 U.S.C. § 102. This argument fails. It is well recognized that a manufacturing method

or process claim is anticipated (or obvious) where the method of manufacture is revealed by

inspection of a publicly known, used, sold, or offered for sale product produced therefrom.  It is

only when the evidence demonstrates that the public <u>could not</u> learn the claimed process from

the product that the manufacturing method is shielded from invalidity.  *See e.g.*, *W.L. Gore &

Associates v. Garlock, Inc.*, 721 F.2d 1540, 1550 (Fed. Cir. 1983) ("Assuming, arguendo, that

Budd sold tape produced on the Cropper machine before October 1969, and that that tape was

made by a process set forth in the claim of the '566 patent, the issue under § 102(b) is whether

that sale would defeat Dr. Gore's right to a patent on the process inventions set forth in the

claims. . . .  Neither party contends, and there was no evidence, that the public could learn the

claimed process by examining the tape. . . . The district court therefore erred as a matter of law in

applying the statute and in its determination that Budd's secret use of the Cropper machine and

sale of tape rendered all process claims of the '566 ptaent invalid under § 102(b).").  The District

Court in *Transweb, LLC v. 3M Innovative Prop. Co.*, 16 F. Supp. 3d 385, 395 (D. N.J. 2014),

applied this standard, citing *W.L. Gore*, to find that physical samples of a material distributed at a

trade show anticipated method of manufacture claims, noting that "[f]or the Expo samples to

qualify as prior art against 3M's patented method, a person of ordinary skill in the art must be

able to determine TransWeb's method from analyzing these samples."  The Court found

evidence that reverse engineering did in fact happen as well as evidence that analytical testing

(reverse engineering) *could* reveal the method sufficient. *Id.* at 396.

      For any prior art reference, the anticipation issue is whether "one skilled in the art would

reasonably understand or infer from" the reference, the claimed combination. *In re Baxter*

*Travenol Labs.*, 952 F.2d 388, 390 (Fed. Cir. 1991); *accord Blue Calypso, LLC v. Groupon, Inc.*,

815 F.3d 1331, 1344 (Fed. Cir. 2016) (a "skilled artisan would 'at once envisage' the

combination"). Here even if the skilled artisan thought an alternative manufacturing technique

was theoretically possible, that artisan would have reasonably understood, inferred and

envisioned the devices having been pre-assembled in the manner claimed based on nothing more

than inspecting the Prior Art Nightforce Scopes.

      Leupold's infringement contentions relied on exactly this type of analysis in reaching

their conclusion of infringement. Moreover, Mr. Byron, Leupold's expert, admits that his review

of the prior art scopes showed him that the pivoting lens unit was keyed to the pivot cartridge

outside of the housing. (*See* Ex. 5, Byron Rebuttal Report, page 170-171.) This is sufficient to

anticipate the claims.

## VI.    <u>THE ASSERTED CLAIMS ARE INVALID AS OBVIOUS</u>

      As discussed above, the "pre-assembled" limitation is the only claim element that is in

arguably dispute with respect to either the apparatus claims or the method claims. Nightforce

contends that this is not a genuine dispute.

      In the event the Court determines that there is a genuinely disputed issue as to

anticipation of the "pre-assembled" and "preassembly" limitations, the asserted claims are

nonetheless invalid as obvious.

A.    **The Law Of Obviousness**

Patent invalidity under obviousness is ultimately a question of law, but must be grounded in factual inquiries. *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17 (1966). These inquiries include: (1) the scope and content of the prior art; (2) the differences between the claims and the prior art; (3) the level of ordinary skill in the pertinent art; and (4) secondary considerations. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). Additionally, obviousness is concerned with "whether a skilled artisan not only *could have made* but *would have been motivated to make* the combinations or modifications of prior art to arrive at the claimed invention." *Belden Inc. v. Berk-Tek LLC*, 805 F.3d 1064, 1073 (Fed. Cir. 2015) (emphasis in original).

In appropriate circumstances, a patent may be found obvious in view of a single prior art reference if an obvious modification of the reference produces the claimed invention. *See, e.g.*, *George M. Martin Co. v. Alliance Mach. Sys. Int'l LLC*, 618 F.3d 1294, 1302-04 (Fed. Cir. 2010) (determining that two separate mechanical devices each rendered the patented product obvious); *B.F. Goodrich Co. v. Aircraft Braking Sys. Corp.*, 72 F.3d 1577, 1582 (Fed. Cir. 1996) (finding the patented method for a break assembly obvious in view of a single reference); *Belden Inc.*, 805 F.3d at 1074 (method for manufacturing an insulated cable invalidated by single patent reference). Printed publications or articles of manufacture may act as a single reference for purposes of obviousness. *See Martin*, 618 F.3d at 1300-1302 (assembly line machinery constituted invalidating prior art); *B.F. Goodrich*, 72 F.3d at 1583 (single printed publication rendered the asserted method obvious).

