1          IN THE UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF OREGON

3

LEUPOLD & STEVENS, INC.,          )

4                                 )
              Plaintiff,          ) No. 3:16-cv-01570-HZ

5                                 )
          vs.                     ) December 17, 2018

6                                 )
LIGHTFORCE USA, INC. doing        ) Portland, Oregon

7  business as NIGHTFORCE OPTICS   )
   doing business as NIGHTFORCE    )

8  USA,                           )
                                  )

9              Defendant.         )
   --------------------------------

10

11

12

13

14

15
                     **MOTION HEARING**

16
                TRANSCRIPT OF PROCEEDINGS

17
         BEFORE THE HONORABLE MARCO A. HERNANDEZ

18
           UNITED STATES DISTRICT COURT JUDGE

19

20

21

22

23

24

25

```
1                        APPEARANCES

2    FOR THE PLAINTIFF:    Brian C. Park
                           Stoel Rives LLP
3                          600 University Street
                           Suite 3600
4                          Seattle, WA  98101

5                          Nathan C. Brunette
                           Elliott J. Williams
6                          Stoel Rives LLP
                           760 S. W. Ninth Avenue
7                          Suite 3000
                           Portland, OR  97205
8
     FOR THE DEFENDANT:    David A. Casimir
9                          Casimir Jones S.C.
                           2275 Deming Way
10                         Suite 310
                           Middleton, WI  53562
11
                           Scott E. Davis
12                         Todd M. Siegel
                           Klarquist Sparkman, LLP
13                         One World Trade Center
                           121 S. W. Salmon Street
14                         Suite 1600
                           Portland, OR  97204
15
     COURT REPORTER:       Nancy M. Walker, CSR, RMR, CRR
16                         United States District Courthouse
                           1000 S. W. Third Avenue, Room 301
17                         Portland, OR  97204
                           (503) 326-8186
18

19

20

21

22

23

24

25
```

P R O C E E D I N G S

 1
 2          THE COURT:  Have a seat.
 3          THE CLERK:  Your Honor, we're here today for oral
 4  argument on the parties' cross-motions for summary judgment in
 5  the matter of Leupold & Stevens, Inc. versus Lightforce USA,
 6  Inc., Case No. 16-cv-1570.
 7          Counsel, please state your appearances for the
 8  record.
 9          MR. PARK:  Hello, Your Honor.  I'm Brian Park for the
10  plaintiff, Leupold & Stevens.
11          I'll let my co-counsel introduce themselves, but I
12  would like to introduce a client representative we have here,
13  Ms. Mikael Crowther, who is the legal manager at Leupold.
14          THE COURT:  I'm sorry.  Who is the legal manager of
15  the --
16          MR. PARK:  At Leupold & Stevens.
17          THE COURT:  Oh, thank you.
18          MR. BRUNETTE:  Your Honor, Nathan Brunette.
19          MR. WILLIAMS:  Elliott Williams for Leupold.
20          MR. DAVIS:  Good afternoon, Your Honor.  Scott Davis
21  of Klarquist Sparkman for defendant.
22          MR. CASIMIR:  And David Casimir for defendant.
23          THE COURT:  Welcome.
24          Let's reason together for a minute.  We have two
25  hours scheduled for this afternoon, I think.  You've given

1   me -- I don't know -- eight patents, some of them rolled into

2   one, some of them not, and hundreds of pages of documents to

3   review and understand.

4            I'm thinking that I've given you two hours, and that

5   may not be enough for you to cover all the material that you'd

6   like to cover in support of your summary judgment motions,

7   which is one of the reasons I asked you to bring your

8   calendars.

9            And I can make you race through the two hours that we

10  have, and I'll give you an hour and you an hour, and I'll go

11  back and figure out the rest on my own, or I can give you some

12  more time -- but it won't be today -- in order to give you a

13  little more time to present your cases in a way where you're

14  not feeling the pressure of time.

15           The other thing that is apparent to me is that your

16  trial date is going to get struck.  I'm not taking you to

17  trial in April.  And what I want to do on that issue is I want

18  to give you the results of your summary judgment motions; and

19  then after you have those, get us back together and get a

20  realistic trial date based on my rulings, as opposed to trying

21  to squeeze everything in between now -- and I think we were in

22  April for trial.  That's just not going to work.

23           So maybe -- and I can -- you know, I can find

24  somewhere in the not-too-distant future maybe a whole day for

25  you to finish up with your summary judgment stuff or a half a

1　　day, whatever you think you might need to kind of wrap it up

2　　in a more thoughtful way.  Because I'll tell you that I have

3　　a -- I'm good at mechanics.  I get them.  And this is mostly a

4　　mechanical case.  But there are some things that are a little

5　　bit puzzling to me and some legal issues that I think we're

6　　going to wrestle with, trying to get to the answers that

7　　you're all asking me to arrive at.

8　　　　　　　The only certainty that I do have is that the case is

9　　not going to end at summary judgment.  There's no way.  It's

10　　going to march on.  And I think that's probably true from both

11　　sides requesting summary judgment.  The case is not ending

12　　after we have oral argument.  That, I'm pretty confident, is

13　　going to be the case, so that there will be at least some

14　　things to take to the jury.

15　　　　　　　The other thing I understand is you all have another

16　　case in front of Judge Acosta.  I don't know who the backup

17　　judge is in that particular case.  I was visiting with him

18　　this afternoon briefly and just kind of asking him what his

19　　case is about.  He said his case is about cross-hairs, which

20　　is a different issue than the case you have.  And I don't know

21　　if -- you're the plaintiff in that case, and you're the

22　　defendant in that case, different patents, which must have

23　　been why, at some point, somebody decided that it didn't need

24　　to be consolidated with this case and brought to me.

25　　　　　　　That's an issue that I'm willing to revisit at some

point.  And I can assign myself to be the backup judge behind
Judge Acosta.  And at some point, if you all think it makes
sense to put things together, then I'm willing to think about
that.

Some other things that we should reason about
together:  This case, as I look at the number of patents and
the number of arguments that you all are putting on the table,
leads me to conclude that inevitably -- inevitably, when you
get in front of a jury and you spend two or three weeks
presenting all of the information you want to be decided in
front of a jury, and they are set to deliberate on this case,
they will be lost.  This patent case is just simply -- if it
was one patent, maybe.  You have eight patents or so.  I don't
remember what the number is.  You've got a lot of them.  It's
my impression that they will not grasp -- if anticipation, for
example, or obviousness is still on the table and the theories
behind those things, I don't think they're going to get it.

So my thought is you should at least have a
conversation amongst yourselves as to whether or not it makes
sense to present these matters to a jury over the course of
three weeks.  I've been there, and I've done that.  It is my
suggestion that it just may be too much for them to grasp.
And what I think sometimes can happen in those cases is the
jury, because they are lost, they negotiate.

So think about that and whether or not it might be

1    better, after conferring, to waive jury in this matter and

2    present the matter to the Court.  I have plenty more time.  I

3    get to interrupt and ask questions.  There's just a lot more

4    flexibility when you have a judge deciding as opposed to a

5    jury.  But, again, that's your decision.  I'm just telling you

6    what my observations have been in these kinds of cases.

7              So let's talk about this afternoon right now.  And

8    Jennifer right now is looking through the calendar trying to

9    figure out where we might find another day or so to finish up

10   summary judgment, so you don't have to rush through this

11   afternoon.

12             And let me first turn to the plaintiffs.  Do you have

13   any responses to my suggestions or ideas right now?  And, if

14   so, now is a good time to let me know.

15             MR. PARK:  Thank you, Your Honor.

16             Yes, the Court's assessment of the time demands is on

17   point.  I'm sure both sides have been challenged trying to

18   boil everything down for purposes of today's presentation.  So

19   to the extent the Court is agreeable to giving us more time

20   for a second hearing on summary judgment, I think that would

21   be welcomed by both sides.  It will allow us to go into more

22   detail in a more methodical way, rather than just speeding

23   through everything to try to get it in the record.

24             THE COURT:  Okay.

25             Does that make sense to you, from the defense

1   perspective?

2          MR. CASIMIR:  Yes.  Trying to fit everything in today

3   I think -- I'm assuming both sides had a plan to prioritize a

4   few and then, if we had to, just let the others go on the

5   papers.

6          What might inform this is the parties did agree,

7   coming into today, that there were two patents in particular

8   that seemed most relevant.  And I think where we're both

9   deeming most relevant -- and this is the '305 patent and the

10  '907 patent, because over 90 percent of the alleged monetary

11  damages tie to those two patents.

12         THE COURT:  Oh, okay.

13         MR. CASIMIR:  A number of the other ones, the

14  economics are small enough that there's a question about

15  whether we'd be spending more money fighting about it than the

16  case is worth, I think.

17         So we were going to prioritize those two within our

18  presentations.

19         THE COURT:  Okay.

20         MR. CASIMIR:  And so we had already, I think, reached

21  some conclusions about a bifurcation, not necessarily that

22  we'd get a second crack at it, but that we knew which ones

23  we'd leave behind.

24         THE COURT:  And, again, we have two hours.  If you

25  want to then say, "Let's talk about this patent today and

1  leave the others for another day," I'm good with that, or if

2  you want to talk about these two patents today, I'm good with

3  that, and we'll leave the rest for another day, however you

4  all might want to divide it up.

5            Mr. Park, what are you thinking?

6            MR. PARK:  I think that makes sense, Your Honor.

7            The two patents, the '907 and the '305, aside from

8  representing the largest pool of potential damages, also

9  represent the largest number of issues, both on infringement

10 and validity, enforceability.  And so it may be time well

11 spent if we could focus on those today, get those done in the

12 time allowed, and then march on with the remainder in due

13 course.

14           From the plaintiff's standpoint, of those two

15 patents, the '907, by far, is going to occupy more time.  I

16 suspect that may be true for the defense, but I'm not sure.

17           So we would submit that we start with the '907.  And

18 what the parties have met and conferred about is ping-ponging

19 back and forth, as we did at the *Markman* hearing, so that the

20 plaintiff would go, the defendant would go, and the Court

21 would let us ping-pong back and forth until that issue is

22 exhausted.  Then we move to the '305.

23           THE COURT:  All right.

24           Is that acceptable to you?

25           MR. CASIMIR:  I think it would make sense to do the

'305 first, because it's more discrete.  We can for sure get
it done today.  The '907 has four positive motions on the
defendant's side and numerous ones on the plaintiff's side.
I'm not sure we will be able to complete the '907 today.

   THE COURT:  Okay.

   Why don't we start with the other one, then, given
that.  And we can do the ping-ponging back and forth until you
all are exhausted or I can't take anymore.  And then we'll
call it good for this afternoon, and then we'll give you a new
date.

   But, you know, there's a lot of lawyers here; and so
that we can kind of start looking at calendars here, let me
throw out some dates for you, for us to finish this up.

   THE CLERK:  Full day or half day?

   THE COURT:  Do you need a full day?

   How about I give you a full day?  If you don't use
it, you don't use it.  How's that?

   MR. PARK:  That sounds good, Your Honor.

   MR. DAVIS:  Agreed.

   THE CLERK:  January 11th.

   MR. PARK:  One question, Your Honor.  You had
mentioned before that the trial date will be rescheduled.

   THE COURT:  Yes.

   MR. PARK:  Does that mean the corresponding briefing
days for things like motions in limine likewise will be pushed

1  out and stricken?

2              THE COURT:  Yes.

3              MR. PARK:  Okay.

4              January 11, that works for Mr. Park.

5              Mr. Brunette?  Mr. Williams?

6              Yes, Your Honor, that's agreeable.

7              THE COURT:  And for defense, it looks like you were

8  nodding yes.

9              MR. CASIMIR:  Yes for me.  We're checking with Scott

10 right now.

11             MR. DAVIS:  Yes, Your Honor.

12             THE COURT:  Okay.  January 11th.  We'll schedule you

13 for the whole day.

14             All right.  Is there anything else we need to talk

15 about before we get rolling?  We're going to start with the

16 '305.

17             No?  Are you ready?

18             MR. BRUNETTE:  Yes, Your Honor.  Just one moment

19 to --

20             THE COURT:  Take your time.

21             MR. BRUNETTE:  -- get my slide started.

22             THE COURT:  While he's doing that, can I ask one

23 other question.

24             What are you all doing about trying to settle your

25 case?  Have you gone towards a mediation or not?  What's going

1    on?

2         MR. PARK:  Your Honor, we've had various iterations

3    of discussions back and forth.  Some settlement offers have

4    been exchanged, both formal offers and informal discussions.

5         We are in the process of trying to schedule a

6    mediation, but the parties -- not the most auspicious start --

7    can't agree on whether we should start and have a first

8    mediation with a court neutral or a private neutral.  The

9    plaintiff's view is let's start with a court neutral, because

10   most likely we can get it scheduled more quickly and for free.

11        So those are some of the issues we're discussing.

12        THE COURT:  Do you want me to find a judge for you?

13        MR. CASIMIR:  Just the defense view on the mediation

14   is there are so many complex issues, we thought that a private

15   would be the only way we could get the time and focus needed

16   to get through the issues.

17        THE COURT:  Okay.  So the answer is no.

18        I can take no for an answer.  I tell people no all

19   the time.  So --

20        MR. PARK:  We would say yes, we would love it.  But,

21   of course, it takes two to tango.

22        THE COURT:  Look, if you're thinking that you won't

23   have a judge that's available, why don't I see if I can find

24   somebody.  I'll tell them that they're going to need a couple

25   of days, if not more, to do this.  And, honestly, I don't know

1   that I'll find somebody that can do it.  I think that the

2   defense instincts, in some respect, are correct about that.

3   But sometimes I'm surprised and I am able to find a judge.

4            But if I'm telling them I need a judge that's going

5   to devote two or three days, at least, to try and settle this

6   case, and that means that's another three days to prepare,

7   that's a lot of judge time.  I don't know that I'll be able to

8   find anybody.

9            But I can do that.  I can let the parties know that

10  I have found a judge.  I can let you know that they're

11  available.  I will not force you to see that judge.  If you

12  decide after I tell you who's available and they've said yes,

13  if I can find somebody, and you decide that's not something

14  you're interested in, no hard feelings.  Just go ahead and

15  march on, okay.

16           Is that all right?

17           MR. PARK:  Thank you.

18           MR. BRUNETTE:  David, you have the slides, so you

19  might want to get one ahead, just to see if there is anything

20  that concerns you as we're going.

21           Your Honor, I propose to start with the '305 patent.

22  And the first thing we wanted to talk about on the '305 patent

23  is the success that we have had in narrowing this case, which

24  is on the '305 patent.  We have, in Leupold's opposition

25  brief, stepped away from our allegations of infringement as to

1  everything except the method claims in the '305 patent; and we

2  believe that those are no longer at issue.  We withdrew our

3  allegations of infringement with prejudice as to those claims.

4       Now, Nightforce still has made declaratory judgment

5  counterclaims as to those claims, but there is no longer any

6  live case or controversy.  Leupold is not asserting

7  infringement; and, therefore, there is no basis for

8  declaratory judgment jurisdiction over those counterclaims,

9  and we believe that there is no reason to proceed forward to

10 talk about them and don't plan to do so today.

11      And I would cite the *SanDisk* case cited in our

12 briefing as an example of a case where withdrawal of

13 infringement allegations moots declaratory judgment

14 counterclaims of invalidity.  It is as if we had not alleged

15 those claims at all.  Nightforce, in that instance, certainly

16 could not seek a declaratory judgment of invalidity as to

17 unasserted claims.  The same is true now that those claims are

18 unasserted.

19      THE COURT:  So you're saying that even though they

20 have counterclaims, that doesn't matter?

21      MR. BRUNETTE:  Your Honor, those counterclaims are

22 moot.  There is no Article III case or controversy as to those

23 counterclaims because no one is suing Nightforce on those

24 counterclaims nor, frankly, does Leupold have any intention of

25 doing so, at least with respect to Nightforce's current

1   products.

2        There may remain some chance that there is some

3   future product that Leupold chose to sue Nightforce on before

4   the termination of this patent, which is not that far away.

5   That is extremely speculative and certainly not a basis on

6   which there could be declaratory judgment jurisdiction.

7        THE COURT:  So Leupold is not being sued by

8   Nightforce regarding those counterclaims.

9        MR. BRUNETTE:  Nightforce has counterclaimed.  But in

10  order to press a declaratory judgment counterclaim, there has

11  to be a real case or controversy.  Nightforce has to have some

12  reason to be in fear that someone is going to assert those

13  claims against them.

14       And since we have withdrawn our allegation of

15  infringement with prejudice, there is no longer any reason for

16  them to be in fear as to those claims.  And with only one

17  party arguing about those claims, there is no longer a

18  justiciable case or controversy.  They're moot.

19       THE COURT:  Thank you.

20       MR. BRUNETTE:  Your Honor, so moving ahead with

21  Claims 26 and 27, the two method claims, the primary issue

22  about which the parties argue is whether some old Nightforce

23  scopes that are from 1995 to 2001 -- and for the sake of

24  brevity, I will try to call them "the old Nightforce scopes"

25  today -- whether those can prove anticipation or obviousness

1   of Claims 26 or 27.

2           The key issue here is a claim construction.  It is

3   thankfully not a claim construction dispute, but it is the

4   application of a claim construction.

5           So the parties stipulated on September 29th, 2017

6   that "pre-assembling," which used to be "pre-assembled or

7   pre-assembling," but "pre-assembled" went away with the

8   method -- or with the apparatus claims.  Now we're talking

9   only about "pre-assembling," which is used in Claims 26 and

10  27, means "assembling in a separate operation, in advance of

11  installation in the housing."

12          And the citation for this is docket 45 at page 69.

13  That is the joint claim construction chart that the parties

14  filed.

15          Your Honor, applying that claim construction,

16  Nightforce presents no evidence that the structures, if you

17  were to call them pivot cartridges -- and we'll assume for

18  purposes of this discussion as to anticipation that they could

19  prove that their pivot cartridges on the old Nightforce scopes

20  were pre-assembled in a separate operation before installation

21  into the housing.

22          So the question is -- the real question is:  What

23  evidence is there that the pre-assembly of the structures that

24  Nightforce refers to as pivot cartridges in the old

25  Nightforce scopes were not just assembled together as a unit

1    before being stuck into the tube, but were assembled together

2    as a unit in a separate operation, which the parties

3    stipulated is required for pre-assembling, before they were

4    stuck into the tube.

5              The problem is --

6              THE COURT:  I'm sorry.  Explain those differences to

7    me, because it was hard for me to hear what the difference

8    between those two things was.

9              MR. BRUNETTE:  Your Honor, the difference, as we see

10   it, is "pre-assembling," the parties have stipulated, means

11   not just "assembling in advance," but "assembling in advance,

12   in a separate operation," which the parties agreed was part of

13   the claim construction and even set off with a comma in the

14   agreed claim construction.

15             THE COURT:  And so that means it's not part of like

16   an assembly line, but it was separate, in a different setting

17   or --

18             MR. BRUNETTE:  I'm not a hundred percent certain that

19   the parties are in 100 percent agreement about what exactly

20   that means.

21             THE COURT:  Okay.

22             MR. BRUNETTE:  But it means something.  And I think

23   "It means something" is enough that we can stop and decide

24   summary judgment on the anticipation and obviousness claims,

25   because Nightforce doesn't have any evidence of any

"something."  Whatever may be enough "something," there is

zero "something" in Nightforce's evidence; and, therefore,

Nightforce cannot get summary judgment of anticipation.

So the key problem Nightforce is having is that

assembly of these scopes happened outside the United States,

these old Nightforce scopes.  Nightforce didn't make them

themselves.

And Nightforce simply has a very limited set of

documents about these old scopes, and those documents show

exploded diagrams that show what the scope looks like and what

the parts look like and generally how they go together, but

there are not any documents that describe the assembly

process.  There are not any documents that show how they went

together, and there's not anyone who actually knows that who

has testified about it on the record in this case.

It is Nightforce's burden to prove anticipation by

clear and convincing evidence.  So Nightforce has to come in

with someone who knows this or some document that shows how

these scopes were assembled.

A further problem is we're talking about method

claims.  And so the question is:  Was this method known or in

use in the United States?  Well, there's no evidence that it

was in use in the United States.  The old Nightforce scopes

were assembled in Japan.  So the question is:  Was it known in

the United States?

```
 1          And the argument I think Nightforce is making -- it's
 2   not entirely clear -- is that the method was known in the
 3   United States, they say, because a person of skill in the art
 4   could have taken apart one of their old Nightforce scopes and
 5   could tell from the scope itself how it was put together.
 6          And the problem with that is a person of skill in
 7   the art might be able to make some assumptions about which
 8   parts were put together first, based on how the parts go
 9   together -- this one must screw into that one before it goes
10   into here  (indicating) because it would be impossible to do
11   it otherwise --
12          THE COURT:  Right.
13          MR. BRUNETTE:  -- but there's no way that a person
14   can take apart a scope and tell whether it was put together in
15   a separate operation or not.
16          And that's critical to the operation of the invention
17   of this patent because it's what makes it efficient to do.  It
18   makes it efficient to put a bunch of these together all at
19   once and -- the idea that you can build a bunch of these pivot
20   cartridges and then insert them into scopes whenever you want
21   to.  So "in a separate operation" is important.
22          There is no evidence that someone could look at these
23   old scopes and tell, even if -- we are not convinced, and our
24   expert has testified that a person could not look at these
25   scopes and tell whether they were put together in advance of
```

 1  installation of the housing or not, but there is absolutely no
 2  evidence that someone could look at these scopes and tell
 3  whether they were put together in a separate operation in
 4  advance of installation in the housing.  And that's the
 5  critical issue.
 6          And under *Net Money* and other cases that we've cited
 7  in the briefing, in order to prove anticipation, Nightforce
 8  has to show that every claim element is present in the prior
 9  art, in a single prior art reference, arranged the same way as
10  in patent claims; and they cannot do so.
11          THE COURT:  So if it wasn't done in a separate
12  operation, how else could it have been done?
13          MR. BRUNETTE:  Your Honor, exactly as you say:  It
14  could have been done continuously.
15          THE COURT:  Like in an assembly line, and it's just
16  part of the next step in an assembly line, and that doesn't
17  count as a separate operation?
18          MR. BRUNETTE:  Well, it could be done in an assembly
19  line or it could have been done all on a bench at once.  It
20  may be that these were assembled one by one and, therefore,
21  that a technician sat down with one scope and assembled it all
22  the way through, from beginning to end, on one bench top, or
23  that an assembler did at least some steps in the middle that
24  involved both putting together the pivot cartridge and
25  inserting the pivot cartridge into the housing.

1          We simply have no evidence whatsoever about how these

2     were assembled.  And that's the problem that Nightforce has

3     is --

4          THE COURT:  Is the pivot cartridge the innards of the

5     scope itself?  Is that what the "pivot cartridge" means?  What

6     is that?

7          MR. BRUNETTE:  "Pivot cartridge" is a term of art in

8     this patent that is somewhat different than "erector tube,"

9     which is a more common phrase in the industry.  It is not

10    quite a term that was invented for this patent, but it is

11    described in the patent.

12         And essentially it means the erector tube, which is

13    the tube that has a stack of lenses in it, and a means of

14    attaching it, a pivoting means that's attached to it.  It's

15    not a means-plus-function format, but a pivoting structure

16    that is attached to the pivot cartridge, which is what

17    differentiates it from a traditional pivot tube or erector

18    tube.

19         THE COURT:  And the pivoting structure is the

20    structure that would sit on top of a rifle and allow the scope

21    to move left to right?

22         MR. BRUNETTE:  Yes, Your Honor.

23         So on top of the rifle there is a housing.

24         MR. CASIMIR:  (Handing).

25         MR. BRUNETTE:  Thank you.

1          So there's a housing.  There's an external aluminum

2    housing to this.  Inside this center part of the aluminum

3    housing and in here (indicating), which is the end you look

4    through, there is a second tube that has a bunch of lenses in

5    it.

6          THE COURT:  Correct.

7          MR. BRUNETTE:  And that tube starts out here with the

8    lenses on this end (indicating) and ends somewhere right here

9    in the middle (indicating).

10          And what happens with these two dials is that when

11   you dial them up and down, the end of that pivot cartridge

12   inside either pivots up or pivots down or pivots left or

13   right, which changes the point of aim of the rifle, so then

14   when you're looking through it, you're actually pointed over

15   here or over there (indicating).

16          THE COURT:  Okay.

17          MR. BRUNETTE:  That's what that piece is inside.

18          And there is a pivot housing that is attached to the

19   cartridge that helps attach it to this outer body here

20   (indicating).  And that is what Leupold claims is innovative

21   about this patent, is both the idea of having the pivot seat

22   attached already and assembling it in advance, in a separate

23   operation.

24          I'll stop Mr. Davis and Mr. Casimir worrying about me

25   dropping their scope (handing).

1           So, Your Honor, moving on to obviousness, it's

2    exactly the same argument.  The problem that Nightforce has on

3    obviousness is the exact element that's missing in their

4    anticipation case.  The pre-assembly in advance, in a separate

5    operation, is the same element that they don't find anywhere

6    else in the prior art.  So they don't point to some other

7    patent that's out there in the world that teaches assembling

8    in a separate operation.  They don't point to knowledge in the

9    industry or some document that existed at the time or any

10   other evidence.  Their expert doesn't even talk about a

11   separate operation anywhere in his reports.  They simply have

12   no evidence to turn to to supply that missing element.

