1          IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF OREGON

3

LEUPOLD & STEVENS, INC.,              )

4                                     )
              Plaintiff,              )  No. 3:16-cv-01570-HZ

5                                     )
        vs.                           )  January 11, 2019

6                                     )
LIGHTFORCE USA, INC. doing            )  Portland, Oregon

7   business as NIGHTFORCE OPTICS      )
    doing business as NIGHTFORCE       )

8   USA,                               )
                                      )

9              Defendant.             )
    ---------------------------------

10

11

12

13

14

15              **CONTINUED MOTION HEARING**

16                       **DAY 2**

17              TRANSCRIPT OF PROCEEDINGS

18       BEFORE THE HONORABLE MARCO A. HERNANDEZ

19          UNITED STATES DISTRICT COURT JUDGE

20

21

22

23

24

25

```
 1                        APPEARANCES

 2   FOR THE PLAINTIFF:    Brian C. Park
                           Stoel Rives LLP
 3                         600 University Street
                           Suite 3600
 4                         Seattle, WA  98101

 5                         Nathan C. Brunette
                           Elliott J. Williams
 6                         Kassim M. Ferris
                           Stoel Rives LLP
 7                         760 S. W. Ninth Avenue
                           Suite 3000
 8                         Portland, OR  97205

 9   FOR THE DEFENDANT:    David A. Casimir
                           Mary Ann D. Brow
10                         Jason R. Bond
                           Casimir Jones S.C.
11                         2275 Deming Way
                           Suite 310
12                         Middleton, WI  53562

13                         Scott E. Davis
                           Todd M. Siegel
14                         Klarquist Sparkman, LLP
                           One World Trade Center
15                         121 S. W. Salmon Street
                           Suite 1600
16                         Portland, OR  97204

17   ALSO PRESENT:         Mikael Crowther

18   COURT REPORTER:       Nancy M. Walker, CSR, RMR, CRR
                           United States District Courthouse
19                         1000 S. W. Third Avenue, Room 301
                           Portland, OR  97204
20                         (503) 326-8186

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S
 2             THE COURT:  Good morning.  Be seated.
 3             THE CLERK:  Your Honor, we're here today for a
 4    continuation of oral argument on the parties' cross-motions
 5    for summary judgment in the matter of Leupold & Stevens, Inc.,
 6    versus Lightforce, Inc., Case No. 16-cv-1570.
 7             Counsel, please state your appearances for the
 8    record.
 9             MR. PARK:  Good morning.
10             For the plaintiff, Brian Park.  And we also have a
11    client representative again, Mikael Crowther, in the gallery,
12    who is the legal manager for Leupold & Stevens.
13             MR. BRUNETTE:  Nathan Brunette.
14             MR. WILLIAMS:  Billy Williams.
15             MR. DAVIS:  And Scott Davis for defendant.
16             MR. CASIMIR:  David Casimir for defendant.
17             THE COURT:  There's a whole bunch of other people
18    back there.
19             MR. SIEGEL:  I'm Todd Siegel from Klarquist for
20    defendant.
21             MR. BOND:  Jason Bond for the defendant.
22             MS. BROW:  Mary Ann Brow for defendant.
23             MR. FERRIS:  Kassim Ferris for plaintiff.
24             THE COURT:  Well, welcome to all of you.
25             Let me just get my computer going.  This is the
```

 1   realtime.  In case I miss something that you said, I can look

 2   over at my screen and see what it is I missed.

 3                (The Court and the court reporter confer off the

 4   record.)

 5                THE COURT:  We're going to be talking actuators

 6   today, ridges, and all kinds of things, cam followers, pins,

 7   bushings.  All good.

 8                (There is a brief pause in the proceedings.)

 9                THE COURT:  Let's see.  There we go.

10                I don't know if you all discussed how you want to

11   proceed.  I'm okay with whatever agreement you reach between

12   each other about how to proceed this morning and through the

13   day.

14                Mr. Park?

15                MR. PARK:  Yes, Your Honor.

16                At the last installment of the hearing, we conferred

17   with the other side.  We thought it would make sense to start

18   with the same ping-ponging back and forth.  We thought it

19   would make sense to dive into the '907 patent today, with

20   Mr. Brunette leading off, followed by the other side

21   responding, and back and forth and so forth until that one is

22   completed.

23                And then from there, we would move on to the five

24   locking turret knob patents.

25                THE COURT:  You think you're going to finish the '907

1   today?

2           MR. PARK:  Yes.  We certainly hope so.

3           THE COURT:  So do I.

4           All right.  That's acceptable to the defense?

5           MR. CASIMIR:  It is.

6           THE COURT:  All right.

7           Mr. Brunette, you're up.

8           MR. BRUNETTE:  Your Honor, before I get started, I

9   have a copy of our slides that I will give to opposing

10  counsel.

11          Would the Court like a copy?

12          THE COURT:  Sure.  That's really helpful to me, when

13  I get copies.

14          MR. BRUNETTE:  (Handing).

15          Okay.  Your Honor, starting with the '907 patent this

16  morning, which I think has the most issues, to briefly

17  overview the way I hope to tackle them, we would start with

18  the issue of infringement and talk about pin and actuator, the

19  two issues there.  That is an issue on which only Leupold is

20  moving for summary judgment.

21          Then I'll be turning to four issues on which there

22  are cross-motions for summary judgment -- the date of

23  invention issue, the entitlement to provisional priority

24  issue, the certificate of correction issue, and equitable

25  estoppel -- those all being defenses of Nightforce where the

1    parties are cross moving.

2            And then after that, there are two more Nightforce

3    defenses where only Leupold is moving for summary judgment;

4    and those are the Altenheiner patent defenses and the

5    Schmidt & Bender device defenses.

6            THE COURT:  Okay.

7            MR. BRUNETTE:  So diving right in on infringement,

8    there are only two issues here, as I said a moment ago.  They

9    turn on the proper understanding of the term "pin" and the

10   proper understanding of the term "actuator."

11           Of course, the claim construction of those terms is

12   a legal issue.  And once that legal issue is resolved, that's

13   the end of the discussion of infringement from our

14   perspective.  There simply is no factual dispute as to what

15   the structure of the accused products is or how they work.

16   It's only about what does the claim term mean; and, thus, is

17   it in the undisputed facts or isn't it.

18           We presented the testimony of Leupold's expert,

19   Mr. Byron.  I don't intend to talk extensively about that

20   today, since Leupold is the only one moving for summary

21   judgment.  I plan to focus more on the testimony of

22   Nightforce's personnel and their expert to show why there is

23   no dispute here.

24           And, critically, Nightforce's expert,

25   Mr. Brandenburg, admits that the Nightforce products include a

1    pin.  In fact, he used that term himself, voluntarily, to

2    describe the accused structure in those products.

3         So turning to the first image here, this is from a

4    set of Nightforce assembly instructions.  And it shows how the

5    accused products go together and, thus, what is inside of

6    them.  And we are talking in particular about item 6 in this

7    figure, which I've called out with a red box.  That is a pin.

8         It gets threaded into -- it's a little bit difficult

9    to see, certainly from the glare that I have on this monitor,

10   but if you follow the line, it threads into a hole in an arm

11   that extends up through that hole in the scope.  You can kind

12   of see a light gray circle.

13        There are threads on the right side of that pin that

14   engage into the hole in that follower arm.  If you follow the

15   follower arm down into the riflescope body, it is attached to

16   a focus lens.

17        And then once that is screwed into place, part 7,

18   which is a bushing, goes around the pin.  And the pin then

19   engages into the spiral cam track.

20        And I'll flip to the next picture here, where you can

21   see the spiral cam track in the figure on the left -- it's

22   labeled "inward face of focus helix" -- and part 7, which was

23   that bushing with the pin inside of it, sticking out from the

24   scope now that it's screwed into place.

25        So when you turn that focus helix around and stick it

1   over that hole in the scope to make the turret, the pin part

2   and the bushing, together the cam follower, extend into that

3   groove.  And as you turn the knob, that causes the focus helix

4   part to turn.

5           And, as you can see, the radius between the inside of

6   the focus helix groove way down at the bottom is really small;

7   and the radius between the hole and the groove way out at the

8   left side, all the way around on the other side, is really

9   considerably wider.  And so that pushes the pin back and forth

10  laterally, and that pushes the arm back and forth laterally,

11  which pushes the lens back and forth laterally, adjusting the

12  parallax focus of the scope.

13          Moving ahead to the testimony, this slide is

14  testimony from the Rule 30(b)(6) deposition of Nightforce's

15  designee, Klaus Johnson.  He was asked, is there any

16  difference between the various Nightforce products, and

17  testified that, yes, there are differences, but the only

18  differences that could possibly be relevant to infringement as

19  to the '907 patent are as to the specific shape of that spiral

20  cam, how many degrees around it goes, how much a degree of

21  rotation changes the amount of lateral movement of the pin.

22          There's no other difference as to what the pin looks

23  like or how the focus arm works or any of that.  That's all

24  the same across all of the accused products.  There's been no

25  argument from Nightforce that there's any difference between

1  the accused products.  They all rise or fall together.

2          So then moving ahead, this next slide is Nightforce's

3  expert on the '907 patent.  They hold out Allen Brandenburg as

4  their expert.  And he's asked -- so the first question here,

5  starting at line 17, we're referring to the same figure that I

6  put up first, the picture of that pin and the bushing and how

7  they go together in the scope.

8          And I asked, How do -- how are those two parts -- in

9  other words, the pin and the bushing -- joined together?

10          He answers, "If that's a bushing and it's assembled

11  over a pin, I can assume that it's a slide fit over the pin,"

12  recognizing on his own, without prompting, without the words

13  being put into his mouth, that that part No. 6 is a pin.

14          And then just following up on that, to make sure

15  we're all clear, "You would consider the elongated head to

16  that screw a pin?"

17          At that point he realizes that he has just used the

18  claim language to describe the accused product and tries to

19  backpedal a little bit and says, "Well . . . do you mean a

20  'pin' as defined in the patent?"

21          And I say, You just used the word "pin."  I was

22  asking to make sure that's what you meant.

23          And he says, "I'll change it to a post."

24          Then we follow up:  Do you understand there to be a

25  difference between "pin" and "post"?

1           And he says, Well, I don't want to use the claim

2    language.  I want to use a different word, okay.

3           Ultimately he comes down to, is there a difference?

4           Well, "pin" might be a little bit narrower than

5    "post," because he thinks that pin needs to be metallic.

6           It's not at all clear where he's getting that from.

7    It is not the construction that the parties discussed and came

8    to a tentative agreement on.  It is certainly not the

9    construction that is advocated in Mr. Byron's report, which is

10   a solid, rigid protruding structure.  I believe it's a short,

11   solid, rigid protruding structure.  I may have the order of

12   those wrong.  That's what we think that "pin" means.

13          And there's certainly nothing in the '907 patent that

14   says that the pin needs to be metallic.

15          But, regardless, the claim construction almost isn't

16   necessary to resolve to the extent that there's a difference

17   between the experts, because everybody agrees, as

18   Mr. Brandenburg said when we started the conversation, before

19   he was prompted and before he thought about the legal

20   ramifications of what he was saying, part No. 6 is a pin.  And

21   the claim language for Claims 6 and 16 that this relates to

22   simply requires that the cam follower includes a pin.

23          There is no question that the parts 6 and 7 together

24   engage in the groove and are a cam follower.  There is no

25   question that that part includes a pin.  And on that basis, we

1   think that summary judgment of infringement as to the pin

2   issue is appropriate.

3           THE COURT:  Is there -- at some point, are we going

4   to have a conversation about what a "groove" is or is not?

5           MR. BRUNETTE:  I'm not exactly certain when we would

6   have a conversation about what "groove" is or is not, although

7   I would say "cam track" is a term that the Court has

8   construed.

9           THE COURT:  Right.

10          MR. BRUNETTE:   And it is --

11          THE COURT:  Well, you just used the word "groove."

12  And I'm not -- and I see the word "groove" throughout your

13  paperwork in a couple of places, as I recall.  And I was

14  curious about how you all were using that word.  If you're

15  talking about the cam track and that's the groove --

16          MR. BRUNETTE:  That's correct, Your Honor, yes.

17          We use "groove" as an embodiment of the cam track.

18  Now, the claim language for Claims 6 and 16 doesn't just add

19  to the base Claim 1 and 10 the requirement that the cam

20  follower includes a pin.  It also requires that the cam track

21  includes a groove.

22          There has not been any dispute on that issue in the

23  briefing.  I don't -- as far as I understand it, Nightforce is

24  not contesting that their products, the inward face of that

25  focus helix, that the cam track cut into that is, in fact, a

1    groove; in other words, I would say a recessed area, recessed
2    below the drive face --
3              THE COURT:  Okay.
4              MR. BRUNETTE:  -- which is also a term we construe.
5              THE COURT:  And, again, maybe I'm just giving you all
6    a heads up about something that I was just puzzled about; and
7    that is there was some discussion in the briefing, as I
8    recall, between whether or not a track is simply the inverse
9    of something that's cut out or not or sits on top of it, and
10   how all of that -- whether either one of those might be a
11   groove or not and whether it makes any difference.
12             I don't know.  I just remember kind of reading
13   through all of that.  And maybe that's a conversation that's
14   going to happen later on when we talk about the cam track.
15             MR. BRUNETTE:  Your Honor, yes.
16             I think the short answer is there will be a
17   conversation about that.  It is -- it is part of the
18   conversation about priority entitlement with respect to the
19   claims other than 6 and 16, which have to do with whether the
20   provisional application discloses a ridge or rail embodiment
21   to a person skilled in the art.
22             THE COURT:  Okay.
23             MR. BRUNETTE:  Because the provisional definitely has
24   at least a groove, and we think that a person skilled in the
25   art would understand the inverse of a groove as well.  But

1  that's where that inverse of a groove comes in.

2           THE COURT:  Thank you.  All right.

3           MR. BRUNETTE:  So moving to the second infringement

4  issue --

5           THE COURT:  All right.

6           MR. BRUNETTE:  -- actuator.  So this has to do with

7  both Claim 1 and Claim 10 and, therefore, all asserted claims

8  of the '907 patent.

9           The undisputed evidence shows that the structure of

10  the accused products is what it is.  Again, we can refer back

11  to that testimony of Mr. Johnson.  There is no difference

12  between the different products.

13           Mr. Brandenburg admits that he's taken a very narrow

14  interpretation of what "actuator" means; and, in fact, not

15  just narrow, but limited to the specific Part 122 called out

16  in the specification.

17           There is also no question that the Court has already

18  heard this issue.  We debated about the meaning of the term

19  "actuator" back at the *Markman* hearing.  And at that hearing

20  Nightforce took the position that "actuator" was limited to

21  the specific embodiments shown in the specification.  We

22  argued that it was not and that "actuator" should be given its

23  full broad plain and ordinary meaning.

24           The Court agreed with Leupold on that issue and how

25  that actuator is entitled to its plain and ordinary meaning

1    and is not limited to the specific embodiments shown in the

2    specification.  Now, Mr. Brandenburg disagrees with the Court

3    on that, but that is not an expert opinion that could overcome

4    summary judgment.

5          So going through some of the testimony on this --

6    this is from Mr. Brandenburg's deposition transcript.  We had

7    a conversation -- and it's cited in the briefing; I don't want

8    to put it all up because it's somewhat more lengthy -- before

9    this part that I'm quoting now, where we talked with him about

10   his understanding of the term "actuator," divorced from the

11   '907 patent, just the ordinary English word "actuator."  And

12   he agreed that it has a plain and ordinary meaning and it's

13   relatively broad.

14         Then he says, Well, in the context of the '907

15   patent, I have a narrower understanding of "actuator."  And he

16   says it's based on Part 122 shown in the specification.

17         So I asked him, Is it your understanding that it's

18   limited to Part 122?

19         He says, I wouldn't say it -- it narrows the general

20   application, but it defines what it is in the patent.

21         And so I say, So that's -- you're taking the position

22   that the cam -- that the actuator is limited to Part 122 shown

23   in the specification, asking, "The understanding of the claim

24   construction of actuator" --

25         THE COURT:  You're going to need to slow down.

1           MR. BRUNETTE:  I'm sorry.

2           "That's the understanding of the claim construction

3    of actuator that you used in forming your non-infringement --

4           "Yes.

5           -- "conclusions?"

6           And then he clarifies:  "I concluded that the part

7    they called out as an actuator was what they meant as an

8    actuator.

9           "Specifically Part 122?

10          "Yes."

11          So it's very clear that Mr. Brandenburg's point of

12   non-infringement is based on his opinion that the proper

13   construction of "actuator" is limited to Part 122 as called

14   out in the specification.

15          Here is a brief excerpt from the Court's *Markman*

16   order.  There are three stars in the middle, so these were on

17   different pages.  At the top the Court is describing what

18   Nightforce's argument was there, which is that "actuator" is

19   limited to what's called out in the specification.  At the

20   bottom is the Court's conclusion rejecting that argument.

21          So "actuator" is entitled to its plain and ordinary

22   meaning and is not limited to the specific embodiments

23   discussed in the specification.

24          So let's look at what the claim language actually

25   requires here, because Nightforce wants to argue -- at least

1    in their reply brief they come back and say, Well, look, we're

2    not really making the argument that Mr. Brandenburg made,

3    which is that "actuator" is limited to Part 122.  What we

4    really want to argue here is that the actuator has to be

5    outside the housing of the scope and that the actuator has to

6    be directly attached to slide along the housing of the scope.

7            That argument does not work with the claim language.

8    So here's the language of Claim 1.  I've highlighted the

9    relevant part, which is the only part that talks about where

10   the actuator is with respect to the housing or how it attaches

11   to the housing.  And all it says is "an actuator slidably

12   mounted for movement along the longitudinal axis of the

13   housing."

14           Nothing about that language requires the actuator to

15   be outside the housing.  Nothing about that language requires

16   the actuator to be mounted to the housing, only that it is

17   mounted to something in a manner that allows it to move along

18   the axis of the housing.

19           There is no dispute that the actuator in the

20   Nightforce product slidably moves along the housing.  That is

21   all that is required.

22           In any event, the actuator in fact does stick out

23   from the housing, as we saw in the pictures we looked at a few

24   moments ago, because the cam follower is defined in the claims

25   as a part of the actuator; and the cam follower sticks out

through that hole in the scope to engage into the spiral cam

helix.  But the Court need not reach that issue because the

claim language doesn't require it in any event.

THE COURT:  I lost you as to what you are defining as

the actuator itself.  Is it the pin?

MR. BRUNETTE:  So the actuator, as defined in the

patent is -- includes -- the cam follower is a part of the

actuator.

THE COURT:  Okay.

MR. BRUNETTE:  So we think the actuator includes at

least that pin and probably also some part of that arm that it

attaches into.

It is not critical how much of that is or isn't an

actuator.  It doesn't really matter.  The pin slides back and

forth.  And whether the arm is a mounting structure or is part

of the actuator we don't see as relevant.

THE COURT:  Okay.

MR. BRUNETTE:  With that, we think we're done on

infringement.

THE COURT:  All right.

MR. BRUNETTE:  Those are the only two issues.  I'm

happy to come back to it if there are questions after

Nightforce's presentation.  We'll move on to the defenses.

Oh, just to flag for the Court -- I'm sorry.  I

missed this slide.  Any dispute about the scope of the meaning

 1   of the term "actuator" or of the term "pin" is a legal dispute

 2   that does not preclude summary judgment.  Here are two cases

 3   where there were disputes about claim construction that the

 4   Court properly resolved on summary judgment and then entered

 5   summary judgment based on the proper claim construction.

 6             THE COURT:  All right.

 7             MR. BRUNETTE:  Our next question is date of the

 8   invention.  So this is one of the four Nightforce defenses on

 9   which the parties cross-moved for summary judgment.

10             Our position is that Mr. Otteman invented his spiral

11   cam focus mechanism before March 1998.  The reason everybody

12   keeps talking about March 1998 is that that is the date of a

13   claimed prior art reference.  It's the German utility model

14   that everybody keeps talking about with the number that starts

15   with the letters "DE."

16             And the critical dispute about that reference is

17   whether it is prior art or whether it is not prior art.  And

18   that turns both on priority entitlement back to the

19   provisional and the date of the invention, but I want to

20   separate them and talk about them separately because it's

21   possible that one of them might be -- that the Court may

22   ultimately decide to enter summary judgment on one and not the

23   other or may view them differently, so we'll talk about them

24   separately.

25             We believe that there is ample evidence demonstrating

that Mr. Otteman invented the claimed spiral cam focus

mechanism much earlier than 1998.  In fact, there is clear

documentary evidence showing that he did so in 1995.  So

there's certainly no room for dispute that it was well before

1998.

So starting with the law on entitlement to an

invention date, there is a rule of reason standard and a

corroboration requirement, and corroboration is judged under

that rule of reason standard.

So under the rule of reason, although some

corroboration of inventor testimony is required, if inventor

testimony is used to prove the date of invention, there is no

requirement to ignore all of the inventor's testimony.  The

inventor's testimony can still be used.  Nightforce's brief

suggests we just throw out all of the inventor's testimony and

look at what else there is.  That is not the standard.

It is -- the ultimate question is whether the

inventor's testimony, plus whatever corroboration there is, is

sufficient that a reasonable juror could find that there has

been invention before the date of the prior art reference.

Second, there is no requirement to corroborate every

step or every claim element.  So we don't have to show every

single thing that Mr. Otteman did in coming up with the

invention and reducing it to practice through corroboration.

There just needs to be enough corroboration overall that the

1  story is believable.

2          We consider the totality of the evidence, not

3  individual documents.  So the fact that an individual document

4  does not tell the whole story does not mean that it is not

5  corroborating.

6          And circumstantial evidence is sufficient.  We don't

7  need to have an independent over-the-shoulder observer

8  watching the expert.  We can look at circumstantial evidence.

9          And here are three cases, all of which talk about how

10  this works.  In *Fleming*, for example, corroboration of

11  reduction to practice was found based on circumstantial

12  evidence, even though the Federal Circuit expressly recognized

13  that none of the corroborating evidence definitively proved

14  the inventor's account and none of it disclosed each claim

15  limitation.  So some claim limitations were not in the

16  corroboration, but corroboration was still found and there was

17  sufficient evidence.

18          Similarly, in *Cooper* corroboration was found based on

19  circumstantial evidence, even though not every claim element

20  was shown in the corroborating evidence.

21          And in *Loral* corroboration was found on

22  circumstantial evidence, even though there was no direct proof

23  that any prototype had been made.  There was only

24  circumstantial evidence of a mask, which is a form of tooling,

25  which would have been consistent with having made the

prototype, but did not prove that that mask was every actually

used to make a prototype, plus the mere contemporaneous

documents shortly after the fact that claimed, in marketing to

third parties, the ability to practice the invention.

So what we can draw from these cases is there is a

corroboration requirement, but it does not require direct

proof of every element of the claims.  And the *Mahurkar* case

that we cited in our briefing talks extensively about how the

burden shifts back and forth between the parties.

So it is clear that Nightforce is the party asserting

invalidity.  Nightforce always has the burden to prove

invalidity by clear and convincing evidence.

Leupold, as the party asserting invention prior to

its patent filing date, has the burden of production to come

forward with sufficient evidence that a rational juror could

find that the invention took place before March 1998.  As soon

as we cross the threshold that a rational juror could find in

favor of Leupold on this question, the burden shifts back to

Nightforce to persuade the trier of fact that it did not

happen.  And the applicable burden there is the clear and

convincing evidence standard to prove invalidity.

So the question we're asking today is twofold,

because there are cross-motions for summary judgment:  Is

there at least enough evidence that a rational juror could

find, drawing all inferences in Leupold's favor, that

1    Mr. Otteman invented before March 1998?  And we think the

2    answer to that is definitively yes.

3          And then the second question for Leupold's motion:

4    Drawing the inferences in Nightforce's favor, would a rational

5    juror still have to find that the invention was invented

6    before 1998?  In other words, that Nightforce does not

7    disprove corroboration of the invention before 1998, under the

8    clear and convincing evidence standard.

9          So flipping forward to the testimony, to take a look

10   at what evidence there is to meet this standard, Mr. Otteman

11   testified that he created electronic drawings of the invention

12   the summer of 1995.  He testified that he sent those

13   electronic drawings to a third-party company called Ideality

14   and specifically to Ric Landvatter, who worked at Ideality at

15   the time, for production of the prototype spiral cam parts.

16   The critical -- the part with the helix in it and the follower

17   were plastic parts in the prototype and in Leupold's

18   embodiment that were made for the prototype by Ideality.

19          And Mr. Otteman testified that he got those parts

20   back from Mr. Landvatter and assembled them into a complete

21   prototype scope and confirmed that the focus mechanism

22   actually operated.  He said all of that, and the citations

23   here are to his deposition transcript.

24          It was a bit of an issue.  So before his deposition,

25   his testimony was reduced to a declaration, and that

declaration was provided to Nightforce so they would

understand what he was going to say and there would not be any

claim of surprise about what his testimony was.  And he relied

on that declaration during his testimony, because there were a

number of exhibits attached to it.  So he would refer to the

exhibits that were all put together with his declaration.  But

he testified to this live and under oath at his deposition,

and that's what we're citing to on this slide.

There are also citations to his affidavit testimony,

which are proper on summary judgment.  But it is all confirmed

in the deposition transcript itself.

And it's clear from his testimony that all of this

took place in 1995.  And then he hedges a little bit and says,

"I don't fully remember.  I'm looking at the documents, and

the documents seem to say it's summer of 1995.  But at the

latest, it would have been early 1996."

This all happened pretty quickly after he finished up

the electronic drawings.  There is no question that this

happened long, long before March of 1998.

That's the inventor testimony.  And that inventor

testimony, absent the corroboration requirement, right there

should be sufficient to overcome summary judgment.

So the question is:  Is there at least enough

circumstantial evidence to corroborate that inventor

testimony, put together with the inventor testimony, to make

1  the story believable to a rational juror, drawing all

2  inferences in Leupold's favor for our motion and in

3  Nightforce's favor -- or in Leupold's favor for their motion,

4  in Nightforce's motion for our motion?

5        So the first things are specific dated CAD drawings

6  that corroborate Mr. Otteman's testimony.  We have the very

7  CAD drawings that he created in July of 1995.  We know we have

8  the right CAD drawings because they were preserved on a backup

9  CD that was was created on June 27, 1996, critically, almost

10  two years before March 1998.

11        And Nightforce argues, well, those drawings show

12  conception, but not reduction to practice.  But, in fact, at

13  least as circumstantial evidence, the drawings are much more

14  important than just that.  They corroborate Mr. Otteman's

15  testimony about when he created the drawings, but he also said

16  he took these drawings and sent them to Ideality.

17        So the fact these drawings exist and are dated to

18  1995 and that they were backed up in 1996 and had, at that

19  time, a last change date in July of 1995 -- so almost a year

20  later the files are unchanged -- is certainly circumstantial

21  evidence to show that this all happened immediately after the

22  drawings were created, just as Mr. Otteman testified.

23        So these drawings sat on the computer for a year,

24  then were backed up in 1996.  Certainly at some time in there,

25  consistent with Mr. Otteman's testimony, they were sent to

1   Mr. Landvatter.

2          And so here is a picture that was produced in the

3   case and is in the summary judgment record of the backup CD,

4   but we actually also produced all the files off the backup CD.

5          And here is a picture of the data off of the backup

6   CD showing -- these are not all of the files.  There are more

7   relevant files on there, but here is an example of two of

8   them, spiral cam 1.1 and spiral cam 1A.1, both dated from

9   July 26, 1995, their last change date.

10          And there's a bit of a question about the endings on

11   those files, because the original files would have had

12   extensions for the CAD system in between the first dot and the

13   dot 1.  The dot 1 is the version history.  It appears that

14   that was cut out in the process of creating the backup CD in

15   1996, because a faxed copy of the data drawn from the system

16   that Mr. Otteman sent around in 1998, which is in the record,

17   has those extensions, but the backup CD created in 1996 does

18   not.

19          Nightforce at one point took the position, well, we

20   don't know for sure that these files, without the extensions,

21   are real or date to before 1998.  But there's no question

22   about that, because these files, without the extension, were

23   created -- or were archived in 1996.  So we know the CD was

24   created and burned at that time.

25          In addition to having these drawing files that we can

1    definitively date to 1996 -- and I would add, there is also an

2    independent corroborating witness, Mr. Hammond, who is a

3    custodian of record at Leupold, who backs up that this disc is

4    a disc created in 1996 and maintained in the course of

5    Leupold's business.  Although he is a Leupold employee, for

6    purposes of corroboration Leupold employees count as being

7    separate and independent because they are not the inventor

8    himself.

9          So, in addition, we have a true third party,

10    Mr. Landvatter, the gentleman from Ideality who actually

11    produced the spiral cam parts.  We took his deposition.  He's

12    a third party with no financial interest in the case.  He

13    built the prototypes.  And he confirms Mr. Otteman's testimony

14    about what was done and the dates that it was done.

15          He also confirms that a series of contemporaneous or

16    near-contemporaneous financial records from Leupold showing

17    the financial transactions associated with making that

18    prototype would have related to that prototype.  So he

19    authenticates those documents as well, which is further

20    corroboration.

21          Just scanning through a few examples of his

22    testimony, here he takes a look through a variety of the

23    documents associated with Mr. Otteman's testimony and recalls

24    that he would have built the parts, driven them to Leupold's

25    offices to deliver them to Mr. Otteman.  And although he

1   didn't understand all of the inner workings of the scope that

2   they were going into, he knew they were going into a

3   riflescope and that they were going to be used to adjust the

4   focus of the -- adjust a lens; in other words, adjust focus.

5   So he confirms the point of the invention and what this

6   relates to, the parts that he was making at this time.

7          There's also clear testimony that this happened in

8   1995 or early 1996.  I would direct the Court in particular to

9   the last two lines that are up on this slide, slide 26.  He's

10  shown Mr. Otteman's declaration.  He reads through the

11  description of when the reduction to practice happens, and he

12  says, "It's -- I could agree with everything he has said

13  here."

14         That is the essence of corroboration.  That testimony

15  from a third party is sufficient that a rational jury,

16  certainly drawing all inferences in Leupold's favor, could

17  find that Mr. Otteman's testimony is credible and

18  corroborated.

19         In addition, he's asked about the financial records.

20  And I have two slides of this, because he goes through

21  different packets of invoices.  They're actually purged

22  records of invoices, so -- the original invoices no longer

23  exist because they're so old.  But when they were -- when

24  those records were removed from the company, records were kept

25  of what the basic data of the invoice was.  And these paper

1    records were found in paper archives of Leupold's.  There's a

2    declaration attesting to what these are and where they came

3    from from Mr. Dugan, the CFO of Leupold.

4           And, in addition, Mr. Landvatter testifies -- this

5    one isn't on a slide, but it's in his transcript at 30 -- that

6    he recalled that the spiral cam was one of the earliest

7    projects that he did for Leupold.

8           So he looks back through these invoices and

9    ultimately concludes -- "Do you think all of these would have

10   been related to the spiral cam project?

11          "Yeah.

12          "Okay.

13          "Yes."

14          He's quite clear that he thinks these would have been

15   related to the spiral cam project and these are transactions

16   from 1995, and he's also quite clear that the spiral cam

17   project was one of the very earliest projects that he did for

18   Leupold, which also undermines Nightforce's argument that all

19   of this really took place in late 1998 or early 1999.

20          Nightforce's fallback argument is even if you believe

21   that all of this happened, they say, "Well, there's no

22   evidence that Mr. Otteman actually tested the scope to see if

23   it worked, because we haven't seen any test report.  Where is

24   the corroboration?  Where is the documentation that testing

25   actually occurred?"

1           And there are two arguments here.  There's a legal

2   argument and a factual argument.  The legal side of the

3   argument is, under the *Slip Track Systems* case from the

4   Federal Circuit in 2002, testing is not required for an

5   invention that's mechanical and that is sufficiently simple

6   that a person of skill in the art, when they build the

7   prototype, would automatically, in the course of building the

8   prototype, already know that the invention works.

9           The invention in *Slip Track Systems* is a drywall

10  bracket that hangs drywall that has some give in it.  And it

11  is designed for use in places where there are earthquakes, so

12  that when there is a minor earthquake, the drywall can slide

13  back and forth slightly in the hanger track and does not

14  crack.

15          And in that case there was no evidence of testing,

16  but the Federal Circuit said, well, it wasn't necessary to

17  test the bracket because by the time you built the prototype

18  bracket and stuck it on a piece of drywall, you would already

19  know, without any formal testing needed, that there was play

20  between the bracket and drywall, or even just by measuring the

21  bracket.  You wouldn't have to put it on drywall.  You would

22  know the thickness of the piece of drywall and therefore know

23  that there would be play and therefore know that the invention

24  would work to have play.  You don't have to test it in an

25  actual earthquake or a simulated earthquake to know that the

plaster won't crack.  The point of the invention is just that it is a bracket that allows play to reduce the chance of cracking.

The same is true here.  By the time Mr. Otteman put together the parts that we -- his equivalent of the parts that we saw, a cam hub with a groove in a spiral and a pin sticking up into that groove, there's no question that he would have known that it would work to move the focus lens.  And Mr. Byron says that in his rebuttal report.

But the Court need not resolve that argument, in any event, because there is evidence that it was -- that there was testing to confirm that the prototype scope worked. Mr. Otteman said that.

And, in addition, Mr. Landvatter confirms that Mr. Otteman contemporaneously told him that the spiral cam prototype worked for its intended purpose.  There are three cites to Mr. Landvatter's transcript here, at 49, 69, and 76, where he says that.

And this lines up exactly with the *Cooper* case that I cited earlier.  The same thing happens there.  There is no direct evidence that the inventor tested his invention at the time of the prototype, but what there was was evidence from someone who was working with him at the time, who said, "Well, the inventor told me contemporaneously that he had tested it and that the fiber length was of the right length."  That's

1    consistent with Mr. Landvatter's testimony here.

2             Now, in a footnote of its response brief, Nightforce

3    argues, well, this testimony from Mr. Landvatter is nice, but

4    that's hearsay and the Court shouldn't consider it.  We

5    responded to that in our evidentiary surreply.

6             But just briefly, to follow up on that, this is

7    exactly the same as the evidence that was allowed in *Cooper*.

8    And it qualifies for a hearsay exception both because -- so

9    Mr. Otteman's -- or Mr. Landvatter's testimony about what he

10   heard is proper testimony because he was speaking at a

11   deposition.  And Mr. Otteman's statement that he's testifying

12   to was a present sense impression, explaining that his product

13   worked and, in any event, is admissible as a prior consistent

14   statement, because by challenging Mr. Otteman's invention

15   story and demanding corroboration, Nightforce is calling into

16   question the veracity of Mr. Otteman's claims that he tested

17   the scope; and, therefore, we're allowed to use a prior

18   consistent statement.  So under either of those exceptions,

19   this testimony comes in.

20            The other evidentiary issue on this question of

21   inventorship is a sham affidavit objection.  So while we're on

22   evidentiary questions, I'll address that briefly.  Again, our

23   response to this issue is spelled out in our evidentiary

24   surreply.

25            Nightforce asserts that the supplemental declaration

1    of Mr. Byron and the declaration of Mr. Otteman are sham

2    affidavits.  This is particularly problematic as to

3    Mr. Otteman's declaration because his declaration precedes the

4    testimony that Nightforce says makes it a sham.

5           And there is at least one District of Oregon case,

6    the *Too Marker Products* case from Judge Papak in 2010, that

7    says that can't happen.  If the testimony happens first and

8    then the allegedly inconsistent testimony happens later, then

9    the first testimony can't have been a sham.

10          But, in any event, Nightforce is not moving against

11   Mr. Otteman's deposition transcript.  And he says all the same

12   things on direct at his deposition that he said in his

13   declaration, so the point is moot in any event.  He

14   authenticated all the documents and provided all the same

15   testimony on the record.

16          As to Mr. Byron's declaration, this falls far short

17   of the sham affidavit doctrine.  As detailed in our briefing

18   on the evidentiary surreply, the sham affidavit doctrine is an

19   extremely high standard.  And in order to prove it, you have

20   to show enough evidence that the Court can make a specific

21   factual determination, first, that there is a contradiction

22   between the testimony and the earlier testimony and that that

23   contradiction is actually a sham and not merely the result of

24   clarification or a mistake or a misstatement or simply some

25   tension between the statements; and, second, that the

1  inconsistency between the deposition testimony and a later

2  affidavit is clear and unambiguous.

3       There is no ability to make those showings here.

4  And, in any event, the supplemental Byron declaration that's

5  at issue is the Byron declaration about whether testing is

6  necessary.  And even if the Court were to strike that as a

7  sham -- and we don't think the Court should -- there is other

8  corroborating evidence -- specifically, Mr. Landvatter's

9  testimony that Mr. Otteman contemporaneously told him that the

10 scope was tested and worked -- that is sufficient, so the

11 Court need not get to this issue in any event.

12       I think that concludes the date of invention issue.

13 So then moving on to the other half of the priority debate,

14 this is whether the '907 patent claims are entitled to claim

15 priority back to the provisional patent application.

16       So a bit of background on the way patent applications

17 are often filed, often an inventor files a provisional

18 application and then has a year to follow up after that with a

19 non-provisional application that has more detail; and then it

20 is the non-provisional application that actually gets

21 prosecuted into a patent.  But if certain requirements are

22 met, that patent gets priority back to the earlier provisional

23 filing, which is often put into the record a bit more quickly

24 to get it on file.

25       I want to take the claims in two different buckets

with respect to priority, because the issues are quite

different between them.  Dependent Claims 6 and 16 are

significantly narrower than the broader independent claims and

the other dependent claims in a critical aspect, which is

Claims 6 and 16 -- 6 relates back to 1, and 16 relates back to

10.  Otherwise, they're essentially the same.  And they

say -- the thing that's claimed in Claim 1 or Claim 10 is "in

which the spiral cam track includes a spiral groove and in

which the cam follower includes a pin."

There is no question and there is no debate that the

provisional discloses an adjustment mechanism that otherwise

meets the elements of Claim 1, "and in which the spiral cam

track includes a spiral groove and in which the cam follower

includes a pin."  And the same is true with respect to

Claim 10.

Nightforce's only argument with respect to Claims 6

and 16 has to do with the word "includes."  Nightforce takes

the surprising and remarkable position that because the

open-ended claim term "includes" is used in this claim, the

provisional, in order to be entitled to priority, would have

to disclose every possible structure that could be included in

the cam follower, in addition to a pin; otherwise, the claim

is invalid.

I say that that's surprising because it is not the

law.  Nightforce cites no authority holding that unclaimed

1    elements, such as this, are required to be supported either in

2    a patent specification or in a provisional application.  And

3    this is important, because it's the same test.  It's the same

4    enablement and written description test that applies to the

5    provisional and to the specification itself.

6          So if Nightforce's position were adopted, not only

7    would every provisional application but also every patent

8    specification case, every time an open-ended term is used, it

9    would have to call out every possible, imaginable structure

10   that could be added to the claim structure, because if a later

11   defendant, under Nightforce's position, could envision some

12   hypothetical structure that is not disclosed in the

13   provisional, that would invalidate the patent.

14         That simply isn't the law.  There is no way that a

15   patentee could include every possible structure within its

16   claims.  And the vast majority of patent claims use the

17   open-ended term "comprises," which -- we've cited authority in

18   our brief -- is exactly the same as "includes."  They both

19   mean the accused device has to have everything that's in the

20   claim language, but it can have anything else in addition to

21   that and still infringe.

22         And the Federal Circuit -- and this is a

23   non-precedential case, but it has addressed this issue and

24   said, quote, There is no precedent requiring a patentee to

25   disclose or enable unclaimed elements.  And I think it's

1    telling that this is in a non-prec decision.  The Federal

2    Circuit did not think this was a controversial point of law.

3            The only case that Nightforce points to to dispute

4    this is the *D Three* case, in which Mr. Davis was counsel.  And

5    Nightforce says, well, there the washer could have been either

6    above or below.  And that's true.  The claim language in *D*

7    *Three* is broad enough, it doesn't say whether the washer is

8    above or below.

9            But the critical thing is -- the critical difference

10   is here the bushing is not claimed anywhere in the claim.  The

11   washer in *D Three* was required by the claim.  And so the claim

12   language here does not say anything about a bushing one way or

13   another, no matter where it is.  It simply says you have to

14   have a pin in your cam follower and you can have anything

15   else, as long as you have a pin.

16           There is no legal requirement that a patentee

17   disclose or enable the unclaimed elements of anything else

18   that falls within that "including."  That legal issue is the

19   end of the analysis as to Claims 6 and 16.  And on that basis,

20   partial summary judgment should be entered that Claims 6 and

21   16, at least, are entitled to priority back to the provisional

22   application.

23           There is a hotter dispute as to the other claims.

24   And the question is:  Would a person of ordinary skill in the

25   art understand, from looking at the provisional disclosure,

1    that Mr. Otteman possessed a rail and fork embodiment?

2           And the two cases here, *Trading Technologies* and

3    *Hologics*, are discussed in the briefing.  In *Trading*

4    *Technologies*, it describes an example where there is a

5    single-action user input device.  And the example given is a

6    single mouse click.  So it's single-action user input device.

7    It's not like a keyboard --

8           THE COURT REPORTER:  Counsel, I'm going to have to

9    have you slow down.

10          MR. BRUNETTE:  Sorry.

11          A single-action user input device, that's the term in

12   the claim at issue in *Trading Technologies*.  And the

13   provisional application in *Trading Technologies* calls out a

14   single mouse click as an example for that single-action user

15   input device.

16          And the argument is made -- I actually don't remember

17   if it's a provisional or if it's a specification, but it

18   doesn't matter; the test is the same.  The question is whether

19   there is written description support for a patent claim that

20   is broader and claims the entire genus of single-action user

21   input devices, not just a single mouse click.

22          And the Federal Circuit finds that there is support

23   because a person of skill in the art would readily understand

24   from saying, well, you could use a single mouse click because

25   it's single action, that there are many other things, like a

double mouse click, that are also a single user action; and,
therefore, that disclosure of the single mouse click is
sufficient to support the claims, even though the claims are
broader than what was literally disclosed in -- and, as I say,
I forget whether it's the specification or the provisional.

In *Hologic*, the Federal Circuit clarified that there
is a lesser showing required for written description in
predictable art fields.

So, for example, when the invention is mechanical and
a person of skill in the art can look at a drawing and
understand how the part operates, they have a broader
understanding of what the alternative possibilities are in
those mechanical fields, as compared to, for example, chemical
arts, which is where many of the cases that Nightforce cites
come from, because a chemist cannot necessarily look at a
chemical formula and fully envision how the chemicals are
physically interacting with each other and how small changes
to the chemical formula might or might not change those
interactions.  There is some unpredictability in the chemical
arts as compared to the mechanical arts.

So turning to the issue on summary judgment, what
evidence is there to answer the question about what a person
of skill in the art would understand?  First, there is
testimony from Mr. Byron that a person of skill in the art
would understand that Mr. Otteman possessed the rail and fork

1    embodiment just by looking at the provisional application.  On

2    that testimony alone, Nightforce's motion for summary judgment

3    should fail.  A juror could believe Mr. Byron's testimony; and

4    therefore find that Mr. Otteman had and understood a rail and

5    fork embodiment at the time that he came up with the

6    provisional application.

7            And just to go back for a second, because I dived

8    into this, and I want to make sure everybody is on the same

9    page, the reason we care about a rail and fork embodiment is

10   because the Court's claim construction of cam track was broad

11   enough to include both a groove or the alternative rail and

12   fork that's discussed in the specification of the patent.

13           So the patent specification says the cam track -- you

14   could do the cam track as a groove.  All the figures in the

15   patent show the cam track as a groove.  But there's an offhand

16   statement saying the cam track could also be a rail and the

17   cam follower could be a fork or a notch of some kind that fits

18   over that rail, and it would work the same way.  So the Court

19   construed "cam track" broadly enough that the words "cam

20   track" include both a groove and a rail/fork type embodiment.

21           And now Nightforce is making the argument, well, the

22   provisional didn't have that offhand sentence about how you

23   could do it either with a rail or with a groove; and,

24   therefore, it doesn't support the broader claims because of

25   the Court's broader claim construction read on a rail and fork

1    embodiment.  And so the debate we're having is whether a

2    person skilled in the art looking at the provisional would

3    understand that Mr. Otteman possessed the rail and fork

4    embodiment, knew that you could just invert the groove and do

5    the same thing.

6          The first point I made is that on Leupold's side of

7    the ledger there is evidence from Mr. Byron that a person of

8    skill in the art would make that conclusion, and that should

9    preclude Nightforce from getting summary judgment on this

10   issue.

11         The second question is:  Can Leupold get summary

12   judgment on this question?  And there we have to look at what

13   evidence there is on Nightforce's side of the ledger.  And on

14   Nightforce's side of the ledger, Nightforce relies on the

15   testimony of Mr. Brandenburg.  But Mr. Brandenburg is not a

16   person skilled in the art.  His testimony was quite clear that

17   he has never designed a riflescope.  He has never designed

18   parts for a riflescope.  He has no experience with optical

19   devices of any kind.

20         And so this fits directly with the Federal Circuit's

21   2016 decision in *Sport Dimension*.  I call out *Sundance* because

22   it's another case and it preceded *Sport Dimension*.  In

23   *Sundance* there was a purported expert witness who purported to

24   testify about obviousness.  Obviousness, like the written

25   description and enablement doctrines that we're discussing

here, requires analysis through the head of a person skilled in the art, what would such a person understand. And in *Sundance* the Federal Circuit tells us someone who is not a person skilled in the art and does not have experience in the relevant art field cannot tell us what was in the head of a person who is, only a person who is or is very close.

Sport Dimension makes that same analysis, but I call out *Sport Dimension* separately because it is very close to the facts of this case. And I will put it up.

So here is *Sport Dimension*, Federal Circuit, April 2016. And I've called out here the relevant language. Mr. Bressler is the expert in *Sport Dimension*. The products at issue in *Sport Dimension* are personal flotation devices; in other words, lifejackets. And there's a debate about how the lifejacket works. And the District Court excluded the expert, saying that even though he was an industrial design consultant with four decades of industry experience, who had designed all kinds of products, he had never developed any personal flotation devices and had, quote, no experience whatsoever in the field of -- it's PFDs, but the Court changes it to "personal flotation devices."

Exactly the same is true for Mr. Brandenburg. Mr. Brandenburg has done lots of industrial design. He has designed lots of products. He has a litany of patents. They relate, for example, to paper towel dispensers, soap

dispensers, medical devices.  They do not relate to optical

devices, riflescopes, or shooting sports of any kind.

In fact, Mr. Brandenburg admits that he has no

experience with riflescope design, with optical design, or

with any kind of focusing device.  And when asked what his

closest analogous experience is, the closest thing he could

think of were endosurgery tools.  In other words, he has no

experience in the field and no analogous experience.

And if I don't have that on one of the slides, the

citations for that are in the brief.  But they are the

Brandenburg transcript, which is Exhibit 38, at pages 11 to 17

and 238 to 242.

So on that basis, Mr. Brandenburg can't tell us what

a person of skill in the art would or would not understand

that Mr. Otteman possessed.  And since the only evidence of

record is from Mr. Byron, saying that a person of skill in the

art would understand that Mr. Otteman possessed the rail/fork

embodiment, that should be the end of the inquiry and summary

judgment in Leupold's favor should be entered on this issue.

But, at a minimum, Mr. Byron's evidence is in the record, and

Nightforce can't get summary judgment on this issue.

That brings us to the third of the Nightforce

defenses on which the parties have cross-motions for summary

judgment.  This is a somewhat novel and unusual defense that

Nightforce raises.  Nightforce argues that it should get a

free pass on all six years of past damages because it contends
that the '907 patent was facially invalid until 2016; and,
therefore, it gets a pass on all infringement before that
time.

Nightforce has not made a showing that the '907
patent in fact was facially invalid.  And, to the contrary, to
the extent there may have been an error in the '907 patent at
the time it was granted, that error was properly corrected in
2003.  And although there was a further certificate of
correction, making a further correction in 2016, that was a
belt-and-suspenders approach, based on an argument Nightforce
raised just before this litigation was filed.  It was not
necessary.  It was done only out of an abundance of caution.
And the patent was fully valid and certainly at least not
facially invalid prior to that time.

So the debate here centers on the difference between
a couple of cases.  The two most pertinent of those are the
*Carotek* case, which is relied upon in Leupold's briefing, and
the *Worlds, Inc. v. Blizzard* case that is relied on by
Nightforce.

Critically, as we've pointed out in our briefing, the
*Carotek* case lines up with where the '907 patent stood in 2003
after the 2003 certificate of correction was entered.  At that
time, the '907 patent had a claim of priority back to its
provisional application, and that claim of priority was made

on the face of the '907 patent, right on the front page, where
anybody glancing at the patent could see it, but was not
included in the first sentence of the specification.  It's in
the bibliographic data up above that.  Exactly the same was
true in *Carotek*, and the *Carotek* Court held that the patent
was valid and therefore not facially invalid.

*Worlds*, on the other hand, is different.  In *Worlds*
there was no certificate of correction at the time the case
was filed.  The *Worlds* patent, like the '907 patent before the
2003 certificate of correction, had no claim of priority in
the patent itself.  The claim had been made in the materials
filed with the application, but for whatever reason was not in
the application and was not in the issued patent.

Unlike Leupold and unlike the plaintiff in *Carotek*,
the plaintiff in *Worlds* did not go out and get a certificate
of correction.  Therefore, it did not put a claim of priority
on the face of patent or in the first sentence of the
specification of the patent or anywhere whatsoever in the
patent until the issue was raised on summary judgment by the
other side.

Now, before the litigation became final, there was a
certificate of correction in *Worlds*.  And in *Worlds* that
certificate of correction put the claim everywhere.  It put it
at the beginning of the patent.  It put it at the beginning of
the specification.  But the Court said, "Well, it's too late

now."  So it doesn't look at the certificate of correction
because the certificate of correction was too late.

Here the certificate of correction that we have, just
like the certificate of correction in *Carotek*, was obtained
early on.  In *Carotek* it was during the litigation.  In our
case it was many years before the litigation and before there
was any dispute between Leupold and Nightforce.  And like in
*Carotek*, the certificate of correction put the claim of
priority on the face of the patent, but not in the
specification.

And so Nightforce's argument centers on a USPTO
regulation that requires the claim of priority to be made in
the first sentence of the specification.  The *Carotek* case,
citing to a variety of Federal Circuit authorities, notes that
the point of that requirement is to make it easy for someone
searching the patent to see where the claim of priority is and
how far back a patent claims, and that that purpose is served
as well or probably even better if the claim is placed right
on the face of the patent than if it's buried in the first
line of the specification, which may not be on the first page
and may fall after the figures.  Therefore, just as in
*Carotek*, the patent was not invalid on its face.

Now, in fallback, in its reply brief, Nightforce
makes a further argument and says, well, that's true, but
Nightforce -- but Leupold confused the Patent Office because

they filed their certificate of correction, the 2003 one,

claiming it was the Patent Office's error, not Leupold's

error, in the original application.  That's all beside the

point because that's all equally true in *Carotek*.

So in *Carotek*, the patentee claimed  that it was the

Patent and Trademark Office's fault, the original error.  And

the Court ultimately said, You know what?  I disagree.  I

think it was the patentee that screwed up in *Carotek*, but I

don't care, because it got corrected in time; and the

correction worked just as well as if it had been perfectly

correct and serves the purpose of the regulation.  And that's

what the Federal Circuit has told us is important and that's

what it enforces.

And a consistent case is the *Prism* case, which is

cited in the briefing.  There again a certificate of

correction added a specific priority claim to the title page

of the patent but not to the first sentence of the

specification, and the Court held that that was legally

effective as an exercise of the Patent and Trademark Office's

discretion.

*Carotek* also picks up on this issue and notes that

the PTO would never have issued the certificate of correction,

like the 2003 certificate of correction here, unless it

believed that that certificate of correction was effective to

correct the priority date.  And since the Patent and Trademark

1    Office, in its discretion, allowed the correction to be made

2    on the front page of the patent instead of in the first line

3    of the specification and because the Federal Circuit tells us

4    that that is sufficient to meet the policy concerns of the

5    regulation, that's the end of the story.  The patent is valid

6    and certainly not facially invalid as of 2003.

7           A brief fallback position, even if the Court adopted

8    Nightforce's argument and even if the Court thought that the

9    patent after 2003 and before 2016 was questionable as to its

10   validity, there is no question that the 2016 certificate of

11   correction, adding the same claim of priority to the first

12   sentence of the specification, makes the '907 patent valid at

13   all times relevant to this case, because it was obtained

14   before the case was filed.

15          And the '907 patent was not invalid on its face

16   before that time because you'd have to look beyond the face of

17   the '907 patent to find that there was any prior art even

18   potentially invalidating the '907 patent between the time of

19   the provisional and the time of the non-provisional filing.

20   And since that arguable invalidity is not facial invalidity,

21   there still would be no basis to find that there's no damages

22   under the '907 patent.

23          As I said, I don't think the Court should reach that.

24   It's a fallback position.  But even if Nightforce were right

25   on this -- and they are not -- it would not support their

1  argument.

2          The fourth and final issue on which the parties

3  move -- cross-move for summary judgment is equitable estoppel.

4  This is an equitable defense that Nightforce asserts.

5  Critically, there is today a significant difference between

6  equitable estoppel and laches in the context of a patent claim

7  for damages.

8          Looking backward, before a couple of years ago there

9  were very few patent cases that ever got to the issue of

10  equitable estoppel because there was a strong doctrine of

11  laches.  And almost any time you had equitable estoppel, you'd

12  have laches and it was easier to prove laches.

13          The Supreme Court has done away with laches as a

14  defense to a patent infringement claim for damages.  It's

15  simply no longer available because there is a specific statute

16  of limitations.  Therefore, the duty that Leupold was under

17  that's relevant to this equitable estoppel defense is not the

18  duty of laches, it is not the duty to bring a lawsuit in a

19  timely manner.  It is the duty to not deceive anyone about

20  your intent to bring a lawsuit.

21          And Nightforce doesn't prevail just by showing delay

22  and prejudice.  It has to show deception, reliance on that

23  deception, and resulting prejudice.  And so the difference

24  between being able to rely on delay alone -- in other words,

25  that Leupold did not sue when it first learned of the

1    infringement -- versus having to prove deception and reliance

2    on that deception is critical to why Nightforce's defense

3    fails.

4         So here are the three elements of an equitable

5    estoppel defense as laid out by the Federal Circuit:

6    misleading conduct, which can be silence, as long as there's

7    something more in addition to the silence; reliance by

8    Nightforce on the misleading conduct; and material prejudice,

9    which must result from the reliance.  It can't just be

10   prejudice divorced from the reliance.

11        So starting out, what evidence is there about the

12   alleged deception?  Well, Nightforce argues that the deception

13   occurred as a result of a back-and-forth that the parties had

14   years ago about infringement.  Leupold wrote to Nightforce

15   saying, "We think you might want to take a license to this

16   '907 patent.  It looks like you might be practicing it.  Let's

17   talk about it."

18        There's a back-and-forth.  There's a series of

19   e-mails back and forth.  And those ultimately end with an

20   e-mail that Leupold's counsel sent to Nightforce's counsel

21   saying, "Here are the arguments you've made about why you

22   think our patent is invalid.  We don't agree with them.  But

23   let us know what your responses to our counter arguments are."

24        And Leupold gets no response to that.  And then

25   counsel for Leupold, Mr. Ferris, calls and leaves a message

1    for opposing counsel and hears nothing back.  And ultimately

2    Leupold doesn't sue, but things stay in Nightforce's court,

3    waiting for a response.  There is no lawsuit.  In 2016 Leupold

4    picks the issue up again, writes another demand letter, and

5    ultimately files this lawsuit.

6         And so I would first point to the *ThermoLife* case

7    from the Southern District of California in 2016, which makes

8    clear that on summary judgment -- so there's cross-motions for

9    summary judgment here, and *ThermoLife* is particularly relevant

10   to Nightforce's motion that it gets summary judgment of

11   equitable estoppel.

12        And in *ThermoLife* they say that the only way you can

13   get summary judgment as to the deception prong in the

14   defendant asserting equitable estoppel's favor is if the only

15   possible inference from the facts is an inference of

16   deception.  If there is any alternative inference, then the

17   defendant can't meet its clear and convincing burden -- or,

18   I'm sorry, cannot meet its burden -- it's not clear and

19   convincing here -- cannot meet its burden and summary judgment

20   is not proper.

21        But we think under these facts, given that the ball

22   was left in Nightforce's court, and Nightforce is the party

23   that elected never to respond and to draw things out, that

24   deception is not the only possible inference and, in any

25   event, that deception by Leupold is not the only possible

1    inference.

2          And I will get to this, but there is also a question

3    of funny business about what Nightforce was saying at the time

4    and the potential that Nightforce misled Leupold at the time

5    of these discussions.

6          The *Hemstreet* case from 1992 is on point with the

7    facts of this case.  There the ball was left in the

8    defendant's court in the negotiations back and forth, and

9    there was no specific threat to sue or allegation of

10   infringement.  There was a discussion about licensing.  The

11   same is true here.  Leupold's letter was couched in terms of

12   licensing.  And the negotiations went back and forth and ended

13   in Nightforce's court.  So just like *Hemstreet*, we should not

14   find any deception.

15         Those legal arguments aside, the facts are quite

16   clear.  So during the 30(b)(6) deposition of Klaus Johnson,

17   who was Nightforce's 30(b)(6) designee with respect to this

18   defense, he was asked, "Has anyone at Leupold ever done

19   anything to mislead Nightforce?"

20         And he starts to repeat the question, "Has anyone at

21   Leupold any" -- and the question is "Yeah, that you're aware

22   of."

23         "Answer:  No.  I'm not aware of that at all.

24         "Question" -- getting more specific now:  "Any kind

25   of fraud or deception by Leupold?

1              "No, not that I'm aware of.

2              "What about with respect to its patent rights?  Has

3    Leupold ever misled Nightforce about its patent rights?

4              "Answer:  I'm not aware of any -- anything like that.

5              "Question:  You don't have any reason to think so?

6              "Answer:  No."

7         That is an admission by Nightforce, via its 30(b)(6)

8    representative, that Nightforce was never misled by Leupold.

9    Critically, there is nothing in the record from Mr. Johnson

10   retracting that statement or testimony or taking an

11   alternative position on behalf of Nightforce or arguing that

12   he wasn't prepared for his deposition or didn't know about

13   this or explaining why.

14        Leupold is entitled to rely on Nightforce's

15   admissions at its 30(b)(6) deposition, by its 30(b)(6)

16   representatives, as admissions of the company.  This alone

17   should be sufficient to grant summary judgment.

18             However, even more critically and more tellingly, the

19   record is also clear that Nightforce did not ever rely on any

20   misleading conduct.  So even if the Court were to agree with

21   Nightforce and conclude that it was somehow misleading of

22   Leupold to not follow up and send an e-mail, saying, "By the

23   way, guys, we retain the right to sue you at any time," which

24   is an action Leupold could have taken, which certainly would

25   not have been deceptive, Leupold was not required to file a

lawsuit at that time.  They could have just said, "Hey, we are
reserving our rights.  We could sue you any time.  You're
taking that risk if you don't respond to us."

There is absolutely no evidence that if there was any
deception in failing to do that, in failing to be clear about
the fact that Leupold might sue in the future, that Nightforce
relied in any way on that lack of clarity in going forward and
continuing to make the same infringing products for the next
approximately 10 years.

And this is clear from a case called *Gasser Chair*.
It's an older Federal Circuit case from 1995.  And there the
case, because it's from before the laches defense went away,
talks mostly about laches, but there is a discussion of
equitable estoppel at the end.  It largely tracks the laches
discussion.

What the Federal Circuit said is -- well, there's two
parts.  One is the Federal Circuit says that the defendant in
*Gasser Chair* engaged in some egregious conduct that tipped the
equities against them.  But separate from that, the defendant
never relied on misleading conduct and instead made a business
judgment that it was going to win the litigation if the
litigation was ever filed.  So in that case it was clear from
the testimony that the executive of the defendant was not
relying on the fact that he thought the other party had given
up its right to sue.  He was relying on the fact that he

1    thought the patent was invalid and he was going to win.

2            And the Federal Circuit tells us that that is not the

3    basis for an equitable estoppel defense.  If a party is making

4    a business judgment that the patent is invalid and they're

5    going to win, then they are not relying on any deception;

6    they're relying on their business judgment.  And Ray Dennis

7    has been extremely clear that he has made exactly such a

8    business judgment, that he believed that Nightforce did not

9    infringe any valid claims of the '907 patent; and, therefore,

10   that under no circumstances, no matter what Leupold had said

11   and no matter when Leupold had said it, he never, ever would

12   have changed his products.

13           So here is some of that testimony.  So the first test

14   we have is after this litigation was filed, did Nightforce

15   stop making these products?  Because if it was making the

16   products based on reliance on the idea that it would never get

17   sued, that notion certainly was dispelled when the litigation

18   was filed.

19           Nightforce had not changed its products.  And when

20   Mr. Dennis was asked why it has not changed its products, he

21   said, "No need to.  There's no infringement."  In other words,

22   "We're not infringing any valid claim of the patent."

23           Then he was asked -- so the context for this slide is

24   he's being shown the demand letter that was sent to Nightforce

25   shortly before this litigation was filed -- When you got this

letter, did you change what you were doing?  Did you change
your product to stop infringing on the '907 patent?

And he said, "No," on the basis of a legal opinion.
He then stops there, on instruction of counsel, and does not
disclose what that legal opinion was.

So you didn't even go down the path of exploring
different design options?

"No.  No.  We're certain that -- we're certain."

And then we continue on:  What about the '907 patent?

Well, he brings up the '907 patent.  And the next
slide continues the same line of testimony, from line 4 to
line 5.  The questioner points out that the cease and desist
letter at issue is not just about the '907 patent.  And
Mr. Dennis says "Okay."

The questioner points out two of the other patents
that are involved, and then Mr. Dennis cuts the questioner off
and interjects:  "So we've gone through all of these
individually, Nathan, every single one through this pile.  And
in every one of those I've explained what you've asked me now,
which is that, no, I didn't consider removing any of them from
the market because I don't believe we infringe, so there's no
reason to remove things from the market if you have that
belief."

Then just a few minutes later in the deposition,
Mr. Dennis is asked, "So I take it, then, that Nightforce's

1  decision not to change its products had to do with its view of

2  the substance of the issues and not with the timing of this

3  letter.  Is that accurate?

4          "No, it's the substance of the issue.

5          "So it wouldn't have mattered when this letter was

6  received?"

7          And "this letter" that we're referring to is again

8  the cease and desist letter saying, "We're going to sue you."

9          "No.

10         "The answer would have been the same?

11         "Would have been the same, except more years would

12  have bypassed us.

13         "Question:  Even if it was received in 2007, no

14  change?

15         "Answer:  Correct.  I would have been in the same

16  position."

17         That testimony is fatal to Nightforce's equitable

18  estoppel argument.  Even if Leupold had clearly told

19  Nightforce in 2007 that they were about to sue them on the

20  '907 patent or we're going to sue them into 2016, whatever

21  that hypothetical letter would have said, if he had received a

22  hypothetical letter in 2007 saying, "We're about to sue you,"

23  he still would have done nothing.

24         Mr. Dennis was not relying on the fact that Leupold

25  didn't respond or didn't follow up.  He was relying on the

1   fact that he thought he was going to win any litigation

2   because he believed the patent was invalid.  And just like in

3   *Gasser Chair*, if the defendant is relying on its view of the

4   merits and a business judgment that it will take the risk that

5   it gets sued, then it is not relying on any deception and

6   there is no equitable estoppel.

7          And, indeed, here's paragraph 11 of the declaration

8   that Mr. Dennis put in on summary judgment in this case, where

9   he essentially agrees with the point that Leupold is making.

10  He says, "I reviewed and considered this information at the

11  time" -- that's the back-and-forth that the parties had

12  had -- "and made the business decision to risk a lawsuit by

13  not complying with Leupold's demands."

14         If you take that language and compare it back to the

15  language in *Gasser Chair*, it is almost identical to what the

16  Federal Circuit said in *Gasser Chair* is not sufficient to

17  support an equitable estoppel defense.

18         In addition, there's the question of funny business.

19  So the *ThermoLife* and *A.C. Auckerman* cases that were discussed

20  in our briefing point out that because equitable estoppel is

21  an equitable defense, the Court has to consider all the

22  equities in weighing whether equity supports barring the

23  plaintiff's claims.

24         And in this case there is at least a question of

25  fact -- if the Court had not already disposed of Nightforce's

1   motion for summary judgment that it is entitled to the defense

2   of equitable estoppel, there is at least a question of fact

3   about Nightforce's own deceptive conduct that would preclude

4   giving Nightforce summary judgment of equitable estoppel.  And

5   that has to do with the funny business about the cameras and

6   the dates.

7           So when the parties had this back-and-forth 10 years

8   before this lawsuit, Nightforce said, "We've got killer prior

9   art back before your patent date."  And Leupold asked for the

10  details on that, and that's exactly the e-mail where the

11  conversation cut off.  Nightforce never provided those

12  details.

13          And, in fact, we now know that the killer prior art

14  that Nightforce is asserting -- and we'll get to this when we

15  talk about the Schmidt & Bender products specifically -- is

16  based upon a supposed teardown that Nightforce allegedly did

17  of a Schmidt & Bender long-range scope that purportedly

18  happened in March of 1997, but that we know really can't have

19  been at that time because the camera that was allegedly

20  used to take the picture -- or that was used to take the

21  pictures of whenever the teardown actually happened, was not

22  on the market in March of 1997 and because the dates of the

23  photos compared with dates of other photos taken with the same

24  camera are inconsistent with each other, with the testimony of

25  the witness who actually took the photos, and with a

meticulously maintained desk calendar with the days checked
off that appears in one of the photos of another product with
the exact same date, but could not have been taken on that
date.

For all these reasons --

THE COURT:  I want to interrupt you.  I'm going to
take a recess at this juncture.

Let's take 15 minutes, and then we'll get back
together.

Thank you.

(A recess is then taken.)

THE COURT:  Have a seat.  I'm sorry.  You're all
standing up.

Go ahead.  You can proceed.

MR. BRUNETTE:  Your Honor, I had been talking about
the equitable estoppel issue.  I had reached essentially the
end of what I was going to say about that.

THE COURT:  Okay.

MR. BRUNETTE:  So I will just dive in with the next
issue.

Just a brief reference back to the road map of where
we are, we talked about infringement on which just Leupold is
moving.  We've now talked about the four Nightforce defenses
on which the parties have cross-motions, and the next two
things up are two additional Nightforce defenses on which only

1    Leupold is moving.

2              So the first of those are anticipation and

3    obviousness defenses.

4              THE COURT:  I want you to go back a minute.  I don't

5    know that you quite finished up with your equitable estoppel.

6    You were telling me about the funny business and the camera

7    that was invented after the date that the photographs were

8    purportedly taken.

9              How does that fit into the equitable estoppel

10   argument that is being made here?

11             MR. BRUNETTE:  The way those fit together is

12   Nightforce's statement in the back-and-forth in the 2006

13   exchange that the -- that Nightforce had killer prior art from

14   before the patent's filing date, which we understand now to

15   have been these photos.  And Nightforce says, you know, "Well,

16   we've got killer art back before you."

17             In fact, what they were relying on in making that

18   statement is prior art that they don't really have.  And when

19   we asked for details about what their argument is and why they

20   think that it gets before our real provisional filing date,

21   that's exactly when they cut off the communications.

22             And so it's at least difficult to imagine how

23   Nightforce can, back at that time, take the position that

24   "Well, we're going to tell Leupold we've got this great prior

25   art and then refuse to say anything," and now say, "Oh, we are

```
 1    the ones who were deceived.  We didn't understand you.  We
 2    thought that you certainly would have sued us or you would
 3    have told us that you were going to sue us," after they were
 4    the ones that said, "We've got this killer prior art," and
 5    then refused to say anything more about it.
 6            It seems like having -- having taken those actions to
 7    try to take Leupold off the ball and keep Leupold down about
 8    moving forward, that it would not be equitable for Nightforce
 9    to take advantage of that, to then turn around and argue that
10    the delay somehow bars the claim later.
11            THE COURT:  While it's kind of interesting, I don't
12    know that it adds much to your equitable estoppel argument
13    that you already have.  But that being the case, you can go
14    ahead and move on.
15            MR. BRUNETTE:  I think the strongest argument is the
16    reliance point.
17            THE COURT:  Thank you.
18            MR. BRUNETTE:  So moving on to the Altenheiner
19    patent, which is a patent on a set of binoculars, here is the
20    face page of the Altenheiner patent, annotated with the
21    critical fact, which is simple.
22            What is shown here is binoculars.  It is not a
23    riflescope or a telescopic rifle sight, to use the terminology
24    of the '907 patent.  Nothing in the Altenheiner patent talks
25    about a riflescope, talks about aiming a rifle, or talks about
```

1    either a scope or a firearm in any way.  It is simply a patent
2    on binoculars.
3            Now, Nightforce argues, ,notwithstanding this that
4    the Altenheiner binocular patent somehow anticipates the
5    claims of the '907 patent.  And the reasoning behind that
6    argument -- so stepping back, the legal test for
7    anticipation -- and we cite the *Net MoneyIN* case repeatedly in
8    our briefing for this -- in order to prove anticipation under
9    Section 102, Nightforce would have to show that a single prior
10   art reference includes all elements of the claims arranged in
11   the same way that they are in the claim.  So if there is any
12   difference, any element of the claim that's missing from the
13   face of the Altenheiner patent, it can't be anticipating.
14           What's missing from the Altenheiner patent, as shown
15   in the red annotation, is that it's not a telescopic rifle
16   sight.  Nightforce's argument is, yeah, but telescopic rifle
17   sight isn't really required.  They say that's only in the
18   preamble language of the claims; and, therefore, it's not a
19   limitation of the claims.
20           If this preamble argument sounds vaguely familiar to
21   the Court, it's because this is a fight that we had on several
22   other patent terms at the claim construction stage about
23   whether preambles or when preambles are limiting, because
24   sometimes they are and sometimes they're not.
25           And a critical issue that the parties briefed and

that the Court decided at that time involved situations where
the preamble provides antecedent basis for terms used in the
body of the claims.  And where the body of a claim
uses -- uses the phrase that is also in the preamble and the
preamble is necessary to provide antecedent basis, then the
preamble is limiting.  There are a variety of case cites in
our claim construction brief and also in the *Markman* order
adopting that position.

            And so the question is -- and it's docket 69, at 15
to 16, is where the Court takes this on with respect to a
different patent, but it's the same issue.

            So let's look at the claims of the '907 patent to
assess whether a telescopic rifle sight, which is right there
in the first four words of Claim 10, is necessary to provide
antecedent basis for anything else in the claim.  And the full
preamble here is long, but it is "a telescopic rifle sight
having an adjustable focus setting and an adjustable aiming
offset, the telescopic rifle sight including a tubular
housing," and so on, all the way down to "comprising."

            What you can see is that in 10(a) and 10(c)(ii), at
the very end, highlighted in blue, is the language, "the
telescopic rifle sight."

            So "the telescopic rifle sight" can only refer back
up to "a telescopic rifle sight" at the beginning of Claim 10,
which therefore provides antecedent basis for the telescopic

1    rifle sight, and telescopic rifle sight is a limitation of the
2    claims.
3            In addition, the additional phrase, "the telescopic
4    rifle sight, including a tubular housing" used in the preamble
5    provides antecedent basis for the phrase, "the housing," which
6    is used later in the preamble and in 10(a), 10(b), the flush
7    language of 10(c), in 10(c)(i), and in 10(c)(ii).
8            And this point is discussed further in the claim
9    construction briefing but was also decided by the Court:  When
10   just a small part of a longer preamble phrase is referenced
11   subsequently in the body of the claims, such as "the housing"
12   here referencing the longer phrase "the telescopic rifle sight
13   including the tubular housing," the entire phrase from the
14   preamble, not just the shorthand version, is limiting.
15           Again, that's fully briefed in the claim construction
16   briefing and I believe is addressed in the *Markman* order as
17   well.
18           So given the use of "the telescopic rifle sight" and
19   "the housing" in the claim body, a telescopic rifle sight is
20   required for a product to infringe or anticipate -- because
21   the test is the same -- the claims of the '907 patent; and,
22   therefore, Altenheiner is not anticipating prior art.
23           Nightforce's fallback position is, well, if
24   Altenheiner isn't anticipating, then it renders the claims
25   obvious.  Now, Nightforce, again, is not moving for summary

judgment of obviousness; Leupold is moving.  And so the
question is:  Is there any evidence that Nightforce could rely
upon to show that -- or to convince a person, a reasonable
juror, that the claim is obvious by clear and convincing
evidence?

          And there are key questions that Nightforce has to
answer that it cannot answer because it has no evidence.  So
there is no evidence in the record why a person of skill in
the art would select Altenheiner to build a rifle sight, no
evidence of why or how a person skilled in the art would
modify Altenheiner to make it into a rifle sight, and no
evidence of any non-hindsight rationale to modify Altenheiner
into a rifle sight.

          What evidence there is is the Byron testimony
establishing the opposite.  There is not much from
Mr. Brandenburg on this point.  But if Nightforce were to
point to Mr. Brandenburg's testimony, as discussed earlier,
for the same reasons set out in *Sport Dimension v. Coleman*,
Mr. Brandenburg is not a person of skill in the art in the
field of rifle sights.

          I do want to point out at this point a question that
we kind of skipped over when we talked about *Sport Dimension*
before and an argument I expect Nightforce may make is:  What
is the field of art of the '907 patent and is it really
riflescopes?  That's one of their arguments, is it's not

1    really riflescopes.

2           But we just went over that point now on anticipation,

3    and we can definitively say that the '907 patent requires a

4    telescopic rifle sight.  So the field of the invention is a

5    telescopic rifle sight, just as the first words of every claim

6    set out some variation on a telescopic rifle sight.

7           And Mr. Brandenburg has no experience in that field

8    and therefore cannot tell us what would be in the head of a

9    person skilled in the art at the time of the invention in

10   terms of why they might pick out -- or not -- Altenheiner to

11   build a rifle sight, how or why they would modify Altenheiner

12   to make it into a rifle sight or why they would be motivated

13   or have a rationale to do so.

14          And absent that evidence, some basis for that

15   evidence -- and it can't come from Mr. Brandenburg --

16   Nightforce can't win on that defense, and summary judgment is

17   appropriate.

18          The last issue as to the '907 patent is another

19   Nightforce defense.  This is the Schmidt & Bender prior art

20   scope.  This is where we get into the photos.  And, again,

21   it's only Leupold asking for summary judgment on this issue.

22          So Nightforce has -- is arguing that a Schmidt &

23   Bender scope was itself prior art to the '907 patent.  In

24   order to prevail on that, Nightforce has to show, since

25   Schmidt & Bender was making those scopes in Germany, outside

the United States, that the scope was publicly available in
the U.S. more than one year before the date of the filing of
the '907 patent, which, as we discussed earlier, Leupold
contends the appropriate filing date is the priority date of
the application.  So the date that Nightforce has to get the
Schmidt & Bender product in front of is January of 1998.

This is an affirmative defense that Nightforce has to
prove by clear and convincing evidence.  And instead of clear
and convincing evidence, Nightforce has no evidence from which
a rational trier of fact could find that there was a Schmidt &
Bender scope that had the patented spiral cam system inside
that was available in the United States before the critical
date in January of 1998.

There are three general kinds of evidence that
Nightforce tries to rely upon, and none of them help it out to
make this showing.  The first is advertisements.  The second
is the photos and testimony about a teardown, at some unknown
date, of a Schmidt & Bender device.  And the third are two
Schmidt & Bender e-mails, which are inadmissible hearsay.

So going through those, first, the advertisements
that I've shown on slide 58, which is up on the screen now, is
an example of one of these advertisements.  And they certainly
show -- this one dates from the fall of 1997, and it shows
that Schmidt & Bender is selling some kind of a scope with a
third turret on it, and that's what both the spiral cam scopes

1    and a variety of other prior art scopes that used different

2    designs to accomplish parallax focus have.  There's nothing

3    about the text or the image of this advertisement -- and it's

4    exemplary; I think the same is true of all the other

5    advertisements that are in the record -- that says anything

6    about what's inside that scope and whether it's a spiral cam

7    or an orbital pin or some other design.  They simply don't

8    tell us.  All that this can prove is that Schmidt & Bender was

9    selling some kind of side parallax focus scope.

10           They also don't tell us whether the scopes were in

11   the United States.  And the advertisements themselves can't be

12   a printed publication that would be prior art because they

13   don't disclose the spiral cam mechanism.

14           Next, Nightforce tries to fill this in by saying,

15   "Well, we know what was inside those scopes because we tore

16   one down."  All we know there is that at some point Nightforce

17   got its hands on a Schmidt & Bender long-range scope.  We

18   don't know if it's the same kind of scope that was being sold

19   in 1997 or not.  We don't know when Nightforce got its hands

20   on it, and we don't know when Nightforce tore it down.  We

21   don't even know how Nightforce got its hands on the scope or

22   whether such scopes were publicly available in the United

23   States.

24           In fact, the photos of that teardown show only that

25   some Schmidt & Bender scope had a spiral cam mechanism.  The

dates on the photos are demonstrably incorrect.  They're
inconsistent with when the camera was available.  They're
inconsistent with other dates that Mr. Stockdill, who took the
pictures, identified and the dates of other photos taken with
the same camera.  And other photos taken the same --
purportedly taken the same date, dated the same date by the
camera, are inconsistent with a desk calendar shown in one of
the photos with the dates crossed off, even though
Mr. Stockdill testified that he's meticulous about changing
calendars and that if he walks into a conference room and sees
a calendar that's wrong, he changes it; and that if he sees a
VCR flashing, he feels compelled to set the VCR clock.

So this guy, who's meticulous about dates, has a
picture of his own desk calendar on his desk, with the dates
crossed off, that cannot be consistent with the month or date
of these photos.

And in its opposition brief to summary judgment,
Nightforce says, "Well, that's okay.  We don't need to rely on
that metadata.  What we'll rely on is the testimony of
Mr. Stockdill to tell us when those photos were taken."

But Mr. Stockdill can't provide that testimony.  He
said at his deposition that he didn't have any idea where the
scope came from, when the scope was obtained.  And he was
quite adamant that the pictures must have been taken in March
of 1997, but he admitted that he was basing that answer only

1   on the metadata associated with the pictures and nothing else.

2         So he doesn't have any independent recollection of

3   when those photos were taken.  His testimony is just repeating

4   reliance on the metadata that we know is wrong.

5         So all we know is that Schmidt & Bender advertised

6   some kind of third turret scope.  And at some point -- we

7   don't know when, we don't know if it was before January 1998

8   or not -- Nightforce tore down some Schmidt & Bender scope

9   with a third turret and found a spiral cam inside.

10        That's not sufficient to show that any Schmidt &

11  Bender product was actually on sale in the U.S., that such a

12  product on sale and publicly available in the U.S. had a

13  spiral cam, and that all of this occurred before January of

14  1998.  And no rational trier of fact could find that

15  Nightforce has carried its burden to prove all of those things

16  by clear and convincing evidence.

17        The last set of evidence that Nightforce relies upon

18  are two e-mails produced by Leupold from Schmidt & Bender

19  containing statements that Schmidt & Bender made in 2004 and

20  2006 about when they first shipped certain scopes.  Those

21  e-mails are hearsay.  They contain out-of-court statements by

22  Hans Bender of Schmidt & Bender and by Sabine Brandt of

23  Schmidt & Bender, who we know from the context of the e-mails

24  was Mr. Bender's personal assistant.  So really, both of these

25  statements are coming from the memory of Hans Bender.

1           Hans Bender is talking in 2004 and 2006 about his
2    recollection of events that happened purportedly in 1997.  As
3    a result, these are not business records -- his recollection
4    is not a business record of Schmidt & Bender because it is not
5    a record made by someone contemporaneous with the happening of
6    the events by someone who had knowledge.  There's certainly no
7    foundation for that.

8           Mr. Bender is not available.  There's no indication
9    that he'll be available to testify to tell us anything about
10   when this happened or what happened.

11          And even if one were to fully read and accept
12   everything in these e-mails, notwithstanding the hearsay
13   doctrine -- and they should not be admissible and should not
14   be considered -- they still only say that certain scopes were
15   shipped.  They do not prove that those scopes were publicly
16   available in the U.S.

17          For example, they don't identify whether any scopes
18   that were shipped were advance shipment to a U.S. distributor,
19   whether they were for confidential review in advance of the
20   actual launch of the product.  We have no idea when or whether
21   those scopes were made publicly available in the United
22   States.

23          And so even if Nightforce could get these e-mails
24   admitted -- and they're hearsay and Nightforce cannot -- they
25   still can't prove by clear and convincing evidence that scopes

1   with these features were available in the United States before
2   the critical date in January 1998.
3           And so that gets me all the way through the issues.
4   With that, I would reserve for rebuttal after Nightforce's
5   presentation.
6           THE COURT:  Thank you.
7           MR. CASIMIR:  Is there a way to turn the light off on
8   this?  It's creating a lot of glare.
9           (There is a brief pause in the proceedings.)
10          MR. CASIMIR:  Thank you so much.
11          All right.  So we're going to start with the four
12  issues on the '907 patent that Nightforce affirmatively moved
13  for, and then we'll come back after that and address the
14  issues that only Leupold moved on.
15          And we're going to have a little bit of a split
16  presentation here.  So the four topics of, number one, that
17  Leupold cannot demonstrate an earlier invention and therefore
18  the claims are invalid, I'll be presenting that topic.
19          Second, we're going to address the issue of whether
20  the '907 claims are entitled to the provisional priority date;
21  and, if not, therefore the claims are invalid.  And Mr. Davis
22  will be presenting that.
23          I will then come back and present on the equitable
24  estoppel issue as well as the late certificate of correction
25  affecting when damages are available.

1              So on each of these, we're going to be putting this

2    in the context of a series of timelines.  The information on

3    this slide you don't need to pay too much attention to at this

4    point.  It's just identifying that the story of the '907

5    patent and these issues can be told in a series of timelines.

6              THE COURT:  Do you have copies of your slides?

7              MR. CASIMIR:  Oh, yes.  Sorry.

8              THE COURT:  I actually can see these a little bit

9    better.

10             MR. CASIMIR:  (Handing.)

11             (There is a brief pause in the proceedings.)

12             THE COURT:  Thank you.

13             MR. CASIMIR:  All right.  And so let's start with a

14   little technical background that's going to help inform all of

15   these issues.  I think it's important to understand, when we

16   try to identify when an invention happened, what the invention

17   is, because it's not just a component with a spiral in it.

18   The claims in the '907 patent claim much more.

19             So we need to understand, what is the invention that

20   we're looking at to determine when it was invented.  And we

21   also need to understand those claims to identify whether

22   there's infringement.  We need to see the claim elements.  And

23   we didn't get a chance to study those this morning, so we have

24   just a brief technical background, lining up the structures of

25   the scopes with some of the claim language so we have some

1    common vocabulary as we go through this.

2          So the first slide here is showing a telescopic rifle

3    sight, and circled is an adjustment mechanism on the side.

4    And I'm going to morph this into some of the patent figures

5    from the '907 patent.  So we're overlaying a blow-apart image

6    of the parallax adjustment knob from the '907 patent.  Two

7    items are colored.  The first, in purple, is the actuator

8    we've been talking about.  And that's the piece with the

9    little nub on it, which is the cam follower, which will

10   interface with the light green piece.

11         We can't see the groove on the other side of it, but

12   on the next slide here, we're blowing that up and turning that

13   around so you can see the drive face with the spiral cam

14   groove to which that nub on the actuator would interface.

15         And then we're going to look at the claim language

16   with respect to a figure from the '907 patent that shows a

17   cross-section, and we're just reproducing the colors here.

18   When looked at in cross-section, the spiral cam is the light

19   greenish-blue portion.  And you can see it's interfacing with

20   the purple portion, which is the actuator shown in side view.

21         So now let's look at the claim language.  And we're

22   using Claim 10 as an example.  It's one of the two independent

23   claims asserted against Nightforce and it has the most

24   elements, so if we look at Claim 10, we will have identified

25   all of the features that are relevant to any of the claims in

1   the case, in terms of the issues we're discussing here.

2           So we start off with the beginning of Claim 10,

3   where we have the telescopic rifle sight.  It has an

4   adjustable focus setting.  And a key feature I wanted to

5   highlight here as part of Claim 10 -- and this is true of

6   Claim 1 as well -- is there is a tubular housing.  So we're

7   not just claiming a adjustment knob here; we're claiming a

8   adjustment knob in the context of a telescopic rifle sight.

9   It's part of the larger product.  The housing is identified by

10  the dark purple in this slide.

11          The claim continues on to say that that housing has

12  an interior and an exterior, first and second ends, and

13  includes an elongate erector assembly, which has been

14  identified in the dark purple here.  And you'll recall when we

15  discussed the '305 patent previously, that patent related to

16  aspects of an erector tube.  This is a component that has the

17  various lens components in it and gets shifted slightly up and

18  down in response to adjustment knob manipulations.  So that is

19  part of the claim.

20          Another component of Claim 10 is an adjustable aiming

21  control device, again highlighted in the purple here, that

22  moves that erector assembly.  So, again, these claims are

23  focusing on a lot of different components of this aiming

24  device.

25          Next is the movable optical element.  And this is a

1    piece that it will be directly interacting with -- or I guess

2    indirectly interacting with the parallax adjustment knob,

3    highlighted in purple here.  This is within the housing and

4    moves in a particular manner.

5           And then the last major component in Claim 10 is the

6    manually adjustable focus control device.  This is the

7    component that has the actuator within it and has the drive

8    face with the spiral in it.  Claim 10 describes that this as

9    "projecting outwardly from the exterior of the housing."  So

10   it gives us information about the location of it.

11          We then go into the subparts of this control device.

12   One of them is the cam hub, again, going back to the

13   greenish-blue color.  The second component is -- again, the

14   specificity on the cam hub, it has this drive face with the

15   spiral cam track that we've been talking about.

16          And then the second component is the actuator.  And

17   this is "an actuator slide slidably mounted to the housing for

18   movement along the longitudinal axis."  So we get information

19   about how it's mounted on the housing.  And that actuator

20   includes the cam follower -- there's the "cam follower"

21   language -- that is "operably engaged in the spiral cam

22   track."  That's shown in the circle here, where you can see

23   that nub is now sitting into the groove, looking at the side

24   view of the cam hub.  And that connectivity is what gives the

25   ability to create motion within the device.

1         We also have another piece, which is the actuator,

2    that "the actuator slide is operatively connected to the

3    movable optical element."  And we see that here with the

4    little thin piece in the dark purple, where you can see it

5    connects to the actuator on one end and then links up to the

6    movable optical element on the other, so that when the

7    actuator moves side to side, that connector piece will then

8    also move side to side, pulling the movable optical element

9    with it.

10        So that ends Claim 10.  So we see there's a lot of

11   pieces here that are claimed.  This is the invention of the

12   '907 patent.  It is not just a cam hub with a spiral cam.

13        Claim 1, the other independent claim, is similar.

14   It does not require as many pieces.  It does not require the

15   erector or the knob adjusting the erector, but it does require

16   the movable optical element and the connectivity between that

17   and the focus control knob.

18        Let me stop there and see if there are any questions

19   on the technical description before we go into the subject

20   matter of the four issues.

21        THE COURT:  No.  I'm good.  Thank you.

22        MR. CASIMIR:  Okay.  So issue No. 1, that Leupold

23   cannot demonstrate an earlier invention -- and, of course,

24   from the introductory presentation, what we're talking about

25   here is an invention earlier than the German publication.

1          It's important to note here that when prior art is

2     identified that predates the date of filing of a patent

3     application -- and in this case, this prior art predates both

4     the patent filing date as well as the provisional filing

5     date -- the burden then shifts to the other party, to the

6     patent holder, to demonstrate that they can prove an earlier

7     invention.  It is Leupold's burden of production to

8     demonstrate that here.  They need to provide evidence that

9     demonstrates that point.  And they do not have probative

10    evidence on that point, as we'll see.

11         Under the law, there are different processes one can

12    use to show earlier invention.  In this case Leupold is only

13    relying on one of those processes, which is that they are

14    required to show an earlier conception date -- in other words,

15    the fully formed idea of the invention was in the minds of the

16    inventors prior to the prior art date -- and reduction to

17    practice, that a prototype was made and shown to work for its

18    intended purpose.  And Leupold cannot meet its burden on these

19    grounds.

20         A lot of the presentation earlier today was related

21    to the conception component.  For the purposes of this motion,

22    we're not disputing conception.  There are significant

23    problems with their conception evidence, but we don't need to

24    get into those here.  The reduction to practice component

25    alone is sufficient to grant this motion, and that's been our

1    focus in our motion.

2           I think the reason we've heard a lot about the

3    conception is they have some evidence of conception.  Again,

4    we're not getting into why that evidence is faulty, but they

5    lack evidence of reduction to practice.  By merging those two

6    concepts, I believe they've tried to make it appear that

7    there's more than there actually is.

8           All right.  So let's look at our first timeline here.

9    So a key date is the filing date of the patent itself, not the

10   provisional, but the final version that is the granted patent.

11   This was January 31, the year 2000.

12          Leupold is claiming that it deserves a priority claim

13   for its claims asserted in this case to a provisional patent

14   application, which was filed January 29, 1999.  We'll get into

15   that dispute as the second point.  But that marks our two key

16   dates for identifying prior art.

17          Prior art that's prior to either of those is relevant

18   to this case.  Most relevantly, however, is the prior art

19   we've been describing as the German publication.  This is the

20   Schmidt & Bender patent describing their own spiral cam design

21   that was published on March 26, 1998, predating both of the

22   filing dates.  This was based on a German patent filing

23   initially made on November 22nd, '97.  It took several months

24   for that to publish.  It's the publication date which acts as

25   prior art under U.S. law, so the March 26, 1998 date.

1          What makes this issue simpler than it might have

2     otherwise been is the parties acknowledge -- there's no

3     dispute on this -- that if the German publication is prior

4     art, either because the claims are not entitled to an earlier

5     priority date or because Leupold cannot show earlier

6     invention, the claims are invalid.  There's no dispute in this

7     case that that German publication teaches all of the elements

8     of the asserted claims.

9          And a simple picture here helps illustrate that

10    point.  You can see that the earlier Schmidt & Bender

11    invention looks nearly identical in terms of its structure to

12    what was filed later by Leupold.

13         And I'll wait for you to look away, okay, before I

14    shift to the next slide.

15         Thank you.

16         So as we'll see, focusing on reduction to practice,

17    there is no probative evidence of reduction to practice.  A

18    number of items of evidence have been highlighted.  We'll deal

19    with each of them individually to demonstrate that they do not

20    link to the '907 patent, or if it's testimony, that that

21    testimony was recanted.

22         What does the evidence actually show, the evidence we

23    have in hand about when reduction to practice occurred?  Let's

24    go back to our timeline.

25         And so the first item I'm highlighting here I've

added to our old timeline, is in the middle there is a

November 24, 1998 date.  We know from document production that

Leupold was aware of the Schmidt & Bender patent before it

filed its own patent.  We know that because they received an

English translation of the original German document on

November 24, 1998.  So they had the Schmidt & Bender patent in

hand, with all of the details in it, before they filed their

own patent application.

In December 1998 and after that period, going into

1999, we get the actual documents indicating work on reduction

to practice.  So we see CAD drawings, engineering drawings

that appear to have been the type that would have been sent

off to third-party manufacturers to make parts.  We see the

actual work being done on a prototype starting as early as

December '98 and afterwards, much of the work in 1999.  All of

this is after the date of the German publication.

So the real evidence, the concrete evidence, where

you can see the pictures and line them up to the product,

comes afterwards.  The documentary evidence to corroborate

reduction to practice only appears after the German

publication.

All right.  So we need to understand the legal

standard here.  To demonstrate reduction to practice, Leupold

must demonstrate two things:  first, that a prototype was made

prior to the German publication; and, second, that the

1   prototype worked for its intended purpose.

2            What evidence is required to meet that burden?

3   Inventor testimony can be part of it, but the law says

4   inventor testimony alone is insufficient.  There must be

5   corroboration.  Why is that?  Inventor testimony is

6   oftentimes, in these patent cases, old, stale, sometimes

7   biased.  The law is crystal clear we cannot rely on that

8   testimony alone.  And what we run into in this case is both

9   problematic initial testimony and a complete absence of

10  relevant probative corroboration.  And the corroboration must

11  show both that a prototype was made and that it worked for its

12  intended purpose.

13           So let's start with the "worked for its intended

14  purpose" because, in a sense, it makes the case very

15  straightforward and it makes it easy to find, on summary

16  judgment, invalidity in favor of Nightforce's motion.  The

17  reason for this is Leupold has provided no corroborating

18  evidence that a prototype worked for its intended purpose

19  prior to the German publication.  There is no evidence.  That

20  is issue dispositive on its own.

21           Recognizing this issue, in the middle of summary

22  judgment briefing Leupold came forward with a late-filed

23  declaration from its expert, for the first time taking a

24  position and arguing that this invention is so simple no

25  testing was required to demonstrate that it worked for its

intended purpose.  They needed to say that because the case was over otherwise.

We'll get into that specific testimony.  We'll get into the law on that issue, because the late-filed Byron declaration does not satisfy the law on the issue, and the cursory language used on it does not provide a factual basis to support that point, regardless of what the law is.

Keep in mind, now that we've looked at what the invention was in those initial slides, the invention is not just that cam surface.  The invention is this device that has all of these components working together, moving parts, sensitive parts, sensitive optical parts.

All right.  So let's walk through this late Byron declaration, keeping in mind that before this was filed, we were done.  The '907 was invalid.  One of the prongs of corroborating evidence that was necessary was not in the case. And rather than providing that evidence, we're now hearing that they don't need to because this is one of those special cases where the invention is so simple, no testing is required.

Problem No. 1 with the Byron declaration is it says the exact opposite of every position he had taken in the case before that moment.  And we see a quote here from Mr. Byron, from his expert reports, that "Solving a design problem in the field of riflescope adjustments has always involved severe

testing, such as impact tests, recoil tests, submersion tests,
and pressure tests," the exact opposite of this late-filed
statement he's making.

Other statements from Mr. Byron:  "A riflescope is a
precision optical instrument which is subjected to forces that
bend and distort it, yet when it returns to rest, it must
still return all of its component to the same zero point
without damage.  The design and mechanisms in the patents
asserted by Leupold in this case incorporate these
requirements."

That leaves very little doubt about whether testing
is required or not.  And we know that.  The claim we looked at
has sensitive optical components connected by fragile pieces
to each other, creating movement, that all have to be handled
in very sensitive ways so that when it's mounted on a
riflescope -- or mounted on a rifle and the rifle is fired,
all of these points that Mr. Byron historically had made are
designed into that product so that the product does not fail.

Mr. Byron made similar assertions in four other
paragraphs.  The citation is here.  This is also cited in our
brief.

In addition to being contrary to his own prior
testimony, it's contrary to everything we've seen in this case
so far.  So on June 18th, Inventor Otteman signed a
declaration that was written by Leupold, testifying that a

1    working prototype was made and tested.  So apparently he felt

2    testing was needed.  He did testing.

3         On June 29th, during his deposition, Mr. Otteman, the

4    inventor of the '907, testified that testing is important.  So

5    the inventor disagrees with the Byron's new position.  He

6    agrees with his original one, disagrees with his new one.

7    Otteman didn't remember when he actually did the testing and

8    didn't remember what testing he did, but he did note that it

9    was important.

10        On September 10th Byron submitted a rebuttal report

11   on the issue of validity, asserting that the evidence in the

12   record showed that the inventor had demonstrated that

13   "it" -- the invention of the '907 patent -- "worked for its

14   intended purpose by making a working prototype," and then went

15   on to discuss the importance of testing.  Everything we saw

16   before summary judgment, testing was mandated.

17        September 25th Mr. Byron is deposed and extensively

18   questioned on the issue related to the '907 patent about

19   evidence for whether -- whether there was any evidence that

20   testing was done that it worked for its intended purpose.  At

21   that point Mr. Byron never raised this issue that testing was

22   not necessary.  Again, not an issue until they needed it to be

23   to try to salvage what was a legal position that loses then

24   validity on summary judgment on the '907 patent.

25        Importantly, October 5 Leupold moved for validity on

1    the '907 patent.  So they have a motion saying that the '907

2    is valid around the German publication, arguing that they had

3    earlier invention.  So in this case they bear the burden to

4    show reduction to practice.  They relied on Byron's rebuttal

5    report and all of his historic testimony, which says testing

6    is needed.  They never raised the issue that testing is not

7    necessary.

8           They carried the burden.  They had to show that

9    reduction to practice occurred.  They had to show that a

10   prototype was made.  They had to show that that prototype

11   worked for its intended purpose.  And if they believed no

12   testing was required, they needed to make that argument.

13          Silence.  It's not in there.  Why?  Because that has

14   never been their position in the case until it needed to be

15   after Nightforce submitted its summary judgment motion, also

16   on October 5, calling out this absence of evidence that's

17   fatal to the position of validity.

18          And then 21 days later, along comes the late Byron

19   declaration with his contradictory testimony, changing his

20   position, for the first time saying the invention is so

21   simple, no testing is required.

22          So let's talk about that declaration.  First,

23   Nightforce takes the position that it should be dismissed as

24   coming in too late.  This is an issue of validity that Leupold

25   bore the burden on in their initial summary judgment motion.

1   This is an issue that's been in this case since its beginning.

2          Why are we seeing it after substantial summary

3   judgment briefing is in place?  We know why.  They had to do

4   something.  Otherwise, they were going to lose this case.  It

5   is improper.

6          In their briefing, they argued that Nightforce needs

7   to show prejudice to be able to argue that the document is too

8   late and to have the Court dismiss it as being too late.  The

9   prejudice here is clear:  Absent this late declaration, the

10  patent is invalid.

11         Further, the declaration should be dismissed as

12  providing contradictory testimony.  One cannot create a fact

13  issue to try to survive summary judgment by submitting an

14  affidavit contradicting the prior position.  We can't create

15  disputed facts by disputing things ourselves, our own

16  testimony.

17         We highlighted the sham affidavit rule in our

18  briefing on this.  Leupold responded with a surreply on that

19  point, citing several cases; and we heard a little bit about

20  that today.  Their cases are unavailing.

21         They cite the *Kennedy v. Allied Mutual Insurance* case

22  to suggest that it's not an absolute rule that if some

23  testimony is contradictory, you throw out the second

24  declaration.  However, that case tells us that it is the

25  general rule and that there needs to be circumstances in which

the second affidavit can stand; and those circumstances are
that the second affidavit needs to explain the difference.

That case, giving examples, says perhaps in the
original testimony, the original declarant or deponent was
confused, and they can clarify that in their second affidavit.

In this case Leupold makes an attorney argument that
they believe the testimony is not inconsistent because
earlier, they are alleging -- purely by attorney argument --
that the earlier testimony was talking about prototyping for
commercialization, and this new testimony is talking about
prototyping for the original engineering and design.  We'll
see in a second that that's nonsense.

But what's lacking to defeat the sham evidence rule
is Byron telling us that, saying, "Here I'm saying something
that appears to be exactly the opposite, and here's why my
earlier inconsistent testimony differs."  That's missing.

The second case they cite, which was cited in their
slides, which was the *Van Asdale* case, says that.  They even
clarified that in their surreply, describing that that case
talks about circumstances where the second affidavit clarifies
the first one.  Here we don't have any clarification.  We just
have an opposite statement.

The sham affidavit rule applies.  And even if it
didn't, you still cannot create a disputed fact by saying one
thing and then saying the opposite later where they have the

1    burden of proof.  They have to prove earlier invention.

2              Lastly, and regardless of if we accept it as not

3    being late, if we accept it as not violating the sham

4    affidavit rule, the substance of the Byron declaration itself

5    does not get them out of the invalidity position.

6              First of all -- and I encourage you to read it in

7    detail; it's very brief -- it provides an unsupported

8    assertion that the invention, appearing to focus on the cam

9    component and not the entire product, is so simple that no

10   testing is required.  That simple statement contrasts the

11   extensively developed record of all the prior testimony

12   explaining why testing is required, giving specific reasons

13   and talking about what that testing is.

14             Furthermore, the new Byron late declaration does not

15   address the elements of the claims.  The invention is the

16   invention of the claims.  Mr. Byron does not say that that

17   whole thing is simple, and we know it's not.  He didn't talk

18   about the optical components and how they get adjusted when

19   all of these bits and pieces moved.

20             And, as we'll see, the law says that there are very

21   rare circumstances where an invention is so simple that no

22   testing is needed; and this is clearly not one of them.

23   Mr. Byron did not address any of that law or any of the facts

24   relevant to assessing that law.  So his late declaration, in

25   addition to being too late, in addition to being

1    contradictory, lacks the substance needed for them to salvage

2    this issue.

3            Let's look at the law.  So this is one of the cases

4    that Leupold cited in its briefing, the *Scott v. Finney* case.

5    And for simplicity, we've created the category language here.

6    This is not language that's in the case, but it's going to

7    make it easier to understand the different levels of testing

8    that might be required.

9            The *Scott v. Finney* case, addressing the issue of

10   whether testing is needed to demonstrate reduction to

11   practice, describes several different categories of when it is

12   required and how much is required.  And it says we use a

13   "common sense" approach.

14           So depending on the nature of the invention, it may

15   need to be tested "under actual conditions of use" -- we're

16   going to call that Category 4 -- or it "may be tested under

17   'bench' or laboratory conditions which fully duplicate each

18   and every condition of actual use," so not actual use, but

19   simulations of it -- Category 3 -- or in some cases it "may be

20   tested under laboratory conditions which do not duplicate all

21   of the conditions of actual use" -- Category 2 -- each of

22   these cases requiring testing.

23           Lastly, "In instances where the invention is

24   sufficiently simple, mere construction or synthesis of the

25   subject matter may be sufficient to show that it will operate

satisfactorily" is Category 1.  No testing may be required if the invention is so simple.

All right.  So let's look at the case law of where things fall in the Categories 1 through 4.

So Category 1, where no testing is required, it's very difficult to find these cases.  There's not many of them. The *Slip Track* case is cited here.  That's one of the cases cited by Leupold.  Another one in the citation chain of the various cases is this *In re Asahi*.

So the simple inventions, where the Courts have held no testing is needed, from everything we've seen, all have no moving parts.  The *Slip Track* case was a wall bracket with holes in it.  The *In re Asahi* case was a tube within a tube to prevent leaks; in other words, if the first tube leaks, you have a second tube around it as a backup.  Really simple, no moving parts.

Category 2, where some testing is required, examples include a rail car coupled mount and a penile pump implant.

Category 3, more testing is required, not field testing, but simulated field testing, a situation where we have a perforating pipe string in a well.

And then Category 4, where the most severe real world testing is required, two cases:  *Payne v. Hurley*, related to spark plugs which undergo stress in real life, temperature changes, pressure changes, and we need to test the prototype

1  to see if it's going to work; and the *Elmore v. Schmitt* case

2  related to an oscilloscope which gets subjected to vibrations

3  and temperature changes in the context where it's going to be

4  used.

5          So where does the claim subject matter of the '907

6  patent fall?  It is clearly not Category 1.

7          So in the Byron late declaration, he says that

8  testing is not required because the "mechanical operation of

9  the device is straightforward and predictable," without going

10  into any discussion of the legal basis, the legal standard, or

11  what facts he's looking at or even what parts of the

12  technology he's looking at to make that conclusion.  He can't

13  make that conclusion with the riflescope, the optical device

14  claimed in the '907 patent.

15          No evidence was provided as to why the device is

16  allegedly so straightforward.  And Mr. Byron failed to address

17  all the claim elements, so, again, lacking.

18          So let's compare the designs from the *Slip Track* case

19  where no testing was required.  This was a simple bracket with

20  elongated screw holes in it.  That's the invention.  The

21  reason it helps withstand earthquakes is there is a little bit

22  of give where the screw holes are.  They're a little longer,

23  so it can shift a little bit, an extremely simple invention.

24          Compare that to the '907.  We have multiple moving

25  parts.  We have knobs that need to be rotated.  We have an

1    actuator that slides linearly in response to the cam rotation.

2    We have a linker arm that's moved by the actuator.  We have

3    precision optics that move with the actuator slide.

4         For Claim 10, we also have the erector with the

5    sensitive lens units that have to be aligned to all of these

6    other components.  Byron already told us -- and he was correct

7    in his earlier statements -- this type of invention requires

8    testing.

9         Leupold's prior position, at every point up until

10   they needed to say otherwise, was that this wasn't even just

11   Category 2 or 3 -- if it's any of those categories, they're

12   out.  But their position was it was Category 4.  Again, Byron

13   says, "Solving a design problem in the field of riflescope

14   adjustments has always involved severe testing."

15        And then we go into the details of those tests, which

16   include recoil tests, pressure tests.  And you're seeing

17   trigger language here from the Category 4 cases.

18        Byron also says "riflescopes must also be capable of

19   operation under severe conditions" -- more trigger words from

20   the Category 4 cases -- "of high and low temperatures."

21        Byron is not unequivocal at all about this before

22   summary judgment:  "As all who are versed in the firearms arts

23   understand, there are unique design challenges, including but

24   not limited to:  impulse loading, shock, potentially

25   destructive oscillations, shape changes, weathering, and the

1    like" -- again, all of the Category 4 trigger words.

2              Leupold in their briefing -- again, not from the

3    mouth of Mr. Byron, but in their attorney argument --

4    suggested that Mr. Byron was talking about commercial design

5    and not original design.  That's just not the case.  You can

6    see in these quotes, he's talking about design challenges.

7              And we have much more from him, making it clear he's

8    talking about the original design, not commercialization.

9    This is the language from his deposition.  I asked, "To

10   determine whether" -- and in this case we were talking about

11   the Windauer knob.  They make the same argument in the

12   Windauer case.  All the same argument applies to the '907 as

13   well.

14             It says, "To determine whether it's going to be

15   useful on a riflescope, is durability testing, environmental

16   testing, wear testing required?"

17             And then Mr. Byron asked for clarification:  "Are we

18   talking about the design or the product?"

19             So he wants to know if we're talking about the

20   commercialization or the early work, which he's referring to

21   as "design."

22             I clarified, "The prototype," so we have no question.

23             He goes on:  "The prototype.  As a rule, prototypes

24   are just that.  They're made for either form, form and fit, or

25   form, fit, and function.  It really depends on which stage of

1  prototyping you are at in order to say whether or not it could

2  be used on a firearm."

3          I asked, "When we're assessing a prototype for form,

4  fit, and function, particularly the function aspect of it, is

5  that testing required?"

6          We had an objection as to whether my hypothetical was

7  complete.

8          "Answer:  If you are getting to the point where you

9  are at form, fit, and function, that would be the stage where

10  you would begin testing."

11          So Byron had no problem agreeing that during the

12  design stage, testing is required of the type of Category 4.

13          This issue also came up in Mr. Byron's testimony when

14  he was talking about the Altenheiner binocular prior art and

15  trying to distinguish the complexities of riflescope design

16  compared to binocular design to argue that they are different

17  from each other.

18          So Byron says, "Binoculars, unlike riflescopes, are

19  not attached to firearms; and, as such, binocular optical

20  elements and mechanical adjustment do not have to be and are

21  not designed to withstand repeated devastating forces of

22  recoil, including from high-caliber weapons."

23          The obvious corollary to that is riflescopes do

24  require such testing.

25          Byron's second statement:  "Because binoculars are

1  not designed to be mounted on a weapon and to withstand

2  recoil, they are also not engineered to manage backlash during

3  recoil."

4          The corollary is riflescopes are engineered, designed

5  to withstand recoil, again, Category 4.

6          Byron emphasized -- and, again, everything Leupold

7  said before summary judgment required Category 4 testing.

8  Byron was extreme in his position on this, saying that "If

9  there is any play or slop between the parts of the focus

10 control mechanism" -- so here we're talking about the spiral

11 cam and the actuator and the way it connects to the optical

12 components -- "when the firearm is fired and recoil forces

13 impact the scope, the setting, such as the focus setting" --

14 the subject matter of the '907 patent -- "may move as a result

15 of recoil, potentially resulting in a miss with the next

16 shot."

17         "Slight errors in adjustment, potential subtle

18 reticle movement relative to the target with head movement in

19 a riflescope parallax focus adjustment are critical."

20         "The stakes for potential slight adjustment errors in

21 aiming a lethal projectile with a riflescope can mean life and

22 death."

23         I think that's obvious with riflescopes.  Testing is

24 required.

25         This next slide just lines up the language from Byron

1    to the language from the Category 4 *Payne* and *Elmore* cases,

2    where when there are issues of objects losing their shape,

3    being exposed to high temperatures and pressures, to

4    temperature changes, to vibrations, like with oscilloscopes

5    and spark plugs, Category 4 testing is required.  These are

6    all of the trigger words that Byron used before he changed his

7    mind.

8          Leupold has not provided any evidence of testing, let

9    alone Category 4, 3, or 2.  It doesn't matter which categories

10   it's in.  So there's no to practice demonstrated.  On that

11   basis alone, summary judgment is appropriate.

12         Earlier today there was a suggestion that

13   Mr. Landvatter, who is the person at Ideality who made two

14   parts for Inventor Otteman, testified that there was success

15   with the prototype.  We'll get to that when we get to

16   Mr. Landvatter's testimony.

17         The citations provided by Leupold, he said no such

18   thing.  He says he actually never saw a prototype.  The only

19   communication he had is Mr. Otteman told him that the parts

20   that were sent to him worked.  We have no date of when that

21   occurred.  And there's good reasons to believe that happened

22   in 1999, as we'll see when we get to Mr. Landvatter's

23   testimony.  That's the only other thing they've raised to

24   suggest corroboration of "worked for its intended purpose."

25   That was not for the claimed invention, and there's no date on

1   that.

2           So no reduction to practice, no prior invention

3   demonstrated.  Thus, the German publication anticipates, and

4   the asserted claims are invalid.

5           THE COURT:  Let me interrupt you for a second.  And

6   I just -- it may be in the materials and I'm just not

7   remembering.

8           You said that there was no information given to you

9   that testing occurred.  In the discovery process, was there

10  any information that testing ever occurred?

11          MR. CASIMIR:  There was indication in 1999,

12  indirectly, that testing occurred, in the sense that what we

13  saw was CAD drawings of what looked to be a completely

14  engineered set of components that one could use to assemble a

15  case.  But we actually don't have any idea of the actual

16  testing that was conducted.

17          Mr. Otteman testified during his deposition, however,

18  that it was routine practice for these types of products --

19  riflescopes -- to be tested as part of the design and

20  prototyping stage.

21          THE COURT:  Thank you.

22          MR. CASIMIR:  All right.  So any other questions on

23  the aspect of "worked for its intended purpose"?  If not,

24  we're going to move to whether there's evidence that a

25  prototype was even made prior to the German publication.

1    THE COURT:  I don't have any questions.  Thank you.

2    MR. CASIMIR:  Okay.  So we think that the lack of

3 evidence that it worked for its intended purpose is

4 dispositive.  But even if there was such evidence, there is no

5 evidence that a prototype was made prior to the German

6 publication, no probative evidence.  And, again, this issue on

7 its own is dispositive.  So if Nightforce prevails on this

8 single issue, the '907 patent claims are invalid and the '907

9 patent goes away.

10    With the issue of "worked for its intended purpose,"

11 Leupold provided nothing.  With the issue of "was a prototype

12 made," they provided a few things, three things in particular.

13 But as we'll see, this is not probative evidence that can

14 allow Leupold to meet its burden of proof.

15    So the first was declaration testimony by the

16 inventor, Otteman.  As we know under the law, without some

17 level of corroboration, that is insufficient on its own.  And

18 as we'll see, he recanted that testimony.

19    Second, they provided financial records.  As we'll

20 see, there is no basis at all to say that those financial

21 records have anything to do with the '907 patent.  They have

22 no probative value.

23    Lastly, they provided testimony from the part maker,

24 Landvatter, which we saw earlier today.  That was relied on

25 for corroboration.  What we saw was testimony he gave in his

opening testimony.  Upon cross-examination he recanted the points we saw earlier today.  He testified that he never saw a prototype.  And, in fact, he testified that the parts that he made for Leupold -- and he had memory of this -- were not the parts that matched the designs that Mr. Otteman sent to him. They, in fact, matched the design from 1999, not the early design from Mr. Otteman, if we can put an early date on it.

So nothing probative from Mr. Landvatter.  If there is anything probative, it suggested that any work he did related to the reduction to practice occurred after the German publication.  But let's take each of those three things in turn, starting with Otteman's testimony.

So Mr. Otteman submitted a declaration in this case -- it's in the record -- saying that he oversaw assembly of a prototype in late 1995 to early 1996.  On cross-examination in his deposition, he acknowledged that he didn't write the declaration and that he did not gather any of the information or evidence used in that declaration.  Those were prepared by Leupold and handed to him.  He reviewed them, presumably believing that accurate information was being provided to him, and signed the declaration.  When we walked through the details with him on cross-examination, he recanted on the dates.

So, importantly, on cross-examination he testified that he had no independent recollection of the timing of

reduction to practice other than financial documents that were

provided to him that had 1995 and 1996 dates on them.  We'll

get to those documents in a second.  Those documents have

nothing to do with the '907 patent.

So he was handed documents with 1995, '96 dates on

them.  He believed they might have been related to the '907

patent and signed his declaration based on that.  Again, on

cross-examination, after reviewing those, he acknowledged that

he cannot say that those were related to the '907 patent, and

he had no independent memory of when he did reduction to

practice.

And, in fact, when I asked him for his independent

memory, his independent memory was that his conception of the

invention occurred near the filing of the patent.  We know

that was 1999.  So his independent recollection was it was

later.  The only basis for 1995 to '96 for reduction to

practice was these financial documents.  He did not know which

project those financial documents were from.

And just a reminder, his initial testimony here is

insufficient without corroboration.  And this is the very

reason why corroboration is important, because we have someone

who didn't remember anything from this time period, who had

memories created by documents unrelated to the '907 patent

that were the basis for his declaration.

Here's a physical copy of one of the pages from the

financial documents.  What you'll see here is Ideality, Inc.,
the company who made two parts for Mr. Otteman, and some dates
from 1995 and 1996.  Lacking from this is any indication that
these relate to the '907 patent at all.  And no witness has
put these in relation to the '907 patent, as we'll see.

So this is a check registry.  It's a check registry
with five dated entries from 1995 to '96 for unknown work
conducted by Ideality.  There are no project identifiers.

We learned from other documents in this case and from
Mr. Otteman's and Mr. Landvatter's testimonies that Leupold
was working with Ideality on other projects at the time.  We
don't have any evidence that they were working on the '907
project at the time, but they were working on other projects
at the time, so it's no surprise that there are invoices from
that time period to Ideality.

Mr. Otteman testified that he cannot say that those
invoices, which he relied on for the date, relate to the '907
project.

Mr. Landvatter was also asked about this, and he said
he cannot say that these are for the '907 patent on
cross-exam.  And, in fact, because he only made two parts for
this project, as he recalled, the fact that there were five
invoices led him to believe that those invoices are probably
not for the '907 patent.  He couldn't say one way or the
other, but he concluded they were probably not.  Why would

1    there be five invoices for two parts?

2            So these financial documents have no probative value.

3    This was one of the two pieces of corroboration used to

4    identify -- to corroborate reduction to practice, that a

5    prototype was made.  One of them is out the door.

6            Let's look at the second one, which is Landvatter's

7    testimony.  We saw again earlier today some testimony

8    suggesting that he thought work might have happened in 1995,

9    '96.  Why was that?  Well, it turns out that Leupold's

10   attorney had met with him prior to the deposition -- the

11   citation is on the fourth bullet point here from the

12   deposition -- and previewed the relevant paragraph from

13   Otteman's declaration showing those dates.

14           So Mr. Landvatter saw a sworn statement from

15   Mr. Otteman -- and this occurred after the Otteman

16   deposition -- showing that his colleague believed this

17   happened in 1995 to '96.  He didn't have any reason to doubt

18   that at that time.  That's the basis for him saying 1995 to

19   '96 in his opening deposition testimony.

20           But again, on cross-examination, when looking at the

21   records, he recanted.  He made it clear he never saw a

22   prototype.  So he's not useful for telling us that a prototype

23   was made.  He only provided two parts to Mr. Otteman.  And all

24   of the statements in his deposition related to the

25   prototyping -- well, it's not even related to the

1    prototyping -- related to whether those parts were useful was

2    his statement, that he recalled Mr. Otteman telling him that

3    those parts worked, not that a prototype worked, not that they

4    got put into a scope with all those other pieces, with the

5    erector, with the tube, with the lens unit, with the moving

6    pieces.  He had no knowledge of any of that.

7         I asked him if he had seen any drawings related to

8    those, and he said, no, and he never saw a prototype.  He was

9    just told the two parts worked.  When was he told that?  He

10   didn't know.  The only basis he had for thinking that might

11   have been '95 to '96 was that he had seen the Otteman

12   declaration ahead of time.

13        And, in fact, when I opened up his cross-examination,

14   I asked him if he had talked to Leupold's attorney before the

15   case.  He said he had, but nothing about the case.  I then

16   challenged him on that and asked him if he had seen the

17   declaration, and he admitted that he did, that they had shown

18   it to him ahead of time.  I don't know if that was a lapse of

19   memory in the 10 or 15 minutes between when he saw it and when

20   he testified about it or if he was feeling guilty about that

21   issue.

22        Again, no probative value here.  Mr. Landvatter knows

23   nothing about a prototype.

24        Now, the last point, which is bullet point 3 on this

25   slide, is I had Mr. Landvatter look at pictures.  So over on

the right-hand side we have two different spiral cam designs.
The top one is the image from the alleged 1995 drawings that
Mr. Otteman says he provided to Mr. Landvatter, upon which
parts were made.  The bottom one is the 1999 drawings.  And
you can see the top one has an incomplete spiral; the bottom
one goes more than 360 degrees around.

I asked Mr. Landvatter about the initial parts he
made, the first ones he made for a prototype for Leupold, and
he did remember it, and he said the spiral went 360 degrees or
more.  It was not the design that was sent by Mr. Otteman.

So he had no recollection of seeing a prototype, but
he did remember the design he made for them was of the type
from 1999.  It was not the design that Mr. Otteman sent him.

No probative value.  All evidence indicates reduction
to practice happened in '99.  It's Leupold's burden to show a
prototype was made, and they have no probative evidence.  They
have a declaration that they wrote for Mr. Otteman that he
recanted.  They have a financial document that has nothing to
do or cannot be proven to have anything to do with the '907
patent, as corroboration No. 1, which was in fact the basis
for Mr. Otteman's alleged recollection of the dates.  So it
corroborates nothing.  It was the source of the information.
And then Mr. Landvatter's testimony that he never saw a
prototype and in fact believed that the part he made was from
1999.

1          Result:  They cannot demonstrate they had a reduction
2     to practice because they cannot demonstrate a prototype was
3     even made before the German publication.  Therefore, no prior
4     invention, the German publication anticipates, and the
5     asserted claims are invalid.
6          There are no disputed facts here.  We have on the
7     "works for its intended purpose" no evidence, on the "a
8     prototype was made" incredibly bad evidence, written up and
9     designed in a way to make it look like there was something
10    where there wasn't.  And on cross-examination, all the
11    witnesses ended up recanting.
12         All right.  That ends the initial two components of
13    no earlier invention.  I will now turn to Mr. Davis for no
14    priority date, unless there are any questions.
15         THE COURT:  I don't have any questions, but I want to
16    stop before we start a new section.
17         So why don't we come back together at 1:00, a little
18    less than an hour.
19         MR. CASIMIR:  All right.  Thank you.
20         THE COURT:  See you then.
21         (A lunch recess is then taken.)
22         THE COURT:  Good afternoon.  Be seated.
23         Proceed.
24         MR. DAVIS:  Thank you, Your Honor.
25         Good afternoon, Your Honor.

1          Before the lunch break, you heard about one

2   independent reason why the '907 patent is invalid, because the

3   other side can't backdate their invention ahead of the

4   Schmidt & Bender German publication in March of '98.

5          A second independent basis for invalidity is that

6   Leupold cannot backdate the claims in the '907 patent to the

7   1999 provisional application because the 1999 provisional

8   application did not disclose the full scope of what was later

9   claimed.  And for that reason, the claims would not be

10   entitled to a date earlier than the year 2000, which again

11   postdates the 1999 German publication by more than a year, and

12   the claims would be invalid.

13          So there's no dispute about that, that the '907

14   patent is invalid if they do not get priority for the claims

15   in the '907 patent itself to the 1999 provisional application.

16          That provisional application disclosed only one

17   design for the cam hub.  There was a cam groove and a cam

18   follower pin; and we'll get to the exact language in a minute.

19   No claim is limited to the single design that was disclosed in

20   1999, so none of them are entitled to the 1999 filing date.

21          The timeline for this motion is quite simple.  We

22   only require two pieces of evidence and two dates.  In January

23   of 1999 Leupold filed its provisional application, which, as

24   noted, was after they were aware of the German publication

25   disclosing the exact same invention.  January 2000, a regular

1    patent application is filed.  And we'll get to the certificate

2    of correction issues in a minute, but none of them affect this

3    motion either.  We'll assume for purposes of this motion that

4    the other side is entitled to an earlier invention date and

5    also that the certificates of correction were effective or

6    that that issue is simply not relevant in deciding this.

7          So the law is somewhat difficult to apply in certain

8    situations, but it boils down to a pretty simple principle:

9    that you can't claim in a later patent application something

10   that was not described in the earlier application and get

11   priority back to the earlier application.

12         There's lots of cases cited in the briefing.  This is

13   a principle that dates back to a 19th century Supreme Court

14   case quoted here, O'*Reilly v. Morse*:  One "can lawfully claim

15   only what he has invented and described, and if he claims

16   more, his patent is void."

17         Claims broader than what was disclosed in the 1999

18   application simply aren't entitled to the 1999 filing date.

19         And we've heard -- we'll get to the evidence that the

20   other side has cited.  They get into the Byron report a little

21   bit, and we'll discuss that.  But, at best, Byron and Leupold

22   have offered some suggestion that what was claimed in the 2000

23   application was in fact obvious in view of what was disclosed

24   in the 1999 application, but that's not the test.  Express

25   disclosure is required.

1          And the *TurboCare* case quoted here is that which

2     "may have been obvious is not enough to satisfy the written

3     description requirement."  That also is quoted in and the

4     principle repeated in the *D Three* case on which we rely.

5          So touching on the *D Three* case that the other side

6     tried to distinguish earlier today, it's actually a very

7     simple illustration of a mechanical device similar to this

8     one, where it's quite easy to see how what was disclosed in

9     the earlier provisional application was not supported by what

10    was later claimed.

11         I think the easiest example to see and one that I

12    think Leupold has overlooked largely in the briefing is

13    Claim 4 that was at issue in the *D Three* decision.  So just

14    walking through the facts briefly of that case, they

15    had -- they relied on a 2009 provisional application in that

16    case for a disclosure of what was later claimed in 2013

17    applications.

18         Well, the original provisional application showed

19    only one position for a washer, colored in blue on this slide

20    50, and that was to place it above the flashing.  This is a

21    patent with claims to roof mount assemblies, such as would be

22    used to hold a solar panel on a roof.  And the washer is there

23    to seal out the water, clearly.

24         So they disclose a soft rubber washer, and they

25    disclose a single place to put it:  above the flashing.  And

1  that has something to do with some of the other details of

2  what they claim the invention is that aren't pertinent here.

3          Well, the two simplest claims to understand at issue

4  in that case and how that relates to this written description

5  requirement that the other side has -- that Leupold has failed

6  to comply with here is when they later claimed in 2013, they

7  wrote claims that, one, expressly claimed putting the washer

8  underneath the flashing, but there was just no disclosure of

9  that in the 2009 application.  So that claim was not entitled

10  to the earlier filing date; and for that reason, it was

11  undisputed also in that case that without the earlier filing

12  date, the claim would be invalid, and it was.

13          Claim 4 is interesting because it talks about a

14  washer, but it's agnostic about the position of the washer and

15  the number of washers, simply recites that there is a washer.

16  Well, that is the third example on this slide 50.  Claim 4

17  allowed the washer to be above the flashing, as it was

18  described in 2009, which is fine, but it also allows for the

19  washer to be placed under the flashing, and it also allowed

20  for using a washer both above and below the flashing.

21          Those examples were not disclosed anywhere in the

22  earlier application, and so this claim likewise was invalid

23  because it wasn't entitled to the earlier priority date.

24          Now, how does that relate here?  Well, here for the

25  '907 patent, this is the extent of the written disclosure in

1    the provisional application filed in 1999 of the cam hub we've

2    been discussing.  It specifically called out "a spiral cam

3    groove" and "a cam follower pin."  And that is the only

4    example in either the figures or the text of this cam hub.  It

5    has a cam groove and it has a follower pin.

6            When the regular patent application was filed in

7    2000, the description was expanded.  No new figures were

8    added, but the written -- the text was expanded a bit.  Now

9    they call it, more generically, "a spiral cam track," and they

10   expressly recite two embodiments.

11           "In one embodiment, the spiral cam track is a spiral

12   groove" -- just like it was in 1999 -- "and the cam follower

13   includes a pin."

14           "In an alternative embodiment" -- a second one not

15   disclosed in 1999 -- the cam track may be "a spiral ridge or

16   rail and the cam follower is a notch or fork."  In other

17   words, the second alternative embodiment allows the groove to

18   actually be a ridge above the drive face instead of recessed

19   into it.

20           So here we have a similar figure to what we looked at

21   for the *D Three* case that shows the same problem.  In the 1999

22   application on the far left, one groove that was etched into

23   or carved into the drive face and below the drive face was the

24   cam.

25           Later, in 2000, they expanded the description in the

1   text and they also wrote broader claims.  The claims, except

2   for 6 and 16, all go -- only require a cam track, which we

3   saw in the previous slide may be a groove or a ridge or a

4   rail.  The ridge or rail embodiment wasn't disclosed in '99,

5   so the claims covering it are not entitled to the 1999 filing

6   date.

7          So the parallels continue, though, with the *D Three*

8   case.  Remember Claim 4 that was agnostic about how many

9   washers and where they were positioned, well, in the middle

10  example -- in the third example from the left on slide 54

11  here, we have an example that is very similar to the problem

12  in the *D Three* case.  And this goes to all of the claims,

13  including Claims 6 and 16, which do recite in them a groove.

14  However, it's non-limiting language, as was at issue in the

15  *D Three* case, and it merely recites in Claims 6 and 16 that

16  the cam track includes a groove.  It doesn't limit the cam

17  track to being a groove, which is all that was disclosed in

18  1999.

19         So in that third example on slide 54, we've tried to

20  illustrate just that, an example that's covered by Claims 6

21  and 16 as well as the other claims in the '907 patent, where a

22  ridge or rail is above the drive face and a groove is also

23  recessed in it.  And examples similar to this were provided in

24  our brief, and while Leupold -- Leupold took issue with them,

25  but did not actually ever disagree that they were within the

1    scope of the asserted claims of the '907 patent.

2            THE COURT:  Let me interrupt you for a second.

3            When you're talking about the word "groove" -- and

4    this kind of gets back to one of my earlier questions I think

5    I posed to the plaintiff in the case -- does the 1999

6    disclosure in the provisional say "groove below the drive

7    face" or does it just say "groove"?

8            MR. DAVIS:  It just says "groove."

9            On slide 52, it says "spiral cam groove formed in the

10   drive face."  And then the figures illustrate what that means,

11   and that is recessed into the drive face.

12           THE COURT:  And so do I have to, in order to resolve

13   this problem, decide what "groove" means or can mean?

14           MR. DAVIS:  Well, Your Honor, I believe you already

15   have sufficiently answered that question for this case in the

16   claim construction process.

17           In particular, Leupold, aware that this problem was

18   coming down the line for them, advocated for a construction

19   that a groove -- that a cam track is "a groove that is curved

20   along its length."  They wanted the cam track merely to be a

21   groove.  Your Honor rejected their construction.

22           And Nightforce was contending "a component of a cam

23   hub in the form of a groove or a rail for engaging a cam

24   follower," which expressly incorporates the additional

25   disclosure from the 2000 application, where you have a ridge

1    or a rail and a cam follower that is a fork.

2              THE COURT:  So it sounds like, from what you last

3    read, that I was distinguishing between what a groove is and

4    what a rail is.  Is that correct?

5              MR. DAVIS:  Yes, Your Honor.  I think that it's been

6    understood throughout the case that they are different.

7              THE COURT:  Okay.  Thank you.

8              MR. DAVIS:  The plain meaning, I think, would support

9    that as well, that a ridge or a rail is something above.

10             And I think when every witness was questioned about

11   this, including Mr. Otteman, I think his testimony was that,

12   you know, this was something different, was not in the 1999

13   application, but he recalled having that idea for an

14   alternative embodiment.  And it's expressly --

15             THE COURT:  Explain what you just said to me again.

16   I didn't catch that.

17             MR. DAVIS:  Yes, Your Honor.

18             Mr. Otteman, the named inventor on this patent, when

19   he was questioned about the embodiments in the patent versus

20   the 1999 application, he was unable to identify any disclosure

21   in the 1999 application of a ridge or rail embodiment, but he

22   did recall that he did have that idea being a different idea

23   than the groove, which is later described in the 2000

24   application here, where they expand the idea of a cam track to

25   include a ridge or rail.

1          So it's Nightforce's view that, essentially for the

2   same reasons as the locations for a washer were overclaimed in

3   the *D Three* case, Leupold has overclaimed in this case that

4   which was not disclosed in 1999 with claims, all of which

5   cover embodiments that were not disclosed in 1999.

6          And touching on some of the evidence, other than the

7   patent applications themselves that I showed on the timeline,

8   Leupold has pointed to their expert, Mr. Byron, again on this

9   issue as well.  And I'd like to touch on that, because it's

10  very -- the law is clear that the burden of production, the

11  burden of establishing evidence sufficient to show entitlement

12  to the earlier filing date of 1999, that burden is on Leupold.

13  There's no presumption that they get the 1999 filing date just

14  because they tell the Patent Office that they want to claim

15  priority to it.

16         Okay.  The *Research Corp. Technologies* case we cited

17  in the briefing is a good example explaining the burdens on

18  summary judgment for this issue.

19         And going back to Mr. Byron, which is all they've

20  really offered to try to explain that alternative embodiments

21  are supported by the 1999 application, first, on this point,

22  Mr. Byron provides no facts or supporting analysis to support

23  his conclusory opinion.  And the Federal Circuit is strict at

24  summary judgment on this.  The expert has to set forth the

25  factual foundation for his opinion to survive summary

1   judgment.  Conclusory expert assertions do not give rise to a
2   genuine issue of material fact.
3           And the first case that I would cite for that is the
4   *Arthur A. Collins* case, Federal Circuit, 2000, 216 F.3d 1042.
5   Also, the *Streck* case is a good example, S-t-r-e-c-k, at
6   665 F.3d 1269, from 2012.
7           Simply, Byron identifies nothing in the 1999
8   application that would establish what Leupold needs to
9   establish here; and that is that a person of ordinary skill in
10  the art, reading the 1999 application, would consider that
11  Mr. Otteman, the inventor, was in possession of all the
12  embodiments covered by the claims in the 2000 patent
13  application.
14          The sum total of Mr. Byron's analysis on this point
15  is a single paragraph in his report.  And his report is found
16  at ECF No. 83-2, and this quote is at 144.  His conclusion is
17  that "a rail is merely the inverse of a track" or "a groove
18  and a cam follower that is a rail is merely the inverse of a
19  track that is a ridge or a rail with a follower such as a fork
20  that fits around the rail or ridge."
21          There is no explanation of how a person of skill in
22  the art, looking at the 1999 application and its disclosure,
23  would conclude that the applicant for the later patent
24  understood and had within his possession in 1999 embodiments
25  where there was a ridge or a rail instead of a groove on the

cam face.

Mr. Byron cites to two pieces of evidence in this
paragraph on this issue.  One is Otteman's deposition
transcript, where Mr. Byron takes the position that
Mr. Otteman had the idea, basically, that he reached the same
conclusion when he invented -- that he "recognized at the time
of his invention. . . that the groove embodiment depicted in
the" provisional application "was a preferred alternative to
embodiments with the inverse mechanism, such as a ridge or
rail."

But what he doesn't say is looking at the 1999
application, a person of skill in the art would reach the
conclusion that Mr. Otteman understood that or considered the
ridge or rail embodiment to be a part of his invention.

And the case law is that it's really irrelevant what
Mr. Otteman thought he invented.  It needs to be disclosed in
the 1999 patent application.  The test requires an objective
inquiry into the four corners of the priority document, here
the 1999 application.  And that's clear from the Federal
Circuit's en banc decision in *Ariad Pharmaceuticals*, 598 F.3d
1336.

Mr. Byron cites to one other piece of evidence to try
to support his conclusion that the rail or track was somehow
within the scope of the 1999 application.  That additional
piece of evidence is boilerplate at the end of the 1999

 1    application.  That boilerplate said -- crafty patent lawyers

 2    add things to try to broaden stuff out.  It said, "It will be

 3    obvious to those having skill in the art that many changes may

 4    be made to the details of the above-described embodiments of

 5    this invention without departing from the underlying

 6    principles thereof."

 7           Well, in decisions preceding but certainly in the

 8    *D Three* case, the Federal Circuit has made clear that that

 9    boilerplate is essentially worthless these days.  It's not a

10    disclosure of anything.  *D Three* tried to rely on the same

11    type of boilerplate to support the different locations for the

12    washer in that case, and the Federal Circuit rejected that as

13    not being sufficient to show disclosure of the actual

14    combinations of where the washer could be.  And in that case

15    the boilerplate read that "A person of skill in the art will

16    recognize certain modifications, permutations, additions, and

17    sub-combinations therefore."

18           Now, that language certainly suggests different

19    locations for a washer might be possible, but the case law is

20    language that makes it obvious to a person of skill in the art

21    that there are other ways to do it is not sufficient.  That's

22    not disclosure of what the applicant considered to be an

23    invention encompassing that obvious additional material.  And

24    the cases for that are covered in the briefing, but *TurboCare*

25    is a good one that obvious is not the standard.

1           And no matter what they wrote in the 1999

2    application, if that renders obvious to a person of skill in

3    the art that you could use a ridge or rail instead of a groove

4    on that drive face as a cam, that's not sufficient to be

5    disclosure in the 1999 application of these additional

6    embodiments.

7           So that's the sum total of the evidence that Leupold

8    relies on as allegedly supporting the 1999 application,

9    providing support for the later claims in the 2000 application

10   that resulted in the '907 patent.  It's no more than saying

11   that it's obvious, according to Byron, that you could use a

12   raised ridge instead of a recessed groove.  And he doesn't

13   explain the reasons why a person would reach that conclusion

14   reading the 1999 application.  But, in any event, obvious is

15   not the standard, so it just doesn't really matter.

16          And then the evidence he cites is insufficient

17   because the Otteman testimony is irrelevant to the issue.  It

18   just simply does not matter what the inventor thought he

19   invented.  If it's in his head and not written in the patent

20   document to inform the public, it doesn't help them on the

21   written description case.  And the boilerplate at the end of

22   the 1999 application, that alternative embodiments may be

23   possible, also is just not good enough.

24          So, in summary, on slide 56, all of the '907 claims

25   cover more than what the 1999 application disclosed; and that

1   is a cam track that is a groove and a cam follower that is a

2   pin.

3          I think that Leupold has effectively conceded, I

4   think, that the ridge or rail design was not in any of the

5   asserted claims, except they argue more strenuously about 6

6   and 16.  But all of the asserted claims, other than Claims 6

7   and 16, recite only a cam track, which the written description

8   in the 2000 application specifies can be one of two possible

9   embodiments, a groove or a ridge.  And none of those claims

10  require a groove, and none of them require that the cam track

11  be a groove.

12         As to Claims 6 and 16, they recite that the cam track

13  includes a groove and a cam follower that is a pin.  But they

14  are not limited to a cam track being a groove, which is all

15  that was disclosed in 1999.

16         So going back to the visual on that, the three

17  examples to the right are covered by each of the asserted

18  claims; however, not disclosed or suggested in the 1999

19  application.

20         And going to another basis on which Leupold attempted

21  to distinguish the *D Three* case and other case law, there was

22  a suggestion that unclaimed elements, because these are

23  "comprising" or "including" claims, aren't relevant.  But what

24  we're pointing to are claimed elements.  They claim a cam

25  track.  They claim a cam follower.  But they disclosed only

1    one example of a cam track in 1999, a groove; and they

2    disclosed only one example of a cam follower in 1999, and it

3    was a pin.

4          So the claims -- asserted claims in the '907 patent

5    simply claim more than was described in the 1999 application,

6    so there is no effective claim to priority back to 1999,

7    invalidating -- rendering those claims indisputably invalid.

8    There is no dispute from Leupold that the claims could

9    possibly be valid if they're only entitled to the 2000 filing

10   date, and that's because of the German publication and other

11   prior art.  The German publication is more than one year

12   before January 2000 and invalidates the claims once they're

13   not entitled to a 1999 filing date.

14          Any questions about this segment, Your Honor?

15          THE COURT:  No, sir.

16          MR. DAVIS:  Thank you.

17          THE COURT:  Thank you.

18          MR. CASIMIR:  All right.  We're now turning to the

19   equitable estoppel.  And I think this is best represented by

20   the timeline.  So let's build back a little of the history.

21          So we had the German publication sitting as prior art

22   in March of 1998.  What we haven't talked about yet and is

23   relevant to this story is that not only Schmidt & Bender had

24   done this first, but Nightforce had done this first.  So the

25   products that are accused of infringement use a design that

Nightforce was working on in the prior art time period.  So in
the summer of 1998, Nightforce was designing the spiral cam
product which ultimately is accused of infringement.

We know that Leupold became aware of the Schmidt &
Bender patent because we know that they received the German
translation in November of 1998 and then filed their
provisional application a couple of months thereafter.

In between the provisional application and the
non-provisional application, Nightforce actually launched its
first product with the spiral cam, keeping in mind that the
provisional application would have been a secret document at
that point.  So at this point Nightforce is aware of Schmidt &
Bender's work and has launched their own product.

And then in January of 2000, the non-provisional
version of the '907 patent is filed.

A couple years later, in March of 2002, the '907
patent issues and, in theory, could be asserted at this point.
And at this point Nightforce has products on the market with
the spiral cam design.

As we'll get into in more detail when we talk about
the certificate of correction case, in 2003 Leupold files for
a certificate of correction to correct what no one is
disputing at this point was a failed priority claim in the
original filing.  And, as we'll talk about, that 2003
certificate of correction is also a failure.  But relative to

the timeline here, according to its interrogatory responses in
this case, Leupold formed a belief in 2004 that Nightforce
products infringed the '907 patent.  So as early as 2004 they
believed there was infringement.

In 2006, June, they send their letter alleging
infringement.  We don't know why they waited two years to do
that, but we'll see a series of time gaps here.

Nightforce very quickly turned around and sent a
response letter asserting invalidity, and it asserted
invalidity on multiple grounds.  One of them was identifying
the German publication as prior art and pointing out to
Leupold that they did not have a priority claim that would
allow them to avoid it.

In December we get a second letter from Leupold
following on and saying, "We've looked at your information.
We believe you infringe."  And notably in that letter they
say, "Look at the certificate of correction that was part of
the patent we gave you in our first letter."

So we know from that record that when Nightforce was
arguing in 2006 that there was no priority claim, it was aware
of that 2003 certificate of correction and had deemed it not
functional.  So at this point in 2006 Leupold was warned that
it did not have a proper priority claim.

What happened next from Leupold?  Almost 10 years of
silence.  So we have this very, very long time gap.  Leupold,

1   to our knowledge, did nothing during this time period.

2   There's no evidence anything was done during this time period.

3   But Nightforce did do some things.

4           So we know from Ray Dennis, the party who was relying

5   on Leupold's inactivity, who was deposed -- and we heard about

6   testimony earlier today -- in 2007 assumed that Leupold had

7   abandoned its claim.  There were these 2006 communications.

8   About a year went by, and there was an assumption that Leupold

9   had gone away and would not come back.

10          By the year 2012, six years after their initial

11  infringement letter, damages are going away.  So we know that

12  statutorily at this time, when laches was still around as a

13  doctrine, you couldn't get damages six years back.  So by 2012

14  there is infringement that -- alleged infringement that

15  Leupold was aware of and they were sacrificing damages, just

16  giving them up.  That doesn't make any sense.

17          And as you'll see in the briefing, we cited a Central

18  District of California case on exactly this issue, holding

19  that extensive silence to this effect can only be explained as

20  misleading behavior.  Why would any rational person give up

21  damages if they're aware of an infringement?

22          2013 to 2014 Nightforce does more things.  They

23  dramatically expand their product offerings, both by sales

24  volume and number of different scopes incorporating the spiral

25  cam design.  We're now many, many, many years after the

original infringement letter and many years after the
assumption that Leupold had gone away.  That was rational
behavior.

More years go by and then we get the third Leupold
letter in March of 2016, alleging infringement of a number of
patents, all of the patents in this case, including the '907
patent.

Nightforce turned around and responded, explaining
why, again, the '907 patent was invalid, this time
highlighting its own 1999 sales, keeping in mind the 1999
sales are prior art to the regular patent but not the
provisional.  So, once again, Nightforce is making it clear
there is no proper priority claim because it is highlighting
prior art that is only prior art if there is no priority
claim.

Unbeknownst to Nightforce at the time, apparently
looking into this issue, Leupold files the 2016 certificate of
correction to add that priority claim that had been missing up
until that date.

Then in August of 2016 Leupold filed this lawsuit
without the '907 patent.  They sued on every other patent
mentioned in their 2016 letter.  The '907 was left out.  Once
again, the only conclusion that Nightforce can draw from that,
based on what it knew, was yet again they weren't interested
in asserting that patent.

1          The certificate of correction adding the priority

2    claim issued in February.  And then for the first time in the

3    10-plus-year time period, Nightforce believes they're going to

4    get sued because they were sued.  An Amended Complaint was

5    added including the '907 patent.

6          So a fairly classic timeline for estoppel:

7    Infringement contentions were made.  A massive amount of time

8    went by.  And Nightforce relied on that to expand its

9    products.

10          Let's get into the legal issues.  There are three

11   requirements to demonstrate equitable estoppel:  number one,

12   misleading conduct; number two, reliance on the misleading

13   conduct; and, number three, prejudice.  And in this case

14   Leupold does not dispute that there is prejudice, so what

15   we're talking about is:  Was there misleading conduct and was

16   there reliance?

17          Leupold's initial presentation today and all of its

18   briefing focus on the silence and they ignore the other

19   misleading conduct.  The silence wasn't the only misleading

20   conduct.  So we have the silence from 2007 to 2016, but we had

21   a failure to correct that priority claim.  And we know

22   that -- there's no dispute in this case, without the priority

23   claim, the '907 patent is invalid.  There's no dispute from

24   the parties on that issue.

25          So that patent sat out there until 2017 without that

1    correction, sitting out there invalid.  That's misleading

2    behavior.  If Leupold ever intended to assert that patent,

3    they would have, should have fixed that priority claim so it

4    would have been in a position to assert.  It was not.

5         And we saw that in 2016 when they filed the lawsuit

6    and did not include the '907.  They waited until that

7    certificate of correction was granted adding the priority

8    claim before they brought it, giving up more damages.  Again,

9    the tail end of that six-year window is disappearing.

10        Earlier today we heard that that was simply a

11   belt-and-suspenders correction to what Leupold asserts was a

12   2003 appropriate certificate of correction.  Their behavior

13   belies that.  The certificate of correction itself in 2016

14   admitted they made an error.

15        The loss of damages and the waiting to file the

16   lawsuit and, again, not sending a letter to Nightforce saying,

17   "We're waiting to fix the certificate of correction here.

18   We're going to sue you," but just silence again, no lawsuit on

19   the '907, everything from the outside looks like they're not

20   asserting it.  And the fact that they weren't in a position to

21   assert it without fixing that priority claim is independent

22   misleading behavior.

23        Then we have the unexplained surrender of past

24   damages.  The Central District of California case cited in the

25   briefing:  There's no logic to giving up past damages.  The

public view of that would be that you don't intend to assert your patent.  And in this case, when we tie in the failure to correct the priority claim -- Leupold was put on notice about that in 2006 by Nightforce pointing out that they did not have a priority claim.

No assertion of the '907 in the 2016 Complaint itself again continues the misleading conduct, with no letter explaining it or other indication explaining it.

There's been no enforcement against third parties. Other companies are out there with spiral cam designs. They've never been sued and weren't sued during that window of silence.  It's not just Nightforce.

There's been no patent markings.  So Leupold has admitted in their interrogatory responses that they've never marked any products with the '907 patent, even though they sell products themselves with the '907 patent design.  So, again, what does that convey to Nightforce and the public? That they don't have a patent they intend to assert.

And, lastly, the patent is nearly dead due to its life span.  Nightforce has been on the market since before the patent was filed with their product.  And almost all of the patent life has expired before they brought the suit, again conveying to the Nightforce and the world they never intended to assert this.  There's lots of misleading conduct besides the silence itself.

1           Let's turn to reliance.  And the citations are here.
2    This is referring to testimony from Ray Dennis, who is the
3    owner of Nightforce.  Nightforce assumed that Leupold had
4    abandoned its claim in 2007, citation to Mr. Dennis's
5    testimony.  Nightforce significantly increased its product
6    offerings during that period of silence, relying on the fact
7    that they were not going to be sued.
8           And then we didn't hear about this earlier today, but
9    Mr. Dennis testified that Nightforce would have designed
10   around the '907 patent had Leupold asserted that patent early
11   and put it in a position to be enforced.
12          So when we heard earlier today about Mr. Dennis's
13   testimony saying in 2007 he wouldn't have done anything
14   different because the patent was invalid, we're dealing with a
15   different fact pattern than the case law that Leupold was
16   relying on because we're not dealing with a situation where
17   the misleading conduct was just silence.  The misleading
18   conduct here was also their failure to correct that priority
19   claim.  That patent was not in a position to be asserted.
20          So when Mr. Dennis is talking about what he would
21   have done in 2007 if they had brought suit, that patent was
22   not in a position to do anything.  They hadn't fixed it yet.
23   So all the testimony they pointed to was on a side issue.  The
24   corrected patent was not there in 2007.  And Mr. Dennis
25   testified that if it had been, Nightforce would have designed

1    around it.

2             Leupold also pointed to contemporary testimony of

3    whether Nightforce has designed around it since they have

4    brought suit.  And Mr. Dennis replied at this point that

5    they're not going to because we're in a different situation

6    than we were in 2006.  It's a different issue.

7             So technically for estoppel, Leupold doesn't need to

8    give excuses for its misleading behavior, but it would

9    certainly be helpful to explain why all of these things

10   happened, because we have to look at it, from an estoppel

11   standpoint, based on what Nightforce believed and was it

12   reasonable to believe those things.  And these aren't

13   reasonable to believe.

14            There's no excuse for nearly a decade of silence.

15   There's no excuse for waiting until 2017 to correct that

16   priority claim.  There's no excuse for surrendering the past

17   damages or for not asserting the '907 in the 2016 Complaint.

18   If the certificate of correction was just belt and suspenders,

19   why wasn't it brought in the 2016 Complaint and then the belt

20   and suspenders dealt with afterwards?

21            There's no excuse for no patent marking.  They're

22   conveying to the world this patent is not going to be asserted

23   or exist.  And there's still no excuse for not going after

24   others, which they still have not today.

25            Leupold introduced a few arguments against the

1  reliance, Nightforce's reliance position, but they're
2  irrelevant or not sufficient for defeating the motion.

3         First of all, they highlighted a statement from
4  Mr. Johnson, who was Nightforce's 30(b)(6) deponent, initially
5  identified to speak on many topics, one of which was estoppel.
6  And we saw the quote earlier today from that testimony where
7  he was being asked whether he was aware of Leupold having any
8  fraudulent behavior and he responded in the negative.

9         What we didn't see was the context of that question.
10  It was not in the context of the '907 patent.  It was not in
11  the context of estoppel.  It was right in the middle of a
12  discussion of the Windauer patents, out of the blue; and one
13  could only presume, if one was in the deponent's seat, it was
14  about the Windauer patents.

15        If you read that in context, there's no way
16  Mr. Johnson could have understood that this was going to be
17  used in the context of estoppel or was on the topic of
18  estoppel.  This was apparently a strategic "gotcha" stuck in
19  the middle of a series of unrelated deposition questions.

20        Mr. Johnson was later asked about the issues on the
21  '907 patent and about reliance and issues associated with
22  estoppel, and he pointed Leupold's counsel to Mr. Dennis as
23  the person who would know that information.  Mr. Dennis was
24  subsequently deposed and testified about the reliance we're
25  talking about here.  So the out-of-context question of

1  Mr. Johnson is not a defense or a disputed fact that allows

2  Leupold to avoid the motion.

3         Leupold also made a legal argument that if there's

4  any inference at all that could be drawn for why the silence

5  existed for so long, that the motion can be defeated.

6         Well, two points on that.  First, that only addresses

7  the silence and not the other misleading behavior.  They need

8  to address all of the misleading behavior.  Second, the

9  inferences they raise in their motion or in their briefing on

10  this motion are not credible.

11         And we received three inferences:  number one, that

12  Leupold believed that Nightforce might have stopped

13  infringing.  That's not a useful inference, because the issue

14  on estoppel is what Nightforce believed, not what Leupold

15  believed.  They're basically saying they didn't sue because

16  maybe they thought that Nightforce stopped infringing.

17         We know that's not the case, though, because we know

18  from their interrogatories that they disassembled multiple

19  Nightforce scopes over time, including in 2008 and 2016.  They

20  were aware that Nightforce was still using the spiral cam

21  design.  That inference is not backed up by fact nor is it

22  relevant because the issue is what did Leupold convey to

23  Nightforce, not what did Leupold internally believe.

24         Next they argue an inference that maybe Leupold was

25  waiting for Nightforce to respond to their communication in

1    2006.  That might be an argument for March of 2007 or maybe

2    August of 2007.  It's not an argument for 2016 or 2017.  It's

3    not rational or reasonable to think that they were waiting for

4    10 years for Nightforce to get back to them.  And, again,

5    Leupold's state of mind here is not relevant; it's

6    Nightforce's state of mind.

7         Lastly, Leupold argues that an inference that could

8    be drawn is that Leupold would ultimately enforce the patent.

9    Maybe they were just going to wait 10 years.  Again, not

10   reasonable.  They would be giving up damages.  And the

11   evidence says otherwise, because we have testimony from

12   Mr. Dennis on this point.  Ray Dennis said that by 2007

13   Nightforce believed that Leupold had abandoned its claim.  So

14   we know that that inference is not real.

15        And, again, these arguments only address the silence,

16   not the other misleading conduct.

17        Lastly, Leupold raises an equities argument, which

18   Your Honor had some questions about earlier today, related to

19   photographs and cameras and dates.  That's really a nonissue

20   and I think even factually misdescribed.

21        In the 2006 letter Nightforce identified two pieces

22   of prior art:  the German publication, explaining there was no

23   priority claim.  They also identified the earlier Schmidt &

24   Bender scopes, identifying that they had obtained a scope in

25   2007 and 2008 that had the spiral cam design.  There was no

discussion of photographs.  All of that came in the

2016-to-2017 discussions, so they're points off topic here.

Further, Leupold was not in any way deceived by this

if they somehow thought it was a deceptive comment.  In the

follow-up letter from Kassim Ferris in 2006, he indicated

Leupold investigated that issue and determined that it had no

merit.  They were not deceived, to the extent any deception

could be interpreted there.  So factually wrong and a

nonissue.

All equities here favor a ruling of estoppel.  We've

got an unjust 10-year delay where Nightforce dramatically

expanded its business.  And to this point, based on Leupold's

damages expert's numbers, over 97 percent of the damages

asserted in this case come from the '907 patent and they're

tied to the six-year window between 2010 to 2016.

So this is a classic, classic estoppel case.  It's a

"gotcha."  It's a "We're going to threaten you.  We're going

to make it look like we're never going to assert this patent

to you and everyone else out in the world, and then we're

going to wait until you do dramatically high volumes of

product sales, and then we're going to sue you when you did

that believing we weren't going to."

THE COURT:  So I would have to find for this

particular argument not only that there was misleading

conduct, but that the purpose of the misleading conduct was

1  intentional and the intent was to mislead Nightforce all

2  along?

3          MR. CASIMIR:  There is a -- you'd have to find that

4  the misleading conduct was misleading.  How strong is the

5  intent component?

6          THE COURT:  That's a question.  Is it simply

7  misleading conduct or is it intentionally misleading conduct,

8  and the intent going to, as I suggested, setting up --

9  essentially it's a setup:  "We are intending to set Nightforce

10  up."

11          MR. CASIMIR:  It does not need to rise to that level.

12  It can be misleading conduct.

13          THE COURT:  Just simply misleading conduct, without

14  an intent element attached to it?

15          MR. CASIMIR:  Correct.

16          THE COURT:  Okay.  Thank you.

17          MR. CASIMIR:  Yes.

18          So we have this unjust delay in adding the priority

19  claim.  It doesn't make sense why they waited.  We have this

20  unjust public perception of no intent to enforce.

21          And then one of the problems we have when parties

22  wait so long to file lawsuits is documents disappear, and

23  that's been a problem in this case.  So we learned -- and

24  we'll come back to this in the certificate of correction

25  section.

1          There were the e-mails earlier today where Leupold

2    was investigating when Schmidt & Bender first put their

3    product on the market and was told they did so in 1997.  Those

4    e-mails were back-and-forth communications where Leupold was

5    talking to Schmidt & Bender, and Schmidt & Bender apparently

6    had the records because Hans Bender was able to look it up and

7    tell them.

8          We subpoenaed Schmidt & Bender in this case for those

9    same records and were told that everything has been destroyed.

10   Had they brought suit in 2006, timely, we wouldn't be a

11   decade-plus away from the facts.  We wouldn't have missing

12   evidence that would have otherwise been there related to the

13   invalidity.

14         One of the rationales for estoppel is it is unfair to

15   create this late situation where a party has to defend

16   themselves, not only after they've relied on everything, but

17   where they're basically at the mercy of this extreme delay on

18   all fronts, including lack of evidence to defend itself,

19   although, as we'll see, there is plenty of evidence to defend

20   itself.

21         That's the end of my equitable estoppel presentation.

22   Let me stop there and see if you have any questions.

23         THE COURT:  No.  Thank you.

24         MR. CASIMIR:  All right.  Let's turn to the last of

25   the four positive motions that Nightforce has filed.

1          This is a simple one, which is the certificate of

2     correction issue.  Nightforce has moved for a ruling that

3     damages on the '907 patent cannot start until the certificate

4     of correction from 2017 was granted adding the priority claim,

5     because up until that point the patent was invalid and there

6     were no damages to be had.  And we do have this convenient

7     situation here where the parties are in agreement that if

8     there is no priority claim, the patent is invalid.

9          And we've cited the *Southwest Software* case as a

10    case supporting the concept that damages begin no earlier than

11    the certificate of correction.  So when you fix a patent with

12    a certificate of correction, that's when your damages begin.

13          Timeline:  This story also works well off of a

14    timeline.  So the '907 patent was filed in January of 2000.

15    It had a priority claim listed on an inventor declaration.

16    Under the law, that is not a priority claim.  And they're not

17    disagreeing with that.  They filed a 2003 certificate of

18    correction to try to fix that issue.

19          And, in fact, the *Carotek* case that they cite to

20    support their position in this case makes it clear that doing

21    such a thing is applicant error.  It's not a mistake by the

22    Patent Office.  They gave some information to the Patent

23    Office about a priority claim, but the fact that the

24    information did not get onto the patent in the right location

25    is applicant error according to Leupold's own case.

1          All right.  Along comes 2003, where they filed the

2     first certificate of correction.  That did not fix the

3     problem.  In this case it had multiple problems associated

4     with it.  First, it once again put the priority claim in the

5     wrong location.

6          The *Carotek* case which Leupold is relying on to

7     excuse this behavior -- and, mind you, I believe this was a

8     District of Massachusetts case; this is not well-established

9     precedent -- excused an error that was not the same, which is

10    to say in the *Carotek* case the Patent Office contributed to

11    the mistake, in terms of where the priority claim ended up.

12    It was not purely applicant error, as it was here with

13    Leupold.

14          Further, we know from *Carotek* that the original

15    problem that's trying to be corrected in 2003 was applicant

16    error.  There are two ways you can file certificates of

17    corrections.  One form you file if it was the Patent Office's

18    mistake, and that's free.  The Patent Office does not require

19    you to pay for Patent Office errors.

20          The second requirement is -- or, I'm sorry, the

21    second document is one where it's the applicant's error and

22    you have to pay a fee.  You have to pay the Patent Office for

23    their time and energy to correct the mistake that you, as the

24    applicant, made.

25          So not only was the 2003 correction wrong because,

1   again, the priority claim was put in the wrong location, it

2   was filed as a Patent Office error, which it was not, and the

3   fee was not paid.  That fee is required.  So on multiple

4   bases, that certificate of correction was invalid.

5          And, as we know, we had this long period of silence

6   and only in 2016 was a new certificate of correction filed,

7   which ultimately issued in 2017, which is where the damages

8   would start if there were any.  In this certificate of

9   correction they acknowledged it was applicant error, they paid

10  the fee, and they used the right form and they put the

11  priority claim in a location that is suitable for the

12  government to submit it.

13         They argued earlier today that that was just belts

14  and suspenders.  I would say it was belts and suspenders only

15  in the sense that these patent documents have specific rules

16  because there's notice issues to the public, and the Patent

17  Office requires that fees be paid and the correct forms be

18  used.  So if the belt is a fee and the suspenders is the

19  correct form, I agree it was belts and suspenders, but belts

20  and suspenders were required.  The 2003 certificate of

21  correction was not a valid correction.  That's why they did it

22  later on.  That's why they waited to file suit.

23         That is the end of the certificate of correction

24  portion.  Let me see if there are any questions on that.

25                THE COURT:  No.

1            MR. CASIMIR:  All right.  We're now going to shift

2    from those issues on which Nightforce has affirmatively moved

3    to those where only Leupold has.  So we're going to switch

4    mindsets here as well.  In this case now what we're looking

5    for is:  Are there disputed factual issues so that Leupold's

6    motions can and should be denied?

7            Let's start with the invalidity position on the

8    Altenheiner patent.  You'll recall, this is the patent with

9    the binoculars.  The Altenheiner patent is ancient.  It goes

10   back to 1978.  So there's no dispute from that perspective

11   that it is prior art that significantly predates the '907

12   patent, any of its dates.  And it's more than one year before

13   the provisional date, so it qualifies as prior art under

14   102(b).  Invention dates become irrelevant.  Nonetheless, it's

15   before the alleged invention date as well.

16           You'll see a picture on the right showing a mechanism

17   that is essentially identical to what we see in the '907

18   patent in terms of a spiral cam used to adjust optics.

19   Leupold's only alleged difference on why the Altenheiner

20   patent does not anticipate or make obvious the claims of the

21   '907 patent is that it's binoculars and not a riflescope.  So

22   we have a fairly simple issue here.

23           So there is an initial question of whether a

24   riflescope is actually a distinction for anticipation.  So

25   Nightforce's position is it's obvious to use the design in the

binoculars in a riflescope, and that's backed up by expert testimony.  It's backed up by Leupold's own witnesses' testimony, so we have plenty of evidence on that.

However, it goes one step further.  The claims are broad enough that they don't exclude binoculars.  So the claims recite "a telescopic rifle sight," not riflescope.  As mentioned today, that language is in the preamble of the claim, and there was an argument about whether that should count as an element or not in a discussion about during claim construction we talked about preambles.  We did talk about preambles for other patents.  We did not talk about them for this case.

And now we run into a situation that was introduced in our response briefing to Leupold's opening motion. Leupold's opening motion moved for summary judgment on every issue of validity and every issue of infringement of every claim -- nearly every claim of every asserted patent, over 70 claims in a 35-page document.  They raised hundreds and hundreds of issues.  Our response to that, being limited to 35 pages, responded to each of those, giving at least one example of why there was a factual dispute, but could not thoroughly address every one of the issues by argument in the briefing. We provided citations, similar to what they did for distinctions.

One thing Leupold did not do in its very brief

1  multi-hundred issue opening motion is develop its claim

2  construction arguments.  It did a cursory job of almost

3  everything in introducing its arguments, including claim

4  construction.  We heard part of their claim construction

5  argument on this point today, but its briefing does not

6  develop the case.  So this issue of anticipation remains an

7  open issue on summary judgment.

8          Further, we know that binoculars can be used as

9  telescopic rifle sights.  How do we know that?  So initially

10  during the expert report stage in this case, Leupold argued

11  that various of Nightforce's experts lacked design experience

12  in riflescopes and therefore could not opine on certain

13  issues.  We responded by noting that their own expert,

14  Mr. Byron, has never designed riflescopes and that the experts

15  were all equivalently placed.  Mr. Byron, Leupold's expert,

16  has some experience in gun part design, as does

17  Mr. Brandenburg, not highlighted earlier today, but they're

18  all equivalently placed.

19          As a defense to that, Leupold made the point of

20  saying that, no, in fact, while he hasn't designed

21  riflescopes, Mr. Byron, their expert, did work on sighting,

22  riflescope sighting.  And the only example of his lifetime

23  experience related to that was using binoculars to sight

24  riflescopes.  So it's fairly disingenuous that we're hearing

25  that binoculars cannot be used for sighting riflescopes when

1   Leupold's own expert's only experience at all in designing

2   rifle aiming systems involved binoculars.

3        Now let's turn to the obviousness piece, which is not

4   an afterthought argument, but a primary argument.

5        So Leupold's defense to the obviousness argument is

6   that riflescopes and binoculars are not analogous fields and

7   that people would not look to the binocular arts to design

8   riflescope parts.  And their expert, Mr. Byron, talks about

9   that, even though he had used binoculars himself in an aiming

10  system, which is rather curious.

11       More importantly, Mr. Otteman, the inventor of the

12  '907 patent, was asked about this and testified that not only

13  did it happen, but it was common to look at features from one

14  optical product, like a binocular, and use that information to

15  help design other products like riflescopes.  And, in fact,

16  that happens at Leupold.  Mr. Otteman does it himself.  He has

17  patents on both binoculars and riflescopes.

18       In the deposition of Mr. Regan, who is the inventor

19  of the '305 patent, who in his various stages at the company

20  supervised engineers and design people, testified that

21  Leupold, first, makes both products -- that's obvious from

22  their website -- and has during this entire time window, and

23  that the design engineers for both types of products

24  interacted with the various inventors, so inventors who in

25  this space are working with design engineers from both fields.

1          We clearly have at least a disputed fact as to

2     whether one of ordinary skill in the art would look at

3     binoculars in helping select design features for riflescopes.

4          Furthermore, we have Mr. Brandenburg's testimony on

5     this, Nightforce's expert.  He has expert reports on this.

6     The primary -- I believe the only defense we're hearing from

7     Leupold is that he's not qualified to talk on that topic.

8          He is qualified to talk on that topic.  He has

9     designed gun parts.  He is an expert on designing small

10    components used to adjust other features.  He has as much

11    design experience with riflescopes as Mr. Byron does in that

12    neither of them has designed riflescopes; they've both worked

13    on guns.

14         At this point Leupold has not developed a case

15    sufficient to remove Mr. Brandenburg's testimony.  We haven't

16    had motions on that issue yet, so we have lots of disputed

17    facts, with a debate among experts about who is right.  In

18    this case we have Nightforce's expert and Leupold's inventor

19    on one side and Leupold's expert on the other.

20         Any questions on Altenheiner before I shift to the

21    Schmidt & Bender products?

22         THE COURT:  No.

23         MR. CASIMIR:  All right.  Now we have these old

24    scopes that were sold by Schmidt & Bender prior to the Leupold

25    patent.  I think we can simplify this issue a lot.  Almost

1   everything we heard about this morning, Leupold was assuming

2   that they were entitled to a January 1999 provisional filing

3   date and that they could go back with earlier invention dates

4   to prior to the German publication.  Obviously Nightforce has

5   moved on those issues, and we believe that there is no dispute

6   on those issues, that summary judgment can be granted.

7          Now, when we're talking about Leupold's motion here

8   for validity, Leupold has to take the position that there's no

9   argument on that issue, that they are entitled -- that there

10  are no factual disputes, that they are entitled to their

11  priority date and that there's no factual disputes, that they

12  are entitled to an earlier invention to predate the German

13  publication.

14         Of course that's not the case.  So the relevant date

15  here for the Schmidt & Bender product sales is January 31,

16  2000, the filing date of the patent or, at its earliest,

17  January 29, 1999, not some earlier date.  And it strains

18  credulity that Schmidt & Bender prepared for a commercial

19  launch in 1997 and then didn't launch the product until after

20  January 31, 2000.

21         So the question is:  Can the jury, from the evidence

22  of record, conclude that Schmidt & Bender had products on sale

23  in the U.S. prior to January 31, 2000?  There can be no doubt.

24         Let's look at our last timeline.  So in 1997

25  Schmidt & Bender starts advertising this product and starts a

1    commercial ramp-up.  How do we know that?  This product was

2    not just in advertising, but it was in their 1997 catalog for

3    sale.

4           Now, we heard earlier today questions about whether

5    that -- whether the pictures in those advertisements in the

6    catalog show the spiral cam design.  They don't.  But we know

7    the names of the scopes.  Those are in the catalog and the

8    advertisements; and those scopes, by name, are the ones that

9    had the spiral cam.  We know that from later documents and

10   information.

11          So we then had e-mails from Leupold's own

12   investigation of when these products were on sale.  And they

13   did this investigation prior to threatening Nightforce of

14   infringement.  Apparently they wanted to see how they stood

15   before they moved ahead.

16          So one of those e-mails -- and we just saw the header

17   of it earlier today; we didn't see the content of it -- was

18   Leupold inquiring, clearly for the purpose of determining

19   whether the Schmidt & Bender products were prior art, of

20   Schmidt & Bender when those products were on sale.  Because

21   the questions were crystal clear.  They were "When did you

22   bring this -- when was this sold into the U.S.?  When was this

23   brought into the U.S.?"  And the response from Schmidt &

24   Bender was "We shipped into the U.S. in December of 1997,"

25   really, really early and consistent with their advertisements

1    and magazines.

2              Now, Leupold has argued that we should -- we should

3    ignore that evidence because it's hearsay.  Now, we haven't

4    had any evidentiary hearings on whether it's hearsay.  There

5    are multiple grounds by which it cannot be considered hearsay,

6    that it's not hearsay; for example, 801(d)(2)(B), which

7    relates to the fact that Leupold's 30(b)(6) witness on these

8    issues admitted during his deposition, after seeing those

9    e-mails, that he believed there was no reason to doubt it and

10   assumed it to be true, the content.  So we have an adopted

11   admission from Leupold.

12             Also, 801(d)(2)(E), we don't have evidence in front

13   of you on this, but we'd be happy to raise this if we want to

14   have an evidentiary hearing on these documents, but this

15   relates to -- it's not quite the alternative, because they can

16   coexist, but there's evidence that Schmidt & Bender and

17   Leupold were working together related to this patent to

18   enhance its ability to assert it.

19             They actually had a secret license agreement between

20   the two of them where Leupold gave up all of their worldwide

21   rights on this in exchange for access to the German patent,

22   which was only good in Germany and it was only good for 10

23   years and had very little commercial value.  They gave up the

24   store for this patent.  And then there were these various

25   communications between the parties with some very suspicious

 1   language in it, where it looked like they may have been

 2   working together on this issue.

 3          Again, we can get into that if you want to have a

 4   hearing.  But there's not a basis, as we sit here today, to

 5   dismiss these e-mails.

 6          All right.  What happened after that?  We also know

 7   from these e-mails that additional products hit the market

 8   under different names from Schmidt & Bender in 1998 and 1999,

 9   well before the 2000 filing date.  It wasn't just that first

10   one.

11          We also know that Nightforce obtained and tore apart

12   one of these scopes and took photographs of it.  We have those

13   photographs, and they show the spiral.

14          Now, we heard a lot this morning about the date on

15   those photographs, whether it was March of '97 or some later

16   date.  We don't need to rely on the March of '97 date here.

17   The person who did the tear-apart was deposed, and he

18   indicated why they did it.

19          You'll recall that Nightforce had designed their own

20   spiral cam design and launched it as a product in 1999.  They

21   did this tear-apart to look at what other people were doing.

22   And there's faxes and other documents showing that this

23   information about the Schmidt & Bender design was being sent

24   to a contract manufacturer that Nightforce was using to figure

25   out how to do their own design.  And we know from that

1    testimony that that happened no later than June of 1998.

2            So there was a question about when were these

3    photographs?  Are they after March of '97?  For the purposes

4    of this issue, we're happy to have them be June of 1998,

5    significantly predating the 2000 date that's relevant here.

6            So we have a catalog offering to sell the product in

7    1997.  Nightforce got their hands on an actual product, opened

8    it up, and demonstrated that it had the spiral design in 1998,

9    all in the relevant prior art time period.

10           And then just putting in a few other dates here, we

11   know that Schmidt & Bender filed their own patent application

12   on this design in '97, consistent with the fact that they're

13   commercializing around that time period.  It published in

14   March of '98, and the Leupold provisional and the Leupold

15   patent were well after these dates.

16           A jury can reasonably conclude that there's a -- a

17   reasonable basis for saying, by clear and convincing evidence,

18   Schmidt & Bender was selling products prior to these patent

19   dates, based on the evidence in the record.

20           Any questions on the Schmidt & Bender prior art?

21           THE COURT:  No.  Thank you.

22           MR. CASIMIR:  All right.  We'll turn to the very last

23   issues on the '907, which are the infringement issues.

24           We heard earlier today that there are two issues for

25   non-infringement, one related to actuator, one related to the

1    pin.  Pictured on this slide is a photograph from Leupold's

2    infringement contentions, looking down into the scope where

3    the knob has been removed, where they point to the bushing as

4    the cam follower -- that's part of the actuator -- and then

5    something down below it as the additional part of the

6    actuator.

7              The '907 claims don't just say "actuator."  So we

8    heard earlier today that this issue was being posed in the

9    context of claim construction of "actuator."  It's not.  The

10   issue here is that the claims tell us about how the actuator

11   interfaces with the other components.  The non-infringement

12   position here is that Nightforce's products don't interface in

13   that way.

14             So we walked through Claim 10, for example,

15   independent Claim 10, in our original technological

16   introduction and noted that the language in that claim

17   requires that the knob that contains the actuator project

18   outwardly from the exterior of the housing.  So that claim

19   requires that the actuator be outside of the housing.  It's

20   not in the Nightforce products.  It's tucked away inside.

21             THE COURT:  Does it break the plane of the housing?

22             MR. CASIMIR:  So Mr. Brunette earlier today suggested

23   it did.  It does not.

24             So if we look at the next slide, this is a higher res

25   of the figure that he showed where the -- we can see the

1   component on the inside there identified as the actuator and

2   the bushing, which they're identifying as the cam follower.

3   The dimensions there tuck that well down on the inside.

4           There are some engineering drawings associated with

5   this product that were in Mr. Byron's expert report that show

6   a side view and show that it's below.  They're fairly poorly

7   resolutioned, so I didn't show that slide.  But it is tucked

8   away inside.

9           THE COURT:  So I don't know that -- is there

10  anything -- any way that I'm going to be able to look at it

11  and say, yes, conclusively it's one way or the other?  Because

12  you're both telling me different things.  And, honestly, by

13  looking at the diagram, I'm not convinced one way or the

14  other.

15          MR. CASIMIR:  This is a CAD drawing of the actual

16  product, based on the dimensions.  It does show, if you were

17  to move those pieces, that it would be within the housing at

18  that point.

19          But no, there is no evidence in the record presented

20  for summary judgment that lets you know one way or the other.

21          THE COURT:  Thank you.

22          MR. CASIMIR:  All right.  So we have disputed facts

23  on that issue, at least.

24          Let's turn to the pin so while we're on this figure,

25  we can look at it.  So Leupold's expert initially took the

position that the bushing was a pin.  But the parties agreed
to claim construction language on what a pin is that made the
bushing not qualify.  So Leupold changed direction and they've
argued that the screw, identified as No. 6 in this drawing, is
in fact the pin, even though as it's used, it's completely
encompassed by the bushing.

        In fact, if we turn back to the photograph, looking
at a top view, you can see part of the screw head shows
through a hole on the top of the bushing, showing that the
screw is entirely encompassed within the bushing.  You can
also determine it and see that from the figure.  The bushing
sits over the screw.  The screw is covered up.  It is the
bushing that is the cam follower.  It is the bushing that
makes contact with the groove and does the operation, not the
pin inside of it.

        So now we're hearing argument that the pin in
fact -- or, sorry, that the screw is the pin of the claims.
That's all attorney argument.  That's not supported by expert
testimony.  That's sort of a late game change by Leupold and
not sufficiently supported in their summary judgment documents
in a manner that allows them to obtain summary judgment of
infringement on this issue.

        Furthermore, this whole -- so the pin issue relates
to Claims 6 and 16.  And we saw earlier today the claim
language said that the cam follower includes a pin.  And so at

1   this point, even though the pin is not used as a cam follower,
2   Leupold is attempting to read Claim 6 to not require a pin cam
3   follower.

4          The claim language, when it says that the cam
5   follower includes a pin, I think any reasonable interpretation
6   of that and any reasonable claim construction on that implies
7   that the pin is acting as the follower.

8          Now, again, there hasn't been claim construction
9   developed on this.  This is Leupold's motion.  They haven't
10  developed this thoroughly.  We're not in a position to rule on
11  that one way or another.

12         It's also inconsistent with the specification in
13  terms of saying that this thing contained in something else
14  can be the cam follower.  It rasies the question of can
15  anything be a cam follower if it has a pin in it, even if the
16  cam follower otherwise seems not to look anything like a pin
17  or behave like a pin or isn't a pin?  It's not clear what type
18  of cam follower doesn't have something like a pin in it.
19  Somehow that cam follower has to be mounted to some other
20  piece.  A reading of Claim 6 that implies that "a cam follower
21  including a pin" can be anything just puts us back into
22  Claim 1, and then Claim 6 doesn't make any sense.

23         Furthermore -- and this goes to our issue on not
24  being entitled to their priority date -- by trying to clarify
25  that they have an infringement case here, they're saying that

Claims 6 and 16 are broad, because they're saying that the cam
follower need not be a pin but can have a pin inside of it and
can include lots of other things.  That only goes to hurt
their argument that Claims 6 and 16 are entitled to the
provisional date, which provides no support for a concept of
anything comprising a pin.  The cam follower is a pin in the
provisional.

That concludes Nightforce's position on the '907
patent.

THE COURT:  Thank you.

MR. BRUNETTE:  Your Honor, I do have some brief
rebuttal.

THE COURT:  Yeah.  Go for it.

MR. DAVIS:  If you'll bear with me, as we try to do
this, I'm going to have one of my colleagues help me pull up
some slides that weren't in the original deck.  I hope that
goes well.

Your Honor, I want to take this a little bit out of
both the order that Nightforce presented it and the original
order.  I'm going to start with infringement and then try to
generally track through the order that they did, since
infringement is fresh.

The first issue that we just talked about was
actuator.  And on the question of actuator, what Nightforce is
leaving out of its presentation is the fact that Claim 1 and

1   Claim 10 are somewhat different, but neither of them require

2   the actuator to extend out of the plane of the housing, and

3   neither of them require the actuator to be directly connected

4   to the housing.

5            So I put up Claim 1 earlier today, and that is on --

6            THE COURT:  I think all that -- on Claim 1 I think I

7   have -- I think it was a closer call on Claim 10.

8            MR. DAVIS:  Right.

9            So the point I wanted to make on Claim 1 is note that

10  Claim 1 is very different than Claim 10.  The language of

11  Claim 10 is in a slide that we have -- and, Elliott, if you

12  could pull up -- there's a hidden slide in there that has the

13  Claim 10 language in the actuator section.  It would be right

14  near 15.

15           As we start talking about that, the critical thing

16  with respect to Claim 10 is that it requires that the focus

17  control knob extend outwardly from the housing.  Nothing about

18  that claim language requires that every aspect of the focus

19  control knob, every component of the focus control knob be

20  outside the housing or outside the plane of the housing.

21  Instead, it only requires that some portion of the knob extend

22  outwardly from the housing.

23           The actuator is but one of many components of the

24  focus control knob.  You can see that that's right at the

25  beginning of (c):  "a manually adjustable focus control device

projecting outwardly from the exterior of the housing."  The
"projecting outwardly" language does not require it's located
entirely outside, merely that some part of the device projects
outwardly.

THE COURT:  Hang on just a second.

So when it says that the "focus control device
projecting outwardly from the exterior of the housing," and
then it talks about the direction, and then it says "the focus
control device including," and that then talks about the
actuator, you're saying that does not mean that it needs to be
outside of the housing?

MR. DAVIS:  I would clarify that slightly, Your
Honor.  I would say that that does not mean that it needs to
be entirely outside the housing.

THE COURT:  Okay.

MR. DAVIS:  There is no dispute that the focus
control knob, the side turret knob on the Nightforce product,
extends outwardly from the housing.  The dispute is whether
one of the internal components of that knob is located inside
or outside the plane of the housing.  That's just not required
by the claim language.  The claim language only requires that
some part of the focus control device -- presumably the
knob -- sticks out to the side of the scope.

The second part of that is mounting to the housing.
So there is no mounting to the housing requirement in Claim 1

1    at all.  The mounting to the housing requirement in Claim 10

2    is located in Claim 10(c)(ii), which you can see here, which

3    says that the "actuator slide is slidably mounted to the

4    housing," but it does not say that the actuator slide has to

5    be mounted directly to the housing.  And certainly indirect

6    mounting is entirely possible, and that's what has happened in

7    the Nightforce product.  It does slide along the housing and

8    it is indirectly mounted to the housing, but it is not

9    directly mounted to the housing.  The presence of intervening

10   parts in between the actuator and the housing is not a problem

11   because of the open-ended claim language "comprising."

12          The second aspect of this is the word "pin."  I want

13   to focus first on what is the pin within the Nightforce

14   product and the question of whether it's the pin or the

15   bushing.

16          The *CCS Fitness* case is important here.  In *CCS*

17   *Fitness* there is a two-part mechanism.  So there's a mechanism

18   that's called out in the claim language.  And I have forgotten

19   what the exact word from *CCS* is, but that mechanism in the

20   accused product is made up of two different parts joined

21   together, and *CCS Fitness* is clear that that is perfectly

22   okay.  You can have two different structures that are joined

23   together that satisfy a single claim limitation or two

24   joined-together structures that satisfy two different claim

25   limitations, even though they're integral with each other.

1          And under the general concept of patent law claim

2   construction, those are all fine as long as the claim is not

3   so clear that it precludes that.  Nothing here about "cam

4   follower that includes a pin" says that the cam follower can't

5   be multiple parts, one of which is a pin and one of which here

6   is a bushing.

7          Nightforce also argues that the pin is not a cam

8   follower because -- and I think the argument they're trying to

9   make -- I'm not a hundred percent sure I'm getting it right,

10  but what I thought I just heard was that, well, could anything

11  be a cam follower, if it doesn't look like it acts as a cam

12  follower, because it has a pin in it?

13         But, of course, anything that has a pin in it is not

14  necessarily a cam follower.  Only something that is designed

15  in such a way that it engages into a cam track can be a cam

16  follower, into or onto.  And so the fact that there is a cam

17  follower here that is designed to fit into the cam track is

18  what makes it a cam follower.

19         And what makes it infringe Claims 6 and 16 is the

20  fact that there is a pin, that solid metal projection in the

21  middle.  The fact that it has a bushing around it and it's the

22  bushing that actually touches the side wall of the cam track,

23  not the pin, is irrelevant, because the two pieces together,

24  joined together, as in *CCS Fitness*, function as a cam

25  follower.

1          And when Mr. Byron calls out item No. 7, he's looking
2   at figures where items 6 and 7 -- it's the same figures we
3   looked at earlier, where items 6 and 7 in the Nightforce
4   assembly instructions, where 6 is the bushing and 7 is the
5   pin, get joined together to form a cam follower.  That's what
6   he's pointing out as the cam follower that includes a pin.
7   There's no change in Leupold's position throughout this case.
8          Oh, and I have a slide of that if you want to see
9   that quickly.
10         Elliott, could you pull up slide No. 10?
11         There it is.  So this is a cut from paragraph 485 of
12  Mr. Byron's opening report where he points this out, and you
13  can see there is text talking about what is the pin and then
14  he points to this figure.  And in the figure, item 7 that he's
15  pointing out is assembled with item 6 already inside of it.
16  So it is a bushing surrounding a pin that is the cam follower
17  he's talking about there.  It's the same image we looked at
18  earlier today in my earlier presentation.
19         THE COURT:  Does that pin have a -- inside the
20  bushing, is it a screw?  Is that how it goes into that
21  structure?
22         MR. BRUNETTE:  Yes.
23         Let's see if we can --
24         THE COURT:  That's okay.  It's not essential to my
25  decision.  I was just curious.

1          MR. BRUNETTE:  It's this (indicating).  That's a

2     picture of how it all goes together.  So that part No. 6, the

3     right side of it, behind the flange, is threaded, so it is in

4     that sense a screw.  And those threads go into the arm that

5     sticks out in the scope.  And then the part on the left side

6     of the flange is the pin.

7          THE COURT:  So that bushing that fits over the top of

8     that has a slot so that it can expand and then contract after

9     it snaps over the top.

10         MR. BRUNETTE:  I think the slot that's in the middle

11    of 6 is actually so that you can screw into the arm, as if it

12    was a screw.

13         THE COURT:  I'm guessing that No. 7 has a slot that

14    runs down its side in order to fit over the top of that.

15         MR. BRUNETTE:  That's possible.  Yeah, I'm not

16    certain if it snaps around the side or if it's somewhat

17    elastic.

18         THE COURT:  Okay.  Thank you.

19         MR. BRUNETTE:  Changing next, Your Honor, to the

20    issue of date of invention, I want to start with what we

21    didn't hear from Nightforce; and what we didn't hear from

22    Nightforce was anything about the rule of reason.  Instead of

23    talking about the rule of reason standard, Nightforce wants to

24    make up its own standard and assert that specific

25    corroboration of every aspect of testing in particular and

1  reduction to practice in general is required.

2          Notably, when Nightforce talked about that, it did

3  not cite to authority, because the controlling authority is

4  that there is a rule of reason standard.  And the overall

5  question is not whether every aspect of reduction to practice

6  is proven by specific corroborating independent evidence, but

7  whether the overall story is sufficiently corroborated that it

8  is believable to a reasonable juror in light of the

9  corroboration requirement.

10          And of particular importance here is the

11  burden-shifting that I mentioned in my opening argument from

12  the *Mahurkar* case at 79 F.3d at 1578.  All Leupold has to come

13  forward with is enough evidence that, drawing all inferences

14  in Leupold's favor with respect to Nightforce's motion, a

15  rational juror could find that Mr. Otteman invented earlier

16  than 1998.  Once that standard is met, then the burden shifts

17  back to Nightforce to disprove that and persuade a jury that

18  he did not do so.

19          So starting with the testing issue, because I think

20  Nightforce spent more of its time on that and I want to dig

21  into that first, and starting first with the evidence that

22  there was testing -- Elliott, if you could pull up slide

23  No. 30 -- Nightforce takes the position that there is no

24  evidence that Mr. Otteman actually put together the scope and

25  tested it as a prototype.  And that's how we get into this

1   whole debate about the supplemental Byron declaration and

2   whether testing is required or not.  The Court doesn't even

3   need to go down that rabbit hole, because there is sufficient

4   evidence that testing occurred.

5           So here are some quotes from Mr. Landvatter's

6   testimony (reading):  "Do you ever recall discussing any

7   testing Mr. Otteman did on a prototype you generated?

8           "Just that our part worked sufficiently.

9           "Okay.  So going back again to paragraph 12 of

10  Mr. Otteman's declaration, is it your recollection that

11  Mr. Otteman communicated to you that the parts you made for

12  him related to the spiral cam worked?

13          "Yes.

14          "And would he have communicated that to you shortly

15  after you delivered the parts to him?

16          "He would have tested them right when I was there.

17          "Okay.

18          "And the reason I would have gone" -- "and that's the

19  reason I would have gone down to make sure the parts were

20  working correctly."

21          So Mr. Otteman told Mr. Landvatter that he tested the

22  parts and they worked at approximately the same time that the

23  prototype was delivered.

24          Mr. Otteman also testified that he put together the

25  entire scope and it worked.  Indeed, Nightforce cites that as

1   evidence that he thought testing was required.  But that's not

2   what Mr. Otteman said.  He didn't say he was required to test

3   it.  He said he did.  This evidence corroborates Mr. Otteman's

4   own testimony and is sufficient to find testing.

5        Now, Nightforce wants to talk about their idea that

6   there are four different categories of testing, and there is a

7   case that calls out a bunch of different examples of what

8   might be sufficient testing under the circumstances.  But

9   Nightforce's assertion of what constitutes sufficient testing

10  in individual cases -- the idea that no testing is required

11  only where the invention is simple and the field is

12  predictable versus severe real world testing is required where

13  severe real world conditions like vibration are going to be

14  expected -- is something that Nightforce made up.  There is no

15  general Category 4 test for testing.  There is, instead, a

16  rule of reason.  The standard is whether the testing was

17  sufficient under the circumstances.

18        And what we really know is that, in fact, while the

19  claims of this patent require both a spiral cam mechanism and

20  various parts of the riflescope around them, most of the parts

21  that were used were already tested and commercially viable.

22        Mr. Landvatter -- excuse me.  Mr. Otteman testified

23  that when he made his prototype of the spiral cam scope -- and

24  this is on page 36 of his deposition transcript and in even

25  more detail at 80 and 81 -- that he worked from an existing

commercial Leupold scope.  And that scope, as he testified,
would have already been subject to testing.  The only thing
he changed out was he changed out an existing orbital pin
design for the side parallax focus for the specific spiral cam
parts.

Well, switching out one kind of control for another
is very different from developing an entirely new riflescope
from scratch.

The analogy that comes to mind for me here is if
someone invented a new and better shape for a steering wheel
for an automobile and they could simply take out -- do a
little mechanical re-jiggering and take out the existing
steering wheel and pop in their new prototype steering wheel,
they would not have to independently test whether the engine
still works or whether the taillight still works or whether
the car hangs together over bumps.

Those are all important things in designing a car,
but they're not part of testing that steering wheel prototype,
even if the patent on the steering wheel prototype talks about
the car and the wheel and the engine, because they're all
important to how the new steering wheel works better than the
old design.  They're not an important part of testing whether
that prototype, under a rule of reason standard, works for its
intended purpose.

THE COURT:  I think that's a bad example, because if

1   someone is putting a steering wheel on a car, I'm going to

2   expect there's going to be tons and tons and tons of testing

3   of that steering wheel.

4           MR. BRUNETTE:  Oh, certainly there will be extensive

5   testing before the product is commercialized.

6           THE COURT:  Oh, even after you put it on for the

7   first time, if you're putting it on a car, my guess is -- just

8   common sense tells me you don't just put it on a car and not

9   test it a lot to make sure that everything works.

10          Your point is made.  I just don't know that your

11  example is the best one to choose.

12          MR. BRUNETTE:  I see your point, Your Honor.

13          I think the overall point is that the scope is

14  already vetted.  And with the addition of these parts, the

15  parts were tested, the parts were assembled into a prototype,

16  and the prototype worked for its intended purpose.  That

17  didn't require impact testing to know that the spiral cam

18  mechanism would move the focus control knob.

19          So that brings me to the separate issue of, well,

20  even if there wasn't evidence of testing -- actually, one more

21  thing I want to go back and do there.  As to the four

22  categories that Nightforce came up with, sort of moving from

23  no testing on the left-hand side to extensive testing on the

24  right-hand side, they talk about severe real world conditions

25  and vibration being one of the criteria that if met, if that's

1    something you expect the invention to encounter in real life,

2    then you have to do more testing.

3         Well, that's completely inconsistent with the Federal

4    Circuit's decision in *Slip Track*, because *Slip Track* is a

5    mounting system that's supposed to withstand earthquakes, and

6    yet the testing that was done was simply making the prototype

7    and confirming its size and confirming the way that it fits on

8    wallboard.  It did not require actually putting it on

9    wallboard and shaking it on a shake table to simulate an

10   earthquake or putting it somewhere in an earthquake-prone area

11   to know that it was going to work in an earthquake.

12        And in just the same way, even though riflescopes are

13   subject to abuse and even though in selecting what kind of

14   mechanism to design for a riflescope, keeping that abuse in

15   mind is important, which is all Mr. Byron has said about the

16   obviousness points that Nightforce is trying to turn around

17   and make about testing.  The fact is in order to know that

18   this focus control knob works, you don't need to impact test

19   it and weather test it, particularly when you're attaching it

20   to a scope that already works.

21        Leupold also argues that Mr. Byron's declaration is

22   late.  And this is an argument about the summary judgment

23   burdens and what happens.

24        Just to be clear, on October -- is it 5th or 10th?

25   At the beginning of October Leupold filed a summary judgment

motion which was a *Celotex*-type motion, merely pointing out that Nightforce had not met its burden on various issues. Then Nightforce filed its motion; and in responding to Nightforce's motion, Leupold entirely properly put in the evidence that it had to prove up its claims.

That evidence was not required earlier. And the failure to anticipate the argument that Nightforce was going to make and put that evidence in in the first place in our motion is certainly not a basis to grant Nightforce's motion.

In any event, untimely expert reports are subject to being stricken only when there is prejudice, and there is no prejudice here. Nightforce says, "Well, there is prejudice because we win otherwise." But that's always true. If it's important, that's always true.

It's some prejudice beyond, "Hey, your evidence is good for you" that makes the lateness the prejudice. And that is not sufficient. There has to be something that they would have done differently that they're not now able to do to constitute such prejudice. And given that discovery is still open, there's nothing that they couldn't do, particularly since they had an opportunity to reply.

In addition, Mr. Byron's testimony that no testing is required is not inconsistent with his testimony that it is really important to understand recoil when you're designing systems for riflescopes. This is both because Mr. Otteman

1    started from a platform that was already properly tested and

2    in a working commercial scope and because the point that

3    Mr. Byron was making is you can't just go out to other fields.

4              This is really what Mr. Byron was saying.  You can't

5    go out to a video camera and effectively just put them on a --

6              THE COURT REPORTER:  Counsel, I really have to have

7    you slow down.

8              MR. BRUNETTE:  I'll try to stay closer to the mic as

9    well.

10             What Mr. Byron was saying in the testimony that they

11   cite is that you can't simply go out to a video camera and

12   stick it on a riflescope and expect it to work.  He was not

13   saying that in order to know whether every individual part of

14   a riflescope is going to work, if changed slightly, that you

15   would need to redo all of that testing.

16             Those are very different ideas.  And the fact that he

17   said one does not make -- the fact that he took different

18   positions on those very different questions is not in any way

19   inconsistent, nor is there any testimony from any other expert

20   taking a different position.

21             Finally, Nightforce argues that Mr. Otteman admitted

22   that testing was required, but that is not what the testimony

23   said.  That is simply a mischaracterization of the testimony.

24   In fact, Mr. Otteman's transcript, page 36, lines 12 to 19 --

25   it's docket 92-1 -- he says -- he confirms that the prototype

1   would have been tested to see if it worked as intended.  But

2   he did not say that testing was required, merely that it

3   happened.  It's not an admission that testing was necessary to

4   know if it worked.

5          Moving over to the broader issue of corroboration of

6   reduction to practice, Nightforce ignores entirely the

7   documents that are perhaps most telling, which is those 1995

8   drawings, which are definitively dated and were preserved on a

9   1996 CD with no change to their content since 1995.  So we

10  know that whenever they were sent to Mr. Landvatter, they were

11  the same as when they were created in 1995.  Mr. Landvatter

12  tells us that he made the prototypes and that he believes they

13  were in 1995 or 1996.

14         Now, in trying to rebut this testimony, Nightforce

15  throws around the word "recants."  But Mr. Landvatter and

16  Mr. Otteman did not recant any of their testimony.  They did

17  not get up on the stand and say, "Oh, never mind.  Everything

18  I said was wrong.  I take it back."  That's not true.

19         Nightforce thinks that it got some admissions that it

20  could use on cross-examination to undermine the credibility of

21  their testimony.  That may be right and it may be wrong.  But

22  that is what we have juries for.  And so, at most, that is a

23  reason that there's a fact dispute about what really happened

24  and about the details.  It is not a basis to grant summary

25  judgment in Nightforce's favor, that there is no

1  corroboration.  A jury, drawing all inferences in Leupold's

2  favor, could believe the testimony that Mr. Otteman and

3  Mr. Landvatter gave.

4        And, in particular, if you actually look at the

5  statements in Nightforce's brief -- and there are many of them

6  and I won't go through them all here.  But if you look at the

7  statements in Nightforce's brief and then go back and read the

8  transcripts, including the questions they ask and the

9  questions around them, it will be very clear that Nightforce

10  is very optimistic about the effect of the admissions that it

11  feels it got on cross-examination.  They are not so clear that

12  that is necessarily the only conclusion the jury could reach

13  from the testimony taken on cross.

14        An example of this is the "gotcha" argument that

15  Nightforce makes with respect to the shape of the spiral cam.

16  So Nightforce -- and this is on -- in Mr. Landvatter's

17  transcript I believe it's on page 68, but it's cited in

18  Nightforce's briefing.  And they make this argument that

19  Mr. Landvatter misidentified which shape of the spiral cam,

20  and they put in their slide deck the two different spiral

21  cams, one of which goes around slightly more than 360 degrees

22  and one of which is slightly less.

23        If you actually read through the questioning that's

24  in the record, Mr. Landvatter is asked, "Would you recognize

25  those if you -- which one is which, which one was the first

1  one that you made out of the various different spiral cam

2  shapes that you make?"  And he said, no, wouldn't be able to

3  do it.

4          And then they asked him, "Well, there's one that's

5  more than 360 degrees."  And ultimately all he says is that

6  that's consistent with what he made, it might have been.

7          He's certainly not saying, "Yes, I" -- he's not

8  presented with both of them.  And upon hearing about the shape

9  of one of them, he says, "That's consistent with what I made,"

10  not, "Yeah, that's definitely the first one that I made."

11          Nightforce is -- their conclusions about the effect

12  of the testimony that they're getting and the extent of that

13  testimony are not entirely consistent with the actual

14  underlying testimony.  So I encourage the Court to read it

15  closely in going through those.

16          The next issue I'll turn to is the provisional

17  priority.  So starting first with Claims 6 and 16, Nightforce

18  has not cited to any case in which an unclaimed element of the

19  claim has to -- in which any Court has held that an unclaimed

20  element of the claim must be disclosed in either the

21  specification or in the provisional.  Of course that cannot be

22  the law.

23          If Mr. Otteman's patent were written so that only the

24  asserted elements and no -- the claimed elements and nothing

25  more could be part of the invention -- in other words, if it

1    was closed-ended claiming, then if Nightforce simply tacked

2    lens caps, which are a non-claimed element, onto the end of

3    its scopes, they would be non-infringing because it would

4    include elements that are not permitted in the claimed design.

5         But, of course, that's not how patent law work.

6    Everyone writes their claims open ended so that the infringer

7    can't just add one more feature and make them infringing.  And

8    the fact that -- the patentee cannot be expected to imagine

9    every feature that could possibly be added to its scopes and

10   include every one of those -- or any other patent -- and

11   include every one of those in the provisional and in the

12   specification, because while they might be able to imagine

13   that someone would put lens caps on a riflescope, it's

14   possible that someone could put a competitor's logo or a new

15   competitor's logo on the outside or, in a joke, might attach a

16   pair of fuzzy dice to a riflescope for luck.

17        None of those things have to be disclosed in the

18   specification.  That is not what the written description

19   requirement requires.  And the *D Three* case that Nightforce is

20   so eager to talk about is not different.  Each of the claims

21   at issue requires a washer.  None of the claims of the '907

22   patent requires a bushing.  Instead, they require a pin.  And

23   the provisional discloses a cam follower that includes a pin.

24   The provisional need not disclose every other thing in

25   addition to a pin that could possibly be part of a cam

1  follower.

2       There simply is no Federal Circuit or any other

3  authority to the contrary.  And, indeed, the *Lochner* case that

4  we cited in my opening presentation expressly says the

5  opposite:  Unclaimed elements do not need to be disclosed.

6       Turning, then, to all of the other claims besides 6

7  and 16, provisional priority is a one-sided battle of the

8  experts.  In other words, the ultimate question is one of

9  expert proof.  How would a person of skill in the art

10  understand what Mr. Otteman had or had not disclosed in his

11  patent?

12       Now, Nightforce tries to say, and said standing here

13  a relatively short time ago, that the disclosure requirement

14  is one of, quote, express disclosure.  That is not an accurate

15  statement of the law.  A provisional or a specification need

16  not expressly disclose everything that falls within the scope

17  of the claims.  Rather, whether the disclosure is sufficient

18  is judged from the perspective of a person skilled in the art

19  and whether a person of skill in the art would understand that

20  the patentee possessed what is claimed.

21       That is different from an express disclosure

22  requirement.  It is narrower than the standard for

23  obviousness, but it is broader than express disclosure.

24  Mr. Byron's testimony is not framed in terms of obviousness.

25  It is framed in terms of the correct legal standard:  what a

 1    person of skill in the art would understand.

 2              Now, counsel for Nightforce disagreed with

 3    Mr. Byron's assessment of what a person of skill in the art

 4    would understand.  But we don't get to resolve a disagreement

 5    between Nightforce's counsel and an expert witness by granting

 6    summary judgment.  That's what trials are for, if there are

 7    two experts that reach different conclusions.

 8              Here the only expert is Mr. Byron because the

 9    opposing expert who offers an opposing viewpoint on this issue

10    is not really a person of skill in the art in the field.  Now,

11    Nightforce says, well, really both experts are the same in

12    terms of their skill, but that's actually not accurate.  If

13    you dig into it, the only thing that Mr. Brandenburg has done

14    in the field is to design a single part for a friend, for the

15    handhold on one gun, and to make some drawings of another gun

16    in a computer.

17              That does not make him any different than the expert

18    in *Sport Dimension* who had come up with some things that

19    floated and had designed some products that floated and would

20    have been qualified to testify whether the personal flotation

21    device would float, but not whether it would work as a

22    personal flotation device for what a person of skill in the

23    art in the field of designing personal floatation devices

24    would have known.

25              So Mr. Brandenburg is not a person of skill of the

1   relevant art; Mr. Byron is.  And, therefore, Leupold's motion

2   should be granted on this and Nightforce's denied.  At a

3   minimum, there is at least a battle of the experts; and

4   Nightforce cannot win summary judgment on this issue.

5           Now, a couple of other things.  The Court asked, when

6   counsel for Nightforce was up here -- I believe the question

7   was "Do I have to decide what 'groove' means to decide this

8   dispute?"

9           And Leupold's answer to that is that the question of

10  what the disclosure of a groove in the provisional means is

11  not a question of law for the Court; it is a question of fact.

12  Because the question is not, as a matter of law, what does

13  "groove" mean?  The question is what would a person of skill

14  in the art have understood a groove to disclose?  And the

15  answer to that is found in the expert testimony, and in

16  particular the expert testimony given by Mr. Byron.

17          Turning next to the issues of equitable estoppel and

18  the certificate of correction, I'm going to take those out of

19  order because Nightforce's discussion of equitable estoppel

20  assumes that Nightforce is going to win on the certificate of

21  correction issue, so I think it makes more sense to take them

22  in the opposite order.

23          THE COURT:  Can we take a break right at this time?

24  We're getting onto a new topic.

25          I need a cup of coffee to recharge my brain, and then

1   I'll be better ready to listen to you for the next couple of

2   hours.  All right?

3            So let's take 15 minutes.  We'll be back.

4            (A recess is then taken.)

5            MR. BRUNETTE:  Your Honor, I think where we were, we

6   were just finished with provisional priority and moving on to

7   certificate of correction.

8            So on this issue, the key issue to look at is the

9   *Carotek* case, discussed in my opening remarks.  And an

10  argument that we heard extensively from Nightforce is, well,

11  this case is different.  And Nightforce argues that this case

12  is different because the error was Leupold's fault, that

13  Leupold was the one who purportedly made a mistake in putting

14  the claim of priority in an inventor declaration rather than

15  in the application itself, and Leupold should have come clean

16  on that at the time and failed to do so.  That's their

17  argument for why the 2003 certificate of correction is not

18  effective.

19           That is the exact same argument that was made and

20  that was only half successful in *Carotek*.  So in *Carotek* they

21  had exactly the same debate about exactly the same question.

22  And the Court in *Carotek* ultimately agreed with the defendant

23  that the error was the patentee's fault, but did not agree

24  that that error or the fact that the error was the patentee's

25  fault or the fact that the certificate of correction fixing

1    the error only put the claim of priority on the face of the

2    patent and not in the first sentence of the specification,

3    none of those things were sufficient to make the patent

4    invalid on its face prior -- at the time.

5          So in *Carotek* there is no second certificate of

6    correction that fixes the -- that fixes putting the priority

7    claim into the first sentence of the specification in addition

8    to on the face of the patent because the *Carotek* Court says,

9    "That's okay.  The regulations would require that, but the

10   Patent Office only would have issued this certificate of

11   correction if it thought that what you did was good enough."

12         And, in fact, the Federal Circuit tells us that the

13   point here is the public notice function and "Looking at the

14   face of the patent, this priority claim is really clear.  It's

15   maybe clearer here than if you had just complied with the

16   statute, and that's good enough."

17         The point is the *Carotek* Court, one, did not care

18   whose fault it was.  The *Carotek* Court made a finding on that

19   but it didn't matter to the outcome, and the same is true

20   here.

21         And, two, the *Carotek* Court and the *Prism* Court both

22   say that putting a priority claim via certificate of

23   correction on the face of the patent is sufficient to make the

24   patent valid because the PTO, in issuing the certificate, is

25   exercising its discretion and holding that that is sufficient.

1                In contrast, there is no case holding that a

2       certificate of correction that puts the priority claim only on

3       the face of the patent is not sufficient.  There's no case

4       going the other way.  The only case that Nightforce cites on

5       this issue is the *Worlds* case, but that case is entirely

6       factually different.

7                There the certificate of correction issues only after

8       this issue was raised on summary judgment and is not effective

9       not because it puts the claim of priority in the wrong

10      place -- there was no claim of priority -- and then an

11      untimely certificate of correction puts it in the right place.

12      Here, the 2003 certificate of correction is timely and the

13      place where it puts the provisional claim is good enough,

14      according to the *Carotek* Court and the *Prism* Court.

15               This is important both to the certificate of

16      correction issue, but also because Nightforce tries to take

17      the certificate of correction issue and make it its new basis

18      for its equitable estoppel argument because its old equitable

19      estoppel argument wasn't working.

20               So turning to -- one last thing on certificate of

21      correction.  There is no case contrary to *Carotek*, holding

22      that going to the PTO and seeking a certificate, saying that

23      you think the error was the PTO's error in not having a

24      priority claim at all, makes the resulting certificate

25      invalid.  Nightforce is making that argument, but they cite no

1    authority.

2          And *Carotek* is, again, contrary authority, where the

3    patentee all along took the position that the error was the

4    PTO's, the Court finds that the error was really the

5    patentee's, but that doesn't matter.  The certificate of

6    correction issued under the assumption that it was the Patent

7    and Trademark Office's error is still sufficient.

8          Now, turning to equitable estoppel, first on the

9    issue of deception, Nightforce's argument seems to turn on

10   three different kinds of deceptive conduct.  They restate them

11   in different ways to try to make more bullets on their slides,

12   but they all come down to either silence, the absence of the

13   patent marking, or certificates of correction issues.

14         So going through those three, first as to silence,

15   the *Hemstreet* case from the Federal Circuit is clear that

16   where the ball is in the patentee's court, silence is not

17   going to be enough, particularly where the opening

18   communications are about licensing, not an express threat to

19   sue.  That's exactly the facts we have here.

20         Nightforce talks about the *Akeso* case out of the

21   Central District of California, but the reasoning of that case

22   suffers from a fundamental problem in that much like many of

23   Nightforce's arguments here, it is merging the doctrine of

24   laches into the doctrine of equitable estoppel.

25         So *Akeso* draws on this idea from back when there was

a laches defense that was effective, that there is a six-year presumption of laches.  All of that is gone, but *Akeso* resurrects that six-year presumption of laches and sticks it into the "silence" portion of equitable estoppel, saying that once you go over six years, there's sort of a presumption that you must be doing something.  There is no support in Federal Circuit law for that reasoning on equitable estoppel.  It all comes out of laches, and that's not appropriate.  Laches is gone.  The Supreme Court struck it down as a defense to patent damages actions.

Second, patent marking.  So Nightforce makes an argument for the first time in either its opposition or its reply brief that, well, the deceptive conduct here is that Leupold didn't go out and mark its patent numbers on its products.  The whole reason that marking comes up on this case is because they asked a series of discovery question about marking, because it's relevant to damages limitations.  But there are two problems.

One, there is no evidence in the record that Nightforce knew that Leupold was not marking at the relevant time.  They're drawing on interrogatory responses during this litigation about whether marking occurred.  There is no showing that Nightforce knew or relied upon a lack of marking at the relevant time.

Second, even if Nightforce had known about the

relevant -- the lack of marking, there is a statutory penalty

for failure to mark.  A patentee can make a choice not to

mark; and the penalty that it takes is the penalty provided by

statute, which is a limitation on its damages.  It would be

inappropriate to take that choice and turn it around and use

it to entirely cut off a patentee's damages.

In fact, this would be like exactly the problem that

happened under the doctrine of laches.  There is a statutory

limitation on damages periods, and therefore delay causes a

patentee to suffer the statutory consequence -- limitation on

damages -- not the broader consequence of barring its claim

entirely.

Third, the certificate of correction issue.

Nightforce's argument under equitable estoppel assumes that

Nightforce wins on the certificate of correction issue; and,

therefore, that from 2003 until 2016 the '907 patent was

invalid on its face.  That is wrong for all the reasons I just

discussed.  For all the reasons set out in *Carotek*, it is

entirely appropriate that Leupold handled the situation

exactly as it did.  Leupold corrected any error in the '907

patent in 2003, and it has been valid at all times since.

Now, Nightforce makes the further argument that it

purportedly gave some kind of warning to Leupold in 2006 that

its patent was invalid and that Leupold needed to deal with

this.  And then Nightforce draws out of that an argument that

1  Leupold, having that warning, sat on its rights for 10 years

2  and did nothing.

3          That sounds compelling, except that it is not

4  consistent with the factual record.  Nightforce did not say in

5  2006, "Guys, we've looked at your 2003 certificate of

6  correction and we think it puts the claim of priority in the

7  wrong place."  Instead, what Nightforce said in 2006 is "Your

8  patent, on its face, does not include a claim of priority at

9  all; and, therefore, we think that things that are in between

10  1999 and 2000 are prior art and you have a real problem."

11          Leupold wrote back and said, "Hey, guys, there's a

12  2003 certificate of correction.  So that's not shown on the

13  face of the patent, but we really do -- we've corrected that,

14  and we are claiming priority back to the 1999 provisional."

15          What did Nightforce say in response?  Absolutely

16  nothing.  That's the e-mail that Nightforce chose as the time

17  to let the conversation drop in 2006 and refused to respond

18  even when Leupold's counsel called and left a message with the

19  secretary, asking for a response.  No response.

20          So Nightforce can't stand up here and say Leupold was

21  warned.  Instead, the only evidence of when Leupold found out

22  about the argument Nightforce is now making, that the 2003

23  certificate of correction purportedly put the claim of

24  priority in the wrong place, is in 2016.  And we know that

25  when Leupold got notice that Nightforce was making that

1   argument, Leupold went and got another certificate of

2   correction just as extra insurance, just to make sure.

3          And being aware of cases like *Worlds* that say that

4   it's critical to have such a certificate of correction in

5   place before filing suit, Leupold decided to wait just a few

6   months more before filing suit on the '907 patent, as those

7   cases instruct.

8          Nothing about this was in any way deceptive.  And,

9   indeed, that's exactly what Klaus Johnson said.  There was no

10  carve-out in the designation of Klaus Johnson as Nightforce's

11  designee, saying, "He's designated for everything except this

12  defense."  He was designated for this defense.

13         And there was nothing tricky about the questions he

14  was asked.  He was asked very clearly, "Was there anything

15  about Leupold's conduct with respect to patents that you

16  thought was misleading?"  He was given every opportunity, if

17  he thought that Leupold had done something misleading, to say

18  so.  And, indeed, he's never come in and changed his testimony

19  on that.  There's no correcting declaration saying, "Oh, I was

20  mistaken.  I was thinking about the Windauer patents."  That's

21  simply not in the record.

22         But, in any event, even if there had been deceptive

23  conduct, Nightforce cannot tie any reliance both to that

24  deceptive conduct and to resulting prejudice, because that's

25  the kind of nexus that it needs.  It needs to have something

that was misleading; reliance, not just in general but on the
thing that was misleading; and resulting prejudice, not just
in general but because of its reliance on the misleading
thing.

It is absolutely clear from the record what Ray
Dennis was relying on, and that is his conclusion that the
'907 patent would ultimately be found invalid.  And it is also
absolutely clear that nothing Leupold said in 2007, 2008, or
any time between then and 2016 would have caused Ray Dennis to
tell Nightforce -- and he was the ultimate decision-maker --
to change its products.

In fact, Mr. Dennis was so clear about this that he
even said so in his summary judgment declaration in this case,
and that's the slide we have up here.  This is paragraph 17 of
Mr. Dennis's summary judgment declaration, where he says the
only circumstance under which he would have changed his
product.  And that was if Leupold had "brought suit in 2006 or
shortly thereafter" -- and this is the critical part, not only
that Leupold had to sue -- "and prevailed or showed signs of
prevailing."

So even if Leupold had very clearly told Nightforce
in 2006, "We're going to sue you later, just so you know.  Do
what you need to do," even if Leupold had actually sued
Nightforce in 2006, even if Leupold had proceeded with that
lawsuit but not yet showed signs of prevailing, under all of

those circumstances, Nightforce would not have changed its products.

The prejudice that Nightforce is claiming is that it made an investment in its products after it was purportedly deceived. That prejudice is not caused by any reliance on any misleading conduct. That is the cost of Mr. Dennis's business judgment, that he was really sure he was going to win on the '907 patent. So maybe it turns out that he's right and maybe it turns out that he's wrong, but he doesn't get to use the fact that he made that gamble to preclude Leupold from bringing its claim.

Finally, on the issue of prejudice, Nightforce makes an argument that Schmidt & Bender purportedly destroyed some documents at some point. But there's nothing in the record about that. That's merely argument that came out during the argument today. There's no evidence on that. So that can't be the prejudice. And, in any event, it's almost impossible to imagine how that relates in any way to any reliance that Mr. Dennis had.

Once again, what Nightforce is really doing is trying to turn equitable estoppel back into laches. If document destruction were a kind of prejudice, it would be a prejudice that results not from reliance, but from delay. And delay alone is insufficient to establish equitable estoppel.

1                  Proceeding briefly to the two remaining arguments,

2      one of them is about Altenheiner, the binoculars.  Nightforce

3      makes the argument that Mr. -- that binoculars are a kind of

4      telescopic rifle sight, citing some testimony from Mr. Byron.

5      Nightforce cites that testimony entirely out of context.

6                  What Mr. Byron was talking about was an aiming device

7      for counter-sniper fire.  So this is a product that he

8      developed for the military that was ultimately never fielded,

9      but it uses binocular machine vision.  So, in other words,

10     there are multiple cameras mounted on posts some distance

11     apart from each other, and they see the flash when a sniper's

12     muzzle goes off.  And by triangulating that flash between

13     cameras at different points -- in other words, with binocular

14     machine vision -- it can pinpoint automatically, via computer,

15     without human intervention, both which direction the sniper

16     round is coming from and how far away it is, using

17     trigonometry, based on having the binoculars some distance

18     apart.

19                 And the way the system works is it then sounds an

20     alarm so that people near where the shot is coming in have a

21     second or two to duck, because in long-range sniper fire there

22     actually is some period of time between when the muzzle flash

23     happens and when the bullet hits, and it automatically directs

24     counter-sniper fire from some kind of automated battery that

25     sends a mortar or an artillery round or something of that kind

1    back.

2              These binoculars are not telescopic rifle sights.

3    They are an optical aiming system in the sense that they

4    assist in aiming another device, but it's via a computer and

5    entirely different.  Nothing about that experience suggests

6    that the ordinary field binoculars described in Altenheiner

7    are a telescopic rifle sight.  They plainly are not.

8              And, in any event, the question on anticipation is

9    not what Mr. Byron thinks about the binoculars.  It is what's

10   disclosed in the Altenheiner reference on its face.  And on

11   the four corners of the Altenheiner reference, there is

12   nothing in there that suggests a firearm or a rifle of any

13   kind.  Altenheiner, therefore, cannot be anticipating.

14             As to obviousness, it's a repeat of the same

15   discussion about whether Mr. Brandenburg is or is not a

16   qualified expert, which is ripe for decision on the briefing.

17             And I do want to pause for just a moment to go back.

18   Nightforce made several mentions to Leupold's opening brief as

19   being cursory in dealing with the issues -- and there are many

20   of them -- only in 35 pages.  And I just wanted to make sure

21   the Court is clear -- I think we've said this in a footnote in

22   our brief -- as to why we only filed one motion as opposed to

23   multiple motions as Nightforce did, and that's because we were

24   warned in a prior case to keep to one.

25             THE COURT:  Because I said so.

1          MR. BRUNETTE:  That is precisely why, Your Honor.

2    We listened.

3          Finally, Your Honor, getting to the Schmidt & Bender

4    scope, the critical issue here, one of them is the hearsay

5    documents.  There is absolutely nothing to make Hans Bender's

6    statements about what he purportedly thought Schmidt & Bender

7    had done in 1997 as of 2004 or 2006 an admission of Leupold.

8          Indeed, the only question that Leupold's designee,

9    Mr. Worth, was asked is whether he thought that Mr. Bender was

10   a trustworthy person; and he said, in general, yes.  But

11   there's no showing that Mr. Worth knew anything about these

12   e-mails or that Leupold had any reason to know whether

13   anything in these e-mails was or was not true.  That simply is

14   not an appropriate basis for an 801 hearsay exception nor has

15   there been any briefing on this issue.  Nightforce could have

16   taken the opportunity to brief this issue and has not done

17   that.

18         Nightforce also makes the argument, well, you can tie

19   together the advertisements that talk about a scope with a

20   third turret on it with the photos of the teardown, whenever

21   that happened, to reach the conclusion that whatever scope was

22   in there must be the same scope because it has the same name.

23   And they say, well, it's very expressly called out as the same

24   name.

25         I just want to make sure it's clear in the record

1   what that name is.  The scope that was torn down is a Long

2   Range scope.  That's the name that was called out.  And that

3   does not seem to be sufficiently specific to say, well, the

4   Long Range scope that was advertised in 1997 and the Long

5   Range scope that was torn down at some unknown later date --

6   we don't know when -- must have been the same because they

7   both say "Long Range" on them and they happen to be the same

8   objective size.  There is simply no evidence as to what, if

9   anything, Schmidt & Bender was actually selling in the United

10  States in 1997.

11          That's all I have at this point, Your Honor.

12          THE COURT:  Thank you.

13          Anything else?

14          MR. CASIMIR:  Just a brief response on a few of those

15  points.

16          THE COURT:  Sure.

17          MR. CASIMIR:  And I'll just, since it's fresh in our

18  minds, on the point of the Long Range scope, "Long Range" was

19  a Schmidt & Bender brand name.  It wasn't referring to a scope

20  that was useful at long ranges.  It was also that, but it's a

21  brand name.

22          And then also just a quick note on the hundreds of

23  issues in one motion, the issue isn't so much that there was

24  one motion.  The issue is they moved for every -- they moved

25  on every issue in the case in that one motion, including for

1   validity and infringement on claims they've since withdrawn.

2   The issue is they -- the overwhelming onslaught of every

3   issue, many of which are not possibly suitable for summary

4   judgment.

5        But let's get into some of the specifics here.  So

6   let's start, very quickly, on the infringement issue.

7        THE COURT:  Can I interrupt you for a second?

8        MR. CASIMIR:  Sure.

9        THE COURT:  On the first point you made regarding

10  Long Range, is that something that is ascertainable from the

11  evidence that's before this Court?

12       MR. CASIMIR:  It is.  The catalog from 1997 lists the

13  two brand name scopes that added the side parallax.  One was

14  called a Varmint.  One was called the Long Range.

15       THE COURT:  Okay.  Thank you.

16       MR. CASIMIR:  All right.  Very quickly on the

17  infringement, the key issue here is we have an undeveloped

18  record and arguments from Leupold based on undeveloped claim

19  construction positions.

20       We heard an argument about whether the actuator needs

21  to be fully inside or outside of the scope, but the issue here

22  is in the claimed invention the actuator and the cam are part

23  of the knob.  In the accused infringing product the alleged

24  actuator is a different component inside the scope; it's not

25  part of the knob.

1          And it gets into layers of claim construction in this

2     undeveloped record we haven't gotten to, but just as an

3     example, on slide 73 on the screen here is a description from

4     the specification of the '907, explaining what the invention

5     is, not what are embodiments of the invention, but what the

6     invention is.  And it was the idea of having the cam and the

7     actuator together in the knob positioned above the housing.

8          So it says, from the specification here, "The focus

9     control knob of the present invention" -- not of the

10    embodiments, but of the invention -- "includes a cam hub

11    mounted to the housing for rotation about an axis of rotation.

12    The cam hub includes a drive face positioned facing the

13    interior of the housing and a spiral cam track formed in the

14    drive face around the axis of rotation and spiraling outwardly

15    from the axis of rotation.  An actuator slide positioned

16    between the cam hub and the housing of the sight includes a

17    cam follower slidably engaged with the spiral cam track."

18         It then goes on to talk about particular embodiments.

19    But the description of what the focus control knob is, it

20    includes those two components together and specifies that the

21    actuator is positioned between the cam hub and the housing.

22    And that's consistent with the claim language, where the

23    actuator is part of the knob.

24         In the accused infringing products, it's not.  It's

25    this free-floating component on the inside that just the tip

1   of the bushing can interact with the under portion of the

2   knob, but it's not part of the knob.

3          Again, that's just an example of where, you know,

4   there's layers of record that we would have to go through to

5   do claim construction, which in their cursory summary judgment

6   motion Leupold did not do.

7          Along those lines, there's also two experts with

8   opposing opinions on these points, not all of which have been

9   resolved in the record here.

10          Turning to the date of invention, keeping in mind

11   that Nightforce's position is there's no evidence of reduction

12   to practice, we heard Leupold argue and give some quotes about

13   some testing that might have been done.  But the problem is

14   they have no evidence of when that testing got done, and

15   that's the problem in meeting their burden of proof.

16          Everything from the 1995-'96 date is tied to those

17   invoices, which were first used to pollute Otteman's

18   declaration, which were then shown to Landvatter.  There's no

19   evidence that any testing that might have been done was done

20   prior to the German publication, and none of the quotes that

21   you just saw put a date on it.

22          The burden of production on this issue was and is at

23   all times Leupold's to show earlier invention.  So they also

24   raise the question about why, in their opening motion on

25   validity, they didn't raise these issues.  But they've had

1    the burden.  So when they filed for a motion on validity of

2    the '907, and they were aware of the German publication being

3    the key prior art, they needed to show in that opening motion

4    that there was reduction to practice, that a prototype was

5    made in the relevant time period, and that it worked for its

6    intended purpose in the relevant time period.  They failed to

7    do that.

8        Regarding testing, we heard a discussion of some of

9    the case law.  I encourage the Court to review the various

10   cites.  It's very clear riflescopes require testing, in view

11   of all of the case law.  How else do we know that?  Leupold's

12   expert, Byron, told us that.  And Leupold's position across

13   the board, before summary judgment, was that testing was

14   required for the design of the '907 adjustment knob.

15       Last point on the earlier invention:  Once again

16   Leupold has pointed to conception, alleged conception evidence

17   to suggest that a prototype was made and that it worked for

18   its intended purposes.  The drawings they use for conception

19   don't show all the parts.  They're not a prototype.  They

20   don't show a picture of the prototype.  They don't tell us

21   when or if a prototype was made.  Mr. Landvatter never saw a

22   prototype.  There's just no evidence that a prototype was made

23   or tested prior to the German publication.

24       Turning quickly to the estoppel issue, just a

25   correction on the interpretation of the Central District of

1    California case.  Mr. Brunette argued that it maybe shouldn't

2    be followed as a decision because it imports the concepts of

3    laches into its arguments and its holdings, and it's just

4    simply not the case.

5            The Supreme Court got rid of laches because it was

6    unnecessary, because the patent statute says you can only go

7    back six years for damages.  The Central District of

8    California case is addressing that issue, that after you wait

9    more than six years, the silence becomes not just regular

10   misleading silence, but inexplicable misleading silence

11   because you're giving up damages.

12           Absent the laches doctrine, that's also true.

13   There's a six-year window of sliding damages.  If you wait

14   seven years to sue, you've given up a year of damages under

15   the patent statute, not just laches.

16           That's all I have.

17           THE COURT:  Thank you.

18           Anything else?

19           MR. BRUNETTE:  Your Honor --

20           MR. CASIMIR:  Oh, I'm sorry.  Mr. Davis may have one

21   quick point on the issues he raises.

22           THE COURT:  Mr. Davis, I don't want to take away your

23   moment in the sun.

24           MR. DAVIS:  Thank you, Your Honor.

25           So just quickly responding to some of the points made

on the priority date motion, the unclaimed element argument
that we keep hearing is simply inapt here, and especially the
lens cap analogy.  We're not talking here about adding an
accessory to a scope having the spiral cam mechanism or a
groove or a ridge or a rail.  What we're talking about here is
the claimed elements in the '907 patent of a cam track and a
cam follower.

And the fact is that Leupold claimed in 2000
iterations of cam tracks and cam followers that were not
disclosed in 1999.  And I provided examples on this slide 54
for the Court, and there's never been an argument that any of
these three examples is not within the scope of all of the
asserted claims, including Claims 6 and 16, nor is there any
express disclosure of such embodiments, including the later
disclosed ridge or rail, in the 1999 application.  Leupold has
never seriously disputed there's no express disclosure of
anything but the recessed groove in the 1999 application.

Then the issue becomes whether somehow a person of
skill in the art, reading the 1999 application, would be able
to see in that application what you and I cannot or something
that's not there.  And the answer to that could vary based on
the disclosure and the art we're talking about here.

But this is not a battle of the experts as counsel
argued.  In support of Nightforce's summary judgment motion on
this issue, we cited to no expert testimony from Nightforce's

1    experts because this is a burden of production on Leupold.

2         So the only issue in this motion is Byron's

3    testimony, and there is nothing in Byron's testimony to

4    support that Mr. Otteman possessed a ridge or rail or any

5    other embodiment of a cam in 1999 that can be discerned by

6    viewing the 1999 application.  Byron's report is extremely

7    conclusory on this.

8         If I might switch to the document camera --

9         (Pause) It's displaying on the camera.

10        (Off-the-record discussion between counsel and the

11   clerk.)

12        MR. DAVIS:  I have a copy I could hand up, Your

13   Honor, if that would --

14        THE COURT:  Sure.

15        We'll blame it on the government shutdown.

16        (There is a brief pause in the proceedings.)

17        MR. DAVIS:  There is still money left for the

18   document camera electricity after all, at least for a week

19   maybe.

20        So I mentioned earlier in the argument Byron's report

21   on this issue of the priority of the 1999 application, and the

22   substance of it is highlighted here in its entirety from

23   paragraph 332 of his declaration.  The beginning portion of

24   this merely recites what Mr. Brandenburg was arguing.

25        And then he goes on in this highlighted portion, at

1    ECF 83-2 at 149, to explain why he thinks that -- his opinion

2    on the priority issue boils down to nothing more than a person

3    of skill in the art would recognize that a spiral cam track

4    that is a groove and a cam follower that is a rail is merely

5    the inverse of a track that is a ridge or rail with a follower

6    such as a fork that fits around the rail or ridge.

7         So whether a person would readily recognize that it's

8    the inverse is exactly the obviousness standard I was alluding

9    to earlier.  He's not referring to the 1999 application and

10   suggesting that there's any reason that a person reading that

11   1999 application would believe not that it's obvious to do it

12   a different way, but that this inventor, Otteman, was in

13   possession of that alternative.

14        There's no tie in this report to the document in the

15   1999 application.  And why a person looking at that document

16   would think that Mr. Otteman was in possession of the ridge or

17   rail embodiment when it's not mentioned anywhere in the 1999

18   application -- recognizing that a ridge is the inverse of a

19   groove is an obvious observation, but that's not the test

20   under *TurboCare* and other Federal Circuit cases.

21        So the 1999 application is simply not a disclosure of

22   a ridge or a rail that was expressly disclosed in 2000.

23        Also, Mr. Byron's report here, which he swore to for

24   the purpose of summary judgment, is simply too conclusory and

25   entitled to no weight for summary judgment purposes.  I

1    mentioned the *Arthur Collins* case earlier, and the *D Three*

2    case that's come up a lot today also goes directly to this

3    issue as well.

4           These conclusory assertions by an expert that the

5    expert sees what we cannot in the four corners of a document,

6    without any supporting analysis, effectively what the *D Three*

7    Court says is there's no answer to the question "Why?"  Why

8    would a person reading the 1999 application think that this

9    inventor was in possession of something that's not within the

10   four corners of the document?  It's just a conclusion he

11   states without any supporting reasoning.  And under Federal

12   Circuit summary judgment law, it's entitled to no real weight.

13          And then I think there was also a question earlier

14   about claim construction and how that interplays with the

15   disclosure of the 1999 application.  It's not for the experts,

16   Your Honor, because this idea of a "groove" is in fact a claim

17   term, and it's a term that happens to also appear in the 1999

18   application.  But interpreting that term in the claims is

19   something Your Honor has already done for the purposes of this

20   case.  And the Court's construction inherently requires that a

21   groove, ridge, and rail be separate and different things and

22   that -- and there's no reason a different interpretation could

23   be applied to the 1999 application.  The Court construed a cam

24   track as follows, quote:  a groove, ridge, or a rail that is

25   curved along its length, for engaging a cam follower, at ECF

1    69, page 21.

2              So the idea that a groove could inherently disclose

3    or include a ridge or a rail in 1999, in that application, has

4    no support and would be contradictory to the Court's -- the

5    inherent impact of the Court's construction.

6              So even if we credit Byron's explanation here on the

7    document camera that -- or his opinion that the idea of a cam

8    being a ridge or a rail as the inverse and easily recognized

9    as the inverse of a groove, that doesn't get them there for

10   purposes of summary judgment.  There's no explanation of why,

11   and certainly no explanation of why a person of skill in the

12   art could read the 1999 application and see something that's

13   not within the four corners of the document, which is the

14   test.

15             In the *Ariad* en banc decision from the Federal

16   Circuit, the test is an objective inquiry into the four

17   corners of the 1999 application, *Ariad*, 598 F.3d at 1531.  And

18   there is simply no basis to conclude that an objective reading

19   of the 1999 application would disclose to a person of skill in

20   the art or anyone else a cam that is not a groove.

21             And that's where their problem came in, because we're

22   not talking about unclaimed elements.  What we're talking

23   about is a claimed element of a cam track and the claimed

24   element of a cam follower.  And there's been no real debate

25   that cam tracks and cam followers that were not disclosed in

1    1999 are within the scope of the later claims in 2000, so

2    there is no priority back to the 2000 application.

3            And lacking priority, there is no debate between the

4    parties that without that priority claim being effective,

5    giving them a filing date of 1999, the '907 patent and all of

6    the asserted claims within it are invalid.

7            Any questions about this segment, Your Honor?

8            THE COURT:  No.  Thank you.

9            MR. DAVIS:  Thank you.

10           THE COURT:  Anything else?

11           MR. BRUNETTE:  Your Honor, if I may respond very

12   briefly.

13           THE COURT:  Sure.

14           MR. BRUNETTE:  I can just stand up and do it from

15   here and save a second.

16           THE COURT:  Whatever you like.

17           MR. BRUNETTE:  So, first, with respect to the

18   priority issue, a critical distinction is between the claim

19   language that was construed, which says a cam track is a

20   groove, ridge, or rail, and the fanciful embodiments that

21   counsel has come up with that are up on the screen, which are

22   a groove and a ridge, which would not fall within the claim

23   language.

24           In other words, an additional element, whether that

25   additional element is a second version of an existing element,

1  such as a second scope housing, a second groove, or a pair of

2  fuzzy dice attached to the scope, whatever that additional

3  element is, it is not required to be described within the

4  specification.  That's what the Federal Circuit said in

5  *Lochner*, and there is no contrary authority.

6         Second, as to the Byron declaration, Byron asserts

7  and applies the correct legal standard, and counsel simply

8  disagrees with his conclusion.  That is not a sufficient basis

9  to enter summary judgment.

10        In addition, Nightforce's own expert,

11 Mr. Brandenburg, admitted that cams have been known and

12 applied in a variety of different ways for thousands of years,

13 entirely consistent with Mr. Byron's testimony that a person

14 of skill in the art would recognize that Mr. Otteman possessed

15 both the groove and the ridge or rail embodiment.

16        Finally, Nightforce ignores the authority contrary to

17 its position, such as the *Trading Tech.* or *Hologic* cases,

18 which make clear that a single example can be sufficient to

19 disclose an entire genus, such as the genus of single-click

20 user input devices discussed in *Trading Technologies*.  Thus,

21 the single example of a groove is sufficient to disclose the

22 genus of cam followers that also include ridges or rails.

23        Turning to infringement, counsel makes an argument

24 that actuator is an issue that needs further development for

25 claim construction before summary judgment can be decided.

1    However, that ignores that this Court has already construed

2    the meaning of "actuator" in the '907 patent.

3               In any event, the specification example called out by

4    Nightforce is not a limitation of the claims, and the claims

5    are written more broadly than that example discussed in the

6    specification.  That is normal, and there is nothing wrong

7    with that.

8               Finally, as to an invention and reduction to

9    practice, under a rule of reason, there is ample evidence of

10   when the prototype scope was tested.  Mr. Landvatter testified

11   that it was tested soon after his delivery of the prototype.

12              Mr. Landvatter also examined the financial documents

13   and, after looking at them, agreed that they definitely

14   related -- at least some of them related to the spiral cam

15   product.  And the 1995 undisputed electronic documents showing

16   that Mr. Otteman created the drawings that were given to

17   Mr. Landvatter in 1995 and that they were preserved unchanged

18   a year later, in 1996, are all circumstantial evidence that,

19   under a rule of reason, more than adequately corroborate the

20   date of the testing.

21              Thank you, Your Honor.

22              THE COURT:  Thank you.

23              Shall we move to the next topic?

24              MR. PARK:  Sounds good, Your Honor.  Thank you.

25              MR. CASIMIR:  Now, we might want to have a discussion

1   about process.

2         How much more time do we have today?

3         THE COURT:  My brain is probably good for another

4   hour, a little bit more.

5         MR. CASIMIR:  Okay.  So the next one we had queued up

6   was the set of five locking patents.  It is impossible to get

7   through those within an hour.

8         There are two patents, I think, in the case we could

9   get through within an hour.  One is the flip cap patent, which

10  I'm not recommending we do.  The damages in that one are a

11  triviality.  I believe their damages expert said it's worth

12  $80,000.  Ours said that it's worth $5,000.  I don't know that

13  we should prioritize that.

14        The other is the '067 patent.  The issues are pretty

15  simple.  I think we could complete that within an hour.  The

16  other ones, we don't have a prayer.

17        THE COURT:  Oh, okay.

18        MR. PARK:  It seems like the five locking turret knob

19  patents all deal with similar mechanical concepts.  We have

20  the three Windauer patents, and then we have the pinch turn

21  and the ZeroLock.

22        We also have -- I agree that the flip-up lens cap

23  probably does not need to be argued.  It's also the subject of

24  ongoing settlement discussions, which we hope will be

25  completed soon.  And then there is the government contract

1  defense that Nightforce has raised.

2          So depending on the Court's preference and the time

3  we have, the government contract defense I think we could

4  certainly get through today, both sides' arguments.  I agree

5  with Mr. Casimir that in terms of the locking turret knob

6  patents, though, it would be aggressive, even if we took a few

7  of them and tried to cleave those arguments.

8          THE COURT:  You know more about how long everything

9  is going to take than I do.  You have an hour.  It's your

10 nickel.  You get to spend it however you want.

11         MR. PARK:  And, Your Honor, I know we talked about

12 timing at the beginning of today's session.  After the hour,

13 both parties would understand that we're done with the

14 argument.

15         THE COURT:  I've got more time.  If you need more

16 time to finish up, I can give you another day.  I had a couple

17 of trials that went away, so that freed up some time.  I think

18 I have time in February to finish up.  If you want, I can give

19 you a date.  You could look at your calendars right now.

20         That's what I like about federal court.  Things open

21 up.

22         Let's see.  I think in the middle of February we had

23 time.

24         THE CLERK:  The 12th or 13th would be probably best.

25         (The Court and the clerk confer off the record.)

1          THE COURT:  So I have time on -- it's a Tuesday and a

2     Wednesday, the 12th and 13 of February.

3          MR. PARK:  The 13th would work for us.

4          Would that work for you?

5          MR. CASIMIR:  The 13th also works for me, yes.

6          MR. DAVIS:  Yes.

7          THE COURT:  So we'll schedule you at 9:00.  I have

8     the whole day.  I hope we'll be finished in less than the

9     whole day.

10          MR. PARK:  Yes.

11          THE COURT:  If not, that's fine.  We'll give you the

12     day.

13          MR. PARK:  Okay.  Thank you, Your Honor.

14          For purposes of today, shall we make progress on the

15     government contract defense?

16          MR. CASIMIR:  That's what we're thinking as well.

17     That can definitely be done in the time period, and then it

18     keeps related subject matter together.

19          MR. PARK:  Sounds good.

20          THE COURT:  Let's do that, then.

21          By the way, while you're walking up there, did you

22     all get a time with Judge Beckerman yet?

23          MR. PARK:  Not yet, Your Honor.  We're working on it.

24          THE COURT:  Okay.

25          MR. PARK:  Mr. Brunette, if I could have you put up

1    docket 137 on the projector, please.

2            MR. BRUNETTE:  It should be up, if you hit

3    "Attorney 2."

4            MR. PARK:  Thank you.

5            And if you could display, starting with page 3, that

6    would be great.

7            For the record, I'm Brian Park on behalf of the

8    plaintiff, Leupold & Stevens.

9            Your Honor, with respect to the government contractor

10   defense that Nightforce has asserted under 28 USC Section

11   1498, with the exception of fewer than a handful of sales,

12   Nightforce asserts that its sales to the U.S. government enjoy

13   a broad blanket immunity from patent infringement based on

14   this concept of implied consent, and that's to be contrasted

15   with the concept of express authorization and consent where a

16   specific contract provision incorporates a provision of the

17   FAR, the Federal Acquisition Regulations, specifically, for

18   example, FAR clause 52.227-1.  Where that clause is missing,

19   the law requires that there be a sufficient showing of implied

20   or implicit consent.

21           However, on their face, the vast majority of orders

22   for which Nightforce claims immunity do not enjoy

23   authorization and consent under the transaction's own terms.

24   And in the Ferris declaration we have here on the projector,

25   we have undertaken to go through a number of the transactions

for which Nightforce claims this immunity and explain why the
authorization and consent is lacking; why the FAR clause is
lacking; or, if there is a FAR clause that's invoked, why the
thresholds required under the contract's own terms or the
purchase order terms or the FAR clause terms aren't satisfied.

Now, in support of Nightforce's argument that FAR
clause 52.227-1 is optional under the so-called simplified
acquisition procedures that are used for many of Nightforce's
government sales, the parties dispute legally what the term
"optional" means in this context.  "Optional" does not mean
automatically immune or automatically applicable.  It just
means it can be included or not included.  It doesn't have to
be included.  But, of course, if the authorization and consent
provision is not included, then it's not applicable.

Nightforce also argues in its summary judgment reply
brief on this issue that it would be somehow unfair for the
government on the one hand to say that the authorization and
consent clause is optional, but then on the other hand for the
Court to find that such sales are not covered by this concept
of implied authorization and consent under Section 1498(a).

But there's nothing unfair about that at all.  Why?
First, not every sale to the U.S. government is intended to be
immune from liability.  And the case law that both sides have
cited make this abundantly clear.  It's not an automatic
immunity.

1          Two, there is no immunity if there are non-infringing

2     alternatives to the patented technology.  If the contract does

3     not require that there be patent infringement, there's no need

4     for immunity in the first place.  And that's another reason

5     why the FAR clause need not be included in the terms of the

6     contract.

7          Now, authorization and consent can be implied, that's

8     true.  But the law requires more of a showing than merely a

9     contract formation.  It's not automatic.  To meet that burden,

10    Nightforce has to make the requisite showing, because the law

11    has indicated that sovereign immunity, of course, is not to be

12    taken lightly or to be liberally applied.  The law states that

13    waivers of sovereign immunity are actually to be strictly

14    construed.

15         And this is discussed in the *Irwin v. Department of

16    Veteran Affairs* case cited in the briefing, 498 U.S. 89, page

17    94, from 1990.  The law states that authorization and consent

18    requires, quote, explicit acts or extrinsic evidence

19    sufficient to prove the government's intention to accept

20    liability for a specific act of infringement, end quote.  This

21    is from the *Larson v. United States* case, 26 Cl. Ct. 365, at

22    pages 369 to 370, from 1992.

23         That makes sense.  Otherwise, contractors would

24    always enjoy blanket immunity on all deals with the

25    government, and the U.S. government could be sued on any and

1    every commercial transaction it engages in.  Plainly that's
2    not the law and plainly that's not the government's intent.

3         So how does one tell the difference?  If there is no
4    applicable FAR clause that's built into or incorporated into
5    the contract, how does one determine if there is authorization
6    and consent or not?  And that's exactly how the issue is
7    joined by virtue of the three-prong test for implied
8    authorization and consent, and that test is set forth in the
9    *Larson* case from the Court of Federal Claims -- or, excuse me,
10   the U.S. Claims Court.

11        Now, it's noteworthy that the U.S. Claims Court,
12   which is now called the U.S. Court of Federal Claims, is the
13   court with jurisdiction over lawsuits against the U.S.
14   government for money damages, including for patent
15   infringement.  That specific court in D.C. deals with
16   sovereign immunity issues all the time.  It deals with
17   authorization and consent issues all the time.

18        And under the *Larson* jurisprudence, the three-prong
19   test for implied authorization and consent requires, first,
20   that the government expressly contracted for work to meet
21   certain specifications; second, that the specifications cannot
22   be met without infringing the patent at issue; third, that the
23   government had some knowledge of the patent infringement.

24        Again, conceptually this makes sense because if the
25   government is going to be held to this standard of implied

1    authorization and consent, it needs to know what it's

2    authorizing and consenting to, specifically some form of

3    patent infringement.

4         Nightforce's attempt to distinguish the government

5    contract cases cited in the briefing rings hollow.  Under the

6    Patent Act, a patent claim is infringed by any number of

7    activities.  It can be by making, using, selling, offering to

8    sell, or importing an infringing device.  Whether the

9    infringer is contracting with the government to make and sell

10   infringing products or to use the patented invention and

11   infringe in that way is irrelevant.  Instead, the key point is

12   whether a private party is doing something by contracting with

13   the government to do some act that infringes a patent; and, if

14   so, is the three-part test that we just outlined satisfied?

15        To support ignoring the three-part test that -- thank

16   you.  To support disregarding the three-part test from *Larson*

17   for implied authorization and consent, Nightforce relies on a

18   number of unpublished decisions, decisions like the *Nasaka*

19   case from the Eastern District of Virginia, 1994, or the

20   *Racing Optics* case from the Middle District of North Carolina,

21   2017.

22        Those cases highlighted by Nightforce in its briefing

23   are distinguishable in a couple of respects.  One key point is

24   that the patentees in those cases sold the patent-infringing

25   device only to the government and exclusively to the

government.  The government was the only customer for the infringing device, and it was on an exclusive basis.  And so there's logically a natural inference that by requesting that device and having it be sole sourced to the government and only the government, that authorization and consent can be implied.

        And, by the way, another distinction from the *Nasaka* case is that the U.S. government's authorization and consent was not really in question because over the course of the dispute, a patent attorney working on behalf of the Pentagon reached out to the patent owner and said, "Hey, we see there's a patent infringement dispute here.  If you want to do something about it, you need to sue in the Court of Federal Claims or initiate some sort of administrative action with respect to your patent rights."

        So there is no question that the government knew about the patent infringement, wanted the patent infringement, and appeared to put the patent owner on notice that if the patent owner wanted a remedy, they needed to go after the government, a clear case of implied authorization and consent.

        That, though, is not the case here.  Here Nightforce sells the accused infringing products to many different customers, to the U.S. military and also to the private sector, through the commercial markets.

        Further, there are eight separate patents-in-suit in

this case.  There's been no showing from Nightforce that the
government specifically wanted riflescopes that had all of the
patented features.  And those patented features, as we've
discussed over the course of this case, deal with many
different aspects of the riflescope technology.

Nightforce has also not shown that the government
expressly requested the infringing product.  That's prong 1
from the three-part test I discussed.

Nightforce's government contracts are not in
evidence.  We have a bunch of purchase orders from its prime
contractors for which it subs.  And to the extent they don't
exist, they can't be used to show that the government
authorized implicitly some form of authorization and consent.

At most, what Nightforce has attempted to show is
that the prime contractor, the contractor that formed the
relationship with the government for whom Nightforce then
subs, that the prime contractor issued a purchase order to
Nightforce saying, "We would like you to supply us, the prime
contractor, with a certain product that we can then use to
fulfill the government's requirements."  But, of course, a
prime contractor can't implicitly authorize and consent to
patent infringement on behalf of the government.  Only the
government can do that because it's a form of sovereign
immunity.

In terms of prong No. 2 from the three-part test,

Nightforce also has not shown that the government requirements
can't be met without infringing Leupold's patents-in-suit.  In
fact, there are many available technologies out there.  And
absent such a showing, there is no implied authorization and
consent.

In terms of prong No. 3, Nightforce also has not
shown that the government has any knowledge of the patent
infringement, much less of this patent litigation.  We don't
know if Nightforce has informed the U.S. government of this
patent dispute.  And there's no evidence in the record that
the government has known about it.  Certainly they've not
appeared and attempted to intervene or to notify Leupold, as
in the *Nasaka* case, that there was a remedy elsewhere.

Absent those showings, there's a gaping hole in
Nightforce's invocation of the government contractor defense.
If there are situations where in fact there is express
authorization and consent and all the criteria for that
express authorization and consent are satisfied, then fine.
And, as I mentioned at the beginning of my remarks, it appears
there are two recent examples where that appears to be the
case, and that's fine.

For the vast majority of the transactions here for
which Nightforce is trying to invoke this shield, there's no
such showing.  There's no express FAR clause that's written
into the contract.  In fact, there's no contract that we have

1  seen that's in evidence.  And there's no groundwork, no legal

2  framework that's supported by competent evidence to apply

3  implied authorization and consent.

4          And so for those reasons, summary judgment should be

5  granted for Leupold on that defense, at least with respect to

6  the contracts, the transactions for which Nightforce claims

7  it's implied.

8          If there are no further questions or if there are no

9  questions, Your Honor, I think I'll pass the mic to

10  Nightforce's counsel.  And then I'd like to reserve some

11  rebuttal.

12          THE COURT:  Fine.

13          MR. PARK:  Thank you.

14          MR. CASIMIR:  Mr. Davis will be making the argument,

15  and I've got copies of his slides (handing).

16          THE COURT:  Thank you.

17          MR. DAVIS:  Your Honor, just to be clear for the

18  record, this is an issue on which both parties have moved.

19  Nightforce has moved for summary judgment that its government

20  sales are immune, pursuant to Section 1498(a); and Leupold has

21  moved against that defense on the theory that there's no

22  evidence from which a reasonable jury could conclude the

23  defense applies.

24          So for context, we ought to take a step back here and

25  think about the argument that Leupold is making here, which is

1  surprising, given that they're a government contractor
2  supplying the military as well.

3          So Nightforce's sales are exactly the kind of sales
4  that this defense was meant to apply to.  The genesis of
5  Section 1498(a) was the 1918 Act passed as a result of the
6  Secretary of the Navy complaining that there was a concern
7  patent infringement allegations could prevent the Navy from
8  getting the materials and supplies it needed, and they did not
9  want threats of patent infringement to get in the way of
10  national defense.

11          That Act was very similar to the current iteration in
12  28 USC Section 1498(a), and these military sales are exactly
13  what should be protected by it.  If the Navy Seals and other
14  special operations units who use Nightforce products
15  specifically want and think that the Nightforce product is one
16  they need, then 28 USC 1498(a) ought to make sure they get it
17  without Nightforce having any concern about a patent
18  infringement suit from Leupold, who no doubt would have liked
19  to have made that same sale, but lost it to the superior
20  Nightforce product.

21          It would be very scary to interpret the law as
22  Leupold is advocating it, because it would essentially be an
23  impediment to the implementation of 1498 and its predecessor,
24  the 1918 Act, as Congress intended.  There is no case that
25  Leupold has cited that denies the defense of supplying

1   critical military and war supplies to the U.S. government and

2   its military branches or its law enforcement, and those are

3   exactly the sales that are at the core of Nightforce's motion,

4          There's a mention of express consent, and I guess

5   there's no debate that those contracts that have the express

6   consent clause are covered, and sales pursuant to those would

7   be covered by the defense.

8          The big issue is implied consent.  And the reason

9   that's a big issue is Leupold complains that there's no formal

10  contract to support those sales, to explain the government's

11  motivation or what it knew about whether there was patent

12  infringement.  But that's the whole point of the simplified

13  acquisition procedures that are used to purchase these kinds

14  of supplies in relatively small quantities.

15         Simplified acquisition applies, per regulation, to

16  sales under $150,000.  And almost all of Nightforce's sales to

17  the U.S. government are that.  They're for just a few scopes.

18  If we look at slide 126, this is an example.  It's for 120

19  scopes.  It's not a huge order.  Most of these are used in

20  relatively small quantities by special -- for very special

21  purposes, special operations and the like.

22         Now, there's not a lot of detail in a typical order,

23  but there is some information there that supports Nightforce's

24  position.  The government is telling us that these products

25  must be certified for national defense use.  They're mil spec

1    products.  There was a suggestion that these products are sold
2    to others.  Mil spec generally is not sold by Nightforce to
3    civilians or non-government entities.
4         THE COURT:  Are these contracts that are directly
5    with the government or -- is this an example of a contract
6    that's directly with the government or is being filtered
7    through a third party or can you tell from the exhibit?
8         MR. DAVIS:  I honestly don't recall from this
9    exhibit.  This may well be one that's through a prime
10   contractor.
11        THE COURT:  And from your perspective, that doesn't
12   matter.  As long as it's a government contract, the purposes
13   of the statute are met; and the prime contractor, as well as
14   the subcontractor, is protected.
15        MR. DAVIS:  Absolutely, Your Honor.  The statute is
16   clear and the implementing regulations are clear that the
17   protection flows down to subcontractors, and that's the
18   intent.
19        The three-part test that Leupold argues Nightforce
20   can't meet isn't really relevant.  Their own cases state
21   exactly the point that we're making.  There's a different test
22   that they aren't mentioning.  The three-part test is one way
23   to show implied authorization and consent, but in the District
24   Court decision of *Madey v. Duke*, 413 F.Supp.2d 601, at 609,
25   "Implied authorization and consent will also be found where

the government requires the private contractor to manufacture the allegedly infringing device."

Nightforce submits that's exactly what happens here, because the government orders a specific Nightforce model number.  I've highlighted it in blue here on Exhibit 127 for an order that went directly to the FBI from Nightforce.  They specify the Nightforce Optics model C297 scope.

Now, it can't possibly be Leupold's argument that the FBI or another government agency, the special operations units of the military, don't know what specific model -- what comes in -- what features are in specific Nightforce models.  That's exactly what the government wants, and that's exactly what Nightforce is obligated to deliver pursuant to these contracts.

It would be a breach of contract, Your Honor, if Nightforce received an order from a government agency for a model like C297 and changed it because of an alleged patent infringement problem to be something different for the government.

THE COURT:  I think they're taking the position that they couldn't accept the negotiations in the contract in the first place if they know that you're selling an infringing product.

MR. DAVIS:  The parties don't seem to agree on what the law is here, Your Honor.

1          THE COURT:  All right.  That's my job then.

2          MR. DAVIS:  Yeah.  Well, that the government need not

3    know of or require the infringement, that's not the test.  The

4    implied authorization and consent applies whenever a specific

5    product is ordered by the government and that's what's

6    delivered.  And if it happens to have features that are

7    accused of patent infringement, if those are features the

8    government wanted, then it's absolutely covered.

9          And we're talking here about on some of these

10   contracts -- loosely called because they're such simple

11   documents.  Many of them are on what's called Form 1449, and

12   there's very little to it.  It looks more like a purchase

13   order than anything else.  There's not a lot of contract

14   language.  But that's the whole point of simplified

15   acquisition, to make that speedy and get these things

16   delivered to the people who need it.

17         On slide 126, the part description refers to the

18   ZeeroStop elevation brake, which just happens to be an accused

19   feature in this case.  But it need not specify that.  The

20   point is the government knows what it's getting when they

21   order a specific part number from Nightforce, and Nightforce

22   is obligated to deliver it notwithstanding any possible

23   allegation of patent infringement.

24         Just briefly, to distinguish one of their cases, the

25   *TecSEC* case involving Adobe software, the issue in that

1   case -- first, it may well have been wrongly decided.  The
2   District Courts don't seem to apply 1498 in ways that can
3   necessarily be perfectly harmonized.  But, in any event, in
4   that case the Court was concerned that the specific feature of
5   this Adobe software wasn't necessarily even requested by the
6   government.

7           These products are very different, Your Honor.  As
8   we've seen through the various presentations on the summary
9   judgment motions on the merits, I mean, virtually every piece
10  of this Nightforce product is accused of patent infringement
11  in some way.  They accuse lens caps.  They accuse the
12  adjustment knobs.  They accused the pivoting lens unit inside.
13  I mean, there's virtually nothing left, other than the housing
14  or the fact that it's a riflescope.  All of these features
15  can't be taken out of a product to avoid patent infringement
16  allegations when it's supplied and sold to the government, and
17  the government knows that.

18          So this seems, to us, to be a clear case where
19  implied consent ought to be found for each of the purchases by
20  the U.S. government from Nightforce.  And the record has a
21  pile of these documents in it, amounting to several thousand
22  Nightforce scopes.

23          But, you know, going back to the original point, the
24  spirit and intent of this law, it simply can't be that the
25  government can't, on a simple form, or even without maybe a

1  paper form but a handshake, get a specific specialized piece

2  of equipment like one of these riflescopes for use by its

3  special forces or law enforcement without negotiating or

4  knowing about or inquiring about whether there's alleged

5  patent infringement.  It's simply not a requirement that they

6  know of any alleged patent infringement.  It simply is enough

7  that they order a specific product and that's what's

8  delivered.

9        And that's exactly what the Act of 1918 and the later

10  1498 was meant to allow for, so that our military and our law

11  enforcement agencies can get the equipment they need without

12  any threat of patent infringement getting in the way.

13        THE COURT:  Is there something in the documents that

14  came through third parties to your client that would alert

15  them that what they were ordering was, in fact, for the

16  government?  I mean, is that -- is that even a necessary

17  requirement, or that it happens to be for the government gives

18  them protection?

19        MR. DAVIS:  So I think, Your Honor, you're asking

20  about the sales that go through a primary contractor to the

21  ultimate government purchaser.

22        So the way those really work is -- as outlined in the

23  Bill Bracken declarations that we've submitted with this

24  issue, what really happens is it may be funneled through a

25  larger prime contract, a single smaller purchase, but this is

1    what the military does apparently.  You know, they'll issue

2    like a large contract for tens or hundreds of millions of

3    dollars to a select number of prime contractors, and they get

4    what they need.  They literally have a catalog of stuff, and

5    they get what the government orders from the subs.

6          But the greater point is do they know where it's

7    coming from and going?  Oftentimes, as Bill Bracken explained,

8    what happens is the ultimate purchaser, like Navy Seals, for

9    example, are in direct contact with the salespeople at

10   Nightforce, and it's just an expediency that the actual money

11   is flowing through a prime contract.

12         So the government knows exactly what they're

13   ordering.  The prime contractor knows what's happening,

14   obviously.  And Nightforce ultimately gets paid via the prime

15   contract.  But the government is effectively ordering the

16   specific model number directly from Nightforce.  It's just

17   being paid via contract.

18         THE COURT:  But if the prime contractor is somebody

19   who has an existing relationship with the subcontractor and on

20   a continuing basis is ordering the same thing -- and I don't

21   know if I'm describing reality or not.

22         But if that's the reality, it might make some

23   difference to me -- again, I'm going to go and read the

24   statute and do statutory interpretation, right.  But it might

25   make some difference to me if the subcontractor, your client,

1  knows and is aware that really the ultimate purchaser in this

2  case is the government:  "I don't need to worry about

3  infringement because I'm actually selling to the government,"

4  as opposed to "I'm selling to a prime contractor and I have no

5  idea where those scopes are going, whether it's to the

6  government or not."

7         Now, I don't know whether ultimately, when I'm

8  deciding this issue, that will make a difference or not.  And

9  I don't know whether that evidence is something that exists in

10 the record or not.  But I'd like you to address that point.

11        MR. DAVIS:  Absolutely, Your Honor.  It's a great

12 point.

13        And absolutely Nightforce knows where its scopes are

14 going.  And they know exactly the special operations unit,

15 branch of the military, law enforcement agency.  They know

16 that these sales are ultimately being delivered to the United

17 States government.

18        THE COURT:  And is that something I can figure out

19 from the record as it exists presently before this Court?

20        MR. DAVIS:  I believe that's set forth in Bill

21 Bracken's declaration, how it works.  Because they went

22 through, and it's -- because a lot of these contracts are

23 relatively small, it's quite an exercise.  There's a lot of

24 paper, and I apologize for that, Your Honor.  There are large

25 binders with all of this.

1           But Nightforce went through and they identified every

2   one of these sales that we put into the record.  They went

3   back and they -- you know, they had personal knowledge.  Even

4   if they didn't have a paper documenting it, they had personal

5   knowledge of -- that each of these particular sales was

6   destined for a U.S. government purchaser.

7           THE COURT:  Okay.  Thank you.

8           MR. PARK:  Brief response, Your Honor?

9           THE COURT:  Sure.

10          MR. PARK:  Your Honor, the simplified acquisition

11  procedure is not synonymous with automatic immunity, automatic

12  sovereign immunity.  Sure, the government can use the

13  simplified acquisition procedures to expedite the provision of

14  goods and services to satisfy its needs.  That's a different

15  issue, though, about whether or not that carries the legal

16  implication of being subject to patent infringement liability

17  for the contractor that fulfills the contract or not, or

18  whether the patentee has to go to the Court of Federal Claims

19  to seek a remedy for the patent infringement.

20          So simply because the SAP, that simplified procedure,

21  is used doesn't -- that's not synonymous with "You can't sue

22  us.  We have a 'get out of jail free' card."  In fact, clearly

23  not all government contracts are subject to this sovereign

24  immunity, this government contractor defense.

25          The question is whether the contract requires each of

the patents-in-suit or -- one question is -- or whether there
are non-infringing alternatives.  If that weren't the case, if
it were so simple as Nightforce says, then there wouldn't be
any need for FAR clause 52.227-1.  It would automatically
apply as soon as the government enters into a contract to be
provided with goods or services.

Nightforce also raises the issue of flow-down
provisions.  Leupold agrees that where applicable, flow-down
provisions that go to the prime contractor flow down and apply
to the subcontractor.  That's the law.  We don't dispute that.
The issue, though, is there has to be something to flow down.
It's not just a matter of contract formation.

So, for example, Nightforce has used in one of its
demonstratives, on slide 126 of Nightforce's presentation,
docket 96-13, which I've marked with my arrow here, this was
one of the government contracts -- government orders discussed
in Mr. Ferris's declaration.

Under the flow-down column in the middle of this
chart, Nightforce was arguing that "Here's a government order
that was fulfilled.  Flow-down applies.  Therefore, we're
immune."

The evidence shows, when we actually go and look at
what the flow-down provision is, it's not a FAR clause
regarding sovereign immunity or government contractor immunity
at all.  It's the code of conduct to the primary contractor,

1   which in this case was ADS; the code of conduct meaning, you

2   know, "We're an equal opportunity employer.  We don't tolerate

3   certain types of behavior.  These are your obligations in

4   terms of disclosure because we have business with the

5   government."

6          It doesn't talk about 52.227-1.  It doesn't talk

7   about authorization and consent for patent infringement.  And

8   so in that example, there's no -- there's no immunity that

9   applies.

10          If, for example, the flow-down provision were

11  otherwise, if the flow-down provision said, boom, "Here is

12  authorization and consent," we would be having a different

13  discussion, but that's not the case.

14          In addition -- would you mind going back to slide

15  126, please.

16          Nightforce has put up this transaction as another

17  example of one that is subject to implied authorization and

18  consent.

19          Now, to clarify the record, the ZeroStop functionally

20  here is not accused of patent infringement in this case.

21  Nightforce actually owns its own patent on the ZeroStop.

22  That's a different technology.  That's not to say that other

23  features of the riflescopes that Nightforce chose to fulfill

24  this transaction with may be accused of infringement.  But in

25  terms of the ZeroStop, it's a different technology than

1    Leupold's ZeroLock.

2            At the *Markman* hearing, the Court may recall the

3    difference between a stop and a lock in terms of securing a

4    device, a knob, against inadvertent rotation in two directions

5    as opposed to just one direction.

6            So I make that point for two reasons:  one, to

7    clarify the record; secondly, the fact that in this example

8    that Nightforce uses, this is not an example of the government

9    asking for specific patented technology from Nightforce to

10   fulfill a contract.  This is an example of Nightforce deciding

11   which of its technologies it's going to use in connection with

12   this particular transaction.

13           Your Honor is correct that at the end of the day, the

14   Court needs to resolve the legal dispute between the parties.

15   And the parties disagree about what the legal framework is.

16   A number of the District Courts come to different conclusions.

17           I think it's helpful, though, to keep in mind the

18   fundamental guiding principle of sovereign immunity.

19   Sovereign immunity is not to be liberally construed, much less

20   inferred.  It has to be strictly construed.  And in instances

21   where it's appropriate, there has to be a legal -- either an

22   express legal predicate or some sort of implicit authorization

23   and consent based on the facts of that particular situation.

24   It should be the exception rather than the default rule.

25           THE COURT:  On all the cases that you are claiming

 1    there was infringement based on this structure where there was

 2    a primary contractor who was in an agreement with the

 3    government, who then turned around and purchased scopes from

 4    the defense, do you believe that, while you may not assert

 5    them, that you have claims against the primary contractor as

 6    well, or is the analysis different as between the primary

 7    contractor and the subcontractor?

 8              MR. PARK:  That's a good question.

 9              THE COURT:  I like good questions.

10              MR. PARK:  The answer, I think, depends on the same

11    factual considerations about whether the government, when it

12    was requesting product from the prime contractor or the

13    primary contractor, whether it basically said, "We need

14    riflescopes," and the prime contractor decided to fill the

15    order with infringing riflescopes as opposed to one of the

16    non-infringing alternatives.

17              Similarly, that same concept, as we've been using the

18    concept "flow down," would flow down to the subcontractor.  So

19    if there is a government contract --

20              THE COURT:  Well, but let me interrupt you there for

21    a second.

22              So my question is if liability lands with Nightforce,

23    why wouldn't it also be landing with the primary?  Why would

24    there be a difference in analysis?

25              MR. PARK:  It could.  Liability could land with both

1    if neither of them enjoyed authorization and consent.

2            THE COURT:  But in order for them to have

3    authorization and consent, that's going to depend on the same

4    circumstances as between the government and the primary than

5    as between the primary and Nightforce, would it not?

6            MR. PARK:  Yes.

7            THE COURT:  So it seems to me that in every case that

8    you are claiming that Nightforce has liability, then, unless

9    you can give me kind of weird examples, it seems to me that

10   also that primary contractor would also have liability.

11           MR. PARK:  That's possible.

12           THE COURT:  You haven't really thought through that

13   yet maybe.

14           MR. PARK:  Well, I think the answer is the

15   subcontractor should not be treated differently or specially

16   just because they're a sub.  If Nightforce were the prime

17   contractor, the analysis would be the same.  If Nightforce was

18   the subcontractor for a prime contractor, the analysis is the

19   same.

20           The question is whether between the government and

21   the contracting parties there's been either express

22   authorization and consent or implied authorization and

23   consent.

24           THE COURT:  I just can't think of an example where

25   you would have liability that exists with Nightforce where it

1   wouldn't exist as regards the prime contractor.  It seems to

2   me that in every case, given the way you're looking at the

3   statute, that if Nightforce is liable, that the prime would

4   also be liable.

5          MR. PARK:  I think that's right, except here

6   Nightforce's liability goes far beyond the prime contractor's

7   liability because they've been selling vast amounts of

8   riflescopes into the private market as well.

9          THE COURT:  That's separate, though, right?  We're

10  just talking about the government contracts here.  I'm not

11  talking about the rest of your case.  I'm talking about just

12  this issue.

13         MR. PARK:  No, I think you're right.  Although there

14  would be a question about remedies, harm, whether there are

15  double damages, issues we haven't thought of for purposes of

16  this case.

17         THE COURT:  I'm not talking about damages either.

18  I'm only talking about issues of liability.

19         MR. PARK:  I think the Court is correct.

20         THE COURT:  Okay.  You can think about that some

21  more.

22         MR. PARK:  Right.  I think that goes to the nature of

23  the flow-down concept.

24         THE COURT:  Right.

25         MR. PARK:  The flow-down concept is that prime and

1    sub enjoy the same legal position, whatever that may be.

2              THE COURT:  Okay.  Thank you.

3              MR. FERRIS:  If I may, Your Honor?

4              THE COURT:  Who are you?

5              MR. FERRIS:  Kassim Ferris for the plaintiff.

6         If I may, Your Honor, just to supplement the question

7    you're asking about, if there is no implied authorization and

8    consent and only express authorization and consent between the

9    government and the prime contractor, but no flow-down

10   provision in the contract between the prime and subcontractor,

11   then that might be a situation where the subcontractor would

12   carry liability, but the prime would not.

13             Does that make sense?

14             THE COURT:  It makes sense, although I can't imagine

15   how that would happen, but it makes sense.

16             Thank you.

17             MR. FERRIS:  All right.

18             MR. DAVIS:  If I might, Your Honor, briefly,

19   Nightforce is not arguing that there's automatic applicability

20   of 1498.  We don't need to.

21             The cases that really wrestle with whether 1498

22   applies generally do have fact patterns where the government

23   contract is fairly non-specific for goods and services, and

24   there might be -- and the question sometimes Courts ask is:

25   Was there flexibility in how the contract was fulfilled or did

1    the contractor necessarily need to infringe the patent?

2            That's not this case.  Very specific models of

3    Nightforce scopes are being ordered by the government.

4            And, I mean, going to this issue also of whether

5    there are non-infringing alternatives, it's not -- that's a

6    separate damages question for lost profits.  I don't think

7    that has any applicability here, whether there are

8    non-infringing alternatives or non-infringing ways to comply

9    with the contract.

10           But, again, while that's an interesting question some

11   Courts have to grapple with, this Court need not because the

12   government is ordering very specific Nightforce products.

13           And then the question is, well, could the government

14   have ordered maybe a different Nightforce product or maybe a

15   non-infringing one?  Well, that question need not be answered

16   here because Leupold accuses every single Nightforce scope

17   ever made, which goes to the prior art on the '305 patent.

18   But every single Nightforce scope is, in their view, within

19   the scope of their patent.

20           So it's not like it depends on which model number the

21   government is ordering.  If they're ordering a Nightforce

22   scope -- and they're doing it very specifically by model

23   number.  But in any event, any of these Nightforce scopes are

24   accused of patent infringement by Leupold.

25           There was a mention of the particular contract that's

1   shown here on slide 126, and apparently counsel clicked on the

2   link and found that the flow-down -- the language of the

3   flow-down provision didn't actually show up.  It went to a

4   code of conduct or something like that.

5        But whether the prime contractor at present has a

6   broken link on its website should not be a concern for

7   deciding this case.  The contract at issue, as many of them do

8   with this contractor, prime contractor ADS, at ECF 96-13, at

9   the bottom it says, "The terms and conditions found at" --

10  then the website link -- "adsinc.com/po-flowdowns are hereby

11  incorporated into this Purchase Order by reference."  If that

12  link happened to be broken and didn't go to flow-down

13  provisions but went to a code of conduct when counsel

14  investigated that, that should have nothing to do with whether

15  this defense applies here.

16       The government knew what it was ordering and it got

17  what it ordered, and Nightforce had no option but to fulfill

18  its contractual obligation to provide to the government scopes

19  that were accused of infringement by Leupold, and we know that

20  because every scope that Nightforce makes is accused of

21  infringement by Leupold.

22       THE COURT:  Thank you.

23       MR. PARK:  Just briefly, Your Honor, there seems to

24  be this fundamental disconnect.  The starting point and the

25  ending point of this analysis is this is an affirmative

 1   defense.   Nightforce bears the burden of proving this defense.

 2              To that point, the key issue is whether Nightforce

 3   put evidence into the record about underlying government

 4   contracts.   And so as described in the Ferris declaration, in

 5   the second column from the right, everywhere this is marked

 6   "no," there is no underlying government contract.   There is no

 7   predicate in the record from which immunity could flow down.

 8   That's the point of this table on this page and the following

 9   page of the Ferris declaration.

10              Thank you.

11              THE COURT:   So the contracts aren't in the record in

12   enough detail or the contracts aren't in the record for me to

13   understand whether or not they're government contracts or not

14   that have the provisions of the statute contained therein?

15              MR. DAVIS:   That is correct, Your Honor.   As to some

16   of the prime contracts, the prime contractor did not provide

17   them to Nightforce.

18              What we do have, though, is evidence in the form of

19   testimony from the Nightforce salespeople linking the specific

20   sales transactions to the known government purchaser.

21              THE COURT:   Okay.   Thank you.

22              That's all for today.   We gave you a new date and a

23   new time for us to finish up.

24              Is there anything else we need to talk about before

25   we stop for the day?

1          First from plaintiff's perspective?

2          MR. PARK:  No, Your Honor.  Thank you.

3          THE COURT:  Thank you.

4          From the defense perspective?

5          MR. CASIMIR:  No.

6          MR. DAVIS:  No, Your Honor.

7          THE COURT:  All right.  Until next time.

8          Thank you.  We're in recess.

9

10

11          (Proceedings adjourned.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          --oOo--

2

3          I certify, by signing below, that the

4      foregoing is a correct transcript of the record

5      of proceedings in the above-titled cause.  A

6      transcript without an original signature,

7      conformed signature or digitally signed signature

8      is not certified.

9

10

11     */s/ Nancy M. Walker*              *1-18-19*

12     _____      _____
       NANCY M. WALKER, CSR, RMR, CRR        DATE
13     Official Court Reporter
       Oregon CSR No. 90-0091
14

15

16

17

18

19

20

21

22

23

24

25

## $

**$150,000** [1] - 294:16
**$5,000** [1] - 281:12
**$80,000** [1] - 281:12

## '

**'067** [1] - 281:14
**'305** [3] - 153:15, 221:19, 310:17
**'907** [123] - 82:19, 82:25, 83:15, 86:19, 87:3, 88:13, 91:8, 92:11, 92:14, 111:14, 121:2, 121:5, 121:7, 121:22, 121:24, 122:1, 122:9, 125:12, 125:15, 125:17, 125:18, 125:22, 127:16, 132:9, 133:2, 133:9, 133:10, 133:13, 134:20, 139:24, 140:5, 141:12, 142:21, 143:24, 144:3, 144:18, 144:23, 145:3, 150:12, 150:20, 151:4, 151:18, 152:5, 152:6, 152:16, 155:12, 158:20, 161:15, 163:4, 163:13, 163:18, 163:24, 164:1, 170:5, 170:14, 170:24, 172:12, 174:14, 177:8, 177:21, 179:4, 179:6, 179:9, 179:23, 180:4, 180:5, 180:12, 180:17, 180:20, 180:24, 183:19, 185:2, 185:6, 185:13, 185:15, 188:25, 190:21, 191:1, 197:10, 197:24, 199:4, 200:15, 200:16, 201:3, 203:6, 203:9, 203:21, 203:22, 204:5, 204:23, 205:6, 205:19, 206:6, 206:15, 206:16, 207:10, 208:17, 209:10, 209:21, 212:14, 215:3, 215:14, 218:11, 218:17, 218:21, 221:12, 227:23, 228:7, 232:8, 250:21, 259:16, 259:20, 261:6, 262:7, 263:8, 269:4, 271:2, 271:14, 273:6, 278:5, 280:2
**'95** [1] - 182:11
**'96** [7] - 179:5, 179:16, 180:7, 181:9, 181:17, 181:19, 182:11
**'97** [5] - 157:23, 226:15, 226:16, 227:3, 227:12
**'98** [3] - 159:15, 185:4, 227:14
**'99** [2] - 183:15, 190:4
**'bench'** [1] - 168:17
**'get'** [1] - 302:22
**'groove'** [1] - 253:7
**'pin'** [1] - 87:20

## /

**/s** [1] - 314:11

## 1

**1** [25] - 89:19, 91:7, 94:8, 103:13, 112:5, 112:7, 112:12, 153:6, 155:13, 155:22, 161:21, 169:1, 169:4, 169:5, 170:6, 183:20, 231:22, 232:25, 233:5, 233:6, 233:9, 233:10, 234:25, 290:7
**1-18-19** [1] - 314:11
**1.1** [1] - 103:8
**10** [34] - 89:19, 91:7, 112:6, 112:7, 112:15, 131:9, 136:7, 141:14, 141:24, 152:22, 152:24, 153:2, 153:5, 153:20, 154:5, 154:8, 155:10, 171:4, 182:19, 201:24, 211:4, 211:9, 225:22, 228:14, 228:15, 233:1, 233:7, 233:10, 233:11, 233:13, 233:16, 235:1, 237:10, 260:1
**10(a** [2] - 141:20, 142:6
**10(b** [1] - 142:6
**10(c** [1] - 142:7
**10(c)(i** [1] - 142:7
**10(c)(ii** [2] - 141:20, 235:2
**10(c)(ii)** [1] - 142:7
**10-plus-year** [1] - 204:3
**10-year** [1] - 212:11
**1000** [1] - 80:19
**102** [1] - 140:9
**102(b)** [1] - 218:14
**1042** [1] - 194:4
**10th** [2] - 163:10, 244:24
**11** [3] - 79:5, 120:11, 135:7
**12** [2] - 240:9, 246:24
**120** [1] - 294:18
**121** [1] - 80:15
**122** [7] - 91:15, 92:16, 92:18, 92:22, 93:9, 93:13, 94:3
**126** [5] - 294:18, 297:17, 303:14, 304:15, 311:1
**1269** [1] - 194:6
**127** [1] - 296:5
**12th** [2] - 282:24, 283:2
**13** [1] - 283:2
**1336** [1] - 195:21
**137** [1] - 284:1
**13th** [3] - 282:24, 283:3, 283:5
**144** [1] - 194:16
**1449** [1] - 297:11
**149** [1] - 275:1
**1498** [6] - 284:11, 293:23, 298:2, 299:10, 309:20, 309:21
**1498(a** [4] - 292:20, 293:5, 293:12, 293:16
**1498(a)** [1] - 285:20
**15** [5] - 137:8, 141:9, 182:19, 233:14, 254:3
**1531** [1] - 277:17
**1578** [1] - 239:12
**16** [24] - 88:21, 89:18, 90:19, 112:2, 112:5, 112:17, 114:19, 114:21, 141:10, 190:2, 190:13, 190:15, 190:21, 198:6, 198:7, 198:12, 230:24, 232:1, 232:4, 236:19, 249:17, 251:7, 273:13
**16-cv-1570** [1] - 81:6
**1600** [1] - 80:15
**17** [3] - 87:5, 120:11, 262:14
**18th** [1] - 162:24

**19** [1] - 246:24
**1918** [3] - 293:5, 293:24, 299:9
**1978** [1] - 218:10
**1990** [1] - 286:17
**1992** [2] - 129:6, 286:22
**1994** [1] - 288:19
**1995** [27] - 97:3, 100:12, 101:13, 101:15, 102:7, 102:18, 102:19, 103:9, 105:8, 106:16, 131:11, 178:15, 179:2, 179:5, 179:16, 180:3, 180:7, 181:8, 181:17, 181:18, 183:2, 247:7, 247:9, 247:11, 247:13, 280:15, 280:17
**1995-'96** [1] - 270:16
**1996** [16] - 101:16, 102:9, 102:18, 102:24, 103:15, 103:17, 103:23, 104:1, 104:4, 105:8, 178:15, 179:2, 180:3, 247:9, 247:13, 280:18
**1997** [16] - 136:18, 136:22, 145:23, 146:19, 147:25, 149:2, 214:3, 223:19, 223:24, 224:2, 224:24, 227:7, 266:7, 267:4, 267:10, 268:12
**1998** [31] - 96:11, 96:12, 97:2, 97:5, 99:16, 100:1, 100:6, 100:7, 101:19, 102:10, 103:16, 103:21, 106:19, 145:6, 145:13, 148:7, 148:14, 150:2, 157:21, 157:25, 159:2, 159:6, 159:9, 199:22, 200:2, 200:6, 226:8, 227:1, 227:4, 227:8, 239:16
**1999** [88] - 106:19, 157:14, 159:10, 159:15, 175:22, 176:11, 178:6, 179:15, 183:4, 183:13, 183:25, 185:7, 185:11, 185:15, 185:20, 185:23, 186:17, 186:18, 186:24, 189:1, 189:12, 189:15, 189:21, 190:5, 190:18, 191:5, 192:12, 192:20, 192:21, 193:4, 193:5, 193:12, 193:13, 193:21, 194:7, 194:10, 194:22, 194:24, 195:11, 195:17, 195:19, 195:24, 195:25, 197:1, 197:5, 197:8, 197:14, 197:22, 197:25, 198:15, 198:18, 199:1, 199:2, 199:5, 199:6, 199:13, 203:10, 223:2, 223:17, 226:8, 226:20, 260:10, 260:14, 273:10, 273:15, 273:17, 273:19, 274:5, 274:6, 274:21, 275:9, 275:11, 275:15, 275:17, 275:21, 276:8, 276:15, 276:17, 276:23, 277:3, 277:12, 277:17, 277:19, 278:1, 278:5
**19th** [1] - 186:13
**1:00** [1] - 184:17
**1A.1** [1] - 103:8

## 2

**2** [7] - 79:16, 168:21, 169:17, 171:11, 175:9, 284:3, 290:25
**2000** [26] - 157:11, 185:10, 185:25, 186:22, 189:7, 189:25, 191:25, 192:23, 194:4, 194:12, 197:9, 198:8, 199:9, 199:12, 200:14, 215:14,

223:16, 223:20, 223:23, 226:9, 227:5, 260:10, 273:8, 275:22, 278:1, 278:2
**2002** [2] - 107:4, 200:16
**2003** [24] - 121:9, 121:22, 121:23, 122:10, 124:1, 124:23, 125:6, 125:9, 200:21, 200:24, 201:21, 205:12, 215:17, 216:1, 216:15, 216:25, 217:20, 254:17, 256:12, 259:16, 259:21, 260:5, 260:12, 260:22
**2004** [5] - 148:19, 149:1, 201:2, 201:3, 266:7
**2006** [21] - 138:12, 148:20, 149:1, 201:5, 201:20, 201:22, 202:7, 206:4, 208:6, 211:1, 211:21, 212:5, 214:10, 259:23, 260:5, 260:7, 260:17, 262:17, 262:22, 262:24, 266:7
**2007** [14] - 134:13, 134:19, 134:22, 202:6, 204:20, 207:4, 207:13, 207:21, 207:24, 211:1, 211:2, 211:12, 211:25, 262:8
**2008** [3] - 210:19, 211:25, 262:8
**2009** [3] - 187:15, 188:9, 188:18
**2010** [2] - 110:6, 212:15
**2012** [3] - 194:6, 202:10, 202:13
**2013** [3] - 187:16, 188:6, 202:22
**2014** [1] - 202:22
**2016** [26] - 118:21, 119:11, 121:2, 121:10, 125:9, 125:10, 128:3, 128:7, 134:20, 203:5, 203:17, 203:20, 203:22, 204:20, 205:5, 205:13, 206:6, 208:17, 208:19, 210:19, 211:2, 212:15, 217:6, 259:16, 260:24, 262:9
**2016-to-2017** [1] - 212:2
**2017** [6] - 204:25, 208:15, 211:2, 215:4, 217:7, 288:21
**2019** [1] - 79:5
**21** [2] - 164:18, 277:1
**216** [1] - 194:4
**2275** [1] - 80:11
**22nd** [1] - 157:23
**238** [1] - 120:12
**24** [2] - 159:2, 159:6
**242** [1] - 120:12
**25th** [1] - 163:17
**26** [5] - 103:9, 105:9, 157:21, 157:25, 286:21
**27** [1] - 102:9
**28** [3] - 284:10, 293:12, 293:16
**29** [2] - 157:14, 223:17
**29th** [1] - 163:3

### 3

**3** [7] - 168:19, 169:19, 171:11, 175:9, 182:24, 284:5, 291:6
**30** [2] - 106:5, 239:23
**30(b)(6** [8] - 86:14, 129:16, 129:17, 130:7, 130:15, 209:4, 225:7
**3000** [1] - 80:7
**301** [1] - 80:19

**31** [4] - 157:11, 223:15, 223:20, 223:23
**310** [1] - 80:11
**326-8186** [1] - 80:20
**332** [1] - 274:23
**35** [2] - 219:19, 265:20
**35-page** [1] - 219:18
**36** [2] - 241:24, 246:24
**360** [4] - 183:6, 183:9, 248:21, 249:5
**3600** [1] - 80:3
**365** [1] - 286:21
**369** [1] - 286:22
**370** [1] - 286:22
**38** [1] - 120:11
**3:16-cv-01570-HZ** [1] - 79:4

### 4

**4** [19] - 133:11, 168:16, 169:4, 169:22, 171:12, 171:17, 171:20, 172:1, 173:12, 174:5, 174:7, 175:1, 175:5, 175:9, 187:13, 188:13, 188:16, 190:8, 241:15
**413** [1] - 295:24
**485** [1] - 237:11
**49** [1] - 108:17
**498** [1] - 286:16

### 5

**5** [3] - 133:12, 163:25, 164:16
**50** [2] - 187:20, 188:16
**503** [1] - 80:20
**52** [1] - 191:9
**52.227-1** [4] - 284:18, 285:7, 303:4, 304:6
**53562** [1] - 80:12
**54** [3] - 190:10, 190:19, 273:10
**56** [1] - 197:24
**58** [1] - 145:21
**598** [2] - 195:20, 277:17
**5th** [1] - 244:24

### 6

**6** [37] - 85:6, 87:13, 88:20, 88:21, 88:23, 89:18, 90:19, 112:2, 112:5, 112:16, 114:19, 114:20, 190:2, 190:13, 190:15, 190:20, 198:5, 198:6, 198:12, 230:4, 230:24, 231:2, 231:20, 231:22, 232:1, 232:4, 236:19, 237:2, 237:3, 237:4, 237:15, 238:2, 238:11, 249:17, 251:6, 273:13
**600** [1] - 80:3
**601** [1] - 295:24
**609** [1] - 295:24
**665** [1] - 194:6
**68** [1] - 248:17
**69** [3] - 108:17, 141:9, 277:1

### 7

**7** [9] - 85:17, 85:22, 88:23, 237:1, 237:2, 237:3, 237:4, 237:14, 238:13
**70** [1] - 219:17
**73** [1] - 269:3
**76** [1] - 108:17
**760** [1] - 80:7
**79** [1] - 239:12

### 8

**80** [1] - 241:25
**801** [1] - 266:14
**801(d)(2)(B** [1] - 225:6
**801(d)(2)(E** [1] - 225:12
**81** [1] - 241:25
**83-2** [1] - 194:16, 275:1
**89** [1] - 286:16

### 9

**90-0091** [1] - 314:13
**92-1** [1] - 246:25
**94** [1] - 286:17
**96-13** [2] - 303:15, 311:8
**97** [1] - 212:13
**97204** [2] - 80:16, 80:19
**97205** [1] - 80:8
**98101** [1] - 80:4
**9:00** [1] - 283:7

### A

**A.C** [1] - 135:19
**abandoned** [3] - 202:7, 207:4, 211:13
**ability** [4] - 99:4, 111:3, 154:25, 225:18
**able** [8] - 126:24, 165:7, 214:6, 229:10, 245:18, 249:2, 250:12, 273:19
**above-described** [1] - 196:4
**above-titled** [1] - 314:5
**absence** [3] - 160:9, 164:16, 257:12
**absent** [6] - 101:21, 144:14, 165:9, 272:12, 291:4, 291:14
**absolute** [1] - 165:22
**absolutely** [9] - 131:4, 260:15, 262:5, 262:8, 266:5, 295:15, 297:8, 301:11, 301:13
**abundance** [1] - 121:13
**abundantly** [1] - 285:24
**abuse** [2] - 244:13, 244:14
**accept** [5] - 149:11, 167:2, 167:3, 286:19, 296:21
**acceptable** [1] - 83:4
**access** [1] - 225:21
**accessory** [1] - 273:4
**accomplish** [1] - 146:2
**according** [4] - 197:11, 201:1, 215:25, 256:14
**account** [1] - 98:14

**accurate** [4] - 134:3, 178:20, 251:14, 252:12
**accuse** [2] - 298:11
**accused** [23] - 84:15, 85:2, 85:5, 86:24, 87:1, 87:18, 91:10, 113:19, 199:25, 200:3, 235:20, 268:23, 269:24, 289:22, 297:7, 297:18, 298:10, 298:12, 304:20, 304:24, 310:24, 311:19, 311:20
**accuses** [1] - 310:16
**acknowledge** [1] - 158:2
**acknowledged** [3] - 178:16, 179:8, 217:9
**Acquisition** [1] - 284:17
**acquisition** [6] - 285:8, 294:13, 294:15, 297:15, 302:10, 302:13
**act** [2] - 286:20, 288:13
**Act** [5] - 288:6, 293:5, 293:11, 293:24, 299:9
**acting** [1] - 231:7
**action** [9] - 115:5, 115:6, 115:11, 115:14, 115:20, 115:25, 116:1, 130:24, 289:14
**actions** [2] - 139:6, 258:10
**activities** [1] - 288:7
**acts** [3] - 157:24, 236:11, 286:18
**actual** [14] - 107:25, 149:20, 159:10, 159:14, 168:15, 168:18, 168:21, 176:15, 196:13, 227:7, 229:15, 249:13, 300:10
**actuator** [79] - 83:18, 84:10, 91:6, 91:14, 91:19, 91:20, 91:22, 91:25, 92:10, 92:11, 92:15, 92:22, 92:24, 93:3, 93:7, 93:8, 93:13, 93:18, 93:21, 94:3, 94:4, 94:5, 94:10, 94:11, 94:14, 94:16, 94:19, 94:22, 94:25, 95:5, 95:6, 95:8, 95:10, 95:14, 95:16, 96:1, 152:7, 152:14, 152:20, 154:7, 154:16, 154:17, 154:19, 155:1, 155:2, 155:5, 155:7, 171:1, 171:2, 171:3, 174:11, 227:25, 228:4, 228:6, 228:7, 228:9, 228:10, 228:17, 228:19, 229:1, 232:24, 233:2, 233:3, 233:13, 233:23, 234:10, 235:3, 235:4, 235:10, 268:20, 268:22, 268:24, 269:7, 269:15, 269:21, 269:23, 279:24, 280:2
**actuators** [1] - 82:5
**adamant** [1] - 147:24
**add** [5] - 89:18, 104:1, 196:2, 203:18, 250:7
**added** [7] - 113:10, 124:16, 159:1, 189:8, 204:5, 250:9, 268:13
**adding** [6] - 125:11, 204:1, 205:7, 213:18, 215:4, 273:3
**addition** [19] - 103:25, 104:9, 105:19, 106:4, 108:14, 112:22, 113:20, 127:7, 135:18, 142:3, 162:22, 167:25, 243:14, 245:22, 250:25, 255:7, 279:10, 304:14
**additional** [11] - 137:25, 142:3, 191:24,

195:24, 196:23, 197:5, 226:7, 228:5, 278:24, 278:25, 279:2
**additions** [1] - 196:16
**address** [10] - 109:22, 150:13, 150:19, 167:15, 167:23, 170:16, 210:8, 211:15, 219:22, 301:10
**addressed** [2] - 113:23, 142:16
**addresses** [1] - 210:6
**addressing** [2] - 168:9, 272:8
**adds** [1] - 139:12
**adequately** [1] - 280:19
**adjourned** [1] - 313:11
**adjust** [5] - 105:3, 105:4, 218:18, 222:10
**adjustable** [6] - 141:17, 153:4, 153:20, 154:6, 233:25
**adjusted** [1] - 167:18
**adjusting** [2] - 86:11, 155:15
**adjustment** [13] - 112:11, 152:3, 152:6, 153:7, 153:8, 153:18, 154:2, 173:20, 174:17, 174:19, 174:20, 271:14, 298:12
**adjustments** [2] - 161:25, 171:14
**administrative** [1] - 289:14
**admissible** [2] - 109:13, 149:13
**admission** [4] - 130:7, 225:11, 247:3, 266:7
**admissions** [4] - 130:15, 130:16, 247:19, 248:10
**admits** [3] - 84:25, 91:13, 120:3
**admitted** [8] - 147:25, 149:24, 182:17, 205:14, 206:14, 225:8, 246:21, 279:11
**Adobe** [2] - 297:25, 298:5
**adopted** [3] - 113:6, 125:7, 225:10
**adopting** [1] - 141:8
**ADS** [2] - 304:1, 311:8
**adsinc.com/po** [1] - 311:10
**adsinc.com/po-flowdowns** [1] - 311:10
**advance** [2] - 149:18, 149:19
**advantage** [1] - 139:9
**advertised** [2] - 148:5, 267:4
**advertisement** [1] - 146:3
**advertisements** [9] - 145:16, 145:20, 145:22, 146:5, 146:11, 224:5, 224:8, 224:25, 266:19
**advertising** [2] - 223:25, 224:2
**advocated** [2] - 88:9, 191:18
**advocating** [1] - 293:22
**Affairs** [1] - 286:16
**affect** [1] - 186:2
**affecting** [1] - 150:25
**affidavit** [7] - 101:9, 109:21, 110:17, 110:18, 111:2, 165:14, 165:17, 166:1, 166:2, 166:5, 166:20, 166:23, 167:4
**affidavits** [1] - 110:2
**affirmatively** [2] - 150:12, 218:2
**afternoon** [2] - 184:22, 184:25
**afterthought** [1] - 221:4
**afterwards** [3] - 159:15, 159:19, 208:20
**agencies** [1] - 299:11

**agency** [3] - 296:9, 296:16, 301:15
**aggressive** [1] - 282:6
**agnostic** [2] - 188:14, 190:8
**ago** [5] - 84:8, 94:24, 126:8, 127:14, 251:13
**agree** [8] - 105:12, 127:22, 130:20, 217:19, 254:23, 281:22, 282:4, 296:24
**agreed** [5] - 91:24, 92:12, 230:1, 254:22, 280:13
**agreeing** [1] - 173:11
**agreement** [5] - 82:11, 88:8, 215:7, 225:19, 306:2
**agrees** [4] - 88:17, 135:9, 163:6, 303:8
**ahead** [8] - 86:13, 87:2, 137:14, 139:14, 182:12, 182:18, 185:3, 224:15
**aiming** [10] - 139:25, 141:17, 153:20, 153:23, 174:21, 221:2, 221:9, 264:6, 265:3, 265:4
**Akeso** [3] - 257:20, 257:25, 258:2
**alarm** [1] - 264:20
**alert** [1] - 299:14
**aligned** [1] - 171:5
**allegation** [2] - 129:9, 297:23
**allegations** [2] - 293:7, 298:16
**alleged** [11] - 127:12, 183:2, 183:21, 202:14, 218:15, 218:19, 268:23, 271:16, 296:17, 299:4, 299:6
**allegedly** [6] - 110:8, 136:16, 136:19, 170:16, 197:8, 296:2
**alleging** [3] - 166:8, 201:5, 203:5
**Allen** [1] - 87:3
**Allied** [1] - 165:21
**allow** [3] - 177:14, 201:13, 299:10
**allowed** [5] - 109:7, 109:17, 125:1, 188:17, 188:19
**allows** [6] - 94:17, 108:2, 188:18, 189:17, 210:1, 230:21
**alluding** [1] - 275:8
**almost** [11] - 88:15, 102:9, 102:19, 126:11, 135:15, 201:24, 206:21, 220:2, 222:25, 263:17, 294:16
**alone** [9] - 117:2, 126:24, 130:16, 156:25, 160:4, 160:8, 175:9, 175:11, 263:24
**ALSO** [1] - 80:17
**Altenheiner** [24] - 84:4, 139:18, 139:20, 139:24, 140:4, 140:13, 140:14, 142:22, 142:24, 143:9, 143:11, 143:12, 144:10, 144:11, 173:14, 218:8, 218:9, 218:19, 222:20, 264:2, 265:6, 265:10, 265:11, 265:13
**alternative** [12] - 116:12, 117:11, 128:16, 130:11, 189:14, 189:17, 192:14, 193:20, 195:8, 197:22, 225:15, 275:13
**alternatives** [5] - 286:2, 303:2, 306:16, 310:5, 310:8
**Amended** [1] - 204:4
**amount** [2] - 86:21, 204:7
**amounting** [1] - 298:21

**amounts** [1] - 308:7
**ample** [2] - 96:25, 280:9
**analogous** [3] - 120:6, 120:8, 221:6
**analogy** [2] - 242:9, 273:3
**analysis** [11] - 114:19, 119:1, 119:7, 193:22, 194:14, 276:6, 306:6, 306:24, 307:17, 307:18, 311:25
**ancient** [1] - 218:9
**Ann** [2] - 80:9, 81:22
**annotated** [1] - 139:20
**annotation** [1] - 140:15
**answer** [18] - 90:16, 100:2, 116:22, 129:23, 130:4, 130:6, 134:10, 134:15, 143:7, 147:25, 173:8, 253:9, 253:15, 273:21, 276:7, 306:10, 307:14
**answered** [2] - 191:15, 310:15
**answers** [1] - 87:10
**antecedent** [5] - 141:2, 141:5, 141:15, 141:25, 142:5
**anticipate** [3] - 142:20, 218:20, 245:7
**anticipates** [3] - 140:4, 176:3, 184:4
**anticipating** [4] - 140:13, 142:22, 142:24, 265:13
**anticipation** [7] - 138:2, 140:7, 140:8, 144:2, 218:24, 220:6, 265:8
**apart** [6] - 152:5, 226:11, 226:17, 226:21, 264:11, 264:18
**apologize** [1] - 301:24
**appear** [3] - 157:6, 159:12, 276:17
**APPEARANCES** [1] - 80:1
**appearances** [1] - 81:7
**appeared** [2] - 289:18, 291:12
**appearing** [1] - 167:8
**applicability** [2] - 309:19, 310:7
**applicable** [5] - 99:20, 285:11, 285:14, 287:4, 303:8
**applicant** [8] - 194:23, 196:22, 215:21, 215:25, 216:12, 216:15, 216:24, 217:9
**applicant's** [1] - 216:21
**application** [92] - 90:20, 92:20, 111:15, 111:18, 111:19, 111:20, 113:2, 113:7, 114:22, 115:13, 117:1, 117:6, 121:25, 122:12, 122:13, 124:3, 145:5, 156:3, 157:14, 159:8, 185:7, 185:8, 185:15, 185:16, 185:23, 186:1, 186:9, 186:10, 186:11, 186:18, 186:23, 186:24, 187:9, 187:15, 187:18, 188:9, 188:22, 189:1, 189:6, 189:22, 191:25, 192:13, 192:20, 192:21, 192:24, 193:21, 194:8, 194:10, 194:13, 194:22, 195:8, 195:12, 195:17, 195:19, 195:24, 196:1, 197:2, 197:5, 197:8, 197:9, 197:14, 197:22, 197:25, 198:4, 198:19, 199:5, 200:7, 200:8, 200:9, 200:11, 227:11, 254:15, 273:15, 273:17, 273:19, 273:20, 274:6, 274:21, 275:9, 275:11, 275:15, 275:18, 275:21, 276:8, 276:15, 276:18, 276:23, 277:3, 277:12, 277:17, 277:19, 278:2

**applications** [3] - 111:16, 187:17, 193:7
**applied** [3] - 276:23, 279:12, 286:12
**applies** [11] - 113:4, 166:23, 172:12, 279:7, 292:23, 294:15, 297:4, 303:20, 304:9, 309:22, 311:15
**apply** [6] - 186:7, 292:2, 293:4, 298:2, 303:5, 303:9
**approach** [2] - 121:11, 168:13
**appropriate** [9] - 89:2, 144:17, 145:4, 175:11, 205:12, 258:8, 259:19, 266:14, 305:21
**April** [1] - 119:10
**archived** [1] - 103:23
**archives** [1] - 106:1
**area** [2] - 90:1, 244:10
**arguable** [1] - 125:20
**argue** [8] - 93:25, 94:4, 139:9, 165:7, 173:16, 198:5, 210:24, 270:12
**argued** [9] - 91:22, 165:6, 217:13, 220:10, 225:2, 230:4, 272:1, 273:24, 281:23
**argues** [12] - 102:11, 109:3, 120:25, 127:12, 140:3, 211:7, 236:7, 244:21, 246:21, 254:11, 285:15, 295:19
**arguing** [8] - 130:11, 144:22, 160:24, 164:2, 201:20, 274:24, 303:19, 309:19
**argument** [84] - 81:4, 86:25, 93:18, 93:20, 94:2, 94:7, 106:18, 106:20, 107:2, 107:3, 108:10, 112:16, 115:16, 117:21, 121:11, 123:11, 123:24, 125:8, 126:1, 134:18, 138:10, 138:19, 139:12, 139:15, 140:6, 140:16, 140:20, 143:23, 164:12, 166:6, 166:8, 172:3, 172:11, 172:12, 210:3, 211:1, 211:2, 211:17, 212:24, 219:8, 219:22, 220:5, 221:4, 221:5, 223:9, 230:16, 230:18, 232:4, 236:8, 239:11, 244:22, 245:7, 248:14, 248:18, 254:10, 254:17, 254:19, 256:18, 256:19, 256:25, 257:9, 258:12, 259:14, 259:22, 259:25, 260:22, 261:1, 263:13, 263:15, 263:16, 264:3, 266:18, 268:20, 273:1, 273:11, 274:20, 279:23, 282:14, 285:6, 292:14, 292:25, 296:8
**arguments** [15] - 107:1, 127:21, 127:23, 129:15, 143:25, 208:25, 211:15, 220:2, 220:3, 257:23, 264:1, 268:18, 272:3, 282:4, 282:7
**Ariad** [3] - 195:20, 277:15, 277:17
**arm** [10] - 85:10, 85:14, 85:15, 86:10, 86:23, 95:11, 95:15, 171:2, 238:4, 238:11
**arranged** [1] - 140:10
**arrow** [1] - 303:15
**art** [88] - 90:21, 90:25, 96:13, 96:17, 97:20, 107:6, 114:25, 115:23, 116:8, 116:10, 116:23, 116:24, 118:2, 118:8, 118:16, 119:2, 119:4, 119:5, 120:14, 120:17, 125:17, 136:9, 136:13,

138:13, 138:16, 138:18, 138:25, 139:4, 140:10, 142:22, 143:9, 143:10, 143:19, 143:24, 144:9, 144:19, 144:23, 146:1, 146:12, 156:1, 156:3, 156:16, 157:16, 157:17, 157:18, 157:25, 158:4, 173:14, 194:10, 194:22, 195:12, 196:3, 196:15, 196:20, 197:3, 199:11, 199:21, 200:1, 201:11, 203:11, 203:14, 211:22, 218:11, 218:13, 222:2, 224:19, 227:9, 227:20, 251:9, 251:18, 251:19, 252:1, 252:3, 252:10, 252:23, 253:1, 253:14, 260:10, 271:3, 273:19, 273:22, 275:3, 277:12, 277:20, 279:14, 310:17
**Arthur** [2] - 194:4, 276:1
**artillery** [1] - 264:25
**arts** [5] - 116:14, 116:20, 171:22, 221:7
**Asahi** [2] - 169:9, 169:13
**ascertainable** [1] - 268:10
**Asdale** [1] - 166:18
**aside** [1] - 129:15
**aspect** [7] - 112:4, 173:4, 176:23, 233:18, 235:12, 238:25, 239:5
**aspects** [2] - 153:16, 290:5
**assemble** [1] - 176:14
**assembled** [4] - 87:10, 100:20, 237:15, 243:15
**assemblies** [1] - 187:21
**assembly** [5] - 85:4, 153:13, 153:22, 178:14, 237:4
**assert** [10] - 205:2, 205:4, 205:21, 206:1, 206:18, 206:24, 212:18, 225:18, 238:24, 306:4
**asserted** [23] - 91:7, 152:23, 157:13, 158:8, 162:9, 176:4, 184:5, 191:1, 198:5, 198:6, 198:17, 199:4, 200:17, 201:9, 207:10, 207:19, 208:22, 212:14, 219:17, 249:24, 273:13, 278:6, 284:10
**asserting** [9] - 99:10, 99:13, 128:14, 136:14, 163:11, 201:9, 203:25, 205:20, 208:17
**assertion** [3] - 167:8, 206:6, 241:9
**assertions** [3] - 162:19, 194:1, 276:4
**asserts** [5] - 109:25, 126:4, 205:11, 279:6, 284:12
**assess** [1] - 141:13
**assessing** [2] - 167:24, 173:3
**assessment** [1] - 252:3
**assist** [1] - 265:4
**assistant** [1] - 148:24
**associated** [6] - 104:17, 104:23, 148:1, 209:21, 216:3, 229:4
**assume** [2] - 87:11, 186:3
**assumed** [3] - 202:6, 207:3, 225:10
**assumes** [2] - 253:20, 259:14
**assuming** [1] - 223:1
**assumption** [3] - 202:8, 203:2, 257:6
**attach** [1] - 250:15
**attached** [6] - 85:15, 94:6, 101:5,

5

173:19, 213:14, 279:2
**attaches** [2] - 94:10, 95:12
**attaching** [1] - 244:19
**attempt** [1] - 288:4
**attempted** [3] - 198:20, 290:14, 291:12
**attempting** [1] - 231:2
**attention** [1] - 151:3
**attesting** [1] - 106:2
**attorney** [7] - 166:6, 166:8, 172:3, 181:10, 182:14, 230:18, 289:10
**Attorney** [1] - 284:3
**Auckerman** [1] - 135:19
**August** [2] - 203:20, 211:2
**authenticated** [1] - 110:14
**authenticates** [1] - 104:19
**authorities** [1] - 123:14
**authority** [9] - 112:25, 113:17, 239:3, 251:3, 257:1, 257:2, 279:5, 279:16
**authorization** [35] - 284:15, 284:23, 285:2, 285:13, 285:17, 285:20, 286:7, 286:17, 287:5, 287:8, 287:17, 287:19, 288:1, 288:17, 289:5, 289:8, 289:20, 290:13, 291:4, 291:17, 291:18, 292:3, 295:23, 295:25, 297:4, 304:7, 304:12, 304:17, 305:22, 307:1, 307:3, 307:22, 309:7, 309:8
**authorize** [1] - 290:21
**authorized** [1] - 290:13
**authorizing** [1] - 288:2
**automated** [1] - 264:24
**automatic** [5] - 285:24, 286:9, 302:11, 309:19
**automatically** [4] - 107:7, 264:14, 264:23, 285:11, 303:4
**automobile** [1] - 242:11
**available** [13] - 126:15, 145:1, 145:12, 146:22, 147:2, 148:12, 149:8, 149:9, 149:16, 149:21, 150:1, 150:25, 291:3
**Avenue** [2] - 80:7, 80:19
**avoid** [3] - 201:13, 210:2, 298:15
**aware** [17] - 129:21, 129:23, 130:1, 130:4, 159:3, 185:24, 191:17, 200:4, 200:12, 201:20, 202:15, 202:21, 209:7, 210:20, 261:3, 271:2, 301:1
**axis** [6] - 94:12, 94:18, 154:18, 269:11, 269:14, 269:15

## B

**back-and-forth** [6] - 127:13, 127:18, 135:11, 136:7, 138:12, 214:4
**backdate** [2] - 185:3, 185:6
**backed** [5] - 102:18, 102:24, 210:21, 219:1, 219:2
**background** [3] - 111:16, 151:14, 151:24
**backlash** [1] - 174:2
**backpedal** [1] - 87:19
**backs** [1] - 104:3
**backup** [7] - 102:8, 103:3, 103:4, 103:5,

103:14, 103:17, 169:15
**backward** [1] - 126:8
**bad** [2] - 184:8, 242:25
**ball** [4] - 128:21, 129:7, 139:7, 257:16
**banc** [2] - 195:20, 277:15
**barring** [2] - 135:22, 259:11
**bars** [1] - 139:10
**base** [1] - 89:19
**based** [21] - 92:16, 93:12, 96:5, 98:11, 98:18, 121:11, 132:16, 136:16, 157:22, 179:7, 203:24, 208:11, 212:12, 227:19, 229:16, 264:17, 268:18, 273:21, 284:13, 305:23, 306:1
**bases** [1] - 217:4
**basic** [1] - 105:25
**basing** [1] - 147:25
**basis** [33] - 88:25, 114:19, 120:13, 125:21, 132:3, 133:3, 141:2, 141:5, 141:15, 141:25, 142:5, 144:14, 161:6, 170:10, 175:11, 177:20, 179:16, 179:24, 181:18, 182:10, 183:20, 185:5, 198:20, 226:4, 227:17, 245:9, 247:24, 256:17, 266:14, 277:18, 279:8, 289:2, 300:20
**battery** [1] - 264:24
**battle** [3] - 251:7, 253:3, 273:23
**bear** [2] - 164:3, 232:14
**bears** [1] - 312:1
**became** [2] - 122:21, 200:4
**Beckerman** [1] - 283:22
**become** [1] - 218:14
**becomes** [2] - 272:9, 273:18
**BEFORE** [1] - 79:18
**begin** [3] - 173:10, 215:10, 215:12
**beginning** [10] - 122:24, 141:24, 153:2, 165:1, 233:25, 244:25, 274:23, 282:12, 291:19
**behalf** [4] - 130:11, 284:7, 289:10, 290:22
**behave** [1] - 231:17
**behavior** [11] - 202:20, 203:3, 205:2, 205:12, 205:22, 208:8, 209:8, 210:7, 210:8, 216:7, 304:3
**behind** [2] - 140:5, 238:3
**belief** [2] - 133:23, 201:2
**belies** [1] - 205:13
**believable** [3] - 98:1, 102:1, 239:8
**believes** [2] - 204:3, 247:12
**below** [9] - 90:2, 114:6, 114:8, 188:20, 189:23, 191:6, 228:5, 229:6, 314:3
**belt** [5] - 121:11, 205:11, 208:18, 208:19, 217:18
**belt-and-suspenders** [2] - 121:11, 205:11
**belts** [4] - 217:13, 217:14, 217:19
**bend** [1] - 162:6
**Bender** [58] - 84:5, 136:15, 136:17, 144:19, 144:23, 144:25, 145:6, 145:11, 145:18, 145:19, 145:24, 146:8, 146:17, 146:25, 148:5, 148:8,

148:11, 148:18, 148:19, 148:22, 148:23, 148:25, 149:1, 149:4, 157:20, 158:10, 159:3, 159:6, 185:4, 199:23, 200:5, 211:24, 214:2, 214:5, 214:6, 214:8, 222:21, 222:24, 223:15, 223:18, 223:22, 223:25, 224:19, 224:20, 224:24, 225:16, 226:8, 226:23, 227:11, 227:18, 227:20, 263:13, 266:3, 266:6, 267:9, 267:19
**bender** [2] - 149:8, 266:9
**Bender's** [2] - 200:13, 266:5
**bender's** [1] - 148:24
**beside** [1] - 124:3
**best** [4] - 186:21, 199:19, 243:11, 282:24
**better** [5] - 123:18, 151:9, 242:10, 242:21, 254:1
**between** [48] - 82:11, 86:5, 86:7, 86:16, 86:25, 87:25, 88:17, 90:8, 91:12, 99:9, 103:12, 107:20, 110:22, 110:25, 111:1, 112:2, 121:16, 123:7, 125:18, 126:5, 126:24, 155:16, 174:9, 182:19, 192:3, 200:8, 212:15, 225:19, 225:25, 235:10, 252:5, 260:9, 262:9, 264:12, 264:22, 269:16, 269:21, 274:10, 278:3, 278:18, 305:3, 305:14, 306:6, 307:4, 307:5, 307:20, 309:8, 309:10
**beyond** [3] - 125:16, 245:15, 308:6
**biased** [1] - 160:7
**bibliographic** [1] - 122:4
**big** [2] - 294:8, 294:9
**Bill** [3] - 299:23, 300:7, 301:20
**Billy** [1] - 81:14
**binders** [1] - 301:25
**binocular** [8] - 140:4, 173:14, 173:16, 173:19, 221:7, 221:14, 264:9, 264:13
**Binoculars** [1] - 173:18
**binoculars** [22] - 139:19, 139:22, 140:2, 173:25, 218:9, 218:21, 219:1, 219:5, 220:8, 220:23, 220:25, 221:2, 221:6, 221:9, 221:17, 222:3, 264:2, 264:3, 264:17, 265:2, 265:6, 265:9
**bit** [17] - 85:8, 87:19, 88:4, 100:24, 101:13, 103:10, 111:16, 111:23, 150:15, 151:8, 165:19, 170:21, 170:23, 186:21, 189:8, 232:18, 281:4
**bits** [1] - 167:19
**blame** [1] - 274:15
**blanket** [2] - 284:13, 286:24
**Blizzard** [1] - 121:19
**blow** [1] - 152:5
**blow-apart** [1] - 152:5
**blowing** [1] - 152:12
**blue** [6] - 141:21, 152:19, 154:13, 187:19, 209:12, 296:5
**board** [1] - 271:13
**body** [5] - 85:15, 141:3, 142:11, 142:19
**boilerplate** [6] - 195:25, 196:1, 196:9, 196:11, 196:15, 197:21
**boils** [2] - 186:8, 275:2

**BOND** [1] - 81:21
**Bond** [2] - 80:10, 81:21
**boom** [1] - 304:11
**bore** [1] - 164:25
**bottom** [5] - 86:6, 93:20, 183:4, 183:5, 311:9
**box** [1] - 85:7
**Bracken** [2] - 299:23, 300:7
**Bracken's** [1] - 301:21
**bracket** [8] - 107:10, 107:17, 107:18, 107:20, 107:21, 108:2, 169:12, 170:19
**brain** [2] - 253:25, 281:3
**brake** [1] - 297:18
**branch** [1] - 301:15
**branches** [1] - 294:2
**brand** [3] - 267:19, 267:21, 268:13
**Brandenburg** [23] - 84:25, 87:3, 88:18, 91:13, 92:2, 94:2, 118:15, 119:22, 119:23, 120:3, 120:11, 120:13, 143:16, 143:19, 144:7, 144:15, 220:17, 252:13, 252:25, 265:15, 274:24, 279:11
**Brandenburg's** [5] - 92:6, 93:11, 143:17, 222:4, 222:15
**Brandt** [1] - 148:22
**breach** [1] - 296:15
**break** [3] - 185:1, 228:21, 253:23
**Bressler** [1] - 119:12
**Brian** [3] - 80:2, 81:10, 284:7
**brief** [30] - 82:8, 93:15, 94:1, 97:14, 109:2, 113:18, 120:10, 123:23, 125:7, 137:21, 141:7, 147:17, 150:9, 151:11, 151:24, 162:21, 167:7, 190:24, 219:25, 232:11, 248:5, 248:7, 258:13, 265:18, 265:22, 266:16, 267:14, 274:16, 285:16, 302:8
**briefed** [2] - 140:25, 142:15
**briefing** [36] - 89:23, 90:7, 92:7, 99:8, 110:17, 115:3, 121:18, 121:21, 124:15, 135:20, 140:8, 142:9, 142:16, 160:22, 165:3, 165:6, 165:18, 168:4, 172:2, 186:12, 187:12, 193:17, 196:24, 202:17, 204:18, 205:25, 210:9, 219:14, 219:22, 220:5, 248:18, 265:16, 266:15, 286:16, 288:5, 288:22
**briefly** [9] - 83:16, 109:6, 109:22, 187:14, 264:1, 278:12, 297:24, 309:18, 311:23
**bring** [3] - 126:18, 126:20, 224:22
**bringing** [1] - 263:11
**brings** [3] - 120:22, 133:10, 243:19
**broad** [7] - 91:23, 92:13, 114:7, 117:10, 219:5, 232:1, 284:13
**broaden** [1] - 196:2
**broader** [11] - 112:3, 115:20, 116:4, 116:11, 117:24, 117:25, 186:17, 190:1, 247:5, 251:23, 259:11
**broadly** [2] - 117:19, 280:5
**broken** [2] - 311:6, 311:12
**brought** [8] - 205:8, 206:22, 207:21,

208:4, 208:19, 214:10, 224:23, 262:17
**BROW** [1] - 81:22
**Brow** [2] - 80:9, 81:22
**Brunette** [7] - 80:5, 81:13, 82:20, 83:7, 228:22, 272:1, 283:25
**BRUNETTE** [40] - 81:13, 83:8, 83:14, 84:7, 89:5, 89:10, 89:16, 90:4, 90:15, 90:23, 91:3, 91:6, 93:1, 95:6, 95:10, 95:18, 95:21, 96:7, 115:10, 137:15, 137:19, 138:11, 139:15, 139:18, 232:11, 237:22, 238:1, 238:10, 238:15, 238:19, 243:4, 243:12, 246:8, 254:5, 266:1, 272:19, 278:11, 278:14, 278:17, 284:2
**buckets** [1] - 111:25
**build** [4] - 107:6, 143:9, 144:11, 199:20
**building** [1] - 107:7
**built** [4] - 104:13, 104:24, 107:17, 287:4
**bullet** [3] - 181:11, 182:24, 264:23
**bullets** [1] - 257:11
**bumps** [1] - 242:16
**bunch** [3] - 81:17, 241:7, 290:10
**burden** [31] - 99:9, 99:11, 99:14, 99:18, 99:20, 128:17, 128:18, 128:19, 148:15, 156:5, 156:7, 156:18, 160:2, 164:3, 164:8, 164:25, 167:1, 177:14, 183:15, 193:10, 193:11, 193:12, 239:11, 239:16, 245:2, 270:15, 270:22, 271:1, 274:1, 286:9, 312:1
**burden-shifting** [1] - 239:11
**burdens** [2] - 193:17, 244:23
**buried** [1] - 123:19
**burned** [1] - 103:24
**bushing** [28] - 85:18, 85:23, 86:2, 87:6, 87:9, 87:10, 114:10, 114:12, 228:3, 229:2, 230:1, 230:3, 230:6, 230:9, 230:10, 230:11, 230:13, 235:15, 236:6, 236:21, 236:22, 237:4, 237:16, 237:20, 238:7, 250:22, 270:1
**bushings** [1] - 82:7
**business** [18] - 79:7, 79:7, 104:5, 129:3, 131:20, 132:4, 132:6, 132:8, 135:4, 135:12, 135:18, 136:5, 138:6, 149:3, 149:4, 212:12, 263:6, 304:4
**bypassed** [1] - 134:12
**Byron** [70] - 84:19, 108:9, 110:1, 111:4, 111:5, 116:24, 118:7, 120:16, 143:14, 161:4, 161:13, 161:21, 161:23, 162:4, 162:17, 162:19, 163:10, 163:17, 163:21, 164:18, 166:14, 167:4, 167:14, 167:16, 167:23, 170:7, 170:16, 171:6, 171:12, 171:18, 171:21, 172:3, 172:4, 172:17, 173:11, 173:18, 174:6, 174:8, 174:25, 175:6, 186:20, 186:21, 193:8, 193:19, 193:22, 194:7, 195:2, 195:4, 195:22, 197:11, 220:14, 220:15, 220:21, 221:8, 222:11, 237:1, 240:1, 244:15, 246:3, 246:4, 246:10, 252:8, 253:1, 253:16, 264:4, 264:6, 265:9, 271:12,

279:6
**Byron's** [22] - 88:9, 110:16, 117:3, 120:20, 163:5, 164:4, 173:13, 173:25, 194:14, 229:5, 237:12, 244:21, 245:22, 251:24, 252:3, 274:2, 274:3, 274:6, 274:20, 275:23, 277:6, 279:13

## C

**C297** [2] - 296:7, 296:17
**CAD** [7] - 102:5, 102:7, 102:8, 103:12, 159:11, 176:13, 229:15
**calendar** [4] - 137:1, 147:7, 147:11, 147:14
**calendars** [2] - 147:10, 282:19
**caliber** [1] - 173:22
**California** [6] - 128:7, 202:18, 205:24, 257:21, 272:1, 272:8
**cam** [188] - 82:6, 85:19, 85:21, 86:2, 86:20, 88:22, 88:24, 89:7, 89:15, 89:17, 89:19, 89:20, 89:25, 90:14, 92:22, 94:24, 94:25, 95:1, 95:7, 96:11, 97:1, 100:15, 103:8, 104:11, 106:6, 106:10, 106:15, 106:16, 108:6, 108:15, 112:8, 112:9, 112:12, 112:13, 112:22, 114:14, 117:10, 117:13, 117:14, 117:15, 117:16, 117:17, 117:19, 145:11, 145:25, 146:6, 146:13, 146:25, 148:9, 148:13, 152:9, 152:13, 152:18, 154:12, 154:14, 154:15, 154:20, 154:21, 154:24, 155:12, 157:20, 161:10, 167:8, 171:1, 174:11, 183:1, 185:17, 189:1, 189:2, 189:3, 189:4, 189:5, 189:9, 189:11, 189:12, 189:15, 189:16, 189:24, 190:2, 190:16, 191:9, 191:19, 191:20, 191:22, 191:23, 192:1, 192:24, 194:18, 195:1, 197:4, 198:1, 198:7, 198:10, 198:12, 198:13, 198:14, 198:24, 198:25, 199:1, 199:2, 200:2, 200:10, 200:19, 202:25, 206:10, 210:20, 211:25, 218:18, 224:6, 224:9, 226:20, 228:4, 229:2, 230:13, 230:25, 231:1, 231:2, 231:4, 231:14, 231:15, 231:16, 231:18, 231:19, 231:20, 232:1, 232:6, 236:3, 236:4, 236:7, 236:11, 236:14, 236:15, 236:16, 236:17, 236:18, 236:22, 236:24, 237:5, 237:6, 237:16, 240:12, 241:19, 241:23, 242:4, 243:17, 248:15, 248:19, 249:1, 250:23, 250:25, 268:22, 269:6, 269:10, 269:12, 269:13, 269:16, 269:17, 269:21, 273:4, 273:6, 273:7, 273:9, 274:5, 275:3, 275:4, 276:23, 276:25, 277:7, 277:20, 277:23, 277:24, 277:25, 278:19, 279:22, 280:14
**camera** [12] - 136:19, 136:24, 138:6, 147:2, 147:5, 147:7, 246:5, 246:11, 274:8, 274:9, 274:18, 277:7

**cameras** [4] - 136:5, 211:19, 264:10, 264:13

**cams** [2] - 248:21, 279:11

**cannot** [33] - 116:15, 119:5, 128:18, 128:19, 143:7, 144:8, 147:15, 149:24, 150:17, 155:23, 156:18, 158:5, 160:7, 165:12, 166:24, 179:9, 180:16, 180:20, 183:19, 184:1, 184:2, 185:6, 215:3, 220:25, 225:5, 249:21, 250:8, 253:4, 261:23, 265:13, 273:20, 276:5, 287:21

**cap** [3] - 273:3, 281:9, 281:22

**capable** [1] - 171:18

**caps** [3] - 250:2, 250:13, 298:11

**car** [7] - 169:18, 242:16, 242:17, 242:20, 243:1, 243:7, 243:8

**card** [1] - 302:22

**care** [3] - 117:9, 124:9, 255:17

**Carolina** [1] - 288:20

**Carotek** [31] - 121:18, 121:22, 122:5, 122:14, 123:4, 123:5, 123:8, 123:13, 123:22, 124:4, 124:5, 124:8, 124:21, 215:19, 216:6, 216:10, 216:14, 254:9, 254:20, 254:22, 255:5, 255:8, 255:17, 255:18, 255:21, 256:14, 256:21, 257:2, 259:18

**carried** [2] - 148:15, 164:8

**carries** [1] - 302:15

**carry** [1] - 309:12

**carve** [1] - 261:10

**carve-out** [1] - 261:10

**carved** [1] - 189:23

**Case** [1] - 81:6

**case** [200] - 82:1, 99:7, 103:3, 104:12, 107:3, 107:15, 108:19, 110:5, 110:6, 113:8, 113:23, 114:3, 114:4, 118:22, 119:9, 121:18, 121:19, 121:22, 122:8, 123:6, 123:13, 124:14, 125:13, 125:14, 128:6, 129:6, 129:7, 131:10, 131:11, 131:12, 131:22, 135:8, 135:24, 139:13, 140:7, 141:6, 153:1, 156:3, 156:12, 157:13, 157:18, 158:7, 160:8, 160:14, 161:1, 161:16, 161:22, 162:9, 162:23, 164:3, 164:14, 165:1, 165:4, 165:21, 165:24, 166:3, 166:6, 166:17, 166:18, 166:19, 168:4, 168:6, 168:9, 169:3, 169:7, 169:12, 169:13, 170:1, 170:18, 172:5, 172:10, 172:12, 176:15, 178:14, 180:9, 182:15, 186:14, 187:1, 187:4, 187:5, 187:14, 187:16, 188:4, 188:11, 189:21, 190:8, 190:12, 190:15, 191:5, 191:15, 192:6, 193:3, 193:16, 194:3, 194:4, 194:5, 195:15, 196:8, 196:12, 196:14, 196:19, 197:21, 198:21, 200:21, 201:2, 202:18, 203:6, 204:13, 204:22, 205:24, 206:2, 207:15, 210:17, 212:14, 212:16, 213:23, 214:8, 215:9, 215:10, 215:19, 215:20, 215:25, 216:3, 216:6, 216:8, 216:10, 218:4,

219:12, 220:6, 220:10, 222:14, 222:18, 223:14, 231:25, 235:16, 237:7, 239:12, 241:7, 249:18, 250:19, 251:3, 254:9, 254:11, 256:1, 256:3, 256:4, 256:5, 256:21, 257:15, 257:20, 257:21, 258:15, 262:13, 265:24, 267:25, 271:9, 271:11, 272:1, 272:4, 272:8, 276:1, 276:2, 276:20, 281:8, 285:23, 286:16, 286:21, 287:9, 288:19, 288:20, 289:8, 289:20, 289:21, 290:1, 290:4, 291:13, 291:21, 293:24, 297:19, 297:25, 298:1, 298:4, 298:18, 301:2, 303:2, 304:1, 304:13, 304:20, 307:7, 308:2, 308:11, 308:16, 310:2, 311:7

**cases** [36] - 96:2, 98:9, 99:5, 115:2, 116:14, 121:17, 126:9, 135:19, 160:6, 161:19, 165:19, 165:20, 168:3, 168:19, 168:22, 169:6, 169:7, 169:9, 169:23, 171:17, 171:20, 175:1, 186:12, 196:24, 241:10, 261:3, 261:7, 275:20, 279:17, 288:5, 288:22, 288:24, 295:20, 297:24, 305:25, 309:21

**casimir** [1] - 80:9

**CASIMIR** [36] - 81:16, 83:5, 150:7, 150:10, 151:7, 151:10, 151:13, 155:22, 176:11, 176:22, 177:2, 184:19, 199:18, 213:3, 213:11, 213:15, 213:17, 214:24, 218:1, 222:23, 227:22, 228:22, 229:15, 229:22, 267:14, 267:17, 268:8, 268:12, 268:16, 272:20, 280:25, 281:5, 283:5, 283:16, 292:14, 313:5

**Casimir** [3] - 80:10, 81:16, 282:5

**catalog** [6] - 224:2, 224:6, 224:7, 227:6, 268:12, 300:4

**catch** [1] - 192:16

**categories** [5] - 168:11, 171:11, 175:9, 241:6, 243:22

**Categories** [1] - 169:4

**category** [1] - 168:5

**Category** [21] - 168:16, 168:19, 168:21, 169:1, 169:5, 169:17, 169:19, 169:22, 170:6, 171:11, 171:12, 171:17, 171:20, 172:1, 173:12, 174:5, 174:7, 175:1, 175:5, 175:9, 241:15

**caused** [2] - 262:9, 263:5

**causes** [2] - 86:3, 259:9

**caution** [1] - 121:13

**CCS** [5] - 235:16, 235:19, 235:21, 236:24

**CD** [8] - 102:9, 103:3, 103:4, 103:6, 103:14, 103:17, 103:23, 247:9

**cease** [2] - 133:12, 134:8

**Celotex** [1] - 245:1

**Celotex-type** [1] - 245:1

**Center** [1] - 80:14

**centers** [2] - 121:16, 123:11

**Central** [5] - 202:17, 205:24, 257:21,

271:25, 272:7

**century** [1] - 186:13

**certain** [13] - 89:5, 111:21, 133:8, 148:20, 149:14, 186:7, 196:16, 220:12, 238:16, 287:21, 290:19, 304:3

**certainly** [25] - 83:2, 85:9, 88:8, 88:13, 97:4, 102:20, 102:24, 105:16, 121:14, 125:6, 130:24, 132:17, 139:2, 145:22, 149:6, 196:7, 196:18, 208:9, 235:5, 243:4, 245:9, 249:7, 277:11, 282:4, 291:11

**certificate** [71] - 83:24, 121:9, 121:23, 122:8, 122:10, 122:15, 122:22, 122:23, 123:1, 123:2, 123:3, 123:4, 123:8, 124:1, 124:15, 124:22, 124:23, 124:24, 125:10, 150:24, 186:1, 200:21, 200:22, 200:25, 201:17, 201:21, 203:17, 204:1, 205:7, 205:12, 205:13, 205:17, 208:18, 213:24, 215:1, 215:3, 215:11, 215:12, 215:17, 216:2, 217:4, 217:6, 217:8, 217:20, 217:23, 253:18, 253:20, 254:7, 254:17, 254:25, 255:5, 255:10, 255:22, 255:24, 256:2, 256:7, 256:11, 256:12, 256:15, 256:17, 256:20, 256:22, 256:24, 257:5, 259:13, 259:15, 260:5, 260:12, 260:23, 261:1, 261:4

**certificates** [3] - 186:5, 216:16, 257:13

**certified** [2] - 294:25, 314:8

**certify** [1] - 314:3

**CFO** [1] - 106:3

**chain** [1] - 169:8

**Chair** [5] - 131:10, 131:18, 135:3, 135:15, 135:16

**challenged** [1] - 182:16

**challenges** [2] - 171:23, 172:6

**challenging** [1] - 109:14

**chance** [2] - 108:2, 151:23

**change** [12] - 87:23, 102:19, 103:9, 116:18, 133:1, 134:1, 134:14, 230:19, 237:7, 247:9, 262:11

**changed** [12] - 132:12, 132:19, 132:20, 175:6, 230:3, 242:3, 246:14, 261:18, 262:16, 263:1, 296:17

**changes** [10] - 86:21, 116:17, 119:20, 147:11, 169:25, 170:3, 171:25, 175:4, 196:3

**changing** [3] - 147:9, 164:19, 238:19

**chart** [1] - 303:19

**check** [2] - 180:6

**checked** [1] - 137:1

**chemical** [4] - 116:13, 116:16, 116:18, 116:19

**chemicals** [1] - 116:16

**chemist** [1] - 116:15

**choice** [2] - 259:2, 259:5

**choose** [1] - 243:11

**chose** [2] - 260:16, 304:23

**circle** [2] - 85:12, 154:22

**circled** [1] - 152:3
**Circuit** [30] - 98:12, 107:4, 107:16, 113:22, 114:2, 115:22, 116:6, 119:3, 119:10, 123:14, 124:12, 125:3, 127:5, 131:11, 131:16, 131:17, 132:2, 135:16, 193:23, 194:4, 196:8, 196:12, 251:2, 255:12, 257:15, 258:7, 275:20, 276:12, 277:16, 279:4
**Circuit's** [3] - 118:20, 195:20, 244:4
**circumstance** [1] - 262:16
**circumstances** [9] - 132:10, 165:25, 166:1, 166:20, 167:21, 241:8, 241:17, 263:1, 307:4
**circumstantial** [10] - 98:6, 98:8, 98:11, 98:19, 98:22, 98:24, 101:24, 102:13, 102:20, 280:18
**citation** [4] - 162:20, 169:8, 181:11, 207:4
**citations** [6] - 100:22, 101:9, 120:10, 175:17, 207:1, 219:23
**cite** [8] - 140:7, 165:21, 166:17, 194:3, 215:19, 239:3, 246:11, 256:25
**cited** [24] - 92:7, 99:8, 108:20, 113:17, 124:15, 162:20, 166:17, 168:4, 169:7, 169:8, 186:12, 186:20, 193:16, 202:17, 205:24, 215:9, 248:17, 249:18, 251:4, 273:25, 285:24, 286:16, 288:5, 293:25
**cites** [11] - 108:17, 112:25, 116:14, 141:6, 195:2, 195:22, 197:16, 240:25, 256:4, 264:5, 271:10
**citing** [4] - 101:8, 123:14, 165:19, 264:4
**civilians** [1] - 295:3
**Cl** [1] - 286:21
**Claim** [45] - 89:19, 91:7, 94:8, 112:7, 112:12, 112:15, 141:14, 141:24, 152:22, 152:24, 153:2, 153:5, 153:6, 153:20, 154:5, 154:8, 155:10, 155:13, 171:4, 187:13, 188:13, 188:16, 190:8, 228:14, 228:15, 231:2, 231:20, 231:22, 232:25, 233:1, 233:5, 233:6, 233:7, 233:9, 233:10, 233:11, 233:13, 233:16, 234:25, 235:1, 235:2
**claim** [168] - 84:11, 84:16, 87:18, 88:1, 88:15, 88:21, 89:18, 92:23, 93:2, 93:24, 94:7, 95:3, 96:3, 96:5, 97:22, 98:14, 98:15, 98:19, 101:3, 111:14, 112:19, 112:22, 113:10, 113:20, 114:6, 114:10, 114:11, 115:12, 115:19, 117:10, 117:25, 121:24, 121:25, 122:10, 122:11, 122:16, 122:23, 123:8, 123:12, 123:16, 123:18, 124:16, 125:11, 126:6, 126:14, 132:22, 139:10, 140:11, 140:12, 140:22, 141:3, 141:7, 141:15, 142:8, 142:15, 142:19, 143:4, 144:5, 151:18, 151:22, 151:25, 152:15, 152:21, 153:11, 153:19, 155:13, 157:12, 162:12, 170:5, 170:17, 185:19, 186:9, 186:14, 188:2, 188:9,

188:12, 188:22, 191:16, 193:14, 198:24, 198:25, 199:5, 199:6, 200:23, 201:12, 201:20, 201:23, 202:7, 203:13, 203:15, 203:18, 204:2, 204:21, 204:23, 205:3, 205:8, 205:21, 206:3, 206:5, 207:4, 207:19, 208:16, 211:13, 211:23, 213:19, 215:4, 215:8, 215:15, 215:16, 215:23, 216:4, 216:11, 217:1, 217:11, 219:8, 219:9, 219:17, 220:1, 220:3, 220:4, 228:9, 228:16, 228:18, 230:2, 230:24, 231:4, 231:6, 231:8, 233:18, 234:21, 235:11, 235:18, 235:23, 235:24, 236:1, 236:2, 249:19, 249:20, 254:14, 255:1, 255:7, 255:14, 255:22, 256:2, 256:9, 256:10, 256:13, 256:24, 259:11, 260:6, 260:8, 260:23, 263:11, 268:18, 269:1, 269:22, 270:5, 276:14, 276:16, 278:4, 278:18, 278:22, 279:25, 288:6
**claimed** [25] - 96:13, 97:1, 99:3, 112:7, 114:10, 124:5, 155:11, 170:14, 175:25, 185:9, 186:22, 187:10, 187:16, 188:6, 188:7, 198:24, 249:24, 250:2, 250:4, 251:20, 268:22, 273:6, 273:8, 277:23
**claiming** [9] - 124:2, 153:7, 157:12, 250:1, 260:14, 263:3, 305:25, 307:8
**Claims** [24] - 88:21, 89:18, 112:2, 112:5, 112:16, 114:19, 114:20, 190:13, 190:15, 190:20, 198:6, 198:12, 230:24, 232:1, 232:4, 236:19, 249:17, 273:13, 287:9, 287:10, 287:11, 287:12, 289:14, 302:18
**claims** [100] - 90:19, 91:7, 94:24, 99:7, 109:16, 111:14, 111:25, 112:3, 112:4, 113:16, 114:23, 115:20, 116:3, 117:24, 123:17, 132:9, 135:23, 140:5, 140:10, 140:18, 140:19, 141:3, 141:12, 142:2, 142:11, 142:21, 142:24, 150:18, 150:20, 150:21, 151:18, 151:21, 152:23, 152:25, 153:22, 157:13, 158:4, 158:6, 158:8, 167:15, 167:16, 176:4, 177:8, 184:5, 185:6, 185:9, 185:12, 185:14, 186:15, 186:17, 187:21, 188:3, 188:7, 190:1, 190:5, 190:12, 190:21, 191:1, 193:4, 194:12, 197:9, 197:24, 198:5, 198:6, 198:9, 198:18, 198:23, 199:4, 199:7, 199:8, 199:12, 218:20, 219:4, 219:6, 219:18, 228:7, 228:10, 230:17, 241:19, 245:5, 250:6, 250:20, 250:21, 251:6, 251:17, 268:1, 273:13, 276:18, 278:1, 278:6, 280:4, 284:22, 285:1, 292:6, 306:5
**clarification** [3] - 110:24, 166:21, 172:17
**clarified** [3] - 116:6, 166:19, 172:22
**clarifies** [2] - 93:6, 166:20
**clarify** [5] - 166:5, 231:24, 234:12, 304:19, 305:7

**clarity** [1] - 131:7
**classic** [3] - 204:6, 212:16
**clause** [13] - 284:18, 285:2, 285:3, 285:5, 285:7, 285:18, 286:5, 287:4, 291:24, 294:6, 303:4, 303:23
**clean** [1] - 254:15
**clear** [60] - 87:15, 88:6, 93:11, 97:2, 99:10, 99:12, 99:20, 100:8, 101:12, 105:7, 106:14, 106:16, 111:2, 118:16, 128:8, 128:17, 128:18, 129:16, 130:19, 131:5, 131:10, 131:22, 132:7, 143:4, 145:8, 148:16, 149:25, 160:7, 165:9, 172:7, 181:21, 193:10, 195:19, 196:8, 203:12, 215:20, 224:21, 227:17, 231:17, 235:21, 236:3, 244:24, 248:9, 248:11, 255:14, 257:15, 262:5, 262:8, 262:12, 265:21, 266:25, 271:10, 279:18, 285:24, 289:20, 292:17, 295:16, 298:18
**clearer** [1] - 255:15
**clearly** [9] - 134:18, 167:22, 170:6, 187:23, 222:1, 224:18, 261:14, 262:21, 302:22
**cleave** [1] - 282:7
**CLERK** [2] - 81:3, 282:24
**clerk** [2] - 274:11, 282:25
**click** [7] - 115:6, 115:14, 115:21, 115:24, 116:1, 116:2, 279:19
**clicked** [1] - 311:1
**client** [3] - 81:11, 299:14, 300:25
**clock** [1] - 147:12
**close** [2] - 119:6, 119:8
**closed** [1] - 250:1
**closed-ended** [1] - 250:1
**closely** [1] - 249:15
**closer** [2] - 233:7, 246:8
**closest** [2] - 120:6
**code** [4] - 303:25, 304:1, 311:4, 311:13
**coexist** [1] - 225:16
**coffee** [1] - 253:25
**Coleman** [1] - 143:18
**colleague** [1] - 181:16
**colleagues** [1] - 232:15
**Collins** [2] - 194:4, 276:1
**color** [1] - 154:13
**colored** [2] - 152:7, 187:19
**colors** [1] - 152:17
**column** [2] - 303:18, 312:5
**combinations** [2] - 196:14, 196:17
**coming** [7] - 97:23, 148:25, 164:24, 191:18, 264:16, 264:20, 300:7
**comment** [1] - 212:4
**commercial** [8] - 172:4, 223:18, 224:1, 225:23, 242:1, 246:2, 287:1, 289:24
**commercialization** [3] - 166:10, 172:8, 172:20
**commercialized** [1] - 243:5
**commercializing** [1] - 227:13
**commercially** [1] - 241:21
**common** [4] - 152:1, 168:13, 221:13,

243:8
**communicated** [2] - 240:11, 240:14
**communication** [2] - 175:19, 210:25
**communications** [5] - 138:21, 202:7, 214:4, 225:25, 257:18
**companies** [1] - 206:10
**company** [5] - 100:13, 105:24, 130:16, 180:2, 221:19
**compare** [3] - 135:14, 170:18, 170:24
**compared** [4] - 116:13, 116:20, 136:23, 173:16
**compelled** [1] - 147:12
**compelling** [1] - 260:3
**competent** [1] - 292:2
**competitor's** [2] - 250:14, 250:15
**complaining** [1] - 293:6
**complains** [1] - 294:9
**Complaint** [4] - 204:4, 206:6, 208:17, 208:19
**complete** [4] - 100:20, 160:9, 173:7, 281:15
**completed** [2] - 82:22, 281:25
**completely** [3] - 176:13, 230:5, 244:3
**complexities** [1] - 173:15
**complied** [1] - 255:15
**comply** [2] - 188:6, 310:8
**complying** [1] - 135:13
**component** [17] - 151:17, 153:16, 153:20, 154:5, 154:7, 154:13, 154:16, 156:21, 156:24, 162:7, 167:9, 191:22, 213:5, 229:1, 233:19, 268:24, 269:25
**components** [14] - 153:17, 153:23, 161:11, 162:13, 167:18, 171:6, 174:12, 176:14, 184:12, 222:10, 228:11, 233:23, 234:19, 269:20
**comprises** [1] - 113:17
**comprising** [4] - 141:19, 198:23, 232:6, 235:11
**computer** [5] - 81:25, 102:23, 252:16, 264:14, 265:4
**conceded** [1] - 198:3
**concept** [10] - 215:10, 232:5, 236:1, 284:14, 284:15, 285:19, 306:17, 306:18, 308:23, 308:25
**conception** [11] - 102:12, 156:14, 156:21, 156:22, 156:23, 157:3, 179:13, 271:16, 271:18
**concepts** [3] - 157:6, 272:2, 281:19
**conceptually** [1] - 287:24
**concern** [3] - 293:6, 293:17, 311:6
**concerned** [1] - 298:4
**concerns** [1] - 125:4
**conclude** [6] - 130:21, 194:23, 223:22, 227:16, 277:18, 292:22
**concluded** [2] - 93:6, 180:25
**concludes** [3] - 106:9, 111:12, 232:8
**conclusion** [15] - 93:20, 118:8, 170:12, 170:13, 194:16, 195:6, 195:13, 195:23, 197:13, 203:23, 248:12, 262:6, 266:21, 276:10, 279:8

**conclusions** [4] - 93:5, 249:11, 252:7, 305:16
**conclusively** [1] - 229:11
**conclusory** [5] - 193:23, 194:1, 274:7, 275:24, 276:4
**concrete** [1] - 159:17
**condition** [1] - 168:18
**conditions** [8] - 168:15, 168:17, 168:20, 168:21, 171:19, 241:13, 243:24, 311:9
**conduct** [33] - 127:6, 127:8, 130:20, 131:18, 131:20, 136:3, 204:12, 204:13, 204:15, 204:19, 204:20, 206:7, 206:24, 207:17, 207:18, 211:16, 212:25, 213:4, 213:7, 213:12, 213:13, 257:10, 258:13, 261:15, 261:23, 261:24, 263:6, 303:25, 304:1, 311:4, 311:13
**conducted** [2] - 176:16, 180:8
**confer** [2] - 82:3, 282:25
**conference** [1] - 147:10
**conferred** [1] - 82:16
**confidential** [1] - 149:19
**confirm** [1] - 108:12
**confirmed** [2] - 100:21, 101:10
**confirming** [2] - 244:7
**confirms** [5] - 104:13, 104:15, 105:5, 108:14, 246:25
**conformed** [1] - 314:7
**confused** [2] - 123:25, 166:5
**Congress** [1] - 293:24
**connected** [3] - 152:3, 162:13, 233:3
**connection** [1] - 305:11
**connectivity** [2] - 154:24, 155:16
**connector** [1] - 155:7
**connects** [2] - 155:5, 174:11
**consent** [42] - 284:14, 284:15, 284:20, 284:23, 285:2, 285:13, 285:18, 285:20, 286:7, 286:17, 287:6, 287:8, 287:17, 287:19, 288:1, 288:17, 289:5, 289:8, 289:20, 290:13, 290:21, 291:5, 291:17, 291:18, 292:3, 294:4, 294:6, 294:8, 295:23, 295:25, 297:4, 298:19, 304:7, 304:12, 304:18, 305:23, 307:1, 307:3, 307:22, 307:23, 309:8
**consenting** [1] - 288:2
**consequence** [2] - 259:10, 259:11
**consider** [6] - 87:15, 98:2, 109:4, 133:20, 135:21, 194:10
**considerably** [1] - 86:9
**considerations** [1] - 306:11
**considered** [5] - 135:10, 149:14, 195:13, 196:22, 225:5
**consistent** [9] - 98:25, 102:25, 109:1, 109:13, 109:18, 124:14, 147:15, 224:25, 227:12, 249:6, 249:9, 249:13, 260:4, 269:22, 279:13
**constitute** [1] - 245:19
**constitutes** [1] - 241:9
**construction** [35] - 84:11, 88:7, 88:9, 88:15, 92:24, 93:2, 93:13, 96:3, 96:5,

117:10, 117:25, 140:22, 141:7, 142:9, 142:15, 168:24, 191:16, 191:18, 191:21, 219:10, 220:2, 220:4, 228:9, 230:2, 231:6, 231:8, 236:2, 268:19, 269:1, 270:5, 276:14, 276:20, 277:5, 279:25
**construe** [1] - 90:4
**construed** [8] - 89:8, 117:19, 276:23, 278:19, 280:1, 286:14, 305:19, 305:20
**consultant** [1] - 119:16
**contact** [2] - 230:14, 300:9
**contain** [1] - 148:21
**contained** [2] - 231:13, 312:14
**containing** [1] - 148:19
**contains** [1] - 228:17
**contemporaneous** [4] - 99:2, 104:15, 104:16, 149:5
**contemporaneously** [3] - 108:15, 108:24, 111:9
**contemporary** [1] - 208:2
**contending** [1] - 191:22
**contends** [2] - 121:1, 145:4
**content** [3] - 224:17, 225:10, 247:9
**contentions** [2] - 204:7, 228:2
**contesting** [1] - 89:24
**context** [17] - 92:14, 126:6, 132:23, 148:23, 151:2, 153:8, 170:3, 209:9, 209:10, 209:11, 209:15, 209:17, 209:25, 228:9, 264:5, 285:10, 292:24
**continuation** [1] - 81:4
**continue** [2] - 133:9, 190:7
**CONTINUED** [1] - 79:15
**continues** [3] - 133:11, 153:11, 206:7
**continuing** [2] - 131:8, 300:20
**contract** [37] - 226:24, 238:8, 281:25, 282:3, 283:15, 284:16, 286:2, 286:6, 286:9, 287:5, 288:5, 291:25, 294:10, 295:5, 295:12, 296:15, 296:21, 297:13, 299:25, 300:2, 300:11, 300:15, 300:17, 302:17, 302:25, 303:5, 303:12, 305:10, 306:19, 309:10, 309:23, 309:25, 310:9, 310:25, 311:7, 312:6
**contract's** [1] - 285:4
**contracted** [1] - 287:20
**contracting** [3] - 288:9, 288:12, 307:21
**contractor** [36] - 284:9, 290:15, 290:17, 290:19, 290:21, 291:15, 293:1, 295:10, 295:13, 296:1, 299:20, 300:13, 300:18, 301:4, 302:17, 302:24, 303:9, 303:24, 303:25, 306:2, 306:5, 306:7, 306:12, 306:13, 306:14, 307:10, 307:17, 307:18, 308:1, 309:9, 310:1, 311:5, 311:8, 312:16
**contractor's** [1] - 308:6
**contractors** [3] - 286:23, 290:11, 300:3
**contracts** [15] - 290:9, 292:6, 294:5, 295:4, 296:14, 297:10, 301:22, 302:23, 303:16, 308:10, 312:4, 312:11, 312:12, 312:13, 312:16

**contractual** [1] - 311:18
**contradicting** [1] - 165:14
**contradiction** [2] - 110:21, 110:23
**contradictory** [5] - 164:19, 165:12, 165:23, 168:1, 277:4
**contrary** [8] - 121:6, 162:22, 162:23, 251:3, 256:21, 257:2, 279:5, 279:16
**contrast** [1] - 256:1
**contrasted** [1] - 284:14
**contrasts** [1] - 167:10
**contributed** [1] - 216:10
**control** [19] - 153:21, 154:6, 154:11, 155:17, 174:10, 233:17, 233:19, 233:24, 233:25, 234:6, 234:9, 234:17, 234:22, 242:6, 243:18, 244:18, 269:9, 269:19
**controlling** [1] - 239:3
**controversial** [1] - 114:2
**convenient** [1] - 215:6
**conversation** [9] - 88:18, 89:4, 89:6, 90:13, 90:17, 90:18, 92:7, 136:11, 260:17
**convey** [2] - 206:17, 210:22
**conveying** [2] - 206:23, 208:22
**convince** [1] - 143:3
**convinced** [1] - 229:13
**convincing** [11] - 99:12, 99:21, 100:8, 128:17, 128:19, 143:4, 145:8, 145:9, 148:16, 149:25, 227:17
**Cooper** [3] - 98:18, 108:19, 109:7
**copies** [3] - 83:13, 151:6, 292:15
**copy** [5] - 83:9, 83:11, 103:15, 179:25, 274:12
**core** [1] - 294:3
**corners** [6] - 195:18, 265:11, 276:5, 276:10, 277:13, 277:17
**corollary** [2] - 173:23, 174:4
**Corp** [1] - 193:16
**correct** [21] - 89:16, 124:11, 124:25, 134:15, 171:6, 192:4, 200:22, 204:21, 206:3, 207:18, 208:15, 213:15, 216:23, 217:17, 217:19, 251:25, 279:7, 305:13, 308:19, 312:15, 314:4
**corrected** [6] - 121:8, 124:9, 207:24, 216:15, 259:20, 260:13
**correcting** [1] - 261:19
**correction** [78] - 83:24, 121:10, 121:23, 122:8, 122:10, 122:16, 122:22, 122:23, 123:1, 123:2, 123:3, 123:4, 123:8, 124:1, 124:10, 124:16, 124:22, 124:23, 124:24, 125:1, 125:11, 150:24, 186:2, 186:5, 200:21, 200:22, 200:25, 201:17, 201:21, 203:18, 204:1, 205:1, 205:7, 205:11, 205:12, 205:13, 205:17, 208:18, 213:24, 215:2, 215:4, 215:11, 215:12, 215:18, 216:2, 216:25, 217:4, 217:6, 217:9, 217:21, 217:23, 253:18, 253:21, 254:7, 254:17, 254:25, 255:6, 255:11, 255:23, 256:2, 256:7, 256:11, 256:12,

256:16, 256:17, 256:21, 257:6, 257:13, 259:13, 259:15, 260:6, 260:12, 260:23, 261:2, 261:4, 271:25
**corrections** [1] - 216:17
**correctly** [1] - 240:20
**corroborate** [7] - 97:21, 101:24, 102:6, 102:14, 159:19, 181:4, 280:19
**corroborated** [2] - 105:18, 239:7
**corroborates** [2] - 183:22, 241:3
**corroborating** [8] - 98:5, 98:13, 98:20, 104:2, 111:8, 160:17, 161:16, 239:6
**corroboration** [33] - 97:8, 97:11, 97:18, 97:24, 97:25, 98:10, 98:16, 98:18, 98:21, 99:6, 100:7, 101:21, 104:6, 104:20, 105:14, 106:24, 109:15, 160:5, 160:10, 175:24, 177:17, 177:25, 179:20, 179:21, 181:3, 183:20, 238:25, 239:9, 247:5, 248:1
**cost** [1] - 263:6
**couched** [1] - 129:11
**counsel** [22] - 81:7, 83:10, 114:4, 115:8, 127:20, 127:25, 128:1, 133:4, 209:22, 252:2, 252:5, 253:6, 260:18, 273:23, 274:10, 278:21, 279:7, 279:23, 292:10, 311:1, 311:13
**Counsel** [1] - 246:6
**count** [2] - 104:6, 219:9
**counter** [3] - 127:23, 264:7, 264:24
**counter-sniper** [2] - 264:7, 264:24
**couple** [9] - 89:13, 121:17, 126:8, 200:7, 200:16, 253:5, 254:1, 282:16, 288:23
**coupled** [1] - 169:18
**course** [13] - 84:11, 104:4, 107:7, 155:23, 223:14, 236:13, 249:21, 250:5, 285:13, 286:11, 289:9, 290:4, 290:20
**COURT** [130] - 79:1, 79:19, 80:18, 81:2, 81:17, 81:24, 82:5, 82:9, 82:25, 83:3, 83:6, 83:12, 84:6, 89:3, 89:9, 89:11, 90:3, 90:5, 90:22, 91:2, 91:5, 92:25, 95:4, 95:9, 95:17, 95:20, 96:6, 115:8, 137:6, 137:12, 137:18, 138:4, 139:11, 139:17, 150:6, 151:6, 151:8, 151:12, 155:21, 176:5, 176:21, 177:1, 184:15, 184:20, 184:22, 191:2, 191:12, 192:2, 192:7, 192:15, 199:15, 199:17, 212:23, 213:6, 213:13, 213:16, 214:23, 217:25, 222:22, 227:21, 228:21, 229:9, 229:21, 232:10, 232:13, 233:6, 234:5, 234:15, 237:19, 237:24, 238:7, 238:13, 238:18, 242:25, 243:6, 246:6, 253:23, 265:25, 267:12, 267:16, 268:7, 268:9, 268:15, 272:17, 272:22, 274:14, 278:8, 278:10, 278:13, 278:16, 280:22, 281:3, 281:17, 282:8, 282:15, 283:1, 283:7, 283:11, 283:20, 283:24, 292:12, 292:16, 295:4, 295:11, 296:20, 297:1, 299:13, 300:18, 301:18, 302:7, 302:9, 305:25, 306:9,

306:20, 307:2, 307:7, 307:12, 307:24, 308:9, 308:17, 308:20, 308:24, 309:2, 309:4, 309:14, 311:22, 312:11, 312:21, 313:3, 313:7
**Court** [77] - 82:3, 83:11, 89:7, 91:17, 91:24, 92:2, 93:17, 95:2, 95:24, 96:4, 96:21, 105:8, 108:10, 109:4, 110:20, 111:6, 111:7, 111:11, 117:18, 119:15, 119:20, 122:5, 122:25, 124:7, 124:18, 125:7, 125:8, 125:23, 126:13, 130:20, 135:21, 135:25, 140:21, 141:1, 141:10, 142:9, 165:8, 186:13, 240:2, 249:14, 249:19, 253:5, 253:11, 254:22, 255:8, 255:17, 255:18, 255:21, 256:14, 257:4, 258:9, 265:21, 268:11, 271:9, 272:5, 273:11, 276:7, 276:23, 280:1, 282:25, 285:19, 287:9, 287:10, 287:11, 287:12, 289:13, 295:24, 298:4, 301:19, 302:18, 305:2, 305:14, 308:19, 310:11, 314:13
**court** [10] - 82:3, 128:2, 128:22, 129:8, 129:13, 148:21, 257:16, 282:20, 287:13, 287:15
**Court's** [8] - 93:15, 93:20, 117:10, 117:25, 276:20, 277:4, 277:5, 282:2
**Courthouse** [1] - 80:18
**Courts** [5] - 169:10, 298:2, 305:16, 309:24, 310:11
**cover** [2] - 193:5, 197:25
**covered** [9] - 190:20, 194:12, 196:24, 198:17, 230:12, 285:19, 294:6, 294:7, 297:8
**covering** [1] - 190:5
**crack** [2] - 107:14, 108:1
**cracking** [1] - 108:3
**crafty** [1] - 196:1
**create** [5] - 154:25, 165:12, 165:14, 166:24, 214:15
**created** [13] - 100:11, 102:7, 102:9, 102:15, 102:22, 103:17, 103:23, 103:24, 104:4, 168:5, 179:23, 247:11, 280:16
**creating** [3] - 103:14, 150:8, 162:14
**credibility** [1] - 247:20
**credible** [2] - 105:17, 210:10
**credit** [1] - 277:6
**credulity** [1] - 223:18
**criteria** [2] - 243:25, 291:17
**critical** [18] - 95:13, 96:16, 100:16, 112:4, 114:9, 127:2, 139:21, 140:25, 145:12, 150:2, 174:19, 233:15, 261:4, 262:18, 266:4, 278:18, 294:1
**critically** [6] - 84:24, 102:9, 121:21, 126:5, 130:9, 130:18
**cross** [24] - 81:4, 83:22, 84:1, 96:9, 99:17, 99:23, 120:23, 126:3, 128:8, 137:24, 152:17, 152:18, 178:1, 178:16, 178:22, 178:24, 179:8, 180:21, 181:20, 182:13, 184:10, 247:20, 248:11, 248:13

**cross-exam** [1] - 180:21
**cross-examination** [10] - 178:1, 178:16, 178:22, 178:24, 179:8, 181:20, 182:13, 184:10, 247:20, 248:11
**cross-motions** [6] - 81:4, 83:22, 99:23, 120:23, 128:8, 137:24
**cross-move** [1] - 126:3
**cross-moved** [1] - 96:9
**cross-section** [2] - 152:17, 152:18
**crossed** [2] - 147:8, 147:15
**Crowther** [2] - 80:17, 81:11
**CRR** [2] - 80:18, 314:12
**crystal** [2] - 160:7, 224:21
**CSR** [3] - 80:18, 314:12, 314:13
**Ct** [1] - 286:21
**cup** [1] - 253:25
**curious** [3] - 89:14, 221:10, 237:25
**current** [1] - 293:11
**cursory** [4] - 161:6, 220:2, 265:19, 270:5
**curved** [2] - 191:19, 276:25
**custodian** [1] - 104:3
**customer** [1] - 289:1
**customers** [1] - 289:23
**cut** [7] - 89:25, 90:9, 103:14, 136:11, 138:21, 237:11, 259:6
**cuts** [1] - 133:16

# D

**D.C** [1] - 287:15
**damage** [1] - 162:8
**damages** [38] - 121:1, 125:21, 126:7, 126:14, 150:25, 202:11, 202:13, 202:15, 202:21, 205:8, 205:15, 205:24, 205:25, 208:17, 211:10, 212:13, 215:3, 215:6, 215:10, 215:12, 217:7, 258:10, 258:17, 259:4, 259:6, 259:9, 259:11, 272:7, 272:11, 272:13, 272:14, 281:10, 281:11, 287:14, 308:15, 308:17, 310:6
**dark** [3] - 153:10, 153:14, 155:4
**data** [4] - 103:5, 103:15, 105:25, 122:4
**date** [85] - 83:22, 96:7, 96:12, 96:19, 97:7, 97:12, 97:20, 99:14, 102:19, 103:9, 103:21, 104:1, 111:12, 124:25, 136:9, 137:3, 137:4, 138:7, 138:14, 138:20, 145:2, 145:4, 145:5, 145:13, 145:18, 147:6, 147:15, 150:2, 150:20, 156:2, 156:4, 156:5, 156:14, 156:16, 157:9, 157:24, 157:25, 158:5, 159:2, 159:16, 175:20, 175:25, 178:7, 180:17, 184:14, 185:10, 185:20, 186:4, 186:18, 188:10, 188:12, 188:23, 190:6, 193:12, 193:13, 199:10, 199:13, 203:19, 218:13, 218:15, 223:3, 223:11, 223:14, 223:16, 223:17, 226:9, 226:14, 226:16, 227:5, 231:24, 232:5, 238:20, 267:5, 270:10, 270:16, 270:21, 273:1,
278:5, 280:20, 282:19, 312:22
**DATE** [1] - 314:12
**dated** [6] - 102:5, 102:17, 103:8, 147:6, 180:7, 247:8
**dates** [28] - 104:14, 136:6, 136:22, 136:23, 145:23, 147:1, 147:3, 147:4, 147:8, 147:13, 147:14, 157:16, 157:22, 178:23, 179:2, 179:5, 180:2, 181:13, 183:21, 185:22, 186:13, 211:19, 218:12, 218:14, 223:3, 227:10, 227:15, 227:19
**David** [2] - 80:9, 81:16
**DAVIS** [28] - 81:15, 184:24, 191:8, 191:14, 192:5, 192:8, 192:17, 199:16, 232:14, 233:8, 234:12, 234:16, 272:24, 274:12, 274:17, 278:9, 283:6, 292:17, 295:8, 295:15, 296:24, 297:2, 299:19, 301:11, 301:20, 309:18, 312:15, 313:6
**Davis** [8] - 80:13, 81:15, 114:4, 150:21, 184:13, 272:20, 272:22, 292:14
**DAY** [1] - 79:16
**days** [3] - 137:1, 164:18, 196:9
**DE** [1] - 96:15
**dead** [1] - 206:19
**deal** [4] - 158:18, 259:24, 281:19, 290:4
**dealing** [3] - 207:14, 207:16, 265:19
**deals** [3] - 286:24, 287:15, 287:16
**dealt** [1] - 208:20
**death** [1] - 174:22
**debate** [1] - 111:13, 112:10, 118:1, 119:14, 121:16, 222:17, 240:1, 254:21, 277:24, 278:3, 294:5
**debated** [1] - 91:18
**decade** [2] - 208:14, 214:11
**decade-plus** [1] - 214:11
**decades** [1] - 119:17
**deceive** [1] - 126:19
**deceived** [4] - 139:1, 212:3, 212:7, 263:5
**December** [4] - 159:9, 159:15, 201:14, 224:24
**deception** [17] - 126:22, 126:23, 127:1, 127:2, 127:12, 128:13, 128:16, 128:24, 128:25, 129:14, 129:25, 131:5, 132:5, 135:5, 212:7, 257:9
**deceptive** [8] - 130:25, 136:3, 212:4, 257:10, 258:13, 261:8, 261:22, 261:24
**decide** [4] - 96:22, 191:13, 253:7
**decided** [6] - 141:1, 142:9, 261:5, 279:25, 298:1, 306:14
**deciding** [4] - 186:6, 301:8, 305:10, 311:7
**decision** [13] - 114:1, 118:21, 134:1, 135:12, 187:13, 195:20, 237:25, 244:4, 262:10, 265:16, 272:2, 277:15, 295:24
**decision-maker** [1] - 262:10
**decisions** [3] - 196:7, 288:18
**deck** [2] - 232:16, 248:20
**declarant** [1] - 166:4
**declaration** [56] - 100:25, 101:1, 101:4, 101:6, 105:10, 106:2, 109:25, 110:1, 110:3, 110:13, 110:16, 111:4, 111:5, 135:7, 160:23, 161:5, 161:14, 161:21, 162:25, 164:19, 164:22, 165:9, 165:11, 165:24, 167:4, 167:14, 167:24, 170:7, 177:15, 178:13, 178:17, 178:18, 178:21, 179:7, 179:24, 181:13, 182:12, 182:17, 183:17, 215:15, 240:1, 240:10, 244:21, 254:14, 261:19, 262:13, 262:15, 270:18, 274:23, 279:6, 284:24, 301:21, 303:17, 312:4, 312:9
**declarations** [1] - 299:23
**deemed** [1] - 201:21
**default** [1] - 305:24
**defeat** [1] - 166:13
**defeated** [1] - 210:5
**defeating** [1] - 209:2
**defend** [3] - 214:15, 214:18, 214:19
**defendant** [13] - 81:15, 81:16, 81:20, 81:21, 81:22, 113:11, 128:14, 128:17, 131:17, 131:19, 131:23, 135:3, 254:22
**Defendant** [1] - 79:9
**DEFENDANT** [1] - 80:9
**defendant's** [1] - 129:8
**defense** [43] - 83:4, 120:24, 126:4, 126:14, 126:17, 127:2, 127:5, 129:18, 131:12, 132:3, 135:17, 135:21, 136:1, 144:16, 144:19, 145:7, 210:1, 220:19, 221:5, 222:6, 258:1, 258:9, 261:12, 282:1, 282:3, 283:15, 284:10, 291:15, 292:5, 292:21, 292:23, 293:4, 293:10, 293:25, 294:7, 294:25, 302:24, 306:4, 311:15, 312:1, 313:4
**defenses** [10] - 83:25, 84:3, 84:4, 84:5, 95:23, 96:8, 120:23, 137:23, 137:25, 138:3
**defined** [3] - 87:20, 94:24, 95:6
**defines** [1] - 92:20
**defining** [1] - 95:4
**definitely** [4] - 90:23, 249:10, 280:13, 283:17
**definitively** [5] - 98:13, 100:2, 104:1, 144:3, 247:8
**degree** [1] - 86:20
**degrees** [5] - 86:20, 183:6, 183:9, 248:21, 249:5
**delay** [9] - 126:21, 126:24, 139:10, 212:11, 213:18, 214:17, 259:9, 263:23, 263:24
**deliver** [3] - 104:25, 296:13, 297:22
**delivered** [6] - 240:15, 240:23, 297:6, 297:16, 299:8, 301:16
**delivery** [1] - 280:11
**demand** [2] - 128:4, 132:24
**demanding** [1] - 109:15
**demands** [1] - 135:13
**Deming** [1] - 80:11

**demonstrably** [1] - 147:1
**demonstrate** [12] - 150:17, 155:23, 156:6, 156:8, 158:19, 159:23, 159:24, 160:25, 168:10, 184:1, 184:2, 204:11
**demonstrated** [4] - 163:12, 175:10, 176:3, 227:8
**demonstrates** [1] - 156:9
**demonstrating** [1] - 96:25
**demonstratives** [1] - 303:14
**denied** [2] - 218:6, 253:2
**denies** [1] - 293:25
**Dennis** [21] - 132:6, 132:20, 133:14, 133:16, 133:25, 134:24, 135:8, 202:4, 207:2, 207:9, 207:20, 207:24, 208:4, 209:22, 209:23, 211:12, 262:6, 262:9, 262:12, 263:19
**Dennis's** [4] - 207:4, 207:12, 262:15, 263:6
**departing** [1] - 196:5
**Department** [1] - 286:15
**dependent** [2] - 112:2, 112:4
**depicted** [1] - 195:7
**deponent** [2] - 166:4, 209:4
**deponent's** [1] - 209:13
**deposed** [4] - 163:17, 202:5, 209:24, 226:17
**deposition** [30] - 86:14, 92:6, 100:23, 100:24, 101:7, 101:11, 104:11, 109:11, 110:11, 110:12, 111:1, 129:16, 130:12, 130:15, 133:24, 147:22, 163:3, 172:9, 176:17, 178:16, 181:10, 181:12, 181:16, 181:19, 181:24, 195:3, 209:19, 221:18, 225:8, 241:24
**describe** [2] - 85:2, 87:18
**described** [9] - 186:10, 186:15, 188:18, 192:23, 196:4, 199:5, 265:6, 279:3, 312:4
**describes** [3] - 115:4, 154:8, 168:11
**describing** [5] - 93:17, 157:19, 157:20, 166:19, 300:21
**description** [16] - 105:11, 113:4, 115:19, 116:7, 118:25, 155:19, 187:3, 188:4, 189:7, 189:25, 197:21, 198:7, 250:18, 269:3, 269:19, 297:17
**deserves** [1] - 157:12
**design** [58] - 119:16, 119:23, 120:4, 133:7, 146:7, 157:20, 161:24, 162:8, 166:11, 171:13, 171:23, 172:4, 172:5, 172:6, 172:8, 172:18, 172:21, 173:12, 173:15, 173:16, 176:19, 178:6, 178:7, 183:10, 183:12, 183:13, 185:17, 185:19, 198:4, 199:25, 200:19, 202:25, 206:16, 210:21, 211:25, 218:25, 220:11, 220:16, 221:7, 221:15, 221:20, 221:23, 221:25, 222:3, 222:11, 224:6, 226:20, 226:23, 226:25, 227:8, 227:12, 242:4, 242:22, 244:14, 250:4, 252:14, 271:14
**designated** [2] - 261:11, 261:12

**designation** [1] - 261:10
**designed** [21] - 107:11, 118:17, 119:17, 119:24, 162:18, 173:21, 174:1, 174:4, 184:9, 207:9, 207:25, 208:3, 220:14, 220:20, 222:9, 222:12, 226:19, 236:14, 236:17, 252:19
**designee** [4] - 86:15, 129:17, 261:11, 266:8
**designing** [6] - 200:2, 221:1, 222:9, 242:17, 245:24, 252:23
**designs** [5] - 146:2, 170:18, 178:5, 183:1, 206:10
**desist** [2] - 133:12, 134:8
**desk** [4] - 137:1, 147:7, 147:14
**destined** [1] - 302:6
**destroyed** [2] - 214:9, 263:13
**destruction** [1] - 263:22
**destructive** [1] - 171:25
**detail** [6] - 111:19, 167:7, 200:20, 241:25, 294:22, 312:12
**detailed** [1] - 110:17
**details** [9] - 136:10, 136:12, 138:19, 159:7, 171:15, 178:22, 188:1, 196:4, 247:24
**determination** [1] - 110:21
**determine** [5] - 151:20, 172:10, 172:14, 230:11, 287:5
**determined** [1] - 212:6
**determining** [1] - 224:18
**devastating** [1] - 173:21
**develop** [2] - 220:1, 220:6
**developed** [6] - 119:18, 167:11, 222:14, 231:9, 231:10, 264:8
**developing** [1] - 242:7
**development** [1] - 279:24
**device** [33] - 84:5, 113:19, 115:5, 115:6, 115:11, 115:15, 120:5, 145:18, 153:21, 153:24, 154:6, 154:11, 154:25, 161:10, 170:9, 170:13, 170:15, 187:7, 233:25, 234:3, 234:6, 234:9, 234:22, 252:21, 252:22, 264:6, 265:4, 288:8, 288:25, 289:2, 289:4, 296:2, 305:4
**devices** [4] - 115:21, 118:19, 119:13, 119:19, 119:21, 120:1, 120:2, 252:23, 279:20
**diagram** [1] - 229:13
**dice** [2] - 250:16, 279:2
**difference** [21] - 86:16, 86:22, 86:25, 87:25, 88:3, 88:16, 90:11, 91:11, 114:9, 121:16, 126:5, 126:23, 140:12, 166:2, 218:19, 287:3, 300:23, 300:25, 301:8, 305:3, 306:24
**differences** [2] - 86:17, 86:18
**different** [70] - 88:2, 91:12, 93:17, 105:21, 111:25, 112:2, 122:7, 133:7, 141:11, 146:1, 153:23, 156:11, 168:7, 168:11, 173:16, 183:1, 192:6, 192:12, 192:22, 196:11, 196:18, 202:24, 207:14, 207:15, 208:5, 208:6, 226:8,

229:12, 233:1, 233:10, 235:20, 235:22, 235:24, 241:6, 241:7, 242:7, 246:16, 246:17, 246:18, 246:20, 248:20, 249:1, 250:20, 251:21, 252:7, 252:17, 254:11, 254:12, 256:6, 257:10, 257:11, 264:13, 265:5, 268:24, 275:12, 276:21, 276:22, 279:12, 289:22, 290:5, 295:21, 296:18, 298:7, 302:14, 304:12, 304:22, 304:25, 305:16, 306:6, 310:14
**differently** [3] - 96:23, 245:18, 307:15
**differs** [1] - 166:16
**difficult** [4] - 85:8, 138:22, 169:6, 186:7
**dig** [2] - 239:20, 252:13
**digitally** [1] - 314:7
**Dimension** [10] - 118:21, 118:22, 119:7, 119:8, 119:10, 119:12, 119:13, 143:18, 143:22, 252:18
**dimensions** [2] - 229:3, 229:16
**direct** [6] - 98:22, 99:6, 105:8, 108:21, 110:12, 300:9
**direction** [4] - 230:3, 234:8, 264:15, 305:5
**directions** [1] - 305:4
**directly** [11] - 94:6, 118:20, 154:1, 233:3, 235:5, 235:9, 276:2, 295:4, 295:6, 296:6, 300:16
**directs** [1] - 264:23
**disagree** [3] - 124:7, 190:25, 305:15
**disagreed** [1] - 252:2
**disagreeing** [1] - 215:17
**disagreement** [1] - 252:4
**disagrees** [4] - 92:2, 163:5, 163:6, 279:8
**disappear** [1] - 213:22
**disappearing** [1] - 205:9
**disassembled** [1] - 210:18
**disc** [2] - 104:3, 104:4
**discerned** [1] - 274:5
**disclose** [15] - 112:21, 113:25, 114:17, 133:5, 146:13, 185:8, 187:24, 187:25, 250:24, 251:16, 253:14, 277:2, 277:19, 279:19, 279:21
**disclosed** [29] - 98:14, 113:12, 116:4, 185:16, 185:19, 186:17, 186:23, 187:8, 188:21, 189:15, 190:4, 190:17, 193:4, 193:5, 195:16, 197:25, 198:15, 198:18, 198:25, 199:2, 249:20, 250:17, 251:5, 251:10, 265:10, 273:10, 273:15, 275:22, 277:25
**discloses** [3] - 90:20, 112:11, 250:23
**disclosing** [1] - 185:25
**disclosure** [26] - 114:25, 116:2, 186:25, 187:16, 188:8, 188:25, 191:6, 191:25, 192:20, 194:22, 196:10, 196:13, 196:22, 197:5, 251:13, 251:14, 251:17, 251:21, 251:23, 253:10, 273:14, 273:16, 273:22, 275:21, 276:15, 304:4
**disconnect** [1] - 311:24

**discovery** [3] - 176:9, 245:19, 258:16
**discretion** [3] - 124:20, 125:1, 255:25
**discuss** [2] - 163:15, 186:21
**discussed** [18] - 82:10, 88:7, 93:23, 115:3, 117:12, 135:19, 142:8, 143:17, 145:3, 153:15, 254:9, 259:18, 279:20, 280:5, 286:15, 290:4, 290:8, 303:16
**discussing** [4] - 118:25, 153:1, 189:2, 240:6
**discussion** [15] - 84:13, 90:7, 129:10, 131:13, 131:15, 170:10, 209:12, 212:1, 219:9, 253:19, 265:15, 271:8, 274:10, 280:25, 304:13
**discussions** [3] - 129:5, 212:2, 281:24
**disingenuous** [1] - 220:24
**dismiss** [2] - 165:8, 226:5
**dismissed** [2] - 164:23, 165:11
**dispelled** [1] - 132:17
**dispensers** [2] - 119:25, 120:1
**display** [1] - 284:5
**displaying** [1] - 274:9
**disposed** [1] - 135:25
**dispositive** [3] - 160:20, 177:4, 177:7
**disprove** [2] - 100:7, 239:17
**dispute** [32] - 84:14, 84:23, 89:22, 94:19, 95:25, 96:1, 96:16, 97:4, 114:3, 114:23, 123:7, 157:15, 158:3, 158:6, 185:13, 199:8, 204:14, 204:22, 204:23, 218:10, 219:21, 223:5, 234:16, 234:18, 247:23, 253:8, 285:9, 289:10, 289:12, 291:10, 303:10, 305:14
**disputed** [5] - 165:15, 166:24, 184:6, 210:1, 218:5, 222:1, 222:16, 229:22, 273:16
**disputes** [3] - 96:3, 223:10, 223:11
**disputing** [3] - 156:22, 165:15, 200:23
**disregarding** [1] - 288:16
**distance** [2] - 264:10, 264:17
**distinction** [3] - 218:24, 278:18, 289:7
**distinctions** [1] - 219:24
**distinguish** [5] - 173:15, 187:6, 198:21, 288:4, 297:24
**distinguishable** [1] - 288:23
**distinguishing** [1] - 192:3
**distort** [1] - 162:6
**distributor** [1] - 149:18
**District** [15] - 80:18, 110:5, 119:15, 128:7, 202:18, 205:24, 216:8, 257:21, 271:25, 272:7, 288:19, 288:20, 295:23, 298:2, 305:16
**DISTRICT** [3] - 79:1, 79:2, 79:19
**dive** [2] - 82:19, 137:19
**dived** [1] - 117:7
**diving** [1] - 84:7
**divorced** [2] - 92:10, 127:10
**docket** [4] - 141:9, 246:25, 284:1, 303:15
**doctrine** [9] - 110:17, 110:18, 126:10, 149:13, 202:13, 257:23, 257:24,

259:8, 272:12
**doctrines** [1] - 118:25
**document** [19] - 98:3, 159:2, 159:5, 165:7, 183:18, 195:18, 197:20, 200:11, 216:21, 219:18, 263:22, 274:8, 274:18, 275:14, 275:15, 276:5, 276:10, 277:7, 277:13
**documentary** [2] - 97:3, 159:19
**documentation** [1] - 106:24
**documenting** [1] - 302:4
**documents** [22] - 98:3, 99:3, 101:14, 101:15, 104:19, 104:23, 110:14, 159:10, 179:1, 179:3, 179:5, 179:17, 179:18, 179:23, 180:1, 180:9, 181:2, 213:22, 217:15, 224:9, 225:14, 226:22, 230:20, 247:7, 263:14, 266:5, 280:12, 280:15, 297:11, 298:21, 299:13
**dollars** [1] - 300:3
**done** [29] - 95:18, 104:14, 119:23, 121:13, 126:13, 129:18, 134:23, 159:14, 161:15, 163:20, 199:24, 202:2, 207:13, 207:21, 244:6, 245:18, 252:13, 261:17, 266:7, 266:16, 270:13, 270:14, 270:19, 276:19, 282:13, 283:17
**door** [1] - 181:5
**dot** [3] - 103:12, 103:13
**double** [2] - 116:1, 308:15
**doubt** [5] - 162:11, 181:17, 223:23, 225:9, 293:18
**down** [45] - 85:15, 86:6, 88:3, 92:25, 115:9, 133:6, 139:7, 141:19, 146:16, 146:20, 148:8, 153:18, 186:8, 191:18, 228:2, 228:5, 229:3, 238:14, 240:3, 240:19, 246:7, 257:12, 258:9, 267:1, 267:5, 275:2, 295:17, 303:7, 303:8, 303:9, 303:11, 303:18, 303:20, 303:23, 304:10, 304:11, 306:18, 308:23, 308:25, 309:9, 311:2, 311:3, 311:12, 312:7
**dramatically** [3] - 202:23, 212:11, 212:20
**draw** [3] - 99:5, 128:23, 203:23
**drawing** [11] - 99:25, 100:4, 102:1, 103:25, 105:16, 116:10, 229:15, 230:4, 239:13, 248:1, 258:21
**drawings** [24] - 100:11, 100:13, 101:18, 102:5, 102:7, 102:8, 102:11, 102:13, 102:15, 102:16, 102:17, 102:22, 102:23, 159:11, 176:13, 182:7, 183:2, 183:4, 229:4, 247:8, 252:15, 271:18, 280:16
**drawn** [3] - 103:15, 210:4, 211:8
**draws** [2] - 257:25, 259:25
**drive** [14] - 90:2, 152:13, 154:7, 154:14, 189:18, 189:23, 190:22, 191:6, 191:10, 191:11, 191:17, 197:4, 269:12, 269:14
**driven** [1] - 104:24
**drop** [1] - 260:17

**drywall** [7] - 107:9, 107:10, 107:12, 107:18, 107:20, 107:21, 107:22
**duck** [1] - 264:21
**due** [1] - 206:19
**Dugan** [1] - 106:3
**Duke** [1] - 295:24
**duplicate** [2] - 168:17, 168:20
**durability** [1] - 172:15
**during** [17] - 101:4, 123:5, 129:16, 163:3, 173:11, 174:2, 176:17, 202:1, 202:2, 206:11, 207:6, 219:9, 220:10, 221:22, 225:8, 258:21, 263:15
**duty** [4] - 126:16, 126:18, 126:19

# E

**e-mail** [4] - 127:20, 130:22, 136:10, 260:16
**e-mails** [16] - 127:19, 145:19, 148:18, 148:21, 148:23, 149:12, 149:23, 214:1, 214:4, 224:11, 224:16, 225:9, 226:5, 226:7, 266:12, 266:13
**eager** [1] - 250:20
**earliest** [3] - 106:6, 106:17, 223:16
**early** [12] - 101:16, 105:8, 106:19, 123:5, 159:14, 172:20, 178:6, 178:7, 178:15, 201:3, 207:10, 224:25
**earthquake** [6] - 107:12, 107:25, 244:10, 244:11
**earthquake-prone** [1] - 244:10
**earthquakes** [3] - 107:11, 170:21, 244:5
**easier** [2] - 126:12, 168:7
**easiest** [1] - 187:11
**easily** [1] - 277:8
**Eastern** [1] - 288:19
**easy** [3] - 123:15, 160:15, 187:8
**ECF** [4] - 194:16, 275:1, 276:25, 311:8
**effect** [3] - 202:19, 248:10, 249:11
**effective** [8] - 124:19, 124:24, 186:5, 199:6, 254:18, 256:8, 258:1, 278:4
**effectively** [4] - 198:3, 246:5, 276:6, 300:15
**egregious** [1] - 131:18
**eight** [1] - 289:25
**either** [17] - 90:10, 109:18, 113:1, 114:5, 117:23, 140:1, 157:17, 158:4, 172:24, 186:3, 189:4, 249:20, 257:12, 258:12, 305:21, 307:21, 308:17
**elastic** [1] - 238:17
**elected** [1] - 128:23
**electricity** [1] - 274:18
**electronic** [4] - 100:11, 100:13, 101:18, 280:15
**element** [21] - 97:22, 98:19, 99:7, 140:12, 153:25, 155:3, 155:6, 155:8, 155:16, 213:14, 219:9, 249:18, 249:20, 250:2, 273:1, 277:23, 277:24, 278:24, 278:25, 279:3
**elements** [20] - 112:12, 113:1, 113:25, 114:17, 127:4, 140:10, 151:22,

152:24, 158:7, 167:15, 170:17,
173:20, 198:22, 198:24, 249:24,
250:4, 251:5, 273:6, 277:22
**elevation** [1] - 297:18
**Elliott** [4] - 80:5, 233:11, 237:10, 239:22
**Elmore** [2] - 170:1, 175:1
**elongate** [1] - 153:13
**elongated** [2] - 87:15, 170:20
**elsewhere** [1] - 291:13
**embodiment** [22] - 89:17, 90:20,
100:18, 115:1, 117:1, 117:5, 117:9,
117:20, 118:1, 118:4, 120:18, 189:11,
189:14, 189:17, 190:4, 192:14,
192:21, 195:7, 195:14, 274:5, 275:17,
279:15
**embodiments** [19] - 91:21, 92:1, 93:22,
189:10, 192:19, 193:5, 193:20,
194:12, 194:24, 195:9, 196:4, 197:6,
197:22, 198:9, 269:5, 269:10, 269:18,
273:14, 278:20
**emphasized** [1] - 174:6
**employee** [1] - 104:5
**employees** [1] - 104:6
**employer** [1] - 304:2
**en** [2] - 195:20, 277:15
**enable** [2] - 113:25, 114:17
**enablement** [2] - 113:4, 118:25
**encompassed** [2] - 230:6, 230:10
**encompassing** [1] - 196:23
**encounter** [1] - 244:1
**encourage** [3] - 167:6, 249:14, 271:9
**end** [17] - 84:13, 114:19, 120:18, 125:5,
127:19, 131:14, 137:17, 141:21,
155:5, 195:25, 197:21, 205:9, 214:21,
217:23, 250:2, 286:20, 305:13
**ended** [9] - 112:19, 113:8, 113:17,
129:12, 184:11, 216:11, 235:11,
250:1, 250:6
**ending** [1] - 311:25
**endings** [1] - 103:10
**endosurgery** [1] - 120:7
**ends** [3] - 153:12, 155:10, 184:12
**energy** [1] - 216:23
**enforce** [2] - 211:8, 213:20
**enforced** [1] - 207:11
**enforcement** [5] - 206:9, 294:2, 299:3,
299:11, 301:15
**enforces** [1] - 124:13
**engage** [3] - 85:14, 88:24, 95:1
**engaged** [3] - 131:18, 154:21, 269:17
**engages** [3] - 85:19, 236:15, 287:1
**engaging** [2] - 191:23, 276:25
**engine** [2] - 242:14, 242:20
**engineered** [3] - 174:2, 174:4, 176:14
**engineering** [3] - 159:11, 166:11, 229:4
**engineers** [3] - 221:20, 221:23, 221:25
**English** [2] - 92:11, 159:5
**enhance** [1] - 225:18
**enjoy** [4] - 284:12, 284:22, 286:24,

309:1
**enjoyed** [1] - 307:1
**enter** [2] - 96:22, 279:9
**entered** [4] - 96:4, 114:20, 120:19,
121:23
**enters** [1] - 303:5
**entire** [6] - 115:20, 142:13, 167:9,
221:22, 240:25, 279:19
**entirely** [15] - 230:10, 234:3, 234:14,
235:6, 242:7, 245:4, 247:6, 249:13,
256:5, 259:6, 259:12, 259:19, 264:5,
265:5, 279:13
**entirety** [1] - 274:22
**entities** [1] - 295:3
**entitled** [26] - 91:25, 93:21, 111:14,
112:20, 114:21, 130:14, 136:1,
150:20, 158:4, 185:10, 185:20, 186:4,
186:18, 188:9, 188:23, 190:5, 199:9,
199:13, 223:2, 223:9, 223:10, 223:12,
231:24, 232:4, 275:25, 276:12
**entitlement** [5] - 83:23, 90:18, 96:18,
97:6, 193:11
**entries** [1] - 180:7
**environmental** [1] - 172:15
**envision** [2] - 113:11, 116:16
**equal** [1] - 304:2
**equally** [1] - 124:4
**equipment** [2] - 299:2, 299:11
**equitable** [39] - 83:24, 126:3, 126:4,
126:6, 126:10, 126:11, 126:17, 127:4,
128:11, 128:14, 131:14, 132:3,
134:17, 135:6, 135:17, 135:20,
135:21, 136:2, 136:4, 137:16, 138:5,
138:9, 139:8, 139:12, 150:23, 199:19,
204:11, 214:21, 253:17, 253:19,
256:18, 257:8, 257:24, 258:4, 258:7,
259:14, 263:21, 263:24
**equities** [4] - 131:19, 135:22, 211:17,
212:10
**equity** [1] - 135:22
**equivalent** [1] - 108:5
**equivalently** [2] - 220:15, 220:18
**erector** [7] - 153:13, 153:16, 153:22,
155:15, 171:4, 182:5
**error** [25] - 121:7, 121:8, 124:2, 124:3,
124:6, 205:14, 215:21, 215:25, 216:9,
216:12, 216:16, 216:21, 217:2, 217:9,
254:12, 254:23, 254:24, 255:1,
256:23, 257:3, 257:4, 257:7, 259:20
**errors** [3] - 174:17, 174:20, 216:19
**especially** [1] - 273:2
**essence** [1] - 105:14
**essential** [1] - 237:24
**essentially** [8] - 112:6, 135:9, 137:16,
193:1, 196:9, 213:9, 218:17, 293:22
**establish** [3] - 194:8, 194:9, 263:24
**established** [1] - 216:8
**establishing** [2] - 143:15, 193:11
**estoppel** [48] - 83:25, 126:3, 126:6,
126:10, 126:11, 126:17, 127:5,

128:11, 131:14, 132:3, 134:18, 135:6,
135:17, 135:20, 136:2, 136:4, 137:16,
138:5, 138:9, 139:12, 150:24, 199:19,
204:6, 204:11, 208:7, 208:10, 209:5,
209:11, 209:17, 209:18, 209:22,
210:14, 212:10, 212:16, 214:14,
214:21, 253:17, 253:19, 256:18,
256:19, 257:8, 257:24, 258:4, 258:7,
259:14, 263:21, 263:25, 271:24
**estoppel's** [1] - 128:14
**etched** [1] - 189:22
**event** [17] - 94:22, 95:3, 108:11, 109:13,
110:10, 110:13, 111:4, 111:11,
128:25, 197:14, 245:10, 261:22,
263:17, 265:8, 280:3, 298:3, 310:23
**events** [2] - 149:2, 149:6
**everywhere** [2] - 122:23, 312:5
**evidence** [146] - 91:9, 96:25, 97:3, 98:2,
98:6, 98:8, 98:12, 98:13, 98:17, 98:19,
98:20, 98:22, 98:24, 99:12, 99:15,
99:21, 99:24, 100:8, 100:10, 101:24,
102:13, 102:21, 106:22, 107:15,
108:11, 108:21, 108:22, 109:7,
110:20, 111:8, 116:22, 118:7, 118:13,
120:15, 120:20, 127:11, 131:4, 143:2,
143:5, 143:7, 143:8, 143:10, 143:12,
143:14, 144:14, 144:15, 145:8, 145:9,
145:14, 148:16, 148:17, 149:25,
156:8, 156:10, 156:23, 157:3, 157:4,
157:5, 158:17, 158:18, 158:22,
159:17, 159:19, 160:2, 160:18,
160:19, 161:16, 161:17, 163:11,
163:19, 164:16, 166:13, 170:15,
175:8, 176:24, 177:3, 177:4, 177:5,
177:6, 177:13, 178:18, 180:12,
183:14, 183:16, 184:7, 184:8, 185:22,
186:19, 193:6, 193:11, 195:2, 195:22,
195:25, 197:7, 197:16, 202:2, 211:11,
214:12, 214:18, 214:19, 219:3,
223:21, 225:3, 225:12, 225:16,
227:17, 227:19, 229:19, 239:6,
239:13, 239:21, 239:24, 240:4, 241:1,
241:3, 243:20, 245:5, 245:6, 245:8,
245:15, 258:19, 260:21, 263:16,
267:8, 268:11, 270:11, 270:14,
270:19, 271:16, 271:22, 280:9,
280:18, 286:18, 290:10, 291:10,
292:1, 292:2, 292:22, 301:9, 303:22,
312:3, 312:18
**evidentiary** [7] - 109:5, 109:20, 109:22,
109:23, 110:18, 225:4, 225:14
**exact** [7] - 137:3, 161:22, 162:2, 185:18,
185:25, 235:19, 254:19
**exactly** [29] - 89:5, 108:19, 109:7,
113:18, 119:22, 122:4, 132:7, 136:10,
138:21, 166:15, 202:18, 254:21,
257:19, 259:7, 259:20, 261:9, 275:8,
287:6, 293:3, 293:12, 294:3, 295:21,
296:3, 296:12, 299:9, 300:12, 301:14
**exam** [1] - 180:21

**examination** [10] - 178:1, 178:16, 178:22, 178:24, 179:8, 181:20, 182:13, 184:10, 247:20, 248:11
**examined** [1] - 280:12
**example** [48] - 98:10, 103:7, 115:4, 115:5, 115:14, 116:9, 116:13, 119:25, 145:22, 149:17, 152:22, 187:11, 188:16, 189:4, 190:10, 190:11, 190:19, 190:20, 193:17, 194:5, 199:1, 199:2, 219:20, 220:22, 225:6, 228:14, 242:25, 243:11, 248:14, 269:3, 270:3, 279:18, 279:21, 280:3, 280:5, 284:18, 294:18, 295:5, 300:9, 303:13, 304:8, 304:10, 304:17, 305:7, 305:8, 305:10, 307:24
**examples** [11] - 104:21, 166:3, 169:17, 188:21, 190:23, 198:17, 241:7, 273:10, 273:12, 291:20, 307:9
**except** [6] - 134:11, 190:1, 198:5, 260:3, 261:11, 308:5
**exception** [4] - 109:8, 266:14, 284:11, 305:24
**exceptions** [1] - 109:18
**excerpt** [1] - 93:15
**exchange** [2] - 138:13, 225:21
**exclude** [1] - 219:5
**excluded** [1] - 119:15
**exclusive** [1] - 289:2
**exclusively** [1] - 288:25
**excuse** [8] - 208:14, 208:15, 208:16, 208:21, 208:23, 216:7, 241:22, 287:9
**excused** [1] - 216:9
**excuses** [1] - 208:8
**executive** [1] - 131:23
**exemplary** [1] - 146:4
**exercise** [2] - 124:19, 301:23
**exercising** [1] - 255:25
**Exhibit** [2] - 120:11, 296:5
**exhibit** [2] - 295:7, 295:9
**exhibits** [2] - 101:5, 101:6
**exist** [5] - 102:17, 105:23, 208:23, 290:12, 308:1
**existed** [1] - 210:5
**existing** [5] - 241:25, 242:3, 242:12, 278:25, 300:19
**exists** [3] - 301:9, 301:19, 307:25
**expand** [4] - 192:24, 202:23, 204:8, 238:8
**expanded** [4] - 189:7, 189:8, 189:25, 212:12
**expect** [4] - 143:23, 243:2, 244:1, 246:12
**expected** [2] - 241:14, 250:8
**expediency** [1] - 300:10
**expedite** [1] - 302:13
**experience** [15] - 118:18, 119:4, 119:17, 119:19, 120:4, 120:6, 120:8, 144:7, 220:11, 220:16, 220:23, 221:1, 222:11, 265:5
**expert** [45] - 84:18, 84:22, 84:24, 87:3,

87:4, 92:3, 98:8, 118:23, 119:12, 119:15, 160:23, 161:24, 193:8, 193:24, 194:1, 219:1, 220:10, 220:13, 220:15, 220:21, 221:8, 222:5, 222:9, 222:18, 222:19, 229:5, 229:25, 230:18, 245:10, 246:19, 251:9, 252:5, 252:8, 252:9, 252:17, 253:15, 253:16, 265:16, 271:12, 273:25, 276:4, 276:5, 279:10, 281:11
**expert's** [2] - 212:13, 221:1
**experts** [12] - 88:17, 220:11, 220:14, 222:17, 251:8, 252:7, 252:11, 253:3, 270:7, 273:23, 274:1, 276:15
**expired** [1] - 206:22
**explain** [8] - 166:2, 192:15, 193:20, 197:13, 208:9, 275:1, 285:1, 294:10
**explained** [3] - 133:19, 202:19, 300:7
**explaining** [9] - 109:12, 130:13, 167:12, 193:17, 203:8, 206:8, 211:22, 269:4
**explanation** [4] - 194:21, 277:6, 277:10, 277:11
**explicit** [1] - 286:18
**exploring** [1] - 133:6
**exposed** [1] - 175:3
**express** [16] - 186:24, 251:14, 251:21, 251:23, 257:18, 273:14, 273:16, 284:15, 291:16, 291:18, 291:24, 294:4, 294:5, 305:22, 307:21, 309:8
**expressly** [15] - 98:12, 188:7, 189:10, 191:24, 192:14, 251:4, 251:16, 266:23, 275:22, 287:20, 290:7
**extend** [4] - 86:2, 233:2, 233:17, 233:21
**extends** [2] - 85:11, 234:18
**extension** [1] - 103:22
**extensions** [3] - 103:12, 103:17, 103:20
**extensive** [3] - 202:19, 243:4, 243:23
**extensively** [5] - 84:19, 99:8, 163:17, 167:11, 254:10
**extent** [6] - 88:16, 121:7, 188:25, 212:7, 249:12, 290:11
**exterior** [5] - 153:12, 154:9, 228:18, 234:1, 234:7
**extra** [1] - 261:2
**extreme** [2] - 174:8, 214:17
**extremely** [4] - 110:19, 132:7, 170:23, 274:6
**extrinsic** [1] - 286:18

# F

**F.3d** [5] - 194:4, 194:6, 195:20, 239:12, 277:17
**F.Supp.2d** [1] - 295:24
**face** [37] - 85:22, 89:24, 90:2, 122:1, 122:17, 123:9, 123:19, 123:22, 125:15, 125:16, 139:20, 140:13, 152:13, 154:8, 154:14, 189:18, 189:23, 190:22, 191:7, 191:10, 191:11, 195:1, 197:4, 255:1, 255:4, 255:8, 255:14, 255:23, 256:3, 259:17,

260:8, 260:13, 265:10, 269:12, 269:14, 284:21
**facial** [1] - 125:20
**facially** [5] - 121:2, 121:6, 121:15, 122:6, 125:6
**facing** [1] - 269:12
**fact** [80] - 85:1, 89:25, 91:14, 94:22, 97:2, 98:3, 99:3, 99:19, 102:12, 102:17, 120:3, 121:6, 131:6, 131:24, 131:25, 134:24, 135:1, 135:25, 136:2, 136:13, 138:17, 139:21, 145:10, 146:24, 148:14, 165:12, 166:24, 178:3, 178:6, 179:12, 180:21, 180:22, 182:13, 183:20, 183:24, 186:23, 194:2, 205:20, 207:6, 207:15, 210:1, 210:21, 215:19, 215:23, 220:20, 221:15, 222:1, 225:7, 227:12, 230:5, 230:7, 230:17, 232:25, 236:16, 236:20, 236:21, 241:18, 244:17, 246:16, 246:17, 246:24, 247:23, 250:8, 253:11, 254:24, 254:25, 255:12, 259:7, 262:12, 263:10, 273:8, 276:16, 291:3, 291:16, 291:25, 298:14, 299:15, 302:22, 305:7, 309:22
**facts** [17] - 84:17, 119:9, 128:15, 128:21, 129:7, 129:15, 165:15, 167:23, 170:11, 184:6, 187:14, 193:22, 214:11, 222:17, 229:22, 257:19, 305:23
**factual** [11] - 84:14, 107:2, 110:21, 161:6, 193:25, 218:5, 219:21, 223:10, 223:11, 260:4, 306:11
**factually** [3] - 211:20, 212:8, 256:6
**fail** [2] - 117:3, 162:18
**failed** [5] - 170:16, 188:5, 200:23, 254:16, 271:6
**failing** [2] - 131:5
**fails** [1] - 127:3
**failure** [6] - 200:25, 204:21, 206:2, 207:18, 245:7, 259:2
**fairly** [5] - 204:6, 218:22, 220:24, 229:6, 309:23
**fall** [6] - 87:1, 123:21, 145:23, 169:4, 170:6, 278:22
**fallback** [5] - 106:20, 123:23, 125:7, 125:24, 142:23
**falls** [3] - 110:16, 114:18, 251:16
**familiar** [1] - 140:20
**fanciful** [1] - 278:20
**far** [7] - 89:23, 110:16, 123:17, 162:24, 189:22, 264:16, 308:6
**FAR** [11] - 284:17, 284:18, 285:2, 285:3, 285:5, 285:6, 286:5, 287:4, 291:24, 303:4, 303:23
**fatal** [2] - 134:17, 164:17
**fault** [5] - 124:6, 254:12, 254:23, 254:25, 255:18
**faulty** [1] - 157:4
**favor** [14] - 99:18, 99:25, 100:4, 102:2, 102:3, 105:16, 120:19, 128:14,

160:16, 212:10, 239:14, 247:25, 248:2
**faxed** [1] - 103:15
**faxes** [1] - 226:22
**FBI** [2] - 296:6, 296:9
**feature** [5] - 153:4, 250:7, 250:9, 297:19, 298:4
**features** [12] - 150:1, 152:25, 221:13, 222:3, 222:10, 290:3, 296:11, 297:6, 297:7, 298:14, 304:23
**February** [4] - 204:2, 282:18, 282:22, 283:2
**federal** [1] - 282:20
**Federal** [38] - 98:12, 107:4, 107:16, 113:22, 114:1, 115:22, 116:6, 118:20, 119:3, 119:10, 123:14, 124:12, 125:3, 127:5, 131:11, 131:16, 131:17, 132:2, 135:16, 193:23, 194:4, 195:19, 196:8, 196:12, 244:3, 251:2, 255:12, 257:15, 258:6, 275:20, 276:11, 277:15, 279:4, 284:17, 287:9, 287:12, 289:13, 302:18
**fee** [5] - 216:22, 217:3, 217:10, 217:18
**fees** [1] - 217:17
**felt** [1] - 163:1
**FERRIS** [4] - 81:23, 309:3, 309:5, 309:17
**Ferris** [8] - 80:6, 81:23, 127:25, 212:5, 284:24, 309:5, 312:4, 312:9
**Ferris's** [1] - 303:17
**few** [11] - 94:23, 104:21, 126:9, 133:24, 177:12, 208:25, 227:10, 261:5, 267:14, 282:6, 294:17
**fewer** [1] - 284:11
**fiber** [1] - 108:25
**field** [16] - 119:5, 119:20, 120:8, 143:20, 143:24, 144:4, 144:7, 161:25, 169:19, 169:20, 171:13, 241:11, 252:10, 252:14, 252:23, 265:6
**fielded** [1] - 264:8
**fields** [5] - 116:8, 116:13, 221:6, 221:25, 246:3
**fight** [1] - 140:21
**figure** [12] - 85:7, 85:21, 87:5, 152:16, 189:20, 226:24, 228:25, 229:24, 230:11, 237:14, 301:18
**figures** [8] - 117:14, 123:21, 152:4, 189:4, 189:7, 191:10, 237:2
**file** [7] - 111:24, 130:25, 205:15, 213:22, 216:16, 216:17, 217:22
**filed** [38] - 111:17, 121:12, 122:9, 122:12, 124:1, 125:14, 131:22, 132:14, 132:18, 132:25, 157:14, 158:12, 159:4, 159:7, 160:22, 161:4, 161:14, 162:2, 185:23, 186:1, 189:1, 189:6, 200:6, 200:15, 203:20, 205:5, 206:21, 214:25, 215:14, 215:17, 216:1, 217:2, 217:6, 227:11, 244:25, 245:3, 265:22, 271:1
**files** [13] - 102:20, 103:4, 103:6, 103:7, 103:11, 103:20, 103:22, 103:25, 111:17, 128:5, 200:21, 203:17

**filing** [30] - 99:14, 111:23, 125:19, 138:14, 138:20, 145:2, 145:4, 156:2, 156:4, 157:9, 157:22, 179:14, 185:20, 186:18, 188:10, 188:11, 190:5, 193:12, 193:13, 199:9, 199:13, 200:24, 223:2, 223:16, 226:9, 261:5, 261:6, 278:5
**fill** [2] - 146:14, 306:14
**filtered** [1] - 295:6
**final** [3] - 122:21, 126:2, 157:10
**finally** [5] - 246:21, 263:12, 266:3, 279:16, 280:8
**financial** [13] - 104:12, 104:16, 104:17, 105:19, 177:19, 177:20, 179:1, 179:17, 179:18, 180:1, 181:2, 183:18, 280:12
**fine** [6] - 188:18, 236:2, 283:11, 291:18, 291:21, 292:12
**finish** [4] - 82:25, 282:16, 282:18, 312:23
**finished** [4] - 101:17, 138:5, 254:6, 283:8
**Finney** [2] - 168:4, 168:9
**fire** [3] - 264:7, 264:21, 264:24
**firearm** [4] - 140:1, 173:2, 174:12, 265:12
**firearms** [2] - 171:22, 173:19
**fired** [2] - 162:16, 174:12
**first** [78] - 85:3, 87:4, 87:6, 102:5, 103:12, 110:7, 110:9, 110:21, 116:23, 118:6, 122:3, 122:17, 123:13, 123:19, 123:20, 124:17, 125:2, 125:11, 126:25, 128:6, 132:13, 138:2, 141:14, 144:5, 145:16, 145:20, 148:20, 152:2, 152:7, 153:12, 157:8, 158:25, 159:24, 160:23, 164:20, 164:22, 166:21, 167:6, 169:14, 177:15, 183:8, 193:21, 194:3, 199:24, 200:10, 201:18, 204:2, 209:3, 210:6, 214:2, 216:2, 216:4, 221:21, 226:9, 232:23, 235:13, 239:21, 243:7, 245:8, 248:25, 249:10, 249:17, 255:2, 255:7, 257:8, 257:14, 258:12, 268:9, 270:17, 278:17, 285:22, 286:4, 287:19, 296:22, 298:1, 313:1
**fit** [9] - 87:11, 138:9, 138:11, 172:24, 172:25, 173:4, 173:9, 236:17, 238:14
**Fitness** [4] - 235:16, 235:17, 235:21, 236:24
**fits** [6] - 117:17, 118:20, 194:20, 238:7, 244:7, 275:6
**five** [6] - 82:23, 180:7, 180:22, 181:1, 281:6, 281:18
**fix** [4] - 205:17, 215:11, 215:18, 216:2
**fixed** [2] - 205:3, 207:22
**fixes** [2] - 255:6
**fixing** [2] - 205:21, 254:25
**flag** [1] - 95:24
**flange** [2] - 238:3, 238:6
**flash** [3] - 264:11, 264:12, 264:22

**flashing** [7] - 147:12, 187:20, 187:25, 188:8, 188:17, 188:19, 188:20
**Fleming** [1] - 98:10
**flexibility** [1] - 309:25
**flip** [3] - 85:20, 281:9, 281:22
**flip-up** [1] - 281:22
**flipping** [1] - 100:9
**float** [1] - 252:21
**floatation** [1] - 252:23
**floated** [2] - 252:19
**floating** [1] - 269:25
**flotation** [5] - 119:13, 119:19, 119:21, 252:20, 252:22
**flow** [18] - 303:7, 303:8, 303:9, 303:11, 303:18, 303:20, 303:23, 304:10, 304:11, 306:18, 308:23, 308:25, 309:9, 311:2, 311:3, 311:12, 312:7
**flow-down** [13] - 303:7, 303:8, 303:18, 303:20, 303:23, 304:10, 304:11, 308:23, 308:25, 309:9, 311:2, 311:3, 311:12
**flowdowns** [1] - 311:10
**flowing** [1] - 300:11
**flows** [1] - 295:17
**flush** [1] - 142:6
**focus** [42] - 84:21, 85:16, 85:22, 85:25, 86:3, 86:6, 86:12, 86:23, 89:25, 96:11, 97:1, 100:21, 105:4, 108:8, 141:17, 146:2, 146:9, 153:4, 154:6, 155:17, 157:1, 167:8, 174:9, 174:13, 174:19, 204:18, 233:16, 233:18, 233:19, 233:24, 233:25, 234:6, 234:8, 234:16, 234:22, 235:13, 242:4, 243:18, 244:18, 269:8, 269:19
**focusing** [3] - 120:5, 153:23, 158:16
**follow** [8] - 85:10, 85:14, 87:24, 109:6, 111:18, 130:22, 134:25, 212:5
**follow-up** [1] - 212:5
**followed** [2] - 82:20, 272:2
**follower** [68] - 85:14, 85:15, 86:2, 88:22, 88:24, 89:20, 94:24, 94:25, 95:7, 100:16, 112:9, 112:13, 112:22, 114:14, 117:17, 152:9, 154:20, 185:18, 189:3, 189:5, 189:12, 189:16, 191:24, 192:1, 194:18, 194:19, 198:1, 198:13, 198:25, 199:2, 228:4, 229:2, 230:13, 230:25, 231:1, 231:3, 231:5, 231:7, 231:14, 231:15, 231:16, 231:18, 231:19, 231:20, 232:2, 232:6, 236:4, 236:8, 236:11, 236:12, 236:14, 236:16, 236:17, 236:18, 236:25, 237:5, 237:6, 237:16, 250:23, 251:1, 269:17, 273:7, 275:4, 275:5, 276:25, 277:24
**followers** [4] - 82:6, 273:9, 277:25, 279:22
**following** [3] - 87:14, 201:15, 312:8
**follows** [1] - 276:24
**footnote** [2] - 109:2, 265:21
**FOR** [3] - 79:2, 80:2, 80:9

**forces** [4] - 162:5, 173:21, 174:12, 299:3
**foregoing** [1] - 314:4
**forget** [1] - 116:5
**forgotten** [1] - 235:18
**fork** [12] - 115:1, 116:25, 117:5, 117:9, 117:12, 117:17, 117:25, 118:3, 189:16, 192:1, 194:19, 275:6
**Form** [1] - 297:11
**form** [17] - 98:24, 172:24, 172:25, 173:3, 173:9, 191:23, 216:17, 217:10, 217:19, 237:5, 288:2, 290:13, 290:23, 298:25, 299:1, 312:18
**formal** [2] - 107:19, 294:9
**formation** [2] - 286:9, 303:12
**formed** [5] - 156:15, 191:9, 201:2, 269:13, 290:15
**forming** [1] - 93:3
**forms** [1] - 217:17
**formula** [2] - 116:16, 116:18
**forth** [21] - 82:18, 82:21, 86:9, 86:10, 86:11, 95:15, 99:9, 107:13, 127:13, 127:18, 127:19, 129:8, 129:12, 135:11, 136:7, 138:12, 193:24, 214:4, 287:8, 301:20
**forward** [6] - 99:15, 100:9, 131:7, 139:8, 160:22, 239:13
**foundation** [2] - 149:7, 193:25
**four** [18] - 83:21, 96:8, 119:17, 137:23, 141:14, 150:11, 150:16, 155:20, 162:19, 195:18, 214:25, 241:6, 243:21, 265:11, 276:5, 276:10, 277:13, 277:16
**fourth** [2] - 126:2, 181:11
**fragile** [1] - 162:13
**framed** [2] - 251:24, 251:25
**framework** [2] - 292:2, 305:15
**fraud** [1] - 129:25
**fraudulent** [1] - 209:8
**free** [3] - 121:1, 216:18, 269:25
**free'** [1] - 302:22
**free-floating** [1] - 269:25
**freed** [1] - 282:17
**fresh** [2] - 232:22, 267:17
**friend** [1] - 252:14
**front** [4] - 122:1, 125:2, 145:6, 225:12
**fronts** [1] - 214:18
**fulfill** [4] - 290:20, 304:23, 305:10, 311:17
**fulfilled** [2] - 303:20, 309:25
**fulfills** [1] - 302:17
**full** [3] - 91:23, 141:15, 185:8
**fully** [8] - 101:14, 116:16, 121:14, 142:15, 149:11, 156:15, 168:17, 268:21
**function** [6] - 172:25, 173:4, 173:9, 236:24, 255:13
**functional** [1] - 201:22
**functionally** [1] - 304:19
**fundamental** [2] - 257:22, 305:18, 311:24

**funneled** [1] - 299:24
**funny** [4] - 129:3, 135:18, 136:5, 138:6
**furthermore** [4] - 167:14, 222:4, 230:23, 231:23
**future** [1] - 131:6
**fuzzy** [2] - 250:16, 279:2

## G

**gallery** [1] - 81:11
**gamble** [1] - 263:10
**game** [1] - 230:19
**gap** [1] - 201:25
**gaping** [1] - 291:14
**gaps** [1] - 201:7
**Gasser** [5] - 131:10, 131:18, 135:3, 135:15, 135:16
**gather** [1] - 178:17
**general** [9] - 92:19, 145:14, 165:25, 236:1, 239:1, 241:15, 262:1, 262:3, 266:10
**generally** [3] - 232:21, 295:2, 309:22
**generated** [1] - 240:7
**generically** [1] - 189:9
**genesis** [1] - 293:4
**gentleman** [1] - 104:10
**genuine** [1] - 194:2
**genus** [4] - 115:20, 279:19, 279:22
**German** [33] - 96:13, 155:25, 157:19, 157:22, 158:3, 158:7, 159:5, 159:16, 159:20, 159:25, 160:19, 164:2, 176:3, 176:25, 177:5, 178:10, 184:3, 184:4, 185:4, 185:11, 185:24, 199:10, 199:11, 199:21, 200:5, 201:11, 211:22, 223:4, 223:12, 225:21, 270:20, 271:2, 271:23
**Germany** [2] - 144:25, 225:22
**given** [13] - 91:22, 115:5, 128:21, 131:24, 142:18, 176:8, 245:19, 253:16, 261:16, 272:14, 280:16, 293:1, 308:2
**glancing** [1] - 122:2
**glare** [2] - 85:9, 150:8
**goods** [3] - 302:14, 303:6, 309:23
**gotcha** [3] - 209:18, 212:17, 248:14
**government** [101] - 217:12, 274:15, 281:25, 282:3, 283:15, 284:9, 284:12, 285:9, 285:17, 285:22, 286:25, 287:14, 287:20, 287:23, 287:25, 288:4, 288:9, 288:13, 288:25, 289:1, 289:4, 289:5, 289:16, 289:20, 290:2, 290:6, 290:9, 290:12, 290:16, 290:22, 290:23, 291:1, 291:7, 291:9, 291:11, 291:15, 292:19, 293:1, 294:1, 294:17, 294:24, 295:3, 295:5, 295:6, 295:12, 296:1, 296:4, 296:9, 296:12, 296:16, 296:19, 297:2, 297:5, 297:8, 297:20, 298:6, 298:16, 298:17, 298:20, 298:25, 299:16, 299:17, 299:21, 300:5, 300:12, 300:15, 301:2, 301:3,

301:6, 301:17, 302:6, 302:12, 302:23, 302:24, 303:5, 303:16, 303:19, 303:24, 304:5, 305:8, 306:3, 306:11, 306:19, 307:4, 307:20, 308:10, 309:9, 309:22, 310:3, 310:12, 310:13, 310:21, 311:16, 311:18, 312:3, 312:6, 312:13, 312:20
**government's** [5] - 286:19, 287:2, 289:8, 290:20, 294:10
**grant** [4] - 130:17, 156:25, 245:9, 247:24
**granted** [7] - 121:8, 157:10, 205:7, 215:4, 223:6, 253:2, 292:5
**granting** [1] - 252:5
**grapple** [1] - 310:11
**gray** [1] - 85:12
**great** [3] - 138:24, 284:6, 301:11
**greater** [1] - 300:6
**green** [1] - 152:10
**greenish** [2] - 152:19, 154:13
**greenish-blue** [2] - 152:19, 154:13
**groove** [83] - 86:3, 86:6, 86:7, 88:24, 89:4, 89:6, 89:11, 89:12, 89:15, 89:17, 89:21, 90:1, 90:11, 90:24, 90:25, 91:1, 108:6, 108:7, 112:8, 112:13, 117:11, 117:14, 117:15, 117:20, 117:23, 118:4, 152:11, 152:14, 154:23, 185:17, 189:3, 189:5, 189:12, 189:17, 189:22, 190:3, 190:13, 190:16, 190:17, 190:22, 191:3, 191:6, 191:7, 191:8, 191:9, 191:13, 191:19, 191:21, 191:23, 192:3, 192:23, 194:17, 194:25, 195:7, 197:3, 197:12, 198:1, 198:9, 198:10, 198:11, 198:13, 198:14, 199:1, 230:14, 253:10, 253:13, 253:14, 273:5, 273:17, 275:4, 275:19, 276:16, 276:21, 276:24, 277:2, 277:9, 277:20, 278:20, 278:22, 279:1, 279:15, 279:21
**grounds** [3] - 156:19, 201:10, 225:5
**groundwork** [1] - 292:1
**guess** [3] - 154:1, 243:7, 294:4
**guessing** [1] - 238:13
**guiding** [1] - 305:18
**guilty** [1] - 182:20
**gun** [4] - 220:16, 222:9, 252:15
**guns** [1] - 222:13
**guy** [1] - 147:13
**Guys** [1] - 260:5
**guys** [2] - 130:23, 260:11

## H

**half** [2] - 111:13, 254:20
**Hammond** [1] - 104:2
**hand** [9] - 122:7, 158:23, 159:7, 183:1, 243:23, 243:24, 274:12, 285:17, 285:18
**handed** [2] - 178:19, 179:5
**handful** [1] - 284:11

**handhold** [1] - 252:15
**handing** [1] - 151:10
**handing)** [2] - 83:14, 292:15
**handled** [2] - 162:14, 259:19
**hands** [4] - 146:17, 146:19, 146:21, 227:7
**handshake** [1] - 299:1
**hang** [1] - 234:5
**hanger** [1] - 107:13
**hangs** [2] - 107:10, 242:16
**Hans** [5] - 148:22, 148:25, 149:1, 214:6, 266:5
**happy** [3] - 95:22, 225:13, 227:4
**harm** [1] - 308:14
**harmonized** [1] - 298:3
**head** [7] - 87:15, 119:1, 119:5, 144:8, 174:18, 197:19, 230:8
**header** [1] - 224:16
**heads** [1] - 90:6
**hear** [3] - 207:8, 238:21
**heard** [20] - 91:18, 109:10, 157:2, 165:19, 185:1, 186:19, 202:5, 205:10, 207:12, 220:4, 223:1, 224:4, 226:14, 227:24, 228:8, 236:10, 254:10, 268:20, 270:12, 271:8
**HEARING** [1] - 79:15
**hearing** [12] - 82:16, 91:19, 161:17, 220:24, 222:6, 225:14, 226:4, 230:16, 249:8, 273:2, 305:2
**hearings** [1] - 225:4
**hears** [1] - 128:1
**hearsay** [12] - 109:4, 109:8, 145:19, 148:21, 149:12, 149:24, 225:3, 225:4, 225:5, 225:6, 266:4, 266:14
**hedges** [1] - 101:13
**held** [5] - 122:5, 124:18, 169:10, 249:19, 287:25
**helix** [7] - 85:22, 85:25, 86:3, 86:6, 89:25, 95:2, 100:16
**help** [5] - 145:15, 151:14, 197:20, 221:15, 232:15
**helpful** [3] - 83:12, 208:9, 305:17
**helping** [1] - 222:3
**helps** [2] - 158:9, 170:21
**Hemstreet** [3] - 129:6, 129:13, 257:15
**hereby** [1] - 311:10
**HERNANDEZ** [1] - 79:18
**hidden** [1] - 233:12
**high** [5] - 110:19, 171:20, 173:22, 175:3, 212:20
**high-caliber** [1] - 173:22
**higher** [1] - 228:24
**highlight** [1] - 153:5
**highlighted** [12] - 94:8, 141:21, 153:21, 154:3, 158:18, 165:17, 209:3, 220:17, 274:22, 274:25, 288:22, 296:5
**highlighting** [3] - 158:25, 203:10, 203:13
**himself** [4] - 85:1, 104:8, 221:9, 221:16

**hindsight** [1] - 143:12
**historic** [1] - 164:5
**historically** [1] - 162:17
**history** [2] - 103:13, 199:20
**hit** [2] - 226:7, 284:2
**hits** [1] - 264:23
**hold** [2] - 87:3, 187:22
**holder** [1] - 156:6
**holding** [5] - 112:25, 202:18, 255:25, 256:1, 256:21
**holdings** [1] - 272:3
**hole** [9] - 85:10, 85:11, 85:14, 86:1, 86:7, 95:1, 230:9, 240:3, 291:14
**holes** [3] - 169:13, 170:20, 170:22
**hollow** [1] - 288:5
**Hologic** [2] - 116:6, 279:17
**Hologics** [1] - 115:3
**honestly** [2] - 229:12, 295:8
**Honor** [56] - 81:3, 82:15, 83:8, 83:15, 89:16, 90:15, 137:15, 184:24, 184:25, 191:14, 191:21, 192:5, 192:17, 199:14, 211:18, 232:11, 232:18, 234:13, 238:19, 243:12, 254:5, 266:1, 266:3, 267:11, 272:19, 272:24, 274:13, 276:16, 276:19, 278:7, 278:11, 280:21, 280:24, 282:11, 283:13, 283:23, 284:9, 292:9, 292:17, 295:15, 296:15, 296:25, 298:7, 299:19, 301:11, 301:24, 302:8, 302:10, 305:13, 309:3, 309:6, 309:18, 311:23, 312:15, 313:2, 313:6
**HONORABLE** [1] - 79:18
**hope** [5] - 83:2, 83:17, 232:16, 281:24, 283:8
**hotter** [1] - 114:23
**hour** [7] - 184:18, 281:4, 281:7, 281:9, 281:15, 282:9, 282:12
**hours** [1] - 254:2
**housing** [55] - 94:5, 94:6, 94:10, 94:11, 94:13, 94:15, 94:16, 94:18, 94:20, 94:23, 141:19, 142:4, 142:5, 142:11, 142:13, 142:19, 153:6, 153:9, 153:11, 154:3, 154:9, 154:17, 154:19, 228:18, 228:19, 228:21, 229:17, 233:2, 233:4, 233:17, 233:20, 233:22, 234:1, 234:7, 234:11, 234:14, 234:18, 234:20, 234:24, 234:25, 235:1, 235:4, 235:5, 235:7, 235:8, 235:9, 235:10, 269:7, 269:11, 269:13, 269:16, 269:21, 279:1, 298:13
**hub** [13] - 108:6, 154:12, 154:14, 154:24, 155:12, 185:17, 189:1, 189:4, 191:23, 269:10, 269:12, 269:16, 269:21
**huge** [1] - 294:19
**human** [1] - 264:15
**hundred** [2] - 220:1, 236:9
**hundreds** [4] - 219:18, 219:19, 267:22, 300:2
**Hurley** [1] - 169:23

**hurt** [1] - 232:3
**hypothetical** [4] - 113:12, 134:21, 134:22, 173:6

**I**

**idea** [18] - 132:16, 147:22, 149:20, 156:15, 176:15, 192:13, 192:22, 192:24, 195:5, 241:5, 241:10, 257:25, 269:6, 276:16, 277:2, 277:7, 301:5
**Ideality** [10] - 100:13, 100:14, 100:18, 102:16, 104:10, 175:13, 180:1, 180:8, 180:11, 180:15
**ideas** [1] - 246:16
**identical** [3] - 135:15, 158:11, 218:17
**identified** [11] - 147:4, 152:24, 153:9, 153:14, 156:2, 209:5, 211:21, 211:23, 229:1, 230:4, 302:1
**identifiers** [1] - 180:8
**identifies** [1] - 194:7
**identify** [5] - 149:17, 151:16, 151:21, 181:4, 192:20
**identifying** [5] - 151:4, 157:16, 201:10, 211:24, 229:2
**ignore** [3] - 97:13, 204:18, 225:3
**ignores** [3] - 247:6, 279:16, 280:1
**ignoring** [1] - 288:15
**illustrate** [3] - 158:9, 190:20, 191:10
**illustration** [1] - 187:7
**image** [5] - 85:3, 146:3, 152:5, 183:2, 237:17
**imaginable** [1] - 113:9
**imagine** [5] - 138:22, 250:8, 250:12, 263:18, 309:14
**immediately** [1] - 102:21
**immune** [4] - 285:11, 285:23, 292:20, 303:21
**immunity** [20] - 284:13, 284:22, 285:1, 285:25, 286:1, 286:4, 286:11, 286:13, 286:24, 287:16, 290:24, 302:11, 302:12, 302:24, 303:24, 304:8, 305:18, 305:19, 312:7
**impact** [5] - 162:1, 174:13, 243:17, 244:18, 277:5
**impediment** [1] - 293:23
**implant** [1] - 169:18
**implementation** [1] - 293:23
**implementing** [1] - 295:16
**implication** [1] - 302:16
**implicit** [2] - 284:20, 305:22
**implicitly** [2] - 290:13, 290:21
**Implied** [1] - 295:25
**implied** [20] - 284:14, 284:19, 285:20, 286:7, 287:7, 287:19, 287:25, 288:17, 289:6, 289:20, 291:4, 292:3, 292:7, 294:8, 295:23, 297:4, 298:19, 304:17, 307:22, 309:7
**implies** [2] - 231:6, 231:20
**importance** [2] - 163:15, 239:10
**important** [16] - 102:14, 113:3, 124:12,

151:15, 156:1, 163:4, 163:9, 179:21, 235:16, 242:17, 242:21, 242:22, 244:15, 245:14, 245:24, 256:15
**importantly** [3] - 163:25, 178:24, 221:11
**importing** [1] - 288:8
**imports** [1] - 272:2
**impossible** [2] - 263:17, 281:6
**impression** [1] - 109:12
**improper** [1] - 165:5
**impulse** [1] - 171:24
**IN** [1] - 79:1
**inactivity** [1] - 202:5
**inadmissible** [1] - 145:19
**inadvertent** [1] - 305:4
**inappropriate** [1] - 259:5
**inapt** [1] - 273:2
**INC** [2] - 79:3, 79:6
**Inc** [4] - 81:5, 81:6, 121:19, 180:1
**include** [15] - 84:25, 113:15, 117:11, 117:20, 169:18, 171:16, 192:25, 205:6, 232:3, 250:4, 250:10, 250:11, 260:8, 277:3, 279:22
**included** [7] - 112:21, 122:3, 285:12, 285:13, 285:14, 286:5
**includes** [28] - 88:22, 88:25, 89:20, 89:21, 95:7, 95:10, 112:8, 112:9, 112:13, 112:14, 112:17, 112:19, 113:18, 140:10, 153:13, 154:20, 189:13, 190:16, 198:13, 230:25, 231:5, 236:4, 237:6, 250:23, 269:10, 269:12, 269:16, 269:20
**including** [21] - 114:18, 141:18, 142:4, 142:13, 171:23, 173:22, 190:13, 192:11, 198:23, 203:6, 204:5, 210:19, 214:18, 220:3, 231:21, 234:9, 248:8, 267:25, 273:13, 273:14, 287:14
**incomplete** [1] - 183:5
**inconsistency** [1] - 111:1
**inconsistent** [11] - 110:8, 136:24, 147:2, 147:3, 147:7, 166:7, 166:16, 231:12, 244:3, 245:23, 246:19
**incorporate** [1] - 162:9
**incorporated** [2] - 287:4, 311:11
**incorporates** [2] - 191:24, 284:16
**incorporating** [1] - 202:24
**incorrect** [1] - 147:1
**increased** [1] - 207:5
**incredibly** [1] - 184:8
**indeed** [6] - 135:7, 240:25, 251:3, 261:9, 261:18, 266:8
**independent** [17] - 98:7, 104:2, 104:7, 112:3, 148:2, 152:22, 155:13, 178:25, 179:10, 179:12, 179:13, 179:15, 185:2, 185:5, 205:21, 228:15, 239:6
**independently** [1] - 242:14
**indicated** [3] - 212:5, 226:18, 286:11
**indicates** [1] - 183:14
**indicating** [1] - 159:10
**indicating)** [1] - 238:1
**indication** [4] - 149:8, 176:11, 180:3,

206:8
**indirect** [1] - 235:5
**indirectly** [3] - 154:2, 176:12, 235:8
**indisputably** [1] - 199:7
**individual** [4] - 98:3, 241:10, 246:13
**individually** [1] - 133:18, 158:19
**industrial** [2] - 119:16, 119:23
**industry** [1] - 119:17
**inexplicable** [1] - 272:10
**inference** [12] - 128:15, 128:16, 128:24, 129:1, 210:4, 210:13, 210:21, 210:24, 211:7, 211:14, 289:3
**inferences** [8] - 99:25, 100:4, 102:2, 105:16, 210:9, 210:11, 239:13, 248:1
**inferred** [1] - 305:20
**inform** [2] - 151:14, 197:20
**information** [17] - 135:10, 151:2, 154:10, 154:18, 176:8, 176:10, 178:18, 178:20, 183:22, 201:15, 209:23, 215:22, 215:24, 221:14, 224:10, 226:23, 294:23
**informed** [1] - 291:9
**infringe** [8] - 113:21, 132:9, 133:21, 142:20, 201:16, 236:19, 288:11, 310:1
**infringed** [2] - 201:3, 288:6
**infringement** [76] - 83:18, 84:7, 84:13, 86:18, 89:1, 91:3, 93:3, 93:12, 95:19, 121:3, 126:14, 127:1, 127:14, 129:10, 132:21, 137:22, 151:22, 199:25, 200:3, 201:4, 201:6, 202:11, 202:14, 202:21, 203:1, 203:5, 204:7, 219:16, 224:14, 227:23, 227:25, 228:2, 228:11, 230:22, 231:25, 232:20, 232:22, 268:1, 268:6, 268:17, 279:23, 284:13, 286:3, 286:20, 287:15, 287:23, 288:3, 289:12, 289:17, 290:22, 291:8, 293:7, 293:9, 293:18, 294:12, 296:18, 297:3, 297:7, 297:23, 298:10, 298:15, 299:5, 299:6, 299:12, 301:3, 302:16, 302:19, 304:7, 304:20, 304:24, 306:1, 310:24, 311:19, 311:21
**infringer** [2] - 250:6, 288:9
**infringes** [1] - 288:13
**infringing** [27] - 131:8, 132:22, 133:2, 210:13, 210:16, 250:3, 250:7, 268:23, 269:24, 286:1, 287:22, 288:8, 288:10, 288:24, 289:2, 289:22, 290:7, 291:2, 296:2, 296:22, 303:2, 306:15, 306:16, 310:5, 310:8, 310:15
**inherent** [1] - 277:5
**inherently** [2] - 276:20, 277:2
**initial** [9] - 160:9, 161:9, 164:25, 179:19, 183:7, 184:12, 202:10, 204:17, 218:23
**initiate** [1] - 289:14
**inner** [1] - 105:1
**input** [6] - 115:5, 115:6, 115:11, 115:15, 115:21, 279:20
**inquiring** [2] - 224:18, 299:4
**inquiry** [3] - 120:18, 195:18, 277:16
**inside** [20] - 85:5, 85:23, 86:5, 145:11,

146:6, 146:15, 148:9, 228:20, 229:1, 229:3, 229:8, 230:15, 232:2, 234:19, 237:15, 237:19, 268:21, 268:24, 269:25, 298:12
**installment** [1] - 82:16
**instances** [2] - 168:23, 305:20
**instead** [14] - 125:2, 131:20, 145:8, 189:18, 194:25, 197:3, 197:12, 233:21, 238:22, 241:15, 250:22, 260:7, 260:21, 288:11
**instruct** [1] - 261:7
**instruction** [1] - 133:4
**instructions** [2] - 85:4, 237:4
**instrument** [1] - 162:5
**insufficient** [5] - 160:4, 177:17, 179:20, 197:16, 263:24
**insurance** [1] - 261:2
**Insurance** [1] - 165:21
**integral** [1] - 235:25
**intend** [3] - 84:19, 206:1, 206:18
**intended** [24] - 108:16, 156:18, 160:1, 160:12, 160:13, 160:18, 161:1, 163:14, 163:20, 164:11, 175:24, 176:23, 177:3, 177:10, 184:7, 205:2, 206:23, 242:24, 243:16, 247:1, 271:6, 271:18, 285:22, 293:24
**intending** [1] - 213:9
**intent** [9] - 126:20, 213:1, 213:5, 213:8, 213:14, 213:20, 287:2, 295:18, 298:24
**intention** [1] - 286:19
**intentional** [1] - 213:1
**intentionally** [1] - 213:7
**interact** [1] - 270:1
**interacted** [1] - 221:24
**interacting** [3] - 116:17, 154:1, 154:2
**interactions** [1] - 116:19
**interest** [1] - 104:12
**interested** [1] - 203:24
**interesting** [3] - 139:11, 188:13, 310:10
**interface** [3] - 152:10, 152:14, 228:12
**interfaces** [1] - 228:11
**interfacing** [1] - 152:19
**interior** [2] - 153:12, 269:13
**interjects** [1] - 133:17
**internal** [1] - 234:19
**internally** [1] - 210:23
**interplays** [1] - 276:14
**interpret** [1] - 293:21
**interpretation** [5] - 91:14, 231:5, 271:25, 276:22, 300:24
**interpreted** [1] - 212:8
**interpreting** [1] - 276:18
**interrogatories** [1] - 210:18
**interrogatory** [3] - 201:1, 206:14, 258:21
**interrupt** [5] - 137:6, 176:5, 191:2, 268:7, 306:20
**intervene** [1] - 291:12
**intervening** [1] - 235:9

**intervention** [1] - 264:15
**introduced** [2] - 208:25, 219:13
**introducing** [1] - 220:3
**introduction** [1] - 228:16
**introductory** [1] - 155:24
**invalid** [39] - 112:23, 121:2, 121:6, 121:15, 122:6, 123:22, 125:6, 125:15, 127:22, 132:1, 132:4, 135:2, 150:18, 150:21, 158:6, 161:15, 165:10, 176:4, 177:8, 184:5, 185:2, 185:12, 185:14, 188:12, 188:22, 199:7, 203:9, 204:23, 205:1, 207:14, 215:5, 215:8, 217:4, 255:4, 256:25, 259:17, 259:24, 262:7, 278:6
**invalidate** [1] - 113:13
**invalidates** [1] - 199:12
**invalidating** [2] - 125:18, 199:7
**invalidity** [12] - 99:11, 99:12, 99:21, 125:20, 160:16, 167:5, 185:5, 201:9, 201:10, 214:13, 218:7
**invented** [12] - 96:10, 97:1, 100:1, 100:5, 138:7, 151:20, 186:15, 195:6, 195:16, 197:19, 239:15, 242:10
**invention** [88] - 83:23, 96:8, 96:19, 97:7, 97:12, 97:20, 97:24, 99:4, 99:13, 99:16, 100:5, 100:7, 100:11, 105:5, 107:5, 107:8, 107:9, 107:23, 108:1, 108:21, 109:14, 111:12, 116:9, 144:4, 144:9, 150:17, 151:16, 151:19, 155:11, 155:23, 155:25, 156:7, 156:12, 156:15, 158:6, 158:11, 160:24, 161:9, 161:10, 161:19, 163:13, 164:3, 164:20, 167:1, 167:8, 167:15, 167:16, 167:21, 168:14, 168:23, 169:2, 170:20, 170:23, 171:7, 175:25, 176:2, 179:14, 184:4, 184:13, 185:3, 185:25, 186:4, 188:2, 195:7, 195:14, 196:5, 196:23, 218:14, 218:15, 223:3, 223:12, 238:20, 241:11, 244:1, 249:25, 268:22, 269:4, 269:5, 269:6, 269:9, 269:10, 270:10, 270:23, 271:15, 280:8, 288:10
**inventions** [1] - 169:10
**Inventor** [2] - 162:24, 175:14
**inventor** [27] - 97:11, 101:20, 101:24, 101:25, 104:7, 108:21, 108:24, 111:17, 160:3, 160:4, 160:5, 163:4, 163:5, 163:12, 177:16, 192:18, 194:11, 197:18, 215:15, 221:11, 221:18, 222:18, 254:14, 275:12, 276:9
**inventor's** [5] - 97:13, 97:14, 97:15, 97:18, 98:14
**inventors** [3] - 156:16, 221:24
**inventorship** [1] - 109:21
**inverse** [11] - 90:8, 90:25, 91:1, 194:17, 194:18, 195:9, 275:5, 275:8, 275:18, 277:8, 277:9
**invert** [1] - 118:4
**investigated** [2] - 212:6, 311:14
**investigating** [1] - 214:2

**investigation** [2] - 224:12, 224:13
**investment** [1] - 263:4
**invocation** [1] - 291:15
**invoice** [1] - 105:25
**invoices** [10] - 105:21, 105:22, 106:8, 180:14, 180:17, 180:23, 181:1, 270:17
**invoke** [1] - 291:23
**invoked** [1] - 285:3
**involved** [5] - 133:16, 141:1, 161:25, 171:14, 221:2
**involving** [1] - 297:25
**inward** [2] - 85:22, 89:24
**irrelevant** [6] - 195:15, 197:17, 209:2, 218:14, 236:23, 288:11
**Irwin** [1] - 286:15
**issue** [160] - 83:18, 83:19, 83:23, 83:24, 84:12, 89:2, 89:22, 91:4, 91:18, 91:24, 95:2, 100:24, 109:20, 109:23, 111:5, 111:11, 111:12, 113:23, 114:18, 115:12, 116:21, 118:10, 119:13, 120:19, 120:21, 122:19, 124:21, 126:2, 126:9, 128:4, 133:13, 134:4, 137:16, 137:20, 140:25, 141:11, 144:18, 144:21, 150:19, 150:24, 155:22, 158:1, 160:20, 160:21, 161:4, 161:5, 163:11, 163:18, 163:21, 163:22, 164:6, 164:24, 165:1, 165:13, 168:2, 168:9, 173:13, 177:6, 177:8, 177:10, 177:11, 182:21, 186:6, 187:13, 188:3, 190:14, 190:24, 193:9, 193:18, 194:2, 195:3, 197:17, 202:18, 203:17, 204:24, 207:23, 208:6, 210:13, 210:22, 212:6, 215:2, 215:18, 218:22, 219:16, 220:1, 220:6, 220:7, 222:16, 222:25, 223:9, 226:2, 227:4, 228:8, 228:10, 229:23, 230:22, 230:23, 231:23, 232:23, 238:20, 239:19, 243:19, 247:5, 249:16, 250:21, 252:9, 253:4, 253:21, 254:8, 256:5, 256:8, 256:16, 256:17, 257:9, 259:13, 259:15, 263:12, 266:4, 266:15, 266:16, 267:23, 267:24, 267:25, 268:2, 268:3, 268:6, 268:17, 268:21, 270:22, 271:24, 272:8, 273:18, 273:25, 274:2, 274:21, 275:2, 276:3, 278:18, 279:24, 285:16, 287:6, 287:22, 292:18, 294:8, 294:9, 297:25, 299:24, 300:1, 301:8, 302:15, 303:7, 303:11, 308:12, 310:4, 311:7, 312:2
**issued** [7] - 122:13, 124:22, 204:2, 217:7, 255:10, 257:6, 290:17
**issues** [45] - 83:16, 83:19, 83:21, 84:8, 95:21, 112:1, 134:2, 150:3, 150:12, 150:14, 151:5, 151:15, 153:1, 155:20, 175:2, 186:2, 200:17, 204:10, 209:20, 209:21, 217:16, 218:2, 218:5, 219:19, 219:22, 220:13, 223:5, 223:6, 225:8, 227:23, 227:24, 245:2, 253:17, 256:7, 257:13, 265:19, 267:23, 270:25, 272:21, 281:14, 287:16, 287:17,

308:15, 308:18
**issuing** [1] - 255:24
**item** [5] - 85:6, 158:25, 237:1, 237:14, 237:17
**items** [4] - 152:7, 158:18, 237:2, 237:3
**iteration** [1] - 293:11
**iterations** [1] - 273:9
**itself** [14] - 95:5, 101:11, 113:5, 122:11, 144:23, 157:9, 167:4, 185:15, 205:13, 206:6, 206:25, 214:18, 214:20, 254:15

## J

**jail** [1] - 302:22
**January** [18] - 79:5, 145:6, 145:13, 148:7, 148:13, 150:2, 157:11, 157:14, 185:22, 185:25, 199:12, 200:14, 215:14, 223:2, 223:15, 223:17, 223:20, 223:23
**Jason** [2] - 80:10, 81:21
**jiggering** [1] - 242:12
**job** [2] - 220:2, 297:1
**Johnson** [10] - 86:15, 91:11, 129:16, 130:9, 209:4, 209:16, 209:20, 210:1, 261:9, 261:10
**joined** [7] - 87:9, 235:20, 235:22, 235:24, 236:24, 237:5, 287:7
**joined-together** [1] - 235:24
**joke** [1] - 250:15
**Jones** [1] - 80:10
**JUDGE** [1] - 79:19
**Judge** [2] - 110:6, 283:22
**judged** [2] - 97:8, 251:18
**judgment** [87] - 81:5, 83:20, 83:22, 84:3, 84:21, 89:1, 92:4, 96:2, 96:4, 96:5, 96:9, 96:22, 99:23, 101:10, 101:22, 103:3, 114:20, 116:21, 117:2, 118:9, 118:12, 120:19, 120:21, 120:24, 122:19, 126:3, 128:8, 128:9, 128:10, 128:13, 128:19, 130:17, 131:21, 132:4, 132:6, 132:8, 135:4, 135:8, 136:1, 136:4, 143:1, 144:16, 144:21, 147:17, 160:16, 160:22, 163:16, 163:24, 164:15, 164:25, 165:3, 165:13, 171:22, 174:7, 175:11, 193:18, 193:24, 194:1, 219:15, 220:7, 223:6, 229:20, 230:20, 230:21, 244:22, 244:25, 247:25, 252:6, 253:4, 256:8, 262:13, 262:15, 263:7, 268:4, 270:5, 271:13, 273:24, 275:24, 275:25, 276:12, 277:10, 279:9, 279:25, 285:15, 292:4, 292:19, 298:9
**July** [3] - 102:7, 102:19, 103:9
**juncture** [1] - 137:7
**June** [6] - 102:9, 162:24, 163:3, 201:5, 227:1, 227:4
**juries** [1] - 247:22
**jurisdiction** [1] - 287:13
**jurisprudence** [1] - 287:18
**juror** [10] - 97:19, 99:15, 99:17, 99:24,

100:5, 102:1, 117:3, 143:4, 239:8, 239:15
**jury** [7] - 105:15, 223:21, 227:16, 239:17, 248:1, 248:12, 292:22

## K

**Kassim** [4] - 80:6, 81:23, 212:5, 309:5
**keep** [5] - 139:7, 161:8, 265:24, 273:2, 305:17
**keeping** [5] - 161:14, 200:10, 203:10, 244:14, 270:10
**keeps** [3] - 96:12, 96:14, 283:18
**Kennedy** [1] - 165:21
**kept** [1] - 105:24
**key** [10] - 143:6, 153:4, 157:9, 157:15, 254:8, 268:17, 271:3, 288:11, 288:23, 312:2
**keyboard** [1] - 115:7
**killer** [5] - 136:8, 136:13, 138:13, 138:16, 139:4
**kind** [25] - 85:11, 90:12, 117:17, 118:19, 120:2, 120:5, 129:24, 139:11, 143:22, 145:24, 146:9, 146:18, 148:6, 191:4, 242:6, 244:13, 259:23, 261:25, 263:22, 264:3, 264:24, 264:25, 265:13, 293:3, 307:9
**kinds** [5] - 82:6, 119:18, 145:14, 257:10, 294:13
**Klarquist** [2] - 80:14, 81:19
**Klaus** [4] - 86:15, 129:16, 261:9, 261:10
**knob** [35] - 82:24, 86:3, 152:6, 153:7, 153:8, 153:18, 154:2, 155:15, 155:17, 172:11, 228:3, 228:17, 233:17, 233:19, 233:21, 233:24, 234:17, 234:19, 234:23, 243:18, 244:18, 268:23, 268:25, 269:7, 269:9, 269:19, 269:23, 270:2, 271:14, 281:18, 282:5, 305:4
**knobs** [2] - 170:25, 298:12
**knowing** [1] - 299:4
**knowledge** [7] - 149:6, 182:6, 202:1, 287:23, 291:7, 302:3, 302:5
**known** [6] - 108:8, 252:24, 258:25, 279:11, 291:11, 312:20
**knows** [7] - 182:22, 297:20, 298:17, 300:12, 300:13, 301:1, 301:13

## L

**labeled** [1] - 85:22
**laboratory** [2] - 168:17, 168:20
**laches** [22] - 126:6, 126:11, 126:12, 126:13, 126:18, 131:12, 131:13, 131:14, 202:12, 257:24, 258:1, 258:2, 258:3, 258:8, 259:8, 263:21, 272:3, 272:5, 272:12, 272:15
**lack** [6] - 131:7, 157:5, 177:2, 214:18, 258:23, 259:1
**lacked** [1] - 220:11

**lacking** [6] - 166:13, 170:17, 180:3, 278:3, 285:2, 285:3
**lacks** [1] - 168:1
**laid** [1] - 127:5
**land** [1] - 306:25
**landing** [1] - 306:23
**lands** [1] - 306:22
**Landvatter** [29] - 100:14, 100:20, 103:1, 104:10, 106:4, 108:14, 109:3, 175:13, 177:24, 178:8, 180:19, 181:14, 182:22, 182:25, 183:3, 183:7, 240:21, 241:22, 247:10, 247:11, 247:15, 248:3, 248:19, 248:24, 270:18, 271:21, 280:10, 280:12, 280:17
**Landvatter's** [11] - 108:17, 109:1, 109:9, 111:8, 175:16, 175:22, 180:10, 181:6, 183:23, 240:5, 248:16
**language** [53] - 87:18, 88:2, 88:21, 89:18, 93:24, 94:7, 94:8, 94:14, 94:15, 95:3, 113:20, 114:6, 114:12, 119:11, 135:14, 135:15, 140:18, 141:21, 142:7, 151:25, 152:15, 152:21, 154:21, 161:6, 168:5, 168:6, 171:17, 172:9, 174:25, 175:1, 185:18, 190:14, 196:18, 196:20, 219:7, 226:1, 228:16, 230:2, 230:25, 231:4, 233:10, 233:13, 233:18, 234:2, 234:21, 235:11, 235:18, 269:22, 278:19, 278:23, 297:14, 311:2
**lapse** [1] - 182:18
**large** [2] - 300:2, 301:24
**largely** [2] - 131:14, 187:12
**larger** [2] - 153:9, 299:25
**Larson** [4] - 286:21, 287:9, 287:18, 288:16
**last** [14] - 82:16, 102:19, 103:9, 105:9, 144:18, 148:17, 154:5, 182:24, 192:2, 214:24, 223:24, 227:22, 256:20, 271:15
**lastly** [6] - 167:2, 168:23, 177:23, 206:19, 211:7, 211:17
**late** [22] - 106:19, 122:25, 123:2, 150:24, 160:22, 161:4, 161:13, 162:2, 164:18, 164:24, 165:8, 165:9, 167:3, 167:14, 167:24, 167:25, 170:7, 178:15, 214:15, 230:19, 244:22
**late-filed** [3] - 160:22, 161:4, 162:2
**lateness** [1] - 245:16
**lateral** [1] - 86:21
**laterally** [3] - 86:10, 86:11
**latest** [1] - 101:16
**launch** [3] - 149:20, 223:19
**launched** [3] - 200:9, 200:13, 226:20
**law** [49] - 97:6, 112:25, 113:14, 114:2, 156:11, 157:25, 160:3, 160:7, 161:4, 161:5, 161:7, 167:20, 167:23, 167:24, 168:3, 169:3, 177:16, 186:7, 193:10, 195:15, 196:19, 198:21, 207:15, 215:16, 236:1, 249:22, 250:5, 251:15, 253:11, 253:12, 258:7, 271:9, 271:11,

276:12, 284:19, 285:23, 286:8, 286:10, 286:12, 286:17, 287:2, 293:21, 294:2, 296:25, 298:24, 299:3, 299:10, 301:15, 303:10
**lawfully** [1] - 186:14
**lawsuit** [12] - 126:18, 126:20, 128:3, 128:5, 131:1, 135:12, 136:8, 203:20, 205:5, 205:16, 205:18, 262:25
**lawsuits** [2] - 213:22, 287:13
**lawyers** [1] - 196:1
**layers** [2] - 269:1, 270:4
**leading** [1] - 82:20
**leaks** [2] - 169:14
**learned** [3] - 126:25, 180:9, 213:23
**least** [19] - 90:24, 93:25, 95:11, 99:24, 101:23, 102:13, 110:5, 114:21, 121:14, 135:24, 136:2, 138:22, 219:20, 222:1, 229:23, 253:3, 274:18, 280:14, 292:5
**leaves** [2] - 127:25, 162:11
**leaving** [1] - 232:25
**led** [1] - 180:23
**ledger** [3] - 118:7, 118:13, 118:14
**left** [12] - 85:21, 86:8, 128:22, 129:7, 189:22, 190:10, 203:22, 238:5, 243:23, 260:18, 274:17, 298:13
**left-hand** [1] - 243:23
**legal** [28] - 81:12, 84:12, 88:19, 96:1, 107:1, 107:2, 114:16, 114:18, 129:15, 133:3, 133:5, 140:6, 159:22, 163:23, 170:10, 204:10, 210:3, 251:25, 279:7, 292:1, 302:15, 305:14, 305:15, 305:21, 305:22, 309:1
**legally** [2] - 124:18, 285:9
**length** [4] - 108:25, 191:20, 276:25
**lengthy** [1] - 92:8
**lens** [13] - 85:16, 86:11, 105:4, 108:8, 153:17, 171:5, 182:5, 250:2, 250:13, 273:3, 281:22, 298:11, 298:12
**less** [5] - 184:18, 248:22, 238:8, 291:8, 305:19
**lesser** [1] - 116:7
**lethal** [1] - 174:21
**letter** [24] - 128:4, 129:11, 132:24, 133:1, 133:13, 134:3, 134:5, 134:7, 134:8, 134:21, 134:22, 201:5, 201:9, 201:14, 201:16, 201:18, 202:11, 203:1, 203:5, 203:22, 205:16, 206:7, 211:21, 212:5
**letters** [1] - 96:15
**LEUPOLD** [1] - 79:3
**Leupold** [216] - 81:5, 81:12, 83:19, 84:3, 84:20, 91:24, 99:13, 99:18, 104:3, 104:5, 104:6, 104:16, 106:3, 106:7, 106:18, 118:11, 122:14, 123:7, 123:25, 126:16, 126:25, 127:14, 127:24, 127:25, 128:2, 128:3, 128:25, 129:4, 129:18, 129:21, 129:25, 130:3, 130:8, 130:14, 130:22, 130:24, 130:25, 131:6, 132:10, 132:11,

134:18, 134:24, 135:9, 136:9, 137:22, 138:1, 138:24, 139:7, 143:1, 144:21, 145:3, 148:18, 150:14, 150:17, 155:22, 156:12, 156:18, 157:12, 158:5, 158:12, 159:3, 159:23, 160:17, 160:22, 162:9, 162:25, 163:25, 164:24, 165:18, 166:6, 168:4, 169:8, 172:2, 174:6, 175:8, 175:17, 177:11, 177:14, 178:4, 178:19, 180:10, 183:8, 185:6, 185:23, 186:21, 187:12, 188:5, 190:24, 191:17, 193:3, 193:8, 193:12, 194:8, 197:7, 198:3, 198:20, 199:8, 200:4, 200:21, 201:2, 201:12, 201:14, 201:22, 201:24, 201:25, 202:6, 202:8, 202:15, 203:2, 203:4, 203:17, 203:20, 204:14, 205:2, 205:11, 206:3, 206:13, 207:3, 207:10, 207:15, 208:2, 208:7, 208:25, 209:7, 210:2, 210:3, 210:12, 210:14, 210:22, 210:23, 210:24, 211:7, 211:8, 211:13, 211:17, 212:3, 212:6, 214:1, 214:4, 216:6, 216:13, 218:3, 219:25, 220:10, 220:19, 221:16, 221:21, 222:7, 222:14, 222:24, 223:1, 223:8, 224:18, 225:2, 225:11, 225:17, 225:20, 227:14, 230:3, 230:19, 231:2, 239:12, 242:1, 244:21, 244:25, 245:4, 254:13, 254:15, 258:14, 258:20, 259:19, 259:20, 259:23, 259:24, 260:1, 260:11, 260:20, 260:21, 260:25, 261:1, 261:5, 261:17, 262:8, 262:17, 262:19, 262:21, 262:23, 262:24, 263:10, 266:7, 266:12, 268:18, 270:6, 270:12, 271:16, 273:8, 273:15, 274:1, 284:8, 291:12, 292:5, 292:20, 292:25, 293:18, 293:22, 293:25, 294:9, 295:19, 303:8, 310:16, 310:24, 311:19, 311:21
**Leupold's** [60] - 84:18, 99:25, 100:3, 100:17, 102:2, 102:3, 104:5, 104:24, 105:16, 106:1, 118:6, 120:19, 121:18, 124:2, 127:20, 129:11, 135:13, 156:7, 171:9, 181:9, 182:14, 183:15, 202:5, 204:17, 209:22, 211:5, 212:12, 215:25, 218:5, 218:19, 219:2, 219:14, 219:15, 220:15, 221:1, 221:5, 222:18, 222:19, 223:7, 224:11, 225:7, 228:1, 229:25, 231:9, 237:7, 239:14, 248:1, 253:1, 253:9, 254:12, 260:18, 261:15, 265:18, 266:8, 270:23, 271:11, 271:12, 291:2, 296:8, 305:1
**level** [2] - 177:17, 213:11
**levels** [1] - 168:7
**liability** [12] - 285:23, 286:20, 302:16, 306:22, 306:25, 307:8, 307:10, 307:25, 308:6, 308:7, 308:18, 309:12
**liable** [2] - 308:3, 308:4
**liberally** [2] - 286:12, 305:19
**license** [2] - 127:15, 225:19
**licensing** [3] - 129:10, 129:12, 257:18

**life** [5] - 169:24, 174:21, 206:20, 206:22, 244:1
**lifejacket** [1] - 119:15
**lifejackets** [1] - 119:14
**lifetime** [1] - 220:22
**light** [5] - 85:12, 150:7, 152:10, 152:18, 239:8
**LIGHTFORCE** [1] - 79:6
**Lightforce** [1] - 81:6
**lightly** [1] - 286:12
**likewise** [1] - 188:22
**limit** [1] - 190:16
**limitation** [8] - 98:15, 140:19, 142:1, 235:23, 259:4, 259:9, 259:10, 280:4
**limitations** [4] - 98:15, 126:16, 235:25, 258:17
**limited** [13] - 91:15, 91:20, 92:1, 92:18, 92:22, 93:13, 93:19, 93:22, 94:3, 171:24, 185:19, 198:14, 219:19
**limiting** [4] - 140:23, 141:6, 142:14, 190:14
**line** [9] - 85:10, 87:5, 123:20, 125:2, 133:11, 133:12, 159:18, 191:18
**linearly** [1] - 171:1
**lines** [6] - 105:9, 108:19, 121:22, 174:25, 246:24, 270:7
**lining** [1] - 151:24
**link** [5] - 158:20, 311:2, 311:6, 311:10, 311:12
**linker** [1] - 171:2
**linking** [1] - 312:19
**links** [1] - 155:5
**listed** [1] - 215:15
**listen** [1] - 254:1
**listened** [1] - 266:2
**lists** [1] - 268:12
**litany** [1] - 119:24
**literally** [2] - 116:4, 300:4
**litigation** [12] - 121:12, 122:21, 123:5, 123:6, 131:21, 131:22, 132:14, 132:17, 132:25, 135:1, 258:22, 291:8
**live** [1] - 101:7
**LLP** [3] - 80:2, 80:6, 80:14
**loading** [1] - 171:24
**located** [3] - 234:2, 234:19, 235:2
**location** [5] - 154:10, 215:24, 216:5, 217:1, 217:11
**locations** [3] - 193:2, 196:11, 196:19
**Lochner** [2] - 251:3, 279:5
**lock** [1] - 305:3
**locking** [4] - 82:24, 281:6, 281:18, 282:5
**logic** [1] - 205:25
**logically** [1] - 289:3
**logo** [2] - 250:14, 250:15
**long-range** [3] - 136:17, 146:17, 264:21
**longitudinal** [2] - 94:12, 154:18
**look** [42] - 82:1, 93:24, 94:1, 97:16, 98:8, 100:9, 104:22, 116:10, 116:15, 118:12, 123:1, 125:16, 141:12,

152:15, 152:21, 152:24, 157:8, 158:13, 168:3, 169:3, 181:6, 182:25, 184:9, 208:10, 212:18, 214:6, 221:7, 221:13, 222:2, 223:24, 226:21, 228:24, 229:10, 229:25, 231:16, 236:11, 248:4, 248:6, 254:8, 282:19, 294:18, 303:22
**Look** [1] - 201:17
**looked** [11] - 94:23, 152:18, 161:8, 162:12, 176:13, 189:20, 201:15, 226:1, 237:3, 237:17, 260:5
**Looking** [1] - 255:13
**looking** [21] - 101:14, 114:25, 117:1, 118:2, 126:8, 151:20, 154:23, 170:11, 170:12, 181:20, 194:22, 195:11, 203:17, 218:4, 228:2, 229:13, 230:7, 237:1, 275:15, 280:13, 308:2
**looks** [6] - 86:22, 106:8, 127:16, 158:11, 205:19, 297:12
**loosely** [1] - 297:10
**Loral** [1] - 98:21
**lose** [1] - 165:4
**loses** [1] - 163:23
**losing** [1] - 175:2
**loss** [1] - 205:15
**lost** [3] - 95:4, 293:19, 310:6
**low** [1] - 171:20
**luck** [1] - 250:16
**lunch** [2] - 184:21, 185:1

## M

**machine** [2] - 264:9, 264:14
**Madey** [1] - 295:24
**magazines** [1] - 225:1
**Mahurkar** [2] - 99:7, 239:12
**mail** [4] - 127:20, 130:22, 136:10, 260:16
**mails** [16] - 127:19, 145:19, 148:18, 148:21, 148:23, 149:12, 149:23, 214:1, 214:4, 224:11, 224:16, 225:9, 226:5, 226:7, 266:12, 266:13
**maintained** [2] - 104:4, 137:1
**major** [1] - 154:5
**majority** [3] - 113:16, 284:21, 291:22
**maker** [2] - 177:23, 262:10
**manage** [1] - 174:2
**manager** [1] - 81:12
**mandated** [1] - 163:16
**manipulations** [1] - 153:18
**manner** [4] - 94:17, 126:19, 154:4, 230:21
**manually** [2] - 154:6, 233:25
**manufacture** [1] - 296:1
**manufacturer** [1] - 226:24
**manufacturers** [1] - 159:13
**map** [1] - 137:21
**March** [20] - 96:11, 96:12, 99:16, 100:1, 101:19, 102:10, 136:18, 136:22, 147:24, 157:21, 157:25, 185:4,

199:22, 200:16, 203:5, 211:1, 226:15, 226:16, 227:3, 227:14
**MARCO** [1] - 79:18
**mark** [3] - 258:14, 259:2, 259:3
**marked** [3] - 206:15, 303:15, 312:5
**Marker** [1] - 110:6
**market** [8] - 133:21, 133:22, 136:22, 200:18, 206:20, 214:3, 226:7, 308:8
**marketing** [1] - 99:3
**markets** [1] - 289:24
**marking** [9] - 208:21, 257:13, 258:11, 258:15, 258:17, 258:20, 258:22, 258:23, 259:1
**markings** [1] - 206:13
**Markman** [5] - 91:19, 93:15, 141:7, 142:16, 305:2
**marks** [1] - 157:15
**Mary** [2] - 80:9, 81:22
**mask** [2] - 98:24, 99:1
**Massachusetts** [1] - 216:8
**massive** [1] - 204:7
**matched** [2] - 178:5, 178:6
**material** [3] - 127:8, 194:2, 196:23
**materials** [3] - 122:11, 176:6, 293:8
**matter** [20] - 81:5, 95:14, 114:13, 115:18, 132:10, 132:11, 155:20, 168:25, 170:5, 174:14, 175:9, 197:1, 197:15, 197:18, 253:12, 255:19, 257:5, 283:18, 295:12, 303:12
**mattered** [1] - 134:5
**mean** [14] - 84:16, 87:19, 98:4, 113:19, 174:21, 191:13, 234:10, 234:13, 253:13, 285:10, 298:9, 298:13, 299:16, 310:4
**meaning** [9] - 91:18, 91:23, 91:25, 92:12, 93:22, 95:25, 192:8, 280:2, 304:1
**means** [8] - 88:12, 91:14, 191:10, 191:13, 253:7, 253:10, 285:10, 285:12
**meant** [4] - 87:22, 93:7, 293:4, 299:10
**measuring** [1] - 107:20
**mechanical** [9] - 107:5, 116:9, 116:13, 116:20, 170:8, 173:20, 187:7, 242:12, 281:19
**mechanism** [17] - 96:11, 97:2, 100:21, 112:11, 146:13, 146:25, 152:3, 174:10, 195:9, 218:16, 235:17, 235:19, 241:19, 243:18, 244:14, 273:4
**mechanisms** [1] - 162:8
**medical** [1] - 120:1
**meet** [14] - 100:10, 125:4, 128:17, 128:18, 128:19, 156:18, 160:2, 177:14, 286:9, 287:20, 295:20
**meeting** [1] - 270:15
**meets** [1] - 112:12
**memories** [1] - 179:23
**memory** [6] - 148:25, 178:4, 179:10, 179:13, 182:19
**mention** [2] - 294:4, 310:25
**mentioned** [7] - 203:22, 219:7, 239:11,

274:20, 275:17, 276:1, 291:19
**mentioning** [1] - 295:22
**mentions** [1] - 265:18
**mercy** [1] - 214:17
**mere** [2] - 99:2, 168:24
**merely** [12] - 110:23, 190:15, 191:20, 194:17, 194:18, 234:3, 245:1, 247:2, 263:15, 274:24, 275:4, 286:8
**merging** [2] - 157:5, 257:23
**merit** [1] - 212:7
**merits** [2] - 135:4, 298:9
**message** [2] - 127:25, 260:18
**met** [8] - 111:22, 181:10, 239:16, 243:25, 245:2, 287:22, 291:2, 295:13
**metadata** [3] - 147:19, 148:1, 148:4
**metal** [1] - 236:20
**metallic** [2] - 88:5, 88:14
**meticulous** [2] - 147:9, 147:13
**meticulously** [1] - 137:1
**mic** [2] - 246:8, 292:9
**Middle** [1] - 288:20
**middle** [10] - 93:16, 159:1, 160:21, 190:9, 209:11, 209:19, 236:21, 238:10, 282:22, 303:18
**Middleton** [1] - 80:12
**might** [30] - 88:4, 90:10, 96:21, 116:18, 127:15, 127:16, 131:6, 144:10, 158:1, 168:8, 179:6, 181:8, 182:10, 196:19, 210:12, 211:1, 241:8, 249:6, 250:12, 250:15, 270:13, 270:19, 274:8, 280:25, 300:22, 300:24, 309:11, 309:18, 309:24
**Mikael** [2] - 80:17, 81:11
**mil** [2] - 294:25, 295:2
**military** [10] - 264:8, 289:23, 293:2, 293:12, 294:1, 294:2, 296:10, 299:10, 300:1, 301:15
**millions** [1] - 300:2
**mind** [14] - 161:8, 161:14, 175:7, 200:10, 203:10, 211:5, 211:6, 216:7, 242:9, 244:15, 247:17, 270:10, 304:14, 305:17
**minds** [2] - 156:15, 267:18
**mindsets** [1] - 218:4
**minimum** [2] - 120:20, 253:3
**minor** [1] - 107:12
**minute** [3] - 138:4, 185:18, 186:2
**minutes** [4] - 133:24, 137:8, 182:19, 254:3
**mischaracterization** [1] - 246:23
**misdescribed** [1] - 211:20
**misidentified** [1] - 248:19
**mislead** [2] - 129:19, 213:1
**misleading** [37] - 127:6, 127:8, 130:20, 130:21, 131:20, 202:20, 204:12, 204:15, 204:19, 205:1, 205:22, 206:7, 206:24, 207:17, 208:8, 210:7, 210:8, 211:16, 212:24, 212:25, 213:4, 213:7, 213:12, 213:13, 261:16, 261:17, 262:1, 262:2, 262:3, 263:6, 272:10

**misled** [3] - 129:4, 130:3, 130:8
**miss** [2] - 82:1, 174:15
**missed** [2] - 82:2, 95:25
**missing** [6] - 140:12, 140:14, 166:16, 203:18, 214:11, 284:18
**misstatement** [1] - 110:24
**mistake** [6] - 110:24, 215:21, 216:11, 216:18, 216:23, 254:13
**mistaken** [1] - 261:20
**model** [8] - 96:13, 296:4, 296:7, 296:10, 296:17, 300:16, 310:20, 310:22
**models** [2] - 296:11, 310:2
**modifications** [1] - 196:16
**modify** [3] - 143:11, 143:12, 144:11
**moment** [4] - 84:8, 161:23, 265:17, 272:23
**moments** [1] - 94:24
**money** [3] - 274:17, 287:14, 300:10
**MoneyIN** [1] - 140:7
**monitor** [1] - 85:9
**month** [1] - 147:15
**months** [3] - 157:23, 200:7, 261:6
**moot** [1] - 110:13
**morning** [7] - 81:2, 81:9, 82:12, 83:16, 151:23, 223:1, 226:14
**morph** [1] - 152:4
**Morse** [1] - 186:14
**mortar** [1] - 264:25
**most** [10] - 83:16, 121:17, 152:23, 157:18, 169:22, 241:20, 247:7, 247:22, 290:14, 294:19
**mostly** [1] - 131:13
**motion** [49] - 100:3, 102:2, 102:3, 102:4, 117:2, 128:10, 136:1, 154:25, 156:21, 156:25, 157:1, 160:16, 164:1, 164:15, 164:25, 185:21, 186:3, 209:2, 210:2, 210:5, 210:9, 210:10, 219:14, 219:15, 220:1, 223:7, 231:9, 239:14, 245:1, 245:3, 245:4, 245:9, 253:1, 265:22, 267:23, 267:24, 267:25, 270:6, 270:24, 271:1, 271:3, 273:1, 273:24, 274:2, 294:3
**MOTION** [1] - 79:15
**motions** [11] - 81:4, 83:22, 99:23, 120:23, 128:8, 137:24, 214:25, 218:6, 222:16, 265:23, 298:9
**motivated** [1] - 144:12
**motivation** [1] - 294:11
**mount** [2] - 169:18, 187:21
**mounted** [15] - 94:12, 94:16, 94:17, 154:17, 154:19, 162:15, 162:16, 174:1, 231:19, 235:3, 235:5, 235:8, 235:9, 264:10, 269:11
**mounting** [6] - 95:15, 234:24, 234:25, 235:1, 235:6, 244:5
**mouse** [6] - 115:6, 115:14, 115:21, 115:24, 116:1, 116:2
**mouth** [2] - 87:13, 172:3
**movable** [5] - 153:25, 153:3, 155:6, 155:8, 155:16

**move** [14] - 82:23, 94:17, 95:23, 108:8, 126:3, 139:14, 155:8, 171:3, 174:14, 176:24, 229:17, 243:18, 280:23
**moved** [16] - 96:9, 150:12, 150:14, 163:25, 167:19, 171:2, 215:2, 218:2, 219:15, 223:5, 224:15, 267:24, 292:18, 292:19, 292:21
**movement** [6] - 86:21, 94:12, 154:18, 162:14, 174:18
**moves** [4] - 94:20, 153:22, 154:4, 155:7
**moving** [23] - 83:20, 84:1, 84:3, 84:20, 86:13, 87:2, 91:3, 110:10, 111:13, 137:23, 138:1, 139:8, 139:18, 142:25, 143:1, 161:11, 169:12, 169:16, 170:24, 182:5, 243:22, 247:5, 254:6
**MR** [140] - 81:9, 81:13, 81:14, 81:15, 81:16, 81:19, 81:21, 81:23, 82:15, 83:2, 83:5, 83:8, 83:14, 84:7, 89:5, 89:10, 89:16, 90:4, 90:15, 90:23, 91:3, 91:6, 93:1, 95:6, 95:10, 95:18, 95:21, 96:7, 115:10, 137:15, 137:19, 138:11, 139:15, 139:18, 150:7, 150:10, 151:7, 151:10, 151:13, 155:22, 176:11, 176:22, 177:2, 184:19, 184:24, 191:8, 191:14, 192:5, 192:8, 192:17, 199:16, 199:18, 213:3, 213:11, 213:15, 213:17, 214:24, 218:1, 222:23, 227:22, 228:22, 229:15, 229:22, 232:11, 232:14, 233:8, 234:12, 234:16, 237:22, 238:1, 238:10, 238:15, 238:19, 243:4, 243:12, 246:8, 254:5, 266:1, 267:14, 267:17, 268:8, 268:12, 268:16, 272:19, 272:20, 272:24, 274:12, 274:17, 278:9, 278:11, 278:14, 278:17, 280:24, 280:25, 281:5, 281:18, 282:11, 283:3, 283:5, 283:6, 283:10, 283:13, 283:16, 283:19, 283:23, 283:25, 284:2, 284:4, 292:13, 292:14, 292:17, 295:8, 295:15, 296:24, 297:2, 299:19, 301:11, 301:20, 302:8, 302:10, 306:8, 306:10, 306:25, 307:6, 307:11, 307:14, 308:5, 308:13, 308:19, 308:22, 308:25, 309:3, 309:5, 309:17, 309:18, 311:23, 312:15, 313:2, 313:5, 313:6
**MS** [1] - 81:22
**multi** [1] - 220:1
**multi-hundred** [1] - 220:1
**multiple** [9] - 170:24, 201:10, 210:18, 216:3, 217:3, 225:5, 236:5, 264:10, 265:23
**must** [12] - 127:9, 147:24, 159:24, 160:4, 160:10, 162:6, 171:18, 249:20, 258:6, 266:22, 267:6, 294:25
**Mutual** [1] - 165:21
**muzzle** [2] - 264:12, 264:22

## N

**name** [8] - 224:8, 266:22, 266:24, 267:1, 267:2, 267:19, 267:21, 268:13
**named** [1] - 192:18
**names** [2] - 224:7, 226:8
**Nancy** [1] - 314:11
**nancy** [1] - 80:18
**NANCY** [1] - 314:12
**narrow** [2] - 91:13, 91:15
**narrower** [4] - 88:4, 92:15, 112:3, 251:22
**narrows** [1] - 92:19
**Nasaka** [3] - 288:18, 289:7, 291:13
**Nathan** [3] - 80:5, 81:13, 133:18
**national** [2] - 293:10, 294:25
**natural** [1] - 289:3
**nature** [2] - 168:14, 308:22
**Navy** [4] - 293:6, 293:7, 293:13, 300:8
**near** [4] - 104:16, 179:14, 233:14, 264:20
**near-contemporaneous** [1] - 104:16
**nearly** [4] - 158:11, 206:19, 208:14, 219:17
**necessarily** [6] - 116:15, 236:14, 248:12, 298:3, 298:5, 310:1
**necessary** [11] - 88:16, 107:16, 111:6, 121:13, 141:5, 141:14, 161:16, 163:22, 164:7, 247:3, 299:16
**need** [50] - 92:25, 95:2, 98:7, 108:10, 111:11, 132:21, 147:18, 151:3, 151:19, 151:21, 151:22, 156:8, 156:23, 159:22, 161:18, 168:15, 169:25, 170:25, 208:7, 210:7, 213:11, 226:16, 232:2, 240:3, 244:18, 246:15, 250:24, 251:5, 251:15, 253:25, 262:23, 281:23, 282:15, 286:3, 286:5, 289:13, 293:16, 297:2, 297:16, 297:19, 299:11, 300:4, 301:2, 303:4, 306:13, 309:20, 310:1, 310:11, 310:15, 312:24
**needed** [16] - 107:19, 161:1, 163:2, 163:22, 164:6, 164:12, 164:14, 167:22, 168:1, 168:10, 169:11, 171:10, 259:24, 271:3, 289:19, 293:8
**needs** [17] - 88:5, 88:14, 97:25, 165:6, 165:25, 166:2, 194:8, 195:16, 234:10, 234:13, 261:25, 268:20, 279:24, 288:1, 302:14, 305:14
**negative** [1] - 209:8
**negotiating** [1] - 299:3
**negotiations** [3] - 129:8, 129:12, 296:21
**Net** [1] - 140:7
**never** [29] - 118:17, 119:18, 124:22, 128:23, 130:8, 131:20, 132:11, 132:16, 136:11, 163:21, 164:6, 164:14, 175:18, 178:2, 181:21, 182:8, 183:23, 206:11, 206:14, 206:23, 212:18, 220:14, 247:17, 261:18, 264:8, 271:21, 273:11, 273:16

**new** [16] - 163:5, 163:6, 166:10, 167:14, 184:16, 189:7, 217:6, 242:7, 242:10, 242:13, 242:21, 250:14, 253:24, 256:17, 312:22, 312:23
**next** [23] - 85:20, 87:2, 96:7, 131:8, 133:10, 137:19, 137:24, 146:14, 152:12, 153:25, 158:14, 174:15, 174:25, 201:24, 210:24, 228:24, 238:19, 249:16, 253:17, 254:1, 280:23, 281:5, 313:7
**nexus** [1] - 261:25
**nice** [1] - 109:3
**nickel** [1] - 282:10
**NIGHTFORCE** [2] - 79:7, 79:7
**Nightforce** [311] - 83:25, 84:2, 84:25, 85:4, 86:16, 86:25, 89:23, 91:20, 93:25, 94:20, 96:8, 99:10, 99:11, 99:19, 100:6, 101:1, 102:11, 103:19, 109:2, 109:15, 109:25, 110:4, 110:10, 112:17, 112:25, 114:3, 114:5, 116:14, 117:21, 118:9, 118:14, 120:21, 120:22, 120:25, 121:5, 121:11, 121:20, 123:7, 123:23, 123:25, 125:24, 126:4, 126:21, 127:8, 127:12, 127:14, 128:22, 129:3, 129:4, 129:19, 130:3, 130:7, 130:8, 130:11, 130:19, 130:21, 131:6, 132:8, 132:14, 132:19, 132:24, 134:19, 136:4, 136:8, 136:11, 136:14, 136:16, 137:23, 137:25, 138:13, 138:15, 138:23, 139:8, 140:3, 140:9, 142:25, 143:2, 143:6, 143:16, 143:23, 144:16, 144:19, 144:22, 144:24, 145:5, 145:7, 145:9, 145:15, 146:14, 146:16, 146:19, 146:20, 146:21, 147:18, 148:8, 148:15, 148:17, 149:23, 149:24, 150:12, 152:23, 164:15, 164:23, 165:6, 177:7, 191:22, 199:24, 200:1, 200:2, 200:9, 200:12, 200:18, 201:2, 201:8, 201:19, 202:3, 202:22, 203:8, 203:12, 203:16, 203:23, 204:3, 204:8, 205:16, 206:4, 206:12, 206:17, 206:20, 206:23, 207:3, 207:5, 207:9, 207:25, 208:3, 208:11, 210:12, 210:14, 210:16, 210:19, 210:20, 210:23, 210:25, 211:4, 211:13, 211:21, 212:11, 213:1, 213:9, 214:25, 215:2, 218:2, 223:4, 224:13, 226:11, 226:19, 226:24, 227:7, 228:20, 232:19, 232:24, 234:17, 235:7, 235:13, 236:7, 237:3, 238:21, 238:22, 238:23, 239:2, 239:17, 239:20, 239:23, 240:25, 241:5, 241:14, 243:22, 244:16, 245:2, 245:3, 245:7, 245:12, 246:21, 247:6, 247:14, 247:19, 248:9, 248:15, 248:16, 249:11, 249:17, 250:1, 250:19, 251:12, 252:2, 252:11, 253:4, 253:6, 253:20, 254:10, 254:11, 256:4, 256:16, 256:25, 257:20, 258:11, 258:20, 258:23, 258:25, 259:15,

259:22, 259:25, 260:4, 260:7, 260:15, 260:16, 260:20, 260:22, 260:25, 261:23, 262:10, 262:21, 262:24, 263:1, 263:3, 263:12, 263:20, 264:2, 264:5, 265:18, 265:23, 266:15, 266:18, 279:16, 280:4, 282:1, 284:10, 284:12, 284:22, 285:1, 285:15, 286:10, 288:17, 288:22, 289:21, 290:1, 290:6, 290:14, 290:16, 290:18, 291:1, 291:6, 291:9, 291:23, 292:6, 292:19, 293:14, 293:15, 293:17, 293:20, 295:2, 295:19, 296:3, 296:4, 296:6, 296:7, 296:11, 296:13, 296:16, 297:21, 298:10, 298:20, 298:22, 300:10, 300:14, 300:16, 301:13, 302:1, 303:3, 303:7, 303:13, 303:19, 304:16, 304:21, 304:23, 305:8, 305:9, 305:10, 306:22, 307:5, 307:8, 307:16, 307:17, 307:25, 308:3, 309:19, 310:3, 310:12, 310:14, 310:16, 310:18, 310:21, 310:23, 311:17, 311:20, 312:1, 312:2, 312:17, 312:19

**Nightforce's** [78] - 84:22, 84:24, 86:14, 87:2, 93:18, 95:23, 97:14, 100:4, 102:3, 102:4, 106:18, 106:20, 112:16, 113:6, 113:11, 117:2, 118:13, 118:14, 123:11, 125:8, 127:2, 127:20, 128:2, 128:10, 128:22, 129:13, 129:17, 130:14, 133:25, 134:17, 135:25, 136:3, 138:12, 140:16, 142:23, 150:4, 160:16, 193:1, 209:1, 209:4, 211:6, 218:25, 220:11, 222:5, 222:18, 228:12, 232:8, 239:14, 241:9, 245:4, 245:9, 247:25, 248:5, 248:7, 248:18, 252:5, 253:2, 253:19, 257:9, 257:23, 259:14, 261:10, 270:11, 273:24, 273:25, 279:10, 285:6, 285:8, 288:4, 290:9, 291:15, 292:10, 293:3, 294:3, 294:16, 294:23, 303:14, 308:6

**Ninth** [1] - 80:7

**non** [24] - 93:3, 93:12, 111:19, 111:20, 113:23, 114:1, 125:19, 143:12, 190:14, 200:9, 200:14, 227:25, 228:11, 250:2, 250:3, 286:1, 295:3, 303:2, 306:16, 309:23, 310:5, 310:8, 310:15

**non-claimed** [1] - 250:2

**non-government** [1] - 295:3

**non-hindsight** [1] - 143:12

**non-infringement** [4] - 93:3, 93:12, 227:25, 228:11

**non-infringing** [8] - 250:3, 286:1, 303:2, 306:16, 310:5, 310:8, 310:15

**non-limiting** [1] - 190:14

**non-prec** [1] - 114:1

**non-precedential** [1] - 113:23

**non-provisional** [5] - 111:19, 111:20, 125:19, 200:9, 200:14

**non-specific** [1] - 309:23

**none** [11] - 98:13, 98:14, 145:15,

185:20, 186:2, 198:9, 198:10, 250:17, 250:21, 255:3, 270:20

**nonetheless** [1] - 218:14

**nonissue** [2] - 211:19, 212:9

**nonsense** [1] - 166:12

**normal** [1] - 280:6

**North** [1] - 288:20

**notably** [2] - 201:16, 239:2

**notch** [2] - 117:17, 189:16

**note** [4] - 156:1, 163:8, 233:9, 267:22

**noted** [2] - 185:24, 228:16

**notes** [2] - 123:14, 124:21

**noteworthy** [1] - 287:11

**nothing** [37] - 88:13, 94:14, 94:15, 128:1, 130:9, 134:23, 139:24, 146:2, 148:1, 177:11, 178:8, 179:4, 182:15, 182:23, 183:18, 183:22, 194:7, 202:1, 233:17, 236:3, 245:20, 249:24, 260:2, 260:16, 261:8, 261:13, 262:8, 263:14, 265:5, 265:12, 266:5, 274:3, 275:2, 280:6, 285:21, 298:13, 311:14

**notice** [5] - 206:3, 217:16, 255:13, 260:25, 289:18

**notify** [1] - 291:12

**noting** [1] - 220:13

**notion** [1] - 132:17

**notwithstanding** [3] - 140:3, 149:12, 297:22

**novel** [1] - 120:24

**November** [4] - 157:23, 159:2, 159:6, 200:6

**nub** [3] - 152:9, 152:14, 154:23

**number** [21] - 96:14, 101:5, 150:16, 158:18, 188:15, 202:24, 203:5, 204:11, 204:12, 204:13, 210:11, 284:25, 288:6, 288:18, 296:5, 297:21, 300:3, 300:16, 305:16, 310:20, 310:23

**numbers** [2] - 212:13, 258:14

## O

**O'Reilly** [1] - 186:14

**oath** [1] - 101:7

**objection** [2] - 109:21, 173:6

**objective** [4] - 195:17, 267:8, 277:16, 277:18

**objects** [1] - 175:2

**obligated** [2] - 296:13, 297:22

**obligation** [1] - 311:18

**obligations** [1] - 304:3

**observation** [1] - 275:19

**observer** [1] - 98:7

**obtain** [1] - 230:21

**obtained** [5] - 123:4, 125:13, 147:23, 211:24, 226:11

**obvious** [18] - 142:25, 143:4, 173:23, 174:23, 186:23, 187:2, 196:3, 196:20, 196:23, 196:25, 197:2, 197:11, 197:14, 218:20, 218:25, 221:21, 275:11, 275:19

**obviously** [2] - 223:4, 300:14

**obviousness** [11] - 118:24, 138:3, 143:1, 221:3, 221:5, 244:16, 251:23, 251:24, 265:14, 275:8

**occurred** [14] - 106:25, 127:13, 148:13, 158:23, 164:9, 175:21, 176:9, 176:10, 176:12, 178:10, 179:14, 181:15, 240:4, 258:22

**October** [4] - 163:25, 164:16, 244:24, 244:25

**OF** [2] - 79:2, 79:17

**Off-the-record** [1] - 274:10

**offered** [2] - 186:22, 193:20

**offering** [2] - 227:6, 288:7

**offerings** [2] - 202:23, 207:6

**offers** [1] - 252:9

**offhand** [2] - 117:15, 117:22

**Office** [12] - 123:25, 125:1, 193:14, 215:22, 215:23, 216:10, 216:18, 216:19, 216:22, 217:2, 217:17, 255:10

**Office's** [2] - 124:2, 124:6, 124:19, 216:17, 257:7

**offices** [1] - 104:25

**Official** [1] - 314:13

**offset** [1] - 141:18

**often** [3] - 111:17, 111:23

**oftentimes** [2] - 160:6, 300:7

**old** [6] - 105:23, 159:1, 160:6, 222:23, 242:22, 256:18

**older** [1] - 131:11

**once** [10] - 84:12, 85:17, 199:12, 203:12, 203:22, 216:4, 239:16, 258:5, 263:20, 271:15

**one** [159] - 82:21, 84:20, 90:10, 96:8, 96:21, 96:22, 103:19, 106:5, 106:6, 106:17, 110:5, 114:12, 120:9, 124:1, 131:17, 133:18, 133:19, 137:2, 143:25, 145:2, 145:22, 145:23, 146:16, 147:7, 149:11, 150:16, 152:22, 154:12, 155:5, 156:11, 156:13, 161:15, 161:18, 163:6, 165:12, 166:21, 166:24, 167:22, 168:3, 169:7, 169:8, 176:14, 179:25, 180:24, 181:3, 181:5, 181:6, 183:2, 183:4, 183:5, 183:6, 185:1, 185:16, 186:14, 187:8, 187:11, 187:19, 188:7, 189:11, 189:14, 189:22, 191:4, 195:3, 195:22, 196:25, 198:8, 199:1, 199:2, 199:11, 200:22, 201:10, 204:11, 209:5, 209:12, 209:13, 210:11, 213:21, 214:14, 215:1, 216:17, 216:21, 218:12, 219:4, 219:20, 219:22, 219:25, 221:13, 222:2, 222:19, 224:16, 226:10, 226:12, 227:25, 229:11, 229:13, 229:20, 231:11, 232:15, 233:23, 234:19, 236:5, 242:6, 243:11, 243:20, 243:25, 246:17, 248:21, 248:22, 248:25, 249:1, 249:4, 249:9, 249:10, 250:7, 250:10, 250:11, 251:7, 251:8, 251:14,

252:15, 254:13, 255:17, 256:20, 258:19, 264:2, 265:22, 265:24, 266:4, 267:23, 267:24, 267:25, 268:13, 268:14, 272:20, 281:5, 281:9, 281:10, 285:17, 287:3, 287:5, 288:23, 293:15, 295:9, 295:22, 297:24, 299:2, 302:2, 303:1, 303:13, 303:16, 304:17, 305:5, 305:6, 306:15, 310:15
**One** [1] - 80:14
**one-sided** [1] - 251:7
**ones** [5] - 139:1, 139:4, 183:8, 224:8, 281:16
**ongoing** [1] - 281:24
**onslaught** [1] - 268:2
**oOo** [1] - 314:1
**open** [8] - 112:19, 113:8, 113:17, 220:7, 235:11, 245:20, 250:6, 282:20
**open-ended** [4] - 112:19, 113:8, 113:17, 235:11
**opened** [2] - 182:13, 227:7
**opening** [13] - 178:1, 181:19, 219:14, 219:15, 220:1, 237:12, 239:11, 251:4, 254:9, 257:17, 265:18, 270:24, 271:3
**operably** [1] - 154:21
**operate** [1] - 168:25
**operated** [1] - 100:22
**operates** [1] - 116:11
**operation** [3] - 170:8, 171:19, 230:14
**operations** [4] - 293:14, 294:21, 296:9, 301:14
**operatively** [1] - 155:2
**opine** [1] - 220:12
**opinion** [8] - 92:3, 93:12, 133:3, 133:5, 193:23, 193:25, 275:1, 277:7
**opinions** [1] - 270:8
**opportunity** [4] - 245:21, 261:16, 266:16, 304:2
**opposed** [4] - 265:22, 301:4, 305:5, 306:15
**opposing** [5] - 83:9, 128:1, 252:9, 270:8
**opposite** [8] - 143:15, 161:22, 162:2, 166:15, 166:22, 166:25, 251:5, 253:22
**opposition** [2] - 147:17, 258:12
**optical** [17] - 118:18, 120:1, 120:4, 153:25, 155:3, 155:6, 155:8, 155:16, 161:12, 162:5, 162:13, 167:18, 170:13, 173:19, 174:11, 221:14, 265:3
**OPTICS** [1] - 79:7
**optics** [2] - 171:3, 218:18
**Optics** [2] - 288:20, 296:7
**optimistic** [1] - 248:10
**option** [1] - 311:17
**optional** [4] - 285:7, 285:10, 285:18
**options** [1] - 133:7
**OR** [3] - 80:8, 80:16, 80:19
**oral** [1] - 81:4
**orbital** [2] - 146:7, 242:3
**order** [30] - 88:11, 93:16, 110:19, 112:20, 140:8, 141:7, 142:16, 144:24, 173:1, 191:12, 232:19, 232:20,

232:21, 238:14, 244:17, 246:13, 253:19, 253:22, 285:5, 290:17, 294:19, 294:22, 296:6, 296:16, 297:13, 297:21, 299:7, 303:19, 306:15, 307:2
**Order** [1] - 311:11
**ordered** [4] - 297:5, 310:3, 310:14, 311:17
**ordering** [8] - 299:15, 300:13, 300:15, 300:20, 310:12, 310:21, 311:16
**orders** [4] - 284:21, 290:10, 296:4, 300:5, 303:16
**ordinary** [9] - 91:23, 91:25, 92:11, 92:12, 93:21, 114:24, 194:9, 222:2, 265:6
**OREGON** [1] - 79:2
**Oregon** [3] - 79:6, 110:5, 314:13
**original** [20] - 103:11, 105:22, 124:3, 124:6, 159:5, 163:6, 166:4, 166:11, 172:5, 172:8, 187:18, 200:24, 203:1, 216:14, 228:15, 232:16, 232:19, 298:23, 314:6
**oscillations** [1] - 171:25
**oscilloscope** [1] - 170:2
**oscilloscopes** [1] - 175:4
**otherwise** [13] - 112:6, 112:11, 112:22, 158:2, 161:2, 165:4, 171:10, 211:11, 214:12, 231:16, 245:13, 286:23, 304:11
**Otteman** [69] - 96:10, 97:1, 97:23, 100:1, 100:10, 100:19, 102:22, 103:16, 104:25, 106:22, 108:4, 108:13, 108:15, 110:1, 111:9, 115:1, 116:25, 117:4, 118:3, 120:15, 120:17, 162:24, 163:3, 163:7, 175:14, 175:19, 176:17, 177:16, 178:5, 178:7, 178:13, 180:2, 180:16, 181:15, 181:23, 182:2, 182:11, 183:3, 183:10, 183:13, 183:17, 192:11, 192:18, 194:11, 195:5, 195:13, 195:16, 197:17, 221:11, 221:16, 239:15, 239:24, 240:7, 240:11, 240:21, 240:24, 241:2, 241:22, 245:25, 246:21, 247:16, 248:2, 251:10, 274:4, 275:12, 275:16, 279:14, 280:16
**Otteman's** [23] - 102:6, 102:14, 102:25, 104:13, 104:23, 105:10, 105:17, 109:9, 109:11, 109:14, 109:16, 110:3, 110:11, 178:12, 180:10, 181:13, 183:21, 195:3, 240:10, 241:3, 246:24, 249:23, 270:17
**ought** [3] - 292:24, 293:16, 298:19
**ourselves** [1] - 165:15
**out-of-context** [1] - 209:25
**out-of-court** [1] - 148:21
**outcome** [1] - 255:19
**outlined** [2] - 288:14, 299:22
**outside** [15] - 94:5, 94:15, 144:25, 205:19, 228:19, 233:20, 234:3, 234:11, 234:14, 234:20, 250:15,

268:21
**outwardly** [10] - 154:9, 228:18, 233:17, 233:22, 234:1, 234:2, 234:4, 234:7, 234:18, 269:14
**over-the-shoulder** [1] - 98:7
**overall** [4] - 97:25, 239:4, 239:7, 243:13
**overclaimed** [2] - 193:2, 193:3
**overcome** [2] - 92:3, 101:22
**overlaying** [1] - 152:5
**overlooked** [1] - 187:12
**oversaw** [1] - 178:14
**overview** [1] - 83:17
**overwhelming** [1] - 268:2
**own** [28] - 87:12, 136:3, 147:14, 157:20, 159:4, 159:8, 160:20, 162:22, 165:15, 177:7, 177:17, 200:13, 203:10, 215:25, 219:2, 220:13, 221:1, 224:11, 226:19, 226:25, 227:11, 238:24, 241:4, 279:10, 284:23, 285:4, 295:20, 304:21
**owner** [4] - 207:3, 289:11, 289:18, 289:19
**owns** [1] - 304:21

## P

**packets** [1] - 105:21
**page** [14] - 117:9, 122:1, 123:20, 124:16, 125:2, 139:20, 241:24, 246:24, 248:17, 277:1, 284:5, 286:16, 312:8, 312:9
**pages** [6] - 93:17, 120:11, 179:25, 219:20, 265:20, 286:22
**paid** [5] - 217:3, 217:9, 217:17, 300:14, 300:17
**pair** [2] - 250:16, 279:1
**panel** [1] - 187:22
**Papak** [1] - 110:6
**paper** [6] - 105:25, 106:1, 119:25, 299:1, 301:24, 302:4
**paperwork** [1] - 89:13
**paragraph** [8] - 135:7, 181:12, 194:15, 195:3, 237:11, 240:9, 262:14, 274:23
**paragraphs** [1] - 162:20
**parallax** [8] - 86:12, 146:2, 146:9, 152:6, 154:2, 174:19, 242:4, 268:13
**parallels** [1] - 190:7
**PARK** [29] - 81:9, 82:15, 83:2, 280:24, 281:18, 282:11, 283:3, 283:10, 283:13, 283:19, 283:23, 283:25, 284:4, 292:13, 302:8, 302:10, 306:8, 306:10, 306:25, 307:6, 307:11, 307:14, 308:5, 308:13, 308:19, 308:22, 308:25, 311:23, 313:2
**Park** [4] - 80:2, 81:10, 82:14, 284:7
**Part** [7] - 91:15, 92:16, 92:18, 92:22, 93:9, 93:13, 94:3
**part** [60] - 85:17, 85:22, 86:1, 86:4, 87:13, 88:20, 88:25, 90:17, 92:9, 93:6, 94:9, 94:25, 95:7, 95:11, 95:15,

100:16, 116:11, 142:10, 153:5, 153:9, 153:19, 160:3, 176:19, 177:23, 183:24, 195:14, 201:17, 220:4, 220:16, 228:4, 228:5, 230:8, 234:3, 234:22, 234:24, 235:17, 238:2, 238:5, 240:8, 242:18, 242:22, 246:13, 249:25, 250:25, 252:14, 262:18, 268:22, 268:25, 269:23, 270:2, 288:14, 288:15, 288:16, 290:8, 290:25, 295:19, 295:22, 297:17, 297:21
**partial** [1] - 114:20
**particular** [25] - 85:6, 105:8, 154:4, 177:12, 191:17, 212:24, 238:25, 239:10, 248:4, 253:16, 269:18, 302:5, 305:12, 305:23, 310:25
**particularly** [6] - 110:2, 128:9, 173:4, 244:19, 245:20, 257:17
**parties** [28] - 84:1, 88:7, 96:9, 99:4, 99:9, 120:23, 126:2, 127:13, 135:11, 136:7, 137:24, 140:25, 158:2, 204:24, 206:9, 213:21, 215:7, 225:25, 230:1, 278:4, 282:13, 285:9, 292:18, 296:24, 299:14, 305:14, 305:15, 307:21
**parties'** [1] - 81:4
**parts** [50] - 87:8, 88:23, 100:15, 100:17, 100:19, 104:11, 104:24, 105:6, 108:5, 118:18, 131:17, 159:13, 161:11, 161:12, 169:12, 169:16, 170:11, 170:25, 174:9, 175:14, 175:19, 178:3, 178:5, 180:2, 180:21, 181:1, 181:23, 182:1, 182:3, 182:9, 183:4, 183:7, 221:8, 222:9, 235:10, 235:20, 236:5, 240:11, 240:15, 240:19, 240:22, 241:20, 242:5, 243:14, 243:15, 271:19
**party** [15] - 99:10, 99:13, 100:13, 104:9, 104:12, 105:15, 128:22, 131:24, 132:3, 156:5, 159:13, 202:4, 214:15, 288:12, 295:7
**pass** [3] - 121:1, 121:3, 292:9
**passed** [1] - 293:5
**past** [4] - 121:1, 205:23, 205:25, 208:16
**patent** [299] - 82:19, 83:15, 84:4, 86:19, 87:3, 87:20, 88:13, 91:8, 92:11, 92:15, 92:20, 95:7, 99:14, 111:14, 111:15, 111:16, 111:21, 111:22, 113:2, 113:7, 113:13, 113:16, 115:19, 117:12, 117:13, 117:15, 121:2, 121:6, 121:7, 121:14, 121:22, 121:24, 122:1, 122:2, 122:5, 122:9, 122:11, 122:13, 122:17, 122:18, 122:19, 122:24, 123:9, 123:16, 123:17, 123:19, 123:22, 124:17, 125:2, 125:5, 125:9, 125:12, 125:15, 125:17, 125:18, 125:22, 126:6, 126:9, 126:14, 127:16, 127:22, 130:2, 130:3, 132:1, 132:4, 132:9, 132:22, 133:2, 133:9, 133:10, 133:13, 134:20, 135:2, 136:9, 139:19, 139:20, 139:24, 140:1, 140:4, 140:5, 140:13, 140:14, 140:22, 141:11, 141:12,

142:21, 143:24, 144:3, 144:18, 144:23, 145:3, 150:12, 151:5, 151:18, 152:4, 152:5, 152:6, 152:16, 153:15, 155:12, 156:2, 156:4, 156:6, 157:9, 157:10, 157:13, 157:20, 157:22, 158:20, 159:3, 159:4, 159:6, 159:8, 160:6, 163:13, 163:18, 163:24, 164:1, 165:10, 170:6, 170:14, 174:14, 177:8, 177:9, 177:21, 179:4, 179:7, 179:9, 179:14, 179:23, 180:4, 180:5, 180:20, 180:24, 183:20, 185:2, 185:6, 185:14, 185:15, 186:1, 186:9, 186:16, 187:21, 188:25, 189:6, 190:21, 191:1, 192:18, 192:19, 193:7, 194:12, 194:23, 195:17, 196:1, 197:10, 197:19, 199:4, 200:5, 200:15, 200:17, 201:3, 201:18, 203:7, 203:9, 203:11, 203:21, 203:25, 204:5, 204:23, 204:25, 205:2, 206:2, 206:13, 206:15, 206:16, 206:18, 206:19, 206:21, 206:22, 207:10, 207:14, 207:19, 207:21, 207:24, 208:21, 208:22, 209:10, 209:21, 211:8, 212:14, 212:18, 215:3, 215:5, 215:8, 215:11, 215:14, 215:24, 217:15, 218:8, 218:9, 218:12, 218:18, 218:20, 218:21, 219:17, 221:12, 221:19, 222:25, 223:16, 225:17, 225:21, 225:24, 227:11, 227:15, 227:18, 232:9, 236:1, 241:19, 242:19, 249:23, 250:5, 250:10, 250:22, 251:11, 255:2, 255:3, 255:8, 255:14, 255:23, 255:24, 256:3, 257:13, 258:9, 258:11, 258:14, 259:16, 259:21, 259:24, 260:8, 260:13, 261:6, 262:7, 263:8, 272:6, 272:15, 273:6, 278:5, 280:2, 281:9, 281:14, 284:13, 286:3, 287:14, 287:22, 287:23, 288:3, 288:6, 288:13, 288:24, 289:10, 289:11, 289:12, 289:15, 289:17, 289:18, 289:19, 290:22, 291:7, 291:8, 291:10, 293:7, 293:9, 293:17, 294:11, 296:17, 297:7, 297:23, 298:10, 298:15, 299:5, 299:6, 299:12, 302:16, 302:19, 304:7, 304:20, 304:21, 310:1, 310:17, 310:19, 310:24
**Patent** [18] - 123:25, 124:2, 124:6, 124:19, 124:25, 193:14, 215:22, 216:10, 216:17, 216:18, 216:19, 216:22, 217:2, 217:16, 255:10, 257:6, 288:6
**patent's** [1] - 138:14
**patent-infringing** [1] - 288:24
**patented** [6] - 145:11, 286:2, 288:10, 290:3, 305:9
**patentee** [11] - 113:15, 113:24, 114:16, 124:5, 124:8, 250:8, 251:20, 257:3, 259:2, 259:10, 302:18
**patentee's** [5] - 254:23, 254:24, 257:5, 257:16, 259:6
**patentees** [1] - 288:24

**patents** [20] - 82:24, 119:24, 133:15, 162:8, 203:6, 209:12, 209:14, 219:11, 221:17, 261:15, 261:20, 281:6, 281:8, 281:19, 281:20, 282:6, 289:25, 291:2, 303:1
**patents-in-suit** [3] - 289:25, 291:2, 303:1
**path** [1] - 133:6
**pattern** [1] - 207:15
**patterns** [1] - 309:22
**pause** [5] - 82:8, 150:9, 151:11, 265:17, 274:16
**Pause** [1] - 274:9
**pay** [4] - 151:3, 216:19, 216:22
**Payne** [2] - 169:23, 175:1
**penalty** [3] - 259:1, 259:3
**penile** [1] - 169:18
**Pentagon** [1] - 289:10
**people** [6] - 81:17, 221:7, 221:20, 226:21, 264:20, 297:16
**per** [1] - 294:15
**percent** [2] - 212:13, 236:9
**perception** [1] - 213:20
**perfectly** [3] - 124:10, 235:21, 298:3
**perforating** [1] - 169:21
**perhaps** [2] - 166:3, 247:7
**period** [15] - 159:9, 179:22, 180:15, 200:1, 202:1, 202:2, 204:3, 207:6, 217:5, 227:9, 227:13, 264:22, 271:5, 271:6, 283:17
**periods** [1] - 259:9
**permitted** [1] - 250:4
**permutations** [1] - 196:16
**person** [53] - 90:21, 90:24, 107:6, 114:24, 115:23, 116:10, 116:22, 116:24, 118:2, 118:7, 118:16, 119:1, 119:2, 119:4, 119:6, 120:14, 120:16, 143:3, 143:8, 143:10, 143:19, 144:9, 175:13, 194:9, 194:21, 195:12, 196:15, 196:20, 197:2, 197:13, 202:20, 209:23, 226:17, 251:9, 251:18, 251:19, 252:1, 252:3, 252:10, 252:22, 252:25, 253:13, 266:10, 273:18, 275:2, 275:7, 275:10, 275:15, 276:8, 277:11, 277:19, 279:13
**personal** [9] - 119:13, 119:18, 119:21, 148:24, 252:20, 252:22, 252:23, 302:3, 302:4
**personnel** [1] - 84:22
**perspective** [6] - 84:14, 218:10, 251:18, 295:11, 313:1, 313:4
**persuade** [2] - 99:19, 239:17
**pertinent** [2] - 121:17, 188:2
**PFDs** [1] - 119:20
**Pharmaceuticals** [1] - 195:20
**photograph** [2] - 228:1, 230:7
**photographs** [7] - 138:7, 211:19, 212:1, 226:12, 226:13, 226:15, 227:3
**photos** [16] - 136:23, 136:25, 137:2, 138:15, 144:20, 145:17, 146:24,

147:1, 147:4, 147:5, 147:8, 147:16, 147:20, 148:3, 266:20
**phrase** [6] - 141:4, 142:3, 142:5, 142:10, 142:12, 142:13
**physical** [1] - 179:25
**physically** [1] - 116:17
**pick** [1] - 144:10
**picks** [2] - 124:21, 128:4
**picture** [10] - 85:20, 87:6, 103:2, 103:5, 136:20, 147:14, 158:9, 218:16, 238:2, 271:20
**pictured** [1] - 228:1
**pictures** [8] - 94:23, 136:21, 147:4, 147:24, 148:1, 159:18, 182:25, 224:5
**piece** [14] - 107:18, 107:22, 152:8, 152:10, 154:1, 155:1, 155:4, 155:7, 195:22, 195:25, 221:3, 231:20, 298:9, 299:1
**pieces** [12] - 155:11, 155:14, 162:13, 167:19, 181:3, 182:4, 182:6, 185:22, 195:2, 211:21, 229:17, 236:23
**pile** [2] - 133:18, 298:21
**pin** [91] - 83:18, 84:9, 85:1, 85:7, 85:13, 85:18, 85:23, 86:1, 86:9, 86:21, 86:22, 87:6, 87:9, 87:11, 87:13, 87:16, 87:21, 87:25, 88:4, 88:5, 88:12, 88:14, 88:20, 88:22, 88:25, 89:1, 89:20, 95:5, 95:11, 95:14, 96:1, 108:6, 112:9, 112:14, 112:22, 114:14, 114:15, 146:7, 185:18, 189:3, 189:5, 189:13, 198:2, 198:13, 199:3, 228:1, 229:24, 230:1, 230:2, 230:5, 230:15, 230:16, 230:17, 230:23, 230:25, 231:1, 231:2, 231:5, 231:7, 231:15, 231:16, 231:17, 231:18, 231:21, 232:2, 232:6, 235:12, 235:13, 235:14, 236:4, 236:5, 236:7, 236:12, 236:13, 236:20, 236:23, 237:5, 237:6, 237:13, 237:16, 237:19, 238:6, 242:3, 250:22, 250:23, 250:25
**pinch** [1] - 281:20
**ping** [1] - 82:18
**ping-ponging** [1] - 82:18
**pinpoint** [1] - 264:14
**pins** [1] - 82:6
**pipe** [1] - 169:21
**pivoting** [1] - 298:12
**place** [17] - 85:17, 85:24, 99:16, 101:13, 106:19, 165:3, 187:20, 187:25, 245:8, 256:10, 256:11, 256:13, 260:7, 260:24, 261:5, 286:4, 296:22
**placed** [4] - 123:18, 188:19, 220:15, 220:18
**places** [2] - 89:13, 107:11
**plain** [5] - 91:23, 91:25, 92:12, 93:21, 192:8
**plainly** [3] - 265:7, 287:1, 287:2
**Plaintiff** [1] - 79:4
**plaintiff** [7] - 81:10, 81:23, 122:14, 122:15, 191:5, 284:8, 309:5
**PLAINTIFF** [1] - 80:2

**plaintiff's** [2] - 135:23, 313:1
**plan** [1] - 84:21
**plane** [4] - 228:21, 233:2, 233:20, 234:20
**plaster** [1] - 108:1
**plastic** [1] - 100:17
**platform** [1] - 246:1
**play** [5] - 107:19, 107:23, 107:24, 108:2, 174:9
**plenty** [2] - 214:19, 219:3
**plugs** [2] - 169:24, 175:5
**plus** [3] - 97:18, 99:2, 214:11
**point** [84] - 87:17, 89:3, 93:11, 103:19, 105:5, 108:1, 110:13, 114:2, 118:6, 123:15, 124:4, 128:6, 129:6, 135:9, 135:20, 139:16, 142:8, 143:16, 143:17, 143:21, 144:2, 146:16, 148:6, 151:4, 156:9, 156:10, 157:15, 158:10, 161:7, 162:7, 163:21, 165:19, 171:9, 173:8, 181:11, 182:24, 193:21, 194:14, 200:12, 200:17, 200:18, 200:23, 201:22, 208:4, 211:12, 212:12, 215:5, 220:5, 220:19, 222:14, 228:3, 229:18, 231:1, 233:9, 243:10, 243:12, 243:13, 246:2, 255:13, 255:17, 263:14, 267:11, 267:18, 268:9, 271:15, 272:21, 288:11, 288:23, 294:12, 295:21, 297:14, 297:20, 298:23, 300:6, 301:10, 301:12, 305:6, 311:24, 311:25, 312:2, 312:8
**pointed** [6] - 121:21, 193:8, 207:23, 208:2, 209:22, 271:16
**pointing** [6] - 198:24, 201:11, 206:4, 237:6, 237:15, 245:1
**points** [14] - 114:3, 133:12, 133:15, 162:17, 178:2, 210:6, 212:2, 237:12, 237:14, 244:16, 264:13, 267:15, 270:8, 272:25
**policy** [1] - 125:4
**pollute** [1] - 270:17
**ponging** [1] - 82:18
**poorly** [1] - 229:6
**pop** [1] - 242:13
**portion** [8] - 152:19, 152:20, 217:24, 233:21, 258:4, 270:1, 274:23, 274:25
**Portland** [4] - 79:6, 80:8, 80:16, 80:19
**posed** [2] - 191:5, 228:8
**position** [54] - 91:20, 92:21, 96:10, 103:19, 112:18, 113:6, 113:11, 125:7, 125:24, 130:11, 134:16, 138:23, 141:8, 142:23, 160:24, 161:22, 163:5, 163:23, 164:14, 164:17, 164:20, 164:23, 165:14, 167:5, 171:9, 171:12, 174:8, 187:19, 188:14, 195:4, 205:4, 205:20, 207:11, 207:19, 207:22, 209:1, 215:20, 218:7, 218:25, 223:8, 228:12, 230:1, 231:10, 232:8, 237:7, 239:23, 246:20, 257:3, 270:11, 271:12, 279:17, 294:24, 296:20, 309:1

**positioned** [5] - 190:9, 269:7, 269:12, 269:15, 269:21
**positions** [2] - 246:18, 268:19
**positive** [1] - 214:25
**possessed** [8] - 115:1, 116:25, 118:3, 120:15, 120:17, 251:20, 274:4, 279:14
**possession** [5] - 194:11, 194:24, 275:13, 275:16, 276:9
**possibilities** [1] - 116:12
**possible** [15] - 96:21, 112:21, 113:9, 113:15, 128:15, 128:24, 128:25, 196:19, 197:23, 198:8, 235:6, 238:15, 250:14, 297:22, 307:11
**possibly** [6] - 86:18, 199:9, 250:9, 250:25, 268:3, 296:8
**post** [3] - 87:23, 87:25, 88:5
**postdates** [1] - 185:11
**posts** [1] - 264:10
**potential** [3] - 129:4, 174:17, 174:20
**potentially** [3] - 125:18, 171:24, 174:15
**practice** [33] - 97:24, 98:11, 99:4, 102:12, 105:11, 156:17, 156:24, 157:5, 158:16, 158:17, 158:23, 159:11, 159:20, 159:23, 164:4, 164:9, 168:11, 175:10, 176:2, 176:18, 178:10, 179:1, 179:11, 179:17, 181:4, 183:15, 184:2, 239:1, 239:5, 247:6, 270:12, 271:4, 280:9
**practicing** [1] - 127:16
**prayer** [1] - 281:16
**preamble** [12] - 140:18, 140:20, 141:2, 141:4, 141:5, 141:6, 141:16, 142:4, 142:6, 142:10, 142:14, 219:7
**preambles** [4] - 140:23, 219:10, 219:11
**prec** [1] - 114:1
**preceded** [1] - 118:22
**precedent** [2] - 113:24, 216:9
**precedential** [1] - 113:23
**precedes** [1] - 110:3
**preceding** [1] - 196:7
**precisely** [1] - 266:1
**precision** [2] - 162:5, 171:3
**preclude** [4] - 96:2, 118:9, 136:3, 263:10
**precludes** [1] - 236:3
**predate** [1] - 223:12
**predates** [3] - 156:2, 156:3, 218:11
**predating** [2] - 157:21, 227:5
**predecessor** [1] - 293:23
**predicate** [2] - 305:22, 312:7
**predictable** [3] - 116:8, 170:9, 241:12
**preference** [1] - 282:2
**preferred** [1] - 195:8
**prejudice** [22] - 126:22, 126:23, 127:8, 127:10, 165:7, 165:9, 204:13, 204:14, 245:11, 245:12, 245:15, 245:16, 245:19, 261:24, 262:2, 263:3, 263:5, 263:12, 263:17, 263:22, 263:23
**prepared** [3] - 130:12, 178:19, 223:18
**presence** [1] - 235:9

**present** [4] - 109:12, 150:23, 269:9, 311:5
**PRESENT** [1] - 80:17
**presentation** [11] - 95:23, 150:5, 150:16, 155:24, 156:20, 204:17, 214:21, 232:25, 237:18, 251:4, 303:14
**presentations** [1] - 298:8
**presented** [4] - 84:18, 229:19, 232:19, 249:8
**presenting** [2] - 150:18, 150:22
**presently** [1] - 301:19
**preserved** [3] - 102:8, 247:8, 280:17
**pressure** [3] - 162:2, 169:25, 171:16
**pressures** [1] - 175:3
**presumably** [2] - 178:20, 234:22
**presume** [1] - 209:13
**presumption** [4] - 193:13, 258:2, 258:3, 258:5
**pretty** [3] - 101:17, 186:8, 281:14
**prevail** [2] - 126:21, 144:24
**prevailed** [1] - 262:19
**prevailing** [2] - 262:20, 262:25
**prevails** [1] - 177:7
**prevent** [2] - 169:14, 293:7
**previewed** [1] - 181:12
**previous** [1] - 190:3
**previously** [1] - 153:15
**primary** [12] - 221:4, 222:6, 299:20, 303:25, 306:2, 306:5, 306:6, 306:13, 306:23, 307:4, 307:5, 307:10
**prime** [30] - 290:10, 290:15, 290:17, 290:18, 290:21, 295:9, 295:13, 299:25, 300:3, 300:11, 300:13, 300:14, 300:18, 301:4, 303:9, 306:12, 306:14, 307:16, 307:18, 308:1, 308:3, 308:6, 308:25, 309:9, 309:10, 309:12, 311:5, 311:8, 312:16
**principle** [4] - 186:8, 186:13, 187:4, 305:18
**principles** [1] - 196:6
**printed** [1] - 146:12
**prioritize** [1] - 281:13
**priority** [83] - 83:23, 90:18, 96:18, 111:13, 111:15, 111:22, 112:1, 112:20, 114:21, 121:24, 121:25, 122:10, 122:16, 123:9, 123:12, 123:16, 124:16, 124:25, 125:11, 145:4, 150:20, 157:12, 158:5, 184:14, 185:14, 186:11, 188:23, 193:15, 195:18, 199:6, 200:23, 201:12, 201:20, 201:23, 203:13, 203:14, 203:18, 204:1, 204:21, 204:22, 205:3, 205:7, 205:21, 206:3, 206:5, 207:18, 208:16, 211:23, 213:18, 215:4, 215:8, 215:15, 215:16, 215:23, 216:4, 216:11, 217:1, 217:11, 223:11, 231:24, 249:17, 251:7, 254:6, 254:14, 255:1, 255:6, 255:14, 255:22, 256:2, 256:9, 256:10, 256:24, 260:6, 260:8, 260:14, 260:24, 273:1, 274:21, 275:2,

278:2, 278:3, 278:4, 278:18
**Prism** [3] - 124:14, 255:21, 256:14
**private** [4] - 288:12, 289:23, 296:1, 308:8
**probative** [12] - 156:9, 158:17, 160:10, 177:6, 177:13, 177:22, 178:8, 178:9, 181:2, 182:22, 183:14, 183:16
**problem** [19] - 161:21, 161:24, 171:13, 173:11, 189:21, 190:11, 191:13, 191:17, 213:23, 216:3, 216:15, 235:10, 257:22, 259:7, 260:10, 270:13, 270:15, 277:21, 296:18
**problematic** [2] - 110:2, 160:9
**problems** [4] - 156:23, 213:21, 216:3, 258:18
**procedure** [2] - 302:11, 302:20
**procedures** [3] - 285:8, 294:13, 302:13
**proceed** [4] - 82:11, 82:12, 137:14, 184:23
**proceeded** [1] - 262:24
**proceeding** [1] - 264:1
**proceedings** [6] - 82:8, 150:9, 151:11, 274:16, 313:11, 314:5
**PROCEEDINGS** [1] - 79:17
**process** [4] - 103:14, 176:9, 191:16, 281:1
**processes** [2] - 156:11, 156:13
**produced** [4] - 103:2, 103:4, 104:11, 148:18
**product** [54] - 87:18, 94:20, 109:12, 133:2, 137:2, 142:20, 145:6, 148:11, 148:12, 149:20, 153:9, 159:18, 162:18, 167:9, 172:18, 200:3, 200:10, 200:13, 202:23, 206:21, 207:5, 212:21, 214:3, 221:14, 223:15, 223:19, 223:25, 224:1, 226:20, 227:6, 227:7, 229:5, 229:16, 234:17, 235:7, 235:14, 235:20, 243:5, 262:17, 264:7, 268:23, 280:15, 290:7, 290:19, 293:15, 293:20, 296:23, 297:5, 298:10, 298:15, 299:7, 306:12, 310:14
**production** [7] - 99:14, 100:15, 156:7, 159:2, 193:10, 270:22, 274:1
**products** [54] - 84:15, 84:25, 85:2, 85:5, 86:16, 86:24, 87:1, 89:24, 91:10, 91:12, 119:12, 119:18, 119:24, 131:8, 132:12, 132:15, 132:16, 132:19, 132:20, 134:1, 136:15, 176:18, 199:25, 200:18, 201:3, 204:9, 206:15, 206:16, 221:15, 221:21, 221:23, 222:21, 223:22, 224:12, 224:19, 224:20, 226:7, 227:18, 228:12, 228:20, 252:19, 258:15, 262:11, 263:2, 263:4, 269:24, 288:10, 289:22, 293:14, 294:24, 295:1, 298:7, 310:12
**Products** [1] - 110:6
**profits** [1] - 310:6
**progress** [1] - 283:14
**project** [9] - 106:10, 106:15, 106:17, 179:18, 180:8, 180:13, 180:18,

180:22, 228:17
**projectile** [1] - 174:21
**projecting** [4] - 154:9, 234:1, 234:2, 234:7
**projection** [2] - 236:20
**projector** [2] - 284:1, 284:24
**projects** [5] - 106:7, 106:17, 180:11, 180:13, 234:3
**prompted** [1] - 88:19
**prompting** [1] - 87:12
**prone** [1] - 244:10
**prong** [6] - 128:13, 287:7, 287:18, 290:7, 290:25, 291:6
**prongs** [1] - 161:15
**proof** [6] - 98:22, 99:7, 167:1, 177:14, 251:9, 270:15
**proper** [9] - 84:9, 84:10, 93:12, 96:5, 101:10, 109:10, 128:20, 201:23, 203:13
**properly** [4] - 96:4, 121:8, 245:4, 246:1
**prosecuted** [1] - 111:21
**protected** [2] - 293:13, 295:14
**protection** [2] - 295:17, 299:18
**prototype** [69] - 98:23, 99:1, 99:2, 100:15, 100:17, 100:18, 100:21, 104:18, 107:7, 107:8, 107:17, 108:12, 108:16, 108:22, 156:17, 159:14, 159:24, 160:1, 160:10, 163:1, 163:14, 164:10, 169:25, 172:22, 172:23, 173:3, 175:15, 175:18, 176:25, 177:5, 177:11, 178:3, 178:15, 181:5, 181:22, 182:3, 182:8, 182:23, 183:8, 183:11, 183:16, 183:24, 184:2, 184:8, 239:25, 240:7, 240:23, 241:23, 242:13, 242:18, 242:19, 242:23, 243:15, 243:16, 244:6, 246:25, 271:4, 271:17, 271:19, 271:20, 271:21, 271:22, 280:10, 280:11
**prototypes** [3] - 104:13, 172:23, 247:12
**prototyping** [6] - 166:9, 166:11, 173:1, 176:20, 181:25, 182:1
**protruding** [2] - 88:10, 88:11
**prove** [17] - 97:12, 99:1, 99:11, 99:21, 110:19, 126:12, 127:1, 140:8, 145:8, 146:8, 148:15, 149:15, 149:25, 156:6, 167:1, 245:5, 286:19
**proved** [1] - 98:13
**proven** [2] - 183:19, 239:6
**provide** [7] - 141:5, 141:14, 147:21, 156:8, 161:6, 311:18, 312:16
**provided** [20] - 101:1, 110:14, 136:11, 160:17, 170:15, 175:8, 175:17, 177:11, 177:12, 177:19, 177:23, 178:21, 179:2, 181:23, 183:3, 190:23, 219:23, 259:3, 273:10, 303:6
**provides** [6] - 141:2, 141:25, 142:5, 167:7, 193:22, 232:5
**providing** [3] - 161:17, 165:12, 197:9
**proving** [1] - 312:1
**provision** [9] - 284:16, 285:14, 302:13,

303:23, 304:10, 304:11, 309:10, 311:3
**provisional** [65] - 83:23, 90:20, 90:23, 96:19, 111:15, 111:17, 111:19, 111:20, 111:22, 112:11, 112:20, 113:2, 113:5, 113:7, 113:13, 114:21, 114:25, 115:13, 115:17, 116:5, 117:1, 117:6, 117:22, 118:2, 121:25, 125:19, 138:20, 150:20, 156:4, 157:10, 157:13, 185:7, 185:15, 185:16, 185:23, 187:9, 187:15, 187:18, 189:1, 191:6, 195:8, 200:7, 200:8, 200:9, 200:11, 200:14, 203:12, 218:13, 223:2, 227:14, 232:5, 232:7, 249:16, 249:21, 250:11, 250:23, 250:24, 251:7, 251:15, 253:10, 254:6, 256:13, 260:14
**provisions** [4] - 303:8, 303:9, 311:13, 312:14
**PTO** [3] - 124:22, 255:24, 256:22
**PTO's** [2] - 256:23, 257:4
**public** [6] - 197:20, 206:1, 206:17, 213:20, 217:16, 255:13
**publication** [30] - 146:12, 155:25, 157:19, 157:24, 158:3, 158:7, 159:16, 159:21, 159:25, 160:19, 164:2, 176:3, 176:25, 177:6, 178:11, 184:3, 184:4, 185:4, 185:11, 185:24, 199:10, 199:11, 199:21, 201:11, 211:22, 223:4, 223:13, 270:20, 271:2, 271:23
**publicly** [5] - 145:1, 146:22, 148:12, 149:15, 149:21
**publish** [1] - 157:24
**published** [2] - 157:21, 227:13
**pull** [4] - 232:15, 233:12, 237:10, 239:22
**pulling** [1] - 155:8
**pump** [1] - 169:18
**Purchase** [1] - 311:11
**purchase** [6] - 285:5, 290:10, 290:17, 294:13, 297:12, 299:25
**purchased** [1] - 306:3
**purchaser** [5] - 299:21, 300:8, 301:1, 302:6, 312:20
**purchases** [1] - 298:19
**purely** [2] - 166:8, 216:12
**purged** [1] - 105:21
**purple** [7] - 152:7, 152:20, 153:10, 153:14, 153:21, 154:3, 155:4
**purported** [2] - 118:23
**purportedly** [10] - 136:17, 138:8, 147:6, 149:2, 254:13, 259:23, 260:23, 263:4, 263:13, 266:6
**purpose** [23] - 108:16, 123:17, 124:11, 156:18, 160:1, 160:12, 160:14, 160:18, 161:1, 163:14, 163:20, 164:11, 175:24, 176:23, 177:3, 177:10, 184:7, 212:25, 224:18, 242:24, 243:16, 271:6, 275:24
**purposes** [12] - 104:6, 156:21, 186:3, 227:3, 271:18, 275:25, 276:19, 277:10, 283:14, 294:21, 295:12,

308:15
**pursuant** [3] - 292:20, 294:6, 296:13
**pushes** [2] - 86:9, 86:10, 86:11
**put** [44] - 87:6, 87:13, 92:8, 101:6, 101:25, 107:21, 108:4, 111:23, 119:9, 122:16, 122:23, 122:24, 123:8, 135:8, 178:7, 180:5, 182:4, 187:25, 206:3, 207:11, 214:2, 216:4, 217:1, 217:10, 233:5, 239:24, 240:24, 243:6, 243:8, 245:4, 245:8, 246:5, 248:20, 250:13, 250:14, 255:1, 260:23, 270:21, 283:25, 289:18, 302:2, 304:16, 312:3
**puts** [6] - 231:21, 256:2, 256:9, 256:11, 256:13, 260:6
**putting** [10] - 151:1, 188:7, 227:10, 243:1, 243:7, 244:8, 244:10, 254:13, 255:6, 255:22
**puzzled** [1] - 90:6

---

# Q

**qualified** [4] - 222:7, 222:8, 252:20, 265:16
**qualifies** [2] - 109:8, 218:13
**qualify** [1] - 230:3
**quantities** [2] - 294:14, 294:20
**questionable** [1] - 125:9
**questioned** [3] - 163:18, 192:10, 192:19
**questioner** [3] - 133:12, 133:15, 133:16
**questioning** [1] - 248:23
**questions** [26] - 95:22, 109:22, 143:6, 155:18, 176:22, 177:1, 184:14, 184:15, 191:4, 199:14, 209:19, 211:18, 214:22, 217:24, 222:20, 224:4, 224:21, 227:20, 246:18, 248:8, 248:9, 261:13, 278:7, 292:8, 292:9, 306:9
**queued** [1] - 281:5
**quick** [2] - 267:22, 272:21
**quickly** [8] - 101:17, 111:23, 201:8, 237:9, 268:6, 268:16, 271:24, 272:25
**quite** [11] - 106:14, 106:16, 112:1, 118:16, 129:15, 138:5, 147:24, 185:21, 187:8, 225:15, 301:23
**quote** [9] - 113:24, 119:19, 161:23, 194:16, 209:6, 251:14, 276:24, 286:18, 286:20
**quoted** [3] - 186:14, 187:1, 187:3
**quotes** [4] - 172:6, 240:5, 270:12, 270:20
**quoting** [1] - 92:9

---

# R

**rabbit** [1] - 240:3
**Racing** [1] - 288:20
**radius** [2] - 86:5, 86:7
**rail** [46] - 90:20, 115:1, 116:25, 117:4, 117:9, 117:11, 117:16, 117:18, 117:23, 117:25, 118:3, 169:18,

189:16, 190:4, 190:22, 191:23, 192:1, 192:4, 192:9, 192:21, 192:25, 194:17, 194:18, 194:19, 194:20, 194:25, 195:10, 195:14, 195:23, 197:3, 198:4, 273:5, 273:15, 274:4, 275:4, 275:5, 275:6, 275:17, 275:22, 276:21, 276:24, 277:3, 277:8, 278:20, 279:15
**rail/fork** [2] - 117:20, 120:17
**rails** [1] - 279:22
**raise** [4] - 210:9, 225:13, 270:24, 270:25
**raised** [9] - 121:12, 122:19, 163:21, 164:6, 175:23, 197:12, 219:18, 256:8, 282:1
**raises** [4] - 120:25, 211:17, 272:21, 303:7
**ramifications** [1] - 88:20
**ramp** [1] - 224:1
**ramp-up** [1] - 224:1
**range** [3] - 136:17, 146:17, 264:21
**Range** [8] - 267:2, 267:4, 267:5, 267:7, 267:18, 268:10, 268:14
**ranges** [1] - 267:20
**rare** [1] - 167:21
**rasies** [1] - 231:14
**rather** [5] - 161:17, 221:10, 251:17, 254:14, 305:24
**rational** [12] - 99:15, 99:17, 99:24, 100:4, 102:1, 105:15, 145:10, 148:14, 202:20, 203:2, 211:3, 239:15
**rationale** [2] - 143:12, 144:13
**rationales** [1] - 214:14
**Ray** [6] - 132:6, 202:4, 207:2, 211:12, 262:5, 262:9
**re** [3] - 169:9, 169:13, 242:12
**re-jiggering** [1] - 242:12
**reach** [8] - 82:11, 95:2, 125:23, 195:12, 197:13, 248:12, 252:7, 266:21
**reached** [3] - 137:16, 195:5, 289:11
**read** [12] - 117:25, 149:11, 167:6, 192:3, 196:15, 209:15, 231:2, 248:7, 248:23, 249:14, 277:12, 300:23
**readily** [2] - 115:23, 275:7
**reading** [9] - 90:12, 194:10, 197:14, 231:20, 240:6, 273:19, 275:10, 276:8, 277:18
**reads** [1] - 105:10
**ready** [1] - 254:1
**real** [13] - 103:21, 138:20, 159:17, 169:22, 169:24, 211:14, 241:12, 241:13, 243:24, 244:1, 260:10, 276:12, 277:24
**reality** [2] - 300:21, 300:22
**realizes** [1] - 87:17
**really** [40] - 83:12, 86:6, 86:8, 94:2, 94:4, 95:14, 106:19, 136:18, 138:18, 140:17, 143:24, 144:1, 148:24, 169:15, 172:25, 193:20, 195:15, 197:15, 211:19, 224:25, 241:18, 245:24, 246:4, 246:6, 247:23, 252:10, 252:11, 255:14, 257:4, 260:13, 263:7,

263:20, 289:9, 295:20, 299:22,
299:24, 301:1, 307:12, 309:21
**realtime** [1] - 82:1
**reason** [33] - 96:11, 97:7, 97:9, 97:10,
117:9, 122:12, 130:5, 133:22, 157:2,
160:17, 170:21, 179:21, 181:17,
185:2, 185:9, 188:10, 225:9, 238:22,
238:23, 239:4, 240:18, 240:19,
241:16, 242:23, 247:23, 258:15,
266:12, 275:10, 276:22, 280:9,
280:19, 286:4, 294:8
**reasonable** [11] - 97:19, 143:3, 208:12,
208:13, 211:3, 211:10, 227:17, 231:5,
231:6, 239:8, 292:22
**reasonably** [1] - 227:16
**reasoning** [4] - 140:5, 257:21, 258:7,
276:11
**reasons** [10] - 137:5, 143:18, 167:12,
175:21, 193:2, 197:13, 259:17,
259:18, 292:4, 305:6
**rebut** [1] - 247:14
**rebuttal** [6] - 108:9, 150:4, 163:10,
164:4, 232:12, 292:11
**recalled** [4] - 106:6, 180:22, 182:2,
192:13
**recant** [1] - 247:16
**recanted** [6] - 158:21, 177:18, 178:1,
178:22, 181:21, 183:18
**recanting** [1] - 184:11
**recants** [1] - 247:15
**received** [7] - 134:6, 134:13, 134:21,
159:4, 200:5, 210:11, 296:16
**recent** [1] - 291:20
**recess** [5] - 137:7, 137:11, 184:21,
254:4, 313:8
**recessed** [7] - 90:1, 189:18, 190:23,
191:11, 197:12, 273:17
**recharge** [1] - 253:25
**recite** [5] - 189:10, 190:13, 198:7,
198:12, 219:6
**recites** [3] - 188:15, 190:15, 274:24
**recognize** [5] - 196:16, 248:24, 275:3,
275:7, 279:14
**recognized** [3] - 98:12, 195:6, 277:8
**recognizing** [3] - 87:12, 160:21, 275:18
**recoil** [9] - 162:1, 171:16, 173:22, 174:2,
174:3, 174:5, 174:12, 174:15, 245:24
**recollection** [8] - 148:2, 149:2, 149:3,
178:25, 179:15, 183:11, 183:21,
240:10
**recommending** [1] - 281:10
**record** [49] - 81:8, 82:4, 103:3, 103:16,
104:3, 110:15, 111:23, 120:16,
120:20, 130:9, 130:19, 143:8, 146:5,
149:4, 149:5, 163:12, 167:11, 178:14,
201:19, 223:22, 227:19, 229:19,
248:24, 258:19, 260:4, 261:21, 262:5,
263:14, 266:25, 268:18, 269:2, 270:4,
270:9, 274:10, 282:25, 284:7, 291:10,
292:18, 298:20, 301:10, 301:19,

302:2, 304:19, 305:7, 312:3, 312:7,
312:11, 312:12, 314:4
**records** [12] - 104:16, 105:19, 105:22,
105:24, 106:1, 149:3, 177:19, 177:21,
181:21, 214:6, 214:9
**red** [2] - 85:7, 140:15
**redo** [1] - 246:15
**reduce** [1] - 108:2
**reduced** [1] - 100:25
**reducing** [1] - 97:24
**reduction** [29] - 98:11, 102:12, 105:11,
156:16, 156:24, 157:5, 158:16,
158:17, 158:23, 159:10, 159:20,
159:23, 164:4, 164:9, 168:10, 176:2,
178:10, 179:1, 179:10, 179:16, 181:4,
183:14, 184:1, 239:1, 239:5, 247:6,
270:11, 271:4, 280:8
**refer** [3] - 91:10, 101:5, 141:23
**reference** [8] - 96:13, 96:16, 97:20,
137:21, 140:10, 265:10, 265:11,
311:11
**referenced** [1] - 142:10
**referencing** [1] - 142:12
**referring** [6] - 87:5, 134:7, 172:20,
207:2, 267:19, 275:9
**refers** [1] - 297:17
**refuse** [1] - 138:25
**refused** [2] - 139:5, 260:17
**Regan** [1] - 221:18
**regarding** [3] - 268:9, 271:8, 303:24
**regardless** [3] - 88:15, 161:7, 167:2
**regards** [1] - 308:1
**registry** [1] - 308:1
**regular** [4] - 185:25, 189:6, 203:11,
272:9
**regulation** [4] - 123:12, 124:11, 125:5,
294:15
**Regulations** [1] - 284:17
**regulations** [2] - 255:9, 295:16
**rejected** [2] - 191:21, 196:12
**rejecting** [1] - 93:20
**relate** [5] - 119:25, 120:1, 180:4, 180:17,
188:24
**related** [25] - 104:18, 106:10, 106:15,
153:15, 156:20, 163:18, 169:23,
170:2, 178:10, 179:6, 179:9, 181:24,
181:25, 182:1, 182:7, 211:18, 214:12,
220:23, 225:17, 227:25, 240:12,
280:14, 283:18
**relates** [9] - 88:21, 105:6, 112:5, 188:4,
225:7, 225:15, 230:23, 263:18
**relation** [1] - 180:5
**relationship** [2] - 290:16, 300:19
**relative** [2] - 174:18, 200:25
**relatively** [5] - 92:13, 251:13, 294:14,
294:20, 301:23
**relevant** [30] - 86:18, 94:9, 95:16, 103:7,
119:5, 119:11, 125:13, 126:17, 128:9,
152:25, 157:17, 160:10, 167:24,
181:12, 186:6, 198:23, 199:23,

210:22, 211:5, 223:14, 227:5, 227:9,
253:1, 258:17, 258:20, 258:24, 259:1,
271:5, 271:6, 295:20
**relevantly** [1] - 157:18
**reliance** [21] - 126:22, 127:1, 127:7,
127:9, 127:10, 132:16, 139:16, 148:4,
204:12, 204:16, 207:1, 209:1, 209:21,
209:24, 261:23, 262:1, 262:3, 263:5,
263:18, 263:23
**relied** [12] - 101:3, 121:18, 121:19,
131:7, 131:20, 164:4, 177:24, 180:17,
187:15, 204:8, 214:16, 258:23
**relies** [4] - 118:14, 148:17, 197:8,
288:17
**rely** [11] - 126:24, 130:14, 130:19,
143:2, 145:15, 147:18, 147:19, 160:7,
187:4, 196:10, 226:16
**relying** [15] - 131:24, 131:25, 132:5,
132:6, 134:24, 134:25, 135:3, 135:5,
138:17, 156:13, 202:4, 207:6, 207:16,
216:6, 262:6
**remaining** [1] - 264:1
**remains** [1] - 220:6
**remarkable** [1] - 112:18
**remarks** [2] - 254:9, 291:19
**remedies** [1] - 308:14
**remedy** [3] - 289:19, 291:13, 302:19
**remember** [9] - 90:12, 101:14, 115:16,
163:7, 163:8, 179:22, 183:9, 183:12,
190:8
**remembering** [1] - 176:7
**reminder** [1] - 179:19
**remove** [2] - 133:22, 222:15
**removed** [2] - 105:24, 228:3
**removing** [1] - 133:20
**rendering** [1] - 199:7
**renders** [2] - 142:24, 197:2
**repeat** [2] - 129:20, 265:14
**repeated** [2] - 173:21, 187:4
**repeatedly** [1] - 140:7
**repeating** [1] - 148:3
**replied** [1] - 208:4
**reply** [5] - 94:1, 123:23, 245:21, 258:13,
285:15
**report** [15] - 88:9, 106:23, 108:9,
163:10, 164:5, 186:20, 194:15,
220:10, 229:5, 237:12, 274:6, 274:20,
275:14, 275:23
**reporter** [1] - 82:3
**Reporter** [1] - 314:13
**REPORTER** [3] - 80:18, 115:8, 246:6
**reports** [3] - 161:24, 222:5, 245:10
**representative** [2] - 81:11, 130:8
**representatives** [1] - 130:16
**represented** [1] - 199:19
**reproducing** [1] - 152:17
**requested** [2] - 290:7, 298:5
**requesting** [2] - 289:3, 306:12
**require** [23] - 95:3, 99:6, 155:14, 155:15,
173:24, 185:22, 190:2, 198:10,

216:18, 231:2, 233:1, 233:3, 234:2, 241:19, 243:17, 244:8, 250:22, 255:9, 271:10, 286:3, 297:3
**required** [51] - 94:21, 97:11, 107:4, 113:1, 114:11, 116:7, 130:25, 140:17, 142:20, 156:14, 160:2, 160:25, 161:20, 162:12, 164:12, 164:21, 167:10, 167:12, 168:8, 168:12, 169:1, 169:5, 169:17, 169:19, 169:23, 170:8, 170:19, 172:16, 173:5, 173:12, 174:7, 174:24, 175:5, 186:25, 217:3, 217:20, 234:20, 239:1, 240:2, 241:1, 241:2, 241:10, 241:12, 245:6, 245:23, 246:22, 247:2, 271:14, 279:3, 285:4
**requirement** [19] - 89:19, 97:8, 97:13, 97:21, 99:6, 101:21, 114:16, 123:15, 187:3, 188:5, 216:20, 234:25, 235:1, 239:9, 250:19, 251:13, 251:22, 299:5, 299:17
**requirements** [5] - 111:21, 162:10, 204:11, 290:20, 291:1
**requires** [27] - 88:22, 89:20, 93:25, 94:14, 94:15, 119:1, 123:12, 144:3, 171:7, 195:17, 217:17, 228:17, 228:19, 233:16, 233:18, 233:21, 234:21, 250:19, 250:21, 250:22, 276:20, 284:19, 286:8, 286:18, 287:19, 296:1, 302:25
**requiring** [2] - 113:24, 168:22
**requisite** [1] - 286:10
**res** [1] - 228:24
**Research** [1] - 193:16
**reserve** [2] - 150:4, 292:10
**reserving** [1] - 131:2
**resolutioned** [1] - 229:7
**resolve** [5] - 88:16, 108:10, 191:12, 252:4, 305:14
**resolved** [3] - 84:12, 96:4, 270:9
**respect** [17] - 90:18, 94:10, 112:1, 112:14, 112:16, 129:17, 130:2, 141:10, 152:16, 233:16, 239:14, 248:15, 261:15, 278:17, 284:9, 289:15, 292:5
**respects** [1] - 288:23
**respond** [6] - 128:23, 131:3, 134:25, 210:25, 260:17, 278:11
**responded** [6] - 109:5, 165:18, 203:8, 209:8, 219:20, 220:13
**responding** [3] - 82:21, 245:3, 272:25
**response** [15] - 109:2, 109:23, 127:24, 128:3, 153:18, 171:1, 201:9, 219:14, 219:19, 224:23, 260:15, 260:19, 267:14, 302:8
**responses** [4] - 127:23, 201:1, 206:14, 258:21
**rest** [2] - 162:6, 308:11
**restate** [1] - 257:10
**result** [7] - 110:23, 127:9, 127:13, 149:3, 174:14, 184:1, 293:5
**resulted** [1] - 197:10

**resulting** [5] - 126:23, 174:15, 256:24, 261:24, 262:2
**results** [1] - 263:23
**resurrects** [1] - 258:3
**retain** [1] - 130:23
**reticle** [1] - 174:18
**retracting** [1] - 130:10
**return** [1] - 162:7
**returns** [1] - 162:6
**review** [2] - 149:19, 271:9
**reviewed** [2] - 135:10, 178:19
**reviewing** [1] - 179:8
**Ric** [1] - 100:14
**rid** [1] - 272:5
**ridge** [34] - 90:20, 189:15, 189:18, 190:3, 190:4, 190:22, 191:25, 192:9, 192:21, 192:25, 194:19, 194:20, 194:25, 195:9, 195:14, 197:3, 197:12, 198:4, 198:9, 273:5, 273:15, 274:4, 275:5, 275:6, 275:16, 275:18, 275:22, 276:21, 276:24, 277:3, 277:8, 278:20, 278:22, 279:15
**ridges** [2] - 82:6, 279:22
**rifle** [37] - 139:23, 139:25, 140:15, 140:16, 141:13, 141:16, 141:18, 141:22, 141:23, 141:24, 142:1, 142:4, 142:12, 142:18, 142:19, 143:9, 143:11, 143:13, 143:20, 144:4, 144:5, 144:6, 144:11, 144:12, 152:2, 153:3, 153:8, 162:16, 219:6, 220:9, 221:2, 264:4, 265:2, 265:7, 265:12
**riflescope** [31] - 85:15, 105:3, 118:17, 118:18, 120:4, 139:23, 139:25, 161:25, 162:4, 162:16, 170:13, 171:13, 172:15, 173:15, 174:19, 174:21, 218:21, 218:24, 219:1, 219:6, 220:22, 221:8, 241:20, 242:7, 244:14, 246:12, 246:14, 250:13, 250:16, 290:5, 298:14
**riflescopes** [29] - 120:2, 143:25, 144:1, 171:18, 173:18, 173:23, 174:4, 174:23, 176:19, 220:12, 220:14, 220:21, 220:24, 220:25, 221:6, 221:15, 221:17, 222:3, 222:11, 222:12, 244:12, 245:25, 271:10, 290:2, 299:2, 304:23, 306:14, 306:15, 308:8
**right-hand** [2] - 183:1, 243:24
**rights** [6] - 130:2, 130:3, 131:2, 225:21, 260:1, 289:15
**rigid** [2] - 88:10, 88:11
**rings** [1] - 288:5
**ripe** [1] - 265:16
**rise** [3] - 87:1, 194:1, 213:11
**risk** [3] - 131:3, 135:4, 135:12
**Rives** [1] - 80:2, 80:6
**RMR** [2] - 80:18, 314:12
**road** [1] - 137:21
**roof** [2] - 187:21, 187:22
**Room** [1] - 80:19

**room** [2] - 97:4, 147:10
**rotated** [1] - 170:25
**rotation** [7] - 86:21, 171:1, 269:11, 269:14, 269:15, 305:4
**round** [2] - 264:16, 264:25
**routine** [1] - 176:18
**rubber** [1] - 187:24
**Rule** [1] - 86:14
**rule** [19] - 97:7, 97:9, 97:10, 165:17, 165:22, 165:25, 166:13, 166:23, 167:4, 172:23, 231:10, 238:22, 238:23, 239:4, 241:16, 242:23, 280:9, 280:19, 305:24
**rules** [1] - 217:15
**ruling** [2] - 212:10, 215:2
**run** [2] - 160:8, 219:13
**runs** [1] - 238:14

### S

**S.C** [1] - 80:10
**Sabine** [1] - 148:22
**sacrificing** [1] - 202:15
**sale** [8] - 148:11, 148:12, 223:22, 224:3, 224:12, 224:20, 285:22, 293:19
**sales** [23] - 202:23, 203:10, 203:11, 212:21, 223:15, 284:11, 284:12, 285:9, 285:19, 292:20, 293:3, 293:12, 294:3, 294:6, 294:10, 294:16, 299:20, 301:16, 302:2, 302:5, 312:20
**salespeople** [2] - 300:9, 312:19
**Salmon** [1] - 80:15
**salvage** [2] - 163:23, 168:1
**SAP** [1] - 302:20
**sat** [3] - 102:23, 204:25, 260:1
**satisfactorily** [1] - 169:1
**satisfied** [3] - 285:5, 288:14, 291:18
**satisfy** [5] - 161:5, 187:2, 235:23, 235:24, 302:14
**save** [1] - 278:15
**saw** [22] - 94:23, 108:6, 163:15, 175:18, 176:13, 177:24, 177:25, 178:2, 181:7, 181:14, 181:21, 182:8, 182:19, 183:23, 190:3, 205:5, 209:6, 224:16, 230:24, 270:21, 271:21
**scanning** [1] - 104:21
**scary** [1] - 293:21
**schedule** [1] - 283:7
**Schmidt** [55] - 84:5, 136:15, 136:17, 144:19, 144:22, 144:25, 145:6, 145:10, 145:18, 145:19, 145:24, 146:8, 146:17, 146:25, 148:5, 148:8, 148:10, 148:18, 148:19, 148:22, 148:23, 149:4, 157:20, 158:10, 159:3, 159:6, 185:4, 199:23, 200:4, 200:12, 211:23, 214:2, 214:5, 214:8, 222:21, 222:24, 223:15, 223:18, 223:22, 223:25, 224:19, 224:20, 224:23, 225:16, 226:8, 226:23, 227:11, 227:18, 227:20, 263:13, 266:3, 266:6,

267:9, 267:19
**Schmitt** [1] - 170:1
**scope** [74] - 85:11, 85:24, 86:1, 86:12, 87:7, 94:5, 94:6, 95:1, 95:25, 100:21, 105:1, 106:22, 108:12, 109:17, 111:10, 136:17, 140:1, 144:20, 144:23, 145:1, 145:11, 145:24, 146:6, 146:9, 146:17, 146:18, 146:21, 146:25, 147:23, 148:6, 148:8, 174:13, 182:4, 185:8, 191:1, 195:24, 211:24, 228:2, 234:23, 238:5, 239:24, 240:25, 241:23, 242:1, 243:13, 244:20, 246:2, 251:16, 266:4, 266:19, 266:21, 266:22, 267:1, 267:2, 267:4, 267:5, 267:18, 267:19, 268:21, 268:24, 273:4, 273:12, 278:1, 279:1, 279:2, 280:10, 296:7, 310:16, 310:18, 310:19, 310:22, 311:20
**scopes** [32] - 144:25, 145:25, 146:1, 146:10, 146:15, 146:22, 148:20, 149:14, 149:15, 149:17, 149:21, 149:25, 151:25, 202:24, 210:19, 211:24, 222:24, 224:7, 224:8, 226:12, 250:3, 250:9, 268:13, 294:17, 294:19, 298:22, 301:5, 301:13, 306:3, 310:3, 310:23, 311:18
**Scott** [4] - 80:13, 81:15, 168:4, 168:9
**scratch** [1] - 242:8
**screen** [4] - 82:2, 145:21, 269:3, 278:21
**screw** [13] - 87:16, 170:20, 170:22, 230:4, 230:8, 230:10, 230:12, 230:17, 237:20, 238:4, 238:11, 238:12
**screwed** [3] - 85:17, 85:24, 124:8
**seal** [1] - 187:23
**Seals** [2] - 293:13, 300:8
**searching** [1] - 123:16
**seat** [2] - 137:12, 209:13
**seated** [2] - 81:2, 184:22
**Seattle** [1] - 80:4
**second** [50] - 91:3, 97:21, 100:3, 110:25, 117:7, 118:11, 145:16, 150:19, 153:12, 154:13, 154:16, 157:15, 159:25, 165:23, 166:1, 166:2, 166:5, 166:12, 166:17, 166:20, 169:15, 173:25, 176:5, 177:19, 179:3, 181:6, 185:5, 189:14, 189:17, 191:2, 201:14, 210:8, 216:20, 216:21, 234:5, 234:24, 235:12, 255:5, 258:11, 258:25, 264:21, 268:7, 278:15, 278:25, 279:1, 279:6, 287:21, 306:21, 312:5
**secondly** [1] - 305:7
**secret** [2] - 200:11, 225:19
**secretary** [1] - 260:19
**Secretary** [1] - 293:6
**section** [5] - 152:17, 152:18, 184:16, 213:25, 233:13
**Section** [6] - 140:9, 284:10, 285:20, 292:20, 293:5, 293:12
**sector** [1] - 289:24

**securing** [1] - 305:3
**see** [68] - 82:2, 82:9, 85:9, 85:12, 85:21, 86:5, 89:12, 95:16, 106:22, 122:2, 123:16, 141:20, 151:8, 151:22, 152:11, 152:13, 152:19, 154:22, 155:3, 155:4, 155:10, 155:18, 156:10, 158:10, 158:16, 159:11, 159:13, 159:18, 161:23, 166:12, 167:20, 170:1, 172:6, 175:22, 177:13, 177:18, 177:20, 180:1, 180:5, 183:5, 184:20, 187:8, 187:11, 201:7, 202:17, 209:9, 214:19, 214:22, 217:24, 218:16, 218:17, 224:14, 224:17, 228:25, 230:8, 230:11, 233:24, 235:2, 237:8, 237:13, 237:23, 243:12, 247:1, 264:11, 273:20, 277:12, 282:22, 289:11
**seeing** [4] - 165:2, 171:16, 183:11, 225:8
**seek** [1] - 302:19
**seeking** [1] - 256:22
**seem** [4] - 101:15, 267:3, 296:24, 298:2
**sees** [3] - 147:10, 147:11, 276:5
**segment** [2] - 199:14, 278:7
**select** [3] - 143:9, 222:3, 300:3
**selecting** [1] - 244:13
**sell** [4] - 206:16, 227:6, 288:8, 288:9
**selling** [9] - 145:24, 146:9, 227:18, 267:9, 288:7, 296:22, 301:3, 301:4, 308:7
**sells** [1] - 289:22
**send** [2] - 130:22, 201:5
**sending** [1] - 205:16
**sends** [1] - 264:25
**sense** [19] - 82:17, 82:19, 109:12, 160:14, 168:13, 176:12, 202:16, 213:19, 217:15, 231:22, 238:4, 243:8, 253:21, 265:3, 286:23, 287:24, 309:13, 309:14, 309:15
**sensitive** [5] - 161:12, 162:13, 162:15, 171:5
**sent** [14] - 100:12, 102:16, 102:25, 103:16, 127:20, 132:24, 159:12, 175:20, 178:5, 183:10, 183:13, 201:8, 226:23, 247:10
**sentence** [8] - 117:22, 122:3, 122:17, 123:13, 124:17, 125:12, 255:2, 255:7
**separate** [8] - 96:20, 104:7, 131:19, 243:19, 276:21, 289:25, 308:9, 310:6
**separately** [3] - 96:20, 96:24, 119:8
**September** [2] - 163:10, 163:17
**series** [7] - 104:15, 127:18, 151:2, 151:5, 201:7, 209:19, 258:16
**seriously** [1] - 273:16
**served** [1] - 123:17
**serves** [1] - 124:11
**services** [3] - 302:14, 303:6, 309:23
**session** [1] - 282:12
**set** [13] - 85:4, 139:19, 143:18, 144:6, 147:12, 148:17, 176:14, 193:24,

213:9, 259:18, 281:6, 287:8, 301:20
**setting** [5] - 141:17, 153:4, 174:13, 213:8
**settlement** [1] - 281:24
**setup** [1] - 213:9
**seven** [1] - 272:14
**several** [6] - 140:21, 157:23, 165:19, 168:11, 265:18, 298:21
**severe** [7] - 161:25, 169:22, 171:14, 171:19, 241:12, 241:13, 243:24
**shake** [1] - 244:9
**shaking** [1] - 244:9
**shall** [2] - 280:23, 283:14
**sham** [12] - 109:21, 110:1, 110:4, 110:9, 110:17, 110:18, 110:23, 111:7, 165:17, 166:13, 166:23, 167:3
**shape** [7] - 86:19, 171:25, 175:2, 242:10, 248:15, 248:19, 249:8
**shapes** [1] - 249:2
**shield** [1] - 291:23
**shift** [4] - 158:14, 170:23, 218:1, 222:20
**shifted** [1] - 153:17
**shifting** [1] - 239:11
**shifts** [4] - 99:9, 99:18, 156:5, 239:16
**shipment** [1] - 149:18
**shipped** [4] - 148:20, 149:15, 149:18, 224:24
**shock** [1] - 171:24
**shooting** [1] - 120:2
**short** [4] - 88:10, 90:16, 110:16, 251:13
**shorthand** [1] - 142:14
**shortly** [4] - 99:3, 132:25, 240:14, 262:18
**shot** [2] - 174:16, 264:20
**shoulder** [1] - 98:7
**show** [41] - 84:22, 97:22, 102:11, 102:21, 110:20, 117:15, 126:22, 140:9, 143:3, 144:24, 145:23, 146:24, 148:10, 156:12, 156:14, 158:5, 158:22, 160:11, 164:4, 164:8, 164:9, 164:10, 165:7, 168:25, 183:15, 193:11, 196:13, 224:6, 226:13, 229:5, 229:6, 229:7, 229:16, 270:23, 271:3, 271:19, 271:20, 290:12, 290:14, 295:23, 311:3
**showed** [6] - 163:12, 187:18, 193:7, 228:25, 262:19, 262:25
**showing** [22] - 97:3, 103:6, 104:16, 116:7, 121:5, 126:21, 145:16, 152:2, 181:13, 181:16, 218:16, 226:22, 230:9, 258:23, 266:11, 280:15, 284:19, 286:8, 286:10, 290:1, 291:4, 291:24
**showings** [2] - 111:3, 291:14
**shown** [21] - 91:21, 92:1, 92:16, 92:22, 98:20, 105:10, 132:24, 139:22, 140:14, 145:21, 147:7, 152:20, 154:22, 156:17, 182:17, 260:12, 270:18, 290:6, 291:1, 291:7, 311:1
**shows** [7] - 85:4, 91:9, 145:23, 152:16,

189:21, 230:8, 303:22
**shutdown** [1] - 274:15
**side** [39] - 82:17, 82:20, 85:13, 86:8, 107:2, 118:6, 118:13, 118:14, 122:20, 146:9, 152:3, 152:11, 152:20, 154:23, 155:7, 155:8, 183:1, 185:3, 186:4, 186:20, 187:5, 188:5, 207:23, 222:19, 229:6, 234:17, 234:23, 236:22, 238:3, 238:5, 238:14, 238:16, 242:4, 243:23, 243:24, 268:13
**sided** [1] - 251:7
**sides** [1] - 285:23
**sides'** [1] - 282:4
**Siegel** [2] - 80:13, 81:19
**SIEGEL** [1] - 81:19
**sight** [31] - 139:23, 140:16, 140:17, 141:13, 141:16, 141:18, 141:22, 141:23, 141:24, 142:1, 142:4, 142:12, 142:18, 142:19, 143:9, 143:11, 143:13, 144:4, 144:5, 144:6, 144:11, 144:12, 152:3, 153:3, 153:8, 219:6, 220:23, 264:4, 265:7, 269:16
**sighting** [3] - 220:21, 220:22, 220:25
**sights** [3] - 143:20, 220:9, 265:2
**signature** [3] - 314:6, 314:7
**signed** [4] - 162:24, 178:21, 179:7, 314:7
**significant** [2] - 126:5, 156:22
**significantly** [4] - 112:3, 207:5, 218:11, 227:5
**signing** [1] - 314:3
**signs** [2] - 262:19, 262:25
**silence** [25] - 127:6, 127:7, 164:13, 201:25, 202:19, 204:18, 204:19, 204:20, 205:18, 206:12, 206:25, 207:6, 207:17, 208:14, 210:4, 210:7, 211:15, 217:5, 257:12, 257:14, 257:16, 258:4, 272:9, 272:10
**similar** [9] - 155:13, 162:19, 187:7, 189:20, 190:11, 190:23, 219:23, 281:19, 293:11
**similarly** [2] - 98:18, 306:17
**simple** [26] - 107:5, 139:21, 158:9, 160:24, 161:19, 164:21, 167:9, 167:10, 167:17, 167:21, 168:24, 169:2, 169:10, 169:15, 170:19, 170:23, 185:21, 186:8, 187:7, 215:1, 218:22, 241:11, 281:15, 297:10, 298:25, 303:3
**simpler** [1] - 158:1
**simplest** [1] - 188:3
**simplicity** [1] - 168:5
**simplified** [7] - 285:7, 294:12, 294:15, 297:14, 302:10, 302:13, 302:20
**simplify** [1] - 222:25
**simply** [37] - 84:14, 88:22, 90:8, 110:24, 113:14, 114:13, 126:15, 140:1, 146:7, 186:6, 186:18, 188:15, 194:7, 197:18, 199:5, 205:10, 213:6, 213:13, 242:11, 244:6, 246:11, 246:23, 250:1, 251:2,

261:21, 266:13, 267:8, 272:4, 273:2, 275:21, 275:24, 277:18, 279:7, 298:24, 299:5, 299:6, 302:20
**simulate** [1] - 244:9
**simulated** [2] - 107:25, 169:20
**simulations** [1] - 168:19
**single** [27] - 97:23, 115:5, 115:6, 115:11, 115:14, 115:20, 115:21, 115:24, 115:25, 116:1, 116:2, 133:18, 140:9, 177:8, 185:19, 187:25, 194:15, 235:23, 252:14, 279:18, 279:19, 279:21, 299:25, 310:16, 310:18
**single-action** [5] - 115:5, 115:6, 115:11, 115:14, 115:20
**single-click** [1] - 279:19
**sit** [1] - 226:4
**sits** [2] - 90:9, 230:12
**sitting** [3] - 154:23, 199:21, 205:1
**situation** [9] - 169:20, 207:16, 208:5, 214:15, 215:7, 219:13, 259:19, 305:23, 309:11
**situations** [3] - 141:1, 186:8, 291:16
**six** [11] - 121:1, 202:10, 202:13, 205:9, 212:15, 258:1, 258:3, 258:5, 272:7, 272:9, 272:13
**six-year** [5] - 205:9, 212:15, 258:1, 258:3, 272:13
**size** [2] - 244:7, 267:8
**skill** [33] - 107:6, 114:24, 115:23, 116:10, 116:23, 116:24, 118:8, 120:14, 120:16, 143:8, 143:19, 194:9, 194:21, 195:12, 196:3, 196:15, 196:20, 197:2, 222:2, 251:9, 251:19, 252:1, 252:3, 252:10, 252:12, 252:22, 252:25, 253:13, 273:19, 275:3, 277:11, 277:19, 279:14
**skilled** [9] - 90:21, 90:24, 118:2, 118:16, 119:1, 119:4, 143:10, 144:9, 251:18
**skipped** [1] - 143:22
**slidably** [5] - 94:11, 94:20, 154:17, 235:3, 269:17
**slide** [51] - 86:13, 87:2, 87:11, 94:6, 95:25, 101:8, 105:9, 106:5, 107:12, 132:23, 133:11, 145:21, 151:3, 152:2, 152:12, 153:10, 154:17, 155:2, 158:14, 171:3, 174:25, 182:25, 187:19, 188:16, 190:3, 190:10, 190:19, 191:9, 197:24, 228:1, 228:24, 229:7, 233:11, 233:12, 235:3, 235:4, 235:7, 237:8, 237:10, 239:22, 248:20, 262:14, 269:3, 269:15, 273:10, 294:18, 297:17, 303:14, 304:14, 311:1
**slides** [11] - 83:9, 95:14, 105:20, 120:9, 151:6, 161:9, 166:18, 171:1, 232:16, 257:11, 292:15
**sliding** [1] - 272:13
**slight** [2] - 174:17, 174:20
**slightly** [6] - 107:13, 153:17, 234:12, 246:14, 248:21, 248:22
**Slip** [7] - 107:3, 107:9, 169:7, 169:12,

170:18, 244:4
**slop** [1] - 174:9
**slot** [3] - 238:8, 238:10, 238:13
**slow** [3] - 92:25, 115:9, 246:7
**small** [7] - 86:6, 116:17, 142:10, 222:9, 294:14, 294:20, 301:23
**smaller** [1] - 299:25
**snaps** [2] - 238:9, 238:16
**sniper** [4] - 264:7, 264:15, 264:21, 264:24
**sniper's** [1] - 264:11
**so-called** [1] - 285:7
**soap** [1] - 119:25
**soft** [1] - 187:24
**Software** [1] - 215:9
**software** [2] - 297:25, 298:5
**solar** [1] - 187:22
**sold** [7] - 146:18, 222:24, 224:22, 288:24, 295:1, 295:2, 298:16
**sole** [1] - 289:4
**solid** [3] - 88:10, 88:11, 236:20
**Solving** [1] - 161:24, 171:13
**someone** [10] - 108:23, 119:3, 123:15, 149:5, 149:6, 179:21, 242:10, 243:1, 250:13, 250:14
**sometimes** [4] - 140:24, 160:6, 309:24
**somewhat** [5] - 92:8, 120:24, 186:7, 233:1, 238:16
**somewhere** [1] - 244:10
**soon** [4] - 99:16, 280:11, 281:25, 303:5
**sorry** [9] - 93:1, 95:24, 115:10, 128:18, 137:12, 151:7, 216:20, 230:17, 272:20
**sort** [5] - 230:19, 243:22, 258:5, 289:14, 305:22
**sounds** [6] - 140:20, 192:2, 260:3, 264:19, 280:24, 283:19
**source** [1] - 183:22
**sourced** [1] - 289:4
**Southern** [1] - 128:7
**Southwest** [1] - 215:9
**sovereign** [9] - 286:11, 286:13, 287:16, 290:23, 302:12, 302:23, 303:24, 305:18, 305:19
**space** [1] - 221:25
**span** [1] - 206:20
**spark** [2] - 169:24, 175:5
**Sparkman** [1] - 80:14
**speaking** [1] - 109:10
**spec** [2] - 294:25, 295:2
**special** [8] - 161:18, 293:14, 294:20, 294:21, 296:9, 299:3, 301:14
**specialized** [1] - 299:1
**specially** [1] - 307:15
**specific** [35] - 86:19, 91:15, 91:21, 92:1, 93:22, 102:5, 110:20, 124:16, 126:15, 129:9, 129:24, 161:3, 167:12, 217:15, 238:24, 239:6, 242:4, 267:3, 284:16, 286:20, 287:15, 296:4, 296:10, 296:11, 297:4, 297:21, 298:4, 299:1,

299:7, 300:16, 305:9, 309:23, 310:2, 310:12, 312:19

**specifically** [10] - 93:9, 100:14, 111:8, 136:15, 189:2, 284:17, 288:2, 290:2, 293:15, 310:22

**specification** [36] - 91:16, 91:21, 92:2, 92:16, 92:23, 93:14, 93:19, 93:23, 113:2, 113:5, 113:8, 115:17, 116:5, 117:12, 117:13, 122:3, 122:18, 122:25, 123:10, 123:13, 123:20, 124:18, 125:3, 125:12, 231:12, 249:21, 250:12, 250:18, 251:15, 255:2, 255:7, 269:4, 269:8, 279:4, 280:3, 280:6

**specifications** [2] - 287:21

**specificity** [1] - 154:14

**specifics** [1] - 268:5

**specifies** [2] - 198:8, 269:20

**specify** [2] - 296:7, 297:19

**speedy** [1] - 297:15

**spelled** [1] - 109:23

**spend** [1] - 282:10

**spent** [1] - 239:20

**spiral** [72] - 85:19, 85:21, 86:19, 95:1, 96:10, 97:1, 100:15, 103:8, 104:11, 106:6, 106:10, 106:15, 106:16, 108:6, 108:15, 112:8, 112:12, 112:13, 145:11, 145:25, 146:6, 146:13, 146:25, 148:9, 148:13, 151:17, 152:13, 152:18, 154:8, 154:15, 154:21, 155:12, 157:20, 174:10, 183:1, 183:5, 183:9, 189:2, 189:9, 189:11, 189:15, 191:9, 200:2, 200:10, 200:19, 202:24, 206:10, 210:20, 211:25, 218:18, 224:6, 224:9, 226:13, 226:20, 227:8, 240:12, 241:19, 241:23, 242:4, 243:17, 248:15, 248:19, 248:20, 249:1, 269:13, 269:17, 273:4, 275:3, 280:14

**spiraling** [1] - 269:14

**spirit** [1] - 298:24

**split** [1] - 150:15

**Sport** [10] - 118:21, 118:22, 119:7, 119:8, 119:10, 119:12, 119:13, 143:18, 143:22, 252:18

**sports** [1] - 120:2

**stage** [6] - 140:22, 172:25, 173:9, 173:12, 176:20, 220:10

**stages** [1] - 221:19

**stakes** [1] - 174:20

**stale** [1] - 160:6

**stand** [4] - 166:1, 247:17, 260:20, 278:14

**standard** [22] - 97:7, 97:9, 97:16, 99:21, 100:8, 100:10, 110:19, 159:23, 170:10, 196:25, 197:15, 238:23, 238:24, 239:4, 239:16, 241:16, 242:23, 251:22, 251:25, 275:8, 279:7, 287:25

**standing** [2] - 137:13, 251:12

**standpoint** [1] - 208:11

**stars** [1] - 93:16

**start** [14] - 82:17, 83:17, 150:11, 151:13, 153:2, 160:13, 184:16, 215:3, 217:8, 218:7, 232:20, 233:15, 238:20, 268:6

**started** [3] - 83:8, 88:18, 246:1

**starting** [11] - 83:15, 87:5, 97:6, 127:11, 159:14, 178:12, 239:19, 239:21, 249:17, 284:5, 311:24

**starts** [4] - 96:14, 129:20, 223:25

**state** [4] - 81:7, 211:5, 211:6, 295:20

**statement** [15] - 109:11, 109:14, 109:18, 117:16, 130:10, 138:12, 138:18, 162:3, 166:22, 167:10, 173:25, 181:14, 182:2, 209:3, 251:15

**statements** [10] - 110:25, 148:19, 148:21, 148:25, 162:4, 171:7, 181:24, 248:5, 248:7, 266:6

**STATES** [2] - 79:1, 79:19

**states** [3] - 276:11, 286:12, 286:17

**States** [10] - 80:18, 145:1, 145:12, 146:11, 146:23, 149:22, 150:1, 267:10, 286:21, 301:17

**statute** [10] - 126:15, 255:16, 259:4, 272:6, 272:15, 295:13, 295:15, 300:24, 308:3, 312:14

**statutorily** [1] - 202:12

**statutory** [4] - 259:1, 259:8, 259:10, 300:24

**stay** [2] - 128:2, 246:8

**steering** [8] - 242:10, 242:13, 242:18, 242:19, 242:21, 243:1, 243:3

**step** [3] - 97:22, 219:4, 292:24

**stepping** [1] - 140:6

**STEVENS** [1] - 79:3

**Stevens** [3] - 81:5, 81:12, 284:8

**stick** [3] - 85:25, 94:22, 246:12

**sticking** [2] - 85:23, 108:6

**sticks** [4] - 94:25, 234:23, 238:5, 258:3

**still** [19] - 97:14, 98:16, 100:5, 113:21, 125:21, 134:23, 149:14, 149:25, 162:7, 166:24, 202:12, 208:23, 208:24, 210:20, 242:15, 245:19, 257:7, 274:17

**Stockdill** [4] - 147:3, 147:9, 147:20, 147:21

**Stoel** [2] - 80:2, 80:6

**stood** [2] - 121:22, 224:14

**stop** [7] - 132:15, 133:2, 155:18, 184:16, 214:22, 305:3, 312:25

**stopped** [2] - 210:12, 210:16

**stops** [1] - 133:4

**store** [1] - 225:24

**story** [9] - 98:1, 98:4, 102:1, 109:15, 125:5, 151:4, 199:23, 215:13, 239:7

**straightforward** [3] - 160:15, 170:9, 170:16

**strains** [1] - 223:17

**strategic** [1] - 209:18

**Streck** [1] - 194:5

**STRECK** [1] - 194:5

**Street** [2] - 80:3, 80:15

**strenuously** [1] - 198:5

**stress** [1] - 169:24

**stricken** [1] - 245:11

**strict** [1] - 193:23

**strictly** [2] - 286:13, 305:20

**strike** [1] - 111:6

**string** [1] - 169:21

**strong** [2] - 126:10, 213:4

**strongest** [1] - 139:15

**struck** [1] - 258:9

**structure** [14] - 84:15, 85:2, 88:10, 88:11, 91:9, 95:15, 112:21, 113:9, 113:10, 113:12, 113:15, 158:11, 237:21, 306:1

**structures** [3] - 151:24, 235:22, 235:24

**stuck** [2] - 107:18, 209:18

**study** [1] - 151:23

**stuff** [2] - 196:2, 300:4

**sub** [3] - 196:17, 307:16, 309:1

**sub-combinations** [1] - 196:17

**subcontractor** [10] - 295:14, 300:19, 300:25, 303:10, 306:7, 306:18, 307:15, 307:18, 309:10, 309:11

**subcontractors** [1] - 295:17

**subject** [12] - 155:19, 168:25, 170:5, 174:14, 242:2, 244:13, 245:10, 281:23, 283:18, 302:16, 302:23, 304:17

**subjected** [2] - 162:5, 170:2

**submersion** [1] - 162:1

**submit** [1] - 217:12

**submits** [1] - 296:3

**submitted** [4] - 163:10, 164:15, 178:13, 299:23

**submitting** [1] - 165:13

**subparts** [1] - 154:11

**subpoenaed** [1] - 214:8

**subs** [3] - 290:11, 290:17, 300:5

**subsequently** [2] - 142:11, 209:24

**substance** [5] - 134:2, 134:4, 167:4, 168:1, 274:22

**substantial** [1] - 165:2

**subtle** [1] - 174:17

**success** [1] - 175:14

**successful** [1] - 254:20

**sue** [21] - 126:25, 128:2, 129:9, 130:23, 131:2, 131:6, 131:25, 134:8, 134:19, 134:20, 134:22, 139:3, 205:18, 210:15, 212:21, 257:19, 262:19, 262:22, 272:14, 289:13, 302:21

**sued** [11] - 132:17, 135:5, 139:2, 203:21, 204:4, 206:11, 207:7, 262:23, 286:25

**suffer** [1] - 259:10

**suffers** [1] - 257:22

**sufficient** [37] - 97:19, 98:6, 98:17, 99:15, 101:22, 105:15, 111:10, 116:3,

125:4, 130:17, 135:16, 148:10,
156:25, 168:25, 193:11, 196:13,
196:21, 197:4, 209:2, 222:15, 240:3,
241:4, 241:8, 241:9, 241:17, 245:17,
251:17, 255:3, 255:23, 255:25, 256:3,
257:7, 279:8, 279:18, 279:21, 284:19,
286:19
**sufficiently** [7] - 107:5, 168:24, 191:15,
230:20, 239:7, 240:8, 267:3
**suggest** [3] - 165:22, 175:24, 271:17
**suggested** [5] - 172:4, 178:9, 198:18,
213:8, 228:22
**suggesting** [2] - 181:8, 275:10
**suggestion** [4] - 175:12, 186:22,
198:22, 295:1
**suggests** [4] - 97:15, 196:18, 265:5,
265:12
**suit** [12] - 206:22, 207:21, 208:4,
214:10, 217:22, 261:5, 261:6, 262:17,
289:25, 291:2, 293:18, 303:1
**suitable** [2] - 217:11, 268:3
**Suite** [4] - 80:3, 80:7, 80:11, 80:15
**sum** [2] - 194:14, 197:7
**summary** [82] - 81:5, 83:20, 83:22, 84:3,
84:20, 89:1, 92:4, 96:2, 96:4, 96:5,
96:9, 96:22, 99:23, 101:10, 101:22,
103:3, 114:20, 116:21, 117:2, 118:9,
118:11, 120:18, 120:21, 120:23,
122:19, 126:3, 128:8, 128:9, 128:10,
128:13, 128:19, 130:17, 135:8, 136:1,
136:4, 142:25, 144:16, 144:21,
147:17, 160:15, 160:21, 163:16,
163:24, 164:15, 164:25, 165:2,
165:13, 171:22, 174:7, 175:11,
193:18, 193:24, 193:25, 197:24,
219:15, 220:7, 223:6, 229:20, 230:20,
230:21, 244:22, 244:25, 247:24,
252:6, 253:4, 256:8, 262:13, 262:15,
268:3, 270:5, 271:13, 273:24, 275:24,
275:25, 276:12, 277:10, 279:9,
279:25, 285:15, 292:4, 292:19, 298:8
**summer** [3] - 100:12, 101:15, 200:2
**sun** [1] - 272:23
**Sundance** [3] - 118:21, 118:23, 119:3
**superior** [1] - 293:19
**supervised** [1] - 221:20
**supplement** [1] - 309:6
**supplemental** [3] - 109:25, 111:4, 240:1
**supplied** [1] - 298:16
**supplies** [3] - 293:8, 294:1, 294:14
**supply** [1] - 290:18
**supplying** [2] - 293:2, 293:25
**support** [22] - 115:19, 115:22, 116:3,
117:24, 125:25, 135:17, 161:7, 192:8,
193:22, 195:23, 196:11, 197:9,
215:20, 232:5, 258:6, 273:24, 274:4,
277:4, 285:6, 288:15, 288:16, 294:10
**supported** [6] - 113:1, 187:9, 193:21,
230:18, 230:20, 292:2
**supporting** [5] - 193:22, 197:8, 215:10,

276:6, 276:11
**supports** [2] - 135:22, 294:23
**supposed** [2] - 136:16, 244:5
**Supreme** [4] - 126:13, 186:13, 258:9,
272:5
**surface** [1] - 161:10
**surprise** [2] - 101:3, 180:14
**surprising** [3] - 112:18, 112:24, 293:1
**surrender** [1] - 205:23
**surrendering** [1] - 208:16
**surreply** [5] - 109:5, 109:24, 110:18,
165:18, 166:19
**surrounding** [1] - 237:16
**survive** [2] - 165:13, 193:25
**suspenders** [9] - 121:11, 205:11,
208:18, 208:20, 217:14, 217:18,
217:19, 217:20
**suspicious** [1] - 225:25
**switch** [2] - 218:3, 274:8
**switching** [1] - 242:6
**swore** [1] - 275:23
**sworn** [1] - 181:14
**synonymous** [2] - 302:11, 302:21
**synthesis** [1] - 168:24
**system** [7] - 103:12, 103:15, 145:11,
221:10, 244:5, 264:19, 265:3
**systems** [2] - 221:2, 245:25
**Systems** [2] - 107:3, 107:9

# T

**table** [2] - 244:9, 312:8
**tacked** [1] - 250:1
**tackle** [1] - 83:17
**tail** [1] - 205:9
**taillight** [1] - 242:15
**talks** [13] - 94:9, 99:8, 131:13, 139:24,
139:25, 166:20, 188:13, 221:8, 234:8,
234:9, 242:19, 257:20
**target** [1] - 174:18
**teaches** [1] - 158:7
**tear** [2] - 226:17, 226:21
**tear-apart** [2] - 226:17, 226:21
**teardown** [5] - 136:16, 136:21, 145:17,
146:24, 266:20
**Tech** [1] - 279:17
**technical** [3] - 151:14, 151:24, 155:19
**technically** [1] - 208:7
**technological** [1] - 228:15
**Technologies** [6] - 115:2, 115:4,
115:12, 115:13, 193:16, 279:20
**technologies** [2] - 291:3, 305:11
**technology** [6] - 170:12, 286:2, 290:5,
304:22, 304:25, 305:9
**TecSEC** [1] - 297:25
**telescopic** [26] - 139:23, 140:15,
140:16, 141:13, 141:16, 141:18,
141:22, 141:23, 141:24, 141:25,
142:1, 142:3, 142:12, 142:18, 142:19,
144:4, 144:5, 144:6, 152:2, 153:3,

153:8, 219:6, 220:9, 264:4, 265:2,
265:7
**tellingly** [1] - 130:18
**temperature** [3] - 169:24, 170:3, 175:4
**temperatures** [2] - 171:20, 175:3
**tens** [1] - 300:2
**tension** [1] - 110:25
**tentative** [1] - 88:8
**term** [18] - 84:9, 84:10, 84:16, 85:1,
89:7, 90:4, 91:18, 92:10, 96:1, 112:19,
113:8, 113:17, 115:11, 276:17,
276:18, 285:9
**terminology** [1] - 139:23
**terms** [25] - 84:11, 129:11, 140:22,
141:2, 144:10, 153:1, 158:11, 216:11,
218:18, 231:13, 251:24, 251:25,
252:12, 282:5, 284:23, 285:4, 285:5,
286:5, 290:25, 291:6, 304:4, 304:25,
305:3, 311:9
**test** [33] - 106:23, 107:17, 107:24,
113:3, 113:4, 115:18, 132:13, 140:6,
142:21, 169:25, 186:24, 195:17,
241:2, 241:15, 242:14, 243:9, 244:18,
244:19, 275:19, 277:14, 277:16,
287:7, 287:8, 287:19, 288:14, 288:15,
288:16, 290:8, 290:25, 295:19,
295:21, 295:22, 297:3
**tested** [20] - 106:22, 108:21, 108:24,
109:16, 111:10, 163:1, 168:15,
168:16, 168:20, 176:19, 239:25,
240:16, 240:21, 241:21, 243:15,
246:1, 247:1, 271:23, 280:10, 280:11
**testified** [24] - 86:17, 100:11, 100:12,
100:19, 101:7, 102:22, 147:9, 163:4,
175:14, 176:17, 178:2, 178:3, 178:24,
180:16, 182:20, 207:9, 207:25,
209:24, 221:12, 221:20, 240:24,
241:22, 242:1, 280:10
**testifies** [1] - 106:4
**testify** [3] - 118:24, 149:9, 252:20
**testifying** [2] - 109:11, 162:25
**testimonies** [1] - 180:10
**testimony** [139] - 84:18, 84:21, 86:13,
86:14, 91:11, 92:5, 97:11, 97:12,
97:13, 97:14, 97:15, 97:18, 100:9,
100:25, 101:3, 101:4, 101:9, 101:12,
101:20, 101:21, 101:25, 102:6,
102:15, 102:25, 104:13, 104:22,
104:23, 105:7, 105:14, 105:17, 109:1,
109:3, 109:9, 109:10, 109:19, 110:4,
110:7, 110:8, 110:9, 110:15, 110:22,
111:1, 111:9, 116:24, 117:2, 117:3,
118:15, 118:16, 130:10, 131:23,
132:13, 133:11, 134:17, 136:24,
143:14, 143:17, 145:17, 147:19,
147:21, 148:3, 158:20, 158:21, 160:3,
160:4, 160:5, 160:8, 160:9, 161:3,
162:23, 164:5, 164:19, 165:12,
165:16, 165:23, 166:4, 166:7, 166:9,
166:10, 166:16, 167:11, 173:13,

175:16, 175:23, 177:15, 177:18, 177:23, 177:25, 178:1, 178:12, 179:19, 181:7, 181:19, 183:23, 192:11, 197:17, 202:6, 207:2, 207:5, 207:13, 207:23, 208:2, 209:6, 211:11, 219:2, 219:3, 222:4, 222:15, 227:1, 230:19, 240:6, 241:4, 245:22, 245:23, 246:10, 246:19, 246:22, 246:23, 247:14, 247:16, 247:21, 248:2, 248:13, 249:12, 249:13, 249:14, 251:24, 253:15, 253:16, 261:18, 264:4, 264:5, 273:25, 274:3, 279:13, 312:19

**testing** [96] - 106:24, 107:4, 107:15, 107:19, 108:12, 111:5, 160:25, 161:19, 162:1, 162:11, 163:2, 163:4, 163:7, 163:8, 163:15, 163:16, 163:20, 163:21, 164:5, 164:6, 164:12, 164:21, 167:10, 167:12, 167:13, 167:22, 168:7, 168:10, 168:22, 169:1, 169:5, 169:11, 169:17, 169:19, 169:20, 169:23, 170:8, 170:19, 171:8, 171:14, 172:15, 172:16, 173:5, 173:10, 173:12, 173:24, 174:7, 174:23, 175:5, 175:8, 176:9, 176:10, 176:12, 176:16, 238:25, 239:19, 239:22, 240:2, 240:4, 240:7, 241:1, 241:4, 241:6, 241:8, 241:9, 241:10, 241:12, 241:15, 241:16, 242:2, 242:18, 242:22, 243:2, 243:5, 243:17, 243:20, 243:23, 244:2, 244:6, 244:17, 245:22, 246:15, 246:22, 247:2, 247:3, 270:13, 270:14, 270:19, 271:8, 271:10, 271:13, 280:20

**tests** [7] - 162:1, 162:2, 171:15, 171:16

**text** [5] - 146:3, 189:4, 189:8, 190:1, 237:13

**THE** [134] - 79:1, 79:2, 79:18, 80:2, 80:9, 81:2, 81:3, 81:17, 81:24, 82:5, 82:9, 82:25, 83:3, 83:6, 83:12, 84:6, 89:3, 89:9, 89:11, 90:3, 90:5, 90:22, 91:2, 91:5, 92:25, 95:4, 95:9, 95:17, 95:20, 96:6, 115:8, 137:6, 137:12, 137:18, 138:4, 139:11, 139:17, 150:6, 151:6, 151:8, 151:12, 155:21, 176:5, 176:21, 177:1, 184:15, 184:20, 184:22, 191:2, 191:12, 192:2, 192:7, 192:15, 199:15, 199:17, 212:23, 213:6, 213:13, 213:16, 214:23, 217:25, 222:22, 232:10, 232:13, 233:6, 234:5, 234:15, 237:19, 237:24, 238:7, 238:13, 238:18, 242:25, 243:6, 246:6, 253:23, 265:25, 267:12, 267:16, 268:7, 268:9, 268:15, 272:17, 272:22, 274:14, 278:8, 278:10, 278:13, 278:16, 280:22, 281:3, 281:17, 282:8, 282:15, 282:24, 283:1, 283:7, 283:11, 283:20, 283:24, 292:12, 292:16, 295:4, 295:11, 296:20, 297:1, 299:13, 300:18, 301:18, 302:7, 302:9, 305:25, 306:9, 306:20, 307:2, 307:7, 307:12,

307:24, 308:9, 308:17, 308:20, 308:24, 309:2, 309:4, 309:14, 311:22, 312:11, 312:21, 313:3, 313:7

**themselves** [4] - 146:11, 193:7, 206:16, 214:16

**theory** [2] - 200:17, 292:21

**thereafter** [2] - 200:7, 262:18

**therefore** [28] - 91:7, 107:22, 107:23, 109:17, 116:2, 117:4, 117:24, 121:3, 122:6, 122:16, 123:21, 126:16, 132:9, 140:18, 141:25, 142:22, 144:8, 150:17, 150:21, 184:3, 196:17, 220:12, 253:1, 259:9, 259:16, 260:9, 265:13, 303:20

**therein** [1] - 312:14

**thereof** [1] - 196:6

**ThermoLife** [4] - 128:6, 128:9, 128:12, 135:19

**they've** [7] - 157:6, 175:23, 193:19, 206:11, 206:14, 214:16, 222:12, 230:3, 268:1, 270:25, 291:11, 308:7

**thickness** [1] - 107:22

**thin** [1] - 155:4

**thinking** [3] - 182:10, 261:20, 283:16

**thinks** [5] - 88:5, 106:14, 247:19, 265:9, 275:1

**Third** [1] - 80:19

**third** [21] - 99:4, 100:13, 104:9, 104:12, 105:15, 120:22, 145:18, 145:25, 148:6, 148:9, 159:13, 188:16, 190:10, 190:19, 203:4, 206:9, 259:13, 266:20, 287:22, 295:7, 299:14

**third-party** [2] - 100:13, 159:13

**thoroughly** [2] - 219:21, 231:10

**thousand** [1] - 298:21

**thousands** [1] - 279:12

**threaded** [2] - 85:8, 238:3

**threads** [3] - 85:10, 85:13, 238:4

**threat** [3] - 129:9, 257:18, 299:12

**threaten** [1] - 212:17

**threatening** [1] - 224:13

**threats** [1] - 293:9

**three** [24] - 93:16, 98:9, 108:16, 127:4, 145:14, 177:12, 178:11, 198:16, 204:10, 204:13, 210:11, 257:10, 257:14, 273:12, 281:20, 287:7, 287:18, 288:14, 288:15, 288:16, 290:8, 290:25, 295:19, 295:22

**Three** [17] - 114:4, 114:7, 114:11, 187:4, 187:5, 187:13, 189:21, 190:7, 190:12, 190:15, 193:3, 196:8, 196:10, 198:21, 250:19, 276:1, 276:6

**three-part** [7] - 288:14, 288:15, 288:16, 290:8, 290:25, 295:19, 295:22

**three-prong** [2] - 287:7, 287:18

**threshold** [1] - 99:17

**thresholds** [1] - 285:4

**throughout** [3] - 89:12, 192:6, 237:7

**throw** [2] - 97:15, 165:23

**throws** [1] - 247:15

**tie** [4] - 206:2, 261:23, 266:18, 275:14

**tied** [2] - 212:15, 270:16

**timeline** [11] - 157:8, 158:24, 159:1, 185:21, 193:7, 199:20, 201:1, 204:6, 215:13, 215:14, 223:24

**timelines** [2] - 151:2, 151:5

**timely** [3] - 126:19, 214:10, 256:12

**timing** [3] - 134:2, 178:25, 282:12

**tip** [1] - 269:25

**tipped** [1] - 131:18

**title** [1] - 124:16

**titled** [1] - 314:5

**today** [42] - 81:3, 82:6, 82:19, 83:1, 84:20, 99:22, 126:5, 156:20, 165:20, 175:12, 177:24, 178:2, 181:7, 187:6, 202:6, 204:17, 205:10, 207:8, 207:12, 208:24, 209:6, 211:18, 214:1, 217:13, 219:7, 220:5, 220:17, 224:4, 224:17, 226:4, 227:24, 228:8, 228:22, 230:24, 233:5, 237:18, 263:16, 276:2, 281:2, 282:4, 283:14, 312:22

**today's** [1] - 282:12

**Todd** [2] - 80:13, 81:19

**together** [29] - 85:5, 86:2, 87:1, 87:7, 87:9, 88:23, 101:6, 101:25, 108:5, 137:9, 138:11, 161:11, 184:17, 225:17, 226:2, 235:21, 235:23, 235:24, 236:23, 236:24, 237:5, 238:2, 239:24, 240:24, 242:16, 266:19, 269:7, 269:20, 283:18

**tolerate** [1] - 304:2

**tons** [3] - 243:2

**took** [16] - 91:20, 99:16, 101:13, 102:16, 103:19, 104:11, 106:19, 136:25, 147:3, 157:23, 190:24, 226:12, 229:25, 246:17, 257:3, 282:6

**tooling** [1] - 98:24

**tools** [1] - 120:7

**top** [9] - 90:9, 93:17, 183:2, 183:5, 230:8, 230:9, 238:7, 238:9, 238:14

**topic** [7] - 150:18, 209:17, 212:2, 222:7, 222:8, 253:24, 280:23

**topics** [2] - 150:16, 209:5

**tore** [4] - 146:15, 146:20, 148:8, 226:11

**torn** [2] - 267:1, 267:5

**total** [2] - 194:14, 197:7

**totality** [1] - 98:2

**touch** [1] - 193:9

**touches** [1] - 236:22

**touching** [2] - 187:5, 193:6

**towel** [1] - 119:25

**track** [52] - 85:19, 85:21, 89:7, 89:15, 89:17, 89:20, 89:25, 90:8, 90:14, 107:13, 112:8, 112:13, 117:10, 117:13, 117:14, 117:15, 117:16, 117:19, 117:20, 154:15, 154:22, 189:9, 189:11, 189:15, 190:2, 190:16, 190:17, 191:19, 191:20, 192:24, 194:17, 194:19, 195:23, 198:1, 198:7, 198:10, 198:12, 198:14, 198:25,

199:1, 232:21, 236:15, 236:17,
236:22, 269:13, 269:17, 273:6, 275:3,
275:5, 276:24, 277:23, 278:19
**Track** [7] - 107:3, 107:9, 169:7, 169:12,
170:18, 244:4
**tracks** [3] - 131:14, 273:9, 277:25
**Trade** [1] - 80:14
**Trademark** [4] - 124:6, 124:19, 124:25,
257:7
**Trading** [6] - 115:2, 115:3, 115:12,
115:13, 279:17, 279:20
**transaction** [4] - 287:1, 304:16, 304:24,
305:12
**transaction's** [1] - 284:23
**transactions** [6] - 104:17, 106:15,
284:25, 291:22, 292:6, 312:20
**transcript** [13] - 92:6, 100:23, 101:11,
106:5, 108:17, 110:11, 120:11, 195:4,
241:24, 246:24, 248:17, 314:4, 314:6
**TRANSCRIPT** [1] - 79:17
**transcripts** [1] - 248:8
**translation** [2] - 159:5, 200:6
**treated** [1] - 307:15
**trials** [2] - 252:6, 282:17
**triangulating** [1] - 264:12
**tricky** [1] - 261:13
**tried** [5] - 157:6, 187:6, 190:19, 196:10,
282:7
**trier** [3] - 99:19, 145:10, 148:14
**tries** [5] - 87:18, 145:15, 146:14, 251:12,
256:16
**trigger** [4] - 171:17, 171:19, 172:1,
175:6
**trigonometry** [1] - 264:17
**triviality** [1] - 281:11
**true** [19] - 104:9, 108:4, 112:14, 114:6,
119:22, 122:5, 123:24, 124:4, 129:11,
146:4, 153:5, 225:10, 245:13, 245:14,
247:18, 255:19, 266:13, 272:12, 286:8
**trustworthy** [1] - 266:10
**try** [12] - 139:7, 151:16, 163:23, 165:13,
193:20, 195:22, 196:2, 215:18,
232:14, 232:20, 246:8, 257:11
**trying** [8] - 173:15, 216:15, 231:24,
236:8, 244:16, 247:14, 263:21, 291:23
**tube** [6] - 153:16, 169:13, 169:14,
169:15, 182:5
**tubular** [4] - 141:18, 142:4, 142:13,
153:6
**tuck** [1] - 229:3
**tucked** [2] - 228:20, 229:7
**Tuesday** [1] - 283:1
**TurboCare** [3] - 187:1, 196:24, 275:20
**turn** [20] - 84:9, 85:25, 86:3, 86:4, 139:9,
150:7, 178:12, 184:13, 207:1, 214:24,
221:3, 227:22, 229:24, 230:7, 244:16,
249:16, 257:9, 259:5, 263:21, 281:20
**turned** [1] - 201:8, 203:8, 306:3
**turning** [12] - 83:21, 85:3, 116:21,
152:12, 199:18, 251:6, 253:17,

256:20, 257:8, 270:10, 271:24, 279:23
**turns** [4] - 96:18, 181:9, 263:8, 263:9
**turret** [9] - 82:24, 86:1, 145:25, 148:6,
148:9, 234:17, 266:20, 281:18, 282:5
**two** [68] - 83:19, 84:2, 84:8, 87:8, 95:21,
96:2, 102:10, 103:7, 105:9, 105:20,
107:1, 111:25, 115:2, 121:17, 131:16,
133:15, 137:24, 137:25, 145:18,
148:18, 152:6, 152:22, 157:5, 157:15,
159:24, 169:23, 175:13, 180:2,
180:21, 181:1, 181:3, 181:23, 182:9,
183:1, 184:12, 185:22, 188:3, 189:10,
195:2, 198:8, 201:6, 204:12, 210:6,
211:21, 216:16, 225:20, 227:24,
235:17, 235:20, 235:22, 235:23,
235:24, 236:23, 248:20, 252:7,
255:21, 258:18, 264:1, 264:21,
268:13, 269:20, 270:7, 281:8, 286:1,
291:20, 305:4, 305:6
**two-part** [1] - 235:17
**twofold** [1] - 99:22
**type** [8] - 117:20, 159:12, 171:7, 173:12,
183:12, 196:11, 231:17, 245:1
**types** [3] - 176:18, 221:23, 304:3
**typical** [1] - 294:22

# U

**U.S** [25] - 145:2, 148:11, 148:12, 149:16,
149:18, 157:25, 223:23, 224:22,
224:23, 224:24, 284:12, 285:22,
286:16, 286:25, 287:10, 287:11,
287:12, 287:13, 289:8, 289:23, 291:9,
294:1, 294:17, 298:20, 302:6
**ultimate** [6] - 97:17, 251:8, 262:10,
299:21, 300:8, 301:1
**ultimately** [17] - 88:3, 96:22, 106:9,
124:7, 127:19, 128:1, 128:5, 200:3,
211:8, 217:7, 249:5, 254:22, 262:7,
264:8, 300:14, 301:7, 301:16
**unable** [1] - 192:20
**unambiguous** [1] - 111:2
**unavailing** [1] - 165:20
**unbeknownst** [1] - 203:16
**unchanged** [2] - 102:20, 280:17
**unclaimed** [9] - 112:25, 113:25, 114:17,
198:22, 249:18, 249:19, 251:5, 273:1,
277:22
**under** [47] - 97:8, 97:10, 100:7, 101:7,
107:3, 109:18, 113:11, 125:22,
126:16, 128:21, 132:10, 140:8,
156:11, 157:25, 168:15, 168:16,
168:20, 171:19, 177:16, 188:19,
215:16, 218:13, 226:8, 236:1, 241:8,
241:17, 242:23, 257:6, 259:8, 259:14,
262:16, 262:25, 270:1, 272:14,
275:20, 276:11, 280:9, 280:19,
284:10, 284:23, 285:4, 285:7, 285:20,
287:18, 288:5, 294:16, 303:18
**undergo** [1] - 169:24

**underlying** [4] - 196:5, 249:14, 312:3,
312:6
**undermine** [1] - 247:20
**undermines** [1] - 106:18
**underneath** [1] - 188:8
**understood** [6] - 117:4, 192:6, 194:24,
195:13, 209:16, 253:14
**undertaken** [1] - 284:25
**undeveloped** [3] - 268:17, 268:18,
269:2
**undisputed** [4] - 84:17, 91:9, 188:11,
280:15
**unequivocal** [1] - 171:21
**unexplained** [1] - 205:23
**unfair** [3] - 214:14, 285:16, 285:21
**unique** [1] - 171:23
**unit** [3] - 182:5, 298:12, 301:14
**UNITED** [2] - 79:1, 79:19
**United** [10] - 80:18, 145:1, 145:12,
146:11, 146:22, 149:21, 150:1, 267:9,
286:21, 301:16
**units** [3] - 171:5, 293:14, 296:9
**University** [1] - 80:3
**unjust** [3] - 212:11, 213:18, 213:20
**unknown** [3] - 145:17, 180:7, 267:5
**unless** [3] - 124:23, 184:14, 307:8
**unlike** [3] - 122:14, 173:18
**unnecessary** [1] - 272:6
**unpredictability** [1] - 116:19
**unpublished** [1] - 288:18
**unrelated** [2] - 179:23, 209:19
**unsupported** [1] - 167:7
**untimely** [2] - 245:10, 256:11
**unusual** [1] - 120:24
**up** [99] - 83:7, 85:11, 87:6, 87:14, 87:24,
90:6, 92:8, 97:23, 101:17, 102:18,
102:24, 104:3, 105:9, 108:7, 108:19,
109:6, 111:18, 117:5, 119:9, 121:22,
122:4, 124:8, 124:21, 128:4, 130:22,
131:25, 133:10, 134:25, 137:13,
137:25, 138:5, 141:24, 145:21,
151:24, 152:12, 153:17, 155:5,
159:18, 171:9, 173:13, 174:25,
182:13, 184:8, 184:11, 202:16,
202:20, 203:18, 205:8, 205:25,
210:21, 211:10, 212:5, 213:8, 213:10,
214:6, 215:5, 216:11, 219:1, 219:2,
224:1, 225:20, 225:23, 227:8, 230:12,
232:15, 233:5, 233:12, 235:20,
237:10, 238:24, 239:22, 241:14,
243:22, 245:5, 247:17, 252:18, 253:6,
258:15, 260:20, 262:14, 272:11,
272:14, 274:12, 276:2, 278:14,
278:21, 281:5, 281:22, 282:16,
282:17, 282:18, 282:21, 283:21,
283:25, 284:2, 304:16, 311:3, 312:23
**USA** [2] - 79:6, 79:8
**USC** [3] - 284:10, 293:12, 293:16
**useful** [3] - 172:15, 181:22, 182:1,
210:13, 267:20

**user** [7] - 115:5, 115:6, 115:11, 115:14, 115:20, 116:1, 279:20
**uses** [4] - 141:4, 264:9, 305:8
**USPTO** [1] - 123:11
**utility** [1] - 96:13

## V

**vaguely** [1] - 140:20
**valid** [11] - 121:14, 122:6, 125:5, 125:12, 132:9, 132:22, 164:2, 199:9, 217:21, 255:24, 259:21
**validity** [11] - 125:10, 163:11, 163:24, 163:25, 164:17, 164:24, 219:16, 223:8, 268:1, 270:25, 271:1
**value** [5] - 177:22, 181:2, 182:22, 183:14, 225:23
**Van** [1] - 166:18
**variation** [1] - 144:6
**variety** [5] - 104:22, 123:14, 141:6, 146:1, 279:12
**various** [12] - 86:16, 153:17, 169:9, 220:11, 221:19, 221:24, 225:24, 241:20, 245:2, 249:1, 271:9, 298:8
**Varmint** [1] - 268:14
**vary** [1] - 273:21
**vast** [4] - 113:16, 284:21, 291:22, 308:7
**VCR** [2] - 147:12
**veracity** [1] - 109:16
**versed** [1] - 171:22
**version** [5] - 103:13, 142:14, 157:10, 200:15, 278:25
**versus** [4] - 81:6, 127:1, 192:19, 241:12
**Veteran** [1] - 286:16
**vetted** [1] - 243:14
**via** [6] - 130:7, 255:22, 264:14, 265:4, 300:14, 300:17
**viable** [1] - 241:21
**vibration** [2] - 241:13, 243:25
**vibrations** [2] - 170:2, 175:4
**video** [2] - 246:5, 246:11
**view** [12] - 96:23, 134:1, 135:3, 152:20, 154:24, 186:23, 193:1, 206:1, 229:6, 230:8, 271:10, 310:18
**viewing** [1] - 274:6
**viewpoint** [1] - 252:9
**violating** [1] - 167:3
**Virginia** [1] - 288:19
**virtually** [2] - 298:9, 298:13
**virtue** [1] - 287:7
**vision** [2] - 264:9, 264:14
**visual** [1] - 198:16
**vocabulary** [1] - 152:1
**void** [1] - 186:16
**volume** [1] - 202:24
**volumes** [1] - 212:20
**voluntarily** [1] - 85:1
**vs** [1] - 79:5

## W

**WA** [1] - 80:4
**wait** [7] - 158:13, 211:9, 212:20, 213:22, 261:5, 272:8, 272:13
**waited** [4] - 201:6, 205:6, 213:19, 217:22
**waiting** [6] - 128:3, 205:15, 205:17, 208:15, 210:25, 211:3
**waivers** [1] - 286:13
**walk** [1] - 161:13
**walked** [2] - 178:21, 228:14
**Walker** [2] - 80:18, 314:11
**WALKER** [1] - 314:12
**walking** [2] - 187:14, 283:21
**walks** [1] - 147:10
**wall** [2] - 169:12, 236:22
**wallboard** [2] - 244:8, 244:9
**wants** [5] - 93:25, 172:19, 238:23, 241:5, 296:12
**war** [1] - 294:1
**warned** [3] - 201:22, 260:21, 265:24
**warning** [2] - 259:23, 260:1
**washer** [18] - 114:5, 114:7, 114:11, 187:19, 187:22, 187:24, 188:7, 188:14, 188:15, 188:17, 188:19, 188:20, 193:2, 196:12, 196:14, 196:19, 250:21
**washers** [2] - 188:15, 190:9
**watching** [1] - 98:8
**water** [1] - 187:23
**ways** [7] - 162:15, 196:21, 216:16, 257:11, 279:12, 298:2, 310:8
**weapon** [1] - 174:1
**weapons** [1] - 173:22
**wear** [1] - 172:16
**weather** [1] - 244:19
**weathering** [1] - 171:25
**website** [3] - 221:22, 311:6, 311:10
**Wednesday** [1] - 283:2
**week** [1] - 274:18
**weighing** [1] - 135:22
**weight** [2] - 275:25, 276:12
**weird** [1] - 307:9
**welcome** [1] - 81:24
**well-established** [1] - 216:8
**whatsoever** [2] - 119:19, 122:18
**wheel** [9] - 242:10, 242:13, 242:18, 242:19, 242:20, 242:21, 243:1, 243:3
**whole** [10] - 81:17, 98:4, 167:17, 230:23, 240:1, 258:15, 283:8, 283:9, 294:12, 297:14
**WI** [1] - 80:12
**wider** [1] - 86:9
**Williams** [2] - 80:5, 81:14
**WILLIAMS** [1] - 81:14
**win** [9] - 131:21, 132:1, 132:5, 135:1, 144:16, 245:13, 253:4, 253:20, 263:7
**Windauer** [6] - 172:11, 172:12, 209:12, 209:14, 261:20, 281:20
**window** [5] - 205:9, 206:11, 212:15, 221:22, 272:13
**wins** [1] - 259:15
**withdrawn** [1] - 268:1
**withstand** [5] - 170:21, 173:21, 174:1, 174:5, 244:5
**witness** [7] - 104:2, 118:23, 136:25, 180:4, 192:10, 225:7, 252:5
**witnesses** [1] - 184:11
**witnesses'** [1] - 219:2
**word** [11] - 87:21, 88:2, 89:11, 89:12, 89:14, 92:11, 112:17, 191:3, 235:12, 235:19, 247:15
**words** [23] - 87:9, 87:12, 90:1, 100:6, 105:4, 117:19, 119:14, 120:7, 126:24, 132:21, 141:14, 144:5, 156:14, 169:14, 171:19, 172:1, 175:6, 189:17, 249:25, 251:8, 264:9, 264:13, 278:24
**workings** [1] - 105:1
**works** [16] - 86:23, 98:10, 107:8, 119:15, 184:7, 215:13, 242:15, 242:21, 242:23, 243:9, 244:18, 244:20, 264:19, 283:5, 301:21
**world** [7] - 169:22, 206:23, 208:22, 212:19, 241:12, 241:13, 243:24
**World** [9] - 121:19, 122:7, 122:9, 122:15, 122:22, 256:5, 261:3
**worldwide** [1] - 225:20
**worry** [1] - 301:2
**worth** [4] - 266:9, 266:11, 281:11, 281:12
**worthless** [1] - 196:9
**wrestle** [1] - 309:21
**write** [1] - 178:17
**writes** [2] - 128:4, 250:6
**written** [17] - 113:4, 115:19, 116:7, 118:24, 162:25, 184:8, 187:2, 188:4, 188:25, 189:8, 197:19, 197:21, 198:7, 249:23, 250:18, 280:5, 291:24
**wrongly** [1] - 298:1
**wrote** [6] - 127:14, 183:17, 188:7, 190:1, 197:1, 260:11

## Y

**year** [18] - 102:19, 102:23, 111:18, 145:2, 157:11, 185:10, 185:11, 199:11, 202:8, 202:10, 205:9, 212:15, 218:12, 258:1, 258:3, 272:13, 272:14, 280:18
**years** [25] - 102:10, 121:1, 123:6, 126:8, 127:14, 131:9, 134:11, 136:7, 200:16, 201:6, 201:24, 202:10, 202:13, 202:25, 203:1, 203:4, 211:4, 211:9, 225:23, 258:5, 260:1, 272:7, 272:9, 272:14, 279:12

## Z

**ZeeroStop** [1] - 297:18
**zero** [1] - 162:7
**ZeroLock** [2] - 281:21, 305:1
**ZeroStop** [3] - 304:19, 304:21, 304:25