1          IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF OREGON

3

LEUPOLD & STEVENS, INC.,              )
4                                     )
          Plaintiff,                  ) No. 3:16-cv-01570-HZ
5                                     )
     vs.                              ) February 13, 2019
6                                     )
LIGHTFORCE USA, INC. doing            ) Portland, Oregon
7 business as NIGHTFORCE OPTICS       )
doing business as NIGHTFORCE          )
8 USA,                                )
                                      )
9          Defendant.                 )
  ----------------------------------

10

11

12

13

14

15              **CONTINUED MOTION HEARING**

16                      **DAY 3**

17              TRANSCRIPT OF PROCEEDINGS

18      BEFORE THE HONORABLE MARCO A. HERNANDEZ

19         UNITED STATES DISTRICT COURT JUDGE

20

21

22

23

24

25

```
1                         APPEARANCES

2    FOR THE PLAINTIFF:    Brian C. Park
                           Stoel Rives LLP
3                          600 University Street
                           Suite 3600
4                          Seattle, WA  98101

5                          Nathan C. Brunette
                           Elliott J. Williams
6                          Kassim M. Ferris
                           Stoel Rives LLP
7                          760 S. W. Ninth Avenue
                           Suite 3000
8                          Portland, OR  97205

9    FOR THE DEFENDANT:    David A. Casimir
                           Jason R. Bond
10                         Casimir Jones S.C.
                           2275 Deming Way
11                         Suite 310
                           Middleton, WI  53562
12
                           Scott E. Davis
13                         Klarquist Sparkman, LLP
                           One World Trade Center
14                         121 S. W. Salmon Street
                           Suite 1600
15                         Portland, OR  97204

16   COURT REPORTER:       Nancy M. Walker, CSR, RMR, CRR
                           United States District Courthouse
17                         1000 S. W. Third Avenue, Room 301
                           Portland, OR  97204
18                         (503) 326-8186

19

20

21

22

23

24

25
```

1                    P R O C E E D I N G S

2              THE COURT:  Good morning.  Be seated.

3              THE CLERK:  Your Honor, we're here today for a

4      continuation on the parties' cross-motions for summary

5      judgment in the matter of Leupold & Stevens, Inc. versus

6      Lightforce USA, Inc., Case No. 16-cv-1570.

7              Counsel, please state your appearances for the

8      record.

9              MR. PARK:  Good morning.  Brian Park for the

10     plaintiff, Leupold & Stevens.

11             MR. BRUNETTE:  Nathan Brunette for plaintiff.

12             MR. WILLIAMS:  Elliott Williams for plaintiff.

13             MR. DAVIS:  Scott Davis for defendant.

14             MR. CASIMIR:  David Casimir for defendant.

15             THE COURT:  So, where are we going -- oh, I'm sorry.

16     I didn't see you back there.

17             MR. FERRIS:  Kassim Ferris for plaintiff.

18             THE COURT:  Thank you, Mr. Ferris.

19             So where are we going today?

20             MR. PARK:  Your Honor, I think we've come full circle

21     now, and we're going to complete the summary judgment

22     argument.  We thought it made sense for myself to lead off

23     with the five locking turret knob patents.

24             THE COURT:  I'm sorry?

25             MR. PARK:  The five locking turret knob patents.

1          THE COURT:  Okay.

2          MR. PARK:  So those are the three Windauer patents.

3          THE COURT:  Okay.

4          MR. PARK:  And then the pinch-to-turn patent, which

5   is the '408 patent; and the '068 patent, which is the ZeroLock

6   patent.

7          THE COURT:  Okay.  Go for it.

8          MR. PARK:  As a prefatory matter, Your Honor, the

9   parties have conferred; and we've decided to rest on the

10  briefs with respect to the flip-up lens cover patent --

11         THE COURT:  Okay.

12         MR. PARK:  -- which is the '408 patent.

13         So neither side intends to make any remarks today

14  about that patent -- or, excuse me, the '480 patent.

15         Your Honor, I have some demonstratives that I'll be

16  referring to during my remarks.  I have copies for the Court

17  and for opposing counsel, if that's agreeable.

18         THE COURT:  Sure.

19         MR. PARK:  (Handing).

20         So, Your Honor, I'll be addressing the issue of

21  infringement of the five locking turret knob patents, which,

22  as I mentioned a moment ago, have been grouped into three

23  buckets.  The first bucket is the three Windauer patents:  the

24  '429, the '736, and '120 patents.

25         The second bucket consists of the '408 patent, also

1  called the pinch-to-turn patent.  And then the third bucket is

2  the '068 patent, also called the ZeroLock patent.

3          After I go through the various infringement

4  arguments, I will pass the microphone to my colleague,

5  Mr. Williams, who will address the validity issues with

6  respect to each of those patents.

7          And then, by agreement with opposing counsel, at that

8  point we'll use the same ping-ponging back-and-forth procedure

9  that we've been using over these proceedings, back and forth

10  until the parties feel that they've been heard and the

11  arguments have been satisfied.

12          THE COURT:  Or I can't take anymore.

13          MR. PARK:  Exactly.

14          THE COURT:  Go ahead.

15          MR. PARK:  So starting first with the three Windauer

16  patents, Leupold's motion for summary judgment affirmatively

17  sets forth the evidence about why Nightforce's ATACR and BEAST

18  riflescopes with the ZeroHold knob and the i4F knob infringe

19  these three Windauer patents; and those arguments are set

20  forth in docket 101, pages 21 to 24 specifically.

21          For Nightforce's ZeroHold knobs, which are used for

22  windage and elevation on the ATACR and BEAST accused products,

23  Nightforce only relies on the government contract defense that

24  we talked about during our last meeting.

25          Significantly, Nightforce does not assert any

 1   technological-based defense to non-infringement for the
 2   ZeroHold knobs as to the three Windauer patents.

 3        As to the Nightforce BEAST i4F 360 brake knob,
 4   Nightforce's non-infringement position as to the three
 5   Windauer patents is that the BEAST rotary adjustment knob
 6   doesn't actually lock.

 7        Now, the background of Nightforce's infringement
 8   defense provides insight, because defendant's "locked does not
 9   actually mean locked" theory has evolved.  Originally, at the
10   *Markman* briefing stage and at the *Markman* hearing, Nightforce
11   took the position that "locked does not mean locked" because
12   some of their devices have a fine adjust lever which can still
13   change a knob setting even if the lock is engaged.  For
14   example, the *Markman* hearing transcript at pages 61 through 65
15   talks about that issue.

16        Apparently after Nightforce determined that the lock
17   was still fully engaged even if the whole actuated lock
18   structure was rotated using the thumb lever of the fine adjust
19   lever, Nightforce changed its position to its current
20   iteration of the "locked does not actually mean locked"
21   theory.

22        Nightforce's rationale for this defense is that if a
23   user applies enough force to the adjustment knobs, beyond the
24   level to which a normal ordinary user would apply to prevent
25   inadvertent bumping or rotation, the accused products will

1   turn; and, therefore, Nightforce argues the BEAST i4F knob

2   doesn't actually lock or it doesn't have a locked claim

3   element to satisfy the Windauer patents.

4          There are several problems with Nightforce's current

5   non-infringement defense as to the Windauer patents.  As a

6   road map, first I'll be talking about the legal reasons why

7   Nightforce's contention is incorrect, that this "locked does

8   not actually mean locked" theory is legally flawed.

9          Second, I'll discuss Nightforce's own admissions in

10  the case, in the form of different forms of evidence that

11  rebut its "locked does not actually mean locked" defense.

12         Third, I'll explain the reasons why there is some

13  what has been called over the course of the case "funny

14  business" about Nightforce's contention that "locked does not

15  actually mean locked" is technologically flawed and legally

16  irrelevant.

17         And then, fourth, I will address the inaccuracy of

18  Nightforce's assertion that the rebuttal declaration of

19  Leupold's technical expert, Mr. Byron, at docket 129, which

20  confirms my first three points, was somehow untimely.  Quite

21  to the contrary, Mr. Byron's summary judgment declaration was

22  timely and necessary to address information raised during the

23  deposition of Nightforce's expert, Mr. Douglas DuFaux, fewer

24  than 29 days earlier.

25         The first main point on the three Windauer patents is

the legal definition of "locked," this concept of normal use.
That normal use concept is an important one.

The question first arose at the *Markman* hearing, as
I alluded to earlier, in the context of the BEAST fine adjust
lever.  Even using the fine adjust lever, the evidence shows
that the lock is fully engaged; and Nightforce's claim that
all BEAST adjustment levers always turn by design, even when
that lock is in position, doesn't matter.  The fact is the
claim requires a certain locking mechanism be engaged.  And
if, for whatever reason, whether it's a fine adjustment lever
or extra-ordinary force, if the lock remains engaged, then
there's infringement.  The claim is satisfied.

Now, the assertion is interesting because
Nightforce's current iteration of this defense was never
mentioned during any of Nightforce's documents that were
produced in the case or until the summary judgment briefing.
Other than the post hoc expert opinion of Nightforce's expert,
there is no document or user manual stating that the BEAST was
designed to work this way or that it was ever intended to be
used this way by a user in the normal course.

The only support Nightforce has for this theory is
from Mr. DuFaux, Nightforce's expert, who states that he
received sample scopes that were not in the box in unopened
condition.  Mr. DuFaux does not know the source of those
scopes that he tested or whether they were in unmodified

1    condition.  There is no competent evidence in the record for

2    Nightforce to show that they in fact were new.

3         But regardless, this defense theory by Nightforce is

4    legally irrelevant based on common sense and everyday

5    experience, because a lock is still a lock even if it can be

6    overcome with extreme force.  It may not be the best lock in

7    the world, but it's still a lock.

8         During the *Markman* hearing -- and this is at the

9    transcript pages 61 to 65 -- the parties discussed with the

10   Court the concept of whether "locked" means locked or whether

11   a little bit of jiggling was okay or whether being able to be

12   overcome using extreme measures of force, by really cranking

13   on the lock mechanism, whether that meant that the definition

14   of "lock" was not satisfied or that something ceased to be a

15   lock.

16        If I have a lock on a door at home that I can

17   overcome by pushing on it very hard, does that make it any

18   less of a lock?  If I have a luggage lock on my suitcase that

19   TSA decides to force open, does that make that padlock any

20   less of a lock?

21        Our position is no.  And by reading the patent

22   definition in the Windauer specifications, the legal

23   definitions, the answer is no.

24        So in the context of the Windauer patents, the

25   specifications themselves describe what "lock" means and how

far that definition should be applied.  Each of the three
Windauer patents -- the '429, the '736, and the '120
patents -- describe the concept of "mechanically lockable" as,
quote, thereby eliminating inadvertent adjustments of an
optical setting by accidental physical contact, end quote.

By virtue of being locked in this sense, quote,
optical or power settings made by a user are reliably
maintained, regardless of the environmental conditions or
whether the adjustment knob is accidentally touched, end
quote.

So that's from the '429 patent specification, column
4, lines 11 to 17; the same citation for the '736 patent
specification, which is the same; and then the '120 patent
specification at column 4, lines 21 to 29.

And this is why the concept of "normal use" is
important in the context of these particular Windauer
patents-in-suit.  Users in the field do not apply
extraordinary force using a torque wrench to their riflescopes
when they're using them in the field.  They don't use tools to
loosen them up or overcome the mechanical restraints, as
Nightforce's expert, Mr. DuFaux, has done.

In normal use, using a finger grip, which is what
these knobs use in order to be actuated, not using a hand
grip, as Mr. DuFaux described in his expert report, every
Nightforce accused product locks.

1            Let me grab one of these scopes as an example.

2            So during the parties' submissions, there was some

3      dispute about the proper grip to be applied by a user in

4      normal use.  Mr. DuFaux, Nightforce's expert, described in his

5      expert report applying a hand grip, basically as you would on

6      a faucet.  But clearly with respect to a riflescope, the user

7      in the field -- a shooter -- uses a thumb and an index finger

8      to actuate the knob, to effect the rotation.  He's not taking

9      his eye off the target in order to apply a more fulsome

10     aggressive grip.

11            And that's an important distinction, again, because

12     the patent specification talks about what "locked" means and

13     what the limits of "locked" should be, to prevent inadvertent

14     accidental touching or bumping.

15            For that reason, the side dispute about whether

16     Nightforce's BEAST knobs do or don't lock in an absolute

17     sense, under extraordinary force, is not the correct legal

18     issue.  The correct legal issue is whether in normal use

19     Nightforce's accused products satisfy the Windauer patent

20     specification's definition of "locked."  Under that proper

21     legal lens, each of the accused products satisfies the

22     "locked" or "locking" claim elements.  Nightforce admits

23     itself, under oath, the same.

24            And that brings me to the second point about the

25     Windauer patents:  Nightforce's own admissions.

 1          The undisputed fact that the accused products'

 2   adjustment knobs lock is confirmed in four separate ways, four

 3   different forms of evidence:  one, by Nightforce's 30(b)(6)

 4   deposition witness under oath -- that's Mr. Sean Murphy; two,

 5   Nightforce's Rule 30(a) admissions by its owner, Dr. Ray

 6   Dennis; three, Nightforce's own user manuals and marketing

 7   materials; and, four, Nightforce's correspondence with its

 8   business partners.

 9          I've put up on the ELMO here an excerpt from the

10   deposition of Mr. Murphy, docket 117, Exhibit 92, page 27,

11   line 23, to page 28, line 9.

12          During the deposition, Mr. Murphy was asked the

13   following questions and he gave the following answers.

14          "Question:  So of these various Nightforce scopes,

15   which one of these have an option for a locking turret knob?"

16          There was an objection.

17          And the witness asked, "Locking in what way?"

18          "Question:  In the sense of having some sort of

19   mechanism that prevents inadvertent rotation without it

20   unlocking."

21          Another objection.

22          The question:  "Do you understand the question?"

23          "Answer:  Yes.  The BEAST model, as well as the ATACR

24   4-16 x 42 F1."

25          So this is one instance of Nightforce's 30(b)(6)

1    corporate representative answering a question about which of

2    these scopes lock, and those are the examples he gave.

3            Consistent with that testimony, Dr. Dennis,

4    Nightforce's owner and Rule 30(a) deponent, was asked -- this

5    is at docket 92, Exhibit 17, page 203, lines 7 to 12:

6            "Question:  The second bullet point under that

7    says -- describes as a feature of the scope the unique i4F,

8    intelligent four function elevation control.  Do you know what

9    the four functions of the i4F turret are?"

10           So by way of reference to our exemplar here, the i4F

11   turret here is this four-function turret on the top of the

12   BEAST scope (indicating).

13           "Answer:  The fine tune adjustment, the coarse tune

14   adjustment, the locking system, and the ZeroStop."

15           This testimony is consistent with the 30(b)(6)

16   testimony of Mr. Murphy that, in fact, the BEAST i4F turret

17   knob has a locking function.  In fact, that's one of the four

18   functions of the i4F.

19           We've reproduced here an excerpt from docket 92,

20   Exhibit 32, at page 4.  This is a snippet from Nightforce's

21   BEAST owner's manual describing the 360 brake control, the

22   knob on the top of the BEAST.

23           Interestingly, and hearkening back to the Windauer

24   patent specifications, the definition of "locked" in the

25   patents as a means to preserve -- to prevent a knob from

1    losing its setting by inadvertent bumping, that's exactly what

2    the BEAST owner's manual calls out the i4F knob is doing.

3            "The 360 brake control prevents accidental or

4    unintended adjustment to the XtremeSpeed elevation

5    adjustment."

6            Later on in that same passage, it talks about

7    preventing the XtremeSpeed elevation adjustment from moving.

8            The manual doesn't talk about applying extraordinary

9    force using a torque wrench.  It doesn't talk about applying

10   force using a hand grip.  The assumption in the owner's

11   manual, of course, is that users of the device are interested

12   in normal use, and that's exactly what this is talking about.

13           Likewise, Nightforce's *Markman* materials also track

14   the definition of "locked" as described in the three Windauer

15   patent specifications.

16           The discussions I'm pointing out here on the ELMO is

17   the "ZeroHold windage limiter prevents unintended adjustment

18   to the windage dial," and below that, the "i4F360 brake

19   prevents accidental adjustment of the XtremeSpeed elevation."

20           Again, going back to the concept of normal use, the

21   lock, for purposes of this invention and for purposes of these

22   accused products, is necessary to secure the adjustment of the

23   knobs against bumping.  When a sniper is in the field, trying

24   to zero in on a target, what they're concerned about is that

25   something in the environment or their movement may touch the

knob, as in the prior art, and cause that sniper to lose his
or her setting; and that's specifically the context with which
Nightforce marketed its BEAST products.

In this case the evidence shows not just infringement
of the three Windauer locking turret knob patents, but
actually willful infringement.  I've placed on the ELMO an
excerpt from docket 92-4, ECF, page 43.

In 2013 -- this is an e-mail from Kyle Brown at
Nightforce to Richard Mann and Sean Murphy.  Richard Mann was
a publisher that was helping Nightforce write an article to be
published in the NRA journal.

Nightforce appears to have realized in this time
frame that it had an infringement problem with the Windauer
patents.  This is back in 2013.  What it instructed Mr. Mann,
one of its advertisers -- he's from the company Empty Cases,
presumably referring to bullet shell casings.  Nightforce
instructed Mr. Mann to change the text in an article for
publication by the NRA to describe the BEAST locking turret
knobs as having a brake, quote, unquote, not a lock, due to
infringement of Leupold's patents.

So with reference to the ELMO exhibit, in the
highlighted portion, Mr. Brown, who was the director of sales
and marketing at Nightforce at the time, advises Mr. Mann,
"Please see the attached and slightly corrected article.  I
changed your references to the terms 'lock or locking' to

1    brake.  The reason behind this is patent infringement on the

2    Leupold locking elevation system.  Hence, we reference our

3    elevation brake system as a brake.  I hope this makes sense."

4         Further down in the area I've marked with the blue

5    box, Mr. Brown says, "Thanks, Richard.  I was very impressed

6    that you 'got it' and was able to relay what it is that you

7    got.  Not many people can put said benefits and features into

8    copy to where others can 'get it' too."

9         This e-mail and the attachment are describing

10   Nightforce's own assessment of its product, the BEAST

11   riflescope with a locking turret knob, and advising their

12   publisher to recharacterize one of the features, the locking

13   turret knob feature, not as a lock, but as a brake.  Why?

14   Because of the patent infringement problem with Leupold.

15        Now, it's interesting.  If we turn to the

16   attachment -- this is on ECF, page 55 of 98.  The article,

17   even as edited according to Nightforce's suggestions, still

18   refers to "locking turrets."  I've highlighted one instance

19   here.  And on ECF page 56, I've highlighted multiple

20   instances, where even after the editing -- and we can see

21   where the text was changed to describe the BEAST as having a

22   brake control rather than a lock.  But when describing what

23   the brake does, it still talks about it in terms of it being a

24   lock.

25        This is from Nightforce's own words.  Based on this

1    evidence, there can be no question, there's no genuine issue

2    of material fact in dispute that Nightforce's adjustment knobs

3    are locking turret knobs; and, accordingly, summary judgment

4    of infringement should be granted in favor of Leupold on that

5    basis.

6            The third main point I'd like to make with respect to

7    the Windauer patents is this issue of "funny business."

8    Leupold and its technical expert have tried to duplicate

9    Nightforce's findings and have not been able to do so without

10   breaking the locking turret knob mechanism of the BEAST, using

11   an extraordinary amount of force, way beyond what a human

12   hand, much less a finger grip, could apply in normal use.

13           On its own and through its technical expert, Leupold

14   tested three Nightforce BEAST scopes that were purchased brand

15   new, in the box, from the market, as a customer would find

16   them.  None of them would rotate in the locked position using

17   hand strength, even if someone were to really crank on those

18   adjustment knobs.  And these findings are described in the

19   expert declaration of Mr. Byron, docket 129, paragraphs 8

20   through 10, from October 26, 2018.

21           In its summary judgment briefing, Nightforce included

22   drawings to suggest that it would be easy to rotate the BEAST

23   i4F adjustment knob when in a locked position.  Here's an

24   example (indicating).

25           Nightforce's suggestion is that the riflescopes, even

if subjected to normal force, but certainly extraordinary
force, as described by Mr. DuFaux, their expert, that this
locking mechanism could be overcome because the only thing
preventing rotation are these ridged corners, the brake
detents.  The suggestion appears to be that somehow over time,
that this locking mechanism can be loosened up.

Notably, though, Nightforce doesn't cite a single
document or user manual that actually says that, that actually
talks about loosening or that talks about the range of the
lock not really being locked, that it can actually still move.
And certainly Nightforce never instructed its users that that
would be the normal way to use such locking turret knobs.

Why?  Well, clearly users wouldn't like a locking
turret knob that didn't actually lock.  The whole point of
having that type of feature is to prevent an inadvertent
change in a setting through use in the field.

That technical theory and the legal argument appeared
for the first time, for purposes of non-infringement, after
the *Markman* hearing, after the *Markman* briefing, in the
summary judgment papers.

So to address that, Leupold has purchased, tested,
and brought today a sample BEAST riflescope to put
Nightforce's theory to the test, and that's what we have
before the bench right here.  Unlike the two Nightforce BEAST
scopes that its expert, Mr. DuFaux, tested, the scopes that

1   Leupold acquired were pristine, in the box, purchased on the

2   market, just as a customer would get them, all from authorized

3   Nightforce dealers, in their original packaging.

4          One of them has been broken by Leupold's expert,

5   Mr. Byron, as described in his declaration, docket 129,

6   paragraphs 18 to 24, as he was trying to replicate

7   Nightforce's assertions and the assertions of Mr. DuFaux about

8   how even when in the locked position, they would still rotate,

9   and he was not able to replicate those findings.

10          Looking at the sample that's been brought to court

11  today, when the i4F knob is in the locked position -- so, in

12  other words, when this mechanism is rotated, it pops up, and

13  there's a red indicator underneath to show that it's

14  locked -- using finger grips or even really trying to crank on

15  it, this thing won't turn.

16          So I offer this sample to the Court for inspection,

17  but it's apparent there's no way this adjustment knob setting

18  can be changed, certainly not if inadvertently bumped or

19  rotated in the environment that a sniper would use it, but

20  even using tremendous amounts of strength.

21          So, if Your Honor would like -- I can have this

22  available if Your Honor would like to play with it yourself.

23          THE COURT:  Okay.  Thank you.

24          MR. PARK:  The fourth and final point on the three

25  Windauer patents I'd like to make goes to the declaration of

1   Mr. Byron, which was necessitated by this technological

2   inconsistency between the BEAST scopes that Leupold tested

3   after purchasing them on the market and the scopes that

4   Nightforce's expert, Mr. DuFaux, tested, that appeared to turn

5   even when the locks was engaged.

6            In its summary judgment reply, docket 142, Nightforce

7   argues that Mr. Byron's declaration submitted in opposition,

8   at docket 129, to Nightforce's motion for partial summary

9   judgment should not be considered at all.

10           Nightforce's position is unsettling.  Let's think

11   about this.  Leupold called out Nightforce for providing not

12   new, not original-condition scopes to its expert for testing,

13   scopes that were not in in-the-box condition with locking

14   turret knobs that accurately reflected the conditions

15   experienced by customers in real life under normal use.

16           What was Nightforce's reaction to Leupold's questions

17   about that alleged "funny business"?  Did Nightforce deny it

18   or try to explain it?  No.  Nightforce just criticized Leupold

19   for not catching it sooner and says it's too late, it

20   shouldn't be considered.

21           That misses the point.  But regardless, the Byron

22   declaration was timely.  It was offered 29 days after Leupold

23   uncovered the relevant facts during the deposition of

24   Mr. DuFaux, Nightforce's expert in Buffalo, New York.

25           In its briefing, Nightforce alleges that between

September 11 and October 4, 2018, quote, 24 days passed with
no relevant action by Leupold, end quote.  That's from docket
142 at page 2 or ECF page 7.

Nightforce apparently lost track of the timing,
because something in fact highly relevant occurred during that
window of time.  That's precisely the window in which Leupold
deposed Mr. DuFaux in Buffalo, on September 27, 2018.  And
during that September 27 deposition, Mr. DuFaux revealed for
the first time that he received the sample BEAST riflescopes
that he tested without any of the original packaging, without
any indication that the scopes were new, in unopened, pristine
condition, as would be found by users in the market.  Quite to
the contrary, Mr. DuFaux could not say either way whether the
riflescopes were new or old.

Should Leupold have simply assumed, when it received
Mr. DuFaux's September 10 expert report, that the riflescopes
Nightforce sent to him had been loosened up somehow or broken
or tampered with?  Was Leupold wrong to assume the integrity
of the scopes that Nightforce sent to its expert for testing?
Was Leupold misguided to give Nightforce the benefit of the
doubt that the sample scopes were in the same condition a
customer would receive in the market?

Well, Leupold didn't presume any of those things.
Leupold didn't presume that there had been any irregularities
or "funny business."  And not until Mr. DuFaux's deposition on

September 27 of 2018 did Leupold realize that the riflescopes
sent to and tested by Nightforce's expert may not have been
new and in factory condition at all.  There's no evidence in
the record to support that.  And Mr. DuFaux, when he was asked
about it, didn't have any information about that.

So then 29 days later, on October 26th, 2018,
Leupold's technical expert, Mr. Byron, submitted his findings
via supplemental declaration in opposition to Nightforce's
motion for summary judgment, where he called out this issue
that was discovered during the deposition and concluded that
those scopes that Mr. DuFaux tested could not have been in
new, original, pristine condition.

The Byron declaration is proper and timely.  It
corroborates the other independent legal reasons showing that
there is infringement, and it's consistent with Nightforce's
own factual admissions illustrating why Nightforce's "locked
does not actually mean locked" defense is wrong.

Accordingly, summary judgment should be entered on
each of the three Windauer patents.

I'd like to shift gears now to talk about the '408
patent, the pinch-to-turn patent.  So when we talk about the
pinch-to-turn, we're talking about this other adjustment knob
on the side (indicating).  As the Court, I think, can see,
there's a red button in this position on the knob.

THE COURT:  You have a lot more faith in my vision

1    than --

2            MR. PARK:  Let me see if I can put it up here on the

3    ELMO.

4            THE COURT:  I see it now.

5            MR. PARK:  This knob right here (indicating).

6            And so the concept of the '408 pinch-to-turn patent

7    is that when a pinching movement is applied using a force in

8    this direction (indicating), the locking mechanism disengages

9    and the knob can rotate.  And then when the pinching is

10   removed, the knob locks in a certain position.  So this is the

11   pinching force that we're talking about.

12           We also have a couple of exemplar Leupold & Stevens

13   scopes that apply the same type of pinching force.  In one

14   embodiment there are two buttons, one that engages the thumb

15   and one that engages the index finger; and in another

16   embodiment, there's just one, as with the BEAST riflescope.

17           Nightforce's non-infringement defense on the '408

18   patent is focused on the claim term, quote, mechanically

19   driving, end quote.  Nightforce's position seems to be that

20   there can be no button mechanically driving the locking

21   mechanism because in the accused products Nightforce has fused

22   two separate pieces, the button and the lock mechanism, into

23   one integrated structure.  And that's true in the ZeroHold

24   knobs used in the BEAST riflescopes and the ATACR riflescopes.

25           So, in other words, if there is a button mechanism

1   and there is a locking mechanism, which could be a pin, if

2   they're fused together, Nightforce's argument is that there

3   can be no "mechanically driving" when the button is pushed

4   because these two items are one, they're joined, they're an

5   integrated structure.

6          Nightforce's position on this issue, though,

7   misunderstands the law of claim construction.  It's a legal

8   issue.  As a starting point we have the law of this case.  In

9   the Court's *Markman* order, pages 25 to 29, the Court decided

10  that the term "locking mechanism" from the '408 patent was not

11  limited, quote, to a multi-component structure, end quote, as

12  Nightforce had urged during the *Markman* phase of the case.

13  And, instead, the Court held that the term "locking mechanism"

14  refers broadly to, quote, a mechanism for securing a structure

15  in place, end quote.  And that's at docket 69, page 26.

16         The Court went on and also determined that the term

17  "button" from the '408 patent is controlled by its plain

18  ordinary meaning and did not require a claim construction that

19  the button must be separate from the locking mechanism or

20  otherwise limited based on the button's interactivity with

21  other components.  That's the Court's *Markman* order, docket

22  69, at pages 28 to 29.

23         There is also the law of the Federal Circuit.  More

24  broadly, this Court's prior rulings are consistent with that

25  law, which has clearly and consistently held that just as one

claim term can be satisfied by two structures, two claim terms

can be satisfied by one unitary structure.  And the Federal

Circuit has described this concept in any number of different

contexts, including those involving two separate claim terms

that are described as interacting with each other in some form

or fashion or being connected to each other or communicating

each other or influencing some sort of effect, one on the

other.

As a starting point, the Federal Circuit has said the

use of different claim terms, quote, connotes different

meanings, end quote, not necessarily different structures or

distinct structures.  And that's the case unless the

specification specifically requires or explains otherwise.

That's the *Applied Medical v. U.S. Surgical* case,

448 F.3d 1324, page 1333, note 3.  In that case the Federal

Circuit vacated and remanded summary judgment of

non-infringement.

The law is also clear that one claim element can be

satisfied by two or multiple structures.  For example, there

is the *CCS Fitness, Incorporated v. Brunswick Corporation*

case, 288 F.3d 1359, pages 1367 to 1369, Federal Circuit,

2002.

In that case the Federal Circuit reversed the

District Court's narrow construction of the term

"reciprocating member" because the District Court required a

single straight bar that was physically separated from any
other structure.  The Federal Circuit held that the ordinary
meaning was broad enough to include multi-component structures
as used in the accused products in that case.

        The Federal Circuit held that the drawings of one
embodiment of the invention did not limit the broader meaning
of the claim language for the specification did not uniquely
define or disclaim the scope of the claim language or it
didn't distinguish the prior art on that basis or didn't
describe that a single-component configuration was a key
feature of the actual invention.  For that reason, the Federal
Circuit reversed summary judgment of non-infringement.

        As particularly relevant here, the Federal Circuit
also holds that two claim elements can be satisfied by one
combined structure.  And this hearkens back to Nightforce's
defense that if you have a button that's fused to a locking
mechanism, that this can't satisfy two different claim
elements.

        There is the *In re Papst Digital Camera* case,
778 F.3d 1255, pages 1262 to 2764, Federal Circuit, 2015.  In
that case the Federal Circuit held that the proper
constructions of the terms "interface device" and "data
transmit/receive device," did not require separate and
distinct structures.  The Federal Circuit vacated and remanded
the District Court's summary judgment of non-infringement on

1    that basis.

2           There's also the *Powell v. Home Depot* case,

3    663 F.3d 1221, at pages 1231 to 1232, Federal Circuit, 2011.

4    In that case the Federal Circuit rejected an argument, like

5    Nightforce's here, that a claim reciting a cutting box in

6    fluid communication with a dust collection structure required

7    that these two structures be physically separate and distinct,

8    even though they were listed as separate elements in the

9    patent claims.

10          There the accused product included a structure that

11   functioned both as a cutting box and also as a dust collection

12   structure; and the Federal Circuit reasoned that the broad

13   claim language describing two structures in fluid

14   communication with each other did not require wholly separate

15   structures, since the specification didn't require it.

16          And, finally, there is the *Rexnord v. Laitram* case,

17   274 F.3d 1336, pages 1343 to 1345, Federal Circuit, 2001.  In

18   that case the Federal Circuit held that the proper

19   construction of "link module portion" and "cantilevered

20   portion" did not require separate structures, even though they

21   were listed as separate elements in the patent claims.  For

22   that reason, the Federal Circuit reversed and remanded the

23   District Court's summary judgment of non-infringement.

24          So that's the backdrop.  That is basically the

25   context legally in which to assess Nightforce's defense on

this issue.  The law holds that two distinct claim elements can be satisfied by different parts of the same structure. Here the '408 patent specification is general and does not make any contrary limitations or disclaimers, and so the full scope of the plain meaning should be followed.

For the '408 patent in this case, there is a button mechanically driving a locking mechanism; and it doesn't require two separate and distinct structures that aren't fused together.

So how would that look to one of ordinary skill in the art?  I've brought a couple examples from everyday usage, where we have here a cabinet lock for child safety.  It's one unitary structure, but there's a button, this striated portion here with the ridges, that mechanically drives the locking mechanism, which is a different part of the same unitary structure, that has the hook, the latch that engages the other portion of the locking mechanism.

Here's another ubiquitous example known to one of ordinary skill in the art, a snap buckle lock, used for luggage or backpacks, pet collars, and that sort of thing: one unitary structure, a button, mechanically driving the locking mechanism, which then fits into or releases the other half of the buckle.

Likewise, Nightforce's ZeroHold knobs have a button mechanically driving the locking mechanism in the ATACR and

1    BEAST riflescopes.  The fact that Nightforce and its engineers

2    may have taken the button and fused it to the pin or the other

3    various iterations of the locking mechanism doesn't prevent

4    there from being infringement, exactly for the reasons we've

5    just gone through with respect to the case law.

6            Accordingly, summary judgment in favor of Leupold is

7    appropriate on the '408 pinch-to-turn patent as well.

8            Shifting gears once more now, I'd like to talk about

9    the '068 patent, the ZeroLock patent.

10           THE COURT:  Before you leave that one, is the bottom

11   line on your argument that you were just making that

12   Nightforce's product is -- the pin and the lock are all the

13   same thing, that it drives and it's one; and then with

14   Leupold, it's two different pieces?

15           MR. PARK:  Yes.

16           THE COURT:  I guess your argument is it doesn't

17   matter.  But I just want to make sure I understand the way the

18   mechanism itself works as between the two products.

19           MR. PARK:  That's right, Your Honor.

20           THE COURT:  Okay.  Thank you.

21           Go ahead and move on.

22           MR. PARK:  With respect to the '068 patent, the issue

23   of infringement turns on the definition of "slide surface,"

24   specifically whether a slide surface which extends around, in

25   the sense of encircling on all sides of a rotational axis,

1    must have sliding at all 360 degree positions or only some

2    positions.

3         Leupold understands the term "slide surface" to be a

4    surface of a slide component, but not that every portion of

5    that surface must experience sliding.  This comports with the

6    plain ordinary meaning of the words in everyday common sense

7    experience.

8         So what would that look like to one of ordinary skill

9    in the art?  Here are some examples.  This is the interior of

10   a water slide tube.  The slide surface is one unitary

11   structure extending 360 degrees around a rotational axis, but

12   there is not sliding on every part of the circumference.

13        Here is another common example from everyday

14   experience that would be commonly understood by one of

15   ordinary skill in the art, a curtain rod.  The slide surface

16   is one unitary structure, extending 360 degrees around a

17   rotational axis.  But, again, there is not sliding on every

18   part of the circumference.

19        During the deposition in Buffalo of Nightforce's

20   technical expert, Mr. DuFaux, this issue came up, and

21   Mr. DuFaux was asked about it.  This is at docket 117,

22   Exhibit 79, page 2.  It's an excerpt from Mr. DuFaux's

23   deposition transcript at page 168.

24        "Question:  Does there have to be sliding on every

25   part of a slide surface?

1               "Answer:  I don't think so.

2               "Question:  What about --

3               "Answer:  Well, clearly not.  Again, my ice skating

4     example:  You have a skater on one half.  The whole thing is

5     still a slide surface.

6               "Question:  Does it have to have the same coefficient

7     of friction across the whole slide surface?

8               "Answer:  No, I don't think so."

9               That excerpt is not exactly in line with the examples

10    that I've provided, but it goes to this understanding of what

11    an engineer would understand "slide surface" to be and whether

12    a slide surface is only a slide surface if there's the same

13    amount of sliding on every portion of it.

14              Likewise, in this case the guideway rings of

15    Nightforce's locking turret knob slide surfaces -- and here

16    are two examples -- are one unitary structure extending 360

17    degrees around a rotational axis, but there is not sliding on

18    every part of the circumference.  Under the proper

19    construction of that term, "slide surface," there is still

20    infringement.

21              Accordingly, that claim element, the only contested

22    claim element of the '068 patent, is satisfied; and, likewise,

23    summary judgment of literal infringement in favor of Leupold

24    is appropriate.

25              With that, Your Honor, if the Court has no further

1    questions, I think I'll yield the microphone to my colleague,

2    Mr. Williams, to address the validity issues.

3              THE COURT:  Okay.  I know that from your perspective,

4    it's easier for you to kind of take these all up and then talk

5    about validity now, but my brain works better in smaller

6    chunks, and it might be easier for me if I can hear their

7    response to the issues that you've already raised now and then

8    switch back to the validity issues.

9              MR. PARK:  That makes sense.

10             MR. CASIMIR:  Okay.  Just a second, while we find the

11   right --

12             THE COURT:  Sure.  I know I messed you up a little

13   bit.

14             (There is a brief pause in the proceedings.)

15             MR. CASIMIR:  All right.  I'm going to split these

16   into slightly different units, just because one of these

17   issues was raised affirmatively on a non-infringement motion

18   by Nightforce, so I'll address that first.

19             The other issues Nightforce has not moved on, so

20   we're just defending against the summary judgment ruling of

21   infringement on the remaining claims.

22             THE COURT:  Okay.

23             MR. CASIMIR:  And, Scott, can you grab the two

24   scopes?  We might need to look at those.

25             All right.  So the one issue that Nightforce moved

for summary judgment of non-infringement on relates to the
BEAST scope that we heard about earlier.  And, in
particular -- and it's important to note the BEAST scope has
two different knobs that have been accused of infringement
that have two different mechanisms.

So here we are going to be talking about the one on
the top, where the issue had arisen about braking -- not
breaking as in broken, but braking as in a car stopping --
versus locking.  And that's the elevation turret on the BEAST
scope.

And I'll actually grab a sample scope here, in case
we need to talk about it.

THE COURT:  Is that the same scope that's on the
table right there next to you?

MR. CASIMIR:  It's the same model, BEAST scope.

This is one of the two scopes that Nightforce's
expert, DuFaux, used and tested in his testimony, that Leupold
indicated there was some "funny business" -- and we'll talk
about that -- and indicated that this was broken.  But as
you'll see, it's working exactly as intended.

THE COURT:  Okay.

MR. CASIMIR:  All right.  So in Leupold's opening
arguments, they sidestepped the legal issue.  Mr. Park had
indicated -- or opened his argument with a legal argument,
which was a claim construction argument, and he talked about

1    the construction of the phrase "locking mechanism."

2           What he did not talk about is that during the claim

3    construction order this Court construed the phrase

4    "selectively movable," which is described in the context of a

5    substantially wordy claim with a lot of details about what the

6    locking mechanism is and what it does.

7           And citing here on this first slide, we have a

8    construction of "selectively movable" that says, "The second

9    portion is movable by a user between a first position where it

10   is unable to be rotated about the axis of rotation relative to

11   the firearm sighting device, and a second position where it is

12   able to be rotated about the axis of rotation relative to the

13   firearm sighting device."

14          And during the claim construction oral arguments we

15   had a lot of discussion about whether there was any give

16   allowable in the locking.  And the conclusion that ended up in

17   the discussion and then ultimately in the order is that in the

18   context of the locking mechanism, with the phrase "selectively

19   movable," the claims require that in the locked position, the

20   knob be unable to be rotated.

21          The key issue here is the accused knob in the BEAST

22   scopes is able to be rotated, and we'll look at the underlying

23   mechanism and why that's the case.

24          So, first, looking at Leupold's basic argument, they

25   argue that the Court should not limit the claims to turrets

1   that are impossible to turn when attacked with intentional and
2   forcible rotation.  This is language from their argument.

3          What they're ignoring in all of their arguments in
4   their briefing and in the oral arguments today, though, is the
5   claim construction that we have in this case, where we have a
6   requirement that these knobs be unable to be rotated.  There's
7   no limitation put on the amount of force required to rotate.

8          And, in fact, it really gets to a central issue.
9   And, in a sense, there's no disagreement between the parties
10  on this central issue.  And that issue is:  What is the
11  difference between a lock and a brake?  And by "brake," it's
12  b-r-a-k-e, because we're hearing the word "break," as in
13  broken, as well.  So I'll do my best to try to keep the record
14  clear on which word I'm using.

15         Both experts, both Leupold's expert and Nightforce's
16  expert who have opined on this issue, appear to be in
17  agreement on the concept of what differentiates a lock from a
18  brake.  A lock is a mechanism that if sufficient force is
19  applied to overcome it, something is broken.  The lock
20  is -- is damaged, destroyed.  It's no longer functional.

21         That differentiates from a brake, b-r-a-k-e, where
22  applying a sufficient amount of force causes movement, but the
23  mechanism retains its ability to brake, b-r-a-k-e again.

24         And that goes directly to the claim construction
25  issue in this case about whether the accused knob is able to

1    be rotated or unable to be rotated.  The Nightforce mechanism

2    is designed to be a brake, b-r-a-k-e, in that the

3    force -- sometimes a substantial amount of force is needed,

4    and we'll show that in a second here -- can be overcome and

5    the mechanism is not broken.

6            And I'm going to illustrate that with the model here.

7    So I currently have this in the unbraked position, where the

8    knob is designed to turn fairly freely, and a simple finger

9    grip is sufficient to turn it.  If you can hear the

10   clicking -- I'm not sure if the sound -- if it's making noise.

11           When we engage the knob into the braked position -- I

12   always forget it's a push down and turn, if you're going to

13   play with the scopes yourself.  You can now see the red band,

14   so it's in the braked position.  A finger pinch, unless you

15   have extremely strong hands, will no longer turn this.

16           The brake is designed to prevent inadvertent turning

17   but to allow turning if the user wants it.  If they ultimately

18   want to turn it in that position, it can be turned with more

19   of a grip with the hand.

20           So in the -- and if Your Honor plays with this -- and

21   we've got the quantitative numbers that show this -- there is

22   a substantial difference between the two settings.  One is

23   very easy to turn.  I would say some people may be unable to

24   turn it in the other -- in the braked position.  It's fairly

25   stiff.  It does require a good bit of hand strength.

1          But this scope which we've talked about here and I've

2     just shown I can turn in both positions, is not broken.  This

3     has been turned many times.  In Mr. DuFaux's deposition, which

4     is Nightforce's expert, he turned it many times on camera.  It

5     works.  And continuously when you put it to the unbraked

6     position, it's relatively loose; and in the braked position,

7     it's very, very stiff and hard to turn.  It is not broken.

8     It's working exactly as intended.  It's being braked,

9     b-r-a-k-e-d.

10          And on the slide run, I will compare that to one of

11    the designs in the Windauer patent.  Showing here is

12    Figure 6A.  This is one of the mechanisms in the patent.  The

13    wedge pin, No. 509, interacts with grooves, 511, in a locked

14    position.

15          The way this mechanism works is there's this central

16    circle, 602, which is effectively a screw that you would

17    loosen and tighten from above.  And it's got a little cam

18    opening, 603, so that if you turn that -- in this case,

19    clockwise -- the pin will retract into that groove and the tip

20    of the pin will leave the groove, 511, and move to an unlocked

21    position.

22          Just for a note, the piece on the other side which

23    has a spring associated with it is meant to cause the clicking

24    mechanism you hear when you turn the knob.  Because it has a

25    spring, it's able to move as it goes around the circle.

1           But that pin, when it's in the locked position, when

2      the groove is not actuated, if one was to turn that until it

3      moved, that pin would break and you would no longer have a

4      locking mechanism.  You could no longer relock that.  It would

5      no longer work, differentiated from a brake.

6           So let's talk about the evidence.  And, again, with

7      respect to whether the mechanism can be turned, we actually

8      have agreement between the experts.  So both parties' experts

9      agree that this mechanism will turn.

10          So Leupold's expert -- there was a mention that three

11     scopes were tested.  He evaluated three scopes.  Two he

12     evaluated with hand strength, probably all three.  But only

13     the third one did he turn to the point where it did turn.  So

14     we only have one example where he tested it to determine what

15     force it would take to turn it.  He was able to turn it by

16     applying 35.25 newton meters of force to it, and it did turn.

17          Nightforce's expert, DuFaux, tested two scopes.  One

18     of the two is sitting here today.  And he tested it in both

19     the braked position and the unbraked position.  In the

20     unbraked position, it required 0.5 Nm to turn, so relatively

21     loose; and that's the strength where you can turn it with

22     finger motion.  And in the braked position, it varied between

23     2.1 and 4.6 Nm force required to turn it, so substantially

24     more.

25          THE COURT:  I'm sorry.  2.1 to what?

1              MR. CASIMIR:  To 4.6.

2              THE COURT:  How does that translate to foot-pounds or

3     what I would use on a -- I'm a torque wrench guy.

4              MR. CASIMIR:  I would have to use a calculator to do

5     the cheap calculation on the conversion.  But one of the two

6     scopes he tested is the one I had here, and the .5 is the

7     difference between a light finger touch versus a more

8     significant hand grip.

9              THE COURT:  But it is something that is able to be

10    done with the human hand, normal strength?

11             MR. CASIMIR:  In the the 2.1 to 4.6 range, yes.

12             The 35 range from the data from Leupold's expert

13    would go beyond hand strength.  You would probably need a tool

14    to turn it, if that number is accurate.

15             THE COURT:  So why isn't there a factual dispute in

16    front of the Court?

17             MR. CASIMIR:  Well, so there is at least a factual

18    dispute on their issue of their motion for infringement.  I

19    don't think there's a factual dispute from the issue of our

20    motion for non-infringement in that there is nothing in the

21    claims that require hand strength to turn it.

22             The issue is:  Is it locked, unable to be moved, or

23    not?  And with a braking mechanism --

24             THE COURT:  So from your perspective, if I have to

25    put a vice grip on that in order to turn it, that's still

1   okay?  That's part of normal operations?

2          MR. CASIMIR:  So one additional detail that came out

3   from Leupold's expert's testing is he indicated that after he

4   turned it that first time, it was then looser.  He did not

5   show us the numbers of how much looser it was.  He suggested

6   it was broken.  We'll talk about that, because he actually

7   presented zero evidence that it was broken.

8          He indicated that it behaved similar to the scopes

9   that Mr. DuFaux tested.  If that is the case, then it's

10  working as intended.  The first turn would have been harder.

11  The second and additional turns would not have been as hard.

12         THE COURT:  You have to kind of break it in.

13         MR. CASIMIR:  Essentially.

14         Think of it as like opening a jar.  The first turn is

15  a tough one.

16         THE COURT:  Okay.  Keep going.

17         MR. CASIMIR:  And so the point here being with the

18  claim construction, the claims require this issue of able to

19  be rotated or not able to be rotated.  Even their own expert's

20  evidence indicates they're able to be rotated.  There's no

21  limitation in the claim that it has to be done by hand

22  strength.

23         And this does tie to the mechanism.  We saw a version

24  of this picture earlier.  The mechanism in the Nightforce

25  device is spring opposed, which is to say it is inherently

1    designed to give when sufficient pressure is applied.  When

2    you overcome the strength of that spring, it's going to move,

3    and it's not going to break, b-r-e-a-k.  It's not going to

4    become broken.

5           The turning of that top knob that moves it from the

6    unindicated position to the red-line-indicated position is

7    moving that component back and forth.  So it's either engaging

8    the edge or not.  So in the unbraked position, there's no

9    contact with that outside edge.  In the braked position, it's

10   advanced forward and is now opposed by the spring force, so

11   you have to overcome the spring force to turn it.  So by its

12   very design, it is designed for that force to be overcome.

13          All right.  Let's talk about this issue of whether

14   it's broken when it's turned.

15          So Nightforce's expert demonstrated -- and it's in

16   his expert report, which is cited to in the briefing -- that

17   these knobs are not broken after they're turned.  We have the

18   quantitative numbers showing that it retains its stiffness in

19   the braked position and after many, many, many, many turns.

20          Leupold's expert speculates that the knobs are

21   broken.  And I don't -- well, I suspect I know why we didn't

22   see any evidence on that, because I assume it's not good.

23          So Leupold's expert found that the initial turn on

24   the one scope he tested did require some significant force to

25   rotate it.  And then he speculated in his late motion that the

 1  locking mechanism failed, but provided no evidence for that.

 2  We did not see any quantitative testing of what the turning

 3  was in the braked and unbraked position.  He did not discuss

 4  that there were any rattling pieces in there.  He did not

 5  discuss that he opened it up and saw anything broken.  We have

 6  no evidence whatsoever that it was broken in any way.

 7          All he said is that after that initial turn, it now

 8  turns easily, but failed to report any data associated with

 9  that or provide any pictures or other information.

10          Legally, his speculation about whether the mechanism

11  is broken or not, without evidence to support it, does not

12  create a genuine issue of fact.  Quoting here from the

13  *Novartis* case:  "Theoretical speculation lacking a basis in

14  the record will not create a genuine issue of fact,"

15  271 F.3d 1043, Fed Circuit, 2001.

16          Let me see if there are any questions on that before

17  I turn to the evidence they provided.

18          THE COURT:  No.  I'm good.  Thank you.

19          MR. CASIMIR:  All right.  I'm going to switch to the

20  ELMO, and let's look at their evidence.

21          Okay.  So first let me just clarify a couple points

22  that Mr. Park raised earlier today.  His first argument was a

23  legal argument, but he was using the wrong legal issue.  He

24  did not talk about the full claim construction in this case.

25          He also implied that Mr. DuFaux required a torque

1    wrench to turn the knob that you just saw me turn with my hand

2    in the braked position, implying that a torque wrench was used

3    to provide substantial force.  That's not correct.  Mr. DuFaux

4    used a torque wrench to measure the amount of force required.

5    He could turn it with hand strength, as Mr. Park, who took

6    that deposition, was aware because it was captured on video.

7        All right.  Let's talk about the facts.  So Mr. Park

8    introduced four items that he says are facts demonstrating

9    that Nightforce acknowledged this is a locking turret.  When

10   we look at them, they are actually not what he put forth.

11       So the first was the testimony of Sean Murphy, where

12   there was an indication that the BEAST and the ATACR scopes

13   have a locking feature.  There is nothing about that

14   questioning that indicated which knob he was talking about.

15   As you saw earlier, the BEAST scope has a knob on the side

16   with a push button that is a separate locking mechanism.  It

17   is a knob that locks.  So this evidence says nothing about the

18   top knob.

19       Further, Sean Murphy is not a patent attorney or a

20   technical person and is not aware of the claim construction in

21   this case.  So his view of what's locking or not locking has

22   no particular bearing on the issues of infringement here.  But

23   nonetheless, this quote is not on point because it is not

24   talking about the braking system of the BEAST knob.

25       Second, we have a quote from Mr. Dennis's deposition.

1    Mr. Dennis is the owner of Nightforce.  And he was asked about

2    the four functions of the i4F turret and then listed a number

3    of things.  Again, not a patent attorney, not familiar with

4    the claim construction, not on point relevant to this, but

5    nonetheless his answer shows that he did not understand the

6    question because he's talking about ZeroStop in his answer to

7    the four functions of the i4F.

8            The ZeroStop is the other locking knob on that

9    turret -- or, sorry, on the BEAST scope.  It is not the i4F

10   turret.  So he's not answering about the i4F turret.  He's

11   answering about the BEAST scope more generally.

12           Next we have the owner's manual, evidence item No. 3,

13   that talks about preventing accidental or unintended

14   adjustment.  Well, in fact, the braking system does just that.

15   That does not imply there is a lock.

16           Mr. Park was suggesting because there was language in

17   the specification about the intended purpose of the Windauer

18   device, that that's what the claims say.  They do not.  We

19   have specific terms in the claims that have been construed and

20   require the term -- or the concept that the knob be unable to

21   be turned.  Mr. Park would like to extend that to allow some

22   turning based on language in the specification, but that is

23   not the claims we have before us.

24           The same issue with the website.  Yes, it talks about

25   the brake preventing accidental adjustment.  It does.  In the

1   braked position, it's very stiff.  And if Your Honor plays

2   with the scope, you'll see it's stiff enough that no amount of

3   nudging will turn it in the braked position.

4           Next we have the e-mail from Kyle Brown, which has

5   been misinterpreted or mischaracterized, somehow implying that

6   Mr. Brown was telling the journalist who was going to publish

7   an article or the marketing group who was going to publish the

8   article that the term "lock" should be termed "brake" because

9   of patent infringement.  Again, Mr. Brown is not a patent

10  attorney.

11          This same point was raised to Mr. Dennis in his

12  deposition, and that language was not provided here, but

13  Mr. Dennis explained in his deposition the key point here,

14  which is Nightforce, at the time, was aware of the Windauer

15  patents and had designed this braking mechanism as a

16  design-around.  And what Mr. Brown is referring to here is the

17  fact that it's a braking mechanism, not a locking mechanism.

18  It was designed that way to avoid patent infringement, which

19  it does, and correcting the literature to show the same.

20          There is nothing in this statement suggesting in any

21  way that Nightforce believes that that turret is a patent

22  infringement.

23          All right.  Let's talk about the alleged "funny

24  business."  The alleged "funny business" was the idea that

25  somehow Mr. DuFaux was given scopes that were broken and were

1   not working and different than the ones fresh out of the box.

2           It is correct that he was given scopes that were not

3   fresh out of the box.  However, as we discussed earlier, they

4   are not broken.  They work exactly as intended.  And we have

5   one of them here.  The braking mechanism works just fine.

6           The last point Mr. Park made related to whether the

7   Byron declaration was late or not.  I think there's sufficient

8   discussion in the briefing on this point, but just to

9   highlight that, Leupold was aware of this issue well before

10  the DuFaux deposition.  They had deposed a 30(b)(6) witness,

11  Klaus Johnson, of Nightforce, months earlier than that, and

12  had understood and discussed the braking issue and how the

13  brake worked and that it was not considered a lock by

14  Nightforce.

15          Furthermore, Leupold moved expressly for summary

16  judgment of infringement on this issue, and their expert did

17  not put in this evidence in support of their motion.  They

18  were aware of this issue, admittedly, a month before that time

19  period or some number of weeks before that time period, but

20  they did not add this in their affirmative motion, which they

21  would have needed to demonstrate infringement, being aware of

22  the issue.  It did come in late.

23          Let me stop there and see if there are any questions

24  related to the non-infringement of the braking turret on the

25  BEAST scope.

1          THE COURT:  No questions.

2          MR. CASIMIR:  Okay.

3          So let me find our position in the slides for the

4   second topic.  And my colleague is going to handle the '068

5   patent, but for continuity, I'll do the '408 patent next.

6          THE COURT:  Why don't I let you get your stuff in

7   order.  I'm ready for a break.

8          MR. CASIMIR:  Okay.  That's perfect.

9          THE COURT:  Thank you.

10          (A recess is then taken.)

11          THE COURT:  Have a seat.

12          Go ahead.

13          MR. CASIMIR:  All right.  With the benefit of the

14   break, I was able to break out my calculator and do the

15   newton-meter-to-foot-pound conversion.  They're fairly

16   similar, actually.

17          So the 0.5 newton meter, which is the light touch,

18   converts to 0.37 foot-pounds.  And the stiffer braked range of

19   2.1 to 4.6 newton meters converts to 1.5 to 3.4 foot-pounds.

20          THE COURT:  Okay.  Thank you.

21          MR. CASIMIR:  All right.  So we're going to now --

22   this will be much quicker -- turn now to the second type of

23   locking -- accused locking knob, which is the one on the side

24   with the push button that we saw earlier.  This is referred to

25   as the ZeroHold turret.

 1          And I think there is sort of a global -- this gets to
 2     one of the global issues in the case, and we talked about it
 3     briefly in the last hearing.  But we have a situation where
 4     there are literally hundreds of issues raised in Leupold's
 5     motion, over 70 claims, over eight patents.  All have been
 6     moved for both validity and non-infringement.
 7          And one result of that, rather than being more
 8     selective about what to focus on, is there's very little
 9     development of those issues.  And that impacts the
10     infringement case on the ZeroHold.  And I'm just going to show
11     one example of that, although I think it's a theme across
12     almost all of their motions, especially on these locking
13     turret knobs, where there are many different patents and many
14     different claims, is they just haven't developed their case.
15          So the example here is, with respect to the ZeroHold,
16     there are three subparts, so three different types of
17     ZeroHold:  the SA344, the SA270, and the SA271, which refers
18     to different models with slightly different internal
19     components associated with them.
20          The SA344 is a mil spec scope, so it's sold
21     exclusively to the military.  Evidence for this, we can go
22     directly to Leupold's own materials.  I've put a table on the
23     right-hand side of this slide with Leupold's expert on
24     damages, Justin Lewis, who identifies the 344 containing
25     scopes as being mil spec.  The colors are highlighted there.

1        It's worth noting that the other two versions, the

2   SA270 and SA271, are also sold to the military, which you'll

3   also see in that table.  But my understanding is the SA344 is

4   exclusively sold to the military.

5        And as we talked about in the last hearing,

6   Nightforce has moved for the position that such scopes are not

7   part of this case because the ability to seek infringement

8   against them rests with suing the military organizations in

9   the Court of Claims.

10       And as we talked about in the last hearing, there was

11  some debate about different forms of military consent to

12  infringement and the impact that has.  There was no dispute

13  between the parties that if there is express consent and

14  agreement, those scopes are not part of the case.  There was a

15  debate about whether implied consent existed or not.

16       But just as an example, Leupold has failed in their

17  cursory briefing to identify a single scope containing an

18  SA344 that is not part of an express consent contract and

19  should be part of this case.

20       And, unfortunately, the record is not very well --

21  super well-developed on this, but if we look at the next

22  slide -- and this is, I think, a failure of the infringement

23  case -- SA344 scopes are part of express contracts.  I've

24  identified one here, which is the 52.227-1, which has the

25  authorization and consent statement.  The evidence for this is

1  cited in ECF 125-11, page 28.

2        Under that contract, over on the right, are two

3  particular scopes that contain SA344 turrets.  What makes this

4  complicated is that phrase doesn't appear on there.  The part

5  numbers are M583 and M584 for the particular types of scopes,

6  but I understand those to contain the SA344.

7        So we know that SA344 scopes are not part of this

8  case, per Leupold's own admission.  They failed to identify a

9  single one that is.  And this is a result and an example of

10  this sort of cursory attempt to show infringement without

11  developing a factual basis.

12        Any questions on the ZeroHold turrets?

13        THE COURT:  No.

14        MR. CASIMIR:  Okay.  If we can switch to the second

15  presentation on the '408.

16        We're going to switch to the pinch-to-turn patent,

17  the '408.  I always refer to it as the push button one.  So if

18  you hear me say that, when I mention "push button patent," it

19  will be the '408 patent.

20        And in the opening arguments, again, I think the

21  legal issue was dodged on this one.  We heard a discussion of

22  the Court's claim construction order on the term "button,"

23  that it was fairly open ended, and on the term "locking

24  mechanism," which was ultimately decided to not require that

25  the locking mechanism itself contain two or more parts.  A

1    locking mechanism, according to the order, could be a single

2    part.

3           But what was not discussed was the actual issue

4    before us, which is, again, another word and phrase in the

5    claim separate from "button" and separate from "locking

6    mechanism."  So all of the case law we heard, all of the

7    discussion we heard about whether those two pieces can be one

8    piece or not is mooted by the fact that we have this

9    additional phrase in the claim.

10          We have a requirement that the button mechanically

11   drive the locking mechanism so as to cause a series of

12   results, which are recited in detail in the claim,

13   specifically disengaging or engaging the locking mechanism.

14   There's a lot of terminology around that.  But there is a

15   requirement that a "mechanically driving" event occur.

16          That is not a phrase that was construed during the

17   claim construction hearing.  That was one of the terms that

18   was set aside for the parties to discuss amongst themselves

19   and agree on.

20          And -- sorry.  The first slide here is just showing

21   you a picture, if you want to see a closer-up version of the

22   push button on an ATACR scope, and then showing a simple

23   mechanism, which is just a pin-button combination.  It's a

24   single solid unit.  We saw that earlier today.

25          And let's get into the specifics.

1           So the two experts have opined on claim construction

2     of "locking mechanism," and there's not a disagreement on what

3     that term means, at least from what I can see.  Both experts

4     agree that -- I'm sorry, on "mechanically driving," that

5     "mechanically driving" requires a transfer of force from an

6     object to another object.

7           There is no mechanical transfer of force in the

8     ZeroHold accused product.  The pin, which is just a single

9     little metal dowel-shaped piece, and the button that have been

10    pointed to by Leupold as the button and the locking

11    mechanism -- here the locking mechanism is that simple little

12    metal pin that's part of the button -- are one piece.  There's

13    no transfer of mechanical force from the button to the pin, as

14    required by the claim, and as both experts in this case

15    acknowledge is a requirement of the phrase "mechanically

16    driving," a transfer of force.

17          So we have Nightforce's expert, Mr. DuFaux,

18    explaining in detail, which is cited in the briefing, why

19    there is no mechanical transfer of force.  And Leupold's

20    expert really doesn't go into any detail.  He just -- he goes

21    into no detail.  He just says that element is present, without

22    explaining what's transferring force to what else.  So we have

23    an understanding on the legal issue.  We have a dispute on the

24    factual issue.

25          And this particular issue, Nightforce has not moved

1  for summary judgment of non-infringement.  This is one of the

2  issues that simply is Leupold's motion for infringement.

3        And in this case we don't even necessarily have a

4  battle of the experts, because the experts agree on what it

5  means.  And we have one expert explaining why there is no

6  transfer of force, the other one staying silent on the issue.

7  But had Leupold's expert opined on that, then we would have a

8  dispute among the experts; and there's no basis for granting

9  summary judgment in that context.

10       Leupold's briefing on this attempts to recast this as

11 a claim construction dispute and does focus on "button" and

12 "locking mechanism" language.  But this is all about the

13 "mechanically driving" language.  And we don't have a legal

14 dispute on what that means, although I'm hearing a new one may

15 be emerging today.  We didn't have one coming into this

16 hearing.

17       There are also multiple other non-infringement issues

18 that were raised in the correspondence between the parties.

19 They're briefly addressed in the briefing, so you'll see some

20 additional non-infringement arguments.  We didn't hear about

21 them today in the opening.  I won't discuss them here as well.

22 But again, very, very poorly developed on multiple grounds,

23 not just the "mechanically driving."  There's no basis for

24 granting summary judgment of infringement.

25       With that, I will turn to my colleague to discuss the

1   '068 patent.

2            THE COURT:  Okay.

3            MR. CASIMIR:  Let me see if there are any questions

4   on the push button.

5            THE COURT:  I do not.

6            MR. CASIMIR:  Okay.

7            MR. DAVIS:  So, Your Honor, I will address today the

8   '068 patent to Crispin, and there are actually dueling

9   cross-motions on that patent.  Nightforce moved for

10  non-infringement; and Leupold, as you heard earlier from

11  Mr. Park, has moved for infringement of that patent.

12           And the parties' dispute at summary judgment does

13  come down to a relatively simple term called a "slide surface"

14  and how that is particularly claimed in the '068 patent, which

15  only has one independent claim.  So if the Court finds, as a

16  matter of law, or that no reasonable jury could conclude that

17  the slide surface, as claimed, is in the accused products,

18  then there is no infringement of the '068 patent.

19           So what is a slide surface?  It's a pretty -- a

20  relatively simple issue compared to some of the others we've

21  been dealing with in this case.  Quite simply, on this motion,

22  Nightforce's affirmative motion, there is no contact of a pin,

23  a tab, or anything else with any surface that encircles or is

24  on all sides of any rotational axis.

25           So earlier today, the focus in the argument was

1  whether there was some thing that goes all the way around the
2  rotational axis on the accused product, focusing on "slide
3  surface," but ignoring the second requirement of the claim,
4  that there is a guide tab that's biased against the slide
5  surface.
6        And, again, the claim construction order does require
7  that "around" in this context means "all sides of, encircle."
8  So it's got to go all the way around the rotational axis of
9  one of these turrets on the scopes.
10       So no accused product has, and Leupold has presented
11 no evidence of a slide surface that goes all the way around,
12 against which a guide tab could be biased, because quite
13 simply, what Leupold has pointed to is a portion of the part
14 that no guide tab or anything else can contact, because when
15 the scope is fully assembled, it is hidden away and unable to
16 be touched by a pin or a tab or anything rotating above it.
17       So we already saw the two parts at issue.  And then
18 in the briefing, not in expert reports or declarations, but
19 just in a brief, we saw a yellow ring appear on the inside of
20 this part for the first time that was added by Leupold's
21 attorneys.
22       So, first, that's not evidence.  The red arrows on
23 these parts were added by Mr. Byron, Leupold's expert, in his
24 report, but in no way did he indicate that a slide surface
25 extended all the way around on this part.  The yellow

1    annotation is just attorney argument, not evidence for summary

2    judgment.

3            So, effectively, Leupold is suggesting that any part

4    that has a slide surface anywhere on it and happens to be a

5    round part, has a slide surface, that it's good enough if

6    there's some portion that goes all the way around.

7            That's contrary to the ordinary -- under any ordinary

8    understanding of a slide surface.  And our view would be there

9    at least must be a capability for sliding to happen on the

10   slide surface, okay.

11           So there was an example earlier of an ice rink.  That

12   also came up in the briefing.  Well, if the ice skater skates

13   on only one side of the rink, that doesn't preclude the ice

14   skater from skating to the other side of the rink, turning the

15   entire ice surface into a slide surface.  It's capable of

16   being -- of the skater sliding on it.

17           This yellow ring on the inside surface of the part

18   that's at issue here is tucked away and hidden.  Nothing can

19   contact it.  Nothing can slide on it in the accused product.

20           And here's a picture of the assembled product, where

21   you can see that (indicating).  And this is an illustration we

22   had in our briefing, taken -- photos taken from Leupold's

23   expert report.

24           So as you can see on the turret, once the part is

25   assembled, the inside portion that's been highlighted in

yellow by Leupold's attorneys is completely tucked away.  It's invisible to anything rotating above it.  There's no possibility for a pin, guide tab, or anything else to contact it, that relates to this claim.

So we have an example of this.  And it's much easier to see than any of the pictures.  This is an ATACR scope that's accused on this claim.  And this top turret, quite simply, just take out the cover, and you can look down at the view that's shown on the right in slide 7 that's in front of you now, Your Honor.

And, also, on the bottom side of this cap, once it's taken off, one can see inside of it -- it's very small, but there's a pin on the inside of it.

I'm not sure if this is going to work.  So sI'm moving my finger by the button on the outside, which actuate the pin movement on the inside.  And it's just a very small metal pin.

And then if you look at the scope itself, you'll see that the part that was identified, highlighted in yellow, is down here (indicating).  It would be inside between the black and silver part here, the silver part being the one the parties have focused on.  There's no way that anything can get inside there to contact it or be biased against it.

Instead, on a different plane above the portion -- there's a raised portion on the part, okay, that has a notch

1  cut into it.  And only on this straight tangent line across

2  the inside here (indicating) can the pin contact the inside of

3  this raised portion, and they can fit into the notch here,

4  which the button actuates the pin to move -- to disengage the

5  turret knob.

6         So, simply, what was highlighted in yellow in the

7  briefing by Leupold can't be a slide surface because there's

8  no possibility any sliding could happen there.

9         Now, they didn't point to the top surface here

10 (indicating) with that yellow annotation, as near as I can

11 tell, but that wouldn't be good enough either, because

12 this -- one can examine this pin and see that it's simply not

13 long enough and does not touch or ride across this top flat

14 surface either.  The only thing it contacts is the inside

15 portion of this tab here (indicating).

16        And I'd like to hand this up, Your Honor, because

17 it's very difficult to see on the document camera, if that's

18 okay.

19             THE COURT:  Sure.

20             MR. DAVIS:  And it's quite easy to just pull this cap

21 off and put it back on.  And even without the screws in it,

22 you can engage the button and disengage it and rotate it and

23 see how that works.

24        But looking at the profile of it, you'll see the

25 raised portion towards one end of the scope, with the notch

1   cut into it, and that is the only portion that this tiny pin

2   on the inside could contact.  And that is, in our view, the

3   only thing that could possibly be a slide surface (handing).

4          THE COURT:  The plaintiffs are arguing that the

5   inside of that ring is the slide surface.  Am I understanding

6   that correctly?

7          MR. DAVIS:  Well, that seems to be the position,

8   based on this yellow ring that's in the brief and the red

9   arrow their expert added.

10         So, again, looking back at slide 7, the red arrow

11   from the expert and the yellow ring added by the attorneys,

12   well, the red arrow seems to point to what I was indicating,

13   the flat surface against which the pin can actually make

14   contact.  But the yellow ring is on the inside of this part

15   and, quite simply, when you look at the scope, is not exposed.

16   No guide tab, nothing can touch or contact that in any way.

17         So it's simply not possible to satisfy the other

18   portion of the claim requirement that there -- that the slide

19   surface be a surface against which a guide tab can be biased,

20   because it's not exposed to where a pin or guide tab would be

21   in this product.

22         So as Your Honor examines the scope -- and when you

23   rotate it, there's no resistance at all, once you've unlocked

24   it.  The pin that's on the inside there is just free floating.

25         And there's testimony in the record about this from

1    the technical folks at Nightforce that that pin that's in the

2    bottom of the cap there, it does not touch the ring, other

3    than this flat portion that's indicated in the red arrow on

4    slide 7.  It's not long enough to touch the metal ring 360

5    degrees around as you rotate it.

6             So counsel had a couple of examples he provided.  One

7    was of a water slide with a round tube.  Now, again, in that

8    example it's certainly possible for the user to slide around

9    on the sides and up near the top, and that's why the water

10   slide has a round tube, to keep the person using it from

11   coming out.  There's a surface that can be slid on.

12            Here, this interior surface that Leupold has pointed

13   to can't be slid upon.  Nothing can slide there that's

14   relevant to the claim.  The claim talks about a guide tab

15   being biased against that surface.  And the only surface that

16   they point to that goes all the way around does not contact

17   the guide tab ever, let alone 360 degrees around.

18            THE COURT:  Once I engage the button here on the side

19   and turn the knob on the top, is that doing anything in this

20   case?

21            MR. DAVIS:  When you push the button, if you -- if

22   you have the turret in the position where it won't turn, if

23   that button is engaged, what that pin does is it fits in the

24   notch.

25            THE COURT:  Right.  And it locks it at the zero

1   position.

2            MR. DAVIS:  Yes, yes.

3            THE COURT:  Okay.  But once it's down, if I push the

4   button, I can then rotate the knob?

5            MR. DAVIS:  Yes.

6            THE COURT:  As I'm rotating the knob, is there

7   anything happening in the scope?

8            MR. DAVIS:  Well, as far as any adjustments being

9   made internally?

10            THE COURT:  Yes.

11            MR. DAVIS:  Well, yes.  That's the whole point of the

12   knob is that once it's --

13            THE COURT:  But it doesn't seem to me like this thing

14   would be doing anything, because there are pieces perhaps

15   missing?

16            No?  That's the way it works?

17            MR. DAVIS:  No, Your Honor.  No parts of missing from

18   this.  It may be that --

19            THE COURT:  Okay.  That's fine.

20            MR. DAVIS:  -- without the screws engaged, which I

21   took out so you could remove the cap --

22            THE COURT:  Oh, okay.

23            MR. DAVIS:  There are two screws in it.  There are

24   holes in the side, opposite each other, that I had to remove

25   to be able to lift that cap off, so you'd be able to see the

```
 1    inside of it.  And to that extent, yes, there are two missing
 2    parts on the lectern here.
 3              THE COURT:  That's what I thought, was that there was
 4    something that would cause this thing to be shifting and
 5    moving, but that was missing.  So as I was turning it, it
 6    looked to me -- it seemed to me like nothing was happening.
 7    And it may be that the screws that would otherwise engage this
 8    cap are missing.
 9              MR. DAVIS:  That may be, Your Honor.
10              And so I apologize for the confusion on that.  They
11    were so small, I did not notice them there.  But yes,
12    absolutely, those screws need to be in there to hold the cap
13    on top and in place.
14              But the point being -- go ahead.  You had a question.
15              THE COURT:  Yes.
16              So if those screws are in here, once I get to the
17    zero position and then this is locked and I push the button
18    and it begins to rotate, that ring that we're looking at
19    remains stationary; is that correct?  It does not move, the
20    silver colored --
21              MR. DAVIS:  Yes.  That's my understanding, Your
22    Honor.
23              THE COURT:  Okay.
24              MR. DAVIS:  And the point of it -- of disassembling
25    it like this is when you're free rotating it like that, what
```

1    the other side has identified as being the "guide tab," the

2    word used in the claim, they point to the little pin that you

3    can see on the inside of the cap.

4            And when these screws are out, that thing

5    is -- whether the screws or in or not, that pin is just not

6    long enough to contact the part we're looking at on slide 7.

7    It rotates freely and is in space until it hits the portion

8    that has the notch in it on the right-hand portion of slide 7

9    here, where the red arrows are pointed.

10           And there is this other portion on the edge, which is

11   just a stop.  It's about the six o'clock position on the part

12   on slide 7 here.  And the tab does not bias against that.  It

13   merely stops when it hits it.  So if you rotate that far

14   enough in one direction, you're going to hit a stop where it

15   just won't go any further.

16           THE COURT:  All right.

17           MR. DAVIS:  But no one is saying that a stop is a

18   slide surface, as near as I can tell.  That's merely a feature

19   that prevents you from over rotating it and stops it.  The

20   tab -- or the pin does not extend to the inside of that other

21   knob or protrusion on the six o'clock position there and

22   engage the inner surface where that yellow line is.  It does

23   not do that.

24           THE COURT:  Okay.  Thank you.

25           MR. DAVIS:  And then I think for context, when you

1    look at this patent claim and then compare it to the figures

2    in the patent -- so Figure 5 is a good example, where this

3    time Nightforce's lawyers added yellow highlighting for

4    indication here on Figure 5 on slide 8, what the patent

5    describes as a tab that's biased against the slide surface, it

6    absolutely does, in the embodiment shown in the patent, ride

7    against or be biased against what we've highlighted in yellow

8    on the one side of this part shown in Figure 5.

9         But, of course, those yellow rings, given the angle,

10   would extend all the way around, 360 degrees.  In fact, nearly

11   two full rotations are permitted, 720 degrees.  So surface 212

12   on Figure 5 is highlighted in yellow, and it continues around,

13   and there's surface 204 on the outer ring there that's also

14   highlighted in yellow.

15        So this contrasts very much with the design of the

16   Nightforce product accused here, where you do have 360

17   degrees around a surface, the slide surface, against which the

18   claimed guide tab is biased and makes contact as one rotates

19   fully around the 360 degrees, very different than the accused

20   product, where what they call a guide tab is just a pin,

21   contacts nothing, other than around about a -- what? -- 20- or

22   30-degree arc, rather than 360 degrees.  There is no surface

23   that pin -- called a "guide tab" by Leupold -- can contact all

24   the way around.

25        Unless Your Honor has questions about that, I think

1    that that's the presentation on the '068 patent and why

2    Nightforce does not infringe.

3              THE COURT:  Thank you.

4              Would you mind making sure that we get copies of your

5    exhibits, please.

6              MR. DAVIS:  Absolutely.  We'll provide those, Your

7    Honor.  I have a hard copy I can hand up on this particular

8    presentation.

9              MR. PARK:  Is there a copy available for the

10   plaintiffs, also?

11             MR. DAVIS:  (Handing).

12             MR. PARK:  Hi, Your Honor, just a couple of brief

13   response points.

14             To start out, Your Honor asked a question earlier in

15   the session about whether Leupold offers both types of button

16   lock structures.  And I believe I misspoke.  The answer is

17   yes.  Leupold embodiments of the patent include both a

18   two-part structure, where the button and the mechanically

19   driven locking device are separate, and then a unitary

20   structure where the button and the locking element are fused.

21             As we discussed this morning, our position is the

22   patent claims cover both, but I wanted to clarify the record

23   in that respect.

24             During Nightforce's counsel's comments, there was

25   some discussion about a distinction between the term "locked"

1    and the term "brake."  Nightforce is applying different

2    meaning to those terms in the sense that a lock isn't a lock

3    if it can -- if there's any play at all; that's what a brake

4    is.  In other words, in order for a lock to be locked, in

5    order for a lock to qualify for the definition of a lock, it

6    has to be physically broken.  Otherwise, it's a brake.

7        That is not how the Windauer patent's specification

8    talks about the concept of "lock."  As we went through this

9    morning, the specification is very clear that the locking it's

10   talking about is to prevent against inadvertent bumping or

11   accidental adjustment.  That's the context that's relevant to

12   the legal claim construction issues here.

13       So through that lens, with all the discussion about

14   is there jiggling room, does it move, does it not move, does

15   there have to be extraordinary force, largely that's legally

16   irrelevant.  The legal question is "locked" means "secured in

17   place" for purposes of preventing against an inadvertent or

18   accidental adjustment.

19       There is reference to the Court's *Markman* ruling with

20   respect to the term "selectively movable."

21       If I could have Mr. Brunette put up -- this is a

22   visual aid that was used to illustrate the point for the term

23   the Court construed at the *Markman* hearing in terms of locked

24   or unlocked being "selectively movable" between a locked and

25   unlocked position.

1          If you could go ahead and run the presentation.

2          (Video presentation played for the Court.)

3          MR. PARK:  If you could pause right there.

4          So this is the unlocked position, where the red

5     structure is no longer engaged.  This is the adjustment knob

6     being in a selectively movable position between a locked and

7     unlocked position.

8          And then if you could go ahead and play it again.

9          (Video presentation played for the Court.)

10         MR. PARK:  And then when we see the red element go

11    down in between the teeth, that is the locked position.

12         That's the claim construction that the Court ruled on

13    at the *Markman* phase.  There's nothing about this claim term

14    that inherently requires that "locked" means locked under any

15    amount of force.  An infinite amount of force would not be

16    able to render this lock moving out of the engaged position.

17    That's simply not what the patents are concerned about.  And

18    no lock could satisfy that definition.

19         There was also some discussion about whether or not

20    the devices that Nightforce's expert, Mr. DuFaux, tested were

21    in new condition or whether they had been broken in.  The

22    record isn't clear about that because Mr. DuFaux didn't know.

23    But certainly there's no basis to suggest that normal use

24    requires breaking in using a torque wrench.  Perhaps if

25    Nightforce's user manuals instructed the Navy Seals or Delta

1    Force to do it that way, we'd be having a different

2    conversation, but there's no basis in the record or in reality

3    for that type of qualification.

4              There was also some discussion about Dr. Ray Dennis's

5    testimony about the BEAST i4F knob.  There is a suggestion

6    that he was confusing its capability.

7              If we could have the next demonstrative put up,

8    please.

9              So this is from docket 92-6, Exhibit 32, at ECF page

10   8.  And it's clear in the area that's highlighted in the gray

11   that Dr. Dennis got it right.  He's describing accurately in

12   his deposition the i4F elevation control, the BEAST knob.  And

13   he talks about the brake control.  And right after that, in

14   the manual itself it talks about the ZeroStop.  So during his

15   deposition, when he was describing the four features of the

16   i4F -- the fine tune adjustment, the coarse tune adjustment,

17   the locking system, and the ZeroStop -- he was testifying

18   accurately.

19             It's interesting that one of the key legal issues now

20   has become what normal use is.  In Leupold's summary judgment

21   reply brief, docket 147, page 26, on the top paragraph, there

22   was some discussion about this, with citation.

23             During that back and forth, as part of the

24   dispositive motion briefing, it was apparent that at the time

25   Nightforce itself, when hearkening back to the *Markman*

1    briefing, did not take the position that "locked" means locked
2    under an infinite or extraordinary amount of force.
3    Nightforce, at the *Markman* hearing, agreed that ordinary
4    normal usage was the standard.
5        I've highlighted here a portion of that for
6    reference.  This is docket 147, during the back and forth of
7    the *Markman* hearing, the transcript itself, page 64, line 19,
8    to 65, line 5, where both sides agree that the relevant
9    standard was normal usage.
10        There was also some discussion about the Section 1498
11    affirmative defense and the government contract interplay with
12    the issues here.  As we talked about at the last hearing, it's
13    important to understand that that is an affirmative defense.
14    The first step is to determine whether or not there's
15    infringement or non-infringement.  If there is infringement,
16    then does the affirmative defense apply?  And that's
17    Nightforce's burden to establish.
18        Conflating the two analyses into one and saying,
19    "Well, some of these scopes were provided to the government;
20    therefore, there doesn't have to be a determination on
21    infringement," that combines and reduces the analysis into one
22    step, which is not how the affirmative defense should work.
23        Lastly, on the three Windauer patents, so there's
24    this -- looking at it at the fundamental level, there's this
25    legal dispute over claim construction, over what "locked"

1  means, very basic to each of these patents.

2          Once that issue is decided, many of the other

3  purported factual disputes about how the scopes actually work,

4  it doesn't matter.  As long as it's clear that they -- whether

5  they, as the sample that Leupold has acquired and tested or

6  the sample that Nightforce provided to Mr. DuFaux, whether

7  there is some play or some amount of force that can be

8  measured by a torque wrench, if the definition from the patent

9  specifications is satisfied in the sense that locking turret

10  knobs are unable to be rotated, again in this concept of

11  ordinary use, then the rest really is irrelevant.  It's a

12  legal issue.

13          Your Honor, before I remove the sample BEAST scope,

14  I wanted to make sure that the Court didn't want to have a

15  chance to play with it.

16          THE COURT:  Hand it up.  I'll take a look at both

17  yours and the one that defense counsel wanted me to take a

18  look at.

19          MR. PARK:  (Handing).

20          THE COURT:  Thank you.

21          MR. CASIMIR:  May I make just a quick note on the

22  functionality, because it takes a while to sort it out if

23  you're experimenting.  You have to push down and turn to

24  actuate it.  If you try just spinning it, like it suggests

25  with the arrows, it will never go up.  It's a push down and

1    turn to get the brake engaged or not.

2              THE COURT:  Okay.  Thank you.

3              MR. PARK:  With respect to the '408 patent, the

4    parties dispute the legal meaning of the term "mechanically

5    driving."  Nightforce's position is if the button is fused

6    with the locking mechanism, by legal definition, there can be

7    no mechanically driving because their view is that there has

8    to be a separation of structure in order to accomplish that.

9              In contrast, Leupold's view is of course there can be

10   mechanically driving.  The button can mechanically drive the

11   locking mechanism whether they're separate or whether they're

12   part of the same unitary structure.  That is common in

13   engineering and everyday experience.  If you have one unitary

14   structure that has a button portion that mechanically drives

15   in order to actuate or release a lock mechanism, that doesn't

16   require any sort of unusual understanding or interpretation of

17   the term "mechanically driving."

18             Lastly, with respect to the '068 patent, there is

19   another legal distinction here, a legal dispute, over the term

20   "slide surface."  Nightforce's argument is -- is circular --

21   no pun intended -- in that Nightforce presumes that in order

22   for a slide surface to be a slide surface, it has to have

23   sliding and, therefore, a guide tab with biasing at all 360

24   degree positions.

25             Leupold's position is different.  Leupold's position

1    is that "slide surface" is a surface of a slide component

2    that does not require sliding at every position around the

3    clock, as long as there is sliding at a critical position --

4    for example, the locked or unlocked position -- and,

5    correspondingly, that there is biasing through the guide tab

6    at that key position.

7            Nightforce appears to be basing its argument on the

8    exemplary embodiments described in the specification, which we

9    looked at a moment ago during opposing counsel's presentation.

10   But it's bedrock claim construction law that the claims should

11   not be limited to the exemplary embodiments in the

12   specification, even if there is only one, the Federal Circuit

13   says, even if there is only one exemplary or preferred

14   embodiment described.

15           Unless there is an express disclaimer or definition

16   or other type of restriction that applies, the claim should be

17   given the full breadth of their plain ordinary meaning.  For

18   that reason, infringement on this issue is proper as well.

19           Thank you, Your Honor.

20           THE COURT:  Do you -- and I'm sorry.  I probably just

21   have gotten confused over all of the exhibits.

22           Can you bring up the exhibit where you show where the

23   slide surface is and exactly what it is sliding against?  Do

24   you have an exhibit that shows that, from your perspective?

25           MR. PARK:  Sure.

 1                So this is the exhibit that I used before.  Here is

 2      the 360-degree lock ring or slide surface.

 3                THE COURT:  And does that correspond with where -- on

 4      the right there -- oh, I see.  It does.  I'm sorry.  There's

 5      an arrow there that points right to where the surface is.

 6                Thank you.

 7                MR. PARK:  Yes.

 8                THE COURT:  And you are telling the Court that the

 9      slide surface related to this ring is on the inside of the

10      ring?

11                MR. PARK:  Is the inside of the ring, where the

12      sliding occurs at the critical moment, this kind of two

13      o'clock to four o'clock position, or, in this example, at the

14      eight o'clock to ten o'clock position.  That is where the

15      structure abuts so that the guide tab experiences that biasing

16      and sliding.

17                THE COURT:  Does that ring move at all?

18                MR. PARK:  The ring does not move, as we understand

19      it.  It's the other structures attached to the cap, once

20      assembled, that rotate around it.

21                THE COURT:  So the inside where the four screws are,

22      as I'm looking down on it, that structure moves against the

23      ring when the cap is turned?

24                MR. PARK:  I don't know if the four screws move, but

25      there is a part that is secured to that four-screw structure

1    that rotates 360 degrees, what the person is holding here with
2    the button and the locking mechanism.
3            THE COURT:  But that's not -- that's not what you're
4    saying that the ring slides against, because that is going to
5    move the interior portion, the inside of something within
6    where that ring is located, correct?
7            MR. PARK:  We are saying at this position, as I'm
8    indicating with my pen, here, and again here, when it's not in
9    the assembled configuration, that this portion (indicating) of
10   the 360-degree structure experiences sliding.  And
11   likewise --
12           THE COURT:  Yeah, but that's not what moves, right?
13   For there to be sliding, something has to move against it.
14           MR. PARK:  That's correct, Your Honor.  This part
15   rotates around (indicating).  And here you can see that
16   there's the button with the tab inside.  This tab would fit
17   within this notch, once it gets to that sweet spot
18   (indicating).
19           THE COURT:  It seems to me that the slide surface
20   would be on the outside of that ring as opposed to the inside
21   of that ring, if you're telling me the thing that slides
22   against it is the knob itself that's there pictured with
23   somebody's hand.
24           MR. PARK:  I see your point, Your Honor.
25           The way that the structure is configured, when you

 1    press the button in, it releases; and when you let it go, it

 2    locks.

 3              But the parties' dispute is over whether this biasing

 4    has to occur at a 360-degree level and same here.

 5              THE COURT:  All right.

 6              MR. PARK:  We say no.  They say yes.

 7              THE COURT:  Okay.  Thank you.

 8              MR. PARK:  Thanks.

 9              THE COURT:  Next?

10              MR. CASIMIR:  Just a few brief points on that.

11              On the issue of brake versus lock, the phrase "unable

12    to be rotated," which is in the claim construction, didn't

13    come out of nowhere.  It's in the specification of the patent

14    over and over again.  That phrase comes from the patent.  That

15    was in the briefing.  And when Your Honor selected that

16    terminology for the claim construction, it's from the

17    specification.

18              What we're hearing from Mr. Park is a request for a

19    redo on that claim construction.  He gave a different

20    definition of what he hopes it means, based on the

21    specification, where there can be some additional give.  But

22    the claim construction does not allow that.  And well

23    supported, the phrase "unable to be rotated," multiple times.

24              I think he also miscast the issue.  This isn't an

25    issue where Nightforce is saying infinite force can be

 1    applied, and that's what dictates whether it's a lock or not.

 2          We have agreement among the experts on this point,

 3    that a lock is something that can hold its position; and if

 4    forced to turn, it becomes broken.  That's the differential

 5    feature.  Obviously all locks are going to break before

 6    infinite force is applied.

 7          How do we know if it's a lock versus a brake?  When

 8    it does turn, it's broken and no longer works.  So when we saw

 9    the video of the pin going down into that slot, if you -- in

10    that locked position, if you were to turn that, something is

11    going to give, presumably the pin would snap off.  In theory,

12    if they didn't use good materials, perhaps the groove, the

13    ridges of the groove would break off.  But it would be then a

14    broken device.  So that is a lock as described in that video.

15    It's not a brake.

16          If it had been spring biased so that a sufficient

17    amount of force caused that pin to retract, then it's a brake.

18    So it's about broken versus not broken, not infinite force.

19          On the issue of the ZeroHold and the government

20    affirmative defense, that was being used to illustrate an

21    example of their underdeveloped argument; and we actually, I

22    think, aren't in disagreement on the issue.  So we heard

23    during those arguments that both parties are in agreement that

24    if there's an express consent clause, it's not part of this

25    case.

 1             So in terms of sort of the administrative issue of is

 2    there infringement first versus then determining whether an

 3    affirmative defense applies, the parties agree that if there's

 4    express consent, it's not part of this case.  So that issue is

 5    resolved between the parties.

 6             And they have not identified a single product that

 7    does not fit that category.  So, essentially, a party -- if

 8    they all fit that category, we have a party admission that

 9    they're not part of this case and we need not get to the

10    infringement question.

11             Lastly, on the push button and the issue of the

12    button mechanically driving a locking mechanism, we have

13    disagreeing experts on the point.  There's a factual dispute

14    there.  It's not a legal issue.  There's an open factual

15    question about whether anything is transferring force to

16    another, because the parties agree that a transfer of force is

17    required.

18             Their analogies are not particularly useful here.

19    They gave us two examples that I think there is a question

20    about whether there are buttons on those or not.  But

21    regardless, the locking mechanisms in both of their examples

22    involve multiple components.  The cabinet had another plastic

23    piece mounted to the housing that the other piece snapped

24    into.  The luggage connector had two separate pieces.  They

25    did not show an example where the locking mechanism is a

1     single piece, where there is a transfer of mechanical force

2     from the button to the locking mechanism.

3             But, again, the analogies are not particularly useful

4     here.  We go with what the patent says and what our experts

5     say.  And we have one expert saying one thing and the other

6     silent on the issue, other than unilaterally just making the

7     point without any supporting evidence or basis.

8             My colleague, Mr. Davis, has a quick point on the

9     '068.

10            MR. DAVIS:  Your Honor, if I might, the one point

11     that was made was that "slide surface" and the '068 patent

12     issues boil down to a claim construction issue.  The claim

13     construction was already resolved by the Court, and this is

14     not a situation where Nightforce is using any of the preferred

15     embodiments in the patent to limit the claim.  We're using the

16     claim construction as provided by the Court and the words of

17     the claim itself.

18            Showing Figure 5 is merely illustrative to show how

19     it can be that you would design -- that one of these products

20     could be designed where you would have a slide surface against

21     which a tab could be biased all the way around the ring, just

22     to prove that it's not an impossibility here.  It's just a

23     different way of designing it.

24            Now, as to being defined by the claims, if you look

25     at the claim itself, there's a couple of features that, again,

1   Leupold is effectively reading out of the claim to try to

2   argue that what they highlighted in yellow in the slide deck

3   is the slide surface.

4          First, there's the requirement in the box here on

5   slide 3.  I've excerpted Claim 1 from the '068 patent.  And at

6   column 11, lines 4 to 5, it describes the limitation of

7   "around," which the Court construed to be "encircle," and it

8   needs to go all the way around.  But the same element talks

9   about the slide surface having a notch formed in the slide

10  surface.

11         Well, if one looks at the -- what was highlighted in

12  yellow by Leupold, there is no notch in that surface anywhere.

13  Your Honor had a chance to inspect the scope earlier, and the

14  portion that has a notch in it is raised above that yellow

15  ring.  And there is no notch that extends down into that

16  region indicated in yellow by Leupold.

17         And we can see that somewhat on the pictures here on

18  slide 7.  Again, that highlight in yellow and the red arrow

19  pointing to a notch, that notch, when one looks at the actual

20  scope, it's easy to see that notch does not extend down below

21  the plane of the top surface of the part and into the plane

22  that has that inner yellow highlight in it.

23         The other claim requirement that's being overlooked

24  by Leupold's argument is that the guide tab is biased against

25  what is called the slide surface, and that is back on slide 3,

1   Claim 1, lines 11 to 13.  You have a guide tab being movable

2   relevant to the knob and biased against the slide surface.

3               Again, what was indicated in yellow on slide 7 of our

4   presentation by Leupold on this part is nothing that the guide

5   tab or a pin can ever contact.  So it can't be that it's a

6   slide surface.

7               And there was also a question, Your Honor, asked

8   about whether this part we've been pointing to -- which, to be

9   specific, on slide 5 of the presentation is SA267, this

10  rim-shaped part -- can it ever rotate?  It doesn't, Your

11  Honor.

12              And on this particular slide 5 on the left, at about

13  the seven o'clock position you can see a black protrusion; and

14  about the two o'clock position, another black protrusion.

15  Those are screws that hadn't been fully removed from the part.

16              And if Your Honor would like to see it again on the

17  specimen we have here, there are, in fact, three screws that

18  go through this part, SA267, and secure it to the scope.  And

19  it does not rotate.

20              There is no way, with this thing screwed down, that

21  it's going to rotate and that any kind of sliding could happen

22  between the inner portion of the turret and this area on the

23  inside that they indicated with the yellow ring.  Nothing can

24  slide again it, not a pin, not a tab, and not any other part

25  of the scope, because it is affixed by these screws to the

1   rest of the turret.  It can't slide across anything that was

2   indicated in yellow.

3           THE COURT:  My question was more:  I get that the

4   ring doesn't move.  That doesn't mean it doesn't have a slide

5   surface, because something might move against it.  And I was

6   just having trouble figuring out, well, what moves against it?

7           MR. DAVIS:  Understood, Your Honor.

8           And looking at it from that perspective, there's also

9   nothing that can move against or relative in any way against

10  this inner portion indicated in yellow in Leupold's highlight.

11          THE COURT:  All right.

12          MR. DAVIS:  And I'm happy to hand this back up, for

13  Your Honor to see where the notch is and where it is not cut,

14  if you'd like to inspect that.

15          THE COURT:  Sure.

16          MR. DAVIS:  But those were the points on the SA267.

17          And I guess for completeness, Your Honor, on slide 5

18  we have pictured here SA271, which I inadvertently overlooked

19  in my opening presentation; and that's, in some ways, for a

20  very good reason.  The arguments are essentially the same.

21  However, SA271 was discontinued before the '068 patent issued.

22          And in the briefing, Leupold speculates that it's

23  possible that something from the warehouse was shipped after

24  the patent issued or that someone somewhere sold one of these

25  and somehow there was inducement of infringement there.

1             There is no evidence to support any of that

2    speculation.  It's pure speculation that a product that was no

3    longer manufactured might have been sold, isn't enough to get

4    over summary judgment when there's no evidence of any

5    infringement using SA271, no one making, using, selling,

6    importing, doing anything with that after the patent issued.

7             So, again, there's just no evidence on that.  So I

8    skipped over SA271 in part because there's simply no evidence

9    that it's been shipped or used in any product since the patent

10   issued by anyone for which Nightforce could be held liable.

11            Unless you have questions, Your Honor, that's all I

12   have on the '068.

13            THE COURT:  Thanks.  We'll move on.

14            You've got more?

15            MR. PARK:  I have two quick clarifications.

16            THE COURT:  Go ahead.

17            MR. PARK:  One I think may be helpful with respect to

18   one of the Court's questions.

19            Let me start first with the last point Nightforce's

20   counsel made with respect to the discontinuation of the SA271

21   configuration.  That's a representation that Nightforce has

22   made.  We asked for evidence to establish that, and they said

23   that they don't have records sufficient to show that no

24   product with that configuration was sold after the issuance of

25   the patent claims.

1          And so that's where that issue lies.  It's not --
2     there's no way Leupold could have that proof.  That's proof
3     that resides in Nightforce's hands.
4          Your Honor asked about the configuration of the slide
5     surface.  It's hard to see in the copy, but if I could draw
6     the Court's attention to this tab right here (indicating),
7     with this button, this tab is the member that engages this
8     portion of the slide surface when it's not pushed in.  When
9     it's pushed in, then it's in the rotatable configuration.  But
10    if it's rotated so that this tab is kind of coming upward out
11    of the page, once it gets to this portion (indicating), it
12    begins to experience that sliding until it finds, aha, here's
13    the notch, click, and then it locks.  Same thing with this
14    (indicating).
15         So there's a point made -- this also goes to the
16    pinch-to-turn patent, the term "mechanically driving."
17    Nightforce's counsel indicated that the examples that were
18    provided all have one part of the structure, one part of the
19    unitary structure that may or may not serve as a button and
20    another part of the structure that may or may not serve as the
21    locking mechanism, and then there is obviously something else
22    that it locks into it.
23         That's how every lock works.  There's got to be --
24    you know, whether you have a button or a lever that's engaging
25    a locking mechanism, it has to lock into something else.  So,

1    likewise, with respect to these products, we have a button and
2    the locking mechanism mating.  It has to mate with something
3    else in order for it to engage.
4            So that's the clarification I wanted to make.  Thank
5    you, Your Honor.
6            THE COURT:  Thanks.
7            Next?
8            MR. WILLIAMS:  Your Honor, are you happy to dive in
9    or take a break whenever you like?
10           THE COURT:  Go ahead.
11           MR. WILLIAMS:  We can pause now or I'm happy to get
12   started.
13           All right.  May it please Your Honor, I'm Elliott
14   Williams on behalf of Leupold.  I'll be presenting on validity
15   issues regarding the locking turret knob patents.
16           Let me get my PowerPoint to come up here.
17           All right.  So I'll be addressing the three Windauer
18   patents as well as the '408 patent and the '068 patent.
19           Nightforce pleaded several affirmative defenses
20   against these patents, but without supporting evidence,
21   summary judgment is appropriate for many of these defenses.
22   I'll just walk through some of them, highlight for the Court
23   the low-hanging fruit as well as the more complex defenses,
24   where resolving a legal issue would result in summary judgment
25   against that defense.

1          So to begin with, I want to address three prior art

2    references that Nightforce asserts against the Windauer

3    patents that are not actually prior art.  They're dated after

4    the invention date of most of the Windauer claims.

5          Leupold moved for summary judgment of no anticipation

6    of those claims, and they're referred to in the briefing as

7    the 2004 priority claims.  And Nightforce's cross-motion seeks

8    summary judgment of anticipation for a subset of those claims,

9    which Nightforce alleges are anticipated by the Japanese

10   publication.

11         Critical to Nightforce's motion, however, is the

12   argument that Leupold hasn't met its burden to show prior

13   invention.  And we're going to walk through the evidence in a

14   moment.  But the three references we're dealing with are the

15   Canon device, the Japanese publication, and the Casas patent,

16   all dated after Leupold's invention date for the Windauer

17   patents.

18         So to show prior invention, the burden of proof is on

19   Nightforce to prove invalidity by clear and convincing

20   evidence.  There is a burden of production on Leupold to come

21   forward with evidence supporting its asserted invention date

22   for the 2004 priority claims, but the burden of proof always

23   remains on Nightforce to show invalidity.  And this is

24   discussed in the *Mahurkar* case from the Federal Circuit.

25         Leupold has more than met its burden of coming

forward with evidence to show reduction to practice of a prototype locking turret knob no later than May 17th, 2004. Just flipping back for a moment, May 17 is prior to the dates of those three references.

Just for a moment, going through the burden of proof -- because the *Mahurkar* case deals with a situation similar to ours.  In that case the defendant, Bard, had offered a document that was dated three months prior to the patent's filing date.  And so the plaintiff, Mahurkar, had the burden to offer evidence showing prior invention.  Had he not done so, the reference offered by the defense would have been prior art.

However, Dr. Mahurkar did offer evidence to show prior invention.  He met his burden of production. Consequently, the Court turned to evaluate all of the evidence, putting the burden on the defense to show invalidity under the clear and convincing evidence standard.

The Court said that "Bard bears the burden of persuasion on the status of the Cook catalog as prior art." And, as a result, on the record here, the Court concluded that, as a matter of law, no reasonable juror could find the reference was prior art; consequently, judgment for the plaintiff of no anticipation.  That is what we ask for here.

Let's walk through some of the evidence.

So Leupold has more than met its burden of

1    production, showing its reduction to practice by Mr. Windauer

2    of a prototype locking turret knob no later than May 17, 2004.

3    I've cited at the bottom of the slide the references in

4    Leupold's briefing.

5         Mr. Windauer built the locking turret knob prototype

6    for a German riflescope company called Schmidt & Bender,

7    specifically for the elevation and windage knobs on their

8    Short Dot scope.  And we have the drawings that he made for

9    that prototype.

10        This is a screenshot from the file opened in a

11   program called AutoCad.  You can see on the left there are

12   five drawings grouped together, in the top row an assembly

13   drawing and then four part drawings following.  You can see

14   off to the lower right there's what appears to be an alternate

15   sixth drawing, which is the same color and shape as the fifth

16   drawing in the center of the screenshot.

17        Also up on the screenshot is some metadata for this

18   file, showing a creation date of March 15, 2004, last saved by

19   Bernie Windauer.

20        Now, Leupold produced this electronic file as well as

21   printouts of the parts and assembly drawings prior to summary

22   judgment briefing.

23        Let's take a look at some of the printouts.  So this

24   is of the assembly drawing, showing a divided view:  on the

25   left the locked condition of the knob, and on the right the

1   unlocked condition of the knob.  We've highlighted in pink the
2   lock ring and then in green the lock pin, so that in the
3   locked condition you can see that the pin is engaged, an
4   engagement surface with the locked ring; and in the unlocked
5   condition, the knob is lifted upward so that the pin
6   disengages from the lock ring.  There's a spring there that
7   gets compressed, and the knob is free to rotate to make an
8   adjustment.

9         And I also want to point out -- oh, let's see.
10  You've got a top view here as well.  It shows the same thing.
11  In pink you've got highlighted the lock ring, the notches
12  around the circumference of the ring, then in green how the
13  lock pin engages those notches at various positions.

14        I'll highlight, also, with some further detail from
15  one of the part drawings -- this is for the lock ring.  You
16  can see the notches all the way around.  And I think because
17  these came from Schmidt & Bender originally and Mr. Windauer
18  made his modifications to their knob, I think the drawing is
19  labeled as a "sperrenring," which is the German term for the
20  lock ring.

21        I would note around the three o'clock position on
22  this drawing, there is an annotation of 61.6 degrees.  We've
23  highlighted the arc in green.  That area on the lock ring has
24  no notches.  And that's significant, because we're going to
25  look in a moment at contemporary correspondence between

1   Mr. Windauer and Schmidt & Bender that discusses this aspect

2   of his prototype and design.

3          So the 61.6 degrees pertains to an area having no

4   notches.  And then down below, at the six o'clock position,

5   there's another annotation that identifies 52 notches, each

6   having 5.7386 degrees, that then make up the remainder of the

7   lock ring.  And I highlight that number as well because it

8   will show up in the correspondence, and that helps us connect

9   these drawings to what Mr. Windauer did and when he did it.

10         So we've seen Mr. Windauer's design for a locking

11  turret knob.  Let's take a look at the correspondence he had

12  contemporaneous with that design, showing when he made it and

13  when he reduced it to practice.  As laid out in the briefing,

14  contemporaneous e-mails between Mr. Windauer and

15  representatives of Schmidt & Bender establish those dates.

16         So this is an e-mail dated April 21st, 2004 to

17  Mr. Windauer from a fellow named Andreas Schafer at Schmidt &

18  Bender.  He says, "Hans Bender forwarded the drawings that you

19  originally sent to his brother to me."

20         And then Mr. Schafer has some questions about the

21  drawing.  In the first bullet point, quote:  "On the

22  'Sperrenring' there is an area of 61.6 degrees that has no

23  notches."  He asks why.

24         He suggests, quote:  "Wouldn't it be better then to

25  have notches across the whole diameter?  This would afford a

 1    slight modification, though, regarding the notch-to-notch

 2    angle in order to get a 'round' amount of notches, 63 notches

 3    with 5.71428 degrees."

 4            So Mr. Schafer is asking a question about the drawing

 5    we just looked at and why there is that 61.6 degree area

 6    without notches.

 7            Mr. Windauer's response on April 27, 2004, addresses

 8    this in the e-mail.  "Item 1, Sperrenring," Mr. Windauer says

 9    that "The center axis of the area of 61.6 degrees with no

10    notches" -- again referring to the drawing we saw -- aligns

11    "with the spring loaded ball bearing and stop area of the

12    saddle," corresponds to components of the original Schmidt &

13    Bender knob "that had no notches."

14            He suggests, quote:  "We could make more notches in

15    the Sperrenring, but the angle of 5.7386 degrees does not

16    allow for an even number of notches in 360 degrees."  You

17    would end up with 62.73 notches.  You could go for "63 notches

18    and change the angle."

19            Down at the bottom of the e-mail, Mr. Windauer also

20    says that he's been in touch with Hans Bender, told him,

21    quote:  "I will be making the prototype in the next week for

22    trials of fit, finish, and function."

23            THE COURT:  What's the date of this e-mail?

24            MR. WILLIAMS:  Highlighted at the top, Your Honor,

25    April 27.

 1            THE COURT:  Thank you.

 2            MR. WILLIAMS:  The next day, April 28th, Mr. Schafer

 3    writes back.  And regarding the sperrenring, he says, "This

 4    part now has 63 notches with 5.71429 degrees, which makes 360

 5    degrees."

 6            This is notable because the drawing we looked at a

 7    moment ago had the earlier notch angle, the 5.7386 degree

 8    notch angle, which sets a boundary in time for when that

 9    drawing was finalized.  Schmidt & Bender made this change to

10    63 degrees.  Mr. Windauer's version of the drawings, which we

11    looked at, retained the 5.7386 degrees for the notch angle on

12    the lock ring.

13            At the end of the e-mail, Andreas Schafer notes, "I

14    am really looking forward to seeing your samples."

15            Shortly thereafter we have confirmation that

16    Mr. Windauer made the prototype, sent the samples to Schmidt &

17    Bender and that they were approved by Schmidt & Bender.

18            So on May 17, 2004 -- and this is the date that

19    Leupold points to in its briefing as a "no later than" date

20    for reduction to practice of the Windauer prototype.  On this

21    date Mr. Windauer sent an e-mail regarding the final invoice

22    for Short Dot windage and elevation knob prototype.

23            He contacts Mr. Hans Bender and says, quote:  "I was

24    waiting for your telephone call on Saturday to find out about

25    your trip and what you thought of the Short Dot prototype

knob.  Is it satisfactory to you?"

And below he says, "Attached is the final invoice for the windage and elevation knob prototype work."

And that attachment has the same date, May 17th, 2004, quote:  "Listed below is the final invoice for the Short Dot elevation and windage knob design and prototype development work.  As I mentioned on the telephone, I have made the required changes to the drawings after testing of the prototype."

The invoice states that Mr. Windauer tested the prototype.  And the fact that he delivered it, the finished prototype, to his customer, and requested payment is circumstantial evidence that the prototype worked for its intended purpose.

And, indeed, a couple weeks later Mr. Andreas Schafer at Schmidt & Bender wrote to Mr. Windauer, stating, quote: "Hans Bender forwarded your sample turret to us, and it is really looking (and working) good," confirmation that the prototype was delivered and that it worked.

He also says further down in the e-mail, quote: "Hans Bender informed us that you would adapt the 'locking technology' of the elevation turret to this turret as well."

Schmidt & Bender liked what Mr. Windauer had delivered and they wanted to do another one, this time for an illumination turret.

 1            So this evidence demonstrates that Mr. Windauer

 2    designed, built, tested a prototype locking turret knob as

 3    shown in the drawings prior to May 17, 2004.

 4            In response, Nightforce does not rebut the evidence

 5    presented by Leupold.  Instead, Nightforce argues that Leupold

 6    hasn't met its burden because of two alleged legal

 7    requirements:  conception and corroboration.  But these

 8    arguments, as explained in Leupold's briefing, do not apply.

 9            First, regarding conception, Nightforce argues that

10    Leupold hasn't proved conception.  But the law doesn't require

11    conception when a party shows prior invention by a reduction

12    to practice.

13            This quote I put on here is from *Purdue Pharma*,

14    Federal Circuit, 2001.  It's cited by Nightforce in its

15    opening brief.  It's also stated in Leupold's reply brief,

16    docket 147, pages 25 to 26.  And the rule is not in question:

17    "To antedate or establish priority of an invention, a party

18    must show either, one, an earlier reduction to practice; or,

19    two, an earlier conception followed by a diligent reduction to

20    practice."

21            Leupold picked No. 1, an earlier reduction to

22    practice.  We've made that evidence.  We've satisfied our

23    burden of production to come forward with that evidence, and

24    now the burden is on Nightforce to rebut it.  So conception is

25    not an issue.

 1          Nightforce next argues that Leupold hasn't met its

 2     burden of production because the evidence is not corroborated.

 3     But this argument also falls flat, because the law is clear

 4     that corroboration is only required for inventor testimony.

 5     The briefing cites to the case *Price v. Symsek* from the

 6     Federal Circuit, quote:  "Only the inventor's testimony

 7     requires corroboration before it can be considered."

 8          The *Slip Track* case, also in the briefing, says,

 9     "Corroboration. . . is not a requisite when a physical exhibit

10     is presented as evidence of conception."  And that is the

11     approach that Leupold is taking here:  physical exhibits,

12     documents to show the date of invention and the reduction to

13     practice.

14          In short, Leupold has met its burden of coming

15     forward with evidence to show prior invention.  Like the

16     patent owner in *Mahurkar*, then the burden of production now

17     shifts back to Nightforce, who always and still bears the

18     burden of proof, by clear and convincing evidence, to show

19     that its asserted references are actually prior to the

20     Windauer invention.  Because Nightforce cannot carry that

21     burden -- indeed, has made no effort to rebut Leupold's

22     reduction to practice evidence -- summary judgment on this

23     issue is appropriate.

24          Next we can transition to Nightforce's equitable

25     defenses.  The defense pleaded laches, waiver, acquiescence,

1    estoppel, and failure to mitigate damages.  Leupold moved for

2    summary judgment against those defenses.

3              In response to Leupold's motion, Nightforce

4    identified facts relating to the '907 and the '305 patents,

5    but nothing for the five locking turret knob patents or the

6    '480 patent relating to the flip-up lens covers.  So summary

7    judgment should be entered against those equitable defenses,

8    as to those six patents.

9              Shall I move on?

10             THE COURT:  Yeah.  Keep going.

11             MR. WILLIAMS:  Thank you.

12             Next I want to address their Section 112 defenses.

13   Nightforce pleaded three of them:  indefiniteness, lack of

14   enablement, and lack of written description.

15             Just by way of overview, these three defenses are

16   related to each other by the patent statute, specifically

17   Section 112, which sets forth technical requirements for the

18   disclosure provided in a patent.

19             So paragraph 1 includes the requirement that "the

20   specification shall contain a written description of the

21   invention," and also that the description must "enable any

22   person skilled in the art to which it pertains. . . to make

23   and use the same."  That's the enablement requirement.

24             And then in paragraph 2, there must be "one or more

25   claims particularly pointing out and distinctly claiming the

1   subject matter which the applicant regards as his invention."

2          So as regards the Windauer patents, Leupold moved for

3   summary judgment against those defenses, pointing out in

4   detail those portions of the patents that demonstrate how the

5   claims are not indefinite, that they are enabled, and that

6   they are supported by adequate written description in the

7   specification.

8          In response, Nightforce cites no legal authority and

9   for factual support relies only on what I will call the

10  "Velcro plus sandpaper" argument from its expert, Mr. DuFaux.

11  Leupold's reply reiterates the correct legal standard and

12  explains why the "Velcro plus sandpaper" argument fails under

13  that standard.

14         So I'll just walk the Court through an example.

15  Let's look at Nightforce's evidence of indefiniteness cited

16  against the '429 patent.  Here it is.  Paragraph 208 of

17  Mr. DuFaux's report, I'll read, quote:  "All of the asserted

18  claims of the '429 patent require an 'engagement member' and

19  'engagement surface' as the two components that lock together.

20  As indicated above, I understand these elements to be

21  virtually any two components that will lock, including

22  sandpaper and Velcro.  However, it is unknown to one of skill

23  in the art what the boundaries are for these terms, rendering

24  them indefinite."

25         DuFaux says the engagement member and the engagement

surface could be anything, virtually any locking components; and, therefore, the claims are indefinite.  That's not the right legal analysis.  The legal question is whether the claim as a whole, read in light of the patent as a whole, reasonably informs a person of ordinary skill in the art of the scope of the invention.

Let's start with the claim.  Claim 1 from the '429 patent begins, "A locking turret knob."  Right there, Nightforce misses the ball.  There's no evidence -- Nightforce can't carry its burden on this question, that a person of skill in the art, thinking about a locking turret knob, would wonder where the Velcro is or where the sandpaper is.

The claim continues:  "an adjustment member adjustably positional," and a first member having an engagement member, a second member having at least one engagement surface.

The adjustment member is "adjustably positional about the axis of rotation" when the engagement member "does not engage an engagement surface," and it's "locked in a selected position" when the two do engage.

And when you read the claim as a whole to assess indefiniteness, a person of ordinary skill in the art also looks to the specification and the figures.  And we've gone through something similar when we looked at Mr. Windauer's drawings for the Schmidt & Bender prototype.

1          This is Figure 1 from the Windauer patents.  You see

2     a locking turret knob.  You can see the pins, which are

3     designated as element 108 in the drawing, and the lock rings

4     designated as element 106.  Here it's shown in the locked

5     condition.

6          Figure 2, the knob cover is lifted up, compressing

7     the springs and withdrawing the lock pin from the engagement

8     surface of the lock ring, allowing the knob to rotate freely.

9          DuFaux's hypothetical dismembers the claim from the

10    patent and the claim elements from each other.  By making the

11    argument that an engagement member or an engagement surface

12    could be anything, DuFaux is completely divorced from the

13    context in which the indefiniteness analysis occurs, these

14    figures, the patent claim as a whole.

15         Under the correct legal standard, a person skilled in

16    the art would not have been concerned about DuFaux's

17    speculative question:  Could you do it with Velcro plus

18    sandpaper?  Therefore, DuFaux's statements do not meet or

19    support the indefiniteness argument under the correct legal

20    standard and, thus, cannot create any ambiguity in the mind of

21    a POSA regarding the scope of the claim.

22         For these reasons, Nightforce fails to create a fact

23    issue on whether the claim as a whole, not just isolated

24    elements thought about in the abstract, reading the claim in

25    light of the patent as a whole, adequately informs those in

1    the art about the scope of the invention.  Yet this argument

2    is the only argument and the only evidence that Nightforce

3    argues to support its 112 defenses.

4           So for the '429, the '736, and the '120 patents,

5    Nightforce refers to paragraphs 208, 209, 210 of Mr. DuFaux's

6    report, which are essentially copy-and-paste versions of each

7    other, making the "Velcro plus sandpaper" argument.

8           Similarly, with respect to enablement and written

9    description, Nightforce's argument is that the patents don't

10   enable a person skilled in the art to make and use a locking

11   turret knob that has Velcro and sandpaper, or they don't

12   include a written description of a locking turret knob made

13   with Velcro plus sandpaper.  That's the DuFaux report again,

14   paragraphs 200 to 206.

15          These arguments fail to apply the correct legal

16   standard for enablement, for written description, and for

17   indefiniteness.  And Nightforce cites no legal authority to

18   support this position.

19          And just one more point on this issue.  In the

20   briefing Nightforce tries to set this up as a battle between

21   experts.  That's not what's going on here.  Even if we set

22   aside Leupold's expert on this issue for the purposes of

23   Leupold's motion, Nightforce does not have a material fact

24   dispute to resist summary judgment.

25          Because Nightforce's only evidence for its Section

1   112 defenses is the "Velcro plus sandpaper" argument, which

2   fails to address the correct legal standard, these defenses

3   under Section 112 should not be sent to the jury.

4           I'm ready to move on to another issue.

5           THE COURT:  Let's stop there.

6           When we resume after lunch, I want to turn to the

7   defense and hear your response to the information you've given

8   me.  Again, it works easier if I kind of keep it in smaller

9   pieces.

10          MR. WILLIAMS:  Sounds good.

11          THE COURT:  All right.  So why don't we get back

12  together -- I don't know.  Is 45 minutes long enough for you

13  guys?

14          MR. DAVIS:  Yes, Your Honor.

15          THE COURT:  All right.

16          MR. PARK:  Yes, Your Honor.

17          THE COURT:  All right.  Forty-five.  See you then.

18          (A lunch recess is then taken.)

19          THE COURT:  Welcome back.  Have a seat.

20          We're going to roll on with the defense at this

21  point.

22          MR. CASIMIR:  All right.  We had three segments from

23  this morning.  The issues of whether certain prior art

24  references are prior art or not based on the ability to show

25  earlier invention -- I will hit that first -- and then the

1   equitable remedies, and then the 112 indefiniteness,

2   enablement, written description.  We'll take them in the same

3   order.

4            And, Scott, is your computer live?

5            MR. DAVIS:  Yes.

6            MR. CASIMIR:  There we go.

7            All right.  So I think there was kind of an

8   interesting turn of events in the opening arguments that may

9   simplify this for us.  The arguments that were just presented

10  to show earlier invention are different than the ones in the

11  briefing, not inconsistent, but a simpler version of it and a

12  slight twist.

13           Our briefing and, as well, the presentation I have

14  here goes into detail about how conception cannot be shown,

15  how reduction to practice cannot be shown based on a failure

16  to demonstrate that a prototype was made in the correct time

17  frame, and that there was no evidence that that prototype was

18  tested to show that it worked for its intended purpose in that

19  time frame.

20           And I want to maybe figure out exactly if we're all

21  on the same page here, because it very much may simplify

22  things.  What I heard in the opening presentation is that

23  Leupold is no longer going to rely on conception, but the

24  conception will be assumed from the reduction to practice,

25  from the prototype.  I have some slides to argue about the

1    conception, but we can significantly reduce that or skip that

2    if I heard that correctly, that they are no longer disputing

3    the issue of conception.

4            And maybe it's worth getting clarification on that

5    point.

6            MR. WILLIAMS:  Sure.  I think the plaintiff's

7    position is that we have proved reduction to practice and that

8    conception is not at issue with respect to our summary

9    judgment motion.

10           Does that answer your question?

11           MR. CASIMIR:  I think so.  If I heard that as we

12   don't have to demonstrate that there was no evidence of

13   conception, but that you're -- you're not taking a position

14   that you can show conception, I think we're on the same page,

15   and then we can dramatically reduce that issue.

16           Otherwise, I'll present the arguments that they

17   cannot demonstrate conception.

18           THE COURT:  The way you're saying it is not how I

19   understood their argument.  How I understood their argument is

20   that they have, in fact, proven conception by the evidence

21   that they simply presented here this morning and a little bit

22   into this afternoon, and they've shown that it was reduced to

23   production and tested and all of those things that you're

24   arguing about.  They're saying the evidence shows that all of

25   those things have taken place.

1           MR. CASIMIR:  I'll go through the conception, then,

2      just so that we're clear on the record.

3           The other twist here is previously, as I understood

4      it, they were going to rely on the inventor testimony in

5      corroboration to show reduction to practice.  And what I heard

6      this morning is they are happy to rely on the physical

7      prototype, as shown by the documents presented this morning,

8      which also is a simplifying issue on that, because -- but I'm

9      assuming we won't get clarity, specific clarity on that as

10     well, so I will just make my presentation.

11          But understanding the view that they raised this

12     morning, I think we actually have dramatically simplified the

13     issues and have a clear route for the Court to rule on summary

14     judgment of invalidity.

15          All right.  So we talked earlier -- heard earlier

16     today about this Japanese prior art application.  It is a

17     patent publication that published six months before the

18     Windauer provisional patent application was filed.  And what

19     simplifies matters here is there's not a dispute between the

20     parties as to the impact of that patent if it is prior art.

21          So if Leupold is unable to show an earlier invention,

22     there's not disagreement that the impact of that is the claims

23     that were identified by Nightforce as being anticipated are,

24     in fact, anticipated and invalid.

25          Shown here are some pictures from that Japanese

 1   publication.  This is a patent application by a company called

 2   Nikon, or Nikon, depending on how you pronounce it.

 3           On the left-hand side is a side cut-away view showing

 4   a very similar structure where certain components, when the

 5   knob is in a lower position, interact with certain grooves.

 6   And then not shown in the picture, when it's raised, they

 7   leave the grooves and the knob can turn.

 8           Shown on the image on the right are the little

 9   triangular-shaped pins.

10           THE COURT:  Can I have you slow down just a bit,

11   because I feel tension from my right.

12           MR. CASIMIR:  Very good.

13           So a very, very similar mechanism to what is in the

14   Windauer patents.

15           All right.  So Leupold is relying on the idea of

16   reduction to practice, is what we heard this morning, to

17   demonstrate an earlier invention.  Going through the rules for

18   conception and reduction to practice, we hit reduction to

19   practice quite a bit previously, in the last session, when we

20   talked about the '907 patent.  You'll see a lot of the same

21   sort of legal principles outlined here.  And to the extent

22   that those are still fresh in your mind, we can move by those

23   more quickly, but I'll check as we go along.

24           What we did not discuss with the '907 patent was the

25   rules around conception.  To demonstrate conception of an

invention at a particular date, one has to show every feature

of the claims is embodied in the conception; and then that

conception must be corroborated.  An inventor just saying they

did it is not enough; we need additional evidence to

demonstrate that point.

And, as we'll see, there's no evidence of conception

before the date, May 27th date of the Japanese publication,

showing all the features of the claimed invention.

Reduction to practice shows a requirement for two

things:  number one, that a working prototype was made

embodying every feature of the claimed invention.  And, as

we'll see, there's no evidence showing that prior to the date

of the Japanese publication, the May 27 date.  And then,

second, that the prototype must be tested to show that it

worked for its intended purpose.  And each of -- the existence

of the prototype and the fact that the testing showed that it

worked for its intended purpose must be corroborated.

You may recall when we were talking about the '907

patent we had a very long discussion about the lack of

evidence presented in that case for any testing showing that a

prototype worked for its intended purpose.  The same issue is

presented here.

As you'll see when we review Leupold's evidence,

there is zero evidence prior to May 27, 2004, showing that any

testing occurred on any type of prototype, let alone a

1    prototype embodying all the features of the claimed invention.
2    We've got none.

3              Similar to the '907 patent, we received in the middle
4    of the summary judgment briefing a late-filed declaration by
5    Leupold's expert, Mr. Byron, explaining for the first time and
6    contrary to his prior testimony that this invention is so
7    simple, no testing is required.

8              We did not hear about that at all in the opening
9    argument.  And, in fact, it sounds like they're moving away
10   from that position and instead just relying on the
11   documentation to demonstrate a prototype and that testing
12   occurred, and that's much easier -- that's a very simple thing
13   to address.

14             But all of the issues that we talked about in the
15   '907 apply here as well, in that they've failed to provide any
16   evidence of testing of a prototype, that it worked for its
17   intended purpose.  And I have quite a few slides on that that
18   are similar to what we had in the '907.  And I think we can
19   breeze by a lot of those because they have not raised that and
20   seem to have shifted away from that argument.

21             THE COURT:  As you breeze by, just remember that I
22   have a court reporter.

23             MR. CASIMIR:  Understood.

24             We'll breeze by in terms of me clicking by the
25   slides, not, hopefully, the tempo of my speech.

1          THE COURT:  Thank you.

2          MR. CASIMIR:  All right.  So let's talk about the

3     failure to corroborate every feature of the claims.

4          So this is a paraphrasing.  All of the claims --

5     there are many, many claims in this case.  They have different

6     elements to them.  But elements that all of the claims share

7     is that there is a locking mechanism composed of first and

8     second locking parts -- we've seen pictures of that -- pins

9     interacting with splines, pins interacting with slots, various

10    pictures from the patents.

11         The claims also require an adjustment mechanism or

12    member, which is the component of the system, the claimed

13    invention, that adjusts the optics.  And so, for example, if

14    we look at Figure 1 from the Windauer patents, shown in the

15    lower left, we can see the locking mechanism components on the

16    side.  And then down in the center, at the bottom, is a

17    connectivity with a screw component and a linkage to the

18    optical system inside the scope, so that the sensitive optics

19    can be finely adjusted.

20         Lacking from anything you heard earlier today is any

21    evidence of conception or reduction to practice of an

22    invention having this adjustment mechanism or member prior to

23    the relevant date.

24         All right.  Let's go into detail.  And this is going

25    to apply to both conception and reduction to practice.

1    Earlier today this same evidence was used to demonstrate

2    reduction to practice.  We discuss it in the context of

3    conception.  But the relevant details are the same.

4            So there is no valid corroboration evidence of

5    conception prior to the relevant date.  What we have in this

6    case is a series of CAD drawings.  And we saw this drawing on

7    the right.  I have an amplified portion on the upcoming slide

8    so we can zoom in on bits of it, but just showing it from a

9    distance with the six different drawings.

10           Initially we had this as evidence in the case as hard

11   copies, black and white images.  During the summary judgment

12   process we received for the first time the electronic CAD

13   drawing versions of these.  So this was new material to us.

14   We've since analyzed this material.  And the metadata in it is

15   tremendously not helpful for Leupold's case.  In fact, it

16   makes this evidence irrelevant for showing conception and

17   reduction to practice, as we'll see on the upcoming slides.

18           So the particular image shown here is the six-drawing

19   picture that we saw earlier.  What's important to note is the

20   hard copy versions we have are undated.  So we had no dates at

21   all up to the point of the summary judgment briefing, when we

22   finally got the electronic documents.

23           The documents do have dates.  And the dates,

24   importantly, show that this document, the one we're able to

25   see, is from January 12th of 2005, seven months after the

1    Japanese publication.

2            And let's zoom in and take a closer look.  So we'll

3    zoom in one more time.  I believe this is the same image we

4    saw earlier.  The white box is showing the metadata, which I'm

5    going to pull out to the side here so we can see the text

6    easier.

7            What was highlighted in the slides this morning was a

8    create date of March 15, 2004, which means some file of

9    unknown content originally got created on that date, which is

10    actually not that far before the Japanese publication that

11    came shortly thereafter.

12            Most important, which we didn't see highlighted this

13    morning, is the modified date.  This document was last

14    modified January 12, 2005, seven months after the Japanese

15    publication.  And we also get to see the amount of editing

16    time:  45 hours and 54 minutes.  It was not trivial.  Lots of

17    changes were made or, I suppose in theory, a few changes were

18    made and took an extraordinary amount of time, which I don't

19    think would make much logical sense.

20            But the important point here is the document we're

21    looking at is a January 12, 2005 document.  And it has no

22    relevant bearing of what existed prior to the Japanese

23    publication.

24            This is not the first time parties have tried to

25    represent such evidence for trying to prove conception or

1   reduction to practice.  We've got three cases cited here.

2          The first one is the *Boydstun* case, B-o-y-d-s-t-u-n,

3   519 F.Supp.2d 1119, from this district in 2007.  Quoting the

4   decision:  "However, because of the disparity between the

5   file's created date and last modified date, it is unclear how

6   much of the design was complete in early 2003.  The AutoCAD

7   file does not sufficiently corroborate the testimony of

8   Cottrell employees about the design process."

9          The second case, the *Taurus* case, 534 F.Supp.2d.

10  This is my hometown, the Western District of Wisconsin.

11  Quoting from the Court:  "The only indication that the subject

12  matter of the '568 patent" -- correcting that, "'658

13  patent was 'conceived of' or 'reduced to practice' by June 10,

14  1996 is the fact that the computer file containing the data

15  model for the '658 patent was created on that day. . . that

16  evidence is of no significance in light of the clear and

17  convincing evidence marshaled by defendants:  the computer

18  file was last modified on December 11, 1996, much later than

19  the original file was created."

20         Lastly, the *Transocean* case, 443 Supp. 2d 856 from

21  the Southern District of Texas in 2006:  "Holding that an

22  inventor's testimony that he made electronic drawings of an

23  invention before the 'Last Modified Date'" -- which we don't

24  have in this case, mind you -- "of the files required

25  corroboration and that his testimony that 'each of the drawing

1   files on the disks have a 'Last Modified Date' in the

2   electronic directory showing the last time the drawing was

3   changed' was insufficient to corroborate that date because of

4   the lack of 'evidence that the drawings were contemporaneously

5   disclosed to or witnessed by anyone else.'"

6         Likewise, we have none of that in this case.  The

7   drawings, which are the primary basis of evidence relied on by

8   Leupold for conception and reduction to practice, have no

9   probative value.  We have no idea what they looked like at the

10  relevant date.

11        Let's drill down a little bit more.  We saw one of

12  these drawings shown in more detail that related to the

13  particular angles and linked to a particular e-mail that came

14  prior to the Japanese publication.

15        That evidence alone is not relevant.  First of all,

16  we don't know what the original drawing looked like on that

17  date.  We only have the final drawing.  But even if we were to

18  assume it was the same, it's not helpful.

19        Why is it not helpful?  That particular drawing shows

20  one part of an invention that requires multiple parts in the

21  claim.  At most, even if we were to give credit that that

22  representation of the drawing was accurate on that date -- and

23  we don't have that -- all we know is that a ring with some

24  grooves in it existed.  That would only show, at most, a work

25  in progress.

1          And, in fact, that particular e-mail showed a work in

2     progress in terms of the discussion contained in it.  And

3     Leupold has not taken the position that there was conception

4     and reduction to practice at that point.

5          A corollary to that is it clearly does not show all

6     of the features of the claimed invention.  It does not have

7     the first and second lock elements.

8          We saw a second drawing that appeared to perhaps have

9     pins associated with it.  That is another panel in this

10    drawing, with no evidence at all that that existed prior to

11    the Japanese publication.  And, again, that is not the

12    complete invention, because it does not discuss the components

13    that adjust the optics.

14         THE COURT:  Even if you look at all of those

15    drawings, does it show the complete invention?

16         MR. CASIMIR:  There's one panel -- and let me go to

17    the next slide because it shows a slightly blown-up version.

18    The component shown in the highest resolution here is the one

19    we were just talking about.

20         There's one to the left of that in the panel that has

21    a drawing that looks somewhat similar to one of the drawings

22    in the patent.  Presumably that would have been the last one

23    that was finalized and edited.  We don't know when.  That

24    could have been in January 2005.

25         THE COURT:  That wasn't my question.  I understand

1    your issue regarding the dates.  But does that drawing in the

2    lower right show all of the components of the invention, from

3    your perspective?

4         MR. CASIMIR:  I'm re-looking at it closely.  I'm

5    not -- it's hard to tell from the image I'm seeing here, but

6    I'm not sure I see an operative interface to the optical

7    component in this drawing.  There's -- I can see the region

8    where that would be.

9         I will say I have not looked for that specific issue

10   before.  But looking at it on the image here, that does not

11   seem to match what we see in the patent with respect to that

12   component, nor has Leupold raised that issue in any of its

13   briefing.  But nonetheless, too late in time.

14        This is the only evidence that was presented at any

15   point in this case related to the conception portion of this

16   analysis.  Knowing that those drawings are not useful because

17   they're too late, conception has not been demonstrated, which

18   I believe is why it was not argued this morning.  There's an

19   understanding that the evidence of conception is lacking; and,

20   instead, we heard a focus on reduction to practice.

21        Notably, these same drawings were used to demonstrate

22   reduction to practice; and for the same reasons, it is not

23   valid or useful evidence.  It provides zero probative value

24   for when a prototype was made or if -- well, the drawings

25   themselves don't say anything about whether it was tested or

1       the outcome of testing.

2              So let's turn to reduction to practice now.  So we

3       have the two prongs that must be demonstrated for reduction to

4       practice.  The first is that a prototype was made embodying

5       the fully claimed invention.  The second is that it worked for

6       its intended purpose.

7              We have zero evidence prior to the Japanese

8       publication of any testing done or any evidence that a

9       prototype worked for its intended purpose.  It's absent.

10             So, similarly to what we saw with the '907 patent,

11      recognizing that deficiency in the middle of summary judgment

12      briefing, we received this late declaration from Leupold's

13      expert, Mr. Byron, for the first time saying no testing is

14      needed because the invention is so very simple.

15             And here's where I think, because we didn't hear any

16      counter arguments to that this morning, we can breeze through

17      this a bit more quickly than we did with the '907 patent.

18             So just hitting the key points on slide 15, we

19      reproduced the quotes from the same expert, Mr. Byron, prior

20      to summary judgment, making it crystal clear that these

21      inventions -- the Windauer invention in particular -- always

22      requires severe testing, impact testing, recoil testing,

23      submersion testing, pressure testing, and that that was true

24      of all of the patents asserted in this case.

25             Only when there was a recognition that that would

1    lead to a summary judgment ruling of invalidity did we get

2    this late-filed declaration saying the opposite, arguing for

3    the first time that these are so simple no testing is

4    required.

5            And I think we can go through the timeline here very

6    quickly.  This issue has been ripe for a long time.  The

7    inventor himself, Mr. Windauer, testified that he tested a

8    prototype.  He didn't remember when.  But there was never an

9    assertion from the inventor that testing is not required.

10   Mr. Byron submitted a rebuttal report in this case making all

11   of his strong allegations that testing is absolutely required

12   and substantial testing, because of the extreme conditions

13   these devices go through.

14          He also testified that working for its intended

15   purpose was relevant.  Leupold moved for summary judgment of

16   validity, never raising the issue that the product does not

17   have to demonstrate that it works for its intended purpose.

18          They argued an earlier invention than the Japanese

19   publication.  They argued conception.  They argued reduction

20   to practice, but never raised the point that no testing was

21   required.  Only when they realized that the law required such

22   and the evidence was missing did we get that late declaration.

23          As with the '907 patent, we've argued that that

24   declaration is too late and can be dismissed for being too

25   late.  There's no excuse for not having that information

1    earlier from Mr. Byron.  It can be dismissed as providing

2    contradictory testimony.  The sham evidence rule is cited in

3    the briefing, and we argued and talked about the case law on

4    that topic with respect to the '907 patent.  That equally

5    applies here.

6         No matter what, where Leupold has the burden of

7    production, they cannot create a disputed fact to avoid

8    summary judgment of invalidity by having the same expert say

9    two opposite things.

10        Furthermore, that late declaration did not solve the

11   problem.  It was very cursory.  It did not talk about the

12   claimed invention as a whole.  It provided almost no detail

13   about the basis for the conclusion as opposed to the great

14   detail provided earlier with the opposite position that lots

15   of testing is required.  It did not talk about any of the

16   relevant case law or apply any facts to that case law.

17        And this is a section I think we can spend a little

18   less time with.  This has been fully briefed and discussed in

19   the context of the '907 patent.  It is also briefed for the

20   Windauer patents.  The slides and the discussion we had and

21   the record on this for the '907 patent apply equally well

22   here.

23        But the case law relied on by Leupold identifies

24   different types of testing that may be required based on the

25   nature of the invention.  Sometimes you have to do testing

1    under actual use conditions, and in rare cases you can get

2    away with no testing if the invention is sufficiently simple.

3            As with the '907 patent, we identified case law

4    putting things into different categories.  The collective

5    result of this case law is that only the very simplest

6    inventions require no testing, generally things with no moving

7    parts.

8            The types of things that require the testing that

9    Mr. Byron said are needed for riflescope parts are in the most

10   extreme category, which we have deemed Category 4 for

11   illustration purposes, which is full testing under actual

12   conditions of use.  These are things that are subjected to

13   strenuous temperature, pressure, or other forces, such as

14   spark plugs and oscilloscopes.  But no matter what category

15   it's in, it's not in Category 1.

16           And, again, all of the case law was previously cited.

17   We have that in the record now.  And we encourage you to look

18   back at the '907 patent discussion if there are any questions

19   about this.

20           If this Court were to hold that this is a Category 1

21   invention, that no testing is required, this will be the most

22   complex device that undergoes the most extreme environmental

23   conditions of any decision to date that we've seen or that

24   we've seen the other side present.  So this will be the

25   outlier case of over a hundred years of precedent if it is

1    determined that no testing is required.

2            So just moving by this more quickly because, again,

3    this is paralleling what we've discussed prior with the '907,

4    we have a clear case here where testing is required.

5            The knob in the Windauer patent has multiple moving

6    parts.  It turns.  It lifts.  There's springs.  There's pins

7    that interact with splines in the embodiment shown here.

8    There's a sensitive internal component that has to move, turn

9    to then adjust sensitive optics within the scope, all the

10   things Mr. Byron, Leupold's expert, said required severe

11   testing for exactly these reasons until he said the opposite

12   late in the game.

13           Keeping in mind, Mr. Byron highlighted reasons why

14   the testing was required -- pressure, temperature, shape

15   changes -- these are all things that parallel the case law.

16           This is a quote that's in the prior materials as well

17   (indicating).  We don't need to look at it here.  It's just

18   highlighting the point that Mr. Byron was talking about the

19   initial design, not the commercialization.  Leupold argued in

20   their briefing that -- tried to cast Mr. Byron's testimony as

21   arguing about commercialization rather than design.  That's

22   clearly not the case.

23           And then this just lines up those details with the

24   court cases that talk about the Category 4 testing.  It

25   relates to high temperature, vibration, shape changes, all the

1    things that Mr. Byron said applied to this device.

2         So we have zero evidence from Mr. Byron that would

3    provide any basis for saying that this is anything other than

4    a Category 2, 3, or 4 device, which would require testing.

5    And we have zero evidence of testing.  We heard a little bit

6    this morning, but as we'll see in a second here, that evidence

7    is from after the Japanese publication.  And it also --

8    there's no indication that Mr. Windauer was involved in that

9    whatsoever.  And we'll come to that.

10        With no evidence of testing that the prototype, if

11   there was one, worked for its intended purpose, that issue

12   alone is dispositive of invalidity.  And on that basis alone,

13   summary judgment can be granted.  However, there's no evidence

14   of a prototype in the relevant time period.  And let's go

15   through that.

16        So the twist I heard earlier this morning is they're

17   not going to rely on the inventor testifying when he did this.

18   They're going to rely on the documents we saw.  And the

19   documents we saw this morning not only don't demonstrate that

20   an earlier prototype was made and tested, it suggests the

21   opposite.  So let's look at it more carefully.

22        So we -- one of these e-mails we saw this morning.

23   There are two highlighted in Leupold's briefing.  So we'll

24   talk about both of them.  I think I understand why they didn't

25   show the second one, because it's actually hurtful to their

1    case rather than helpful.

2            First, it's important to note, these are too late.

3    So keep in mind, we had the drawings as evidence, which we

4    know were a representation of what existed in 2005, seven

5    months too late, and then we have these e-mails.  This is the

6    collective evidence for reduction to practice, worked for its

7    intended purpose.

8            These two e-mails are after the Japanese publication.

9    So the one we saw earlier today is the one on the right from

10   June 3rd, 2004.  Mind you, the Japanese publication was

11   May 27, 2004.

12           And we saw the language highlighted in the box here:

13   "Hans Bender forwarded your sample turret to us and it is

14   really looking (and working) good."

15           This is the evidence they provided for the fact that

16   the invention worked.  So first I will note, we don't know

17   what was tested here.  They have no evidence of whether this

18   was simply some of the subparts or whether it was the entire

19   invention as claimed.  We've not seen any evidence that these

20   pieces that were tested included all of the components in the

21   claim:  the first and second locking element and then the

22   adjustment mechanism that adjusts the optics in the scope.

23   But even if they did, this is too late.

24           THE COURT:  You're looking at different e-mails than

25   the ones that they showed, that the plaintiff showed me

1    earlier, correct?

2              MR. CASIMIR:  This may be in the same chain.

3              THE COURT:  What I recall was that there was an

4    e-mail back in April of 2004.

5              MR. CASIMIR:  Yes.

6              So they were not relying on that for demonstrating

7    reduction to practice and that it was tested on its own.  The

8    April e-mail was the one that showed just the one component,

9    the ring with the spokes on it that had the angles.

10             THE COURT:  Then they showed an April 27th e-mail

11   saying that the prototype was going to be manufactured very

12   soon.

13             MR. CASIMIR:  Right.  So we know at that point it

14   didn't exist yet.

15             THE COURT:  And then on May 17th a prototype was made

16   and tested and sent, and that the inventor was seeking payment

17   for his work.

18             MR. CASIMIR:  So we'll get to the May 17th one on an

19   upcoming slide here.  Again, on that May 17th one, we don't

20   know what component was being provided.

21             So all indication is that the testing to see if this

22   works to alter optics was done by Schmidt & Bender.

23   Mr. Windauer made certain component parts that Schmidt &

24   Bender tested themselves.  And we see that in the "working

25   good" e-mail from June 3rd here.  We have no idea what

1    Mr. Windauer sent them.

2           And as you'll see -- let's actually look at the

3    leftmost e-mail.  So this is June 1st, 2004, after the

4    Japanese publication.  We didn't see this earlier today, but

5    it was used in their briefing for demonstration of reduction

6    to practice, because there's an indication that the --

7    something had been sent to Schmidt & Bender.

8           But in the highlighted box here -- and I'll read it

9    because it's hard to see -- we can see it's still a work in

10   progress.

11          "I commented that the locking pins should have a

12   taper on the bottom to make their entry into the locking

13   splines smooth.  You will feel that they 'stick' upon entry

14   when trying the prototype.  The top edge of the locking

15   splines" -- and then it goes on.

16          So they were still working out the kinks in the

17   prototype as of June 1st.  It was not a completed prototype

18   that was successful.

19          Here we can see it looks like it was not successful

20   in doing the locking and unlocking because the pins were

21   sticking.  And then there is no evidence it was successful in

22   testing to see if it would change the optics or if it would be

23   durable and withstand the types of conditions needed, that

24   Mr. Byron insisted are required for this type of invention.

25          Moving to June 3rd, two days later, we get an

1    indication that Schmidt & Bender had done some testing that

2    worked good.  We don't know on what.  It could have been on

3    subparts.  We have no idea.  We have no idea what that testing

4    was.  It may have been, you know, now the pins are working

5    into the slots.  But we have no indication optics were

6    changed.  We have no indication that this was rugged or

7    durable, the type of testing required for this type of

8    invention.  And this is all too late.

9         Let's look at the invoice.  So the invoice, as with

10   the e-mails associated with it, give us no detail about what

11   the actual part or parts are that were sent.  I think Leupold

12   made something of this because it said "final invoice."  We

13   don't know.  Final for what?  Was it two of the components but

14   not the third?  We don't know.  This is very nondescript

15   material.

16        We know they weren't done yet because weeks later

17   they're still discussing problems and working out kinks.  We

18   know they're not done yet because the engineering drawings are

19   still being altered up through 2005, months and months later.

20        None of this evidence demonstrates that all of the

21   features, as required, in each and every of the claims of the

22   Windauer patents was present in any prototype.

23        What's notably missing in this case is a prototype.

24   So when we heard about the case law earlier today, that

25   documentation -- it was suggested that documentation alone can

1    be sufficient to show reduction to practice, which can then

2    infer a conception.

3            Now, mind you, we haven't ever seen a prototype in

4    any of these pictures of a working component working with a

5    riflescope.  So none of that deals with all of the elements of

6    the claims.  But nonetheless, missing from this case is a

7    prototype.

8            The case law we saw cited earlier today, there was a

9    physical prototype that the Court could look at.  We've never

10   seen a physical prototype.  We don't have pictures of it.  We

11   don't have notebook drawings or discussions of it.  All of the

12   things someone keeps, as an engineer, when they make these

13   things either didn't exist -- which is a reasonably fair

14   conclusion, considering the various dates here -- or existed

15   later.  If they don't exist at all anymore, then there's

16   terrible, sloppy recordkeeping.  The consequence of that is

17   you can't demonstrate earlier invention.

18           Demonstrating early invention is a special case when

19   you keep your records correctly and the evidence shows what

20   it's supposed to show.  We don't have any of that here.  We

21   don't know what the prototype is they're discussing.  We don't

22   know when it was made or finalized.  We have a very good

23   indication to suggest it wasn't done in June, which is

24   still -- which is too late.

25           That is not evidence that can meet the burden of

1    production to show that the claimed invention was reduced to

2    practice or conceived.  We know eventually it was, because

3    products hit the market, but well after the Japanese

4    publication.

5            There are also records that you've not seen.  It's

6    not in any of the briefing.  There were drawings showing more

7    details related to some of these components.  There was a

8    mention earlier today of a second knob that was made, the

9    illumination knob that was also locking that Schmidt & Bender

10   wanted done.  We have good records of that.  Those showed up

11   in the record.  There's CAD drawings.  We have dates.  We have

12   clarity.  So we know these people kept good records when these

13   things existed.

14           Why don't we see that here?  Because all of that is

15   too late in time.  None of those records -- no photos, no

16   prototype -- exist prior to the date.  We can assume either

17   they don't exist or they're gone.  The legal effect is the

18   same either way.

19           So, at most, here we have some evidence that some

20   aspects of the claims were conceived and perhaps reduced to

21   practice, at least in terms of a prototype being made by 2005.

22   We have no indication that the rugged testing was done at any

23   point, including even in 2005.  And there's no legal basis for

24   saying that that testing is not required.

25           So it's getting into the weeds a little bit to get

1   there, but it's crystal clear there is not a record here that

2   can demonstrate earlier invention; and summary judgment of

3   invalidity is appropriate.

4           There's one other bit of evidence that came up in the

5   briefing.  It was not argued this morning, but I'll highlight

6   it here.  It was another late submission that came to us in

7   the middle of summary judgment briefing, after we called out

8   the lack of evidence of an actual prototype or a reduction to

9   practice with testing.

10          This evidence, I believe -- I assume it was not

11  brought up this morning because it's not particularly useful.

12  I think the fact that it was submitted late and Leupold

13  apparently felt it was needed is telling as to how they

14  actually believe as to the strength of their case.

15          We got this declaration from Mr. Larsen.  Mr. Larsen

16  testified that he made locking turret knob parts for

17  Mr. Windauer's design, for Schmidt & Bender, quote, in the

18  2004 time frame.  Notably lacking from that is any statement

19  that that was prior to May 27.  That's a statement that's

20  perfectly accurate if it was in December of 2004, November,

21  et cetera, too late, useless, yet they felt the need to bring

22  this forward late in the game.

23          He also testified that he's reviewed exhibits to his

24  declaration, referring to the various drawings we've been

25  looking at, and said that the parts shown in those drawings

1    are typical of the parts he made for Mr. Windauer.

2             Again, not particularly useful, because we don't know

3    when, but also telling, "typical of," implying that they're

4    not the same, that the prototype parts he made for him were

5    perhaps different.  I don't know why you'd not use more

6    precise language, where you'd say they were the same.

7             If anything, the lack of useful content in here and

8    the ambiguity is suggestive that reduction to practice

9    actually happened later.  But we have no obligation to

10   demonstrate that.  It's Leupold's burden of production to

11   provide evidence that can demonstrate an early invention.

12   They don't have it.

13            So the conclusion.  We have three separate

14   independent bases, any one of which is sufficient to find

15   summary judgment of invalidity:  No evidence that a prototype

16   was constructed in the relevant time period that embodied all

17   the claim features.  No evidence that there was testing done

18   that it worked for its intended purpose.  They haven't tried

19   to provide any, other than the late e-mail.  That's the only

20   thing we have at all that suggests there was testing; and,

21   again, we don't know of what.  And no conception demonstrated.

22            All right.  So let me see -- that's the conclusion of

23   the prior invention section.  Let me see if there's any

24   questions on that before we move on to the equitable remedy

25   argument.

1          THE COURT:  I have no questions.

2          MR. CASIMIR:  Okay.  Equitable remedies is going to

3    be very quick.

4          On the equitable remedies, Nightforce has not moved

5    on any of those.  It is a motion by Leupold to address issues

6    raised in the Complaint.  This has been briefed, and I will

7    point to the briefing on it, but just in short, the briefing

8    highlights that any motion on this is preliminary at this

9    point.

10          These equitable remedies -- for example, damage

11    mitigation -- are ongoing issues.  Leupold has an obligation,

12    as we go forward, to continue to try to mitigate damages.

13    These are, if anything, ripe for motions near the point of

14    trial.

15          Any questions on that before we shift to the 112

16    issues?

17          THE COURT:  No.

18          MR. CASIMIR:  All right.  So the arguments we heard

19    this morning on 112 got into, I think, more of the substance

20    of the issues.  As you review the briefing, you'll see that

21    there's a large reliance by Leupold on an argument that

22    Nightforce's expert's testimony can be ignored because of lack

23    of competence of that expert.

24          We didn't hear about any of that this morning, so

25    I'm just going to note that the briefing highlights that

1   Mr. DuFaux, Nightforce's expert, is eminently competent to

2   talk on these issues, much more so than Mr. Leupold's expert,

3   Mr. Byron.  He's trained in this area.  He's designed

4   adjustment knobs.  His specialty is high-impact materials.

5   He's designed weapons systems.  He's exactly the type of

6   person appropriate for this case, whereas Mr. Byron is not.

7        So, again, it was not raised this morning.  I'll just

8   refer to the briefing.  To the extent they are at some point

9   going to rely on those arguments, there's no basis for it.

10        And, as you'll note when you go through the briefing,

11   their reliance on that is significant.  Some of their

12   arguments are entirely reliant for summary judgment on having

13   Mr. DuFaux's testimony stricken.  Absent it being stricken --

14   although they have not moved to strike it -- we have factual

15   disputes.

16        Let's get into the substance.  So one preliminary

17   point -- and this goes back to a point I highlighted earlier

18   today -- we have this unusual circumstance I've never seen

19   before, but it was interesting to try to address it, where

20   hundreds of issues were raised in a single 35-page brief.

21        Our responsive brief complains about that, goes into

22   detail about the specifics of the Complaint and notes that the

23   only way we could reasonably respond to that within the page

24   count was to respond with the appropriate level of detail,

25   giving at least one example by which the Court can find that

1    summary judgment is not appropriate for the issues Leupold
2    moved on where Nightforce did not.

3              And that's what we did.  We gave at least one
4    example.  We gave citations to substantial portions of the
5    record where there's a lot more, but it parallels exactly what
6    Leupold did in their opening motions, where in some cases
7    these issues were raised in a single sentence or two
8    sentences, with a long citation to dozens to sometimes
9    hundreds pages of testimony, asking you to go and dig through
10   those details and find the case for them.

11             Each of these issues could have probably merited its
12   own 35-page brief.  Obviously we didn't have the space to do
13   that.  So we heard earlier this morning, "Nightforce only
14   argued this."  We didn't only argue that.  We argued that as
15   an example of why the motion can be dismissed.  The briefing
16   gives citations for many, many, many additional arguments.

17             And I don't know how Your Honor wants to approach
18   that.  We've recommended that you can just dismiss it.  I
19   think it puts an unfair burden on the Court to have to go
20   figure out what their arguments are.  But if you want to do
21   the digging exercise, you're going to have to dig through
22   their cites.  We've provided the counter cites.  It's all
23   there.  It's just a massive amount of work to get there.

24             And so the "You've only heard one argument" that you
25   heard today -- and we may hear it, I suspect, this afternoon

as well -- they're just highlighting the one argument example
we raised in our briefing to demonstrate that their motion can
be dismissed.  That is not exclusive.

Let's talk about indefiniteness and the specific
example raised earlier today.

There is a dispute over whether the claim terms
"engagement member" and "engagement surface" in many of the
claims -- and then there's equivalent terms in other
claims -- are indefinite.  And when you look at the legal
arguments going back and forth, they are ships passing in the
night.  Leupold seems to base their argument on the fact that
one can talk about these terms and identify examples of what
they are.  And we heard that earlier today.  They point to
some examples in the body of their patent application:  pins,
grooves, things like that.

It is true that if you can't understand the term at
all, it's indefinite, so that you cannot picture anything.
But it's also true that a claim is indefinite if you do not
know the boundaries of the invention.  A patent is a property
right.  It's like a deed to physical property.  It's supposed
to define where the boundaries are so that people know what
edge they can walk up to and not violate that patent.  Terms
like "engagement member" and "engagement surface" give us no
ability to do that.

Importantly, these terms are not in the body of the

patent application.  They only appear in the claims.  So these
are not defined terms.  They're not terms you can learn about
what they mean in context.

We heard a lot this morning about the "sandpaper and
Velcro" language, as though it had come from Nightforce's
expert, Mr. DuFaux.  He talked about it in his expert report,
giving examples of what those terms might cover.  But where he
got that from was the inventor.

So this came from the inventor, Mr. Windauer, during
his deposition.  I deposed him.  This is all in the Windauer
deposition testimony.

He -- I asked him, "Do these terms appear in the
patent?"  I don't think he recalled one way or the other.
They're not there.

And I asked him, "What are the boundaries of these?"
And he was having trouble explaining what the boundaries were,
and he effectively said, "It could be just about anything."

And I asked, "Could it be Velcro?"  And he said,
"Yes."

I asked, "Could it be sandpaper?"  And he said,
"Yes," and then gave an answer about, you know, if the
grain -- if the grains were sufficiently different enough,
yes.

And he wasn't saying that those terms could be that
outside of the context of the invention.  He meant it in the

context of the invention.  He was saying the locking mechanism
in the turrets could be Velcro or it could be sandpaper.  He
suggested that the sandpaper might not be a very good locking
mechanism; and I think we could all agree with that.  But he
believed that those terms in his patent covered that.

So it's not Nightforce's expert hand-waving and
making up fallacious concepts of what those terms cover.  The
inventor believes the patent covers those as locking
mechanisms under that terminology.

So where are the boundaries?  He didn't know.  I've
not heard anyone say.  Leupold's expert, Mr. Byron, didn't
tell us where the boundaries were.  Is it two people holding
hands?  It would have to be a big turret.  But there's no --
we don't know what you can do to be within the scope or
outside the scope of those claims.  That's classic
indefiniteness.

They suggested that Mr. DuFaux didn't talk about them
in the right context in his expert report and, therefore, the
testimony can be dismissed.  That's incorrect.  Mr. DuFaux's
report cites the relevant law and applies the relevant law.
As you'll note when you look at Leupold's motion on this, it's
not particularly well-developed, which is going to be true on
all of these 112 issues.

Let's turn to the written description and enablement.
We heard these three categories lumped together this morning,

1   and then the example was given with the indefiniteness.  We

2   didn't get into the details about the written description and

3   enablement, other than bringing up the "sandpaper, Velcro"

4   issue again.  So there's nothing really for me to address.

5   The briefing on this is, I think, more than sufficient.

6          Mr. DuFaux, Nightforce's expert, goes into the law or

7   outlines what his understanding of the law is -- and I haven't

8   heard any dispute about that law being incorrect -- and then

9   applies the facts to the law.  The citations are in the

10  briefing as well as here, where he goes through all of the

11  relevant evidence of why these lack enablement and written

12  description.

13         Keeping in mind that the examples in the

14  specification are extremely limited, if "engagement member"

15  and "engagement surface" cover everything -- people holding

16  hands, Velcro -- there's nothing in the application that

17  conveys the inventor was in possession of that invention at

18  the time those inventions were made, those patents were filed,

19  the written description requirement.  And there's no evidence

20  that the rigorous testing required to demonstrate that these

21  work establishes enablement for the literally nearly infinite

22  number of ways these can be done.  We have three or four

23  specific embodiments in the patent application that all have

24  common shared features.

25         There's no basis -- and, again, mind you, Nightforce

1   has not moved for summary judgment here.  Leupold has moved

2   for summary judgment.  Best case scenario for them is we have

3   a battle of the experts on factual disputes.  There is just

4   simply no basis for summary judgment granting in their favor

5   on these.

6           And that concludes my 112 section.  Let me see if you

7   have any questions there.

8           THE COURT:  I do not.

9           MR. CASIMIR:  Okay.  I'll turn the seat back over to

10  plaintiff.

11          MR. WILLIAMS:  All right.  So if it's all right with

12  you, Your Honor, I'll respond and finish my presentation on

13  the other issues.  Does that sound okay?

14          THE COURT:  Yes.

15          MR. WILLIAMS:  All right.

16          All right.  Let's start with the question about

17  priority of invention, whether Mr. Windauer invented the

18  subject matter of the 2004 priority claims prior to May 17,

19  2004, and whether Leupold has met its burden of production

20  with regard to that date.

21          So what I hear from Nightforce's counsel in that

22  regard is picking apart the evidence that was presented this

23  morning.  We showed a screenshot of an electronic CAD file and

24  a date of when that file was created as well as the date it

25  was last modified by Mr. Windauer, which Nightforce's counsel

highlighted.  We also saw printed drawings from that
electronic file, which copies were created some time ago, as
well as e-mail correspondence contemporaneous with the
creation of the CAD drawings for the prototype locking turret
knob.

And what I haven't heard Nightforce analyze -- and
it's the analysis the Court should use -- is what does that
add up to?  How does the evidence fit together?  And is
there -- does it show prior invention?

And the reason it does is because even though the
drawings themselves aren't dated or the e-mails themselves
don't show the design, the drawings show the design; the
e-mails show the date; and the references, each to the other,
show their connection, how it's talking about the same thing.

And that's why the evidence we presented before the
Court is worthy of summary judgment, because Nightforce has
that evidence and it hasn't rebutted it.  They're taking pot
shots at pieces of it, but they're not using the analysis that
the Court should use to see what it adds up to, whether it
proves prior invention.

And, again, the Court should remember that the burden
of proof remains on Nightforce.  They have to show by clear
and convincing evidence that all the material that we've come
forward with to show the date of Mr. Windauer's invention by
clear and convincing evidence doesn't show a May 17th

1    reduction to practice.  That's their burden.  And because they

2    can't do that, summary judgment is appropriate in our favor.

3                THE COURT:  I still have to look at the evidence in

4    the light most favorable to the defense, do I not?

5                MR. WILLIAMS:  For purposes of our motion, that's

6    correct, Your Honor.

7                For purposes of their motion -- and they have cross

8    moved on this issue -- you construe the evidence in our favor.

9                THE COURT:  All right.

10               MR. WILLIAMS:  Just a couple more specifics on that.

11   I recall there was a reference to a June 1st e-mail, I

12   believe, where there was a discussion of whether the locking

13   pin was sticking as it dropped in.

14               THE COURT:  Right.

15               MR. WILLIAMS:  I think that is entirely consistent

16   with our May 17, 2004 reduction to practice date, because

17   Mr. Windauer shipped the knob off to Schmidt & Bender and then

18   had some follow-up thoughts.  That is a normal part of

19   developing a product.  It's okay to complete an invention,

20   test it, send it to your customer and then say, "Oh, wait.

21   There's something we can do to make it even better."

22               Mr. Windauer, as an inventor, is not to be penalized

23   under patent law for having good customer service, which is

24   what we see in that June 1st e-mail.

25               All right.  There was also discussion of there being

1    a prototype missing and of the fact that we should have

2    evidence of a physical prototype.  Again, the circumstances

3    here were such that Mr. Windauer made the prototype for

4    someone else and sent it to them.  He invented it, but he sold

5    the physical device to someone else.  Patent law doesn't

6    penalize someone for that.  You don't have to show your prior

7    invention with a physical prototype.

8            And I believe Nightforce's counsel said something

9    like, you know, in other cases you have a physical prototype

10   or notebook drawings.  Well, we do have drawings.  We just

11   looked at them.  There's electronic files.  There's printed

12   drawings.  And they're a fit with the references to the

13   numbers, the angle numbers that we looked at, to the timing of

14   the e-mails, to show that it all is part of the same invention

15   activity by Mr. Windauer in that April, early May time frame.

16           So the lack of a physical prototype isn't relevant,

17   and we do have drawings to show documentary evidence of the

18   design and how it fits with the patent claims.

19           I believe the Court asked a question of whether the

20   drawings show the complete invention.  And the answer to that

21   is yes.  In our opening brief we don't lay out claim by claim

22   how each aspect of the invention is shown in the drawings, but

23   the analysis is done by Leupold's expert.  We cite to his

24   report.  I believe it's paragraphs 230, 220, in that range.

25   And we come back to that citation as well in Leupold's reply

1  brief on this issue to show that the patent claims are

2  complete in the prototype.

3         There was also quite a bit of talk about testing, but

4  not a lot of clarity on how it applies here.  So testing, as I

5  understand it -- I believe the law is consistent on this,

6  including the cases cited by Nightforce.  Testing is one way

7  of showing that your invention worked, that you completed a

8  reduction to practice.  It's not the only way.

9         And, in fact, in this situation we have both ways;

10  that is, we have Mr. Windauer's e-mails to Schmidt & Bender

11  that say, "I'm going to build a prototype and test it."  Then

12  we have the e-mails that say, "I sent you the prototype that I

13  tested."

14         That is evidence.  It's circumstantial evidence.

15  It's not as nice as having the prototype in our hands, but

16  that is evidence satisfying Leupold's burden of production to

17  come forward and show the completion of that prototype and

18  that it worked as intended.  And the fact that Mr. Windauer

19  delivered it to his customer and the customer was satisfied is

20  further evidence that the prototype worked as intended.

21         There was -- so the Byron declaration, we don't

22  actually rely on that in our affirmative motion.  But the

23  evidence is in the record that testing is not required for

24  showing that the invention of Mr. Windauer's locking knob

25  would work.  There's a whole lot of back and forth about

1    whether Mr. Byron's declaration was a sham.  We're happy to

2    submit the briefs on that issue.  Leupold has the better of

3    the issue.

4         The critical piece is that Nightforce is conflating

5    different kinds of testing.  Leupold's expert, Mr. Byron, has

6    said that when you release product, you have to test it and

7    make sure it works, especially something relating to firearms.

8         In this particular context, however, when we're

9    talking about replacing a knob with another knob on a fully

10   functional riflescope, you don't have to do all that testing

11   to see if the knob still works.  Mr. Windauer added some

12   components to that knob to make it a locking knob and tested

13   it, and that's what's required.

14        The full form -- you know, level 4, level 3 -- I'm

15   not sure that's borne out in the case law, but what Nightforce

16   is asking for, as far as extreme testing, is not required in

17   these circumstances.  And Mr. Byron's declaration to that

18   effect is not a sham either, because he's talking about

19   testing in this context where you're inventing a locking knob,

20   not an entirely new device, not a new riflescope.

21        One other thing that sort of overarchingly was an

22   issue in rebuttal from Nightforce's counsel is that the

23   arguments made and presented to the Court today are not

24   exhaustive of Leupold's positions or evidence.  I'm sure Your

25   Honor is aware of this.  We've selected certain things that we

1    think are most helpful and most important for the Court to

2    understand and highlighted them.  So, you know, not

3    highlighting something before the Court today doesn't mean we

4    don't argue it.

5            One example of that is inventor testimony.

6    Mr. Windauer did testify about how he invented the locking

7    turret knob in 2004, in April and May, and how he conceived it

8    earlier than that.  And we haven't highlighted that for Your

9    Honor this morning.  There are references to that in the

10   briefing.  And certainly to resist Nightforce's motion, we

11   rely on that evidence.  We don't think we need it for our

12   affirmative motion.

13           But for our -- for raising the issue of fact as to

14   whether Mr. Windauer invented what he invented prior to the

15   priority -- to the prior art that Nightforce has asserted,

16   that evidence is in the record and relevant, and we are not

17   abandoning that -- that evidence.

18           I think enough has been said about the equitable

19   remedies.  I believe those are ripe for decision.  Nightforce

20   has not come forward with evidence about them, nor is there

21   any reason to think that Nightforce should be able to prove

22   those defenses based on facts that have not yet occurred in

23   this case.

24           Turning, then, to the Section 112 issues, Nightforce

25   has argued in rebuttal that it only had space to cite a couple

of different pieces of evidence and that, therefore, the Court

shouldn't -- and this is sort of a blanket defense.

Nightforce has asked the Court to dismiss Leupold's summary

judgment motion entirely for being -- for covering too much

ground.

         Your Honor is familiar with the reasons why we

covered so much ground in one motion.  And with respect to the

Section 112 issues, Nightforce was not hindered by the short

amount of space.

         So let's see if I can find the relevant portion of

their brief.  It's not as though they cited one piece of

evidence because they had more evidence but didn't have space

for it.

         This is on pages 34 to 35, Nightforce's response

brief.  That's docket 120.  It addresses indefiniteness,

enablement.  Nightforce could have cited additional evidence,

and today they haven't come forward with more evidence.

         What they're relying on is this idea put in the mouth

of their expert, Mr. DuFaux, and, as we heard from counsel

this morning, also put in the mouth of Leupold's inventor,

Mr. Windauer, when being deposed by Nightforce's counsel, who

offered the suggestion, "Well, what about Velcro?  Could that

be engagement member?  What about sandpaper?"

         And I think it is fair to say that outside the

context of his patent -- and Mr. Windauer is not a patent

1    attorney -- he thought, well, an engagement member could be

2    Velcro or it could be sandpaper.

3              That is not the analysis, whether it's in the mouth

4    of Mr. Windauer through Nightforce's counsel or through the

5    mouth of Mr. DuFaux through Nightforce's counsel.  That's not

6    the analysis that needs to be done to think about whether the

7    claim as a whole, why the patent as a whole is indefinite;

8    that is, whether it has failed to reasonably inform a person

9    of skill in the art on the scope of invention.

10             And so, for that reason, Nightforce's evidence on

11   that issue of indefiniteness is insufficient to resist summary

12   judgment, and the same is true for the other Section 112

13   issues.

14             Okay.

15             MR. CASIMIR:  Are you ready to start the next?

16             MR. WILLIAMS:  I am.

17             MR. CASIMIR:  Could I make one comment to conclude

18   that section?

19             THE COURT:  No.  Because it's one comment, you can

20   just pick that up when it's your turn.

21             MR. CASIMIR:  Very good.

22             MR. WILLIAMS:  All right.

23             So carrying on, then, with the issue of priority

24   claim entitlement, this is again an issue for the Windauer

25   patents, which each claim priority to a November 30th, 2004

1    provisional application.

2            Nightforce argues that the 2004 priority claims of

3    the Windauer patents aren't entitled to the 2004 priority

4    filing date because they lack written description support in

5    the Windauer provisional.

6            This is a rehash of the "Velcro plus sandpaper"

7    argument, that the provisional lacks written description of a

8    "Velcro plus sandpaper" locking turret knob or doesn't enable

9    a person of skill in the art to make such a knob.  And for

10   that reason Nightforce says the disclosure of the provisional

11   can't support the Windauer claims.

12           Again, Nightforce doesn't have legal authority to

13   support this kind of analysis.  It is not the legal standard

14   for enablement or written description.  The question for

15   written description is whether or not the specification or, in

16   this case, the provisional has shown a person of ordinary

17   skill in the art that the inventor invented the claimed

18   invention.

19           And you can do that by showing a single embodiment.

20   There's not a requirement to show lots of different versions

21   of the invention.  And here, the Windauer provisional clearly

22   shows that Mr. Windauer invented a locking turret knob, as

23   claimed, as of the filing of the provisional application.

24           Let's take a look at some of that evidence.  If we

25   apply the correct legal standard for written description and

1    enablement, the Windauer provisional shows that Mr. Windauer
2    invented the locking turret knob, as claimed, and showed a
3    person of ordinary skill how to make and use it.  That's the
4    enablement standard.
5            So here are the figures from the Windauer
6    provisional:  on the left, Figure 1, shown in the locked
7    position; on the right, Figure 2, shown in the unlocked
8    position.  And it's not surprising here, but worth noting that
9    these figures showing the assembly, Figures 1 and 2, are very
10   similar to the CAD drawings we saw earlier showing prior
11   invention and to the Windauer patent figures, which we also
12   looked at earlier in addressing the Section 112 issue.  It's
13   the same invention throughout.
14           I've highlighted for reference the locking pin or
15   spline -- it could be either -- and the splined locking ring.
16   In Figure 1, highlighted in blue, the pin drops down and
17   engages with the lock ring.  In Figure 2, the knob has been
18   raised up, disengaging the lock pin so that the knob can
19   rotate freely.
20           The specification of the provisional also tells a
21   person of ordinary skill how to make and use the invention and
22   shows that Mr. Windauer possessed the invention that was later
23   claimed in the Windauer patents.
24           So here's an example.  This particular excerpt from
25   the Windauer provisional, page 8, lines 8 through 17,

1    describes how to make the locking turret knob, beginning with

2    a splined locking ring that can be a machined portion of the

3    saddle plate or a separate component, a spur ring attached to

4    the adjustment screw assembly, then an index ring placed on

5    the lock ring.  And then you have to index the index ring and

6    align them with one another.  You add, then, springs, a wave

7    spring or a coil spring.  And the final step is to secure the

8    ring assemblies, maybe with screws or screw threads or a

9    turret knob nut.

10          This meets the enablement standard.  Mr. Windauer has

11   shown a person of skill in the art how to make the invention,

12   and he also describes how to use it.  All you need to do is

13   lift the index ring, rotate it to the desired setting, and

14   release.

15          "It should be noted that the locking/unlocking

16   function may be accomplished with a spring-loaded button, pin,

17   or lever that is actuated with finger pressure."

18          The material issue for priority is that the Windauer

19   provisional shows that Mr. Windauer invented a locking turret

20   knob as claimed and showed a person of ordinary skill how to

21   make it, how to use it.  The absence of a "Velcro plus

22   sandpaper" discussion, which is Nightforce's affirmative

23   defense here that we're addressing, has no bearing on those

24   legal issues.

25          Just a further comment on where Nightforce is coming

from with these arguments.  Nightforce's arguments appear to
rely on a faulty legal assumption, that support for claims in
a priority application requires the inventor to disclose every
imaginable embodiment within the scope of the claims, even
embodiments beyond imagination, like Velcro and sandpaper.

That legal assumption is wrong for multiple reasons.
First, we already looked at, what is the correct legal
standard for written description and enablement?  It's not
that you disclose every conceivable embodiment.  One is
enough.

Furthermore, the Federal Circuit has expressly
addressed this issue.  The *Cordis Corp.* case cited in the
briefing is a great example, quote:  "An applicant is not
required to describe in the specification every conceivable
and possible future embodiment of his invention."

And the *SRI* case from the Federal Circuit gives a
reason why, based on the structure of the statute.  So
Section 112, we saw earlier in the presentation, has a
paragraph 1 addressing the requirements for the specification
and paragraph 2 addressing the claims.

In *SRI*, the Federal Circuit explains that you
wouldn't need the claims of paragraph 2 if the law invalidated
claims that were broader than the embodiments disclosed, as
required by paragraph 1, the specification.

So Section 112 clearly contemplates and the Federal

1    Circuit has been consistent on this point that the claims will

2    be broader than the embodiments disclosed in the

3    specification, both of the patent itself and of a provisional

4    priority application.

5         So Nightforce's -- they don't cite any cases to

6    explain this, but I'm addressing the legal assumption that --

7    I wish they'd make their arguments in their briefs.  It's just

8    inconsistent with the law on this point.

9         In short, Nightforce's arguments lack any legal

10   foundation.  They run contrary to established authority on

11   written description, enablement, contrary to the structure of

12   the statute, Section 112, and contrary to established

13   authority on whether an applicant can claim more broadly than

14   the embodiments disclosed in a priority application.

15        For each of these reasons, summary judgment in

16   Leupold's favor on priority of the 2004 priority claims of the

17   Windauer patents to the date of the Windauer provisional

18   should be granted.

19        All right.  And then to wrap up, I have a collection

20   of different issues to address regarding prior art arguments

21   that Nightforce has made against some of the locking turret

22   knob patents.

23        THE COURT:  Okay.

24        MR. WILLIAMS:  So beginning with the Windauer

25   publication, Nightforce argues that the subject matter

1    disclosed in the Windauer patents, and specifically an early

2    published version of those patents, anticipates the claims of

3    the '408 patent.  The '408 patent, for refresher, is the

4    pinch-and-turn patent that was discussed earlier in the

5    infringement context.

6            Leupold moved for summary judgment against this

7    defense based on the fact that the Windauer publication lacks

8    an element present in all claims of the '408 patent.  That

9    element is a button "manually depressible transverse to the

10   axis."

11           Instead, Windauer describes a button depressible

12   along the axis of rotation.  And there are some images to

13   illustrate.  The figure on the left is from the Windauer

14   publication.  It illustrates a button, highlighted in green,

15   depressible in the direction shown by the red arrow, along the

16   axis of rotation, illustrated by the blue line.  You'll see

17   that the direction in which the button is depressed lines up

18   with, it runs along the axis of rotation.

19           The figure on the right is a figure from the '408

20   patent, illustrating the button is depressible transverse to

21   the axis.  The buttons highlighted in green are squeezed

22   inward or pinched, as shown in the red arrows, the direction

23   in which the buttons move; and that's towards the axis of

24   rotation, transverse to that axis.

25           The Windauer button clearly does not teach or

1    disclose the structure described and claimed in the '408

2    patent, as illustrated here.

3         In response to this, Nightforce's briefing makes one

4    argument:  that the Windauer provisional application, which is

5    incorporated by reference into the Windauer publication,

6    states that the locking/unlocking function may be accomplished

7    with a button.  But the Windauer provisional, as we just saw,

8    does not describe a transversely depressible button.  It

9    merely states that that locking/unlocking function can be

10   accomplished with different kinds of actuators -- a button,

11   pin, a lever -- actuated with finger pressure.

12        As explained in Leupold's reply, an anticipating

13   reference must disclose all elements arranged in the same way

14   as claimed.  As illustrated here, the Windauer provisional and

15   the Windauer publication do not describe or disclose a button

16   manually depressible transverse to the axis.

17        Ironically, in the context of the priority claim

18   entitlement discussion, which we just finished, against the

19   Windauer patents, Nightforce argues that the disclosure of the

20   Windauer provisional is too thin, too limited to support

21   Windauer's claims.

22        Yet now, in the context of using the Windauer

23   provisional as alleged prior art, we see Nightforce arguing

24   that the Windauer provisional has a very fulsome disclosure,

25   even covering the transversely depressible button as claimed

1   in a different patent, in the '408 patent.  Nightforce is

2   wrong on both counts.  And with respect to the '408 patent,

3   Windauer plainly does not disclose the transversely

4   depressible button claimed in the '408 patent and, therefore,

5   cannot anticipate.

6           One final point on this reference:  Nightforce's own

7   expert in deposition testified that he thought the transverse

8   button was not disclosed or even obvious in light of a button

9   that moves along the axis of rotation.  Highlighted here is an

10  excerpt from DuFaux's deposition.

11          "Question:  If someone wanted to design a locking

12  mechanism for a turret like this where the force were applied

13  in a perpendicular direction to the longitudinal axis, how

14  much of an exercise would that be?  In other words, would you

15  feel like this drawing enables force applied in a

16  perpendicular direction as opposed to a longitudinal

17  direction?"

18          There was some discussion about what "transverse"

19  means.  Then the answer:  "I don't know -- I think that's new.

20  I don't know how you would do that, how you would convert this

21  to that because, again, the force you apply is up and down and

22  it's the outer part that goes up and down."

23          Based on this testimony, not only can the Windauer

24  publication not anticipate, it does not render obvious the

25  claims of the '408 patent.

1          All right.  The next reference to address is the
2     Canon video camera.  The Canon XL-2 device is a digital video
3     camera that Nightforce argues anticipates all of the claims of
4     the '408 patent.  And Leupold has moved for summary judgment
5     because Canon lacks an element of every claim of the '408
6     patent; namely, a "spindle operatively coupled to an
7     adjustable portion of the optical device to thereby adjust the
8     adjustable portion in response to rotation of the spindle."

9          And the parties dispute the proper construction of
10    the term "operatively coupled."  Leupold argues that a person
11    of ordinary skill, reading the claim in light of the intrinsic
12    record of the patent, would understand that "operatively
13    coupled" means "mechanically linked, directly or indirectly."
14    Nightforce argues that the term covers any kind of link that
15    operates.

16         Notably, when I put in the slide here some citations
17    to the *Markman* briefing, which includes more analysis on those
18    terms -- it wasn't addressed at the hearing, due to the
19    Court's request to narrow the subject matter of the hearing,
20    but there is briefing at the *Markman* stage on this issue.

21         Just highlighting some of the evidence presented in
22    those briefs, Nightforce's own dictionary that they rely on
23    supports Leupold's position.  Nightforce -- Nightforce's
24    proposed construction uses the word "operate," "to run or
25    function effectively."  But that is a much broader term than

the word "operative," which is the word used in the claim,
"exerting influence or force, like a push or a pull."

Furthermore, the language of the claim in the patent
also supports a mechanical understanding of the term
"operatively coupled."

So Claim 1 describes the relationship between the
spindle and other elements of the claim as a mechanical
relationship.  Going through some of the elements of Claim 1,
it includes "an engagement surface fixed relative to the
optical device," and then the "spindle rotatably supported on
the optical device."

It rotates "relative to the optical device and the
engagement surface."  And it's "operatively coupled to an
adjustable portion," and it adjusts "the adjustable portion in
response to rotation of the spindle."  As you turn the
spindle, the adjustable portion moves in response to it,
through the operative coupling.

The specification, similarly, contemplates mechanical
relationships among all of the knob components.  Thus, a
person of ordinary skill reading the claim as a whole, in the
context of the patent as a whole, would understand that
"operatively coupled" to refer to a mechanical link.

Also, one of Nightforce's engineers, a person skilled
in the art, testified about the meaning of "operatively
coupled."  This is from the deposition of Kevin Stockdill,

1   Exhibit 23 to Leupold's opening brief.

2           "Question:  Okay.  And it says that the first

3   adjustor is operatively coupled with the objective lens

4   assembly.

5           "Answer:  Correct.

6           "Question:  What does the 'operatively coupled' mean?

7           "Answer:  It combined or conjoined with the optic

8   system to -- 'coupled' meaning it -- in the way I'm

9   interpreting that is, it is a part of that system.

10          "Question:  So it means it's mechanically linked to

11  it?

12          "Answer:  Correct."

13          So that's "operatively coupled," a mechanical link,

14  direct or indirect.  The Canon device doesn't have one.

15          By contrast, the power dial on the Canon device is

16  not mechanically linked to any portion of an optical device.

17  The power dial, rather, is a selector ring, basically a

18  multi-position electronic switch where the user rotates the

19  ring to select different automated program modes for the video

20  camera.

21          I've highlighted those modes on this slide, which is

22  from the Canon device operator manual.  In the middle there's

23  one that says "power off."  So there's the "off" position.

24  You can rotate to the "VCR mode" for playback or an "external

25  control mode."  And then there are a variety of recording

programs, such as "auto," "manual," and other preprogrammed settings for different conditions.

Thus, the Canon dial is a selector, not an adjustor. It activates the preprogrammed electronic mode electronically. It is not coupled operatively to an adjustable portion of an optical device.  There is no operative coupling whereby rotation of the dial causes adjustment of a coupled portion in response to rotation.  It's not as though you can move an optical component or an adjustable portion by turning the knob through an operative coupling.

In short, because the Canon selector ring is not mechanically linked to an adjustable portion of the optical device, it is not operatively coupled to an adjustable portion of an optical device and cannot anticipate any claim of the '408 patent.

Let's take a look at how the Canon device stacks up against the '068 patent.  Nightforce also argues that the Canon device anticipates all of the claims of this patent, and Leupold moved for summary judgment because all of the claims of the '068 patent require "a riflescope or other aiming device," and the Canon video camera is neither of those.

In response to this argument, Nightforce argues that the camera could be used as an aiming device.  But Nightforce's support for this argument is a single citation to Mr. DuFaux, which is not an analysis, is not evidence, is not

1    even an argument.  It's a parenthesis.

2           I'll read the relevant portion:  "In regard to

3    independent Claim 1, the Canon XL-2 video camera (an aiming

4    device)" -- that's it.  This is purely a "he says" argument,

5    not based on experience or specialized knowledge, and should

6    be accorded no weight.

7           Assuming that it does bear weight, there is the

8    testimony of Nightforce's 30(b)(6) witness, who testified

9    unequivocally that a video camera is not an aiming device.

10   This is from Sean Murphy's deposition, page 56, lines 3 to 7.

11          "Question:  Would you consider a video camera to be

12   an aiming device?

13          "Answer:  Not related to a firearm, no.

14          "Question:  In any sense?

15          "Answer:  Not that I can think of."

16          The evidence of record is clear that the Canon video

17   camera is not a riflescope nor an aiming device, and summary

18   judgment should be entered against this defense as well.

19          Finishing out the Canon device then, let's address

20   obviousness, because Nightforce also argues that if the Canon

21   device does not anticipate, it must render obvious all the

22   claims of the '408 patent and the '068 patent.  But at least

23   two separate issues, in addition to the ones we've discussed,

24   prevent the Canon device from being used in an obviousness

25   analysis.

1          First, it is non-analogous art.  The relevant field

2     of the locking turret knob is riflescopes.  And I want to

3     highlight a point from the briefing about the determination of

4     the field of the invention being firearm specific.

5          In the *Sport Dimension* case, the District Court

6     relied on the patent disclosure to determine that the

7     pertinent art was personal flotation devices rather than

8     merely industrial design in the marine and soft goods

9     industries, as had been argued by the defense.

10         Similarly, the District Court in *Hypertherm v.*

11    *American Torch Tip*, a case discussed at length in the *Sport*

12    *Dimension* case, rejected the defense argument that the

13    pertinent field was mechanical engineering as it relates to

14    design and manufacture of consumable parts.  The Court there

15    found that the patents-in-suit related to plasma arc torches,

16    including consumable tips and nozzles, but as it related to

17    plasma arc cutters.

18         Also, the Federal Circuit's opinion in *Mintz v.*

19    *Dietz & Watson*, cited in the briefing, addresses the issue of

20    identifying the field of the invention.  In *Mintz*, the patent

21    related to a knitted encasement for meat.  And the District

22    Court had invalidated the patent as obvious.  The Federal

23    Circuit reversed on this issue.

24         The Federal Circuit explained that the District Court

25    erred by not requiring the field of the invention and the

knowledge of a skilled person in that field to include meat in
the meat encasement art.  The Federal Circuit held that
without some understanding of meat and meat encasement
technology, the artisan of ordinary skill would not grasp many
aspects of the invention.

Similarly here, without some understanding of
firearms and firearm-aiming technologies, a skilled person
fails to appreciate many aspects of the locking turret knob
inventions.

The Canon device is not in this field nor does it
address an analogous problem.  It is a digital recording
device.  It is extremely sensitive.  It records video and
audio media to a miniature digital cassette tape.

And just one example of this, if we look through --
here we go.  This is the first page of the Canon user manual.
You look at the title, the cover page.  You flip it open, and
this is what you read.  This is what a person of ordinary
skill would read, consulting the Canon device:  "Warning:  To
reduce risk of fire or electric shock, do not expose this
product to rain or moisture."

In sum, the Canon device is not analogous art, and
only in hindsight could someone attempt to integrate it with
riflescope art.  So for these reasons, the Canon device is not
evidence of obviousness of the '408 or the '068 patents.

Lastly, let's address the Gorsek reference.

1    Nightforce argues that a patent by Gorsek anticipates certain

2    claims of the '429 patent.  This is the earliest Windauer

3    patent.  Leupold moved for summary judgment of no anticipation

4    based on the fact that Gorsek doesn't have an element required

5    by all the claims; specifically, a locking turret knob.

6         So one of the issues here is whether the preamble is

7    limiting, because that is where the locking turret knob

8    limitation appears.  And the answer to that question is yes.

9    It was addressed in the *Markman* briefing, but not at the

10   *Markman* hearing or in the *Markman* order.  So there are some

11   citations on this slide to relevant briefing.

12        But most importantly, the principle, the legal

13   principle that applies here, is the one that if a preamble is

14   necessary to give life, meaning, and vitality to the claim,

15   then it is limiting.  And a great example of how that

16   principle applies to facts such as these is the *Poly-Am v.*

17   *GSE* case from the Federal Circuit, 2004.

18        In that case the claim element, "blown-film,"

19   appearing in the preamble, was found to be limiting because

20   the specification -- and I'm quoting now from the Federal

21   Circuit's opinion, quote:  "The specification is replete with

22   references to the invention as a 'blown-film' liner, including

23   the title of the patent itself and the 'Summary of the

24   Invention.'  The phrase is used repeatedly to describe

25   preferred embodiments, and the entire preamble 'blown-film

1   textured liner' is restated in each of the patent's seven

2   claims."

3           All those things are true here in the '429 patent.

4   "Locking Turret Knob" is the title of the patent.  It

5   describes every preferred embodiment in the figures.  It's

6   recited as the preamble to every claim in the patent.  And the

7   subject matter of the entire disclosure is for a locking

8   turret knob.

9           Furthermore, other claim elements, although not

10  deriving antecedent basis from the locking turret knob, derive

11  their meaning from that context and would not make sense

12  outside of that context.  For instance, an "axis of rotation"

13  and "adjustably positional about the axis of rotation,"

14  "locked in a select position," and "engagement member," those

15  terms make sense in the context of a locking turret knob,

16  which, fitting with the *Poly-Am* case and others of this line,

17  require the preamble in those situations to be limiting.

18          So taking "locking turret knob" as a claim

19  limitation, it must be understood in its ordinary and

20  customary meaning to one skilled in the art.  "Locking turret

21  knob" is a term well understood in the art as meaning the

22  knob, the locking knob, of a riflescope.

23          This particular deposition transcript expert is from

24  Nightforce's -- one of Nightforce's business managers, Tod

25  Litt, cited in the briefing, Leupold's reply brief, at page 28

1   and 29.

2           "Question:  For the record, you used the word

3   'turret.'"

4           He had volunteered that term.

5           "Can you describe what that is?

6           "Answer:  There's several, several pieces of

7   nomenclature.  It's the elevation and windage drum, the dial,

8   the turret, the turret mechanism.  It is the dial that adjusts

9   the erector inside of the riflescope to make elevation and

10  windage adjustments for impact shift on target."

11          That's the plain and ordinary meaning of a turret

12  knob.  At a minimum, a "locking turret knob" is a locking

13  weatherproof adjustment for an optical device.  Here is an

14  example from the specification of the '429 patent.  It is a

15  "mechanically lockable and weatherproof" adjustment knob.

16          By contrast, Gorsek is not that.  Gorsek describes an

17  outer cap that is -- and I've highlighted some relevant

18  language from the Gorsek patent.  This is column 5 of Gorsek.

19          "The cap is aligned" with a shaft "and snappingly

20  engaged by applying a downward force."  And then to

21  disassemble the knob, "a compressive or squeezing force is

22  applied to the knob body. . . perpendicular to the pointer,"

23  causing "the body to elongate. . . spread apart" its

24  "shoulders, releasing their engagement. . . and permitting

25  removal of the cap."

1                So Gorsek provides a cheap snap-on and snap-off

2      adjustment knob and may suit for things like electronic test

3      tools that are used indoors -- and those are the embodiments

4      discussed in Gorsek -- but is not suitable for use as a turret

5      knob on a riflescope or other optical device exposed to the

6      elements and other harsh conditions.  Because Gorsek lacks a

7      locking turret knob, it cannot anticipate.

8                And that's all I have for now.  I'll turn it over to

9      defense.

10               THE COURT:  Let's take our afternoon break.  We'll be

11     in recess for 15 minutes.

12               Thank you.

13               (A recess is then taken.)

14               THE COURT:  I don't mean to suggest that by carrying

15     a cup of coffee, that's a comment on the subject matter that

16     we're talking about.

17               Go ahead and have a seat.

18               MR. CASIMIR:  All right.  So along the coffee line,

19     we're in the home stretch, so not much more here.

20               THE COURT:  You wanted to make a comment, and I said

21     I'd give you a chance to make a comment.

22               MR. CASIMIR:  I've ended up integrating that into the

23     discussion I'm going to have on these issues, so it will be

24     folded in.

25               THE COURT:  Okay.  Good.

1              MR. CASIMIR:  Okay.  So we're kind of jumping around

2     to a lot of different issues here, but let's start with the

3     issue of the Windauer patents and whether they're entitled to

4     the provisional priority date.

5              The impact of this, of course, is critical for any of

6     the claims we've been discussing that would be invalid because

7     earlier invention can't be shown.  If there's no priority

8     claim, those claims are doomed, right.  We don't even get to

9     the point of marching back earlier because the provisional

10    date is lost.  So it's a significant gating issue for those

11    claims, on whether the priority date is available or not.

12             We have not -- so everything we're going to talk

13    about for the remainder of my presentation are not issues that

14    Nightforce has moved on.  So we are just defending against the

15    positive motion of infringement or validity of Leupold.  So I

16    think this may go a bit quicker because we're basically just

17    going to be highlighting disputed facts and moving on issue to

18    issue.

19             So regarding the priority date, the provisional

20    application itself, the locking turrets are not the focus of

21    it.  And when you look at the provisional application, only a

22    few paragraphs in there mention locking turrets.  Most of the

23    subject matter is something else.  So when you compare the

24    text of it to the Windauer patents that eventually issued,

25    it's just dramatically smaller.  It doesn't have many of the

 1  different embodiments.  It just has the one embodiment in

 2  terms of the figures.  So it's a much simpler document.

 3          We've already talked about how summary judgment

 4  cannot be granted that the claims are enabled by the Windauer

 5  patent itself.  So all of that then also applies to the

 6  provisional application, which is weaker in disclosure than

 7  the patents that issued.  So at least for the same reasons,

 8  those claims are not enabled or have written description.

 9  Enablement and written description is not found in the

10  provisional.

11          And then so let's talk about some additional reasons.

12  This is rich in factual disputes at this point, in the sense

13  that -- and you didn't get to see all these details.  There's

14  a detailed record in the written submissions on these points.

15  Nightforce's expert, Mr. DuFaux, walks through this, citing

16  the language here.  He's provided a table, highlighting words

17  and phrases in the claim that are not supported in the

18  provisional sufficiently.

19          Ultimately this is an issue that the provisional says

20  almost nothing related to the terms in the issued patents that

21  are extremely broad.

22          And we had some fight about the breadth of the claims

23  during the claim construction, and Your Honor kind of

24  universally ruled on the broader constructions than the

25  narrower ones.  And that, in part, exacerbates this problem

```
1    for Leupold in that the claims are extremely broad.  We've
2    already talked about terms like "engagement member" that are
3    open to just about anything.
4            And that gets to the case law issue.  So in the
5    previous summary judgment session we had, this same issue had
6    arisen in the context of the '907 patent.  And Mr. Davis,
7    during his presentation, identified the cases that are
8    relevant.  I'll note that these are on page 54 of the slide
9    presentation used for the oral arguments in the '907 summary
10   judgment session.  This is the O'Reilly v. Morse case, the
11   Research Corp. Techs v. Microsoft Corp. case, and the
12   TurboCare Division of Demag case.
13           Quotes are in those documents.  The cases are cited
14   there.  But essentially it gets to this principle that if you
15   have a very limited disclosure in your provisional document or
16   your priority document and then you claim things much more
17   broadly later on, you don't get the date.
18           They added lots of embodiments.  They added new
19   inventions.  And the fact that they've done this actually
20   isn't in dispute, in a sense.  The opening presentation seemed
21   to suggest that the provisional was good enough for the claims
22   of the Windauer patents.  But Leupold has admitted -- and this
23   is in the filings -- that many of the claims in the Windauer
24   patents are not entitled to the provisional date.
25           They've characterized claims as 2004 priority date
```

claims and others as 2005 priority date claims.  So they've
already taken the position that some of the claims do not find
support in that provisional.  So we have a dispute about where
that boundary lies.

And Mr. DuFaux's expert report provides the factual
details about why the line should be drawn differently than
how Leupold drew it.  It's a fact-rich dispute which cannot be
resolved on summary judgment.

When we look at whether a priority document provides
support for claims, it involves legal issues like enablement
and written description.  Living under those are complex
factual questions:  Who is the skilled artisan we're talking
about?  And the two parties don't agree on that person of
skill in the art and what their background is.

From an enablement standpoint, there's a series of
factors called the *Wands* factors.  And we have to look at a
number of things:  how detailed the prior art is, the
predictability of the field.  There's all of these different
factors we get into, and they're fact intense.

And in this particular case, none of that has been
raised in Leupold's motions or their briefing.  There's just
no basis on which to say that there is validity here on these
claims.  The record hasn't been developed sufficiently, and
there's factual disputes on all the key issues; and that
precludes summary judgment.

 1              Now, I'll note that our discussion earlier about
 2    braking versus locking exacerbates this issue.  So Leupold has
 3    taken the position that the Windauer claims are broad enough
 4    to cover these braking embodiments, where you can have a
 5    device that can be turned without making the mechanism broken;
 6    for example, the BEAST scope, which has the spring mechanism.
 7    That kind of gets to this Velcro issue, right.  So Velcro
 8    actually, as a mechanism to slow a dial, would be a braking
 9    mechanism rather than a locking mechanism in most cases.
10    Maybe it could be configured otherwise, but it would be
11    providing resistance.
12              So we're left with what do those claims cover?  And
13    it feeds into the indefiniteness we talked about earlier.  If
14    those claims cover braking, what is covered?  They talked
15    about Velcro, but they didn't actually say whether Velcro is
16    covered by those claims or not.  Can Velcro be an engagement
17    member?  They've turned to the Court to interpret that itself,
18    based on its own knowledge.
19              But we rely not on attorney argument or on the
20    Court's knowledge of these things.  We rely on the view of the
21    person of ordinary skill in the art doing a factual-based
22    analysis, and that's not been done here.  It's been done in
23    the record.  Mr. DuFaux does it.  They disagree with those
24    facts, but they're factual disputes.
25              And just to, I suppose, really drive that home, when

1    we look at the turret knob, the elevation turret knob on the

2    BEAST scope that has the braking mechanism, when the brake is

3    off and it turns relatively easy, there's still resistance

4    there.  Is that covered by the claims?  There's two things

5    contacting each other.  Where is the boundary?

6              That's the indefinite issue.  That's the enablement

7    and written description issue.  Because the patents

8    themselves, and even worse in the provisional, only give very

9    specific mechanisms in a very narrow lane about what those

10   are; and the claims cover much more, says Leupold.

11             All right.  So our slides are arranged to cover a

12   number of issues we've already covered -- some of them we've

13   already covered, so I'm going to have to check through.

14             So the Casas prior art, in their briefing they argued

15   issues with the Casas prior art.  It's got a date that falls

16   between the provisional date and the regular U.S. filing date,

17   and so there's arguments made that it's not prior art because

18   Leupold alleges all of their claims -- many of their claims

19   are entitled to the provisional priority date.  That's the

20   issue we just talked about, which is a factual dispute.

21             So they've asked for summary judgment that Casas does

22   not anticipate or make obvious the claims.  That's tied up in

23   the priority date argument.

24             The Japanese publication I think we've handled

25   sufficiently already.

1          Let's talk about the Canon XL camera.

2          So there is one dispute in this case that was not

3     argued today, and that is what is the actual prior art date of

4     that camera?  It's been briefed.  Nightforce positively asked

5     for a ruling that the evidence of record is sufficient to show

6     an August 2004 date.  Leupold has opposed that.

7          Talking amongst the parties, the parties are going to

8     rely on the written disclosures for that issue, and neither of

9     us will argue the specifics on that today, but just to note

10    there is an open issue that we've asked the Court, for

11    efficiency reasons, to note that that is prior art as of

12    August, based on the records.

13         Then there's lots of arguments in the written record

14    about that Canon camera, anticipation and obviousness.  We

15    heard about mostly anticipation this morning.  Obviousness is

16    also fully briefed.  Almost -- I think all of Nightforce's

17    arguments are this reference anticipates and/or renders

18    obvious the claims, in combination with this and this and

19    this.  We didn't get into much of the obviousness, but the

20    written record is sufficient to make those points.  There are

21    factual disputes between the experts on all of those, more

22    than sufficient to avoid summary judgment.

23         And just highlighting a couple of examples, so on

24    point 6 here on slide 47, Leupold makes some arguments about

25    how certain of the dependent claims of one of the patents are

```
 1   not anticipated.  And they base that argument on a concept of,

 2   quote, disengaging the lock by rotating.  But that's not a

 3   claim element.

 4         So just an example where it's -- it's very poorly

 5   developed arguments that have deep layers to them.  This is

 6   something -- an issue that we could have spent a lot of

 7   briefing on.  But, again, we've highlighted enough in the

 8   briefing, and we'll rely on the paper briefing for almost all

 9   of these to demonstrate that their motion for validity is not

10   appropriate for summary judgment; for example, arguing

11   concepts that actually do not appear in the claims.

12         And then highlighting again here our expert,

13   Nightforce's expert, DuFaux's expert report testimony,

14   providing the factual basis for why Nightforce's position is

15   correct.

16         THE COURT:  So are you going to make me go through

17   each and every claim element, compare it with each and every

18   claim element in Canon, and make sure that they either do or

19   do not match in order to figure out whether there is

20   anticipation or not?

21         MR. CASIMIR:  So my position would be I'm not going

22   to make you do that.  And I would say, if I were in your

23   shoes, I would skip the whole process, because Leupold has

24   forced this position by not developing the record.

25         And so we've given one example of why summary
```

1    judgment can be denied.  But to go through those cites, it

2    just parallels their cites.  So their motion for summary

3    judgment oftentimes is a sentence, a single sentence with a

4    string cite.  So to the extent you're willing to undertake the

5    path they've laid out, we've presented the counter path.

6          I would be -- I would welcome you to skip that

7    process entirely.

8          THE COURT:  Of course you would.

9          MR. CASIMIR:  And our opening brief argues why you

10   should.

11         THE COURT:  All right.

12         MR. CASIMIR:  All right.  So a lot of the argument we

13   just heard about the Canon camera relates to whether it's

14   analogous art or not.  So whether something is analogous art

15   or not is a fact-dependent basis, and there's a dispute among

16   the experts on this.

17         However, this issue gets simplified because the

18   claims we're talking about are not, in most cases, limited to

19   riflescopes.  Many of these claims, some expressly, cover

20   other devices like microscopes, things you don't want out in

21   the rain, things where the considerations are different.

22   So -- and this is all briefed in our briefing.

23         Most of the claims they just discussed are not

24   riflescope claims or the sighting device claims.  They're open

25   ended.  And so the whole analogous art argument in the first

1    instance is not appropriate because they're saying they're in

2    a different art than riflescopes, but the claims aren't

3    limited to riflescopes.  Some of them expressly cover things

4    like microscopes, and then their argument is out the door.

5            Even if it applied, the non-analogous art argument is

6    not ripe for summary judgment because it is knees deep in the

7    mess of factual disputes.  Again, who is the skilled artisan?

8    How do they view these things?

9            And we do have evidence in the record that those of

10   skill in the art, in terms of the people who designed these

11   types of products, do look to a lot of different areas.  For

12   example, we cited evidence in the last summary judgment

13   hearing that Mr. Regan, the inventor of the '305 patent,

14   supervises engineers who work on both binoculars and

15   riflescopes.  We heard from Mr. Otteman, the inventor of the

16   '907 patent, which is more direct to riflescopes in a sense,

17   talk about how it is common for people to look to other

18   optical devices, like binoculars, for example, in doing

19   designs.

20           So the non-analogous art argument is contradicted by

21   much of the evidence in the record, including Leupold's own

22   evidence.

23           With respect to whether a camera is a sighting

24   device, that's a disputed fact; and there is expert testimony

25   going both ways on that.

1                And, again, not argued here today, but in the

2      briefing Leupold has extensively argued that Nightforce's

3      expert's testimony can be dismissed because of the lack of

4      expertise.  Again, the briefing and the points I made earlier

5      today demonstrate that that is not the case.  And for summary

6      judgment, it's a lost cause.

7                We heard details about certain claim elements and

8      whether the Canon camera can invalidate because of questions

9      like does it have a -- is it -- is one component operatively

10     connected to another component?  There's disputed expert

11     testimony on those things.

12               And we saw pictures of the Canon power dial earlier

13     today, but there's a second dial on that camera up by the lens

14     called the ND ring, which Mr. DuFaux also talks about, that

15     has a different mechanism.  These things are operatively

16     connected.  In one case, with the ND ring, it is mechanically

17     coupled.

18               Furthermore, the argument we heard today was a claim

19     construction argument.  And we heard a lot of claim

20     construction arguments from Leupold today, trying to avoid

21     invalidity and arguing to the Court to address claim

22     construction issues not yet addressed and arguing for a

23     narrower construction.

24               The claim construction order we pretty much

25     universally -- I think universally -- always went for the

broader construction of these elements.  Applying the same

here, Leupold's arguments do not hold up, if the Court decides

it would like to go to that briefing on those issues and

determine these issues.

Just an example, on "operatively coupled," we heard

some quotes from two of Nightforce's 30(b)(6) deponents on the

issue of a number of the claim elements.  Both of the people

cited were business people.  They were not engineers.  They

were not technical people.  I don't know why that testimony

would be relevant.

Further, that is extrinsic evidence.  We have

intrinsic evidence.  We look at the specification and claims

and file history to resolve these issues.

With respect to "operatively coupled," the

specification describes couplings that are not just

mechanical.  One of them, I believe, mentions gluing, which

would be a chemical coupling.  Again, that's all in the

briefing, but also in the expert reports and in the original

claim construction briefing, lots of factual disputes

unresolved at this point and not resolvable at summary

judgment.

There was a quote from Nightforce's expert,

Mr. DuFaux, talking about one of the figures in the paten, and

taken to be a reference to a general statement about the

patent.  Actually, in each of the instances in which Leupold's

 1    slides quoted someone, the context was incorrect.  It was a

 2    narrow question or a question directed to someone without

 3    expertise in the area, talking about what's represented in a

 4    single figure.  It does not answer the question about the

 5    patent as a whole.

 6           Slide 49 talks about the Gorsek reference, which

 7    again we heard was not on point.  But, again, deep factual

 8    disputes on this issue.

 9           There is a discussion about whether it's a locking

10    turret knob.  We saw a quote put up from one of the patents

11    indicating some language about riflescopes, but it was either

12    that very same sentence or the language right before it that

13    mentioned microscopes and other devices.

14           Again, this is not -- these patents are not limited

15    to riflescopes, and the language Leupold presented to suggest

16    that turret knobs should be read in that context, the language

17    right next to what they cited shows that it should not.  But

18    there are factual disputes around this.

19           We didn't get much into obviousness.  I didn't hear

20    hardly anything on obviousness this morning or in the previous

21    session.  But in our written submissions and the associated

22    expert report, we provide plenty of evidence of obviousness,

23    which, at most, there's factual disputes.

24           Big picture here -- and let's talk about why the

25    Canon camera is present.  We've got -- let's talk about it in

1    the context of the push button on the side embodiment.  We've

2    got the Windauer patent out there that has push button locking

3    systems, and we'll go into more details about what the

4    provisional says.  The provisional doesn't say where.  It

5    could be anywhere.  So there's no limitations on where it

6    could be.

7            But then we also have prior art devices in the optic

8    space, with knobs where the button is on the side.  So one of

9    the reasons we highlight the Canon camera in particular -- and

10   the pictures shown today show it -- is the mechanism used on

11   that dial, or on the two dials -- there's one up by the lens

12   and one on the side -- use almost the exact same mechanism as

13   the Nightforce product.  So it's got a simple button with a

14   pin or tab integrated as part of the button -- it's all fused

15   together as one piece -- that moves in and out of a slot.

16           So we've got a prior art video camera that uses

17   basically the exact same mechanism as the Nightforce design

18   and a prior art scope saying push buttons on locking turrets,

19   with no mention of where.  They could be anywhere.  We didn't

20   hear anything about the obviousness of that, but when you have

21   one patent generic about --

22           THE COURT REPORTER:  Counsel, I really need you to

23   slow down.  "When you have one patent generic"  --

24           MR. CASIMIR:  So we have one patent in the Windauer

25   provisional that is generic as to where the button is, could

1   be anywhere, but describing that one might want push button

2   locking mechanisms on scopes, and another prior art reference

3   in the optics field showing that you could have push buttons

4   on the side.  There's just no invention to be had.  And the

5   obviousness argument is detailed in Mr. DuFaux's report and,

6   at best, is a factual dispute.  I think it's a rather

7   compelling argument.  We did not move for summary judgment on

8   it, but it's a particularly strong argument.

9        (Pause) Sorry.  I'm just scrolling through the slides

10  to see which ones we should additionally cover here, if any.

11       (Pause)  Okay.  That's the end of the Windauer

12  section.  If we could pull up the '408 patent slides, we'll

13  wrap things up.  And I'll talk about the '068 in the context

14  of the '408 together, because I think the issues are the same,

15  and they were presented by Leupold the same way.

16       Let's see.  We've done the non-infringement.  Going

17  to invalidity.

18       All right.  So a slightly better, refined version of

19  what was in Windauer.  So Windauer, there's no dispute that it

20  is prior art to the later '408 patent.  Many, many years

21  separate them.  And there's no dispute that Windauer describes

22  a button-actuated locking firearm adjustment knob.  The

23  picture shows how it works.  You push the button down on the

24  top, which causes little grooves to move down slightly,

25  allowing a pin to retract into the center and out of a slot,

1  moving it from a locked position in the top image to an

2  unlocked in the bottom.

3       That pin that moves is identified as No. 709.  And

4  you can see when the button is pushed down, the little grooves

5  drop and the back of the pin can slide into it, retracting the

6  pin.

7       When we look at the figures of the '408 patent, it's

8  essentially the same design, except we have a button on the

9  side and a little actuator that grazes across the top of the

10 central button pushing it down.  So it's basically, rather

11 than having a finger coming in from the top and pushing down,

12 we have a button and a little mechanical finger sliding across

13 the top which pushes it down.  But other than, they're the

14 same mechanism and not entitled to a separate patent.

15      So the only alleged difference between the Windauer

16 design and the design of the '408 is the position of the

17 button.  Notably, the provisional for Windauer does not limit

18 the position of the button.  It says you can have a button.

19 It could be anywhere.

20      A couple other points that really drive this home:

21 Leupold's expert was deposed on what the teachings of the

22 Windauer provisional provides someone.  And when you see the

23 figure in the Windauer provisional, which did not include the

24 figure with the push-down button that we see in Figure 7 --

25 that was added to the Windauer final patent; it was not in the

1    provisional.

2              He was asked about once you have that first figure in

3    the provisional, how difficult would it be to make push

4    buttons or other designs.  And his view was essentially all

5    locking turret designs were, quote, trivial in view of the

6    disclosure of the Windauer provisional.

7              So Leupold's own expert has argued from his expert

8    opinion that all these different designs, including the

9    Figure 7 design that was added later, is trivial, as well as

10   any other designs.  That direct testimony sits right on top of

11   the alleged invention in the '408.

12             Nightforce's expert explains why it's obvious as

13   well.  So we have some agreement that suggests it's obvious.

14             Now, Leupold's expert also makes some arguments about

15   why it is patentable.  I think they're inconsistent with his

16   deposition testimony on that point, but at most -- or at least

17   we have a dispute among the experts here.  Summary judgment is

18   not appropriate.

19             Really interestingly -- and we have a party

20   admission.  So in the opening summary judgment motion, Leupold

21   characterized one of Windauer's dependent claims -- so

22   Windauer being the prior art here.  So we're asking the

23   question:  Does Windauer disclose or make obvious a button on

24   the side?  And we have two dependent claims in an issued

25   Windauer patent, Claims 11 and 20 of the '120 patent.

1          This is a quote from Leupold's opening brief:  "As to

2     Claims 11 and 20 of the '120 patent" -- that's Windauer prior

3     art -- "those claims require that a second lock element is

4     movable in a radial direction relative to the rotational axis

5     of the adjustment knob; e.g., a button on the side of the

6     knob."

7          So they're saying that Windauer is claiming subject

8     matter that covers a button on the side of the knob.  That's

9     consistent with the provisional that says it could be

10    anywhere.  But now they're trying to argue that Windauer

11    doesn't teach that.  Does that mean that these claims are

12    invalid, dependent Claims 11 and 20, because it's describing

13    something that's not disclosed in the provisional or in the

14    regular application?

15         No.  They've taken the position that those claims are

16    valid.  By taking that position, they're admitting that

17    Windauer discloses concepts that are to be understood to cover

18    a button on the side of the knob.

19         Summary judgment is clearly not available for an

20    argument of validity.  We've got disputing experts.  We've got

21    admissions from Leupold's expert, and we have this admission

22    in their opening brief as well as the provisional, which is

23    generic as to where the position of that button is, and the

24    obviousness argument about the fact that side buttons were

25    known, for example, on the Canon camera.

1          The briefing itself, when you look at it, Leupold

2     doesn't really address the obviousness issue of Windauer

3     making obvious, by itself or in combination with other

4     references, the idea of having the button on the side rather

5     than the top.  The counter arguments for this are attacking

6     Nightforce's expert's expertise, which, as we've noted, is not

7     ripe for summary judgment based on the fact that he is, in

8     fact, an expert on that topic and Leupold has not moved to

9     disqualify him on those points.

10          Furthermore, the briefing again tries to refocus

11     these patents -- this is true of the '068 patent, the '408

12     patent, the Windauer patents -- as riflescope inventions.  A

13     few of the claims mention riflescopes.  Many of them -- many

14     of the patents, none of the claims do.  Some of them expressly

15     describe things like microscopes.

16          And I've got the quote here from the '408 patent,

17     which is the push button patent:  "The auto-locking device may

18     be used with other devices, including optical devices, such as

19     binoculars, spotting scopes or other sighting devices, weapon

20     aiming devices, microscopes, or other suitable optical

21     devices."

22          So all of the arguments about Leupold's expert's

23     expertise is out the door.  He actually designed knobs for

24     microscopes as part of his professional experience.  The

25     arguments about non-analogous art are out the door.  They

premise their arguments on the the fake premise of what the

claims cover.

I've got the intro to Claim 1 of the '408 patent

quoted here, which states "an auto-locking adjustment device

for an optical device."  It does not say "riflescope."

We see the language right above from the

specification that such optical devices include things like

riflescopes, which, again, are electronic devices in many

cases, just like video cameras.  And depending on the

microscope, you probably don't want to take it out in the rain

or out in the field, although obviously there are some

microscopes that are designed to be out in the field.  Many

are not.

So with respect to the Canon camera being

invalidating prior art against the '408 patent, here there's

no dispute that it is prior art.  There are some arguments

made about Windauer, because the Windauer date is much

earlier.  The '408 patent as well as the '068 patent have

much, much later dates, many, many years later.

So there's not a dispute that the Canon camera was

publicly available and it is prior art against these

references.  It uses essentially the same locking mechanism as

the Nightforce product that's been accused, so there can be no

doubt that the claims are argued to encompass those types of

designs.

1            Left with those factual issues, Leupold's arguments

2    again relate to trying to discredit expert testimony, making

3    these non-analogous art arguments, but none of these are

4    relevant.  For example, the '408 is not limited to

5    riflescopes.

6            Then we get a lot of undeveloped claim construction

7    arguments also in their briefing, which are not developed

8    enough for the Court to rule on, nor sufficiently developed

9    for summary judgment or, even if adapted, sufficient to avoid

10   factual disputes.

11           The invalidity arguments highlighted here for the

12   '408 patent apply equally well to the '068 patent, which also

13   had the Canon camera cited as prior art against it.  In that

14   case, recall the '068 relates to this lock ring with the

15   sliding surface.

16           The images provided in the briefing show that the

17   internal portion of those knobs in the Canon camera actually,

18   in fact, has such -- has surfaces that look very much like the

19   ones in the Nightforce product.  If anything, they are more

20   like the ones in the Leupold patent.  But to the extent those

21   claims cover the Nightforce product and design, they would

22   also cover the Canon camera design.  It's some slots in spots

23   where a tab makes contact.

24           And that wraps up our presentation.  And we'll see

25   how close we are to being done.

1          THE COURT:  Thank you.

2          MR. WILLIAMS:  All right.  We have a few comments in

3   response.

4          I don't think I'll use that yet, but maybe in a

5   moment.

6          So, first, Nightforce has presented a lot of facts.

7   They're not material, however, to Leupold's motions because of

8   the structure of the arguments before the Court on Leupold's

9   motion.  So Leupold moved on a number of issues.  The ones

10   we're talking about now are Nightforce's affirmative defenses

11   of patent invalidity, where Nightforce bears the burden of

12   proof, by clear and convincing evidence, to show that the

13   patent is invalid.

14          And so under the *Celotex* decision, on the summary

15   judgment standard where the other party, the nonmoving party,

16   bears the burden of proof, Leupold has taken the position in

17   its motion of saying, "You can't show this element of your

18   affirmative case," it's Nightforce's burden to come back with

19   the facts on that element.  We've seen a lot of other

20   elements, a lot of other facts just now, but not specifically

21   directed to the legal or factual issue pinpointed in Leupold's

22   arguments.  I'll go through some of them.

23          So first let's discuss priority application support.

24   Nightforce's counsel has argued that there's fact issues

25   there, referring again to the DuFaux report, in which

1    Mr. DuFaux recites a number of different excerpts from the

2    Windauer provisional and says that these are different from

3    the Windauer patents; therefore, the claims aren't supported.

4         Well, like our earlier discussion about the

5    appropriate legal standard, this is not referring to the

6    appropriate legal standard, which requires, in the case of

7    enablement, that the priority application show a person

8    skilled in the art how to make and use the invention.  We

9    walked through how Mr. Windauer did that in his provisional

10   application, and for written description, as showing to a

11   person skilled in the art that Mr. Windauer invented the later

12   claimed invention at the time of the provisional application

13   and as disclosed there, and we walked through how Mr. Windauer

14   did that.

15        Specifically, I want to refer the Court to a couple

16   of the cases cited in the briefing that apply the proper

17   standard for written description, enablement, to the priority

18   application support question in a situation like ours.

19        Leupold's briefs cite to the *Hologic* case,

20   H-o-l-o-g-i-c, as well as the *Trading Technologies* case.  Both

21   of those are situations in which the provisional application

22   disclosed a single embodiment.

23        For *Hologic*, I believe it was a fiber optics bundle,

24   and the Court held that that was sufficient written

25   description and enabling disclosure for a later patent claim

1  to that priority date that recited a light guide.  And "light

2  guide" wasn't a term used in the provisional.  It was a term

3  specific to the claims of that patent, which is similar here

4  to the "engagement member," "engagement surface" claims of the

5  Windauer patents that Nightforce has challenged.

6        And the *Trading Technologies* case is a similar

7  situation, where the provisional disclosed a single-action

8  user input device, or that was the claim language.  It was

9  broader.  And then the provisional application disclosed a

10  single click of a user mouse.  And so the disclosure in the

11  priority application of a single mouse click was sufficient

12  written description and enabling support for the broader claim

13  of the user input device, a single-action user input device,

14  which could encompass other things, like keyboard strokes,

15  double clicks.  And the Court recites those and says it's

16  okay.  The claims cover that.  They're not described in the

17  provisional and they don't don't have to be because the

18  standard, the legal standard, is satisfied by the single

19  embodiment disclosed there.

20        Nightforce's counsel referenced a different line of

21  cases.  I don't remember all the names.  I believe the

22  *Research Development Corp.* case is one of them, and some other

23  cases that were discussed on the priority entitlement issue

24  with reference to the '907 patent.  And the issue with those

25  cases and the reason they don't apply here is that in each of

1    those cases the Court found that the provisional application

2    specifically describes the invention as narrow.

3            And I think this line of cases goes back to the

4    *Gentry Gallery* case from the Federal Circuit, where the

5    inventor describes the invention as this focused thing, and

6    "I'm solving a specific problem."  And in *Gentry Gallery* it

7    was a central console for a recliner to sit in.  And the

8    inventor said, you know, "It's here in the middle.  This

9    solves all the problems in the prior art to put it here in the

10   middle."  That was his provisional or priority application.

11   Later on he tried to claim a -- or cover a console off to the

12   side.

13           THE COURT:  But what's the standard?  I mean, I get

14   when you have a broader provisional claim and then there might

15   be some narrower claims that are supported.  That part makes

16   sense to me.  But what you're suggesting is that a narrow

17   claim can support broader claims based on *Hologic* and *Trading*

18   *Technologies*.

19           The problem is:  How far can you go?  What are the

20   outer limits of that, right?  Because it cannot be that every

21   possible thing is protected by a narrow provisional patent.

22           MR. WILLIAMS:  Right.

23           THE COURT:  So what are the standards?  What language

24   is the Federal Circuit using in order to describe that

25   problem?

1           MR. WILLIAMS:  Right.

2           It's the language in Leupold's briefing.  You won't

3    find it in Nightforce's briefing.  It's the language we've

4    been using today.  For written description, it's whether the

5    provisional shows a person of ordinary skill in the art that

6    the inventor possessed the invention, the later-claimed

7    invention, at the time of the provisional or -- it's also

8    phrased in this way -- whether the inventor invented the

9    later-claimed invention at the date of the provisional.

10   That's for written description.

11          THE COURT:  And, by the way, were *Hologic* and *Trading*

12   *Technologies* cases that were being resolved at summary

13   judgment?

14          MR. WILLIAMS:  I don't recall, Your Honor.  We'd have

15   to go look at the cases.  The briefing may go into that.

16          THE COURT:  Okay.  Thank you.

17          Go ahead.

18          MR. WILLIAMS:  All right.

19          Defense counsel made reference to the *Wands* factors

20   for deciding enablement.  And the *Wands* case is one of the

21   ways to analyze enablement, but there is no authority that

22   says you have to use the *Wands* factors.  It's a little bit

23   like the *Sleekcraft* factors in trademark infringement.  It is

24   one way to analyze the enablement question and, in those

25   situations, are all the factors reviewed or decided or

1    relevant to the enablement question.

2            And so this is another place where the burden of

3    proof issue is key.  Leupold has made its motion saying that

4    Nightforce can't show lack of enablement because they don't

5    apply the right standard, which is:  Does the priority

6    application show a skilled person how to make and use the

7    invention, just one embodiment of the invention, does it show

8    someone how to make and use it?  And it's now to Nightforce to

9    come forward with evidence to say that that did not occur in

10   the provisional application.

11           And so it is not Leupold's burden at summary judgment

12   to address the *Wands* factors.  If Nightforce chooses to make

13   its case on its affirmative defense using the *Wands* factors,

14   it's free to do so, but that doesn't count against our motion.

15           Turning to indefiniteness, there was a comment that

16   the claims of -- that some of the Windauer claims are just

17   very broad and that we don't know what their scope is.  For

18   example, is the locking turret knob, could it be locked within

19   the scope of the claims just by having a clicker and no

20   locking mechanism?

21           And that's a hypothetical attorney argument that

22   isn't sufficient to resist summary judgment, isn't sufficient

23   for Nightforce to carry its burden on indefiniteness,

24   particularly in light of the claim limitations, which, for

25   instance, in Claim 1 of the Windauer patent, '429, requires

1   that the -- that the element be "selectively movable" between

2   the locked and unlocked positions.  That was one of the terms

3   construed by the Court in *Markman*.

4        Well, a clicker isn't selectively movable.  It just

5   clicks when you turn the knob.  And so that particular

6   embodiment is not a good example of -- of Nightforce's

7   argument that the scope of the claims is indefinite.  And

8   because Nightforce doesn't have better arguments and hasn't

9   put forward better evidence, other than the "Velcro plus

10  sandpaper" arguments that we discussed earlier, summary

11  judgment on that issue is appropriate.

12       There was one more point on indefiniteness, regarding

13  the breadth of the claims.  So in Leupold's briefing we

14  address this issue, and there's very clear statements from the

15  Federal Circuit that really broad claims and really broad

16  terms in a claim don't make the claim indefinite.

17       And some examples here, we cite the *Biosig*

18  *Instruments* case.  And there the term at issue was "space

19  relationship," and there was no recitation in the claim how

20  spaced it should be:  one millimeter, one inch, 50 feet.  It

21  was just "space relationship."  But the Court found in the

22  context of the patent as a whole, which related to exercise

23  machines, where you put your hand on the heart monitor device

24  and there are two electrodes that are spaced apart, that the

25  space relationship in that context was sufficiently definite.

1           Also, the *Eidos Display* -- Eidos is spelled

2    E-i-d-o-s -- is one we cite in the briefing.  The term there

3    was a "contact hole."  Also, the *Sonic Tech.* case from 2017,

4    the term there was "visually negligible."

5           There are all kinds of broad terms that are definite

6    because of the context in which they're used.  And that is

7    exactly the argument we're making.  That's why Nightforce

8    doesn't have evidence to resist summary judgment on

9    indefiniteness, because they haven't and Mr. DuFaux hasn't

10   analyzed whether the term reasonably informs a skilled person

11   of the scope of the claims when reading the claim as a whole,

12   not just isolated terms, and reading that in light of the

13   patent as a whole.  That's the correct standard.

14          Just to go back for a moment to Your Honor's question

15   about the procedural posture for the *Trading Technologies* and

16   *Hologic*, it appears the *Trading Technologies* case, the Federal

17   Circuit did affirm summary judgment in that case.  And in the

18   *Hologic* case, it was a decision of the Patent Trial and Appeal

19   Board after trial that was affirmed.

20          I want to address one question.  I believe Your Honor

21   asked this of Nightforce's counsel, whether the Court can

22   decide anticipation or other prior art defenses without going

23   element by element through the claims.  And the answer to that

24   is yes, because anticipation is Nightforce's burden.  They

25   have to show that all the claims are present, arranged in the

1    same way as claimed.  And Leupold's motion has said, "You're

2    missing an element."

3              So, for instance, in the context of the '408 patent

4    and the Canon device, you're missing the "spindle operatively

5    coupled to adjustable" portion.  So that is the one element

6    that the Court can decide on.  And if, in ruling on the legal

7    issue, claim construction decides that it requires a

8    mechanical link, which the Canon device lacks, that's all the

9    analysis that's needed to rule on summary judgment of no

10   anticipation with respect to the Canon device against the '408

11   patent, for example.  And the same structure is there for the

12   other anticipation arguments.

13             So I also want to respond to an argument that the

14   patents discuss how locking turret knobs can be used for other

15   kinds of devices, like a microscope.  Opposing counsel has

16   suggested that those statements in the patents mean that the

17   field of the invention is broader, should include those

18   devices.  But that's not the case.

19             One can use a rugged device in less rugged contexts.

20   One can use a riflescope locking turret knob on a microscope

21   or on a telescope or in other contexts, and it could be useful

22   there.  But that doesn't make the field of the invention

23   broader to encompass those devices, because the invention was

24   developed in the context of particular problems.  Like if you

25   read the background of the invention on each of the

1    patents -- especially the Windauer patents, I believe -- they

2    discuss the context in which the invention was developed and

3    the problems being solved.  And that's relevant to determining

4    the field of the invention.

5          We discussed earlier the *Mintz v. Dietz & Watson*

6    case.  And there the Federal Circuit goes through the two or

7    three factors to determine the relevant field of the

8    invention.  And one of them is the problems that the inventor

9    was facing and how they could be solved.

10         And so -- and that was the case in which the Court

11   ruled the invention covers a knitted encasement for meat, but

12   your skilled person in the art has to know something about

13   meat and meat encasement; it's not just knitting generally.

14   And so that's another case where, like here, the field of

15   invention had to be narrower so that the skilled person could

16   understand aspects of the invention, the problems being

17   solved, and how the invention solved them in a useful way.

18         There was a comment about how a lot of Leupold's

19   summary judgment arguments are reviving claim construction

20   arguments, and Nightforce has made a comment that -- asking

21   the Court not to rule on them because they're not adequately

22   briefed or not adequately developed in the briefing that's of

23   record.

24         I think it would be appropriate to rule on those at

25   summary judgment because claim construction is a legal issue.

1   And Leupold, despite the large collection of issues in
2   Leupold's motion, was fairly focused on the grounds for each
3   motion.  So we focused on specific claim elements that we
4   believe are lacking in the asserted prior art.
5           And Nightforce has taken a very expansive view to
6   what prior art is encompassed by the claims.  And it's
7   perfectly appropriate at summary judgment to say -- to weed
8   out some of those references, based on claim construction, to
9   say, "No, you're reading this claim too broadly.  That prior
10  art reference is out."  And that is what Leupold's motion
11  does.
12          There was also a comment about relying on witness
13  testimony for claim construction.  We do cite witness
14  testimony as evidence of the ordinary and customary meaning of
15  certain claim elements, which is the way that claim
16  construction happens.  Witness testimony is extrinsic
17  evidence; that is, it's not within the four corners of the
18  patent.
19          However, what we've done is done both.  So in the
20  briefing and in today's presentation and in the *Markman*
21  briefing, if the Court refers back to that, the primary focus
22  is on the intrinsic record of the patent.
23          So, for example, with respect to "operatively
24  coupled," the Court may recall that we read the claim that
25  includes "operatively coupled," because claims terms are

1  construed in light of the claims as a whole.  We also looked

2  at figures.

3          And because the claim was construed in light of the

4  specification as a whole, the comments from Nightforce's

5  engineers, such as Kevin Stockdill, the lead engineer at

6  Nightforce, on the term "operatively coupled," are meant to

7  further solidify what's apparent from the intrinsic record of

8  the patent regarding the more narrow meaning of those terms,

9  which Nightforce would expand for their prior art purposes.

10         There was also a comment about combining the Canon

11 video camera with the Windauer reference.  I think that's

12 against the '408 patent, because that's the only patent

13 against which Windauer is asserted.  There is in the briefing

14 some discussion of why summary judgment should be granted

15 against that obviousness defense.

16         I just want to highlight, though, in response to

17 opposing counsel's comments that this is a particularly strong

18 argument, that the argument is strong in hindsight.  As

19 referred to earlier in the presentation, the Canon device says

20 don't take it out in the rain.  It's a big lumbering

21 electronic thing.  And who, in the relevant field of the

22 invention, would look to that device to improve their

23 riflescope or to improve a locking knob for an optical device

24 that needs to be weatherproof?

25         A person of ordinary skill in the art at the time of

1  the invention, it's Nightforce's burden to show that such a

2  person would select those two pieces of art -- that's the *WBIP*

3  case cited in the briefing -- would combine those two pieces

4  of art, and would expect -- reasonably expect success in

5  making that combination.

6        And because of the significant differences,

7  particularly on the Canon device, we don't think it's

8  analogous art nor could a person -- nor can Nightforce carry

9  its burden to show clearly and convincingly that a skilled

10  person would select the Canon device, combine it with the

11  riflescope, and expect success.  That's their burden.

12        On another specific issue relating to the '408

13  patent, Nightforce's counsel and their briefing argues that

14  it's so similar to the Windauer provisional and the Windauer

15  patent, except that the button is on the side instead of on

16  the top.  That's a significant difference.  That means that

17  Windauer can't anticipate, as we discussed earlier; and

18  Nightforce's counsel hasn't responded to that argument.

19        Furthermore, there was a citation to Leupold's expert

20  on this issue, to the Byron report, page 77, line 22, through

21  page 78, line 7.  And Nightforce's counsel cited that

22  reference, saying, "Look, Leupold's expert agrees that it

23  would be trivial or obvious to move the button from the top to

24  the side."

25        Well, that's not what's being discussed at this

1    reference.  This reference is discussing the Windauer

2    publication and embodiments disclosed in the Windauer

3    publication, not with reference to the '408 patent.

4         Indeed, Mr. Byron did say that different embodiments

5    in the Windauer publication were trivial to develop in light

6    of the embodiment disclosed in the Windauer provisional, thus

7    explaining why those embodiments have support in the Windauer

8    provisional.

9         That's not relevant to the issue here, which is:

10   Does the Windauer provisional anticipate the claim element in

11   the '408 patent, a button on the side, manually depressible

12   transverse to the axis?

13        We saw testimony from Nightforce's expert that that

14   would not be obvious, moving the button from the top to the

15   side, that he wouldn't know how to do that.  Thus, summary

16   judgment against that defense, both anticipation and

17   obviousness, is appropriate because the experts line up on the

18   same side of the issue.  Mr. DuFaux said something different

19   in his report, but his deposition testimony was clear, that he

20   wouldn't know how to do that.

21        Let me flip through.

22        (Pause)  I believe that's all I have, Your Honor.

23        THE COURT:  Thank you.

24        MR. CASIMIR:  Several very brief points here.

25        So talking about the case law and the case law

 1   questions that were raised, we heard a discussion about the

 2   *Hologic* case.  I'll just note that that case is distinguished

 3   on page 29, document 146.

 4           Your Honor had a question about which cases related

 5   to whether a provisional provides support for later-filed

 6   broader claims are -- were decided on the issue of summary

 7   judgment.  Counsel referred to the cases they cited.  But just

 8   to clarify that as well, on the cases we cited, the *Research*

 9   *Corp.* case was a case where summary judgment of a lack of

10   support was found on summary judgment.  Also, from the '907

11   session previously, the *D Three* case, also on summary

12   judgment.  That's the -- that's 890 F.3d 1042, Fed Circuit,

13   from 2018, summary judgment going in the opposite direction.

14           Counsel for Leupold mentioned that the cases

15   Nightforce cited were special cases in that in those cases the

16   provisional had a narrow disclosure and then the later

17   disclosure was very broad.

18           That's exactly the case here.  The disclosure in that

19   provisional application for Windauer is just a couple

20   paragraphs in an application otherwise dedicated to other

21   things.  And we saw a paragraph of it in the slides today.

22   It's extremely narrow in its scope; and when the regular

23   application was filed, it opened it up dramatically.

24           And Your Honor asked, how do we consider that?  What

25   standards do we use?  And we got an answer to that, and that

1   answer ultimately was a fact-intensive inquiry on the written

2   description and enablement standards.  And we've got disputed

3   facts on those issues.

4           There was also a point raised about what is the field

5   of the invention relative to the '408 patent?  And a major

6   consideration for what the field of the invention is is what

7   is claimed.  And the claims of the '408 are tied to optical

8   devices, not riflescopes, as well as many of the claims of the

9   other patents.  Some of the claims in those patents, the

10  claims themselves explicitly recite devices that are not

11  riflescopes:  spotting scopes, microscopes, and the like.  So

12  the claims are at least that broad in terms of their field.

13          And the last point, on the combination of Windauer,

14  which had the push button, and the provisional, anywhere, and

15  the later-filed application, adding a figure with it on top,

16  combined with the idea of the Canon camera dial, which has a

17  button on the side, there was a question about whether it

18  would be appropriate to make that combination.  The argument

19  raised a hindsight argument, saying that why would you apply a

20  video camera that isn't meant to be out in the rain to a

21  riflescope?

22          But the claims of the '408 aren't related to

23  riflescopes.  They're related to optical devices.  So we're

24  talking about putting a push button locking knob on an optical

25  device.  It could be a video camera or a microscope or any

1    number of other devices.

2            So it's not a direction where one is making a

3    riflescope and then looking for art in another field.  It's

4    one making an optical device with a locking knob.  And all of

5    the knob-containing devices in those fields are appropriate

6    for consideration.

7            THE COURT:  Thank you.

8            Did you have anything else?

9            MR. WILLIAMS:  One follow-up point, Your Honor --

10           THE COURT:  Sure.

11           MR. WILLIAMS:  Thanks.

12           -- regarding the legal authority on whether a

13   provisional application provides support for later claims.

14           So the citation by opposing counsel to the *Research*

15   *Corp.* case or the *D Three* case, opposing counsel characterized

16   these as being cases in which there was a narrow disclosure in

17   the provisional and then a broader and more complete

18   disclosure in a later-filed application, along with broader

19   claims.

20           That is not how those cases come down.  So this line

21   of cases -- *Research Corp.*, *D Three*, the *Gentry Gallery* case I

22   referred to earlier -- these are in a line of cases which are

23   distinguished because in the provisional application the

24   inventor has said something about his invention being tied to

25   a certain embodiment, so -- so something like "The present

1   invention is," or in the case of the *Gentry Gallery* situation,

2   the inventor said in the priority application that the center

3   console was the only possible location and that variations on

4   that were, quote, outside the stated purpose of the invention,

5   end quote.

6        And this line of cases is different than the line

7   that we should apply here, the *Trading Technologies* and the

8   *Hologic* cases, because in the present situation, although

9   Mr. Windauer's provisional was short -- he didn't make a long

10   application for his locking turret knob -- it was adequate.

11   And he didn't put in any of those limitations, like "This is

12   the only way to do it."

13        In fact, he used broadening language on the

14   "engagement member" and "engagement surface" aspects.  He said

15   it could be a locking pin or a spline or a lever or a button.

16   So he's telling a person of skill in the art that his

17   invention encompasses broader elements, which supports the

18   later broader claims.

19        The *Cordis Corp.* case that's cited in the briefing,

20   C-o-r-d-i-s, from the Federal Circuit, 2003, we discussed it

21   earlier, briefly, that distinguishes the *Gentry Gallery* and

22   *Research Development Corp.* line of cases, explaining that

23   those cases are dealing with a situation where the inventor

24   has clearly indicated that the invention has a narrow scope,

25   which is not case here.

1          Thank you, Your Honor.

2          THE COURT:  Thank you.

3          MR. CASIMIR:  Thirty-second brief response on that

4     last issue?

5          THE COURT:  Sure.

6          MR. CASIMIR:  So the *D Three* case is, I think, not

7     correctly characterized there.  That was a case where the

8     provisional was narrower.  The later non-provisional

9     application added substantial new matter, including new

10    figures and examples.  So that may be true of the other case,

11    but not *D Three*.

12         But the big issue, what this comes down to, is we

13    just heard an argument that the Windauer provisional was

14    adequate.  On what standard?  The standard is from the person

15    of ordinary skill in the art dealing with the written

16    description and enablement issues.  It can't be resolved by

17    attorney argument.  And we have a disagreement on the facts on

18    those issues.  So this is not ripe for summary judgment of

19    validity.

20         THE COURT:  Okay.  Thank you.

21         I think we're done, right?  Anything else?

22         Plaintiffs?  No?

23         MR. PARK:  Your Honor, just one question.  If the

24    Court has had an opportunity to review the exemplar

25    riflescopes --

1          THE COURT:  I will give those back to you.  I don't

2     want them in my office.  I haven't had a chance to look at

3     them closely, but I will, and then maybe tomorrow you can come

4     by and pick them up?

5          MR. PARK:  Thank you, Your Honor.

6          THE COURT:  Anything else from defense?

7          MR. CASIMIR:  Nothing else.

8          THE COURT:  I will take this matter under advisement

9     as of today.

10          I understand -- have you made arrangements to visit

11     with Judge Beckerman?

12          MR. PARK:  Yes, Your Honor.  We have a date:

13     March 7th.

14          THE COURT:  Okay.  I won't have this decided by then.

15          So with that, once I get this decided, I'll issue a

16     written opinion, and then we'll get back together and figure

17     out what to do next.

18          All right.  Good luck with Judge Beckerman.

19          Thank you.

20          MR. PARK:  Thank you.

21          (The Court and the clerk confer off the record.)

22          THE COURT:  It's in April right now?  No, we're not

23     going to trial in April.

24          All right.  Thank you.

25          (Proceedings concluded.)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

--oOo--

I certify, by signing below, that the

foregoing is a correct transcript of the record

of proceedings in the above-titled cause.  A

transcript without an original signature,

conformed signature or digitally signed signature

is not certified.


*/s/ Nancy M. Walker*                    *2-20-19*
_____    _____
NANCY M. WALKER, CSR, RMR, CRR         DATE
Official Court Reporter
Oregon CSR No. 90-0091

## '

**'068** [27] - 318:5, 319:2, 343:9, 343:22, 345:22, 361:4, 368:1, 368:8, 368:14, 368:18, 379:1, 385:18, 392:9, 392:11, 393:5, 395:21, 396:12, 398:18, 469:17, 469:20, 470:22, 472:24, 491:13, 495:11, 496:18, 497:12, 497:14
**'120** [6] - 318:24, 324:2, 324:13, 413:4, 493:25, 494:2
**'305** [2] - 409:4, 486:13
**'408** [53] - 318:5, 318:12, 318:25, 336:20, 337:6, 337:17, 338:10, 338:17, 342:3, 342:6, 343:7, 361:5, 364:15, 364:17, 364:19, 385:3, 398:18, 463:3, 463:8, 463:19, 464:1, 465:1, 465:2, 465:4, 465:25, 466:4, 466:5, 469:15, 470:22, 472:24, 491:12, 491:14, 491:20, 492:7, 492:16, 493:11, 495:11, 495:16, 496:3, 496:15, 496:18, 497:4, 497:12, 506:3, 506:10, 509:12, 510:12, 511:3, 511:11, 513:5, 513:7, 513:22
**'429** [11] - 318:24, 324:2, 324:11, 410:16, 410:18, 411:7, 413:4, 473:2, 474:3, 475:14, 503:25
**'480** [2] - 318:14, 409:6
**'568** [1] - 424:12
**'658** [2] - 424:12, 424:15
**'736** [4] - 318:24, 324:2, 324:12, 413:4
**'907** [21] - 409:4, 418:20, 418:24, 419:18, 420:3, 420:15, 420:18, 428:10, 428:17, 429:23, 430:4, 430:19, 430:21, 431:3, 431:18, 432:3, 479:6, 479:9, 486:16, 500:24, 512:10
**'blown** [2] - 473:22, 473:25
**'blown-film** [1] - 473:25
**'blown-film'** [1] - 473:22
**'conceived** [1] - 424:13
**'coupled'** [1] - 468:8
**'each** [1] - 424:25
**'engagement** [2] - 410:18, 410:19
**'evidence** [1] - 425:4
**'get** [1] - 330:8
**'got** [1] - 330:6
**'Last** [2] - 424:23, 425:1
**'lock** [1] - 329:25
**'locking** [1] - 406:21
**'operatively** [1] - 468:6
**'reduced** [1] - 424:13
**'round'** [1] - 404:2
**'Sperrenring'** [1] - 403:22
**'stick'** [1] - 436:13
**'Summary** [1] - 473:23
**'turret** [1] - 475:3

## /

**/s** [1] - 519:11

## 0

**0.37** [1] - 361:18
**0.5** [2] - 352:20, 361:17

## 1

**1** [20] - 393:5, 394:1, 404:8, 407:21, 409:19, 411:7, 412:1, 421:14, 431:15, 431:20, 459:6, 459:9, 459:16, 461:19, 461:24, 467:6, 467:8, 470:3, 496:3, 503:25
**1.5** [1] - 361:19
**10** [3] - 331:20, 335:16, 424:13
**1000** [1] - 316:17
**101** [1] - 319:20
**1042** [1] - 512:12
**1043** [1] - 356:15
**106** [1] - 412:4
**108** [1] - 412:3
**11** [8] - 324:12, 335:1, 393:6, 394:1, 424:18, 493:25, 494:2, 494:12
**1119** [1] - 424:3
**112** [17] - 409:12, 409:17, 413:3, 414:1, 414:3, 415:1, 442:15, 442:19, 447:23, 449:6, 455:24, 456:8, 457:12, 459:12, 461:18, 461:25, 462:12
**117** [2] - 326:10, 344:21
**12** [3] - 327:5, 423:14, 423:21
**120** [1] - 456:15
**121** [1] - 316:14
**1221** [1] - 341:3
**1231** [1] - 341:3
**1232** [1] - 341:3
**125-11** [1] - 364:1
**1255** [1] - 340:20
**1262** [1] - 340:20
**129** [4] - 321:19, 331:19, 333:5, 334:8
**12th** [1] - 422:25
**13** [2] - 315:5, 394:1
**1324** [1] - 339:15
**1333** [1] - 339:15
**1336** [1] - 341:17
**1343** [1] - 341:17
**1345** [1] - 341:17
**1359** [1] - 339:21
**1367** [1] - 339:21
**1369** [1] - 339:21
**142** [2] - 334:6, 335:3
**146** [1] - 512:3
**147** [3] - 382:21, 383:6, 407:16
**1498** [1] - 383:10
**15** [4] - 401:18, 423:8, 428:18, 476:11
**16-cv-1570** [1] - 317:6
**1600** [1] - 316:14
**168** [1] - 344:23
**17** [9] - 324:12, 327:5, 400:3, 401:2, 405:18, 407:3, 449:18, 451:16, 459:25
**17th** [6] - 400:2, 406:4, 435:15, 435:18,

435:19, 450:25
**18** [1] - 333:6
**19** [1] - 383:7
**1996** [2] - 424:14, 424:18
**1st** [4] - 436:3, 436:17, 451:11, 451:24

## 2

**2** [10] - 335:3, 344:22, 409:24, 412:6, 433:4, 459:7, 459:9, 459:17, 461:20, 461:22
**2-20-19** [1] - 519:11
**2.1** [4] - 352:23, 352:25, 353:11, 361:19
**20** [4] - 378:21, 493:25, 494:2, 494:12
**200** [1] - 413:14
**2001** [3] - 341:17, 356:15, 407:14
**2002** [1] - 339:22
**2003** [2] - 424:6, 515:20
**2004** [29] - 399:7, 399:22, 400:2, 401:2, 401:18, 403:16, 404:7, 405:18, 406:5, 407:3, 419:24, 423:8, 434:10, 434:11, 435:4, 436:3, 440:18, 440:20, 449:18, 449:19, 451:16, 455:7, 457:25, 458:2, 458:3, 462:16, 473:17, 479:25, 483:6
**2005** [9] - 422:25, 423:14, 423:21, 426:24, 434:4, 437:19, 439:21, 439:23, 480:1
**2006** [1] - 424:21
**2007** [1] - 424:3
**2011** [1] - 341:3
**2013** [2] - 329:8, 329:14
**2015** [1] - 340:20
**2017** [1] - 505:3
**2018** [6] - 331:20, 335:1, 335:7, 336:1, 336:6, 512:13
**2019** [1] - 315:5
**203** [1] - 327:5
**204** [1] - 378:13
**206** [1] - 413:14
**208** [2] - 410:16, 413:5
**209** [1] - 413:5
**21** [2] - 319:20, 324:14
**210** [1] - 413:5
**212** [1] - 378:11
**21st** [1] - 403:16
**22** [1] - 510:20
**220** [1] - 452:24
**2275** [1] - 316:10
**23** [2] - 326:11, 468:1
**230** [1] - 452:24
**24** [3] - 319:20, 333:6, 335:1
**25** [2] - 338:9, 407:16
**26** [4] - 331:20, 338:15, 382:21, 407:16
**26th** [1] - 336:6
**27** [10] - 326:10, 335:7, 335:8, 336:1, 404:7, 404:25, 419:13, 419:24, 434:11, 440:19
**271** [1] - 356:15
**274** [1] - 341:17

**2764** [1] - 340:20
**27th** [2] - 419:7, 435:10
**28** [4] - 326:11, 338:22, 364:1, 474:25
**288** [1] - 339:21
**28th** [1] - 405:2
**29** [8] - 321:24, 324:14, 334:22, 336:6, 338:9, 338:22, 475:1, 512:3
**2d** [1] - 424:20

## 3

**3** [8] - 315:16, 339:15, 358:12, 393:5, 393:25, 433:4, 454:14, 470:10
**3.4** [1] - 361:19
**30(a** [2] - 326:5, 327:4
**30(b)(6** [6] - 326:3, 326:25, 327:15, 360:10, 470:8, 488:6
**30-degree** [1] - 378:22
**3000** [1] - 316:7
**301** [1] - 316:17
**30th** [1] - 457:25
**310** [1] - 316:11
**32** [2] - 327:20, 382:9
**326-8186** [1] - 316:18
**34** [1] - 456:14
**344** [1] - 362:24
**35** [2] - 353:12, 456:14
**35-page** [2] - 443:20, 444:12
**35.25** [1] - 352:16
**360** [17] - 320:3, 327:21, 328:3, 344:1, 344:11, 344:16, 345:16, 374:4, 374:17, 378:10, 378:16, 378:19, 378:22, 385:23, 388:1, 404:16, 405:4
**360-degree** [3] - 387:2, 388:10, 389:4
**3600** [1] - 316:3
**3:16-cv-01570-HZ** [1] - 315:4
**3rd** [3] - 434:10, 435:25, 436:25

## 4

**4** [9] - 324:12, 324:14, 327:20, 335:1, 393:6, 431:10, 432:24, 433:4, 454:14
**4-16** [1] - 326:24
**4.6** [4] - 352:23, 353:1, 353:11, 361:19
**42** [1] - 326:24
**43** [1] - 329:7
**443** [1] - 424:20
**448** [1] - 339:15
**45** [2] - 414:12, 423:16
**47** [1] - 483:24
**49** [1] - 489:6

## 5

**5** [12] - 353:6, 378:2, 378:4, 378:8, 378:12, 383:8, 392:18, 393:6, 394:9, 394:12, 395:17, 475:18
**5.71428** [1] - 404:3
**5.71429** [1] - 405:4
**5.7386** [4] - 403:6, 404:15, 405:7,

**405:11
**50** [1] - 504:20
**503** [1] - 316:18
**509** [1] - 351:13
**511** [2] - 351:13, 351:20
**519** [1] - 424:3
**52** [1] - 403:5
**52.227-1** [1] - 363:24
**534** [1] - 424:9
**53562** [1] - 316:11
**54** [2] - 423:16, 479:8
**55** [1] - 330:16
**56** [2] - 330:19, 470:10

## 6

**6** [1] - 483:24
**600** [1] - 316:3
**602** [1] - 351:16
**603** [1] - 351:18
**61** [2] - 320:14, 323:9
**61.6** [5] - 402:22, 403:3, 403:22, 404:5, 404:9
**62.73** [1] - 404:17
**63** [4] - 404:2, 404:17, 405:4, 405:10
**64** [1] - 383:7
**65** [3] - 320:14, 323:9, 383:8
**663** [1] - 341:3
**69** [2] - 338:15, 338:22
**6A** [1] - 351:12

## 7

**7** [14] - 327:5, 335:3, 371:9, 373:10, 374:4, 377:6, 377:8, 377:12, 393:18, 394:3, 470:10, 492:24, 493:9, 510:21
**70** [1] - 362:5
**709** [1] - 492:3
**720** [1] - 378:11
**760** [1] - 316:7
**77** [1] - 510:20
**778** [1] - 340:20
**78** [1] - 510:21
**79** [1] - 344:22
**7th** [1] - 517:13

## 8

**8** [5] - 331:19, 378:4, 382:10, 459:25
**856** [1] - 424:20
**890** [1] - 512:12

## 9

**9** [1] - 326:11
**90-0091** [1] - 519:13
**92** [3] - 326:10, 327:5, 327:19
**92-4** [1] - 329:7
**92-6** [1] - 382:9
**97204** [2] - 316:15, 316:17

**97205** [1] - 316:8
**98** [1] - 330:16
**98101** [1] - 316:4

## A

**abandoning** [1] - 455:17
**ability** [4] - 349:23, 363:7, 414:24, 445:24
**able** [19] - 323:11, 330:6, 331:9, 333:9, 348:12, 348:22, 349:25, 351:25, 352:15, 353:9, 354:18, 354:19, 354:20, 361:14, 375:25, 381:16, 422:24, 455:21
**above-titled** [1] - 519:5
**absence** [1] - 460:21
**absent** [2] - 428:9, 443:13
**absolute** [1] - 325:16
**absolutely** [4] - 376:12, 378:6, 379:6, 429:11
**abstract** [1] - 412:24
**abuts** [1] - 387:15
**accidental** [8] - 324:5, 325:14, 328:3, 328:19, 358:13, 358:25, 380:11, 380:18
**accidentally** [1] - 324:9
**accomplish** [1] - 385:8
**accomplished** [3] - 460:16, 464:6, 464:10
**accorded** [1] - 470:6
**according** [2] - 330:17, 365:1
**accordingly** [4] - 331:3, 336:18, 343:6, 345:21
**accurate** [3] - 353:14, 425:22, 440:20
**accurately** [3] - 334:14, 382:11, 382:18
**accused** [23] - 319:22, 320:25, 324:25, 325:19, 325:21, 326:1, 328:22, 337:21, 340:4, 341:10, 347:4, 348:21, 349:25, 361:23, 366:8, 368:17, 369:2, 369:10, 370:19, 371:7, 378:16, 378:19, 496:23
**acknowledge** [1] - 366:15
**acknowledged** [1] - 357:9
**acquiescence** [1] - 408:25
**acquired** [2] - 333:1, 384:5
**action** [3] - 335:2, 500:7, 500:13
**activates** [1] - 469:4
**activity** [1] - 452:15
**actual** [8] - 340:11, 365:3, 393:19, 431:1, 431:11, 437:11, 440:8, 483:3
**actuate** [4] - 325:8, 371:15, 384:24, 385:15
**actuated** [6] - 320:17, 324:23, 352:2, 460:17, 464:11, 491:22
**actuates** [1] - 372:4
**actuator** [1] - 492:9
**actuators** [1] - 464:10
**adapt** [1] - 406:21
**adapted** [1] - 497:9
**add** [3] - 360:20, 450:8, 460:6

**added** [11] - 369:20, 369:23, 373:9, 373:11, 378:3, 454:11, 479:18, 492:25, 493:9, 516:9
**adding** [1] - 513:15
**addition** [1] - 470:23
**additional** [9] - 354:2, 354:11, 365:9, 367:20, 389:21, 419:4, 444:16, 456:16, 478:11
**additionally** [1] - 491:10
**address** [24] - 319:5, 321:17, 321:22, 332:21, 346:2, 346:18, 368:7, 399:1, 409:12, 414:2, 420:13, 442:5, 443:19, 448:4, 462:20, 466:1, 470:19, 472:11, 472:25, 487:21, 495:2, 503:12, 504:14, 505:20
**addressed** [5] - 367:19, 461:12, 466:18, 473:9, 487:22
**addresses** [3] - 404:7, 456:15, 471:19
**addressing** [7] - 318:20, 398:17, 459:12, 460:23, 461:19, 461:20, 462:6
**adds** [1] - 450:19
**adequate** [3] - 410:6, 515:10, 516:14
**adequately** [3] - 412:25, 507:21, 507:22
**adjust** [7] - 320:12, 320:18, 322:4, 322:5, 426:13, 432:9, 466:7
**adjustable** [10] - 466:7, 466:8, 467:14, 467:16, 469:5, 469:9, 469:12, 469:13, 506:5
**adjustably** [3] - 411:14, 411:17, 474:13
**adjusted** [1] - 421:19
**adjustment** [41] - 320:5, 320:23, 322:7, 322:10, 324:9, 326:2, 327:13, 327:14, 328:4, 328:5, 328:7, 328:17, 328:19, 328:22, 331:2, 331:18, 331:23, 333:17, 336:22, 358:14, 358:25, 380:11, 380:18, 381:5, 382:16, 402:8, 411:13, 411:17, 421:11, 421:22, 434:22, 443:4, 460:4, 469:7, 475:13, 475:15, 476:2, 491:22, 494:5, 496:4
**adjustments** [3] - 324:4, 375:8, 475:10
**adjustor** [2] - 468:3, 469:3
**adjusts** [4] - 421:13, 434:22, 467:14, 475:8
**administrative** [1] - 391:1
**admission** [4] - 364:8, 391:8, 493:20, 494:21
**admissions** [5] - 321:9, 325:25, 326:5, 336:16, 494:21
**admits** [1] - 325:22
**admitted** [1] - 479:22
**admittedly** [1] - 360:18
**admitting** [1] - 494:16
**advanced** [1] - 355:10
**advertisers** [1] - 329:15
**advisement** [1] - 517:8
**advises** [1] - 329:23
**advising** [1] - 330:11
**affirm** [1] - 505:17
**affirmatively** [2] - 319:16, 346:17
**affirmed** [1] - 505:19

**affixed** [1] - 394:25
**afford** [1] - 403:25
**afternoon** [3] - 416:22, 444:25, 476:10
**aggressive** [1] - 325:10
**ago** [4] - 318:22, 386:9, 405:7, 450:2
**agree** [9] - 352:9, 365:19, 366:4, 367:4, 383:8, 391:3, 391:16, 447:4, 480:13
**agreeable** [1] - 318:17
**agreed** [1] - 383:3
**agreement** [7] - 319:7, 349:17, 352:8, 363:14, 390:2, 390:23, 493:13
**agrees** [1] - 510:22
**aha** [1] - 397:12
**ahead** [10] - 319:14, 343:21, 361:12, 376:14, 381:1, 381:8, 396:16, 398:10, 476:17, 502:17
**aid** [1] - 380:22
**aiming** [8] - 469:20, 469:23, 470:3, 470:9, 470:12, 470:17, 472:7, 495:20
**align** [1] - 460:6
**aligned** [1] - 475:19
**aligns** [1] - 404:10
**allegations** [1] - 429:11
**alleged** [7] - 334:17, 359:23, 359:24, 407:6, 464:23, 492:15, 493:11
**alleges** [3] - 334:25, 399:9, 482:18
**allow** [4] - 350:17, 358:21, 389:22, 404:16
**allowable** [1] - 348:16
**allowing** [2] - 412:8, 491:25
**alluded** [1] - 322:4
**almost** [6] - 362:12, 430:12, 478:20, 483:16, 484:8, 490:12
**alone** [6] - 374:17, 419:25, 425:15, 433:12, 437:25
**alter** [1] - 435:22
**altered** [1] - 437:19
**alternate** [1] - 401:14
**ambiguity** [2] - 412:20, 441:8
**American** [1] - 471:11
**amount** [17] - 331:11, 345:13, 349:7, 349:22, 350:3, 357:4, 359:2, 381:15, 383:2, 384:7, 390:17, 404:2, 423:15, 423:18, 444:23, 456:9
**amounts** [1] - 333:20
**amplified** [1] - 422:7
**analogies** [2] - 391:18, 392:3
**analogous** [11] - 471:1, 472:11, 472:21, 485:14, 485:25, 486:5, 486:20, 495:25, 497:3, 510:8
**analyses** [1] - 383:18
**analysis** [15] - 383:21, 411:3, 412:13, 427:16, 450:7, 450:18, 452:23, 457:3, 457:6, 458:13, 466:17, 469:25, 470:25, 481:22, 506:9
**analyze** [3] - 450:6, 502:21, 502:24
**analyzed** [2] - 422:14, 505:10
**Andreas** [3] - 403:17, 405:13, 406:15
**angle** [8] - 378:9, 404:2, 404:15, 404:18,

405:7, 405:8, 405:11, 452:13
**angles** [2] - 425:13, 435:9
**annotation** [4] - 370:1, 372:10, 402:22, 403:5
**answer** [24] - 323:23, 326:23, 327:13, 345:1, 345:3, 345:8, 358:5, 358:6, 379:16, 416:10, 446:21, 452:20, 465:19, 468:5, 468:7, 468:12, 470:13, 470:15, 473:8, 475:6, 489:4, 505:23, 512:25, 513:1
**answering** [3] - 327:1, 358:10, 358:11
**answers** [1] - 326:13
**antecedent** [1] - 474:10
**antedate** [1] - 407:17
**anticipate** [8] - 465:5, 465:24, 469:14, 470:21, 476:7, 482:22, 510:17, 511:10
**anticipated** [4] - 399:9, 417:23, 417:24, 484:1
**anticipates** [5] - 463:2, 466:3, 469:18, 473:1, 483:17
**anticipating** [1] - 464:12
**anticipation** [12] - 399:5, 399:8, 400:23, 473:3, 483:14, 483:15, 484:20, 505:22, 505:24, 506:10, 506:12, 511:16
**apart** [3] - 449:22, 475:23, 504:24
**apologize** [1] - 376:10
**apparent** [3] - 333:17, 382:24, 509:7
**Appeal** [1] - 505:18
**appear** [7] - 349:16, 364:4, 369:19, 446:1, 446:12, 461:1, 484:11
**APPEARANCES** [1] - 316:1
**appearances** [1] - 317:7
**appeared** [3] - 332:17, 334:4, 426:8
**appearing** [1] - 473:19
**applicant** [3] - 410:1, 461:13, 462:13
**application** [39] - 417:16, 417:18, 418:1, 445:14, 446:1, 448:16, 448:23, 458:1, 458:23, 461:3, 462:4, 462:14, 464:4, 477:20, 477:21, 478:6, 494:14, 498:23, 499:7, 499:10, 499:12, 499:18, 499:21, 500:9, 500:11, 501:1, 501:10, 503:6, 503:10, 512:19, 512:20, 512:23, 513:15, 514:13, 514:18, 514:23, 515:2, 515:10, 516:9
**applied** [12] - 324:1, 325:3, 337:7, 349:19, 355:1, 390:1, 390:6, 433:1, 465:12, 465:15, 475:22, 486:5
**Applied** [1] - 339:14
**applies** [10] - 320:23, 386:16, 391:3, 430:5, 447:20, 448:9, 453:4, 473:13, 473:16, 478:5
**apply** [20] - 320:24, 324:17, 325:9, 331:12, 337:13, 383:16, 407:8, 413:15, 420:15, 421:25, 430:16, 430:21, 458:25, 465:21, 497:12, 499:16, 500:25, 503:5, 513:19, 515:7
**applying** [8] - 325:5, 328:8, 328:9, 349:22, 352:16, 380:1, 475:20, 488:1
**appreciate** [1] - 472:8

**approach** [2] - 408:11, 444:17
**appropriate** [20] - 343:7, 345:24, 398:21, 408:23, 440:3, 443:6, 443:24, 444:1, 451:2, 484:10, 486:1, 493:18, 499:5, 499:6, 504:11, 507:24, 508:7, 511:17, 513:18, 514:5
**approved** [1] - 405:17
**April** [11] - 403:16, 404:7, 404:25, 405:2, 435:4, 435:8, 435:10, 452:15, 455:7, 517:22, 517:23
**arc** [4] - 378:22, 402:23, 471:15, 471:17
**area** [11] - 330:4, 382:10, 394:22, 402:23, 403:3, 403:22, 404:5, 404:9, 404:11, 443:3, 489:3
**areas** [1] - 486:11
**argue** [7] - 348:25, 393:2, 415:25, 444:14, 455:4, 483:9, 494:10
**argued** [19] - 427:18, 429:18, 429:19, 429:23, 430:3, 432:19, 440:5, 444:14, 455:25, 471:9, 482:14, 483:3, 487:1, 487:2, 493:7, 496:24, 498:24
**argues** [18] - 321:1, 334:7, 407:5, 407:9, 408:1, 413:3, 458:2, 462:25, 464:19, 466:3, 466:10, 466:14, 469:17, 469:22, 470:20, 473:1, 485:9, 510:13
**arguing** [8] - 373:4, 416:24, 429:2, 432:21, 464:23, 484:10, 487:21, 487:22
**argument** [72] - 317:22, 332:17, 338:2, 341:4, 343:11, 343:16, 347:24, 347:25, 348:24, 349:2, 356:22, 356:23, 368:25, 370:1, 385:20, 386:7, 390:21, 393:24, 399:12, 408:3, 410:10, 410:12, 412:11, 412:19, 413:1, 413:2, 413:7, 413:9, 414:1, 416:19, 420:9, 420:20, 441:25, 442:21, 444:24, 445:1, 445:11, 458:7, 464:4, 469:22, 469:24, 470:1, 470:4, 471:12, 481:19, 482:23, 484:1, 485:12, 485:25, 486:4, 486:5, 486:20, 487:18, 487:19, 491:5, 491:7, 491:8, 494:20, 494:24, 503:21, 504:7, 505:7, 506:13, 509:18, 510:18, 513:18, 513:19, 516:13, 516:17
**arguments** [54] - 319:4, 319:11, 319:19, 347:23, 348:14, 349:3, 349:4, 364:20, 367:20, 390:23, 395:20, 407:8, 413:15, 415:8, 415:9, 416:16, 428:16, 442:18, 443:9, 443:12, 444:16, 444:20, 445:10, 454:23, 461:1, 462:7, 462:9, 462:20, 479:9, 482:17, 483:13, 483:17, 483:24, 484:5, 487:20, 488:2, 493:14, 495:5, 495:22, 495:25, 496:1, 496:16, 497:1, 497:3, 497:7, 497:11, 498:8, 498:22, 504:8, 504:10, 506:12, 507:19, 507:20
**arisen** [2] - 347:7, 479:6
**arose** [1] - 322:3
**arranged** [3] - 464:13, 482:11, 505:25
**arrangements** [1] - 517:10

**arrow** [7] - 373:9, 373:10, 373:12, 374:3, 387:5, 393:18, 463:15
**arrows** [4] - 369:22, 377:9, 384:25, 463:22
**art** [83] - 329:1, 340:9, 342:11, 342:19, 344:9, 344:15, 399:1, 399:3, 400:12, 400:19, 400:22, 409:22, 410:23, 411:5, 411:11, 411:22, 412:16, 413:1, 413:10, 414:23, 414:24, 417:16, 417:20, 455:15, 457:9, 458:9, 458:17, 460:11, 462:20, 464:23, 467:24, 471:1, 471:7, 472:2, 472:21, 472:23, 474:20, 474:21, 480:14, 480:17, 481:21, 482:14, 482:15, 482:17, 483:3, 483:11, 485:14, 485:25, 486:2, 486:5, 486:10, 486:20, 490:7, 490:16, 490:18, 491:2, 491:20, 493:22, 494:3, 495:25, 496:15, 496:16, 496:21, 497:3, 497:13, 499:8, 499:11, 501:9, 502:5, 505:22, 507:12, 508:4, 508:6, 508:10, 509:9, 509:25, 510:2, 510:4, 510:8, 514:3, 515:16, 516:15
**article** [6] - 329:10, 329:17, 329:24, 330:16, 359:7, 359:8
**artisan** [3] - 472:4, 480:12, 486:7
**aside** [2] - 465:18, 413:22
**aspect** [2] - 403:1, 452:22
**aspects** [5] - 439:20, 472:5, 472:8, 507:16, 515:14
**assembled** [5] - 369:15, 370:20, 370:25, 387:20, 388:9
**assemblies** [1] - 460:8
**assembly** [6] - 401:12, 401:21, 401:24, 459:9, 460:4, 468:4
**assert** [1] - 319:25
**asserted** [7] - 399:21, 408:19, 410:17, 428:24, 455:15, 508:4, 509:13
**assertion** [3] - 321:18, 322:13, 429:9
**assertions** [2] - 333:7
**asserts** [1] - 399:2
**assess** [2] - 341:25, 411:21
**assessment** [1] - 330:10
**associated** [5] - 351:23, 356:8, 362:19, 426:9, 437:10, 489:21
**assume** [5] - 335:18, 355:22, 425:18, 439:16, 440:10
**assumed** [2] - 335:15, 415:24
**assuming** [2] - 417:9, 470:7
**assumption** [4] - 328:10, 461:2, 461:6, 462:6
**ATACR** [8] - 319:17, 319:22, 326:23, 337:24, 342:25, 357:12, 365:22, 371:6
**attached** [3] - 329:24, 387:19, 460:3
**Attached** [1] - 406:2
**attachment** [3] - 330:9, 330:16, 406:4
**attacked** [1] - 349:1
**attacking** [1] - 495:5
**attempt** [2] - 364:10, 472:22
**attempts** [1] - 367:10
**attention** [1] - 397:6

**attorney** [8] - 357:19, 358:3, 359:10, 370:1, 457:1, 481:19, 503:21, 516:17
**attorneys** [3] - 369:21, 371:1, 373:11
**audio** [1] - 472:13
**August** [2] - 483:6, 483:12
**authority** [7] - 410:8, 413:17, 458:12, 462:10, 462:13, 502:21, 514:12
**authorization** [1] - 363:25
**authorized** [1] - 333:2
**auto** [3] - 469:1, 495:17, 496:4
**auto-locking** [2] - 495:17, 496:4
**AutoCad** [1] - 401:11, 424:6
**automated** [1] - 468:19
**available** [5] - 333:22, 379:9, 477:11, 494:19, 496:21
**Avenue** [2] - 316:7, 316:17
**avoid** [5] - 359:18, 430:7, 483:22, 487:20, 497:9
**aware** [7] - 357:6, 357:20, 359:14, 360:9, 360:18, 360:21, 454:25
**axis** [25] - 343:25, 344:11, 344:17, 345:17, 348:10, 348:12, 368:24, 369:2, 369:8, 404:9, 411:18, 463:10, 463:12, 463:16, 463:18, 463:21, 463:23, 463:24, 464:16, 465:9, 465:13, 474:12, 474:13, 494:4, 511:12

**B**

**b-r-a-k-e-d** [1] - 351:9
**b-r-e-a-k** [1] - 355:3
**back-and-forth** [1] - 319:8
**backdrop** [1] - 341:24
**background** [3] - 320:7, 480:14, 506:25
**backpacks** [1] - 342:20
**ball** [2] - 404:11, 411:9
**band** [1] - 350:13
**bar** [1] - 340:1
**Bard** [2] - 400:7, 400:18
**base** [2] - 445:11, 484:1
**based** [25] - 320:1, 323:4, 330:25, 338:20, 358:22, 373:8, 389:20, 414:24, 415:15, 430:24, 455:22, 461:17, 463:7, 465:23, 470:5, 473:4, 481:18, 481:21, 483:12, 495:7, 501:17, 508:8
**bases** [1] - 441:14
**basic** [2] - 348:24, 384:1
**basing** [1] - 386:7
**basis** [22] - 331:5, 340:9, 341:1, 356:13, 364:11, 367:8, 367:23, 381:23, 382:2, 392:7, 425:7, 430:13, 433:3, 433:12, 439:23, 443:9, 448:25, 449:4, 474:10, 480:22, 484:14, 485:15
**battle** [3] - 367:4, 413:20, 449:3
**bear** [1] - 470:7
**bearing** [3] - 357:22, 404:11, 423:22, 460:23
**bears** [4] - 400:18, 408:17, 498:11, 498:16

**BEAST** [45] - 319:17, 319:22, 320:3, 320:5, 321:1, 322:4, 322:7, 322:18, 325:16, 326:23, 327:12, 327:16, 327:21, 327:22, 328:2, 329:3, 329:18, 330:10, 330:21, 331:10, 331:14, 331:22, 332:22, 332:24, 334:2, 335:9, 337:16, 337:24, 343:1, 347:2, 347:3, 347:9, 347:15, 348:21, 357:12, 357:15, 357:24, 358:9, 358:11, 360:25, 382:5, 382:12, 384:13, 481:6, 482:2

**Beckerman** [2] - 517:11, 517:18

**become** [2] - 355:4, 382:20

**becomes** [1] - 390:4

**bedrock** [1] - 386:10

**BEFORE** [1] - 315:18

**begin** [1] - 399:1

**beginning** [2] - 460:1, 462:24

**begins** [3] - 376:18, 397:12, 411:8

**behalf** [1] - 398:14

**behaved** [1] - 354:8

**behind** [1] - 330:1

**believes** [2] - 359:21, 447:8

**below** [6] - 328:18, 393:20, 403:4, 406:2, 406:5, 519:3

**bench** [1] - 332:24

**Bender** [26] - 401:6, 402:17, 403:1, 403:15, 403:18, 404:13, 404:20, 405:9, 405:17, 405:23, 406:16, 406:17, 406:21, 406:23, 411:25, 434:13, 435:22, 435:24, 436:7, 437:1, 439:9, 440:17, 451:17, 453:10

**benefit** [2] - 335:20, 361:13

**benefits** [1] - 330:7

**Bernie** [1] - 401:19

**best** [4] - 323:6, 349:13, 449:2, 491:6

**better** [7] - 346:5, 403:24, 451:21, 454:2, 491:18, 504:8, 504:9

**between** [29] - 334:2, 334:25, 343:18, 348:9, 349:9, 349:11, 350:22, 352:8, 352:22, 353:7, 363:13, 367:18, 371:20, 379:25, 380:24, 381:6, 381:11, 391:5, 394:22, 402:25, 403:14, 413:20, 417:19, 424:4, 467:6, 482:16, 483:21, 492:15, 504:1

**beyond** [4] - 320:23, 331:11, 353:13, 461:5

**bias** [1] - 377:12

**biased** [12] - 369:4, 369:12, 371:23, 373:19, 374:15, 378:5, 378:7, 378:18, 390:16, 392:21, 393:24, 394:2

**biasing** [4] - 385:23, 386:5, 387:15, 389:3

**big** [4] - 447:13, 489:24, 509:20, 516:12

**binoculars** [3] - 486:14, 486:18, 495:19

**Biosig** [1] - 504:17

**bit** [14] - 323:11, 346:13, 350:25, 416:21, 418:10, 418:19, 425:11, 428:17, 433:5, 439:25, 440:4, 453:3, 477:16, 502:22

**bits** [1] - 422:8

**black** [4] - 371:20, 394:13, 394:14, 422:11

**blanket** [1] - 456:2

**blown** [2] - 426:17, 473:18

**blown-film** [1] - 473:18

**blown-up** [1] - 426:17

**blue** [3] - 330:4, 459:16, 463:16

**Board** [1] - 505:19

**body** [4] - 445:14, 445:25, 475:22, 475:23

**boil** [1] - 392:12

**Bond** [1] - 316:9

**borne** [1] - 454:15

**bottom** [8] - 343:10, 371:11, 374:2, 401:3, 404:19, 421:16, 436:12, 492:2

**boundaries** [7] - 410:23, 445:19, 445:21, 446:15, 446:16, 447:10, 447:12

**boundary** [3] - 405:8, 480:4, 482:5

**box** [13] - 322:23, 330:5, 331:15, 333:1, 334:13, 341:5, 341:11, 360:1, 360:3, 393:4, 423:4, 434:12, 436:8

**Boydstun** [1] - 424:2

**BOYDSTUN** [1] - 424:2

**brain** [1] - 346:5

**BRAKE** [4] - 349:12, 349:21, 349:23, 350:2

**brake** [33] - 320:3, 327:21, 328:3, 328:18, 329:19, 330:1, 330:3, 330:13, 330:22, 330:23, 332:4, 349:11, 349:18, 349:21, 349:23, 350:2, 350:16, 352:5, 358:25, 359:8, 360:13, 380:1, 380:3, 380:6, 382:13, 385:1, 389:11, 390:7, 390:15, 390:17, 482:2

**braked** [14] - 350:11, 350:14, 350:24, 351:6, 351:8, 352:19, 352:22, 355:9, 355:19, 356:3, 357:2, 359:1, 359:3, 361:18

**braking** [15] - 347:7, 347:8, 353:23, 357:24, 358:14, 359:15, 359:17, 360:5, 360:12, 360:24, 481:2, 481:4, 481:8, 481:14, 482:2

**brand** [1] - 331:14

**breadth** [3] - 386:17, 478:22, 504:13

**break** [11] - 349:12, 352:3, 354:12, 355:3, 361:7, 361:14, 390:5, 390:13, 398:9, 476:10

**breaking** [3] - 331:10, 347:8, 381:24

**breeze** [4] - 420:19, 420:21, 420:24, 428:16

**Brian** [2] - 316:2, 317:9

**brief** [22] - 346:14, 369:19, 373:8, 379:12, 382:21, 389:10, 407:15, 443:20, 443:21, 444:12, 452:21, 453:1, 456:11, 456:15, 468:1, 474:25, 485:9, 494:1, 494:22, 511:24, 516:3

**briefed** [7] - 430:18, 430:19, 442:6, 483:4, 483:16, 485:22, 507:22

**briefing** [90] - 320:10, 322:16, 331:21, 332:19, 334:25, 349:4, 355:16, 360:8, 363:17, 366:18, 367:10, 367:19, 369:18, 370:12, 370:22, 372:7, 382:24, 383:1, 389:15, 395:22, 399:6, 401:4, 401:22, 403:13, 405:19, 407:8, 408:5, 408:8, 413:20, 415:11, 415:13, 420:4, 422:21, 427:13, 428:12, 430:3, 432:20, 433:23, 436:5, 439:6, 440:5, 440:7, 442:7, 442:20, 442:25, 443:8, 443:10, 444:15, 445:2, 448:5, 448:10, 455:10, 461:13, 464:3, 466:17, 466:20, 471:3, 471:19, 473:9, 473:11, 474:25, 480:21, 482:14, 484:7, 484:8, 485:22, 487:2, 487:4, 488:3, 488:18, 488:19, 495:1, 495:10, 497:7, 497:16, 499:16, 502:2, 502:3, 502:15, 504:13, 505:2, 507:22, 508:20, 508:21, 509:13, 510:3, 510:13, 515:19

**briefly** [3] - 362:3, 367:19, 515:21

**briefs** [5] - 318:10, 454:2, 462:7, 466:22, 499:19

**bring** [2] - 386:22, 440:21

**bringing** [1] - 448:3

**brings** [1] - 325:24

**broad** [11] - 340:3, 341:12, 478:21, 479:1, 481:3, 503:17, 504:15, 505:5, 512:17, 513:12

**broadening** [1] - 515:13

**broader** [17] - 340:6, 461:23, 462:2, 466:25, 478:24, 488:1, 500:9, 500:12, 501:14, 501:17, 506:17, 506:23, 512:6, 514:17, 514:18, 515:17, 515:18

**broadly** [5] - 338:14, 338:24, 462:13, 479:17, 508:9

**broken** [28] - 333:4, 335:17, 347:8, 347:19, 349:13, 349:19, 350:5, 351:2, 351:7, 354:6, 354:7, 355:4, 355:14, 355:17, 355:21, 356:5, 356:6, 356:11, 359:25, 360:4, 380:6, 381:21, 390:4, 390:8, 390:14, 390:18, 481:5

**brother** [1] - 403:19

**brought** [4] - 332:22, 333:10, 342:11, 440:11

**Brown** [2] - 329:8, 359:4

**brown** [5] - 329:22, 330:5, 359:6, 359:9, 359:16

**BRUNETTE** [1] - 317:11

**Brunette** [3] - 316:5, 317:11, 380:21

**Brunswick** [1] - 339:20

**bucket** [3] - 318:23, 318:25, 319:1

**buckets** [1] - 318:23

**buckle** [2] - 342:19, 342:23

**Buffalo** [3] - 334:24, 335:7, 344:19

**build** [1] - 453:11

**built** [2] - 401:5, 407:2

**bullet** [3] - 327:6, 329:16, 403:21

**bumped** [1] - 333:18

**bumping** [5] - 320:25, 325:14, 328:1, 328:23, 380:10

**bundle** [1] - 499:23

**burden** [39] - 383:17, 399:12, 399:18, 399:20, 399:22, 399:25, 400:5, 400:10, 400:14, 400:16, 400:18, 400:25, 407:6, 407:23, 407:24, 408:2, 408:14, 408:16, 408:18, 408:21, 411:10, 430:6, 438:25, 441:10, 444:19, 449:19, 450:21, 451:1, 453:16, 498:11, 498:16, 498:18, 503:2, 503:11, 503:23, 505:24, 510:1, 510:9, 510:11
**business** [12] - 315:7, 315:7, 321:14, 326:8, 331:7, 334:17, 335:25, 347:18, 359:24, 474:24, 488:8
**button** [99] - 336:24, 337:20, 337:22, 337:25, 338:3, 338:17, 338:19, 340:16, 342:6, 342:13, 342:21, 342:24, 343:2, 357:16, 361:24, 364:17, 364:18, 364:22, 365:5, 365:10, 365:22, 365:23, 366:9, 366:10, 366:12, 366:13, 367:11, 368:4, 371:15, 372:4, 372:22, 374:18, 374:21, 374:23, 375:4, 376:17, 379:15, 379:18, 379:20, 385:5, 385:10, 385:14, 388:2, 388:16, 389:1, 391:11, 391:12, 392:2, 397:7, 397:19, 397:24, 398:1, 460:16, 463:9, 463:11, 463:14, 463:17, 463:20, 463:25, 464:7, 464:8, 464:10, 464:15, 464:25, 465:4, 465:8, 490:1, 490:2, 490:8, 490:13, 490:14, 490:25, 491:1, 491:22, 491:23, 492:4, 492:8, 492:10, 492:12, 492:17, 492:18, 492:24, 493:23, 494:5, 494:8, 494:18, 494:23, 495:4, 495:17, 510:15, 510:23, 511:11, 511:14, 513:14, 513:17, 513:24, 515:15
**button's** [1] - 338:20
**button-actuated** [1] - 491:22
**buttons** [8] - 337:14, 391:20, 463:21, 463:23, 490:18, 491:3, 493:4, 494:24
**Byron** [28] - 321:19, 331:19, 333:5, 334:1, 334:21, 336:7, 336:13, 360:7, 369:23, 420:5, 428:13, 428:19, 429:10, 430:1, 431:9, 432:10, 432:13, 432:18, 433:1, 433:2, 436:24, 443:3, 443:6, 447:11, 453:21, 454:5, 510:20, 511:4
**Byron's** [5] - 321:21, 334:7, 432:20, 454:1, 454:17

**C**

**cabinet** [2] - 342:12, 391:22
**CAD** [6] - 422:6, 422:12, 439:11, 449:23, 450:4, 459:10
**calculation** [1] - 353:5
**calculator** [2] - 353:4, 361:14
**cam** [1] - 351:17
**Camera** [1] - 340:19
**camera** [31] - 351:4, 372:17, 466:2,

466:3, 468:20, 469:21, 469:23, 470:3, 470:9, 470:11, 470:17, 483:1, 483:4, 483:14, 485:13, 486:23, 487:8, 487:13, 489:25, 490:9, 490:16, 494:25, 496:14, 496:20, 497:13, 497:17, 497:22, 509:11, 513:16, 513:20, 513:25
**cameras** [1] - 496:9
**cannot** [13] - 408:20, 412:20, 415:14, 415:15, 416:17, 430:7, 445:17, 465:5, 469:14, 476:7, 478:4, 480:7, 501:20
**Canon** [44] - 399:15, 466:2, 466:5, 468:14, 468:15, 468:22, 469:3, 469:11, 469:16, 469:18, 469:21, 470:3, 470:16, 470:19, 470:20, 470:24, 472:10, 472:15, 472:18, 472:21, 472:23, 483:1, 483:14, 484:18, 485:13, 487:8, 487:12, 489:25, 490:9, 494:25, 496:14, 496:20, 497:13, 497:17, 497:22, 506:4, 506:8, 506:10, 509:10, 509:19, 510:7, 510:10, 513:16
**cantilevered** [1] - 341:19
**cap** [13] - 371:11, 372:20, 374:2, 375:21, 375:25, 376:8, 376:12, 377:3, 387:19, 387:23, 475:17, 475:19, 475:25
**capability** [2] - 370:9, 382:6
**capable** [1] - 370:15
**captured** [1] - 357:6
**car** [1] - 347:8
**carefully** [1] - 433:21
**carry** [4] - 408:20, 411:10, 503:23, 510:8
**carrying** [2] - 457:23, 476:14
**Casas** [4] - 399:15, 482:14, 482:15, 482:21
**Case** [1] - 317:6
**case** [142] - 321:10, 321:13, 322:16, 329:4, 338:8, 338:12, 339:12, 339:14, 339:15, 339:21, 339:23, 340:4, 340:19, 340:21, 341:2, 341:4, 341:16, 341:18, 342:6, 343:5, 345:14, 347:11, 348:23, 349:5, 349:25, 351:18, 354:9, 356:13, 356:24, 357:21, 362:2, 362:10, 362:14, 363:7, 363:14, 363:19, 363:23, 364:8, 365:6, 366:14, 367:3, 368:21, 374:20, 390:25, 391:4, 391:9, 399:24, 400:6, 400:7, 408:5, 408:8, 419:20, 421:5, 422:6, 422:10, 422:15, 424:2, 424:9, 424:20, 424:24, 425:6, 427:15, 428:24, 429:10, 430:3, 430:16, 430:23, 431:3, 431:5, 431:16, 431:25, 432:4, 432:15, 432:22, 434:1, 437:23, 437:24, 438:6, 438:8, 438:18, 440:14, 443:6, 444:10, 449:2, 454:15, 455:23, 458:16, 461:12, 461:16, 471:5, 471:11, 471:12, 473:17, 473:18, 474:16, 479:4, 479:10, 479:11, 479:12, 480:20, 483:2, 487:5, 487:16, 497:14, 498:18, 499:6, 499:19, 499:20, 500:6, 500:22, 501:4,

502:20, 503:13, 504:18, 505:3, 505:16, 505:17, 505:18, 506:18, 507:6, 507:10, 507:14, 510:3, 511:25, 512:2, 512:9, 512:11, 512:18, 514:15, 514:21, 515:1, 515:19, 515:25, 516:6, 516:7, 516:10
**cases** [34] - 424:1, 431:1, 432:24, 444:6, 452:9, 453:6, 462:5, 479:7, 479:13, 481:9, 485:18, 496:9, 499:16, 500:21, 500:23, 500:25, 501:1, 501:3, 502:12, 502:15, 512:4, 512:7, 512:8, 512:14, 512:15, 514:16, 514:20, 514:21, 514:22, 515:6, 515:8, 515:22, 515:23
**Cases** [1] - 329:15
**CASIMIR** [53] - 317:14, 346:10, 346:15, 346:23, 347:15, 347:22, 353:1, 353:4, 353:11, 353:17, 354:2, 354:13, 354:17, 356:19, 361:2, 361:8, 361:13, 361:21, 364:14, 368:3, 368:6, 384:21, 389:10, 414:22, 415:6, 416:11, 417:1, 418:12, 420:23, 421:2, 426:16, 427:4, 435:2, 435:5, 435:13, 435:18, 442:2, 442:18, 449:9, 457:15, 457:17, 457:21, 476:18, 476:22, 477:1, 484:21, 485:9, 485:12, 490:24, 511:24, 516:3, 516:6, 517:7
**casimir** [1] - 316:9
**Casimir** [2] - 316:10, 317:14
**casings** [1] - 329:16
**cassette** [1] - 472:13
**cast** [1] - 432:20
**catalog** [1] - 400:19
**catching** [1] - 334:19
**categories** [2] - 431:4, 447:25
**category** [4] - 391:7, 391:8, 431:10, 431:14
**Category** [5] - 431:10, 431:15, 431:20, 432:24, 433:4
**caused** [1] - 390:17
**causes** [3] - 349:22, 469:7, 491:24
**causing** [1] - 475:23
**CCS** [1] - 339:20
**ceased** [1] - 323:14
**Celotex** [1] - 498:14
**center** [5] - 401:16, 404:9, 421:16, 491:25, 515:2
**Center** [1] - 316:13
**central** [5] - 349:8, 349:10, 351:15, 492:10, 501:7
**certain** [12] - 322:9, 337:10, 414:23, 418:4, 418:5, 435:23, 454:25, 473:1, 483:25, 487:7, 508:15, 514:25
**certainly** [6] - 332:1, 332:11, 333:18, 374:8, 381:23, 455:10
**certified** [1] - 519:8
**certify** [1] - 519:3
**cetera** [1] - 440:21
**chain** [1] - 435:2
**challenged** [1] - 500:5
**chance** [4] - 384:15, 393:13, 476:21,

517:2
**change** [6] - 320:13, 329:17, 332:16, 404:18, 405:9, 436:22
**changed** [5] - 320:19, 329:25, 330:21, 333:18, 437:6
**changed'** [1] - 425:3
**changes** [5] - 406:8, 423:17, 432:15, 432:25
**characterized** [4] - 479:25, 493:21, 514:15, 516:7
**cheap** [2] - 353:5, 476:1
**check** [2] - 418:23, 482:13
**chemical** [1] - 488:17
**child** [1] - 342:12
**chooses** [1] - 503:12
**chunks** [1] - 346:6
**circle** [3] - 317:20, 351:16, 351:25
**Circuit** [39] - 338:23, 339:3, 339:9, 339:16, 339:21, 339:23, 340:2, 340:5, 340:12, 340:13, 340:20, 340:21, 340:24, 341:3, 341:4, 341:12, 341:17, 341:18, 341:22, 356:15, 386:12, 399:24, 407:14, 408:6, 461:11, 461:16, 461:21, 462:1, 471:23, 471:24, 472:2, 473:17, 501:4, 501:24, 504:15, 505:17, 507:6, 512:12, 515:20
**Circuit's** [2] - 471:18, 473:21
**circular** [1] - 385:20
**circumference** [4] - 344:12, 344:18, 345:18, 402:12
**circumstance** [1] - 443:18
**circumstances** [2] - 452:2, 454:17
**circumstantial** [2] - 406:13, 453:14
**citation** [7] - 324:12, 382:22, 444:8, 452:25, 469:24, 510:19, 514:14
**citations** [5] - 444:4, 444:16, 448:9, 466:16, 473:11
**cite** [9] - 332:7, 452:23, 455:25, 462:5, 485:4, 499:19, 504:17, 505:2, 508:13
**cited** [28] - 355:16, 364:1, 366:18, 401:3, 407:14, 410:15, 424:1, 430:2, 431:16, 438:8, 453:6, 456:11, 456:16, 461:12, 471:19, 474:25, 479:13, 486:12, 488:8, 489:17, 497:13, 499:16, 510:3, 510:21, 512:7, 512:8, 512:15, 515:19
**cites** [8] - 408:5, 410:8, 413:17, 444:22, 447:20, 485:1, 485:2
**citing** [2] - 348:7, 478:15
**Claim** [8] - 393:5, 394:1, 411:7, 467:6, 467:8, 470:3, 496:3, 503:25
**claim** [141] - 321:2, 322:6, 322:9, 322:12, 325:22, 337:18, 338:7, 338:18, 339:1, 339:4, 339:10, 339:18, 340:7, 340:8, 340:14, 340:17, 341:5, 341:13, 342:1, 345:21, 345:22, 347:25, 348:2, 348:5, 348:14, 349:5, 349:24, 354:18, 354:21, 356:24, 357:20, 358:4, 364:22, 365:5, 365:9, 365:12, 365:17, 366:1, 366:14,

367:11, 368:15, 369:3, 369:6, 371:4, 371:7, 373:18, 374:14, 377:2, 378:1, 380:12, 381:12, 381:13, 383:25, 386:10, 386:16, 389:12, 389:16, 389:19, 389:22, 392:12, 392:15, 392:16, 392:17, 392:25, 393:1, 393:23, 411:3, 411:7, 411:13, 411:21, 412:9, 412:10, 412:14, 412:21, 412:23, 412:24, 425:21, 434:21, 441:17, 445:6, 445:18, 452:21, 457:7, 457:24, 457:25, 462:13, 464:17, 466:5, 466:11, 467:1, 467:3, 467:7, 467:20, 469:14, 473:14, 473:18, 474:6, 474:9, 474:18, 477:8, 478:17, 478:23, 479:16, 484:3, 484:17, 484:18, 487:7, 487:18, 487:19, 487:21, 487:24, 488:7, 488:19, 497:6, 499:25, 500:8, 500:12, 501:11, 501:14, 501:17, 503:24, 504:16, 504:19, 505:11, 506:7, 507:19, 507:25, 508:3, 508:8, 508:9, 508:13, 508:15, 508:24, 509:3, 511:10
**claimed** [26] - 368:14, 368:17, 378:18, 419:8, 419:11, 420:1, 421:12, 426:6, 428:5, 430:12, 434:19, 439:1, 458:17, 458:23, 459:2, 459:23, 460:20, 464:1, 464:14, 464:25, 465:4, 499:12, 502:6, 502:9, 506:1, 513:7
**claiming** [2] - 409:25, 494:7
**claims** [134] - 341:9, 341:21, 346:21, 348:19, 348:25, 353:21, 354:18, 358:18, 358:19, 358:23, 362:5, 362:14, 379:22, 386:10, 392:24, 396:25, 399:4, 399:6, 399:7, 399:8, 399:22, 409:25, 410:5, 410:18, 411:2, 417:22, 419:2, 421:3, 421:4, 421:5, 421:6, 421:11, 437:21, 438:6, 439:20, 445:8, 445:9, 446:1, 447:15, 449:18, 452:18, 453:1, 458:2, 458:11, 461:2, 461:4, 461:20, 461:22, 461:23, 462:1, 462:16, 463:2, 463:8, 464:21, 465:25, 466:3, 469:18, 469:19, 470:22, 473:2, 473:5, 474:2, 477:6, 477:8, 477:11, 478:4, 478:8, 478:22, 479:1, 479:21, 479:23, 479:25, 480:1, 480:2, 480:10, 480:23, 481:3, 481:12, 481:14, 481:16, 482:4, 482:10, 482:18, 482:22, 483:18, 483:25, 484:11, 485:18, 485:19, 485:23, 485:24, 486:2, 488:12, 493:21, 493:24, 494:3, 494:11, 494:15, 495:13, 495:14, 496:2, 496:24, 497:21, 499:3, 500:3, 500:4, 500:16, 501:15, 501:17, 503:16, 503:19, 504:7, 504:13, 504:15, 505:11, 505:23, 505:25, 508:6, 508:25, 509:1, 512:6, 513:7, 513:8, 513:9, 513:10, 513:12, 513:22, 514:13, 514:19, 515:18
**Claims** [4] - 363:9, 493:25, 494:2, 494:12

**clarification** [2] - 398:4, 416:4
**clarifications** [1] - 396:15
**clarify** [3] - 356:21, 379:22, 512:8
**clarity** [4] - 417:9, 439:12, 453:4
**classic** [1] - 447:15
**clause** [1] - 390:24
**clear** [22] - 339:18, 349:14, 380:9, 381:22, 382:10, 384:4, 399:19, 400:17, 408:3, 408:18, 417:2, 417:13, 424:16, 428:20, 432:4, 440:1, 450:22, 450:25, 470:16, 498:12, 504:14, 511:19
**clearly** [12] - 325:6, 332:13, 338:25, 345:3, 426:5, 432:22, 458:21, 461:25, 463:25, 494:19, 510:9, 515:24
**CLERK** [1] - 317:3
**clerk** [1] - 517:21
**click** [3] - 397:13, 500:10, 500:11
**clicker** [1] - 503:19, 504:4
**clicking** [3] - 350:10, 351:23, 420:24
**clicks** [2] - 500:15, 504:5
**clock** [1] - 386:3
**clockwise** [1] - 351:19
**close** [1] - 497:25
**closely** [1] - 427:4, 517:3
**closer** [2] - 365:21, 423:2
**closer-up** [1] - 365:21
**coarse** [2] - 327:13, 382:16
**coefficient** [1] - 345:6
**coffee** [2] - 476:15, 476:18
**coil** [1] - 460:7
**collars** [1] - 342:20
**colleague** [5] - 319:4, 346:1, 361:4, 367:25, 392:8
**collection** [4] - 341:6, 341:11, 462:19, 508:1
**collective** [1] - 431:4, 434:6
**color** [1] - 401:15
**colored** [1] - 376:20
**colors** [1] - 362:25
**column** [4] - 324:11, 324:14, 393:6, 475:18
**combination** [6] - 365:23, 483:18, 495:3, 510:5, 513:13, 513:18
**combine** [2] - 510:3, 510:10
**combined** [3] - 340:15, 468:7, 513:16
**combines** [1] - 383:21
**combining** [1] - 509:10
**coming** [7] - 367:15, 374:11, 397:10, 399:25, 408:14, 460:25, 492:11
**comment** [11] - 457:17, 457:19, 460:25, 476:15, 476:20, 476:21, 503:15, 507:18, 507:20, 508:12, 509:10
**commented** [1] - 436:11
**comments** [4] - 379:24, 498:2, 509:4, 509:17
**commercialization** [2] - 432:19, 432:21
**common** [6] - 323:4, 344:6, 344:13, 385:12, 448:24, 486:17

**commonly** [1] - 344:14
**communicating** [1] - 339:6
**communication** [2] - 341:6, 341:14
**company** [3] - 329:15, 401:6, 418:1
**compare** [4] - 351:10, 378:1, 477:23, 484:17
**compared** [1] - 368:20
**compelling** [1] - 491:7
**competence** [1] - 442:23
**competent** [2] - 323:1, 443:1
**complains** [1] - 443:21
**Complaint** [2] - 442:6, 443:22
**complete** [8] - 317:21, 424:6, 426:12, 426:15, 451:19, 452:20, 453:2, 514:17
**completed** [2] - 436:17, 453:7
**completely** [2] - 371:1, 412:12
**completeness** [1] - 395:17
**completion** [1] - 453:17
**complex** [3] - 398:23, 431:22, 480:11
**complicated** [1] - 364:4
**component** [20] - 338:11, 340:3, 340:10, 344:4, 355:7, 386:1, 421:12, 421:17, 426:18, 427:7, 427:12, 432:8, 435:8, 435:20, 435:23, 438:4, 460:3, 469:9, 487:9, 487:10
**components** [16] - 338:21, 362:19, 391:22, 404:12, 410:19, 410:21, 411:1, 418:4, 421:15, 426:12, 427:2, 434:20, 437:13, 439:7, 454:12, 467:19
**comports** [1] - 344:5
**composed** [1] - 421:7
**compressed** [1] - 402:7
**compressing** [1] - 412:6
**compressive** [1] - 475:21
**computer** [3] - 415:4, 424:14, 424:17
**conceivable** [2] - 461:9, 461:14
**conceived** [3] - 439:2, 439:20, 455:7
**concept** [13] - 322:1, 322:2, 323:10, 324:3, 324:15, 328:20, 337:6, 339:3, 349:17, 358:20, 380:8, 384:10, 484:1
**conception** [38] - 407:7, 407:9, 407:10, 407:11, 407:19, 407:24, 408:10, 415:14, 415:23, 415:24, 416:1, 416:3, 416:8, 416:13, 416:14, 416:17, 416:20, 417:1, 418:18, 418:25, 419:2, 419:3, 419:6, 421:21, 421:25, 422:3, 422:5, 422:16, 423:25, 425:8, 426:3, 427:15, 427:17, 427:19, 429:19, 438:2, 441:21
**concepts** [3] - 447:7, 484:11, 494:17
**concerned** [3] - 328:24, 381:17, 412:16
**conclude** [2] - 368:16, 457:17
**concluded** [3] - 336:10, 400:20, 517:25
**concludes** [1] - 449:6
**conclusion** [5] - 348:16, 430:13, 438:14, 441:13, 441:22
**condition** [14] - 322:24, 323:1, 334:12, 334:13, 335:12, 335:21, 336:3, 336:12, 381:21, 401:25, 402:1, 402:3, 402:5, 412:5

**conditions** [9] - 324:8, 334:14, 429:12, 431:1, 431:12, 431:23, 436:23, 469:2, 476:6
**confer** [1] - 517:21
**conferred** [1] - 318:9
**configuration** [6] - 340:10, 388:9, 396:21, 396:24, 397:4, 397:9
**configured** [2] - 388:25, 481:10
**confirmation** [2] - 405:15, 406:18
**confirmed** [1] - 326:2
**confirms** [1] - 321:20
**conflating** [2] - 383:18, 454:4
**conformed** [1] - 519:7
**confused** [1] - 386:21
**confusing** [1] - 382:6
**confusion** [1] - 376:10
**conjoined** [1] - 468:7
**connect** [1] - 403:8
**connected** [7] - 363:11, 363:13, 363:15, 363:18, 363:25, 390:24, 391:4
**connection** [1] - 450:14
**connectivity** [1] - 421:17
**connector** [1] - 391:24
**connotes** [1] - 339:10
**consent** [7] - 363:11, 363:13, 363:15, 363:18, 363:25, 390:24, 391:4
**consequence** [1] - 438:16
**consequently** [2] - 400:15, 400:22
**consider** [2] - 470:11, 512:24
**consideration** [2] - 513:6, 514:6
**considerations** [1] - 485:21
**considered** [4] - 334:9, 334:20, 360:13, 408:7
**considering** [1] - 438:14
**consistent** [8] - 327:3, 327:15, 336:15, 338:24, 451:15, 453:5, 462:1, 494:9
**consistently** [1] - 338:25
**consists** [1] - 318:25
**console** [3] - 501:7, 501:11, 515:3
**constructed** [1] - 441:16
**construction** [49] - 338:7, 338:18, 339:24, 341:19, 345:19, 347:25, 348:1, 348:3, 348:8, 348:14, 349:5, 349:24, 354:18, 356:24, 357:20, 358:4, 364:22, 365:17, 366:1, 367:11, 369:6, 380:12, 381:12, 383:25, 386:10, 389:12, 389:16, 389:19, 389:22, 392:12, 392:13, 392:16, 466:9, 466:24, 478:23, 487:19, 487:20, 487:22, 487:23, 487:24, 488:1, 488:19, 497:6, 506:7, 507:19, 507:25, 508:8, 508:13, 508:16
**constructions** [2] - 340:22, 478:24
**construe** [1] - 451:8
**construed** [8] - 348:3, 358:19, 365:16, 380:23, 393:7, 504:3, 509:1, 509:3
**consulting** [1] - 472:18
**consumable** [2] - 471:14, 471:16
**contact** [18] - 324:5, 355:9, 368:22, 369:14, 370:19, 371:3, 371:23, 372:2, 373:2, 373:14, 373:16, 374:16, 377:6,

378:18, 378:23, 394:5, 497:23, 505:3
**contacting** [1] - 482:5
**contacts** [3] - 372:14, 378:21, 405:23
**contain** [4] - 364:3, 364:6, 364:25, 409:20
**contained** [1] - 426:2
**containing** [4] - 362:24, 363:17, 424:14, 514:5
**contemplates** [2] - 461:25, 467:18
**contemporaneous** [3] - 403:12, 403:14, 450:3
**contemporaneously** [1] - 425:4
**contemporary** [1] - 402:25
**content** [2] - 423:9, 441:7
**contention** [2] - 321:7, 321:14
**contested** [1] - 345:21
**context** [39] - 322:4, 323:24, 324:16, 329:2, 341:25, 348:4, 348:18, 367:9, 369:7, 377:25, 380:11, 412:13, 422:2, 430:19, 446:3, 446:25, 447:1, 447:18, 454:8, 454:19, 456:25, 463:5, 464:17, 464:22, 467:21, 474:11, 474:12, 474:15, 479:6, 489:1, 489:16, 490:1, 491:13, 504:22, 504:25, 505:6, 506:3, 506:24, 507:2
**contexts** [3] - 339:4, 506:19, 506:21
**continuation** [1] - 317:4
**continue** [1] - 442:12
**CONTINUED** [1] - 315:15
**continues** [2] - 378:12, 411:13
**continuity** [1] - 361:5
**continuously** [1] - 351:5
**contract** [4] - 319:23, 363:18, 364:2, 383:11
**contracts** [1] - 363:23
**contradicted** [1] - 486:20
**contradictory** [1] - 430:2
**contrary** [8] - 321:21, 335:13, 342:4, 370:7, 420:6, 462:10, 462:11, 462:12
**contrast** [3] - 385:9, 468:15, 475:16
**contrasts** [1] - 378:15
**control** [7] - 327:8, 327:21, 328:3, 330:22, 382:12, 382:13, 468:25
**controlled** [1] - 338:17
**conversation** [1] - 382:2
**conversion** [2] - 353:5, 361:15
**convert** [1] - 465:20
**converts** [2] - 361:18, 361:19
**conveys** [1] - 448:17
**convincing** [7] - 399:19, 400:17, 408:18, 424:17, 450:23, 450:25, 498:12
**convincingly** [1] - 510:9
**Cook** [1] - 400:19
**copies** [4] - 318:16, 379:4, 422:11, 450:2
**copy** [6] - 330:8, 379:7, 379:9, 397:5, 413:6, 422:20
**copy-and-paste** [1] - 413:6

**Cordis** [2] - 461:12, 515:19
**CORDIS** [1] - 515:20
**corners** [2] - 332:4, 508:17
**corollary** [1] - 426:5
**Corp** [9] - 461:12, 479:11, 500:22, 512:9, 514:15, 514:21, 515:19, 515:22
**corporate** [1] - 327:1
**Corporation** [1] - 339:20
**correct** [22] - 325:17, 325:18, 357:3, 360:2, 376:19, 388:6, 388:14, 410:11, 412:15, 412:19, 413:15, 414:2, 415:16, 435:1, 451:6, 458:25, 461:7, 468:5, 468:12, 484:15, 505:13, 519:4
**corrected** [1] - 329:24
**correcting** [2] - 359:19, 424:12
**correctly** [4] - 373:6, 416:2, 438:19, 516:7
**correspond** [1] - 387:3
**correspondence** [6] - 326:7, 367:18, 402:25, 403:8, 403:11, 450:3
**correspondingly** [1] - 386:5
**corresponds** [1] - 404:12
**corroborate** [3] - 421:3, 424:7, 425:3
**corroborated** [3] - 408:2, 419:3, 419:17
**corroborates** [1] - 336:14
**Corroboration** [1] - 408:9
**corroboration** [6] - 407:7, 408:4, 408:7, 417:5, 422:4, 424:25
**Cottrell** [1] - 424:8
**Counsel** [1] - 490:22
**counsel** [27] - 317:7, 318:17, 319:7, 374:6, 384:17, 396:20, 397:17, 449:21, 449:25, 452:8, 454:22, 456:19, 456:21, 457:4, 457:5, 498:24, 500:20, 502:19, 505:21, 506:15, 510:13, 510:18, 510:21, 512:7, 512:14, 514:14, 514:15
**counsel's** [3] - 379:24, 386:9, 509:17
**count** [2] - 443:24, 503:14
**counter** [4] - 428:16, 444:22, 485:5, 495:5
**counts** [1] - 465:2
**couple** [13] - 337:12, 342:11, 356:21, 374:6, 379:12, 392:25, 406:15, 451:10, 455:25, 483:23, 492:20, 499:15, 512:19
**coupled** [19] - 466:6, 466:10, 466:13, 467:5, 467:13, 467:22, 467:25, 468:3, 468:13, 469:5, 469:7, 469:13, 487:17, 488:5, 488:14, 506:5, 508:24, 508:25, 509:6
**coupled'** [1] - 468:6
**coupling** [4] - 467:17, 469:6, 469:10, 488:17
**couplings** [1] - 488:15
**course** [7] - 321:13, 322:20, 328:11, 378:9, 385:9, 477:5, 485:8
**COURT** [129] - 315:1, 315:19, 316:16, 317:2, 317:15, 317:18, 317:24, 318:1, 318:3, 318:7, 318:11, 318:18, 319:12,

319:14, 333:23, 336:25, 337:4, 343:10, 343:16, 343:20, 346:3, 346:12, 346:22, 347:13, 347:21, 352:25, 353:2, 353:9, 353:15, 353:24, 354:12, 354:16, 356:18, 361:1, 361:6, 361:9, 361:11, 361:20, 364:13, 368:2, 368:5, 372:19, 373:4, 374:18, 374:25, 375:3, 375:6, 375:10, 375:13, 375:19, 375:22, 376:3, 376:15, 376:23, 377:16, 377:24, 379:3, 384:16, 384:20, 385:2, 386:20, 387:3, 387:8, 387:17, 387:21, 388:3, 388:12, 388:19, 389:5, 389:7, 389:9, 395:3, 395:11, 395:15, 396:13, 396:16, 398:6, 398:10, 404:23, 405:1, 409:10, 414:5, 414:11, 414:15, 414:17, 414:19, 416:18, 418:10, 420:21, 421:1, 426:14, 426:25, 434:24, 435:3, 435:10, 435:15, 442:1, 442:17, 449:8, 449:14, 451:3, 451:9, 451:14, 457:19, 462:23, 476:10, 476:14, 476:20, 476:25, 484:16, 485:8, 485:11, 490:22, 498:1, 501:13, 501:23, 502:11, 502:16, 511:23, 514:7, 514:10, 516:2, 516:5, 516:20, 517:1, 517:6, 517:8, 517:14, 517:22
**court** [3] - 333:10, 420:22, 432:24
**Court** [70] - 318:16, 323:10, 333:16, 336:23, 338:9, 338:13, 338:16, 339:25, 345:25, 348:3, 348:25, 353:16, 363:9, 368:15, 380:23, 381:2, 381:9, 381:12, 384:14, 387:8, 392:13, 392:16, 393:7, 398:22, 400:15, 400:18, 400:20, 410:14, 417:13, 424:11, 431:20, 438:9, 443:25, 444:19, 450:7, 450:16, 450:19, 450:21, 452:19, 454:23, 455:1, 455:3, 456:1, 456:3, 471:5, 471:10, 471:14, 471:22, 471:24, 481:17, 483:10, 487:21, 488:2, 497:8, 498:8, 499:15, 499:24, 500:15, 501:1, 504:3, 504:21, 505:21, 506:6, 507:10, 507:21, 508:21, 508:24, 516:24, 517:21, 519:13
**Court's** [12] - 338:9, 338:21, 338:24, 339:24, 340:25, 341:23, 364:22, 380:19, 396:18, 397:6, 466:19, 481:20
**Courthouse** [1] - 316:16
**cover** [22] - 318:10, 371:8, 379:22, 412:6, 446:7, 447:7, 448:15, 472:16, 481:4, 481:12, 481:14, 482:10, 482:11, 485:19, 486:3, 491:10, 494:17, 496:2, 497:21, 497:22, 500:16, 501:11
**covered** [7] - 447:5, 456:7, 481:14, 481:16, 482:4, 482:12, 482:13
**covering** [2] - 456:4, 464:25
**covers** [5] - 409:6, 447:8, 466:14, 494:8, 507:11
**crank** [2] - 331:17, 333:14

**cranking** [1] - 323:12
**create** [6] - 356:12, 356:14, 412:20, 412:22, 423:8, 430:7
**created** [6] - 423:9, 424:5, 424:15, 424:19, 449:24, 450:2
**creation** [2] - 401:18, 450:4
**credit** [1] - 425:21
**Crispin** [1] - 368:8
**critical** [5] - 386:3, 387:12, 399:11, 454:4, 477:5
**criticized** [1] - 334:18
**cross** [4] - 317:4, 368:9, 399:7, 451:7
**cross-motion** [1] - 399:7
**cross-motions** [2] - 317:4, 368:9
**CRR** [2] - 316:16, 519:12
**crystal** [2] - 428:20, 440:1
**CSR** [3] - 316:16, 519:12, 519:13
**cup** [1] - 476:15
**current** [3] - 320:19, 321:4, 322:14
**cursory** [3] - 363:17, 364:10, 430:11
**curtain** [1] - 344:15
**customary** [2] - 474:20, 508:14
**customer** [8] - 331:15, 333:2, 335:22, 406:12, 451:20, 451:23, 453:19
**customers** [1] - 334:15
**cut** [4] - 372:1, 373:1, 395:13, 418:3
**cut-away** [1] - 418:3
**cutters** [1] - 471:17
**cutting** [2] - 341:5, 341:11

## D

**damage** [1] - 442:10
**damaged** [1] - 349:20
**damages** [3] - 362:24, 409:1, 442:12
**data** [4] - 340:22, 353:12, 356:8, 424:14
**DATE** [1] - 519:12
**date** [56] - 399:4, 399:16, 399:21, 400:9, 401:18, 404:23, 405:18, 405:19, 405:21, 406:4, 408:12, 419:1, 419:7, 419:12, 419:13, 421:23, 422:5, 423:8, 423:9, 423:13, 424:5, 425:3, 425:10, 425:17, 425:22, 431:23, 439:16, 449:20, 449:24, 450:13, 450:24, 451:16, 458:4, 462:17, 477:4, 477:10, 477:11, 477:19, 479:17, 479:24, 479:25, 480:1, 482:15, 482:16, 482:19, 482:23, 483:3, 483:6, 496:17, 500:1, 502:9, 517:12
**Date'** [2] - 424:23, 425:1
**dated** [5] - 399:3, 399:16, 400:8, 403:16, 450:11
**dates** [9] - 400:3, 403:15, 422:20, 422:23, 427:1, 438:14, 439:11, 496:19
**David** [2] - 316:9, 317:14
**DAVIS** [25] - 317:13, 368:7, 372:20, 373:7, 374:21, 375:2, 375:5, 375:8, 375:11, 375:17, 375:20, 375:23, 376:9, 376:21, 376:24, 377:17, 377:25, 379:6, 379:11, 392:10, 395:7,

395:12, 395:16, 414:14, 415:5
**Davis** [4] - 316:12, 317:13, 392:8, 479:6
**DAY** [1] - 315:16
**days** [5] - 321:24, 334:22, 335:1, 336:6, 436:25
**dealers** [1] - 333:3
**dealing** [4] - 368:21, 399:14, 515:23, 516:15
**deals** [2] - 400:6, 438:5
**debate** [2] - 363:11, 363:15
**December** [2] - 424:18, 440:20
**decide** [2] - 505:22, 506:6
**decided** [8] - 318:9, 338:9, 364:24, 384:2, 502:25, 512:6, 517:14, 517:15
**decides** [3] - 323:19, 488:2, 506:7
**deciding** [1] - 502:20
**decision** [5] - 424:4, 431:23, 455:19, 498:14, 505:18
**deck** [1] - 393:2
**declaration** [21] - 321:18, 321:21, 331:19, 333:5, 333:25, 334:7, 334:22, 336:8, 336:13, 360:7, 420:4, 428:12, 429:2, 429:22, 429:24, 430:10, 440:15, 440:24, 453:21, 454:1, 454:17
**declarations** [1] - 369:18
**dedicated** [1] - 512:20
**deed** [1] - 445:20
**deemed** [1] - 431:10
**deep** [3] - 484:5, 486:6, 489:7
**Defendant** [1] - 315:9
**DEFENDANT** [1] - 316:9
**defendant** [3] - 317:13, 317:14, 400:7
**defendant's** [1] - 320:8
**defendants** [1] - 424:17
**defending** [2] - 346:20, 477:14
**defense** [38] - 319:23, 320:1, 320:8, 320:22, 321:5, 321:11, 322:14, 323:3, 336:17, 337:17, 340:16, 341:25, 383:11, 383:13, 383:16, 383:22, 384:17, 390:20, 391:3, 398:25, 400:11, 400:16, 408:25, 414:7, 414:20, 451:4, 456:2, 460:23, 463:7, 470:18, 471:9, 471:12, 476:9, 502:19, 503:13, 509:15, 511:16, 517:6
**defenses** [15] - 398:19, 398:21, 398:23, 408:25, 409:2, 409:7, 409:12, 409:15, 410:3, 413:3, 414:1, 414:2, 455:22, 498:10, 505:22
**deficiency** [1] - 428:11
**define** [2] - 340:8, 445:21
**defined** [2] - 392:24, 446:2
**definite** [2] - 504:25, 505:5
**definition** [14] - 322:1, 323:13, 323:22, 324:1, 325:20, 327:24, 328:14, 343:23, 380:5, 381:18, 384:8, 385:6, 386:15, 389:20
**definitions** [1] - 323:23
**degree** [4] - 344:1, 385:24, 404:5, 405:7
**degrees** [23] - 344:11, 344:16, 345:17, 374:5, 374:17, 378:10, 378:11,

378:17, 378:19, 378:22, 388:1, 402:22, 403:3, 403:6, 403:22, 404:3, 404:9, 404:15, 404:16, 405:4, 405:5, 405:10, 405:11
**delivered** [4] - 406:11, 406:19, 406:24, 453:19
**Delta** [1] - 381:25
**Demag** [1] - 479:12
**Deming** [1] - 316:10
**demonstrate** [21] - 360:21, 410:4, 415:16, 416:12, 416:17, 418:17, 418:25, 419:5, 420:11, 422:1, 427:21, 429:17, 433:19, 438:17, 440:2, 441:10, 441:11, 445:2, 448:20, 484:9, 487:5
**demonstrated** [4] - 355:15, 427:17, 428:3, 441:21
**demonstrates** [2] - 407:1, 437:20
**demonstrating** [3] - 357:8, 435:6, 438:18
**demonstration** [1] - 436:5
**demonstrative** [1] - 382:7
**demonstratives** [1] - 318:15
**denied** [1] - 485:1
**Dennis** [6] - 326:6, 327:3, 358:1, 359:11, 359:13, 382:11
**Dennis's** [2] - 357:25, 382:4
**deny** [1] - 334:17
**dependent** [5] - 483:25, 485:15, 493:21, 493:24, 494:12
**deponent** [1] - 327:4
**deponents** [1] - 488:6
**deposed** [5] - 335:7, 360:10, 446:10, 456:21, 492:21
**deposition** [27] - 321:23, 326:4, 326:10, 326:12, 334:23, 335:8, 335:25, 336:10, 344:19, 344:23, 351:3, 357:6, 357:25, 359:12, 359:13, 360:10, 382:12, 382:15, 446:10, 446:11, 465:7, 465:10, 467:25, 470:10, 474:23, 493:16, 511:19
**Depot** [1] - 341:2
**depressed** [1] - 463:17
**depressible** [9] - 463:9, 463:11, 463:15, 463:20, 464:8, 464:16, 464:25, 465:4, 511:11
**derive** [1] - 474:10
**deriving** [1] - 474:10
**describe** [12] - 323:25, 324:3, 329:18, 330:21, 340:10, 461:14, 464:8, 464:15, 473:24, 475:5, 495:15, 501:24
**described** [14] - 324:24, 325:4, 328:14, 331:18, 332:2, 333:5, 339:3, 339:5, 348:4, 386:8, 386:14, 390:14, 464:1, 500:16
**describes** [13] - 327:7, 378:5, 393:6, 460:1, 460:12, 463:11, 467:6, 474:5, 475:16, 488:15, 491:21, 501:2, 501:5
**describing** [8] - 327:21, 330:9, 330:22, 341:13, 382:11, 382:15, 491:1, 494:12

**description** [31] - 409:14, 409:20, 409:21, 410:6, 413:9, 413:12, 413:16, 415:2, 447:24, 448:2, 448:12, 448:19, 458:4, 458:7, 458:14, 458:15, 458:25, 461:8, 462:11, 478:8, 478:9, 480:11, 482:7, 499:10, 499:17, 499:25, 500:12, 502:4, 502:10, 513:2, 516:16
**design** [27] - 322:7, 355:12, 359:16, 378:15, 392:19, 403:2, 403:10, 403:12, 406:6, 424:6, 424:8, 432:19, 432:21, 440:17, 450:12, 452:18, 465:11, 471:8, 471:14, 490:17, 492:8, 492:16, 493:9, 497:21, 497:22
**design-around** [1] - 359:16
**designated** [2] - 412:3, 412:4
**designed** [15] - 322:19, 350:2, 350:8, 350:16, 355:1, 355:12, 359:15, 359:18, 392:20, 407:2, 443:3, 443:5, 486:10, 495:23, 496:12
**designing** [1] - 392:23
**designs** [7] - 351:11, 486:19, 493:4, 493:5, 493:8, 493:10, 496:25
**desired** [1] - 460:13
**despite** [1] - 508:1
**destroyed** [1] - 349:20
**detail** [15] - 354:2, 365:12, 366:18, 366:20, 366:21, 402:14, 410:4, 415:14, 421:24, 425:12, 430:12, 430:14, 437:10, 443:22, 443:24
**detailed** [3] - 478:14, 480:17, 491:5
**details** [10] - 348:5, 422:3, 432:23, 439:7, 444:10, 448:2, 478:13, 480:6, 487:7, 490:3
**detents** [1] - 332:5
**determination** [2] - 383:20, 471:3
**determine** [5] - 352:14, 383:14, 471:6, 488:4, 507:7
**determined** [3] - 320:16, 338:16, 432:1
**determining** [2] - 391:2, 507:3
**develop** [1] - 511:5
**developed** [11] - 362:14, 363:21, 367:22, 447:22, 480:23, 484:5, 497:7, 497:8, 506:24, 507:2, 507:22
**developing** [3] - 364:11, 451:19, 484:24
**Development** [2] - 500:22, 515:22
**development** [2] - 362:9, 406:7
**device** [66] - 328:11, 340:22, 340:23, 348:11, 348:13, 354:25, 358:18, 379:19, 390:14, 399:15, 431:22, 433:1, 433:4, 452:5, 454:20, 466:2, 466:7, 467:10, 467:11, 467:12, 468:14, 468:15, 468:16, 468:22, 469:6, 469:13, 469:14, 469:16, 469:18, 469:21, 469:23, 470:4, 470:9, 470:12, 470:17, 470:19, 470:21, 470:24, 472:10, 472:12, 472:18, 472:21, 472:23, 475:13, 476:5, 481:5, 485:24, 486:24, 495:17, 496:4, 496:5, 500:8, 500:13, 504:23, 506:4, 506:8, 506:10, 506:19, 509:19, 509:22,

509:23, 510:7, 510:10, 513:25, 514:4
**devices** [23] - 320:12, 381:20, 429:13, 471:7, 485:20, 486:18, 489:13, 490:7, 495:18, 495:19, 495:20, 495:21, 496:7, 496:8, 506:15, 506:18, 506:23, 513:8, 513:10, 513:23, 514:1, 514:5
**dial** [12] - 328:18, 468:15, 468:17, 469:3, 469:7, 475:7, 475:8, 481:8, 487:12, 487:13, 490:11, 513:16
**dials** [1] - 490:11
**diameter** [1] - 403:25
**dictates** [1] - 390:1
**dictionary** [1] - 466:22
**Dietz** [2] - 471:19, 507:5
**difference** [5] - 349:11, 350:22, 353:7, 492:15, 510:16
**differences** [1] - 510:6
**different** [57] - 321:10, 326:3, 339:3, 339:10, 339:11, 340:17, 342:2, 342:15, 343:14, 346:16, 347:4, 347:5, 360:1, 362:13, 362:14, 362:16, 362:18, 363:11, 371:24, 378:19, 380:1, 382:1, 385:25, 389:19, 392:23, 415:10, 421:5, 422:9, 430:24, 431:4, 434:24, 441:5, 446:22, 454:5, 456:1, 458:20, 462:20, 464:10, 465:1, 468:19, 469:2, 477:2, 478:1, 480:18, 485:21, 486:2, 486:11, 487:15, 493:8, 499:1, 499:2, 500:20, 511:4, 511:18, 515:6
**differential** [1] - 390:4
**differentiated** [1] - 352:5
**differentiates** [2] - 349:17, 349:21
**differently** [1] - 480:6
**difficult** [2] - 372:17, 493:3
**dig** [2] - 444:9, 444:21
**digging** [1] - 444:21
**Digital** [1] - 340:19
**digital** [3] - 466:2, 472:11, 472:13
**digitally** [1] - 519:7
**diligent** [1] - 407:19
**Dimension** [2] - 471:5, 471:12
**direct** [3] - 468:14, 486:16, 493:10
**directed** [2] - 489:2, 498:21
**direction** [11] - 337:8, 377:14, 463:15, 463:17, 463:22, 465:13, 465:16, 465:17, 494:4, 512:13, 514:2
**directly** [3] - 349:24, 362:22, 466:13
**director** [1] - 329:22
**directory** [1] - 425:2
**disagree** [1] - 481:23
**disagreeing** [1] - 391:13
**disagreement** [5] - 349:9, 366:2, 390:22, 417:22, 516:17
**disassemble** [1] - 475:21
**disassembling** [1] - 376:24
**disclaim** [1] - 340:8
**disclaimer** [1] - 386:15
**disclaimers** [1] - 342:4
**disclose** [7] - 461:3, 461:9, 464:1,

464:13, 464:15, 465:3, 493:23
**disclosed** [14] - 425:5, 461:23, 462:2, 462:14, 463:1, 465:8, 494:13, 499:13, 499:22, 500:7, 500:9, 500:19, 511:2, 511:6
**discloses** [1] - 494:17
**disclosure** [16] - 409:18, 458:10, 464:19, 464:24, 471:6, 474:7, 478:6, 479:15, 493:6, 499:25, 500:10, 512:16, 512:17, 512:18, 514:16, 514:18
**disclosures** [1] - 483:8
**discontinuation** [1] - 396:20
**discontinued** [1] - 395:21
**discovered** [1] - 336:10
**discredit** [1] - 497:2
**discuss** [12] - 321:9, 356:3, 356:5, 365:18, 367:21, 367:25, 418:24, 422:2, 426:12, 498:23, 506:14, 507:2
**discussed** [19] - 323:9, 360:3, 360:12, 365:3, 379:21, 399:24, 430:18, 432:3, 463:4, 470:23, 471:11, 476:4, 485:23, 500:23, 504:10, 507:5, 510:17, 510:25, 515:20
**discusses** [1] - 403:1
**discussing** [4] - 437:17, 438:21, 477:6, 511:1
**discussion** [26] - 348:15, 348:17, 360:8, 364:21, 365:7, 379:25, 380:13, 381:19, 382:4, 382:22, 383:10, 419:19, 426:2, 430:20, 431:18, 451:12, 451:25, 460:22, 464:18, 465:18, 476:23, 481:1, 489:9, 499:4, 509:14, 512:1
**discussions** [2] - 328:16, 438:11
**disengage** [2] - 372:4, 372:22
**disengages** [2] - 337:8, 402:6
**disengaging** [3] - 365:13, 459:18, 484:2
**disks** [1] - 425:1
**dismembers** [1] - 412:9
**dismiss** [2] - 444:18, 456:3
**dismissed** [6] - 429:24, 430:1, 444:15, 445:3, 447:19, 487:3
**disparity** [1] - 424:4
**Display** [1] - 505:1
**dispositive** [2] - 382:24, 433:12
**dispute** [34] - 325:3, 325:15, 331:2, 353:15, 353:18, 353:19, 363:12, 366:23, 367:8, 367:11, 367:14, 368:12, 383:25, 385:4, 385:19, 389:3, 391:13, 413:24, 417:19, 445:6, 448:8, 466:9, 479:20, 480:3, 480:7, 482:20, 483:2, 485:15, 491:6, 491:19, 491:21, 493:17, 496:16, 496:20
**disputed** [5] - 430:7, 477:17, 486:24, 487:10, 513:2
**disputes** [13] - 384:3, 443:15, 449:3, 478:12, 480:24, 481:24, 483:21, 486:7, 488:19, 489:8, 489:18, 489:23, 497:10

**disputing** [2] - 416:2, 494:20
**disqualify** [1] - 495:9
**distance** [1] - 422:9
**distinct** [5] - 339:12, 340:24, 341:7, 342:1, 342:8
**distinction** [3] - 325:11, 379:25, 385:19
**distinctly** [1] - 409:25
**distinguish** [1] - 340:9
**distinguished** [2] - 512:2, 514:23
**distinguishes** [1] - 515:21
**District** [11] - 316:16, 339:24, 339:25, 340:25, 341:23, 424:10, 424:21, 471:5, 471:10, 471:21, 471:24
**district** [1] - 424:3
**DISTRICT** [3] - 315:1, 315:2, 315:19
**dive** [1] - 398:8
**divided** [1] - 401:24
**Division** [1] - 479:12
**divorced** [1] - 412:12
**docket** [19] - 319:20, 321:19, 326:10, 327:5, 327:19, 329:7, 331:19, 333:5, 334:6, 334:8, 335:2, 338:15, 338:21, 344:21, 382:9, 382:21, 383:6, 407:16, 456:15
**document** [13] - 322:18, 332:8, 372:17, 400:8, 422:24, 423:13, 423:20, 423:21, 478:2, 479:15, 479:16, 480:9, 512:3
**documentary** [1] - 452:17
**documentation** [3] - 420:11, 437:25
**documents** [8] - 322:15, 408:12, 417:7, 422:22, 422:23, 433:18, 433:19, 479:13
**dodged** [1] - 364:21
**done** [24] - 324:21, 353:10, 354:21, 400:11, 428:8, 435:22, 437:1, 437:16, 437:18, 438:23, 439:10, 439:22, 441:17, 448:22, 452:23, 457:6, 479:19, 481:22, 491:16, 497:25, 508:19, 516:21
**doomed** [1] - 477:8
**door** [4] - 323:16, 486:4, 495:23, 495:25
**Dot** [5] - 401:8, 405:22, 405:25, 406:6
**double** [1] - 500:15
**doubt** [2] - 335:21, 496:24
**Douglas** [1] - 321:23
**dowel** [1] - 366:9
**dowel-shaped** [1] - 366:9
**down** [34] - 330:4, 350:12, 368:13, 371:8, 371:20, 375:3, 381:11, 384:23, 384:25, 387:22, 390:9, 392:12, 393:15, 393:20, 394:20, 403:4, 404:19, 406:20, 418:10, 421:16, 425:11, 459:16, 465:21, 465:22, 490:23, 491:23, 491:24, 492:4, 492:10, 492:11, 492:13, 492:24, 514:20, 516:12
**downward** [1] - 475:20
**dozens** [1] - 444:8
**Dr** [5] - 326:5, 327:3, 382:4, 382:11,

400:13
**dramatically** [4] - 416:15, 417:12, 477:25, 512:23
**draw** [1] - 397:5
**drawing** [27] - 401:13, 401:15, 401:16, 401:24, 402:18, 402:22, 403:21, 404:4, 404:10, 405:6, 405:9, 412:3, 422:6, 422:13, 422:18, 424:25, 425:2, 425:16, 425:17, 425:19, 425:22, 426:8, 426:10, 426:21, 427:1, 427:7, 465:15
**drawings** [42] - 331:22, 340:5, 401:8, 401:12, 401:13, 401:21, 402:15, 403:9, 403:18, 405:10, 406:8, 407:3, 411:25, 422:6, 422:9, 424:22, 425:4, 425:7, 425:12, 426:15, 426:21, 427:16, 427:21, 427:24, 434:3, 437:18, 438:11, 439:6, 439:11, 440:24, 440:25, 450:1, 450:4, 450:11, 450:12, 452:10, 452:12, 452:17, 452:20, 452:22, 459:10
**drawn** [1] - 480:6
**drew** [1] - 480:7
**drill** [1] - 425:11
**drive** [4] - 365:11, 385:10, 481:25, 492:20
**driven** [1] - 379:19
**drives** [3] - 342:14, 343:13, 385:14
**driving** [18] - 337:19, 337:20, 338:3, 342:7, 342:21, 342:25, 365:15, 366:4, 366:5, 366:16, 367:13, 367:23, 385:5, 385:7, 385:10, 385:17, 391:12, 397:16
**drop** [1] - 492:5
**dropped** [1] - 451:13
**drops** [1] - 459:16
**drum** [1] - 475:7
**due** [2] - 329:19, 466:18
**dueling** [1] - 368:8
**DuFaux** [48] - 321:23, 322:22, 322:24, 324:21, 324:24, 325:4, 332:2, 332:25, 333:7, 334:4, 334:24, 335:7, 335:8, 335:13, 336:4, 336:11, 344:20, 344:21, 347:17, 352:17, 354:9, 356:25, 357:3, 359:25, 360:10, 366:17, 381:20, 381:22, 384:6, 410:10, 410:25, 412:12, 413:13, 443:1, 446:6, 447:17, 448:6, 456:19, 457:5, 469:25, 478:15, 481:23, 487:14, 488:23, 498:25, 499:1, 505:9, 511:18
**DuFaux's** [15] - 335:16, 335:25, 344:22, 351:3, 410:17, 412:9, 412:16, 412:18, 413:5, 443:13, 447:19, 465:10, 480:5, 484:13, 491:5
**duplicate** [1] - 331:8
**durable** [2] - 436:23, 437:7
**during** [26] - 318:16, 319:24, 321:22, 322:15, 323:8, 325:2, 326:12, 334:23, 335:5, 335:8, 336:10, 338:12, 344:19, 348:2, 348:14, 365:16, 379:24,

382:14, 382:23, 383:6, 386:9, 390:23, 422:11, 446:9, 478:23, 479:7
**dust** [2] - 341:6, 341:11

# E

**e-mail** [21] - 329:8, 330:9, 359:4, 403:16, 404:8, 404:19, 404:23, 405:13, 405:21, 406:20, 425:13, 426:1, 435:4, 435:8, 435:10, 435:25, 436:3, 441:19, 450:3, 451:11, 451:24
**e-mails** [11] - 403:14, 433:22, 434:5, 434:8, 434:24, 437:10, 450:11, 450:13, 452:14, 453:10, 453:12
**e.g** [1] - 494:5
**earliest** [1] - 473:2
**early** [5] - 424:6, 438:18, 441:11, 452:15, 463:1
**easier** [6] - 346:4, 346:6, 371:5, 414:8, 420:12, 423:6
**easily** [1] - 356:8
**easy** [5] - 331:22, 350:23, 372:20, 393:20, 482:3
**ECF** [6] - 329:7, 330:16, 330:19, 335:3, 364:1, 382:9
**edge** [5] - 355:8, 355:9, 377:10, 436:14, 445:22
**edited** [2] - 330:17, 426:23
**editing** [2] - 330:20, 423:15
**effect** [4] - 325:8, 339:7, 439:17, 454:18
**effectively** [5] - 351:16, 370:3, 393:1, 446:17, 466:25
**efficiency** [1] - 483:11
**effort** [1] - 408:21
**Eidos** [2] - 505:1
**EIDOS** [1] - 505:2
**eight** [2] - 362:5, 387:14
**either** [12] - 335:13, 355:7, 372:11, 372:14, 407:18, 438:13, 439:16, 439:18, 454:18, 459:15, 484:18, 489:11
**electric** [1] - 472:19
**electrodes** [1] - 504:24
**electronic** [13] - 401:20, 422:12, 422:22, 424:22, 425:2, 449:23, 450:2, 452:11, 468:18, 469:4, 476:2, 496:8, 509:21
**electronically** [1] - 469:4
**element** [28] - 321:3, 339:18, 345:21, 345:22, 366:21, 379:20, 381:10, 393:8, 412:3, 412:4, 434:21, 463:8, 463:9, 466:5, 473:4, 473:18, 484:3, 484:17, 484:18, 494:3, 498:17, 498:19, 504:1, 505:23, 506:2, 506:5, 511:10
**elements** [25] - 325:22, 340:14, 340:18, 341:8, 341:21, 342:1, 410:20, 412:10, 412:24, 421:6, 426:7, 438:5, 464:13, 467:7, 467:8, 474:9, 476:6, 487:7, 488:1, 488:7, 498:20, 508:3, 508:15, 515:17

**elevation** [17] - 319:22, 327:8, 328:4, 328:7, 328:19, 330:2, 330:3, 347:9, 382:12, 401:7, 405:22, 406:3, 406:6, 406:22, 475:7, 475:9, 482:1
**eliminating** [1] - 324:4
**Elliott** [3] - 316:5, 317:12, 398:13
**ELMO** [6] - 326:9, 328:16, 329:6, 329:21, 337:3, 356:20
**elongate** [1] - 475:23
**embodied** [2] - 419:2, 441:16
**embodiment** [19] - 337:14, 337:16, 340:6, 378:6, 386:14, 432:7, 458:19, 461:4, 461:9, 461:15, 474:5, 478:1, 490:1, 499:22, 500:19, 503:7, 504:6, 511:6, 514:25
**embodiments** [17] - 379:17, 386:8, 386:11, 392:15, 448:23, 461:5, 461:23, 462:2, 462:14, 473:25, 476:3, 478:1, 479:18, 481:4, 511:2, 511:4, 511:7
**embodying** [3] - 419:11, 420:1, 428:4
**emerging** [1] - 367:15
**eminently** [1] - 443:1
**employees** [1] - 424:8
**Empty** [1] - 329:15
**enable** [3] - 409:21, 413:10, 458:8
**enabled** [3] - 410:5, 478:4, 478:8
**enablement** [29] - 409:14, 409:23, 413:8, 413:16, 415:2, 447:24, 448:3, 448:11, 448:21, 456:16, 458:14, 459:1, 459:4, 460:10, 461:8, 462:11, 478:9, 480:10, 480:15, 482:6, 499:7, 499:17, 502:20, 502:21, 502:24, 503:1, 503:4, 513:2, 516:16
**enables** [1] - 465:15
**enabling** [2] - 499:25, 500:12
**encasement** [5] - 471:21, 472:2, 472:3, 507:11, 507:13
**encircle** [2] - 369:7, 393:7
**encircles** [1] - 368:23
**encircling** [1] - 343:25
**encompass** [3] - 496:24, 500:14, 506:23
**encompassed** [1] - 508:6
**encompasses** [1] - 515:17
**encourage** [1] - 431:17
**end** [12] - 324:5, 324:9, 335:2, 337:19, 338:11, 338:15, 339:11, 372:25, 404:17, 405:13, 491:11, 515:5
**ended** [4] - 348:16, 364:23, 476:22, 485:25
**engage** [8] - 350:11, 372:22, 374:18, 376:7, 377:22, 398:3, 411:19, 411:20
**engaged** [2] - 320:13, 320:17, 322:6, 322:9, 322:11, 334:5, 374:23, 375:20, 381:5, 381:16, 385:1, 402:3, 475:20
**engagement** [28] - 402:4, 410:25, 411:15, 411:16, 411:18, 411:19, 412:7, 412:11, 445:7, 445:23, 448:14, 448:15, 456:23, 457:1, 467:9, 467:13, 474:14, 475:24, 479:2, 481:16, 500:4,

515:14
**engages** [6] - 337:14, 337:15, 342:16, 397:7, 402:13, 459:17
**engaging** [3] - 355:7, 365:13, 397:24
**engineer** [3] - 345:11, 438:12, 509:5
**engineering** [3] - 385:13, 437:18, 471:13
**engineers** [5] - 343:1, 467:23, 486:14, 488:8, 509:5
**entered** [3] - 336:18, 409:7, 470:18
**entire** [4] - 370:15, 434:18, 473:25, 474:7
**entirely** [5] - 443:12, 451:15, 454:20, 456:4, 485:7
**entitled** [5] - 458:3, 477:3, 479:24, 482:19, 492:14
**entitlement** [3] - 457:24, 464:18, 500:23
**entry** [2] - 436:12, 436:13
**environment** [2] - 328:25, 333:19
**environmental** [2] - 324:8, 431:22
**equally** [3] - 430:4, 430:21, 497:12
**equitable** [7] - 408:24, 409:7, 415:1, 441:24, 442:4, 442:10, 455:18
**Equitable** [1] - 442:2
**equivalent** [1] - 445:8
**erector** [1] - 475:9
**erred** [1] - 471:25
**especially** [3] - 362:12, 454:7, 507:1
**essentially** [8] - 354:13, 391:7, 395:20, 413:6, 479:14, 492:8, 493:4, 496:22
**establish** [4] - 383:17, 396:22, 403:15, 407:17
**established** [2] - 462:10, 462:12
**establishes** [1] - 448:21
**estoppel** [1] - 409:1
**et** [1] - 440:21
**evaluate** [1] - 400:15
**evaluated** [2] - 352:11, 352:12
**event** [1] - 365:15
**events** [1] - 415:8
**eventually** [2] - 439:2, 477:24
**everyday** [5] - 323:4, 342:11, 344:6, 344:13, 385:13
**evidence** [152] - 319:17, 321:10, 322:5, 323:1, 326:3, 329:4, 331:1, 336:3, 352:6, 354:7, 354:20, 355:22, 356:1, 356:6, 356:11, 356:17, 356:20, 357:17, 358:12, 360:17, 362:21, 363:25, 369:11, 369:22, 370:1, 392:7, 396:1, 396:4, 396:7, 396:8, 396:22, 398:20, 399:13, 399:20, 399:21, 400:1, 400:10, 400:13, 400:16, 400:17, 400:24, 406:13, 407:1, 407:4, 407:22, 407:23, 408:2, 408:10, 408:15, 408:18, 408:22, 410:15, 411:9, 413:2, 413:25, 415:17, 416:12, 416:20, 416:24, 419:4, 419:6, 419:12, 419:20, 419:23, 419:24, 420:16, 421:21, 422:1, 422:4, 422:10, 422:16, 423:25, 424:16, 424:17, 425:7,

425:15, 426:10, 427:14, 427:19, 427:23, 428:7, 428:8, 429:22, 430:2, 433:2, 433:5, 433:6, 433:10, 433:13, 434:3, 434:6, 434:15, 434:17, 434:19, 436:21, 437:20, 438:19, 438:25, 439:19, 440:4, 440:8, 440:10, 441:11, 441:15, 441:17, 448:11, 448:19, 449:22, 450:8, 450:15, 450:17, 450:23, 450:25, 451:3, 451:8, 452:2, 452:17, 453:14, 453:16, 453:20, 453:23, 454:24, 455:11, 455:16, 455:17, 455:20, 456:1, 456:12, 456:16, 456:17, 457:10, 458:24, 466:21, 469:25, 470:16, 472:24, 483:5, 486:9, 486:12, 486:21, 486:22, 488:11, 488:12, 489:22, 498:12, 503:9, 504:9, 505:8, 508:14, 508:17
**evolved** [1] - 320:9
**exacerbates** [2] - 478:25, 481:2
**exact** [2] - 490:12, 490:17
**exactly** [15] - 319:13, 328:1, 328:12, 343:4, 345:9, 347:20, 351:8, 360:4, 386:23, 415:20, 432:11, 443:5, 444:5, 505:7, 512:18
**examine** [1] - 372:12
**examines** [1] - 373:22
**example** [48] - 320:14, 325:1, 331:24, 339:19, 342:18, 344:13, 345:4, 352:14, 362:11, 362:15, 363:16, 364:9, 370:11, 371:5, 374:8, 378:2, 386:4, 387:13, 390:21, 391:25, 410:14, 421:13, 442:10, 443:25, 444:4, 444:15, 445:1, 445:5, 448:1, 455:5, 459:24, 461:13, 472:14, 473:15, 475:14, 481:6, 484:4, 484:10, 484:25, 486:12, 486:18, 488:5, 494:25, 497:4, 503:18, 504:6, 506:11, 508:23
**examples** [16] - 327:2, 342:11, 344:9, 345:9, 345:16, 374:6, 391:19, 391:21, 397:17, 445:12, 445:14, 446:7, 448:13, 483:23, 504:17, 516:10
**except** [2] - 492:8, 510:15
**excerpt** [7] - 326:9, 327:19, 329:7, 344:22, 345:9, 459:24, 465:10
**excerpted** [1] - 393:5
**excerpts** [1] - 499:1
**exclusive** [1] - 445:3
**exclusively** [2] - 362:21, 363:4
**excuse** [2] - 318:14, 429:25
**exemplar** [3] - 327:10, 337:12, 516:24
**exemplary** [3] - 386:8, 386:11, 386:13
**exercise** [2] - 444:21, 465:14, 504:22
**exerting** [1] - 467:2
**exhaustive** [1] - 454:24
**exhibit** [5] - 329:21, 386:22, 386:24, 387:1, 408:9
**Exhibit** [6] - 326:10, 327:5, 327:20, 344:22, 382:9, 468:1
**exhibits** [4] - 379:5, 386:21, 408:11,

440:23
**exist** [5] - 435:14, 438:13, 438:15, 439:16, 439:17
**existed** [7] - 363:15, 423:22, 425:24, 426:10, 434:4, 438:14, 439:13
**existence** [1] - 419:15
**expand** [1] - 509:9
**expansive** [1] - 508:5
**expect** [3] - 510:4, 510:11
**experience** [8] - 323:5, 344:5, 344:7, 344:14, 385:13, 397:12, 470:5, 495:24
**experienced** [1] - 334:15
**experiences** [2] - 387:15, 388:10
**experimenting** [1] - 384:23
**expert** [89] - 321:19, 321:23, 322:17, 322:22, 324:21, 324:24, 325:4, 325:5, 331:8, 331:13, 331:19, 332:2, 332:25, 333:4, 334:4, 334:12, 334:24, 335:16, 335:19, 336:2, 336:7, 344:20, 347:17, 349:15, 349:16, 351:4, 352:10, 352:17, 353:12, 355:15, 355:16, 355:20, 355:23, 360:16, 362:23, 366:17, 366:20, 367:5, 367:7, 369:18, 369:23, 370:23, 373:9, 373:11, 381:20, 392:5, 410:10, 413:22, 420:5, 428:13, 428:19, 430:8, 432:10, 442:23, 443:1, 443:2, 446:6, 447:6, 447:11, 447:18, 448:6, 452:23, 454:5, 456:19, 465:7, 474:23, 478:15, 480:5, 484:12, 484:13, 486:24, 487:10, 488:18, 488:22, 489:22, 492:21, 493:7, 493:12, 493:14, 494:21, 495:8, 497:2, 510:19, 510:22, 511:13
**expert's** [6] - 354:3, 354:19, 442:22, 487:3, 495:6, 495:22
**expertise** [4] - 487:4, 489:3, 495:6, 495:23
**experts** [19] - 349:15, 352:8, 366:1, 366:3, 366:14, 367:4, 367:8, 390:2, 391:13, 392:4, 413:21, 449:3, 483:21, 485:16, 493:17, 494:20, 511:17
**explain** [3] - 321:12, 334:18, 462:6
**explained** [4] - 359:13, 407:8, 464:12, 471:24
**explaining** [7] - 366:18, 366:22, 367:5, 420:5, 446:16, 511:7, 515:22
**explains** [4] - 339:13, 410:12, 461:21, 493:12
**explicitly** [1] - 513:10
**expose** [1] - 472:19
**exposed** [3] - 373:15, 373:20, 476:5
**express** [6] - 363:13, 363:18, 363:23, 386:15, 390:24, 391:4
**expressly** [5] - 360:15, 461:11, 485:19, 486:3, 495:14
**extend** [4] - 358:21, 377:20, 378:10, 393:20
**extended** [1] - 369:25
**extending** [3] - 344:11, 344:16, 345:16
**extends** [2] - 343:24, 393:15

**extensively** [1] - 487:2
**extent** [5] - 376:1, 418:21, 443:8, 485:4, 497:20
**external** [1] - 468:24
**extra** [1] - 322:11
**extra-ordinary** [1] - 322:11
**extraordinary** [8] - 324:18, 325:17, 328:8, 331:11, 332:1, 380:15, 383:2, 423:18
**extreme** [6] - 323:6, 323:12, 429:12, 431:10, 431:22, 454:16
**extremely** [6] - 350:15, 448:14, 472:12, 478:21, 479:1, 512:22
**extrinsic** [2] - 488:11, 508:16
**eye** [1] - 325:9

# F

**F.3d** [7] - 339:15, 339:21, 340:20, 341:3, 341:17, 356:15, 512:12
**F.Supp.2d** [2] - 424:3, 424:9
**F1** [1] - 326:24
**facing** [1] - 507:9
**fact** [48] - 322:8, 323:2, 326:1, 327:16, 327:17, 331:2, 335:5, 343:1, 349:8, 356:12, 356:14, 358:14, 359:17, 365:8, 378:10, 394:17, 406:11, 412:22, 413:23, 416:20, 417:24, 419:16, 420:9, 422:15, 424:14, 426:1, 430:7, 434:15, 440:12, 445:11, 452:1, 453:9, 453:18, 455:13, 463:7, 473:4, 479:19, 480:7, 480:19, 485:15, 486:24, 494:24, 495:7, 495:8, 497:18, 498:24, 513:1, 515:13
**fact-dependent** [1] - 485:15
**fact-intensive** [1] - 513:1
**fact-rich** [1] - 480:7
**factors** [10] - 480:16, 480:19, 502:19, 502:22, 502:23, 502:25, 503:12, 503:13, 507:7
**factory** [1] - 336:3
**facts** [15] - 334:23, 357:7, 357:8, 409:4, 430:16, 448:9, 455:22, 473:16, 477:17, 481:24, 498:6, 498:19, 498:20, 513:3, 516:17
**factual** [30] - 336:16, 353:15, 353:17, 353:19, 364:11, 366:24, 384:3, 391:13, 391:14, 410:9, 443:14, 449:3, 478:12, 480:5, 480:12, 480:24, 481:21, 481:24, 482:20, 483:21, 484:14, 486:7, 488:19, 489:7, 489:18, 489:23, 491:6, 497:1, 497:10, 498:21
**factual-based** [1] - 481:21
**fail** [1] - 413:15
**failed** [6] - 356:1, 356:8, 363:16, 364:8, 420:15, 457:8
**fails** [4] - 410:12, 412:22, 414:2, 472:8
**failure** [4] - 363:22, 409:1, 415:15, 421:3
**fair** [2] - 438:13, 456:24

**fairly** [5] - 350:8, 350:24, 361:15, 364:23, 508:2
**faith** [1] - 336:25
**fake** [1] - 496:1
**fallacious** [1] - 447:7
**falls** [2] - 408:3, 482:15
**familiar** [2] - 358:3, 456:6
**far** [6] - 324:1, 375:8, 377:13, 423:10, 454:16, 501:19
**fashion** [1] - 339:6
**faucet** [1] - 325:6
**faulty** [1] - 461:2
**favor** [7] - 331:4, 343:6, 345:23, 449:4, 451:2, 451:8, 462:16
**favorable** [1] - 451:4
**feature** [10] - 327:7, 330:13, 332:15, 340:11, 357:13, 377:18, 390:5, 419:1, 419:11, 421:3
**features** [10] - 330:7, 330:12, 382:15, 392:25, 419:8, 420:1, 426:6, 437:21, 441:17, 448:24
**February** [1] - 315:5
**Fed** [2] - 356:15, 512:12
**Federal** [39] - 338:23, 339:2, 339:9, 339:15, 339:21, 339:23, 340:2, 340:5, 340:11, 340:13, 340:20, 340:21, 340:24, 341:3, 341:4, 341:12, 341:17, 341:18, 341:22, 386:12, 399:24, 407:14, 408:6, 461:11, 461:16, 461:21, 461:25, 471:18, 471:22, 471:24, 472:2, 473:17, 473:20, 501:4, 501:24, 504:15, 505:16, 507:6, 515:20
**feeds** [1] - 481:13
**feet** [1] - 504:20
**fellow** [1] - 403:17
**felt** [2] - 440:13, 440:21
**FERRIS** [1] - 317:17
**Ferris** [3] - 316:6, 317:17, 317:18
**few** [6] - 389:10, 420:17, 423:17, 477:22, 495:13, 498:2
**fewer** [1] - 321:23
**fiber** [1] - 499:23
**field** [26] - 324:17, 324:19, 325:7, 328:23, 332:16, 471:1, 471:4, 471:13, 471:20, 471:25, 472:1, 472:10, 480:18, 491:3, 496:11, 496:12, 506:17, 506:22, 507:4, 507:7, 507:14, 509:21, 513:4, 513:6, 513:12, 514:3
**fields** [1] - 514:5
**fifth** [1] - 401:15
**fight** [1] - 478:22
**Figure** [14] - 351:12, 378:2, 378:4, 378:8, 378:12, 392:18, 412:1, 421:14, 459:6, 459:7, 459:16, 459:17, 492:24, 493:9
**figure** [13] - 412:6, 415:20, 444:20, 463:13, 463:19, 484:19, 489:4, 492:23, 492:24, 493:2, 513:15, 517:16
**figures** [12] - 378:1, 411:23, 412:14, 459:5, 459:9, 459:11, 474:5, 478:2,

488:23, 492:7, 509:2, 516:10
**Figures** [1] - 459:9
**figuring** [1] - 395:6
**file** [12] - 401:10, 401:18, 401:20, 423:8, 424:7, 424:14, 424:18, 424:19, 449:23, 449:24, 450:2, 488:13
**file's** [1] - 424:5
**filed** [8] - 417:18, 420:4, 429:2, 448:18, 512:5, 512:23, 513:15, 514:18
**files** [3] - 424:24, 425:1, 452:11
**filing** [4] - 400:9, 458:4, 458:23, 482:16
**filings** [1] - 479:23
**film** [2] - 473:18, 473:25
**film'** [1] - 473:22
**final** [10] - 333:24, 405:21, 406:2, 406:5, 425:17, 437:12, 437:13, 460:7, 465:6, 492:25
**finalized** [3] - 405:9, 426:23, 438:22
**finally** [2] - 341:16, 422:22
**findings** [4] - 331:9, 331:18, 333:9, 336:7
**fine** [9] - 320:12, 320:18, 322:4, 322:5, 322:10, 327:13, 360:5, 375:19, 382:16
**finely** [1] - 421:19
**finger** [14] - 324:22, 325:7, 331:12, 333:14, 337:15, 350:8, 350:14, 352:22, 353:7, 371:15, 460:17, 464:11, 492:11, 492:12
**finish** [2] - 404:22, 449:12
**finished** [2] - 406:11, 464:18
**finishing** [1] - 470:19
**fire** [1] - 472:19
**firearm** [5] - 348:11, 348:13, 470:13, 471:4, 472:7, 491:22
**firearm-aiming** [1] - 472:7
**firearms** [2] - 454:7, 472:7
**first** [50] - 318:23, 319:15, 321:6, 321:20, 321:25, 322:3, 332:18, 335:9, 346:18, 348:7, 348:9, 348:24, 354:4, 354:10, 354:14, 356:21, 356:22, 357:11, 365:20, 369:20, 369:22, 383:14, 391:2, 393:4, 396:19, 403:21, 407:9, 411:14, 414:25, 420:5, 421:7, 422:12, 423:24, 424:2, 425:15, 426:7, 428:4, 428:13, 429:3, 434:2, 434:16, 434:21, 461:7, 468:2, 471:1, 472:15, 485:25, 493:2, 498:6, 498:23
**fit** [7] - 372:3, 388:16, 391:7, 391:8, 404:22, 450:8, 452:12
**Fitness** [1] - 339:20
**fits** [3] - 342:22, 374:23, 452:18
**fitting** [1] - 474:16
**five** [6] - 317:23, 317:25, 318:21, 401:12, 409:5, 414:17
**fixed** [1] - 467:9
**flat** [4] - 372:13, 373:13, 374:3, 408:3
**flawed** [2] - 321:8, 321:15
**flip** [4] - 318:10, 409:6, 472:16, 511:21
**flip-up** [2] - 318:10, 409:6
**flipping** [1] - 400:3

**floating** [1] - 373:24
**flotation** [1] - 471:7
**fluid** [2] - 341:6, 341:13
**focus** [6] - 362:8, 367:11, 368:25, 427:20, 477:20, 508:21
**focused** [5] - 337:18, 371:22, 501:5, 508:2, 508:3
**focusing** [1] - 369:2
**folded** [1] - 476:24
**folks** [1] - 374:1
**follow** [2] - 451:18, 514:9
**follow-up** [2] - 451:18, 514:9
**followed** [2] - 342:5, 407:19
**following** [3] - 326:13, 401:13
**foot** [4] - 353:2, 361:15, 361:18, 361:19
**foot-pounds** [3] - 353:2, 361:18, 361:19
**FOR** [3] - 315:2, 316:2, 316:9
**Force** [1] - 382:1
**force** [54] - 320:23, 322:11, 323:6, 323:12, 323:19, 324:18, 325:17, 328:9, 328:10, 331:11, 332:1, 332:2, 337:7, 337:11, 337:13, 349:7, 349:18, 349:22, 350:3, 352:15, 352:16, 352:23, 355:10, 355:11, 355:12, 355:24, 357:3, 357:4, 366:5, 366:7, 366:13, 366:16, 366:19, 366:22, 367:6, 380:15, 381:15, 383:2, 384:7, 389:25, 390:6, 390:17, 390:18, 391:15, 391:16, 392:1, 465:12, 465:15, 465:21, 467:2, 475:20, 475:21
**forced** [2] - 390:4, 484:24
**forces** [1] - 431:13
**forcible** [1] - 349:2
**foregoing** [1] - 519:4
**forget** [1] - 350:12
**form** [3] - 321:10, 339:5, 454:14
**formed** [1] - 393:9
**forms** [3] - 321:10, 326:3, 363:11
**forth** [11] - 319:8, 319:9, 319:17, 319:20, 355:7, 357:10, 382:23, 383:6, 409:17, 445:10, 453:25
**forty** [1] - 414:17
**forty-five** [1] - 414:17
**forward** [14] - 355:10, 399:21, 400:1, 405:14, 407:23, 408:15, 440:22, 442:12, 450:24, 453:17, 455:20, 456:17, 503:9, 504:9
**forwarded** [3] - 403:18, 406:17, 434:13
**foundation** [1] - 462:10
**four** [18] - 326:2, 326:7, 327:8, 327:9, 327:11, 327:17, 357:8, 358:2, 358:7, 382:15, 387:13, 387:21, 387:24, 387:25, 401:13, 448:22, 508:17
**four-function** [1] - 327:11
**four-screw** [1] - 387:25
**fourth** [2] - 321:17, 333:24
**frame** [5] - 329:13, 415:17, 415:19, 440:18, 452:15
**free** [4] - 373:24, 376:25, 402:7, 503:14
**freely** [4] - 350:8, 377:7, 412:8, 459:19

**fresh** [3] - 360:1, 360:3, 418:22
**friction** [1] - 345:7
**front** [2] - 353:16, 371:9
**fruit** [1] - 398:23
**full** [7] - 317:20, 342:4, 356:24, 378:11, 386:17, 431:11, 454:14
**fully** [9] - 320:17, 322:6, 369:15, 378:19, 394:15, 428:5, 430:18, 454:9, 483:16
**fulsome** [2] - 325:9, 464:24
**function** [8] - 327:8, 327:11, 327:17, 404:22, 460:16, 464:6, 464:9, 466:25
**functional** [2] - 349:20, 454:10
**functionality** [1] - 384:22
**functioned** [1] - 341:11
**functions** [4] - 327:9, 327:18, 358:2, 358:7
**fundamental** [1] - 383:24
**funny** [7] - 321:13, 331:7, 334:17, 335:25, 347:18, 359:23, 359:24
**furthermore** [6] - 360:15, 430:10, 461:11, 467:3, 474:9, 487:18, 495:10, 510:19
**fused** [8] - 337:21, 338:2, 340:16, 342:8, 343:2, 379:20, 385:5, 490:14
**future** [1] - 461:15

## G

**Gallery** [5] - 501:4, 501:6, 514:21, 515:1, 515:21
**game** [2] - 432:12, 440:22
**gating** [1] - 477:10
**gears** [2] - 336:20, 343:8
**general** [2] - 342:3, 488:24
**generally** [4] - 358:11, 431:6, 507:13
**generic** [4] - 490:21, 490:23, 490:25, 494:23
**Gentry** [5] - 501:4, 501:6, 514:21, 515:1, 515:21
**genuine** [3] - 331:1, 356:12, 356:14
**German** [2] - 401:6, 402:19
**given** [7] - 359:25, 360:2, 378:9, 386:17, 414:7, 448:1, 484:25
**global** [2] - 362:1, 362:2
**gluing** [1] - 488:16
**goods** [1] - 471:8
**Gorsek** [9] - 472:25, 473:1, 473:4, 475:16, 475:18, 476:1, 476:4, 476:6, 489:6
**government** [4] - 319:23, 383:11, 383:19, 390:19
**grab** [3] - 325:1, 346:23, 347:11
**grain** [1] - 446:22
**grains** [1] - 446:22
**granted** [5] - 331:4, 433:13, 462:18, 478:4, 509:14
**granting** [3] - 367:8, 367:24, 449:4
**grasp** [1] - 472:4
**gray** [1] - 382:10
**grazes** [1] - 492:9

**great** [3] - 430:13, 461:13, 473:15
**green** [5] - 402:2, 402:12, 402:23, 463:14, 463:21
**grip** [11] - 324:22, 324:24, 325:3, 325:5, 325:10, 328:10, 331:12, 350:9, 350:19, 353:8, 353:25
**grips** [1] - 333:14
**groove** [5] - 351:19, 351:20, 352:2, 390:12, 390:13
**grooves** [7] - 351:13, 418:5, 418:7, 425:24, 445:15, 491:24, 492:4
**ground** [2] - 456:5, 456:7
**grounds** [2] - 367:22, 508:2
**group** [1] - 359:7
**grouped** [2] - 318:22, 401:12
**GSE** [1] - 473:17
**guess** [3] - 343:16, 395:17
**guide** [21] - 369:4, 369:12, 369:14, 371:3, 373:16, 373:19, 373:20, 374:14, 374:17, 377:1, 378:18, 378:20, 378:23, 385:23, 386:5, 387:15, 393:24, 394:1, 394:4, 500:1, 500:2
**guideway** [1] - 345:14
**guy** [1] - 353:3
**guys** [1] - 414:13

## H

**half** [2] - 342:23, 345:4
**hand** [25] - 324:23, 325:5, 328:10, 331:12, 331:17, 350:19, 350:25, 352:12, 353:8, 353:10, 353:13, 353:21, 354:21, 357:1, 357:5, 362:23, 372:16, 377:8, 379:7, 384:16, 388:23, 395:12, 418:3, 447:6, 504:23
**hand-waving** [1] - 447:6
**handing** [3] - 318:19, 373:3, 379:11
**Handing)** [1] - 384:19
**handle** [1] - 361:4
**handled** [1] - 482:24
**hands** [5] - 350:15, 397:3, 447:13, 448:16, 453:15
**hanging** [1] - 398:23
**Hans** [6] - 403:18, 404:20, 405:23, 406:17, 406:21, 434:13
**happy** [5] - 395:12, 398:8, 398:11, 417:6, 454:1
**hard** [9] - 323:17, 351:7, 354:11, 379:7, 397:5, 422:10, 422:20, 427:5, 436:9
**harder** [1] - 354:10
**hardly** [1] - 489:20
**harsh** [1] - 476:6
**hear** [5] - 346:6, 350:9, 351:24, 364:18, 367:20, 414:7, 420:8, 428:15, 442:24, 444:25, 449:21, 489:19, 490:20
**heard** [39] - 319:10, 347:2, 364:21, 365:6, 365:7, 368:10, 390:22, 415:22, 416:2, 416:11, 417:5, 417:15, 418:16, 421:20, 427:20, 433:5, 433:16,

437:24, 442:18, 444:13, 444:24, 444:25, 445:13, 446:4, 447:11, 447:25, 448:8, 450:6, 456:19, 483:15, 485:13, 486:15, 487:7, 487:18, 487:19, 488:5, 489:7, 512:1, 516:13
**HEARING** [1] - 315:15
**hearing** [21] - 320:10, 320:14, 322:3, 323:8, 332:19, 349:12, 362:3, 363:5, 363:10, 365:17, 367:14, 367:16, 380:23, 383:3, 383:7, 383:12, 389:18, 466:18, 466:19, 473:10, 486:13
**hearkening** [2] - 327:23, 382:25
**hearkens** [1] - 340:15
**heart** [1] - 504:23
**held** [9] - 338:13, 338:25, 340:2, 340:5, 340:21, 341:18, 396:10, 472:2, 499:24
**helpful** [6] - 396:17, 422:15, 425:18, 425:19, 434:1, 455:1
**helping** [1] - 329:10
**helps** [1] - 403:8
**hence** [1] - 330:2
**HERNANDEZ** [1] - 315:18
**hi** [1] - 379:12
**hidden** [2] - 369:15, 370:18
**high** [2] - 432:25, 443:4
**high-impact** [1] - 443:4
**highest** [1] - 426:18
**highlight** [11] - 360:9, 393:18, 393:22, 395:10, 398:22, 402:14, 403:7, 440:5, 471:3, 490:9, 509:16
**highlighted** [37] - 329:22, 330:18, 330:19, 362:25, 370:25, 371:19, 372:6, 378:7, 378:12, 378:14, 382:10, 383:5, 393:2, 393:11, 402:1, 402:11, 402:23, 404:24, 423:7, 423:12, 432:13, 433:23, 434:12, 436:8, 443:17, 450:1, 455:2, 455:8, 459:14, 459:16, 463:14, 463:21, 465:9, 468:21, 475:17, 484:7, 497:11
**highlighting** [9] - 378:3, 432:18, 445:1, 455:3, 466:21, 477:17, 478:16, 483:23, 484:12
**highlights** [2] - 442:8, 442:25
**highly** [1] - 335:5
**himself** [1] - 429:7
**hindered** [1] - 456:8
**hindsight** [3] - 472:22, 509:18, 513:19
**history** [1] - 488:13
**hit** [4] - 377:14, 414:25, 418:18, 439:3
**hits** [2] - 377:7, 377:13
**hitting** [1] - 428:18
**hoc** [1] - 322:17
**hold** [4] - 376:12, 390:3, 431:20, 488:2
**holding** [4] - 388:1, 424:21, 447:12, 448:15
**holds** [2] - 340:14, 342:1
**hole** [1] - 505:3
**holes** [1] - 375:24
**Hologic** [8] - 499:19, 499:23, 501:17, 502:11, 505:16, 505:18, 512:2, 515:8

**HOLOGIC** [1] - 499:20
**home** [4] - 323:16, 476:19, 481:25, 492:20
**Home** [1] - 341:2
**hometown** [1] - 424:10
**Honor** [60] - 317:3, 317:20, 318:8, 318:15, 318:20, 333:21, 333:22, 343:19, 345:25, 350:20, 359:1, 368:7, 371:10, 372:16, 373:22, 375:17, 376:9, 376:22, 378:25, 379:7, 379:12, 379:14, 384:13, 386:19, 388:14, 388:24, 389:15, 392:10, 393:13, 394:7, 394:11, 394:16, 395:7, 395:13, 395:17, 396:11, 397:4, 398:5, 398:8, 398:13, 404:24, 414:14, 414:16, 444:17, 449:12, 451:6, 454:25, 455:9, 456:6, 478:23, 502:14, 505:20, 511:22, 512:4, 512:24, 514:9, 516:1, 516:23, 517:5, 517:12
**Honor's** [1] - 505:14
**HONORABLE** [1] - 315:18
**hook** [1] - 342:16
**hope** [1] - 330:3
**hopefully** [1] - 420:25
**hopes** [1] - 389:20
**hours** [1] - 423:16
**housing** [1] - 391:23
**human** [2] - 331:11, 353:10
**hundred** [1] - 431:25
**hundreds** [3] - 362:4, 443:20, 444:9
**hurtful** [1] - 433:25
**Hypertherm** [1] - 471:10
**hypothetical** [2] - 412:9, 503:21

## I

**i4F** [18] - 319:18, 320:3, 321:1, 327:7, 327:9, 327:10, 327:16, 327:18, 328:2, 331:23, 333:11, 358:2, 358:7, 358:9, 358:10, 382:5, 382:12, 382:16
**i4F360** [1] - 328:18
**ice** [5] - 345:3, 370:11, 370:12, 370:13, 370:15
**idea** [9] - 359:24, 418:15, 425:9, 435:25, 437:3, 456:18, 495:4, 513:16
**identified** [9] - 363:24, 371:19, 377:1, 391:6, 409:4, 417:23, 431:3, 479:7, 492:3
**identifies** [3] - 362:24, 403:5, 430:23
**identify** [3] - 363:17, 364:8, 445:12
**identifying** [1] - 471:20
**ignored** [1] - 442:22
**ignoring** [2] - 349:3, 369:3
**illumination** [2] - 406:25, 439:9
**illustrate** [2] - 350:6, 380:22, 390:20, 463:13
**illustrated** [3] - 463:16, 464:2, 464:14
**illustrates** [1] - 463:14
**illustrating** [2] - 336:16, 463:20
**illustration** [2] - 370:21, 431:11

**illustrative** [1] - 392:18
**image** [6] - 418:8, 422:18, 423:3, 427:5, 427:10, 492:1
**images** [3] - 422:11, 463:12, 497:16
**imaginable** [1] - 461:4
**imagination** [1] - 461:5
**impact** [7] - 363:12, 417:20, 417:22, 428:22, 443:4, 475:10, 477:5
**impacts** [1] - 362:9
**implied** [2] - 356:25, 363:15
**imply** [1] - 358:15
**implying** [3] - 357:2, 359:5, 441:3
**important** [10] - 322:2, 324:16, 325:11, 347:3, 383:13, 422:19, 423:12, 423:20, 434:2, 455:1
**importantly** [3] - 422:24, 445:25, 473:12
**importing** [1] - 396:6
**impossibility** [1] - 392:22
**impossible** [1] - 349:1
**impressed** [1] - 330:5
**improve** [2] - 509:22, 509:23
**IN** [1] - 315:1
**in-the-box** [1] - 334:13
**inaccuracy** [1] - 321:17
**inadvertent** [9] - 320:25, 324:4, 325:13, 326:19, 328:1, 332:15, 350:16, 380:10, 380:17
**inadvertently** [2] - 333:18, 395:18
**INC** [2] - 315:3, 315:6
**Inc** [2] - 317:5, 317:6
**inch** [1] - 504:20
**include** [7] - 340:3, 379:17, 413:12, 472:1, 492:23, 496:7, 506:17
**included** [3] - 331:21, 341:10, 434:20
**includes** [4] - 409:19, 466:17, 467:9, 508:25
**including** [10] - 339:4, 410:21, 439:23, 453:6, 471:16, 473:22, 486:21, 493:8, 495:18, 516:9
**inconsistency** [1] - 334:2
**inconsistent** [3] - 415:11, 462:8, 493:15
**incorporated** [1] - 464:5
**Incorporated** [1] - 339:20
**incorrect** [4] - 321:7, 447:19, 448:8, 489:1
**indeed** [3] - 406:15, 408:21, 511:4
**indefinite** [10] - 410:5, 410:24, 411:2, 445:9, 445:17, 445:18, 457:7, 482:6, 504:7, 504:16
**indefiniteness** [17] - 409:13, 410:15, 411:22, 412:13, 412:19, 413:17, 415:1, 445:4, 447:16, 448:1, 456:15, 457:11, 481:13, 503:15, 503:23, 504:12, 505:9
**independent** [4] - 336:14, 368:15, 441:14, 470:3
**index** [6] - 325:7, 337:15, 460:4, 460:5, 460:13
**indicate** [1] - 369:24

**indicated** [16] - 347:18, 347:19, 347:24, 354:3, 354:8, 355:6, 357:14, 374:3, 393:16, 394:3, 394:23, 395:2, 395:10, 397:17, 410:20, 515:24
**indicates** [1] - 354:20
**indicating** [9] - 337:8, 372:2, 372:10, 373:12, 388:8, 388:9, 397:6, 397:11, 489:11
**indicating)** [11] - 327:12, 331:24, 336:23, 337:5, 370:21, 371:20, 372:15, 388:15, 388:18, 397:14, 432:17
**indication** [12] - 335:11, 357:12, 378:4, 424:11, 433:8, 435:21, 436:6, 437:1, 437:5, 437:6, 438:23, 439:22
**indicator** [1] - 333:13
**indirect** [1] - 468:14
**indirectly** [1] - 466:13
**indoors** [1] - 476:3
**inducement** [1] - 395:25
**industrial** [1] - 471:8
**industries** [1] - 471:9
**infer** [1] - 438:2
**infinite** [6] - 381:15, 383:2, 389:25, 390:6, 390:18, 448:21
**influence** [1] - 467:2
**influencing** [1] - 339:7
**inform** [1] - 457:8
**information** [5] - 321:22, 336:5, 356:9, 414:7, 429:25
**informed** [1] - 406:21
**informs** [3] - 411:5, 412:25, 505:10
**infringe** [2] - 319:18, 379:2
**infringement** [65] - 318:21, 319:3, 320:1, 320:4, 320:7, 321:5, 322:12, 329:4, 329:6, 329:13, 329:20, 330:1, 330:14, 331:4, 332:18, 336:15, 337:17, 339:17, 340:12, 340:25, 341:23, 343:4, 343:23, 345:20, 345:23, 346:17, 346:21, 347:1, 347:4, 353:18, 353:20, 357:22, 359:9, 359:18, 359:22, 360:16, 360:21, 360:24, 362:6, 362:10, 363:7, 363:12, 363:22, 364:10, 367:1, 367:2, 367:17, 367:20, 367:24, 368:10, 368:11, 368:18, 383:15, 383:21, 386:18, 391:2, 391:10, 395:25, 396:5, 463:5, 477:15, 491:16, 502:23
**inherently** [2] - 354:25, 381:14
**initial** [3] - 355:23, 356:7, 432:19
**inner** [4] - 377:22, 393:22, 394:22, 395:10
**input** [3] - 500:8, 500:13
**inquiry** [1] - 513:1
**inside** [27] - 369:19, 370:17, 370:25, 371:12, 371:13, 371:16, 371:20, 371:23, 372:2, 372:14, 373:2, 373:5, 373:14, 373:24, 376:1, 377:3, 377:20, 387:9, 387:11, 387:21, 388:5, 388:16, 388:20, 394:23, 421:18, 475:9

**insight** [1] - 320:8
**insisted** [1] - 436:24
**inspect** [2] - 393:13, 395:14
**inspection** [1] - 333:16
**instance** [6] - 326:25, 330:18, 474:12, 486:1, 503:25, 506:3
**instances** [2] - 330:20, 488:25
**instead** [7] - 338:13, 371:24, 407:5, 420:10, 427:20, 463:11, 510:15
**instructed** [4] - 329:14, 329:17, 332:11, 381:25
**Instruments** [1] - 504:18
**insufficient** [2] - 425:3, 457:11
**integrate** [1] - 472:22
**integrated** [3] - 337:23, 338:5, 490:14
**integrating** [1] - 476:22
**integrity** [1] - 335:18
**intelligent** [1] - 327:8
**intended** [22] - 322:19, 347:20, 351:8, 354:10, 358:17, 360:4, 385:21, 406:14, 415:18, 419:15, 419:17, 419:21, 420:17, 428:6, 428:9, 429:14, 429:17, 433:11, 434:7, 441:18, 453:18, 453:20
**intends** [1] - 318:13
**intense** [1] - 480:19
**intensive** [1] - 513:1
**intentional** [1] - 349:1
**interact** [2] - 418:5, 432:7
**interacting** [3] - 339:5, 421:9
**interactivity** [1] - 338:20
**interacts** [1] - 351:13
**interested** [1] - 328:11
**interesting** [5] - 322:13, 330:15, 382:19, 415:8, 443:19
**interestingly** [2] - 327:23, 493:19
**interface** [2] - 340:22, 427:6
**interior** [3] - 344:9, 374:12, 388:5
**internal** [3] - 362:18, 432:8, 497:17
**internally** [1] - 375:9
**interplay** [1] - 383:11
**interpret** [1] - 481:17
**interpretation** [1] - 385:16
**interpreting** [1] - 468:9
**intrinsic** [4] - 466:11, 488:12, 508:22, 509:7
**intro** [1] - 496:3
**introduced** [1] - 357:8
**invalid** [4] - 417:24, 477:6, 494:12, 498:13
**invalidate** [1] - 487:8
**invalidated** [2] - 461:22, 471:22
**invalidating** [1] - 496:15
**invalidity** [13] - 399:19, 399:23, 400:16, 417:14, 429:1, 430:8, 433:12, 440:3, 441:15, 487:21, 491:17, 497:11, 498:11
**invented** [1] - 449:17, 452:4, 455:6, 455:14, 458:17, 458:22, 459:2,

460:19, 499:11, 502:8
**inventing** [1] - 454:19
**Invention** [1] - 473:24
**invention** [115] - 328:21, 340:6, 340:11, 399:4, 399:13, 399:16, 399:18, 399:21, 400:10, 400:14, 407:11, 407:17, 408:12, 408:15, 408:20, 409:21, 410:1, 411:6, 413:1, 414:25, 415:10, 417:21, 418:17, 419:1, 419:8, 419:11, 420:1, 420:6, 421:13, 421:22, 424:23, 425:20, 426:6, 426:12, 426:15, 427:2, 428:5, 428:14, 428:21, 429:18, 430:12, 430:25, 431:2, 431:21, 434:16, 434:19, 436:24, 437:8, 438:17, 438:18, 439:1, 440:2, 441:11, 441:23, 445:19, 446:25, 447:1, 448:17, 449:17, 450:9, 450:20, 450:24, 451:19, 452:7, 452:14, 452:20, 452:22, 453:7, 453:24, 457:9, 458:18, 458:21, 459:11, 459:13, 459:21, 459:22, 460:11, 461:15, 471:4, 471:20, 471:25, 472:5, 473:22, 477:7, 491:4, 493:11, 499:8, 499:12, 501:2, 501:5, 502:6, 502:7, 502:9, 503:7, 506:17, 506:22, 506:23, 506:25, 507:2, 507:4, 507:8, 507:11, 507:15, 507:16, 507:17, 509:22, 510:1, 513:5, 513:6, 514:24, 515:1, 515:4, 515:17, 515:24
**inventions** [6] - 428:21, 431:6, 448:18, 472:9, 479:19, 495:12
**inventor** [26] - 408:4, 417:4, 419:3, 429:7, 429:9, 433:17, 435:16, 446:8, 446:9, 447:8, 448:17, 451:22, 455:5, 456:20, 458:17, 461:3, 486:13, 486:15, 501:5, 501:8, 502:6, 502:8, 507:8, 514:24, 515:2, 515:23
**inventor's** [2] - 408:6, 424:22
**invisible** [1] - 371:2
**invoice** [7] - 405:21, 406:2, 406:5, 406:10, 437:9, 437:12
**involve** [1] - 391:22
**involved** [1] - 433:8
**involves** [1] - 480:10
**involving** [1] - 339:4
**inward** [1] - 463:22
**ironically** [1] - 464:17
**irregularities** [1] - 335:24
**irrelevant** [5] - 321:16, 323:4, 380:16, 384:11, 422:16
**isolated** [2] - 412:23, 505:12
**issuance** [1] - 396:24
**issue** [129] - 318:20, 320:15, 325:18, 331:1, 331:7, 336:9, 338:6, 338:8, 342:1, 343:22, 344:20, 346:25, 347:7, 347:23, 348:21, 349:8, 349:10, 349:16, 349:25, 353:18, 353:19, 353:22, 354:18, 355:13, 356:12, 356:14, 356:23, 358:24, 360:9, 360:12, 360:16, 360:18, 360:22,

364:21, 365:3, 366:23, 366:24, 366:25, 367:6, 368:20, 369:17, 370:18, 384:2, 384:12, 386:18, 389:11, 389:24, 389:25, 390:19, 390:22, 391:1, 391:4, 391:11, 391:14, 392:6, 392:12, 397:1, 398:24, 407:25, 408:23, 412:23, 413:19, 413:22, 414:4, 416:3, 416:8, 416:15, 417:8, 419:21, 427:1, 427:9, 427:12, 429:6, 429:16, 433:11, 448:4, 451:8, 453:1, 454:2, 454:3, 454:22, 455:13, 457:11, 457:23, 457:24, 459:12, 460:18, 461:12, 466:20, 471:19, 471:23, 477:3, 477:10, 477:17, 477:18, 478:19, 479:4, 479:5, 481:2, 481:7, 482:6, 482:7, 482:20, 483:8, 483:10, 484:6, 485:17, 488:7, 489:8, 495:2, 498:21, 500:23, 500:24, 503:3, 504:11, 504:14, 504:18, 506:7, 507:25, 510:12, 510:20, 511:9, 511:18, 512:6, 516:4, 516:12, 517:15

**issued** [8] - 395:21, 395:24, 396:6, 396:10, 477:24, 478:7, 478:20, 493:24

**issues** [57] - 319:5, 346:2, 346:7, 346:8, 346:17, 346:19, 357:22, 362:2, 362:4, 362:9, 367:2, 367:17, 380:12, 382:19, 383:12, 392:12, 398:15, 414:23, 417:13, 420:14, 442:5, 442:11, 442:16, 442:20, 443:2, 443:20, 444:1, 444:7, 444:11, 447:23, 449:13, 455:24, 456:8, 457:13, 460:24, 462:20, 470:23, 473:6, 476:23, 477:2, 477:13, 480:10, 480:24, 482:12, 482:15, 487:22, 488:3, 488:4, 488:13, 491:14, 497:1, 498:9, 498:24, 508:1, 513:3, 516:16, 516:18

**it'** [2] - 330:6, 330:8

**item** [2] - 358:12, 404:8

**items** [2] - 338:4, 357:8

**iteration** [2] - 320:20, 322:14

**iterations** [1] - 343:3

**itself** [17] - 325:23, 343:18, 364:25, 371:18, 382:14, 382:25, 383:7, 388:22, 392:17, 392:25, 462:3, 473:23, 477:20, 478:5, 481:17, 495:1, 495:3

### J

**January** [4] - 422:25, 423:14, 423:21, 426:24

**Japanese** [20] - 399:9, 399:15, 417:16, 417:25, 419:7, 419:13, 423:1, 423:10, 423:14, 423:22, 425:14, 426:11, 428:7, 429:18, 433:7, 434:8, 434:10, 436:4, 439:3, 482:24

**jar** [1] - 354:14

**Jason** [1] - 316:9

**jiggling** [2] - 323:11, 380:14

**Johnson** [1] - 360:11

**joined** [1] - 338:4

**Jones** [1] - 316:10

**journal** [1] - 329:11

**journalist** [1] - 359:6

**Judge** [2] - 517:11, 517:18

**JUDGE** [1] - 315:19

**judgment** [107] - 317:5, 317:21, 319:16, 321:21, 322:16, 331:3, 331:21, 332:20, 334:6, 334:9, 336:9, 336:18, 339:16, 340:12, 340:25, 341:23, 343:6, 345:23, 346:20, 347:1, 360:16, 367:1, 367:9, 367:24, 368:12, 370:2, 382:20, 396:4, 398:21, 398:24, 399:5, 399:8, 400:22, 401:22, 408:22, 409:2, 409:7, 410:3, 413:24, 416:9, 417:14, 420:4, 422:11, 422:21, 428:11, 428:20, 429:1, 429:15, 430:8, 433:13, 440:2, 440:7, 441:15, 443:12, 444:1, 449:1, 449:2, 449:4, 450:16, 451:2, 456:4, 457:12, 462:15, 463:6, 466:4, 469:19, 470:18, 473:3, 478:3, 479:5, 479:10, 480:8, 480:25, 482:21, 483:22, 484:10, 485:1, 485:3, 486:6, 486:12, 487:6, 488:21, 491:7, 493:17, 493:20, 494:19, 495:7, 497:9, 498:15, 502:13, 503:11, 503:22, 504:11, 505:8, 505:17, 506:9, 507:19, 507:25, 508:7, 509:14, 511:16, 512:7, 512:9, 512:10, 512:12, 512:13, 516:18

**jumping** [1] - 477:1

**June** [9] - 424:13, 434:10, 435:25, 436:3, 436:17, 436:25, 438:23, 451:11, 451:24

**juror** [1] - 400:21

**jury** [2] - 368:16, 414:3

**Justin** [1] - 362:24

### K

**Kassim** [2] - 316:6, 317:17

**keep** [7] - 349:13, 354:16, 374:10, 409:10, 414:8, 434:3, 438:19

**keeping** [2] - 432:13, 448:13

**keeps** [1] - 438:12

**kept** [1] - 439:12

**Kevin** [2] - 467:25, 509:5

**key** [8] - 340:10, 348:21, 359:13, 382:19, 386:6, 428:18, 480:24, 503:3

**keyboard** [1] - 500:14

**kind** [12] - 346:4, 354:12, 387:12, 394:21, 397:10, 414:8, 415:7, 458:13, 466:14, 477:1, 478:23, 481:7

**kinds** [4] - 454:5, 464:10, 505:5, 506:15

**kinks** [2] - 436:16, 437:17

**Klarquist** [1] - 316:13

**Klaus** [1] - 360:11

**knees** [1] - 486:6

**knitted** [2] - 471:21, 507:11

**knitting** [1] - 507:13

**knob** [145] - 317:23, 317:25, 318:21,

319:18, 320:3, 320:5, 320:13, 321:1, 324:9, 325:8, 326:15, 327:17, 327:22, 327:25, 328:2, 329:1, 329:5, 330:11, 330:13, 331:10, 331:23, 332:14, 333:11, 333:17, 336:22, 336:24, 337:5, 337:9, 337:10, 345:15, 348:20, 348:21, 349:25, 350:8, 350:11, 351:24, 355:5, 357:1, 357:14, 357:15, 357:17, 357:18, 357:24, 358:8, 358:20, 361:23, 372:5, 374:19, 375:4, 375:6, 375:12, 377:21, 381:5, 382:5, 382:12, 388:22, 394:2, 398:15, 400:2, 401:2, 401:5, 401:25, 402:1, 402:5, 402:7, 402:18, 403:11, 404:13, 405:22, 406:1, 406:3, 406:6, 407:2, 409:5, 411:8, 411:11, 412:2, 412:6, 412:8, 413:11, 413:12, 418:5, 418:7, 432:5, 439:8, 439:9, 440:16, 450:5, 451:17, 453:24, 454:9, 454:11, 454:12, 454:19, 455:7, 458:8, 458:9, 458:22, 459:2, 459:17, 459:18, 460:1, 460:9, 460:20, 462:22, 467:19, 469:9, 471:2, 472:8, 473:5, 473:7, 474:8, 474:10, 474:15, 474:18, 474:21, 474:22, 475:12, 475:15, 475:21, 475:22, 476:2, 476:5, 476:7, 482:1, 489:10, 491:22, 494:5, 494:6, 494:8, 494:18, 503:18, 504:5, 506:20, 509:23, 513:24, 514:4, 514:5, 515:10

**Knob** [1] - 474:4

**knob-containing** [1] - 514:5

**knobs** [28] - 319:21, 320:2, 320:23, 324:23, 325:16, 326:2, 328:23, 329:19, 331:2, 331:3, 331:18, 332:12, 334:14, 337:24, 342:24, 347:4, 349:6, 355:17, 355:20, 362:13, 384:10, 401:7, 443:4, 489:16, 490:8, 495:23, 497:17, 506:14

**knowing** [1] - 427:16

**knowledge** [4] - 470:5, 472:1, 481:18, 481:20

**known** [3] - 342:18, 494:25

**Kyle** [2] - 329:8, 359:4

### L

**labeled** [1] - 402:19

**laches** [1] - 408:25

**lack** [14] - 409:13, 409:14, 419:19, 425:4, 440:8, 441:7, 442:22, 448:11, 452:16, 458:4, 462:9, 487:3, 503:4, 512:9

**lacking** [5] - 356:13, 421:20, 427:19, 440:18, 508:4

**lacks** [5] - 458:7, 463:7, 466:5, 476:6, 506:8

**laid** [2] - 403:13, 485:5

**Laitram** [1] - 341:16

**lane** [1] - 482:9

**language** [25] - 340:7, 340:8, 341:13,

349:2, 358:16, 358:22, 359:12, 367:12, 367:13, 434:12, 441:6, 446:5, 467:3, 475:18, 478:16, 489:11, 489:12, 489:15, 489:16, 496:6, 500:8, 501:23, 502:2, 502:3, 515:13
**large** [2] - 442:21, 508:1
**largely** [1] - 380:15
**Larsen** [2] - 440:15
**last** [18] - 319:24, 360:6, 362:3, 363:5, 363:10, 383:12, 396:19, 401:18, 418:19, 423:13, 424:5, 424:18, 425:2, 426:22, 449:25, 486:12, 513:13, 516:4
**lastly** [5] - 383:23, 385:18, 391:11, 424:20, 472:25
**latch** [1] - 342:16
**late** [25] - 334:19, 355:25, 360:7, 360:22, 420:4, 427:13, 427:17, 428:12, 429:2, 429:22, 429:24, 429:25, 430:10, 432:12, 434:2, 434:5, 434:23, 437:8, 438:24, 439:15, 440:6, 440:12, 440:21, 440:22, 441:19
**late-filed** [2] - 420:4, 429:2
**later-claimed** [2] - 502:6, 502:9
**later-filed** [3] - 512:5, 513:15, 514:18
**law** [39] - 338:7, 338:8, 338:23, 338:25, 339:18, 342:1, 343:5, 365:6, 368:16, 386:10, 400:21, 407:10, 408:3, 429:21, 430:3, 430:16, 430:23, 431:3, 431:5, 431:16, 432:15, 437:24, 438:8, 447:20, 448:6, 448:7, 448:8, 448:9, 451:23, 452:5, 453:5, 454:15, 461:22, 462:8, 479:4, 511:25
**lawyers** [1] - 378:3
**lay** [1] - 452:21
**layers** [1] - 484:5
**lead** [3] - 317:22, 429:1, 509:5
**learn** [1] - 446:2
**least** [11] - 353:17, 366:3, 370:9, 411:15, 439:21, 443:25, 444:3, 470:22, 478:7, 493:16, 513:12
**leave** [3] - 343:10, 351:20, 418:7
**lectern** [1] - 376:2
**left** [10] - 394:12, 401:11, 401:25, 418:3, 421:15, 426:20, 459:6, 463:13, 481:12, 497:1
**left-hand** [1] - 418:3
**leftmost** [1] - 436:3
**legal** [59] - 321:6, 322:1, 323:22, 325:17, 325:18, 325:21, 332:17, 336:14, 338:7, 347:23, 347:24, 356:23, 364:21, 366:23, 367:13, 380:12, 380:16, 382:19, 383:25, 384:12, 385:4, 385:6, 385:19, 391:14, 398:24, 407:6, 410:8, 410:11, 411:3, 412:15, 412:19, 413:15, 413:17, 414:2, 418:21, 439:17, 439:23, 445:9, 458:12, 458:13, 458:25, 460:24, 461:2, 461:6, 461:7, 462:6, 462:9, 473:12, 480:10, 498:21, 499:5, 499:6, 500:18, 506:6, 507:25, 514:12

**legally** [6] - 321:8, 321:15, 323:4, 341:25, 356:10, 380:15
**length** [1] - 471:11
**lens** [7] - 318:10, 325:21, 380:13, 409:6, 468:3, 487:13, 490:11
**less** [5] - 323:18, 323:20, 331:12, 430:18, 506:19
**LEUPOLD** [1] - 315:3
**Leupold** [113] - 317:5, 317:10, 330:2, 330:14, 331:4, 331:8, 331:13, 332:21, 333:1, 334:2, 334:11, 334:18, 334:22, 335:2, 335:6, 335:15, 335:18, 335:20, 335:23, 335:24, 336:1, 337:12, 343:6, 343:14, 344:3, 345:23, 347:17, 360:9, 360:15, 363:16, 366:10, 368:10, 369:10, 369:13, 370:3, 372:7, 374:12, 378:23, 379:15, 379:17, 384:5, 393:1, 393:12, 393:16, 394:4, 395:22, 397:2, 398:14, 399:5, 399:12, 399:20, 399:25, 400:25, 401:20, 405:19, 407:5, 407:10, 407:21, 408:1, 408:11, 408:14, 409:1, 410:2, 415:23, 417:21, 418:15, 425:8, 426:3, 427:12, 429:15, 430:6, 430:23, 432:19, 437:11, 440:12, 442:5, 442:11, 442:21, 444:1, 444:6, 445:11, 449:1, 449:19, 454:2, 463:6, 466:4, 466:10, 469:19, 473:3, 477:15, 479:1, 479:22, 480:7, 481:2, 482:10, 482:18, 483:6, 483:24, 484:23, 487:2, 487:20, 489:15, 491:15, 493:20, 495:1, 495:8, 497:20, 498:9, 498:16, 503:3, 508:1, 512:14
**Leupold's** [87] - 319:16, 321:19, 329:20, 333:4, 334:16, 336:7, 347:22, 348:24, 349:15, 352:10, 353:12, 354:3, 355:20, 355:23, 362:4, 362:22, 362:23, 364:8, 366:19, 367:2, 367:7, 367:10, 369:20, 369:23, 370:22, 371:1, 382:20, 385:9, 385:25, 393:24, 395:10, 399:16, 401:4, 407:8, 407:15, 408:21, 409:3, 410:11, 413:22, 413:23, 419:23, 420:5, 422:15, 428:12, 432:10, 433:23, 441:10, 443:2, 447:11, 447:21, 452:23, 452:25, 453:16, 454:5, 454:24, 456:3, 456:20, 462:16, 464:12, 466:23, 468:1, 474:25, 480:21, 486:21, 488:2, 488:25, 492:21, 493:7, 493:14, 494:1, 494:21, 495:22, 497:1, 498:7, 498:8, 498:21, 499:19, 502:2, 503:11, 504:13, 506:1, 507:18, 508:2, 508:10, 510:19, 510:22
**level** [6] - 320:24, 383:24, 389:4, 443:24, 454:14
**lever** [10] - 320:12, 320:18, 320:19, 322:5, 322:10, 397:24, 460:17, 464:11, 515:15
**levers** [1] - 322:7
**Lewis** [1] - 362:24
**liable** [1] - 396:10

**lies** [2] - 397:1, 480:4
**life** [2] - 334:15, 473:14
**lift** [2] - 375:25, 460:13
**lifted** [2] - 402:5, 412:6
**lifts** [1] - 432:6
**light** [15] - 353:7, 361:17, 411:4, 412:25, 424:16, 451:4, 465:8, 466:11, 500:1, 503:24, 505:12, 509:1, 509:3, 511:5
**Lightforce** [1] - 317:6
**LIGHTFORCE** [1] - 315:6
**likewise** [7] - 328:13, 342:24, 345:14, 345:22, 388:11, 398:1, 425:6
**limit** [4] - 340:6, 348:25, 392:15, 492:17
**limitation** [5] - 349:7, 354:21, 393:6, 473:8, 474:19
**limitations** [4] - 342:4, 490:5, 503:24, 515:11
**limited** [10] - 338:11, 338:20, 386:11, 448:14, 464:20, 479:15, 485:18, 486:3, 489:14, 497:4
**limiter** [1] - 328:17
**limiting** [4] - 473:7, 473:15, 473:19, 474:17
**limits** [2] - 325:13, 501:20
**line** [23] - 326:11, 343:11, 345:9, 355:6, 372:1, 377:22, 383:7, 383:8, 463:16, 474:16, 476:18, 480:6, 500:20, 501:3, 510:20, 510:21, 511:17, 514:20, 514:22, 515:6, 515:22
**liner** [1] - 473:22
**liner'** [1] - 474:1
**lines** [9] - 324:12, 324:14, 327:5, 393:6, 394:1, 432:23, 459:25, 463:17, 470:10
**link** [5] - 341:19, 466:14, 467:22, 468:13, 506:8
**linkage** [1] - 421:17
**linked** [5] - 425:13, 466:13, 468:10, 468:16, 469:12
**listed** [4] - 341:8, 341:21, 358:2, 406:5
**literal** [1] - 345:23
**literally** [2] - 362:4, 448:21
**literature** [1] - 359:19
**Litt** [1] - 474:25
**live** [1] - 415:4
**living** [1] - 480:11
**LLP** [3] - 316:2, 316:6, 316:13
**loaded** [2] - 404:11, 460:16
**located** [1] - 388:6
**location** [1] - 515:3
**lock** [81] - 320:6, 320:13, 320:16, 320:17, 321:2, 322:6, 322:8, 322:11, 323:5, 323:6, 323:7, 323:13, 323:14, 323:15, 323:16, 323:18, 323:20, 323:25, 325:16, 326:2, 327:2, 328:21, 329:19, 330:13, 330:22, 330:24, 332:10, 332:14, 337:22, 342:12, 342:19, 343:12, 349:11, 349:17, 349:18, 349:19, 358:15, 359:8, 360:13, 379:16, 380:2, 380:4, 380:5, 380:8, 381:16, 381:18, 385:15, 387:2,

389:11, 390:1, 390:3, 390:7, 390:14, 397:23, 397:25, 402:2, 402:6, 402:11, 402:13, 402:15, 402:20, 402:23, 403:7, 405:12, 410:19, 410:21, 412:3, 412:7, 412:8, 426:7, 459:17, 459:18, 460:5, 484:2, 494:3, 497:14
**lockable** [2] - 324:3, 475:15
**locked** [60] - 320:8, 320:9, 320:11, 320:20, 321:2, 321:7, 321:8, 321:11, 321:14, 321:15, 322:1, 323:10, 324:6, 325:12, 325:13, 325:20, 325:22, 327:24, 328:14, 331:16, 331:23, 332:10, 333:8, 333:11, 333:14, 336:16, 336:17, 348:19, 351:13, 352:1, 353:22, 376:17, 379:25, 380:4, 380:16, 380:23, 380:24, 381:6, 381:11, 381:14, 383:1, 383:25, 386:4, 390:10, 401:25, 402:3, 402:4, 411:19, 412:4, 459:6, 474:14, 492:1, 503:18, 504:2
**locking** [154] - 317:23, 317:25, 318:21, 322:9, 325:22, 326:15, 327:14, 327:17, 329:5, 329:18, 330:2, 330:11, 330:12, 330:18, 331:3, 331:10, 332:3, 332:6, 332:12, 332:13, 334:13, 337:8, 337:20, 338:1, 338:10, 338:13, 338:19, 340:16, 342:7, 342:14, 342:17, 342:22, 342:25, 343:3, 345:15, 347:9, 348:1, 348:6, 348:16, 348:18, 352:4, 356:1, 357:9, 357:13, 357:16, 357:21, 358:8, 359:17, 361:23, 362:12, 364:23, 364:25, 365:1, 365:5, 365:11, 365:13, 366:2, 366:10, 366:11, 367:12, 379:19, 379:20, 380:9, 382:17, 384:9, 385:6, 385:11, 388:2, 391:12, 391:21, 391:25, 392:2, 397:21, 397:25, 398:2, 398:15, 400:2, 401:2, 401:5, 403:10, 407:2, 409:5, 411:1, 411:8, 411:11, 412:2, 413:10, 413:12, 421:7, 421:8, 421:15, 434:21, 436:11, 436:12, 436:14, 436:20, 439:9, 440:16, 447:1, 447:3, 447:8, 450:4, 451:12, 453:24, 454:12, 454:19, 455:6, 458:8, 458:22, 459:2, 459:14, 459:15, 460:1, 460:2, 460:19, 462:21, 465:11, 471:2, 472:8, 473:5, 473:7, 474:7, 474:10, 474:15, 474:18, 474:20, 474:22, 475:12, 476:7, 477:20, 477:22, 481:2, 481:9, 489:9, 490:2, 490:18, 491:2, 491:22, 493:5, 495:17, 496:4, 496:22, 503:18, 503:20, 506:14, 506:20, 509:23, 513:24, 514:4, 515:10, 515:15
**Locking** [2] - 326:17, 474:4
**locking'** [1] - 329:25
**locking/unlocking** [3] - 460:15, 464:6, 464:9
**locks** [9] - 324:25, 334:5, 337:10, 357:17, 374:25, 389:2, 390:5, 397:13, 397:22

**logical** [1] - 423:19
**longitudinal** [2] - 465:13, 465:16
**look** [47] - 342:10, 344:8, 346:24, 348:22, 356:20, 357:10, 363:21, 371:8, 371:18, 373:15, 378:1, 384:16, 384:18, 392:24, 401:23, 402:25, 403:11, 410:15, 421:14, 423:2, 426:14, 431:17, 432:17, 433:21, 436:2, 437:9, 438:9, 445:9, 447:21, 451:3, 458:24, 469:16, 472:14, 472:16, 477:21, 480:9, 480:16, 482:1, 486:11, 486:17, 488:12, 492:7, 495:1, 497:18, 502:15, 509:22, 517:2
**Look** [1] - 510:22
**looked** [14] - 376:6, 386:9, 404:5, 405:6, 405:11, 411:24, 425:9, 425:16, 427:9, 452:11, 452:13, 459:12, 461:7, 509:1
**looking** [18] - 333:10, 348:24, 372:24, 373:10, 376:18, 377:6, 383:24, 387:22, 395:8, 405:14, 406:18, 423:21, 427:4, 427:10, 434:14, 434:24, 440:25, 514:3
**looks** [5] - 393:11, 393:19, 411:23, 426:21, 436:19
**loose** [2] - 351:6, 352:21
**loosen** [2] - 324:20, 351:17
**loosened** [2] - 332:6, 335:17
**loosening** [1] - 332:9
**looser** [2] - 354:4, 354:5
**lose** [1] - 329:1
**losing** [1] - 328:1
**lost** [3] - 335:4, 477:10, 487:6
**low** [1] - 398:23
**low-hanging** [1] - 398:23
**lower** [4] - 401:14, 418:5, 421:15, 427:2
**luck** [1] - 517:18
**luggage** [3] - 323:18, 342:20, 391:24
**lumbering** [1] - 509:20
**lumped** [1] - 447:25
**lunch** [2] - 414:6, 414:18

# M

**M583** [1] - 364:5
**M584** [1] - 364:5
**machined** [1] - 460:2
**machines** [1] - 504:23
**Mahurkar** [5] - 399:24, 400:6, 400:9, 400:13, 408:16
**mail** [21] - 329:8, 330:9, 359:4, 403:16, 404:8, 404:19, 404:23, 405:13, 405:21, 406:20, 425:13, 426:1, 435:4, 435:8, 435:10, 435:25, 436:3, 441:19, 450:3, 451:11, 451:24
**mails** [11] - 403:14, 433:22, 434:5, 434:8, 434:24, 437:10, 450:11, 450:13, 452:14, 453:10, 453:12
**main** [2] - 321:25, 331:6
**maintained** [1] - 324:8
**major** [1] - 513:5

**managers** [1] - 474:24
**Mann** [5] - 329:9, 329:14, 329:17, 329:23
**manual** [11] - 322:18, 327:21, 328:2, 328:8, 328:11, 332:8, 358:12, 382:14, 468:22, 469:1, 472:15
**manually** [3] - 463:9, 464:16, 511:11
**manuals** [2] - 326:6, 381:25
**manufacture** [1] - 471:14
**manufactured** [2] - 396:3, 435:11
**map** [1] - 321:6
**March** [3] - 401:18, 423:8, 517:13
**marching** [1] - 477:9
**MARCO** [1] - 315:18
**marine** [1] - 471:8
**marked** [1] - 330:4
**market** [6] - 331:15, 333:2, 334:3, 335:12, 335:22, 439:3
**marketed** [1] - 329:3
**marketing** [3] - 326:6, 329:23, 359:7
**Markman** [24] - 320:10, 320:14, 322:3, 323:8, 328:13, 332:19, 338:9, 338:12, 338:21, 380:19, 380:23, 381:13, 382:25, 383:3, 383:7, 466:17, 466:20, 473:9, 473:10, 504:3, 508:20
**marshaled** [1] - 424:17
**massive** [1] - 444:23
**match** [2] - 427:11, 484:19
**mate** [1] - 398:2
**material** [8] - 331:2, 413:23, 422:13, 422:14, 437:15, 450:23, 460:18, 498:7
**materials** [6] - 326:7, 328:13, 362:22, 390:12, 432:16, 443:4
**mating** [1] - 398:2
**matter** [20] - 317:5, 318:8, 322:8, 343:17, 368:16, 384:4, 400:21, 410:1, 424:12, 430:6, 431:14, 449:18, 462:25, 466:19, 474:7, 476:15, 477:23, 494:8, 516:9, 517:8
**matters** [1] - 417:19
**mean** [15] - 320:9, 320:11, 320:20, 321:8, 321:11, 321:15, 336:17, 395:4, 446:3, 455:3, 468:6, 476:14, 494:11, 501:13, 506:16
**meaning** [17] - 338:18, 340:3, 340:6, 342:5, 344:6, 380:2, 385:4, 386:17, 467:24, 468:8, 473:14, 474:11, 474:20, 474:21, 475:11, 508:14, 509:8
**meanings** [1] - 339:11
**means** [18] - 323:10, 323:25, 325:12, 327:25, 366:3, 367:5, 367:14, 369:7, 380:16, 381:14, 383:1, 384:1, 389:20, 423:8, 465:19, 466:13, 468:10, 510:16
**meant** [5] - 323:13, 351:23, 446:25, 509:6, 513:20
**measure** [1] - 357:4
**measured** [1] - 384:8
**measures** [1] - 323:12
**meat** [8] - 471:21, 472:1, 472:2, 472:3, 507:11, 507:13

**mechanical** [14] - 324:20, 366:7, 366:13, 366:19, 392:1, 467:4, 467:7, 467:18, 467:22, 468:13, 471:13, 488:16, 492:12, 506:8

**mechanically** [30] - 324:3, 337:18, 337:20, 338:3, 342:7, 342:14, 342:21, 342:25, 365:10, 365:15, 366:4, 366:5, 366:15, 367:13, 367:23, 379:18, 385:4, 385:7, 385:10, 385:14, 385:17, 391:12, 397:16, 466:13, 468:10, 468:16, 469:12, 475:15, 487:16

**mechanism** [91] - 322:9, 323:13, 326:19, 331:10, 332:3, 332:6, 333:12, 337:8, 337:21, 337:22, 337:25, 338:1, 338:10, 338:13, 338:14, 338:19, 340:17, 342:7, 342:15, 342:17, 342:22, 342:25, 343:3, 343:18, 348:1, 348:6, 348:18, 348:23, 349:18, 349:23, 350:1, 350:5, 351:15, 351:24, 352:4, 352:7, 352:9, 353:23, 354:23, 354:24, 356:1, 356:10, 357:16, 359:15, 359:17, 360:5, 364:24, 364:25, 365:1, 365:6, 365:11, 365:13, 365:23, 366:2, 366:11, 367:12, 385:6, 385:11, 385:15, 388:2, 391:12, 391:25, 392:2, 397:21, 397:25, 398:2, 418:13, 421:7, 421:11, 421:15, 421:22, 434:22, 447:1, 447:4, 465:12, 475:8, 481:5, 481:6, 481:8, 481:9, 482:2, 487:15, 490:10, 490:12, 490:17, 492:14, 496:22, 503:20

**mechanisms** [6] - 347:5, 351:12, 391:21, 447:9, 482:9, 491:2

**media** [1] - 472:13

**Medical** [1] - 339:14

**meet** [2] - 412:18, 438:25

**meeting** [1] - 319:24

**meets** [1] - 460:10

**member** [22] - 339:25, 397:7, 410:25, 411:13, 411:14, 411:15, 411:17, 411:18, 412:11, 421:12, 421:22, 445:7, 445:23, 448:14, 456:23, 457:1, 474:14, 479:2, 481:17, 500:4, 515:14

**member'** [1] - 410:18

**mention** [6] - 352:10, 364:18, 439:8, 477:22, 490:19, 495:13

**mentioned** [5] - 318:22, 322:15, 406:7, 489:13, 512:14

**mentions** [1] - 488:16

**merely** [5] - 377:13, 377:18, 392:18, 464:9, 471:8

**merited** [1] - 444:11

**mess** [1] - 486:7

**messed** [1] - 346:12

**met** [8] - 399:12, 399:25, 400:14, 400:25, 407:6, 408:1, 408:14, 449:19

**metadata** [3] - 401:17, 422:14, 423:4

**metal** [4] - 366:9, 366:12, 371:17, 374:4

**meter** [2] - 361:15, 361:17

**meters** [2] - 352:16, 361:19

**microphone** [2] - 319:4, 346:1

**microscope** [4] - 496:10, 506:15, 506:20, 513:25

**microscopes** [8] - 485:20, 486:4, 489:13, 495:15, 495:20, 495:24, 496:12, 513:11

**Microsoft** [1] - 479:11

**middle** [6] - 420:3, 428:11, 440:7, 468:22, 501:8, 501:10

**Middleton** [1] - 316:11

**might** [9] - 346:6, 346:24, 392:10, 395:5, 396:3, 446:7, 447:3, 491:1, 501:14

**mil** [2] - 362:20, 362:25

**military** [5] - 362:21, 363:2, 363:4, 363:8, 363:11

**millimeter** [1] - 504:20

**mind** [10] - 379:4, 412:20, 418:22, 424:24, 432:13, 434:3, 434:10, 438:3, 448:13, 448:25

**miniature** [1] - 472:13

**minimum** [1] - 475:12

**Mintz** [3] - 471:18, 471:20, 507:5

**minutes** [3] - 414:12, 423:16, 476:11

**miscast** [1] - 389:24

**mischaracterized** [1] - 359:5

**misguided** [1] - 335:20

**misinterpreted** [1] - 359:5

**misses** [2] - 334:21, 411:9

**missing** [11] - 375:15, 375:17, 376:1, 376:5, 376:8, 429:22, 437:23, 438:6, 452:1, 506:2, 506:4

**misspoke** [1] - 379:16

**misunderstands** [1] - 338:7

**mitigate** [2] - 409:1, 442:12

**mitigation** [1] - 442:11

**mode** [3] - 468:24, 468:25, 469:4

**model** [4] - 326:23, 347:15, 350:6, 424:15

**models** [1] - 362:18

**modes** [2] - 468:19, 468:21

**modification** [1] - 404:1

**modifications** [1] - 402:18

**modified** [5] - 423:13, 423:14, 424:5, 424:18, 449:25

**Modified** [2] - 424:23, 425:1

**module** [1] - 341:19

**moisture** [1] - 472:20

**moment** [10] - 318:22, 386:9, 387:12, 399:14, 400:3, 400:5, 402:25, 405:7, 498:5, 505:14

**monitor** [1] - 504:23

**month** [1] - 360:18

**months** [6] - 360:11, 400:8, 417:17, 422:25, 423:14, 434:5, 437:19

**mooted** [1] - 365:8

**morning** [31] - 317:2, 317:9, 379:21, 380:9, 414:23, 416:21, 417:6, 417:7, 417:12, 418:16, 423:7, 423:13,

427:18, 428:16, 433:6, 433:16, 433:19, 433:22, 440:5, 440:11, 442:19, 442:24, 443:7, 444:13, 446:4, 447:25, 449:23, 455:9, 456:20, 483:15, 489:20

**Morse** [1] - 479:10

**most** [18] - 399:4, 423:12, 425:21, 425:24, 431:9, 431:21, 431:22, 439:19, 451:4, 455:1, 473:12, 477:22, 481:9, 485:18, 485:23, 489:23, 493:16

**mostly** [1] - 483:15

**MOTION** [1] - 315:15

**motion** [44] - 319:16, 334:8, 336:9, 346:17, 352:22, 353:18, 353:20, 355:25, 360:17, 360:20, 362:5, 367:2, 368:21, 368:22, 382:24, 399:7, 399:11, 409:3, 413:23, 416:9, 442:5, 442:8, 444:15, 445:2, 447:21, 451:5, 451:7, 453:22, 455:10, 455:12, 456:4, 456:7, 477:15, 484:9, 485:2, 493:20, 498:9, 498:17, 503:3, 503:14, 506:1, 508:2, 508:3, 508:10

**motions** [7] - 317:4, 362:12, 368:9, 442:13, 444:6, 480:21, 498:7

**mounted** [1] - 391:23

**mouse** [2] - 500:10, 500:11

**mouth** [4] - 456:18, 456:20, 457:3, 457:5

**movable** [11] - 348:4, 348:8, 348:9, 348:19, 380:20, 380:24, 381:6, 394:1, 494:4, 504:1, 504:4

**move** [28] - 332:10, 343:21, 351:20, 351:25, 355:2, 372:4, 376:19, 380:14, 387:17, 387:18, 387:24, 388:5, 388:13, 395:4, 395:5, 395:9, 396:13, 409:9, 414:4, 418:22, 432:8, 441:24, 463:23, 469:8, 491:7, 491:24, 510:23

**moved** [27] - 346:19, 346:25, 352:3, 353:22, 360:15, 362:6, 363:6, 366:25, 368:9, 368:11, 399:5, 409:1, 410:2, 429:15, 442:4, 443:14, 444:2, 449:1, 451:8, 463:6, 466:4, 469:19, 473:3, 477:14, 495:8, 498:9

**movement** [4] - 328:25, 337:7, 349:22, 371:16

**moves** [8] - 355:5, 387:22, 388:12, 395:6, 465:9, 467:16, 490:15, 492:3

**moving** [13] - 328:7, 355:7, 371:15, 376:5, 381:16, 420:9, 431:6, 432:2, 432:5, 436:25, 477:17, 492:1, 511:14

**MR** [143] - 317:9, 317:11, 317:12, 317:13, 317:14, 317:17, 317:20, 317:25, 318:2, 318:4, 318:8, 318:12, 318:19, 319:13, 319:15, 333:24, 337:2, 337:5, 343:15, 343:19, 343:22, 346:9, 346:10, 346:15, 346:23, 347:15, 347:22, 353:1, 353:4, 353:11, 353:17, 354:2, 354:13, 354:17, 356:19, 361:2, 361:8, 361:13, 361:21, 364:14, 368:3, 368:6, 368:7, 372:20,

373:7, 374:21, 375:2, 375:5, 375:8, 375:11, 375:17, 375:20, 375:23, 376:9, 376:21, 376:24, 377:17, 377:25, 379:6, 379:9, 379:11, 379:12, 381:3, 381:10, 384:19, 384:21, 385:3, 386:25, 387:7, 387:11, 387:18, 387:24, 388:7, 388:14, 388:24, 389:6, 389:8, 389:10, 392:10, 395:7, 395:12, 395:16, 396:15, 396:17, 398:8, 398:11, 404:24, 405:2, 409:11, 414:10, 414:14, 414:16, 414:22, 415:5, 415:6, 416:6, 416:11, 417:1, 418:12, 420:23, 421:2, 426:16, 427:4, 435:2, 435:5, 435:13, 435:18, 442:2, 442:18, 449:9, 449:11, 449:15, 451:5, 451:10, 451:15, 457:15, 457:16, 457:17, 457:21, 457:22, 462:24, 476:18, 476:22, 477:1, 484:21, 485:9, 485:12, 490:24, 498:2, 501:22, 502:1, 502:14, 502:18, 511:24, 514:9, 514:11, 516:3, 516:6, 516:23, 517:5, 517:7, 517:12, 517:20
**multi** [3] - 338:11, 340:3, 468:18
**multi-component** [2] - 338:11, 340:3
**multi-position** [1] - 468:18
**multiple** [9] - 330:19, 339:19, 367:17, 367:22, 389:23, 391:22, 425:20, 432:5, 461:6
**Murphy** [7] - 326:4, 326:10, 326:12, 327:16, 329:9, 357:11, 357:19
**Murphy's** [1] - 470:10
**must** [14] - 338:19, 344:1, 344:5, 370:9, 407:18, 409:21, 409:24, 419:3, 419:14, 419:17, 428:3, 464:13, 470:21, 474:19

# N

**named** [1] - 403:17
**namely** [1] - 466:6
**names** [1] - 500:21
**Nancy** [1] - 519:11
**nancy** [1] - 316:16
**NANCY** [1] - 519:12
**narrow** [12] - 339:24, 466:19, 482:9, 489:2, 501:2, 501:16, 501:21, 509:8, 512:16, 512:22, 514:16, 515:24
**narrower** [5] - 478:25, 487:23, 501:15, 507:15, 516:8
**Nathan** [2] - 316:5, 317:11
**nature** [1] - 430:25
**Navy** [1] - 381:25
**ND** [2] - 487:14, 487:16
**near** [4] - 372:10, 374:9, 377:18, 442:13
**nearly** [2] - 378:10, 448:21
**necessarily** [2] - 339:11, 367:3
**necessary** [3] - 321:22, 328:22, 473:14
**necessitated** [1] - 334:1
**need** [12] - 346:24, 347:12, 353:13, 376:12, 391:9, 419:4, 432:17, 440:21,

455:11, 460:12, 461:22, 490:22
**needed** [7] - 350:3, 360:21, 428:14, 431:9, 436:23, 440:13, 506:9
**needs** [3] - 393:8, 457:6, 509:24
**negligible** [1] - 505:4
**never** [8] - 322:14, 332:11, 384:25, 429:8, 429:16, 429:20, 438:9, 443:18
**New** [1] - 334:24
**new** [16] - 323:2, 331:15, 334:12, 335:11, 335:14, 336:3, 336:12, 367:14, 381:21, 422:13, 454:20, 465:19, 479:18, 516:9
**newton** [4] - 352:16, 361:15, 361:17, 361:19
**newton-meter-to-foot-pound** [1] - 361:15
**next** [18] - 347:14, 358:12, 359:4, 361:5, 363:21, 382:7, 389:9, 398:7, 404:21, 405:2, 408:1, 408:24, 409:12, 426:17, 457:15, 466:1, 489:17, 517:17
**nice** [1] - 453:15
**night** [1] - 445:11
**Nightforce** [144] - 319:23, 319:25, 320:3, 320:10, 320:16, 320:19, 321:1, 322:21, 323:2, 323:3, 324:25, 325:22, 326:14, 329:3, 329:9, 329:10, 329:12, 329:16, 329:23, 331:14, 331:21, 332:7, 332:11, 332:24, 333:3, 334:6, 334:11, 334:17, 334:18, 334:25, 335:4, 335:17, 335:19, 335:20, 337:21, 338:12, 343:1, 346:18, 346:19, 346:25, 350:1, 354:24, 357:9, 358:1, 359:14, 359:21, 360:11, 360:14, 363:6, 366:25, 368:9, 374:1, 378:16, 379:2, 380:1, 382:25, 383:3, 384:6, 385:21, 386:7, 389:25, 392:14, 396:10, 396:21, 398:19, 399:2, 399:9, 399:19, 399:23, 407:4, 407:5, 407:9, 407:14, 407:24, 408:1, 408:17, 408:20, 409:3, 409:13, 410:8, 411:9, 412:22, 413:2, 413:5, 413:17, 413:20, 413:23, 417:23, 442:4, 444:2, 444:13, 448:25, 450:6, 450:16, 450:22, 453:6, 454:4, 454:15, 455:15, 455:19, 455:21, 455:24, 456:3, 456:8, 456:16, 458:2, 458:10, 458:12, 460:25, 462:21, 462:25, 464:19, 464:23, 465:1, 466:3, 466:14, 466:23, 469:17, 469:22, 470:20, 473:1, 477:14, 483:4, 490:13, 490:17, 496:23, 497:19, 497:21, 498:6, 498:11, 500:5, 503:4, 503:8, 503:12, 503:23, 504:8, 505:7, 507:20, 508:5, 509:6, 509:9, 510:8, 512:15
**NIGHTFORCE** [2] - 315:7, 315:7
**Nightforce's** [131] - 319:17, 319:21, 320:4, 320:7, 320:22, 321:4, 321:7, 321:9, 321:14, 321:18, 321:23, 322:6, 322:14, 322:15, 322:17, 322:22, 324:21, 325:4, 325:16, 325:19,

325:25, 326:3, 326:5, 326:6, 326:7, 326:25, 327:4, 327:20, 328:13, 330:10, 330:17, 330:25, 331:2, 331:9, 331:25, 332:23, 333:7, 334:4, 334:8, 334:10, 334:16, 334:24, 336:2, 336:8, 336:15, 336:16, 337:17, 337:19, 338:2, 338:6, 340:15, 341:5, 341:25, 342:24, 343:12, 344:19, 345:15, 347:16, 349:15, 351:4, 352:17, 355:15, 366:17, 368:22, 378:3, 379:24, 381:20, 381:25, 383:17, 385:5, 385:20, 396:19, 397:3, 397:17, 399:7, 399:11, 408:24, 410:15, 413:9, 413:25, 442:22, 443:1, 446:5, 447:6, 448:6, 449:21, 449:25, 452:8, 454:22, 455:10, 456:14, 456:21, 457:4, 457:5, 457:10, 460:22, 461:1, 462:5, 462:9, 464:3, 465:6, 466:22, 466:23, 467:23, 469:24, 470:8, 474:24, 478:15, 483:16, 484:13, 484:14, 487:2, 488:6, 488:22, 493:12, 495:6, 498:10, 498:18, 498:24, 500:20, 502:3, 504:6, 505:21, 505:24, 509:4, 510:1, 510:13, 510:18, 510:21, 511:13
**Nikon** [2] - 418:2
**Ninth** [1] - 316:7
**Nm** [2] - 352:20, 352:23
**noise** [1] - 350:10
**nomenclature** [1] - 475:7
**non** [26] - 320:1, 320:4, 321:5, 332:18, 337:17, 339:17, 340:12, 340:25, 341:23, 346:17, 347:1, 353:20, 360:24, 362:6, 367:1, 367:17, 367:20, 368:10, 383:15, 471:1, 486:5, 486:20, 491:16, 495:25, 497:3, 516:8
**non-analogous** [5] - 471:1, 486:5, 486:20, 495:25, 497:3
**non-infringement** [20] - 320:1, 320:4, 321:5, 332:18, 337:17, 339:17, 340:12, 340:25, 341:23, 346:17, 347:1, 353:20, 360:24, 362:6, 367:1, 367:17, 367:20, 368:10, 383:15, 491:16
**non-provisional** [1] - 516:8
**nondescript** [1] - 437:14
**none** [9] - 331:16, 420:2, 425:6, 437:20, 438:5, 439:15, 480:20, 495:14, 497:3
**nonetheless** [4] - 357:23, 358:5, 427:13, 438:6
**nonmoving** [1] - 498:15
**normal** [21] - 320:24, 322:1, 322:2, 322:20, 324:15, 324:22, 325:4, 325:18, 328:12, 328:20, 331:12, 332:1, 332:12, 334:15, 353:10, 354:1, 381:23, 382:20, 383:4, 383:9, 451:18
**notable** [1] - 405:6
**notably** [6] - 332:7, 427:21, 437:23, 440:18, 466:16, 492:17
**notch** [20] - 371:25, 372:3, 372:25, 374:24, 377:8, 388:17, 393:9, 393:12,

393:14, 393:15, 393:19, 393:20, 395:13, 397:13, 404:1, 405:7, 405:8, 405:11
**notch-to-notch** [1] - 404:1
**notches** [18] - 402:11, 402:13, 402:16, 402:24, 403:4, 403:5, 403:23, 403:25, 404:2, 404:6, 404:10, 404:13, 404:14, 404:16, 404:17, 405:4
**note** [16] - 339:15, 347:3, 351:22, 384:21, 402:21, 422:19, 434:2, 434:16, 442:25, 443:10, 447:21, 479:8, 481:1, 483:9, 483:11, 512:2
**notebook** [2] - 438:11, 452:10
**noted** [2] - 460:15, 495:6
**notes** [2] - 405:13, 443:22
**nothing** [19] - 353:20, 357:13, 357:17, 359:20, 370:18, 370:19, 373:16, 374:13, 376:6, 378:21, 381:13, 394:4, 394:23, 395:9, 409:5, 448:4, 448:16, 478:20, 517:7
**notice** [1] - 376:11
**noting** [2] - 363:1, 459:8
**Novartis** [1] - 356:13
**November** [2] - 440:20, 457:25
**nowhere** [1] - 389:13
**nozzles** [1] - 471:16
**NRA** [2] - 329:11, 329:18
**nudging** [1] - 359:3
**number** [14] - 339:3, 353:14, 358:2, 360:19, 403:7, 404:16, 419:10, 448:22, 480:17, 482:12, 488:7, 498:9, 499:1, 514:1
**numbers** [6] - 350:21, 354:5, 355:18, 364:5, 452:13
**nut** [1] - 460:9

## O

**o'clock** [10] - 377:11, 377:21, 387:13, 387:14, 394:13, 394:14, 402:21, 403:4
**O'Reilly** [1] - 479:10
**oath** [2] - 325:23, 326:4
**object** [2] - 366:6
**objection** [2] - 326:16, 326:21
**objective** [1] - 468:3
**obligation** [2] - 441:9, 442:11
**obvious** [12] - 465:8, 465:24, 470:21, 471:22, 482:22, 483:18, 493:12, 493:13, 493:23, 495:3, 510:23, 511:14
**obviously** [4] - 390:5, 397:21, 444:12, 496:11
**obviousness** [15] - 470:20, 470:24, 472:24, 483:14, 483:15, 483:19, 489:19, 489:20, 489:22, 490:20, 491:5, 494:24, 495:2, 509:15, 511:17
**occur** [3] - 365:15, 389:4, 503:9
**occurred** [4] - 335:5, 419:25, 420:12, 455:22
**occurs** [2] - 387:12, 412:13
**October** [3] - 331:20, 335:1, 336:6

**OF** [2] - 315:2, 315:17
**of'** [1] - 424:13
**offer** [3] - 333:16, 400:10, 400:13
**offered** [4] - 334:22, 400:8, 400:11, 456:22
**offers** [1] - 379:15
**office** [1] - 517:2
**Official** [1] - 519:13
**oftentimes** [1] - 485:3
**old** [1] - 335:14
**once** [14] - 343:8, 370:24, 371:11, 373:23, 374:18, 375:3, 375:12, 376:16, 384:2, 387:19, 388:17, 397:11, 493:2, 517:15
**one** [190] - 322:2, 325:1, 326:3, 326:15, 326:25, 327:17, 329:15, 330:12, 330:18, 333:4, 337:13, 337:14, 337:15, 337:16, 337:23, 338:4, 338:25, 339:2, 339:7, 339:18, 340:5, 340:14, 342:10, 342:12, 342:18, 342:21, 343:10, 343:13, 344:8, 344:10, 344:14, 344:16, 345:4, 345:16, 346:16, 346:25, 347:6, 347:16, 350:22, 351:10, 351:12, 352:2, 352:13, 352:14, 352:17, 353:5, 353:6, 354:2, 354:15, 355:24, 360:5, 361:23, 362:2, 362:7, 362:11, 363:24, 364:9, 364:17, 364:21, 365:7, 365:17, 366:12, 367:1, 367:5, 367:6, 367:14, 367:15, 368:15, 369:9, 370:13, 371:12, 371:21, 372:12, 372:25, 374:6, 377:14, 377:17, 378:8, 378:18, 382:19, 383:18, 383:21, 384:17, 385:13, 386:12, 386:13, 392:5, 392:10, 392:19, 393:11, 393:19, 395:24, 396:5, 396:17, 396:18, 397:18, 402:15, 406:24, 407:18, 409:24, 410:22, 411:15, 413:19, 419:1, 419:10, 422:24, 423:3, 424:2, 425:11, 425:20, 426:16, 426:18, 426:20, 426:21, 426:22, 433:11, 433:22, 433:25, 434:9, 435:8, 435:18, 435:19, 440:4, 441:14, 443:16, 443:25, 444:3, 444:24, 445:1, 445:12, 446:13, 453:6, 454:21, 455:5, 456:7, 456:11, 457:17, 457:19, 460:6, 461:9, 464:3, 465:6, 467:23, 468:14, 468:23, 472:14, 473:6, 473:13, 474:20, 474:24, 478:1, 483:2, 483:25, 484:25, 487:9, 487:16, 488:16, 488:23, 489:10, 490:8, 490:11, 490:12, 490:15, 490:21, 490:23, 490:24, 491:1, 493:21, 500:22, 502:22, 502:24, 503:7, 504:2, 504:12, 504:20, 505:2, 505:20, 506:5, 506:19, 506:20, 507:8, 514:2, 514:4, 514:9, 516:23
**One** [1] - 316:13
**ones** [9] - 360:1, 415:10, 434:25, 470:23, 478:25, 491:10, 497:19, 497:20, 498:9

**ongoing** [1] - 442:11
**oOo** [1] - 519:1
**open** [7] - 323:19, 364:23, 391:14, 472:16, 479:3, 483:10, 485:24
**opened** [4] - 347:24, 356:5, 401:10, 512:23
**opening** [18] - 347:22, 351:18, 354:14, 364:20, 367:21, 395:19, 407:15, 415:8, 415:22, 420:8, 444:6, 452:21, 468:1, 479:20, 485:9, 493:20, 494:1, 494:22
**operate** [1] - 466:24
**operates** [1] - 466:15
**operations** [1] - 354:1
**operative** [5] - 427:6, 467:1, 467:17, 469:6, 469:10
**operatively** [19] - 466:6, 466:10, 466:12, 467:5, 467:13, 467:22, 467:24, 468:3, 468:13, 469:5, 469:13, 487:9, 487:15, 488:5, 488:14, 506:4, 508:23, 508:25, 509:6
**operator** [1] - 468:22
**opined** [3] - 349:16, 366:1, 367:7
**opinion** [5] - 322:17, 471:18, 473:21, 493:8, 517:16
**opportunity** [1] - 516:24
**opposed** [6] - 354:25, 355:10, 388:20, 430:13, 465:16, 483:6
**opposing** [7] - 318:17, 319:7, 386:9, 506:15, 509:17, 514:14, 514:15
**opposite** [7] - 375:24, 429:2, 430:9, 430:14, 432:11, 433:21, 512:13
**opposition** [2] - 334:7, 336:8
**optic** [2] - 468:7, 490:7
**optical** [25] - 324:5, 324:7, 421:18, 427:6, 466:7, 467:10, 467:11, 467:12, 468:16, 469:6, 469:9, 469:12, 469:14, 475:13, 476:5, 486:18, 495:18, 495:20, 496:5, 496:7, 509:23, 513:7, 513:23, 513:24, 514:4
**optics** [10] - 421:13, 421:18, 426:13, 432:9, 434:22, 435:22, 436:22, 437:5, 491:3, 499:23
**OPTICS** [1] - 315:7
**option** [1] - 326:15
**OR** [3] - 316:8, 316:15, 316:17
**oral** [3] - 348:14, 349:4, 479:9
**order** [23] - 324:23, 325:9, 338:9, 338:21, 348:3, 348:17, 353:25, 361:7, 364:22, 365:1, 369:6, 380:4, 380:5, 385:8, 385:15, 385:21, 398:3, 404:2, 415:3, 473:10, 484:19, 487:24, 501:24
**ordinary** [31] - 320:24, 322:11, 338:18, 340:2, 342:10, 342:19, 344:6, 344:8, 344:15, 370:7, 383:3, 384:11, 386:17, 411:5, 411:22, 458:16, 459:3, 459:21, 460:20, 466:11, 467:20, 472:4, 472:17, 474:19, 475:11, 481:21, 502:5, 508:14, 509:25, 516:15
**OREGON** [1] - 315:2

**Oregon** [2] - 315:6, 519:13
**organizations** [1] - 363:8
**original** [9] - 333:3, 334:12, 335:10, 336:12, 404:12, 424:19, 425:16, 488:18, 519:6
**original-condition** [1] - 334:12
**originally** [4] - 320:9, 402:17, 403:19, 423:9
**oscilloscopes** [1] - 431:14
**otherwise** [7] - 338:20, 339:13, 376:7, 380:6, 416:16, 481:10, 512:20
**Otteman** [1] - 486:15
**outcome** [1] - 428:1
**outer** [4] - 378:13, 465:22, 475:17, 501:20
**outlier** [1] - 431:25
**outlined** [1] - 418:21
**outlines** [1] - 448:7
**outside** [8] - 355:9, 371:15, 388:20, 446:25, 447:15, 456:24, 474:12, 515:4
**overarchingly** [1] - 454:21
**overcome** [10] - 323:6, 323:12, 323:17, 324:20, 332:3, 349:19, 350:4, 355:2, 355:11, 355:12
**overlooked** [2] - 393:23, 395:18
**overview** [1] - 409:15
**own** [17] - 321:9, 325:25, 326:6, 330:10, 330:25, 331:13, 336:16, 354:19, 362:22, 364:8, 435:7, 444:12, 465:6, 466:22, 481:18, 486:21, 493:7
**owner** [4] - 326:5, 327:4, 358:1, 408:16
**owner's** [4] - 327:21, 328:2, 328:10, 358:12

**P**

**packaging** [2] - 333:3, 335:10
**padlock** [1] - 323:19
**page** [30] - 326:10, 326:11, 327:5, 327:20, 329:7, 330:16, 330:19, 335:3, 338:15, 339:15, 344:22, 344:23, 364:1, 382:9, 382:21, 383:7, 397:11, 415:21, 416:14, 443:23, 459:25, 470:10, 472:15, 472:16, 474:25, 479:8, 510:20, 510:21, 512:3
**pages** [12] - 319:20, 320:14, 323:9, 338:9, 338:22, 339:21, 340:20, 341:3, 341:17, 407:16, 444:9, 456:14
**panel** [3] - 426:9, 426:16, 426:20
**paper** [1] - 484:8
**papers** [1] - 332:20
**Papst** [1] - 340:19
**paragraph** [9] - 382:21, 409:19, 409:24, 410:16, 461:19, 461:20, 461:22, 461:24, 512:21
**paragraphs** [7] - 331:19, 333:6, 413:5, 413:14, 452:24, 477:22, 512:20
**parallel** [1] - 432:15
**paralleling** [1] - 432:3
**parallels** [2] - 444:5, 485:2

**paraphrasing** [1] - 421:4
**parenthesis** [1] - 470:1
**PARK** [40] - 317:9, 317:20, 317:25, 318:2, 318:4, 318:8, 318:12, 318:19, 319:13, 319:15, 333:24, 337:2, 337:5, 343:15, 343:19, 343:22, 346:9, 379:9, 379:12, 381:3, 381:10, 384:19, 385:3, 386:25, 387:7, 387:11, 387:18, 387:24, 388:7, 388:14, 388:24, 389:6, 389:8, 396:15, 396:17, 414:16, 516:23, 517:5, 517:12, 517:20
**Park** [11] - 316:2, 317:9, 347:23, 356:22, 357:5, 357:7, 358:16, 358:21, 360:6, 368:11, 389:18
**part** [62] - 342:15, 344:12, 344:18, 344:25, 345:18, 354:1, 363:7, 363:14, 363:18, 363:19, 363:23, 364:4, 364:7, 365:2, 366:12, 369:13, 369:20, 369:25, 370:3, 370:5, 370:17, 370:24, 371:19, 371:21, 371:25, 373:14, 377:6, 377:11, 378:8, 379:18, 382:23, 385:12, 387:25, 388:14, 390:24, 391:4, 391:9, 393:21, 394:4, 394:8, 394:10, 394:15, 394:18, 394:24, 396:8, 397:18, 397:20, 401:13, 402:15, 405:4, 425:20, 437:11, 451:18, 452:14, 465:22, 468:9, 478:25, 490:14, 495:24, 501:15
**partial** [1] - 334:8
**particular** [22] - 324:16, 347:3, 357:22, 364:3, 364:5, 366:25, 379:7, 394:12, 419:1, 422:18, 425:13, 425:19, 426:1, 428:21, 454:8, 459:24, 474:23, 480:20, 490:9, 504:5, 506:24
**particularly** [12] - 340:13, 368:14, 391:18, 392:3, 409:25, 440:11, 441:2, 447:22, 491:8, 503:24, 509:17, 510:7
**parties** [19] - 318:9, 319:10, 323:9, 349:9, 363:13, 365:18, 367:18, 371:22, 385:4, 390:23, 391:3, 391:5, 391:16, 417:20, 423:24, 466:9, 480:13, 483:7
**parties'** [5] - 317:4, 325:2, 352:8, 368:12, 389:3
**partners** [1] - 326:8
**parts** [19] - 342:2, 364:25, 369:17, 369:23, 375:17, 376:2, 401:21, 421:8, 425:20, 431:7, 431:9, 432:6, 435:23, 437:11, 440:16, 440:25, 441:1, 441:4, 471:14
**party** [7] - 391:7, 391:8, 407:11, 407:17, 493:19, 498:15
**pass** [1] - 319:4
**passage** [1] - 328:6
**passed** [1] - 335:1
**passing** [1] - 445:10
**paste** [1] - 413:6
**paten** [1] - 488:23
**Patent** [1] - 505:18
**patent** [215] - 318:4, 318:5, 318:6,

318:10, 318:12, 318:14, 318:25, 319:1, 319:2, 323:21, 324:11, 324:12, 324:13, 325:12, 325:19, 327:24, 328:15, 330:1, 330:14, 336:21, 337:6, 337:18, 338:10, 338:17, 341:9, 341:21, 342:3, 342:6, 343:7, 343:9, 343:22, 345:22, 351:11, 351:12, 357:19, 358:3, 359:9, 359:18, 359:21, 361:5, 364:16, 364:18, 364:19, 368:1, 368:8, 368:9, 368:11, 368:14, 368:18, 378:1, 378:2, 378:4, 378:6, 379:1, 379:17, 379:22, 384:8, 385:3, 385:18, 389:13, 389:14, 392:4, 392:11, 392:15, 393:5, 395:21, 395:24, 396:6, 396:9, 396:25, 397:16, 398:18, 399:15, 408:16, 409:6, 409:16, 409:18, 410:16, 410:18, 411:4, 411:8, 412:10, 412:14, 412:25, 417:17, 417:18, 417:20, 418:1, 418:20, 418:24, 419:19, 420:3, 424:12, 424:13, 424:15, 426:22, 427:11, 428:10, 428:17, 429:23, 430:4, 430:19, 430:21, 431:3, 431:18, 432:5, 445:14, 445:19, 445:22, 446:1, 446:13, 447:5, 447:8, 448:23, 451:23, 452:5, 452:18, 453:1, 456:25, 457:7, 459:11, 462:3, 463:3, 463:4, 463:8, 463:20, 464:2, 465:1, 465:2, 465:4, 465:25, 466:4, 466:6, 466:12, 467:3, 467:21, 469:15, 469:17, 469:18, 469:20, 470:22, 471:6, 471:20, 471:22, 473:1, 473:2, 473:3, 473:23, 474:3, 474:4, 474:6, 475:14, 475:18, 478:5, 479:6, 486:13, 486:16, 488:25, 489:5, 490:2, 490:21, 490:23, 490:24, 491:12, 491:20, 492:7, 492:14, 492:25, 493:25, 494:2, 495:11, 495:12, 495:16, 495:17, 496:3, 496:15, 496:18, 497:12, 497:20, 498:11, 498:13, 499:25, 500:3, 500:24, 501:21, 503:25, 504:22, 505:13, 506:3, 506:11, 508:18, 508:22, 509:8, 509:12, 510:13, 510:15, 511:3, 511:11, 513:5
**patent's** [3] - 380:7, 400:9, 474:1
**patentable** [1] - 493:15
**patents** [83] - 317:23, 317:25, 318:2, 318:21, 318:23, 318:24, 319:6, 319:16, 319:19, 320:2, 320:5, 321:3, 321:5, 321:25, 323:24, 324:2, 324:3, 324:17, 325:25, 327:25, 329:5, 329:14, 329:20, 331:7, 333:25, 336:19, 359:15, 362:5, 362:13, 381:17, 383:23, 384:1, 398:15, 398:18, 398:20, 399:3, 399:17, 409:4, 409:5, 409:8, 410:2, 410:4, 412:1, 413:4, 413:9, 418:14, 421:10, 421:14, 428:24, 430:20, 437:22, 448:18, 457:25, 458:3, 459:23, 462:17, 462:22, 463:1, 463:2, 464:19, 471:15, 472:24, 477:3, 477:24, 478:7, 478:20,

479:22, 479:24, 482:7, 483:25, 489:10, 489:14, 495:11, 495:12, 495:14, 499:3, 500:5, 506:14, 506:16, 507:1, 513:9
**patents-in-suit** [2] - 324:17, 471:15
**path** [2] - 485:5
**pause** [3] - 346:14, 381:3, 398:11
**Pause** [3] - 491:9, 491:11, 511:22
**payment** [2] - 406:12, 435:16
**pen** [1] - 388:8
**penalize** [1] - 452:6
**penalized** [1] - 451:22
**people** [11] - 330:7, 350:23, 439:12, 445:21, 447:12, 448:15, 486:10, 486:17, 488:7, 488:8, 488:9
**per** [1] - 364:8
**perfect** [1] - 361:8
**perfectly** [2] - 440:20, 508:7
**perhaps** [6] - 375:14, 381:24, 390:12, 426:8, 439:20, 441:5
**period** [4] - 360:19, 433:14, 441:16
**permitted** [1] - 378:11
**permitting** [1] - 475:24
**perpendicular** [3] - 465:13, 465:16, 475:22
**person** [38] - 357:20, 374:10, 388:1, 409:22, 411:5, 411:10, 411:22, 412:15, 413:10, 443:6, 457:8, 458:9, 458:16, 459:3, 459:21, 460:11, 460:20, 466:10, 467:20, 467:23, 472:1, 472:7, 472:17, 480:13, 481:21, 499:7, 499:11, 502:5, 503:6, 505:10, 507:12, 507:15, 509:25, 510:2, 510:8, 510:10, 515:16, 516:14
**personal** [1] - 471:7
**perspective** [5] - 346:3, 353:24, 386:24, 395:8, 427:3
**persuasion** [1] - 400:19
**pertains** [2] - 403:3, 409:22
**pertinent** [2] - 471:7, 471:13
**pet** [1] - 342:20
**Pharma** [1] - 407:13
**phase** [2] - 338:12, 381:13
**photos** [2] - 370:22, 439:15
**phrase** [12] - 348:1, 348:3, 348:18, 364:4, 365:4, 365:9, 365:16, 366:15, 389:11, 389:14, 389:23, 473:24
**phrased** [1] - 502:8
**phrases** [1] - 478:17
**physical** [12] - 324:5, 408:9, 408:11, 417:6, 438:9, 438:10, 445:20, 452:2, 452:5, 452:7, 452:9, 452:16
**physically** [3] - 340:1, 341:7, 380:6
**pick** [2] - 457:20, 517:4
**picked** [1] - 407:21
**picking** [1] - 449:22
**picture** [8] - 354:24, 365:21, 370:20, 418:6, 422:19, 445:17, 489:24, 491:23
**pictured** [1] - 388:22, 395:18
**pictures** [10] - 356:9, 371:6, 393:17,

417:25, 421:8, 421:10, 438:4, 438:10, 487:12, 490:10
**piece** [10] - 351:22, 365:8, 366:9, 366:12, 391:23, 392:1, 454:4, 456:11, 490:15
**pieces** [13] - 337:22, 343:14, 356:4, 365:7, 375:14, 391:24, 414:9, 434:20, 450:18, 456:1, 475:6, 510:2, 510:3
**pin** [54] - 338:1, 343:2, 343:12, 351:13, 351:19, 351:20, 352:1, 352:3, 365:23, 366:8, 366:12, 366:13, 368:22, 369:16, 371:3, 371:13, 371:16, 371:17, 372:2, 372:4, 372:12, 373:1, 373:13, 373:20, 373:24, 374:1, 374:23, 377:2, 377:5, 377:20, 378:20, 378:23, 390:9, 390:11, 390:17, 394:5, 394:24, 402:2, 402:3, 402:5, 402:13, 412:7, 451:13, 459:14, 459:16, 459:18, 460:16, 464:11, 490:14, 491:25, 492:3, 492:5, 492:6, 515:15
**pin-button** [1] - 365:23
**pinch** [10] - 318:4, 319:1, 336:21, 336:22, 337:6, 343:7, 350:14, 364:16, 397:16, 463:4
**pinch-and-turn** [1] - 463:4
**pinch-to-turn** [8] - 318:4, 319:1, 336:21, 336:22, 337:6, 343:7, 364:16, 397:16
**pinched** [1] - 463:22
**pinching** [4] - 337:7, 337:9, 337:11, 337:13
**ping** [1] - 319:8
**ping-ponging** [1] - 319:8
**pink** [2] - 402:1, 402:11
**pinpointed** [1] - 498:21
**pins** [10] - 412:2, 418:9, 421:8, 421:9, 426:9, 432:6, 436:11, 436:20, 437:4, 445:14
**place** [3] - 338:15, 376:13, 380:17, 416:25, 503:2
**placed** [2] - 329:6, 460:4
**plain** [5] - 338:17, 342:5, 344:6, 386:17, 475:11
**plainly** [1] - 465:3
**Plaintiff** [1] - 315:4
**plaintiff** [8] - 317:10, 317:11, 317:12, 317:17, 400:9, 400:23, 434:25, 449:10
**PLAINTIFF** [1] - 316:2
**plaintiff's** [1] - 416:6
**plaintiffs** [3] - 373:4, 379:10, 516:22
**plane** [3] - 371:24, 393:21
**plasma** [2] - 471:15, 471:17
**plastic** [1] - 391:22
**plate** [1] - 460:3
**play** [6] - 333:22, 350:13, 380:3, 381:8, 384:7, 384:15
**playback** [1] - 468:24
**played** [2] - 381:2, 381:9
**plays** [2] - 350:20, 359:1
**pleaded** [3] - 398:19, 408:25, 409:13
**plenty** [1] - 489:22

**plugs** [1] - 431:14
**plus** [10] - 410:10, 410:12, 412:17, 413:7, 413:13, 414:1, 458:6, 458:8, 460:21, 504:9
**point** [69] - 319:8, 321:25, 325:24, 327:6, 331:6, 332:14, 333:24, 334:21, 338:8, 339:9, 352:13, 354:17, 357:23, 358:4, 359:11, 359:13, 360:6, 360:8, 372:9, 373:12, 374:16, 375:11, 376:14, 376:24, 377:2, 380:22, 388:24, 390:2, 391:13, 392:7, 392:8, 392:10, 396:19, 397:15, 402:9, 403:21, 413:19, 414:21, 416:5, 419:5, 422:21, 423:20, 426:4, 427:15, 429:20, 432:18, 435:13, 439:23, 442:7, 442:9, 442:13, 443:8, 443:17, 445:13, 462:1, 462:8, 465:6, 471:3, 477:9, 478:12, 483:24, 488:20, 489:7, 493:16, 504:12, 513:4, 513:13, 514:9
**pointed** [4] - 366:10, 369:13, 374:12, 377:9
**pointer** [1] - 475:22
**pointing** [5] - 328:16, 393:19, 394:8, 409:25, 410:3
**points** [14] - 321:20, 356:21, 379:13, 387:5, 389:10, 395:16, 405:19, 428:18, 478:14, 483:20, 487:4, 492:20, 495:9, 511:24
**Poly** [2] - 473:16, 474:16
**Poly-Am** [2] - 473:16, 474:16
**ponging** [1] - 319:8
**poorly** [2] - 367:22, 484:4
**pops** [1] - 333:12
**portion** [49] - 329:22, 341:19, 341:20, 342:13, 342:17, 344:4, 345:13, 348:9, 369:13, 370:6, 370:25, 371:24, 371:25, 372:3, 372:15, 372:25, 373:1, 373:18, 374:3, 377:7, 377:8, 377:10, 383:5, 385:14, 388:5, 388:9, 393:14, 394:22, 395:10, 397:8, 397:11, 422:7, 427:15, 456:10, 460:2, 466:7, 466:8, 467:14, 467:16, 468:16, 469:5, 469:7, 469:9, 469:12, 469:13, 470:2, 497:17, 506:5
**portions** [2] - 410:4, 444:4
**Portland** [4] - 315:6, 316:8, 316:15, 316:17
**POSA** [1] - 412:21
**position** [98] - 320:4, 320:11, 320:19, 322:8, 323:21, 331:16, 331:23, 333:8, 333:11, 334:10, 336:24, 337:10, 337:19, 338:6, 348:9, 348:11, 348:19, 350:7, 350:11, 350:14, 350:18, 350:24, 351:6, 351:14, 351:21, 352:1, 352:19, 352:20, 352:22, 355:6, 355:8, 355:9, 355:19, 356:3, 357:2, 359:1, 359:3, 361:3, 363:6, 373:7, 374:22, 375:1, 376:17, 377:11, 377:21, 379:21, 380:25, 381:4, 381:6, 381:7, 381:11, 381:16, 383:1, 385:5, 385:25,

386:2, 386:3, 386:4, 386:6, 387:13, 387:14, 388:7, 390:3, 390:10, 394:13, 394:14, 402:21, 403:4, 411:20, 413:18, 416:7, 416:13, 418:5, 420:10, 426:3, 430:14, 459:7, 459:8, 466:23, 468:18, 468:23, 474:14, 480:2, 481:3, 484:14, 484:21, 484:24, 492:1, 492:16, 492:18, 494:15, 494:16, 494:23, 498:16
**positional** [3] - 411:14, 411:17, 474:13
**positions** [7] - 344:1, 344:2, 351:2, 385:24, 402:13, 454:24, 504:2
**positive** [1] - 477:15
**positively** [1] - 483:4
**possessed** [2] - 459:22, 502:6
**possession** [1] - 448:17
**possibility** [2] - 371:3, 372:8
**possible** [6] - 373:17, 374:8, 395:23, 461:15, 501:21, 515:3
**possibly** [1] - 373:3
**post** [1] - 322:17
**posture** [1] - 505:15
**pot** [1] - 450:17
**pound** [1] - 361:15
**pounds** [3] - 353:2, 361:18, 361:19
**Powell** [1] - 341:2
**power** [5] - 324:7, 468:15, 468:17, 468:23, 487:12
**PowerPoint** [1] - 398:16
**practice** [41] - 400:1, 401:1, 403:13, 405:20, 407:12, 407:18, 407:20, 407:22, 408:13, 408:22, 415:15, 415:24, 416:7, 417:5, 418:16, 418:18, 418:19, 419:9, 421:21, 421:25, 422:2, 422:17, 424:1, 425:8, 426:4, 427:20, 427:22, 428:2, 428:4, 429:20, 434:6, 435:7, 436:6, 438:1, 439:2, 439:21, 440:9, 441:8, 451:1, 451:16, 453:8
**practice'** [1] - 424:13
**preamble** [6] - 473:6, 473:13, 473:19, 473:25, 474:6, 474:17
**precedent** [1] - 431:25
**precise** [1] - 441:6
**precisely** [1] - 335:6
**preclude** [1] - 370:13
**precludes** [1] - 480:25
**predictability** [1] - 480:18
**prefatory** [1] - 318:8
**preferred** [4] - 386:13, 392:14, 473:25, 474:5
**preliminary** [2] - 442:8, 443:16
**premise** [2] - 496:1
**preprogrammed** [2] - 469:1, 469:4
**present** [9] - 366:21, 416:16, 431:24, 437:22, 463:8, 489:25, 505:25, 514:25, 515:8
**presentation** [22] - 364:15, 379:1, 379:8, 381:1, 381:2, 381:9, 386:9, 394:4, 394:9, 395:19, 415:13, 415:22, 417:10, 449:12, 461:18, 477:13,

479:7, 479:9, 479:20, 497:24, 508:20, 509:19
**presented** [18] - 354:7, 369:10, 407:5, 408:10, 415:9, 416:21, 417:7, 419:20, 419:22, 427:14, 449:22, 450:15, 454:23, 466:21, 485:5, 489:15, 491:15, 498:6
**presenting** [1] - 398:14
**preserve** [1] - 327:25
**press** [1] - 389:1
**pressure** [6] - 355:1, 428:23, 431:13, 432:14, 460:17, 464:11
**presumably** [3] - 329:16, 390:11, 426:22
**presume** [2] - 335:23, 335:24
**presumes** [1] - 385:21
**pretty** [2] - 368:19, 487:24
**prevent** [8] - 320:24, 325:13, 327:25, 332:15, 343:3, 350:16, 380:10, 470:24
**preventing** [5] - 328:7, 332:4, 358:13, 358:25, 380:17
**prevents** [5] - 326:19, 328:3, 328:17, 328:19, 377:19
**previous** [2] - 479:5, 489:20
**previously** [4] - 417:3, 418:19, 431:16, 512:11
**Price** [1] - 408:5
**primary** [2] - 425:7, 508:21
**principle** [4] - 473:12, 473:13, 473:16, 479:14
**principles** [1] - 418:21
**printed** [2] - 450:1, 452:11
**printouts** [2] - 401:21, 401:23
**priority** [36] - 399:7, 399:22, 407:17, 449:17, 449:18, 455:15, 457:23, 457:25, 458:2, 458:3, 460:18, 461:3, 462:4, 462:14, 462:16, 464:17, 477:4, 477:7, 477:11, 477:19, 479:16, 479:25, 480:1, 480:9, 482:19, 482:23, 498:23, 499:7, 499:17, 500:1, 500:11, 500:23, 501:10, 503:5, 515:2
**pristine** [3] - 333:1, 335:11, 336:12
**probative** [2] - 425:9, 427:23
**problem** [8] - 329:13, 330:14, 430:11, 472:11, 478:25, 501:6, 501:19, 501:25
**problems** [7] - 321:4, 437:17, 501:9, 506:24, 507:3, 507:8, 507:16
**procedural** [1] - 505:15
**procedure** [1] - 319:8
**PROCEEDINGS** [1] - 315:17
**proceedings** [4] - 319:9, 346:14, 517:25, 519:5
**process** [4] - 422:12, 424:8, 484:23, 485:7
**produced** [2] - 322:16, 401:20
**product** [24] - 324:25, 330:10, 341:10, 343:12, 366:8, 369:2, 369:10, 370:19, 370:20, 373:21, 378:16, 378:20, 391:6, 396:2, 396:9, 396:24, 429:16, 451:19, 454:6, 472:20, 490:13,

496:23, 497:19, 497:21
**production** [12] - 399:20, 400:14, 401:1, 407:23, 408:2, 408:16, 416:23, 430:7, 439:1, 441:10, 449:19, 453:16
**products** [14] - 319:22, 320:25, 325:19, 325:21, 328:22, 329:3, 337:21, 340:4, 343:18, 368:17, 392:19, 398:1, 439:3, 486:11
**products'** [1] - 326:1
**professional** [1] - 495:24
**profile** [1] - 372:24
**program** [2] - 401:11, 468:19
**programs** [1] - 469:1
**progress** [3] - 425:25, 426:2, 436:10
**prongs** [1] - 428:3
**pronounce** [1] - 418:2
**proof** [10] - 397:2, 399:18, 399:22, 400:6, 408:18, 450:22, 498:12, 498:16, 503:3
**proper** [9] - 325:3, 325:20, 336:13, 340:21, 341:18, 345:18, 386:18, 466:9, 499:16
**property** [2] - 445:19, 445:20
**proposed** [1] - 466:24
**protected** [1] - 501:21
**prototype** [68] - 400:2, 401:2, 401:5, 401:9, 403:2, 404:21, 405:16, 405:20, 405:22, 405:25, 406:3, 406:6, 406:9, 406:11, 406:12, 406:13, 406:19, 407:2, 411:25, 415:16, 415:17, 415:25, 417:7, 419:10, 419:14, 419:16, 419:21, 419:25, 420:1, 420:11, 420:16, 427:24, 428:4, 428:9, 429:8, 433:10, 433:14, 433:20, 435:11, 435:15, 436:14, 436:17, 437:22, 437:23, 438:3, 438:7, 438:9, 438:10, 438:21, 439:16, 439:21, 440:8, 441:4, 441:15, 450:4, 452:1, 452:2, 452:3, 452:7, 452:9, 452:16, 453:2, 453:11, 453:12, 453:15, 453:17, 453:20
**protrusion** [3] - 377:21, 394:13, 394:14
**prove** [4] - 392:22, 399:19, 423:25, 455:21
**proved** [2] - 407:10, 416:7
**proven** [1] - 416:20
**proves** [1] - 450:20
**provide** [6] - 356:9, 357:3, 379:6, 420:15, 433:3, 441:11, 441:19, 489:22
**provided** [17] - 345:10, 356:1, 356:17, 359:12, 374:6, 383:19, 384:6, 392:16, 397:18, 409:18, 430:12, 430:14, 434:15, 435:20, 444:22, 478:16, 497:16
**provides** [8] - 320:8, 427:23, 476:1, 480:5, 480:9, 492:22, 512:5, 514:13
**providing** [4] - 334:11, 430:1, 481:11, 484:14
**provisional** [79] - 417:18, 458:1, 458:5, 458:7, 458:10, 458:16, 458:21,

458:23, 459:1, 459:6, 459:20, 459:25,
460:19, 462:3, 462:17, 464:4, 464:7,
464:14, 464:20, 464:23, 464:24,
477:4, 477:9, 477:19, 477:21, 478:6,
478:10, 478:18, 478:19, 479:15,
479:21, 479:24, 480:3, 482:8, 482:16,
482:19, 490:4, 490:25, 492:17,
492:22, 492:23, 493:1, 493:3, 493:6,
494:9, 494:13, 494:22, 499:2, 499:9,
499:12, 499:21, 500:2, 500:7, 500:9,
500:17, 501:1, 501:10, 501:14,
501:21, 502:5, 502:7, 502:9, 503:10,
510:14, 511:6, 511:8, 511:10, 512:5,
512:16, 512:19, 513:14, 514:13,
514:17, 514:23, 515:9, 516:8, 516:13

**publication** [30] - 329:18, 399:10,
399:15, 417:17, 418:1, 419:7, 419:13,
423:1, 423:10, 423:15, 423:23,
425:14, 426:11, 428:8, 429:19, 433:7,
434:8, 434:10, 436:4, 439:4, 462:25,
463:7, 463:14, 464:5, 464:15, 465:24,
482:24, 511:2, 511:3, 511:5
**publicly** [1] - 496:21
**publish** [2] - 359:6, 359:7
**published** [3] - 329:11, 417:17, 463:2
**publisher** [2] - 329:10, 330:12
**pull** [4] - 372:20, 423:5, 467:2, 491:12
**pun** [1] - 385:21
**purchased** [3] - 331:14, 332:21, 333:1
**purchasing** [1] - 334:3
**Purdue** [1] - 407:13
**pure** [1] - 396:2
**purely** [1] - 470:4
**purported** [1] - 384:3
**purpose** [15] - 358:17, 406:14, 415:18,
419:15, 419:17, 419:21, 420:17,
428:6, 428:9, 429:15, 429:17, 433:11,
434:7, 441:18, 515:4
**purposes** [9] - 328:21, 332:18, 380:17,
413:22, 431:11, 451:5, 451:7, 509:9
**push** [25] - 350:12, 357:16, 361:24,
364:17, 364:18, 365:22, 368:4,
374:21, 375:3, 376:17, 384:23,
384:25, 391:11, 467:2, 490:1, 490:2,
490:18, 491:1, 491:3, 491:23, 492:24,
493:3, 495:17, 513:14, 513:24
**push-down** [1] - 492:24
**pushed** [4] - 338:3, 397:8, 397:9, 492:4
**pushes** [1] - 492:13
**pushing** [3] - 323:17, 492:10, 492:11
**put** [22] - 326:9, 330:7, 332:22, 337:2,
349:7, 351:5, 353:25, 357:10, 360:17,
362:22, 372:21, 380:21, 382:7,
407:13, 456:18, 456:20, 466:16,
489:10, 501:9, 504:9, 504:23, 515:11
**puts** [1] - 444:19
**putting** [3] - 400:16, 431:4, 513:24

## Q

**qualification** [1] - 382:3
**qualify** [1] - 380:5
**quantitative** [3] - 350:21, 355:18, 356:2
**questioning** [1] - 357:14
**questions** [20] - 326:13, 334:16, 346:1,
356:16, 360:23, 361:1, 364:12, 368:3,
378:25, 396:11, 396:18, 403:20,
431:18, 441:24, 442:1, 442:15, 449:7,
480:12, 487:8, 512:1
**quick** [4] - 384:21, 392:8, 396:15, 442:3
**quicker** [2] - 361:22, 477:16
**quickly** [4] - 418:23, 428:17, 429:6,
432:2
**quite** [10] - 321:20, 335:12, 368:21,
369:12, 371:7, 372:20, 373:15,
418:19, 420:17, 453:3
**quote** [40] - 324:4, 324:5, 324:6, 324:10,
329:19, 335:1, 335:2, 337:18, 337:19,
338:11, 338:14, 338:15, 339:10,
339:11, 357:23, 357:25, 403:21,
403:24, 404:14, 404:21, 405:23,
406:5, 406:16, 406:20, 407:13, 408:6,
410:17, 432:16, 440:17, 461:13,
473:21, 484:2, 488:22, 489:10, 493:5,
494:1, 495:16, 515:4, 515:5
**quoted** [2] - 489:1, 496:4
**quotes** [3] - 428:19, 479:13, 488:6
**quoting** [4] - 356:12, 424:3, 424:11,
473:20

## R

**radial** [1] - 494:4
**rain** [5] - 472:20, 485:21, 496:10,
509:20, 513:20
**raised** [27] - 321:22, 346:7, 346:17,
356:22, 359:11, 362:4, 367:18,
371:25, 372:3, 372:25, 393:14,
417:11, 418:6, 420:19, 427:12,
429:20, 442:6, 443:7, 443:20, 444:7,
445:2, 445:5, 459:18, 480:21, 512:1,
513:4, 513:19
**raising** [2] - 429:16, 455:13
**range** [5] - 332:9, 353:11, 353:12,
361:18, 452:24
**rare** [1] - 431:1
**rather** [11] - 330:22, 362:7, 378:22,
432:21, 434:1, 468:17, 471:7, 481:9,
491:6, 492:10, 495:4
**rationale** [1] - 320:22
**rattling** [1] - 356:4
**Ray** [2] - 326:5, 382:4
**re** [2] - 340:19, 427:4
**re-looking** [1] - 427:4
**reaction** [1] - 334:16
**read** [10] - 410:17, 411:4, 411:21, 436:8,
470:2, 472:17, 472:18, 489:16,
506:25, 508:24

**reading** [8] - 323:21, 393:1, 412:24,
466:11, 467:20, 505:11, 505:12, 508:9
**ready** [3] - 361:7, 414:4, 457:15
**real** [1] - 334:15
**reality** [1] - 382:2
**realize** [1] - 336:1
**realized** [2] - 329:12, 429:21
**really** [18] - 323:12, 331:17, 332:10,
333:14, 349:8, 366:20, 384:11,
405:14, 406:18, 434:14, 448:4,
481:25, 490:22, 492:20, 493:19,
495:2, 504:15
**reason** [13] - 322:10, 325:15, 330:1,
340:11, 341:22, 386:18, 395:20,
450:10, 455:21, 457:10, 458:10,
461:17, 500:25
**reasonable** [2] - 368:16, 400:21
**reasonably** [6] - 411:4, 438:13, 443:23,
457:8, 505:10, 510:4
**reasoned** [1] - 341:12
**reasons** [16] - 321:6, 321:12, 336:14,
343:4, 412:22, 427:22, 432:11,
432:13, 456:6, 461:6, 462:15, 472:23,
478:7, 478:11, 483:11, 490:9
**rebut** [4] - 321:11, 407:4, 407:24,
408:21
**rebuttal** [4] - 321:18, 429:10, 454:22,
455:25
**rebutted** [1] - 450:17
**recalled** [1] - 446:13
**recast** [1] - 367:10
**receive** [1] - 335:22
**received** [6] - 322:23, 335:9, 335:15,
420:3, 422:12, 428:12
**recess** [4] - 361:10, 414:18, 476:11,
476:13
**recharacterize** [1] - 330:12
**reciprocating** [1] - 339:25
**recitation** [1] - 504:19
**recite** [1] - 513:10
**recited** [3] - 365:12, 474:6, 500:1
**recites** [2] - 499:1, 500:15
**reciting** [1] - 341:5
**recliner** [1] - 501:7
**recognition** [1] - 428:25
**recognizing** [1] - 428:11
**recoil** [1] - 428:22
**recommended** [1] - 444:18
**record** [36] - 317:8, 323:1, 336:4,
349:13, 356:14, 363:20, 373:25,
379:22, 381:22, 382:2, 400:20, 417:2,
430:21, 431:17, 439:11, 440:1, 444:5,
453:23, 455:16, 466:12, 470:16,
475:2, 478:14, 480:23, 481:23, 483:5,
483:13, 483:20, 484:24, 486:9,
486:21, 507:23, 508:22, 509:7,
517:21, 519:4
**recording** [2] - 468:25, 472:11
**recordkeeping** [1] - 438:16
**records** [8] - 396:23, 438:19, 439:5,

439:10, 439:12, 439:15, 472:12, 483:12
**red** [15] - 333:13, 336:24, 350:13, 355:6, 369:22, 373:8, 373:10, 373:12, 374:3, 377:9, 381:4, 381:10, 393:18, 463:15, 463:22
**red-line-indicated** [1] - 355:6
**redo** [1] - 389:19
**reduce** [3] - 416:1, 416:15, 472:19
**reduced** [4] - 403:13, 416:22, 439:1, 439:20
**reduces** [1] - 383:21
**reduction** [38] - 400:1, 401:1, 405:20, 407:11, 407:18, 407:19, 407:21, 408:12, 408:22, 415:15, 415:24, 416:7, 417:5, 418:16, 418:18, 419:9, 421:21, 421:25, 422:2, 422:17, 424:1, 425:8, 426:4, 427:20, 427:22, 428:2, 428:3, 429:19, 434:6, 435:7, 436:5, 438:1, 440:8, 441:8, 451:1, 451:16, 453:8
**refer** [4] - 364:17, 443:8, 467:22, 499:15
**reference** [26] - 327:10, 329:21, 330:2, 380:19, 383:6, 400:11, 400:22, 451:11, 459:14, 464:5, 464:13, 465:6, 466:1, 472:25, 483:17, 488:24, 489:6, 491:2, 500:24, 502:19, 508:10, 509:11, 510:22, 511:1, 511:3
**referenced** [1] - 500:20
**references** [14] - 329:25, 399:2, 399:14, 400:4, 401:3, 408:19, 414:24, 450:13, 452:12, 455:9, 473:22, 495:4, 496:22, 508:8
**referred** [5] - 361:24, 399:6, 509:19, 512:7, 514:22
**referring** [7] - 318:16, 329:16, 359:16, 404:10, 440:24, 498:25, 499:5
**refers** [5] - 330:18, 338:14, 362:17, 413:5, 508:21
**refined** [1] - 491:18
**reflected** [1] - 334:14
**refocus** [1] - 495:10
**refresher** [1] - 463:3
**Regan** [1] - 486:13
**regard** [3] - 449:20, 449:22, 470:2
**regarding** [12] - 398:15, 404:1, 405:3, 405:21, 407:9, 412:21, 427:1, 462:20, 477:19, 504:12, 509:8, 514:12
**regardless** [4] - 323:3, 324:8, 334:21, 391:21
**regards** [2] - 410:1, 410:2
**region** [2] - 393:16, 427:7
**regular** [3] - 482:16, 494:14, 512:22
**rehash** [1] - 458:6
**reiterates** [1] - 410:11
**rejected** [2] - 341:4, 471:12
**relate** [1] - 497:2
**related** [16] - 360:6, 360:24, 387:9, 409:16, 425:12, 427:15, 439:7, 470:13, 471:15, 471:16, 471:21,

478:20, 504:22, 512:4, 513:22, 513:23
**relates** [6] - 347:1, 371:4, 432:25, 471:13, 485:13, 497:14
**relating** [4] - 409:4, 409:6, 454:7, 510:12
**relationship** [5] - 467:6, 467:8, 504:19, 504:21, 504:25
**relationships** [1] - 467:19
**relative** [7] - 348:10, 348:12, 395:9, 467:9, 467:12, 494:4, 513:5
**relatively** [5] - 351:6, 352:20, 368:13, 368:20, 482:3
**relay** [1] - 330:6
**release** [3] - 385:15, 454:6, 460:14
**releases** [2] - 342:22, 389:1
**releasing** [1] - 475:24
**relevant** [37] - 334:23, 335:2, 335:5, 340:13, 358:4, 374:14, 380:11, 383:8, 394:2, 421:23, 422:3, 422:5, 423:22, 425:10, 425:15, 429:15, 430:16, 433:14, 441:16, 447:20, 448:11, 452:16, 455:16, 456:10, 470:2, 471:1, 473:11, 475:17, 479:8, 488:10, 497:4, 503:1, 507:3, 507:7, 509:21, 511:9
**reliably** [1] - 324:7
**reliance** [2] - 442:21, 443:11
**reliant** [1] - 443:12
**relied** [3] - 425:7, 430:23, 471:6
**relies** [2] - 319:23, 410:9
**relock** [1] - 352:4
**rely** [14] - 415:23, 417:4, 417:6, 433:17, 433:18, 443:9, 453:22, 455:11, 461:2, 466:22, 481:19, 481:20, 483:8, 484:8
**relying** [5] - 418:15, 420:10, 435:6, 456:18, 508:12
**remainder** [2] - 403:6, 477:13
**remaining** [1] - 346:21
**remains** [4] - 322:11, 376:19, 399:23, 450:22
**remanded** [3] - 339:16, 340:24, 341:22
**remarks** [2] - 318:13, 318:16
**remedies** [5] - 415:1, 442:2, 442:4, 442:10, 455:19
**remedy** [1] - 441:24
**remember** [4] - 420:21, 429:8, 450:21, 500:21
**removal** [1] - 475:25
**remove** [3] - 375:21, 375:24, 384:13
**removed** [2] - 337:10, 394:15
**render** [3] - 381:16, 465:24, 470:21
**rendering** [1] - 410:23
**renders** [1] - 483:17
**repeatedly** [1] - 473:24
**replacing** [1] - 454:9
**replete** [1] - 473:21
**replicate** [2] - 333:6, 333:9
**reply** [7] - 334:6, 382:21, 407:15, 410:11, 452:25, 464:12, 474:25
**report** [22] - 324:24, 325:5, 335:16, 355:16, 356:8, 369:24, 370:23,

410:17, 413:6, 413:13, 429:10, 446:6, 447:18, 447:20, 452:24, 480:5, 484:13, 489:22, 491:5, 498:25, 510:20, 511:19
**Reporter** [1] - 519:13
**reporter** [1] - 420:22
**REPORTER** [2] - 316:16, 490:22
**reports** [2] - 369:18, 488:18
**represent** [1] - 423:25
**representation** [3] - 396:21, 425:22, 434:4
**representative** [1] - 327:1
**representatives** [1] - 403:15
**represented** [1] - 489:3
**reproduced** [2] - 327:19, 428:19
**request** [2] - 389:18, 466:19
**requested** [1] - 406:12
**require** [25] - 338:18, 340:23, 341:14, 341:15, 341:20, 342:8, 348:19, 350:25, 353:21, 354:18, 355:24, 358:20, 364:24, 369:6, 385:16, 386:2, 407:10, 410:18, 421:11, 431:6, 431:8, 433:4, 469:20, 474:17, 494:3
**required** [36] - 339:25, 341:6, 349:7, 352:20, 352:23, 356:25, 357:4, 366:14, 391:17, 406:8, 408:4, 420:7, 424:24, 429:4, 429:9, 429:11, 429:21, 430:15, 430:24, 431:21, 432:1, 432:4, 432:10, 432:14, 436:24, 437:7, 437:21, 439:24, 448:20, 453:23, 454:13, 454:16, 461:14, 461:24, 473:4
**requirement** [13] - 349:6, 365:10, 365:15, 366:15, 369:3, 373:18, 393:4, 393:23, 409:19, 409:23, 419:9, 448:19, 458:20
**requirements** [3] - 407:7, 409:17, 461:19
**requires** [12] - 322:9, 339:13, 366:5, 381:14, 381:24, 408:7, 425:20, 428:22, 461:3, 499:6, 503:25, 506:7
**requiring** [1] - 471:25
**requisite** [1] - 408:9
**Research** [6] - 479:11, 500:22, 512:8, 514:14, 514:21, 515:22
**resides** [1] - 397:3
**resist** [5] - 413:24, 455:10, 457:11, 503:22, 505:8
**resistance** [3] - 373:23, 481:11, 482:3
**resolution** [1] - 426:18
**resolvable** [1] - 488:20
**resolve** [1] - 488:13
**resolved** [5] - 391:5, 392:13, 480:8, 502:12, 516:16
**resolving** [1] - 398:24
**respect** [26] - 318:10, 319:6, 325:6, 331:6, 343:5, 343:22, 352:7, 362:15, 379:23, 380:20, 385:3, 385:18, 396:17, 396:20, 398:1, 413:8, 416:8, 427:11, 430:4, 456:7, 465:2, 486:23, 488:14, 496:14, 506:10, 508:23

**respond** [4] - 443:23, 443:24, 449:12, 506:13
**responded** [1] - 510:18
**response** [17] - 346:7, 379:13, 404:7, 407:4, 409:3, 410:8, 414:7, 456:14, 464:3, 466:8, 467:15, 467:16, 469:8, 469:22, 498:3, 509:16, 516:3
**responsive** [1] - 443:21
**rest** [3] - 318:9, 384:11, 395:1
**restated** [1] - 474:1
**restraints** [1] - 324:20
**restriction** [1] - 386:16
**rests** [1] - 363:8
**result** [5] - 362:7, 364:9, 398:24, 400:20, 431:5
**results** [1] - 365:12
**resume** [1] - 414:6
**retained** [1] - 405:11
**retains** [2] - 349:23, 355:18
**retract** [1] - 351:19, 390:17, 491:25
**retracting** [1] - 492:5
**revealed** [1] - 335:8
**reversed** [4] - 339:23, 340:12, 341:22, 471:23
**review** [3] - 419:23, 442:20, 516:24
**reviewed** [2] - 440:23, 502:25
**reviving** [1] - 507:19
**Rexnord** [1] - 341:16
**rich** [2] - 478:12, 480:7
**Richard** [3] - 329:9, 330:5
**ride** [2] - 372:13, 378:6
**ridged** [1] - 332:4
**ridges** [2] - 342:14, 390:13
**riflescope** [23] - 325:6, 330:11, 332:22, 337:16, 401:6, 431:9, 438:5, 454:10, 454:20, 469:20, 470:17, 472:23, 474:22, 475:9, 476:5, 485:24, 495:12, 496:5, 506:20, 509:23, 510:11, 513:21, 514:3
**riflescopes** [25] - 319:18, 324:18, 331:25, 335:9, 335:14, 335:16, 336:1, 337:24, 343:1, 471:2, 485:19, 486:2, 486:3, 486:15, 486:16, 489:11, 489:15, 495:13, 496:8, 497:5, 513:8, 513:11, 513:23, 516:25
**right-hand** [2] - 362:23, 377:8
**rigorous** [1] - 448:20
**rim** [1] - 394:10
**rim-shaped** [1] - 394:10
**ring** [53] - 369:19, 370:17, 373:5, 373:8, 373:11, 373:14, 374:2, 374:4, 376:18, 378:13, 387:2, 387:9, 387:10, 387:11, 387:17, 387:18, 387:23, 388:4, 388:6, 388:20, 388:21, 392:21, 393:15, 394:23, 395:4, 402:2, 402:4, 402:6, 402:11, 402:12, 402:15, 402:20, 402:23, 403:7, 405:12, 412:8, 425:23, 435:9, 459:15, 459:17, 460:2, 460:3, 460:4, 460:5, 460:8, 460:13, 468:17, 468:19, 469:11, 487:14, 487:16,

497:14
**rings** [3] - 345:14, 378:9, 412:3
**rink** [3] - 370:11, 370:13, 370:14
**ripe** [6] - 429:6, 442:13, 455:19, 486:6, 495:7, 516:18
**risk** [1] - 472:19
**Rives** [2] - 316:2, 316:6
**RMR** [2] - 316:16, 519:12
**road** [1] - 321:6
**rod** [1] - 344:15
**roll** [1] - 414:20
**Room** [1] - 316:17
**room** [1] - 380:14
**rotary** [1] - 320:5
**rotatable** [1] - 397:9
**rotatably** [1] - 467:10
**rotate** [21] - 331:16, 331:22, 333:8, 337:9, 349:7, 355:25, 372:22, 373:23, 374:5, 375:4, 376:18, 377:13, 387:20, 394:10, 394:19, 394:21, 402:7, 412:8, 459:19, 460:13, 468:24
**rotated** [17] - 320:18, 333:12, 333:19, 348:10, 348:12, 348:20, 348:22, 349:6, 350:1, 354:19, 354:20, 384:10, 389:12, 389:23, 397:10
**rotates** [6] - 377:7, 378:18, 388:1, 388:15, 467:12, 468:18
**rotating** [6] - 369:16, 371:2, 375:6, 376:25, 377:19, 484:2
**rotation** [19] - 320:25, 325:8, 326:19, 332:4, 348:10, 348:12, 349:2, 411:18, 463:12, 463:16, 463:18, 463:24, 465:9, 466:8, 467:15, 469:7, 469:8, 474:12, 474:13
**rotational** [8] - 343:25, 344:11, 344:17, 345:17, 368:24, 369:2, 369:8, 494:4
**rotations** [1] - 378:11
**round** [3] - 370:5, 374:7, 374:10
**route** [1] - 417:13
**row** [1] - 401:12
**rugged** [4] - 437:6, 439:22, 506:19
**rule** [7] - 407:16, 417:13, 430:2, 497:8, 506:9, 507:21, 507:24
**Rule** [2] - 326:5, 327:4
**ruled** [3] - 381:12, 478:24, 507:11
**rules** [2] - 417:18, 418:25
**ruling** [5] - 346:20, 380:19, 429:1, 483:5, 506:6
**rulings** [1] - 338:24
**run** [4] - 351:10, 381:1, 462:10, 466:24
**runs** [1] - 463:18

## S

**S.C** [1] - 316:10
**SA267** [3] - 394:9, 394:18, 395:16
**SA270** [2] - 362:17, 363:2
**SA271** [7] - 362:17, 363:2, 395:18, 395:21, 396:5, 396:8, 396:20
**SA344** [8] - 362:17, 362:20, 363:3,

363:18, 363:23, 364:3, 364:6, 364:7
**saddle** [2] - 404:12, 460:3
**safety** [1] - 342:12
**sales** [1] - 329:22
**Salmon** [1] - 316:14
**sample** [12] - 322:23, 332:22, 333:10, 333:16, 335:9, 335:21, 347:11, 384:5, 384:6, 384:13, 406:17, 434:13
**samples** [2] - 405:14, 405:16
**sandpaper** [21] - 410:10, 410:12, 410:22, 411:12, 412:18, 413:7, 413:11, 413:13, 414:1, 446:4, 446:20, 447:2, 447:3, 448:3, 456:23, 457:2, 458:6, 458:8, 460:22, 461:5, 504:10
**satisfactory** [1] - 406:1
**satisfied** [13] - 319:11, 322:12, 323:14, 339:1, 339:2, 339:19, 340:14, 342:2, 345:22, 384:9, 407:22, 453:19, 500:18
**satisfies** [1] - 325:21
**satisfy** [5] - 321:3, 325:19, 340:17, 373:17, 381:18
**satisfying** [1] - 453:16
**Saturday** [1] - 405:24
**saved** [1] - 401:18
**saw** [30] - 354:23, 356:5, 357:1, 357:15, 361:24, 365:24, 369:17, 369:19, 390:8, 404:10, 422:6, 422:19, 423:4, 425:11, 426:8, 428:10, 433:18, 433:19, 433:22, 434:9, 434:12, 438:8, 450:1, 459:10, 461:18, 464:7, 487:12, 489:10, 511:13, 512:21
**scenario** [1] - 449:2
**Schafer** [6] - 403:17, 403:20, 404:4, 405:2, 405:13, 406:15
**Schmidt** [20] - 401:6, 402:17, 403:1, 403:15, 403:17, 404:12, 405:9, 405:16, 405:17, 406:16, 406:23, 411:25, 435:22, 435:23, 436:7, 437:1, 439:9, 440:17, 451:17, 453:10
**scope** [52] - 327:7, 327:12, 340:8, 342:5, 347:2, 347:3, 347:10, 347:11, 347:13, 347:15, 351:1, 355:24, 357:15, 358:9, 358:11, 359:2, 360:25, 362:20, 363:17, 365:22, 369:15, 371:6, 371:18, 372:25, 373:15, 373:22, 375:7, 384:13, 393:13, 393:20, 394:18, 394:25, 401:8, 411:5, 412:21, 413:1, 421:18, 432:9, 434:22, 447:14, 447:15, 457:9, 461:4, 481:6, 482:2, 490:18, 503:17, 503:19, 504:7, 505:11, 512:22, 515:24
**scopes** [42] - 322:23, 322:25, 325:1, 326:14, 327:2, 331:14, 332:25, 334:2, 334:3, 334:12, 334:13, 335:11, 335:19, 335:21, 336:11, 337:13, 346:24, 347:16, 348:22, 350:13, 352:11, 352:17, 353:6, 354:8, 357:12, 359:25, 360:2, 362:25, 363:6, 363:14, 363:23, 364:3, 364:5, 364:7, 369:9, 383:19, 384:3, 491:2, 495:19, 513:11

**Scott** [4] - 316:12, 317:13, 346:23, 415:4
**screenshot** [4] - 401:10, 401:16, 401:17, 449:23
**screw** [5] - 351:16, 387:25, 421:17, 460:4, 460:8
**screwed** [1] - 394:20
**screws** [14] - 372:21, 375:20, 375:23, 376:7, 376:12, 376:16, 377:4, 377:5, 387:21, 387:24, 394:15, 394:17, 394:25, 460:8
**scrolling** [1] - 491:9
**Seals** [1] - 381:25
**Sean** [5] - 326:4, 329:9, 357:11, 357:19, 470:10
**seat** [4] - 361:11, 414:19, 449:9, 476:17
**seated** [1] - 317:2
**Seattle** [1] - 316:4
**second** [28] - 318:25, 321:9, 325:24, 327:6, 346:10, 348:8, 348:11, 350:4, 354:11, 357:25, 361:4, 361:22, 364:14, 369:3, 411:15, 419:14, 421:8, 424:9, 426:7, 426:8, 428:5, 433:6, 433:25, 434:21, 439:8, 487:13, 494:3, 516:3
**section** [5] - 430:17, 441:23, 449:6, 457:18, 491:12
**Section** [12] - 383:10, 409:12, 409:17, 413:25, 414:3, 455:24, 456:8, 457:12, 459:12, 461:18, 461:25, 462:12
**secure** [3] - 328:22, 394:18, 460:7
**secured** [2] - 380:16, 387:25
**securing** [1] - 338:14
**see** [88] - 317:16, 329:24, 330:20, 336:23, 337:2, 337:4, 347:20, 350:13, 355:22, 356:2, 356:16, 359:2, 360:23, 363:3, 365:21, 366:3, 367:19, 368:3, 370:21, 370:24, 371:6, 371:12, 371:18, 372:12, 372:17, 372:23, 372:24, 375:25, 377:3, 381:10, 387:4, 388:15, 388:24, 393:17, 393:20, 394:13, 394:16, 395:13, 397:5, 401:11, 401:13, 402:3, 402:9, 402:16, 412:1, 412:2, 414:17, 418:20, 419:6, 419:12, 419:23, 421:15, 422:17, 422:25, 423:5, 423:12, 423:15, 427:6, 427:7, 427:11, 433:6, 435:21, 435:24, 436:2, 436:4, 436:9, 436:19, 436:22, 439:14, 441:22, 441:23, 442:20, 449:6, 450:19, 451:24, 454:11, 456:10, 463:16, 464:23, 478:13, 491:10, 491:16, 492:4, 492:22, 492:24, 496:6, 497:24
**seeing** [2] - 405:14, 427:5
**seek** [1] - 363:7
**seeking** [1] - 435:16
**seeks** [1] - 399:7
**seem** [3] - 375:13, 420:20, 427:11
**segments** [1] - 414:22
**select** [4] - 468:19, 474:14, 510:2,

510:10
**selected** [3] - 389:15, 411:19, 454:25
**selective** [1] - 362:8
**selectively** [8] - 348:4, 348:8, 348:18, 380:20, 380:24, 381:6, 504:1, 504:4
**selector** [3] - 468:17, 469:3, 469:11
**selling** [1] - 396:5
**send** [1] - 451:20
**sense** [20] - 317:22, 323:4, 324:6, 325:17, 326:18, 330:3, 343:25, 344:6, 346:9, 349:9, 380:2, 384:9, 423:19, 470:14, 474:11, 474:15, 478:12, 479:20, 486:16, 501:16
**sensitive** [4] - 421:18, 432:8, 432:9, 472:12
**sent** [13] - 335:17, 335:19, 336:2, 403:19, 405:16, 405:21, 414:3, 435:16, 436:1, 436:7, 437:11, 452:4, 453:12
**sentence** [4] - 444:7, 485:3, 489:12
**sentences** [1] - 444:8
**separate** [22] - 326:2, 337:22, 338:19, 339:4, 340:23, 341:7, 341:8, 341:14, 341:20, 341:21, 342:8, 357:16, 365:5, 379:19, 385:11, 391:24, 441:13, 460:3, 470:23, 491:21, 492:14
**separated** [1] - 340:1
**separation** [1] - 385:8
**September** [5] - 335:1, 335:7, 335:8, 335:16, 336:1
**series** [3] - 365:11, 422:6, 480:15
**serve** [2] - 397:19, 397:20
**service** [1] - 451:23
**session** [6] - 379:15, 418:19, 479:5, 479:10, 489:21, 512:11
**set** [4] - 319:19, 365:18, 413:20, 413:21
**sets** [3] - 319:17, 405:8, 409:17
**setting** [7] - 320:13, 324:5, 328:1, 329:2, 332:16, 333:17, 460:13
**settings** [3] - 324:7, 350:22, 469:2
**seven** [5] - 394:13, 422:25, 423:14, 434:4, 474:1
**several** [5] - 321:4, 398:19, 475:6, 511:24
**severe** [2] - 428:22, 432:10
**shaft** [1] - 475:19
**shall** [2] - 409:9, 409:20
**sham** [3] - 430:2, 454:1, 454:18
**shape** [3] - 401:15, 432:14, 432:25
**shaped** [3] - 366:9, 394:10, 418:9
**share** [1] - 421:6
**shared** [1] - 448:24
**shell** [1] - 329:16
**shift** [3] - 336:20, 442:15, 475:10
**shifted** [1] - 420:20
**shifting** [2] - 343:8, 376:4
**shifts** [1] - 408:17
**shipped** [3] - 395:23, 396:9, 451:17
**ships** [1] - 445:10

**shock** [1] - 472:19
**shoes** [1] - 484:23
**shooter** [1] - 325:7
**Short** [4] - 401:8, 405:22, 405:25, 406:5
**short** [6] - 408:14, 442:7, 456:8, 462:9, 469:11, 515:9
**shortly** [2] - 405:15, 423:11
**shots** [1] - 450:18
**shoulders** [1] - 475:24
**show** [67] - 323:2, 333:13, 350:4, 350:21, 354:5, 359:19, 362:10, 364:10, 386:22, 391:25, 392:18, 396:23, 399:12, 399:18, 399:23, 400:1, 400:13, 400:16, 403:8, 407:18, 408:12, 408:15, 408:18, 414:24, 415:10, 415:18, 416:14, 417:5, 417:21, 419:1, 419:14, 422:24, 425:24, 426:5, 426:15, 427:2, 433:25, 438:1, 438:20, 439:1, 450:9, 450:12, 450:13, 450:14, 450:22, 450:24, 450:25, 452:6, 452:14, 452:17, 452:20, 453:1, 453:17, 458:20, 483:5, 490:10, 497:16, 498:12, 498:17, 499:7, 503:4, 503:6, 503:7, 505:25, 510:1, 510:9
**showed** [10] - 419:16, 426:1, 434:25, 435:8, 435:10, 439:10, 449:23, 459:2, 460:20
**showing** [28] - 336:14, 351:11, 355:18, 365:20, 365:22, 392:18, 400:10, 401:1, 401:18, 401:24, 403:12, 418:3, 419:8, 419:12, 419:20, 419:24, 422:8, 422:16, 423:4, 425:2, 439:6, 453:7, 453:24, 458:19, 459:9, 459:10, 491:3, 499:10
**shown** [28] - 351:2, 371:9, 378:6, 378:8, 407:3, 412:4, 415:14, 415:15, 416:22, 417:7, 417:25, 418:6, 418:8, 421:14, 422:18, 425:12, 426:18, 432:7, 440:25, 452:22, 458:16, 459:6, 459:7, 460:11, 463:15, 463:22, 477:7, 490:10
**shows** [18] - 322:5, 329:4, 358:5, 386:24, 402:10, 407:11, 416:24, 419:9, 425:19, 426:17, 438:19, 458:22, 459:1, 459:22, 460:19, 489:17, 491:23, 502:5
**sl'm** [1] - 371:14
**side** [37] - 318:13, 325:15, 336:23, 351:22, 357:15, 361:23, 362:23, 370:13, 370:14, 371:11, 374:18, 375:24, 377:1, 378:8, 418:3, 421:16, 423:5, 431:24, 490:1, 490:8, 490:12, 491:4, 492:9, 493:24, 494:5, 494:8, 494:18, 494:24, 495:4, 501:12, 510:15, 510:24, 511:11, 511:15, 511:18, 513:17
**sides** [5] - 343:25, 368:24, 369:7, 374:9, 383:8
**sidestepped** [1] - 347:23
**sighting** [5] - 348:11, 348:13, 485:24,

486:23, 495:19
**signature** [3] - 519:6, 519:7
**signed** [1] - 519:7
**significance** [1] - 424:16
**significant** [7] - 353:8, 355:24, 402:24, 443:11, 477:10, 510:6, 510:16
**significantly** [2] - 319:25, 416:1
**signing** [1] - 519:3
**silent** [2] - 367:6, 392:6
**silver** [3] - 371:21, 376:20
**similar** [13] - 354:8, 361:16, 400:7, 411:24, 418:4, 418:13, 420:3, 420:18, 426:21, 459:10, 500:3, 500:6, 510:14
**similarly** [5] - 413:8, 428:10, 467:18, 471:10, 472:6
**simple** [11] - 350:8, 365:22, 366:11, 368:13, 368:20, 420:7, 420:12, 428:14, 429:3, 431:2, 490:13
**simpler** [2] - 415:11, 478:2
**simplest** [1] - 431:5
**simplified** [2] - 417:12, 485:17
**simplifies** [1] - 417:19
**simplify** [2] - 415:9, 415:21
**simplifying** [1] - 417:8
**simply** [14] - 335:15, 367:2, 368:21, 369:13, 371:8, 372:6, 372:12, 373:15, 373:17, 381:17, 396:8, 416:21, 434:18, 449:4
**single** [22] - 332:7, 340:1, 340:10, 363:17, 364:9, 365:1, 365:24, 366:8, 391:6, 392:1, 443:20, 444:7, 458:19, 469:24, 485:3, 489:4, 499:22, 500:7, 500:10, 500:11, 500:13, 500:18
**single-action** [2] - 500:7, 500:13
**single-component** [1] - 340:10
**sit** [1] - 501:7
**sits** [1] - 493:10
**sitting** [1] - 352:18
**situation** [9] - 362:3, 392:14, 400:6, 453:9, 499:18, 500:7, 515:1, 515:8, 515:23
**situations** [3] - 474:17, 499:21, 502:25
**six** [7] - 377:11, 377:21, 403:4, 409:8, 417:17, 422:9, 422:18
**six-drawing** [1] - 422:18
**sixth** [1] - 401:15
**skater** [4] - 345:4, 370:12, 370:14, 370:16
**skates** [1] - 370:12
**skating** [2] - 345:3, 370:14
**skill** [26] - 342:10, 342:19, 344:8, 344:15, 410:22, 411:5, 411:11, 411:22, 457:9, 458:9, 458:17, 459:3, 459:21, 460:11, 460:20, 466:11, 467:20, 472:4, 472:18, 480:14, 481:21, 486:10, 502:5, 509:25, 515:16, 516:15
**skilled** [16] - 409:22, 412:15, 413:10, 467:23, 472:1, 472:7, 474:20, 480:12, 486:7, 499:8, 499:11, 503:6, 505:10,

507:12, 507:15, 510:9
**skip** [3] - 416:1, 484:23, 485:6
**skipped** [1] - 396:8
**Sleekcraft** [1] - 502:23
**slid** [2] - 374:11, 374:13
**slide** [93] - 343:23, 343:24, 344:3, 344:4, 344:10, 344:15, 344:25, 345:5, 345:7, 345:11, 345:12, 345:15, 345:19, 348:7, 351:10, 362:23, 363:22, 365:20, 368:13, 368:17, 368:19, 369:2, 369:4, 369:11, 369:24, 370:4, 370:5, 370:8, 370:10, 370:15, 370:19, 371:9, 372:7, 373:3, 373:5, 373:10, 373:18, 374:4, 374:7, 374:8, 374:10, 374:13, 377:6, 377:8, 377:12, 377:18, 378:4, 378:5, 378:17, 385:20, 385:22, 386:1, 386:23, 387:2, 387:9, 388:19, 392:11, 392:20, 393:2, 393:3, 393:5, 393:9, 393:18, 393:25, 394:2, 394:3, 394:6, 394:9, 394:12, 394:24, 395:1, 395:4, 395:17, 397:4, 397:8, 401:3, 422:7, 426:17, 428:18, 435:19, 466:16, 468:21, 473:11, 479:8, 483:24, 489:6, 492:5
**slides** [14] - 361:3, 388:4, 388:21, 415:25, 420:17, 420:25, 422:17, 423:7, 430:20, 482:11, 489:1, 491:9, 491:12, 512:21
**sliding** [22] - 344:1, 344:5, 344:12, 344:17, 344:24, 345:13, 345:17, 370:9, 370:16, 372:8, 385:23, 386:2, 386:3, 386:23, 387:12, 387:16, 388:10, 388:13, 394:21, 397:12, 492:12, 497:15
**slight** [2] - 404:1, 415:12
**slightly** [6] - 329:24, 346:16, 362:18, 426:17, 491:18, 491:24
**Slip** [1] - 408:8
**sloppy** [1] - 438:16
**slot** [3] - 390:9, 490:15, 491:25
**slots** [3] - 421:9, 437:5, 497:22
**slow** [3] - 418:10, 481:8, 490:23
**small** [3] - 371:12, 371:16, 376:11
**smaller** [3] - 346:5, 414:8, 477:25
**smooth** [1] - 436:13
**snap** [4] - 342:19, 390:11, 476:1
**snap-off** [1] - 476:1
**snap-on** [1] - 476:1
**snapped** [1] - 391:23
**snappingly** [1] - 475:19
**sniper** [3] - 328:23, 329:1, 333:19
**snippet** [1] - 327:20
**soft** [1] - 471:8
**sold** [7] - 362:20, 363:2, 363:4, 395:24, 396:3, 396:24, 452:4
**solid** [1] - 365:24
**solidify** [1] - 509:7
**solve** [1] - 430:10
**solved** [4] - 507:3, 507:9, 507:17
**solves** [1] - 501:9

**solving** [1] - 501:6
**someone** [12] - 331:17, 395:24, 438:12, 452:4, 452:5, 452:6, 465:11, 472:22, 489:1, 489:2, 492:22, 503:8
**sometimes** [3] - 350:3, 430:25, 444:8
**somewhat** [2] - 393:17, 426:21
**somewhere** [1] - 395:24
**Sonic** [1] - 505:3
**soon** [1] - 435:12
**sooner** [1] - 334:19
**sorry** [9] - 317:15, 317:24, 352:25, 358:9, 365:20, 366:4, 386:20, 387:4
**Sorry** [1] - 491:9
**sort** [11] - 326:18, 339:7, 342:20, 362:1, 364:10, 384:22, 385:16, 391:1, 418:21, 454:21, 456:2
**sound** [2] - 350:10, 449:13
**sounds** [2] - 414:10, 420:9
**source** [1] - 322:24
**Southern** [1] - 424:21
**space** [9] - 377:7, 444:12, 455:25, 456:9, 456:12, 490:8, 504:18, 504:21, 504:25
**spaced** [2] - 504:20, 504:24
**spark** [1] - 431:14
**Sparkman** [1] - 316:13
**spec** [2] - 362:20, 362:25
**special** [2] - 438:18, 512:15
**specialized** [1] - 470:5
**specialty** [1] - 443:4
**specific** [12] - 358:19, 394:9, 417:9, 427:9, 445:4, 448:23, 471:4, 482:9, 500:3, 501:6, 508:3, 510:12
**specifically** [12] - 319:20, 329:2, 339:13, 343:24, 365:13, 401:7, 409:16, 463:1, 473:5, 498:20, 499:15, 501:2
**specification** [35] - 324:11, 324:13, 324:14, 325:12, 339:13, 340:7, 341:15, 342:3, 358:17, 358:22, 380:7, 380:9, 386:8, 386:12, 389:13, 389:17, 389:21, 409:20, 410:7, 411:23, 448:14, 458:15, 459:20, 461:14, 461:19, 461:24, 462:3, 467:18, 473:20, 473:21, 475:14, 488:12, 488:15, 496:7, 509:4
**specification's** [1] - 325:20
**specifications** [5] - 323:22, 323:25, 327:24, 328:15, 384:9
**specifics** [4] - 365:25, 443:22, 451:10, 483:9
**specimen** [1] - 394:17
**speculated** [1] - 355:25
**speculates** [1] - 355:20, 395:22
**speculation** [4] - 356:10, 356:13, 396:2
**speculative** [1] - 412:17
**speech** [1] - 420:25
**spelled** [1] - 505:1
**spend** [1] - 430:17
**spent** [1] - 484:6

**Sperrenring** [2] - 404:8, 404:15
**sperrenring** [2] - 402:19, 405:3
**spindle** [7] - 466:6, 466:8, 467:7, 467:10, 467:15, 467:16, 506:4
**spinning** [1] - 384:24
**spline** [2] - 459:15, 515:15
**splined** [2] - 459:15, 460:2
**splines** [4] - 421:9, 432:7, 436:13, 436:15
**split** [1] - 346:15
**spokes** [1] - 435:9
**Sport** [2] - 471:5, 471:11
**spot** [1] - 388:17
**spots** [1] - 497:22
**spotting** [2] - 495:19, 513:11
**spread** [1] - 475:23
**spring** [13] - 351:23, 351:25, 354:25, 355:2, 355:10, 355:11, 390:16, 402:6, 404:11, 460:7, 460:16, 481:6
**spring-loaded** [1] - 460:16
**springs** [3] - 412:7, 432:6, 460:6
**spur** [1] - 460:3
**squeezed** [1] - 463:21
**squeezing** [1] - 475:21
**SRI** [2] - 461:16, 461:21
**stacks** [1] - 469:16
**stage** [2] - 320:10, 466:20
**standard** [25] - 383:4, 383:9, 400:17, 410:11, 410:13, 412:15, 412:20, 413:16, 414:2, 458:13, 458:25, 459:4, 460:10, 461:8, 498:15, 499:5, 499:6, 499:17, 500:18, 501:13, 503:5, 505:13, 516:14
**standards** [3] - 501:23, 512:25, 513:2
**standpoint** [1] - 480:15
**start** [6] - 379:14, 396:19, 411:7, 449:16, 457:15, 477:2
**started** [1] - 398:12
**starting** [3] - 319:15, 338:8, 339:9
**state** [1] - 317:7
**statement** [5] - 359:20, 363:25, 440:18, 440:19, 488:24
**statements** [3] - 412:18, 504:14, 506:16
**states** [5] - 322:22, 406:10, 464:6, 464:9, 496:4
**States** [1] - 316:16
**STATES** [2] - 315:1, 315:19
**stating** [2] - 322:18, 406:16
**stationary** [1] - 376:19
**status** [1] - 400:19
**statute** [3] - 409:16, 461:17, 462:12
**staying** [1] - 367:6
**step** [3] - 383:14, 383:22, 460:7
**STEVENS** [1] - 315:3
**Stevens** [3] - 317:5, 317:10, 337:12
**sticking** [2] - 436:21, 451:13
**stiff** [4] - 350:25, 351:7, 359:1, 359:2
**stiffer** [1] - 361:18
**stiffness** [1] - 355:18

**still** [21] - 320:12, 320:17, 323:5, 323:7, 330:17, 330:23, 332:10, 333:8, 345:5, 345:19, 353:25, 408:17, 418:22, 436:9, 436:16, 437:17, 437:19, 438:24, 451:3, 454:11, 482:3
**Stockdill** [2] - 467:25, 509:5
**Stoel** [2] - 316:2, 316:6
**stop** [6] - 360:23, 377:11, 377:14, 377:17, 404:11, 414:5
**stopping** [1] - 347:8
**stops** [2] - 377:13, 377:19
**straight** [2] - 340:1, 372:1
**Street** [2] - 316:3, 316:14
**strength** [12] - 331:17, 333:20, 350:25, 352:12, 352:21, 353:10, 353:13, 353:21, 354:22, 355:2, 357:5, 440:14
**strenuous** [1] - 431:13
**stretch** [1] - 476:19
**striated** [1] - 342:13
**stricken** [2] - 443:13
**strike** [1] - 443:14
**string** [1] - 485:4
**strokes** [1] - 500:14
**strong** [5] - 350:15, 429:11, 491:8, 509:17, 509:18
**structure** [38] - 320:18, 337:23, 338:5, 338:11, 338:14, 339:2, 340:2, 340:15, 341:6, 341:10, 341:12, 342:2, 342:13, 342:16, 342:21, 344:11, 344:16, 345:16, 379:18, 379:20, 381:5, 385:8, 385:12, 385:14, 387:15, 387:22, 387:25, 388:10, 388:25, 397:18, 397:19, 397:20, 418:4, 461:17, 462:11, 464:1, 498:8, 506:11
**structures** [13] - 339:1, 339:11, 339:12, 339:19, 340:3, 340:24, 341:7, 341:13, 341:15, 341:20, 342:8, 379:16, 387:19
**stuff** [1] - 361:6
**subject** [9] - 410:1, 424:11, 449:18, 462:25, 466:19, 474:7, 476:15, 477:23, 494:7
**subjected** [2] - 332:1, 431:12
**submersion** [1] - 428:23
**submission** [1] - 440:6
**submissions** [3] - 325:2, 478:14, 489:21
**submit** [1] - 454:2
**submitted** [4] - 334:7, 336:7, 429:10, 440:12
**subparts** [3] - 362:16, 434:18, 437:3
**subset** [1] - 399:8
**substance** [2] - 442:19, 443:16
**substantial** [6] - 350:3, 350:22, 357:3, 429:12, 444:4, 516:9
**substantially** [2] - 348:5, 352:23
**success** [2] - 510:4, 510:11
**successful** [3] - 436:18, 436:19, 436:21
**sufficient** [18] - 349:18, 349:22, 350:9, 355:1, 360:7, 390:16, 396:23, 438:1, 441:14, 448:5, 483:5, 483:20, 483:22,

497:9, 499:24, 500:11, 503:22
**sufficiently** [8] - 424:7, 431:2, 446:22, 478:18, 480:23, 482:25, 497:8, 504:25
**suggest** [6] - 331:22, 381:23, 438:23, 476:14, 479:21, 489:15
**suggested** [5] - 354:5, 437:25, 447:3, 447:17, 506:16
**suggesting** [4] - 358:16, 359:20, 370:3, 501:16
**suggestion** [4] - 331:25, 332:5, 382:5, 456:22
**suggestions** [1] - 330:17
**suggestive** [1] - 441:8
**suggests** [6] - 384:24, 403:24, 404:14, 433:20, 441:20, 493:13
**suing** [1] - 363:8
**suit** [3] - 324:17, 471:15, 476:2
**suitable** [2] - 476:4, 495:20
**suitcase** [1] - 323:18
**Suite** [4] - 316:3, 316:7, 316:11, 316:14
**sum** [1] - 472:21
**summary** [106] - 317:4, 317:21, 319:16, 321:21, 322:16, 331:3, 331:21, 332:20, 334:6, 334:8, 336:9, 336:18, 339:16, 340:12, 340:25, 341:23, 343:6, 345:23, 346:20, 347:1, 360:15, 367:1, 367:9, 367:24, 368:12, 370:1, 382:20, 396:4, 398:21, 398:24, 399:5, 399:8, 401:21, 408:22, 409:2, 409:6, 410:3, 413:24, 416:8, 417:13, 420:4, 422:11, 422:21, 428:11, 428:20, 429:1, 429:15, 430:8, 433:13, 440:2, 440:7, 441:15, 443:12, 444:1, 449:1, 449:2, 449:4, 450:16, 451:2, 456:3, 457:11, 462:15, 463:6, 466:4, 469:19, 470:17, 473:3, 478:3, 479:5, 479:9, 480:8, 480:25, 482:21, 483:22, 484:10, 484:25, 485:2, 486:6, 486:12, 487:5, 488:20, 491:7, 493:17, 493:20, 494:19, 495:7, 497:9, 498:14, 502:12, 503:11, 503:22, 504:10, 505:8, 505:17, 506:9, 507:19, 507:25, 508:7, 509:14, 511:15, 512:6, 512:9, 512:10, 512:11, 512:13, 516:18
**super** [1] - 363:21
**supervises** [1] - 486:14
**Supp** [1] - 424:20
**supplemental** [1] - 336:8
**support** [25] - 322:21, 336:4, 356:11, 360:17, 396:1, 410:9, 412:19, 413:3, 413:18, 458:4, 458:11, 458:13, 461:2, 464:20, 469:24, 480:3, 480:10, 498:23, 499:18, 500:12, 501:17, 511:7, 512:5, 512:10, 514:13
**supported** [6] - 389:23, 410:6, 467:10, 478:17, 499:3, 501:15
**supporting** [3] - 392:7, 398:20, 399:21
**supports** [3] - 466:23, 467:4, 515:17
**suppose** [2] - 423:17, 481:25
**supposed** [2] - 438:20, 445:20

**surface** [86] - 343:23, 343:24, 344:3, 344:4, 344:5, 344:10, 344:15, 344:25, 345:5, 345:7, 345:11, 345:12, 345:19, 368:13, 368:17, 368:19, 368:23, 369:3, 369:5, 369:11, 369:24, 370:4, 370:5, 370:8, 370:10, 370:15, 370:17, 372:7, 372:9, 372:14, 373:3, 373:5, 373:13, 373:19, 374:11, 374:12, 374:15, 377:18, 377:22, 378:5, 378:11, 378:13, 378:17, 378:22, 385:20, 385:22, 386:1, 386:23, 387:2, 387:5, 387:9, 388:19, 392:11, 392:20, 393:3, 393:9, 393:10, 393:12, 393:21, 393:25, 394:2, 394:6, 395:5, 397:5, 397:8, 402:4, 411:1, 411:16, 411:19, 412:8, 412:11, 445:7, 445:23, 448:15, 467:9, 467:13, 497:15, 500:4, 515:14
**surface'** [1] - 410:19
**surfaces** [2] - 345:15, 497:18
**Surgical** [1] - 339:14
**surprising** [1] - 459:8
**suspect** [2] - 355:21, 444:25
**sweet** [1] - 388:17
**switch** - 346:8, 356:19, 364:14, 364:16, 468:18
**Symsek** [1] - 408:5
**system** [10] - 327:14, 330:2, 330:3, 357:24, 358:14, 382:17, 421:12, 421:18, 468:8, 468:9
**systems** [2] - 443:5, 490:3

## T

**tab** [34] - 368:23, 369:4, 369:12, 369:14, 369:16, 371:3, 372:15, 373:16, 373:19, 373:20, 374:14, 374:17, 377:1, 377:12, 377:20, 378:5, 378:18, 378:20, 378:23, 385:23, 386:5, 387:15, 388:16, 392:21, 393:24, 394:1, 394:5, 394:24, 397:6, 397:7, 397:10, 490:14, 497:23
**table** [4] - 347:14, 362:22, 363:3, 478:16
**talks** [15] - 320:15, 325:12, 328:6, 330:23, 332:9, 358:13, 358:24, 374:14, 380:8, 382:13, 382:14, 393:8, 487:14, 489:6
**tampered** [1] - 335:18
**tangent** [1] - 372:1
**tape** [1] - 472:13
**taper** [1] - 436:12
**target** [3] - 325:9, 328:24, 475:10
**Taurus** [1] - 424:9
**teach** [2] - 463:25, 494:11
**teachings** [1] - 492:21
**Tech** [1] - 505:3
**technical** [10] - 321:19, 331:8, 331:13, 332:17, 336:7, 344:20, 357:20, 374:1, 409:17, 488:9
**technological** [2] - 320:1, 334:1
**technological-based** [1] - 320:1

**technologically** [1] - 321:15
**technologies** [1] - 472:7
**Technologies** [7] - 499:20, 500:6, 501:18, 502:12, 505:15, 505:16, 515:7
**technology** [1] - 472:4
**technology'** [1] - 406:22
**Techs** [1] - 479:11
**teeth** [1] - 381:11
**telephone** [2] - 405:24, 406:7
**telescope** [1] - 506:21
**temperature** [3] - 431:13, 432:14, 432:25
**tempo** [1] - 420:25
**ten** [1] - 387:14
**tension** [1] - 418:11
**term** [38] - 337:18, 338:10, 338:13, 338:16, 339:1, 339:24, 344:3, 345:19, 358:20, 359:8, 364:22, 364:23, 366:3, 368:13, 379:25, 380:1, 380:20, 380:22, 381:13, 385:4, 385:17, 385:19, 397:16, 402:19, 445:16, 466:10, 466:14, 466:25, 467:4, 474:21, 475:4, 500:2, 504:18, 505:2, 505:4, 505:10, 509:6
**termed** [1] - 359:8
**terminology** [3] - 365:14, 389:16, 447:9
**terms** [40] - 329:25, 330:23, 339:1, 339:4, 339:10, 340:22, 358:19, 365:17, 380:2, 380:23, 391:1, 410:23, 420:24, 426:2, 439:21, 445:6, 445:8, 445:12, 445:22, 445:25, 446:2, 446:7, 446:12, 446:24, 447:5, 447:7, 466:18, 474:15, 478:2, 478:20, 479:2, 486:10, 504:2, 504:16, 505:5, 505:12, 508:25, 509:8, 513:12
**terrible** [1] - 438:16
**test** [5] - 332:23, 451:20, 453:11, 454:6, 476:2
**tested** [34] - 322:25, 331:14, 332:21, 332:25, 334:2, 334:4, 335:10, 336:2, 336:11, 347:17, 352:11, 352:14, 352:17, 352:18, 353:6, 354:9, 355:24, 381:20, 384:5, 406:10, 407:2, 415:18, 416:23, 419:14, 427:25, 429:7, 433:20, 434:17, 434:20, 435:7, 435:16, 435:24, 453:13, 454:12
**testified** [7] - 429:7, 429:14, 440:16, 440:23, 465:7, 467:24, 470:8
**testify** [1] - 455:6
**testifying** [2] - 382:17, 433:17
**testimony** [37] - 327:3, 327:15, 327:16, 347:17, 357:11, 373:25, 382:5, 408:4, 408:6, 417:4, 420:6, 424:7, 424:22, 424:25, 430:2, 432:20, 442:22, 443:13, 444:9, 446:11, 447:19, 455:5, 465:23, 470:8, 484:13, 486:24, 487:3, 487:11, 488:9, 493:10, 493:16, 497:2, 508:13, 508:14, 508:16, 511:13, 511:19
**testing** [59] - 334:12, 335:19, 354:3,

356:2, 406:8, 419:16, 419:20, 419:25, 420:7, 420:11, 420:16, 428:1, 428:8, 428:13, 428:22, 428:23, 429:3, 429:9, 429:11, 429:12, 429:20, 430:15, 430:24, 430:25, 431:2, 431:6, 431:8, 431:11, 431:21, 432:1, 432:4, 432:11, 432:14, 432:24, 433:4, 433:5, 433:10, 435:21, 436:22, 437:1, 437:3, 437:7, 439:22, 439:24, 440:9, 441:17, 441:20, 448:20, 453:3, 453:4, 453:6, 453:23, 454:5, 454:10, 454:16, 454:19
**Texas** [1] - 424:21
**text** [4] - 329:17, 330:21, 423:5, 477:24
**textured** [1] - 474:1
**THE** [132] - 315:1, 315:2, 315:18, 316:2, 316:9, 317:2, 317:3, 317:15, 317:18, 317:24, 318:1, 318:3, 318:7, 318:11, 318:18, 319:12, 319:14, 333:23, 336:25, 337:4, 343:10, 343:16, 343:20, 346:3, 346:12, 346:22, 347:13, 347:21, 352:25, 353:2, 353:9, 353:15, 353:24, 354:12, 354:16, 356:18, 361:1, 361:6, 361:9, 361:11, 361:20, 364:13, 368:2, 368:5, 372:19, 373:4, 374:18, 374:25, 375:3, 375:6, 375:10, 375:13, 375:19, 375:22, 376:3, 376:15, 376:23, 377:16, 377:24, 379:3, 384:16, 384:20, 385:2, 386:20, 387:3, 387:8, 387:17, 387:21, 388:3, 388:12, 388:19, 389:5, 389:7, 389:9, 395:3, 395:11, 395:15, 396:13, 396:16, 398:6, 398:10, 404:23, 405:1, 409:10, 414:5, 414:11, 414:15, 414:17, 414:19, 416:18, 418:10, 420:21, 421:1, 426:14, 426:25, 434:24, 435:3, 435:10, 435:15, 442:1, 442:17, 449:8, 449:14, 451:3, 451:9, 451:14, 457:19, 462:23, 476:10, 476:14, 476:20, 476:25, 484:16, 485:8, 485:11, 490:22, 498:1, 501:13, 501:23, 502:11, 502:16, 511:23, 514:7, 514:10, 516:2, 516:5, 516:20, 517:1, 517:6, 517:8, 517:14, 517:22
**theme** [1] - 362:11
**themselves** [8] - 323:25, 365:18, 427:25, 435:24, 450:11, 482:8, 513:10
**theoretical** [1] - 356:13
**theory** [9] - 320:9, 320:21, 321:8, 322:21, 323:3, 332:17, 332:23, 390:11, 423:17
**thereafter** [2] - 405:15, 423:11
**thereby** [2] - 324:4, 466:7
**therefore** [9] - 321:1, 383:20, 385:23, 411:2, 412:18, 447:18, 456:1, 465:4, 499:3
**they've** [10] - 319:10, 416:22, 420:15, 479:19, 479:25, 480:1, 481:17, 482:21, 485:5, 494:15
**thin** [1] - 464:20
**thinking** [1] - 411:11

**third** [5] - 319:1, 321:12, 331:6, 352:13, 437:14
**Third** [1] - 316:17
**thirty** [1] - 516:3
**thirty-second** [1] - 516:3
**thoughts** [1] - 451:18
**threads** [1] - 460:8
**three** [37] - 318:2, 318:22, 318:23, 319:15, 319:19, 320:2, 320:4, 321:20, 321:25, 324:1, 326:6, 328:14, 329:5, 331:14, 333:24, 336:19, 352:10, 352:11, 352:12, 362:16, 383:23, 394:17, 398:17, 399:1, 399:14, 400:4, 400:8, 402:21, 409:13, 409:15, 414:22, 424:1, 441:13, 447:25, 448:22, 507:7
**Three** [5] - 512:11, 514:15, 514:21, 516:6, 516:11
**throughout** [1] - 459:13
**thumb** [1] - 320:18, 325:7, 337:14
**tie** [1] - 354:23
**tied** [3] - 482:22, 513:7, 514:24
**tighten** [1] - 351:17
**timeline** [1] - 429:5
**timely** [3] - 321:22, 334:22, 336:13
**timing** [2] - 335:4, 452:13
**tiny** [1] - 373:1
**Tip** [1] - 471:11
**tip** [1] - 351:19
**tips** [1] - 471:16
**title** [3] - 472:16, 473:23, 474:4
**titled** [1] - 519:5
**Tod** [1] - 474:24
**today** [39] - 317:3, 317:19, 318:13, 332:22, 333:11, 349:4, 352:18, 356:22, 365:24, 367:15, 367:21, 368:7, 368:25, 417:16, 421:20, 422:1, 434:9, 436:4, 437:24, 438:8, 439:8, 443:18, 444:25, 445:5, 445:13, 454:23, 455:3, 456:17, 483:3, 483:9, 487:1, 487:5, 487:13, 487:18, 487:20, 490:10, 502:4, 512:21, 517:9
**today's** [1] - 508:20
**together** [10] - 338:2, 342:9, 401:12, 410:19, 414:12, 447:25, 450:8, 490:15, 491:14, 517:16
**tomorrow** [1] - 517:3
**took** [4] - 320:11, 357:5, 375:21, 423:18
**tool** [1] - 353:13
**tools** [2] - 324:19, 476:3
**top** [28] - 327:11, 327:22, 347:7, 355:5, 357:18, 371:7, 372:9, 372:13, 374:9, 374:19, 376:13, 382:21, 393:21, 401:12, 402:10, 404:24, 436:14, 491:24, 492:1, 492:9, 492:11, 492:13, 493:10, 495:5, 510:16, 510:23, 511:14, 513:15
**topic** [3] - 361:4, 430:4, 495:8
**Torch** [1] - 471:11
**torches** [1] - 471:15

**torque** [8] - 324:18, 328:9, 353:3, 356:25, 357:2, 357:4, 381:24, 384:8
**touch** [8] - 328:25, 353:7, 361:17, 372:13, 373:16, 374:2, 374:4, 404:20
**touched** [2] - 324:9, 369:16
**touching** [1] - 325:14
**tough** [1] - 354:15
**towards** [2] - 372:25, 463:23
**track** [2] - 328:13, 335:4
**Track** [1] - 408:8
**Trade** [1] - 316:13
**trademark** [1] - 502:23
**Trading** [7] - 499:20, 500:6, 501:17, 502:11, 505:15, 505:16, 515:7
**trained** [1] - 443:3
**transcript** [7] - 320:14, 323:9, 344:23, 383:7, 474:23, 519:4, 519:6
**TRANSCRIPT** [1] - 315:17
**transfer** [8] - 366:5, 366:7, 366:13, 366:16, 366:19, 367:6, 391:16, 392:1
**transferring** [2] - 366:22, 391:15
**transition** [1] - 408:24
**translate** [1] - 353:2
**transmit/receive** [1] - 340:23
**Transocean** [1] - 424:20
**transverse** [7] - 463:9, 463:20, 463:24, 464:16, 465:7, 465:18, 511:12
**transversely** [3] - 464:8, 464:25, 465:3
**tremendous** [1] - 333:20
**tremendously** [1] - 422:15
**trial** [3] - 442:14, 505:19, 517:23
**Trial** [1] - 505:18
**trials** [1] - 404:22
**triangular** [1] - 418:9
**triangular-shaped** [1] - 418:9
**tried** [5] - 331:8, 423:24, 432:20, 441:18, 501:11
**tries** [2] - 413:20, 495:10
**trip** [1] - 405:25
**trivial** [5] - 423:16, 493:5, 493:9, 510:23, 511:5
**trouble** [2] - 395:6, 446:16
**true** [9] - 337:23, 428:23, 445:16, 445:18, 447:22, 457:12, 474:3, 495:11, 516:10
**try** [6] - 334:18, 349:13, 384:24, 393:1, 442:12, 443:19
**trying** [8] - 328:23, 333:6, 333:14, 423:25, 436:14, 487:20, 494:10, 497:2
**TSA** [1] - 323:19
**tube** [3] - 344:10, 374:7, 374:10
**tucked** [2] - 370:18, 371:1
**tune** [4] - 327:13, 382:16
**TurboCare** [1] - 479:12
**turn** [69] - 318:4, 319:1, 321:1, 322:7, 330:15, 333:15, 334:4, 336:21, 336:22, 337:6, 343:7, 349:1, 350:8, 350:9, 350:12, 350:15, 350:18, 350:23, 350:24, 351:2, 351:7, 351:18,

351:24, 352:2, 352:9, 352:13, 352:15, 352:16, 352:20, 352:21, 352:23, 353:14, 353:21, 353:25, 354:10, 354:14, 355:11, 355:23, 356:7, 356:17, 357:1, 357:5, 359:3, 361:22, 364:16, 367:25, 374:19, 374:22, 384:23, 385:1, 390:4, 390:8, 390:10, 397:16, 414:6, 415:8, 418:7, 428:2, 432:8, 447:24, 449:9, 457:20, 463:4, 467:15, 476:8, 504:5
**turned** [12] - 350:18, 351:3, 351:4, 352:7, 354:4, 355:14, 355:17, 358:21, 387:23, 400:15, 481:5, 481:17
**turning** [10] - 350:16, 350:17, 355:5, 356:2, 358:22, 370:14, 376:5, 455:24, 469:9, 503:15
**turns** [6] - 343:23, 354:11, 355:19, 356:8, 432:6, 482:3
**Turret** [1] - 474:4
**turret** [88] - 317:23, 317:25, 318:21, 326:15, 327:9, 327:11, 327:16, 329:5, 329:18, 330:11, 330:13, 331:3, 331:10, 332:12, 332:14, 334:14, 345:15, 347:9, 357:9, 358:2, 358:9, 358:10, 359:21, 360:24, 361:25, 362:13, 370:24, 371:7, 372:5, 374:22, 384:9, 394:22, 395:1, 398:15, 400:2, 401:2, 401:5, 403:11, 406:17, 406:22, 406:25, 407:2, 409:5, 411:8, 411:11, 412:2, 413:11, 413:12, 434:13, 440:16, 447:13, 450:4, 455:7, 458:8, 458:22, 459:2, 460:1, 460:9, 460:19, 462:21, 465:12, 471:2, 472:8, 473:5, 473:7, 474:8, 474:10, 474:15, 474:18, 474:20, 475:8, 475:11, 475:12, 476:4, 476:7, 482:1, 489:10, 489:16, 493:5, 503:18, 506:14, 506:20, 515:10
**turrets** [9] - 330:18, 348:25, 364:3, 364:12, 369:9, 447:2, 477:20, 477:22, 490:18
**twist** [3] - 415:12, 417:3, 433:16
**two** [67] - 326:4, 332:24, 337:14, 337:22, 338:4, 339:1, 339:4, 339:19, 340:14, 340:17, 341:7, 341:13, 342:1, 342:8, 343:14, 343:18, 345:16, 346:23, 347:4, 347:5, 347:16, 350:22, 352:11, 352:17, 352:18, 353:5, 363:1, 364:2, 364:25, 365:7, 366:1, 369:17, 375:23, 376:1, 378:11, 379:18, 383:18, 387:12, 391:19, 391:24, 394:14, 396:15, 407:6, 407:19, 410:19, 410:21, 411:20, 419:9, 428:3, 430:9, 433:23, 434:8, 436:25, 437:13, 444:7, 447:12, 470:23, 480:13, 482:4, 488:6, 490:11, 493:24, 504:24, 507:6, 510:2, 510:3
**two-part** [1] - 379:18
**type** [10] - 332:15, 337:13, 361:22, 382:3, 386:16, 419:25, 436:24, 437:7, 443:5

**types** [8] - 362:16, 364:5, 379:15, 430:24, 431:8, 436:23, 486:11, 496:24
**typical** [2] - 441:1, 441:3

## U

**U.S** [2] - 339:14, 482:16
**ubiquitous** [1] - 342:18
**ultimately** [5] - 348:17, 350:17, 364:24, 478:19, 513:1
**unable** [12] - 348:10, 348:20, 349:6, 350:1, 350:23, 353:22, 358:20, 369:15, 384:10, 389:11, 389:23, 417:21
**unbraked** [6] - 350:7, 351:5, 352:19, 352:20, 355:8, 356:3
**unclear** [1] - 424:5
**uncovered** [1] - 334:23
**undated** [1] - 422:20
**under** [23] - 325:17, 325:20, 325:23, 326:4, 327:6, 334:15, 345:18, 364:2, 370:7, 381:14, 383:2, 400:17, 410:12, 412:15, 412:19, 414:3, 431:1, 431:11, 447:9, 451:23, 480:11, 498:14, 517:8
**underdeveloped** [1] - 390:21
**undergoes** [1] - 431:22
**underlying** [1] - 348:22
**underneath** [1] - 333:13
**understood** [10] - 344:14, 360:12, 395:7, 416:19, 417:3, 420:23, 474:19, 474:21, 494:17
**undertake** [1] - 485:4
**undeveloped** [1] - 497:6
**undisputed** [1] - 326:1
**unequivocally** [1] - 470:9
**unfair** [1] - 444:19
**unfortunately** [1] - 363:20
**unilaterally** [1] - 392:6
**unindicated** [1] - 355:6
**unintended** [3] - 328:4, 328:17, 358:13
**unique** [1] - 327:7
**uniquely** [1] - 340:7
**unit** [1] - 365:24
**unitary** [11] - 339:2, 342:13, 342:15, 342:21, 344:10, 344:16, 345:16, 379:19, 385:12, 385:13, 397:19
**United** [1] - 316:16
**UNITED** [2] - 315:1, 315:19
**units** [1] - 346:16
**universally** [3] - 478:24, 487:25
**University** [1] - 316:3
**unknown** [2] - 410:22, 423:9
**unless** [5] - 339:12, 350:14, 378:25, 386:15, 396:11
**unlike** [1] - 332:24
**unlocked** [12] - 351:20, 373:23, 380:24, 380:25, 381:4, 381:7, 386:4, 402:1, 402:4, 459:7, 492:2, 504:2
**unlocking** [2] - 326:20, 436:20
**unmodified** [1] - 322:25

**unopened** [2] - 322:23, 335:11
**unquote** [1] - 329:19
**unresolved** [1] - 488:20
**unsettling** [1] - 334:10
**untimely** [1] - 321:20
**unusual** [2] - 385:16, 443:18
**up** [64] - 318:10, 324:20, 326:9, 332:6, 333:12, 335:17, 337:2, 344:20, 346:4, 346:12, 348:16, 356:5, 365:21, 370:12, 372:16, 374:9, 379:7, 380:21, 382:7, 384:16, 384:25, 386:22, 395:12, 398:16, 401:17, 403:6, 403:8, 404:17, 409:6, 412:6, 413:20, 422:21, 426:17, 432:23, 437:19, 439:10, 440:4, 440:11, 445:22, 447:7, 448:3, 450:8, 450:19, 451:18, 457:20, 459:18, 462:19, 463:17, 465:21, 465:22, 469:16, 476:22, 482:22, 487:13, 488:2, 489:10, 490:11, 491:12, 491:13, 497:24, 511:17, 512:23, 514:9, 517:4
**upcoming** [2] - 422:7, 422:17, 435:19
**upward** [2] - 397:10, 402:5
**urged** [1] - 338:12
**USA** [3] - 315:6, 315:8, 317:6
**usage** [3] - 342:11, 383:4, 383:9
**useful** [9] - 391:18, 392:3, 427:16, 427:23, 440:11, 441:2, 441:7, 506:21, 507:17
**useless** [1] - 440:21
**user** [19] - 320:23, 320:24, 322:18, 322:20, 324:7, 325:3, 325:6, 326:6, 332:8, 348:9, 350:17, 374:8, 381:25, 468:18, 472:15, 500:8, 500:10, 500:13
**users** [5] - 324:17, 328:11, 332:11, 332:13, 335:12
**uses** [4] - 325:7, 466:24, 490:16, 496:22

## V

**vacated** [2] - 339:16, 340:24
**valid** [3] - 422:4, 427:23, 494:16
**validity** [12] - 319:5, 346:2, 346:5, 346:8, 362:6, 398:14, 429:16, 477:15, 480:22, 484:9, 494:20, 516:19
**value** [2] - 425:9, 427:23
**variations** [1] - 515:3
**varied** [1] - 352:22
**variety** [1] - 468:25
**various** [7] - 319:3, 326:14, 343:3, 402:13, 421:9, 438:14, 440:24
**VCR** [1] - 468:24
**Velcro** [26] - 410:10, 410:12, 410:22, 411:12, 412:17, 413:7, 413:11, 413:13, 414:1, 446:5, 446:18, 447:2, 448:3, 448:16, 456:22, 457:2, 458:6, 458:8, 460:21, 461:5, 481:7, 481:15, 481:16, 504:9
**version** [7] - 354:23, 365:21, 405:10, 415:11, 426:17, 463:2, 491:18

**versions** [5] - 363:1, 413:6, 422:13, 422:20, 458:20
**versus** [4] - 317:5, 347:9, 353:7, 389:11, 390:7, 390:18, 391:2, 481:2
**via** [1] - 336:8
**vibration** [1] - 432:25
**vice** [1] - 353:25
**video** [17] - 357:6, 390:9, 390:14, 466:2, 468:19, 469:21, 470:3, 470:9, 470:11, 470:16, 472:12, 490:16, 496:9, 509:11, 513:20, 513:25
**Video** [2] - 381:2, 381:9
**view** [15] - 357:21, 370:8, 371:9, 373:2, 385:7, 385:9, 401:24, 402:10, 417:11, 418:3, 481:20, 486:8, 493:4, 493:5, 508:5
**violate** [1] - 445:22
**virtually** [2] - 410:21, 411:1
**virtue** [1] - 324:6
**vision** [1] - 336:25
**visit** [1] - 517:10
**visual** [1] - 380:22
**visually** [1] - 505:4
**vitality** [1] - 473:14
**volunteered** [1] - 475:4
**vs** [1] - 315:5

## W

**WA** [1] - 316:4
**wait** [1] - 451:20
**waiting** [1] - 405:24
**waiver** [1] - 408:25
**walk** [5] - 398:22, 399:13, 400:24, 410:14, 445:22
**walked** [2] - 499:9, 499:13
**WALKER** [1] - 519:12
**Walker** [2] - 316:16, 519:11
**walks** [1] - 478:15
**Wands** [6] - 480:16, 502:19, 502:20, 502:22, 503:12, 503:13
**wants** [2] - 350:17, 444:17
**warehouse** [1] - 395:23
**warning** [1] - 472:18
**water** [3] - 344:10, 374:7, 374:9
**Watson** [2] - 471:19, 507:5
**wave** [1] - 460:6
**waving** [1] - 447:6
**ways** [6] - 326:2, 395:19, 448:22, 453:9, 486:25, 502:21
**WBIP** [1] - 510:2
**weaker** [1] - 478:6
**weapon** [1] - 495:19
**weapons** [1] - 443:5
**weatherproof** [3] - 475:13, 475:15, 509:24
**website** [1] - 358:24
**wedge** [1] - 351:13
**weed** [1] - 508:7

**weeds** [1] - 439:25
**week** [1] - 404:21
**weeks** [3] - 360:19, 406:15, 437:16
**weight** [2] - 470:6, 470:7
**welcome** [2] - 414:19, 485:6
**well-developed** [2] - 363:21, 447:22
**Western** [1] - 424:10
**whatsoever** [2] - 356:6, 433:9
**whereas** [1] - 443:6
**whereby** [1] - 469:6
**white** [2] - 422:11, 423:4
**whole** [26] - 320:17, 332:14, 345:4, 345:7, 375:11, 403:25, 411:4, 411:21, 412:14, 412:23, 412:25, 430:12, 453:25, 457:7, 467:20, 467:21, 484:23, 485:25, 489:5, 504:22, 505:11, 505:13, 509:1, 509:4
**wholly** [1] - 341:14
**WI** [1] - 316:11
**willful** [1] - 329:6
**WILLIAMS** [23] - 317:12, 398:8, 398:11, 404:24, 405:2, 409:11, 414:10, 416:6, 449:11, 449:15, 451:5, 451:10, 451:15, 457:16, 457:22, 462:24, 498:2, 501:22, 502:1, 502:14, 502:18, 514:9, 514:11
**Williams** [5] - 316:5, 317:12, 319:5, 346:2, 398:14
**willing** [1] - 485:4
**windage** [9] - 319:22, 328:17, 328:18, 401:7, 405:22, 406:3, 406:6, 475:7, 475:10
**Windauer** [166] - 318:2, 318:23, 319:15, 319:19, 320:2, 320:5, 321:3, 321:5, 321:25, 323:22, 323:24, 324:2, 324:16, 325:19, 325:25, 327:23, 328:14, 329:5, 329:13, 331:7, 333:25, 336:19, 351:11, 358:17, 359:14, 380:7, 383:23, 398:17, 399:2, 399:4, 399:16, 401:1, 401:5, 401:19, 402:17, 403:1, 403:9, 403:14, 403:17, 404:8, 404:19, 405:16, 405:20, 405:21, 406:10, 406:16, 406:23, 407:1, 408:20, 410:2, 412:1, 417:18, 418:14, 421:14, 428:21, 429:7, 430:20, 432:5, 433:8, 435:23, 436:1, 437:22, 441:1, 446:9, 446:10, 449:17, 449:25, 451:17, 451:22, 452:3, 452:15, 453:18, 454:11, 455:6, 455:14, 456:21, 456:25, 457:4, 457:24, 458:3, 458:5, 458:11, 458:21, 458:22, 459:1, 459:5, 459:11, 459:22, 459:23, 459:25, 460:10, 460:18, 460:19, 462:17, 462:24, 463:1, 463:7, 463:11, 463:13, 463:25, 464:4, 464:5, 464:7, 464:14, 464:15, 464:19, 464:20, 464:22, 464:24, 465:3, 465:23, 473:2, 477:3, 477:24, 478:4, 479:22, 479:23, 481:3, 490:2, 490:24, 491:11, 491:19, 491:21, 492:15, 492:17, 492:22,

492:23, 492:25, 493:6, 493:22, 493:23, 493:25, 494:2, 494:7, 494:10, 494:17, 495:2, 495:12, 496:17, 499:2, 499:3, 499:9, 499:11, 499:13, 500:5, 503:16, 503:25, 507:1, 509:11, 509:13, 510:14, 510:17, 511:1, 511:2, 511:5, 511:6, 511:7, 511:10, 512:19, 513:13, 516:13
**Windauer's** [11] - 403:10, 404:7, 405:10, 411:24, 440:17, 450:24, 453:10, 453:24, 464:21, 493:21, 515:9
**window** [2] - 335:6
**Wisconsin** [1] - 424:10
**wish** [1] - 462:7
**withdrawing** [1] - 412:7
**withstand** [1] - 436:23
**witness** [7] - 326:4, 326:17, 360:10, 470:8, 508:12, 508:13, 508:16
**witnessed** [1] - 425:5
**wonder** [1] - 411:12
**word** [8] - 349:12, 349:14, 365:4, 377:2, 466:24, 467:1, 475:2
**words** [8] - 330:25, 333:12, 337:25, 344:6, 380:4, 392:16, 465:14, 478:16
**wordy** [1] - 348:5
**works** [15] - 343:18, 346:5, 351:5, 351:15, 360:5, 372:23, 375:16, 390:8, 397:23, 414:8, 429:17, 435:22, 454:7, 454:11, 491:23
**World** [1] - 316:13
**world** [1] - 323:7
**worse** [1] - 482:8
**worth** [3] - 363:1, 416:4, 459:8
**worthy** [1] - 450:16
**wrap** [2] - 462:19, 491:13
**wraps** [1] - 497:24
**wrench** [8] - 324:18, 328:9, 353:3, 357:1, 357:2, 357:4, 381:24, 384:8
**write** [1] - 329:10
**writes** [1] - 405:3
**written** [36] - 409:14, 409:20, 410:6, 413:8, 413:12, 413:16, 415:2, 447:24, 448:2, 448:11, 448:19, 458:4, 458:7, 458:14, 458:15, 458:25, 461:8, 462:11, 478:8, 478:9, 478:14, 480:11, 482:7, 483:8, 483:13, 483:20, 489:21, 499:10, 499:17, 499:24, 500:12, 502:4, 502:10, 513:1, 516:15, 517:16
**wrote** [1] - 406:16

# X

**XL** [1] - 483:1
**XL-2** [2] - 466:2, 470:3
**XtremeSpeed** [3] - 328:4, 328:7, 328:19

# Y

**years** [3] - 431:25, 491:20, 496:19
**yellow** [26] - 369:19, 369:25, 370:17,

371:1, 371:19, 372:6, 372:10, 373:8, 373:11, 373:14, 377:22, 378:3, 378:7, 378:9, 378:12, 378:14, 393:2, 393:12, 393:14, 393:16, 393:18, 393:22, 394:3, 394:23, 395:2, 395:10
**yield** [1] - 346:1
**York** [1] - 334:24
**yourself** [2] - 333:22, 350:13

# Z

**zero** [9] - 328:24, 354:7, 374:25, 376:17, 419:24, 427:23, 428:7, 433:2, 433:5
**ZeroHold** [13] - 319:18, 319:21, 320:2, 328:17, 337:23, 342:24, 361:25, 362:10, 362:15, 362:17, 364:12, 366:8, 390:19
**ZeroLock** [3] - 318:5, 319:2, 343:9
**ZeroStop** [5] - 327:14, 358:6, 358:8, 382:14, 382:17
**zoom** [3] - 422:8, 423:2, 423:3