IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

LEUPOLD & STEVENS, INC.,                          No. 3:16-cv-01570-HZ

             Plaintiff,                          OPINION & ORDER

   v.

LIGHTFORCE USA, INC. d/b/a
NIGHTFORCE OPTICS and
NIGHTFORCE USA,

          Defendant.

Kassim M. Ferris
Nathan C. Brunette
Stoel Rives LLP
760 SW Ninth Ave., Suite 3000
Portland, OR 97205

1- OPINION & ORDER

Brian C. Park
Stoel Rives LLP
600 University Street, Suite 3600
Seattle, WA 98101

        Attorneys for Plaintiff

Scott E. Davis
Klarquist Sparkman, LLP
121 SW Salmon St., Suite 1600
Portland, OR 97204

David Casimir
Casimir Jones S.C.
2275 Deming Way, Suite 310
Middleton, WI 53562

        Attorneys for Defendant

HERNÁNDEZ, District Judge:

Plaintiff Leupold & Stevens, Inc. ("Leupold"), brings this action against Defendant Lightforce USA, Inc. ("Nightforce"), alleging that it infringes eight of Leupold's patents concerning optical devices such as riflescopes. Both parties submitted motions for summary judgment on all eight patents, addressing more than seventy claims and numerous defenses. In this opinion, the Court resolves only those motions related to the '907 patent. For the reasons that follow, Leupold's motion is DENIED in part and GRANTED in part. Nightforce's motion is DENIED.

## BACKGROUND

Leupold and Nightforce design, manufacture, and sell, among other things, optical scopes. Am. Compl. ¶¶ 2–4, ECF 28. Leupold alleges that Nightforce's accused products infringe the patents-in-suit involving optical device structures and functions including: locking adjustment knobs; pivoting lens units; and pivoting lens covers. *Id.* at ¶¶ 10–16. The dispute

centers generally around patents relating to locking adjustment knobs on riflescopes that can be locked after adjustment in order to prevent inadvertent adjustment through physical contact or vibration. At issue here is Count VII, United States Patent No. 6,351,907 ("the '907 patent"), entitled *Spiral Cam Mechanism for Rifle Sight Adjustment*. *See* Brunette Decl. Ex. 2, ECF 92.

## STANDARDS

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial responsibility of informing the court of the basis of its motion, and identifying those portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting former Fed. R. Civ. P. 56(c)).

Once the moving party meets its initial burden of demonstrating the absence of a genuine issue of material fact, the burden then shifts to the nonmoving party to present "specific facts" showing a "genuine issue for trial." *Fed. Trade Comm'n v. Stefanchik*, 559 F.3d 924, 927–28 (9th Cir. 2009). The nonmoving party must go beyond the pleadings and designate facts showing an issue for trial. *Bias v. Moynihan*, 508 F.3d 1212, 1218 (9th Cir. 2007).

The substantive law governing a claim determines whether a fact is material. *Suever v. Connell*, 579 F.3d 1047, 1056 (9th Cir. 2009). The court draws inferences from the facts in the light most favorable to the nonmoving party. *Earl v. Nielsen Media Research, Inc.*, 658 F.3d 1108, 1112 (9th Cir. 2011).

If the factual context makes the nonmoving party's claim as to the existence of a material issue of fact implausible, that party must come forward with more persuasive evidence to support

his claim than would otherwise be necessary. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## DISCUSSION

### I.    Person of Skill in the Art

As an initial matter, Leupold argues that Nightforce expert Allen Brandenburg is not an expert in the relevant field and therefore cannot opine as a "person of skill in the art." The Federal Circuit has explained that:

> it is an abuse of discretion to permit a witness to testify as an expert on the issues of noninfringement or invalidity unless that witness is qualified as an expert in the pertinent art. Testimony proffered by a witness lacking the relevant technical expertise fails the standard of admissibility under Fed. R. Evid. 702. Indeed, where an issue calls for consideration of evidence from the perspective of one of ordinary skill in the art, it is contradictory to Rule 702 to allow a witness to testify on the issue who is not qualified as a technical expert in that art.

*Sundance, Inc. v. DeMonte Fabricating Ltd.*, 550 F.3d 1356, 1363 (Fed. Cir. 2008). In *Sundance*, the court considered the admissibility of expert testimony by a patent attorney on noninfringement and invalidity, among other issues. The court observed that the defendant, proponent of the testimony, failed to explain how the attorney was an expert in the pertinent art of tarps or covers. *Id.* at 1362. Nor did the defendant establish that the attorney's experience was "sufficiently related" to the pertinent art. *Id.* Thus, he was unqualified to offer expert testimony on the topic of invalidity. *Id.*

*Sundance* offers two ways an expert may testify on issues of invalidity under Rule 702. First, the witness is qualified if he or she has expertise in the precise pertinent art at issue. Alternatively, the witness's testimony may still be admissible if the expertise possessed by the witness is "sufficiently related" to the pertinent art. *See Sport Dimension, Inc. v. The Coleman Co., Inc.*, No. CV1400438BROMRWX, 2015 WL 12732710, at *5 (C.D. Cal. Jan. 29, 2015)

(concluding that under *Sundance*, "an expert need not have an expertise in the specific pertinent art to be qualified as an expert [under Rule 702], but the expert must nevertheless demonstrate that his or her technical background is sufficiently related to that pertinent art"), *aff'd*, 820 F.3d 1316 (Fed. Cir. 2016).

In *Sport Dimension*, for example, the court struck an expert's testimony after finding that he was unqualified to opine as a person of skill in the art. 2015 WL 12732710, at * 7. The court noted that the expert intended to testify on the *functionality* of a patent. *Id.* at *6. The functionality of the patent was premised on two fields of relevant art. *Id.* The court found that the expert had "sufficient knowledge regarding the first of these fields—the development of buoyant devices—but not the second field—designing wearable devices." *Id.* The court then noted that "[o]rdinarily, expertise in *any* relevant field would render [the expert] qualified to testify as an expert on that matter." *Id.* (emphasis added). But in this specific case, the expert's

> ability to testify regarding the functionality of elements of a device requires him to understand the overall function of the device, and the function of a wearable buoyant device such as a personal flotation device is markedly different than the function of other buoyant devices. Indeed, [the expert]'s own testimony demonstrates that he has no better than a lay opinion as to the function of a wearable buoyant device.

*Id.* The Federal Circuit affirmed, finding that the district court did not abuse its discretion in concluding the expert could not testify when he had no experience in the field of wearable buoyancy devices and his proposed alternative designs were based solely on his imagination. *Sport Dimension, Inc. v. Coleman Co.*, 820 F.3d 1316, 1323 (Fed. Cir. 2016).

While Brandenburg is admittedly not an expert in riflescopes, his testimony may still be admissible if his knowledge and expertise are sufficiently related to the relevant field of art. Leupold argues that the relevant field is riflescopes, and Brandenburg has no expertise in any analogous field. Rather, Brandenburg's closest relevant experience is his work in endo-surgery

tools. While Nightforce does not name the relevant art, it argues that, for the purposes of the '907 patent, the "appropriate expert is one familiar with the mechanical engineering principles of applying a . . . spiral cam mechanism to small, compact adjustment components." Def. Resp. 2–3.

Brandenburg has a BES in engineering and has been licensed as professional engineer for over thirty years. Conway Decl. Ex. C, ECF 127. He has significant experience in the field of mechanical engineering and industrial design. *Id.* This experience includes designing the forearm grip of a rifle component and creating dimensional files for a handgun. Brunette Decl. Ex. 38 ("Brandenburg Dep.") 11:23–17:18. It also includes work with fixtures, automated manufacturing processes, and endoscopic surgical instruments. *Id.* at 238:23–242:1.

Here, Brandenburg opines on the infringement and invalidity of mechanical devices. Based on the parties' citations to the record, his opinion is limited to issues related to his expertise as a professional engineer and industrial designer—relevant fields given the basic mechanical nature of the device at issue. The parties have not identified testimony on issues related to, for example, the functionality of optical devices generally, lenses, or even the specialized testing the parties argue is required for the final product. Thus, given the basic mechanical principals at issue, and the scope of his testimony, Brandenburg's industrial technology and engineering education and experience is sufficiently related to the pertinent art and will be both relevant and useful to the jury. Thus, to the extent that Leupold urges the Court to strike—or at least disregard—his testimony, the Court declines to take such action.

