IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION


LEUPOLD & STEVENS, INC.,                          No. 3:16-cv-01570-HZ

        Plaintiff,                               OPINION & ORDER

    v.

LIGHTFORCE USA, INC. d/b/a
NIGHTFORCE OPTICS and
NIGHTFORCE USA,

        Defendant.


Kassim M. Ferris
Nathan C. Brunette
Stoel Rives LLP
760 SW Ninth Ave., Suite 3000
Portland, OR 97205

Brian C. Park
Stoel Rives LLP
600 University Street, Suite 3600
Seattle, WA 98101

      Attorneys for Plaintiff

Scott E. Davis
Klarquist Sparkman, LLP
121 SW Salmon St., Suite 1600
Portland, OR 97204

David Casimir
Casimir Jones S.C.
2275 Deming Way, Suite 310
Middleton, WI 53562

      Attorneys for Defendant

HERNÁNDEZ, District Judge:

Plaintiff Leupold & Stevens, Inc. ("Leupold") brings this action against Defendant Lightforce USA, Inc. ("Nightforce") alleging that it infringes eight of Leupold's patents concerning optical devices such as riflescopes. Both parties submitted motions for summary judgment on all eight patents, addressing more than seventy claims and numerous defenses. In this opinion, the Court resolves only those motions related to the '305 patent. For the reasons that follow, Leupold's motions are GRANTED in part and DENIED in part. Nightforce's motions are GRANTED in part and DENIED AS MOOT in part.

## BACKGROUND

Leupold and Nightforce design, manufacture, and sell, among other things, optical scopes. Am. Compl. ¶¶ 2–4, ECF 28. Leupold alleges that Nightforce's accused products infringe its eight patents-in-suit involving optical device structures and functions including: locking adjustment knobs; pivoting lens units; and pivoting lens covers. *Id.* at ¶¶ 10–16. At issue

here is Count V, United States Patent No. 6,816,305 ("the '305 patent"), entitled *Pre-Assembled Pivoting Lens Unit*. *See* Brunette Decl. Ex. 1, ECF 92-1.

**STANDARDS**

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial responsibility of informing the court of the basis of its motion, and identifying those portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting former Fed. R. Civ. P. 56(c)). A dispute about a material fact is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Vas-Cath Inc. v. Mahurkar*, 935 F.2d 1555 (Fed. Cir. 1991) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

Once the moving party meets its initial burden of demonstrating the absence of a genuine issue of material fact, the burden then shifts to the nonmoving party to present "specific facts" showing a "genuine issue for trial." *Fed. Trade Comm'n v. Stefanchik*, 559 F.3d 924, 927–28 (9th Cir. 2009) (internal quotation marks omitted). The nonmoving party must go beyond the pleadings and designate facts showing an issue for trial. *Bias v. Moynihan*, 508 F.3d 1212, 1218 (9th Cir. 2007) (citing *Celotex*, 477 U.S. at 324).

The substantive law governing a claim determines whether a fact is material. *Suever v. Connell*, 579 F.3d 1047, 1056 (9th Cir. 2009). The court draws inferences from the facts in the light most favorable to the nonmoving party. *Earl v. Nielsen Media Research, Inc*., 658 F.3d 1108, 1112 (9th Cir. 2011). If the factual context makes the nonmoving party's claim as to the

existence of a material issue of fact implausible, that party must come forward with more persuasive evidence to support his claim than would otherwise be necessary. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## DISCUSSION

### I. Claims 1, 5–8, 12–15

In its response to Nightforce's motion for summary judgment, Leupold withdrew with prejudice its assertions of infringement as to claims 1, 5–8, and 12–15 of the '305 patent. Leupold argues that Nightforce's invalidity assertions as to these claims are therefore moot.

"Article III courts have subject matter jurisdiction only if there is an actual case or controversy." *Amaranth, Inc. v. Domino's Pizza, LLC*, 2019-1144, 2019 WL 5681315, *2 (Fed. Cir. Nov. 1, 2019) (citing *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 126–27 (2007)). "In patent cases, 'the existence of a case or controversy must be evaluated on a claim-by-claim basis.'" *Fox Group, Inc. v. Cree, Inc.*, 700 F.3d 1300, 1307 (Fed. Cir. 2012) (quoting *Jervis B. Webb Co. v. So. Sys., Inc.*, 742 F.2d 1388, 1399 (Fed. Cir. 1984) (citations omitted)). "[J]urisdiction must exist at all stages of review, not merely at the time the complaint [was] filed." *Streck, Inc. v. Research & Diagnostic Sys., Inc.*, 665 F.3d 1269, 1282–83 (Fed. Cir. 2012) (second bracket in original) (quotations and citations omitted).

An original case or controversy may cease if the patentee withdraws its claims of infringement. *Amaranth, Inc.*, 2019 WL 5681315 at *3. Thus, "a counterclaimant must show a continuing case or controversy with respect to withdrawn or otherwise unasserted claims." *Streck, Inc.*, 665 F.3d at 1283. In *Fox Group, Inc.*, for example, the Federal Circuit held that a district court erred in finding *all* claims of a patent invalid after the patentee had narrowed the focus of its infringement cause of action to only two claims before summary judgment. 700

F.3d at 1308; *see also Alcon Research Ltd. v. Barr Laboratories, Inc.*, 745 F.3d 1180, 1188 (Fed. Cir. 2014) (discussing *SanDisk Corp. v. Kingston Tech. Co.*, 695 F.3d 1348, 1353 (Fed. Cir. 2012) and noting that "a patentee's announcement that it was no longer pursuing particular claims, coupled with its ceasing to litigate them, was sufficient to remove those claims from the case even without [] formalities.").

