IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

LEUPOLD & STEVENS, INC.,                          No. 3:16-cv-01570-HZ

        Plaintiff,                              OPINION & ORDER

    v.

LIGHTFORCE USA, INC. d/b/a
NIGHTFORCE OPTICS and
NIGHTFORCE USA,

        Defendant.


Kassim M. Ferris
Nathan C. Brunette
Stoel Rives LLP
760 SW Ninth Ave., Suite 3000
Portland, OR 97205

Brian C. Park
Stoel Rives LLP
600 University Street, Suite 3600
Seattle, WA 98101

      Attorneys for Plaintiff

Scott E. Davis
Klarquist Sparkman, LLP
121 SW Salmon St., Suite 1600
Portland, OR 97204

David Casimir
Casimir Jones S.C.
2275 Deming Way, Suite 310
Middleton, WI 53562

      Attorneys for Defendant


HERNÁNDEZ, District Judge:

     Plaintiff Leupold & Stevens, Inc. ("Leupold") brings this action against Defendant

Lightforce USA, Inc. ("Nightforce") alleging the infringement of eight Leupold patents. Both

parties submitted motions for summary judgment on all eight patents. To date, the Court has

resolved motions related to the '305 patent, the '907 patent, and Nightforce's affirmative defense

under 28 U.S.C. § 1498(a).  In this opinion, the Court resolves the remaining motions. For the

reasons that follow, Leupold's motions are GRANTED in part and DENIED in part.

Nightforce's motions are GRANTED in part and DENIED in part.

## BACKGROUND

     Leupold and Nightforce design, manufacture, and sell, among other things, optical

scopes. Am. Compl. ¶¶ 2–4, ECF 28. Leupold alleges that Nightforce's accused products

infringe its eight patents-in-suit involving optical device structures and functions including:

locking adjustment knobs; pivoting lens units; and pivoting lens covers. *Id.* at ¶¶ 10–16. Before

the Court are the parties' motions for summary judgment on Count I, United States Patent No. No. 8,006,429 ("the '429 patent"); Count II, United States Patent No. 8,516,736 ("the '736 patent"); Count III, United States Patent No. 9,188,408 ("the '408 patent"); Count IV, United States Patent No. 9,170,068 ("the '068 patent"); and Count VIII, United States Patent No. 9,665,120 ("the '120 patent").

## STANDARDS

Summary judgment is appropriate if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial responsibility of informing the court of the basis of its motion, and identifying those portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting former Fed. R. Civ. P. 56(c)). A dispute about a material fact is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Vas-Cath Inc. v. Mahurkar*, 935 F.2d 1555, 1560 (Fed. Cir. 1991) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

Once the moving party meets its initial burden of demonstrating the absence of a genuine issue of material fact, the burden then shifts to the nonmoving party to present "specific facts" showing a "genuine issue for trial." *Fed. Trade Comm'n v. Stefanchik*, 559 F.3d 924, 927–28 (9th Cir. 2009) (internal quotation marks omitted). The nonmoving party must go beyond the pleadings and designate facts showing an issue for trial. *Bias v. Moynihan*, 508 F.3d 1212, 1218 (9th Cir. 2007) (citing *Celotex*, 477 U.S. at 324).

The substantive law governing a claim determines whether a fact is material. *Suever v. Connell*, 579 F.3d 1047, 1056 (9th Cir. 2009). The court draws inferences from the facts in the light most favorable to the nonmoving party. *Earl v. Nielsen Media Research, Inc.*, 658 F.3d 1108, 1112 (9th Cir. 2011). If the factual context makes the nonmoving party's claim about the existence of a material issue of fact implausible, that party must come forward with more persuasive evidence to support his claim than would otherwise be necessary. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

**DISCUSSION**

**I.      Person of Skill in the Art**

As an initial matter, Leupold argues that Nightforce expert Douglas DuFaux is not an expert in the relevant field and therefore cannot opine as a "person of skill in the art." The Federal Circuit has explained that:

> it is an abuse of discretion to permit a witness to testify as an expert on the issues of noninfringement or invalidity unless that witness is qualified as an expert in the pertinent art. Testimony proffered by a witness lacking the relevant technical expertise fails the standard of admissibility under Fed. R. Evid. 702. Indeed, where an issue calls for consideration of evidence from the perspective of one of ordinary skill in the art, it is contradictory to Rule 702 to allow a witness to testify on the issue who is not qualified as a technical expert in that art.

*Sundance, Inc. v. DeMonte Fabricating Ltd.*, 550 F.3d 1356, 1363 (Fed. Cir. 2008). *Sundance* offers two ways an expert may testify on issues of invalidity and infringement under Rule 702. First, the witness is qualified if he or she has expertise in the precise pertinent art at issue. *Id.* at 1362 (patent attorney was not an expert in the precise pertinent art of tarps or covers and therefore could not testify on the issues of noninfringement and invalidity). Alternatively, the witness's testimony may still be admissible if the witness's expertise is "sufficiently related" to the pertinent art. *See Sport Dimension, Inc. v. The Coleman Co., Inc.*, No.

CV1400438BROMRWX, 2015 WL 12732710, at *5 (C.D. Cal. Jan. 29, 2015) (concluding that

under *Sundance*, "an expert need not have an expertise in the specific pertinent art to be qualified

as an expert [under Rule 702], but the expert must nevertheless demonstrate that his or her

technical background is sufficiently related to that pertinent art"), aff'd, 820 F.3d 1316 (Fed. Cir.

2016).

In *Sport Dimension*, for example, the court struck an expert's testimony after finding him

unqualified to testify about the functionality of elements of a wearable buoyant device. 2015 WL

12732710 at *6–7. The functionality of this wearable buoyant device was premised on two fields

of relevant art. *Id.* While the expert had "sufficient knowledge regarding the first of these

fields—the development of buoyant devices," he lacked sufficient knowledge regarding the

"second field—designing wearable devices." *Id.* The court noted that "[o]rdinarily, expertise in

any relevant field would render [the expert] qualified to testify as an expert on that matter." *Id.*

(emphasis added). But in this specific case, the expert's

> ability to testify regarding the functionality of elements of a device requires him
> to understand the overall function of the device, and the function of a wearable
> buoyant device such as a personal flotation device is markedly different than the
> function of other buoyant devices. Indeed, [the expert]'s own testimony
> demonstrates that he has no better than a lay opinion as to the function of a
> wearable buoyant device.

*Id.* The Federal Circuit affirmed, finding the district court did not abuse its discretion in

excluding the expert testimony where the expert had no experience in the field of "wearable

buoyancy devices" and where he proposed alternative designs based on his "imagination." *Sport*

*Dimension, Inc. v. Coleman Co.*, 820 F.3d 1316, 1323 (Fed. Cir. 2016).

Here, Leupold appears to identify the relevant art as "riflescopes or adjustment knobs for

riflescopes." Pl. Mot. Summ. J. 20 ("Pl. Mot."), ECF 101. Nightforce, in turn, argues that "the

five locking turret patents (the '408 patent, the '068 patent, and the three Windauer patents[]) . . .

are directed to locking adjustment knobs" more generally. Def. Resp. 2, ECF 120. According to Nightforce, "the appropriate expert is [therefore] familiar with the mechanical engineering principles of applying a locking mechanism . . . to small, compact adjustment components." *Id.* at 2–3. The Court agrees; as discussed throughout this opinion, the Court is not convinced that the patents at issue are directed solely to riflescopes. *See, e.g.*, '068 Patent col. 1 ll. 5–9, ECF 92-1 ("The field of the present disclosure relates generally to rotating adjustment mechanisms, and in particular, to locking adjustment knobs for actuating optical or electrical elements such as an elevation adjustment knob for a sighting device, such as a riflescope, a telescope, other aimed optical device."); '429 Patent col. 1 ll. 15–20, ECF 92-1 ("The present disclosure relates to an optical enhancing device, such as a telescopic observation sighting device or individual shoulder (or hand-fired) firearms sighting device (telescopic sight herein). Embodiments described herein may also be used with any optical enhancing device containing adjusters, such as a microscope, telescope, etc.").

DuFaux has a B.S. and M.S. in Mechanical Engineering and is a licensed professional engineer. Conway Decl. Ex. B at 2, ECF 127-2. He has more than twenty years' experience in the field of mechanical engineering and industrial design. *Id.* at 1–2. This experience includes developing advanced materials for warheads, *id.*, working with microscope knobs and position adjustment equipment, Conway Decl. Ex. F ("DuFaux Dep.") at 13:12–19, ECF 127-7, and designing "locking mechanisms for positional control systems," DuFaux Dep. at 56:21–57:5.

DuFaux opines on the infringement and invalidity of mechanical devices related to locking adjustment knobs. Not only does he have expertise as a professional engineer and industrial designer—relevant fields given the basic mechanical nature of the devices at issue— but he has specific experience with adjustment knobs and locking mechanisms. Given this

experience, as well as the basic mechanical principals at issue and the scope of his testimony, DuFaux's education and experience is sufficiently related to the pertinent art and will be both relevant and useful to the jury. Thus, to the extent Leupold urges the Court to strike or otherwise disregard his testimony, the Court declines to take such action.

**II.    Side Button Locking Patents**

Leupold moves for summary judgment on five issues related to the '408 patent and the '068 patent (collectively, the "Side Button Locking Patents"). Nightforce moves for summary judgment on one issue related to the '068 patent.

### A.  Infringement

#### i.  Standards

A patent holder has the right "to exclude others from making, using, offering for sale, or selling the invention throughout the United States or importing the invention into the United States[.]" 35 U.S.C. § 154(a)(1). A party therefore infringes a patent if, "without authority," it "makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent[.]" 35 U.S.C. § 271(a).

A patent infringement analysis involves two steps. First, the court construes the asserted patent claims. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc). Second, the factfinder determines whether the accused product or method infringes the asserted claim as construed. *Id.*

The first step, claim construction, is a matter of law "exclusively within the province of the court." *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996); *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). "It is a bedrock principle of patent law

that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quotation marks and citations omitted). Patent claims must precisely define the relevant invention to put both the public and competitors on notice of the claimed invention. *Id.*

To construe a patent claim, courts first look to the language of the claims in the patent itself, the description in the patent's specification, and the patent's prosecution history, all of which constitute a record "on which the public is entitled to rely." *Vitronics*, 90 F.3d at 1583; *Dow Chem. Co. v. Sumitomo Chem. Co.*, 257 F.3d 1364, 1372 (Fed. Cir. 2001). In most cases, the court should be able to resolve ambiguous claim terms by analyzing this intrinsic evidence. *See Phillips*, 415 F.3d at 1313–14. The court considers extrinsic evidence only if the intrinsic evidence is insufficient to resolve the ambiguity of a term. *Vitronics*, 90 F.3d at 1586.

"The actual words of the claim are the controlling focus." *Digital Biometrics, Inc. v. Identix, Inc.*, 149 F.3d 1335, 1344 (Fed. Cir. 1998). "[T]he words of the claims are generally given their ordinary and customary meaning." *Phillips*, 415 F.3d at 1312 (quotation marks and citations omitted). "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id.* at 1313. There is a "heavy presumption" that a claim term carries its ordinary and customary meaning, and a party seeking to convince a court that a term has some other meaning "must, at the very least," point to statements in the written description that "affect the patent's scope." *Johnson Worldwide Assocs., Inc. v. Zebco Corp.*, 175 F.3d 985, 989 (Fed. Cir. 1999) (quotation marks and citation omitted). This may be accomplished if: (1) "a different meaning clearly and deliberately set forth in the intrinsic materials" of the patent; or (2) use of "the ordinary and accustomed meaning of a

disputed term would deprive the claim of clarity[.]" *K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1363 (Fed. Cir. 1999) (citations omitted). In making this assessment, the court should use common sense and "the understanding of those of ordinary skill in the art" of the patent at issue, unless the patent history supplies another meaning. *Id.* at 1365.

Beyond the plain language of the claims, the patent specification is always highly relevant and often dispositive to the proper construction. *Vitronics*, 90 F.3d at 1582 (explaining that the specification is "the single best guide to the meaning of a disputed term"). The purpose of the patent specification is to teach and enable those skilled in the art to make and use the invention, along with the best method for doing so. *Cyber Acoustics, LLC v. Belkin Int'l., Inc.*, No. 3:13–cv–01144–SI, 2014 WL 1225198, at *2 (D. Or. Mar. 24, 2014) (citing *Phillips*, 415 F.3d at 1323). The inventor can use the specification to describe the invention in a number of ways. For example, the inventor can describe different "embodiments" of the invention that serve as illustrative examples of the invention claimed. *Phillips*, 415 F.3d at 1323 ("One of the best ways to teach a person of ordinary skill in the art how to make and use the invention is to provide an example of how to practice the invention in a particular case."). The inventor can also clarify that he or she intends the claim language to carry a specific meaning different from its ordinary one. *Id.* at 1316; *Metabolite Lab., Inc. v. Lab. Corp. of Am. Holdings*, 370 F.3d 1354, 1360 (Fed. Cir. 2004). In these cases, "the inventor's lexicography governs." *Phillips*, 415 F.3d at 1316.