If the obviousness inquiry results in no genuine dispute of material fact, summary judgment is available and should be granted. *See Tokai Corp. v. Easton Enter., Inc.*, 632 F.3d

1358, 1366-70 (Fed. Cir. 2011) (affirming lower court's grant of summary judgment that the claimed safety mechanism was obvious); *Martin*, 618 F.3d at 1296 (aff'g judgment as a matter of law, finding no dispute of fact); *KSR Int'l*, 550 U.S. at 426-27 (holding that when "obviousness of the claim is apparent in light of [the *Graham* factors], summary judgment is appropriate").

The Supreme Court and Federal Circuit have recognized that the mechanical arts may be invalidated more readily through a showing of motivation or suggestion to modify the prior art because known problems are likely within the technical and creative grasp of the skilled artisan. *KSR*, 550 U.S. at 421; *Tokai*, 632 F.3d at 1371-72. Additionally, when testimony indicates "that there were only a discrete number of possible design options" for modifying the art, the results when expected, stem from "ordinary skill and common sense." *Martin*, 618 F.3d at 1302 (emphasis added) (citation omitted). However, the motivation or suggestion "need not be expressly stated." *B.F. Goodrich*, 72 F.3d at 1582-83.

In *Martin*, the Federal Circuit held that testimony demonstrating only three possible locations for the "compliance structure" in either the claimed apparatus or single reference "is exactly the type of 'finite number of identified, predictable solutions' that justifies a legal conclusion that the result, when expected, is 'the product not of innovation but of ordinary skill and common sense.'" 618 F.3d at 1302 (quoting *KSR*, 550 U.S. at 421). Similarly, regarding the second reference, testimony revealed that enlarging the platforms of the second machine would have been the "straightforward" and "simple solution" to addressing the spacing between the pressurized platforms, the expected result of applying a "fundamental and basic principle of physics." *Id*. at 1303-04. In concluding obviousness, the court in *Martin* implied that the knowledge of a person of ordinary skill and the minor differences between the claims and prior art, were alone sufficient to provide the motivation or suggestion. *Id*. at 1302-04; *see also B.F.*

*Goodrich*, 72 F.3d at 1583 (holding that where only minor variations exist between the claims and single reference, and testimony indicates the variations would have been "logical" or "obvious" to a person of ordinary skill, the teachings of the prior art are alone sufficient to provide suggestion and motivation).

###### B.    The Prior Art Nightforce Scopes Render Obvious The Asserted Claims

As discussed throughout, there is no dispute that Prior Art Nightforce Scopes included a pivoting lens unit, and that the only disputed issue is the timing of assembly of the pivoting lens unit; i.e., before or after installation of the unit into the housing.

Leupold's own expert, Mr. Byron, admitted that the Prior Art Nightforce Scopes may have been manufactured according to the claimed steps; i.e., where the pivoting lens unit was "pre-assembled." (Ex. 5, Byron Rebuttal Report, ¶ 393.) But Mr. Byron also suggested one other possible alternative regarding the installation of the pivoting lens unit. Specifically, he stated that the final lock ring theoretically could have been added to the keyed pivoting lens unit <u>after</u> it was inserted into the housing. This argument is summarized in paragraph 393 of Mr. Byron's rebuttal report:

> In sum, regarding point (a)—whether the pivoting erector portions of the 1995-2001 Nightforce Scopes must have been pre-assembled, based on my specialized knowledge, experience, training, and skill, it is my opinion is that the pivoting erector portions of the 1995-2001 Nightforce Scopes may have been assembled outside the scope body, but not necessarily since they could have been assembled in the scope body by fastening the lock-ring retainer onto the rear of the pivot cartridge within the scope body.

Mr. Byron's theory is not tenable. First, Mr. Byron acknowledged during his deposition that he does not have personal experience or knowledge about lens unit manufacture and assembly into riflescopes. (Ex. 6, Byron Deposition Transcript, 34:1-36:4.)  The degree to which the lock ring is tightened sets the tension of the pivot tube (see Ex. D, Stockdill Decl., ¶ 14). Mr. Bryon acknowledged the criticality of setting the tension correctly, acknowledging that if it is set

incorrectly a riflescope will not function.  This was in response to questioning about paragraph

17 of his report, which states: "Pivoting lens units that are pre-assembled to form the pivot join

[sic] prior to installation in the riflescope housing (main tube) can be tested for proper fit and

pivot tension before inserting them into the riflescope housing." (Ex. 2, Byron Infringement

Report, paragraph 17).