13           And they can't just turn to common sense because

14   common sense can't just be a shortcut for reasoning.  They

15   need something more, something to point to, something where

16   assembly "in a separate operation" comes from.  And there is

17   simply nothing that they can point to on this.

18           So the two example cases we have are *Vizio* from the

19   Federal Circuit in 2010 and *Environmental Manufacturing*

20   *Solutions*, cited in our briefing, which grants summary

21   judgment to a patentee on an obviousness defense in exactly

22   the situation where there is a missing element from the prior

23   art, and it's simply missing from all the references that the

24   defendant tries to combine.

25           In addition, Your Honor, there is no evidence of a

1    non-hindsight rationale to modify the old scopes to say, hey,

2    we'll take these old scopes and whatever the method -- we

3    don't know what it was, but whatever the method was of putting

4    them together, we'll modify it to make it assembly in a

5    separate operation.

6         They don't explain -- because their expert doesn't

7    talk about a separate operation at all, they don't explain why

8    they would do this.  And Mr. Byron's testimony cited in the

9    briefing describes why a person wouldn't do that.  And so,

10   again, there is simply no evidence for Nightforce to meet its

11   burden on obviousness.

12        Moving ahead, the next issue is indefiniteness.  This

13   is an issue -- this does not come up on cross-motions for

14   summary judgment.  Only Leupold is moving for summary judgment

15   on indefiniteness.  So we're trying to knock out Nightforce's

16   defense of indefiniteness.

17        Now, the issues with this one, again, I'm going to

18   say no evidence.  Nightforce presented no expert testimony in

19   its opposition.  Leupold filed the first motion, called

20   Nightforce out:  Show your cards.  How are you going to prove

21   indefiniteness?

22        Nightforce doesn't present any expert testimony on

23   this in their opposition.  You can look at their brief at page

24   11 where they discuss indefiniteness.  And, instead, they rely

25   solely on the testimony of the inventor.  They say, "We

deposed the inventor, and we asked the inventor what the key

claim terms mean.  And the inventor said, 'You know, those are

really not my words.  I can tell you how the invention works,

but I don't like talking about the claim terms.'"

And they say, well, that proves it.  The inventor is

a person of skill in the art.  So, therefore, he doesn't want

to talk about it.  He can't tell us what they mean at his

deposition.  They must be indefinite.

That's a clever argument.  Unfortunately for

Nightforce, it is an argument that has been rejected by the

Federal Circuit in the *Solomon* case from 2000 and also the

*Douglas Dynamics* case that we cite from the Western District

of Wisconsin in 2014, affirmed by the Federal Circuit in 2016,

and the *EcoServices* case from the Central District of

California earlier this year.

All of them talk about this very problem.  And the

reasoning they give is the inventor is a person who

understands the invention, but they are not a patent lawyer,

and they hire a patent lawyer to write the claims for them.

And so when they, at their deposition, in the context of

litigation, are not able to give a legal opinion about what

the claims mean, that does not mean that a person skilled in

the art in the field, applying this in the ordinary course,

outside of litigation, not in a deposition, wouldn't

understand the claims.  It just isn't evidence that a Court

1   can rely on to find indefiniteness.  And Nightforce has come

2   forward with no other evidence, other than this snippet of

3   deposition testimony.

4        And, I would add, Mr. Reagan's (ph) testimony on this

5   point very closely tracks the reasoning from *Douglas Dynamics*

6   and *EcoServices*, because he said, Look, I understand how the

7   device works.  I don't want to talk about what the legal

8   meaning of this claim is," which is exactly why Courts don't

9   allow this to be a basis for finding indefiniteness.

10       So that's the basis for our motion for summary

11  judgment on that defense.

12       And the final issue is infringement.  Here Nightforce

13  admitted in "interrogatory response that its documents

14  demonstrate pre-assembly pursuant to the '305 patent.  That's

15  in Exhibit 28.

16       Any citations to exhibits without further

17  clarification either in the briefs or in our presentation are

18  to the Brunette declarations.  So this is Exhibit 28 to the

19  first Brunette declaration.

20       In addition, Nightforce's current assembly

21  instructions demonstrate that there is pre-assembly in a

22  separate operation today.  So we don't have -- these are

23  modern documents of scopes that didn't exist in 2001.  They

24  don't tell us anything about the anticipation issue.  But we

25  know today what Nightforce's assembly instructions say.  And I

1  will put one up here.

2          Here --

3          THE COURT:  Just so I understand what it is you're

4  saying, you're saying while Nightforce can't tell us anything

5  about the earlier scopes and the way that they were placed,

6  put together, we know now that the later scopes were

7  pre-assembled.

8          MR. BRUNETTE:  Exactly, Your Honor.

9          THE COURT:  Okay.

10         MR. BRUNETTE:  This is a document from January of

11 2018.

12         THE COURT:  Okay.

13         MR. BRUNETTE:  So it tells us nothing about how some

14 other party in Japan manufactured the old scopes in 2001 and

15 before, but today we can see -- step 29 at the top of this

16 slide is the last step in assembling the erector tube, and we

17 can see that the last part of that is getting it all adjusted

18 and then gluing it up.  And then they take it to the oven

19 where they bake it for an hour to cure the glue.  And then

20 presumably, because they're going to handle it again, they

21 have to let it cool down after it bakes in the oven for an

22 hour.  And then at some later time they come back with the

23 next operation, step 30, where they install it into the

24 housing.

25         And so we know today that they have to bake and

1  cure glue, creating a separate step.  That is not all one

2  continuous process.  You take it off to the oven, to a

3  different -- off of the bench, put it in the oven, bake it for

4  an hour, let it cool, and then at some point come back to it.

5          We don't think any other issue, other than "in a

6  separate operation" -- that there's any question on anything

7  else.  Nightforce hasn't opposed summary judgment on

8  infringement by arguing that any other element is missing.

9          So, Your Honor, that's what I have on the '305

10  patent.

11          THE COURT:  Thank you.

12          MR. CASIMIR:  Before we begin, we brought a

13  demonstrative you may want to look at.

14          THE COURT:  Sure.

15          MR. CASIMIR:  This is a 1996 prior art Nightforce

16  scope.  We've taken it down so that the lens unit can be

17  easily removed.

18          THE COURT:  Okay.

19          MR. CASIMIR:  And we'll have the two components in

20  the claim:  the lens cartridge, which is the thicker black

21  ring, and then the lens tube.  And you can play with it to see

22  that it pivots and get an idea of how they're connected.

23          One of the issues we'll be talking about is a

24  particular screw that attaches these two pieces together,

25  which reveals the order of steps in which the scope was

1  assembled, because when put back together, there's no way to

2  install that screw except if it's outside of the housing.

3       And so if it's okay, I will hand that off.

4       THE COURT:  Sure.

5       MR. CASIMIR:  (Handing).

6       THE CLERK:  (Handing).

7       MR. CASIMIR:  I'll just note, if you do pull out that

8  tube and then want to reinsert it fully, sometimes you have to

9  wiggle it a little bit to get it to go all the way back down

10  into the tube.

11       All right.  Before going into the specifics of our

12  presentation, let's address the apparatus claims that Leupold

13  has withdrawn from their infringement case.  And they've

14  argued that there is no dispute as to them at this point; and,

15  therefore, Nightforce's request for invalidity on those claims

16  can be ignored.

17       The case law does not support that in the condition

18  in which they've left those withdrawn claims, which is to say

19  they've withdrawn them with prejudice with respect to the

20  accused products in this case.  However, those claims still

21  sit out there and can be asserted against other products.

22       And most relevantly to this point, many of

23  Nightforce's scopes that it sells that have been accused in

24  this case are fully produced and assembled in Japan by a

25  company called LOW, Light Optical Works.  And in the recent

1   month or two previous, Leupold has sent an infringement letter

2   to LOW, accusing them of infringement and listing the '305

3   patent as one of the infringed patents.  So while they've

4   dropped certain claims against Nightforce, they are currently

5   threatening a Nightforce supplier with infringement and

6   presumably injunction under the same patent.

7            Short of a covenant that relieves Nightforce of

8   future liability against the '305, the declaratory judgment

9   case stands, and that is supported by case law.  *Lear*

10  *Automotive Dearborn, Inc. v. Johnson Controls*, 528 F.Supp.2d

11  654, it's an Eastern District of Michigan case from 2007

12  invalidating patent claims on summary judgment, in finding

13  declaratory judgment jurisdiction remained over patent claims

14  expressly asserted in unamended Complaint, although not

15  further pursued in the litigation and where plaintiff provided

16  covenant not to sue on that claim, so covenant not to sue

17  being a key feature there.

18           We look at *Harris Corp. v. Federal Express*

19  *Corporation*, 670 F.Supp.2d 1306.  This is a 2009 decision in

20  Florida:  "In order to moot FedEx's counterclaims, the

21  covenant must eliminate the possibility of future infringement

22  suits regarding alleged past infringement of the unasserted

23  patents."

24           THE COURT:  Does it matter -- I mean, what they're

25  telling me is, "Look, as regards the controversy between the

1   plaintiff and the defendant, we're giving them a dismissal

2   with prejudice.  We can never bring another case against the

3   defendants in this case, and so there no longer exists a case

4   or controversy as regards the parties there are to this case."

5          And it sounds like what you're telling me is, "Yeah,

6   but the suppliers are still vulnerable in this case, even

7   though they're not parties to this case."

8          And, you know, you're giving me citations.  But in

9   the citations, do we have that same -- the same problem where

10  it isn't the parties that are wrestling with potential future

11  lawsuits, but it's outside parties and other vendors and

12  suppliers and things like that?

13         Do you understand my question?

14         MR. CASIMIR:  I do.

15         There is the direct threat, however, in their

16  accusations against LOW, of the very products that we're

17  selling and taking them out of the commerce chain.

18         THE COURT:  I'm sorry.  You used some terms.  "LOW"?

19         MR. CASIMIR:  Oh, sorry.  LOW is the Japanese

20  manufacturer that is providing the rifle scopes to Nightforce,

21  which they sell in the United States.

22         THE COURT:  So they're like a -- they're like

23  somebody that Nightforce contracts with in order to make the

24  scopes; is that correct?

25         MR. CASIMIR:  Correct.

1          THE COURT:  And, again, to my point, they're not a

2   party to this case right now.  Does that matter?

3          MR. CASIMIR:  The scopes they are providing to

4   Nightforce are accused scopes in this case.

5          THE COURT:  And because of that, from your

6   perspective, anyway, there's still a case and controversy?

7          MR. CASIMIR:  Yes.

8          THE COURT:  And the cases you just cited -- and I

9   don't have them, but they're in the record and I can always

10  get them -- those cases support the notion that you're

11  presenting to this Court?

12         MR. CASIMIR:  That it takes a covenant not to sue to

13  remove the DJ jurisdiction.

14         THE COURT:  That even though the person that might be

15  threatened with suit is a nonparty, that the case and

16  controversy lives on?

17         MR. CASIMIR:  Yes.

18         The very injunction that they've asked for in this

19  case would have the same impact if brought against the

20  Japanese manufacturer.

21         THE COURT:  That's a different question.  You're

22  asking the Court in that case to look at how Nightforce might

23  still be affected, and the effect would be an indirect effect,

24  but -- because it would be affecting a nonparty to this case.

25         That sounds -- it just sounds different to me than

1    "These are still the parties in issue.  We're not walking away

2    until we get a covenant not to sue."  And I get that.  But

3    their point is there no case and controversy present any more

4    when all issues as between these two parties are resolved.

5            And what you're saying is, "Yeah, but there's this

6    other company that is a supplier or a contractor with the

7    defendants in this case.  And because of that indirect effect,

8    there's still a case and controversy."

9            MR. CASIMIR:  Right.

10           THE COURT:  And your cases that you cited to me

11   support that notion?

12           MR. CASIMIR:  I do not believe either of those cases

13   have that exact fact pattern.

14           THE COURT:  Okay.  All right.  So you're asking the

15   Court maybe to stretch a little bit to a new territory here if

16   they don't have that fact pattern?

17           There's nothing wrong with that, by the way.

18   Sometimes that's our jobs.

19           MR. CASIMIR:  Only stretching to the extent it's

20   asking that Nightforce be put in the position as though those

21   claims were truly withdrawn against them, because bringing the

22   case against the manufacturer LOW is granting them rights in

23   claims and producing the same effect as what they're

24   requesting in this case.

25           THE COURT:  They're still causing you pain, right?

1          MR. CASIMIR:  Correct.

2          THE COURT:  Okay.  I don't know if that's a legal

3     terminology, by the way.

4          MR. CASIMIR:  All right.

5          So you've heard the three issues, which we'll go

6     through in some detail here.  The first is whether the claims

7     are invalid as anticipated or obvious in view of the prior

8     art.  The second is whether they are -- Nightforce has moved

9     for the first issue.  The second issue, only Leupold has moved

10    for, whether the claims are indefinite.  And then last, the

11    infringement case.  And each of these, as you'll see, have

12    some clear answers when we look at the details.

13         All right.  Let's look at the structure of the scope.

14    One of the issues here that is being dodged in Leupold's

15    opening arguments is what the claims actually say.  They've

16    introduced a claim construction issue in an interesting way,

17    and we'll get to that in a little bit more detail.  But their

18    entire argument is premised on this concept of "in a separate

19    operation."  You didn't hear any defense to invalidity other

20    than relying on that terminology.

21         While the parties agreed to that terminology for

22    claim construction, the parties did not agree to that

23    terminology in terms of how Leupold is now interpreting it.

24    In effect, they're doing claim construction on a claim

25    construction.  Those words don't appear in the claim, and that

would not be a proper claim construction of the terms in a

claim had we argued that.  And we can get into that in detail,

but just to foreshadow that as we go through some of the

technical description here.

        We have two remaining claims in this case.  There

were a large number of apparatus claims that have been dropped

with respect to the infringement claim.  The remaining claims

are two method claims that tell us what the steps are in terms

of what pieces get added when.  No special definition of

"pre-assembling" is required.  The claims recite what the

steps are in the assembly, as we'll see.

        So to show a blow-apart picture of the scope, we've

indicated the lens unit, oftentimes also called an "erector,"

in the light blue and orange color.  And if you look at the

demonstrative, the piece that you pull out will look very

similar to that.

        THE COURT:  That's the erector, also known as the

lens unit, is what you just said, right?

        MR. CASIMIR:  Yes.

        THE COURT:  Okay.

        MR. CASIMIR:  And then what you're seeing in the rest

of that diagram are the other scope parts that ultimately

encompass it in the finalized scope.

        And so the key issue is:  Is that lens unit

pre-assembled and then later installed into the tubular

1   housing?

2              So a few of the claim terms, so that when we look at

3   the claims, we know what the pieces and parts are, here we

4   have a zoomed-in picture of the lens unit.  And two claim

5   terms you'll see in the claims are, first, the blue portion is

6   the "pivot tube," and the orange portion is the "pivot

7   cartridge," referring to two terms in the claims.

8              As you hold that unit, and if you want to handle the

9   demonstrative, if you hold it by the orange portion, the blue

10  portion will pivot.  In the drawing here you see the arrow

11  representing a pivoting motion, in the drawing, indicating the

12  movement that the tube can take, and that's in any direction.

13              THE COURT:  Okay.

14              MR. CASIMIR:  And then again, just showing it, how

15  that looks inside of a scope when installed (indicating).  So

16  the pre-assembled pivoting lens unit is positioned in the

17  housing and then ultimately secured into the housing.

18  Typically it's attached by a screw or some other component so

19  that when they're together, it forms a solid structure.

20              All right.  So first we have the first method claim,

21  Claim 26.  It's a relatively straightforward claim here.  We

22  have "a method for manufacturing an optical sighting device,"

23  and it has four steps.  Step 1 is we provide "a tubular

24  housing, the housing having a longitudinal axis," so basically

25  providing the housing.

1          Step (b) is "pre-assembling a pivoting lens unit."

2     And then in this particular step, that's really the only verb

3     we're dealing with.  We just have "pre-assembling" a lens

4     unit.  The rest of that element just describes what's in that

5     lens unit.

6          To know if we've got a lens unit according to Claim

7     26, it has to have "a pivot cartridge, sized to be at least

8     partially received by the housing" -- that's that orange part

9     we were looking at in the drawing -- "a pivot tube" -- that's

10    the blue part -- "the pivot tube including a first end

11    moveably coupled to the pivot cartridge and a second end

12    extending from the pivot cartridge, the second end being

13    rotatable transversely of the longitudinal axis of the

14    housing."  That phrase, "being rotatable transversely of," is

15    the phrase we're fighting about indefiniteness on.

16         But generally what we're seeing in the second

17    component here is that we have this tube somehow pivotally

18    attached to that orange cartridge.

19         And then the last bit is "a lens assembly disposed

20    within the pivot tube between the first and second ends,"

21    referring to the glass discs that are the optical components

22    in the device.

23         The third step is positioning that lens unit in the

24    housing, and the last step is securing it to the housing.

25         So relatively straightforward:  We provide the

1    housing.  We have a -- we pre-assemble a pivoting lens unit.

2    We position it into the housing, and then we secure it in the

3    housing.

4          Just referencing back to this claim construction

5    issue, the claim tells us what the steps are.  We don't need

6    to give any special meaning to "in a separate operation."  We

7    have the operation steps here.

8          And, in fact, in Claim 26 these operation steps are

9    contrary to the special meaning that Leupold is trying to give

10   that phrase, "in a separate operation," keeping in mind

11   they're construing a claim construction and not a claim term

12   here.

13         Why it's counterintuitive is this claim certainly

14   permits, by expressly reciting, that we provide a housing in

15   step (a); then we pre-assemble the pivoting lens unit in step

16   (b); and then we position it into the housing.  Under their

17   view, whatever it means -- and we'll come back to not

18   understanding actually what they mean by "in a separate

19   operation" -- it doesn't fit this structure of Claim 26, where

20   we have a housing and then we make the lens unit and then we

21   put the lens unit in the housing.  The claim tells us what the

22   steps are.

23         So what also makes the invalidity fairly

24   straightforward on the '305 is there's not really disagreement

25   that the manufacturing steps in the prior art, as deducible by

looking at the scope, involve all of these steps and parts.  A
tubular housing is clearly provided.  The scope has one.  A
pivoting lens unit has obviously been positioned within it,
when you look at the final scope.  And there's a pivot
cartridge secured within the housing.

We'll come back to the pre-assembly steps in an
upcoming slide where we talk about how the structure of it
revealed that it had to have been assembled outside of the
housing, pre-assembled outside of the housing.

Claim 27 is a variation on this.  It's very similar.
It only has three steps, though.  We pre-assemble the pivoting
lens unit.  We then position it into the housing.  And then we
secure it.

In this case the pre-assembled lens unit is described
by steps in which it's made rather than what it's made of.

In this case we have two sub steps.  Number (i) is
"pivotally seating the lens-holding pivot tube" -- the blue
part -- "in a pivot cartridge" -- the orange part -- "so that
the pivot tube is pivotable transversely to the longitudinal
axis of the housing when the pivoting lens unit is installed
in the housing; and, (ii), after pivotally seating the pivot
tube in the pivot cartridge, attaching a fastener to the pivot
cartridge to retain the pivot tube to the pivot cartridge."

So sub (i), we bring the blue part and the orange
part together; sub (ii), we fasten them together with a

fastener.  And then we move on to steps (b) and (c), where we put it into the tube and secure it in the tube.  Again, very straightforward, and every one of these steps is clearly deducible from the structure of the scope.  We know that the prior art manufacturer did these steps by looking at the scope; and, therefore, the method is known in the art.

While Leupold has raised issues about this "in a separate operation," as you'll see in the upcoming slides here, Leupold's expert has agreed on both Claims 26 and 27 to assembly steps from the prior art scope that match each of the steps in Claims 26 and 27.  We actually don't have a controversy in the fact that certain steps occurred in the prior art and are deducible from the scope.  The disagreement is:  Is there special meaning in the phrase "pre-assembling"?

So that brings us to the central issue, whether the prior art Nightforce scopes disclose pre-assembling the pivoting lens unit.  There is no dispute that these are in the prior art.  What we have is a situation where Nightforce was obtaining these rifle scopes from the Japanese manufacturer, LOW, as early as 1994, selling them for years and years and years.

Leupold then -- and this is from the period 1994 through 2002.  Leupold then allegedly invents this invention in their company, files a patent on it, gets it granted; and then many, many, many years later sues Nightforce for selling

1    scopes that are identical in structure and function and from

2    deducible manufacturing steps as the ones that were being

3    produced in 1994 through 2002, years before their patent.

4           So the "pre-assembling," the word in contention here,

5    is defined in the claims itself.  We don't need special

6    meaning.  The claim construction of "in a separate operation"

7    had no meeting of the minds at the time the parties agreed to

8    that phraseology in terms of the special meaning that Leupold

9    now wants to place on that claim.

10          Nightforce always understood the phrase, the

11   stipulated construction to mean that the pre-assembled lens

12   unit was completed in totality before it was inserted into the

13   tubing, into the housing, not that it happened in a separate

14   building or in a separate company or in a separate assembly

15   line.  So there has never been a meeting of the minds on what

16   that term means.

17          Leupold's special meaning of that term has come up

18   recently.  They may have always had that in mind, and perhaps

19   that was a "gotcha" they were waiting to save for summary

20   judgment.  I don't know.  But we had this issue presented to

21   us in the expert reports for the first time, and there has

22   been no concurrence on their special definition.

23          To the extent that we need to do claim construction

24   on it, their construction cannot apply.  For one thing, it's

25   reading concepts into the claim that simply aren't there.  And

```
 1    it's reading concepts in the claim that are not words or
 2    phrases or limitations defined in the specification as
 3    limitations on the method.  There are descriptions in the
 4    specification of embodiments where that might be useful to,
 5    say, make a number of units separately, but no limitation in
 6    the specification.
 7            We went through claim construction in this case.
 8    Both parties at various times argued to read special
 9    limitations into the claims, they presented legal arguments,
10    and Your Honor's claim construction denied it in every case,
11    regardless of which party brought it.  We have another
12    instance of Leupold trying to do the same here.
13            Another reason that claim construction cannot be
14    appropriate is the language of Claim 26 that we looked at
15    earlier, where the housing is provided as a first step.
16    While the order of steps is not an absolute requirement in a
17    claim, by putting step (a) first, it is certainly covered by
18    Claim 26.  Claim 26 contemplates having the housing first,
19    then pre-assembling the lens unit, and then installing it into
20    the housing.  That is inconsistent with any definition of "in
21    a separate operation" that I've heard from Leupold.
22            THE COURT:  Hang on a second.
23            On this slide you have -- and, honestly, I don't
24    remember this -- that the parties had stipulated to what
25    "pre-assembling" or "pre-assembled" means.  And then you have
```

1  a quote as to what the parties had agreed to.

2          MR. CASIMIR:  Correct.

3          THE COURT:  So if I decide I don't like your

4  definitions, either one of them, I get to say, "I don't like

5  your definitions, either one of them," and give you my own,

6  correct?

7          MR. CASIMIR:  Correct.

8          THE COURT:  And I can do that at any time, correct?

9          MR. CASIMIR:  Correct.

10          THE COURT:  Even at trial if I wanted to, correct?

11          MR. CASIMIR:  I think it would be inefficient, but

12  correct.

13          I don't think there's any legal or factual or

14  evidentiary basis for their special construction.

15          THE COURT:  That's not my point.

16          My point is:  What is the authority of the Court?  I

17  like knowing what the parameters are.  And if I don't like

18  your definition because I think the terms are inconsistent

19  with each other, one with the other, then I get to give it

20  what I think is the correct construction.

21          MR. CASIMIR:  Correct.

22          For clarity, though, Nightforce's construction is the

23  words of the claim.

24          THE COURT:  Okay.  That may not be helpful.

25          MR. CASIMIR:  Now, the problem we have -- and a

1   substantial problem we have with Leupold's special definition

2   is we actually don't know what that special definition is.

3          I think Your Honor asked about it a little earlier

4   today, when Leupold was presenting.  And we didn't get an

5   answer as to what it was.  All we heard was that whatever it

6   is, Nightforce can't show that it's there.  For claim

7   construction, we need to know what it is.

8          And cited in Nightforce's briefs are a torturous,

9   multi-question interrogation I had with Leupold's expert on

10  what that phrase meant, as it was first -- the concept,

11  Leupold's special definition, was first introduced in the

12  expert's expert report.  And I invite you to read that,

13  because we never get a definition.  It moves around.  There's

14  a lack of clarity.

15         At one point he suggested that there was a timing

16  component, and then he walked away from that; possibly a

17  geographic component, and then he walked away from it.  It got

18  down to a situation where it depended even on the temperament

19  of the person who was doing the operation, to determine

20  whether one person could do it all sitting at a desk all in

21  one place or whether things had to happen in separate

22  locations using more than one person.

23         We have no clarity of what they mean with their

24  special definition of "in a separate operation," other than

25  their desire to have it mean something that prevents their

1    claims from being invalid.