## II.    Infringement

### A.  Standards

Patent infringement analysis involves two steps. First, the court construes the asserted patent claims. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc). Second, the factfinder determines whether the accused product or method infringes the asserted claim as construed. *Id.*

The first step, claim construction, is a matter of law "exclusively within the province of the court." *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996); *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). "It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quotation marks and citations omitted). Patent claims must precisely define the relevant invention to put both the public and competitors on notice of the claimed invention. *Id.*

To construe a patent claim, courts first look to the language of the claims in the patent itself, the description in the patent's specification, and the patent's prosecution history, all of which constitute a record "on which the public is entitled to rely." *Vitronics*, 90 F.3d at 1583; *Dow Chem. Co. v. Sumitomo Chem. Co.*, 257 F.3d 1364, 1372 (Fed. Cir. 2001). In most cases, the court should be able to resolve ambiguous claim terms by analyzing this intrinsic evidence. *See Phillips*, 415 F.3d at 1313–14. The court considers extrinsic evidence only if the intrinsic evidence is insufficient to resolve the ambiguity of a term. *Vitronics*, 90 F.3d at 1586. "The actual words of the claim are the controlling focus." *Digital Biometrics, Inc. v. Identix, Inc.*, 149 F.3d 1335, 1344 (Fed. Cir. 1998). "[T]he words of the claims are generally given their ordinary and customary meaning." *Phillips*, 415 F.3d at 1312 (quotation marks and citations

omitted). "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id.* at 1313. There is a "heavy presumption" that a claim term carries its ordinary and customary meaning, and a party seeking to convince a court that a term has some other meaning "must, at the very least," point to statements in the written description that "affect the patent's scope." *Johnson WorldwideAssocs., Inc. v. Zebco Corp.*, 175 F.3d 985, 989 (Fed. Cir. 1999) (quotation marks and citation omitted). This may be accomplished if: (1) "a different meaning [is] clearly and deliberately set forth in the intrinsic materials" of the patent; or (2) use of "the ordinary and accustomed meaning of a disputed term would deprive the claim of clarity[.]" *K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1363 (Fed. Cir. 1999) (citations omitted). In making this assessment, the court should use common sense and "the understanding of those of ordinary skill in the art" of the patent at issue, unless the patent history supplies another meaning. *Id.* at 1365.

Beyond the plain language of the claims, the patent specification is always highly relevant and often dispositive to the proper construction. *Vitronics*, 90 F.3d at 1582 (explaining that the specification is "the single best guide to the meaning of a disputed term"). The purpose of the patent specification is to teach and enable those skilled in the art to make and use the invention, along with the best method for doing so. *Cyber Acoustics, LLC v. Belkin Int'l., Inc.*, No. 3:13–cv–01144–SI, 2014 WL 1225198, at *2 (D. Or. Mar. 24, 2014) (citing *Phillips*, 415 F.3d at 1323). The inventor can use the specification to describe the invention in a number of ways, such as describing different "embodiments" of the invention and by assigning particular meanings to specific claim language. *Metabolite Lab., Inc. v. Lab. Corp. of Am. Holdings*, 370 F.3d 1354, 1360 (Fed. Cir. 2004); *Phillips*, 415 F.3d at 1316. The embodiments serve as

illustrative examples of the invention claimed. *Phillips*, 415 F.3d at 1323 ("One of the best ways to teach a person of ordinary skill in the art how to make and use the invention is to provide an example of how to practice the invention in a particular case."). The inventor can also clarify that he or she intends the claim language to carry a specific meaning different from its ordinary one. *Id.* In these cases, "the inventor's lexicography governs." *Id.* at 1316.

The second step in the infringement analysis requires the factfinder to determine whether the accused product or method infringes the asserted claim as construed. *Markman*, 52 F.3d at 976. At this step, "[p]atent infringement, whether literal or by equivalence, is an issue of fact, which the patentee must prove by a preponderance of the evidence." *Siemens Med. Sols. USA, Inc. v. Saint–Gobain Ceramics & Plastics, Inc.*, 637 F.3d 1269, 1279 (Fed. Cir. 2011).

To establish literal infringement, "every limitation set forth in a claim must be found in an accused product, exactly." *Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc.*, 699 F.3d 1340, 1356 (Fed. Cir. 2012) (internal quotation marks omitted). A dependent claim cannot be infringed if the independent claim is not infringed. *Wahpeton Canvas Co. v. Frontier, Inc.*, 870 F.2d 1546, 1552 n.9 (Fed. Cir. 1989).

### B.  Analysis

Leupold moves for summary judgment on the issue of infringement. Leupold has provided evidence, via expert Byron, that claims 1, 2, 6, 7, 10, 11, 16, 17 and 19 of the '907 patent are infringed by Nightforce's side focus parallax adjustment device ("accused device").[1] Brunette Decl. Ex. 3 ("Byron Supplemental Report") ¶¶ 472–544, ECF 83-3. In response, Nightforce argues that two limitations—the "pin" and "actuator," described in claims 1, 6, 10,

---

[11] The Court makes no finding as to which Nightforce products contain the side focus parallax adjustment device. Leupold's argument on this issue consists of a string cite to deposition testimony. With no explanation or argument, the issue is not sufficiently developed at this time.

and 16—do not, in fact, appear as claimed in the accused device. Leupold responds that Nightforce has raised only claim construction issues and that, when properly construed, Nightforce has failed to identify a question of fact as to whether the accused device includes these limitations.

### i. Pin

The Court finds that Nightforce has failed to raise a question of fact as to whether the accused device contains a "pin." The parties appear to agree that a pin is "a short, rigid, solid protruding structure." *See* Brunette Decl. Ex. 37 ("Brandenburg Rebuttal") ¶ 29, ECF 92-6; Byron Supplemental Report ¶ 474.

According to Nightforce, the accused device does not contain a "pin," but rather a "freely rotating bushing." Def. Resp. 13. Nightforce does not, however, challenge the structure at issue—that is, Nightforce does not contest that the accused device contains, at a minimum, a bushing that surrounds an elongated screw head.

"[I]t is well-established that the presence of additional structure, such as the intervening structure, in the accused device will not exclude a finding of infringement." *Bernard Dalsin Mfg. Co. v. RMR Products, Inc.*, 10 F. App'x 882, 888 (Fed. Cir. 2001); *Mannesmann Demag Corp. v. Engineered Metal Products Co., Inc.*, 793 F.2d 1279, 1282–1283 (Fed. Cir. 1986) ("The presence of additional elements is irrelevant if all the claimed elements are present in the accused structure."). In *Bernard Dalsin*, for example, the patent claimed a chimney damper that mounted to a chimney flue. 10 F. App'x at 883–84. The alleged infringer argued, in part, that the accused devices did not infringe because the damper was attached to an interior ledge, rather than the flue itself. *Id.* at 888. The court disagreed and explained that:

> [i]n both [of the accused] devices, the damper plate does not directly contact the
> top of the chimney flue when it is in its closed position. RMR asserts that because

the damper plate is not *directly* mounted to the chimney flue in either of the accused products, a finding of infringement is precluded. However, it is well established that the presence of an additional structure, such as the intervening structure, in the accused device will not exclude a finding of infringement . . . and there is no requirement in the claim here that such additional structure be absent.

*Id.* (citations omitted) (emphasis in original).

Here, the parties do not contest the existence of an interior screw. They also do not contest that this screw is a "short, rigid, solid protruding structure." The bushing is at most an intervening structure. Because there is no requirement in the claim that this additional structure be absent, a finding of infringement is not precluded. Thus, Nightforce's arguments that the accused device lacks a "pin" are without merit.

### ii. Actuator

Nightforce also argues, via expert Brandenburg, that the accused device lacks an actuator as claimed. Brandenburg Rebuttal ¶¶ 31–73. Specifically, Nightforce argues that the actuator is not positioned between the cam hub and the tubular housing of the rifle sight, as claimed by the '907 patent. *Id.* Leupold argues that this is a claim construction issue for the Court.

The Court considered the term "actuator" during claim construction. It held that the "ordinary and customary meaning of this term as a POSA would understand it controls and 'actuator' [did] not require construction from the Court." *Leupold & Stevens v. Lightforce USA, Inc.*, No. 3:16–cv–01570–HZ, 2018 WL 648362, *12 (D. Or. Jan. 31, 2018) ("Claim Construction Order"). In reaching this conclusion, the Court rejected Nightforce's proposed definition of "[a] device for actuating as embodied in the Specification (actuator 122 in Figs. 3, 4, and 5, that is slidably mountable between the housing and the cam hub, in contact with the drive face of the cam hub, and that comprises a cam follower engaged with a spiral cam track on

the cam hub)." *Id.* at *10–12. The term actuator appears in independent claims 1 and 10 of the '907 patent.

### a.  Claim 1

In relevant part, claim 1 requires:

> an actuator slidably mounted for movement along the longitudinal axis of the housing and including a cam follower operably engaged in the spiral cam track so that the actuator moves generally along the longitudinal 20 axis in response to rotation of the cam hub, the actuator operatively connected to the optical element to drive the optical element in response to rotation of the cam hub.

'907 Patent col. 7 l. 17–24.