Here, Leupold withdrew claims 1, 5–8, and 12–15 with prejudice before a dispositive ruling by the Court. Nightforce's hypothesized future litigation against a third party not privy to this action, based solely upon Leupold's right to threaten or maintain litigation in the future for infringement of the withdrawn claims, does not establish the existence of a continuing case or controversy. Thus, Nightforce's invalidity assertions as to claims 1, 5–8, and 12–15 are moot.

## II.     Infringement

### A.  Standards

A patent infringement analysis involves two steps. First, the court construes the asserted patent claims. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc). Second, the factfinder determines whether the accused product or method infringes the asserted claim as construed. *Id.*

The first step, claim construction, is a matter of law "exclusively within the province of the court." *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996); *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). "It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quotation marks and citations omitted). Patent claims must precisely define the relevant invention to put both the public and competitors on notice of the claimed invention. *Id.*

The second step in the infringement analysis requires the factfinder to determine whether the accused product or method infringes the asserted claim as construed. *Markman*, 52 F.3d at 976. At this step, "[p]atent infringement, whether literal or by equivalence, is an issue of fact, which the patentee must prove by a preponderance of the evidence." *Siemens Med. Sols. USA, Inc. v. Saint–Gobain Ceramics & Plastics, Inc.*, 637 F.3d 1269, 1279 (Fed. Cir. 2011).

To establish literal infringement, "every limitation set forth in a claim must be found in an accused product, exactly." *Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc.*, 699 F.3d 1340, 1356 (Fed. Cir. 2012) (internal quotation marks omitted). Similarly, "a patent for a method or process is not infringed unless all steps or stages of the claimed process are utilized." *Roberts Dairy Co. v. United States*, 530 F.2d 1342, 1354 (Ct. Cl. 1976).

### B. Analysis

Leupold moves for summary judgment on the issue of infringement, arguing that "for all Nightforce riflescopes made, sold, offered for sale, or imported since August 2, 2010, Nightforce infringed method claims 26 and 27[.]" Pl. Mot. 4. Specifically, scopes made in the Unites States infringe under 35 U.S.C. § 271(a),[1] and scopes made in Japan infringe under 35 U.S.C. § 271(g).

#### i. 35 U.S.C. § 271(a)

35 U.S.C. § 271(a) provides, in relevant part, that

> whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent.

---

[1] "Section 271(a) is only actionable against patent infringement that occurs within the United States." *NTP, Inc. v. Research In Motion, Ltd.*, 418 F.3d 1282, 1313 (Fed. Cir. 2005) (abrogated on other grounds). "[A] process cannot be used 'within' the United States as required by section 271(a) unless each of the steps is performed within this country." *Id.* at 1318. Thus, scopes made in Japan cannot infringe under 35 U.S.C. § 271(a).

"Direct infringement under § 271(a) occurs where all steps of a claimed method are performed by or attributable to a single entity." *Akamai Technologies, Inc. v. Limelight Networks, Inc.*, 797 F.3d 1020, 1022 (Fed. Cir. 2015). "Where more than one actor is involved in practicing the steps, a court must determine whether the acts of one are attributable to the other such that a single entity is responsible for the infringement." *Id.* An entity is "responsible for others' performance of method steps in two sets of circumstances: (1) where that entity directs or controls others' performance, and (2) where the actors form a joint enterprise." *Id.*

Claims 26 and 27 each require the "pre-assembly" of a pivoting lens unit. Claim 26 provides:

A method for manufacturing an optical sighting device, comprising:

(a) providing a tubular housing, the housing having a longitudinal axis;
(b) pre-assembling a pivoting lens unit, the lens unit including:
(i) a pivot cartridge sized to be at least partially received by the housing,
(ii) a pivot tube, the pivot tube including a first end movably coupled to the pivot cartridge and a second end extending from the pivot cartridge, the second end being rotatable transversely of the longitudinal axis of the housing, and
(iii) a lens assembly disposed within the pivot tube between the first and second ends;
(c) positioning the pivoting lens unit in said housing; and
(d) securing the pivot cartridge within the housing.

Claim 27 provides:

A method of manufacturing a riflescope, comprising the steps of

(a) pre-assembling a pivoting lens unit for insertion into a tubular housing of the riflescope having a longitudinal axis by the steps of:
(i) pivotally seating a lens-holding pivot tube in a pivot cartridge so that the pivot tube is pivotable transversely to the longitudinal axis of the housing when the pivoting lens unit is installed in the housing, and
(ii) after pivotally seating the pivot tube in the pivot cartridge, attaching a fastener to the pivot cartridge to retain the pivot tube to the pivot cartridge;
(b) positioning the pre-assembled pivoting lens unit in the housing; and
(c) securing the pre-assembled pivoting lens unit in the housing.

Nightforce has offered evidence that a third party, "Optex," constructs various subassemblies at a Texas facility. *See* Conway Decl. Ex. G ("Johnson Dep.") 48:23–53:11, ECF 127-8.[2] Accordingly, Nightforce argues that the "pre-assembly" steps of claims 26 and 27 are not performed by or attributable to a single entity. Rather, certain lens units are pre-assembled by Optex and later positioned and secured within the scope housing by Nightforce. Def. Resp. 8, 10, ECF 120. In response, Leupold appears to argue that Nightforce is responsible for Optex's performance of the methods steps because it either directs or controls Optex's performance. However, Leupold's entire argument on the subject appears as follows:

> Nightforce has not made any assertion of divided infringement, and it cannot succeed on any such argument. Any subcontractors that may sometimes perform method steps on Nightforce's behalf act as agents, performing the method steps at Nightforce's direction and under its control. See Ex. 97 (Johnson Tr. 51:7-52:17, 261:17-262:15, 288:4-290:15; 98 (Bates Tr. 74:2-8, 75:1-76:8, 76:15-77:20).