Finally, the prosecution history, which contains the record of the proceedings before the Patent and Trademark Office, informs what a person skilled in the art would understand the term to mean. *Vitronics*, 90 F.3d. at 1582–83. The prosecution history becomes useful where it "provides evidence of how the PTO and the inventor understood the patent." *Phillips*, 415 F.3d

at 1317. However, this evidence is less valuable because it represents an "ongoing negotiation" between the inventor and the PTO. *Id.* The final result of that negotiation, the patent itself, provides better evidence of the claim's intended meanings at the time the patent issued. *Id.*

The second step in the infringement analysis requires the factfinder to determine whether the accused product or method infringes the asserted claim as construed. *Markman*, 52 F.3d at 976. At this step, "[p]atent infringement, whether literal or by equivalence, is an issue of fact, which the patentee must prove by a preponderance of the evidence." *Siemens Med. Sols. USA, Inc. v. Saint–Gobain Ceramics & Plastics, Inc.*, 637 F.3d 1269, 1279 (Fed. Cir. 2011).

"To establish literal infringement, every limitation set forth in a claim must be found in an accused product, exactly." *Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc.*, 699 F.3d 1340, 1356 (Fed. Cir. 2012) (quoting *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1575 (Fed. Cir. 1995)).

### ii.  '068

Both parties move for summary judgment on the issue of whether two Nightforce turrets—the SA267 and SA271—infringe claims 1–3, 5–7, 12–13, and 15–18 of the '068 patent.[1]

The '068 patent contains one independent claim. This claim requires, in relevant part,

A locking adjustment device for adjusting a setting of a riflescope or other aiming device, comprising:

> a guideway including a slide surface extending around a rotational axis, and a notch formed in the slide surface[.]

'068 Patent col. 11 ll. 2–5.

At claim construction, the Court construed the term "around" to mean "on all sides of; encircle." *Leupold & Stevens v. Lightforce USA, Inc.*, No. 3:16–cv–01570–HZ, 2018 WL

---

[1] Nightforce also argues that Leupold cannot show infringement of claims 9 and 10.

648362, at *9 (D. Or. Jan. 31, 2018) ("Claim Construction Order"). Thus, the slide surface must extend "on all sides of; encircle" a rotational axis.

Nightforce argues that neither accused device has a slide surface that extends "on all sides of" or "encircles" the rotational axis of the turret. According to Nightforce, "a slide surface is a surface where sliding happens (or at least can happen)." Def. Reply '068 at 2, ECF 133. Thus, unless sliding occurs or can occur on all sides of a rotational axis, the slide surface does not encircle the rotational axis. Leupold argues that Nightforce misidentifies the slide surface. According to Leupold, "a slide surface is simply 'the surface of a slide component.'" Pl. Resp. '068 at 4, ECF 122 (citations omitted). The question is therefore whether a "slide surface" may include sections where no sliding occurs or can occur.

The Court agrees with Leupold that a slide surface does not require sliding to occur on *every* part of the slide surface. Nightforce's argument to the contrary relies entirely on analogy and conclusory attorney argument. *See* Def. Reply '068 at 3 (arguing, without further explanation, that Leupold's interpretation "is not a plausible interpretation in the context of the '068 patent claims, because the claim construction for 'around' was made expressly in the context of the words 'slide surface' and the rest of the claim."). Nightforce fails, however, to support its argument with any citation to the claims, the specification, or the patent's prosecution history.[2] It also fails to cite any expert testimony. Given this lack of support, and Byron's opinion that "a person of ordinary skill in the art would understand the term 'slide surface' as the surface of a slide component," Byron Decl. Ex. 1 ("Byron Report") ¶ 304, ECF 83-1, the Court

---

[2] To the extent Nightforce suggested at oral argument that its position is supported by Claim 1's requirement that a guide tab be "biased against the slide surface," the Court sees nothing in the claim to suggest the guide tab must contact—or be biased against—*all* portions of the slide surface.

cannot conclude that Nightforce's narrow interpretation controls. *See Phillips*, 415 F.3d at 1313 ("[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention[.]"); *Thorner* v. *Sony Computer Entertainment America LLC*, 669 F.3d 1362, 1367 (Fed. Cir. 2012) ("The patentee is free to choose a broad term and expect to obtain the full scope of its plain and ordinary meaning unless the patentee explicitly redefines the term or disavows its full scope.").

### a.  SA271 Turret

Given this conclusion as to claim construction, the Court finds that each and every limitation set forth in the identified claims appears in the SA271. Nightforce raises no arguments to the contrary; it does not, for example, contest Byron's testimony or dispute the physical structure. Leupold therefore prevails on this narrow issue.

There is, however, the question of sales. The Court agrees with Nightforce that Leupold has failed to provide any evidence that the SA271 has "been sold or offered for sale by Nightforce in the United States at any time since the '068 patent issued on October 27, 2015." Def. Mot. Summ. J. on the '068 ("Def. Mot. '068") at 12, ECF 89. Leupold does not provide the Court with any evidence to the contrary. Instead, Leupold argues that Nightforce is still selling the *SA267* turret and complains that "Nightforce did not maintain and retain records that would show when it sold out its inventory of scopes made with the older SA-271 knob design, or records of which sales used which knob designs." Pl. Resp. '068 at 6. Leupold fails to explain the relevance of either argument, or provide any legal citation suggesting that Nightforce's liability hinges on its failure to maintain and retain records of its sales and inventory.

The Court also notes that, as the patentee, Leupold bears the burden of proving infringement by a preponderance of the evidence.[3] *See Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665, 679 (Fed. Cir. 2008) (en banc). To meet its burden of proof, Leupold must "either point to specific instances of direct infringement or show that the accused device necessarily infringes the patent in suit." *Lucent Techns., Inc. v. Gateway, Inc.*, 543 F.3d 710, 723 (Fed. Cir. 2008) (no infringement of method claims where plaintiff failed to identity any specific instances of direct infringement or show, with more than speculative, circumstantial evidence, that the allegedly infringing software had ever actually run) (quoting *ACCO Brands, Inc. v. ABA Locks Mfr. Co.*, 501 F.3d 1307, 1313 (Fed. Cir. 2007)). Here, Leupold relies on a declaration from its attorney Bryan Park. In this declaration, Mr. Park writes that, during a break in deposition testimony, a Nightforce attorney stated that

> Nightforce was not able to represent that riflescopes with the earlier-design SA-271 turrets had not been sold after issuance of the '068 patent, because Nightforce lacked records from its authorized dealers correlating its design change to the sales of riflescopes utilizing the original vs. new turret designs. Mr. Casimir also advised me that Nightforce does not know whether or not its authorized dealers continued to sell riflescopes with the earlier SA-271 turret design after issuance of the '068 patent due to how riflescopes were kept in inventory.

Park Decl. ¶ 3, ECF 119.

While Nightforce does not challenge this declaration, it does not change the analysis here. It does not contradict the declaration provided by Nightforce, in which Klaus Johnson, a 30(b)(6) witness, states that, to the best of his knowledge, "Nightforce has not offered to sell or sold the prior SA271 product with the curved edge stop collar at any time since" the '068 patent

---

[3] To the extent Leupold argues that Nightforce may be liable for "inducing" dealers to infringe by selling those scopes with the SA271 in their inventory after the '068 patent issued, Leupold again cites no evidence that any dealers actually sold these scopes. *See, e.g., Limelight Networks, Inc. v. Akamai Techs., Inc.*, 572 U.S. 915, 922 (2014) ("[W]here there has been no direct infringement, there can be no inducement of infringement under § 271(b).").

was issued.  Johnson Decl. ¶ 6, ECF 91. Instead, it simply confirms that Nightforce lacks sales

data from its authorized dealers. In other words, the Park declaration does not itself provide any

*affirmative* evidence to support Leupold's position. Because Leupold has offered no evidence—

direct or circumstantial—that any scopes with the SA271 turret were sold after October 27, 2015,

it cannot meet its burden and Nightforce is entitled to summary judgment on this issue.

### b.  SA267 Turret

Even with the claim construction above, there are outstanding questions of fact as to

whether scopes with the SA267 turret infringe the '068 patent. While the parties do not dispute

the SA267's physical structure, there is some dispute as to which part of that structure is properly

categorized as a slide surface. In other words, while the SA271 contains a single, unbroken

surface (with a notch) that extends around a rotational axis, the SA267 may contain two separate

surfaces: one (without a notch) that extends around a rotational axis and one (with a notch) on a

plane above the ring that does *not* extend around a rotational axis.

To illustrate:



A different view of the SA267 shows this allegedly separate surface as well:



If, in fact, there are two separate surfaces, then infringement may not be warranted. According to Nightforce, there is *no* contact between the pin and the lower, interior ring surface that extends around the rotational axis. Instead, "[t]he only place the pin makes contact in the SA-267 is on the straight tangent surface," "which is in a different plane *above* the ring" and does not extend around a rotational axis. Def. Reply '068 at 5 (emphasis in original). The "pin does not extend down to or contact the [lower] surface[4] . . . nor could it because th[at] surface . . . is not exposed to and does not face the pin in the assembled product." *Id.* Thus, the SA267 would not contain "a guideway including a slide surface extending around a rotational axis, and a notch formed in the slide surface[.]"

In making this argument, Nightforce relies on deposition testimony from Klaus Johnson, a 30(b)(6) witness. The Court is not convinced, however, that Johnson testified to two distinct surfaces. Johnson stated that

> the pin doesn't have any contact or ride anywhere on part 15 until the very end portions of it to where the zero position is at. When the dial -- once you come away from the zero position, the pin is essentially in space, an air gap during the normal turret operation. And then when it comes to the zero point, there's a tangent surface, a straight line that the pin comes into, and then its depressed as you rotate it into a zero position.

Pellikaan Decl. Ex. A ("Johnson Dep.") 134:6–15, ECF 135-1. He also stated that "[t]he pin does not contact the lower ring other than very near where the zero—where the notch is at." *Id.* at 137:8–10. Thus, he does not clearly opine that there are two separate surfaces or that a pin never contacts the lower interior ring surface. Given this ambiguity, and Byron's conclusory opinion that the "lock ring" contains "a guideway with a slide surface extending around a rotational axis and surrounding it as one-piece structure, and has a notch formed in the slide surface," Byron

---

[4] This surface is highlighted with a "yellow ring" in Leupold's briefing.

Decl. Ex. 3 ("Byron Supp. Report) ¶ 307, ECF 83-3,[5] the Court finds there is an outstanding

question of fact. Summary judgment is therefore denied.

### iii.  '408

Leupold argues "that all Nightforce riflescopes with locking ZeroHold turrets . . . infringe

asserted claims 1, 3, 9, 10, 11, 12, 18, 19, 20, 21, 23, and 25 of the '408 patent." Pl. Mot. 16. In

its response, Nightforce identifies elements in the asserted claims that are not found in the

accused products. In particular, Nightforce argues that the accused products do not contain a

*mechanically driven* locking mechanism as required by each '408 patent claim.[6] *See* '408 Patent

col. 15 ll. 48–49, ECF 92-1 ("the button mechanically driving the locking mechanism").

According to Nightforce, the term "'mechanically driving' requires a transfer of force from one

component to another and [] the accused products do not have this feature because the pin or tab

that Leupold has identified as meeting the claim requirement is integrally connected to the button

and moves together as one component (a technical point that is not in dispute)." Def. Resp. 21. In

other words, the parties appear to agree that the term "mechanically driving" requires the transfer

of force. *See* Byron Report ¶ 259 (concluding, in his infringement analysis, that the button on the

ZeroHold Turret "transfers mechanical force to move (mechanically drives) the pin or tab from

locked to unlocked conditions, under the ordinary and customary meaning of 'mechanically

driving.'"); Brunette Decl. Ex. 47 ("DuFaux Rebuttal") ¶ 56, ECF 92-7 ("Mechanically driving

requires a transfer of force from one component to another."). According to Nightforce's expert,

---

[5] Byron also fails to distinguish between the clearly different structures of the SA267 and the
SA271 in this opinion.

[6] In its briefing, Leupold addresses additional arguments raised in DuFaux's expert report.
Because the Court finds that issues surrounding the term "mechanically driving" preclude
summary judgment, it declines to address any additional claim construction arguments at this
time.

however, a transfer of force cannot occur in a single structure. *See* DuFaux Rebuttal ¶ 56 ("If the Zerohold pin or tab was considered a locking mechanism, the button cannot be said to mechanically drive the locking mechanism as the Zerohold button and pin/tab are integrated as a single structure and force is not transferred from the button to the pin or tab."). Thus, there is a dispute as to whether the required transfer of force necessitates a multicomponent structure, *i.e.*, whether the locking mechanism and button must be separate structures.

Leupold argues that Nightforce raises only an issue of claim construction for the Court. Moreover, according to Leupold, the Court already resolved this issue by rejecting Nightforce's proposed claim construction at the *Markman* hearing. While this Court previously rejected proposed constructions for the terms "button" and "locking mechanism" that would limit these terms to multicomponent structures, the Court did not construe the term "mechanically driving." If the Court were to construe the term "mechanically driving," it may again determine that the term does not require a multi-component structure. Leupold does not, however, present the Court with a proposed construction or any argument to support a proposed construction.