> Q. Why is pivot tension important?
> A. Because you need to be able to have precise aim.
> Q. If it's adjusted incorrectly, what's the consequence of that?
> A. You won't hit your target.
> Q. Is the riflescope useful anyway, though?
> A. It looks nice.
> Q. So it would be useful as a decoration?
> A. Well, if you can't hit your target, then what good is it?

(Ex. 6, Byron Deposition Transcript, 189:4-13.)

Because the lock ring sets the tension, Mr. Byron's hypothetical alternative

manufacturing method is not a credible alternative for the Prior Art Nightforce Scopes according

to his own testimony. His theoretical one alternative way the Prior Art Nightforce Riflescopes

could have been assembled is nonsensical—it would not have produced functional riflescopes.

When pointedly asked about the illogic of adding the lock ring after installation of the keyed

pivot cartridge/pivot tube to the housing, Mr. Byron could only dodge this issue by pointing to

the fact that sometimes companies do illogical things or suggesting that LOW might have used

the old prior art techniques of assembling parts one-by-one—techniques that Mr. Byron

understood were not used in Nightforce's manufacturing methods as disclosed by inspection of a

Prior Art Nightforce Scope. (*See* Ex. 5, Byron Rebuttal Report, page 170-171; Ex. 6,  Byron

Deposition Transcript, 231:2-233:2.)

Even if Mr. Byron's "second" option was considered a real possibility by a skilled

artisan, that leaves the skilled artisan who reviewed the scope's construction with two options for

manufacturing such a scope: 1) the claimed method where all of the components of the pivoting lens unit were pre-assembled prior to placement of the lens unit in the scope housing; or 2) where everything was added except the lock ring prior to placement of the lens unit in the scope with the lock ring added afterwards. All evidence demonstrates that option 1 is superior (indeed, the only viable option). Regardless, given only two options, with no motivation or suggestion to select the second option over the superior first option, the first option (*i.e.*, the claimed manufacturing method) is an obvious choice. And it's the only choice that makes sense because setting the pivot tension is easily done outside the scope housing using option 1, and the scope is worthless without setting that tension. (*See* Ex. 6, Byron Deposition Transcript, 189:4-13.) With only a discrete number of possible design options (indeed, only one viable one), that option is obvious absent evidence to the contrary. *See KSR*, 550 U.S. at 421. Leupold has adduced no credible evidence to the contrary. Indeed, Leupold filed suit based on a tear down of a Nightforce scope, leading Leupold to the conclusion that the scope was manufactured by the claimed method. However, Leupold applies a different standard when it comes to inspecting a prior art scope—blinders prevent it from seeing that the Prior Art Nightforce Scope was made by the claimed method based on a simple tear down of the scope. Leupold should not be allowed to have it both ways. The same standard should be applied to Leupold regardless whether the inspection is to determine infringement or invalidity—if Leupold was able to discern whether accused scopes were made according to the '305 Patent by inspection, a person of skill in the art also can discern whether prior art scopes were made according to the '305 Patent by inspection.

Likewise, no credible arguments of secondary considerations prevent a finding of obviousness. The fact that Nightforce was using the technology for many years before Leupold's patent filing (and before Leupold's alleged invention date) contradicts any allegations

of Leupold solving a long-felt but unmet need (i.e., Nightforce had already independently and earlier solved any such need).  Leupold has not identified evidence demonstrating any secondary considerations of non-obviousness in discovery. (*See, e.g*., Ex. 1, Leupold's Response to Interrogatory No. 14 at 10-11.)

If not invalid as anticipated, all asserted claims in the '305 Patent are invalid as obvious.

## VII.  **CONCLUSION**

For the reasons stated, the Court should grant partial summary judgment that (1) each asserted claim product claim (claims 1, 5-8, and 12-15) of  the '305 Patent is invalid for anticipation or obviousness; (2) each asserted method claim (26 and 27) of the '305 Patent is invalid for anticipation or obviousness; and (3) to the extent that Leupold takes the position that claims 1-25 are both device and method claims, then claims 1-25 are invalid as indefinite.

DATED October 5, 2018

Respectfully submitted,

By:  *s/Scott E. Davis*
Scott E. Davis, OSB No. 022883
Email: scott.davis@klarquist.com
Todd M. Siegel, OSB No. 001049
Email:  todd.siegel@klarquist.com
KLARQUIST SPARKMAN, LLP

David A. Casimir, *pro hac vice*
Email: dacasimir@casimirjones.com
CASIMIR JONES, S.C.

*Attorneys for Defendant*
LIGHTFORCE USA, INC.

DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT OF INVALIDITY OF U.S. PAT. NO. 6,816,305                    33