2          Another problem with their construction and not

3    having clarity on it is they are accusing scopes manufactured

4    by LOW, the same party that made the prior art scopes, of

5    infringement.  They've taken no discovery on LOW.  They don't

6    know what process they use.  By alleging infringement, we can

7    only assume they've deduced that infringement must be there by

8    looking at the structure of the scopes, the very argument that

9    demonstrates that they are invalid based on the prior art

10   scopes.

11         Other than that, I don't see any basis for them

12   saying scopes made in LOW today infringe.  The document they

13   showed in the presentation was not a document for LOW's

14   manufacturing process.  That was a document used by another

15   manufacturer, not LOW.  They have no documents showing how LOW

16   manufactures the scopes today.  So I don't know how they would

17   know that LOW does them in a separate operation today, yet

18   those scopes stand accused.

19         Why?  Because we can look at the scopes and determine

20   how they're made; and we can do that with the prior art scope,

21   as we'll see in the upcoming slides here.

22         All right.  So just making the point again, but

23   showing a document that makes this very public, it's

24   undisputed that the prior art Nightforce scopes were in public

25   use and sold in the United States in the prior art time

period.  October 28, 2001 is one year before Leupold filed
their patent.

Shown on this page is a picture from the 1996
Nightforce catalog that actually shows a picture of the
pre-assembled erector in the public 1996 catalog document.  It
shows the pivot cartridge attached to the pivot tube and
retained together by little screw in the black ring, which is
called a keying screw.

Someone looking at this catalog alone can deduce what
the manufacturing process was.  We're not moving on the
catalog alone as invalidating prior art.  The scopes
themselves, when you disassemble them, reveal more than a
picture does in the catalog.  But just to show, this isn't a
hidden secret.  In 1996 -- many, many years before the Leupold
patent was filed -- the public got to see that Nightforce's
scopes used these pre-assembled lens units.

Again, not debated at this point, but each of the
scopes sold by Nightforce -- and there were numerous of them
listed here -- used the same style of design.  So every one of
these scopes in the prior art time period represents a scope
that was known to the public and revealed the manufacturing
process.  It was many scopes over many years.

This picture (indicating) aligns an example of one of
the prior art lens units with the picture from the patent.  So
you can see that they both contain a pivot tube, a pivot

1  cartridge that are fastened together.

2          And here's one of the key issues that reads to the

3  anticipation conclusion of Claims 26 and 27.  So when -- we

4  have here a disassembled prior art erector unit, where the

5  cartridge is shown removed from the lens tube.  So the portion

6  on the right ultimately slides over the portion where it says

7  "threaded hole in pivot tube."  And then the keying screw

8  attaches those two together and fastens them together.  And

9  then if you were to hold the cartridge, you can bend the tube,

10  once those two are fastened together.

11          So this shows that in disassembled format.  The

12  keying screw goes through that slot that we see in the

13  cartridge and into a threaded hole, fastening those two

14  together.

15          This (indicating) is an engineering drawing showing

16  that construction.  The blow-up circle on the right shows that

17  that screw passes through the side of the cartridge and into

18  the lens unit through the threaded hole and fastens the two

19  together.  So when those two are coupled and the screw is

20  added, they're fastened together.

21          Now, this is where the demonstrative may be helpful,

22  although this is not a disputed point.  That screw that

23  fastens the two together cannot be added once the tube

24  is -- or once the pivoting lens unit is in the housing.  There

25  is just simply no space.  It snugly fits in there.  There's no

special tool you can use.  It's impossible to attach that
fastening screw outside of the housing.  And from what I can
tell, we actually don't have a disagreement between the
parties on that.  That alone is dispositive of anticipation in
the claims.

So on the right we have testimony from Kevin
Stockdill, a declarant for Nightforce, who was the technical
person involved with these scopes in the prior art time
period, explaining that very point, that the screw could only
be added outside of the housing.

Here's a quote from Leupold's expert on this point,
who appears not to disagree:  "I understand that in the
1995-2001 Nightforce scopes, the erector is keyed to the pivot
cartridge via a screw through the outside of the pivot
cartridge.  Based on the information I have reviewed, once
this screw has been installed outside of the scope housing,
the pivot cartridge and erector may be seated in the scope
body."

He acknowledges that that screw is added outside of
the scope housing.  He couldn't acknowledge otherwise and he
never says otherwise because it would be impossible to do so
otherwise.

Again, just showing the picture, this is the picture
from the drawing (indicating).  There is just no space to put
the screw in otherwise.

1          So let's look at what that does to Claim 26.  There's

2     no dispute that a housing is provided, that a pre-assembled

3     lens unit of some sort is obtained, that it's positioned in

4     the housing, and it's secured.  The question is:  In the prior

5     art time period, were the scopes manufactured in a way where

6     the pre-assembled pivoting lens unit has the characteristics

7     in Claim 26?

8          Does it have a pivot cartridge sized to be at least

9     partially received by the housing.

10         Yes.  And there's been no dispute on that.

11         Does it have a pivot tube having the various

12    properties recited there, basically that it pivots when

13    attached to the cartridge?  No dispute on that.

14         Does it have a lens assembly in it?  No dispute on

15    that.

16         Very, very simple anticipation here.  Everyone is

17    acknowledging that those pieces were attached together by a

18    screw outside of the housing.  That hits all the elements of

19    Claim 26.

20         The same for Claim 27, remembering that Claim 27 has

21    this one additional feature that it says the lens unit has to

22    be seated in the cartridge, which obviously it is.  When it's

23    assembled, it's clear that has to have happened.  And it has

24    to be fastened together.  The keying screw fastened those

25    together, and there's no dispute on that that I can tell.

1    Claim 27 is gone, anticipated.

2              The only dispute left is the special definition of

3    "in a separate operation."  Without that:  clean, easy summary

4    judgment of anticipation.

5              With respect to the -- let me stop there and see if

6    you have any questions on that before we move to the 30-second

7    argument on the device claims.

8              THE COURT:  No.

9              MR. CASIMIR:  So the 30-second argument on the device

10   claims --

11             THE COURT:  You have more than 30 seconds, by the

12   way.

13             MR. CASIMIR:  It's only going to take 30 seconds.

14             We put arguments in our briefing that the claims are

15   invalid.  They provided no counter evidence or argument.  It's

16   easy for the Court to rule on those claims being invalid.

17             Less than 30 seconds.

18             All right.  Turning to the indefiniteness

19   argument -- and the argument a little earlier today I think

20   mischaracterized Inventor Reagan's (ph) testimony.  It was

21   correct in part, but not correct in whole.

22             So the indefiniteness phrase in this claim relates

23   to -- and, actually, sorry; we'll go to the "pivotable

24   transversely to" and "of" language -- relates to the

25   highlighted elements in Claims 1 and 8, which are out of the

1    case from an infringement standpoint, not from invalidity, 26

2    and 27.  We have three different technical phrases.

3            THE COURT:  Can you slow down a little bit?

4            MR. CASIMIR:  Sure.

5            THE COURT:  You're just going to make my life

6    miserable because you make my reporter's life miserable, and

7    that's not a good thing, so just relax a little bit and --

8            MR. CASIMIR:  Gotcha.

9            THE COURT:  -- slow down.

10           MR. CASIMIR:  So we're on slide 24 here.

11           THE COURT:  Thank you.

12           MR. CASIMIR:  So we have three alternative phrases to

13   describe the concept of how the pivot tube interacts with the

14   pivot cartridge.  In one case it is "movable transversely to."

15   In another case it is "rotatable transversely of."  In another

16   case it is "pivotable transversely to."

17           All of these words and phrases are not found in the

18   specification.  We don't know exactly what they mean.  The

19   inventor was asked what they meant.  He did at one point say,

20   "I'm not a patent attorney.  I don't know the legal

21   definition."  And there was an objection in the record about

22   asking for a legal conclusion.

23           What wasn't raised is that I followed up that

24   question by saying, "One of ordinary skill in the art needs to

25   know the metes and bounds of the claims.  One of ordinary

1    skill in the art is not an attorney either.  From a technical

2    standpoint, what is your understanding of what these phrases

3    mean?"  And the expert could not answer.  He said it wasn't

4    his language, if I recall that correctly.

5           I have yet to hear an understanding from anyone,

6    what's the difference between these phrases.  And they have

7    differences.  "Rotatable" means something different than

8    "pivotable," I believe.  In the context of the claims, they

9    don't make sense.

10           And keep in mind Nightforce has not moved for summary

11    judgment of invalidity on this.  Leupold has moved for summary

12    judgment of validity.  There's clearly a question for the jury

13    here as to whether these terms are clear, particularly because

14    not all of these phrases even appear in the specification.

15    They appear only in the claims.

16           Let me stop there and see if there are any questions

17    on validity issues before I move to infringement.

18           THE COURT:  No questions.

19           MR. CASIMIR:  Okay.

20           The infringement story is a bit more interesting than

21    Mr. Brunette indicated earlier today.  We have scopes produced

22    in many different manners in this case.  None of the scopes

23    accused of infringement in the window period of time where

24    Leupold is asking for damages under the '305 patent were

25    produced at Nightforce.

1            So we have two different scenarios -- three different

2    scenarios, actually.  So there are a series of scopes that are

3    entirely produced in Japan by the company LOW and imported

4    into the United States, where they're sold by Nightforce.  So

5    with respect to the pre-assembling, any assembling type at

6    all, whatever is happening in the manufacturing is happening

7    entirely in Japan.

8            So Nightforce does not conduct methods Claims 26 or

9    27 with respect to those scopes.  They don't do any

10   manufacturing on those scopes.

11           The remaining scopes, the pre-assembling step happens

12   in the hands of another company, some of them at the company

13   LOW in Japan, where LOW makes the lens unit as a stand-alone

14   unit, does that pre-assembling, ships that piece to the United

15   States, where then Nightforce puts it into the housing.  So in

16   that case, again, Nightforce is never conducting the steps of

17   Claims 26 and 27 itself.  At least one of the steps is being

18   done by another party; in this case, an international party.

19           The third set of scopes, which completes the set of

20   scopes that have been accused for damages, are a set where the

21   lens unit is produced by a company called Optex.  Although

22   there are some other scopes produced by other vendors as well,

23   the vast majority of these three entities, all of them fit

24   this category of the lens units being produced by someone

25   else.

1    The Texas company, Optex, produces the lens units.

2 They do the pre-assembly --

3    THE COURT REPORTER:  I'm going ask you to slow down,

4 please.

5    MR. CASIMIR:  Sorry.

6    THE COURT REPORTER:  "The Texas company, Optex,

7 produces the lens units."  If you'd pick up from there,

8 please.

9    MR. CASIMIR:  Optex pre-assembles the lens unit and

10 ships it to Nightforce where Nightforce then installs it into

11 the housing.

12    So, again, Claims 26 and 27, not done by Nightforce.

13    In its motion, Leupold identified a small subset of

14 scopes prior to 2016 that one of Nightforce's witnesses

15 identified were produced fully at Nightforce.  That's outside

16 the window of where they're asking for damages on the '305

17 patent, however.

18    They have since tried to expand that window.  We can

19 come back to a discussion on that, I think, in the ping-pong

20 if they raise that point, because they're not legally able to

21 expand that window.

22    Okay.  Why does this matter?  Leupold runs into some

23 legal issues here.  So, again, going back to the claims,

24 Leupold has not presented any evidence or any product that

25 Nightforce has actually performed all the method steps.

1          We're looking at the steps in Claim 26 and 27 here.

2     In Claim 26 the pre-assembling is done by someone else.   In

3     Claim 27, step (a), the pre-assembling is done by someone

4     else.

5          So of the categories we talked about, the situation

6     where parties manufacture the lens unit first and ship it to

7     Nightforce is a situation called "divided infringement," where

8     two different parties do different steps.  Divided

9     infringement is not a defense against infringement, as

10    suggested in Leupold's reply brief.  It is an affirmative case

11    of infringement that has to be pled.  It has to be in the

12    Complaint.

13         Leupold has never pled divided infringement in this

14    case; and in its infringement contentions, it's never raised

15    it.  It seems to me Claims 26 and 27 were always an

16    afterthought for them.  They were relying on the apparatus

17    claims, which they've since withdrawn from their infringement

18    claim.  They simply have not alleged divided infringement.

19    They have to have.  It's not part of the case.

20         Furthermore, they haven't shown any facts to

21    establish divided infringement.  Divided infringement is a

22    special type of infringement that introduces a new scope of

23    law.  There are one of two things Leupold would have to show

24    to demonstrate divided infringement.

25         One is either direction or control, showing that the

1    party who, in this case, pre-assembled was acting as an agent

2    or that there was a contract with them in one or more -- to

3    conduct the steps in the claims.  Leupold has not provided any

4    evidence that such a situation exists.  They haven't even

5    named who the third parties are that are manufacturing or

6    pre-assembling the lens units.  So not only did they not plead

7    it, which is required, they did not put it in their

8    infringement contentions.  In their motion, they haven't even

9    identified who the parties are.

10           So option 1 for them to show direct infringement is

11   they'd have to show direction or control.  Option 2 is to show

12   a joint enterprise, which they haven't attempted to do.  This

13   is all in the case law.  It's cited in our briefing.

14           To show a joint enterprise, they have to show an

15   agreement, they have to show a common purpose, a community of

16   pecuniary interest in that purpose, and an equal right to a

17   voice in the direction of the enterprise.  There's been no

18   attempt to show any of these elements required.

19           So not only can they not sustain their motion for

20   summary judgment of infringement, they don't have a basis to

21   take the infringement case to a jury.  And this was brought

22   about by them withdrawing their infringement claims on the

23   apparatus claims.  So we have -- and they did that midstream

24   in summary judgment.

25           THE COURT:  Why would that be true as regards the

1   method claims?

2           In other words, it seems to me that if what you're

3   saying is true, that the lack of pleading what in normal life

4   I call "aiding and assisting" or "aiding and abetting" in

5   violation of the law, and you're calling "divided

6   infringement," why would it make any difference that the

7   apparatus claims were withdrawn?

8           MR. CASIMIR:  So with the apparatus claims, they were

9   claiming the device itself and then arguing that Nightforce

10  infringed that by selling it.  And Nightforce did sell a

11  device.

12          THE COURT:  Oh, okay.  Okay.  I see what you're

13  saying.

14          Okay.  I understand now.

15          MR. CASIMIR:  So slide 30 shows the relevant case law

16  showing that divided infringement is required in the

17  pleadings.  It's simply not part of the case.

18          Sorry.  Let me know when you're done with that slide

19  and I will shift on.

20          THE COURT:  Go ahead.

21          MR. CASIMIR:  The only place Leupold has addressed

22  this at all in the case is a footnote in their reply brief and

23  summary judgment.  They say that "Nightforce has not made any

24  assertion of divided infringement, and it cannot succeed on

25  any such argument."

1          It's not Nightforce's position to make an assertion

2     of divided infringement.  That's Leupold's job to do.

3     Infringement is their requirement, to both plead it and show

4     the elements of it.

5          Also of relevance -- let me switch back to the case

6     law here.  Let's see.  I guess we have it on an upcoming slide

7     here.

8          A second problem they have here is one of the two

9     parties that made pre-assembled lens units for Leupold is in

10    Japan.  The law says that international companies, if some of

11    the acts are occurring overseas, cannot be part of divided

12    infringement.  So with respect to those, even had they pled

13    it, even had they done the work to show the elements needed to

14    demonstrate divided infringement, they cannot go after divided

15    infringement where some of the steps are produced overseas.

16    The case law simply does not permit that.  That's the *NTP* case

17    cited in our briefing.

18         So going back to their footnote, they've got the

19    burden of proof wrong here.  They have to assert divided

20    infringement before we're obligated to put in a defense

21    against it.  Notably, in their citations for where they think

22    there's some evidence of divided infringement, that first

23    citation is referencing scopes or lens units produced by LOW

24    in Japan, which cannot be part of divided infringement because

25    it did not occur in the United States.

1          Do you have any questions on the divided infringement

2     piece?

3          THE COURT:  No.

4          MR. CASIMIR:  Okay.  So turning to the last category,

5     where there are scopes in their damages window, the scopes

6     that LOW in Japan makes in their entirety and ships to the

7     U.S., again, LOW did the steps in the claim perhaps.  We don't

8     know what they did.  Nightforce did not perform those steps.

9          So the only way to pursue Nightforce for those

10    actions is under 271(g).  It's a statutory category that says

11    if a party imports into the United States a device made by a

12    method patented into the United States, there, in theory, can

13    be infringement if the elements and conditions are otherwise

14    met.  So, again, it's a special case of infringement.  Again,

15    they did not plead 271(g), and it's not in their infringement

16    contentions.

17         The parties agreed in this case, for procedural

18    purposes, to proceed under the Western District of Washington

19    rules.  Those rules require that if you're going to raise

20    271(g), it be in the pleadings or infringement contentions.

21         There is a case essentially identical to our own from

22    Washington, where a party raised this issue at summary

23    judgment and the 271(g) issue for the first time and had that

24    claim stricken.  That is *Deep 9 Corp. v. Barnes & Noble, Inc.*,

25    2012 Westlaw 4336726, Western District of Washington,

1   September 12, 2012.

2           So those products are out of the case.  And that

3   leaves us with an interesting situation on their infringement

4   case, which is they've not alleged or presented evidence of

5   any acts of infringement that carry any damages.  Those scopes

6   made by LOW in their entirety are not part of the case.  They

7   haven't pled or brought 271(g) into the case, as required.

8   The divided infringement cannot apply.  They didn't plead it,

9   and they haven't developed a case on it.

10          Leupold's damages window in this case begins in 2016.

11  That's the first time Nightforce received notice of a letter

12  identifying the '305 patent.  Very recently Leupold has sent

13  correspondence suggesting that because they believe they --

14  because they have attempted to withdraw the apparatus claims

15  from the case, they believe that they're now allowed to go

16  back further in time for damages, arguing under the premise

17  that if they hadn't brought device claims originally, they

18  could have sought an earlier date, the issue there being when

19  you seek device claims, the damages start when the device is

20  either marked, which they've never marked in this case, or

21  where there's actual notice.

22          The same does not necessarily apply to method claims.

23  They're trying to expand the scope of the case by withdrawing

24  claims from the case.  The case law does not support that.

25  And if they would like to raise that point, we're happy to

1    brief that or cite the appropriate case law.

2           So that leaves us with a situation where Leupold has

3    not identified a single product manufactured at Nightforce

4    where Nightforce carried out the steps of Claims 26 or 27 in

5    the relevant damages window.

6           And we perhaps can leave this for later, but it does

7    raise the question about -- since this is an issue that was

8    created part way through the process of summary judgment, had

9    this existed earlier, we undoubtedly would have moved for

10   non-infringement of summary judgment.  This seems to present a

11   Rule 12(c) issue.  And we may wish to discuss whether the

12   Court will permit us to raise that issue as a 12(c) issue, to

13   remove the infringement case from -- the infringement claims

14   from the case.

15          On 271(g), we're relying on -- I'm sorry.  I think I

16   cited the wrong case.

17          Is that correct, Scott?

18          MR. DAVIS:  (Nods head.)

19          MR. CASIMIR:  Let me make sure I've got the right one

20   here.

21          (There is a brief pause in the proceedings.)

22          MR. CASIMIR:  Okay.  I've got it correct there.

23          Let's see.  Any other questions on the '305?

24          THE COURT:  No.

25          MR. CASIMIR:  All right.  Thank you.

1          THE COURT:  Thank you.

2          MR. BRUNETTE:  Your Honor, if I may briefly respond

3   to those points, starting with the question about the

4   apparatus claims and whether those claims are moot, there is

5   certainly no intention on Leupold's part to be tricky and come

6   after Nightforce via its supplier after dropping those claims.

7   Leupold is not planning to sue Light Optical Works on the

8   claims that were dropped from this case with respect to any

9   Nightforce products.

10         I will say it on the record.  That is not going to

11  happen.  With respect to the products that were at issue in

12  this case and the claims that were at issue in this case that

13  were dropped, we will not be suing Light Optical Works on

14  those products and those claims.

15         The concern with actually coming out and formally

16  giving a covenant not to sue, the only reason that has not

17  happened is because there is some concern that Nightforce

18  could make a roundabout argument that by formally issuing a

19  covenant not to sue, that somehow creates an implied license

20  that waives Leupold's rights as to the method claims that

21  we're still trying to assert.  All we are trying to do is

22  preserve -- as to the products that exist today, all we are

23  trying to do is preserve our rights to assert the method

24  claims against Nightforce.  We are not asserting the apparatus

25  claims against them anymore.

1          THE COURT:  Yeah, you're acting a little paranoid, it

2     seems to me.  Because you're smart lawyers; and if you wanted

3     to reduce that to a writing that narrowly did what you want it

4     to do, you could do that.

5          MR. BRUNETTE:  Your Honor, we have looked at some

6     cases, and we're a little concerned about such writings being

7     construed against people in a way that we think they didn't

8     intend and that we certainly don't intend.

9          THE COURT:  Yeah, but you draft around those

10    concerns, right?  You guys are smart lawyers.  You include

11    those concerns and draft around them, so that everybody is

12    clear about what the limitation is -- the limitations of what

13    the consent is or what the agreement is.

14         MR. BRUNETTE:  Perhaps based on that feedback, Your

15    Honor, we may yet be able to do that.

16         THE COURT:  Yeah.  Come on.  These are smart people,

17    and there's a whole bunch of you.  You ought to be able to

18    come up with language that does exactly what you want it to do

19    and doesn't do what you don't want it to do, right?

20         MR. BRUNETTE:  I'm not sure that it would be so easy

21    to get an agreement between the parties to do that, but --

22         THE COURT:  Yeah, okay.  All right.  Fair enough.

23         MR. BRUNETTE:  But unilaterally, we may still be able

24    to accomplish it.

25         THE COURT:  Okay.

1          MR. BRUNETTE:  Your Honor, moving on to the "special

2   construction" language that we repeatedly heard from

3   Nightforce, there is no special meaning that Leupold is trying

4   to assert in this case.  The parties agreed more than a year

5   ago that "pre-assembling" means "assembling in a separate

6   operation, in advance of installation in the housing."

7   Leupold's understanding upon entering into that agreement is

8   that "in a separate operation" meant something, that it was --

9   it was compromise language, worked out by the parties, but it

10  meant something.

11         And today, for the first time, we're a bit distressed

12  to hear Nightforce backing away from that agreement, because

13  it's a backing away that did not happen in the briefing.  And

14  now today Nightforce is saying, "Well, you know, Your Honor,

15  that really is not a correct construction."

16         Leupold has a procedural problem with that, which is

17  this agreement was reached before the parties briefed claim

18  construction.  So the parties did not brief claim construction

19  on this "pre-assembling" term.  We have not had an opportunity

20  to go in front of Your Honor and tell you what we think that

21  means and why we think it means that, which is why you haven't

22  seen that, because the parties reached an agreement up front,

23  and that is the agreement we have in front of you.  That is

24  the agreement that all expert discovery in this case has been

25  taken on and all fact discovery.  And that could yet change,

but we would at least ask for an opportunity to be heard about what the meaning of the claim language should be before that changes.

Assuming that we stick with the agreement that the parties have, that language has to mean something.  It was inserted in there, and it is not merely duplicative of "pre-assembling."

In addition, Nightforce walked through the (a), (b), (c), (d) elements of the method claims, but it's important to understand that although those elements are arrayed in an order in the claim, the fact that they're in a particular order in the claim is not itself limiting.

So the background law is that method claims -- you can do the method in any order unless the claim specifies otherwise.  So this "pre-assembling" language is important, and "in a separate operation" is also important, and it is called out in the patent.  It's the first half of column 3 of the '305 patent, talks about why this is important.

It makes it easier to do quality control.  It increases efficiency and consistency.  It reduces costs.  It reduces irregularities.  And, in particular, with respect to the way Nightforce implements it, it is extremely useful for them to use this method to reduce the point of aim shift of their devices.  So there are many reasons why "in a separate operation" is important.

1              That was not extensively briefed because up until

2      today the parties had an agreement about "in a separate

3      operation" being something they agreed upon to do.

4              There is also -- it is easy to imagine how a scope

5      might or might not be assembled in a separate operation.  It

6      might be possible to assemble all of the pivot cartridges

7      first, bake 20 or 30 of them in an oven all at once and let

8      them cool to take advantage of that oven, for example, under

9      Nightforce's process, or it might be possible instead to

10     assemble the scopes one at a time, so that a single technician

11     at a bench gets each one adjusted just right before it's put

12     together.  Either of those is possible, and there is no

13     evidence in this case to tell us which of those happened at

14     Light Optical Works in Japan between 1995 and 2001.

15             In the absence of that evidence, Nightforce cannot

16     prevail on anticipation; and Nightforce did not even address

17     obviousness in its presentation.

18             THE COURT:  But what you're saying is if you have a

19     single technician at a bench that's putting these things

20     together, that that can't mean "in a separate operation."

21             MR. BRUNETTE:  It is difficult for me to imagine how

22     a single technician who takes the parts and puts them together

23     one at a time, how you can call that "in a separate operation"

24     if it is all done continuously, or at least if the pivot

25     cartridge assembly and installation of the housing is done

1   continuously.  You finish one up, you crank it down, and you

2   insert it into the housing.  It is difficult to imagine how

3   that is "in a separate operation" any more than assembling the

4   different parts of the pivot cartridge together are all in one

5   operation.