Nightforce, via expert Brandenburg, offers a single argument here: that the actuator must be positioned between the cam hub and tubular housing of a telescopic rifle sight because the patent specification does not teach or suggest any embodiments in which the actuator is not in this position. Brandenburg Rebuttal ¶¶ 37, 44. Brandenburg then construes "the term 'actuator' . . .  as meaning a component of a focus control knob mechanism that is positioned between a cam hub and the housing of the sight, that is slidably mounted for movement along the longitudinal axis of the housing, and that includes a cam follower for operable engagement in a spiral cam track of the cam hub." Brandenburg Rebuttal ¶ 28. Thus, Brandenburg clearly applies the proposed construction rejected by the Court in its original claim construction order. *See* Claim Construction Order at *10–12. Nightforce's argument—that the accused device does not contain an actuator as construed by Brandenburg in claim 1—is therefore without merit. Claim 1 and its dependent claims are therefore infringed by the accused device.

### b.  Claim 10

In relevant part, claim 10 claims "a manually adjustable focus control device projecting outward from the exterior of the housing." '907 Patent col. 8 ll. 1–2. The manually adjustable

focus control device includes "an actuator slide." *Id.* at ll. 1–22. This actuator slide must be "slidably mounted to the housing for movement along the longitudinal axis." *Id.* at ll. 13–14.

After reviewing the parties' cursory briefing and expert reports, the Court believes that Nightforce raises three arguments against infringement: (1) the accused device does not contain an "actuator slide" as the term is construed by Brandenburg (i.e., located between the cam hub and housing); (2) the accused device does not contain an actuator slide located entirely outside the housing; and (3) the accused device does not contain an actuator slide that is "slidably mounted to the housing."

Nightforce's first argument again relies on Brandenburg's erroneous construction of the term "actuator" (or here, "actuator slide"). As discussed above, this argument is without merit.

Nightforce also argues that claim 10 requires the actuator slide to *project outward* from *the exterior* of the housing—i.e., the actuator slide must be located entirely outside of the housing. Def. Resp. 13. Leupold argues that nothing in the claim requires the actuator be "entirely, mostly, or even partially" outside the housing. Pl. Reply 3. This is a claim construction issue for the Court. *See Lighting Ballast Control LLC v. Philips Electronics North America Corp.*, 744 F.3d 1272, 1284–85 (Fed. Cir. 2014) (en banc) ("At the threshold, the court establishes the metes and bounds of the claims that define the patent right. The questions of claim construction are not questions of weight of evidence or credibility of witnesses, but of the claim scope as set forth in the patent documents."); *Pall Corp. v. Hemasure Inc.*, 181 F.3d 1305, 1308 (Fed. Cir. 1999) ("Analysis of patent infringement starts with 'construction' of the claim, where by the court establishes the scope and limits of the claim, interprets any technical or other terms whose meaning is at issue, and thereby defines the claim with greater precision than had the patentee."). While a court must establish the "the metes and bounds of the claims," the

arguments before this Court are insufficiently developed at this time. Neither party has provided

any support for its respective position. Thus, the Court will not resolve the dispute without

further argument.

Finally, Nightforce argues the accused device does not contain an actuator "mounted" to

the housing. Brandenburg Rebuttal ¶ 63. In response, Leupold argues that nothing in the claim

requires that the actuator slide be *directly* mounted to the housing. Pl. Reply 3 n.4. As discussed

above, intervening structures will not exclude a finding of infringement when there is no

requirement in the claim that such a structure be absent. *See Bernard Dalsin Manufacturing Co.

v. RMR Products, Inc.*, 10 F. App'x 882, 888 (Fed. Cir. 2001) ("[I]t is well-established that the

presence of additional structure, such as the intervening structure, in the accused device will not

exclude a finding of infringement.").

Here, however, Nightforce has not simply identified an intervening structure. Rather,

Brandenburg opines that there is no "actuator or actuator slide that is 'mounted' to the housing."

Brandenburg Rebuttal ¶ 63. He does not state whether "mounted" means directly or indirectly

mounted. While Leupold's expert presumably disagrees,[2] neither party has directed the Court to

any evidence that might resolve this factual issue. Thus, there is a question of fact as to whether

the actuator slide is mounted—either directly or indirectly—to the housing in the first instance.

Summary judgment on whether the accused device infringes claim 10 is therefore denied.

---

[2] While Leupold argues that "the undisputed evidence establishes that the actuator is indirectly
mounted to the housing," it has not provided a citation for this proposition. Pl. Reply 3 n.4.  The
Court will not review the record without direction to determine whether the argument is
supported. *See Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001) (a district
court is not required to comb the record to find some reason to deny a motion for summary
judgment); Local Rule 56–1(a) ("A party's factual positions must be supported by citations, by
page and line as appropriate, to the particular parts of materials in the record").

### III.    Invalidity

A patent issued by the Patent Trademark Office (PTO) is presumed valid. *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 95 (2011); 35 U.S.C. § 282 (2000). "To overcome this presumption of validity, the party challenging a patent must prove facts supporting a determination of invalidity by clear and convincing evidence." *Id.*; *Schumer v. Laboratory Computer Systems, Inc.,* 308 F.3d 1304, 1315 (Fed. Cir. 2002).

### A.    Anticipation

"A patent is invalid for anticipation if a single prior art reference discloses each and every limitation of the claimed invention." *Schering Corp. v. Geneva Pharm.*, 339 F.3d 1373, 1377 (Fed. Cir. 2003). "Anticipation is a question of fact." *Atlas Powder Co. v. Ireco, Inc.*, 190 F.3d 1342, 1346 (Fed. Cir. 1999). "Typically, testimony concerning anticipation must be testimony from one skilled in the art and must identify each claim element, state the witnesses' interpretation of the claim element, and explain in detail how each claim element is disclosed in the prior art reference. The testimony is insufficient if it is merely conclusory." *Schumer*, 308 F.3d at 1315–16.

### i.    German Publication

Both parties move for summary judgment on the issue of whether the Schmidt & Bender German Utility Model patent DE 297 20 737 ("German Publication") anticipates the '907 patent as prior art. Nightforce, via expert Brandenburg, argues that the German Publication is prior art that discloses each limitation in the '907 patent. Def. Mot. 5; Conway Decl. Ex. 6 ¶ 52, ECF 105. Leupold does not identify any missing limitations in the German Publication. Rather, Leupold argues that the German Publication is not prior art under 35 U.S.C. § 102(a) (pre-AIA) because

the '907 device was invented no later than 1996—more than one year before the German Publication was published.[3]

Under 35 U.S.C. § 102(a) (pre-AIA), a person is not entitled to a patent when "the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent." Here, the German Publication was filed on November 22, 1997, registered on February 12, 1998, and published on March 28, 1998. Conway Decl. Ex. 6 ¶ 52.

Once there is evidence of a putative prior art reference, the opposing party may attempt to establish an invention date that antedates the prior art reference. "To antedate (or establish priority) of an invention, a party must show either an earlier reduction to practice, or an earlier conception followed by a diligent reduction to practice." *Purdue Pharma L.P. v. Boehringer Ingelheim GMBH*, 237 F.3d 1359, 1365 (Fed. Cir. 2001). Conception and reduction to practice are questions of law, based on subsidiary findings of fact. *Hybritech Inc. v. Monoclonal Antibodies*, *Inc.*, 802 F.2d 1367, 1376 (Fed. Cir. 1986). For the purposes of this motion, Nightforce does not challenge Leupold's proof of conception. Rather, Nightforce argues that Leupold cannot prove reduction to practice.

"Reduction to practice follows conception." *Mahurkar v. CR Bard, Inc.*, 79 F.3d 1572, 1579 (Fed. Cir. 1996). "To establish an actual reduction to practice," Leupold "must establish three things: (1) construction of an embodiment or performance that met all the limitations of the interference count; (2) determination that the invention would work for its intended purpose, and (3) the existence of sufficient evidence to corroborate inventor testimony regarding these

---

[3] Leupold also argues that the German Publication is not prior art under 35 U.S.C. § 102(b) (pre-AIA). This argument is addressed later in the opinion.

events." *Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1169 (Fed. Cir. 2006) (alterations and quotation marks omitted) (quoting *Cooper v. Goldfarb*, 154 F.3d 1321, 1327 (9th Cir. 1998)).

Whether sufficient evidence corroborates an inventor's testimony is a question of fact. *Id.* at 1171. "Sufficiency of corroboration is determined by using a 'rule of reason' analysis, under which all pertinent evidence is examined when determining the credibility of an inventor's testimony." *Id.* at 1170. "Independent corroboration may consist of testimony of a witness, other than the inventor, to the actual reduction to practice or it may consist of evidence of surrounding facts and circumstances independent of information received from the inventor." *Id.* (quoting *Reese v. Hurst*, 661 F.2d 1222, 1225 (C.C.P.A. 1981).