Pl. Reply 14 n.12, ECF 147.

Leupold provides no legal authority or analysis to support this argument. The citation to deposition testimony alone—without any argument as to the significance or legal relevance of that deposition testimony—is insufficient to show that Leupold is entitled to judgment as a matter of law. The Court will not attempt to flesh out legal arguments that Leupold failed to make. Leupold's motion for summary judgment of infringement under § 271(a) is therefore denied.

### ii. 35 U.S.C. § 271(g)

Leupold also argues that scopes made in Japan and imported into the United States infringe under 35 U.S.C. § 271(g). "Section 271(g) of title 35 sets forth a basis for infringement

---

[2] It also appears to the Court that Nightforce may have manufactured certain scopes in Idaho. However, neither side has developed any argument on the issue.

in situations where the patented process is used abroad, but where the product made by the patented process is imported, sold or used within the United States." *CNET Networks, Inc. v. Etilize, Inc.*, 528 F. Supp. 2d 985, 992 (N.D. Cal. 2007). Specifically, § 271(g) provides:

> Whoever without authority imports into the United States or offers to sell, sells, or uses within the United States a product which is made by a process patented in the United States shall be liable as an infringer, if the importation, offer to sell, sale, or use of the product occurs during the term of such process patent.

Leupold has offered evidence that each structural limitation set forth in claims 26 and 27 also appears in at least one Nightforce scope.[3] *See* Byron Decl. Ex. 1 ("Byron Rpt.") ¶¶ 453–70, ECF 83-1. Under § 271(g), however, Leupold also must establish that the accused scopes were, in fact, manufactured according to the claimed process. *See Ajinomoto Co., Inc. v. Archer-Daniels-Midland Co.*, 228 F.3d 1338, 1347 (Fed. Cir. 2000) ("[Patentee] bore the burden of establishing that the imported strains were manufactured by a process covered by the [] patent [at issue.]"). In other words, Leupold must establish that, pursuant to claims 26 and 27, the pivoting lens unit was pre-assembled before it was installed in the scope housing.

Leupold argues, in part, that it has met this burden through evidence of:

(1) Nightforce's own written assembly instructions, *see* Brunette Decl. Ex. 31, ECF 92-6 (showing that the pivoting lens unit was assembled before it was installed in the scope housing), and

(2) Nightforce's interrogatory response asserting that "Nightforce and its contract manufacturer (LOW) have, from 1995 to present, used the same process to assemble scopes that involves assembly of a lens tube in a separate operation, in advance of installation in the housing of the scope." Brunette Decl. Ex. 28, ECF 92-4.

---

[3] While Leupold argues that "all Nightforce riflescopes made, sold, offered for sale, or imported since August 2, 2010" infringe method claims 26 and 27 of the '305 patent, the Court makes no finding on *which* scopes and models contain the infringing "pre-assembled lens unit." While the Court reviewed Leupold's citations to expert reports, deposition testimony, and various other exhibits, the Court cannot reconstruct or verify the assertion, which is insufficiently explained or supported.

Nightforce argues only that because "Leupold took no discovery from LOW [the Japanese manufacturer] and otherwise has no direct evidence of any process, or step, performed by LOW in Japan," summary judgment is not warranted. Def. Resp. 11.

A patentee is not necessarily required to produce direct evidence from a manufacturer in order to establish that a product was, in fact, manufactured according to the claimed process. *See Nichia Corp. v. VIZIO, Inc.*, CV 8:16-0545 SJO (MRWx), 2019 WL 1966664 (C.D. Cal. Mar. 13, 2019). In *Nichia Corp.*, for example, the court found that plaintiff's expert's examination of the accused products alone was "sufficient to establish that [] they were manufactured according to the claimed method and that there was no need to seek discovery from the manufacturers themselves to confirm this." 2019 WL 1966664 at *8. The court noted that

> the claimed process merely requires that the two components consist of certain materials and have certain properties and that they be combined in a particular manner. Whether this occurred can be readily determined by an expert after the fact and need not be ascertained through direct observation of the manufacturing process or discovery directed at the manufacturers themselves. Ultimately, the actual physical manner in which the devices are constructed is largely irrelevant to the question of infringement. From this testimony, it seems apparent that the basic manufacturing process of the Accused Products is ascertainable by examining the structure and makeup of the finished product.

*Id.* at *9.

Here, not only is the basic manufacturing process of the accused scopes ascertainable by examining the structure and makeup of the finished product, *see* discussion on anticipation *infra* Section III.B, but the Court agrees that Nightforce's written assembly instructions and response to interrogatory 19 also demonstrate pre-assembly. Thus, without further argument from Nightforce, the Court finds that despite a lack of direct evidence from the manufacturer in Japan,

Leupold has shown that the pre-assembled pivoting lens unit at issue, imported from Japan by Nightforce, infringes claims 26 and 27 under § 271(g).[4]

### III.    Invalidity

A patent issued by the Patent Trademark Office (PTO) is presumed valid. *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 95 (2011); 35 U.S.C. § 282. "To overcome this presumption of validity, the party challenging a patent must prove facts supporting a determination of invalidity by clear and convincing evidence." *Id.*; *Schumer v. Laboratory Computer Systems, Inc.,* 308 F.3d 1304, 1315 (Fed. Cir. 2002).