At oral argument, Leupold expanded upon its limited briefing to argue that case law shows that "two claim elements can be satisfied by one combined structure." Transcript of Oral Argument ("Oral Argument") at 340. While this general premise may be correct, Leupold still fails to address the specific claim limitations at issue here. *See In re Papst Licensing Dig. Camera Patent Litig.*, 778 F.3d 1255, 1262–64 (Fed. Cir. 2015) (relying on a detailed analysis of the claim language and intrinsic record to find that the district court erred in defining "interface device" to require a multi-component structure). At oral argument, for example, Leupold argued generally that the "408 patent specification is general and does not make any contrary limitations or disclaimers" that might require multiple structures. Oral Argument at 342. But again, Leupold

did not cite the claim language or specification, or attempt to explain why or whether "mechanically driving"—and the transfer of force—*in this specific patent* does not require separate structures.[7] In fact, it ignored the term "mechanically driving" and Nightforce's position regarding the transfer of force between objects altogether. The Court cannot construe the term on this conclusory and undeveloped briefing and argument. Thus, to the extent Nightforce has merely identified a claim construction issue, neither party has offered sufficient argument to resolve the issue. To the extent there is simply a factual issue—whether force is, in fact, transferred in the ZeroHold design—the Court sees competing opinions between experts. Summary judgment is therefore denied.

### B. Invalidity

A patent issued by the Patent Trademark Office (PTO) is presumed valid. *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 95 (2011); 35 U.S.C. § 282. "To overcome this presumption of validity, the party challenging a patent must prove facts supporting a determination of invalidity by clear and convincing evidence." *Schumer v. Lab. Comp. Sys., Inc.*, 308 F.3d 1304, 1315 (Fed. Cir. 2002).

### i. Anticipation

Leupold argues that Nightforce cannot show the '068 and '408 are invalid as anticipated.

---

[7] Leupold did suggest that the "embodiments of the patent include both a two-part structure, where the button and the mechanically driven locking device are separate, and then a unitary structure where the button and the locking element are fused." Oral Argument at 379. Again, Leupold did not explain this position or cite the patent or any expert testimony to support it. Without any direction or citation, the Court cannot determine, at a minimum, which embodiment Leupold intended to reference. The argument therefore remains undeveloped at this time.

### a. Standards

"A patent is invalid for anticipation if a single prior art reference discloses each and every limitation of the claimed invention." *Schering Corp. v. Geneva Pharm.*, 339 F.3d 1373, 1377 (Fed. Cir. 2003). "Anticipation is a question of fact[.]" *Atlas Powder Co. v. Ireco, Inc.*, 190 F.3d 1342, 1346 (Fed. Cir. 1999). "Typically, testimony concerning anticipation must be testimony from one skilled in the art and must identify each claim element, state the witnesses' interpretation of the claim element, and explain in detail how each claim element is disclosed in the prior art reference. The testimony is insufficient if it is merely conclusory." *Schumer*, 308 F.3d at 1315–16.

### b. Canon XL-2 Video Camera

Leupold first argues that Nightforce has made no anticipation arguments related to claims 11 and 12 of the '408 patent and claims 9 and 10 of the '068 patent based on the Canon XL-2 video camera. *See* Byron Decl. Ex. 2 ("Byron Rebuttal") ¶¶ 55–56, 73–74, 156, 168, ECF 83-2. Because Nightforce does not respond to this argument, summary judgment as to these claims is granted.

Leupold also argues that Nightforce cannot prove that claims 1, 3, 9, 10, 18–21, 23, and 25 of the '408 patent and claims 1, 5–7, 12, 13, and 15–18 of the '068 patent are anticipated by the Canon XL-2 because the XL-2 "does not disclose required elements of the asserted claims." Pl. Mot. 19. Specifically, as to the '408, Leupold argues that

> the Canon XL-2 video camera lacks a "spindle operatively coupled to an adjustable [optical] portion of the optical device to thereby adjust the adjustable portion in response to rotation of the spindle" (required by *all* asserted claims), as well as additional required elements of certain asserted dependent claims, including a knob "installed over the spindle" (claims 18-21, 25) and a knob "selectively coupled to the spindle for selecting either rotation with the spindle or rotation relative to the spindle" (claims 19-20).

*Id.* (citation omitted).

As to the '068, Leupold argues that

the Canon XL-2 video camera is not a "riflescope or other aiming device" as required by all asserted claims, and also fails to disclose additional elements of certain asserted dependent claims, including "a scale comprising indicia spaced apart on a circumference of the knob to facilitate fine adjustments" (claim 17), and "the locked position corresponds to a baseline position of the adjustable setting" (claim 18).

*Id.* (citations omitted). In response, Nightforce argues that its expert opines that the XL-2 describes each element of the claimed invention and Leupold has simply identified questions of fact.

As to the '408, the Court agrees with Nightforce. While Leupold's expert may opine that the Canon XL-2 lacks certain required elements, Nightforce's expert opines that the XL-2 does, in fact, disclose those very elements. Def. Resp. Ex. V ("DuFaux Report") ¶¶ 172, 187, ECF 131-13. While Leupold argues, for the first time in reply, that Nightforce identifies issues of claim construction rather than issues of fact, it fails to develop the argument. It does not, for example, provide the Court with its proposed construction or support for that construction. Instead, it merely states that "[u]nder the appropriate (legal) claim constructions of 'operatively coupled,' 'adjustable portion,' and 'installed over the spindle' there is no dispute of fact," and cites its own claim construction briefing from 2017. Pl. Reply 15, ECF 147 (citation omitted). The Court will not attempt to develop the parties' arguments for them or construe three separate phrases without further direction at this time. Summary judgment on this issue is therefore denied.

As to the '068 patent, the Court again agrees with Nightforce. First, Nightforce has raised a question of fact as to whether the Canon XL-2 discloses the limitations at issue. On claims 17 and 18, DuFaux states: "Claim 17 – the knob has indicia spaced apart on the circumferences to

facilitate fine adjustment to the desired setting; and Claim 18 – the power is "off" (baseline) on

the Camera when the button is in the locked (out) position." DuFaux Report ¶ 173. While

Leupold, in its reply, argues that DuFaux fails to address elements from claims 17 and 18, it fails

to identify those elements or otherwise acknowledge DuFaux's opinion.

      Second, as to whether the Canon XL-2 is an aiming device, Leupold argues that the Court

"recognized on claim construction [that] an aiming device must aim some other device (such as a

telescope or projectile weapon), and a POSA would not view a video camera as an aiming device

for aiming something else." Pl. Reply 18. The Court has reviewed its claim construction order

and sees no statement to this effect. Rather, it appears that Leupold is asking the Court to *infer*

this conclusion from its general discussion of various claim terms and patents. *See* Byron

Rebuttal ¶ 151 ("the Court repeatedly recognized the distinction between optical devices used

only for observation, such as a telescope or camera, and aiming devices or sighting devices,

which are attached to and used to point another device," citing Claim Construction Order at 7–

10, 15–17). At claim construction, Leupold argued that the term "'sighting' . . . consistently

refers 'to aim-assisting devices, such as for aiming a firearm or for aiming another device such as

a high-powered observation telescope.'" Claim Construction Order at *4 (emphasis omitted).

The Court ultimately "agree[d] with [Leupold] that a POSA would understand the term 'sighting

device' in the context of the '120 patent to mean an aim-assisting device." *Id.*[8] But this does not

equate to a general holding that "an aiming device must aim some other device." While Leupold

may be correct—and an aiming device must aim some other device—with no argument as to

---

[8] The Court fails to see the relevance of Leupold's reliance on the Court's construction of the
phrase "locking adjustment device for adjusting a setting of a riflescope or other aiming device,"
to mean "a securable adjuster of an aimed optical device." Claim Construction Order at *8.

why this claim construction is appropriate, the Court cannot resolve the issue at this time.

Summary judgment is therefore denied.

### c.   Windauer '490 Application

Leupold argues that Nightforce cannot show that claims 1, 3, 11, 12, 18–21, 23, and 25 of

the '408 patent are anticipated by PCT Application WO2006/060490 (the "Windauer '490

application").[9] Specifically, Leupold argues that the "Windauer '490 application lacks 'a button .

. . manually depressible transverse to the axis' of rotation of the knob (required by all asserted

claims)." Pl. Mot. 20 (quoting Byron Rebuttal ¶¶ 82–90) (alteration in original). It also fails to

disclose "additional required elements of certain asserted dependent claims, including 'an

actuator shaft attached to the button and extending from the button through a bore in the knob to

a position proximate the axis' (claims 21, 25)." *Id.*

Nightforce, in response, argues that DuFaux opines "that the provisional application[]

disclose[s] . . . a button on the side." Def. Resp. 22. The Court has reviewed Nightforce's

citation to DuFaux's report and sees no statement to this effect. *See* DuFaux Report ¶ 195.

Instead, DuFaux appears to opine that "[t]he position of the push button, whether transverse to

the axis or in any other position is an arbitrary design choice." *Id.* Nightforce offers no argument

as to the relevance of this statement, or how it might impact the requirement that "a single prior

art reference [must] disclose[] each and every limitation of the claimed invention." *Schering*

*Corp.*, 339 F.3d at 1377.[10]

---

[9] Leupold also argues that Nightforce has not offered any anticipation arguments related to the
'068 patent or claims 9 and 10 of the '408 patent based on the Windauer '490 application.
Because Nightforce does not respond to this argument, summary judgment on this narrow issue
is granted.

[10] Nightforce also provides no argument as to the relevance of DuFaux's position that "[t]he
Provisionals that the '490 Windauer PCT claims priority to (60/632,331 and 60/638,561)

Nightforce also argues that the "missing elements" from claims 21 and 25 are "clearly described in Figure 7A and 7B of the Windauer publication." Def. Resp. 22. Again, the Court sees no statement to this effect in the citation to DuFaux's report. *See* DuFaux Report ¶ 195. To the extent Nightforce asks the Court to simply examine the Windauer publication itself, the Court cannot determine, without assistance from any expert or some direction from the attorneys, how or whether Figures 7A and 7B show "an actuator shaft attached to the button and extending from the button through a bore in the knob to a position proximate the axis." '408 Patent col. 17 ll. 25–26, col. 18 ll. 47–49; *see Schumer*, 308 F.3d at 1315–16 ("Typically, testimony concerning anticipation must be testimony from one skilled in the art and must identify each claim element, state the witnesses' interpretation of the claim element, and explain in detail how each claim element is disclosed in the prior art reference."). With only Byron's testimony to the contrary, the Court finds that Nightforce cannot meet its burden to prove anticipation as to the Windauer '490. Summary judgment is therefore granted.

### ii. Obviousness

A claimed invention is obvious if "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art[.]" 35 U.S.C. § 103(a) (pre-AIA). "To qualify as prior art for an obviousness analysis, a reference must qualify as 'analogous art,' *i.e.*, it must satisfy one of the following conditions: (1) the reference must be from the same field of endeavor; or (2) the reference must be reasonably pertinent to the particular problem with which the inventor is involved." *K-TEC, Inc. v. Vita-Mix Corp.*, 696

---

describe the use of button generically, independent of position." DuFaux Report ¶ 195. Without this explanation, the Court cannot conclude that the Windauer Publication itself discloses each and every limitation of the '408 patent.

F.3d 1364 (Fed. Cir. 2012). "A reference is reasonably pertinent if it, as a result of its subject matter, 'logically would have commended itself to an inventor's attention in considering his problem.'" *Id.* (quoting *Innovention Toys, LLC v. MGA Entm't, Inc.*, 637 F.3d 1314, 1321 (Fed. Cir. 2011)).

While obviousness is ultimately a legal conclusion, it is "based on underlying factual determinations." *Eisai Co. Ltd. v. Dr. Reddy's Lab.*, Ltd., 533 F.3d 1353, 1356 (Fed. Cir. 2008). "The factual determinations underpinning the legal conclusion of obviousness include 1) the scope and content of the prior art, 2) the level of ordinary skill in the art, 3) the differences between the claimed invention and the prior art, and 4) evidence of secondary factors." *Id.* (citing *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966)). Secondary factors include "commercial success, long felt but unsolved needs, failure of others, etc." *KSR Int'l Co*, 550 U.S. at 406 (quoting *Graham*, 353 U.S. at 17–18.). Summary judgment may therefore be appropriate if "the content of the prior art, the scope of the patent claim, and the level of ordinary skill in the art are not in material dispute, and the obviousness of the claim is apparent[.]" *Id.* at 427.

"[A] patent composed of several elements is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art." *Id.* at 418. If, however, "a person of ordinary skill in the art can implement a predictable variation, and would see the benefit of doing so, § 103 likely bars its patentability." *Id.* at 417. As the Supreme Court has observed:

> When there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, a person of ordinary skill has good reason to pursue the known options within his or her technical grasp. If this leads to the anticipated success, it is likely the product not of innovation but of ordinary skill and common sense.

*Id.* at 421. In other words, the results of ordinary innovation are not patentable. *Id.* at 427.

In determining obviousness, courts do not need to find "precise teachings directed to the specific subject matter of the challenged claim, for a court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ." *Id.* at 418. A person of ordinary skill interprets the prior art "using common sense and appropriate perspective." *Unigene Labs., Inc. v. Apotex, Inc.*, 655 F.3d 1352, 1361 (Fed. Cir. 2011) (citing *KSR Int'l Co.*, 550 U.S. at 421).

Here, Leupold argues that Nightforce cannot prevail on a prima facie case of obviousness because (1) DuFaux is not a POSA, (2) the Canon XL-2 video camera is non-analogous art, and (3) as to the '408 patent, all of DuFaux's identified references are missing a "'button . . . manually depressible transverse to the axis' of rotation of the knob, a feature required by all asserted claims of the '408 patent." Pl. Mot. 20.