6           THE COURT:  If it's a single technician, one of their

7   points they spent quite a time with was that there was a

8   particular ring that couldn't be fastened until a set screw

9   was placed down in it.  And then after all that was done, then

10  the cartridge could be inserted into the housing and the rest

11  of it placed back together.

12          I think what you're telling me is that that doesn't

13  matter, because it's not a separate operation unless there is

14  something that specifically separates each of the steps.  Is

15  that -- I mean, I'm having trouble understanding your point.

16          MR. BRUNETTE:  I am 95 percent of the way with the

17  way the Court just phrased that.

18          THE COURT:  Okay.

19          MR. BRUNETTE:  So I think it does not matter that the

20  screw is put into the ring outside the housing.  That is

21  something that the parties are not fighting about at this

22  point.  The fight is about whether once that -- the blue part

23  and the orange part, as it was in Nightforce's presentation,

24  are mated together, are they inserted into the housing in the

25  same operation that they're put together or in a separate

operation?

I think the two parts are -- and it's the two parts of the definition the parties agreed to of "pre-assembling" -- "in a separate operation" and "in advance of installation in the housing."

So they've got "in advance of installation in the housing."  They've shown that the pivot cartridge is put together in advance of installation in the housing.  The question is:  Is that done in a separate operation from installation of the housing?  And that's the issue on which there is no evidence.

THE COURT:  So I guess it depends on what I think "a separate operation" actually means.

MR. BRUNETTE:  Yes, Your Honor.

And there is some expert testimony.  There is some backup for this in the record, in the summary judgment record, but --

THE COURT:  I don't really need expertise to figure that part of it out, right?

MR. BRUNETTE:  It may be helpful, Your Honor, to understand the context of the products, but that -- that, I think, is where I think it could be helpful.

THE COURT:  All right.  Thank you.

MR. BRUNETTE:  Finally, Your Honor, turning to the infringement issues, if much of what we just heard about

infringement sounded new to the Court, that is not surprising, because much of what we just heard about infringement was new.

This is an issue that was raised only briefly in Nightforce's opposition to Leupold's motion for summary judgment because Nightforce did not move for summary judgment on infringement.  So Leupold has never been called out to come forward with all of its evidence and show its cards as to how it's going to prove infringement.

What we said was we think we're entitled to infringement based on the evidence that we put forward.  And that includes the evidence of Nightforce using its subcontractors as its agents in footnote 12 of the reply brief.

If we were to march through all those bits of testimony, most of them come from Nightforce's proposed expert on the '305 patent, who happens, in fact, to also be the general manager of one of Nightforce's contractors, who, in fact, does this work and assembles these products in a large contract with Nightforce.  And establishing -- that testimony establishes that they are contracting with Nightforce, that they act as agents of Nightforce, and that they do whatever Nightforce tells them, in the order and in the way that Nightforce tells them to do that.  So there is no question about that.

It is ironic that Nightforce is coming in and saying,

1   "We need to be sticklers about the rules."  And they

2   say -- and I disagree with this, and we'll get to that in a

3   minute.  But they say, "Well, Leupold didn't specifically say

4   'joint infringement' in their Complaint.  And so because they

5   didn't say the words 'joint infringement'" -- which is just a

6   kind of direct infringement -- "they didn't say it, we need to

7   be sticklers and we throw out their claims because they didn't

8   say that."

9        But, of course, Nightforce went past the dispositive

10  motion deadline in this case and didn't say, "We want to move

11  for summary judgment or judgment on the pleadings on

12  infringement," and now comes in, after having done all the

13  briefing, without having raised this issue and for the first

14  time at oral argument says, "You know, Your Honor, we actually

15  want judgment under 12(c) based on what we believe is a

16  technicality by the other side."

17       Now, in fact, our Complaint does call out joint

18  infringement.  It's called out specifically in the prayer for

19  relief, but we include it within what we are saying is direct

20  infringement.  And we have seen no law cited that says that

21  joint infringement has to be separately pleaded, different

22  from direct infringement.  It is a kind of direct infringement

23  that happens to involve multiple actors infringing together.

24  And there is ample evidence in this case, including what's

25  cited in our footnote, but not limited to what's cited in our

footnote, as an example of evidence of other parties acting as
agents of Nightforce.

So, Your Honor, the one thing I want to come back to
is as to "separate operation," an example of what would be a
separate operation is if, for example, in the Nightforce
process, the scope is baked in an oven or multiple -- a
technician assembles 15 pivot cartridges and then goes over to
the other bench where he has all of his housings laid out or
in an assembly line to the next step where all of the pivot
cartridges get put into the housing.  That would be a separate
operation.

A single technician assembling one scope start to
finish or one pivot cartridge into the housing start to finish
would not be a separate operation.  And that is what we mean
by "separate operation."

THE COURT:  Okay.

MR. BRUNETTE:  Thank you.

THE COURT:  Thank you.

MR. CASIMIR:  So let's pick up on that last point.

Case law is cited in our documents on the divided
infringement.  It has to be pled.  They mention it's in
the -- what did he say? -- remedies or the request for relief.
It must be pled with some degree of particularity.  The
*Yakima* (ph) case makes it clear you need to name the party.
You need to name the acts.  You need to say who's doing what.

1            THE COURT:  Did you raise this in your response or in

2     the paperwork that you submitted, in your briefing to the

3     Court?

4            MR. CASIMIR:  Yes.  It's in there.

5            With respect to the 12(c) request I had, this isn't

6     us waiting until summary judgment to raise this issue.  This

7     issue got created by them dropping the apparatus claims.  When

8     the apparatus claims were around, this issue wasn't ripe.  Now

9     that they've dropped them, they have no remaining claim for

10    damages, so it becomes ripe.  They dropped these

11    claims -- attempted to dropped these claims.  They've dropped

12    the infringement argument on the claims in the middle of

13    summary judgment.

14           With regard to obviousness, it's in our briefing.

15    The context in which it comes up gets into the weeds a bit

16    more.  Leupold had originally argued for some bases -- they

17    hypothesize some ways the scopes might have been assembled at

18    LOW.  And the position we raise in that is even if that were

19    true, the claims are nonetheless obvious.

20           Basically they gave one hypothetical alternative way

21    they could have been manufactured at LOW in the prior art time

22    period that their own expert acknowledges, based on his

23    testimony, the importance of tensioning the unit and the need

24    to fasten certain pieces in certain orders would never be done

25    by anyone.

1          And we raised the issue that, you know, to the extent

2   that was an approach someone would do, no one would ever do it

3   that way.  The easy, practical way to do it would at least be

4   the obvious way to do it.

5          Keep in mind here that they aren't arguing that they

6   invented an assembly line or some process of steps where

7   something happens in one room or another room or on different

8   days.  The patent is about making this piece first so that it

9   can be reviewed and tested to make sure it works before it

10  goes into the housing.  There's no reason a single person

11  cannot do that.

12         The absurdity of what they're asking, without

13  clarity still on what they mean by "in a separate

14  operation" -- they've given an example or two, but they

15  haven't defined the boundaries -- is that someone could

16  practice all of the steps of Claim 26, according to what we

17  just heard, and not have infringed Claim 26.

18         So what we just heard is that if a single operator

19  completely makes the lens unit and then installs it in the

20  housing, doing every step of Claim 26 or every step of Claim

21  27, that's not an infringement.  That's what they're saying.

22         THE COURT:  Well, I think they're saying it's not

23  infringement based on the definition you all adopted regarding

24  what "pre-assembling" means.

25         MR. CASIMIR:  Right.  And the language we adopted,

1   but not the meaning of that language.

2          If they had intended these extra concepts to be in

3   their claim, they're easy to -- they're easy concepts to a

4   claim.  They could have said "make a plurality or a multiple

5   of the lens units and then assemble them into scopes."  None

6   of that language appears in the claim.  It's not what they're

7   claiming.

8          These are method claims that tell us what the steps

9   are.  We don't need a special meaning of a claim construction

10  of a claim construction to understand what the scope of those

11  claims are.

12          THE COURT:  Thank you.

13          Is there anything else you want to give me for

14  plaintiffs?

15          MR. BRUNETTE:  Your Honor, very briefly, just to go

16  back to the issue about agency and joint infringement, again,

17  we have not had an opportunity to fully brief this issue.

18  Nightforce has not asked for summary judgment in its briefing

19  or until today; and we would want an opportunity to fully

20  present the evidence, if the Court is inclined to go in that

21  direction.

22          In any event, the foreign-assembled components and

23  the U.S.-assembled components that Nightforce is talking

24  about, there is no question that those components were built

25  at Nightforce's behest, according to contracts with

Nightforce, by parties who were acting on Nightforce's behalf
and at its direction.  That is why they are agents of
Nightforce, and that is why there is no question about joint
infringement.  Nightforce is simply directly infringing
through itself and through its agents.

And we can call that an agency theory or a respondeat
superior theory.  It's the same concepts.  And calling it
"joint infringement" is something that the Federal Circuit has
done, but it is not different than those broadly applicable
legal concepts.

Thank you, Your Honor.

THE COURT:  Thank you.

All right.  We have about 15 minutes.

Where do you all want to go from here?

MR. PARK:  Your Honor, given the timing -- and we're
open to suggestions, but we don't think it really makes sense
to dive into the '907 patent, which is a large body of issues,
larger than the '305.

Given how much time the '305 discussion took, I think
it makes sense to adjourn for today, since we only have 15
minutes remaining, and then pick it up again during the second
installment.

MR. CASIMIR:  Agreed.

THE COURT:  Okay.

And I already gave you your next court date.  I will

1    send out an e-mail to see if I can find a judge to help do

2    your settlement conference.

3              You shouldn't wait because, honestly, finding a judge

4    to give me that much time I don't think is very likely.  But

5    I'll send out the e-mail over the next few days.  No one is

6    going to respond to me because no one is going to want to take

7    it on because it's too big, so you should kind of be out on

8    your own.  And if something unusual happens, I'll let you

9    know, and you can do with that whatever you want.

10             MR. PARK:  Thank you, Your Honor.

11             One point of clarification that occurs to us, Your

12   Honor mentioned the other lawsuit in this district involving

13   Nightforce.

14             THE COURT:  Yes.

15             MR. PARK:  As the Court knows, we are not counsel of

16   record in that case.

17             THE COURT:  Oh, I did not know that.  I'm sorry.

18             MR. PARK:  And so to the extent that the Court is

19   considering some sort of joint consideration, we wanted to let

20   you know.

21             THE COURT:  Thank you.  I appreciate that.  I was

22   under a misimpression.  Thank you.

23             I'll figure it out.  That's important information.

24   So I'll go from there with that.  Thank you so much.

25             We are in recess.  We'll see you, I think, in

1    January.

2              MR. PARK:   Thank you.

3              THE COURT:   Thank you.

4

5

6              (Proceedings concluded.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

--oOo--

       I certify, by signing below, that the

    foregoing is a correct transcript of the record

    of proceedings in the above-titled cause.  A

    transcript without an original signature,

    conformed signature or digitally signed signature

    is not certified.


    /s/ Nancy M. Walker                    12-27-18
    _____    _____
    NANCY M. WALKER, CSR, RMR, CRR          DATE
    Official Court Reporter
    Oregon CSR No. 90-0091

**'**

**'305** [22] - 8:9, 9:7, 9:22, 10:1, 11:16, 13:21, 13:22, 13:24, 14:1, 26:14, 28:9, 30:2, 30:8, 38:24, 52:24, 54:16, 60:12, 61:23, 65:18, 69:16, 75:18, 75:19
**'907** [7] - 8:10, 9:7, 9:15, 9:17, 10:2, 10:4, 75:17
**'joint** [2] - 70:4, 70:5
**'You** [1] - 25:2

**/**

**/s** [1] - 78:11

**1**

**1** [3] - 36:23, 50:25, 56:10
**100** [1] - 17:19
**1000** [1] - 2:16
**11** [2] - 11:4, 24:24
**11th** [2] - 10:20, 11:12
**12** [2] - 60:1, 69:12
**12(c** [4] - 61:11, 61:12, 70:15, 72:5
**12-27-18** [1] - 78:11
**121** [1] - 2:13
**1306** [1] - 30:19
**15** [3] - 71:7, 75:13, 75:20
**16-cv-1570** [1] - 3:6
**1600** [1] - 2:14
**17** [1] - 1:5
**1994** [3] - 40:20, 40:22, 41:3
**1995** [2] - 15:23, 66:14
**1995-2001** [1] - 48:13
**1996** [4] - 28:15, 46:3, 46:5, 46:14

**2**

**2** [1] - 56:11
**20** [1] - 66:7
**2000** [1] - 25:11
**2001** [5] - 15:23, 26:23, 27:14, 46:1, 66:14
**2002** [2] - 40:23, 41:3
**2007** [1] - 30:11
**2009** [1] - 30:19
**2010** [1] - 23:19
**2012** [2] - 59:25, 60:1
**2014** [1] - 25:13
**2016** [3] - 25:13, 54:14, 60:10
**2017** [1] - 16:5
**2018** [2] - 1:5, 27:11
**2275** [1] - 2:9
**24** [1] - 51:10
**26** [27] - 15:21, 16:1, 16:9, 36:21, 37:7, 38:8, 38:19, 40:9, 40:11, 42:14, 42:18, 47:3, 49:1, 49:7, 49:19, 51:1, 53:8, 53:17, 54:12, 55:1, 55:2, 55:15, 61:4, 73:16, 73:17, 73:20
**27** [19] - 15:21, 16:1, 16:10, 39:10, 40:9,

40:11, 47:3, 49:20, 50:1, 51:2, 53:9, 53:17, 54:12, 55:1, 55:3, 55:15, 61:4, 73:21
**271(g** [5] - 59:15, 59:20, 59:23, 60:7, 61:15
**271(g)** [1] - 59:10
**28** [3] - 26:15, 26:18, 46:1
**29** [1] - 27:15
**29th** [1] - 16:5

**3**

**3** [1] - 65:17
**30** [6] - 27:23, 50:11, 50:13, 50:17, 57:15, 66:7
**30-second** [2] - 50:6, 50:9
**3000** [1] - 2:7
**301** [1] - 2:16
**310** [1] - 2:10
**326-8186** [1] - 2:17
**3600** [1] - 2:3
**3:16-cv-01570-HZ** [1] - 1:4

**4**

**4336726** [1] - 59:25
**45** [1] - 16:12

**5**

**503** [1] - 2:17
**528** [1] - 30:10
**53562** [1] - 2:10

**6**

**600** [1] - 2:3
**654** [1] - 30:11
**670** [1] - 30:19
**69** [1] - 16:12

**7**

**760** [1] - 2:6

**8**

**8** [1] - 50:25

**9**

**9** [1] - 59:24
**90** [1] - 8:10
**90-0091** [1] - 78:13
**95** [1] - 67:16
**97204** [2] - 2:14, 2:17
**97205** [1] - 2:7
**98101** [1] - 2:4

**A**

**abetting** [1] - 57:4
**able** [9] - 10:4, 13:3, 13:7, 19:7, 25:21, 54:20, 63:15, 63:17, 63:23
**above-titled** [1] - 78:5
**absence** [1] - 66:15
**absolute** [1] - 42:16
**absolutely** [1] - 20:1
**absurdity** [1] - 73:12
**acceptable** [1] - 9:24
**accomplish** [1] - 63:24
**according** [3] - 37:6, 73:16, 74:25
**accusations** [1] - 31:16
**accused** [6] - 29:20, 29:23, 32:4, 45:18, 52:23, 53:20
**accusing** [2] - 30:2, 45:3
**acknowledge** [1] - 48:20
**acknowledges** [2] - 48:19, 72:22
**acknowledging** [1] - 49:17
**Acosta** [2] - 5:16, 6:2
**act** [1] - 69:21
**acting** [4] - 56:1, 63:1, 71:1, 75:1
**actions** [1] - 59:10
**actors** [1] - 70:23
**acts** [3] - 58:11, 60:5, 71:25
**actual** [1] - 60:21
**add** [1] - 26:4
**added** [5] - 35:9, 47:20, 47:23, 48:10, 48:19
**addition** [3] - 23:25, 26:20, 65:8
**additional** [1] - 49:21
**address** [2] - 29:12, 66:16
**addressed** [1] - 57:21
**adjourn** [1] - 75:20
**adjusted** [2] - 27:17, 66:11
**admitted** [1] - 26:13
**adopted** [2] - 73:23, 73:25
**advance** [11] - 16:10, 17:11, 19:25, 20:4, 22:22, 23:4, 64:6, 68:4, 68:6, 68:8
**advantage** [1] - 66:8
**affected** [1] - 32:23
**affecting** [1] - 32:24
**affirmed** [1] - 25:13
**afternoon** [6] - 3:20, 3:25, 5:18, 7:7, 7:11, 10:9
**afterthought** [1] - 55:16
**agency** [2] - 74:16, 75:6
**agent** [1] - 56:1
**agents** [5] - 69:12, 69:21, 71:2, 75:2, 75:5
**ago** [1] - 64:5
**agree** [3] - 8:6, 12:7, 34:22
**agreeable** [2] - 7:19, 11:6
**agreed** [12] - 10:19, 17:12, 17:14, 34:21, 40:9, 41:7, 43:1, 59:17, 64:4, 66:3, 68:3, 75:23
**agreement** [12] - 17:19, 56:15, 63:13,

63:21, 64:7, 64:12, 64:17, 64:22, 64:23, 64:24, 65:4, 66:2
**ahead** [5] - 13:14, 13:19, 15:20, 24:12, 57:20
**aiding** [2] - 57:4
**aim** [2] - 22:13, 65:23
**aligns** [1] - 46:23
**allegation** [1] - 15:14
**allegations** [3] - 13:25, 14:3, 14:13
**alleged** [5] - 8:10, 14:14, 30:22, 55:18, 60:4
**allegedly** [1] - 40:23
**alleging** [1] - 45:6
**allow** [3] - 7:21, 21:20, 26:9
**allowed** [2] - 9:12, 60:15
**alone** [4] - 46:9, 46:11, 48:4, 53:13
**alternative** [2] - 51:12, 72:20
**aluminum** [2] - 22:1, 22:2
**ample** [1] - 70:24
**answer** [4] - 12:17, 12:18, 44:5, 52:3
**answers** [2] - 5:6, 34:12
**anticipated** [2] - 34:7, 50:1
**anticipation** [14] - 6:15, 15:25, 16:18, 17:24, 18:3, 18:16, 20:7, 23:4, 26:24, 47:3, 48:4, 49:16, 50:4, 66:16
**anyway** [1] - 32:6
**apart** [3] - 19:4, 19:14, 35:12
**apparatus** [12] - 16:8, 29:12, 35:6, 55:16, 56:23, 57:7, 57:8, 60:14, 62:4, 62:24, 72:7, 72:8
**apparent** [1] - 4:15
**appear** [3] - 34:25, 52:14, 52:15
**appearances** [1] - 3:7
**APPEARANCES** [1] - 2:1
**applicable** [1] - 75:9
**application** [1] - 16:4
**apply** [3] - 41:24, 60:8, 60:22
**applying** [2] - 16:15, 25:23
**appreciate** [1] - 76:21
**approach** [1] - 73:2
**appropriate** [2] - 42:14, 61:1
**April** [2] - 4:17, 4:22
**argue** [1] - 15:22
**argued** [4] - 29:14, 35:2, 42:8, 72:16
**arguing** [5] - 15:17, 28:8, 57:9, 60:16, 73:5
**argument** [17] - 3:4, 5:12, 19:1, 23:2, 25:9, 25:10, 34:18, 45:8, 50:7, 50:9, 50:15, 50:19, 57:25, 62:18, 70:14, 72:12
**arguments** [4] - 6:7, 34:15, 42:9, 50:14
**arranged** [1] - 20:9
**arrayed** [1] - 65:10
**arrive** [1] - 5:7
**arrow** [1] - 36:10
**art** [32] - 19:3, 19:7, 20:9, 21:7, 23:6, 23:23, 25:6, 25:23, 28:15, 34:8, 38:25, 40:5, 40:6, 40:10, 40:13, 40:16, 40:18, 45:4, 45:9, 45:20, 45:24, 45:25, 46:11,

46:20, 46:24, 47:4, 48:8, 49:5, 51:24, 52:1, 72:21
**Article** [1] - 14:22
**aside** [1] - 9:7
**assemble** [6] - 38:1, 38:15, 39:11, 66:6, 66:10, 74:5
**assembled** [30] - 16:6, 16:7, 16:20, 16:25, 17:1, 18:19, 18:24, 20:20, 20:21, 21:2, 27:7, 29:1, 29:24, 35:25, 36:16, 39:8, 39:9, 39:14, 41:11, 42:25, 46:5, 46:16, 49:2, 49:6, 49:23, 56:1, 58:9, 66:5, 72:17, 74:22
**assembler** [1] - 20:23
**assembles** [3] - 54:9, 69:18, 71:7
**assembling** [35] - 16:6, 16:7, 16:9, 16:10, 17:3, 17:10, 17:11, 22:22, 23:7, 27:16, 35:10, 37:1, 37:3, 40:14, 40:16, 41:4, 42:19, 42:25, 53:5, 53:11, 53:14, 55:2, 55:3, 56:6, 64:5, 64:19, 65:7, 65:15, 67:3, 68:3, 71:12, 73:24
**assembly** [24] - 16:23, 17:16, 18:5, 18:12, 20:15, 20:16, 20:18, 23:4, 23:16, 24:4, 26:14, 26:20, 26:21, 26:25, 35:11, 37:19, 39:6, 40:10, 41:14, 49:14, 54:2, 66:25, 71:9, 73:6
**assert** [5] - 15:12, 58:19, 62:21, 62:23, 64:4
**asserted** [2] - 29:21, 30:14
**asserting** [2] - 14:6, 62:24
**assertion** [2] - 57:24, 58:1
**assessment** [1] - 7:16
**assign** [1] - 6:1
**assisting** [1] - 57:4
**assume** [2] - 16:17, 45:7
**assuming** [2] - 8:3, 65:4
**assumptions** [1] - 19:7
**attach** [2] - 22:19, 48:1
**attached** [9] - 21:14, 21:16, 22:18, 22:22, 36:18, 37:18, 46:6, 49:13, 49:17
**attaches** [2] - 28:24, 47:8
**attaching** [2] - 21:14, 39:22
**attempt** [1] - 56:18
**attempted** [3] - 56:12, 60:14, 72:11
**attorney** [2] - 51:20, 52:1
**auspicious** [1] - 12:6
**authority** [1] - 43:16
**Automotive** [1] - 30:10
**available** [3] - 12:23, 13:11, 13:12
**Avenue** [2] - 2:6, 2:16
**axis** [3] - 36:24, 37:13, 39:20

## B

**background** [1] - 65:13
**backing** [2] - 64:12, 64:13
**backup** [3] - 5:16, 6:1, 68:16
**bake** [4] - 27:19, 27:25, 28:3, 66:7
**baked** [1] - 71:6
**bakes** [1] - 27:21

**Barnes** [1] - 59:24
**based** [9] - 4:20, 19:8, 45:9, 48:15, 63:14, 69:10, 70:15, 72:22, 73:23
**bases** [1] - 72:16
**basis** [7] - 14:7, 15:5, 26:9, 26:10, 43:14, 45:11, 56:20
**becomes** [1] - 72:10
**BEFORE** [1] - 1:17
**begin** [1] - 28:12
**beginning** [1] - 20:22
**begins** [1] - 60:10
**behalf** [1] - 75:1
**behest** [1] - 74:25
**behind** [3] - 6:1, 6:17, 8:23
**below** [1] - 78:3
**bench** [6] - 20:19, 20:22, 28:3, 66:11, 66:19, 71:8
**bend** [1] - 47:9
**better** [1] - 7:1
**between** [9] - 4:21, 17:8, 30:25, 33:4, 37:20, 48:3, 52:6, 63:21, 66:14
**bifurcation** [1] - 8:21
**big** [1] - 76:7
**bit** [10] - 5:5, 29:9, 33:15, 34:17, 37:19, 51:3, 51:7, 52:20, 64:11, 72:15
**bits** [1] - 69:14
**black** [2] - 28:20, 46:7
**blow** [2] - 35:12, 47:16
**blow-apart** [1] - 35:12
**blow-up** [1] - 47:16
**blue** [7] - 35:14, 36:5, 36:9, 37:10, 39:17, 39:24, 67:22
**body** [3] - 22:19, 48:18, 75:17
**boil** [1] - 7:18
**boundaries** [1] - 73:15
**bounds** [1] - 51:25
**brevity** [1] - 15:24
**Brian** [2] - 2:2, 3:9
**brief** [9] - 13:25, 24:23, 55:10, 57:22, 61:1, 61:21, 64:18, 69:13, 74:17
**briefed** [2] - 64:17, 66:1
**briefing** [13] - 10:24, 14:12, 20:7, 23:20, 24:9, 50:14, 56:13, 58:17, 64:13, 70:13, 72:2, 72:14, 74:18
**briefly** [4] - 5:18, 62:2, 69:3, 74:15
**briefs** [2] - 26:17, 44:8
**bring** [3] - 4:7, 31:2, 39:24
**bringing** [1] - 33:21
**brings** [1] - 40:15
**broadly** [1] - 75:9
**brought** [7] - 5:24, 28:12, 32:19, 42:11, 56:21, 60:7, 60:17
**Brunette** [6] - 2:5, 3:18, 11:5, 26:18, 26:19, 52:21
**BRUNETTE** [35] - 3:18, 11:18, 11:21, 13:18, 14:21, 15:9, 15:20, 17:9, 17:18, 17:22, 19:13, 20:13, 20:18, 21:7, 21:22, 21:25, 22:7, 22:17, 27:8, 27:10, 27:13, 62:2, 63:5, 63:14, 63:20, 63:23,