"Although each case must be decided in view of its own facts, the determination is not utterly unstructured." *Sandt Tech Ltd. v. Resco*, 264 F.3d 1344, 1350 (Fed. Cir. 2001). "Documentary or physical evidence that is made contemporaneously with the inventive process provides the most reliable proof that the inventor's testimony has been corroborated." *Id.* at 1350–51. "Circumstantial evidence about the inventive process, alone, may also corroborate." *Id.* at 1351 (citing *Knorr v. Pearson*, 671 F.2d 1368, 1373 (C.C.P.A. 1982) ("[S]ufficient circumstantial evidence of an independent nature can satisfy the corroboration rule.")). "Additionally, oral testimony of someone other than the alleged inventor may corroborate an inventor's testimony." *Id.*

As noted above, Nightforce does not contest conception for the purposes of this motion. Instead, Nightforce argues that Leupold cannot show the invention was reduced to practice during the relevant time period. Specifically, it argues that Leupold cannot corroborate the inventor's testimony that he (1) constructed an embodiment that met all the limitations of the interference count or (2) determined that the invention would work for its intended purpose.

Leupold argues that Mr. Otteman—the inventor—conceived of the device around 1995 or 1996 and reduced it to practice soon thereafter. Leupold relies on (1) the declaration and testimony of Mr. Otteman;[4] (2) contemporaneously dated electronic drawings ("CAD drawings"); (3) the testimony of third-party Ric Landvatter, who produced key prototype parts; and (4) financial records showing payments to Mr. Landvatter during the relevant time period.

This evidence raises a question of fact sufficient to survive summary judgment on the issue of whether Mr. Otteman constructed an embodiment of the invention. Mr. Otteman testified that he conceived of and invented the device at issue around 1995 or 1996. Otteman Decl., ECF 84; Brunette Decl. Ex. 12 ("Otteman Dep."). He specifically testified that he constructed an embodiment in the same time period. Otteman Dep. 35–36. The CAD drawings reflect a level of detail and specificity relevant to this construction. *See* Otteman Decl. Ex. B, C. Mr. Landvatter also testified that he produced parts of the '907 device during the relevant period. Brunette Decl. Ex. 14 at 6–49. Financial records show that Mr. Landvatter's company "Ideality" billed Leupold during this period as well. *See* Dugan Decl. Ex. 1, 2, 3, ECF 87. While Nightforce identifies a number of issues with this corroborating evidence—including the fact that the financial records do not reference any projects or parts, *see id.*, and Mr. Landvatter also testified it was possible the invoices could be related to another project, *see* Decl. Ex. 1 at 139:8-23—the weight of this

---

[4] Nightforce challenges Mr. Otteman's declaration as both a "sham" and inadmissible hearsay. The Court does not agree. First, even if the court found "clear and unambiguous inconsistencies" between the deposition testimony and the declaration, *see Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 998–99 (9th Cir. 2009), the declaration here was produced *before* Mr. Otteman was deposed, *see Yeager v. Bowlin*, 693 F.3d 1076 (9th Cir. 2012) ("The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting his *prior* deposition testimony." (emphasis added)). Second, while Nightforce challenges Mr. Otteman's declaration as inadmissible hearsay because it is a "prior inconsistent statement," Nightforce has identified no statements that would be inadmissible at trial. Under Fed. R. Civ. P. 56(c)(4), an affidavit or declaration may be used to support or oppose a motion, but must "set out facts that would be admissible in evidence."

testimony should be determined by the trier of fact. In the light most favorable to the non-moving party, and under a "rule of reason" analysis, this circumstantial evidence supports and corroborates the inference that the embodiment was constructed during the period at issue—at least to the extent that summary judgment is not appropriate.

Nightforce also argues that Leupold failed to show the inventor determined that the physical embodiment worked for its intended purpose. In other words, Nightforce argues there is no corroborating evidence that the invention was tested during the relevant time period. In response, Leupold argues, first, that testing was corroborated, and second, in the alternative, that no testing was needed.

The Court agrees with Nightforce that Leupold has failed to identify evidence to corroborate the inventor's testimony that the device was *actually* tested. The CAD files and financial records at most reflect construction; they are silent as to testing. Mr. Landvatter's testimony is similarly flawed. Mr. Landvatter testified that the inventor told him the part he constructed "worked sufficiently,"[5] that "the reason [he] would have gone [to Leupold's office was] to make sure the part was working correctly," and that the inventor "would have tested [the device] right when [he] was there." Brunette Decl. Ex. 65 at 69:8–10, 76:2–17.  This testimony is either hypothetical and speculative, or based entirely on the inventor's own statements—thus failing to satisfy the "requirement of independent knowledge." *See Medichem, S.A. v. Rolabo,*

---

[5] Nightforce argues this statement is inadmissible hearsay. The Court does not agree. Under Fed. R. Evid. 801(d)(B), a prior consistent statement is not hearsay when "the declarant testifies and is subject to cross-examination about a prior statement, and the statement[] is consistent with the declarant's testimony and is offered[] to rebut an express or implied charge that the declarant recently fabricated it or acted from a recent improper influence or motive in so testifying." Here, Mr. Otteman has been deposed and is under subpoena, and his credibility is necessarily challenged through the "prior invention" analysis.

*S.L.*, 437 F.3d 1157, 1170 (Fed. Cir. 2006) (citing *Reese v. Hurst*, 661 F.2d 1222, 1225 (C.C.P.A. 1981) ("[A]doption of the 'rule of reason' has not altered the requirement that evidence of corroboration must not depend solely on the inventor himself.")).[6]

However, the Court finds that Leupold has raised a question of fact as to whether testing was required in the first place. "[T]esting is relevant in that it is evidence of whether the inventor would have known that an invention is suitable for its intended purpose." *Eastern Rotorcraft Corp. v. United States*, 384 F.2d 429, 431 (Ct. Cl. 1967). Testing is not, however, required in all circumstances:

> Depending on the character of the invention and the problem it solves, [] showing [the invention worked for its intended purpose] may require test results. Less complicated inventions and problems do not demand stringent testing. In fact, some inventions are so simple and their purpose and efficacy so obvious that their complete construction is sufficient to demonstrate workability.

*Mahurkar*, 79 F.3d at 1578 (citations omitted); *accord Cooper*, 154 F.3d at 1328. Thus, "in some cases, where the invention is particularly complicated, the absence of testing may be sufficient in and of itself to justify a grant of summary judgment denying priority for lack of reduction to practice. However, in a case where the necessity of such testing is more uncertain, . . . [and] there is other uncontroverted evidence that the inventor would have known that the invention would work for its intended purpose, it is inappropriate to grant summary judgment on the basis of lack

---

[6] Leupold cites *Cooper* to support its position that testimony from a third-party about an inventor's statements at the time of invention provides sufficient independent corroboration. *See Cooper*, 154 F.3d at 1330. In *Cooper*, however, the court relied on testimony from third parties that "(1) [the inventor] was examining fibril length when he performed the implants; (2) after the successful implants [the inventor] stated that fibril lengths within the count were required; and (3) [the inventor] asked for new tubing having fibril lengths within the count." *Id.* This is more than a third-party account of a conclusory statement of success at the time of invention; it is broad circumstantial evidence that the inventor recognized that he had produced a "successful embodiment of the invention."

of testing alone." *Slip Track Systems, Inc. v. Metal-Lite, Inc.*, 304 F.3d 1256, 1267 (Fed. Cir. 2002).

Where testing is necessary, "the testing should demonstrate 'the soundness of the principles of operation of the invention.' The inventor need show only that the invention is 'suitable' for its intended use." *Scott v. Finney*, 34 F.3d 1058, 1062–63 (Fed. Cir. 1994). "It is not necessary for testing to have proceeded to the point where the device is ready for commercialization in order to have an actual reduction to practice." *Koval v. Bodenschatz*, 463 F.2d 442, 447 (C.C.P.A. 1972); *accord Scott*, 34 F.3d at 1061 ("Reduction to practice does not require that the invention, when tested, be in a commercially satisfactory stage of development."). Accordingly, "[t]esting need not show utility beyond a possibility of failure," but it must show "utility beyond a probability of failure." *Scott*, 34 F.3d at 1061 ("Reduction to practice . . . does not require actual use, but only a reasonable showing that the invention will work to overcome the problem it addresses.").

Here, Leupold argues that "cams are well known and predictable engineering structures." Pl. Resp. 5. Leupold's expert opines that:

> The mechanical operation of the device is straightforward and predictable, once Mr. Otteman had the key idea to create the spiral cam focus mechanism and how to implement it. No further or more technical testing of the prototype was or would have been necessary for a person skilled in the art to confirm that the spiral cam focus mechanism claimed in the '907 patent would work for its intended purpose.