#### A.    Indefinite

Patent claims must particularly point out and distinctly claim the subject matter regarded as the invention. 35 U.S.C. § 112 ¶ 2.[5] A claim, when viewed in light of the patent's specification and prosecution history, must "inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014). If it does not, the claim fails § 112, ¶ 2 and is therefore invalid as indefinite. *Id.* at 901. Whether a claim is indefinite is determined from the perspective of one of ordinary skill in the art as of the time the application for the patent was filed. *Id.* at 2130. As it is a challenge to the validity of a patent, the failure of any claim to comply with § 112 must be shown by clear and convincing evidence. *Microsoft Corp. v. I4I Ltd. Partnership*, 564 U.S. 91, 95 (2011).

Leupold moves for summary judgment on this issue, arguing that Nightforce cannot show that claims 26 and 27 are indefinite and therefore invalid. In support, Leupold relies on its expert,

---

[4] Again, the Court makes no finding as to which scopes contain the infringing unit.
[5] Because the application resulting in the '305 patent was filed before September 16, 2012, the effective date of the America Invents Act ("AIA"), the Court refers to the pre-AIA version of 35 U.S.C. § 112.

Mr. Byron. *See* Byron Decl. Ex. 2 ("Byron Rebuttal") ¶¶ 417–423, ECF 83-2. In response, Nightforce argues only that the terms "rotatable transversely of," "transversely of," and "transversely to" are unclear given the context in which they appear. According to Nightforce, the inventor of the '305 patent admitted "that he does not know how 'transversely to' and 'transversely of' differ, and does not know what 'rotatable transversely of' means as used in the claims." Def. Resp. 11. Without further argument or evidence, Nightforce argues that this admission alone evinces a "lack of clarity" in the meaning of the terms. *Id.*

As a general matter, "[i]nventor testimony, obtained in the context of litigation, should not be used to invalidate issued claims under section 112, paragraph 2." *Solomon v. Kimberly-Clark Corp.*, 216 F.3d 1372, 1380 (Fed. Cir. 2000); *see also Douglas Dynamics, LLC v. Buyers Prods. Co.*, 2014 WL 988755, at *4 (W.D. Wis. Mar. 13, 2014) (citing *Solomon* and holding that inventor's inability to define a term of patent claim during his deposition was "of little relevance") *aff'd*, 628 F. App'x 767 (Fed. Cir. 2016). Indeed, as the Federal Circuit has explained in the context of claim construction, an inventor's testimony may be "limited by the fact that an inventor understands the invention but may not understand the claims, which are typically drafted by the attorney prosecuting the patent applications." *Howmedica Osteonics Corp. v. Wright Med. Tech., Inc.*, 540 F.3d 1337, 1346–47 (Fed. Cir. 2008).

Here, Leupold points out that the inventor is not a lawyer and did not write the claims of the patent. Given the Federal Circuit's admonition against inventor testimony in this context, the Court finds that Nightforce's reliance on the inventor's deposition testimony alone is not sufficient to raise a triable issue of fact. Thus, without any further argument or evidence from Nightforce as to why claims 26 and 27 may be indefinite, Leupold's motion for summary judgment on the issue is granted.

**B. Anticipation**

Both parties move for summary judgment on the issue of whether Nightforce riflescopes, produced and sold between 1995 and 2001 ("1995–2001 Scopes"), anticipate claims 26 and 27 of the '305 patent.[6]

"A patent is invalid for anticipation if a single prior art reference discloses each and every limitation of the claimed invention." *Schering Corp. v. Geneva Pharm.*, 339 F.3d 1373, 1377 (Fed. Cir. 2003). "Anticipation is a question of fact." *Atlas Powder Co. v. Ireco, Inc.*, 190 F.3d 1342, 1346 (Fed. Cir. 1999). "Typically, testimony concerning anticipation must be testimony from one skilled in the art and must identify each claim element, state the witnesses' interpretation of the claim element, and explain in detail how each claim element is disclosed in the prior art reference. The testimony is insufficient if it is merely conclusory." *Schumer*, 308 F.3d at 1315–16.

To show anticipation under 35 U.S.C. § 102(a) or (b), a plaintiff must show that

(a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent, or

(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States[.]

35 U.S.C. § 102 (pre-AIA). Additionally, because the process at issue here was used in a foreign country, the plaintiff must show that a person of ordinary skill in the art (POSA) would be able to determine the claimed process from analyzing the product itself. *See W.L. Gore & Assocs.,*

---

[6] The Court does not address Nightforce's arguments that claims 1, 5–8, and 12–15 are also anticipated, as these arguments are moot. The Court also does not reach Leupold's arguments that U.S. Patent 3,429,634, U.S. Patent 3,962,795, and U.S. Patent 3,484,148 cannot anticipate the '305 patent.

*Inc. v. Garlock, Inc.*, 721 F.2d 1540, 1550 (Fed. Cir. 1983) (holding that, to be prior art against the method claimed in a patent, sales of a physical product require "evidence[] that the public could learn the claimed process by examining the [physical product]"); *see also TransWeb, LLC v. 3M Innovative Properties Co.*, 16 F.Supp.3d 385 (D. N. J. 2014) ("[T]o qualify as prior art against 3M's patented method, a person of ordinary skill in the art must be able to determine TransWeb's method from analyzing these samples.").