First, as stated above, DuFaux may testify as a POSA on issues related to the '408 and '068. Second, any argument as to whether the Canon XL-2 is non-analogous art is insufficiently developed at this time. Leupold relies on its expert Byron. Byron opines broadly that all patents in this case "limit[] or indicate[] that the inventions are for firearms devices." Byron Rebuttal ¶ 31. He also opines that "[a] person skilled in the art of riflescope and weapon aiming device design would have no reason to look to and would not look to video cameras and their adjustment dial and rings as a source for functional adjustment elements for many reasons." *Id.* at ¶¶ 175–78.

Nightforce, in turn, argues that the claims at issue are not directed to riflescopes. Rather, the '408 claims are "directed to an optical device," and the '068 claims are directed to "an aimed optical device." Def. Resp. 23, 26. With regard to the '408, Nightforce identifies two claims that refer to the invention as an optical device: claim 1 ("adjustment device for an optical device")

and claim 12 ("An optical device . . ."). *Id.* at 23. Nightforce also points to a description in the preferred embodiments: "[w]hile the following description [of Figure 3] is made with reference to a riflescope, the autolocking device may be used with other devices, including optical devices such as binoculars, spotting scopes or other sighting devices, weapon aiming devices, microscopes, or other suitable optical devices." Oral Argument at 495; '408 Patent col. 4 ll. 9–14. With regard to the '068, Nightforce argues that "the Court construed the relevant claim language reciting those words [*i.e.*, a locking adjustment device for adjusting a setting of a riflescope or other aiming device] to mean 'a securable adjuster of an aimed optical device,' not limited to weapons." Def. Resp. at 26. Nightforce offers no further explanation or expert testimony to support these arguments.

Neither party applies or even references the applicable test. *See, e.g.*, *In re Clay*, 966 F.2d 656, 658–59 (Fed. Cir. 1992) ("Two criteria have evolved for determining whether prior art is analogous: (1) whether the art is from the same field of endeavor, regardless of the problem addressed, and (2) if the reference is not within the field of the inventor's endeavor, whether the reference still is reasonably pertinent to the particular problem with which the inventor is involved."); *Airbus S.A.S. v. Firepass Corp.*, 941 F.3d 1374, 1380 (Fed. Cir. 2019) ("To determine the applicable field of endeavor, the factfinder must consider explanations of the invention's subject matter in the patent application, including the embodiments, function, and structure of the claimed invention . . . . [T]he factfinder must [also] consider each reference's disclosure in view of the reality of the circumstances, and weigh those circumstances from the vantage point of the common sense likely to be exerted by one of ordinary skill in the art in assessing the scope of the endeavor.") (citations omitted).

To the extent the Court can infer a dispute as to the field of endeavor, the dispute cannot be resolved on the current record. As outlined above, Leupold has cited a single statement from Byron that *all* patents relate to firearms devices. *See* Byron Rebuttal ¶ 31. Leupold does not identify, at a *minimum*, any language from the patent at issue. In other words, while Byron explains at length why a POSA would not look to the Canon XL-2 when designing a riflescope, Leupold provides no support for its position that '408 and '068 are, in fact, directed to riflescopes. Similarly, Nightforce's argument as to the '408 appears to hinge on three phrases referencing optical devices. Yet Nightforce also fails to provide the Court with *any* argument or testimony as to how or why these phrases are relevant to or define the field of endeavor. Given this lack of argument or support from either party, the Court cannot make any finding as to whether the Canon XL-2 is analogous art.[11]

Finally, as to the '408 patent and the missing references to a "'button . . . manually depressible transverse to the axis' of rotation of the knob," Leupold does not address or even acknowledge DuFaux's opinion that the references provide for a button and the position of that button is an arbitrary design choice. *See e.g.*, DuFaux Report ¶ 195. With no further argument, the Court sees only a conclusory dispute between experts. Summary judgment is therefore denied.

---

[11] Leupold also argues, for the first time in reply, that "Nightforce has offered no analysis or evidence of which other prior art it proposes to combine with [the] Canon XL-2 camera, much less how or why a POSA might modify the Canon XL-2 to address the missing claim elements discussed" in its briefing on anticipation. Pl. Reply 15. The Court did not find that Leupold was entitled to summary judgment on the issue of anticipation; whether certain elements are missing from the Canon XL-2 is therefore not established at this time. Additionally, to the extent Leupold argues, again for the first time in reply, that DuFaux "engaged in hindsight during his obviousness analysis," Pl. Reply 16, for the reasons stated below, the Court does not agree.

### iii.  35 U.S.C. § 112

Leupold moves for summary judgment on Nightforce's invalidity assertions under 35 U.S.C. § 112. Leupold argues only that because DuFaux lacks skill in the art, Nightforce cannot carry its burden on the issue. For the reasons stated above, DuFaux may testify as a POSA. The motion is therefore denied.

### III.  Windauer Patents

Both parties move for summary judgment on issues related to the '429 patent, the '736 patent, and the '120 patent (collectively, the "Windauer patents").

#### A.  Infringement

Leupold argues that Nightforce riflescopes with the Rotary Brake Turret and ZeroHold Turret infringe the asserted claims.

##### i.  Rotary Brake Turrets

Leupold argues that the Nightforce Rotary Brake Turrets infringe (1) claims 1, 2, 6, 8–10, 12–14, and 19 of the '429 patent; (2) claims 1, 2, 4, 7, 10, and 14 of the '736 patent; and (3) claims 1–6, 10–12, 14, 15, and 17–24 of the '120 patent.

In response, Nightforce argues that the Rotary Brake Turrets do not "lock" as required by each independent claim. *See* DuFaux Rebuttal ¶¶ 44, 48; '736 Patent col. 10 ll. 46–59 (a locking mechanism with two portions, "the second portion selectively movable between locked and unlocked positions such that when the second portion is in the locked position the first and second portions are engaged so as to restrain the actuator from rotation about the axis of rotation and when the second portion is in the unlocked position the first and second portions are disengaged so that the actuator is rotatable about the axis of rotation for adjusting the setting of the sighting device."); '120 Patent col. 11 ll. 5–12 ("a lock mechanism including: a first lock

29- OPINION & ORDER

element fixed relative to the sighting device; and a second lock element selectively movable relative to the first lock element, wherein the first and second lock elements engage one another in a locked position to restrain rotation of the adjustment knob about the rotational axis[.]"); '429 Patent col. 10 ll. 44–49 ("the adjustment member being adjustably positionable about the axis of rotation when each engagement member does not engage an engagement surface, and the adjustment member being locked in a selected position about the axis of rotation when at least one engagement member engages an engagement surface.").

According to Nightforce, the Court's construction of the term "selectively moveable" / "the second portion selectively moveable between locked and unlocked positions" is determinative. *See* Claim Construction Order at *5–6. The Court construed the phrase to mean that "the second portion is moveable by a user between a first position where it is *unable to be rotated* about the axis of rotation relative to the firearm." *Id.* Nightforce therefore argues there is no infringement because the turrets will rotate when sufficient force is applied; thus, the Rotary Brake Turrets do not lock.

Leupold disputes this construction of "locked." Leupold first argues the Windauer patents do not require "turrets that are impossible to turn when attacked with intentional and forcible rotation." Pl. Mot. 28 (emphasis omitted). In other words, as stated at oral argument, the Court understands Leupold to argue that "locked" should not mean "unable to be rotated" but rather "'secured in place' for purposes of preventing against an inadvertent or accidental adjustment." Oral Argument at 380. Leupold also argues that the Rotary Brake Turrets do not, in fact, rotate when locked without breaking.

Leupold's argument that "locked" should mean "secured in place for purposes of preventing against an inadvertent or accidental adjustment," is unpersuasive. At claim

construction, Leupold and Nightforce jointly proposed a definition that defined a "locked position" as a position where the turret "is unable to be rotated about the axis of rotation" and an "unlocked position" as a position where the turret is "able to be rotated about the axis of rotation." *See* Claim Construction Order at *5–6. The Court simply adopted the proposed definitions. These definitions are supported by the patents' specification: each patent describes a "locking turret knob assembly [] in [a] locked position, as shown in FIG. SA, thereby rendering index ring 504 *unable to be rotated* about axis of rotation." '429 Patent col. 7 ll. 47–49; '736 Patent col. 7 ll. 47–49; '120 Patent col. 8 ll. 2–4 (emphasis added). Leupold offers no explanation for its change of position or argument for why the term should not be consistently construed throughout the patent. *See Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1342 (Fed. Cir. 2001) ("[A] claim term should be construed consistently with its appearance in other places in the same claim or in other claims of the same patent.").

To the extent Leupold relies on the "intrinsic record" to support its new position, Leupold cites only the introduction to the detailed description of preferred embodiments:

> According to one embodiment, an adjustment knob is provided for an optical setting, such as elevation, windage, parallax, or illuminated reticle power control of an optical-based instrument, such as a telescopic sighting system, a telescope or a microscope, that is mechanically lockable and weather proof, thereby *eliminating inadvertent adjustment of an optical setting by accidental physical contact.* Accordingly, the user may mechanically unlock the adjustment knob to make a desired adjustment of an optical or power setting. Thus, optical or power settings made by a user are reliably maintained regardless of the environmental conditions *or whether the adjustment knob is accidentally touched.*

'120 Patent col. 4 ll. 17–29; '429 Patent col. 4 ll. 6–17; '736 Patent col. 4 ll. 6–17 (emphasis added). The Court sees no conflict, however, between this statement of purpose and the Court's definition of locked; a knob that is unable to be rotated when locked would also prevent inadvertent adjustments by accidental physical contact.

To the extent Leupold relies on *Kaneka Corp. v. Xiamen Kingdomway Group Co.*, the case is readily distinguishable. In *Kaneka Corp.*, "the district court construed the term 'sealed tank' to mean 'a tank that is closed to prevent the entry or exit of materials.'" 790 F.3d 1298, 1304 (Fed. Cir. 2015). The Federal Circuit reversed, finding this construction "inconsistent with the intrinsic record." *Id.* In particular, the district court's construction ignored two figures, both of which "suggest that the 'sealed tank' should be sealed to the atmosphere, but not necessarily to other materials, such as solvents." *Id.* In particular, Example 8 depicted "solvent flowing into and out of the extraction tanks[;]" thus "the specification indicates that the 'sealed tank' is not sealed to prevent entry or exit of all materials." *Id.* The Federal Circuit reiterated that "[a] claim construction that excludes a preferred embodiment is rarely, if ever, correct." *Id.* Moreover, "[a] construction that excludes *all* disclosed embodiments, such as the district court's construction of the term 'sealed tank,' is especially disfavored." *Id.* Here, Leupold identifies no embodiment that would be excluded by the Court's construction. As noted above, even the identified statement of purpose is consistent with the Court's construction. Thus, at this time, with no additional evidence or support, the Court cannot conclude that Leupold's proposed definition is correct.[12]

---

[12] To the extent Leupold raises an alternative argument that "locked" must be understood "under conditions of ordinary use," the current record is unpersuasive. Leupold does not explain in its briefing what it means by "ordinary use." At oral argument, Leupold appeared to argue that "ordinary use" means "using a finger grip" to turn the knob. Oral Argument 324. Leupold cites no support or evidence for this position. Similarly, Leupold provides no citation (or additional explanation) for its position that "a POSA would understand that the claimed locking turret knob prevents rotation under conditions of ordinary use." *See* Pl. Mot. 22. Even if the term should be read in the context of ordinary use—thereby excluding movement through "extraordinary force" such as a torque wrench—the Court notes that there is a question of fact as to whether the knob can be rotated with hand strength alone. *See* DuFaux Rebuttal ¶ 39; Oral Argument at 353 (arguing that DuFaux's measurements suggest that normal hand strength could be used to turn the knob but acknowledging that Byron's measurements would require something more).

The Court agrees, however, that knobs that rotate when *broken* may still infringe the asserted claims as construed. But there is a question of fact as to whether the Rotary Brake Turrets only rotate while locked when broken. DuFaux opines, for example, that he could overcome the engaged mechanism with a maximum force of 2.1 to 4.6 Nm. DuFaux Rebuttal ¶ 39. This force could be exerted through hand strength alone. *Id.* And, at these levels, "none of the Nightforce Rotary Break [sic] turrets were damaged or otherwise compromised during the testing." *Id.* at ¶ 41. Byron opines, however, that he could not rotate the knob by hand. Byron Decl. II at ¶ 10, ECF 129.[13] He could only rotate the knob by using a torque meter that required about three times more torque than Mr. DuFaux measured. *Id.* at ¶ 21. Moreover, he believed the knob turned only after the "locking mechanism failed;" a "sudden and catastrophic" event. *Id.* After the mechanism failed, the knob turned easily in the locked position. *Id.* Byron therefore concluded that DuFaux tested a riflescope with a broken lock. *Id.* While Nightforce attempts to argue that Byron fails to definitively show that the rotating knob was actually broken, this inference is reasonable given Byron's observations that the locking mechanism's "failure was sudden and catastrophic" and the "turret knob now turns easily, in the locked position." *Id.* In the light most favorable to the non-moving party, there is therefore a question of fact and summary judgment is denied.