3

64:1, 66:21, 67:16, 67:19, 68:14, 68:20, 68:24, 71:17, 74:15
**build** [1] - 19:19
**building** [1] - 41:14
**built** [1] - 74:24
**bunch** [4] - 19:18, 19:19, 22:4, 63:17
**burden** [3] - 18:16, 24:11, 58:19
**business** [2] - 1:7, 1:7
**Byron's** [1] - 24:8

# C

**calendar** [1] - 7:8
**calendars** [2] - 4:8, 10:12
**California** [1] - 25:15
**cannot** [12] - 18:3, 20:10, 41:24, 42:13, 47:23, 57:24, 58:11, 58:14, 58:24, 60:8, 66:15, 73:11
**cards** [2] - 24:20, 69:7
**carried** [1] - 61:4
**carry** [1] - 60:5
**cartridge** [37] - 20:24, 20:25, 21:4, 21:5, 21:7, 21:16, 22:11, 22:19, 28:20, 36:7, 37:7, 37:11, 37:12, 37:18, 39:5, 39:18, 39:22, 39:23, 46:6, 47:1, 47:5, 47:9, 47:13, 47:17, 48:14, 48:15, 48:17, 49:8, 49:13, 49:22, 51:14, 66:25, 67:4, 67:10, 68:7, 71:13
**cartridges** [7] - 16:17, 16:19, 16:24, 19:20, 66:6, 71:7, 71:10
**case** [109] - 5:4, 5:8, 5:11, 5:13, 5:16, 5:17, 5:19, 5:20, 5:21, 5:22, 5:24, 6:6, 6:11, 6:12, 8:16, 11:25, 13:6, 13:23, 14:6, 14:11, 14:12, 14:22, 15:11, 15:18, 18:15, 23:4, 25:11, 25:12, 25:14, 29:13, 29:17, 29:20, 29:24, 30:9, 30:11, 31:2, 31:3, 31:4, 31:6, 31:7, 32:2, 32:4, 32:6, 32:15, 32:19, 32:22, 32:24, 33:3, 33:7, 33:8, 33:22, 33:24, 34:11, 35:5, 39:14, 39:16, 42:7, 42:10, 51:1, 51:14, 51:15, 51:16, 52:22, 53:16, 53:18, 55:10, 55:14, 55:19, 56:1, 56:13, 56:21, 57:15, 57:17, 57:22, 58:5, 58:16, 59:14, 59:17, 59:21, 60:2, 60:4, 60:6, 60:7, 60:9, 60:10, 60:15, 60:20, 60:23, 60:24, 61:1, 61:13, 61:14, 61:16, 62:8, 62:12, 64:4, 64:24, 66:13, 70:10, 70:24, 71:20, 71:24, 76:16
**Case** [1] - 3:6
**cases** [10] - 4:13, 6:23, 7:6, 20:6, 23:18, 32:8, 32:10, 33:10, 33:12, 63:6
**casimir** [1] - 2:8
**CASIMIR** [54] - 3:22, 8:2, 8:13, 8:20, 9:25, 11:9, 12:13, 21:24, 28:12, 28:15, 28:19, 29:5, 29:7, 31:14, 31:19, 31:25, 32:3, 32:7, 32:12, 32:17, 33:9, 33:12, 33:19, 34:1, 34:4, 35:19, 35:21, 36:14, 43:2, 43:7, 43:9, 43:11, 43:21, 43:25, 50:9, 50:13, 51:4, 51:8, 51:10, 51:12,

52:19, 54:5, 54:9, 57:8, 57:15, 57:21, 59:4, 61:19, 61:22, 61:25, 71:19, 72:4, 73:25, 75:23
**Casimir** [3] - 2:9, 3:22, 22:24
**catalog** [5] - 46:4, 46:5, 46:9, 46:11, 46:13
**categories** [1] - 55:5
**category** [3] - 53:24, 59:4, 59:10
**causing** [1] - 33:25
**center** [1] - 22:2
**Center** [1] - 2:13
**Central** [1] - 25:14
**central** [5] - 17:18, 30:4, 40:12, 72:24
**certain** [6] - 14:15, 15:5, 38:13, 42:17, 62:5, 63:8
**certainty** [1] - 5:8
**certified** [1] - 78:8
**certify** [1] - 78:3
**chain** [1] - 31:17
**challenged** [1] - 7:17
**chance** [1] - 15:2
**change** [1] - 64:25
**changes** [2] - 22:13, 65:3
**characteristics** [1] - 49:6
**chart** [1] - 16:13
**checking** [1] - 11:9
**chose** [1] - 15:3
**circle** [1] - 47:16
**Circuit** [4] - 23:19, 25:11, 25:13, 75:8
**citation** [2] - 16:12, 58:23
**citations** [4] - 26:16, 31:8, 31:9, 58:21
**cite** [3] - 14:11, 25:12, 61:1
**cited** [14] - 14:11, 20:6, 23:20, 24:8, 32:8, 33:10, 44:8, 56:13, 58:17, 61:16, 70:20, 70:25, 71:20
**claim** [59] - 16:2, 16:3, 16:4, 16:13, 16:15, 17:13, 17:14, 20:8, 25:2, 25:4, 26:8, 28:20, 30:16, 34:16, 34:22, 34:24, 34:25, 35:1, 35:2, 35:7, 36:2, 36:4, 36:20, 36:21, 38:4, 38:5, 38:11, 38:13, 38:21, 39:10, 41:6, 41:9, 41:23, 41:25, 42:1, 42:7, 42:10, 42:13, 42:17, 43:23, 44:6, 50:22, 55:18, 59:7, 59:24, 64:17, 64:18, 65:2, 65:11, 65:12, 65:14, 72:9, 74:3, 74:4, 74:6, 74:9, 74:10
**Claim** [20] - 36:21, 37:6, 38:8, 38:19, 42:14, 42:18, 49:1, 49:7, 49:19, 49:20, 50:1, 55:1, 55:2, 55:3, 73:16, 73:17, 73:20
**claiming** [2] - 57:9, 74:7
**claims** [83] - 14:1, 14:3, 14:5, 14:15, 14:17, 15:13, 15:16, 15:17, 15:21, 16:8, 17:24, 18:21, 20:10, 22:20, 25:19, 25:22, 25:25, 29:12, 29:15, 29:18, 29:20, 30:4, 30:12, 30:13, 33:21, 33:23, 34:6, 34:10, 34:15, 35:5, 35:6, 35:7, 35:8, 35:10, 36:3, 36:5, 36:7, 41:5, 42:9, 45:1, 48:5, 50:7,

50:10, 50:14, 50:16, 51:25, 52:8, 52:15, 54:23, 55:17, 56:3, 56:22, 56:23, 57:1, 57:7, 57:8, 60:14, 60:17, 60:19, 60:22, 60:24, 61:13, 62:4, 62:6, 62:8, 62:12, 62:14, 62:20, 62:24, 62:25, 65:9, 65:13, 70:7, 72:7, 72:8, 72:11, 72:12, 72:19, 74:8, 74:11
**Claims** [12] - 15:21, 16:1, 16:9, 40:9, 40:11, 47:3, 50:25, 53:8, 53:17, 54:12, 55:15, 61:4
**clarification** [2] - 26:17, 76:11
**clarity** [5] - 43:22, 44:14, 44:23, 45:3, 73:13
**clean** [1] - 50:3
**clear** [7] - 18:17, 19:2, 34:12, 49:23, 52:13, 63:12, 71:24
**clearly** [3] - 39:2, 40:3, 52:12
**CLERK** [4] - 3:3, 10:14, 10:20, 29:6
**clever** [1] - 25:9
**client** [1] - 3:12
**closely** [1] - 26:5
**co** [1] - 3:11
**co-counsel** [1] - 3:11
**color** [1] - 35:14
**column** [1] - 65:17
**combine** [1] - 23:24
**coming** [3] - 8:7, 62:15, 69:25
**comma** [1] - 17:13
**commerce** [1] - 31:17
**common** [4] - 21:9, 23:13, 23:14, 56:15
**community** [1] - 56:15
**companies** [1] - 58:10
**company** [10] - 29:25, 33:6, 40:24, 41:14, 53:3, 53:12, 53:21, 54:1, 54:6
**Complaint** [4] - 30:14, 55:12, 70:4, 70:17
**complete** [1] - 10:4
**completed** [1] - 41:12
**completely** [1] - 73:19
**completes** [1] - 53:19
**complex** [1] - 12:14
**component** [4] - 36:18, 37:17, 44:16, 44:17
**components** [5] - 28:19, 37:21, 74:22, 74:23, 74:24
**compromise** [1] - 64:9
**concept** [3] - 34:18, 44:10, 51:13
**concepts** [6] - 41:25, 42:1, 74:2, 74:3, 75:7, 75:10
**concern** [2] - 62:15, 62:17
**concerned** [1] - 63:6
**concerns** [3] - 13:20, 63:10, 63:11
**conclude** [1] - 6:8
**concluded** [1] - 77:6
**conclusion** [2] - 47:3, 51:22
**conclusions** [1] - 8:21
**concurrence** [1] - 41:22
**condition** [1] - 29:17
**conditions** [1] - 59:13

**conduct** [2] - 53:8, 56:3
**conducting** [1] - 53:16
**conference** [1] - 76:2
**conferred** [1] - 9:18
**conferring** [1] - 7:1
**confident** [1] - 5:12
**conformed** [1] - 78:7
**connected** [1] - 28:22
**consent** [1] - 63:13
**consideration** [1] - 76:19
**considering** [1] - 76:19
**consistency** [1] - 65:20
**consolidated** [1] - 5:24
**construction** [33] - 16:2, 16:3, 16:4, 16:13, 16:15, 17:13, 17:14, 34:16, 34:22, 34:24, 34:25, 35:1, 38:4, 38:11, 41:6, 41:11, 41:23, 41:24, 42:7, 42:10, 42:13, 43:14, 43:20, 43:22, 44:7, 45:2, 47:16, 64:2, 64:15, 64:18, 74:9, 74:10
**construed** [1] - 63:7
**construing** [1] - 38:11
**contain** [1] - 46:25
**contemplates** [1] - 42:18
**contention** [1] - 41:4
**contentions** [4] - 55:14, 56:8, 59:16, 59:20
**context** [4] - 25:20, 52:8, 68:21, 72:15
**continuous** [1] - 28:2
**continuously** [3] - 20:14, 66:24, 67:1
**contract** [2] - 56:2, 69:19
**contracting** [1] - 69:20
**contractor** [1] - 33:6
**contractors** [1] - 69:17
**contracts** [2] - 31:23, 74:25
**contrary** [1] - 38:9
**control** [3] - 55:25, 56:11, 65:19
**Controls** [1] - 30:10
**controversy** [11] - 14:6, 14:22, 15:11, 15:18, 30:25, 31:4, 32:6, 32:16, 33:3, 33:8, 40:12
**conversation** [1] - 6:19
**convinced** [1] - 19:23
**convincing** [1] - 18:17
**cool** [3] - 27:21, 28:4, 66:8
**Corp** [2] - 30:18, 59:24
**Corporation** [1] - 30:19
**correct** [20] - 13:2, 22:6, 31:24, 31:25, 34:1, 43:2, 43:6, 43:7, 43:8, 43:9, 43:10, 43:12, 43:20, 43:21, 50:21, 61:17, 61:22, 64:15, 78:4
**correctly** [1] - 52:4
**correspondence** [1] - 60:13
**corresponding** [1] - 10:24
**costs** [1] - 65:20
**counsel** [3] - 3:7, 3:11, 76:15
**count** [1] - 20:17
**counter** [1] - 50:15
**counterclaim** [1] - 15:10
**counterclaimed** [1] - 15:9

**counterclaims** [9] - 14:5, 14:8, 14:14, 14:20, 14:21, 14:23, 14:24, 15:8, 30:20
**counterintuitive** [1] - 38:13
**couple** [1] - 12:24
**coupled** [2] - 37:11, 47:19
**course** [5] - 6:20, 9:13, 12:21, 25:23, 70:9
**COURT** [101] - 1:1, 1:18, 2:15, 3:2, 3:14, 3:17, 3:23, 7:24, 8:12, 8:19, 8:24, 9:23, 10:5, 10:15, 10:23, 11:2, 11:7, 11:12, 11:20, 11:22, 12:12, 12:17, 12:22, 14:19, 15:7, 15:19, 17:6, 17:15, 17:21, 19:12, 20:11, 20:15, 21:4, 21:19, 22:6, 22:16, 27:3, 27:9, 27:12, 28:11, 28:14, 28:18, 29:4, 30:24, 31:18, 31:22, 32:1, 32:5, 32:8, 32:14, 32:21, 33:10, 33:14, 33:25, 34:2, 35:17, 35:20, 36:13, 42:22, 43:3, 43:8, 43:10, 43:15, 43:24, 50:8, 50:11, 51:3, 51:5, 51:9, 51:11, 52:18, 54:3, 54:6, 56:25, 57:12, 57:20, 59:3, 61:24, 62:1, 63:1, 63:9, 63:16, 63:22, 63:25, 66:18, 67:6, 67:18, 68:12, 68:18, 68:23, 71:16, 71:18, 72:1, 73:22, 74:12, 75:12, 75:24, 76:14, 76:17, 76:21, 77:3
**court** [3] - 12:8, 12:9, 75:25
**Court** [17] - 7:2, 7:19, 9:20, 25:25, 32:11, 32:22, 33:15, 43:16, 50:16, 61:12, 67:17, 69:1, 72:3, 74:20, 76:5, 76:18, 78:13
**Court's** [1] - 7:16
**Courthouse** [1] - 2:16
**Courts** [1] - 26:8
**covenant** [8] - 30:7, 30:16, 30:21, 32:12, 33:2, 62:16, 62:19
**cover** [2] - 4:5, 4:6
**covered** [1] - 42:17
**crack** [1] - 8:22
**crank** [1] - 67:1
**created** [2] - 61:8, 72:7
**creates** [1] - 62:19
**creating** [1] - 28:1
**critical** [2] - 19:16, 20:5
**cross** [3] - 3:4, 5:19, 24:13
**cross-hairs** [1] - 5:19
**cross-motions** [2] - 3:4, 24:13
**Crowther** [1] - 3:13
**CRR** [2] - 2:15, 78:12
**CSR** [2] - 2:15, 78:12, 78:13
**cure** [2] - 27:19, 28:1
**current** [2] - 14:25, 26:20

# D

**damages** [12] - 8:11, 9:8, 52:24, 53:20, 54:16, 59:5, 60:5, 60:10, 60:16, 60:19, 61:5, 72:10
**date** [6] - 4:16, 4:20, 10:10, 10:22,

60:18, 75:25
**DATE** [1] - 78:12
**dates** [1] - 10:13
**David** [2] - 2:8, 3:22, 13:18
**Davis** [3] - 2:11, 3:20, 22:24
**DAVIS** [4] - 3:20, 10:19, 11:11, 61:18
**days** [6] - 10:25, 12:25, 13:5, 13:6, 73:8, 76:5
**deadline** [1] - 70:10
**dealing** [1] - 37:3
**Dearborn** [1] - 30:10
**debated** [1] - 46:17
**December** [1] - 1:5
**decide** [4] - 13:12, 13:13, 17:23, 43:3
**decided** [2] - 5:23, 6:10
**deciding** [1] - 7:4
**decision** [2] - 7:5, 30:19
**declarant** [1] - 48:7
**declaration** [1] - 26:19
**declarations** [1] - 26:18
**declaratory** [8] - 14:4, 14:8, 14:13, 14:16, 15:6, 15:10, 30:8, 30:13
**deduce** [1] - 46:9
**deduced** [1] - 45:7
**deducible** [4] - 38:25, 40:4, 40:13, 41:2
**deeming** [1] - 8:9
**Deep** [1] - 59:24
**defendant** [6] - 3:21, 3:22, 5:22, 9:20, 23:24, 31:1
**Defendant** [1] - 1:9
**DEFENDANT** [1] - 2:8
**defendant's** [1] - 10:3
**defendants** [2] - 31:3, 33:7
**defense** [11] - 7:25, 9:16, 11:7, 12:13, 13:2, 23:21, 24:16, 26:11, 34:19, 55:9, 58:20
**defined** [3] - 41:5, 42:2, 73:15
**definition** [13] - 35:9, 41:22, 42:20, 43:18, 44:1, 44:2, 44:11, 44:13, 44:24, 50:2, 51:21, 68:3, 73:23
**definitions** [2] - 43:4, 43:5
**degree** [1] - 71:23
**deliberate** [1] - 6:11
**demands** [1] - 7:16
**Deming** [1] - 2:9
**demonstrate** [4] - 26:14, 26:21, 55:24, 58:14
**demonstrates** [1] - 45:9
**demonstrative** [4] - 28:13, 35:15, 36:9, 47:21
**denied** [1] - 42:10
**depended** [1] - 44:18
**deposed** [1] - 25:1
**deposition** [4] - 25:8, 25:20, 25:24, 26:3
**describe** [2] - 18:12, 51:13
**described** [2] - 21:11, 39:14
**describes** [2] - 24:9, 37:4
**description** [1] - 35:4
**descriptions** [1] - 42:3

**design** [1] - 46:19
**desire** [1] - 44:25
**desk** [1] - 44:20
**detail** [4] - 7:22, 34:6, 34:17, 35:2
**details** [1] - 34:12
**determine** [2] - 44:19, 45:19
**developed** [1] - 60:9
**device** [11] - 26:7, 36:22, 37:22, 50:7, 50:9, 57:9, 57:11, 59:11, 60:17, 60:19
**devices** [1] - 65:24
**devote** [1] - 13:5
**diagram** [1] - 35:22
**diagrams** [1] - 18:10
**dial** [1] - 22:11
**dials** [1] - 22:10
**difference** [4] - 17:7, 17:9, 52:6, 57:6
**differences** [2] - 17:6, 52:7
**different** [18] - 5:20, 5:22, 17:16, 21:8, 28:3, 32:21, 32:25, 51:2, 52:7, 52:22, 53:1, 55:8, 67:4, 70:21, 73:7, 75:9
**differentiates** [1] - 21:17
**difficult** [2] - 66:21, 67:2
**digitally** [1] - 78:7
**direct** [6] - 31:15, 56:10, 70:6, 70:19, 70:22
**direction** [6] - 36:12, 55:25, 56:11, 56:17, 74:21, 75:2
**directly** [1] - 75:4
**disagree** [2] - 48:12, 70:2
**disagreement** [3] - 38:24, 40:13, 48:3
**disassemble** [1] - 46:12
**disassembled** [2] - 47:4, 47:11
**disclose** [1] - 40:16
**discovery** [3] - 45:5, 64:24, 64:25
**discrete** [1] - 10:1
**discs** [1] - 37:21
**discuss** [2] - 24:24, 61:11
**discussing** [1] - 12:11
**discussion** [3] - 16:18, 54:19, 75:19
**discussions** [2] - 12:3, 12:4
**dismissal** [1] - 31:1
**disposed** [1] - 37:19
**dispositive** [2] - 48:4, 70:9
**dispute** [9] - 16:3, 29:14, 40:17, 49:2, 49:10, 49:13, 49:14, 49:25, 50:2
**disputed** [1] - 47:22
**distant** [1] - 4:24
**distressed** [1] - 64:11
**District** [6] - 2:16, 25:12, 25:14, 30:11, 59:18, 59:25
**district** [1] - 76:12
**DISTRICT** [3] - 1:1, 1:2, 1:18
**dive** [1] - 75:17
**divide** [1] - 9:4
**divided** [20] - 55:7, 55:8, 55:13, 55:18, 55:21, 55:24, 57:5, 57:16, 57:24, 58:2, 58:11, 58:14, 58:19, 58:22, 58:24, 59:1, 60:8, 71:20
**DJ** [1] - 32:13

**docket** [1] - 16:12
**document** [8] - 18:18, 23:9, 27:10, 45:12, 45:13, 45:14, 45:23, 46:5
**documents** [9] - 4:2, 18:9, 18:12, 18:13, 26:13, 26:23, 45:15, 71:20
**dodged** [1] - 34:14
**done** [21] - 6:21, 9:11, 10:2, 20:11, 20:12, 20:14, 20:18, 20:19, 53:18, 54:12, 55:2, 55:3, 57:18, 58:13, 66:24, 66:25, 67:9, 68:9, 70:12, 72:24, 75:9
**Douglas** [2] - 25:12, 26:5
**down** [13] - 7:18, 20:21, 22:11, 22:12, 27:21, 28:16, 29:9, 44:18, 51:3, 51:9, 54:3, 67:1, 67:9
**draft** [2] - 63:9, 63:11
**drawing** [5] - 36:10, 36:11, 37:9, 47:15, 48:24
**dropped** [8] - 30:4, 35:6, 62:8, 62:13, 72:9, 72:10, 72:11
**dropping** [3] - 22:25, 62:6, 72:7
**due** [1] - 9:12
**duplicative** [1] - 65:6
**during** [1] - 75:21
**Dynamics** [2] - 25:12, 26:5

**E**

**e-mail** [2] - 76:1, 76:5
**early** [1] - 40:20
**easier** [1] - 65:19
**easily** [1] - 28:17
**Eastern** [1] - 30:11
**easy** [7] - 50:3, 50:16, 63:20, 66:4, 73:3, 74:3
**economics** [1] - 8:14
**EcoServices** [2] - 25:14, 26:6
**effect** [5] - 32:23, 33:7, 33:23, 34:24
**efficiency** [1] - 65:20
**efficient** [2] - 19:17, 19:18
**eight** [2] - 4:1, 6:13
**either** [9] - 22:12, 26:17, 33:12, 43:4, 43:5, 52:1, 55:25, 60:20, 66:12
**element** [7] - 20:8, 23:3, 23:5, 23:12, 23:22, 28:8, 37:4
**elements** [8] - 49:18, 50:25, 56:18, 58:4, 58:13, 59:13, 65:9, 65:10
**eliminate** [1] - 30:21
**Elliott** [2] - 2:5, 3:19
**embodiments** [1] - 42:4
**encompass** [1] - 35:23
**end** [8] - 5:9, 20:22, 22:3, 22:8, 22:11, 37:10, 37:11, 37:12
**ending** [1] - 5:11
**ends** [2] - 22:8, 37:20
**enforceability** [1] - 9:10
**engineering** [1] - 47:15
**entering** [1] - 64:7
**enterprise** [3] - 56:12, 56:14, 56:17
**entire** [1] - 34:18
**entirely** [3] - 19:2, 53:3, 53:7

**entirety** [2] - 59:6, 60:6
**entities** [1] - 53:23
**entitled** [1] - 69:9
**Environmental** [1] - 23:19
**equal** [1] - 56:16
**erector** [10] - 21:8, 21:12, 21:17, 27:16, 35:13, 35:17, 46:5, 47:4, 48:13, 48:17
**essentially** [2] - 21:12, 59:21
**establish** [1] - 55:21
**establishes** [1] - 69:20
**establishing** [1] - 69:19
**event** [1] - 74:22
**evidence** [30] - 16:16, 16:23, 17:25, 18:2, 18:17, 18:22, 19:22, 20:2, 21:1, 23:10, 23:12, 23:25, 24:10, 24:18, 25:25, 26:2, 50:15, 54:24, 56:4, 58:22, 60:4, 66:13, 66:15, 68:11, 69:7, 69:10, 69:11, 70:24, 71:1, 74:20
**evidentiary** [1] - 43:14
**exact** [2] - 23:3, 33:13
**exactly** [8] - 17:19, 20:13, 23:2, 23:21, 26:8, 27:8, 51:18, 63:18
**example** [6] - 6:16, 14:12, 23:18, 46:23, 66:8, 71:1, 71:4, 71:5, 73:14
**except** [2] - 14:1, 29:2
**exchanged** [1] - 12:4
**exhausted** [2] - 9:22, 10:8
**Exhibit** [2] - 26:15, 26:18
**exhibits** [1] - 26:16
**exist** [2] - 26:23, 62:22
**existed** [2] - 23:9, 61:9
**exists** [2] - 31:3, 56:4
**expand** [3] - 54:18, 54:21, 60:23
**expert** [15] - 19:24, 23:10, 24:6, 24:18, 24:22, 40:9, 41:21, 44:9, 44:12, 48:11, 52:3, 64:24, 68:15, 69:15, 72:22
**expert's** [1] - 44:12
**expertise** [1] - 68:18
**explain** [3] - 17:6, 24:6, 24:7
**explaining** [1] - 48:9
**exploded** [1] - 18:10
**Express** [1] - 30:18
**expressly** [2] - 30:14, 38:14
**extending** [1] - 37:12
**extensively** [1] - 66:1
**extent** [5] - 7:19, 33:19, 41:23, 73:1, 76:18
**external** [1] - 22:1
**extra** [1] - 74:2
**extremely** [2] - 15:5, 65:22