Byron Decl. ¶¶ 25–27, ECF 129. Thus, Leupold has submitted evidence that a POSA—here, the inventor—would have known the invention would work for its intended purpose without stringent testing. In other words, the construction itself was sufficient to demonstrate workability. Given the mechanical nature of the invention—and again, the lack of argument

regarding optics or lenses—the Court finds that, at most, the necessity of testing is uncertain. Thus, summary judgment based on this lack of testing evidence alone is inappropriate.

Nightforce's remaining arguments to the contrary are unavailing. Nightforce challenges Byron's testimony as a "sham," arguing that it directly contradicts his earlier declaration and the inventor's own testimony. "The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony." *Yeager v. Bowlin*, 693 F.3d 1076, 1080 (9th Cir. 2012) (quoting *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 998 (9th Cir. 2009)). Before striking a declaration as a sham, the court is required to make specific factual determinations that (1) "the contradiction [is] actually a 'sham'" and (2) the "inconsistency between a party's deposition testimony and subsequent affidavit [is] clear and unambiguous." *Van Asdale*, 577 F.3d at 998–99.

The inconsistencies here are not "clear and unambiguous." Byron opines that (1) it was not necessary for a POSA to test the device to determine whether it would work for its intended purpose, and (2) "severe testing" was "always needed" for riflescopes. However, the Court agrees with Leupold that this testimony could be read as describing two different—and non-conflicting—stages of testing. In other words, although testing might not be necessary to determine whether the invention worked for its intended purpose, additional testing would always be necessary to determine whether the product was ready for commercial production. *See Koval*, 463 F.2d at 447 ("It is not necessary for testing to have proceeded to the point where the device is ready for commercialization in order to have an actual reduction to practice."); *Scott*, 34 F.3d at 1061 ("Reduction to practice does not require that the invention, when tested, be in a

commercially satisfactory stage of development.").[7] Thus, the Court denies both parties' motions for summary judgment on the issue of whether the German Publication anticipates the '907 patent.

### ii. Schmidt & Bender Riflescope

Leupold also moves for summary judgment on the issue of whether Schmidt and Bender (S&B) riflescopes anticipate the '907 patent. 35 U.S.C. § 102(b) (pre-AIA) provides, in relevant part, that "[a] person shall be entitled to a patent unless . . . the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States." The question is therefore whether the S&B riflescopes were either in public use or on sale in this country before January 29, 1998 (one year before the provisional application was filed).[8]

Nightforce relies on the following evidence: (1) emails from S&B to Leupold confirming the relevant scopes were shipped to the United States in December 1997; (2) S&B marketing materials published before January 1998; and (3) a teardown of the S&B riflescopes by Nightforce employee Mr. Stockdill.

As a preliminary matter, Leupold objects to the emails from S&B as inadmissible hearsay. Nightforce asked Leupold's 30(b)(6) witness, Howard Werth, whether Leupold had any

---

[7] For the same reasons, Mr. Otteman's testimony that "eventually we would impact test it and cycle focus, cycle the mechanism to see that if it would hold up over time and usage;" and that "it would have been common practice to test for movement based on rifle recoil," Pliklaan Decl. Ex. 1 at 36:12–19; 127:18–20; 143:10–16, does not overcome the question of fact raised by Byron.

[8] For the purposes of this issue, the Court assumes, without deciding, that the '907 patent is entitled to filing date of the '836 Provisional. Additionally, because there is a question of fact as to whether Leupold invented the device in 1995 or 1996, the Court will not address Leupold's arguments on that issue at this time.

reason to doubt the truth of the statement that S&B shipped the scopes at issue to the United

States in 1997. Conway Decl. Ex. M at 150. Werth eventually agreed that "the presumption was"

that the 1997 date of shipment was correctly documented in the emails. *Id.* at 152. The Court

finds this to be an admission. Although the exact meaning of this admission is ambiguous, in the

light most favorable to the non-moving party, it is an admission that S&B did, in fact, ship the

relevant scopes to the United States in December 1997.

This admission supports Nightforce's position that there is a question of fact as to

whether the relevant S&B scopes were on sale or in public use before January 29, 1998.

Nightforce also relies on S&B marketing materials—specifically, magazine advertisements—

that were published in 1997. These materials include a picture of the relevant riflescope and a

description of the "parallax adjustment" mechanism. Conway Decl. Ex. N at 3. Additionally, a

Nightforce employee testified that he completed a "tear down" of the S&B riflescope in 1997.

This teardown, documented by contemporaneously-taken photographs, confirmed that the

riflescope contained the relevant parallax design. Conway Decl. Ex. BB. While Leupold now

argues that Mr. Stockdill has no independent recollection of when this teardown occurred, and

relies on allegedly faulty metadata from these photographs, this remains a question of fact.[9]

Additionally, even without the metadata and testimony, the pictures, when combined with the

marketing materials, confirm that the marketed riflescopes contained the device at issue. Thus,

the Court finds that, in the light most favorable to the non-moving party, there is a question of

---

[9] Leupold argues that this metadata is false in its response to Nightforce's arguments on estoppel. These arguments are insufficiently developed: while Leupold cites Brunette Decl. ¶12, Ex. 75 which purports to show that "E Mavica MVC-FD cameras that could have taken the photographs in the format they were recorded were not even available for sale until several months after March 1997," exhibit 75 without further explanation, does not support this argument.

fact as to whether the S&B riflescopes were on sale or in public use in the United States before

January 29, 1998.

### iii. Altenheiner Patent

Leupold moves for summary judgment on the Altenheiner Patent, arguing that it does not

anticipate the '907 patent. Specifically, Leupold argues that the Altenheiner patent describes

*binoculars* with a spiral cam adjustment mechanism and does not claim a "telescopic rifle sight,"

a limiting element claimed by the '907 patent. Nightforce responds that "telescopic rifle sight" is

not a limiting element, but intended use language that appears only in the claims' preamble.

"A patent claim typically has three parts: 1) the preamble; 2) the transition; and 3) the

body." *E.I. DuPont De Nemours v. Monsanto Co.*, 903 F.Supp. 680, 693 (D. Del. 1995) (citing 2

Donald S. Chisum, Patents § 806 [1][b] (1994)).

> The preamble is an introductory phrase that may summarize the invention, its relation to
> the prior art, or its intended use or properties. It may also constitute a limitation on a
> claim. . . . The transition is a phrase containing a term such as 'comprising' that serves to
> connect the preamble to the body of the claim. . . . The third part of a patent claim, the
> body, is composed of the recitation of the elements and limitations that 'define the
> product or process to be encompassed within the patent monopoly.

*Id.* (internal quotation marks omitted).

"In general, a preamble limits the invention if it recites essential structure or steps, or if it

is 'necessary to give life, meaning, and vitality' to the claim." *Catalina Mktg. Int'l, Inc. v.

Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002) (quoting *Pitney Bowes, Inc. v.

Hewlett-Packard Co.*, 182 F.3d 1298, 1305 (Fed. Cir. 1999)). "Conversely, a preamble is not

limiting 'where a patentee defines a structurally complete invention in the claim body and uses

the preamble only to state a purpose or intended use for the invention.'" *Id.* (quoting *Rowe v.

Dror*, 112 F.3d 473, 478 (Fed. Cir. 1997)). "If the preamble adds no limitations to those in the

body of the claim, the preamble is not itself a claim limitation and is irrelevant to proper

construction of the claim*." IMS Tech., Inc. v. Haas Automation, Inc.*, 206 F.3d 1422, 1434 (Fed. Cir. 2000) (citing *Pitney Bowes*, 182 F.3d at 1305). "[D]ependence on a particular disputed preamble phrase for antecedent basis may limit claim scope because it indicates a reliance on both the preamble and claim body to define the claimed invention. . . . Likewise, when the preamble is essential to understand limitations or terms in the claim body, the preamble limits claim scope." *Catalina Mktg*., 289 F.3d at 808 (citations omitted).

The Court agrees with Leupold that "telescopic rifle sight" recites a limiting element of the claims and is not intended use language. The term "rifle sight" is found in the patent's title, in the preambles of claims 1 and 10, several times in the body of claim 10, in dependent claims 11 through 20, and throughout the specification. For example, claim 10 recites in relevant part:

> A telescopic rifle sight having an adjustable focus setting and an adjustable aiming offset, the telescopic rifle sight including a tubular housing having a longitudinal axis, an interior and exterior, and first and second ends, and an elongate erector assembly pivotally mounted within the interior of the housing generally along the longitudinal axis and medially of the first and second ends, the erector assembly including a distal end, the telescopic rifle sight comprising:
>
> (a) an adjustable aiming control device in operative association with the erector assembly for pivotally moving the erector assembly so that the distal end moves within the housing transversely of the longitudinal axis to thereby adjust the aiming offset of the telescopic rifle sight[.]