Nightforce has offered evidence that the 1995–2001 Scopes disclose each and every limitation of claims 26 and 27. *See, e.g.*, Tran Decl. Ex. 3, ECF 107-1; Stockdill Decl., ECF 112; Johnson Decl., ECF 111. Nightforce has also offered evidence that the 1995–2001 Scopes were advertised and sold to the public in the United States between 1995 and 2001. *See, e.g.*, Stockdill Decl. ¶¶ 11–14, Ex. A, B; Coleman Decl. Ex. A, ECF 110. In response, Leupold argues only that Nightforce cannot show that (1) a pivoting lens unit was "pre-assembled" as required by the claims or (2) that a POSA could conclude, from inspecting the 1995–2001 Scopes, that the pivoting lens unit was "pre-assembled." These arguments turn on the definition of the terms "pre-assembled" and "pre-assembling."[7]

The parties stipulated that the terms "pre-assembled" and "pre-assembling" mean "assembled/assembling in a separate operation, in advance of installation in the housing." Pl. Resp. 1, ECF 124. However, the parties now dispute the meaning of the phrase "in a separate operation." This is a question of claim construction for the Court.

---

[7] As noted above, claim 26 requires "pre-assembling a pivoting lens unit." '305 Patent, col. 8, ll. 49–50. Claim 27 requires "pre-assembling a pivoting lens unit for insertion" and then positioning and securing that "pre-assembled pivoting lens unit in the housing." 305 Patent, col 8, l. 65; col. 10, ll. 1–5.

To construe a patent claim, courts first look to the language of the claims in the patent itself, the description in the patent's specification, and the patent's prosecution history, all of which constitute a record "on which the public is entitled to rely." *Vitronics*, 90 F.3d at 1583; *Dow Chem. Co. v. Sumitomo Chem. Co.*, 257 F.3d 1364, 1372 (Fed. Cir. 2001). In most cases, the court should be able to resolve ambiguous claim terms by analyzing this intrinsic evidence. *See Phillips*, 415 F.3d at 1313–14. The court considers extrinsic evidence only if the intrinsic evidence is insufficient to resolve the ambiguity of a term. *Vitronics*, 90 F.3d at 1586. "The actual words of the claim are the controlling focus." *Digital Biometrics, Inc. v. Identix, Inc.*, 149 F.3d 1335, 1344 (Fed. Cir. 1998). "[T]he words of the claims are generally given their ordinary and customary meaning." *Phillips*, 415 F.3d at 1312 (quotation marks and citations omitted). "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id.* at 1313. There is a "heavy presumption" that a claim term carries its ordinary and customary meaning, and a party seeking to convince a court that a term has some other meaning "must, at the very least," point to statements in the written description that "affect the patent's scope." *Johnson Worldwide Assocs., Inc. v. Zebco Corp.*, 175 F.3d 985, 989 (Fed. Cir. 1999) (quotation marks and citation omitted). This may be accomplished if: (1) "a different meaning [is] clearly and deliberately set forth in the intrinsic materials" of the patent; or (2) use of "the ordinary and accustomed meaning of a disputed term would deprive the claim of clarity[.]" *K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1363 (Fed. Cir. 1999) (citations omitted). In making this assessment, the court should use common sense and "the understanding of those of ordinary skill in the art" of the patent at issue, unless the patent history supplies another meaning. *Id.* at 1365.

Beyond the plain language of the claims, the patent specification is always highly relevant and often dispositive to the proper construction. *Vitronics*, 90 F.3d at 1582 (explaining that the specification is "the single best guide to the meaning of a disputed term"). The purpose of the patent specification is to teach and enable those skilled in the art to make and use the invention, along with the best method for doing so. *Cyber Acoustics, LLC v. Belkin Int'l., Inc.*, No. 3:13–cv–01144–SI, 2014 WL 1225198, at *2 (D. Or. Mar. 24, 2014) (citing *Phillips*, 415 F.3d at 1323). The inventor can use the specification to describe the invention in a number of ways, such as describing different "embodiments" of the invention and by assigning particular meanings to specific claim language. *Metabolite Lab., Inc. v. Lab. Corp. of Am. Holdings*, 370 F.3d 1354, 1360 (Fed. Cir. 2004); *Phillips*, 415 F.3d at 1316. The embodiments serve as illustrative examples of the invention claimed. *Phillips*, 415 F.3d at 1323 ("One of the best ways to teach a person of ordinary skill in the art how to make and use the invention is to provide an example of how to practice the invention in a particular case."). The inventor can also clarify that he or she intends the claim language to carry a specific meaning different from its ordinary one. *Id.* In these cases, "the inventor's lexicography governs." *Id.* at 1316.

Nightforce argues that a plain reading of claims 26 and 27 "clearly defines the boundary between the 'separate operations' of pre-assembling a pivoting lens unit, and subsequently installing the pre-assembled pivoting lens unit in a housing." Def. Reply 6, ECF 139. In other words, claims 26 and 27 recite a clear, two-step process: (1) pre-assembling a pivoting lens unit and then (2) installing that pre-assembled pivoting lens unit into the housing. Thus, according to Nightforce, it is clear from the wording of the claims themselves that the "operation of 'pre-assembling a pivoting lens unit' must occur in advance of the operation of installing the pre-

assembled pivoting lens unit in the housing." *Id.* Nothing else is required by the claims themselves.

Leupold does not, in its briefing, at oral argument, or through its expert, define the term "separate operation." *See, e.g.*, Byron Rebuttal ¶¶ 384–94. Instead, Leupold provides the Court with a string of examples to support its argument that the term "has to mean something." Transcript of Oral Argument at 65, ECF 164. According to Leupold, there must be some sort of separation between the process of assembling the lens unit and the process of installing that lens unit into the housing. That separation could be demonstrated by time or space (e.g., by constructing the lens unit days before inserting it into the scope housing, or constructing it at a different workstation), by different people participating in the processes, or by the number of units produced. Conway Decl. Ex. A ("Byron Dep.") 153:16–61:25, ECF 127-1. Leupold fails, however, to identify how much time or space (or any other factor) might be necessary to constitute a "separate operation." Indeed, it appears to the Court that Leupold can only define what the term is not:

> A single technician assembling one scope start to finish or one pivot cartridge into the housing start to finish would not be a separate operation. And that is what we mean by "separate operation."