---

[13] In its reply, Nightforce asks the Court to strike Byron's second declaration as untimely. The Court declines to do so. While Nightforce asserts the declaration was disclosed on October 26, 2018, well after the final expert report deadline of September 10, 2018, Leupold has supplied reasonable justification for the delay, and Nightforce has failed to identify any harm or prejudice. *See* Fed. R. Civ. P. 37(c)(1) (late filed reports may be excluded unless the failure to timely produce "was substantially justified or is harmless."). Byron's declaration responds to DuFaux's expert report filed on September 10, 2018, and, according to Leupold, to relevant facts uncovered at Mr. DuFaux's September 27, 2018 deposition. Oral Argument at 334.

### ii. ZeroHold Turrets

Leupold argues that Nightforce's BEAST and ATACR riflescopes with ZeroHold Turrets infringe (1) claims 1, 4, 5, 9, 10, 12, and 15 of the '429 patent; (2) claims 1, 2, 7, and 14 of the '736 patent; and (3) claims 1–3, 5, 6, 11, 12, and 17–24 of the '120 patent. Additionally, (1) BEAST and ATACR riflescopes with the SA271 ZeroHold Turret infringe claim 3 of the '736 patent and 7, 8, and 13 of the '120 patent and (2) BEAST and ATACR riflescopes with the SA267 ZeroHold Turret infringe claims 7 and 8 of the '120 patent.

Nightforce argues only that "Leupold's motion fails as it relates to non-infringing government sales and does not specify what scope models allegedly infringe." Def. Resp. 28. As discussed in a previous Opinion & Order, the Court denied both parties' motions for summary judgment on the affirmative defense of government sales under 28 U.S.C. § 1498. *See Leupold & Stevens v. Lightforce USA, Inc.*, No. 3:16–cv–01570–HZ, 449 F.Supp.3d 1015 (D. Or. Mar. 29, 2020). Nightforce also offers no citation or explanation to support its position that Leupold must specify which "scope models allegedly infringe." Def. Resp. 28. Given the information above, Leupold has sufficiently identified the scopes and turrets that are alleged to infringe; Nightforce makes no argument that it does not and cannot know which turrets and riflescopes are at issue. Thus, to the extent Nightforce does not prevail on its § 1498 defense at trial, the Court grants summary judgment as to infringement here.

### B. Anticipation

Both parties move for summary judgment on issues related to anticipation.

### i. Priority Date

The Windauer patents claim priority under 35 U.S.C. § 119(e) to U.S. Provisional Patent Application No. 60/632,331 (the "Windauer Provisional"), filed on November 30, 2004. Leupold

concedes, however, that claims 13 and 14 of the '429 patent, claim 10 of the '736 patent, and claims 4, 11, 14, 15, and 20 of the '120 patent "recite subject matter not described in the Windauer Provisional." Pl. Mot. 24. The question is therefore whether the remaining claims— claims 1, 2, 4–6, 8–10, 12, 15, and 19 of the '429 patent; claims 1–4, 7, and 14 of the '736 patent; and claims 1–3, 5–8, 10, 12, 13, 17–19, and 21–24 of the '120 patent—are entitled to claim priority from the filing date of the provisional application.

"For a patent to claim priority from the filing date of its provisional application, it must satisfy 35 U.S.C. § 119(e)(1) (2006)." *Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015). The Federal Circuit has "made clear that under section 119(e)(1), 'the specification of the provisional must "contain a written description of the invention and the manner and process of making and using it, in such full, clear, concise, and exact terms," 35 U.S.C. § 112 ¶ 1, to enable an ordinarily skilled artisan to practice the invention claimed in the non-provisional application.'" *Purdue Pharma L.P. v. Iancu*, 767 F. App'x 918, 923 (Fed. Cir. 2019) (quoting *New Railhead Mfg., L.L.C. v. Vermeer Mfg. Co.*, 298 F.3d 1290, 1294 (Fed. Cir. 2002) and citing *Dynamic Drinkware*, 800 F.3d at 1378); *see also Amgen Inc. v. Sanofi*, 872 F.3d 1367 (Fed. Cir. 2017) (same).

To satisfy the written description requirement, the "prior application itself must describe an invention, and do so in sufficient detail that one skilled in the art can clearly conclude that the inventor invented the claimed invention as of the filing date sought." *Lockwood v. Am. Airlines, Inc.*, 107 F.3d 1565, 1572 (Fed. Cir. 1997); *Tech. Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1331–32 (Fed. Cir. 2008).

To satisfy the enablement requirement, "the specification must teach those skilled in the art to make and use the *full scope* of the claimed invention without undue experimentation."

*Genentech, Inc. v. Novo Nordisk*, 108 F.3d 1361, 1365 (Fed. Cir. 1997) (emphasis added); *Sitrick*

*v. Dreamworks*, LLC, 516 F.3d 993, 999 (Fed. Cir. 2008). Enablement is a question of law based

on underlying factual determinations. *Storer v. Clark*, 860 F.3d 1340, 1345 (Fed. Cir. 2017).

"Whether undue experimentation is required is not a single, simple factual determination, but

rather is a conclusion reached by weighing many factual considerations." *Id.* (quotation

omitted). "[R]elevant factors may 'include (1) the quantity of experimentation necessary, (2) the

amount of direction or guidance presented, (3) the presence or absence of working examples, (4)

the nature of the invention, (5) the state of the prior art, (6) the relative skill of those in the art,

(7) the predictability or unpredictability of the art, and (8) the breadth of the claims.'" *Id.*

(quoting *In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988)).[14]

    "The court analyzes this issue on a claim-by-claim basis." *D Three Enterprises, LLC v.*

*Rillito River Solar LLC*, 2017 WL 1023389 at *4 (D. Colo. March 15, 2017). "An asserted claim

must be entirely supported by the parent application's disclosure; the Federal Circuit does not

parse a claim into supported and unsupported portions." *Id.*

---

[14] In support of its conclusory argument on this issue, Leupold has suggested that "it is not Leupold's burden at summary judgment to address the *Wands* factors. If Nightforce chooses to make its case on its affirmative defense using the *Wands* factors, it's free to do so, but that doesn't count against our motion." Oral Argument at 503. While Leupold is correct that Nightforce ultimately bears the burden of persuasion on its invalidity defenses, Leupold has the burden of production on the issue of whether "the asserted claim[s are] entitled to the benefit of a filing date prior to the alleged prior art." *Tech. Licensing Corp.*, 545 F.3d at 1327. This means that Leupold must "show not only the existence of the earlier application, but why the written description in the earlier application supports the claim." *Id.* In other words, Leupold must produce "sufficient evidence *and argument* to show that" the provisional application supports all limitations of the asserted claims. *Id.* (emphasis added). The Court sees only a few conclusory sentences from Byron that a POSA "could have made and used" the invention with "no more than the minimal testing and revisions customary to skilled work in this field, and without undue experimentation," *e.g.*, Byron Rebuttal ¶ 216. It offers no further argument from either the expert or the attorneys. As this Court has repeatedly stated, it will not develop the parties' arguments for them.

Leupold, via expert Byron, argues that a person of ordinary skill in the art would recognize that Mr. Windauer possessed the subject matter of the claims at issue by the time the Windauer Provisional was filed. *See* Byron Rebuttal ¶¶ 194–222. Nightforce, in turns, relies on expert DuFaux to argue there is a question of fact as to "whether the missing claim terms find adequate written description support in the Provisionals under 35 U.S.C. §§112, 119." Def. Resp. 29.

The Court has reviewed DuFaux's report. The Court agrees with Leupold that certain statements appear irrelevant to the priority analysis. For example, DuFaux opines, without explanation or analysis, that certain words from the patents' claims do not appear in the provisional. *See, e.g.*, DuFaux Report ¶ 202 ("I did not see that the terms 'first lock element' or 'second lock element' appeared anywhere in the '490 PCT application, and instead were first introduced into the '120 claims … in a Preliminary Amendment dated June 3, 2016"). But "the earlier application need not describe the claimed subject matter in precisely the same terms as found in the claims at issue . . . the prior application must [simply] convey with reasonable clarity to those skilled in the art that, as of the filing date sought, the inventor was in possession of the invention." *Tech. Licensing Corp.*, 545 F.3d at 1331–32.[15]

Leupold is also correct that DuFaux does not state, in these exact terms, that a POSA would not recognize that Mr. Windauer invented what was claimed. DuFaux does opine, however, that the '736 and '120 claims lack written description support as Mr. Windauer himself did not possess certain limitations when the application was filed. DuFaux Report ¶¶ 201–02.[16]

---

[15] To the extent these statements may, in fact, be relevant to the written description analysis, Nightforce provides no argument, explanation, or legal citation to support this relevancy.

[16] To the extent Leupold challenges this opinion by arguing generally that a limited disclosure in the provisional application may be adequate when it shows the inventor possessed the claimed

He also opines that, given the limited examples in the specification, the Windauer Provisional does not provide sufficient detail "to allow one of skill in the art to make and use" the broad claims in the Windauer Patents without "undue experimentation." DuFaux Report ¶¶ 200–02.

Leupold does not provide the Court with any argument as to whether the Windauer Provisional enables the broad patent claims and would allow a POSA to practice the claimed invention without undue experimentation. Instead, Leupold argues, as a general matter, that "[a]n applicant is not required to describe in the specification every conceivable and possible future embodiment of his invention,'" *Cordis Corp. v. Medtronic AVE, Inc.*, 339 F.3d 1352, 1365 (Fed. Cir. 2003), and that "Nightforce's arguments rest on an erroneous legal premise, that claims lack support if they encompass undisclosed embodiments," Pl. Reply 24. While the Court agrees with this general principle, the Court does not agree with this framing of Nightforce's argument. It is not a question of whether the specification fails to disclose certain embodiments, but whether the Provisional's specification would enable a POSA to make and use the full scope of the broader patent claims without undue experimentation. *See MagSil Corp. v. Hitachi Glob. Storage Techs., Inc.*, 687 F.3d 1377, 1380–81 (Fed. Cir. 2012) ("Enablement serves the dual function in the patent system of ensuring adequate disclosure of the claimed invention and of preventing claims broader than the disclosed invention. This important doctrine prevents both inadequate disclosure of an invention and overbroad claiming that might otherwise attempt to cover more than was actually invented. Thus, a patentee chooses broad claim language at the peril of losing any claim that cannot be enabled across its full scope of coverage. The scope of the claims must

---

subject matter, Leupold offers no explanation as to why or how the *Windauer Provisional* shows that Mr. Windauer possessed the claimed subject matter. *See* Pl. Reply 23 (arguing only that "a limited disclosure in the provisional application is adequate where — as here — it shows that the inventor had possession of the claimed subject matter.").

be less than or equal to the scope of the enablement to ensure that the public knowledge is enriched by the patent specification to a degree at least commensurate with the scope of the claims.") (citations omitted); *see also In re Goodman*, 11 F.3d 1046 (Fed. Cir. 1993) (Noting that "the specification must teach those of skill in the art how to make and how to use the invention as broadly as it is claimed" and concluding that a "single example" provided in the specification did not "contain sufficient information to enable the broad scope of the claims"); *Sitrick*, 516 F.3d at 999 ("The scope of the claims must be less than or equal to the scope of the enablement to ensure that the public knowledge is enriched by the patent specification to a degree at least commensurate with the scope of the claims.").

In other words, while Leupold supplies an accurate quote from *Cordis Corp.*, this quote does not speak to the *enablement* opinion at issue here—whether the specification teaches "those skilled in the art to make and use the full scope of the claimed invention without undue experimentation." *Genentech, Inc.*, 108 F.3d at 1365. Leupold does not acknowledge, much less challenge, DuFaux's enablement opinions,[17] or identify any uncontested claims or limitations. With no further argument or development of the facts or legal analysis, the Court cannot conclude that Leupold is entitled to summary judgment at this time.

### ii. Invention Date

Under 35 U.S.C. § 102(a), a person is not entitled to a patent when "the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent." In other words,

---

[17] At oral argument, Leupold attempted to address, for the first time, DuFaux's enablement opinions by asking the Court to look at figures from the Provisional, which its attorneys argued "meet[] the enablement standard." Oral Argument at 460. The Court cannot conclude, on this limited attorney argument, that DuFaux's expert opinions lack merit.

prior art may render a patent invalid. *See Schering Corp.*, 339 F.3d at 1377 ("A patent is invalid for anticipation if a single prior art reference discloses each and every limitation of the claimed invention.").

After a prior art reference has been identified, the patentee may attempt to establish an earlier date of invention. *Mahurkar v. CR Bard, Inc.*, 79 F.3d 1572, 1576–77 (Fed. Cir. 1996). "To antedate (or establish priority) of an invention, a party must show either an earlier reduction to practice, or an earlier conception followed by a diligent reduction to practice." *Purdue Pharma L.P. v. Boehringer Ingelheim GMBH*, 237 F.3d 1359, 1365 (Fed. Cir. 2001). "Conception and reduction to practice are questions of law, based on subsidiary findings of fact." *Id.* (citing *Hybritech Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1376 (Fed. Cir. 1986)).

"Conception requires proof that the inventor formed in his mind 'a definite and permanent idea of the complete and operative invention, as it is hereafter to be applied in practice,' and that the idea be 'so clearly defined in the inventor's mind that only ordinary skill would be necessary to reduce the invention to practice, without extensive research or experimentation.'" *Id.* (quoting *Burroughs Wellcome Co. v. Barr Labs., Inc.*, 40 F.3d 1223, 1228 (Fed. Cir. 1994)).