**F**

**F.Supp.2d** [2] - 30:10, 30:19
**fact** [9] - 33:13, 33:16, 38:8, 40:12, 64:25, 65:11, 69:16, 69:18, 70:17
**facts** [1] - 55:20
**factual** [1] - 43:13
**fair** [1] - 63:22

**fairly** [1] - 38:23
**far** [2] - 9:15, 15:4
**fasten** [2] - 39:25, 72:24
**fastened** [6] - 47:1, 47:10, 47:20, 49:24, 67:8
**fastener** [2] - 39:22, 40:1
**fastening** [2] - 47:13, 48:2
**fastens** [3] - 47:8, 47:18, 47:23
**fear** [2] - 15:12, 15:16
**feature** [2] - 30:17, 49:21
**Federal** [5] - 23:19, 25:11, 25:13, 30:18, 75:8
**FedEx's** [1] - 30:20
**feedback** [1] - 63:14
**feelings** [1] - 13:14
**few** [3] - 8:4, 36:2, 76:5
**field** [1] - 25:23
**fight** [1] - 67:22
**fighting** [3] - 8:15, 37:15, 67:21
**figure** [4] - 4:11, 7:9, 68:18, 76:23
**filed** [4] - 16:14, 24:19, 46:1, 46:15
**files** [1] - 40:24
**final** [2] - 26:12, 39:4
**finalized** [1] - 35:23
**finally** [1] - 68:24
**finish** [6] - 4:25, 7:9, 10:13, 67:1, 71:13
**first** [29] - 7:12, 10:1, 12:7, 13:22, 19:8, 24:19, 26:19, 34:6, 34:9, 36:5, 36:20, 37:10, 37:20, 41:21, 42:15, 42:17, 42:18, 44:10, 44:11, 55:6, 58:22, 59:23, 60:11, 64:11, 65:17, 66:7, 70:13, 73:8
**fit** [3] - 8:2, 38:19, 53:23
**fits** [1] - 47:25
**flexibility** [1] - 7:4
**Florida** [1] - 30:20
**focus** [2] - 9:11, 12:15
**followed** [1] - 51:23
**footnote** [5] - 57:22, 58:18, 69:12, 70:25, 71:1
**FOR** [3] - 1:2, 2:2, 2:8
**force** [1] - 13:11
**foregoing** [1] - 78:4
**foreign** [1] - 74:22
**foreign-assembled** [1] - 74:22
**foreshadow** [1] - 35:3
**formal** [1] - 12:4
**formally** [2] - 62:15, 62:18
**format** [2] - 21:15, 47:11
**forms** [1] - 36:19
**forth** [4] - 9:19, 9:21, 10:7, 12:3
**forward** [4] - 14:9, 26:2, 69:7, 69:10
**four** [2] - 10:2, 36:23
**frankly** [1] - 14:24
**free** [1] - 12:10
**front** [6] - 5:16, 6:9, 6:11, 64:20, 64:22, 64:23
**full** [3] - 10:14, 10:15, 10:16
**fully** [5] - 29:8, 29:24, 54:15, 74:17,

74:19
**function** [2] - 21:15, 41:1
**furthermore** [1] - 55:20
**future** [5] - 4:24, 15:3, 30:8, 30:21, 31:10

### G

**general** [1] - 69:17
**generally** [2] - 18:11, 37:16
**geographic** [1] - 44:17
**given** [6] - 3:25, 4:4, 10:6, 73:14, 75:15, 75:19
**glass** [1] - 37:21
**glue** [2] - 27:19, 28:1
**gluing** [1] - 27:18
**gotcha** [2] - 41:19, 51:8
**granted** [1] - 40:24
**granting** [1] - 33:22
**grants** [1] - 23:20
**grasp** [2] - 6:15, 6:22
**guess** [2] - 58:6, 68:12
**guys** [1] - 63:10

### H

**hairs** [1] - 5:19
**half** [3] - 4:25, 10:14, 65:17
**hand** [1] - 29:3
**handing)** [4] - 21:24, 22:25, 29:5, 29:6
**handle** [2] - 27:20, 36:8
**hands** [1] - 53:12
**hang** [1] - 42:22
**happy** [1] - 60:25
**hard** [2] - 13:14, 17:7
**Harris** [1] - 30:18
**head** [1] - 61:18
**hear** [4] - 17:7, 34:19, 52:5, 64:12
**heard** [9] - 34:5, 42:21, 44:5, 64:2, 65:1, 68:25, 69:2, 73:17, 73:18
**hearing** [2] - 7:10, 9:19
**HEARING** [1] - 1:15
**hello** [1] - 3:9
**help** [1] - 76:1
**helpful** [4] - 43:24, 47:21, 68:20, 68:22
**helps** [1] - 22:19
**HERNANDEZ** [1] - 1:17
**hidden** [1] - 46:14
**highlighted** [1] - 50:25
**hindsight** [1] - 24:1
**hire** [1] - 25:19
**hits** [1] - 49:18
**hold** [3] - 36:8, 36:9, 47:9
**holding** [1] - 39:17
**hole** [3] - 47:7, 47:13, 47:18
**honestly** [5] - 12:25, 42:23, 76:3
**Honor** [40] - 3:3, 3:9, 3:18, 3:20, 7:15, 9:6, 10:18, 10:21, 11:6, 11:11, 11:18, 12:2, 13:21, 14:21, 15:20, 16:15, 17:9,

20:13, 21:22, 23:1, 23:25, 27:8, 28:9, 44:3, 62:2, 63:5, 63:15, 64:1, 64:14, 64:20, 68:14, 68:20, 68:24, 70:14, 71:3, 74:15, 75:11, 75:15, 76:10, 76:12
**Honor's** [1] - 42:10
**HONORABLE** [1] - 1:17
**hour** [5] - 4:10, 27:19, 27:22, 28:4
**hours** [4] - 3:25, 4:4, 4:9, 8:24
**housing** [65] - 16:11, 16:21, 20:1, 20:4, 20:25, 21:23, 22:1, 22:2, 22:3, 22:18, 27:24, 29:2, 36:1, 36:17, 36:24, 36:25, 37:8, 37:14, 37:24, 38:1, 38:2, 38:3, 38:14, 38:16, 38:20, 38:21, 39:2, 39:5, 39:9, 39:12, 39:20, 39:21, 41:13, 42:15, 42:18, 42:20, 47:24, 48:2, 48:10, 48:16, 48:20, 49:2, 49:4, 49:9, 49:18, 53:15, 54:11, 64:6, 66:25, 67:2, 67:10, 67:20, 67:24, 68:5, 68:7, 68:8, 68:10, 71:10, 71:13, 73:10, 73:20
**housings** [1] - 71:8
**hundred** [1] - 17:18
**hundreds** [1] - 4:2
**hypothesize** [1] - 72:17
**hypothetical** [1] - 72:20

### I

**idea** [3] - 19:19, 22:21, 28:22
**ideas** [1] - 7:13
**identical** [2] - 41:1, 59:21
**identified** [4] - 54:13, 54:15, 56:9, 61:3
**identifying** [1] - 60:12
**ignored** [1] - 29:16
**ii** [2] - 39:21, 39:25
**III** [1] - 14:22
**imagine** [3] - 66:4, 66:21, 67:2
**impact** [1] - 32:19
**implements** [1] - 65:22
**implied** [1] - 62:19
**importance** [1] - 72:23
**important** [7] - 19:21, 65:9, 65:15, 65:16, 65:18, 65:25, 76:23
**imported** [1] - 53:3
**imports** [1] - 59:11
**impossible** [3] - 19:10, 48:1, 48:21
**impression** [1] - 6:15
**IN** [1] - 1:1
**Inc** [4] - 3:5, 3:6, 30:10, 59:24
**INC** [2] - 1:3, 1:6
**inclined** [1] - 74:20
**include** [2] - 63:10, 70:19
**includes** [1] - 69:11
**including** [2] - 37:10, 70:24
**inconsistent** [2] - 42:20, 43:18
**increases** [1] - 65:20
**indefinite** [2] - 25:8, 34:10
**indefiniteness** [10] - 24:12, 24:15, 24:16, 24:21, 24:24, 26:1, 26:9, 37:15, 50:18, 50:22

**indicated** [2] - 35:13, 52:21
**indicating** [6] - 19:10, 22:3, 22:8, 36:11, 46:23, 47:15
**indicating)** [5] - 22:9, 22:15, 22:20, 36:15, 48:24
**indirect** [2] - 32:23, 33:7
**industry** [2] - 21:9, 23:9
**inefficient** [1] - 43:11
**inevitably** [2] - 6:8
**inform** [1] - 8:6
**informal** [1] - 12:4
**information** [3] - 6:10, 48:15, 76:23
**infringe** [1] - 45:12
**infringed** [3] - 30:3, 57:10, 73:17
**infringement** [82] - 9:9, 13:25, 14:3, 14:7, 14:13, 15:15, 26:12, 28:8, 29:13, 30:1, 30:2, 30:5, 30:21, 30:22, 34:11, 35:7, 45:5, 45:6, 45:7, 51:1, 52:17, 52:20, 52:23, 55:7, 55:9, 55:11, 55:13, 55:14, 55:17, 55:18, 55:21, 55:22, 55:24, 56:8, 56:10, 56:20, 56:21, 56:22, 57:6, 57:16, 57:24, 58:2, 58:3, 58:12, 58:14, 58:15, 58:20, 58:22, 58:24, 59:1, 59:13, 59:14, 59:15, 59:20, 60:3, 60:5, 60:8, 61:10, 61:13, 68:25, 69:1, 69:2, 69:6, 69:8, 69:10, 70:6, 70:12, 70:18, 70:20, 70:21, 70:22, 71:21, 72:12, 73:21, 73:23, 74:16, 75:4, 75:8
**infringement'** [2] - 70:4, 70:5
**infringing** [2] - 70:23, 75:4
**injunction** [2] - 30:6, 32:18
**innards** [1] - 21:4
**innovative** [1] - 22:20
**insert** [2] - 19:20, 67:2
**inserted** [4] - 41:12, 65:6, 67:10, 67:24
**inserting** [1] - 20:25
**inside** [4] - 22:2, 22:12, 22:17, 36:15
**install** [2] - 27:23, 29:2
**installation** [10] - 16:11, 16:20, 20:1, 20:4, 64:6, 66:25, 68:4, 68:6, 68:8, 68:10
**installed** [4] - 35:25, 36:15, 39:20, 48:16
**installing** [1] - 42:19
**installment** [1] - 75:22
**installs** [2] - 54:10, 73:19
**instance** [2] - 14:15, 42:12
**instead** [2] - 24:24, 66:9
**instincts** [1] - 13:2
**instructions** [2] - 26:21, 26:25
**intend** [2] - 63:8
**intended** [1] - 74:2
**intention** [2] - 14:24, 62:5
**interacts** [1] - 51:13
**interest** [1] - 56:16
**interested** [1] - 13:14
**interesting** [3] - 34:16, 52:20, 60:3
**international** [2] - 53:18, 58:10
**interpreting** [1] - 34:23

**interrogation** [1] - 44:9
**interrogatory** [1] - 26:13
**interrupt** [1] - 7:3
**introduce** [2] - 3:11, 3:12
**introduced** [2] - 34:16, 44:11
**introduces** [1] - 55:22
**invalid** [5] - 34:7, 45:1, 45:9, 50:15, 50:16
**invalidating** [2] - 30:12, 46:11
**invalidity** [7] - 14:14, 14:16, 29:15, 34:19, 38:23, 51:1, 52:11
**invented** [2] - 21:10, 73:6
**invention** [4] - 19:16, 25:3, 25:18, 40:23
**inventor** [7] - 24:25, 25:1, 25:2, 25:5, 25:17, 51:19
**Inventor** [1] - 50:20
**invents** [1] - 40:23
**invite** [1] - 44:12
**involve** [2] - 39:1, 70:23
**involved** [2] - 20:24, 48:8
**involving** [1] - 76:12
**ironic** [1] - 69:25
**irregularities** [1] - 65:21
**issue** [39] - 4:17, 5:20, 5:25, 9:21, 14:2, 15:21, 16:2, 20:5, 24:12, 24:13, 26:12, 26:24, 28:5, 33:1, 34:9, 34:16, 35:24, 38:5, 40:15, 41:20, 59:22, 59:23, 60:18, 61:7, 61:11, 61:12, 62:11, 62:12, 68:10, 69:3, 70:13, 72:6, 72:7, 72:8, 73:1, 74:16, 74:17
**issues** [16] - 5:5, 9:9, 12:11, 12:14, 12:16, 24:17, 28:23, 33:4, 34:5, 34:14, 40:7, 47:2, 52:17, 54:23, 68:25, 75:17
**issuing** [1] - 62:18
**iterations** [1] - 12:2
**itself** [7] - 19:5, 21:5, 41:5, 53:17, 57:9, 65:12, 75:5

## J

**January** [5] - 10:20, 11:4, 11:12, 27:10, 77:1
**Japan** [10] - 18:24, 27:14, 29:24, 53:3, 53:7, 53:13, 58:10, 58:24, 59:6, 66:14
**Japanese** [3] - 31:19, 32:20, 40:19
**Jennifer** [1] - 7:8
**job** [1] - 58:2
**jobs** [1] - 33:18
**Johnson** [1] - 30:10
**joint** [9] - 16:13, 56:12, 56:14, 70:17, 70:21, 74:16, 75:3, 75:8, 76:19
**Jones** [1] - 2:9
**Judge** [2] - 5:16, 6:2
**JUDGE** [1] - 1:18
**judge** [12] - 5:17, 6:1, 7:4, 12:12, 12:23, 13:3, 13:4, 13:7, 13:10, 13:11, 76:1, 76:3
**judgment** [43] - 3:4, 4:6, 4:18, 4:25, 5:9, 5:11, 7:10, 7:20, 14:4, 14:8, 14:13, 14:16, 15:6, 15:10, 17:24, 18:3, 23:21,

24:14, 26:11, 28:7, 30:8, 30:12, 30:13, 41:20, 50:4, 52:11, 52:12, 56:20, 56:24, 57:23, 59:23, 61:8, 61:10, 68:16, 69:5, 70:11, 70:15, 72:6, 72:13, 74:18
**jurisdiction** [4] - 14:8, 15:6, 30:13, 32:13
**jury** [9] - 5:14, 6:9, 6:11, 6:20, 6:24, 7:1, 7:5, 52:12, 56:21
**justiciable** [1] - 15:18

## K

**keep** [2] - 52:10, 73:5
**keeping** [1] - 38:10
**Kevin** [1] - 48:6
**key** [6] - 16:2, 18:4, 25:1, 30:17, 35:24, 47:2
**keyed** [1] - 48:13
**keying** [4] - 46:8, 47:7, 47:12, 49:24
**kind** [6] - 5:1, 5:18, 10:12, 70:6, 70:22, 76:7
**kinds** [1] - 7:6
**Klarquist** [2] - 2:12, 3:21
**knock** [1] - 24:15
**knowing** [1] - 43:17
**knowledge** [1] - 23:8
**known** [6] - 18:21, 18:24, 19:2, 35:17, 40:6, 46:21
**knows** [3] - 18:14, 18:18, 76:15

## L

**lack** [2] - 44:14, 57:3
**laid** [1] - 71:8
**language** [12] - 42:14, 50:24, 52:4, 63:18, 64:2, 64:9, 65:2, 65:5, 65:15, 73:25, 74:1, 74:6
**large** [3] - 35:6, 69:18, 75:17
**larger** [1] - 75:18
**largest** [2] - 9:8, 9:9
**last** [7] - 27:16, 27:17, 34:10, 37:19, 37:24, 59:4, 71:19
**law** [14] - 29:17, 30:9, 55:23, 56:13, 57:5, 57:15, 58:6, 58:10, 58:16, 60:24, 61:1, 65:13, 70:20, 71:20
**lawsuit** [1] - 76:12
**lawsuits** [1] - 31:11
**lawyer** [2] - 25:18, 25:19
**lawyers** [3] - 10:11, 63:2, 63:10
**leads** [1] - 6:8
**Lear** [1] - 30:9
**least** [9] - 5:13, 6:18, 13:5, 14:25, 20:23, 37:7, 49:8, 53:17, 65:1, 66:24, 73:3
**leave** [4] - 8:23, 9:1, 9:3, 61:6
**leaves** [2] - 60:3, 61:2
**left** [4] - 21:21, 22:12, 29:18, 50:2
**legal** [12] - 3:13, 3:14, 5:5, 25:21, 26:7, 34:2, 42:9, 43:13, 51:20, 51:22, 54:23,

75:10
**legally** [1] - 54:20
**lens** [47] - 28:16, 28:20, 28:21, 35:13, 35:18, 35:24, 36:4, 36:16, 37:1, 37:3, 37:5, 37:6, 37:19, 37:23, 38:1, 38:15, 38:20, 38:21, 39:3, 39:12, 39:14, 39:17, 39:20, 40:17, 41:11, 42:19, 46:16, 46:24, 47:5, 47:18, 47:24, 49:3, 49:6, 49:14, 49:21, 53:13, 53:21, 53:24, 54:1, 54:7, 54:9, 55:6, 56:6, 58:9, 58:23, 73:19, 74:5
**lens-holding** [1] - 39:17
**lenses** [3] - 21:13, 22:4, 22:8
**less** [1] - 50:17
**letter** [2] - 30:1, 60:11
**LEUPOLD** [1] - 1:3
**Leupold** [44] - 3:5, 3:10, 3:13, 3:16, 3:19, 14:6, 14:24, 15:3, 15:7, 22:20, 24:14, 24:19, 29:12, 30:1, 34:9, 34:23, 38:9, 40:7, 40:22, 40:23, 41:8, 42:12, 42:21, 44:4, 46:1, 46:14, 52:11, 52:24, 54:13, 54:22, 54:24, 55:13, 55:23, 56:3, 57:21, 58:9, 60:12, 61:2, 62:7, 64:3, 64:16, 69:6, 70:3, 72:16
**Leupold's** [15] - 13:24, 34:14, 40:9, 41:17, 44:1, 44:9, 44:11, 48:11, 55:10, 58:2, 60:10, 62:5, 62:20, 64:7, 69:4
**liability** [1] - 30:8
**license** [1] - 62:19
**life** [3] - 51:5, 51:6, 57:3
**light** [1] - 35:14
**Light** [4] - 29:25, 62:7, 62:13, 66:14
**Lightforce** [1] - 3:5
**LIGHTFORCE** [1] - 1:6
**likely** [2] - 12:10, 76:4
**likewise** [1] - 10:25
**limine** [1] - 10:25
**limitation** [2] - 42:5, 63:12
**limitations** [4] - 42:2, 42:3, 42:9, 63:12
**limited** [2] - 18:8, 70:25
**limiting** [1] - 65:12
**line** [7] - 17:16, 20:15, 20:16, 20:19, 41:15, 71:9, 73:6
**listed** [1] - 46:19
**listing** [1] - 30:2
**litigation** [3] - 25:21, 25:24, 30:15
**live** [1] - 14:6
**lives** [1] - 32:16
**LLP** [3] - 2:2, 2:6, 2:12
**locations** [1] - 44:22
**longitudinal** [3] - 36:24, 37:13, 39:19
**Look** [2] - 26:6, 30:25
**look** [19] - 6:6, 12:22, 18:11, 19:22, 19:24, 20:2, 22:3, 24:23, 28:13, 30:18, 32:22, 34:12, 34:13, 35:14, 35:15, 36:2, 39:4, 45:19, 49:1
**looked** [2] - 42:14, 63:5
**looking** [9] - 7:8, 10:12, 22:14, 37:9, 39:1, 40:5, 45:8, 46:9, 55:1
**looks** [3] - 11:7, 18:10, 36:15

**lost** [2] - 6:12, 6:24
**love** [1] - 12:20
**LOW** [22] - 29:25, 30:2, 31:16, 31:18, 31:19, 33:22, 40:20, 45:4, 45:5, 45:12, 45:15, 45:17, 53:3, 53:13, 58:23, 59:6, 59:7, 60:6, 72:18, 72:21
**LOW's** [1] - 45:13

# M

**mail** [2] - 76:1, 76:5
**majority** [1] - 53:23
**manager** [2] - 3:13, 3:14, 69:17
**manners** [1] - 52:22
**manufacture** [1] - 55:6
**manufactured** [5] - 27:14, 45:3, 49:5, 61:3, 72:21
**manufacturer** [6] - 31:20, 32:20, 33:22, 40:5, 40:19, 45:15
**manufactures** [1] - 45:16
**manufacturing** [9] - 36:22, 38:25, 41:2, 45:14, 46:10, 46:21, 53:6, 53:10, 56:5
**Manufacturing** [1] - 23:19
**march** [4] - 5:10, 9:12, 13:15, 69:14
**MARCO** [1] - 1:17
**marked** [2] - 60:20
**Markman** [1] - 9:19
**match** [1] - 40:10
**mated** [1] - 67:24
**material** [1] - 4:5
**matter** [3] - 3:5, 7:1, 7:2, 14:20, 30:24, 32:2, 54:22, 67:13, 67:19
**matters** [1] - 6:20
**mean** [17] - 10:24, 25:2, 25:7, 25:22, 30:24, 38:18, 41:11, 44:23, 44:25, 51:18, 52:3, 65:5, 66:20, 67:15, 71:14, 73:13
**meaning** [11] - 26:8, 38:6, 38:9, 40:14, 41:6, 41:8, 41:17, 64:3, 65:2, 74:1, 74:9
**means** [21] - 13:6, 16:10, 17:10, 17:15, 17:20, 17:22, 17:23, 21:5, 21:12, 21:13, 21:14, 21:15, 38:17, 41:16, 42:25, 52:7, 64:5, 64:21, 68:13, 73:24
**means-plus-function** [1] - 21:15
**meant** [4] - 44:10, 51:19, 64:8, 64:10
**mechanical** [1] - 5:4
**mechanics** [1] - 5:3
**mediation** [4] - 11:25, 12:6, 12:8, 12:13
**meet** [1] - 24:10
**meeting** [2] - 41:7, 41:15
**mention** [1] - 71:21
**mentioned** [2] - 10:22, 76:12
**merely** [1] - 65:6
**met** [2] - 9:18, 59:14
**metes** [1] - 51:25
**method** [24] - 14:1, 15:21, 16:8, 18:20, 18:21, 19:2, 24:2, 24:3, 35:8, 36:20, 36:22, 40:6, 42:3, 54:25, 57:1, 59:12, 60:22, 62:20, 62:23, 65:9, 65:13,

65:14, 65:23, 74:8
**methodical** [1] - 7:22
**methods** [1] - 53:8
**Michigan** [1] - 30:11
**middle** [3] - 20:23, 22:9, 72:12
**Middleton** [1] - 2:10
**midstream** [1] - 56:23
**might** [15] - 5:1, 6:25, 7:9, 8:6, 9:4, 13:19, 19:7, 32:14, 32:22, 42:4, 66:5, 66:6, 66:9, 72:17
**Mikael** [1] - 3:13
**mind** [4] - 38:10, 41:18, 52:10, 73:5
**minds** [2] - 41:7, 41:15
**minute** [2] - 3:24, 70:3
**minutes** [2] - 75:13, 75:21
**mischaracterized** [1] - 50:20
**miserable** [2] - 51:6
**misimpression** [1] - 76:22
**missing** [5] - 23:3, 23:12, 23:22, 23:23, 28:8
**modern** [1] - 26:23
**modify** [2] - 24:1, 24:4
**moment** [1] - 11:18
**monetary** [1] - 8:10
**Money** [1] - 20:6
**money** [1] - 8:15
**month** [1] - 30:1
**moot** [4] - 14:22, 15:18, 30:20, 62:4
**moots** [1] - 14:13
**most** [6] - 8:8, 8:9, 12:6, 12:10, 29:22, 69:15
**mostly** [1] - 5:3
**motion** [8] - 24:19, 26:10, 36:11, 54:13, 56:8, 56:19, 69:4, 70:10
**MOTION** [1] - 1:15
**motions** [6] - 3:4, 4:6, 4:18, 10:2, 10:25, 24:13
**movable** [1] - 51:14
**move** [7] - 9:22, 21:21, 40:1, 50:6, 52:17, 69:5, 70:10
**moveably** [1] - 37:11
**moved** [5] - 34:8, 34:9, 52:10, 52:11, 61:9
**movement** [1] - 36:12
**moves** [1] - 44:13
**moving** [6] - 15:20, 23:1, 24:12, 24:14, 46:10, 64:1
**MR** [110] - 3:9, 3:16, 3:18, 3:19, 3:20, 3:22, 7:15, 8:2, 8:13, 8:20, 9:6, 9:25, 10:18, 10:19, 10:21, 10:24, 11:3, 11:9, 11:11, 11:18, 11:21, 12:2, 12:13, 12:20, 13:17, 13:18, 14:21, 15:9, 15:20, 17:9, 17:18, 17:22, 19:13, 20:13, 20:18, 21:7, 21:22, 21:24, 21:25, 22:7, 22:17, 27:8, 27:10, 27:13, 28:12, 28:15, 28:19, 29:5, 29:7, 31:14, 31:19, 31:25, 32:3, 32:7, 32:12, 32:17, 33:9, 33:12, 33:19, 34:1, 34:4, 35:19, 35:21, 36:14, 43:2, 43:7, 43:9, 43:11, 43:21, 43:25, 50:9, 50:13, 51:4, 51:8,