'907 Patent col. 7 ll. 50–64. It is a phrase from which other claims derive an antecedent basis and is necessary to give meaning to claims 1 and 10 and their dependent claims. Thus the term is a limiting element of the claims at issue.

A patent will only be found invalid if the prior art reference "expressly or inherently contains each and every limitation of the claimed subject matter." *Schering Corp. v. Geneva Pharms.*, 339 F.3d 1373, 1379 (Fed. Cir. 2003); *Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1371 (Fed. Cir. 2008) ("[T]o demonstrate anticipation, the proponent must show "that the

four corners of a single, prior art document describe every element of the claimed invention."). Nightforce does not argue that the Altenheiner patent "expressly or inherently" contains the limitation at issue. Rather, Nightforce argues that "binoculars find use as rifle sights." Def. Resp. 15. However, the four corners of the Altenhiener patent do not *disclose* a telescopic rifle sight. The Altenheiner patent does not, therefore, anticipate the '907 patent.

### B. Obviousness

A claimed invention is obvious if "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art." 35 U.S.C. § 103(a) (pre-AIA). "To qualify as prior art for an obviousness analysis, a reference must qualify as 'analogous art,' i.e., it must satisfy one of the following conditions: (1) the reference must be from the same field of endeavor; or (2) the reference must be reasonably pertinent to the particular problem with which the inventor is involved." *K-TEC, Inc. v. Vita-Mix Corp.*, 696 F.3d 1364, 1375 (Fed. Cir. 2012) (citing *Innovention Toys, LLC v. MGA Entm't, Inc.*, 637 F.3d 1314, 1321 (Fed. Cir. 2011)). "A reference is reasonably pertinent if, as a result of its subject matter, it 'logically would have commended itself to an inventor's attention in considering his problem.'" *Id*.

While the obviousness inquiry is a legal determination, it is based on underlying factual determinations. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 427 (2007). "The factual determinations underpinning the legal conclusion of obviousness include 1) the scope and content of the prior art, 2) the level of ordinary skill in the art, 3) the differences between the claimed invention and the prior art, and 4) evidence of secondary factors." *Eisai Co. Ltd. v. Dr. Reddy's Lab., Ltd*., 533 F.3d 1353, 1356 (Fed. Cir. 2008) (citing *Graham v. John Deere Co.*, 383

U.S. 1, 17–18 (1966)). Secondary factors include "commercial success, long felt but unsolved needs, failure of others, etc." *KSR Int'l Co*, 550 U.S. at 406 (quoting *Graham*, 353 U.S. at 17–18). Summary judgment may therefore be appropriate if "the content of the prior art, the scope of the patent claim, and the level of ordinary skill in the art are not in material dispute, and the obviousness of the claim is apparent[.]" *Id.* at 427.

A patent "is likely to be obvious when it does no more than yield predictable results" by combining familiar elements according to known methods. *Id.* at 416. "[A] patent composed of several elements is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art." *Id.* at 418. "If a person of ordinary skill in the art can implement a predictable variation, § 103 likely bars its patentability." *Id.* at 417. In determining obviousness, courts do not need to find "precise teachings directed to the specific subject matter of the challenged claim, for a court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ." *Id.* at 418. A person of ordinary skill interprets the prior art "using common sense and appropriate perspective." *Unigene Labs., Inc. v. Apotex, Inc.*, 655 F.3d 1352, 1361 (Fed. Cir. 2011) (citing *KSR Int'l Co.*, 550 U.S. at 421). As the Supreme Court observed:

> When there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, a person of ordinary skill has good reason to pursue the known options within his or her technical grasp. If this leads to the anticipated success, it is likely the product not of innovation but of ordinary skill and common sense.

*KSR Int'l Co.*, 550 U.S. at 421. The results of ordinary innovation are not patentable. *Id.* at 427. Furthermore, "when a patent 'simply arranges old elements with each performing the same function it had been known to perform' and yields no more than one would expect from such an arrangement, the combination is obvious." *Id.* at 417 (quoting *Sakraida v. AG Pro, Inc.*, 425 U.S.

273 (1976)). But "a patent composed of several elements is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art." *Id.* at 418.

Considerations of teaching, suggestion, or motivation to combine elements from different prior art references are not rigid requirements to prove obviousness. *Id.* at 419. "But it is not enough to simply show that the references disclose the claim limitations; in addition 'it can be important to identify a reason that would have prompted a person of ordinary skill in the art to combine the elements as the new invention does.'" *Transocean Offshore Deepwater Drilling, Inc. v. Maersk Contractors USA, Inc.*, 617 F.3d 1296, 1303 (Fed. Cir. 2010) (quoting *KSR Int'l Co.*, 550 U.S. at 401). Moreover, "[e]ven when all claim limitations are found in prior art references, the fact-finder must determine what the prior art teaches, whether the prior art teaches away from the claimed invention, and whether there was motivation to combine teachings from separate references." *Cheese Sys. Inc. v. Tetra Pak Cheese and Powder Sys. Inc.,* 725 F.3d 1341, 1352 (Fed. Cir. 2013). "The presence or absence of a motivation to combine references in an obviousness determination is a pure question of fact." *PAR Pharm., Inc. v. TWI Pharm., Inc.*, 773 F.3d 1186, 1196 (Fed. Cir. 2014).

Secondary considerations of non-obviousness may overcome a prima facie case of obviousness established by the first three *Graham* factors. *Transocean Offshore Deepwater Drilling*, 617 F.3d at 1305. This "objective evidence operates as a beneficial check on hindsight." *Cheese Sys.*, 725 F.3d at 1352.

Leupold moves for summary judgment on the issue of whether the '907 patent claims are obvious. Leupold first argues that Nightforce cannot prove obviousness because it has failed to provide evidence of a motivation or rationale to combine references. Leupold also argues that the Altenheiner patent cannot be used to show obviousness because it discloses binoculars, rather

than a riflescope. According to Leupold, binoculars and riflescopes are nonanalogous fields, and no person skilled in riflescope design would look to binoculars to create a riflescope adjustment mechanism. Pl. Reply 7–8.[10] The Court does not agree.

While Nightforce does not identify expert testimony regarding motivation, this evidence is not a "rigid requirement," and the remaining evidence raises a question of fact sufficient to survive summary judgment. As discussed above, Leupold identified a single missing limitation in its motion for summary judgment on anticipation: the "telescopic rifle sight." Yet according to Nightforce, binoculars can be used as telescopic rifle sights without modification. Nightforce also relies on the opinion of expert Brandenburg. Brandenburg opines that the Altenheiner patent renders the '907 patent obvious. Brunette Decl. Ex. 35 ("Brandenburg Report"). Additionally, Mr. Otteman, the inventor of the '907 patent, agreed that "it was common to look at features from one optical product, like a binocular, and use that information to help design another optical product, like a riflescope." Conway Decl. Ex. K at 56:3–8; *see also Byrne v. Wood, Herron & Evans, LLP*, 450 F. App'x 956 (Fed. Cir. 2011) ("As a general rule, an inventor will be a person of at least ordinary skill in the relevant art, and in many cases the inventor will be one of extraordinary skill in the field of invention."); *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc) (referring to the "well-settled understanding that inventors are typically persons skilled in the field of the invention"). The alleged inventors worked with engineers who designed both binoculars and riflescopes. Conway Decl. Ex. H at 12:2-8. And finally, other patents in this same litigation equate the field of binoculars and riflescopes. *See, e.g.*, U.S. Patent

---

[10] Leupold also argues the German Publication cannot be used to show obviousness. As this argument is premised entirely on Leupold's earlier argument that the German Publication is not prior art because it does not pre-date the alleged 1995-96 date of invention, the Court will not address it again here.

No. 7,721,480 B2 col. 1l. 13-15 ("The technical field relates to optical devices, such as riflescopes, telescopes and binoculars, for example; and in particular, to pivoting lens covers for such devices."), ECF 1-6. In sum, there is a question of fact as to whether binoculars are an analogous field and whether a person skilled in riflescope design would look to binoculars to create a riflescope adjustment mechanism.

### C. Certificate of Correction

Leupold filed the '907 patent application on January 31, 2000. This application did not include a claim to the benefit of '836 Provisional. In 2003, Leupold filed a request for a certificate of correction, which added a reference to the '836 Provisional on the title page. Conway Decl. Ex. 11. However, the "specific reference" to the correction was required to appear in the first sentence of the specification. *See* 37 C.F.R. § 1.78 (1999). In 2016, Leupold filed suit in this case, but did not allege infringement of the '907 patent. ECF 1. In 2017, Leupold added the '907 patent to this case after obtaining a new certificate of correction that added the specific reference to the provisional application to the first sentence of the specification. ECF 29; Conway Decl. Ex. 11.