Transcript of Oral Argument at 71. This is not a viable definition.

Even if this was, somehow, a viable definition, the Court sees no support for it in the patent itself. The term pre-assembly is not defined in the claim language. In fact, the Court sees only one reference to the term pre-assembly in the specification:

> Pre-assembly of the pivoting lens unit in accordance with these aspects and features results in a cost-effect technique for producing the optical sighting device, since rather than tracking a series of components, the manufacturer need only track one components—the pre-assembled pivoting lens unit. Moreover, consistent with an embodiment of the present invention, the entire pivoting lens unit can be pre-assembled at an off-site pre-assembly facility and shipped to the

optical sighting device manufacturer as a single unit. Once the pivoting lens unit is pre-assembled, it can be pre-tested off-site or by the optical sighting device manufacturer before installing in the optical sighting device. Pre-assembly of the pivoting lens unit increases the availability of such units, for the unit can be manufactured, assembled, and tested separately from the optical sighting device and stored as an off-the-shelf item.

Further still, pre-assembling the pivoting lens unit in accordance with the disclosed embodiments of the invention simplifies the final assembly process and eliminates the need for special assembly tools to install the pre-assembled pivoting lens unit within the optical sighting device. In addition, the pre-assembled pivoting lens unit can be easily removed to expose components mounted with the optical sighting device for service or replacement as needed.

'305 Patent, col. 3, ll. 3–26. This language does not mention, much less require, a "separate operation" as conceptualized by Leupold. While it does suggest the lens unit *could* be pre-assembled off-site, this language is not inconsistent with Nightforce's proposed definition—that pre-assembly requires only an assembly operation in advance of installation. Indeed, the specification merely contrasts the claimed method ("pre-assembly") with a method in which the pivoting lens unit is built piece by piece *within* the scope housing, again, consistent with Nightforce's proposed definition.

In sum, the Court sees no support within the patent for the term as conceptualized by Leupold. And, even if there were support for Leupold's position in the specification, to adopt Leupold's position "would be the result of improperly importing a limitation from the specification into the claims." *Plantronics, Inc. v. Aliph, Inc.*, 724 F.3d 1343, 1349–50 (Fed. Cir. 2013) (quoting *Kara Tech. Inc. v. Stamps.com Inc.*, 582 F.3d 1341, 1348 (Fed. Cir. 2009) ("The patentee is entitled to the full scope of his claims, and we will not limit him to his preferred embodiment or import a limitation from the specification into the claims.")).The Court therefore agrees with Nightforce that "pre-assembly" means only "assembly in an operation that occurs in

advance of the operation of installation of the assembled lens unit in a housing." Def. Mot. 7, ECF 109.

Given this construction, Nightforce need not present evidence that a POSA would understand, from inspecting the 1995–2001 Scopes, that the pivoting lens unit was somehow constructed by multiple technicians, or at a different time or in a different space from when or where it was inserted into the scope housing. Rather, in order to prevail on its assertion of anticipation, Nightforce must present evidence that a POSA would understand that the pivoting lens unit was assembled in advance of its installation into the scope housing.

Nightforce has presented the Court with this evidence. In particular, Nightforce has demonstrated that the 1995–2001 Scopes contain a pivoting lens unit, comprised of a pivot cartridge and pivot tube fastened together by a keying screw. Because the keying screw fastens the pivot tube to the pivot cartridge through the outside of the pivot cartridge, it cannot be installed after the pivot cartridge has been placed within the scope housing. Stockdill Decl. ¶ 14, Ex. D. Leupold does not contest this order of operations; to the contrary, its expert agrees. *See* Byron Rebuttal ¶ 391 ("I understand that, in the 1995–2001 Nightforce Scopes, the erector is keyed to the pivot cartridge via a screw through the outside of the pivot cartridge."). Thus, because the keying screw *must* have been fastened before the pivoting lens unit could be placed in the housing, Nightforce has presented evidence that a POSA would understand that the pivoting lens unit was actually assembled in advance of its installation into the scope housing. *See also* Pellikaan Decl. Ex. 3 ("Regan Dep.") 57:10-25, ECF 144-2 (Inventor of the '305 testified that someone skilled in scope design could tell, by taking apart a scope, whether that scope "had initially been manufactured or assembled with a preassembled pivoting lens unit.").

Leupold's only remaining argument is that the pivot cartridge and pivot tube "could have been assembled in the scope body by fastening the lock-ring retainer onto the rear of the pivot cartridge within the scope body." Byron Rebuttal ¶ 393. As noted above, however, there is no dispute that the pivot cartridge and pivot tube are connected (or fastened together) by the keying screw. Thus, while Leupold may argue that the lock-ring fastener could have been added to the device *after* the pivot cartridge and pivot tube were installed into the scope housing—arguably defeating the "pre-assembly" limitation—it fails to account for the fact that the components of the pivoting lens unit (the pivot cartridge, pivot tube, and lens assembly) were *already* assembled and fastened together using the keying screw. Indeed, the Court sees no argument from Leupold that the lock-ring fastener is necessarily part of the pivoting lens unit. Thus, it appears to this Court that any argument as to whether the lock-ring fastener may have been inserted into the scope housing after the pivoting lens unit was in place is irrelevant to the anticipation analysis.