"Reduction to practice follows conception." *Mahurkar*, 79 F.3d at 1579. "To establish an actual reduction to practice," Leupold "must establish three things: "(1) construction of an embodiment or performance that met all the limitations of the interference count; (2) determination that the invention would work for its intended purpose, and (3) the existence of sufficient evidence to corroborate inventor testimony regarding these events." *Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1169 (Fed. Cir. 2006) (alterations and quotation marks omitted) (quoting *Cooper v. Goldfarb*, 154 F.3d 1321, 1327 (9th Cir. 1998).

Whether sufficient evidence corroborates an inventor's testimony is a question of fact. *Id.* at 1171. "Sufficiency of corroboration is determined by using a 'rule of reason' analysis, under which all pertinent evidence is examined when determining the credibility of an inventor's testimony." *Id.* at 1170. "Although each case must be decided in view of its own facts, the determination is not utterly unstructured." *Sandt Tech Ltd. v. Resco*, 264 F.3d 1344, 1350 (Fed. Cir. 2001). "Documentary or physical evidence that is made contemporaneously with the inventive process provides the most reliable proof that the inventor's testimony has been corroborated." *Id.* at 1350–51. "Circumstantial evidence about the inventive process, alone, may also corroborate," as will "oral testimony of someone other than the alleged inventor" *Id.* at 1351.

"Under the rule of reason, the evidence must be considered as a whole, not individually." *NFC Tech., LLC v. Matal*, 871 F.3d 1367, 1372 (Fed. Cir. 2017) (quotation marks and citations omitted). "The law does not impose an impossible standard of 'independence' on corroborative evidence by requiring that every point of a reduction to practice be corroborated by evidence having a source totally independent of the inventor." *Medichem, SA*, 437 F.3d at 1171 (quoting *Cooper*, 154 F.3d at 1330). "Thus, an inventor's conception can be corroborated even though no one piece of evidence in and of itself establishes that fact and even through circumstantial evidence." *NFC Tech.*, 871 F.3d at 1372 (citations and quotation marks omitted).

Leupold argues that Mr. Windauer conceived of the locking turret knob before May 2004 and "physically reduced to practice his invention between April 27 and May 17, 2004[.]" Pl. Mot. 26. This argument relies on Mr. Windauer's own testimony and the following evidence:

> (1) Emails between Mr. Windauer and Schmidt & Bender ("S&B"), sent between April 21, 2004 and May 17, 2004;
>
> (2) A "final invoice" attached to a May 17, 2004 email;

(3) June 2004 emails between Mr. Windauer and S&B;

(4) A set of six drawings, including an assembly drawing bearing production number L&S068439 (the "'439 Assembly Drawing"), showing a locking turret knob;

(5) A set of four drawings showing a locking illumination knob; and

(6) A declaration from machinist David Larsen.

No single piece of evidence corroborates Mr. Windauer's testimony or independently establishes an invention date. For example, while the April and May emails reference a prototype for a "short-dot turret" and a "short dot windage and elevation Knob Prototype" (presumably the same prototype), they provide no information as to what that prototype looked like or whether it demonstrated all claimed limitations. *See* Brunette Decl. Ex. 25–26, ECF 92. While Leupold argues the June emails suggest the prototype was a locking knob with locking pins that traveled in and out of locking splines, between locked and unlocked positions, these emails were exchanged after the date at issue, and, again, fail to disclose each claimed limitation. *See* Second Brunette Decl. Exs. 82–85, ECF 117. Similarly, while Nightforce does not contest that one drawing in the six-drawing set (the '439 Assembly Drawing) shows every claim at issue in the locking turret knobs, neither the '439 Assembly Drawing nor the six-drawing set is dated or identifies Mr. Windauer as the author/inventor. *See* Second Ferris Decl. Ex. 3, ECF 118-1.

While no single piece of evidence corroborates Mr. Windauer's testimony or independently establishes an invention date, a jury could infer, under a rule of reason analysis, sufficient support for Leupold's position when viewing the evidence as a whole. For example, a jury could infer, through certain distinctive details, that the April and May emails reference the six-drawing set. In his April 21, 2004 email, for example, Andreas Schafer, on behalf of S&B, writes that "[o]n the 'Sperrenring' there is an area of 61,6° that has NO notches. For what

reason?" Brunette Decl. Ex. 25 at 2. A drawing in the six-drawing set shows a sperrenring with

no notches on 61.6.° *See* Second Ferris Decl. Ex. 3 at 3. Similarly, in his April 27th email, Mr.

Windauer notes that "the angle of 5.7386 degrees does not allow for an even number of notches

in 360 degrees (360 / 5.7386 = 62.73 notches)." Brunette Decl. Ex. 25 at 2. The same drawing in

the six-drawing set shows each notch on the sperrenring at 5.7386 degrees. Second Ferris Decl.

Ex. 3 at 3. Thus, while the emails do not name or otherwise specifically reference the six-

drawing set, a jury could—from these details—connect a date (from the emails) with the

elements set forth in the drawings.

  To the extent Nightforce challenges the probative value of these drawings, the Court

again sees only a question of fact. For example, Nightforce argues there are serious questions as

to whether these drawings were altered after the relevant date. Nightforce points out that the

drawings contain German words and the S&B name. According to Nightforce, Mr. Windauer

does not speak German and, as of April 28, 2004, S&B did not have the software to add its name

to the drawings. But Mr. Windauer clearly possessed some knowledge of relevant German terms,

as he exchanged emails discussing, for example, a "sperrenring." And, according to Leupold,

these drawings originated from S&B; Mr. Windauer merely used S&B's original drawings to

create the locking turret knob at issue. Oral Argument at 402.[18] The Court also notes that the

drawings show a 5.7386 degree notch angle on the lock ring. Second Ferris Decl. Ex. 3 at 3. An

---

[18] For the first time at oral argument, the parties discussed new data showing a creation date of
March 15, 2004 and a last modified date of January 12, 2005. Oral argument at 401, 422–23.
While the Court agrees with Nightforce that this last modified date raises questions as to the
relevance of these drawings, *see Boydstun Metal Works, Inc. v. Cottrell, Inc.*, 519 F.Supp.2d
1119, 1139 (D. Or. 2007) ("[B]ecause of the disparity between the file's created date and last
modified date, it is unclear how much of the design was complete in early 2003. The AutoCAD
file does not sufficiently corroborate the testimony of Cottrell employees about the design
process."), for the reasons stated herein, there is still a question of fact to be resolved the jury.

April 28, 2004 email states, however, that this angle was changed to 5.71429 degrees. *See*

Brunette Decl. Ex. 25 at 1. In other words, a jury could infer that these drawings were created

before the April 28th email. In sum, the Court sees questions of fact to be resolved by the jury.

      Similarly, as to the question of whether Mr. Windauer produced a prototype that worked

for its intended purpose, the Court agrees that Nightforce raises substantial questions as to

whether the evidence corroborates Mr. Windauer's testimony. For example, the Court agrees

with Nightforce that Larsen's testimony is unhelpfully vague. Larsen states only that he "made

locking turret knob parts for Mr. Windauer's designs for Schmidt & Bender in the 2004

timeframe." Larsen Decl. ¶ 7, ECF 116. And Leupold's arguments regarding the four-drawing

set— "that S&B gave Mr. Windauer the project because the completed physical embodiment of

the first locking knob—the First Short-Dot Prototype—was successful and worked well"—are

entirely speculative. *See* Pl. Resp. Wind. 10.

      However, in the light most favorable to Leupold, a jury could infer sufficient

corroboration. In an April 27, 2004 email, Mr. Windauer wrote that he planned to make "the

prototype in the next week for trials of fit, finish, and function." Brunette Decl. Ex. 25 at 2. In

the May 17, 2004 "final invoice" for the "Short Dot elevation and windage knob design and

prototype," Mr. Windauer wrote that he "made the required changes to the drawings after testing

the prototype." Brunette Decl. Ex. 26 at 2. He also asked Hans Bender for his opinion on the

"Short Dot prototype knob." *Id.* at 1. In an email from June 3, 2004, Mr. Schafer stated that Hans

Bender had forwarded him the "sample turret," the sample turret was "looking (and working

good)," and that Mr. Windauer should adapt the "locking technology" for the illumination knob.

Second Brunette Decl. Ex. 85 at 2.[19] Given the inferences discussed above (connecting the short dot prototype to the six-drawing set), a jury could therefore conclude that Mr. Windauer produced a prototype that worked for its intended purpose.

In sum, in the light most favorable to the non-moving party and under a "rule of reason" analysis, a jury could infer that the emails and drawings, taken together, corroborate Mr. Windauer's testimony or independently establish the date of invention. A jury could also find, however, that the evidence is impermissibly speculative and insufficient. Summary judgment is not therefore appropriate at this time.

### iii.  Japanese Publication

Both parties move for summary judgment on the issue of whether the Japanese Patent Application JP2004150699 (the "Japanese Publication") anticipates the Windauer patents. Nightforce argues the Japanese Publication anticipates (1) claims 1, 2, 4–6, 8–10, 12, and 19 of '429 patent; (2) claims 1, 2, 4, and 14 of the '736 patent; and (3) claims 1, 6, 10, 12, and 17 '120 patent. Leupold, in response, argues that these claims are entitled to an invention date "at least 10 days prior to the Japanese Publication" and are not, therefore, anticipated. Pl. Resp. Wind. 7. Leupold also moves for summary judgment, arguing the Japanese Publication lacks (1) the rotary lock actuator of claims 13 and 14 of the '429 patent, claim 10 of the '736 patent, and claim 4 of the '120 patent; (2) a "second lock element [] movable in a radial direction relative to the rotational axis of the adjustment knob" as required by claims 11 and 20 of the '120 patent; and

---

[19] While Nightforce argues this email is too late to be relevant, the Court does not necessarily agree. The email indicates that, by June 3, 2004, Mr. Schafer—presumably located in Germany—had received and reviewed a sample turret forwarded from Hans Bender. While by no means dispositive, a jury could therefore infer that the prototype was completed before May 27, 2004, the relevant prior art date.

(3) "the detent mechanism or pin biased against the first lock element or locking surface" required by claims 14 and 15 of the '120 patent. Pl. Mot. 28.

To the extent the parties' motions rely on the invention date or priority date analyses, the motions are denied. For the reasons stated above, there is a question of fact as to whether Mr. Windauer possessed the claimed invention before May 27, 2004—the date the Japanese Publication was filed.

Leupold's remaining arguments as to claims 13 and 14 of the '429 patent, claim 10 of the '736 patent, and claims 4, 11, 14, 15, and 20 of the '120 patent are, however, well taken. Nightforce does not dispute the missing claim limitations. Summary judgment is therefore granted.

### iv.  Canon XL-2

Both parties move for summary judgment on the Canon XL-2. Leupold raises the same priority date and invention date arguments addressed above. Leupold also argues that the Cannon XL-2 does not disclose required elements. Nightforce, in turn, asks for summary judgment on the narrow issue of whether "the XL2 was sold in the United States no later than August 31, 2004." Def. Mot Summ. J. on the Windauer Patents ("Def. Mot. Wind.") 8, ECF 97.

### a.  Leupold's Motion

To the extent Leupold's motion again relies on its invention date or priority date analyses, the motion is denied for the reasons stated above. To the extent Leupold's motion relies on missing claim limitations, the arguments are similarly without merit.

Leupold first argues that "the Canon Power Dial and ND Ring each lack the rotary lock actuator of claims 13 and 14 of the '429 patent, claim 10 of the '736 patent, and claim 4 of the

'120 patent." Pl. Mot. 29. According to Leupold, DuFaux merely describes an operation that amounts to a "push to unlock, and then rotate freely." *Id.* This does not, however,

> satisfy the claim limitation of disengaging the lock by rotating "the locking selection member" (the '429 patent, claims 13 and 14), "the lock actuator" (the '736 patent, claim 10), or "the lock-release mechanism" (the '120 patent, claim 4).

*Id.* (emphasis omitted). Thus, according to Leupold, "DuFaux does not identify a rotating means of locking / unlocking—*rather he describes rotation of a dial that has already been unlocked by a push-button means of locking / unlocking*." Pl. Reply 28 (emphasis in original).

Nightforce, in turn, argues that the phrase "disengaging the lock by rotating" does not appear in any of the claims, and Leupold does not argue for claim construction. The Court agrees. Claims 13 and 14 of the '429 patent provide:

> 13. The locking turret knob according to claim 12, wherein the force rotates the locking selection member when the force is applied in a first rotational direction.

> 14. The locking turret knob according to claim 13, wherein when the force is removed and when a second force that is applied to the locking selection member in a second rotational direction, the locking selection member enables at least one engagement member of the first member to engage a corresponding engagement surface of the second member.

'429 Patent col. 11 ll. 27-35. Claim 10 of the '736 patent provides:

> A device according to claim 2, wherein the adjustment knob further comprises:

>> a lock actuator in operative association with the locking mechanism, wherein the lock actuator includes a cam surface aligned with the second portion of the locking mechanism and the lock actuator is rotatable about the axis of rotation between (1) a first rotational position at which the cam surface urges the second portion of the locking mechanism to the locked position and (2) a second rotational position at which the second portion of the locking mechanism is free to move into a recess of the cam surface and thereby into the unlocked position.