9

51:10, 51:12, 52:19, 54:5, 54:9, 57:8, 57:15, 57:21, 59:4, 61:18, 61:19, 61:22, 61:25, 62:2, 63:5, 63:14, 63:20, 63:23, 64:1, 66:21, 67:16, 67:19, 68:14, 68:20, 68:24, 71:17, 71:19, 72:4, 73:25, 74:15, 75:15, 75:23, 76:10, 76:15, 76:18, 77:2
**multi** [1] - 44:9
**multi-question** [1] - 44:9
**multiple** [3] - 70:23, 71:6, 74:4
**must** [6] - 5:22, 19:9, 25:8, 30:21, 45:7, 71:23

## N

**name** [2] - 71:24, 71:25
**named** [1] - 56:5
**nancy** [1] - 2:15
**Nancy** [1] - 78:11
**NANCY** [1] - 78:12
**narrowing** [1] - 13:23
**narrowly** [1] - 63:3
**Nathan** [2] - 2:5, 3:18
**necessarily** [2] - 8:21, 60:22
**need** [19] - 5:1, 5:23, 10:15, 11:14, 12:24, 13:4, 23:15, 38:5, 41:5, 41:23, 44:7, 68:18, 70:1, 70:6, 71:24, 71:25, 72:23, 74:9
**needed** [2] - 12:15, 58:13
**needs** [1] - 51:24
**negotiate** [1] - 6:24
**Net** [1] - 20:6
**neutral** [3] - 12:8, 12:9
**never** [10] - 31:2, 41:15, 44:13, 48:21, 53:16, 55:13, 55:14, 60:20, 69:6, 72:24
**new** [5] - 10:9, 33:15, 55:22, 69:1, 69:2
**next** [6] - 20:16, 24:12, 27:23, 71:9, 75:25, 76:5
**NIGHTFORCE** [2] - 1:7, 1:7
**Nightforce** [103] - 14:4, 14:15, 14:23, 15:3, 15:8, 15:9, 15:11, 15:22, 15:24, 16:16, 16:19, 16:24, 16:25, 17:25, 18:3, 18:4, 18:6, 18:8, 18:17, 18:23, 19:1, 19:4, 20:7, 21:2, 23:2, 24:10, 24:18, 24:20, 24:22, 25:10, 26:1, 26:12, 27:4, 28:7, 28:15, 30:4, 30:5, 30:7, 31:20, 31:23, 32:4, 32:22, 33:20, 34:8, 40:16, 40:18, 40:25, 41:10, 44:6, 45:24, 46:4, 46:18, 48:7, 48:13, 52:10, 52:25, 53:4, 53:8, 53:15, 53:16, 54:10, 54:12, 54:15, 54:25, 55:7, 57:9, 57:10, 57:23, 59:8, 59:9, 60:11, 61:3, 61:4, 62:6, 62:9, 62:17, 62:24, 64:3, 64:12, 64:14, 65:8, 65:22, 66:15, 66:16, 69:5, 69:11, 69:19, 69:20, 69:21, 69:22, 69:23, 69:25, 70:9, 71:2, 71:5, 74:18, 74:23, 75:1, 75:3, 75:4, 76:13
**Nightforce's** [20] - 14:25, 18:2, 18:16, 24:15, 26:20, 26:25, 29:15, 29:23,

43:22, 44:8, 46:15, 54:14, 58:1, 66:9, 67:23, 69:4, 69:15, 69:17, 74:25, 75:1
**Ninth** [1] - 2:6
**Noble** [1] - 59:24
**non** [2] - 24:1, 61:10
**non-hindsight** [1] - 24:1
**non-infringement** [1] - 61:10
**none** [2] - 52:22, 74:5
**nonetheless** [1] - 72:19
**nonparty** [2] - 32:15, 32:24
**normal** [1] - 57:3
**not-too-distant** [1] - 4:24
**notably** [1] - 58:21
**note** [1] - 29:7
**nothing** [3] - 23:17, 27:13, 33:17
**notice** [2] - 60:11, 60:21
**notion** [2] - 32:10, 33:11
**NTP** [1] - 58:16
**number** [8] - 6:6, 6:7, 6:14, 8:13, 9:9, 35:6, 39:16, 42:5
**numerous** [2] - 10:3, 46:18

## O

**objection** [1] - 51:21
**obligated** [1] - 58:20
**observations** [1] - 7:6
**obtained** [1] - 49:3
**obtaining** [1] - 40:19
**obvious** [3] - 34:7, 72:19, 73:4
**obviously** [2] - 39:3, 49:22
**obviousness** [9] - 6:16, 15:25, 17:24, 23:1, 23:3, 23:21, 24:11, 66:17, 72:14
**occupy** [1] - 9:15
**occur** [1] - 58:25
**occurred** [1] - 40:12
**occurring** [1] - 58:11
**occurs** [1] - 76:11
**October** [1] - 46:1
**OF** [2] - 1:2, 1:16
**offers** [2] - 12:3, 12:4
**Official** [1] - 78:13
**oftentimes** [1] - 35:13
**old** [12] - 15:22, 15:24, 16:19, 16:24, 18:6, 18:9, 18:23, 19:4, 19:23, 24:1, 24:2, 27:14
**once** [8] - 19:19, 20:19, 47:10, 47:23, 47:24, 48:15, 66:7, 67:22
**one** [64] - 4:2, 4:7, 6:13, 10:6, 10:21, 11:18, 11:22, 13:19, 14:23, 15:16, 19:4, 19:9, 20:20, 20:21, 20:22, 24:17, 27:1, 28:1, 28:23, 30:3, 34:14, 39:2, 40:3, 41:24, 43:4, 43:5, 43:19, 44:15, 44:20, 44:21, 44:22, 46:1, 46:19, 46:23, 47:2, 49:21, 51:14, 51:19, 51:25, 53:17, 54:14, 55:23, 55:25, 56:2, 58:8, 61:19, 66:10, 66:11, 66:23, 67:1, 67:4, 67:6, 69:17, 71:3, 71:12, 71:13, 72:20, 73:2, 73:7, 76:5, 76:6, 76:11

**One** [2] - 2:13, 51:24
**ones** [4] - 8:13, 8:22, 10:3, 41:2
**oOo** [1] - 78:1
**open** [1] - 75:16
**opening** [1] - 34:15
**operation** [55] - 16:10, 16:20, 17:2, 17:12, 19:15, 19:16, 19:21, 20:3, 20:12, 20:17, 22:23, 23:5, 23:8, 23:11, 23:16, 24:5, 24:7, 26:22, 27:23, 28:6, 34:19, 38:6, 38:7, 38:8, 38:10, 38:19, 40:8, 41:6, 42:21, 44:19, 44:24, 45:17, 50:3, 64:6, 64:8, 65:16, 65:25, 66:3, 66:5, 66:20, 66:23, 67:3, 67:5, 67:13, 67:25, 68:1, 68:4, 68:9, 68:13, 71:4, 71:5, 71:11, 71:14, 71:15, 73:14
**operator** [1] - 73:18
**opinion** [1] - 25:21
**opportunity** [4] - 64:19, 65:1, 74:17, 74:19
**opposed** [3] - 4:20, 7:4, 28:7
**opposition** [4] - 13:24, 24:19, 24:23, 69:4
**Optex** [4] - 53:21, 54:1, 54:6, 54:9
**Optical** [4] - 29:25, 62:7, 62:13, 66:14
**optical** [2] - 36:22, 37:21
**OPTICS** [1] - 1:7
**option** [2] - 56:10, 56:11
**OR** [3] - 2:7, 2:14, 2:17
**oral** [3] - 3:3, 5:12, 70:14
**orange** [8] - 35:14, 36:6, 36:9, 37:8, 37:18, 39:18, 39:24, 67:23
**order** [11] - 4:12, 15:10, 20:7, 28:25, 30:20, 31:23, 42:16, 65:11, 65:12, 65:14, 69:22
**orders** [1] - 72:24
**ordinary** [3] - 25:23, 51:24, 51:25
**OREGON** [1] - 1:2
**Oregon** [2] - 1:6, 78:13
**original** [1] - 78:6
**originally** [2] - 60:17, 72:16
**otherwise** [7] - 19:11, 48:20, 48:21, 48:22, 48:25, 59:13, 65:15
**ought** [1] - 63:17
**outer** [1] - 22:19
**outside** [14] - 18:5, 25:24, 29:2, 31:11, 39:8, 39:9, 48:2, 48:10, 48:14, 48:16, 48:19, 49:18, 54:15, 67:20
**oven** [7] - 27:18, 27:21, 28:2, 28:3, 66:7, 66:8, 71:6
**overseas** [2] - 58:11, 58:15
**own** [5] - 4:11, 43:5, 59:21, 72:22, 76:8

## P

**page** [3] - 16:12, 24:23, 46:3
**pages** [1] - 4:2
**pain** [1] - 33:25
**papers** [1] - 8:5
**paperwork** [1] - 72:2
**parameters** [1] - 43:17

**paranoid** [1] - 63:1
**PARK** [16] - 3:9, 3:16, 7:15, 9:6, 10:18, 10:21, 10:24, 11:3, 12:2, 12:20, 13:17, 75:15, 76:10, 76:15, 76:18, 77:2
**Park** [4] - 2:2, 3:9, 9:5, 11:4
**part** [22] - 17:12, 17:15, 20:16, 22:2, 27:17, 37:8, 37:10, 39:18, 39:24, 39:25, 50:21, 55:19, 57:17, 58:11, 58:24, 60:6, 61:8, 62:5, 67:22, 67:23, 68:19
**partially** [2] - 37:8, 49:9
**particular** [7] - 5:17, 8:7, 28:24, 37:2, 65:11, 65:21, 67:8
**particularity** [1] - 71:23
**particularly** [1] - 52:13
**parties** [42] - 8:6, 9:18, 12:6, 13:9, 15:22, 16:5, 16:13, 17:2, 17:10, 17:12, 17:19, 31:4, 31:7, 31:10, 31:11, 33:1, 33:4, 34:21, 34:22, 41:7, 42:8, 42:24, 43:1, 48:4, 55:6, 55:8, 56:5, 56:9, 58:9, 59:17, 63:21, 64:4, 64:9, 64:17, 64:18, 64:22, 65:5, 66:2, 67:21, 68:3, 71:1, 75:1
**parties'** [1] - 3:4
**parts** [10] - 18:11, 19:8, 35:22, 36:3, 39:1, 66:22, 67:4, 68:2
**party** [11] - 15:17, 27:14, 32:2, 42:11, 45:4, 53:18, 56:1, 59:11, 59:22, 71:24
**passes** [1] - 47:17
**past** [2] - 30:22, 70:9
**patent** [39] - 6:12, 6:13, 8:9, 8:10, 8:25, 13:21, 13:22, 13:24, 14:1, 15:4, 19:17, 20:10, 21:8, 21:10, 21:11, 22:21, 23:7, 25:18, 25:19, 26:14, 28:10, 30:3, 30:6, 30:12, 30:13, 40:24, 41:3, 46:2, 46:15, 46:24, 51:20, 52:24, 54:17, 60:12, 65:17, 65:18, 69:16, 73:8, 75:17
**patented** [1] - 59:12
**patentee** [1] - 23:21
**patents** [11] - 4:1, 5:22, 6:6, 6:13, 8:7, 8:11, 9:2, 9:7, 9:15, 30:3, 30:23
**pattern** [2] - 33:13, 33:16
**pause** [1] - 61:21
**pecuniary** [1] - 56:16
**people** [3] - 12:18, 63:7, 63:16
**percent** [4] - 8:10, 17:18, 17:19, 67:16
**perform** [1] - 59:8
**performed** [1] - 54:25
**perhaps** [4] - 41:18, 59:7, 61:6, 63:14
**period** [7] - 40:22, 46:1, 46:20, 48:9, 49:5, 52:23, 72:22
**permit** [2] - 58:16, 61:12
**permits** [1] - 38:14
**person** [14] - 19:3, 19:6, 19:13, 19:24, 24:9, 25:6, 25:17, 25:22, 32:14, 44:19, 44:20, 44:22, 48:8, 73:10
**perspective** [2] - 8:1, 32:6
**ph** [3] - 26:4, 50:20, 71:24
**phrase** [8] - 21:9, 37:14, 37:15, 38:10, 40:14, 41:10, 44:10, 50:22

**phrased** [1] - 67:17
**phraseology** [1] - 41:8
**phrases** [7] - 42:2, 51:2, 51:12, 51:17, 52:2, 52:6, 52:14
**pick** [3] - 54:7, 71:19, 75:21
**picture** [9] - 35:12, 36:4, 46:3, 46:4, 46:13, 46:23, 46:24, 48:23
**piece** [5] - 22:17, 35:15, 53:14, 59:2, 73:8
**pieces** [5] - 28:24, 35:9, 36:3, 49:17, 72:24
**ping** [4] - 9:18, 9:21, 10:7, 54:19
**ping-pong** [2] - 9:21, 54:19
**ping-ponging** [2] - 9:18, 10:7
**pivot** [51] - 16:17, 16:19, 16:24, 19:19, 20:24, 20:25, 21:4, 21:5, 21:7, 21:16, 21:17, 22:11, 22:18, 22:21, 36:6, 36:10, 37:7, 37:9, 37:10, 37:11, 37:12, 37:20, 39:4, 39:17, 39:18, 39:19, 39:21, 39:22, 39:23, 46:6, 46:25, 47:7, 48:13, 48:14, 48:17, 49:8, 49:11, 51:13, 51:14, 66:6, 66:24, 67:4, 68:7, 71:7, 71:9, 71:13
**pivotable** [4] - 39:19, 50:23, 51:16, 52:8
**pivotally** [3] - 37:17, 39:17, 39:21
**pivoting** [14] - 21:14, 21:15, 21:19, 36:11, 36:16, 37:1, 38:1, 38:15, 39:3, 39:11, 39:20, 40:17, 47:24, 49:6
**pivots** [5] - 22:12, 28:22, 49:12
**place** [3] - 41:9, 44:21, 57:21
**placed** [3] - 27:5, 67:9, 67:11
**plaintiff** [5] - 3:10, 5:21, 9:20, 30:15, 31:1
**Plaintiff** [1] - 1:4
**PLAINTIFF** [1] - 2:2
**plaintiff's** [3] - 9:14, 10:3, 12:9
**plaintiffs** [2] - 7:12, 74:14
**plan** [2] - 8:3, 14:10
**planning** [1] - 62:7
**play** [1] - 28:21
**plead** [4] - 56:6, 58:3, 59:15, 60:8
**pleaded** [1] - 70:21
**pleading** [1] - 57:3
**pleadings** [3] - 57:17, 59:20, 70:11
**pled** [6] - 55:11, 55:13, 58:12, 60:7, 71:21, 71:23
**plenty** [1] - 7:2
**plurality** [1] - 74:4
**plus** [1] - 21:15
**point** [31] - 5:23, 6:1, 6:2, 7:17, 22:13, 23:6, 23:8, 23:15, 23:17, 26:5, 28:4, 29:14, 29:22, 32:1, 33:3, 43:15, 43:16, 44:15, 45:22, 46:17, 47:22, 48:9, 48:11, 51:19, 54:20, 60:25, 65:23, 67:15, 67:22, 71:19, 76:11
**pointed** [1] - 22:14
**points** [2] - 62:3, 67:7
**pong** [2] - 9:21, 54:19
**ponging** [2] - 9:18, 10:7
**pool** [1] - 9:8

**portion** [6] - 36:5, 36:6, 36:9, 36:10, 47:5, 47:6
**Portland** [4] - 1:6, 2:7, 2:14, 2:17
**position** [6] - 33:20, 38:2, 38:16, 39:12, 58:1, 72:18
**positioned** [3] - 36:16, 39:3, 49:3
**positioning** [1] - 37:23
**positive** [1] - 10:2
**possibility** [1] - 30:21
**possible** [3] - 66:6, 66:9, 66:12
**possibly** [1] - 44:16
**potential** [2] - 9:8, 31:10
**practical** [1] - 73:3
**practice** [1] - 73:16
**prayer** [1] - 70:18
**pre** [51] - 16:6, 16:7, 16:9, 16:20, 16:23, 17:3, 17:10, 23:4, 26:14, 26:21, 27:7, 35:10, 35:25, 36:16, 37:1, 37:3, 38:1, 38:15, 39:6, 39:9, 39:11, 39:14, 40:14, 40:16, 41:4, 41:11, 42:19, 42:25, 46:5, 46:16, 49:2, 49:6, 53:5, 53:11, 53:14, 54:2, 54:9, 55:2, 55:3, 56:1, 56:6, 58:9, 64:5, 64:19, 65:7, 65:15, 68:3, 73:24
**pre-assemble** [3] - 38:1, 38:15, 39:11
**pre-assembled** [16] - 16:6, 16:7, 16:20, 27:7, 35:25, 36:16, 39:9, 39:14, 41:11, 42:25, 46:5, 46:16, 49:2, 49:6, 56:1, 58:9
**pre-assembles** [1] - 54:9
**pre-assembling** [25] - 16:6, 16:7, 16:9, 17:3, 17:10, 35:10, 37:1, 37:3, 40:14, 40:16, 41:4, 42:19, 42:25, 53:5, 53:11, 53:14, 55:2, 55:3, 56:6, 64:5, 64:19, 65:7, 65:15, 68:3, 73:24
**pre-assembly** [6] - 16:23, 23:4, 26:14, 26:21, 39:6, 54:2
**prejudice** [4] - 14:3, 15:15, 29:19, 31:2
**premise** [1] - 60:16
**premised** [1] - 34:18
**prepare** [1] - 13:6
**present** [8] - 4:13, 6:20, 7:2, 20:8, 24:22, 33:3, 61:10, 74:20
**presentation** [6] - 7:18, 26:17, 29:12, 45:13, 66:17, 67:23
**presentations** [1] - 8:18
**presented** [5] - 24:18, 41:20, 42:9, 54:24, 60:4
**presenting** [3] - 6:10, 32:11, 44:4
**presents** [1] - 16:16
**preserve** [2] - 62:22, 62:23
**press** [1] - 15:10
**pressure** [1] - 4:14
**presumably** [2] - 27:20, 30:6
**pretty** [1] - 5:12
**prevail** [1] - 66:16
**prevents** [1] - 44:25
**previous** [1] - 30:1
**primary** [1] - 15:21
**prioritize** [2] - 8:3, 8:17

**private** [2] - 12:8, 12:14
**problem** [13] - 17:5, 18:4, 18:20, 19:6, 21:2, 23:2, 25:16, 31:9, 43:25, 44:1, 45:2, 58:8, 64:16
**procedural** [2] - 59:17, 64:16
**proceed** [2] - 14:9, 59:18
**PROCEEDINGS** [1] - 1:16
**proceedings** [3] - 61:21, 77:6, 78:5
**process** [11] - 12:5, 18:13, 28:2, 45:6, 45:14, 46:10, 46:22, 61:8, 66:9, 71:6, 73:6
**produced** [11] - 29:24, 41:3, 52:21, 52:25, 53:3, 53:21, 53:22, 53:24, 54:15, 58:15, 58:23
**produces** [2] - 54:1, 54:7
**producing** [1] - 33:23
**product** [3] - 15:3, 54:24, 61:3
**products** [11] - 15:1, 29:20, 29:21, 31:16, 60:2, 62:9, 62:11, 62:14, 62:22, 68:21, 69:18
**proof** [1] - 58:19
**proper** [1] - 35:1
**properties** [1] - 49:12
**propose** [1] - 13:21
**proposed** [1] - 69:15
**prove** [6] - 15:25, 16:19, 18:16, 20:7, 24:20, 69:8
**proves** [1] - 25:5
**provide** [3] - 36:23, 37:25, 38:14
**provided** [6] - 30:15, 39:2, 42:15, 49:2, 50:15, 56:3
**providing** [3] - 31:20, 32:3, 36:25
**public** [5] - 45:23, 45:24, 46:5, 46:15, 46:21
**pull** [2] - 29:7, 35:15
**purpose** [2] - 56:15, 56:16
**purposes** [3] - 7:18, 16:18, 59:18
**pursuant** [1] - 26:14
**pursue** [1] - 59:9
**pursued** [1] - 30:15
**pushed** [1] - 10:25
**put** [24] - 6:3, 19:5, 19:8, 19:14, 19:18, 19:25, 20:3, 27:1, 27:6, 28:3, 29:1, 33:20, 38:21, 40:2, 48:24, 50:14, 56:7, 58:20, 66:11, 67:20, 67:25, 68:7, 69:10, 71:10
**puts** [2] - 53:15, 66:22
**putting** [5] - 6:7, 20:24, 24:3, 42:17, 66:19
**puzzling** [1] - 5:5

## Q

**quality** [1] - 65:19
**questions** [6] - 7:3, 50:6, 52:16, 52:18, 59:1, 61:23
**quickly** [1] - 12:10
**quite** [2] - 21:10, 67:7
**quote** [2] - 43:1, 48:11

## R

**race** [1] - 4:9
**raise** [8] - 54:20, 59:19, 60:25, 61:7, 61:12, 72:1, 72:6, 72:18
**raised** [7] - 40:7, 51:23, 55:14, 59:22, 69:3, 70:13, 73:1
**rather** [2] - 7:22, 39:15
**rationale** [1] - 24:1
**reached** [3] - 8:20, 64:17, 64:22
**read** [2] - 42:8, 44:12
**reading** [2] - 41:25, 42:1
**reads** [1] - 47:2
**ready** [1] - 11:17
**Reagan's** [2] - 26:4, 50:20
**real** [2] - 15:11, 16:22
**realistic** [1] - 4:20
**really** [6] - 25:3, 37:2, 38:24, 64:15, 68:18, 75:16
**reason** [8] - 3:24, 6:5, 14:9, 15:12, 15:15, 42:13, 62:16, 73:10
**reasoning** [3] - 23:14, 25:17, 26:5
**reasons** [2] - 4:7, 65:24
**received** [3] - 37:8, 49:9, 60:11
**recent** [1] - 29:25
**recently** [2] - 41:18, 60:12
**recess** [1] - 76:25
**recite** [1] - 35:10
**recited** [1] - 49:12
**reciting** [1] - 38:14
**record** [10] - 3:8, 7:23, 18:15, 32:9, 51:21, 62:10, 68:16, 76:16, 78:4
**reduce** [2] - 63:3, 65:23
**reduces** [2] - 65:20, 65:21
**reference** [1] - 20:9
**references** [1] - 23:23
**referencing** [2] - 38:4, 58:23
**referring** [2] - 36:7, 37:21
**refers** [1] - 16:24
**regard** [1] - 72:14
**regarding** [3] - 15:8, 30:22, 73:23
**regardless** [1] - 42:11
**regards** [3] - 30:25, 31:4, 56:25
**reinsert** [1] - 29:8
**rejected** [1] - 25:10
**relates** [2] - 50:22, 50:24
**relatively** [2] - 36:21, 37:25
**relax** [1] - 51:7
**relevance** [1] - 58:5
**relevant** [4] - 8:8, 8:9, 57:15, 61:5
**relevantly** [1] - 29:22
**relief** [2] - 70:19, 71:22
**relieves** [1] - 30:7
**rely** [2] - 24:24, 26:1
**relying** [3] - 34:20, 55:16, 61:15
**remain** [1] - 15:2
**remainder** [1] - 9:12
**remained** [1] - 30:13
**remaining** [5] - 35:5, 35:7, 53:11, 72:9,
75:21
**remedies** [1] - 71:22
**remember** [2] - 6:14, 42:24
**remembering** [1] - 49:20
**remove** [2] - 32:13, 61:13
**removed** [2] - 28:17, 47:5
**repeatedly** [1] - 64:2
**reply** [3] - 55:10, 57:22, 69:12
**report** [1] - 44:12
**Reporter** [1] - 78:13
**REPORTER** [3] - 2:15, 54:3, 54:6
**reporter's** [1] - 51:6
**reports** [2] - 23:11, 41:21
**represent** [1] - 9:9
**representative** [1] - 3:12
**representing** [2] - 9:8, 36:11
**represents** [1] - 46:20
**request** [3] - 29:15, 71:22, 72:5
**requesting** [2] - 5:11, 33:24
**require** [1] - 59:19
**required** [6] - 17:3, 35:10, 56:7, 56:18, 57:16, 60:7
**requirement** [2] - 42:16, 58:3
**rescheduled** [1] - 10:22
**resolved** [1] - 33:4
**respect** [6] - 13:2, 14:25, 29:19, 35:7, 50:5, 53:5, 53:9, 58:12, 62:8, 62:11, 65:21, 72:5
**respond** [2] - 62:2, 76:6
**respondeat** [1] - 75:6
**response** [2] - 26:13, 72:1
**responses** [1] - 7:13
**rest** [5] - 4:11, 9:3, 35:21, 37:4, 67:10
**results** [1] - 4:18
**retain** [1] - 39:23
**retained** [1] - 46:7
**reveal** [1] - 46:12
**revealed** [2] - 39:8, 46:21
**reveals** [1] - 28:25
**review** [1] - 4:3
**reviewed** [2] - 48:15, 73:9
**revisit** [1] - 5:25
**rifle** [5] - 21:20, 21:23, 22:13, 31:20, 40:19
**rights** [3] - 33:22, 62:20, 62:23
**ring** [4] - 28:21, 46:7, 67:8, 67:20
**ripe** [2] - 72:8, 72:10
**Rives** [2] - 2:2, 2:6
**RMR** [2] - 2:15, 78:12
**rolled** [1] - 4:1
**rolling** [1] - 11:15
**Room** [1] - 2:16
**room** [2] - 73:7
**rotatable** [4] - 37:13, 37:14, 51:15, 52:7
**roundabout** [1] - 62:18
**rule** [1] - 50:16
**Rule** [1] - 61:11
**rules** [3] - 59:19, 70:1
**rulings** [1] - 4:20