Nightforce now argues that even if the '907 patent is otherwise found valid, enforceable, and infringed, it is still not liable for any infringement until February 2017—the date the last certificate of correction was issued. The Court does not agree. As explained in *Carotek v. Kobayaski*,

> [t]he purpose of the "specific reference" requirement is clearly to ensure that someone examining a patent claiming the benefit of one earlier filed is readily able to assess the patent's priority date.

875 F.Supp.2d 313, 335 (S.D.N.Y. 2012). There, under similar circumstances, the court held that a patent claimed priority to the provisional application, even though the certificate of correction

referenced the claimed priority date on the title page, rather than in the first sentence of the specification. *Id.* The court found that "the notice function [was] served as well as, if not better than, if the reference had been placed in the specification." *Id.* It also noted that "[t]he Federal Circuit has . . . suggested that some lenity in this arena may be appropriate when a failure is only technical in nature and the public has received sufficient notice of a patent claim." *Id.* (citing *Superior Fireplace Co. v. Majestic Prods. Co.*, 270 F.3d 1358, 1371–72 (Fed. Cir. 2001)).

Here, like in *Carotek*, the parties agree that the certificate of correction added a reference to the '836 Provision on the title page, rather than in the first sentence of the specification. Thus, the "notice function [was] served as well as, if not better than, if the reference had been placed in the specification." *Carotek*, 875 F.Supp.2d at 335. The key is notice, and here, that requirement was satisfied.

Nightforce's remaining arguments—raised for the first time in its reply—are also unavailing. In 2003, Leupold filed its request for a certificate of correction based on the missing priority claim, which it asserted was due to "an error on the part of the PTO office." Brunette Decl. Ex. 64 at 7, ECF 117. Accordingly, Leupold did not pay the mandatory fee to correct the mistake or explain how its request complied with 37 C.F.R. § 1.78(a). Nightforce now relies on *Carotek* to argue that Leupold, not the PTO, was responsible for the missing priority claim, and therefore the 2003 certificate of correction is invalid.

The *Carotek* court did not hold that a missing priority claim is a mistake attributable to the patentee, rather than the PTO, as a matter of law. Rather, the court examined the facts of the case and the evidence before it to determine who was responsible for the mistake. *Id.* at 332–33. Significantly, the court also noted that its decision regarding priority did "not turn on whose fault the mistake was. . . . [A] certificate of correction is the mechanism by which a mistake in a

patent may be corrected, and a certificate has the same legal effect regardless of whether it was issued under section 254 or 255."[11] *Id.* at 333 n.17. Here, neither party has identified any evidence that proves who was responsible for the mistake in the original application. And, even if such evidence were available, Nightforce has cited no support for its position that such a mistake would invalidate a certificate of correction issued by the PTO. Thus, Nightforce's motion for summary judgment on this ground is denied.

### IV.    '836 Provisional Filing date

Under 35 U.S.C. § 112(a), a "specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains . . . to make and use the same."

The written description "must clearly allow [a POSA] to recognize that the inventor invented what is claimed," such that "the disclosure of the application relied upon reasonably conveys to [a POSA] that the inventor had possession of the claimed subject matter as of the filing date." *Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc) (internal quotation marks, brackets, and citations omitted).

"[T]he hallmark of written description is disclosure." *Id.* "Entitlement to a filing date does not extend to subject matter which is not disclosed, but would be obvious over what is expressly disclosed." *Power Oasis, Inc. v. T-Mobile USA, Inc.*, 522 F.3d 1299, 1306–07 (Fed. Cir. 2008). "This inquiry . . . is a question of fact," which "var[ies] depending on the context" and "requires an objective inquiry into the four corners of the specification from the perspective

---

[11] 35 U.S.C. §§ 254 and 255 distinguish between mistakes made by the PTO and mistakes made by other parties.

of a [POSA]." *Ariad*, 598 F.3d at 1351 (citations omitted). Demonstrating adequate written description "requires a precise definition" of the invention. *Id.* at 1350. To claim a genus, the patentee must disclose "a representative number of species falling within the scope of the genus or structural features common to the members of the genus so that [a POSA] can visualize or recognize the members of the genus." *Id.* (internal quotation marks and citation omitted); *see Amgen Inc. v. Sanofi*, 872 F.3d 1367, 1373–74 (Fed. Cir. 2017) (applying *Ariad* to a claimed genus).

"Compliance with the written description requirement is a question of fact but is amenable to summary judgment in cases where no reasonable fact finder could return a verdict for the non-moving party." *PowerOasis*, 522 F.3d at 1306–07; *see also TurboCare Div. of Demag Delaval Turbomachinery Corp. v. Gen. Elec. Co.*, 264 F.3d 1111, 1119 (Fed. Cir. 2001). "The knowledge of ordinary artisans may be used to inform what is actually in the specification, but not to teach limitations that are not in the specification, even if those limitations would be rendered obvious by the disclosure in the specification." *Rivera v. International Trade Commission*, 857 F.3d 1315, 1322 (Fed. Cir. 2017) (citing *Lockwood*, 107 F.3d at 1571).

A defendant bears the "burden of persuasion . . . to prove invalidity by clear and convincing evidence." *Tech. Licensing*, 545 F.3d at 1327; *see also Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 100 (2011). The alleged infringer's burden of persuasion on invalidity never shifts to the plaintiff. *Tech. Licensing*, 545 F.3d at 1329. However, once a defendant identifies sufficient facts that support finding the patent is not entitled to an earlier effective filing date, and that prior art that would invalidate the patent, then plaintiff has "the burden of going forward with evidence . . . [that] the asserted claim is entitled to the benefit of a filing date prior to the alleged prior art." *Id.* at 1327; *see also Research Corp.*, 627 F.3d at 870–71.

Here, both parties move for summary judgment on the '836 Provisional. Nightforce argues that claims 1, 2, 6, 7, 8, 10, 11, 16, and 17–19 are not entitled to the provisional application's filing date because they claim more than was disclosed. Leupold argues that because the '907 is entitled to the provisional application's filing date, the German Publication is not prior art under 35 U.S.C. § 102(b) (pre-AIA).

### a.  Claims 1, 2, 7, 8, 10, 11, and 17–19

Nightforce moves for summary judgment on the issue of whether claims 1, 2, 7, 8, 10, 11, and 17–19 are entitled to the '836 Provisional filing date.[12] Nightforce argues these claims are not entitled to the provisional application's filing date because they claim more than was disclosed. Specifically, each of these claims require a "cam follower" and "cam track." In the claim construction order issued January 1, 2018, the Court construed "cam track" to mean "a groove, ridge, or rail that is curved along its length, for engaging a cam follower." Claim Construction Order at *10. Nightforce therefore argues that because the '836 Provisional claims only a "pin" and "groove," it does not provide "full scope written description support under 35 U.S.C. § 112." Def. Mot. 27. In other words, while the provisional application claims a pin and a groove, the '907 claims a groove, *as well as* a ridge or rail.

In response, Leupold argues that a POSA looking at the provisional application would conclude that the inventor possessed the claimed invention as of that filing date. Specifically, Byron opines, in relevant part, that

> [a] person of skill in the art reviewing the '836 Provisional would readily recognized that a spiral cam track that is a groove and a cam follower that is a rail is merely the inverse of a track that is a ridge or rail with a follower such as a fork that fits around the rail or ridge.

---

[12] Leupold also appears moves for summary judgment on these claims. However, Leupold's motion consists of a single argument—that Brandenburg cannot opine as a POSA. As stated above, this argument is without merit.

Byron Decl. Ex. 2 ("Byron Rebuttal") ¶ 332.

The Court finds, in the light most favorable to the non-moving party, a question of fact as to whether the '836 Provisional provides support for the broader limitations claimed in the '907 patent. *Hologic, Inc. v. Smith & Nephew, Inc.* is instructive. In that case, a provisional application disclosed a "fibre optics bundle." 884 F.3d 1357, 1361 (Fed. Cir. 2018). The patent at issue—which attempted to claim priority to a provisional application—disclosed a "light guide." *Id.* The court noted that the parties did not dispute that a "fibre optic bundle" was a "type of light guide," and that "various types of light guides were well-known in the art." *Id.* Thus, the court concluded that the board did not err in finding that the provisional application "reasonably convey[ed] to a person of ordinary skill that the inventor had possession of a 'light guide.'" *Id.*

Here, the parties do not dispute that a "groove" is a type of cam track. Through the testimony of expert Byron, Leupold has offered evidence that a POSA would understand that the inventor possessed the genus—a cam track—as well as the species—a groove—at the time of invention. While Nightforce identifies a number of issues with this testimony—arguing that it relies on misstated and irrelevant testimony from the patent's inventor—this remains a question of fact for the trier of fact. Thus, the Court denies Nightforce's motion for summary judgment on this issue.