Because Nightforce has presented uncontroverted evidence that the 1995–2001 Scopes disclose each and every limitation of claims 26 and 27, and that a POSA would understand that the pivoting lens unit was assembled in advance of its installation into the scope housing, the Court finds that the 1995–2001 Scopes anticipate claims 26 and 27 of the '305 patent.

### C. Obviousness

Even if claims 26 and 27 were not anticipated by the 1995–2001 Scopes, they are, in the alternative, rendered obvious by them.

A claimed invention is obvious if "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art." 35 U.S.C. § 103(a) (pre-AIA). "To qualify as prior art for an obviousness analysis, a reference must qualify

as 'analogous art,' i.e., it must satisfy one of the following conditions: (1) the reference must be from the same field of endeavor; or (2) the reference must be reasonably pertinent to the particular problem with which the inventor is involved." *K-TEC, Inc. v. Vita-Mix Corp.*, 696 F.3d 1364 (Fed. Cir. 2012) (citing *Innovention Toys, LLC v. MGA Entm't, Inc.*, 637 F.3d 1314, 1321 (Fed. Cir. 2011)). "A reference is reasonably pertinent if, as a result of its subject matter, it 'logically would have commended itself to an inventor's attention in considering his problem.'" *Id*.

  While the obviousness inquiry is a legal determination, it is predicated on underlying facts that are unique to each patent case. *KSR Int'l Co. v. Teleflex Inc*., 550 U.S. 398, 406 (2007). "The factual determinations underpinning the legal conclusion of obviousness include 1) the scope and content of the prior art, 2) the level of ordinary skill in the art, 3) the differences between the claimed invention and the prior art, and 4) evidence of secondary factors." *Eisai Co. Ltd. v. Dr. Reddy's Lab., Ltd*., 533 F.3d 1353, 1356 (Fed. Cir. 2008) (citing *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966)). Secondary factors include "commercial success, long felt but unsolved needs, failure of others, etc." *KSR Int'l Co*, 550 U.S. at 406 (quoting *Graham*, 353 U.S. at 17–18.). Summary judgment may therefore be appropriate if "the content of the prior art, the scope of the patent claim, and the level of ordinary skill in the art are not in material dispute, and the obviousness of the claim is apparent[.]" *Id.* at 427.

  A patent is likely to be obvious if it merely yields predictable results by combining familiar elements according to known methods. *Id.* at 416. "[A] patent composed of several elements is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art." *Id.* at 418. "If a person of ordinary skill in the art can implement a predictable variation, and would see the benefit of doing so, § 103 likely bars its

patentability." *Id.* at 417. In determining obviousness, courts do not need to find "precise

teachings directed to the specific subject matter of the challenged claim, for a court can take

account of the inferences and creative steps that a person of ordinary skill in the art would

employ." *Id.* at 418. A person of ordinary skill interprets the prior art "using common sense and

appropriate perspective." *Unigene Labs., Inc. v. Apotex, Inc.*, 655 F.3d 1352, 1361 (Fed. Cir.

2011) (citing *KSR Int'l Co.*, 550 U.S. at 421). As the Supreme Court observed:

> When there is a design need or market pressure to solve a problem and there are a
> finite number of identified, predictable solutions, a person of ordinary skill has
> good reason to pursue the known options within his or her technical grasp. If this
> leads to the anticipated success, it is likely the product not of innovation but of
> ordinary skill and common sense.

*KSR Int'l Co.*, 550 U.S. at 421. The results of ordinary innovation are not patentable. *Id.* at 427.

Furthermore, "when a patent 'simply arranges old elements with each performing the same

function it had been known to perform' and yields no more than one would expect from such an

arrangement, the combination is obvious." *Id.* at 417 (quoting *Sakraida v. AG Pro, Inc.*, 425 U.S.

273 (1976)). But "a patent composed of several elements is not proved obvious merely by

demonstrating that each of its elements was, independently, known in the prior art." *Id.* at 418.

As a preliminary matter, the Court notes that the content of the prior art, the scope of the

patent claim, and the level of ordinary skill in the art are not in dispute. Nevertheless, both

parties move for summary judgment on whether claims 26 and 27 are rendered obvious by the

1995–2001 Scopes. Leupold's arguments rely primarily on its construction of the terms "pre-

assembly" and "separate operation." As discussed above, those arguments are without merit.

This leaves, as a narrow fallback, Leupold's argument, discussed in the context of anticipation,

that the pivoting lens unit could have been assembled, in part, while seated in the scope housing.

According to Leupold's expert, the lock-ring could, theoretically, have been fastened "onto the

rear of the pivot cartridge within the scope body." Byron Rebuttal ¶ 393. In other words, the 1995–2001 Scopes could have been assembled by: keying the pivot cartridge to the pivot tube, inserting that unified body into the housing, and *then* adding, and tightening, a "final lock-ring" onto the unit. Thus, the 1995–2001 Scopes neither anticipate nor render obvious the required pre-assembly limitation within claims 26 and 27.

As discussed above, the Court found that the lock-ring was not itself a claimed component of the pivoting lens unit. Even if the lock-ring *was* a claimed component (i.e., the fastener), the question would remain whether, assuming the structural components were not *necessarily* pre-assembled into a pivoting lens unit before installation into the scope housing, such pre-assembly was obvious. The Court finds that it was.