'736 Patent col. 11 ll. 56-67. Claim 4 of the '120 patent provides for:

> the adjustment apparatus of claim 2, wherein the lock-release mechanism is rotatable about the rotational axis relative to the adjustment knob to disengage the first and 30 second lock elements.

'120 Patent col. 11 ll. 28-31. The Court sees no obvious requirement for a lock disengaged by rotation (or excluding the use of a push button). And, while Leupold may ultimately prevail in its interpretation of the claim language, it provides no further explanation or argument to connect the dots in its reply. Instead, it appears to argue only that the parties' experts agree on the physical structure, leaving no question of fact. However, given that the parties do not agree on the significance of this structure, and Leupold has failed to adequately explain why its position is correct, the Court cannot grant summary judgment on the record before it.

Second, as to claims 4, 11, 14, 15, and 20 of the '120 patent, Leupold also argues that:

> (1) "[T]he Canon device is neither a 'sighting device' nor a 'riflescope' as required by each of independent claims 1 and 17, respectively, and their dependent claims"; and
>
> (2) "The Canon device also lacks an 'adjustment mechanism configured to adjust a setting of the [sighting device or riflescope]' and 'an adjustment knob operatively coupled to the adjustment mechanism,' as required by both independent claims of the '120 patent."

Pl. Mot. 29–30.

In response, Nightforce points out that DuFaux opines that the Canon XL-2 can serve as a sighting device (claims 4, 11, 14, and 15) or riflescope (claim 17).[20] *See* DuFaux Report ¶¶ 169, 184. As to the remaining limitations, it argues that

---

[20] Specifically, on the issue of whether the Canon XL-2 could serve as a riflescope, DuFaux opines that it "could be used as a Spotter type scope, and is therefore a riflescope device." DuFaux Report ¶ 169. While Byron opines that the Canon XL-2 could not be used as a riflescope, this opinion is based entirely on his experience as a POSA. Byron Rebuttal ¶¶ 293, 309 ("Based on my specialized knowledge, experience, training, and skill in the field, it is my opinion that the Canon XL-2 video camera is not an aiming device or a riflescope."). For example, he argues that spotting targets "is a separate function from aiming" and "a riflescope is necessarily attached to the weapon itself." *Id.* While Byron may be correct, he does not argue for

> Leupold's argument is based on: i) construing "operatively coupled" to
> mean a mechanical connection, not electrical, and ii) alleging that
> Nightforce's expert does not address these elements in the claims. With
> respect to construing "operatively coupled," while the Court has not been
> asked by Leupold to narrowly construe this phrase to limit it to a
> mechanical connection, Nightforce's expert *has* in any event described
> mechanical connections. Second, Nightforce's expert *does* address the
> allegedly missing element: i) for the Canon Power Dial, the "Metal
> Connect Plate on the Spindle Component provides an adjustment
> mechanism" and moves when the Power Dial is moved (so they are
> physically linked) (Ex. V, ¶ 169), and ii) for the Canon ND Ring, the
> Adjusting Link (part of adjustment mechanism) "*mates* with the Adjustor
> Slot on the Sling Ring [knob]" (again a physical connection). (*Id.* ¶184.)
> As the allegedly missing element has been addressed by Nightforce's
> expert, there are disputed facts.

Def. Resp. 32 (emphasis in original).

Leupold does not respond to these arguments in its reply. Instead, it simply states that

"DuFaux's statements about the claim elements that are missing from the Canon XL-2 camera

are implausible and irrelevant — no reasonable juror could find those elements in the Canon XL-

2 camera." Pl. Reply 28. Leupold does not explain why these statements are implausible and

irrelevant, or provide the Court with any further argument to substantiate this conclusion. At this

point in time, the Court sees only conflicting testimony between the parties' experts. Summary

judgment is therefore not appropriate.

### b. Nightforce's Motion

Nightforce moves for summary judgment on the limited issue of whether the Canon XL-2

"was sold in the United States no later than August 31, 2004." Def. Mot. Wind. 17. In support of

this motion, Nightforce offers "documents and other business records showing that the XL2

launched in this country in the summer of 2004." *Id.*; Tran Decl. Exs. 14–16, ECF 98-3 to 98-5.

---

claim construction or cite the patents at issue. The Court therefore sees only a dispute between
experts at this time.

It also relies on the declaration of Vince Agatep, a Canon employee, who provides the evidentiary basis for these documents and, according to Nightforce, establishes that "(1) Canon 'offered for sale in the United States the XL2 video camcorder product at least by August 30, 2004' and (2) 'the XL2 video camcorder bearing Serial No. 332880101028 was sold in the United States to customer A68T (Apple Computer, Inc.) no later than Aug. 31, 2004.'" Def. Mot. Wind. at 17–18 (quoting Agatep Decl. at ¶ 8, 9, ECF 100).

In response, Leupold challenges the admissibility of Nightforce's evidence.[21] First, Leupold argues that "there is no basis to believe that Mr. Agatep, a representative of a third party who works well outside the Court's trial subpoena power, will be available or willing to voluntarily appear to testify at trial." Pl. Resp. Wind. 15. In the Ninth Circuit, evidence that could be presented in an admissible form at trial may be considered at summary judgment. *See Fraser v. Goodale*, 342 F.3d 1032, 1037 (9th Cir. 2003) ("Because the diary's contents could be presented in an admissible form at trial, we may consider the diary's contents in the Bank's summary judgment motion."); *see also* Fed. R. Civ. P. 56, 2010 Amendment Advisory Committee Notes ("Subdivision (c)(2) provides that a party may object that material cited to support or dispute a fact *cannot be presented in a form that would be admissible in evidence*. . . . The burden is on the proponent to show that the material is admissible as presented or to *explain the admissible form that is anticipated.*") (emphasis added). Here, there is no evidence that Mr. Agatap will *not* be available for trial. *See, e.g.*, *Murphy v. Cty. of Yavapai*, No. CV-04-1861-

---

[21] To the extent Leupold argues that the Court may not issue summary judgment on the narrow issue requested, the Court notes that Federal Rule of Civil Procedure 56(a) allows for a party to move for summary judgment on "part of [a] claim or defense." *See also* Fed. R. Civ. P. 56(a), 2010 Amendment Advisory Committee Notes ("The first sentence is added to make clear at the beginning that summary judgment may be requested . . . as to a claim, defense, or part of a claim or defense.").

PCTDGC, 2006 WL 2460916, at *5 (D. Ariz. Aug. 23, 2006) (rejecting proposed testimony at summary judgment when it was "undisputed that [the witness] will not be available to testify at trial" because of a confidentiality agreement).[22] Thus, given that Mr. Agatap could testify at trial—and there is no evidence that he will not—the Court will consider his declaration at summary judgment.[23]

Leupold also argues that because Mr. Agatep does not have personal knowledge about the sale of the Canon XL-2 in 2004, he cannot authenticate the documents at issue. Pl. Resp. Wind. 16. Nightforce first replies that Leupold stipulated to paragraphs 1 through 7 of Agatep's declaration. But Leupold did not stipulate to paragraphs 8 and 9—the paragraphs stating the conclusions at issue here—and also "reserve[d] the right to object . . . to the admissibility of those statements[s] including based on, inter alia, lacking of personal knowledge, foundation, and hearsay." Pellikaan Decl. II Ex. 1 at 1, ECF 145-1. The Court agrees, however, that Leupold's arguments about Mr. Agatep's personal knowledge are unavailing.

Under Federal Rules of Evidence 803(6), business records are admissible if

---

[22] Leupold also cites *Santos v. Murdock*, a Second Circuit case from 2001. In that case, the court found that the affidavit at issue—from a witness recanting his previous statements implicating plaintiff in a criminal case—could only be admitted at trial for impeachment purposes and therefore could not be used to support plaintiff's case at summary judgment. *243 F.3d 681, 684* (2nd Cir. 2001). It then found that (a previous version of) Rule 56 also required an "implicit or explicit showing that the affiant is prepared to testify in a manner consistent with an affidavit is required to oppose summary judgment." Not only does Leupold fail to cite any similar case affirming this position in the Ninth Circuit, but the current version of Rule 56 requires only that "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Moreover, as discussed above, there is no indication in the record that Mr. Agatep, despite submitting the declaration at issue, would not testify if called at trial.

[23] The Court also notes that business records "that meet[] the requirements of Rule 803(6)(A)-(C), as shown by a certification of the custodian or another qualified person" are self-authenticating. Fed. R. Evid. 902(11).

(A) the record was made at or near the time by—or from information transmitted by—someone with knowledge;

(B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;

(C) making the record was a regular practice of that activity;

(D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and

(E) the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

Rule 803(6) does not require the custodian of those records to have personal knowledge about the creation or accuracy of the business records. Fed. R. Evid. 803, 1974 Enactment Notes ("the use of the phrase 'person with knowledge' is not intended to imply that the party seeking to introduce the memorandum, report, record, or data compilation must be able to produce, or even identify, the specific individual upon whose first-hand knowledge the memorandum, report, record or data compilation was based. A sufficient foundation for the introduction of such evidence will be laid if the party seeking to introduce the evidence is able to show that it was the regular practice of the activity to base such memorandums, reports, records, or data compilations upon a transmission from a person with knowledge."); *see also United States v. Armstrong*, 619 F.3d 380, 384–85 (5th Cir. 2010) ("There is no requirement that the witness who lays the foundation be the author of the record or be able to personally attest to its accuracy."). Instead, the declarant must simply "[1] explain the record keeping system of the organization and [2] vouch that the requirements of Rule 803(6) are met." *Armstrong*, 619 F.3d at 385 (quoting *United States v. Brown*, 553 F.3d 768, 792 (5th Cir. 2008)). Here, Mr. Agatep states that the documents at issue "represent product and sales information that ha[ve] been stored and maintained in [Canon's] ordinary course of business." Agatep Decl. at ¶ 6. These documents "were created in the ordinary course of business at or near the time of the events . . . described in

the records, by a person with knowledge," as part of Canon's regular business practice. *Id.* ¶ 7. These records are therefore admissible.

Finally, in attempt to perhaps show that the "source of the information or the method or circumstances of preparation indicate a lack of trustworthiness," *see* Fed. R. Evid. 803(6)(e), Leupold argues that the documents themselves "raise as many questions as they answer," Pl. Wind. Resp. 16. But Leupold identifies only a single "question:" that the "'SHIP TO' address lists only '999999'" for the Apple Computer Company. *Id.* (citing Agatep Decl. Ex. B at 1). However, the Canon documents themselves show that this code ("999999") corresponds to a street address for Apple Computer. *See* Agatep Decl. Ex. A. The Court is not therefore convinced that the documents are untrustworthy or raise a question of material fact.

Because Leupold has not identified any contradictory evidence or raised any persuasive arguments to undermine Nightforce's position, the Court finds there is no dispute of fact as to whether the XL-2 was sold in the United States by August 31, 2004. Nightforce is entitled to summary judgment on this narrow issue.

### v.  Casas Reference

Leupold first argues that because U.S. Patent No. 7,997,163 (the "Casas Reference") was filed on June 13, 2005, it is not prior art to those claims entitled to the Windauer Provisional's filing date. For the reasons stated above, there are questions of fact as to which claims are entitled to the Provisional's 2004 filing date. This argument is therefore without merit.

As to the remaining claims, Leupold argues that the Casas Reference lacks (1) "the rotary lock actuator of claims 13 and 14 of the '429 patent, claim 10 of the '736 patent, and claim 4 of the '120 patent;" (2) the "second lock element" which "is movable in a radial direction relative to the rotational axis of the adjustment knob" of claims 11 and 20 of the '120 patent; and (3) "the

detent mechanism or pin biased against the first lock element or its locking surface of claims 14 and 15 of the '120 patent." Pl. Mot. 27. Nightforce does not dispute these missing claim limitations. Summary judgment is therefore granted.

### vi. Gorsek Reference

Leupold argues that U.S. Patent No. 4,779,305 (the "Gorsek Reference") cannot anticipate the '429 patent because it does not disclose a "locking turret knob" as required by all asserted claims.[24] In response, Nightforce argues only that a "turret knob" is not a claim limitation because the phrase appears only in the preamble of the claims. Given that the '429 patent is titled "Locking turret knob," and the term "turret knob" appears in the patent's abstract, the "summary of the disclosure," the preamble of every claim, and every embodiment described in the specification, the Court finds that a turret knob is a claim limitation. Leupold's motion for summary judgment on this issue is therefore granted.

### C. Obviousness

Leupold argues that Nightforce cannot prove any Windauer patent claim invalid as obvious. First, Leupold argues that Nightforce has not identified any prior art for those claims entitled to the Provisional's 2004 filing date. For the reasons stated above, there is a question of fact as to whether these claims are, in fact, entitled to the Provisional's 2004 filing date. This argument is therefore without merit.

Second, Leupold argues there is no evidence that any prior art describes a "rotary lock actuator as claimed in claims 13 and 14 of the '429 patent, claim 10 of the '736 patent, and claim 4 of the '120 patent." Pl. Mot. 31. This argument again relies on Leupold's position that the Canon XL-2 does not contain a rotary lock actuator. For the reasons stated above, there is a

---

[24] Nightforce does not assert the Gorsek Reference against the '736 or '120 patents.

question of fact as to whether the Canon XL-2 contains a rotary lock actuator. This argument is therefore without merit.