**runs** [1] - 54:22
**rush** [1] - 7:10

# S

**S.C** [1] - 2:9
**sake** [1] - 15:23
**Salmon** [1] - 2:13
**SanDisk** [1] - 14:11
**sat** [1] - 20:21
**save** [1] - 41:19
**scenarios** [2] - 53:1, 53:2
**schedule** [2] - 11:12, 12:5
**scheduled** [2] - 3:25, 12:10
**scope** [32] - 18:10, 19:5, 19:14, 20:21, 21:5, 21:20, 22:25, 28:16, 28:25, 34:13, 35:12, 35:22, 35:23, 36:15, 39:1, 39:2, 39:4, 40:4, 40:6, 40:10, 40:13, 45:20, 46:20, 48:16, 48:17, 48:20, 55:22, 60:23, 66:4, 71:6, 71:12, 74:10
**scopes** [62] - 15:23, 15:24, 16:19, 16:25, 18:5, 18:6, 18:9, 18:19, 18:23, 19:4, 19:20, 19:23, 19:25, 20:2, 24:1, 24:2, 26:23, 27:5, 27:6, 27:14, 29:23, 31:20, 31:24, 32:3, 32:4, 40:16, 40:19, 41:1, 45:3, 45:4, 45:8, 45:10, 45:12, 45:16, 45:18, 45:19, 45:24, 46:11, 46:16, 46:18, 46:20, 46:22, 48:8, 48:13, 49:5, 52:21, 52:22, 53:2, 53:9, 53:10, 53:11, 53:19, 53:20, 53:22, 54:14, 58:23, 59:5, 60:5, 66:10, 72:17, 74:5
**Scott** [4] - 2:11, 3:20, 11:9, 61:17
**screw** [21] - 19:9, 28:24, 29:2, 36:18, 46:7, 46:8, 47:7, 47:12, 47:17, 47:19, 47:22, 48:2, 48:9, 48:14, 48:16, 48:19, 48:25, 49:18, 49:24, 67:8, 67:20
**seat** [2] - 3:2, 22:21
**seated** [2] - 48:17, 49:22
**seating** [2] - 39:17, 39:21
**Seattle** [1] - 2:4
**second** [12] - 7:20, 8:22, 22:4, 34:8, 34:9, 37:11, 37:12, 37:16, 37:20, 42:22, 58:8, 75:21
**seconds** [3] - 50:11, 50:13, 50:17
**secret** [1] - 46:14
**secure** [3] - 38:2, 39:13, 40:2
**secured** [3] - 36:17, 39:5, 49:4
**securing** [1] - 37:24
**see** [24] - 12:23, 13:11, 13:19, 17:9, 27:15, 27:17, 28:21, 34:11, 35:11, 36:5, 36:10, 40:8, 45:11, 45:21, 46:15, 46:25, 47:12, 50:5, 52:16, 57:12, 58:6, 61:23, 76:1, 76:25
**seeing** [2] - 35:21, 37:16
**seek** [2] - 14:16, 60:19
**sell** [2] - 31:21, 57:10
**selling** [4] - 31:17, 40:20, 40:25, 57:10
**sells** [1] - 29:23

**send** [2] - 76:1, 76:5
**sense** [10] - 6:3, 6:20, 7:25, 9:6, 9:25, 23:13, 23:14, 52:9, 75:16, 75:20
**sent** [2] - 30:1, 60:12
**separate** [54] - 16:10, 16:20, 17:2, 17:12, 17:16, 19:15, 19:21, 20:3, 20:11, 20:17, 22:22, 23:4, 23:8, 23:11, 23:16, 24:5, 24:7, 26:22, 28:1, 28:6, 34:18, 38:6, 38:10, 38:18, 40:8, 41:6, 41:13, 41:14, 42:21, 44:21, 44:24, 45:17, 50:3, 64:5, 64:8, 65:16, 65:24, 66:2, 66:5, 66:20, 66:23, 67:3, 67:13, 67:25, 68:4, 68:9, 68:13, 71:4, 71:5, 71:10, 71:14, 71:15, 73:13
**separately** [2] - 42:5, 70:21
**separates** [1] - 67:14
**September** [2] - 16:5, 60:1
**series** [1] - 53:2
**set** [7] - 6:11, 17:13, 18:8, 53:19, 53:20, 67:8
**setting** [1] - 17:16
**settle** [2] - 11:24, 13:5
**settlement** [2] - 12:3, 76:2
**shift** [2] - 57:19, 65:23
**ship** [1] - 55:6
**ships** [3] - 53:14, 54:10, 59:6
**short** [1] - 30:7
**shortcut** [1] - 23:14
**show** [19] - 18:9, 18:10, 18:13, 20:8, 24:20, 35:12, 44:6, 46:13, 55:23, 56:10, 56:11, 56:14, 56:15, 56:18, 58:3, 58:13, 69:7
**showed** [1] - 45:13
**showing** [7] - 36:14, 45:15, 45:23, 47:15, 48:23, 55:25, 57:16
**shown** [4] - 46:3, 47:5, 55:20, 68:7
**shows** [6] - 18:18, 46:4, 46:6, 47:11, 47:16, 57:15
**side** [4] - 10:3, 47:17, 70:16
**sides** [4] - 5:11, 7:17, 7:21, 8:3
**Siegel** [1] - 2:12
**sighting** [1] - 36:22
**signature** [3] - 78:6, 78:7
**signed** [1] - 78:7
**signing** [1] - 78:3
**similar** [2] - 35:16, 39:10
**simple** [1] - 49:16
**simply** [13] - 6:12, 18:8, 21:1, 23:11, 23:17, 23:23, 24:10, 41:25, 47:25, 55:18, 57:17, 58:16, 75:4
**single** [9] - 20:9, 61:3, 66:10, 66:19, 66:22, 67:6, 71:12, 73:10, 73:18
**sit** [2] - 21:20, 29:21
**sitting** [1] - 44:20
**situation** [8] - 23:22, 40:18, 44:18, 55:5, 55:7, 56:4, 60:3, 61:2
**sized** [2] - 37:7, 49:8
**skill** [5] - 19:3, 19:6, 25:6, 51:24, 52:1
**skilled** [1] - 25:22
**slide** [8] - 11:21, 27:16, 39:7, 42:23,

51:10, 57:15, 57:18, 58:6
**slides** [4] - 13:18, 40:8, 45:21, 47:6
**slot** [1] - 47:12
**slow** [3] - 51:3, 51:9, 54:3
**small** [2] - 8:14, 54:13
**smart** [3] - 63:2, 63:10, 63:16
**snippet** [1] - 26:2
**snugly** [1] - 47:25
**sold** [3] - 45:25, 46:18, 53:4
**solely** [1] - 24:25
**solid** [1] - 36:19
**Solomon** [1] - 25:11
**Solutions** [1] - 23:20
**someone** [10] - 15:12, 18:18, 19:22, 20:2, 46:9, 53:24, 55:2, 55:3, 73:2, 73:15
**sometimes** [4] - 6:23, 13:3, 29:8, 33:18
**somewhat** [1] - 21:8
**somewhere** [2] - 4:24, 22:8
**sorry** [9] - 3:14, 17:6, 31:18, 31:19, 50:23, 54:5, 57:18, 61:15, 76:17
**sort** [2] - 49:3, 76:19
**sought** [1] - 60:18
**sounded** [1] - 69:1
**sounds** [4] - 10:18, 31:5, 32:25
**space** [2] - 47:25, 48:24
**Sparkman** [2] - 2:12, 3:21
**special** [21] - 35:9, 38:6, 38:9, 40:14, 41:5, 41:8, 41:17, 41:22, 42:8, 43:14, 44:1, 44:2, 44:11, 44:24, 48:1, 50:2, 55:22, 59:14, 64:1, 64:3, 74:9
**specifically** [3] - 67:14, 70:3, 70:18
**specification** [5] - 42:2, 42:4, 42:6, 51:18, 52:14
**specifics** [1] - 29:11
**specifies** [1] - 65:14
**speculative** [1] - 15:5
**speeding** [1] - 7:22
**spend** [1] - 6:9
**spending** [1] - 8:15
**spent** [2] - 9:11, 67:7
**squeeze** [1] - 4:21
**stack** [1] - 21:13
**stand** [2] - 45:18, 53:13
**stand-alone** [1] - 53:13
**standpoint** [3] - 9:14, 51:1, 52:2
**stands** [1] - 30:9
**start** [11] - 9:17, 10:6, 10:12, 11:15, 12:6, 12:7, 12:9, 13:21, 60:19, 71:12, 71:13
**started** [1] - 11:21
**starting** [1] - 62:3
**starts** [1] - 22:7
**state** [1] - 3:7
**STATES** [2] - 1:1, 1:18
**States** [12] - 2:16, 18:5, 18:22, 18:23, 18:25, 19:3, 31:21, 45:25, 53:4, 53:15, 58:25, 59:11, 59:12
**statutory** [1] - 59:10

**step** [19] - 20:16, 27:15, 27:16, 27:23, 28:1, 36:23, 37:1, 37:2, 37:23, 37:24, 38:15, 42:15, 42:17, 53:11, 55:3, 71:9, 73:20

**stepped** [1] - 13:25

**steps** [37] - 20:23, 28:25, 35:8, 35:11, 36:23, 38:5, 38:7, 38:8, 38:22, 38:25, 39:1, 39:6, 39:11, 39:15, 39:16, 40:1, 40:3, 40:5, 40:10, 40:11, 40:12, 41:2, 42:16, 53:16, 53:17, 54:25, 55:1, 55:8, 56:3, 58:15, 59:7, 59:8, 61:4, 67:14, 73:6, 73:16, 74:8

**STEVENS** [1] - 1:3

**Stevens** [3] - 3:5, 3:10, 3:16

**stick** [1] - 65:4

**sticklers** [2] - 70:1, 70:7

**still** [12] - 6:16, 14:4, 29:20, 31:6, 32:6, 32:23, 33:1, 33:8, 33:25, 62:21, 63:23, 73:13

**stipulated** [5] - 16:5, 17:3, 17:10, 41:11, 42:24

**Stockdill** [1] - 48:7

**Stoel** [2] - 2:2, 2:6

**stop** [4] - 17:23, 22:24, 50:5, 52:16

**story** [1] - 52:20

**straightforward** [4] - 36:21, 37:25, 38:24, 40:3

**Street** [2] - 2:3, 2:13

**stretch** [1] - 33:15

**stretching** [1] - 33:19

**stricken** [2] - 11:1, 59:24

**struck** [1] - 4:16

**structure** [10] - 21:15, 21:19, 21:20, 34:13, 36:19, 38:19, 39:7, 40:4, 41:1, 45:8

**structures** [2] - 16:16, 16:23

**stuck** [2] - 17:1, 17:4

**stuff** [1] - 4:25

**style** [1] - 46:19

**sub** [3] - 39:16, 39:24, 39:25

**subcontractors** [1] - 69:12

**submit** [1] - 9:17

**submitted** [1] - 72:2

**subset** [1] - 54:13

**substantial** [1] - 44:1

**succeed** [1] - 57:24

**success** [1] - 13:23

**sue** [8] - 15:3, 30:16, 32:12, 33:2, 62:7, 62:16, 62:19

**sued** [1] - 15:7

**sues** [1] - 40:25

**suggested** [2] - 44:15, 55:10

**suggesting** [1] - 60:13

**suggestion** [1] - 6:22

**suggestions** [2] - 7:13, 75:16

**suing** [2] - 14:23, 62:13

**suit** [1] - 32:15

**Suite** [4] - 2:3, 2:7, 2:10, 2:14

**suits** [1] - 30:22

**summary** [33] - 3:4, 4:6, 4:18, 4:25, 5:9, 5:11, 7:10, 7:20, 17:24, 18:3, 23:20, 24:14, 26:10, 28:7, 30:12, 41:19, 50:3, 52:10, 52:11, 56:20, 56:24, 57:23, 59:22, 61:8, 61:10, 68:16, 69:4, 69:5, 70:11, 72:6, 72:13, 74:18

**superior** [1] - 75:7

**supplier** [3] - 30:5, 33:6, 62:6

**suppliers** [2] - 31:6, 31:12

**supply** [1] - 23:12

**support** [5] - 4:6, 29:17, 32:10, 33:11, 60:24

**supported** [1] - 30:9

**surprised** [1] - 13:3

**surprising** [1] - 69:1

**suspect** [1] - 9:16

**sustain** [1] - 56:19

**switch** [1] - 58:5

## T

**table** [2] - 6:7, 6:16

**talks** [1] - 65:18

**tango** [1] - 12:21

**teaches** [1] - 23:7

**technical** [4] - 35:4, 48:7, 51:2, 52:1

**technicality** [1] - 70:16

**technician** [7] - 20:21, 66:10, 66:19, 66:22, 67:6, 71:7, 71:12

**temperament** [1] - 44:18

**tensioning** [1] - 72:23

**term** [6] - 21:7, 21:10, 38:11, 41:16, 41:17, 64:19

**termination** [1] - 15:4

**terminology** [4] - 34:3, 34:20, 34:21, 34:23

**terms** [12] - 25:2, 25:4, 31:18, 34:23, 35:1, 35:8, 36:2, 36:5, 36:7, 41:8, 43:18, 52:13

**territory** [1] - 33:15

**tested** [1] - 73:9

**testified** [2] - 18:15, 19:24

**testimony** [12] - 24:8, 24:18, 24:22, 24:25, 26:3, 26:4, 48:6, 50:20, 68:15, 69:15, 69:19, 72:23

**Texas** [2] - 54:1, 54:6

**thankfully** [1] - 16:3

**THE** [107] - 1:1, 1:2, 1:17, 2:2, 2:8, 3:2, 3:3, 3:14, 3:17, 3:23, 7:24, 8:12, 8:19, 8:24, 9:23, 10:5, 10:14, 10:15, 10:20, 10:23, 11:2, 11:7, 11:12, 11:20, 11:22, 12:12, 12:17, 12:22, 14:19, 15:7, 15:19, 17:6, 17:15, 17:21, 19:12, 20:11, 20:15, 21:4, 21:19, 22:6, 22:16, 27:3, 27:9, 27:12, 28:11, 28:14, 28:18, 29:4, 29:6, 30:24, 31:18, 31:22, 32:1, 32:5, 32:8, 32:14, 32:21, 33:10, 33:14, 33:25, 34:2, 35:17, 35:20, 36:13, 42:22, 43:3, 43:8, 43:10, 43:15, 43:24, 50:8, 50:11, 51:3, 51:5, 51:9, 51:11,

52:18, 54:3, 54:6, 56:25, 57:12, 57:20, 59:3, 61:24, 62:1, 63:1, 63:9, 63:16, 63:22, 63:25, 66:18, 67:6, 67:18, 68:12, 68:18, 68:23, 71:16, 71:18, 72:1, 73:22, 74:12, 75:12, 75:24, 76:14, 76:17, 76:21, 77:3

**themselves** [3] - 3:11, 18:7, 46:12

**theories** [1] - 6:16

**theory** [3] - 59:12, 75:6, 75:7

**therefore** [6] - 14:7, 18:2, 20:20, 25:6, 29:15, 40:6

**they've** [18] - 13:12, 29:13, 29:18, 29:19, 30:3, 32:18, 34:15, 45:5, 45:7, 55:17, 58:18, 60:4, 60:20, 68:6, 68:7, 72:9, 72:11, 73:14

**thicker** [1] - 28:20

**thinking** [3] - 4:4, 9:5, 12:22

**Third** [1] - 2:16

**third** [3] - 37:23, 53:19, 56:5

**thoughtful** [1] - 5:2

**threaded** [3] - 47:7, 47:13, 47:18

**threat** [1] - 31:15

**threatened** [1] - 32:15

**threatening** [1] - 30:5

**three** [10] - 6:9, 6:21, 13:5, 13:6, 34:5, 39:11, 51:2, 51:12, 53:1, 53:23

**throw** [2] - 10:13, 70:7

**tie** [1] - 8:11

**timing** [2] - 44:15, 75:15

**titled** [1] - 78:5

**today** [27] - 3:3, 4:12, 8:2, 8:7, 8:25, 9:2, 9:11, 10:2, 10:4, 14:10, 15:25, 26:22, 26:25, 27:15, 27:25, 44:4, 45:12, 45:16, 45:17, 50:19, 52:21, 62:22, 64:11, 64:14, 66:2, 74:19, 75:20

**today's** [1] - 7:18

**Todd** [1] - 2:12

**together** [44] - 3:24, 4:19, 6:3, 6:6, 16:25, 17:1, 18:11, 18:14, 19:5, 19:8, 19:9, 19:14, 19:18, 19:25, 20:3, 20:24, 24:4, 27:6, 28:24, 29:1, 36:19, 39:25, 46:7, 47:1, 47:8, 47:10, 47:14, 47:19, 47:20, 47:23, 49:17, 49:24, 49:25, 66:12, 66:20, 66:22, 67:4, 67:11, 67:24, 67:25, 68:8, 70:23

**took** [1] - 75:19

**tool** [1] - 48:1

**top** [4] - 20:22, 21:20, 21:23, 27:15

**torturous** [1] - 44:8

**totality** [1] - 41:12

**towards** [1] - 11:25

**tracks** [1] - 26:5

**Trade** [1] - 2:13

**traditional** [1] - 21:17

**transcript** [2] - 78:4, 78:6

**TRANSCRIPT** [1] - 1:16

**transversely** [7] - 37:13, 37:14, 39:19, 50:24, 51:14, 51:15, 51:16

**trial** [6] - 4:16, 4:17, 4:20, 4:22, 10:22, 43:10

**tricky** [1] - 62:5
**tried** [1] - 54:18
**tries** [1] - 23:24
**trouble** [1] - 67:15
**true** [6] - 5:10, 9:16, 14:17, 56:25, 57:3, 72:19
**truly** [1] - 33:21
**try** [3] - 7:23, 13:5, 15:24
**trying** [15] - 4:20, 5:6, 7:8, 7:17, 8:2, 11:24, 12:5, 24:15, 38:9, 42:12, 60:23, 62:21, 62:23, 64:3
**tube** [33] - 17:1, 17:4, 21:8, 21:12, 21:13, 21:17, 21:18, 22:4, 22:7, 27:16, 28:21, 29:8, 29:10, 36:6, 36:12, 37:9, 37:10, 37:17, 37:20, 39:17, 39:19, 39:22, 39:23, 40:2, 46:6, 46:25, 47:5, 47:7, 47:9, 47:23, 49:11, 51:13
**tubing** [1] - 41:13
**tubular** [3] - 35:25, 36:23, 39:2
**turn** [3] - 7:12, 23:12, 23:13
**turning** [3] - 50:18, 59:4, 68:24
**two** [39] - 3:24, 4:4, 4:9, 6:9, 8:7, 8:11, 8:17, 8:24, 9:2, 9:7, 9:14, 12:21, 13:5, 15:21, 17:8, 22:10, 23:18, 28:19, 28:24, 30:1, 33:4, 35:5, 35:8, 36:4, 36:7, 39:16, 47:8, 47:10, 47:13, 47:18, 47:19, 47:23, 53:1, 55:8, 55:23, 58:8, 68:2, 73:14
**type** [2] - 53:5, 55:22
**typically** [1] - 36:18

## U

**U.S** [1] - 59:7
**U.S.-assembled** [1] - 74:23
**ultimately** [3] - 35:22, 36:17, 47:6
**unamended** [1] - 30:14
**unasserted** [3] - 14:17, 14:18, 30:22
**under** [10] - 20:6, 30:6, 38:16, 52:24, 59:10, 59:18, 60:16, 66:8, 70:15, 76:22
**understood** [1] - 41:10
**undisputed** [1] - 45:24
**undoubtedly** [1] - 61:9
**unfortunately** [1] - 25:9
**unilaterally** [1] - 63:23
**unit** [38] - 16:25, 17:2, 28:16, 35:13, 35:18, 35:24, 36:4, 36:8, 36:16, 37:1, 37:4, 37:5, 37:6, 37:23, 38:1, 38:15, 38:20, 38:21, 39:3, 39:12, 39:14, 39:20, 40:17, 41:12, 42:19, 47:4, 47:18, 47:24, 49:3, 49:6, 49:21, 53:13, 53:14, 53:21, 54:9, 55:6, 72:23, 73:19
**UNITED** [2] - 1:1, 1:18
**United** [13] - 2:16, 18:5, 18:22, 18:23, 18:25, 19:3, 31:21, 45:25, 53:4, 53:14, 58:25, 59:11, 59:12
**units** [10] - 42:5, 46:16, 46:24, 53:24, 54:1, 54:7, 56:6, 58:9, 58:23, 74:5
**University** [1] - 2:3

**unless** [2] - 65:14, 67:13
**unusual** [1] - 76:8
**up** [21] - 4:25, 5:1, 7:9, 9:4, 10:13, 22:11, 22:12, 24:13, 27:1, 27:18, 41:17, 47:16, 51:23, 54:7, 63:18, 64:22, 66:1, 67:1, 71:19, 72:15, 75:21
**upcoming** [4] - 39:7, 40:8, 45:21, 58:6
**USA** [3] - 1:6, 1:8, 3:5
**useful** [2] - 42:4, 65:22

## V

**validity** [3] - 9:10, 52:12, 52:17
**variation** [1] - 39:10
**various** [3] - 12:2, 42:8, 49:11
**vast** [1] - 53:23
**vendors** [2] - 31:11, 53:22
**verb** [1] - 37:2
**versus** [1] - 3:5
**via** [2] - 48:14, 62:6
**view** [4] - 12:9, 12:13, 34:7, 38:17
**violation** [1] - 57:5
**visiting** [1] - 5:17
**Vizio** [1] - 23:18
**voice** [1] - 56:17
**vs** [1] - 1:5
**vulnerable** [1] - 31:6

## W

**WA** [1] - 2:4
**wait** [1] - 76:3
**waiting** [2] - 41:19, 72:6
**waive** [1] - 7:1
**waives** [1] - 62:20
**walked** [3] - 44:16, 44:17, 65:8
**Walker** [2] - 2:15, 78:11
**WALKER** [1] - 78:12
**walking** [1] - 33:1
**wants** [1] - 41:9
**Washington** [3] - 59:18, 59:22, 59:25
**ways** [1] - 72:17
**weeds** [1] - 72:15
**weeks** [2] - 6:9, 6:21
**welcome** [1] - 3:23
**welcomed** [1] - 7:21
**Western** [3] - 25:12, 59:18, 59:25
**Westlaw** [1] - 59:25
**whatsoever** [1] - 21:1
**whole** [4] - 4:24, 11:13, 50:21, 63:17
**WI** [1] - 2:10
**wiggle** [1] - 29:9
**Williams** [3] - 2:5, 3:19, 11:5
**WILLIAMS** [1] - 3:19
**willing** [2] - 5:25, 6:3
**window** [7] - 52:23, 54:16, 54:18, 54:21, 59:5, 60:10, 61:5
**Wisconsin** [1] - 25:13
**wish** [1] - 61:11

**withdraw** [1] - 60:14
**withdrawal** [1] - 14:12
**withdrawing** [2] - 56:22, 60:23
**withdrawn** [7] - 15:14, 29:13, 29:18, 29:19, 33:21, 55:17, 57:7
**withdrew** [1] - 14:2
**witnesses** [1] - 54:14
**word** [1] - 41:4
**words** [7] - 25:3, 34:25, 42:1, 43:23, 51:17, 57:2, 70:5
**Works** [4] - 29:25, 62:7, 62:13, 66:14
**works** [4] - 11:4, 25:3, 26:7, 73:9
**world** [1] - 23:7
**World** [1] - 2:13
**worrying** [1] - 22:24
**worth** [1] - 8:16
**wrap** [1] - 5:1
**wrestle** [1] - 5:6
**wrestling** [1] - 31:10
**write** [1] - 25:19
**writing** [1] - 63:3
**writings** [1] - 63:6

## Y

**Yakima** [1] - 71:24
**year** [3] - 25:15, 46:1, 64:4
**years** [7] - 40:20, 40:21, 40:25, 41:3, 46:14, 46:22
**yourselves** [1] - 6:19

## Z

**zero** [1] - 18:2
**zoomed** [1] - 36:4
**zoomed-in** [1] - 36:4