### b. Claims 6 and 16

Both parties move for summary judgment on the issue of whether claims 6 and 16 are entitled to the '836 Provisional filing date. Claims 6 and 16 are dependent claims that recite an adjustment mechanism for a telescopic rifle sight "in which the spiral cam track includes a spiral groove and in which the cam follower includes a pin." '907 Patent Col. 7 ll. 37–39, Col. 8 ll. 45–47.

"As a patent law term of art, 'includes' means 'comprising.'" *SanDisk Corp*., 415 F.3d at 1286. "Includes" is non-restrictive terminology that neither "foreclose[s] additional elements that need not satisfy the stated claim limitations," *id*., nor requires "additional, unspecified elements," *Aspex Eyewear, Inc. v. Altair Eyewear, Inc.*, 288 F. App'x 697, 702 (Fed. Cir. 2008). "Includes" here is therefore an open transitional phrase to introduce the body of the claim. While it does not foreclose additional elements, neither does it claim them. Thus, claims 6 and 16 do not claim more than the "pin" and "groove" claimed in the provisional application. They are therefore entitled to the filing date of the provisional application. Leupold's motion on this issue is granted.

## V.    Equitable Estoppel

"[T]he applicability of equitable estoppel is 'committed to the sound discretion of the trial judge.'" *Radio Sys. Corp. v. Lalor*, 709 F.3d 1124, 1130 (Fed. Cir. 2013) (quoting *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1042 (Fed. Cir. 1992)). "Three elements are required for equitable estoppel to bar a patentee's suit: (1) the patentee, through misleading conduct (or silence), leads the alleged infringer to reasonably infer that the patentee does not intend to enforce its patent against the alleged infringer; (2) the alleged infringer relies on that conduct; and (3) the alleged infringer will be materially prejudiced if the patentee is allowed to proceed with its claim." *Id.*

"Misleading conduct occurs when the alleged infringer is aware of the patentee or its patents, and knows or can reasonably infer that the patentee has known of the allegedly infringing activities for some time." *High Point SARL v. Sprint Nextel Corp.*, 817 F.3d 1325, 1330 (Fed. Cir. 2016) (citation omitted). For silence to be misleading, it "must be accompanied by some other factor which indicates that the silence was sufficiently misleading as to amount to

bad faith." *Hemstreet v. Computer Entry Sys. Corp.*, 972 F.2d 1290, 1295 (Fed. Cir. 1992)

(emphasis in original). For example, a patentee might threaten "immediate or vigorous

enforcement of its patent right" but then do "nothing for an unreasonably long time." *Meyers v.*

*Asics Corp.*, 974 F.2d 1304, 1309 (Fed. Cir. 1992) (citations and quotations omitted). However,

"a suggestion of infringement coupled with an offer to license followed by silence would [not]

suffice to establish equitable estoppel." *Id.* at 1308 (quoting *Meyers v. Brooks Shoe Inc.*, 912F.2d

1459, 1464 (Fed. Cir. 1990)).

"To show reliance, the infringer must have had a relationship or communication with the

plaintiff which lulls the infringer into a sense of security in going ahead with [its investments]."

*Gasser Chair Co., Inc. v. Infanti Chair Mfg. Corp.*, 60 F.3d 770, 769 (Fed. Cir. 1995) (quoting

*Aukerman*, 960 F.2d at 1041). A defendant can demonstrate detrimental reliance by showing it

"would have acted differently if the threat of litigation was a possibility.'" *High Point SARL*, 817

F.3d 1331-32; *Akeso Health Sciences LLC v. Designs for Health Inc.*, CV 16-07749 SJO, 2018

WL 2122644, at *4 (C.D. Cal. Apr. 26, 2018). "In deciding whether to bar the suit on estoppel

grounds, the court must consider all evidence relevant to the equities." *Aspex Eyewear Inc. v.*

*Clariti Eyewear, Inc.*, 605 F.3d 1305, 1310 (Fed. Cir. 2010).

Nightforce moves for summary judgement, arguing the '907 patent is unenforceable on

estoppel grounds.[13] Nightforce notes that (1) the '907 patent was issued in 2002; (2) Leupold

---

[13] Leupold also moved for summary judgment on the issue of "equitable estoppel." "The moving
party bears the initial responsibility of informing the court of the basis of its motion, and
identifying those portions of 'the pleadings, depositions, answers to interrogatories, and
admissions on file, together with the affidavits, if any,' which it believes demonstrate the
absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)
(quoting former Fed. R. Civ. P. 56(c)). Here, Leupold's "argument" is comprised of a single
paragraph that fails to identify, at a minimum, the patent at which the motion is directed.
Because the argument is not sufficiently developed, the Court will not address it at this time.

first contacted Nightforce about the alleged in infringement in June 2006, Conway Decl. Ex. 14;

(3) conversations about the alleged infringement ended in December 2006, after Nightforce

informed Leupold that it believed prior art invalidated the patent, Conway Decl. Ex. 17; and (4)

Leupold did not add the '907 patent to this suit until 2017. Def. Mot. 20–21.

Despite the timeline, there is a question of fact on at least one element of the estoppel

test: whether Nightforce relied on Leupold's allegedly misleading conduct. On this issue of

reliance, Nightforce offers a declaration from company owner Mr. Dennis. In this declaration,

Mr. Dennis states that

> had Leupold brought suit in 2006 or shortly thereafter and prevailed or showed signs of
> prevailing, for example by adding a priority claim to the provisional application and
> showing evidence of an invention date that predated [the German Publication], I would
> have directed Nightforce to use different designs in new products and to redesign existing
> products.

Dennis Decl. ¶ 17, ECF 106. Nightforce also argues that there were alternative designs that

"were available, feasible and favored by Nightforce engineering prior to Nightforce contract

manufacturer choosing the accused design." Def. Mot. 25.

However, at least some evidence suggests that Nightforce continued using the design at

issue because it decided the '907 patent was invalid, not because it believed Leupold did not plan

to enforce it. Mr. Dennis testified that he determined, in 2006, that the '907 patent was invalid

based on prior art. Brunette Decl. Ex. 17 ("Dennis Dep.") at 48–51, ECF 92-1. He testified that,

because the patent was invalid, he would not have changed the allegedly infringing product. *Id.*

at 53–57. He further testified that, after receiving another letter in 2016, he did not consider

removing the product from the market because he still did not think it infringed. *Id.* at 274–77.

He also testified that, had he received this letter in 2007, his decision would have remained the

same. *Id.* This testimony could reasonably suggest that Nightforce did not rely on Leupold's

silence or other inaction, but rather decided that the '907 patent was invalid. *See Gasser Chair Co., Inc. v. Infanti Chair Mfg. Corp.*, 60 F.3d 770, 769 (Fed. Cir. 1995) (finding no reliance where defendant stated that "he relied on" the supposed silence but evidence also demonstrated that he ignored "charges of infringement because he believed the patent was invalid."); *Hemstreet*, 972 F.2d at 1294–95, (referring to "a total absence in the record of any showing by CES that its activities were *in reliance upon* supposed actions of Hemstreet, rather than a business judgment of its own—a judgment which subsequent events may well prove to have been faulty."). Thus, in the light most favorable to the non-moving party, there is a question of fact on at least one element of the equitable estoppel analysis. The Court therefore denies summary judgment on this issue.

## CONCLUSION

For the reasons stated above, the Court rules as follows:

(1)    Leupold's motion for summary judgment on the issue of whether claim 1 and its dependent claims are infringed is GRANTED.

(2)    Leupold's motion for summary judgment on the issue of whether claim 10 and its dependent claims are infringed is DENIED.

(3)    The parties' motions for summary judgment on whether the German Publication anticipates the '907 patent are DENIED.

(4)    Leupold's motion for summary judgment on whether the S&B riflescope anticipates the '907 patent is DENIED.

(5)    Leupold's motion for summary judgment on whether the Altenheiner patent anticipates the '907 patent is GRANTED.

(6)     Leupold's motion for summary judgment on whether the Altenheiner patent renders the '907 patent obvious is DENIED.

(7)     Nightforce's motion for summary judgment regarding the certificate of correction is DENIED.

(8)     Nightforce's motion for summary judgment on whether claims 1, 2, 6, 7, 8, 10, 11, 16, and 17–19 are entitled to the '836 Provisional filing date is DENIED.

(9)     Leupold's motion for summary judgment on whether claims 1, 2, 7, 8, 10, 11, and 17–19 are entitled to '836 Provisional filing date is DENIED.

(10)    Leupold's motion for summary judgment on whether claims 6 and 16 are entitled to the '836 Provisional filing date is GRANTED.

(11)    The parties' motions for summary judgment based on equitable estoppel are DENIED.


Dated this _____ day of _____, 2019.


_____
MARCO A. HERNÁNDEZ
United States District Judge