First, as pointed out by Nightforce, Leupold's expert posits only two options for manufacturing the scope at issue: (1) "the claimed method where all the components of the pivoting lens unit were pre-assembled prior to placement of the lens unit in the scope housing[] or (2) where everything was added except the lock-ring prior to placement of the lens unit in the scope with the lock ring added afterwards." Def. Mot. 32. While Leupold's expert Byron opines that the 1995–2001 Scopes could have been constructed using the second option, it offers no argument as to why a POSA would choose this option. Instead, Mr. Byron opines only that "scopes have been assembled that way for a very long time and tensioning was always an issue." Tran Decl. Ex. 6 (Byron Dep.) 231:15-17, ECF 108-3. When pushed, Mr. Byron testified that he could not answer why a reasonable manufacturer would choose the second option, but that "there may be business reasons for doing one or the other," even though the second method was both inefficient and expensive. *Id.* at 231:25–233:2. He also acknowledged that because precise

adjustments to the tension are necessary to ensure the scope functions properly, without proper

tension the scope will not serve its purpose. *Id.* at 189:4-13.[8]

Leopold raises one final argument with regard to commercial success, a secondary indicia

of non-obviousness. While

> this factor "may have relevancy" to the overall obviousness determination,
> *Graham*, 383 U.S. at 18, 86 S.Ct. 684, [] a nexus must exist between the
> commercial success and the claimed invention. *Ormco Corp. v. Align Tech., Inc.*,
> 463 F.3d 1299, 1311–12 (Fed. Cir. 2006) ("Evidence of commercial success . . . is
> only significant if there is a nexus between the claimed invention and the
> commercial success."). If commercial success is due to an element in the prior art,
> no nexus exists. *Id.* at 1312; *see also Richdel, Inc. v. Sunspool Corp.*, 714 F.2d
> 1573, 1580 (Fed. Cir. 1983) (holding claimed invention obvious where patent
> holder "failed to show that such commercial success . . . was due to anything
> disclosed in the patent in suit which was not readily available in the prior art").

*Tokai Corp. v. Easton Enterprises, Inc.*, 632 F.3d 1358, 1369–70 (Fed. Cir. 2011). Here, without

any sales data, Leopold has offered only a conclusory assertion from its expert that both Leopold

and Nightforce have experienced significant commercial success in selling riflescopes with a

pre-assembled pivoting lens unit due to benefits in terms of "quality control, cost savings and

versatility." Byron Rebuttal ¶ 416. Even if it had proffered evidence of this commercial success,

it has offered no evidence from which one could reasonably infer a nexus between any sales data

and the pre-assembly itself. *See Tokai Corp.*, 632 F.3d at 1370. And, even if there were a nexus,

Leopold has still failed to establish that this secondary factor is significant in light of the strong

showing of prima facie obviousness discussed above. *See id.* (citing *Media Tech. Licensing, LLC*

*v. Upper Deck Co.*, 596 F.3d 1334, 1339 (Fed. Cir. 2010) ("Even if [the patentee] could establish

---

[8] While not challenged in Leopold's briefing, the Court finds that not only do the 1995–2001
Scopes themselves provide sufficient evidence of the suggestion or motivation to modify the
teachings of that reference, *see B.F. Goodrich Co. v. Aircraft Braking Systems Corp.*, 72 F.3d
1577, 1582–83 (Fed. Cir. 1996), but this testimony from Leopold's expert provides additional
evidence of motivation as well.

the required nexus, a highly successful product alone would not overcome the strong showing of obviousness.") and *Ryko Mfg. Co. v. Nu-Star, Inc.*, 950 F.2d 714, 719 (Fed. Cir. 1991) (holding on summary judgment that the claimed invention was obvious, despite "assum[ing] that a nexus existed," because "secondary considerations did not carry sufficient weight to override a determination of obviousness based on primary considerations")).

In sum, the Court finds that, given the finite number of identified, predictable solutions, and the obvious advantages of pre-assembly, attaching the lock-ring to the pivoting lens unit before inserting that unit into the scope body would be the product not of innovation but of ordinary skill and common sense. *See KSR Int'l Co.*, 550 U.S. at 421; *see also Geo. M. Martin Co. v. All. Mach. Sys. Int'l. LLC*, 618 F.3d 1294, 1302 (Fed. Cir. 2010) ("Bottom verses top [referencing only three possible locations for a certain structure] is exactly the type of 'finite number of identified, predictable solutions' that justifies a legal conclusion that the result, when expected, is 'the product not of innovation but of ordinary skill and common sense.'"). Because no reasonable jury could return a verdict of non-obviousness on this record, claims 26 and 27 are therefore obvious in light of the 1995–2001 Scopes.

## CONCLUSION

For the reasons stated above, the Court rules as follows:

    (1) Leupold's motion for summary judgment on whether claims 26 and 27 are infringed is GRANTED IN PART and DENIED IN PART.

    (2) Leupold's motion for summary judgment on whether claims 26 and 27 are indefinite is GRANTED.

    (3) Leupold's motion for summary judgment on whether the '305 is anticipated is DENIED.

(4) Nightforce's motion for summary judgment on whether the 1995–2001 Scopes anticipate claims 26 and 27 is GRANTED.

(5) Leupold's motion for summary judgment on whether the 1995–2001 Scopes render claims 26 and 27 obvious is DENIED.

(6) Nightforce's motion for summary judgment on whether the 1995–2001 Scopes render claims 26 and 27 obvious is GRANTED.

(7) Nightforce's motions for summary judgment on whether claims 1, 5–8, and 12–15 are invalid are DENIED AS MOOT.

IT IS SO ORDERED.

Dated: _____January 21, 2020_____.

_Marco Hernández_

MARCO A. HERNÁNDEZ
United States District Judge