Finally, with respect to claims 11, 14, 15, and 20 of the '120 patent, Leupold argues that Nightforce has not offered any non-hindsight rationale or motivation to combine references. Leupold also argues that, to the extent Nightforce relies on the Canon XL-2 and the Gorsek Reference, both references are from non-analogous fields.[25]

First, on the issue of hindsight bias, Leupold argues only that "Nightforce's expert admitted in deposition that his obviousness analysis relied on hindsight bias, by starting with the claim language and then looking back on the prior art to find out which combination of references would best fit the claims." Pl. Reply 30 (citing Third Brunette Decl. Ex. 101 ("DuFaux Dep. II") 223:11–234:2, ECF 136-7, and *Mintz v. Dietz & Watson, Inc.*, 679 F.3d 1372, 1379 (Fed. Cir. 2012)). DuFaux did confirm that "once [he] properly construed the claim in [his] mind, [he would] then look back on the prior art with whatever proper construction of the claim [he] felt was appropriate." DuFaux Dep. II at 233:17–21. But Leupold offers no argument or support for its position that an expert's attempt to first understand the claim necessarily indicates hindsight bias. Leupold's cited case only highlights the dearth of analysis. In *Mintz v. Dietz & Watson, Inc.*, the court explicitly highlighted the importance of secondary factors—specifically, the objective evidence of non-obviousness—to the court's analysis of hindsight bias. 679 F.3d at 1378–80. Yet Leupold offers no argument about these secondary factors or any other relevant analyses. With no further argument or explanation, the Court cannot find this argument sufficiently developed at this time.

---

[25] Leupold also argues, again, that DuFaux cannot opine as a POSA. The argument is without merit.

As to the issue of non-analogous art, Leupold relies on expert Byron to argue that

> non-riflescope knobs are in an entirely different and non-analogous field and that a person skilled in riflescope design would not reasonably look to the field of electronics for knob components or concepts because the skilled person would not expect them to survive weapon recoil or the harsh environment conditions in which riflescopes are designed to operate.

Pl. Mot. 32 (citing Byron Rebuttal ¶¶ 31–36, 151–54). As discussed at length above, neither party applies or even references the applicable test. Leupold offers no argument, evidence, or citation beyond its own expert's testimony. It also fails to offer any analysis tied to the patent language itself. In doing so, it ignores Nightforce's argument that "most of the asserted Windauer claims are not limited to riflescopes (e.g., none of the claims of the '429 patent are limited to riflescopes[])." Def. Resp. 34. It also ignores the argument that the Windauer specification shows "the inventor equated firearms and non-firearm devices (e.g., microscopes and telescopes)," *id.*, and DuFaux's opinion that experts would, in fact, look to devices such as the Canon XL-2. *See, e.g.*, DuFaux Report ¶¶ 131–44. Thus, with no further argument or analysis as to why the Canon XL-2 and Gorsek inhabit non-analogous fields, the Court sees only a dispute between experts at this time. Summary judgment is therefore denied.

### D.  35 U.S.C. § 112 ¶ 2

Patent claims must particularly point out and distinctly claim the subject matter regarded as the invention. 35 U.S.C. § 112 ¶ 2 (pre-AIA). "[A] patent's claims, viewed in light of the specification and prosecution history, [must] inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014). If a claim fails to do so, it is invalid as indefinite. *Id.* at 901. Whether a claim is indefinite is determined from the perspective of one of ordinary skill in the art as of the time the application for the patent was filed. *Id.* at 908. As a challenge to a patent's validity, indefiniteness under §

112 must be shown by clear and convincing evidence. *Microsoft Corp. v. I4I Ltd. Partnership*, 564 U.S. 91, 95 (2011).

Leupold argues that Nightforce cannot show that any Windauer claim is invalid as indefinite. First, Leupold argues that because Mr. DuFaux is not a POSA, he cannot opine as to whether the claims would inform those skilled in the art about the scope of the invention with reasonable certainty. For the reasons stated above, this argument is without merit.

Second, in the alternative, Leupold argues that "the intrinsic record of the Windauer patents strongly suggests that the allegedly indefinite terms ('engagement member' and 'engagement surface,' 'first portion' and 'second portion,' 'first lock element,' and 'second lock element') have defined, objective boundaries to their meaning in light of the specification." Pl. Mot. 33. According to Leupold, "[t]he Windauer Provisional states that 'the knob is locked via mated spline grooves and/or mated locking pins and slots or holes,'" Byron opines that a POSA "would have understood how to make and use the claimed invention," and DuFaux himself "testified in deposition that he had an understanding of the terms 'engagement member' and 'engagement surface.'" *Id.* First, Leupold fails to offer any explanation for why it believes the intrinsic record "strongly suggests that the allegedly indefinite terms . . . have defined, objective boundaries to their meaning in light of the specification." Instead, it offers a single citation to the Windauer Provisional, without argument or explanation as to the significance of this citation. Second, the Court has reviewed Leupold's citation to Byron's rebuttal report and sees no statement that "a POSA at the time of Windauer's invention would have understood how to make and use the claimed invention, including each of the six allegedly indefinite terms." *See id.* (citing Byron Rebuttal ¶¶ 28–29). Rather, Byron merely recites the legal standards for indefiniteness.

Finally, the Court does not agree that DuFaux's excerpted deposition testimony supports Leupold's position that DuFaux understood "engagement member and engagement surface" to be "limited to physical structures that engage something by contact or force." *See e.g.*, Pl. Reply 31; Brunette Decl. Ex. 48 ("DuFaux Dep. III") at 67:20–68:21, ECF 92-7 ("I have to think about that, whether force is required or not, or just simple contact. Contact wouldn't necessarily imply force. I may have to think more about that."). And, even if the Court accepted Leupold's position, the Court sees no argument as to why or how this "understanding" contradicts DuFaux's opinion or suggests that the claims are sufficiently definite.

With no other argument or citation related to the patents' claims, specifications, or prosecution history, the Court sees only DuFaux's report. Even if this report is ultimately unpersuasive, Leupold's motion provides no support for its own contradictory position. Given this lack of relevant development, argument, and support, the Court cannot resolve summary judgment at this time. Summary judgment is therefore denied.

### E.  35 U.S.C. § 112 ¶ 1

In its opening brief, Leupold raises a single argument under 35 U.S.C. § 112 ¶ 1: that Nightforce cannot prove invalidity because DuFaux cannot opine as a POSA. Again, for the reasons stated above, the argument is without merit. In its reply, however, Leupold raises new, substantive arguments regarding DuFaux's opinions. For example, Leupold argues that DuFaux's opinions "are not relevant under the correct legal standard" and "fail under the longstanding rule that '[a]n applicant is not required to describe in the specification every conceivable and possible future embodiment of his invention.'" Pl. Reply 32 (citing *Cordis Corp.*, 339 F.3d at 1365). As an initial matter, these arguments are not properly before the Court. *See, e.g.*, *Novosteel SA v. U.S., Bethlehem Steel Corp.*, 284 F.3d 1261, 1274 (Fed. Cir. 2002)

("Raising the issue for the first time in a reply brief does not suffice; reply briefs reply to arguments made in the response brief—they do not provide the moving party with a new opportunity to present yet another issue for the court's consideration."). Even if these arguments were properly before the Court, for the reasons stated above, they remain unsupported by sufficient explanation or analysis. *See supra* section II.B.i. Summary judgment on this issue is therefore denied.

## IV.    Remaining Issues

Leupold moves for summary judgment on various remaining affirmative defenses. These defenses include equitable estoppel, waiver, acquiescence, mitigation, and laches. The Court has already addressed and denied Leupold's motion regarding the issue of equitable estoppel. *Leupold & Stevens v. Lightforce USA, Inc.*, No. 3:16–cv–01570–HZ, 2019 WL 4696406, at * 19 n.3 (D. Or. Sept. 26, 2019) ("Leupold's 'argument' is comprised of a single paragraph that fails to identify, at a minimum, the patent at which the motion is directed. Because the argument is not sufficiently developed, the Court will not address it at this time."). Leupold's "arguments" on the issues of "waiver, acquiescence, and failure to mitigate damages" are similarly undeveloped; the Court sees a single sentence with no supporting argument. *See* Pl. Mot. 34. ("Nightforce also pleaded generic affirmative defenses of . . . waiver, acquiescence, and failure to mitigate damages, but has no evidence to support these affirmative defenses."). Again, Leupold does not, at a minimum, identify which patent the motions are directed to or the relevant legal standards. Because these arguments are insufficiently developed, the Court will not address them at this time.

Finally, Leupold argues it is entitled to summary judgment on the issue of laches. According to Leupold, laches is no longer a defense to patent damages claims under *SCA*

*Hygiene Prod. v. First Quality Baby Prod., LLC*, 137 S. Ct. 954, 967 (2017). Nightforce raises

no argument to the contrary. The Court therefore agrees that summary judgment is warranted.

## CONCLUSION

For the reasons stated above, the Court rules as follows:

(1) Leupold's motion for summary judgment on whether Nightforce riflescopes

with the SA271 turret infringe claims 1–3, 5–7, 12, 13, and 15–18 of the '068

is DENIED.

(2) Nightforce's motion for summary judgment on whether Nightforce riflescopes

with the SA271 turret infringe claims 1–3, 5–7, 9, 10, 12, 13, and 15–18 of the

'068 is GRANTED.

(3) Both parties' motions for summary judgment on whether Nightforce

riflescopes with the SA267 turret infringe claims 1–3, 5–7, 12, 13, and 15–18

of the '068 are DENIED.

(4) Leupold's motion for summary judgment on whether claims 1, 3, 9–12, 18–

21, 23, and 25 of the '408 patent are infringed is DENIED.

(5) Leupold's motion for summary judgment on whether the Canon XL-2

anticipates claims 1, 3, 9–12, 18–21, 23, and 25 of the '408 patent and claims

1, 5–7, 9, 10, 12, 13, and 15–18 '068 patent is GRANTED in part and

DENIED in part.

(6)  Leupold's motion for summary judgment on whether the Windauer '490

Application anticipates claims 1, 3, 11, 12, 18–21, 23, and 25 of the '408

patent is GRANTED.

(7) Leupold's motion for summary judgment on whether the asserted '408 and '068 claims are obvious is DENIED.

(8) Leupold's motion for summary judgment on whether the asserted '408 and '068 claims are invalid under 35 U.S.C. § 112 is DENIED.

(9) Leupold's motion for summary judgment on whether Nightforce riflescopes with the Rotary Brake Turrets infringe claims 1, 2, 6, 8–10, 12–14, and 19 of the '429 patent; claims 1, 2, 4, 7, 10, and 14 of the '736 patent; and claims 1–6, 10–12, 14, 15, and 17–24 of the '120 patent is DENIED.

(10)   Leupold's motion for summary judgment on whether Nightforce BEAST and ATACR riflescopes with ZeroHold Turrets infringe claims 1, 4, 5, 9, 10, 12, and 15 of the '429 patent; claims 1, 2, 7, and 14 of the '736 patent; and claims 1–3, 5, 6, 11, 12, and 17–24 of the '120 patent is GRANTED to the extent Nightforce does not prevail on its § 1498 defense at trial. Leupold's motion for summary judgment on whether Nightforce BEAST and ATACR riflescopes with the SA271 ZeroHold Turret infringe claim 3 of the '736 patent and 7, 8, and 13 of the '120 patent and BEAST and ATACR riflescopes with the SA267 ZeroHold Turret infringe claims 7 and 8 of the '120 patent is GRANTED to the extent Nightforce does not prevail on its § 1498 defense at trial.

(11)   Leupold's motion for summary judgment on whether claims 1, 2, 4–6, 8–10, 12, 15, and 19 of the '429 patent; claims 1–4, 7, and 14 of the '736 patent; and claims 1–3, 5–8, 10, 12, 13, 17–19, and 21–24 of the '120 patent are entitled to the priority filing date of the Windauer Provisional is DENIED.

(12)    Both parties' motions for summary judgment on the issue of the Windauer invention date are DENIED.

(13)    Both parties' motions for summary judgment on whether the Japanese Publication anticipates the asserted Windauer claims are DENIED.

(14)    Leupold's motion for summary judgment on whether the Canon XL-2 anticipates the asserted Windauer claims is DENIED.

(15)    Nightforce's motion on whether the Canon XL-2 was sold in the United States no later than August 31, 2004 is GRANTED.

(16)    Leupold's motion for summary judgment on whether the Casas Reference anticipates the asserted Windauer claims is GRANTED in part and DENIED in part.

(17)    Leupold's motion for summary judgment on whether the Gorsek Reference anticipates the asserted '429 patent claims is GRANTED.

(18)    Leupold's motion for summary judgment on whether the asserted Windauer claims are obvious is DENIED.

(19)    Leupold's motion for summary judgment on whether the asserted Windauer claims are invalid under 35 U.S.C. § 112 ¶ 2 is DENIED.

(20)    Leupold's motion for summary judgment on whether the asserted Windauer claims are invalid under 35 U.S.C. § 112 ¶ 1 is DENIED.

//

//

//

//

(21)    Leupold's remaining motions for summary judgment on Nightforce's

affirmative defenses are GRANTED in part and DENIED in part.


IT IS SO ORDERED.

Dated: _____November 17, 2020_____.


MARCO A. HERNÁNDEZ
United States District Judge